## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*,<br><br>               Debtors.[1] | Chapter 11<br><br>Case No. 18-_____ (____)<br><br>Joint Administration Requested |

## DECLARATION OF ROBERT DEL GENIO
## IN SUPPORT OF FIRST DAY RELIEF

I, Robert Del Genio, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of The Weinstein Company Holdings LLC ("**TWCH**"), the direct or indirect owner of each of its subsidiaries (together with TWCH, the "**Debtors**" or the "**Company**").

2.      As a Senior Managing Director for Corporate Finance and Restructuring at FTI Consulting, Inc. ("**FTI**"), I was retained by the Company to act as a financial advisor to the Company on October 26, 2017; my retention was expanded to CRO on or about December 1, 2017.  I have more than 30 years of experience in restructuring and mergers and acquisitions and have advised companies, lenders, creditors, corporate boards, and equity sponsors across a diverse range of industries both domestically and internationally. I have assisted clients both in and outside of Chapter 11, designed and evaluated financing packages and presentations to various types of lenders and equity investors and acted as

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are 3837.  The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, NY 10013. Due to the large number of debtors in these cases, for which the Debtors have requested joint administration, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed noticing and claims agent at http://dm.epiq11.com/#/case/twc/info, or by contacting the proposed undersigned counsel for the Debtors.

financial advisor to boards of directors and/or principal shareholders in the purchase or sale of numerous businesses.  In particular, I have advised companies and lenders/investors in entertainment and media-related reorganizations, including Panavision (interim CEO), Penton Media, F+W (CRO), RHI Entertainment (CRO), LodgeNet, Dial Global, Black Crow Media, ICBC Broadcast Holdings and International Management Group (which owned IMG Media).  I also advised the following companies and lenders/investors:   A&P, Buffets/Ovation, Carauster Inc., Central Products Corporation, CEVA Group, CHC Group, Dial Global, Factory Card Outlet Corp., Ferro Corp., Finish Line, Hostess Brands, IMG Worldwide, Logan's Roadhouse, Noranda Aluminum, Malden Mills, Meridian Automotive, MicroAge, Milacron, Panolam, Reichhold, Sangamon, Inc., Sbarro, Sequa Corporation, Sharper Image, Sydran (Burger King/Chili's), Talley Industries, Transtar, UCI International, Unisource, USinternetworking, Inc., Verso Paper, Vertis, Inc., Washington Group International, Wheeling-Pittsburgh Steel and X-Rite, Inc.  I currently serve on the board of directors of Panavision, Inc. and have previously served on the board of Washington Group International, Inc., CHC Group Ltd., Lazare Kaplan International, Inc. and Buffets, Inc.  I also serve on the University of Notre Dame Undergraduate Experience Advisory Council.  Further information on my professional background is available on FTI's website at *http://www.fticonsulting.com/our-people/robert-del-genio*.

3.      The Debtors' principal executive offices are located in New York, New York and in Los Angeles, California.  In connection with my duties for the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

4.      On March 19, 2018 (the "**Petition Date**"), the Debtors commenced their respective bankruptcy cases by filing voluntary petitions for relief under chapter 11 of

2

title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware.  The purpose of the Debtors' bankruptcy proceedings is to permit an orderly sale of substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code (the "**Asset Sale**") in order to maximize the value of the estate for the benefit of creditors and other stakeholders.   Filed concurrently herewith is the Debtors' *Motion for Entry of Orders (I)(A) Approving Bidding Procedures For Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction For, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* (the "**Sale Motion**").

       5.       To enable the Debtors to minimize any adverse effects of the commencement of the chapter 11 case on their businesses until the asset sale is completed, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "**First Day Relief**").  The First Day Relief seeks, among other things, to: (a) permit the Debtors to obtain debtor in possession financing, (b) ensure the continuation of the Debtor's cash management system and other business operations without interruption; (c) pay certain prepetition obligations, including wages, and (d) establish certain other administrative procedures to ensure that the Asset Sale is conducted in an orderly fashion and maximizes value for the Debtors' creditors.  Gaining and maintaining the support of the

Debtors' employees and other constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be critical to the Debtor's sale efforts.

6.      I submit this Declaration in support of the First Day Relief.  Any capitalized terms not expressly defined herein have the meanings set forth in the applicable motion or application.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition or information provided to me by the Debtors' employees.  If I were called upon to testify, I could and would testify to each of the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

## I.      THE DEBTORS' BUSINESS

7.      Founded in 2005 by Robert and Harvey Weinstein, the Company is a "mini-major" film and television production studio that creates, produces, and distributes feature films and premium television content for the U.S. and international markets.  The Company's assets consist primarily of intellectual property, distribution rights, and cash flows related to its film library, television productions, and portfolio of unreleased films.  The Company has produced numerous critically acclaimed and commercially successful films, receiving 23 Academy Awards, including Academy Awards for Best Picture for *The Artist* and *The King's Speech*, and 113 Academy Award nominations.

8.      As a multi-dimensional entertainment company, the affairs of Debtors are very complex.  The Company consists of numerous separate entities for many individual projects and assets.  The financing for these individual projects and assets, consisting of corporate-level and project-level debt, is also complex.  In addition, the Company's assets are not "hard assets," as with a manufacturing company, but consist primarily of contractual

4

rights.  A typical film may involve hundreds of contracts with continuing obligations under each.  The Company has rights in over 275 films.

9.     The termination of the Co-Chairman, as discussed below, led to significant disruption and distraction across the Company and the Company's counterparties in the industry, which overwhelmed the Company's ability to conduct business as usual.  The COO was also terminated for cause, which further eroded the Company's internal ability to address complexity.

A.     **The Debtors' Primary Assets**

The Film Library

10.     The Company's film library consists of 277 feature films that have generated over $2 billion in aggregate box office receipts worldwide.

11.     The revenue streams associated with the film library derive primarily from domestic and international box office receipts; upfront payments related to the sale of distribution rights in foreign markets; direct output deals in selected markets; a multi-year output deal with Netflix that covers virtually all theatrical releases; and ongoing cash flows related to broadcast and cable networks.

12.     The Company estimates that the net cash flow from its film library reached approximately $57 million in the fourth quarter of 2017 and will reach $151 million in 2018.

The Television Business

13.     The Company's television business is one of the most successful television production companies in the industry and has created numerous scripted and unscripted television series, including the *Project Runway* franchise, *Scream*, *Six*, *War and Peace*, *Peaky Blinders*, and *Crouching Tiger, Hidden Dragon*.

5

14.     The Company estimates that its television business generated approximately $97 million in total revenue and $29 million in project profit in 2017, and will generate approximately $255 million in total revenue and $52 million in project profit in 2018.

Unreleased Film Portfolio

15.     The Company's unreleased film portfolio consists of four distribution-ready film titles and additional projects in production or pre-production stages of development.  The Company estimates that the portfolio of distribution-ready titles, when released, will generate approximately $68 million in net cash flow (on an ultimate basis).

Portfolio Funding Company Film Rights

16.     In connection with a prior debt restructuring in 2010, ownership of certain rights in 191 films was transferred to an independent entity currently known as Portfolio Funding Company LLC I ("**PFC**").  The Company has served as distributor for such films under a Master Distribution Agreement.  In 2017, approximately $904,000 in revenue was received pursuant to this arrangement.

B.     **Employees and Organizational Structure**

17.     The Company has 85 full time employees and 12 independent contractors as of the Petition Date.  Such employees are split into five operational categories: Business Infrastructure (30 employees); Creative (22 employees); Production (17 employees); Distribution (11 employees); and Sales and Marketing (14 employees).

18.     The Company paid approximately $21 million in salary to its employees in 2017.  The Company's total overhead for 2017, including payroll, rent, professional fees, and other corporate costs was approximately $41.2 million.

6

C.    **Corporate Structure**

19.    TWCH is the parent holding company and the direct or indirect controlling member and/or shareholder of its subsidiaries, as reflected on the corporate organizational chart attached hereto as Exhibit A.  TWCH's direct and indirect subsidiaries consist of numerous operating subsidiaries, special purpose production vehicles and joint ventures with third-party investors.

## II.    THE DEBTORS' DEBT STRUCTURE

20.    The Debtors' principal secured and unsecured indebtedness is identified and briefly described below.[2]

A.    **Secured Indebtedness**

21.    Union Bank Senior Credit Facility.  TWC Domestic LLC has outstanding secured debt obligations in the aggregate amount of approximately $156.4 million under that certain Second Amended and Restated Credit and Security Agreement dated as of September 30, 2013 (as amended), among TWC Domestic LLC, the lenders referred to therein, and Union Bank, N.A. ("**Union Bank**"), as administrative agent and letter of credit issuer (the "**Union Bank Credit Agreement**").  The Union Bank Credit Agreement provided for a senior secured revolving credit facility (the "**Union Bank Facility**").  The collateral securing the Union Bank Facility consists primarily of a first priority lien on substantially all of TWC Domestic LLC's assets and a senior pledge of The Weinstein Company LLC's equity in TWC Domestic LLC.  The obligations of TWC Domestic LLC under the Union Bank Credit Agreement are guaranteed by The Weinstein Company LLC.

---

[2] The Debtors' debt structure is more fully described in the Debtors' *Motion For Orders (I) Approving Postpetition Financing, (II) Authorizing Use Of Cash Collateral, (III) Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Granting Related Relief, and (VII) Scheduling A Final Hearing* (the "**DIP Motion**"), filed concurrently herewith.

22.    <u>UnionBanCal Junior Credit Facility.</u>    TWC Domestic LLC has outstanding secured debt obligations in the aggregate amount of approximately $15.6 million under that certain Credit and Security Agreement dated as of October 9, 2015 (as amended), among TWC Domestic LLC, the lenders referred to therein, and UnionBanCal Equities, Inc. ("**UBE**"), as administrative agent (the "**UBE Credit Agreement**").    The UBE Credit Agreement provided for a secured term loan credit facility (the "**UBE Facility**").    The collateral securing the UBE Facility consists of a junior lien on substantially all of TWC Domestic LLC's assets.

23.    <u>Bank of America Credit Facility.</u>    Weinstein Television LLC ("**WTV**") has outstanding secured debt obligations in the aggregate amount of approximately $18.1 million under that certain Term Loan Agreement dated as of May 24, 2016 (as amended), among WTV, the lenders referred to therein and Bank of America, N.A., as administrative agent (the "**Bank of America Credit Agreement**").    The Bank of America Credit Agreement provided for a term loan facility (the "**Bank of America Facility**").    The collateral securing the Bank of America Facility consists primarily of the assets of the *Project Runway* franchise and the episodic series *Fashion, Inc.* (the "**Project Runway Collateral**"), the other assets of WTV and its subsidiaries, as well as certain of The Weinstein Company LLC's rights in television products, in each case excluding certain assets encumbered by liens securing then-existing project financings (the "**Non-Project Runway Collateral**") and a senior pledge of TWCH's equity in WTV (the "**Senior WTV Pledge**").    The obligations of WTV under the Bank of America Credit Agreement are guaranteed by Small Screen Trades LLC, Small Screen Productions LLC and Marcothree, LLC, the equity interests of which are also pledged to Bank of America, N.A.

8

24.    <u>Access Industries Credit Facility.</u>    TWC Borrower 2016, LLC has outstanding secured debt obligations in the aggregate amount of approximately $45.5 million under that certain Secured Full Recourse Promissory Note dated as of September 29, 2016, between TWC Borrower 2016, LLC and AI International Holdings (BVI) Ltd (the "**AI Note**").  The collateral securing the AI Note consists of certain foreign distribution rights, a subordinated pledge of TWCH's equity in WTV (the "**Junior WTV Pledge**"), and a pledge of The Weinstein Company LLC's equity in Weinstein Global Film Corporation (the "**WGFC Pledge**").  The obligations of TWC Borrower 2016, LLC under the AI Note are guaranteed by TWCH and by Harvey Weinstein.  TWC and certain of its subsidiaries have agreed to reimburse Harvey Weinstein if he is required to make payments on the AI Note.

25.    <u>TWC Production Facility.</u>    TWC Production LLC has outstanding secured debt obligations in the aggregate amount of approximately $42.5 million under that certain Credit and Security Agreement dated as of August 6, 2014 (as amended), among TWC Production LLC, the lenders  and guarantors referred to therein, and MUFG Union Bank, N.A. as Administrative Agent (the "**TWC Production Credit Agreement**").  The TWC Production Credit Agreement provides for a revolving credit facility (the "**TWC Production Facility**").  The collateral securing the TWC Production Facility consists of a first priority lien on substantially all assets of TWC Production LLC and the guarantors described below, to the extent derived from, related to or used in connection with the exploitation of foreign rights (and subject to certain additional exclusions as set forth in the TWC Production Credit Agreement), a pledge of The Weinstein Company LLC's equity in TWC Production LLC and a subordinated pledge of The Weinstein Company LLC's equity in TWC Domestic LLC. TWC Production LLC's obligations are guaranteed, from time to time, by certain entities

9

formed for the purpose of producing films, all domestic subsidiaries of TWC Production LLC and such entities and, at TWC Production LLC's election, foreign subsidiaries of TWC Production LLC and such entities.

26.    "Single Film Loans."   The Company has approximately $66.6 million in outstanding secured debt obligations related to individual film and television projects, including:

(a)    WTV JCP Borrower 2017, LLC ("**WTV JCP**") has outstanding secured debt obligations in the aggregate amount of approximately $2.1 million under that certain Loan and Security Agreement dated as of April 26, 2017, by and among WTV JCP and Bank Hapoalim B.M. (the "**JCP Credit Agreement**").   WTV JCP's obligations are secured by a lien on all of WTV JCP's assets, including WTV JCP's right to receive certain royalty payments associated with design collections sold at J.C. Penney retail stores based on the television shows "Project Runway," "Project Runway: All Stars" and "Project Runway: Junior," and are guaranteed by The Weinstein Company LLC.

(b)    TWC Polaroid SPV, LLC ("**Polaroid**") has outstanding secured debt obligations in the aggregate amount of approximately $5.3 million under that certain Loan and Security Agreement dated as of April 14, 2017, by and among Polaroid and First Republic Bank, as lender (the "**Polaroid Credit Agreement**").   Polaroid's obligations are secured by a lien on substantially all of Polaroid's assets, including accounts, equipment, inventory, and certain copyrights and proceeds associated with the motion picture "Polaroid," other than certain Excluded Collateral (as such term is defined in the Polaroid Credit Agreement).

(c)    Spy Kids TV Borrower, LLC ("**Spy Kids**") has outstanding secured debt obligations in the aggregate amount of approximately $13.4 million under that certain Loan and Security Agreement dated as of August 12, 2016, by and among Spy Kids, the

lenders referred to therein, and MUFG Union Bank, N.A., as Agent (the "**Spy Kids Credit Agreement**").  The obligations of Spy Kids are secured by a lien on substantially all of Spy Kids' assets, but only to the extent derived from, related to or used in connection with the exploitation of the distribution and exploitation rights of the first and second season of the animated episodic television series "Spy Kids", including accounts, equipment, inventory, and copyrights associated with such series, other than certain Excluded Collateral (as such term is defined in the Spy Kids Credit Agreement).

(d)    TWC Mist, LLC ("**Mist**") has outstanding secured debt obligations in the aggregate amount of approximately $12.4 million under that certain Loan and Security Agreement dated as of November 29, 2016, by and among Mist and Comerica Bank, as lender (the "**Mist Credit Agreement**").  Mist's obligations are secured by a lien on substantially all of Mist's assets, including accounts, letters of credit, and certain copyrights associated with Season 1 of the episodic television series "Mist," other than certain Excluded Assets (as such term is defined in the Mist Credit Agreement).

(e)    TWC Untouchable SPV, LLC ("**Untouchable**") has secured debt obligations in the aggregate amount of approximately $8.9 million under that certain Loan and Security Agreement dated as of March 20, 2017, as amended, by and among Untouchable and First Republic Bank, as lender (the "**Untouchable Credit Agreement**").   Untouchable's obligations are secured by a lien on substantially all of Untouchable's assets, including accounts, equipment, inventory, letters of credit, and copyrights and physical assets associated with the motion picture "The Upside," other than certain Excluded Collateral (as such term is defined in the Untouchable Credit Agreement).

RLF1 19033895v.1

(f)      TWC Waco SPV, LLC ("**Waco**") has secured debt obligations in the aggregate amount of approximately $5.3 million under that certain Loan and Security Agreement dated as of August 11, 2017, by and among Waco and Opus Bank, as lender (the "**Waco Credit Agreement**").  Waco's obligations are secured by a lien on substantially all of Waco's assets, including accounts, equipment, inventory, letters of credit, and copyrights and physical assets associated with the episodic television series "WACO," other than certain Excluded Collateral (as such term is defined in the Waco Credit Agreement).

(g)      TWC Fearless Borrower, LLC ("**Fearless**") has outstanding secured debt obligations in the aggregate amount of approximately $2.8 million under that certain Loan and Security Agreement dated as of August 3, 2017, by and among Fearless and First Republic Bank, as Lender (the "**Fearless Credit Agreement**").  The obligations of Fearless are secured by a lien on substantially all of Fearless's assets, including copyrights and physical property associated with the first season of the episodic television series "Fearless," other than certain Excluded Collateral (as such term is defined in the Fearless Credit Agreement).  As a condition to the full commitment under the Fearless Credit Agreement becoming available, and as part of the sale of streaming rights to Amazon Digital Services LLC, the Fearless Credit Agreement requires Amazon Digital Services LLC to agree to make all payments to First Republic Bank with respect to such series.  Until such time as documentation evidencing such agreement is executed, the obligations of Fearless under the Fearless Credit Agreement are guaranteed by The Weinstein Company LLC.

(h)      Current War SPV, LLC ("**Current War**") has outstanding secured debt obligations in the aggregate amount of approximately $7.0 million under that certain Loan and Security Agreement dated as of December 23, 2016, by and among Current War and East

12

West Bank, as lender (the "**Current War Credit Agreement**").  The obligations of Current War are secured by a lien on substantially all of Current War's domestic assets, including accounts, equipment, inventory, letters of credit, and copyrights and physical assets associated with the motion picture "Current War," other than certain Excluded Collateral (as such term is defined in the Current War Credit Agreement).

> ### B.    Other Indebtedness

27.    Guild Obligations. Certain of the Debtors are signatories to collective bargaining agreements (the "**Guild Agreements**") with one or more of the Directors Guild of America, Inc., Screen Actors Guild–American Federation of Television and Radio Artists and the Writers Guild of America West, Inc. (collectively, the "**Guilds**"). Pursuant to the Guild Agreements, these certain Debtors are required to pay compensation to members of the Guilds for services performed in connection with films and television programs produced by these certain Debtors (the "**Guild Obligations**"). The Guild Obligations are secured through liens on certain personal and intellectual property associated with the films and television programs giving rise to the obligations.

28.    Viacom Advances.  WTV and Next Take Productions, Inc. ("**Next Take**") are indebted to Viacom Media Networks ("**VMN**") in the amount of $8.3 million under an agreement by and among VMN, On-Site Productions Inc., Next Take and WTV dated as of March 7, 2013 (as amended and as supplemented by related side letters, the "**Scream Advances Agreement**"), related to the advancement of expenses for payroll and certain international rights associated with the television series "Scream."  The obligations of WTV and Next Take under the Scream Advances Agreement are secured by a lien on certain of WTV's and Next Take's rights to distribution of the series.  WTV is indebted to VMN in the amount of $20.3 million under an agreement between VMN and WTV dated as of April

13

14, 2017 (as amended and supplemented by related side letters, the "**Yellowstone Advances Agreement**"), related to the advancement of expenses for payroll and accounts payable associated with the television series "Yellowstone."   The obligations of WTV under the Yellowstone Advances Agreement are secured by certain of WTV's rights to distribution of Yellowstone, the episodic television show "The Mist" and the limited documentary television series "The Untitled Kalief Browder Project".   WTV is indebted to VMN in the amount of $1.5 million under an agreement between VMN and WTV dated as of October 17, 2016 (as amended and supplemented by related side letters), related to the advancement of expenses for payroll and accounts payable associated with the television series "Waco."

29.     Cast and Crew Payroll Advance.  TWC is a guarantor of obligations of Next Take Productions, Inc. in the amount of $3.3 million under an agreement dated as of October 5, 2017, between Cast & Crew Financial Services, LLC, Next Take Productions, Inc., and TWC related to the advancement of expenses for payroll associated with the third season of the television series "Scream."

30.     Demand Note.  TWCH is indebted to Robert Weinstein in the amount of $11,187,363 under an unsecured demand note dated as of February 5, 2018.  This balance is reflective of the amount due as of March 16, 2018.

### III.     EVENTS LEADING TO THE CHAPTER 11 FILING

### A.     Public Revelations About TWC's Co-Founder and Former Co-Chairman

31.     On October 5, 2017, The New York Times published an article entitled, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*.  The article detailed allegations of sexual harassment against Harvey Weinstein—TWC's co-founder and then-Co-Chairman—by multiple women spanning nearly three decades.

14

32.    Less than a week later, on October 10, 2017, The New Yorker published an article entitled, *From Aggressive Overtures to Sexual Assault:    Harvey Weinstein's Accusers Tell Their Stories*.    The article recounted in detail seven women's experiences with Harvey Weinstein.    Their accusations ranged from sexual harassment to sexual assault and rape.    Again, the misconduct reportedly took place over the course of more than a decade.

33.    To date, more than 80 women have stepped forward to accuse Harvey Weinstein—a man whose name is eponymous with TWC—of sexual harassment, assault or rape.    There have been numerous news reports, articles, opinion pieces, blogposts and even a television special concerning their accusations.    Allegations have been reported worldwide, prompting police departments in both the United States and the United Kingdom to open investigations and sparking the international *#metoo* and *Time's Up* campaigns.

**B.    The Board Takes Action to Protect the Company**

34.    Following the October 5 New York Times article, TWC's Board of Representatives (the "**Board**") took immediate action to protect the Company and its employees.

35.    On October 6, 2017—the day after The New York Times story broke— the Board publicly announced that it took the accusations "extremely seriously" and was launching "a thorough and independent investigation" into the reported misconduct.    The Board stated that "[n]ext steps" would depend, among other things, on "the outcome of the Board's independent investigation".

36.    Two days later, on October 8, 2017, the Board terminated Harvey Weinstein's employment with the Company effective immediately.    That same day, the Company issued a press release stating:    "In light of new information about misconduct by

15

Harvey Weinstein that has emerged in the past few days, the directors of [T]he Weinstein Company—Robert Weinstein, Lance Maerov, Richard Koenigsberg and Tarak Ben Ammar—have determined, and have informed Harvey Weinstein, that his employment with [T]he Weinstein Company is terminated, effective immediately".

37.     The Board ratified its termination decision on October 17, 2017, at a Special Meeting of the Board.  The Board also formed a Special Committee to formally retain Debevoise & Plimpton LLP ("**Debevoise**") as Independent Counsel to conduct the previously-announced independent investigation.  Following the Board's ratification of the termination of his employment, Harvey Weinstein resigned from the Board at the same Special Meeting.

### C.     TWC Suffers Backlash as a Result of Harvey Weinstein's Reported Misconduct

38.     Notwithstanding the Board's swift action, the backlash against the Company was immediate and intense.  Many contractual counterparties refused to continue normal business dealings with TWC, and many publicly announced their decision to sever ties.

39.     For example:

- On October 6, 2017, one of the world's leading communications firms, Ketchum, publicly declared that it had terminated its production and distribution agreement with TWC;

- On October 9, 2017, Apple Inc. announced that it would end plans for a 10-part Elvis biopic that was set to be produced by the Company;

- On October 12, 2017, the creative team behind Lin Manuel Miranda's *In the Heights* publicly demanded that TWC release its rights to the movie adaptation of the Tony Award-winning play.  That same day, Hachette Book Group

announced that it would shut down the Company's publishing imprint, Weinstein Books; Netflix announced that it would remove the Company's credit from its series *Peaky Blinders*; and A+E Networks announced that it would remove the Company's logo from certain television shows, including *Project Runway*.

- On October 13, 2017, Amazon Studios announced that it would cut ties with the Company, cancelling plans for a high-profile, big budget series from *Silver Linings Playbook* writer-director David O'Russell and dropping TWC as a co-producer of a separate series with *Mad Men* creator Matthew Weiner;

- On October 18, 2017, actor-director Channing Tatum halted development of his movie, *Forgive Me, Leonard Peacock*, with the Company;

- On October 25, 2017, producers of the film *Wind River*, luxury car brand Lexus and Ovation TV all severed ties with the Company; and

- On November 1, 2017, it was reported that Quentin Tarantino was seeking a different studio for his ninth film—marking the first time that the director would use a studio other than TWC (or one of its predecessors) for a feature film.

40. Even longstanding business partners have refused to return the Company's phone calls. Average weekly receipts dropped from $2 million at the end of September 2017 to $150,000 the week before the Petition Date.

41. Indeed, money was so scarce that, by early November 2017, the Special Committee of the Board had to halt the recently-announced investigation being conducted by Debevoise (less than one month after it started), as limited available liquidity had to be directed to payroll and other crucial operational expenses.

42.    In addition to business partners, the Company lost a majority of its Board members.  Between October 5, 2017, and October 14, 2017, five members of the Board resigned:  Dirk Ziff (on October 5); Tim Sarnoff (on October 7); Marc Lasry (on October 7); Paul Tudor Jones (on October 7); and Richard Koenigsberg (on October 14).  Only three of the Board members who served on the Board as of October 5, 2017—Lance Maerov, Tarak Ben Ammar and Robert Weinstein—remained to guide the Company through these difficult circumstances.

43.    The Company has also lost more than 25% of its full-time employees.  On October 1, 2017, the Company had more than 120 full-time employees; as of the Petition Date, the Company has only 85.  The Company is currently missing key executives, including a Chief Operating Officer (who was recently fired for cause) and a General Counsel.  Indeed, the Company does not presently have a single in-house lawyer, instead relying on an outside litigation management consultant.

44.    The Company has also been subjected to numerous lawsuits as a result of Harvey Weinstein's reported misconduct.  TWC has been named in at least nine civil actions commenced by claimed victims of Harvey Weinstein, including a broad federal class action; two civil actions commenced by Harvey Weinstein himself (one for alleged wrongful termination, and one for access to the Company's books and records); and at least six civil actions commenced by contractual counterparties, including a lawsuit by AI International Holdings (BVI) Ltd alleging that Harvey "Weinstein's termination and the facts and circumstances leading to and surrounding that dismissal . . . constitute a Material Adverse Change" under the AI Note and demanding repayment of that note in full (along with accrued and unpaid interest).  The Company was also the target of an investigation by the Office of the

18

Attorney General of the State of New York and was recently sued in a civil lawsuit filed by that same office for alleged civil rights violations.

45.    Faced with these circumstances, the Company has been largely unable to operate following the public disclosure of the allegations against Harvey Weinstein.

**D.    The Board Considers a Sale To Save the Company**

46.    The Board understood immediately that the situation was dire.   On October 26, 2017, the Company amended a prior engagement letter with Moelis & Company ("**Moelis**")—an investment bank with expertise in mergers and acquisitions, recapitalization and financial restructuring—to explore an overall financial restructuring, including a potential sale of substantially all of the Company's assets.   The Company had previously retained Moelis in or around February 2016, to broker a sale of its television assets; however, at that time, Moelis had received only a small number of offers, and negotiations advanced no further than the exchange of preliminary term sheets.

47.    Beginning in mid-October 2017, Colony Capital Acquisitions, LLC ("**Colony**") expressed interest in purchasing the television assets owned by The Weinstein Company LLC and its subsidiaries.   On October 15, 2017, the Company and Colony entered into an exclusivity agreement with regard to Colony's interest.   Ultimately, however, the parties' discussions broke down and no sale was consummated.   The highly publicized end of negotiations with Colony in early November 2017 put additional pressure on TWC.

48.    Toward the end of the Company's negotiations with Colony, the Debtors began negotiations with Fortress Credit Co. LLC ("**Fortress**") regarding rescue financing.   Specifically, Fortress expressed interest in acquiring Weinstein Domestic LLC's outstanding debt under the UBE Facility and extending new loans.   However, the refinancing did not materialize.

19

49.     Needing additional cash, the Company began to market its film *Paddington 2*.  The sale of *Paddington 2* was intended as a stop-gap measure to raise sufficient finances to avert the need to file for bankruptcy protection while the Company continued negotiations to sell its remaining assets.  Moelis worked directly with the Company's Board to market *Paddington 2*.  The Company received approximately five offers for Paddington 2, and ultimately sold the film asset to Warner Brothers for $28.8 million, of which the Company received $13.0 million in immediate cash.  The remaining cash went to the producer, Studiocanal.

50.     On November 8, 2017, the Company received a letter from Maria Contreras-Sweet.  The letter attached a proposed term sheet, proposing to acquire the assets of the Company, to assume substantially all liabilities related to the Company's business operations, to retain most (if not all) employees and to install a majority-female board of representatives.  The Company subsequently began intensive negotiations with Mediaco Acquisition, LLC ("**Mediaco**") regarding a potential sale of substantially all of the Company's assets.  I understand Mediaco to be a consortium of investors that includes the Yucipa Companies ("**Yucaipa**"), Lantern Asset Management LLC ("**Lantern Capital**"), Maria Contreras-Sweet and other investors.  Yucaipa was interested in the Company and its assets since October 2017 and has previously invested, through its affiliates, in certain projects of the Company for years.

51.     On November 23, 2017, the Company was able to sell *War with Grandpa*, to its producers, Marro WWG LLC, for $2.5 million.

52.     Also in November 2017, the Board adopted a broad strategy proposed by Moelis to attract additional bidders.  Moelis distributed slide presentations regarding the

Company's saleable assets to 44 parties by mid-November 2017. Of these 44 parties, 30 signed preliminary letters of interest and gained access to a data room established for this purpose containing extensive documentation regarding the Company's finances and asset holdings. On or around December 8, 2017, Moelis sent process letters to the 30 investors that had signed preliminary letters of interest. The letters provided for a bid deadline of December 20, 2017. In response, the Company received 10 proposals. Each proposal was for a purchase of some combination of the Company's film library, television assets, and portfolio of unreleased films.

53.     Moelis recommended 8 of these proposals for a second round of negotiations, which remained ongoing until shortly before the Petition Date (other than during the Exclusivity Period (as defined below)). The Board considered each of those proposals in detail and, after having detailed discussions and consulting their advisers, passed 8 bidders into the second round. However, of the 8, the Mediaco proposal presented the only real opportunity for a sale of the Company outside of bankruptcy. In fact, all other bidders either explicitly or verbally communicated their intention to acquire assets pursuant to a court-supervised bankruptcy 363 sale.

54.     On January 12, 2018, in an effort to preserve cash, the Company sold *Six Billion Dollar Man* to Warner Bros. Entertainment Inc. for $7.2 million.

55.     After determining that Mediaco appeared to be the best prospect for a sale outside of bankruptcy, on or about January 22, 2018, TWCH entered into a 20-day exclusivity and expense reimbursement agreement with Mediaco. Under this agreement, TWCH agreed not to market the Company's assets to other potential purchasers during the

21

20-day exclusivity period (the "**Exclusivity Period**"), and to reimburse Mediaco's costs up to $1.5 million.

56.     Over the course of negotiations, TWCH and Mediaco exchanged approximately 15 draft Asset Purchase Agreements ("**APAs**") in contemplation of a sale of substantially all of the Company's assets.  The Company engaged in numerous in-person and telephonic meetings with Mediaco, its representatives and its counsel.  Given the possibility that certain members of the Company's management might be employed by the new entity after a transaction, the Board took an active role in negotiations.

57.     On February 11, 2018, the last day of the Exclusivity Period, the Company remained hopeful that it could enter a purchase agreement with Mediaco, although material differences remained.  However, the same day that exclusivity was set to expire, the Attorney General of the State of New York (the "**Attorney General**") commenced a civil lawsuit against the Company (among other defendants) in the Supreme Court of the State of New York, County of New York, captioned *The People of the State of New York v. The Weinstein Company LLC* (the "**Complaint**").  The Complaint alleged that the Company had violated the New York Human Rights Law, New York Civil Rights Law and New York Executive Law in connection with Harvey Weinstein's reported misconduct.  The Complaint sought monetary damages as well as an injunction and other equitable relief, including a prohibition on certain corporate or financial transactions.  The Exclusivity Period thereafter ended without an agreement with Mediaco.

58.     After the filing of the Complaint, the Company began the parallel paths of trying to salvage negotiations with Mediaco while seeking bidders for a potential in-court

22

sale process.  In addition, the Company began negotiations with Union Bank, N.A. regarding the terms of a potential debtor-in-possession financing arrangement.

59.     On or about February 21, 2018, the Company had a productive meeting with Mediaco representatives, facilitated by the Attorney General, and the Company again believed that an out-of-court sale was still a feasible option to avoid a bankruptcy filing.

60.     On February 24, 2018, Moelis delivered its "final call" for bids from other bidders in the event a bankruptcy filing became necessary.  That "final call" to bidders with whom Moelis had been negotiating for months prior to and after the Exclusivity Period, and who during that time had received extensive diligence materials, indicated that final and best bids were due by March 8, 2018, and included a draft Asset Purchase Agreement.

61.     By the evening of Sunday February 25, 2018, it was clear that the Company and Mediaco would be unable to reach agreement on an out-of-court sale of the Company's assets.  As a result, the Company issued a press release indicating that the Company would pursue an orderly bankruptcy process and a bankruptcy filing was imminent.  A true and correct copy of that press release is attached hereto as Exhibit B.

62.     Nevertheless, at the initiative of the Attorney General and with the assistance of a mediator, the Company and Mediaco revived their negotiations.  In a widely publicized turn of events, the Company and Mediaco signed an Asset Purchase Agreement on March 1, 2018, following a full-day meeting at the Attorney General's office.  At Mediaco's insistence, the Asset Purchase Agreement contained a "walk-away" right in Mediaco's favor—a provision the Board agreed upon in an attempt to save jobs, maximize the value of the Company's assets and avoid the costs, disruptions and uncertainty of a bankruptcy filing.  In exchange for an agreement that provided optionality, the Board insisted that Mediaco

23

provide interim financing for the Company between the signing of the Asset Purchase Agreement and the closing of the transaction, the first payment of which would be due on March 6, 2018.

63.     On March 6, 2018, Mediaco failed to make the first interim financing payment and instead terminated the Asset Purchase Agreement.  That same day, the Company again announced its intention to file for bankruptcy.  A true and correct copy of that press release is attached hereto as <u>Exhibit C</u>.

### E.     <u>The Company Prepares for a Chapter 11 Filing</u>

64.     Despite the ongoing out-of-court sale negotiations, in early February the Company began discussions with Union Bank and the other lenders under the Union Bank Facility (the "Union Bank Syndicate") regarding potential debtor-in-possession (DIP) financing, which the Company believed would be necessary to ensure access to cash in the event the Company proved unable to complete an out-of-court sale.  The Company believed that the Union Bank Syndicate would be best-positioned among prospective lenders to provide favorable economic terms and financing certainty given their existing positions in the Company's debt and their familiarity with the Company's assets.  The Company requested that Union Bank, on behalf of the Union Bank Syndicate, prepare an indicative term sheet, which Union Bank delivered to the Company on February 13, 2018.  Over the next two weeks, the Company exchanged drafts of the term sheet with Union Bank.

65.     On February 26, 2018, the day after the Company issued a press release indicating that a bankruptcy filing was imminent, the Company and Moelis began contacting additional prospective lenders to begin in earnest a search for DIP financing.  Over the course of two days, Moelis, on behalf of the Company, made outbound contacts to 25 prospective lenders and received unsolicited inbound inquiries from five additional parties.  Over the

24

course of the following three weeks, the Company and Moelis entered into non-disclosure agreements with, and provided information to, 14 prospective lenders, ultimately receiving non-binding term sheets from six parties.

66.     During such three-week period, the Company, Moelis and FTI reviewed the term sheets received on a rolling basis in light of several factors, including economic terms, financing certainty, proposed restrictions on operation and use of proceeds and the collateral and security grants requested.  As a result of this review, the Company determined that, while the majority of the term sheets received were not likely to lead to a superior financing than that proposed by the Union Bank Syndicate, one prospective lender had proposed terms compelling enough to advance in the process.

67.     Between March 12 and March 16, the Company negotiated with Union Bank and such other prospective lender, moving from term sheets to definitive documentation.  Simultaneously, the Company worked with such other prospective lender to rapidly advance its diligence of the Company, including through several calls with Moelis, FTI and the Company's management, such that it could be prepared to execute a credit agreement in advance of the Petition Date.

68.     Ultimately, the Company determined that, given the other prospective lender's relative unfamiliarity with the complex collateral structure of the Company's existing financings and the need for speed due to the Debtors' strained liquidity position, such lender's offer was substantially less certain than Union Bank's.  Thus, on March 16, 2018, the Company determined that Union Bank's $25 million senior secured superpriority debtor in possession delayed draw term loan, maturing 125 days following the Petition Date (the "**DIP Facility**") appeared to be the best available financing.

69.    Immediately following receipt of the notice of termination from Mediaco, on March 6, the Board resolved to prepare for a potential bankruptcy filing and instructed Moelis to conduct outreach to potential bidders who may be interested in acquiring the Company's assets in a postpetition asset sale under Section 363.  Given the Company's limited remaining cash following Mediaco's failure to make the first interim financing payment, the Board and Moelis focused this outreach on six parties that had previously submitted proposals to acquire the Company's assets through an in-court asset sale, including Lantern Capital, which had previously been involved as an investor in early discussions with Mediaco and that had previously informed the Board and Moelis of its interest in participating in a potential postpetition sale process as a stalking horse bidder.  The Company, with Moelis's assistance, communicated a final bid deadline of March 7, 2018 for stalking horse proposals.

70.    On March 7, 2018, Lantern Capital submitted a proposal to acquire substantially all of the Company's assets in a postpetition asset sale under section 363 for a cash purchase price of $310 million (subject to certain adjustments) and the assumption of certain project-level, non-recourse indebtedness.  Lantern Capital's proposal included a revised Asset Purchase Agreement based on the draft provided to all bidders by Moelis in February 2018.  Additionally, Lantern Capital's proposal indicated an interest to maintain the Company's business intact as a going concern and to offer employment to most of the Company's employees.

71.    On March 8, 2018, the Company received one additional proposal to acquire substantially all of the Company's assets from another interested bidder.  However, this proposal included a lower cash purchase price and additional conditions precedent

26

relating to third-party consents from the Company's business partners.  The Board held a telephonic meeting to evaluate and discuss the proposals.  The Board determined that the offer from Lantern Capital represented the greatest value to the Company and its stakeholders and the greatest closing certainty, and the Board authorized Moelis to continue negotiations with Lantern Capital in order to finalize an Asset Purchase Agreement on the terms outlined in Lantern Capital's proposal.

72.     Between March 8, 2018 and March 18, 2018, the Company and Lantern Capital exchanged approximately eight drafts of the Asset Purchase Agreement.

73.     At a Board meeting on March 18, 2018, the Board approved the Asset Purchase Agreement and the DIP Facility.

74.     At a Board meeting on March 19, 2018, the Board decided that the Company would expressly release any confidentiality provision to the extent it has prevented individuals who suffered or witnessed any form of sexual misconduct by Harvey Weinstein from sharing their stories.

75.     Also on March 19, 2018, the Company entered into the Asset Purchase Agreement for the postpetition sale of substantially all of the Company's assets with Lantern Entertainment LLC, an affiliate of Lantern Capital.

76.     On or about March 20, 2018, the Company and its subsidiaries entered into a DIP Facility with Union Bank.

77.     As of the Petition Date, the Company has less than  $500,000 in cash.

## IV.     FIRST DAY PLEADINGS

78.     An important element to the success of the Debtors' chapter 11 cases is approval of each of the Debtors' requests for First Day Relief submitted concurrently herewith.  Generally, the First Day Relief has been designed to facilitate:  (a) continuing the

27

Debtors' operations in chapter 11 to permit the sale of the Company with as little loss of value as possible, and with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of employees and certain other key constituencies; and (c) establishing procedures to facilitate the sale of substantially all of the Debtors' assets and maximize value for all stakeholders.  I have reviewed the First Day Relief, including the exhibits thereto, and I believe that the relief sought therein is necessary and, appropriate and tailored to meet these goals.

A.    **Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

79.    Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their chapter 11 cases, fifty-five (55) in total, for procedural purposes only. Many of the motions, hearings and other matters involved in the chapter 11 cases will affect all of the Debtors.  Therefore, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.  Accordingly, I believe the Court should approve the joint administration of these chapter 11 cases.

B.    **Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f) Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent to the Debtors, Effective *Nunc Pro Tunc* to the Petition Date (the "<u>Claims Agent Application</u>")**

80.    Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Epiq Bankruptcy Solutions, LLC ("**Epiq**") as the Claims and Noticing Agent for the Debtors in their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed

28

in the chapter 11 cases. Epiq is a leading chapter 11 administrator, with significant experience in noticing, claims administration, solicitation, balloting and other administrative aspects of chapter 11 cases. Given the complexity of these cases and the number of creditors and other parties in interest involved, I believe that appointing Epiq[3] as the Claims and Noticing Agent in these chapter 11 cases will maximize the value of the Debtors' estates for all their stakeholders.

    C.    **Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities; and (III) Establishing Procedures for Resolving Objections to the Debtors' Proposed Form of Adequate Assurance (the "<u>Utilities Motion</u>").**

        81.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (i) approving the proposed form of adequate assurance of payment to the Utility Companies, (ii) establishing procedures for resolving objections by Utility Companies, and (iii) prohibiting Utility Companies from altering, refusing, or discontinuing service to the Debtors on the basis of the commencement of these chapter 11 cases, that a debt owed by the Debtors for prepetition Utility Services was not paid when due, or on account of any perceived inadequacy of the Debtors' Proposed Adequate Assurance.

        82.    The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner and have sufficient funds to do so. Nevertheless, to provide additional assurance of payment to the Utility Companies, the Debtors propose to deposit approximately $9,750.00 (the "**Utility Deposit**") into a segregated, interest-bearing account (the "**Utility Account**") within twenty (20) days of the Petition Date. The amount of

---

[3] In accordance with the Claims Agent Protocol, Epiq was selected following the Debtors' competitive solicitation of two (2) other separate proposals for potential claims and noticing agents.

the Adequate Assurance Deposit equals approximately one half of the Debtors' average monthly cost of Utility Services during the 12-month period prior to the Petition Date.

83.     I believe that uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases.  Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' ability to consummate a sale through chapter 11.  Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Companies without hindering the Debtors' ability to maintain operations.  I am informed and believe that the proposed Adequate Assurance Procedures are consistent with procedures that are typically approved in chapter 11 cases in this District.  Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates and their creditors and all other parties in interest.

**D.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs and (II) Authorizing Financial Institutions to Honor and Process all Related Checks and Transfers (the "Wages Motion")**

84.     In the Wages Motion, the Debtors seek authority to (i) pay prepetition wages, salaries, independent contractor fees, and other compensation, (ii) pay associated taxes, withholdings and other costs, and certain reimbursable pre-petition employee expenses, and (iii) continue the Debtors' employee medical, insurance and other benefits programs on a post-petition basis, including the payment and honoring of obligations relating thereto.

30

85.     As of the Petition Date, the Debtors employed approximately 85 employees (the "**Employees**") and 12 independent contractors (the "**Independent Contractors**" and, together with the Employees, the "**Workforce**").  The Workforce performs a variety of critical functions, including technical, production, public relations, management, and back office functions.  Additionally, the Debtors' Independent Contractors work in the business support functions of IT, Human Resources, and Business & Legal Affairs – as well as in the Film and TV content areas of Post-Production, Music, and Theatrical Distribution. In order to retain the Workforce, the Debtors pay and incur a number of obligations such as compensation, deductions, and payroll taxes, expense reimbursement, and depending on the status of such member of the Workforce, health benefits, workers' compensation benefits, paid leave and time off, life insurance, disability benefits, retirement and savings benefits and other benefits that the Debtors have historically provided in the ordinary course of business (collectively, the "**Prepetition Employee Obligations**").

86.     By the Wages Motion, the Debtors seek the authority, but not the direction, to pay certain Prepetition Employee Obligations and Prepetition Independent Contractor Fees, other than the Excluded Prepetition Employee Obligations.  The Prepetition Employee Obligations and Independent Contractor Fees include:  (i) wages and salaries of Employees and fees due to the Independent Contractors; (ii) expenses incurred by the Workforce in the scope of their service and on behalf of the Debtors (collectively the "**Reimbursable Expenses**"); and (iii) payments related to employee benefit plans and policies (the "**Employee Benefit Obligations**").

87.     The Debtors seek authority to pay Prepetition Employee Obligations, the Independent Contractor Fees, and Reimbursable Expenses (in each case other than the

31

Excluded Prepetition Employee Obligations) provided that the amount paid to any individual Workforce member for wages, salary, or other compensation does not exceed the $12,850 priority cap under section 507(a)(4) of the Bankruptcy Code (the "**Priority Cap**") during the interim period.

88.    Based on these facts, payment of the outstanding Prepetition Employee Obligations and the Independent Contractor Fees is essential to the Debtors' reorganization strategy and will result in enhanced creditor recoveries through the preservation of the value of the Debtors' estates.   Delay or disruption in the satisfaction of these claims could irreparably harm the Debtors' relationships with their Workforce and workplace morale at a time when such morale is most critical.   If such payments are not made, the Workforce necessary to maintain the Debtors' operations, productions, and other operations may seek alternative employment, putting these operations, businesses and productions at risk.   The Workforce and their knowledge specific to the Debtors' operations, relationships with customers, vendors and third parties are necessary to maximizing the value in connection with any restructuring plans. The loss of valuable Workforce members at this critical stage would undoubtedly affect the Debtors' ability to focus on stabilizing their business operations.

89.    Accordingly, I believe that the payment of the Prepetition Employee Obligations and the Independent Contractor Fees (other than the Excluded Prepetition Employee Obligations), in the amount and manner described herein and in the Wages Motion, represents the Debtors' sound business judgment, is in the best interest of the Debtors' estates and creditors, and is critical to prevent the immediate and irreparable harm to Workforce morale and the Company's ability to continue its operations without interruption.

E.      **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing
        Continued Use of Cash Management System and Bank Accounts; (II)
        Waiving Certain United States Trustee Requirements; (III) Authorizing
        Continued Performance of Intercompany Transactions; and (IV) Granting
        Related Relief (the "<u>Cash Management Motion</u>")**

90.     Pursuant to the Cash Management Motion, the Debtors seek authority
to continue to use their existing cash management system (the "**Cash Management System**"),
bank accounts (the "**Bank Accounts**"), and business forms.  In addition, the Debtors seek
authority to continue to engage in intercompany transactions in the ordinary course of
business and to grant administrative expense priority to such postpetition intercompany
transfers.  In the ordinary course of their businesses, the Debtors have historically used their
Cash Management System to fund their operations.  By use of the Cash Management System,
the Debtors collect, concentrate and disburse funds generated by their business.  The Cash
Management System allows the Debtors to efficiently collect and transfer the cash generated
by their business and pay their financial obligations.

91.     The Cash Management System for the Debtors' film business is
centered primarily on bank accounts held by Debtors The Weinstein Company LLC, TWC
Domestic LLC, and Weinstein Global Film Corp.  The Debtors collect money from exhibiting
film content developed, produced, and/or owned by the Debtors and concentrate collected
cash, ultimately, in the Union Bank Collections Account.  Subject to certain payment
priorities described below, the funds in the Union Bank Collections Account are used to pay
down the interest, fees, and principal that have accrued on the Union Bank Facility.

92.     Funds in the Union Bank Collections Account are paid (i) to three other
accounts at Union Bank that are used to pay participations and residuals to the producers,
performers, writers, interparty distributors, co-financiers and other individuals or entities

33

entitled to compensation for the exhibition of the content developed, produced, and/or distributed by the Company, (ii) to other accounts at Union Bank to pay the *pari passu* (a) fees and expenses of MUFG, as administrative agent, and (b) the fees, expenses, and interests of certain counterparties to approved hedging arrangements, (iii) to other accounts at Union Bank to pay the interest, fees, and principal that have accrued under the UBE Credit Agreement, and then (iv) to a collections account held at HSBC by TWC (the "**U.S. Miscellaneous Collections Account**").   Historically, funds in the U.S. Miscellaneous Collections Account would be swept daily to a main operating account held by TWC, which is used to pay the Debtors' employees, as well as the Debtors' marketing costs, other accounts payable, and miscellaneous costs.   Union Bank maintains control over the Union Bank Collections Account per the terms of the Union Bank Credit Agreement.

93.     International receipts are deposited in the International Receipts Account held by Weinstein Global Film Corp.   These funds are swept daily by Portfolio Funding Company LLC I ("**PFC**"), which is an entity that is not a Debtor and not affiliated with the Company.   Funds from the PFC Deposit Account are subsequently swept into an account held at HSBC (9292) by non-Debtor PFC (together with the PFC Deposit Account, the "**PFC Accounts**").   Pursuant to the terms of that certain Master Account Agreement, American Entertainment Investors, Inc. (the "**PFC Administrator**"), distributes all receipts in the PFC Collection Accounts in accordance with the priority of payments structure set forth therein.   On March 8, 2018, the PFC Administrator, acting on behalf of PFC, delivered a notice purporting to set off amounts owing by PFC to TWC under the Master Account

Agreement against amounts that are allegedly past due from TWC licensees.  Under the Master Account Agreement, PFC maintains full cash dominion over the PFC Accounts.[4]

94.     The Cash Management System for the Debtors' television business is centered primarily on bank accounts (the "**TV Production Accounts**") held at Bank of America by WTV.  Cash receipts are paid into the TV Production Accounts are used to either pay down the interest, fees, and principal that have accrued on the Bank of America Facility or pay down the interest, fees, and principal that have accrued on the Access Industries Credit Facility depending on the payee and to which Facility the collateral relates.  Pursuant to the Bank of America Credit Agreement, Bank of America maintains full cash dominion over the TV Production Accounts.

95.     The Debtors also maintain production and collection accounts (the "**SPV Production Accounts**") under the names of certain special purpose vehicles (the "**Debtor SPVs**").  The Debtor SPVs were established to produce a specific film or project as part of the Debtors' overall business.  The SPV Production Accounts are generally funded by loans collateralized by certain receipts and other revenues generated by that specific film or project.  Those receipts or other revenues are then deposited into collection or lockbox accounts (the "**SPV Collection Accounts**") that collect revenue generated by the specific production for the benefit of the lenders affiliated with those productions.  Funds deposited into the SPV Collection Accounts remain under the exclusive control of those lenders.

96.     As discussed above, the Cash Management System and applicable procedures employed by the Debtors constitute ordinary, usual, and essential business practices.  In my opinion, the Cash Management System affords the Debtors significant

---

[4] As noted in the Cash Management Motion, the Debtors reserve their rights to investigate, challenge, and commence actions against PFC and/or the PFC Administrator with respect to the exercise of control by such parties over the Debtors' cash.

benefits, including, among other things, the ability to (a) control corporate funds centrally, (b) ensure the availability of funds when necessary, and (c) reduce costs and minimize administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  It would be unduly difficult and expensive for the Debtors to establish a new cash management system, and forcing the Debtors to do so would unnecessarily deprive them of the efficiencies they enjoy under the existing Cash Management System.  Based on these facts, I believe continuing to use the existing Cash Management System is in the best interests of the estates and will facilitate a smooth transition into chapter 11.

**F.      Debtors' Motion for Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Granting Related Relief and (VII) Scheduling a Final Hearing (the "<u>DIP Motion</u>")**

97.      By the DIP Motion, the Debtors request entry of Interim and Final Orders, (i) approving the DIP Facility, (ii) authorizing the use of cash collateral, (iii) providing superpriority administrative expense status, (iv) granting adequate protection, (v) modifying the automatic stay, (vi) granting related relief, and (vii) scheduling the Final Hearing for the Court to consider entry of the Final Order.  Pursuant the DIP Motion, the Debtors seek authority to enter into the DIP Facility with the DIP Credit Parties.  Under the terms of the DIP Facility, the DIP Facility contemplates a lending limit of up to $8,500,000 in the interim period, and if approved on a final basis, a limit of up to $25,000,000.

98.      The Debtors have entered bankruptcy with nearly no cash on hand and require post-petition financing to sustainably operate until such time that a sale of all or substantially all of the Debtors' assets can be consummated.  As set forth more fully above,

36

prior to filing for chapter 11 protection, Moelis and the Debtors conducted a pre-petition marketing process to identify potential lenders that might extend post-petition financing to the Debtors. After such marketing process was completed, the Debtors, in an exercise of their sound business judgment, determined that all competing bids were inferior, either financially or when considering the potential lender's experience in the entertainment industry and/or its understanding of the Debtors' intricate capital structure, to those offered by the DIP Credit Parties.

99.     The Debtors, in consultation with their professionals and advisors, negotiated the terms and conditions of the DIP Facility with the DIP Credit Parties at arms' length and in good faith.  I believe that the terms and conditions of the DIP Facility are fair, reasonable under the circumstances, and necessary inducements to secure the DIP Facility.

100.    Absent the DIP Facility, the Debtors will likely not have the liquidity to maintain operations and will soon cease to operate.  Such inactivity may jeopardize certain contract rights, vendor and talent relationships, and assets that the Debtors have.  Any damage to the Debtors' assets and relationships will impair the Debtors' ability to maximize value for all stakeholders through a bankruptcy sale, and may entirely impede such process.  The DIP Facility will provide the Debtors the necessary liquidity to avoid a value destructive shutdown and will allow the Debtors to consummate a sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code in an effective manner that maximizes value for all stakeholders.

101.    Further, after diligent consideration, I believe that the proposed budget accompanying the DIP Facility will allow the Debtors to effectively consummate a sale of their assets that maximizes value for all stakeholders.

102.     Under the present circumstances, I believe that the terms and conditions of the DIP Facility are fair, reasonable and consistent with market terms.  Further, given the complexity of the Debtors pre-petition capital structure, unique line of business, and the DIP Credit Parties' experience in working with and financing the Debtors' pre-petition operations, the DIP Facility provides its needed financing on the most favorable terms.

## V.     CONCLUSION

103.     The Debtors' ultimate goal in these Chapter 11 cases is to maximize the value of their estates for the benefit of their creditors and other stakeholders.  To minimize any loss of value of the Debtors' business during the Debtors' transition to operating in Chapter 11, the Debtors' immediate objective is to engage in business as usual with little interruption or disruption to operations as possible.  I believe that if the Court grants the First Day Relief, the Debtors' prospects for achieving their overarching goal of maximizing value for its creditors and stakeholders will be substantially enhanced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  March 20, 2018.

THE WEINSTEIN COMPANY HOLDINGS LLC

_/s/ *Robert Del Genio*_____
By: Robert Del Genio
Chief Restructuring Officer

38

# Exhibit A



# **Exhibit B**

**375 Greenwich St., 3rd Floor, New York, NY 10013**

**February 25, 2018 -- FOR IMMEDIATE RELEASE**

As has been publicly reported, The Weinstein Company has been engaged in an active sale process in the hopes of preserving assets and jobs. Today, those discussions concluded without a signed agreement, as reflected in the attached letter. While we recognize that this is an extremely unfortunate outcome for our employees, our creditors and any victims, the Board has no choice but to pursue its only viable option to maximize the Company's remaining value: an orderly bankruptcy process. Over the coming days, the Company will prepare its bankruptcy filing with the goal of achieving maximum value in court.



# THE WEINSTEIN COMPANY

February 25, 2018

<u>BY EMAIL</u>

Ron Burkle (burkle@protonmail.com)
Maria Contreras-Sweet (mcs@contrerassweet.com)


Ron, Maria,

In a meeting with New York's Attorney General on February 21, you asked The Weinstein Company to work with you as "partners" toward the common goal of saving the Company, preserving jobs and establishing a victims' fund. Given the Company's financial condition, you urged that "time is of the essence" and represented that you were prepared to enter an agreement promptly. That agreement, we were told, could no longer impose any closing obligation or reverse break-up fee; instead, Maria assured us that the Company could – and must – rely on buyer's good-faith intention to sign and close the deal. We mutually agreed that parties should have open and free communication with the Attorney General's office, and any other governmental body with an interest in the transaction.

In the four days since that meeting, we and our advisors have worked tirelessly to finalize an agreement to present to the Attorney General for his approval. While acceding to virtually every demand you imposed, we made clear that the one thing the Company needed in furtherance of your good faith was interim funding to run our business and maintain our employees – employees who have remained dedicated to the Company even amidst great uncertainty. During this time, we waited patiently for you to deliver the terms you represented would save this Company from certain bankruptcy.

Instead, late last night, you returned to us an incomplete document that unfortunately does not keep your promises of February 21, including with respect to the guiding principles set forth by the Attorney General. Nowhere, for instance, is there any provision for the "gold standard" human resources policies you promised; instead, you added all new contingencies relating to David Glasser, the former employee of The Weinstein Company who was recently terminated for cause. Likewise, there is no provision for necessary interim funding to ensure your future employees were paid; instead, you increased the liabilities left behind for the Company, charting a financial path that will fail. Other new conditions make clear that a closing, if one were to happen at all, could take many months (or longer). In short, the draft you returned presents no viable option for a sale.

We have believed in this Company and in the goals set forth by the Attorney General. Based on the events of the past week, however, we must conclude that your plan to buy this company was illusory and would only leave this Company hobbling toward its demise to the detriment of all constituents.  This Board will not let that happen.  Despite your previous statements, it is simply impossible to avoid the conclusion that you have no intention to sign an agreement – much less to close one – and no desire to save valuable assets and jobs.  That is regrettable, but not in our power to change.

While we deeply regret that your actions have led to this unfortunate outcome for our employees, our creditors and any victims, we will now pursue the Board's only viable option to maximize the Company's remaining value:  an orderly bankruptcy process.

The Board of Representatives
of The Weinstein Company

# **Exhibit C**



**THE WEINSTEIN COMPANY**

FOR IMMEDIATE RELEASE – MARCH 6, 2018

We are disappointed by the announcement today that the investor group led by Maria Contreras-Sweet and Ron Burkle has (again) walked away from its bid to buy the assets of The Weinstein Company.  Although we publicly predicted this outcome, the Board entered last week's agreement in the hope and good faith that a transaction would save this Company and its employees.  The investors' excuse that they learned new information about the Company's financial condition is just that — an excuse.  The Company has been transparent about its dire financial condition to the point of announcing its own LIKELY bankruptcy last week.   We regret being correct that this buyer simply had no intention of following through on its promises.  Nevertheless, this Board will not quit.  We will continue to work tirelessly -- as we have for months -- to determine if there are any viable options outside of bankruptcy.  In the meantime, we continue to pursue an orderly bankruptcy process to maximize the Company's value.