## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*, | : | Case No. 18-_____ (___) |
|  | : |  |
|  | : |  |
| Debtors.[1] | : | Joint Administration Requested |
|  | : |  |

-----------------------------------------------------------x

### DEBTORS' MOTION FOR ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) GRANTING <u>RELATED RELIEF, AND (VII) SCHEDULING A FINAL HEARING</u>

The Weinstein Company Holdings LLC ("**TWCH**") and its affiliated debtors and debtors

in possession (collectively, the "**Debtors**" or the "**Company**") respectfully request entry of

interim and final orders pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3),

364(d) and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"); rules 2002, 4001

and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and

rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "**Local Rules**") for:

(i)      authorization for TWCH, The Weinstein Company LLC ("**TWC**") and TWC Domestic LLC ("**TWCD**") to obtain, as co-borrowers (collectively, the "**Borrowers**"), secured, superpriority post-petition loans, advances and other financial accommodations (the "**DIP Facility**"), pursuant to the terms and conditions of that certain Debtor-In-Possession Loan and Security Agreement (as

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**"), a copy of which is attached hereto as <u>Exhibit A</u>,[2] by and among (a) the Borrowers, (b) MUFG Union Bank, N.A., as administrative agent (the "**DIP Agent**"), (c) the guarantors from time to time party thereto (the "**Guarantors**") and (d) the Lenders from time to time party thereto (the "**DIP Lenders**" and each a "**DIP Lender**"; the DIP Agent, the DIP Lenders and the other Secured Parties (as defined in the DIP Credit Agreement) under the DIP Loan Documents (as defined below) are collectively referred to herein as the "**DIP Credit Parties**");[3]

(ii)    authorization to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, the "**DIP Loan Documents**") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(iii)   until the Termination Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions and limitations on availability set forth in the DIP Loan Documents, the DIP Facility and the Interim Order (as defined below), authorization, prior to the entry of the Final Order, to request borrowings under the DIP Facility up to an aggregate principal amount of $7,500,000 (the "**Interim Financing**"), and upon entry of the Final Order, increasing the borrowings available under the DIP Facility to an amount not to exceed the aggregate principal amount of $25,000,000;

(iv)    entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "**Interim Order**"), approving, *inter alia*, the Interim Financing;

(v)     the granting of allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases (and any cases under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases) to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents (collectively, and including all "Obligations" as defined in the DIP Credit Agreement, the "**DIP Obligations**"), subject to the Carve-Out (as defined below);

(vi)    authorization to use cash collateral, as defined in section 363(a) of the Bankruptcy Code, but excluding any cash collateral subject to Pre-Petition Third Party Liens (the "**Cash Collateral**"), that the Debtors are holding or may obtain, pursuant to sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 6004 on the terms and conditions set forth in the DIP Loan Documents and the Interim Order;

---

[2] Certain exhibits of the DIP Agreement are not included in the attachments to this Motion.

[3] Capitalized terms used but not otherwise defined herein have the meanings given to them in the DIP Credit Agreement.

(vii)    the granting of valid, enforceable, nonavoidable and fully perfected security interests and liens (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and consensual priming liens pursuant to section 364(d) of the Bankruptcy Code on the Pre-Petition Collateral (as defined below)) to the DIP Agent, for the benefit of the DIP Credit Parties on all DIP Collateral (as defined below) (the "**DIP Liens**") to secure all DIP Obligations, subject and subordinate only to those security interests and liens on DIP Collateral other than liens securing the Pre-Petition Obligations (as defined below) that, as of the date hereof, were valid, enforceable and nonavoidable (collectively, "**Pre-Petition Third Party Liens**");

(viii)    authorization to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, upfront fees, closing fees, backstop fees, administrative fees, any additional fees set forth in the DIP Loan Documents, the reasonable fees and disbursements of the DIP Credit Parties' attorneys, advisers, accountants and other consultants and all related expenses of the DIP Credit Parties, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents;

(ix)    the provision of adequate protection to the Pre-Petition Lenders to the extent set forth in the Interim Order;

(x)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

(xi)    scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in this Motion, the entry of an order (a "**Final Order**") approving the relief requested in this Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(xii)    granting related relief.

In support of the Motion, the Debtors rely upon and incorporate by reference the

*Declaration of Robert Del Genio in Support of First Day Relief* (the "**First Day Declaration**"),

filed concurrently herewith.  In further support of this Motion, the Debtors respectfully represent

as follows:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334, and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013–1(f), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**I       General Background**

2.       On March 19, 2018 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under Bankruptcy Code sections 1107 and 1108.  As of this date, no trustee, examiner or statutory committee of creditors has been appointed in these chapter 11 cases.

3.       Founded in 2005 by Robert and Harvey Weinstein, the Company is a "mini-major" film and television production studio that creates, produces and distributes feature films and premium television content for the U.S. and international markets.  The Company's assets consist primarily of intellectual property, distribution rights and cash flows related to its film library, television productions and portfolio of unreleased films.  The Company has produced numerous critically acclaimed and commercially successful films, receiving 23 Academy Awards, including Academy Awards for Best Picture for *The Artist* and *The King's Speech*, and 113 Academy Award nominations.

4.       Additional information on the Debtors' business and capital structure, as well as a description of the events precipitating the filing of these cases, is set forth in the First Day Declaration.

4

**II**      **THE DEBTORS' SECURED PREPETITION INDEBTEDNESS**

    **A.**      **MUFG Secured Credit Facility**

    5.      TWC Domestic LLC has outstanding secured debt obligations in the aggregate principal amount of approximately $156,411,347, *plus* accrued and unpaid interest at the default rate with respect thereto and any additional fees, costs and expenses (including any fees and expenses of attorneys, financial advisors and other professionals that are chargeable or reimbursable under the Pre-Petition Loan Documents) now or hereafter due under that certain Second Amended and Restated Credit and Security Agreement dated as of September 30, 2013 (as amended, the "**Pre-Petition Credit Agreement**"), among TWC Domestic LLC, the lenders referred to therein (the "**Pre-Petition Lenders**"), and Union Bank, N.A., now known as MUFG Union Bank, N.A., as administrative agent and letter of credit issuer ("**MUFG**" and, in its capacity as Administrative Agent, the "**Pre-Petition Agent**") and the other Pre-Petition Loan Documents (collectively, together with all other obligations of the Pre-Petition Obligors arising under the Pre-Petition Loan Documents (including, without limitation, the "Obligations" as defined in the Pre-Petition Credit Agreement and the Pre-Petition), the "**Pre-Petition Obligations**"). The Pre-Petition Credit Agreement provided for a senior secured revolving credit facility (the "**Existing MUFG Facility**"). The obligations of TWC Domestic LLC under the Union Bank Credit Agreement are guaranteed by The Weinstein Company LLC. The collateral securing the Existing MUFG Facility (the "**Pre-Petition Collateral**") consists primarily of a first priority lien on substantially all of TWC Domestic LLC's assets and a senior pledge of The Weinstein Company LLC's equity in TWC Domestic LLC.

    **B.**      **UnionBanCal Equities Junior Credit Facility**

    6.      TWC Domestic LLC has outstanding secured debt obligations in the aggregate amount of approximately $15.6 million under that certain Credit and Security Agreement dated

as of October 9, 2015 (as amended), among TWC Domestic LLC, the lenders referred to therein and UnionBanCal Equities, Inc. ("**UBE**"), as administrative agent (the "**UBE Credit Agreement**").  The UBE Credit Agreement provided for a secured term loan credit facility (the "**UBE Facility**").  The collateral securing the UBE Facility consists of a junior lien on substantially all of TWC Domestic LLC's assets.

7.    The respective rights and priorities of MUFG and UBE in the MUFG Collateral are governed by that certain Subordination and Intercreditor Agreement dated as of October 9, 2015 (as amended) among MUFG, UBE, TWC and TWC Domestic LLC.

C.    **Bank of America Credit Facility**

8.    Weinstein Television LLC ("**WTV**") has outstanding secured debt obligations in the aggregate amount of approximately $18.1 million under that certain Term Loan Agreement dated as of May 24, 2016 (as amended), among WTV, the lenders referred to therein and Bank of America, N.A., as administrative agent (the "**Bank of America Credit Agreement**").  The Bank of America Credit Agreement provided for a term loan facility (the "**Bank of America Facility**").  The collateral securing the Bank of America Facility consists primarily of the assets of the "*Project Runway*" franchise and the episodic series "Fashion, Inc.", the other assets of WTV and its subsidiaries, as well as certain of The Weinstein Company LLC's rights in television products, in each case excluding certain assets encumbered by liens securing then-existing project financings and a senior pledge of TWCH's equity in WTV.  The obligations of WTV under the Bank of America Credit Agreement are guaranteed by Small Screen Trades LLC, Small Screen Productions LLC and MarcoThree, LLC, the equity interests of which are also pledged to Bank of America, N.A.

RLF1 19033894v.1

D.    **Access Industries Credit Facility**

9.    TWC Borrower 2016, LLC has outstanding secured debt obligations in the aggregate amount of approximately $45.5 million under that certain Secured Full Recourse Promissory Note dated as of September 29, 2016, between TWC Borrower 2016, LLC and AI International Holdings (BVI) Ltd (the "**AI Note**").  The collateral securing the AI Note consists of certain foreign distribution rights, a subordinated pledge of TWCH's equity in WTV and a pledge of The Weinstein Company LLC's equity in Weinstein Global Film Corporation.  The obligations of TWC Borrower 2016, LLC under the AI Note are guaranteed by TWCH and by Harvey Weinstein.  TWC and certain of its subsidiaries have agreed to reimburse Harvey Weinstein if he is required to make payments on the AI Note.

E.    **TWC Production Facility**

10.    TWC Production LLC has outstanding secured debt obligations in the aggregate amount of approximately $42.5 million under that certain Credit and Security Agreement dated as of August 6, 2014 (as amended), among TWC Production LLC, the lenders  and guarantors referred to therein and MUFG Union Bank, N.A. as administrative agent (the "**TWC Production Credit Agreement**").  The TWC Production Credit Agreement provides for a revolving credit facility (the "**TWC Production Facility**").  The collateral securing the TWC Production Facility consists of a first priority lien on substantially all assets of TWC Production LLC and the guarantors described below, to the extent derived from, related to or used in connection with the exploitation of foreign rights (and subject to certain additional exclusions as set forth in the TWC Production Credit Agreement), a pledge of The Weinstein Company LLC's equity in TWC Production LLC and a subordinated pledge of The Weinstein Company LLC's equity in TWC Domestic LLC.  TWC Production LLC's obligations are guaranteed, from time to time, by certain entities formed for the purpose of producing films, all domestic subsidiaries of TWC

7

Production LLC and such entities and, at TWC Production LLC's election, foreign subsidiaries of TWC Production LLC and such entities.

### F.    **Production-Level Debt**

11.    WTV JCP Borrower 2017, LLC ("**WTV JCP**") has outstanding secured debt obligations in the aggregate amount of approximately $2.1 million under that certain Loan and Security Agreement dated as of April 26, 2017, by and among WTV JCP and Bank Hapoalim B.M. (the "**JCP Credit Agreement**").  WTV JCP's obligations are secured by a lien on all of WTV JCP's assets, including WTV JCP's right to receive certain royalty payments associated with design collections sold at J.C. Penney retail stores based on the television shows "*Project Runway*," "*Project Runway: All Stars*" and "*Project Runway: Junior*," and are guaranteed by The Weinstein Company LLC.

12.    TWC Polaroid SPV, LLC ("**Polaroid**") has outstanding secured debt obligations in the aggregate amount of approximately $5.3 million under that certain Loan and Security Agreement dated as of April 14, 2017, by and among Polaroid and First Republic Bank, as lender (the "**Polaroid Credit Agreement**").  Polaroid's obligations are secured by a lien on substantially all of Polaroid's assets, including accounts, equipment, inventory and certain copyrights and proceeds associated with the motion picture "*Polaroid*," other than certain Excluded Collateral (as such term is defined in the Polaroid Credit Agreement).

13.    Spy Kids TV Borrower, LLC ("**Spy Kids**") has outstanding secured debt obligations in the aggregate amount of approximately $13.4 million under that certain Loan and Security Agreement dated as of August 12, 2016, by and among Spy Kids, the lenders referred to therein and MUFG Union Bank, N.A., as agent (the "**Spy Kids Credit Agreement**").  The obligations of Spy Kids are secured by a lien on substantially all of Spy Kids's assets, but only to the extent derived from, related to or used in connection with the exploitation of the distribution

and exploitation rights of the first and second season of the animated episodic television series "*Spy Kids*", including accounts, equipment, inventory and copyrights associated with such series, other than certain Excluded Collateral (as such term is defined in the Spy Kids Credit Agreement).

14.     TWC Mist, LLC ("**Mist**") has outstanding secured debt obligations in the aggregate amount of approximately $12.4 million under that certain Loan and Security Agreement dated as of November 29, 2016, by and among Mist and Comerica Bank, as lender (the "**Mist Credit Agreement**").  Mist's obligations are secured by a lien on substantially all of Mist's assets, including accounts, letters of credit and certain copyrights associated with Season 1 of the episodic television series "*Mist*," other than certain Excluded Assets (as such term is defined in the Mist Credit Agreement).

15.     TWC Untouchable SPV, LLC ("**Untouchable**") has secured debt obligations in the aggregate amount of approximately $8.9 million under that certain Loan and Security Agreement dated as of March 20, 2017, as amended, by and among Untouchable and First Republic Bank, as lender (the "**Untouchable Credit Agreement**").  Untouchable's obligations are secured by a lien on substantially all of Untouchable's assets, including accounts, equipment, inventory, letters of credit and copyrights and physical assets associated with the motion picture "*The Upside*," other than certain Excluded Collateral (as such term is defined in the Untouchable Credit Agreement).

16.     TWC Waco SPV, LLC ("**Waco**") has secured debt obligations in the aggregate amount of approximately $5.3 million under that certain Loan and Security Agreement dated as of August 11, 2017, by and among Waco and Opus Bank, as lender (the "**Waco Credit Agreement**").  Waco's obligations are secured by a lien on substantially all of Waco's assets,

including accounts, equipment, inventory, letters of credit and copyrights and physical assets associated with the episodic television series "*WACO*," other than certain Excluded Collateral (as such term is defined in the Waco Credit Agreement).

17.     TWC Fearless Borrower, LLC ("**Fearless**") has outstanding secured debt obligations in the aggregate amount of approximately $2.8 million under that certain Loan and Security Agreement dated as of August 3, 2017, by and among Fearless and First Republic Bank, as lender (the "**Fearless Credit Agreement**").  The obligations of Fearless are secured by a lien on substantially all of Fearless's assets, including copyrights and physical property associated with the first season of the episodic television series "*Fearless*," other than certain Excluded Collateral (as such term is defined in the Fearless Credit Agreement).  As a condition to the full commitment under the Fearless Credit Agreement becoming available and as part of the sale of streaming rights to Amazon Digital Services LLC, the Fearless Credit Agreement requires Amazon Digital Services LLC to agree to make all payments to First Republic Bank with respect to such series.  Until such time as documentation evidencing such agreement is executed, the obligations of Fearless under the Fearless Credit Agreement are guaranteed by The Weinstein Company LLC.

18.     Current War SPV, LLC ("**Current War**") has outstanding secured debt obligations in the aggregate amount of approximately $7.0 million under that certain Loan and Security Agreement dated as of December 23, 2016, by and among Current War and East West Bank, as lender (the "**Current War Credit Agreement**").  The obligations of Current War are secured by a lien on substantially all of Current War's domestic assets, including accounts, equipment, inventory, letters of credit and copyrights and physical assets associated with the

motion picture "*Current War*," other than certain Excluded Collateral (as such term is defined in the Current War Credit Agreement).

### G.    Other Debt

19.    Viacom Advances.   WTV and non-Debtor Next Take Productions, Inc. ("**Next Take**") are indebted to Viacom Media Networks ("**VMN**") in the amount of $8.3 million under an agreement by and among VMN, On-Site Productions Inc., Next Take and WTV dated as of March 7, 2013 (as amended and as supplemented by related side letters, the "**Scream Advances Agreement**"), related to the advancement of expenses for payroll and certain international rights associated with the television series "*Scream*."   The obligations of WTV and Next Take under the Scream Advances Agreement are secured by a lien on certain of WTV's and Next Take's rights to distribution of the series.   WTV is indebted to VMN in the amount of $20.3 million under an agreement between VMN and WTV dated as of April 14, 2017 (as amended and supplemented by related side letters, the "**Yellowstone Advances Agreement**"), related to the advancement of expenses for payroll and accounts payable associated with the television series "Yellowstone."   The obligations of WTV under the Yellowstone Advances Agreement are secured by certain of WTV's rights to distribution of Yellowstone, the episodic television show "The Mist" and the limited documentary television series "The Untitled Kalief Browder Project". WTV is indebted to VMN in the amount of $1.5 million under an agreement between VMN and WTV dated as of October 17, 2016 (as amended and supplemented by related side letters), related to the advancement of expenses for payroll and accounts payable associated with the television series "Waco."

20.    Cast and Crew Payroll Advance.   TWC is a guarantor of obligations of Next Take Productions, Inc. in the amount of $3.3 million under an agreement dated as of October 5, 2017, between Cast & Crew Financial Services, LLC, Next Take Productions, Inc. and TWC related to

11

the advancement of expenses for payroll associated with the third season of the television series "*Scream*."

21.     <u>Demand Note</u>.     TWCH is indebted to Robert Weinstein in the amount of $11,187,363 under an unsecured demand note dated as of February 5, 2018.  This balance is reflective of the amount due as of March 16, 2018.

## III     DIP FINANCING OVERVIEW

### A.     <u>Immediate Need for Postpetition Financing and Use of Cash Collateral</u>

22.     The Debtors' need to obtain credit pursuant to the DIP Facility is immediate and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates until a sale of substantially all of the Debtors' assets is completed.     The events leading up to the Debtors' critical financial situation are more fully described in the First Day Declaration.

23.     In conjunction with its financial advisor, FTI Consulting, Inc. ("**FTI**"), the Debtors considered whether it could operate using only the cash generated from its post-petition operations.  The Debtors determined that they could do so only for a limited period of time and then only if they refrained from making payments (such as payroll and other essential payments) that are critical to the success of these cases.

24.     The ability of the Debtors to finance their operations, maintain business relationships, pay their employees, protect the value of their assets and otherwise finance their operations and pursue a strategy to maximize value for their creditors requires the availability of working capital from the DIP Facility and the ability to use Cash Collateral as described below, the absence of either of which would immediately and irreparably harm the Debtors, their estates, their creditors and equity holders, and the possibility for a successful administration of these chapter 11 cases.

12

25.     The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or to maintain their properties in the ordinary course of business—let alone pursue the various options available to create value for stakeholders—without the DIP Facility and authorized use of Cash Collateral.  The DIP Credit Parties are willing to provide liquidity on the terms provided in the DIP Loan Documents and the Interim Order, which provide for the repayment of the DIP Loans from the proceeds of the Debtors' proposed asset sale.

**B.      Prepetition Efforts to Obtain Financing**

26.     Prior to the Petition Date, the Debtors engaged FTI to assist them in evaluating strategic and financial alternatives to improve liquidity.  Robert Del Genio, Senior Managing Director for Corporate Finance and Restructuring at FTI, is currently acting as Chief Restructuring Officer of the Debtors.  The efforts of the Debtors and FTI to raise new capital are described in the First Day Declaration.  Before agreeing to enter into the DIP Credit Agreement, the Debtors made extensive inquiry into their alternatives for financing and solicited proposals for debtor in possession financing from other financial institutions.  The Debtors and their advisors made outbound contacts to 25 prospective lenders and received unsolicited inbound inquiries from five additional parties, ultimately receiving six indicative term sheets.

**C.      No Credit Available on More Favorable Terms**

27.     However, the Debtors were unable to find DIP financing on more favorable terms than the proposed DIP Facility, and the DIP Credit Parties have agreed to provide debtor in possession financing on the terms set forth in this Motion.  The Debtors evaluated prospective lenders and their bids on a number of factors, which included economic terms, financing certainty, proposed restrictions on the operation of the business and the use of proceeds and the collateral and security packages requested. Given their current financial condition, financing

13

arrangements and capital structure, the Debtors were unable to obtain financing from sources other than the DIP Credit Parties with a more favorable mix of terms than the DIP Facility. While some prospective lenders offered, for instance, better economic terms or lighter restrictions on running the business, none offered terms that were superior, as a whole, to the offer from the DIP Credit Parties.  Additionally, the DIP Credit Parties are familiar with the Debtors, giving them the ability to act more quickly and limiting diligence risk, both of which are crucial in light the Debtors' imminent need for liquidity as discussed further below.

28.    The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to the Prepetition Liens, in each case with comparable benefits afforded by the DIP Credit Parties and the DIP Facility.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of the DIP Credit Parties, (1) perfected security interests in and liens on all of the Debtors' existing and after-acquired assets with the priorities set forth in the Interim Order, (2) superpriority claims and (3) the other protections set forth in the Interim Order.

D.    **Use of Proceeds of the DIP Facility**

29.    As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Credit Parties require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used for post-petition working capital purposes of the Debtors, current interest and fees under the DIP Facility,

the payment of adequate protection payments to the Pre-Petition Agent and the Pre-Petition Lenders, the payment of prepetition claims to the extent approved by this Court, and the allowed administrative costs and expenses of the cases, in each case, solely in accordance with the Interim Order or the Final Order, as applicable, and the Initial Approved Budget attached hereto as <u>Exhibit C</u> or a subsequent Approved Budget (as such terms are defined in the Interim Order and the Final Order).

## <u>DESCRIPTION OF DIP FACILITY</u>

30.     Pursuant to Bankruptcy Rule 4001, the Debtors set forth significant elements of the DIP Term Loans, as follows:[4]

| Material Provision | Brief Summary |
| --- | --- |
| **Borrowers** | The Weinstein Company Holdings LLC, The Weinstein Company LLC and TWC Domestic LLC, as debtors and debtors in possession. |
| **Guarantors** | Each of the entities listed on <u>Schedule 1.01</u> to the DIP Credit Agreement shall be Guarantors of the DIP Obligations. |
| **DIP Administrative Agent and Collateral Agent** | MUFG |
| **DIP Lenders** | Each of the lenders listed on <u>Schedule 2.01</u> to the DIP Credit Agreement shall be DIP Lenders. |
| **DIP Facility** | A priming (solely with respect to the Pre-Petition Loans), senior secured, superpriority DIP Facility comprising loans to be advanced and made available to the Borrowers under a delayed draw term loan with disbursements to be made in accordance with the Approved Budget (the "**DIP Facility Loans**")  in the aggregate maximum principal amount of up to $25,000,000 (the "**Delayed Draw Commitment**").  All of the DIP Obligations and DIP Liens shall have the benefit of section 364(e) of the Bankruptcy Code. |

---

[4] This summary is provided in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2.  For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Credit Agreement, the Interim Order, and the Final Order.  The summary herein is qualified in its entirety by reference to such documents and such orders.  Interested parties are strongly encouraged to read the operative documents and such orders.  This is a summary only, and the terms of the DIP Credit Agreement, the Interim Order, and the Final Order, as applicable, shall control in all respects.  Capitalized terms used, but not otherwise defined, in this summary shall be given the same meanings ascribed to them in the DIP Credit Agreement, the Interim Order, and the Final Order, as applicable.

| Material Provision | Brief Summary |
|---|---|
| | During the period from the date of entry of the Interim Order (the date of the initial funding of the DIP Facility Loans, the "**Closing Date**") by this Court through the date of entry of the Final Order by this Court, Interim Financing in an amount of up to $7,500,000 of DIP Facility Loans approved by this Court pursuant to the Interim Order shall be made available, and the balance of the Delayed Draw Commitment shall become available only upon and after entry of the Final Order, at intervals and in amounts that correspond to the Approved Budget. Pending the entry of the Final Order, the DIP Agent and the DIP Lenders shall be afforded all of the protections contained in the Interim Order.<br><br>The DIP Agent shall have the benefit of (i) all deposit account control agreements, escrow agreements, pledgeholder agreements and laboratory access letters to which the Pre-Petition Agent is a party and (ii) subject and subordinate to the rights of the holders of any Third-Party Pre-Petition Liens and any Permitted Third-Party DIP Liens, all other deposit account control agreements, escrow agreements, Pledgeholder Agreements and laboratory access letters to which any Debtor is a party.<br><br>On a monthly basis, all amounts received during such month on account of the Pre-Petition Collateral shall be applied towards the repayment of the DIP Obligations and the Pre-Petition Obligations (pursuant to the terms and conditions set forth in the DIP Credit Agreement, the Interim Order and the Final Order).<br><br>All outstanding DIP Facility Loans and other outstanding DIP Obligations shall be due and payable on the Termination Date. |
| **Interest Rate**<br><br>DIP Credit Agmt. § 2.06 | LIBOR + 9.50% (1.50% LIBOR floor) |
| **Default Interest**<br><br>DIP Credit Agmt. § 2.06 | DIP Interest Rate + 3.0% |
| **Fees And Expenses**<br><br>DIP Credit Agmt. § 2.07 | Upfront Fee = 2.0%<br><br>Exit Fee = 2.0%<br><br>DIP Agency Fee = $50,000 per month<br><br>DIP Backstop Fee (PIK) = 4.0% |

16

| Material Provision | Brief Summary |
|---|---|
| **Termination/Maturity Date**<br><br>DIP Credit Agmt. § 1.01 | The termination/maturity date of the DIP Facility shall be the earliest of—<br><br>(i) 125 days after the Petition;<br><br>(ii) the date of acceleration of the DIP Facility Loans or termination of the Commitments following an Event of Default;<br><br>(iii) the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto;<br><br>(iv) conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Administrative Agent and the Required Lenders;<br><br>(v) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the DIP Agent and the Required Lenders;<br><br>(vi) the date of consummation of the sale of substantially all assets of the Debtors or the sale of substantially all assets of the Debtors comprising Prepetition Collateral; and<br><br>(vii) the effective date of any Borrower's plan of reorganization confirmed in the Chapter 11 Cases, unless extended with the prior written consent of DIP Agent and Required Lenders. |
| **Covenants Regarding the Continuous Engagement of Professional Advisors**<br><br>DIP Credit Agmt. §§ 6.19 | The DIP Credit Agreement provides:<br><br>(i)   The Debtors shall continue to retain Robert Del Genio (individually or through his firm, FTI Consulting) (or another individual or firm selected by Debtors and acceptable to the DIP Agent, the Pre-Petition Agent, the Majority DIP Lenders and the Required Lenders) as chief restructuring officer of the Debtors ("**CRO**") (subject to a period after the Closing Date for the related retention order to be entered),  on terms and scope of authority acceptable to the DIP Agent, the Pre-Petition Agent, the Required Lenders and the Prepetition Required Lenders, which CRO shall have financial and legal control and report to the Board of Directors, or similar body, of each Debtor;<br><br>(ii)   The Debtors shall continue to retain Moelis & Company (or another investment bank selected by Debtors and acceptable to the DIP Agent, the Pre-Petition Agent, the Required Lenders and the Prepetition Required Lenders) as investment bank (the "**Investment Bank**"), on terms reasonably acceptable to the DIP Agent, the Pre-Petition |

| Material Provision | Brief Summary |
|---|---|
| | Agent, the Required Lenders and the Prepetition Required Lenders, to market the assets of the Debtors in connection with obtaining a Stalking Horse Bidder and assist the Debtors with obtaining Bankruptcy Court approval of such sale pursuant to section 363 of the Bankruptcy Code; |
| **Sale Process**<br><br>DIP Credit Agmt. 6.18 | The DIP Credit Agreement provides for the following milestones:<br><br>(i)    No later than thirty-five (35) calendar days after the Petition Date, obtain Bankruptcy Court approval of the Bidding Procedures Motion, pursuant to an order (the "**Bidding Procedures Order**") in form and substance acceptable to Administrative Agent and the Prepetition Agent;<br><br>(ii)    No later than sixty (60) calendar days after the entry of the Bidding Procedures Order, commence and complete, subject to the supervision of this Court and in accordance with the Approved Bidding Procedures, the Auction;<br><br>(iii)    No later than ten (10) Business Days after the conclusion of the Auction, obtain Bankruptcy Court approval of the sale of all or substantially all of the Loan Parties' assets to one or more buyers on the terms of the successful bid (the "**Approved Sale**") pursuant to a sale order in form and substance acceptable to the DIP Agent and the Pre-Petition Agent (the "**Sale Order**"); and<br><br>(iv)    No later than 125 calendar days after the Petition Date, consummate the Approved Sale pursuant to the Sale Order |
| **Liens, Collateral, and Priority**<br><br>**Bankruptcy Rule 4001(c)(1)(B)(i), (vii) & (xi)**<br><br>Interim Order ¶¶ 7, 9, 10 | Effective immediately upon the entry of the Interim Order, pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of itself and the other DIP Credit Parties under the DIP Loan Documents) will be granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral.<br><br>The "**DIP Collateral**" comprises all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired post-petition (including, without limitation, subject to entry of the Final Order, the proceeds of estate causes of action under chapter 5 of the Bankruptcy Code (the "**Avoidance Actions**")), whether now existing or hereafter acquired or arising. DIP Collateral shall also include, and the DIP Liens shall automatically |

18

| Material Provision | Brief Summary |
|---|---|
| | attach to, any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Agent or the DIP Lenders in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.<br><br>More specifically, all obligations of the Debtors under the DIP Facility (the "**DIP Obligations")** shall, subject to the Carve-Out and any Permitted Third-Party DIP Liens be:<br><br>(i)    entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code, including, without limitation, the pre-petition claims and adequate protection claims of the Pre-Petition Agent on behalf of the Pre-Petition Lenders, subject only to the Carve-Out and any Permitted Third-Party DIP Indebtedness. The superpriority claims of the DIP Lenders may be repaid from any cash of the Debtors, including without limitation, Cash Collateral and any proceeds from Avoidance Actions;<br><br>(ii)    secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, binding, continuing enforceable, fully perfected, first priority, senior priming security interests in and liens upon all DIP Collateral comprising Pre-Petition Collateral, subject and subordinate only to those liens on the Pre-Petition Collateral that (a) are valid, enforceable and nonavoidable as of the Petition Date, (b) under applicable law, are senior to, and have not been subordinated to, the Pre-Petition Liens and (c) are not subject to avoidance, reduction, allowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (each, a "**Permitted Priority Lien**");<br><br>(iii)    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, continuing, enforceable, first priority, fully perfected security interests in and liens upon all of the DIP Collateral that is not encumbered by any of the Pre-Petition Liens or the Pre-Petition Third-Party Liens; and<br><br>(iv)    secured, pursuant to section 364(c)(3) of the |

| Material Provision | Brief Summary |
|---|---|
| | Bankruptcy Code, by valid, enforceable, fully perfected security interests in and liens on all of the DIP Collateral that, as of the Petition Date, was subject to any Pre-Petition Third-Party Lien that was perfected prior to the Petition Date or is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, subject and subordinate only to such Pre-Petition Third-Party Liens. |
| **Carve-Out**<br><br>Interim Order ¶ 14 | The "**Carve-Out**" means, collectively, the sum of— <br><br>(i)    all fees required to be paid to the clerk of this Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United State Code (plus any applicable interest at the statutory rate) for the period up to the occurrence of a Carve-Out Trigger (as defined below), <br><br>(ii) the documented and unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Trigger by each person or firm retained by the Debtors and the Committee as an estate professional (collectively, the "**Professionals**") for the benefit of such Professional and payable under sections 330 and 331 of the Bankruptcy Code, to the extent allowed by an order of this Court (whether allowed prior to or after the occurrence of the Carve-Out Trigger), subject to the terms of the Financing Orders and any other orders entered by this Court (including limits imposed on use of the proceeds of the DIP Facility Loans and Cash Collateral for payment of fees and expenses incurred in connection with the investigation, assertion and/or prosecutions of claims and defenses against any of the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders) in an amount not to exceed the respective line item amount set forth for such professional for the applicable period prior to the Carve-Out Trigger in the Approved Budget; and <br><br>(iii) up to a maximum amount of $[250,000] of unpaid documented fees, costs and expenses accrued or incurred by Professionals following the occurrence of the Carve-Out Trigger, payable under sections 330 and 331 of the Bankruptcy Code and subsequently allowed by order of this Court (and, if applicable, in compliance with the Approved Budget (subject to the Permitted Variance). |
| **Events of Default** | In addition to customary events of default, certain additional |

| Material Provision | Brief Summary |
|---|---|
| DIP Credit Agmt.<br>§ 8.01 | bankruptcy-related events, including: |

<table>
<tr><td>(i)</td><td>The Interim Order at any time ceases to be in full force and effect, or is vacated, reversed or stayed, or modified or amended without the prior written consent of the DIP Agent, the Required Lenders, the Pre-Petition Agent, and the Prepetition Required Lenders;</td></tr>
<tr><td>(ii)</td><td>The Final Order shall not have been entered within 35 days after the entry of the Interim Order (or such later date as the DIP Agent and the Pre-Petition Agent may agree) or at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended without the prior written consent of the DIP Agent, the Required Lenders, the Pre-Petition Agent, and the Prepetition Required Lenders;</td></tr>
<tr><td>(iii)</td><td>(a) Any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (b) a Chapter 11 Trustee, a receiver, or an examiner with enlarged powers relating to the operation of the business of any Debtor shall be appointed in any of the Chapter 11 Cases, (c) any other superpriority claim (other than the Carve-Out or with respect to Pre-Petition Third-Party Liens or the Permitted Third-Party DIP Indebtedness) or grant of any other lien (including any adequate protection lien, but excluding any Permitted Third-Party DIP Liens) which is *pari passu* with or senior to the claims and liens of the DIP Agent or the Pre-Petition Agent shall be granted in any of the Chapter 11 Cases, or (d) the filing of any motion seeking the appointment of a Chapter 11 Trustee, a receiver, or an examiner with enlarged powers relating to the operation of the business of any Debtor, or the filing by any Debtor of any pleading seeking or otherwise consenting to or supporting any of the matters set forth in clause (a) or clause (b) of this subsection (iv);</td></tr>
<tr><td>(iv)</td><td>Other than payments authorized by this Court and which are set forth in the Approved Budget (subject to the Permitted Variance) (A) in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases and (B) in respect of adequate protection payments set forth herein and consented to by the DIP Agent and the Required Lenders, in each</td></tr>
</table>

21

| Material Provision | Brief Summary |
|---|---|
| | case to the extent authorized by one or more "first day" or other orders reasonably satisfactory to the DIP Agent, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables (including without limitation, reclamation claims); |
| | (v) The filing of any motion seeking an order from this Court substantively consolidating any of the Debtors' estates; |
| | (vi) This Court shall enter an order granting relief from the automatic stay to the holder or holders of any lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor that have an aggregate value in excess of $100,000; |
| | (vii) The Termination Date (as defined below) shall have occurred; |
| | (viii) The filing by the Debtors of any plan of reorganization or liquidation, or the taking of any action in support of the filing of a plan of reorganization or liquidation by a party other than the Debtors, in each case other than in respect of an Acceptable Plan (as defined below), without the prior written consent of the DIP Agent, the Pre-Petition Agent, the Required Lenders and the Prepetition Required Lenders or the termination of the Debtors' "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization; |
| | (ix) Any Debtor petitions this Court to obtain additional financing, other than the Permitted Third-Party DIP Indebtedness, *pari passu* or senior to the DIP Facility; |
| | (x) (A) The Debtors engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Pre-Petition Loan Documents or the liens on or security interest in the assets of the Debtors securing the DIP Obligations or the obligations of the Debtors under the Pre-Petition Loan Documents (the "**Pre-Petition Obligations**") (other than to seek a determination that an Event of Default has not occurred or is not continuing), including without limitation |

RLF1 19033894v.1

| Material Provision | Brief Summary |
|---|---|
| | seeking to equitably subordinate or avoid the liens securing such obligations or (B) the Debtors engage in or support any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Agent, any DIP Lender, the Pre-Petition Agent or any Pre-Petition Lender; provided, however, that it shall not constitute an Event of Default if any of the Debtors provides information with respect to the Pre-Petition Loan Documents to a party in interest or is compelled to provide information by an order of this Court and provides prior written notice to the DIP Agent and the Pre-Petition Agent of any intention or requirement to do so; |
| | (xi)   Any person shall obtain a section 506(a) judgment or similar determination with respect to the Pre-Petition Obligations that is adverse to the Pre-Petition Agent and Required Lenders; |
| | (xii)   The allowance of any claim or claims under section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the DIP Collateral; |
| | (xiii)   The consummation of a sale of any material portion of the DIP Collateral (other than a sale in the ordinary course of business that is contemplated by the Approved Budget) other than pursuant to an Approved Sale or as otherwise permitted under the DIP Loan Documents; |
| | (xiv)   The allowance of any claim or claims under section 546(c) or 503(b)(9) of the Bankruptcy Code that is not contemplated in the Approved Budget (subject to the Permitted Variance) or is otherwise unacceptable to the DIP Agent and Required Lenders; |
| | (xv)   The filing with this Court, prior to the consummation of the Approved Sale and indefeasible payment in full in cash of all DIP Obligations and Pre-Petition Obligations, of any disclosure statement or plan of reorganization or liquidation that has not been approved, in form and substance, by the DIP Agent, the Pre-Petition Agent, the Required Lenders and the Prepetition Required Lenders; and |

RLF1 19033894v.1

| Material Provision | Brief Summary |
|---|---|
| | (xvi)   the statutory committee of unsecured creditors (the "**Creditors' Committee**"), if any, appointed in the Chapter 11 Cases, or any other party in interest, shall file a complaint or pleading or initiate any other action against the DIP Agent, any of the DIP Lenders, the Pre-Petition Agent or any of the Pre-Petition Lenders, or otherwise file an objection to the claims, or seek to avoid the liens, held by any such party. |
| **Automatic Stay**<br><br>**Bankruptcy Rule 4001 (c)(1)(B) (iv)**<br><br>Interim Order ¶ 22 | The Interim Order and the Final Order shall include relief from the automatic stay with respect to the exercise of rights and remedies upon the occurrence of an Event of Default, subject to a three Business Day notice period. |
| **Challenge Period**<br><br>**Bankruptcy Rule 4001(c)(1)(b) (vii), (viii)**<br><br>Interim Order ¶¶ 15 | The Interim Order and Final Order shall establish a deadline that—<br><br>(i) in the case of a Creditors' Committee, is within 60 days of the appointment of the Creditors' Committee or 75 days from the Petition Date, or<br><br>(ii) in the case of any other party in interest, is within 75 days of the Petition Date, by which the Creditors' Committee, creditor or other party-in-interest (in any case, which has obtained the requisite standing) must commence an adversary proceeding, if at all, against the Pre-Petition Agent or the Pre-Petition Lenders for the purpose of challenging the validity, extent, priority, perfection and enforceability of the pre-petition secured debt under the Pre-Petition Credit Agreement or the other Pre-Petition Loan Documents, or the liens, claims and security interests in the Pre-Petition Collateral in favor of the Pre-Petition Agent or the Pre-Petition Lenders or otherwise asserting any claims or causes of action against the Pre-Petition Agent or such Pre-Petition Lenders on behalf of the Debtors' estates (the "**Challenge**"); provided, however, that nothing contained in the DIP Loan Documents or the Interim or Final Orders shall be deemed to confer standing on the Creditors' Committee or any other party in interest to commence such an adversary proceeding.<br><br>If such an adversary proceeding is not commenced within such period, then the Pre-Petition Agent and the Pre-Petition Lenders shall automatically receive full waivers and releases provided in the Interim or Final Orders and the liens of the Pre-Petition Agent on behalf of the Pre-Petition Lenders shall be valid, perfected, enforceable and unavoidable without any further action by the Pre-Petition Agent or |

| Material Provision | Brief Summary |
|---|---|
| | Pre-Petition Lenders under the terms of the Financing Orders. |
| **Limitation On Use of Proceeds**<br><br>**Bankruptcy Rule 4001 (c)(1)(B)(viii)**<br><br>DIP Credit Agmt. §§ 6.11<br><br>Interim Order ¶¶ I, 31 | The DIP Facility Loans and the Cash Collateral may be used only for post-petition working capital purposes of the Debtors, current interest and fees under the DIP Facility, the payment of adequate protection payments to the Pre-Petition Agent and the Pre-Petition Lenders, the payment of prepetition claims to the extent approved by this Court, and the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the Approved Budget and the Interim and Final Orders. |
| **Indemnification Bankruptcy Rule 4001(c)(1)(B)(ix)**<br><br>DIP Credit Agmt. §§ 13.04(b)<br><br>Interim Order ¶ 7 | The Debtors shall agree to indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other Person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.   All such indemnity obligations shall constitute DIP Obligations entitled to the priority and security described in the section above entitled "Liens, Collateral and Priority." |

## **ADEQUATE PROTECTION**

31.     In consideration of the diminution in value of their interests in the Pre-Petition

Collateral as a result of (a) the provision of this Interim Order granting priming liens on such

Pre-Petition Collateral to the DIP Agent, (b) the authorization of the use of Cash Collateral in the

manner herein described, (c) the imposition of the automatic stay pursuant to section 362 of the

Bankruptcy Code and/or (d) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the Debtors have agreed to pay to the Pre-Petition Lenders up to 50% of all amounts arising from or in connection with Pre-Petition Collateral, subject to disgorgement to the extent of a final and non-appealable Challenge, and allocable as described in the Interim Order (the "**Adequate Protection Payments**"). The Pre-Petition Lender also shall receive adequate protection in the form of—

(i) a superpriority claim under section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or after arising, *provided*, *however*, that such superpriority claim shall be junior and subject to the superpriority claim of the DIP Agent for the benefit of the DIP Lenders in respect of the DIP Facility, any Permitted Third-Party DIP Indebtedness and the Carve-Out (the "**Adequate Protection Superpriority Claims**");

(ii) valid, enforceable, fully perfected security interests in and replacement liens on the DIP Collateral, subordinate only to (a) the DIP Liens, (b) any Permitted Third-Party DIP Liens, (c) the Pre-Petition Third-Party Liens, and (d) the Carve-Out (the "**Adequate Protection Liens**"); and

(iii) payment of all reasonable, documented fees, costs and expenses incurred or accrued by the Pre-Petition Agent (the foregoing to include all unpaid prepetition fees, costs and expenses) in connection with any and all aspects of the chapter 11 cases, and including the reasonable fees and expenses of the legal and financial advisors to the Pre-Petition Agent and the Pre-Petition Lenders (including Sidley Austin LLP, Young Conaway Stargatt & Taylor, LLP and Houlihan Lokey) and other professionals, hired by or on behalf of the Pre-Petition Agent,

(iv) payment upon closing of the DIP Facility, of all accrued and unpaid pre-petition interest owing under the Pre-Petition Credit Agreement as of the closing of the DIP Facility, calculated at the non-default rate (provided, that default interest has and shall continue to accrue pursuant to the terms of the Pre-Petition Credit Agreement notwithstanding the payment, as adequate protection, of pre-petition interest at the non-default rate)

(v) monthly adequate protection payments equal to 50% of funds on deposit in the Collection Account (as defined in the Interim Order) on each Settlement Date (as defined in the Interim Order), subject to certain potential adjustments, all as more specifically described in the Interim Order.

26

32.     The foregoing adequate protection liens shall be deemed automatically perfected as of the Petition Date without further action, although if the DIP Agent and/or the Pre-Petition Agent determine to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be lifted to allow such filings.

33.     The provisions of the DIP Facility and the Interim Order were extensively negotiated and, under the present circumstances, are the most favorable that the Debtors were able to negotiate.  The DIP Facility enables the Debtors to obtain the financing necessary to maintain their operations, and pursue a sale or reorganization that will maximize the value of their estates.

## RELIEF REQUESTED

34.     The Debtors seek entry of an order (a) authorizing the Debtors to, among other things, (i) enter into the DIP Facility on the terms described in the Interim Order and the DIP Loan Documents, (ii) use Cash Collateral on the terms described in the Interim Order and Final Order and in the DIP Loan Documents to administer their chapter 11 cases, and make adequate protection payments, and (iii) grant the Pre-Petition Lender adequate protection of their interests, and (b) scheduling and establishing deadlines relating to the Final Hearing and order authorizing the Debtors to obtain postpetition financing.

## BASIS FOR RELIEF REQUESTED

**I      The Court Should Authorize the Debtors to Provide Adequate Protection to the Prepetition Secured Creditors**

35.     The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders

27

> otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

36.     To the extent any prepetition secured creditor has a lien on a Debtor's assets and does not consent to the Debtor's use of those assets, such creditor must be adequately protected. The propriety of adequate protection is determined on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Grp (In re Swedeland Dev. Grp)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir. 1987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Columbia Gas Sys., Inc.*, Nos. 91_803, 91_804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

37.     Adequate protection shields a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus., 58 B.R. at 736; In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

38.     Adequate protection is not expressly defined in the Bankruptcy Code.  Rather, section 361 of the Bankruptcy Code provides a non-exclusive list of examples of adequate protection.  The flexibility provided by section 361 provides the Court with discretion in fashioning the protection provided to a secured party. *See Resolution Trust (In re Swedeland)*, 16 F.3d at 564.  Adequate protection may be provided through a "replacement lien" or "other

28

relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. *See* 11 U.S.C. § 361(2), (3).

39.     The Debtors are providing the Pre-Petition Lenders with adequate protection for their consent to the priming liens as follows:  by the provision of Adequate Protection Liens and Adequate Protection Superpriority Claims to the Pre-Petition Lenders; and by the provisions of the Adequate Protection Payments to the Pre-Petition Lenders.  The Debtors believe that this form of adequate protection reasonably balances the Debtors' need to use the Pre-Petition Collateral and the Pre-Petition Lenders right to adequate protection under the Bankruptcy Code. As a result, the Debtors submit that the proposed terms of the Debtors' use of Prepetition Collateral should be approved in their entirety.

## II     Approval of the DIP Credit Agreement Is Appropriate Under Section 364 of the Bankruptcy Code

40.     The Debtors are authorized to operate their businesses under section 1108 of the Bankruptcy Code.  As part of that operation, the Debtors may incur unsecured debt in the ordinary course of business.  11 U.S.C. § 364(a).  The Bankruptcy Code offers a debtor in possession additional flexibility to the extent it needs additional credit, but cannot obtain such credit on unsecured terms.  Section 364 of the Bankruptcy Code provides a progression of various protections to induce a postpetition lender to extend credit to a debtor in possession. Specifically, a postpetition lender can be granted a superpriority administrative expense claim, a lien on unencumbered property, a junior lien on encumbered property, and, if the court finds that the interests of the holders of existing liens are adequately protected, a priming lien on encumbered property.  11 U.S.C. § 364(c), (d).

41.     The business necessity for obtaining the DIP Facility is described above.  The Debtors will not have the cash needed to pay their current operating expenses absent the DIP

Facility.  Even if the Debtors obtained this Court's authorization to use every dollar of cash collateral generated from the Debtors' assets over the objections of the Pre-Petition Lender, the Debtors' projected gross cash collections would be insufficient to fund current operating expenses during the pendency of the chapter 11 cases.  During the chapter 11 cases, the Debtors' current operating expenses will exceed their cash collections.  The Debtors can operate without drastic cuts in operations only with new financing.

42.     Section 364 of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such credit is not available.  *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  This is true especially when time is of the essence.  *See, e.g., id.; In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987).  Here, as described in the First Day Declaration, the Debtors have searched for debtor in possession financing on the most favorable terms.  The Debtors' submit that the terms and conditions of the DIP Facility are fair, reasonable and consistent with market terms.  Further, given the complexity of the Debtors pre-petition capital structure, unique line of business, and the DIP Credit Parties' experience in working with and financing the Debtors' pre-petition operations, the Debtors' believe that the DIP Facility provides its needed financing on the most favorable terms.

43.     As a condition to extending the DIP Facility that the Debtors need, the DIP Credit Parties require the protections contained in subsections 364(c) and (d) of the Bankruptcy Code, which the facts in these chapter 11 cases support.  Specifically, the DIP Obligations will be secured, in each case subject to the Carve-Out and the Pre-Petition Third-Party Liens (and any Permitted Third-Party DIP Liens), by (i) first priority perfected liens and security interests in all of the Debtors' unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code,

(ii) second priority perfected liens and security interests in all of the Debtors' assets that are subject to Pre-Petition Third-Party Liens pursuant to section 364(c)(3) of the Bankruptcy Code, and (iii) priming first-priority perfected liens and security interests in all of the Debtors' assets that constitute Prepetition Collateral pursuant to sections 364(d)(1) of the Bankruptcy Code.

44.     In addition, the DIP Credit Parties will receive a superpriority claim under section 364(c)(1) for any unpaid DIP Obligations (a "**DIP Superpriority Claim**").   The DIP Superpriority Claim will be subordinate only to the Carve-Out and will otherwise have priority over any and all administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code.

45.     The DIP Facility provides the funding needed to get to a sale of substantially all of the Debtors' assets.  Without the DIP Facility, the Debtors would be required to terminate some or all of their operations (depending on whether the Court authorized the Debtors to use cash collateral), which would destroy at least a substantial portion of the going concern value of the Debtors' operations.  Preservation of value generally constitutes the "adequate protection" needed to prime existing liens.  *See, e.g.*, Norton, et al., 2 *Norton Bankruptcy Law and Practice 3d*. § 45:7 (2008) (addressing the § 364(d) determination, and providing that "[f]actors influencing a court's decision will be the viability of the debtor's business and the need to protect assets against a sharp decline in value"); *Bray (In re Snowshoe Co. Inc.)*, 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631 (finding that funds from lender given "priming" lien used to improve collateral will be transferred into value "[that] will serve as adequate protection. . . ."); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); *In re Devlin*, 185 B.R.

376, 378 (Bankr. M.D. Fla. 1995) (chapter 11 debtor-motel operator authorized to incur debt with superpriority status to replace air-conditioning unit, boiler and hot water heaters because such expenses were necessary to preserve value and maintain operations).  In any event, the only parties that the Debtors are aware of whose liens are being primed are the Pre-Petition Lenders, and they have consented to the priming lien to preserve the going concern value of their collateral.

**III    Approval of the DIP Facility Is Supported by the Exercise of Sound Business Judgment**

46.    Generally, courts give broad deference to business decisions of a debtor in possession.  *See, e.g., Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).   Moreover, a bankruptcy court generally will respect a debtor in possession's business judgment regarding the need for and the proposed use of funds.  As the court noted in *In re Ames Dep't Stores, Inc.*:

> [T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.

, 115 B.R. 34, 40 (Bankr. S.D.N.Y 1990). Without the ability to incur secured debt, the debtor in possession would be placed at a competitive disadvantage and its efforts to reorganize could be seriously impaired.

47.    In the present case, the Debtors' decision to obtain the DIP Facility represents an exercise of sound business judgment in the continued effort to maximize the value of their operating business.  Without such credit the Debtors would be unable to operate and the value of their business as a going concern would be destroyed.

32

RLF1 19033894v.1

48.    In particular, the Debtors believe that repayment of the amounts outstanding under the Pre-Petition Loan Documents is appropriate under the circumstances and will not prejudice the Debtors or their estates.

49.    The validity, enforceability, and priority of the liens granted by the Debtors under the Pre-Petition Loan Documents are subject to the "Challenge" rights of third parties, as set forth in the Interim Order, including any Committee.  Thus, insofar as the satisfaction of the Pre-Petition Obligations is premised upon the validity of the liens granted by the Debtors thereunder, the Committee will have an opportunity to examine the propriety of such repayment, and to clawback such repayment to the extent that the underlying liens are avoided.

50.    Hence, there should be no prejudice from the proposed repayment to other creditors of these estates because the Pre-Petition Lenders already assert a security interest in the assets that the Debtors propose to pledge to the DIP Lenders that are providing the funds to satisfy the Prepetition Obligations with the DIP Loans.  *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 4-5 (2000) (recognizing that administrative expense claims allowable under section 503(b) of the Bankruptcy Code "do not have priority over secured claims").

51.    Courts have previously permitted debtors to use postpetition financing to pay prepetition claims of a lender.  The claims of the Pre-Petition lender are then fully secured.  As the United States District Court for the District of Delaware recently observed:

> [P]repetition secured claims can be paid off through a "roll-up." Most simply, a [roll up] is the payment of a pre-petition debt with the proceeds of a post-petition loan.  Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code.  The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the

33

> debtor.   As a result, the entirety of the pre-petition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order.   In both a refinancing and a roll-up, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 167 (D. Del. 2015) (emphasis added) (quoting In re Capmark Fin. Group, Inc., 438 B.R. 471, 510-111 (Bankr. D. Del. 2010)).   *See also, e.g., Final Order Authorizing Debtors to Obtain Post-Petition Financing, In re UniTek Global Servs., Inc.*, No. 14-12471-PJW (Bankr. D. Del. Dec. 2, 2014), ECF No. 194*; Final Order Authorizing Postpetition Financing, In re Coldwater Creek Inc.*, No. 14-10867-BLS (Bankr. D. Del. June 12, 2014), ECF No. 573; *Final Order Authorizing Post-Petition Financing, In re Quantum Foods, LLC*, No. 14-10318-KJC (Bankr. D. Del. Mar. 20, 2014), ECF No. 167; *Interim Order Approving Postpetition Financing, In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, No. 14-10193-KG (Bankr. D. Del. Feb. 4, 2014), ECF No. 52; *Interim Order Authorizing Debtors to Obtain Postpetition Financing, In re Southern Air Holdings, Inc.*, No. 12-12690-CSS (Bankr. D. Del. Oct. 1, 2012), ECF No. 77; *Interim Order Authorizing Debtors to Obtain Postpetition Financing, In re Appleseed's Intermediate Holdings LLC*, No. 11-10160-KG (Bankr. D. Del. Jan. 20, 2011), ECF No. 34.

## IV      Immediate Relief Is Justified

52.      Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on a motion to use cash collateral or obtain postpetition financing may not be commenced less than fourteen days after service of such motion.   The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such fourteen-day period and to authorize the debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.   Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors therefore request that the Court (i) authorize the

Debtors to obtain financing on an interim basis pursuant to the terms of the Interim Order and (ii) schedule a final hearing to consider approval of the Debtors' request to obtain financing through the DIP Facility on a final basis pursuant to the terms of the Final Order.

53.     As described above and in the First Day Declaration, without access to the DIP Facility, the Debtors will have no ability to operate their business.  In light of the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001(b) and (c) to support immediate DIP Facility availability pending the entry of the Final Order.  Accordingly, to forestall the immediate and irreparable harm that would inure to the Debtors' estates, creditors and parties in interest absent Court approval of this Motion, the Debtors respectfully request that the Court grant the relief requested herein.

## REQUEST FOR WAIVER OF STAY

54.     Under Federal Rule of Bankruptcy Procedure 6003, the Court may grant a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within 21 days after the chapter 11 case's commencement to the extent "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003. Here, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as set forth in the First Day Declaration, and relief on an interim basis is therefore appropriate under Federal Rule of Bankruptcy Procedure 6003, if applicable.

55.     To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## NOTICE

56.     The Debtors will provide notice of this Motion to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims

against the Debtors on a consolidated basis; (iii) counsel to the DIP Agent and the Pre-Petition Agent; (iv) counsel to the Stalking Horse Bidder; (v) the New York Attorney General and the California Attorney General; (vi) the Office of the United States Attorney for the District of Delaware; (vii) all lienholders; and (viii) all parties entitled to notice pursuant to Local Rule 9013-1(m).  Following the hearing, a copy of this Motion and any order entered with respect to it will be served on the foregoing parties and all parties having filed requests for notice in these chapter 11 cases.   A copy of the Motion is also available on the Debtors' case website at http://dm.epiq11.com/twc.

57.     Due to the urgency of the relief requested, the Debtors submit that no other or further notice is necessary

## NO PRIOR REQUEST

58.     The Debtors have not made any prior request for the relief sought herein to this Court or any other.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request entry of the Interim Order, and pending a final hearing, the Final Order granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:     March 19, 2018
          Wilmington, Delaware

          */s/ Mark D. Collins*
          **RICHARDS, LAYTON & FINGER, P.A.**
          Mark D. Collins (No. 2981)
          Paul N. Heath (No. 3704)
          Jason M. Madron (No. 4431)
          Zachary I. Shapiro (No. 5103)
          Brett M. Haywood (No. 6166)
          One Rodney Square
          920 North King Street
          Wilmington, DE 19801
          Telephone:  (302) 651-7700
          Facsimile:   (302) 651-7701

          - and -

          **CRAVATH, SWAINE & MOORE LLP**
          Paul H. Zumbro
          (*pro hac vice* application pending)
          George E. Zobitz
          (*pro hac vice* application pending)
          Karin A. DeMasi
          (*pro hac vice* application pending)
          Worldwide Plaza
          825 Eighth Avenue
          New York, New York 10019
          Telephone: (212) 474-1000
          Facsimile: (212) 474-3700

          *Proposed Attorneys for the*
          *Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**DIP Credit Agreement**

**EXECUTION COPY**

**DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

Dated as of March [\_\_], 2018

among

**THE WEINSTEIN COMPANY HOLDINGS LLC,**
**THE WEINSTEIN COMPANY LLC**
and
**TWC DOMESTIC LLC**

**THE GUARANTORS REFERRED TO HEREIN**

**THE LENDERS REFERRED TO HEREIN**

and

**MUFG UNION BANK, N.A.,**
as Administrative Agent

————————————

**MUFG UNION BANK, N.A.**
as Lead Arranger

**MUFG UNION BANK, N.A.**
as Sole Bookrunner

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...............................................................................1
    SECTION 1.01    Defined Terms ...........................................................2
    SECTION 1.02    Other Interpretive Provisions...................................25
    SECTION 1.03    Accounting Terms.....................................................26
    SECTION 1.04    Times of Day............................................................26

ARTICLE II THE LOANS................................................................................26
    SECTION 2.01    Loans.........................................................................26
    SECTION 2.02    Borrowings, Conversions and Continuations of Loans ............27
    SECTION 2.03    Prepayments..............................................................28
    SECTION 2.04    Termination or Reduction of the Commitments .......30
    SECTION 2.05    Repayment of Loans .................................................30
    SECTION 2.06    Interest......................................................................30
    SECTION 2.07    Fees...........................................................................31
    SECTION 2.08    Computation of Interest and Fees ............................31
    SECTION 2.09    Evidence of Debt......................................................31
    SECTION 2.10    Payments Generally; Administrative Agent's Clawback .........32
    SECTION 2.11    Sharing of Payments by Lenders .............................34
    SECTION 2.12    Super-Priority Nature of Obligations.......................34
    SECTION 2.13    Payment of Obligations............................................35
    SECTION 2.14    No Discharge; Survival of Claims ...........................35
    SECTION 2.15    Waiver of Priming Rights .........................................35
    SECTION 2.16    Security Interest .......................................................35

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY......................35
    SECTION 3.01    Taxes........................................................................36
    SECTION 3.02    Illegality ...................................................................39
    SECTION 3.03    Inability to Determine Rates .....................................40
    SECTION 3.04    Increased Costs.........................................................40
    SECTION 3.05    Compensation for Losses .........................................41
    SECTION 3.06    Mitigation Obligations; Replacement of Lenders.....................42
    SECTION 3.07    Survival....................................................................42

ARTICLE IV CONDITIONS PRECEDENT .....................................................43
    SECTION 4.01    Conditions Precedent to Closing Date ......................43
    SECTION 4.02    Conditions to all Borrowings ...................................46

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE LOAN PARTIES...........47
    SECTION 5.01    Existence, Qualification and Power..........................47
    SECTION 5.02    Authority; No Contravention ....................................47
    SECTION 5.03    Governmental Authorization; Other Consents...........................47
    SECTION 5.04    Binding Effect..........................................................48
    SECTION 5.05    Financial Statements ................................................48

# TABLE OF CONTENTS
### (continued)

**Page**

SECTION 5.06   Litigation ................................................................48
SECTION 5.07   No Default ..............................................................49
SECTION 5.08   Ownership of Property ...........................................49
SECTION 5.09   Environmental Compliance ....................................49
SECTION 5.10   Insurance ................................................................49
SECTION 5.11   Taxes ......................................................................49
SECTION 5.12   ERISA Compliance ................................................49
SECTION 5.13   Subsidiaries ............................................................50
SECTION 5.14   Margin Regulations; Investment Company Act .......51
SECTION 5.15   Disclosure ..............................................................51
SECTION 5.16   Compliance with Laws ...........................................51
SECTION 5.17   Copyrights, Trademarks and Other Rights ..............51
SECTION 5.18   [Reserved] ..............................................................52
SECTION 5.19   Places of Business .................................................52
SECTION 5.20   Security Interest .....................................................52
SECTION 5.21   Deposit or Other Accounts .....................................52
SECTION 5.22   Approved Budget ...................................................52
SECTION 5.23   Prepetition Obligations; Defenses ..........................53
SECTION 5.24   Prepetition Credit Agreement .................................53
SECTION 5.25   Chapter 11 Case Matters ........................................53

ARTICLE VI  AFFIRMATIVE COVENANTS ...........................................53

SECTION 6.01   Financial Statements ..............................................54
SECTION 6.02   Certificates; Other Information ...............................55
SECTION 6.03   Notices ...................................................................59
SECTION 6.04   Payment of Obligations ..........................................59
SECTION 6.05   Preservation of Existence, Etc ................................59
SECTION 6.06   Maintenance of Properties ......................................60
SECTION 6.07   Maintenance of Insurance .......................................60
SECTION 6.08   Compliance with Laws ...........................................60
SECTION 6.09   Books and Records .................................................61
SECTION 6.10   Inspection and Audit Rights ...................................61
SECTION 6.11   Use of Proceeds .....................................................61
SECTION 6.12   Further Assurances .................................................61
SECTION 6.13   Material Contracts ..................................................62
SECTION 6.14   Copyrights ..............................................................62
SECTION 6.15   Audit Rights ...........................................................62
SECTION 6.16   Laboratories ...........................................................62
SECTION 6.17   Distribution Agreements and Other Receivables Contracts ......63
SECTION 6.18   Sale Process ...........................................................64
SECTION 6.19   Continuous Engagement of Professional Advisors ...................65
SECTION 6.20   Delinquent Receivables ..........................................65

# TABLE OF CONTENTS
### (continued)

Page

ARTICLE VII  NEGATIVE COVENANTS .................................................................66

SECTION 7.01    Liens.................................................................................66
SECTION 7.02    Indebtedness....................................................................67
SECTION 7.03    Limitation on Guaranties ................................................67
SECTION 7.04    Limitations on Investments .............................................67
SECTION 7.05    Restricted Payments........................................................68
SECTION 7.06    Consolidation, Merger or Disposition of Assets, etc ......68
SECTION 7.07    Dispositions.....................................................................68
SECTION 7.08    Places of Business; Change of Name, Jurisdiction........68
SECTION 7.09    Limitations on Capital Expenditures ..............................68
SECTION 7.10    Transactions with Affiliates............................................68
SECTION 7.11    Change in Nature of Business.........................................69
SECTION 7.12    Bank Accounts .................................................................69
SECTION 7.13    ERISA Compliance..........................................................69
SECTION 7.14    Hazardous Materials .......................................................69
SECTION 7.15    Use of Proceeds of Loans ...............................................70
SECTION 7.16    Hedge Agreements...........................................................70
SECTION 7.17    Subsidiaries.....................................................................70
SECTION 7.18    Accounting Changes........................................................70
SECTION 7.19    Modification or Termination of Material Agreements ....70
SECTION 7.20    No Negative Pledge .........................................................70
SECTION 7.21    Chapter 11 Claims...........................................................70
SECTION 7.22    Repayment of Indebtedness ............................................71
SECTION 7.23    Variance Covenant...........................................................71

ARTICLE VIII  EVENTS OF DEFAULT ..................................................................71

SECTION 8.01    Events of Default .............................................................71
SECTION 8.02    Remedies Upon Event of Default ....................................75

ARTICLE IX  GRANT OF SECURITY INTEREST; REMEDIES ...........................76

SECTION 9.01    Security Interests..............................................................76
SECTION 9.02    Collection Account; Escrow Account; Netflix Collection Account ..........77
SECTION 9.03    Loan Parties to Hold in Trust..........................................77
SECTION 9.04    Collections, etc.................................................................78
SECTION 9.05    Possession, Sale of Collateral .........................................78
SECTION 9.06    Power of Attorney............................................................79
SECTION 9.07    Financing Statements, Direct Payments ..........................80
SECTION 9.08    Further Assurances..........................................................80
SECTION 9.09    Termination and Release..................................................80
SECTION 9.10    Remedies Not Exclusive ..................................................81
SECTION 9.11    Quiet Enjoyment ..............................................................81
SECTION 9.12    Continuation and Reinstatement......................................81

# TABLE OF CONTENTS
### (continued)

Page

ARTICLE X  COLLATERAL ACCOUNTS ............................................................................81

    SECTION 10.01    Collateral Accounts.................................................................81
    SECTION 10.02    Grant of Security Interest ......................................................82
    SECTION 10.03    Remittances from the Netflix Collection Account....................82
    SECTION 10.04    Escrow Account ....................................................................82
    SECTION 10.05    HSBC Collection Account.......................................................82

ARTICLE XI  THE ADMINISTRATIVE AGENT .................................................................82

    SECTION 11.01    Appointment and Authority ....................................................82
    SECTION 11.02    Rights as a Lender.................................................................83
    SECTION 11.03    Exculpatory Provisions ..........................................................83
    SECTION 11.04    Reliance by Administrative Agent...........................................84
    SECTION 11.05    Delegation of Duties .............................................................84
    SECTION 11.06    Resignation of the Administrative Agent .................................85
    SECTION 11.07    Non-Reliance on Administrative Agent and Other Lenders........85
    SECTION 11.08    No Other Duties, Etc.............................................................86
    SECTION 11.09    Administrative Agent May File Proof of Claims........................86
    SECTION 11.10    Collateral Matters.................................................................86

ARTICLE XII  .............................................................**Error! Bookmark not defined.**

    SECTION 12.01    Guaranty...............................................................................87
    SECTION 12.02    Guaranty of Payment ............................................................88
    SECTION 12.03    No Discharge or Diminishment of Loan Guaranty....................88
    SECTION 12.04    Defenses Waived ..................................................................88
    SECTION 12.05    Rights of Subrogation; Subordination of Intercompany Indebtedness......89
    SECTION 12.06    Continuing Guarantee; Discharge Only Upon Payment in Full; Reinstatement; Stay of Acceleration..........................................90
    SECTION 12.07    Information ...........................................................................91
    SECTION 12.08    Maximum Liability ................................................................91
    SECTION 12.09    Contribution .........................................................................91
    SECTION 12.10    Liability Cumulative .............................................................92

ARTICLE XIII  MISCELLANEOUS ...................................................................................92

    SECTION 13.01    Amendments ........................................................................92
    SECTION 13.02    Notices; Effectiveness; Electronic Communications................93
    SECTION 13.03    No Waiver; Cumulative Remedies; Enforcement......................95
    SECTION 13.04    Expenses; Indemnity; Damage Waiver; Costs and Expenses...................96
    SECTION 13.05    Payments Set Aside ..............................................................97
    SECTION 13.06    Successors and Assigns.........................................................98
    SECTION 13.07    Treatment of Certain Information; Confidentiality...................101
    SECTION 13.08    Right of Setoff....................................................................102
    SECTION 13.09    Interest Rate Limitation .......................................................102
    SECTION 13.10    Counterparts; Integration; Effectiveness................................103

iv

**TABLE OF CONTENTS**
(continued)

**Page**

SECTION 13.11    Survival of Representations and Warranties ............................................ 103
SECTION 13.12    Severability ............................................................................................ 103
SECTION 13.13    Replacement of Lenders ......................................................................... 103
SECTION 13.14    GOVERNING LAW; JURISDICTION .................................................. 104
SECTION 13.15    WAIVER OF JURY TRIAL .................................................................... 105
SECTION 13.16    No Advisory or Fiduciary Responsibility .............................................. 105
SECTION 13.17    Electronic Execution of Assignments and Certain Other Documents ..... 106
SECTION 13.18    USA PATRIOT Act ................................................................................ 106

Schedules:

| | |
|---|---|
| 1.01A | Chapter 11 Cases |
| 1.01B | Guarantors |
| 2.01 | Commitments |
| 4.01 | Initial Approved Budget |
| 5.06 | Litigation |
| 5.12(c) | Pension Plan |
| 5.13 | Subsidiaries |
| 5.19 | Chief Executive Office |
| 5.23 | Prepetition Obligations |
| 13.02 | Notice Addresses |

Exhibits:

| | |
|---|---|
| A | Form of Assignment and Assumption |
| B | Form of Compliance Certificate |
| C | Form of Loan Notice |
| D | Form of Note |

**DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** dated as of March [__], 2018 (as amended, supplemented or otherwise modified, renewed or replaced from time to time, the "Agreement") among (i) **THE WEINSTEIN COMPANY HOLDINGS LLC,** a Delaware limited liability company and debtor-in-possession under Chapter 11 of the Bankruptcy Code, (ii) **THE WEINSTEIN COMPANY LLC,** a Delaware limited liability company and debtor-in-possession under Chapter 11 of the Bankruptcy Code, (iii) **TWC DOMESTIC LLC,** a Delaware limited liability company and debtor-in-possession under Chapter 11 of the Bankruptcy Code, (iv) the **GUARANTORS** referred to herein and debtors-in-possession under Chapter 11 of the Bankruptcy Code, (v) the **LENDERS** referred to herein and (vi) **MUFG UNION BANK, N.A.,** as the Administrative Agent.

## INTRODUCTORY STATEMENT

Terms not otherwise defined above or in this Introductory Statement are as defined in Article 1 hereof or as defined elsewhere herein.

On March 19, 2018 (the "Petition Date") the Loan Parties commenced Chapter 11 Cases by filing a voluntary petition for reorganization under the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and each of the Loan Parties continues to operate its business and manage its properties as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

Prior to the Petition Date, certain Lenders provided financing to TWC Domestic, pursuant to the Second Amended and Restated Credit Agreement, dated as of September 30, 2013 (as amended, modified or supplemented through the Petition Date, the "Prepetition Credit Agreement"), among TWC Domestic, the financial institutions from time to time party thereto (the "Prepetition Lenders") and MUFG Union Bank, N.A., as administrative agent (in such capacity, the "Prepetition Agent").

TWC Domestic has requested that the Lenders provide a priming (only with respect to the Prepetition Loans), senior secured, superpriority credit facility to the Borrowers to fund the working capital requirements of the Loan Parties and for other purposes permitted under this Agreement during the pendency of the Chapter 11 Cases.

To provide assurance for the repayment of the Loans and the other Obligations hereunder, each Loan Party will, among other things, provide or cause to be provided to the Administrative Agent (for the benefit of the Secured Parties), a security interest in and Lien upon substantially all its existing and after acquired personal property pursuant to Article IX.

Subject to the terms and conditions set forth herein, the Administrative Agent is willing to act as agent for the Lenders and each Lender is willing to make certain loans to the Borrowers after the Petition Date, each as provided herein.

Accordingly, in consideration of the premises and mutual covenants contained herein, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**SECTION 1.01**      <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the respective meanings set forth below:

"<u>Acceptable Plan</u>" shall mean a plan of reorganization or liquidation for each of the Chapter 11 Cases, acceptable in form and substance to the Administrative Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders, that (i) provides for the termination of the unused Commitments under this Agreement, (ii) provides for the indefeasible payment in full in cash of the Obligations and the Prepetition Obligations, in exchange for full discharge thereof, on or prior to the effective date of the plan as a condition to the effectiveness thereof, and (iii) contains releases and other exculpatory provisions for the Administrative Agent, the Lenders, the Prepetition Agent and the Prepetition Lenders in form and substance satisfactory to the Administrative Agent and the Required Lenders (as to the release and exculpation related to this Agreement and the other Loan Documents) and the Prepetition Agent and the Prepetition Required Lenders (as to the release and exculpation related to the Prepetition Credit Agreement and other Prepetition Loan Documents).

"<u>Account Bank</u>" shall mean Union Bank, <u>provided</u>, that OneWest Bank FSB shall be the Account Bank with respect to the Netflix Collection Account.

"<u>Account Control Agreement</u>" shall mean an account control agreement in form and substance reasonably satisfactory to the Administrative Agent, as amended, supplemented or otherwise modified, renewed or replaced from time to time in accordance with the terms thereof and hereof.

"<u>Administrative Agent</u>" shall mean Union Bank, in its capacity as agent for the Lenders hereunder, or such successor Administrative Agent as may be appointed pursuant to <u>Section 11.06</u> hereof.

"<u>Administrative Agent's Office</u>" shall mean the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 13.02</u>, or such other address or account as the Administrative Agent may from time to time notify to the Borrowers and the Lenders.

"<u>Affiliate</u>" shall mean any Person, which, directly or indirectly, is in control of, is controlled by, or is under common control with, another Person.  For purposes of this definition, a Person shall be deemed to be "controlled by" another Person if such latter Person possesses, directly or indirectly, power either to direct or cause the direction of the management and policies of such controlled Person whether by contract or otherwise.

"<u>Applicable Margin</u>" shall mean (i) in the case of LIBO Rate Loans, 9.50% per annum and (ii) in the case of Base Rate Loans, 8.50% per annum.

"<u>Applicable Percentage</u>" shall mean, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Facility represented by such Lender's outstanding Commitment and Loans at such time.  The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on <u>Schedule 2.01</u> or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Approved Bidding Procedures" shall mean bidding procedures in form and substance reasonably acceptable to the Administrative Agent and the Prepetition Agent and approved by the Bankruptcy Court, which shall include, without limitation, a requirement that the Loan Parties solicit bids on their assets in bulk and by asset, specifically allowing bidders to bid solely on the film library comprising the Prepetition Collateral (without necessity to bid on the entirety of the Loan Parties' business or any other assets); provided, that such bidding procedures may not be amended or otherwise modified without the consent of the Administrative Agent and the Prepetition Agent.

"Approved Budget" shall mean the Initial Approved Budget; provided, that upon approval of any updated cash flow budget delivered pursuant to Section 6.02(l), such updated forecast shall thereafter constitute the "Approved Budget".

"Approved Sale" shall have the meaning given to such term in Section 6.18(a)(v) hereof.

"Approved Fund" shall mean any Person (other than a natural person) engaged in the ordinary course of its business in making, purchasing, holding, or investing in commercial loans and similar extensions of credit and that is administered or managed by a Lender or an Affiliate of a Lender (or an entity or an Affiliate of an entity that administers or manages a Lender).

"Arranger" shall mean Union Bank, as a lead arranger in connection with the Facility.

"Assignee Group" shall mean two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" shall mean an agreement substantially in the form of Exhibit A hereto, executed by the assignor, assignee and other parties as contemplated thereby.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy" or any successor statute, and all rules promulgated thereunder.

"Bankruptcy Court" shall have the meaning given to such term in the Introductory Statement hereof.

"Base Rate" shall mean for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1.00%, (b) the rate of interest in effect for such day as publicly announced from time to time by Union Bank as its "base rate" and (c) the LIBO Rate plus 1.00%.  The "base rate" is a rate set by Union Bank based upon various factors including Union Bank's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in such rate announced by Union Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" shall mean a Loan which bears interest based on the Base Rate.

"Bidding Procedures Motion" shall have the meaning given to such term in Section 4.01(h) hereof.

"Bidding Procedures Order" shall have the meaning given to such term in Section 6.18(a)(iii) hereof.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" shall mean any of Holdings, TWC and TWC Domestic, as the context may require, and "Borrowers" shall mean all of the foregoing.

"Borrowing" shall mean a borrowing consisting of simultaneous Loans of the same Type and, in the case of LIBO Rate Loans, having the same Interest Period, made by the Lenders pursuant to Section 2.01.

"Borrowing Base Collateral Account" shall mean the "Borrowing Base Collateral Account" under, and as defined in, the Prepetition Credit Agreement.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, either the State of California or the State of New York and, if such day relates to any LIBO Rate Loan, shall mean any such day that is also a London Banking Day.

"Capital Lease", as applied to any Person, shall mean any lease of any property (whether real, personal or mixed) by that Person as lessee which, in accordance with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"Carve-Out" shall have the meaning given to such term in the Financing Order.

"Cash Collateral" shall have the meaning given to such term in the Financing Order.

"Cash Equivalents" shall mean any of the following types of Investments, to the extent owned by a Loan Party or any of its Subsidiaries:

(a)      readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(b)      time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this

4

definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(c)     commercial paper issued by any Person organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(d)     Investments classified in accordance with GAAP as current assets of such Loan Party or any of its Subsidiaries in money market investment programs registered under the Investment Company Act of 1940 that are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition;

(e)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (b) above;

(f)     direct obligations of any State of the United States (or by any subdivision thereof to the extent such obligations are backed by the full faith and credit of such State), in each case (i) with maturities of not more than 360 days from the date of acquisition thereof and (ii) rated AAA by S&P or Aaa by Moody's; and

(g)     any other investments approved in writing by the Administrative Agent.

"Challenge" shall have the meaning given to such term in the Financing Order.

"Change in Law" shall mean the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any applicable law, rule, regulation or treaty; (b) any change in any applicable law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority; or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Chapter 11 Case" shall mean the case number identified across from each Loan Party's name set forth on Schedule 1.01A attached hereto and "Chapter 11 Cases" shall mean all of the foregoing.

"Chief Restructuring Officer" shall mean Robert Del Genio (individually or through his firm, FTI Consulting), or another individual or firm selected by Borrowers and

acceptable to the Administrative Agent, the Prepetition Agent, the Required Lenders and the Prepetition Required Lenders;

"Closing Date" shall mean the date on which the conditions precedent set forth in Section 4.01 hereof have been satisfied or waived in accordance with the terms hereof.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all of any Loan Party's right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such Loan Party (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, such Loan Party, and regardless of where located, including, but not limited to, all accounts, chattel paper, contract rights (including, without limitation, any rights of such Loan Party to demand and receive any committed but unfunded equity and the rights of such Loan Party under the Loan Documents), copyrights, patents, trademarks, trade names, documents (including any Hedge Agreements), equipment, fixtures, general intangibles, goods, goodwill, instruments, insurance policies, intercompany obligations, inventory, investment property, machinery, partnership and joint venture interests, cash or cash equivalents, letters of credit, letter-of-credit rights and supporting obligations, deposit accounts (including the Collateral Accounts) and all items on deposit therein or otherwise held in or credited thereto, commercial tort claims, farm products, and all accessions to, substitutions for and replacements, proceeds (including stock rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any general intangibles at any time evidencing or relating to any of the foregoing.  Only 65% of voting Equity Interests in any foreign Subsidiary shall be considered Collateral.

"Collateral Accounts" shall mean, collectively, the Borrowing Base Collateral Account, the Collection Account, the Participations and Residuals Reserve Account, the Escrow Account, the Netflix Collection Account and the HSBC Collection Account and any other account subject to an Account Control Agreement pursuant to the Prepetition Credit Agreement.

"Collection Account" shall mean the "Collection Account" under, and as defined in, the Prepetition Credit Agreement.

"Collection Proceedings" shall have the meaning given to such term in Section 6.20(a).

"Commitment" shall mean as to each Lender, its obligation to make Loans to the Borrowers pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement, and "Commitments" shall mean the aggregate Commitments of all Lenders.

"Committee" shall mean the official statutory unsecured creditors' committee, if any, appointed in the Chapter 11 Cases.

"Competitor" shall mean a Person (or a direct or indirect Subsidiary of such Person) that competes with TWC or any of TWC's Affiliates whose primary business is the development, production, marketing, distribution and/or exploitation of motion pictures, provided, that an institutional investor that (x) invests in media and entertainment companies that are Competitors or direct or indirect Subsidiaries of Competitors and (y) is not, directly or indirectly, actively involved in the management of the business operations or control of such Competitor shall not be considered a Competitor for purposes of this Agreement.

"Compliance Certificate" shall mean a certificate substantially in the form of Exhibit B hereto.

"Consolidated Subsidiaries" shall mean all Subsidiaries of a Person which are required or permitted to be consolidated with such Person for financial reporting purposes in accordance with GAAP.

"Contractual Obligation" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Debtor Relief Laws" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Default Rate" shall mean, when used with respect to Obligations, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin for Base Rate Loans plus (iii) 3.00% per annum; provided, however, that with respect to a LIBO Rate Loan, until the end of the applicable Interest Period the Default Rate shall be an interest rate equal to the interest rate (including the Applicable Margin) otherwise applicable to such LIBO Rate Loan plus 3.00% per annum.

"Defaulting Lender" shall mean any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within two (2) Business Days of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, unless the subject of a good faith dispute, or (c) has notified the Administrative Agent, any Lender (subject to such Lender having given notice thereof to the Administrative Agent) or any Borrower (subject to such Borrower having given notice thereof to the Administrative Agent) in writing that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder, (d) has failed, within two (2) Business Days after request by the

7

Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations hereunder, or (e) after the date of this Agreement, has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in such Lender or any direct or indirect parent company thereof by a Governmental Authority. In the event that the Administrative Agent and each Borrower each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to become a Defaulting Lender, then on such date such Lender shall thereafter no longer constitute a Defaulting Lender hereunder (unless and until such Lender again becomes a Defaulting Lender).

"<u>Delinquent Party</u>" shall mean any third party who has failed to make a material payment when due to any Loan Party of monies comprising Prepetition Collateral and has been so identified in a Request for Delinquency Proceeding, and "Delinquent Parties" shall mean all of the foregoing.

"<u>Direction to Pay</u>" shall have the meaning given to such term in the Prepetition Credit Agreement.

"<u>Disposition</u>" shall mean any transaction, or series of related transactions, pursuant to which a Loan Party or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"<u>Dollars</u>" and "<u>$</u>" shall mean lawful money of the United States of America.

"<u>Domestic Distribution Agreement</u>" shall mean (i) each Domestic Output Agreement and (ii) any other distribution agreement, license agreement or exhibition contract between a Loan Party, as licensor, and a Domestic Distributor, as licensee, with respect to the Domestic Distribution Rights relating to one or more Pictures included in the Collateral in the Domestic Territory.

"<u>Domestic Distribution Rights</u>" shall mean (i) all rights to distribute, market, exploit, and promote a Picture, the trailers therefor and other advertising materials in connection therewith, excerpts and clips therefrom, throughout the Domestic Territory, in all media now known or hereafter devised, in any and all languages and versions (including dubbed, subtitled and narrated) in all sizes and gauges of film, tape and other material now known or hereafter devised, including, without limitation, all forms of theatrical and non-theatrical distribution and exploitation, all forms of home video distribution and exploitation (including, without limitation, Blu-Ray, DVD, videocassettes, videodiscs and similar audio-visual devices or methods of delivery whereby an authorized permanent copy is made available to the consumer), and all forms of television distribution, regardless of the delivery or payment system (if any) involved, and all exploitation over the internet via all forms including those forms of exploitation

commonly known as SVOD, AVOD, TVOD, free on demand and electronic sell through, (ii) all proceeds of the rights described in clause (i) and (iii) the exclusive rights, to the full extent that a Loan Party has such rights, to collect all royalties, fees, levies and other revenues arising from any statute or other governmental regulation in connection with, directly or indirectly, any use of a Picture pursuant to any exercise of the Domestic Distribution Rights, including but not limited to the recording and/or retransmission of each Picture by any means now known or hereafter devised.

"Domestic Distributor" shall mean any entity that a Loan Party engages to distribute, license or otherwise exploit any Domestic Distribution Rights pursuant to a Domestic Distribution Agreement.

"Domestic Output Agreement" shall mean the Netflix Agreement.

"Domestic Territory" shall mean the United States and its territories and possessions.

"Eligible Assignee" shall mean any Person that is not a Competitor or an Industry Related Party and meets the requirements to be an assignee under Section 13.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 13.06(b)(iii)).

"Environmental Laws" shall mean any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements with any applicable Governmental Authority or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems as now or hereafter in effect.

"Environmental Liability" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of a Loan Party or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" shall mean shares of the capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person or any warrants, options or other rights to acquire such interests.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as heretofore and hereafter amended, as codified at 29 U.S.C. § 1001 et seq. and the regulations promulgated thereunder.

"ERISA Affiliate" shall mean each Person (as defined in Section 3(9) of ERISA) which is treated as a single employer with any of the Loan Parties under Section 414(b), (c), (m) or (o) of the Code.

"Escrow Account" shall mean the "Escrow Account" as defined in the Escrow Agreement.

"Escrow Agent" shall mean Union Bank and any successor thereto.

"Escrow Agreement" shall mean the Third Amended and Restated Escrow Agreement dated as of September 30, 2013 among TWC Domestic, TWC, the Prepetition Agent and the Escrow Agent, as the same may be amended, supplemented or otherwise modified, renewed or replaced from time to time in accordance with the terms hereof and thereof.

"Event of Default" shall have the meaning given to such term in Article VIII hereof.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of a Loan Party hereunder, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, or by any jurisdiction solely as a result of a present or former connection between such recipient and such jurisdiction (other than any such connection arising solely from such recipient having executed, delivered or performed its obligations or received a payment under, or enforced, any of the Loan Documents), (b) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction, (c) any backup withholding Tax that is required by the Code to be withheld from amounts payable to a Lender that has failed to comply with clause (A) or (B) of Section 3.01(e)(ii), as applicable, (d) any Taxes imposed pursuant to FATCA, and (e) other than in the case of a Lender that is an assignee pursuant to a request by any Borrower under Section 13.13, any withholding Tax that (i) is required to be imposed on amounts payable to such Lender pursuant to the Laws in force at the time such Lender becomes a party hereto (or designates a new Lending Office) except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from such Loan Party with respect to such withholding Tax pursuant to Section 3.01(a)(i) or (ii), or (ii) is attributable to such Lender's failure or inability (other than as a result of a Change in Law) to comply with clause (A) or (B) of Section 3.01(e)(ii).

"Facility" shall mean at any time, the aggregate amount of the Lenders' Commitments at such time.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as in effect on the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and any applicable Treasury regulations promulgated thereunder or official interpretation thereof.

"Federal Funds Rate" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on

the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"Final Order" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Administrative Agent and the Required Lenders (as to this Facility) and the Prepetition Agent and Prepetition Required Lenders (as to the use of Cash Collateral and the provision of adequate protection), and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless the Administrative Agent and the Prepetition Agent waive such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, provides for the superpriority (to the extent provided for herein and therein) of the Administrative Agent's and the Lenders' claims, authorizes the use by the Loan Parties of their Cash Collateral in accordance with the terms of this Agreement and provides for adequate protection of the Liens and claims of the Prepetition Secured Parties under the Prepetition Credit Agreement.

"Financing Order" shall mean, the Interim Order or the Final Order, whichever is in effect at the time of any determination made hereunder, and "Financing Orders" shall mean the Interim Order and the Final Order, collectively.

"Foreign Distribution Agreement" shall mean any distribution agreement, license agreement or exhibition contract between a Loan Party, as licensor, and a Foreign Distributor, as licensee, with respect to the Foreign Distribution Rights relating to one or more Pictures included in the Collateral.

"Foreign Distribution Rights" shall mean (i) all rights to distribute, market, exploit, and promote a Picture, the trailers therefor and other advertising materials in connection therewith, excerpts and clips therefrom, outside the Domestic Territory, in all media now known or hereafter devised, in any and all languages and versions (including dubbed, subtitled and narrated) in all sizes and gauges of film, tape and other material now known or hereafter devised, including, without limitation, all forms of theatrical and non-theatrical distribution and exploitation, all forms of home video distribution and exploitation (including, without limitation, Blu-Ray, DVD, videocassettes, videodiscs and similar audio-visual devices or methods of delivery whereby an authorized permanent copy is made available to the consumer), and all forms of television distribution, regardless of the delivery or payment system (if any) involved, and all exploitation over the internet via all forms including those forms of exploitation commonly known as SVOD, AVOD, TVOD, free on demand and electronic sell through, (ii) all proceeds of the rights described in clause (i) and (iii) the exclusive rights, to the full extent that a Loan Party has such rights, to collect all royalties, fees, levies and other revenues arising from

11

any statute or other governmental regulation in connection with, directly or indirectly, any use of a Picture pursuant to any exercise of the Foreign Distribution Rights, including but not limited to the recording and/or retransmission of each Picture by any means now known or hereafter devised.

"Foreign Distributor" shall mean any entity that a Loan Party engages to distribute, license or otherwise exploit any Foreign Distribution Rights pursuant to a Foreign Distribution Agreement.

"Foreign Lender" shall mean any Lender that is organized under the Laws of a jurisdiction other than that in which the Borrowers are resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"GAAP" shall mean generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" shall mean each of the entities set forth on Schedule 1.01B hereto.

"Guaranty" shall mean, as to any Person:  (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation of another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, that the term Guaranty shall not include endorsements for collection or collections for deposit, in either case in the ordinary course of business; or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of

such Indebtedness to obtain any such Lien).  The amount of any Guaranty shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guaranty is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Hazardous Materials" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedge Agreement" shall mean any agreement with respect to any swap, cap, collar, hedge, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Hedge Termination Value" shall mean, in respect of any one or more Hedge Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreements, (a) for any date on or after the date such Hedge Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedge Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreements (which may include a Lender or any Affiliate of a Lender).

"Holdings" shall mean The Weinstein Company Holdings LLC, a Delaware limited liability company.

"HSBC Collection Account" shall mean the "HSBC Collection Account" under, and as defined in, the Prepetition Credit Agreement.

"Indebtedness" shall mean, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    net obligations of such Person under any Hedge Agreement;

13

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than 120 days after the date on which such trade account was created);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all obligations of such Person under Capital Leases and any financing lease involving substantially the same economic effect;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)     all Guaranties of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person (A) shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person and (B) shall not include (i) any non-refundable advance made to such Person by any Domestic Distributor or Foreign Distributor in connection with the production, distribution or sale of any Picture included in the Collateral or (ii) customary advances from Laboratories or other vendors made in the ordinary course of business in connection with services rendered or to be rendered to such Person.  The amount of any net obligation under any Hedge Agreement on any date shall be deemed to be the Hedge Termination Value thereof as of such date.

"Indemnitee" shall have the meaning given to such term in Section 13.04(b) hereof.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes and Other Taxes.

"Industry Related Party" shall mean (1) a person that (x) reports on the entertainment industry as part of its primary business (including without limitation Internet search engines and Internet sites providing motion picture-related content or information, *e.g.*, Google, Yahoo, Box Office Mojo, etc.), (y) is not a Competitor or a direct or indirect Subsidiary of a Competitor and (z) does not actively participate, directly or indirectly, in the management or control of any Competitor (for clarification purposes, an institutional investor that invests in media and entertainment companies but (A) does not, directly or indirectly, control any news service or other entity that provides reports to the entertainment industry as part of its primary business, (B) does not, directly or indirectly, actively participate in the management of such companies and (C) which is not a Competitor or a direct or indirect Subsidiary of a Competitor and which does not actively participate, directly or indirectly, in the management or control of any Competitor, shall not be considered an Industry Related Party under this clause (1)),

14

(2) owners of equity interests in Miramax, (3) Yucaipa Companies, LLC and its Affiliates, (4) any monoline insurance company, (5) Guggenheim Partners or any other fund managed by the Guggenheim family and (6) prior to the occurrence of an Event of Default, any distress debt, special situation or so-called "vulture capital" fund.

"Information" shall have the meaning given to such term in Section 13.07 hereof.

"Initial Approved Budget" shall have the meaning set forth in Section 4.01(c) hereof.

"Interest Payment Date" shall mean, as to any Loan, the last Business Day of each month (commencing on March 30, 2018) and the Termination Date.

"Interest Period" shall mean as to any LIBO Rate Loan, the period commencing on the date of such Loan or the last day of the preceding Interest Period and ending on the numerically corresponding day (or if there is no corresponding day, the last day) in the calendar month that is one (1), two (2), three (3), six (6) or, if available from all Lenders and consented to by all Lenders, twelve (12) months thereafter as a Borrower may elect; provided, however, that (i) if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such next succeeding Business Day would fall in the next calendar month, in which case, such Interest Period shall end on the next preceding Business Day and (ii) no Interest Period may be selected which would end later than the Termination Date.

"Interim Advance" shall mean $7,500,000.

"Interim Order" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing, in form and substance satisfactory to the Administrative Agent and the Required Lenders (as to this Facility) and the Prepetition Agent and Prepetition Required Lenders (as to the use of Cash Collateral and the provision of adequate protection), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes, on an interim basis, (i) the Loan Parties to execute and perform under the terms of this Agreement, incur Loans in an aggregate principal amount not to exceed the Interim Advance prior to the date of entry of the Final Order and use their Cash Collateral in accordance with the terms of this Agreement and (ii) the Guarantors to execute and perform under the terms of this Agreement.

"Investment" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guaranty or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of related transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Investment Bank" shall mean Moelis & Company (or another investment bank selected by Borrowers and acceptable to the Administrative Agent, the Prepetition Agent, the Required Lenders and the Prepetition Required Lenders) as investment bank.

"IRS" shall mean the United States Internal Revenue Service.

"Laboratory" shall mean any laboratory reasonably acceptable to the Administrative Agent (with Technicolor, Deluxe and NT Audio and their respective Affiliates hereby being pre-approved) which is located in the United States and is a party to a Pledgeholder Agreement or a Laboratory Access Letter.

"Laboratory Access Letter" shall mean a letter agreement among (i) a Laboratory holding any elements (including data backups of work in progress) of any Qualifying Picture to which a Master Distributor has the right of access, (ii) a Master Distributor and (iii) the Prepetition Agent.

"Laws" shall mean, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" and "Lenders" shall mean the financial institutions whose names appear at the foot hereof and any assignee of a Lender pursuant to Section 13.06 hereof, and their respective successors.

"Lending Office" shall mean, with respect to any of the Lenders, the branch or branches (or affiliate or affiliates) from which such Lender's LIBO Rate Loans or Base Rate Loans, as the case may be, are made or maintained and for the account of which all payments of principal of, and interest on, such Lender's LIBO Rate Loans or Base Rate Loans are made, as notified to the Administrative Agent from time to time.

"LIBO Rate" shall mean the greater of (a) 1.50% and (b):

(i)       for any Interest Period with respect to a LIBO Rate Loan, the rate per annum equal to (x) the London Interbank Offered Rate or any successor thereto approved by the Administrative Agent ("LIBOR"), as published by Reuters (or other commercially available source providing quotations of LIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two London Banking Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or (y) if such rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted and with a term equivalent to such Interest Period would be offered by the Administrative Agent's London Branch to major banks in the London interbank Eurodollar

market at their request at approximately 11:00 a.m. (London time) two London Banking Days prior to the commencement of such Interest Period; and

(ii)   for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to (x) LIBOR, at approximately 11:00 a.m., London time determined two London Banking Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (y) if such published rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the Base Rate Loan being made or maintained and with a term equal to one month would be offered by the Administrative Agent's London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination.

"LIBO Rate Loan" shall mean a Loan that bears interest at a rate based on the LIBO Rate.

"Lien" shall mean any mortgage, copyright mortgage, pledge, security interest, encumbrance, lien or charge of any kind whatsoever (including, without limitation, any conditional sale or other title retention agreement, any agreement to grant a security interest at a future date, any lease in the nature of security, and the filing of, or agreement to give, any financing statement under the UCC of any jurisdiction); provided, however, that this term shall not include contractual agreements which do not afford security of the type described in this definition.

"Loan" shall have the meaning given to such term in Section 2.01 hereof.

"Loan Documents" shall mean this Agreement, the Notes (if any), the Financing Orders, and any other document executed in connection with the Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"Loan Guaranty" shall mean the Guaranty provided for by Article XII of this Agreement.

"Loan Notice" shall mean a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of LIBO Rate Loans, in each case, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit C hereto.

"Loan Parties" shall mean, collectively, the Borrowers and the Guarantors and their respective successors and permitted assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.

"London Banking Day" shall mean any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank LIBOR market.

"Margin Stock" shall be as defined in Regulation U of the Board.

"Master Distributor" shall mean each of (i) TWC and (ii) Weinstein Global Film Corp., each in its capacity as "Master Distributor" under the Master Distribution Agreement and each of their respective successors and assigns in such capacity. Each reference herein to the "Master Distributor" shall be deemed to mean a reference to the relevant Master Distributor.

"Master Distribution Agreement" shall mean that certain Second Amended and Restated Master Distribution Agreement, dated as of September 30, 2013, between TWC Domestic and TWC, as amended, supplemented or modified from time to time in accordance with the terms thereof and hereof.

"Master Distributor Default" shall have the meaning given to such term in the Master Distribution Agreement.

"Master Services Agreement" shall mean that certain Second Amended and Restated Master Services Agreement, dated as of September 30, 2013, between TWC Domestic and TWC, as amended, supplemented or modified from time to time in accordance with the terms thereof and hereof.

"Material Adverse Effect" shall mean any change or effect that (a) has a materially adverse effect on the business, assets, properties, operations or financial condition of the Loan Parties, taken as a whole, or any Borrower (other than (i) general economic conditions and events or circumstances which are generally applicable to the industries in which the Loan Parties operate and which have not disproportionately, adversely and materially affected the Loan Parties and (ii) changes due to the performance of any Picture included in the Collateral), (b) materially impairs the legal right, power or authority of the Loan Parties, taken as a whole, or any Borrower to perform their or its respective obligations under any material provision of the Loan Documents or (c) materially impairs the validity or enforceability of, or materially impairs the rights, remedies or benefits available to the Administrative Agent for the benefit of the Secured Parties under any material provision of the Loan Documents.

"Moody's" shall mean Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" shall mean any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any of the Loan Parties or any of their ERISA Affiliates makes or is obligated to make contributions or has any outstanding liability, or during the preceding five plan years, has made or been obligated to make contributions.

"Netflix" shall mean Netflix, Inc., a Delaware corporation.

"Netflix Agreement" shall mean, collectively, (i) the License Agreement for Internet Transmission dated as of January 23, 2012 between TWC and Netflix, (ii) the License Agreement for Internet Transmission No.2 (Shared Window Output) dated as of April 16, 2012 between TWC and Netflix, (iii) the License Agreement for Internet Transmission No.3 (Non-Qualifying Output) dated as of February 2, 2012 between TWC and Netflix, (iv) the License Agreement for Internet Transmission No. 4 dated as of August 12, 2013 between TWC and Netflix and (v) any other license or output agreement between TWC and Netflix approved by the Prepetition Agent prior to the date hereof or by the Prepetition Agent and the Administrative

Agent after the date hereof, in each case, as may be amended, supplemented or modified from time to time in accordance with the terms hereof and thereof.

"<u>Netflix Collection Account</u>" shall mean the "Netflix Collection Account" under, and as defined in, the Prepetition Credit Agreement.

"<u>Note</u>" shall mean a promissory note made by the Borrowers in favor of a Lender evidencing Loans made by such Lender, substantially in the form of <u>Exhibit D</u> hereto.

"<u>Notice of Assignment</u>" shall have the meaning given to such term in the Prepetition Credit Agreement.

"<u>Obligations</u>" shall mean the obligation of the Loan Parties to make due and punctual payment of (i) principal of and interest on the Loans, costs and attorneys' fees and all other monetary obligations of the Borrowers to the Administrative Agent, the Arranger or any Lender under this Agreement or the Notes and (ii) amounts payable to each Account Bank in connection with any bank account maintained by any Loan Party at the Account Bank or any other banking services provided to such Loan Party by the Account Bank.

"<u>Organizational Documents</u>" shall mean, with respect to any Person, as applicable, such Person's certificate of incorporation, articles of incorporation, bylaws, certificate of formation, articles of organization, limited liability company agreement, management agreement, operating agreement, shareholder agreement, partnership agreement or similar document or other agreement governing such Person's existence, organization or management or concerning the disposition of Equity Interests of such Person or voting rights among such Person's owners.

"<u>Other Receivables Contracts</u>" shall mean (i) agreements with respect to receivables relating to domestic and foreign music publishing and soundtrack rights, domestic and foreign sponsorship rights and product placement rights, in each case, included in the Prepetition Collateral and (ii) any other material agreements with respect to receivables relating to, *inter alia*, domestic and foreign music publishing and soundtrack rights, domestic and foreign sponsorship rights and product placement rights.

"<u>Other Taxes</u>" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies imposed by a taxing authority arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"<u>Outstanding Amount</u>" shall mean with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans, as the case may be, occurring on such date.

"<u>Participant</u>" shall have the meaning set forth in <u>Section 13.06(d)</u> hereof.

"<u>Participant Register</u>" shall have the meaning set forth in <u>Section 13.06(f)</u> hereof.

"Participations" shall mean any amount payable to any third parties who furnish rights and/or render services in connection with any Pictures included in the Collateral, whether characterized as a deferment, gross participation, net participation, profit participation, contingent compensation, box office bonus, award or credit bonus or otherwise, which amount is based, dependent, computed, or payable, in whole or in part, on the net or gross receipts, earnings, or proceeds derived from such Pictures or any percentage of the foregoing or is payable at such time as any such receipts, earnings or proceeds equal a specified amount, or any similar type of payment or the economic equivalent thereof.

"Participations and Residuals Reserve Account" shall mean the "Participations and Residuals Reserve Account" under, and as defined in, the Prepetition Credit Agreement.

"PBGC" shall mean the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" shall mean any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Section 302 or Title IV of ERISA or Section 412 of the Code and is sponsored or maintained by any of the Loan Parties or any of their ERISA Affiliates or to which any of the Loan Parties or any of their ERISA Affiliates contributes or has an obligation to contribute or has any outstanding liability or, in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, to which any of the Loan Parties or any of their ERISA Affiliates has made contributions at any time during the immediately preceding five plan years.

"Permitted Encumbrances" shall mean Liens permitted under Section 7.01 hereof.

"Permitted Third-Party DIP Liens" shall mean security interests in and Liens on any Permitted Third-Party DIP Collateral in favor of the providers of any Permitted Third-Party DIP Indebtedness and their Related Parties to secure the obligations of one or more Loan Parties in respect of such Permitted Third-Party DIP Indebtedness, which such security interests or Liens may have priority over any Liens on Permitted Third-Party DIP Collateral securing the Obligations.

"Permitted Third-Party DIP Indebtedness" shall mean additional senior secured, superpriority debtor-in-possession Indebtedness of one or more Loan Parties in an aggregate principal amount not in excess of $10,000,000, which such Indebtedness may be secured solely by Permitted Third-Party DIP Liens and may have superpriority administrative claim status.

"Permitted Third-Party DIP Collateral" shall mean all of Weinstein Television LLC's right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, Weinstein Television LLC (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, Weinstein Television LLC, and regardless of where located.

"Permitted Variance" shall have the meaning given to such term in Section 7.23 hereof.

"Person" shall mean any natural person, corporation, division of a corporation, limited liability company, partnership, trust, joint venture, association, company, estate, unincorporated organization or government or any agency or political subdivision thereof.

"Petition Date" shall have the meaning given to such term in the Introductory Statement hereof.

"Physical Materials" shall mean, with respect to any Picture, all tangible personal property relating to such Picture, including, without limitation, all exposed film, developed film, positives, negatives, prints, positive prints, answer prints, magnetic tapes and other digital or electronic storage media, special effects, preparing materials (including interpositives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements), sound tracks, cutouts, trims and any and all other physical properties of every kind and nature relating to such Picture whether in completed form or in some state of completion, and all masters, duplicates, drafts, versions, variations and copies of each thereof, in all formats whether on film, videotape, disk or otherwise and all music sheets and promotional materials relating to such Picture.

"Picture" shall mean any motion picture, film or other audiovisual product, whether recorded on film, videotape, cassette, cartridge, disc or on or by any other means, method, process or device whether now known or hereafter developed.

"Plan" shall mean any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any of the Loan Parties or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any of their ERISA Affiliates.

"Platform" shall have the meaning given to such term in Section 6.02 hereof.

"Pledgeholder Agreement" shall mean a laboratory pledgeholder agreement among a Loan Party, a third-party creditor of TWC or one of its Affiliates, a Domestic Distributor or Foreign Distributor (as applicable) and one or more Laboratories.

"Prepetition" shall mean the time period ending immediately prior to the filing of the Chapter 11 Case.

"Prepetition Agent" shall have the meaning given to such term in the Introductory Statement hereof.

"Prepetition Collateral" shall have the meaning given to the term "Pre-Petition Collateral" in the Financing Order.

"Prepetition Credit Agreement" shall have the meaning given to such term in the Introductory Statement hereof.

"Prepetition Lenders" shall have the meaning given to such term in the Introductory Statement hereof.

21

"Prepetition Loans" shall mean the "Loans" under, and as defined in, the Prepetition Credit Agreement.

"Prepetition Loan Documents" shall mean the "Loan Documents" under, and as defined in, the Prepetition Credit Agreement.

"Prepetition Obligations" shall mean the "Obligations" under, and as defined in, the Prepetition Credit Agreement.

"Prepetition Required Lenders" shall mean the "Required Lenders" under, and as defined in, the Prepetition Credit Agreement.

"Prepetition Secured Parties" shall mean the "Secured Parties" under, and as defined in, the Prepetition Credit Agreement.

"Prepetition Third-Party Indebtedness" shall mean, with respect to any Loan Party, Indebtedness of such Loan Party owing to a third party other than the Prepetition Agent and the other Prepetition Secured Parties as of the Petition Date.

"Prepetition Third-Party Liens" shall mean security interests in and Liens on the Collateral in favor of third party creditors other than the Prepetition Agent and the other Prepetition Secured Parties that as of the Petition Date, were, in each case, valid, enforceable and nonavoidable.

"Qualifying Picture" shall mean a "Qualifying Picture" under, and as defined in, the Prepetition Credit Agreement.

"Quiet Enjoyment" shall have the meaning given to such term in Section 9.11 hereof.

"Register" shall have the meaning given to such term in Section 13.06(c) hereof.

"Regulations T, U and X" shall mean Regulations T, U and X, respectively, of the Board as each is from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Parties" shall mean with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, attorneys, representatives and advisors of such Person and of such Person's Affiliates.

"Request for Delinquency Proceeding" shall have the meaning set forth in Section 6.20.

"Required Lenders" shall mean, as of any date of determination, Lenders holding more than 50% of the sum of the (a) Total Outstandings and (b) aggregate unused Commitments; provided that the unused Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

22

"Responsible Officer" shall mean, (i) with respect to TWC Domestic, the Chief Restructuring Officer, chief financial officer, executive vice president, chief operating officer or president, (ii) with respect to TWC (including TWC in its capacity as a Master Distributor), the Chief Restructuring Officer, the president, chief executive officer, treasurer, chief financial officer, executive vice president or chief operating officer, (iii) with respect to Holdings, the Chief Restructuring Officer, executive vice president, chief operating officer, chief financial officer, president or treasurer, (iv) with respect to each Guarantor (including Weinstein Global Film Corp. in its capacity as a Master Distributor), the Chief Restructuring Officer, executive vice president, chief operating officer, chief financial officer, president or treasurer.  Any document delivered hereunder that is signed by a Responsible Officer of any Borrower, any Guarantor or any Master Distributor, as applicable, shall be conclusively presumed to have been authorized by all necessary limited liability company and/or other action on the part of such Person and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Person.

"Restricted Payment" shall mean, with respect to any Person (i) any distribution, cash dividend or other direct or indirect payment on account of shares of any Equity Interest of such Person, (ii) any redemption or other acquisition, re-acquisition or retirement by such Person of any Equity Interests of such Person or any Affiliate thereof, now or hereafter outstanding, and (iii) any payment made by such Person to retire, or obtain the surrender of, any outstanding warrants, puts or options or other rights to purchase or otherwise acquire any Equity Interest of such Person or any Affiliate thereof, now or hereafter outstanding.  "Restricted Payment" shall not include payments to any Master Distributor under the Master Distribution Agreement or the Master Services Agreement.

"S&P" shall mean S&P Global Ratings and its successors.

"Sale" shall have the meaning given to such term in Section 4.01(h) hereof.

"Sale Motion" shall have the meaning given to such term in Section 4.01(h) hereof.

"Sale Order" shall have the meaning given to such term in Section 6.18(a)(v) hereof.

"Sale Process" shall have the meaning given to such term in Section 6.18(a) hereof.

"Scheduled Termination Date" shall mean the date that is 125 days after the Petition Date.

"Secured Party" or "Secured Parties" shall mean the Administrative Agent, the Arranger, the Lenders, and any other party which is secured by the Liens granted to Administrative Agent hereunder and under the Loan Documents from time to time pursuant to the terms hereof and thereof.

"Settlement Date" shall mean the final Friday of each calendar month.

"Settlement Report" shall mean a report (in a form agreed) to be delivered by the Administrative Agent to each of the Prepetition Agent and the Borrowers in accordance with Section 2.03(b) hereof.

"Specified Permitted Encumbrances" shall mean (i) Prepetition Third-Party Liens, (ii) Liens permitted under Sections 7.01(d) through (g) and (i) through (l) of the Prepetition Credit Agreement with respect to any Loan Party and (iii) Permitted Third-Party DIP Liens, in each case of clauses (i) and (ii), in existence on the Closing Date.

"Stalking Horse Bidder" shall have the meaning given to such term in Section 4.01(h) hereof.

"Subsidiary" shall mean with respect to any Person, any corporation, limited liability company, association, joint venture, partnership or other business entity (whether now existing or hereafter organized) of which at least a majority of the voting stock or other ownership interests having ordinary voting power for the election of directors (or the equivalent) is, at the time as of which any determination is being made, owned or controlled by such Person or one or more subsidiaries of such Person or by such Person and one or more subsidiaries of such Person.

"Tax" and "Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any taxing authority.

"Termination Date" shall mean the earliest to occur of (a) the Scheduled Termination Date (b) the date of acceleration of the Loans or termination of the Commitments following an Event of Default; (c) the date of termination of the Commitments in accordance with Section 2.04 hereof; (d) the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto; (e) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Administrative Agent and the Required Lenders; (f) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Administrative Agent and the Required Lenders; (g) the date of consummation of the sale of substantially all assets of the Loan Parties or the sale of substantially all assets of the Loan Parties comprising Prepetition Collateral and (h) the effective date of any Loan Party's plan of reorganization or liquidation confirmed in the Chapter 11 Cases.

"Threshold Amount" shall mean $1,000,000.

"Total Commitments" shall mean, at any time, the aggregate amount of the Commitments then in effect of all of the Lenders, as such aggregate amount shall be adjusted from time to time in accordance with the terms of this Agreement.

"Total Outstandings" shall mean the aggregate Outstanding Amount of all Loans.

"TWC" shall mean The Weinstein Company LLC, a Delaware limited liability company.

"TWC Domestic" shall mean TWC Domestic LLC, a Delaware limited liability company.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Base Rate or the LIBO Rate.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Union Bank" shall mean MUFG Union Bank, N.A. and its successors.

"United States" and "U.S." shall mean the United States of America.

"USA PATRIOT Act" shall mean the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended from time to time.

"Variance Report" shall have the meaning assigned to such term in Section 6.02(k).

**SECTION 1.02**      Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  The word "or" is not exclusive.  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organizational Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified, renewed or replaced (subject to any restrictions on such amendments, restatements, supplements, modifications, renewals or replacements set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or

regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)       In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)       Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

SECTION 1.03       Accounting Terms.

(a)       Generally.  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Financial statements and other information required to be delivered by the Borrowers pursuant to Section 6.01 shall be prepared in accordance with GAAP.  Except as otherwise expressly stated herein and subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the financial statements delivered pursuant to Section 6.01, as applicable; provided that the Initial Approved Budget, the Approved Budget, the Permitted Variance, the Variance Report and related information required to be delivered by the Borrowers may be prepared on a cash basis.

(b)       Changes in GAAP.  If at any time any change in GAAP after the date hereof would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrowers or the Required Lenders shall so request, then the Administrative Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

SECTION 1.04       Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

## ARTICLE II
## THE LOANS

SECTION 2.01       Loans.  Subject to the terms and conditions set forth herein, each Lender severally and not jointly agrees to make loans (each such loan, a "Loan") to the Borrowers from time to time, on any Business Day prior to the Termination Date, in an aggregate amount not to exceed at any time the amount of such Lender's Commitment.  Upon

the making by each Lender of a Loan hereunder, the Commitment of such Lender shall be permanently reduced by the aggregate principal amount of the Loan so made.  Amounts of Loans repaid or prepaid may not be reborrowed.  Loans may be Base Rate Loans or LIBO Rate Loans, as further provided herein.  The Borrowers shall be jointly and severally liable in respect of all amounts owing in respect of the Loans.

SECTION 2.02         Borrowings, Conversions and Continuations of Loans.

(a)         Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of LIBO Rate Loans shall be made upon the applicable Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of LIBO Rate Loans or of any conversion of LIBO Rate Loans to Base Rate Loans, and (ii) on the requested date of any Borrowing of Base Rate Loans; provided that if such Loan Notice with respect to any Borrowing of (x) LIBO Rate Loans is received after 11:00 a.m., such Loans will be made available to such Borrower on the fourth Business Day immediately following receipt of such Loan Notice and (y) Base Rate Loans is received after 11:00 a.m., such Loans will be made available to such Borrower on the Business Day immediately following receipt of such Loan Notice.  Each telephonic notice by such Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Loan Notice, appropriately completed and signed by a Responsible Officer of such Borrower.   Each Borrowing of, conversion to or continuation of LIBO Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof (in each case, so long as such amount is not greater than contemplated by the Approved Budget); provided that such continuation or conversion may be in a principal amount equal to the remaining aggregate principal amount of such Borrowing. Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof (in each case, so long as such amount is not greater than contemplated by the Approved Budget); provided that such continuation or conversion may be in a principal amount equal to the remaining aggregate principal amount of such Borrowing.   Each Loan Notice (whether telephonic or written) shall specify (i) whether such Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of LIBO Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto.  If such Borrower fails to specify a Type of Loan in a Loan Notice or if such Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans. If such Borrower requests a Borrowing of, conversion to, or continuation of LIBO Rate Loans in any such Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.  Notwithstanding anything to the contrary in this Agreement, no Borrowing shall be greater than the amount of total cash disbursements set forth in the Approved Budget through the end of the period set forth in the certificate of a Responsible Officer

delivered pursuant to Section 4.02(c)(ii), except to the extent necessary to comply with the borrowing minimums and multiples provided for above in this Section 2.02.

(b)     Following receipt of a Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Loans, and if no timely notice of a conversion or continuation is provided by such Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(a).  In the case of any Borrowing, each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Borrowing hereunder, Section 4.01), the Administrative Agent shall make all funds so received available to such Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of such Borrower on the books of Union Bank with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by such Borrower.  On the date of each Borrowing, each Lender that does not fund its Applicable Percentage of any Borrowing due to an asserted failure of any condition precedent to such Borrowing set forth in Section 4.02 to be satisfied shall give written notice to the Administrative Agent and such Borrower of such non-funding, which notice shall identify, with reasonable specificity, the condition precedent to such Borrowing which has not been satisfied on such date.

(c)     Except as otherwise provided herein, a LIBO Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan unless the Borrowers pay the breakage costs incurred in connection therewith pursuant to Section 3.05.  During the existence of a Default, no Loans may be requested as, converted to or continued as LIBO Rate Loans without the consent of the Required Lenders.

(d)     The Administrative Agent shall promptly notify the Borrowers and the Lenders of the interest rate applicable to any Interest Period for LIBO Rate Loans upon determination of such interest rate.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrowers and the Lenders of any change in Union Bank's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)     After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than five (5) Interest Periods in effect in respect of the Facility.

**SECTION 2.03**     Prepayments.

(a)     Optional.   Subject to the last sentence of this Section 2.03(a), the Borrowers may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; provided that: (A) such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three (3) Business Days prior to any date of prepayment of LIBO Rate Loans and (ii) on the date of

prepayment of Base Rate Loans; (B) any prepayment of LIBO Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof; and (C) any prepayment of Base Rate Loans shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBO Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage).  If such notice is given by the Borrowers, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a LIBO Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.  Each such prepayment shall be paid to the Lenders in accordance with their respective Applicable Percentages.  Any amounts so prepaid may not be reborrowed. Notwithstanding anything to the contrary contained in this Agreement, the Borrowers may rescind any notice of prepayment given under this Section 2.03(a) in anticipation of an Approved Sale if such Approved Sale is not consummated or is otherwise delayed; provided that the Borrowers shall promptly (but in any event within ten (10) Business Days after any such rescission) compensate each Secured Party for any loss, cost or expense incurred by such Secured Party and payable by the Borrowers hereunder as a result thereof.

(b)      Mandatory.  At least four (4) days prior to each Settlement Date, the Administrative Agent shall deliver a Settlement Report for the corresponding calendar month to each of the Prepetition Agent and the Borrowers.  Each of the Prepetition Agent and TWC Domestic shall provide their written consent to such Settlement Report no later than the day prior to such Settlement Date, and such consent from TWC Domestic shall be accompanied by delivery of a confirmatory Borrowing Base Certificate (as defined in the Prepetition Credit Agreement) for such month to each of the Administrative Agent and the Prepetition Agent, duly certified by a Responsible Officer of TWC Domestic; provided that the failure of TWC Domestic to (x) provide such written consent to such Settlement Report on or prior to the Settlement Date, or (y) deliver such confirmatory Borrowing Base Certificate, in each case, shall not prohibit the application of all amounts on deposit in the Collection Account in accordance with this clause (b).  On each such Settlement Date, as more fully set forth in the Settlement Report, (i) 50% (or, at the election of the Required Lenders, a lesser percentage) of all amounts on deposit in the Collection Account at such time shall be applied to repay the Loans hereunder (such amount to be allocated to the outstanding Borrowings as selected by the Borrowers) and (ii) subject to clause (iii) below, 50% (or, at the election of the Required Lenders, a greater percentage) of all amounts on deposit in the Collection Account at such time shall be applied by the Prepetition Agent to the Prepetition Obligations pursuant to the terms and conditions of the Prepetition Credit Agreement; provided, however that, notwithstanding anything to the contrary set forth in this Agreement, at the direction of the Required Lenders, on each such Settlement Date, 100% of all amounts on deposit in the Collection Account shall be applied to the outstanding principal amount of the Loans hereunder.

(i)      Notwithstanding the foregoing, any amounts applied by the Prepetition Agent to the Prepetition Obligations pursuant to the terms and conditions of the

Prepetition Credit Agreement and in accordance with <u>clause (b)(ii)</u> above shall be subject to disgorgement to the extent provided by any final and non-appealable Challenge.

SECTION 2.04    <u>Termination or Reduction of the Commitments</u>.

(a)    <u>Optional</u>.  The Borrowers may, upon notice to the Administrative Agent, terminate the Commitments, or from time to time permanently reduce the Commitments without premium or penalty but subject to <u>Section 3.05</u>; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $1,000,000 in excess thereof.  Notwithstanding anything to the contrary contained in this Agreement, the Borrowers may rescind any notice of termination or reduction given under this <u>Section 2.04(a)</u> in anticipation of an Approved Sale if such Approved Sale is not consummated or is otherwise delayed; provided that the Borrowers shall promptly (but in any event within ten (10) Business Days after any such rescission) compensate each Secured Party for any loss, cost or expense incurred by such Secured Party and payable by the Borrowers hereunder as a result thereof.

(b)    <u>Application of Commitment Reductions</u>; <u>Payment of Fees</u>.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Total Commitments under this <u>Section 2.04</u>.  Upon any reduction of the Total Commitments, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount.  All fees in respect of the Facility accrued until the effective date of any termination of the Facility shall be paid on the effective date of such termination.

SECTION 2.05    <u>Repayment of Loans</u>.  The Borrowers jointly and severally agree to repay to the Lenders on the Termination Date the aggregate principal amount of all Loans and all other Obligations owing to the Secured Parties outstanding on such date.

SECTION 2.06    <u>Interest</u>.

(a)    Subject to the provisions of <u>Section 2.06(b)</u>, (i) each LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the LIBO Rate for such Interest Period plus the Applicable Margin, and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin.

(b)    Upon the occurrence and during the continuance of any Event of Default resulting from the failure to pay any amount of principal of any Loan when due, automatically, and upon the occurrence and during the continuance of any other Event of Default, at the request of the Administrative Agent or the Required Lenders, the Borrowers shall pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after

judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

      **SECTION 2.07**      <u>Fees</u>.

      (a)     <u>Upfront Fee</u>.  On the Closing Date, the Borrowers agree jointly and severally to pay to the Administrative Agent, for the ratable account of each Lender in accordance with its Applicable Percentage, an upfront fee equal to 2.00% multiplied by the aggregate Commitments on the Closing Date, which fee shall be paid in cash and fully earned on the Closing Date and non-refundable once paid.

      (b)     <u>Exit Fee</u>.  On the Termination Date, the Borrowers agree jointly and severally to pay to the Administrative Agent, for the ratable account of each Lender in accordance with its Applicable Percentage, an exit fee equal to 2.00% multiplied by the aggregate Commitments on the Closing Date, which fee shall be paid in cash and fully earned on the Termination Date and non-refundable once paid.

      (c)     <u>Agent Fee</u>. On the final Friday of each calendar month (commencing with the first such date to occur after the Closing Date) and on the Termination Date, the Borrowers agree jointly and severally to pay to the Administrative Agent an agent fee in the amount of $50,000 (which amount shall be pro-rated for any partial month), which fee shall be paid in cash and fully earned on each such date and non-refundable once paid; <u>provided</u> that the Administrative Agent and the Borrowers may agree to modify the timing of the payment of such amounts in keeping with the Approved Budget.

      (d)     <u>Backstop Fee</u>. The Borrowers agree jointly and severally to pay to the Administrative Agent, for the account of certain Lenders agreed to in writing by the Borrower and the Administrative Agent, a backstop fee equal to 4.00% multiplied by the aggregate Commitments on the Closing Date, which fee shall be (i) fully earned on the Closing Date, payable in kind such that the amount of such fee shall be deemed principal on the Closing Date on which interest will accrue until such fee is paid, and (ii) non-refundable once paid. Notwithstanding the foregoing, such fee being deemed principal for purposes of accruing interest shall not operate to reduce the Commitments or increase the Total Outstandings.

      **SECTION 2.08**      <u>Computation of Interest and Fees</u>.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, <u>provided</u> that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.10(a)</u>, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

      **SECTION 2.09**      <u>Evidence of Debt</u>.  The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the

amount of the Loans made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

**SECTION 2.10**      Payments Generally; Administrative Agent's Clawback.

(a)      General.  All payments to be made by the Loan Parties shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Loan Parties hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Loan Parties shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(b)      (i)      Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of LIBO Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Loans of the Type comprising such

Borrowing.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    <u>Payments by Borrowers; Presumptions by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from the Borrowers prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    <u>Failure to Satisfy Conditions Precedent</u>.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Borrowing set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    <u>Obligations of Lenders Several</u>.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to <u>Section 13.04(c)</u> are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under <u>Section 13.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under <u>Section 13.04(c)</u>.

(e)    <u>Funding Source</u>.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    <u>Insufficient Funds</u>.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then

33

due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

**SECTION 2.11**    Sharing of Payments by Lenders.    If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payment on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, then the Lender receiving such greater proportion shall (x) notify the Administrative Agent of such fact, and (y) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, provided that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to (A) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrowers.

Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

**SECTION 2.12**    Super-Priority Nature of Obligations.

(a)    The priority of the Administrative Agent's Liens on the Collateral owned by the Loan Parties shall be set forth in the Financing Order.

34

(b)    All Obligations shall constitute administrative expenses of the Loan Parties in the Chapter 11 Cases, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code (all as more fully set forth in the Financing Order).

(c)    Upon entry of the Final Order, the Administrative Agent, the Lenders, the Prepetition Agent and the Prepetition Lenders shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under Section 552(b) of the Bankruptcy Code.

**SECTION 2.13**    Payment of Obligations.  On the Termination Date, the Secured Parties shall be entitled to immediate payment of all outstanding Obligations without further application to or order of the Bankruptcy Court.

**SECTION 2.14**    No Discharge; Survival of Claims.  Each Loan Party agrees that (i) the Obligations shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the super-priority administrative claim granted pursuant to the Financing Order and described in Section 2.12 and the Liens granted to the Collateral Agent pursuant to the Financing Order and described in Section 2.12 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

**SECTION 2.15**    Waiver of Priming Rights.  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, each Loan Party hereby irrevocably waives any right, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, other than the Permitted Third-Party DIP Liens or as set forth in the Financing Orders.

**SECTION 2.16**    Security Interest.  To the extent set forth in the Financing Order, each Loan Party has pledged, assigned and granted to the Administrative Agent, on behalf of and for the benefit of the Secured Parties, subject only to payment of the Carve-Out, the Prepetition Third-Party Liens and the Permitted Third-Party DIP Liens, a security interest in all of its right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Loan Party.  Each Loan Party hereby agrees to do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such acts, deeds, certificates and other instruments as the Administrative Agent may request in order to evidence and perfect such security interest, and authorizes the Administrative Agent to file all UCC financing statements from time to time requested by the Administrative Agent with respect to the Collateral, and such financing statements may indicate the Collateral as all assets of the applicable Loan Party or words of similar effect.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

**SECTION 3.01**        <u>Taxes</u>.

(a)        <u>Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes</u>.

(i)        Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes. If, however, applicable Laws require any Loan Party or the Administrative Agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined by such Loan Party or the Administrative Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)        If any Loan Party or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then (A) such Loan Party or the Administrative Agent, as applicable, shall withhold or make such deductions as required based upon applicable Laws and the information and documentation it has received pursuant to subsection (e) below, (B) such Loan Party or the Administrative Agent, as applicable, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by such Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)        <u>Payment of Other Taxes by the Loan Parties</u>.   Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)        <u>Tax Indemnifications</u>.

(i)        Without limiting the provisions of subsection (a) or (b) above, the Loan Parties shall, and do hereby, jointly and severally, indemnify the Administrative Agent and each Lender, and shall make payment in respect thereof within ten (10) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) withheld or deducted by any Loan Party or the Administrative Agent or paid by the Administrative Agent or such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The Loan Parties shall also, and do hereby, jointly and severally, indemnify the Administrative Agent, and shall make payment in respect thereof within ten (10) days after demand therefor, for any amount that a Lender for any reason fails to pay indefeasibly to the Administrative Agent as required by clause (ii) of this subsection.   A certificate setting forth in reasonable detail the nature and amount of any such payment or liability delivered to any Loan Party by a Lender (with a copy to

36

the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)    Without limiting the provisions of subsection (a) or (b) above, each Lender shall, and does hereby, indemnify each Loan Party and the Administrative Agent, and shall make payment in respect thereof within ten (10) days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities, penalties, interest and expenses (including the fees, charges and disbursements of any counsel for such Loan Party or the Administrative Agent) incurred by or asserted against any Loan Party or the Administrative Agent by any Governmental Authority as a result of the failure by such Lender to deliver, or as a result of the inaccuracy, inadequacy or deficiency of, any documentation required to be delivered by such Lender to any Loan Party or the Administrative Agent pursuant to subsection (e).  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).  The agreements in this clause (ii) shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Total Commitments and the repayment, satisfaction or discharge of all other Obligations.

(d)    <u>Evidence of Payments</u>.    Upon request by any Loan Party or the Administrative Agent, as the case may be, after any payment of Taxes by any Loan Party or the Administrative Agent to a Governmental Authority as provided in this <u>Section 3.01</u>, such Loan Party shall deliver to the Administrative Agent or the Administrative Agent shall deliver to such Loan Party, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to such Loan Party or the Administrative Agent, as the case may be.

(e)    <u>Status of Lenders; Tax Documentation</u>.

(i)    Each Lender shall deliver to the Borrowers and to the Administrative Agent, at the time or times prescribed by applicable Laws or when reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Borrowers or the Administrative Agent, as the case may be, to determine (A) whether or not payments made hereunder or under any other Loan Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by the Borrowers pursuant to this Agreement or otherwise to establish such Lender's status for withholding Tax purposes in the applicable jurisdiction.

(ii)    Without limiting the generality of the foregoing, if any Borrower is resident for tax purposes in the United States,

(A)    any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrowers and the

Administrative Agent properly completed and duly executed originals of Internal Revenue Service Form W-9 or such other documentation or information prescribed by applicable Laws or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent, as the case may be, to determine whether or not such Lender is subject to backup withholding or information reporting requirements; and

(B)    each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding Tax (including backup withholding) with respect to payments hereunder or under any other Loan Document shall deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter as required under applicable Law or upon the request of the Borrowers or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(1)    properly completed and duly executed originals of Internal Revenue Service Form W-8BEN or Form W-8BEN-E, as applicable, claiming, if applicable, eligibility for benefits of an income tax treaty to which the United States is a party,

(2)    properly completed and duly executed originals of Internal Revenue Service Form W-8ECI,

(3)    properly completed and duly executed originals of Internal Revenue Service Form W-8IMY and all required supporting documentation,

(4)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of any Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) properly completed and duly executed originals of Internal Revenue Service Form W-8BEN or Form W-8BEN-E, as applicable, or

(5)    executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States Federal withholding tax together with such supplementary documentation as may be prescribed by applicable Laws, or any other form or documentation that is generally provided to similarly-situated borrowers as may be reasonably requested by the Borrowers or the Administrative Agent, to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made.

(iii)    Each Lender shall promptly (A) notify the Borrowers and the Administrative Agent of any change in circumstances that would modify or render invalid any claimed exemption or reduction, and (B) take such steps as shall not be materially disadvantageous to it, in the reasonable judgment of such Lender, and as may be reasonably necessary (including the re-designation of its Lending Office in accordance with and subject to the conditions set forth in <u>Section 3.06</u>) to avoid any requirement of applicable Laws of any

jurisdiction that the Borrowers or the Administrative Agent make any withholding or deduction for Taxes from amounts payable to such Lender.

(iv)    If a payment made to a Foreign Lender hereunder or under any other Loan Document would be subject to withholding Tax imposed by FATCA if such Foreign Lender were to fail to comply with the applicable requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable, or in any agreement or request entered into or issued pursuant to such Sections), such Foreign Lender shall deliver to the Borrowers and the Administrative Agent, at the time or times prescribed by Law and at such time or times reasonably requested by the Borrowers or the Administrative Agent, such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA, to determine that such Foreign Lender has complied with such Foreign Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

(f)    <u>Treatment of Certain Refunds</u>.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender.  If the Administrative Agent or any Lender determines, in its good faith judgment, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses incurred by the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of the Administrative Agent or such Lender, agree to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Loan Parties or any other Person.

**SECTION 3.02**    <u>Illegality</u>.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, or to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligation of such Lender to make or continue LIBO Rate Loans or to convert Base Rate Loans to LIBO Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers shall, upon demand

from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all LIBO Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBO Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBO Rate Loans. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**SECTION 3.03**     Inability to Determine Rates.  If the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank LIBOR market for the applicable amount and Interest Period of such LIBO Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or (c) the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrowers and each Lender.  Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrowers may revoke any pending request for a Borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**SECTION 3.04**     Increased Costs.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by Section 3.04(e)); or

(ii)     impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBO Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts (without duplication) as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, such Lender, to a level below that which such Lender or such Lender's holding company would have

achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts (without duplication) as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, and the basis for such request as specified in subsection (a) or (b) of this Section and delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) Business Days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on LIBO Rate Loans.  The Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Borrowers shall have received at least ten (10) Business Days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender.  If a Lender fails to give notice ten Business Days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) Business Days from receipt of such notice.

**SECTION 3.05**    Compensation for Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrowers shall promptly (but in any event within ten (10) Business Days) compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrowers; or

(c)     any assignment of a LIBO Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrowers pursuant to Section 13.13;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing. Each written demand made by any Lender pursuant to this Section 3.05 shall set forth the amount of such loss, cost or expense as reasonably determined by such Lender, the manner of computation thereof in reasonable detail and the basis for such request, which demand shall be conclusive absent manifest error.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBO Rate Loan made by it at the LIBO Rate for such Loan by a matching deposit or other borrowing in the London interbank LIBOR market for a comparable amount and for a comparable period, whether or not such LIBO Rate Loan was in fact so funded.

SECTION 3.06     Mitigation Obligations; Replacement of Lenders.

(a)     Designation of a Different Lending Office. If any Lender requests compensation under Section 3.04, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby jointly and severally agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders. If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrowers may replace such Lender in accordance with Section 13.13.

SECTION 3.07     Survival. All of the Borrowers' obligations under this Article III are joint and several and shall survive termination of the Total Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

42

**ARTICLE IV**
**CONDITIONS PRECEDENT**

**SECTION 4.01**    Conditions Precedent to Closing Date.    The Closing Date hereunder shall have occurred upon the satisfaction in full (or waiver by the Administrative Agent with notice to each of the Lenders) of the following conditions precedent (it being understood that the Loan Parties shall not be required to satisfy on the Closing Date any of the conditions that have been satisfied prior to the Closing Date):

(a)    Loan Documents.    The Administrative Agent's receipt of the following, each of which shall be originals or telecopies (followed in the case of the Loan Parties promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of each Loan Party, as applicable, each dated the Closing Date (unless otherwise specified), and each in form and substance satisfactory to the Administrative Agent:

(i)    executed counterparts of this Agreement, sufficient in number for distribution to the Administrative Agent, each Lender and the Loan Parties;

(ii)    a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)    Account Control Agreements covering (i) each Collateral Account; provided, that the Account Control Agreements in existence on the date hereof to which the Prepetition Agent is party may be deemed sufficient to satisfy this condition if so acknowledged in the Financing Orders, and (ii) each other account of the Loan Parties in which the Administrative Agent determines in its sole discretion a first priority perfected security interest is required;

(iv)    the Escrow Agreement;

(b)    Corporate Documents & Other Deliverables.

(i)    The Administrative Agent's receipt of the following with respect to each Borrower, each of which shall be originals or telecopies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of each Borrower, as applicable, each dated the Closing Date (unless otherwise specified), and each in form and substance satisfactory to the Administrative Agent:

(A)    a copy of the certificate of formation (or equivalent document), certified as of a recent date by the Secretary of State or other relevant office of such Person's jurisdiction of formation or organization, which certificate lists (if such type of list is generally available in the applicable jurisdiction) the charter documents on file in the office of such Secretary of State;

(B)    a certificate of the Secretary of State of such jurisdiction of formation or organization, dated as of a recent date, as to the good standing of, and, if generally available in the applicable jurisdiction, the payment of Taxes by, each such Person; and

(C)    a certificate of the Secretary, Assistant Secretary or other appropriate officer (or member or manager, as the case may be, in the case of limited liability companies) acceptable to the Administrative Agent, of each such Person, dated as of the date hereof and certifying:  (I) that attached thereto is a true and complete copy of the certificate of formation (or equivalent document) of such Person; (II) that attached thereto is a true and complete copy of the limited liability company agreement or equivalent document of such Person as in effect on the date of such certification; (III) that attached thereto is a true and complete copy of the resolutions adopted by the board of directors (or equivalent body) or the members (or other holders of Equity Interests) of such Person authorizing the execution, delivery and performance in accordance with their respective terms of the Loan Documents executed by such Person, and any other documents required or contemplated hereunder or thereunder, the grant of the security interests in the Collateral (if applicable), and in the case of each Borrower, the Borrowings hereunder, and that such resolutions have not been amended, rescinded or supplemented and are currently in effect; and (IV) that the certificate of formation (or equivalent document) of such Person has not been amended since the date of the last amendment thereto indicated on the certificates of the Secretary of State or other appropriate office furnished pursuant to subsection (A) above; and

(D)    a certificate signed by a Responsible Officer of each Borrower certifying that the conditions specified in Sections 4.01(g) and 4.02 have been satisfied;

(ii)    The Administrative Agent's receipt of the following with respect to each Loan Party, each of which shall be originals or telecopies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of each Loan Party, as applicable, each dated the Closing Date (unless otherwise specified), and each in form and substance satisfactory to the Administrative Agent:

(A)    as to the incumbency and specimen signature of each officer (or member or manager, as the case may be) of such party executing any Loan Document or such other documents required or contemplated hereunder or thereunder (such certificate to contain a certification by another officer (or member or manager, as the case may be) of such Person as to the incumbency and signature of the officer (or member or manager, as the case may be) signing the certificate referred to in this clause (A) or a certification by the signing officer (or member or manager, as the case may be) that he or she is the sole officer (or member or manager, as the case may be) of such Person);

(B)    a certificate of a Responsible Officer of each Loan Party either (A) attaching copies of all consents, licenses and approvals required in connection with the consummation by such Person of the transaction contemplated by the Loan Documents (including evidence of all required court approvals of the Facility and Loan Documents and any other motions of the Loan Parties of concern to the Lenders) and the execution, delivery and performance by such Person and the validity against such Person of the Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required; and

(iii)    The Administrative Agent's receipt of such other assurances, certificates, documents, consents or opinions as the Administrative Agent may reasonably require.

(c)    Budget.    Not later than five (5) days prior to the Petition Date, the Administrative Agent and the Prepetition Agent shall have received a cash forecast for the 18-week period commencing on the Petition Date setting forth projected cash flows and disbursements, in form, scope and substance acceptable to the Administrative Agent, the Required Lenders, the Prepetition Agent and Prepetition Required Lenders and attached hereto as Schedule 4.01 (the "Initial Approved Budget").

(d)    Interim Order.    The Interim Order (i) shall have been entered and shall be in full force and effect no later than five (5) Business Days after the Petition Date (or such later date as the Administrative Agent and the Prepetition Agent may agree) and (ii)  shall not have been amended, supplemented, appealed, altered, stayed, vacated, rescinded or otherwise modified.

(e)    First Day Orders.    The Administrative Agent shall have received satisfactory evidence of the entry of all "first day" orders, which shall be satisfactory in form and substance to the Administrative Agent and Prepetition Agent, and which "first day" orders shall have been entered upon an application or motion of the Loan Parties satisfactory in form and substance to the Administrative Agent and the Prepetition Agent and upon prior notice to such parties required to receive such notice.

(f)    Fees and Expenses.    Subject to any court-imposed review period, the payment in full, in cash of the professional fees, costs and expenses of the Administrative Agent, the Prepetition Agent, the Lenders and the Prepetition Lenders.

(g)    Material Changes.    Since the Petition Date: (a) other than those customarily resulting from the commencement of the Chapter 11 Cases, there shall have been no material adverse change, individually or in the aggregate, in the business, prospects, operations, property, assets, or condition, financial or otherwise, of the Loan Parties, taken as a whole, or any Borrower, or the Collateral, (b) there shall have been no material increase in the liabilities, liquidated or contingent, of the Loan Parties, taken as a whole, or any Borrower which could be expected to have a material impact on the Liens hereunder or the Prepetition Liens, or material decrease in the assets of the Loan Parties, and (c) other than those resulting from the commencement of the Chapter 11 Cases, there shall have been no adverse change in the ability of the Administrative Agent and the Lenders to enforce the Loan Documents and the Obligations of the Loan Parties thereunder.

(h)    Sale Motion; Bidding Procedures Motion.    On the Petition Date, (i) the Loan Parties shall have filed a motion (the "Sale Motion") pursuant to Section 363 of the Bankruptcy Code, to sell all or substantially all of their respective assets to a purchaser reasonably acceptable to the Administrative Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders (the "Stalking Horse Bidder") under an asset purchase agreement (pursuant to which, *inter alia*, the purchase price contemplated thereunder is allocated in a manner that provides value with respect to the Prepetition Collateral equal to or in excess of

the aggregate amount of the Obligations and the Prepetition Obligations), in form and substance reasonably acceptable (including, without limitation, with respect to the allocation of the purchase price) to the Administrative Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders (the "Sale") through an auction to the bidder(s) with the highest and/or best bids(s) as determined in accordance with the Approved Bidding Procedures and (ii) the Borrowers shall have filed a motion (the "Bidding Procedures Motion"), in form and substance reasonably acceptable to the Administrative Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders, seeking approval of the Approved Bidding Procedures.

The Administrative Agent shall notify the Borrowers and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

SECTION 4.02    Conditions to all Borrowings.  The obligation of each Lender to honor any Loan Notice (other than a Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of LIBO Rate Loans) is subject to the following conditions precedent:

(a)    the representations and warranties (as updated from time to time by amendment of the Schedules attached to this Agreement or such other Loan Document as permitted hereby or thereby) of the Loan Parties contained in Article V and contained in any other Loan Document shall be true and correct in all material respects on and as of the date of such Borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in Sections 5.05(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01(a) and (b), respectively;

(b)    no Default shall exist or would result from such proposed Borrowing or from the application of the proceeds thereof;

(c)    the Administrative Agent shall have received (i) a Loan Notice in accordance with the requirements hereof, and (ii) a certificate signed by a Responsible Officer of such Borrower certifying that the amount of such Borrowing and the intended use of the funds to be so borrowed are consistent with the Approved Budget and that such funds shall be so used within a designated time period; and

(d)    (i) if (A) such Borrowing is to be made on or after the date thirty-five (35) days after the Petition Date or (B) the amount of such Borrowing, together with the outstanding principal amount of the Loans, shall exceed the Interim Advance, the Bankruptcy Court shall have entered the Final Order on or prior to such date and (ii) the Interim Order or the Final Order, as the case may be, shall not have been amended, supplemented, appealed, altered, stayed, vacated, rescinded or otherwise modified without the consent of the Administrative Agent, the Required Lenders, the Prepetition Agent and Prepetition Required Lenders.

Each Loan Notice (other than a Loan Notice requesting only a conversion of Loans to the other Type or a continuation of LIBO Rate Loans) submitted by the Borrowers shall

be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Borrowing.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE LOAN PARTIES

In order to induce the Administrative Agent and the Lenders to enter into this Agreement and make the Loans provided for herein, as applicable, each Loan Party makes the following representations and warranties to the Administrative Agent and the Lenders, all of which shall survive the execution and delivery of this Agreement, the issuance of the Notes, and the making of Borrowings pursuant to Section 2.01.

**SECTION 5.01**      Existence, Qualification and Power.  Such Loan Party (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and consummate the transactions contemplated thereby, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except, with respect to this clause (c), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

**SECTION 5.02**      Authority; No Contravention.  Subject to the entry of the Financing Orders, the execution, delivery and performance by such Loan Party of each Loan Document to which it is or is to be a party have been duly authorized by all necessary limited liability company action, and do not and will not:  (a) contravene the terms of any of the applicable Organizational Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than Liens created under any such Loan Document or the Financing Orders and Liens permitted under Section 7.01), or require any payment to be made under, (i) any Contractual Obligation to which such Loan Party is a party or affecting such Loan Party or its properties, in each case, the effect of which has not been stayed by the automatic stay or the Bankruptcy Court, and other than where any such conflict, breach or contravention would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, or (ii) in any material respect, any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject, the effect of which has not been stayed by the automatic stay or the Bankruptcy Court; or (c) violate any Law.

**SECTION 5.03**      Governmental Authorization; Other Consents.  Subject to the entry of the Financing Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, such Loan Party of this Agreement or any other Loan Document, or for the consummation of the transactions contemplated thereby, (b) the grant by such Loan Party of the Liens granted by it pursuant to the Loan Documents or the Financing Orders, (c) the perfection or maintenance of the Liens created under the Loan Documents or the Financing Orders (including the first priority nature thereof subject only to Specified Permitted Encumbrances) or

(d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral thereunder.

**SECTION 5.04**        Binding Effect.  Subject to the entry of the Financing Orders, this Agreement has been, and each other Loan Document to which such Loan Party is a party, when delivered hereunder, will have been, duly executed and delivered by such Loan Party.  Subject to the entry of the Financing Orders, this Agreement constitutes, and each such other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, subject, as to the enforcement of remedies, to applicable Debtor Relief Laws and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**SECTION 5.05**        Financial Statements.  The most recent audited financial statements furnished pursuant to Section 6.01(a) (i) have been or will have been prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present or will fairly present in all material respects the financial condition of Holdings and its Consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show or will show all material indebtedness and other liabilities, direct or contingent, of Holdings and its Consolidated Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(a)        The most recent unaudited financial statements furnished pursuant to Section 6.01(b) through (d) (i) have been or will have been prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present or will fairly present in all material respects the financial condition of Holdings, TWC and their respective Consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(b)        Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect other than those which customarily occur as a result of events and circumstances leading up to, including and following the commencement of the Chapter 11 Cases.

(c)        The consolidated forecasted balance sheets, statements of income and cash flows delivered pursuant to Section 4.01 were prepared in good faith on the basis of the assumptions believed to be reasonable at the time made, it being understood by the Administrative Agent and the Lenders that such financial information as it relates to future events is not to be viewed as fact, no assurance is given that the results forecasted in such financial information will be achieved, and actual results during the period or periods covered by any such financial information are subject to significant uncertainties and contingencies and may materially differ from the projected results set forth therein.

**SECTION 5.06**        Litigation.  Other than the Chapter 11 Cases or as otherwise set forth on Schedule 5.06 hereto, there are no actions, suits, proceedings, claims or disputes

48

pending (i.e., validly served) or, to the knowledge of such Loan Party, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against such Loan Party or against any of its properties or revenues (a) of which this Agreement, the Master Distribution Agreement or the Master Services Agreement are subject, (b) that purport to materially adversely affect any other Loan Document or the consummation of the transactions contemplated thereby, or (c) either individually or in the aggregate, if determined adversely, would reasonably be expected to have a Material Adverse Effect.

SECTION 5.07    No Default.  Such Loan Party is not in default (other than a default resulting from the Chapter 11 Cases) under or with respect to, or a party to, any Contractual Obligation that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, except with respect to which enforcement of remedies is stayed by means of the Chapter 11 Cases.

SECTION 5.08    Ownership of Property.  Such Loan Party has good title to each of the properties and assets included in the Collateral, and all such properties and assets are free and clear of Liens except Permitted Encumbrances.  With respect to any Physical Materials that are related to the Collateral and subject to a Pledgeholder Agreement, the relevant Loan Party owns a set of such Physical Materials to which it will retain full access rights, and has the ability to grant the Administrative Agent and/or Prepetition Agent access to such Physical Materials, in each case notwithstanding enforcement of such Pledgeholder Agreement.

SECTION 5.09    Environmental Compliance.  Such Loan Party complies with all applicable Environmental Laws, except where the failure to comply therewith would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and there are no claims alleging potential liability or responsibility for violation of any Environmental Law on its business, operations and properties that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 5.10    Insurance.  The properties of such Loan Party are insured with financially sound and reputable insurance companies that are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where such Loan Party operates.

SECTION 5.11    Taxes.  Such Loan Party has filed all material Federal, state and other tax returns and reports required to be filed by it, and has paid all material Federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon it or its properties, income or assets otherwise due and payable, except those that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  To the knowledge of such Loan Party, there is no proposed tax assessment against such Loan Party that would, if made, have a Material Adverse Effect.  Such Loan Party is not party to any tax sharing agreement

SECTION 5.12    ERISA Compliance.

49

(a)    (i) Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws; (ii) each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of such Loan Party, nothing has occurred that would prevent, or cause the loss of, such qualification; and (iii) such Loan Party and each ERISA Affiliate have made all required contributions to each Pension Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Pension Plan; in each case above other than to the extent (A) the failure of any such Plan to so comply or qualify or of such Loan Party or any such ERISA Affiliate to make any such contribution or (B) the filing of any such application for a funding waiver or of any such extension would not reasonably be expected to have a Material Adverse Effect.

(b)    There are no pending or, to the best knowledge of such Loan Party, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or would reasonably be expected to result in a Material Adverse Effect.

(c)    (i) Except as set forth on Schedule 5.12(c) (as the same may be updated from time to time in accordance with Section 6.02(h)), the present value of all benefits under each Pension Plan (based on the assumptions used to fund the Pension Plan) on the date hereof did not as of the last annual valuation date applicable thereto exceed the actuarial value of the assets of the Pension Plan by an amount in excess of the Threshold Amount; (ii) neither such Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to the termination of any Pension Plan, except as would not reasonably be expected to result in a Material Adverse Effect; (iii) neither such Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred that, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 of ERISA with respect to a Multiemployer Plan, except as would not reasonably be expected to result in a Material Adverse Effect; and (iv) neither such Loan Party nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA, except as would not reasonably be expected to result in a Material Adverse Effect.

**SECTION 5.13**    Subsidiaries.  Schedule 5.13 hereto identifies each Subsidiary of such Loan Party, noting the jurisdiction of its incorporation or organization, as the case may be, the percentage of issued and outstanding shares of each class of its capital stock or other equity interests owned by such Loan Party and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class issued and outstanding. All of the outstanding shares of capital stock and other equity interests of each Subsidiary are validly issued and outstanding and fully paid and nonassessable and all such shares and other equity interests indicated on Schedule 5.13 as owned by such Loan Party are owned, beneficially and of record, by such Loan Party free and clear of all Liens, other than Permitted Encumbrances. There are no outstanding commitments or other obligations of such Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of such Loan Party.

**SECTION 5.14**        Margin Regulations; Investment Company Act.

(a)        Such Loan Party is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock.  No part of the proceeds of any Borrowing will be used, directly or indirectly, whether immediately, incidentally or ultimately (i) to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or (ii) for any other purpose, in each case violative of or inconsistent with any of the provisions of any regulation of the Board, including Regulations T, U and X thereto.

(b)        None of such Loan Party or any Person controlling such Loan Party is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**SECTION 5.15**        Disclosure.  Such Loan Party has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.  No written report, financial statement, certificate or other information furnished in writing by or on behalf of such Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (considered in the context of all other information provided to the Lenders); provided that, with respect to projected financial information, such Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time made, it being understood by the Administrative Agent and the Lenders that such financial information as it relates to future events is not to be viewed as fact, no assurance is given that the results forecasted in such financial information will be achieved, and actual results during the period or periods covered by any such financial information are subject to significant uncertainties and contingencies and may materially differ from the projected results set forth therein.

**SECTION 5.16**        Compliance with Laws.  Such Loan Party is in compliance in all respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and such contest would not reasonably be expected to have a Material Adverse Effect or (b) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

**SECTION 5.17**        Copyrights, Trademarks and Other Rights.

(a)        To the best of such Loan Party's knowledge, (A) all Qualifying Pictures, other Pictures included in the Collateral and other United States copyrights and all component

parts thereof do not and will not violate or infringe upon any copyright, right of privacy, trademark, patent, trade name, performing right or any literary, dramatic, musical, artistic, personal, private, civil, contract, property or copyright right or any other right of any Person or contain any libelous or slanderous material and (B) a Loan Party owns or is licensed sufficient rights under copyright to each such Picture and other United States copyright to satisfy any qualification requirements under the applicable Domestic Distribution Agreements and Foreign Distribution Agreements and to permit the applicable Loan Party to perform its obligations thereunder.

(i)    Except as disclosed on Schedule 5.06, there is no claim, suit, action or proceeding pending or, to the best of such Loan Party's knowledge, threatened against such Loan Party or any other Person that involves a claim of infringement of any copyright with respect to any Qualifying Pictures or other Pictures included in the Collateral, and such Loan Party has no knowledge of any existing infringement by any other Person of any copyright held by any Loan Party with respect to any such Picture or United States copyright, that, in each case, either individually or in the aggregate would reasonably be expected to have a Material Adverse Effect.

(b)    All applications and registrations for all copyrights, trademarks, service marks, trade names and service names in which such Loan Party has any right, title or interest are valid and in full force and effect (other than applications and registrations for trademarks, service marks, trade names and service names that in the aggregate are not material to the business of such Loan Party) and are not and will not be subject to the payment of any taxes or maintenance fees or the taking of any other actions by such Loan Party to maintain their validity or effectiveness.

**SECTION 5.18**    [Reserved].

**SECTION 5.19**    Places of Business.  The chief executive office of such Loan Party is, on the Closing Date, as set forth on Schedule 5.19 hereto.  All of the places where such Loan Party keeps material records concerning the Collateral are also listed on Schedule 5.19 hereto.

**SECTION 5.20**    Security Interest.  This Agreement and the other Loan Documents, when executed and delivered, together with the Financing Orders, will create and grant to the Administrative Agent for the benefit of the Secured Parties, valid and perfected security interests in the Collateral (prior to all other Liens other than the Specified Permitted Encumbrances).

**SECTION 5.21**    Deposit or Other Accounts.  Such Loan Party does not maintain any deposit or securities accounts other than those established and maintained in compliance with the requirements of Section 7.12.

**SECTION 5.22**    Approved Budget.  The Approved Budget reasonably presents, in all material respects, on a pro forma basis, the projected financial operations and disbursements of each Borrower and each Guarantor for the period specified therein and such projections in the view of management of such Loan Party, are reasonably achievable based upon reasonable assumptions and other information available to such Loan Party as of the first day of such period.

**SECTION 5.23**        Prepetition Obligations; Defenses.   As of the Petition Date, the aggregate outstanding principal balance of the Prepetition Obligations of the relevant Loan Parties, and the aggregate face amount of all outstanding loans and letter of credit reimbursement obligations constituting Prepetition Obligations of such Loan Parties, are approximately as set forth in Schedule 5.23 attached hereto, and such Loan Parties are truly and justly indebted (as an allowed secured claim) to the Prepetition Agent and the Prepetition Lenders with respect to the Prepetition Obligations of such Loan Parties without setoff, defense or counterclaim.

**SECTION 5.24**        Prepetition Credit Agreement.   The Loan Parties acknowledge and agree that (i) the Prepetition Loan Documents are valid and enforceable, (ii) the Prepetition Agent for the benefit of the Prepetition Lenders has a valid, enforceable and fully perfected first priority lien in all of the Prepetition Collateral, including Cash Collateral comprising Prepetition Collateral, and all proceeds thereof, subject only to the Liens hereunder, the Carve-Out and Specified Permitted Encumbrances set forth in clause (ii) of the definition thereof, (iii) the Prepetition Lenders have the right to continue to apply the proceeds of the Prepetition Collateral, as and when received, to pay down the Prepetition Obligations pursuant to Section 2.03(b)(ii) hereof and the terms of the Prepetition Credit Agreement and other Prepetition Loan Documents and (iv) the Prepetition Collateral is declining in value.

**SECTION 5.25**        Chapter 11 Case Matters.

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the approval of the Interim Order has been given and proper notice for the hearing for the approval of the Final Order will be given.

(b)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Financing Orders, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having the priority set forth in the Financing Orders.

(c)     After the entry of the Interim Order, the Obligations will be secured by a valid and perfected, enforceable and unavoidable first priority, priming Lien with priority over the Liens of the Prepetition Agent on all of the Collateral to the extent provided and as more fully set forth in the Financing Orders.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on or after entry of the Final Order), as the case may be, is in full force and effect and has not been amended, supplemented, appealed, altered, stayed, vacated, rescinded or otherwise modified.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court, as more fully set forth in the Financing Orders.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

From the date hereof and for so long as the Commitments shall be in effect, any amount shall remain outstanding under any Note, or any other Obligation shall remain unpaid or unsatisfied, each Loan Party agrees that, unless the Required Lenders shall otherwise consent in writing, it will, and will cause its Subsidiaries to:

**SECTION 6.01**      <u>Financial Statements</u>.  Deliver to the Administrative Agent:

(a)      as soon as available, but in any event within 150 days after the end of each fiscal year of Holdings (commencing with the fiscal year ended December 31, 2017), a consolidated balance sheet of Holdings and its Consolidated Subsidiaries as at the end of such fiscal year, and the related consolidated statement of income or operations, changes in shareholders' equity, and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing reasonably acceptable to the Administrative Agent (with Ernst & Young and any of the other so-called "Big Four" accounting firms being hereby pre-approved), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception (other than with respect to the Chapter 11 Cases) or any qualification or exception as to the scope of such audit, and such consolidated statements to be accompanied by a certificate signed by a Responsible Officer of Holdings to the effect that such statements fairly present in all material respects the financial position of Holdings and its Consolidated Subsidiaries as at the dates indicated and the results of their operations for the periods indicated in conformity with GAAP and providing a copy of the management discussion and analysis reports; provided that, notwithstanding the foregoing, such consolidated statements for the fiscal year ended December 31, 2017 shall not be required to be audited or accompanied by a report and opinion of an independent certified public accountant.

(b)      as soon as available, but in any event within 75 days after the end of each of the first three (3) fiscal quarters of each fiscal year of Holdings (commencing with the fiscal quarter ended March 31, 2018), a consolidated balance sheet of Holdings and its Consolidated Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in shareholders' equity, and cash flows for such fiscal quarter and for the portion of Holdings' fiscal year then ended, setting forth in each case in comparative form, as applicable, the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, certified by a Responsible Officer of Holdings as fairly presenting in all material respects the consolidated financial condition, results of operations, shareholders' equity and cash flows of Holdings and its Consolidated Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)      as soon as available, but in any event within 150 days after the end of each fiscal year of TWC (commencing with the fiscal year ended December 31, 2017), a consolidated balance sheet of TWC and its Consolidated Subsidiaries as at the end of such fiscal year, and the related consolidated statement of income or operations, changes in shareholders' equity, and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such

54

consolidated statements to be certified by a Responsible Officer of TWC to the effect that such statements fairly present in all material respects the financial position of TWC and its Consolidated Subsidiaries as at the dates indicated and the results of their operations for the periods indicated in conformity with GAAP, provided, that the financial statements described in this clause (c) shall not be required to be delivered if such financial statements would be the same as the financial statements delivered pursuant to clause (a) above;

(d)    as soon as available, but in any event within 75 days after the end of each of the first three (3) fiscal quarters of each fiscal year of TWC (commencing with the fiscal quarter ended March 31, 2018), a consolidated balance sheet of TWC and its Consolidated Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in shareholders' equity, and cash flows for such fiscal quarter and for the portion of TWC's fiscal year then ended, setting forth in each case in comparative form, as applicable, the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, certified by a Responsible Officer of TWC as fairly presenting in all material respects the consolidated financial condition, results of operations, shareholders' equity and cash flows of TWC and its Consolidated Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, provided, that the financial statements described in this clause (d) shall not be required to be delivered if such financial statements would be the same as the financial statements delivered pursuant to clause (b) above;

(e)    as soon as available, but in any event within 75 days after the end of each fiscal quarter of each fiscal year of TWC Domestic (commencing with the fiscal quarter ended March 31, 2018), a consolidated balance sheet of TWC Domestic as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in shareholders' equity, and cash flows for such fiscal quarter and for the portion of TWC Domestic's fiscal year then ended, all in reasonable detail, certified by a Responsible Officer of TWC Domestic as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of TWC Domestic and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(f)    as soon as available, but in any event no later than concurrently with the financial statements delivered pursuant to Section 6.01(a), an annual business plan and budget of each of TWC Domestic and TWC (on a consolidated basis), including forecasts prepared by management of TWC Domestic and TWC, in a form similar to the business plan and budget provided to the Prepetition Agent pursuant to the terms of the Prepetition Credit Agreement or in such other form reasonably satisfactory to the Administrative Agent, of consolidated statements of income or operations and cash flows and of projected Indebtedness and the projected Borrowings of the Borrowers on a quarterly basis for the immediately following fiscal year.

**SECTION 6.02**    Certificates; Other Information.    Deliver to the Administrative Agent:

(a)    [reserved];

55

(b)       concurrently with the delivery of the financial statements referred to in Sections 6.01(a) to (e) (commencing with the delivery of the financial statements for the fiscal year ended December 31, 2017), a duly completed Compliance Certificate;

(c)       promptly after any request by the Administrative Agent or any Lender (through the Administrative Agent), copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of Holdings by independent accountants in connection with the accounts or books of Holdings or any of its Subsidiaries, or any audit of any of them;

(d)       promptly, and in any event within five (5) Business Days after receipt thereof by Holdings or any of its Subsidiaries, copies of each notice or other correspondence received from the SEC, the United States Department of Justice or the Federal Trade Commission (or comparable state authority or agency in the U.S. or any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such department or agency regarding financial or other operational results or activities of Holdings or any of its Subsidiaries;

(e)       promptly, such additional information (including access to each Loan Party's books, records, personnel and advisors) regarding the business, financial, legal or corporate affairs of the Loan Parties and their respective Subsidiaries or compliance with the terms of the Loan Documents or the Domestic Distribution Agreements or the Foreign Distribution Agreements, as the Administrative Agent or any Lender (through the Administrative Agent) may from time to time reasonably request;

(f)       concurrently with the delivery of each quarterly Compliance Certificate by the Borrowers, copies of all Domestic Distribution Agreements, amendments to Domestic Distribution Agreements, Foreign Distribution Agreements, amendments to Foreign Distribution Agreements, Notices of Assignment, and Directions to Pay, in each case executed by a Loan Party during the preceding quarter and not previously delivered hereunder;

(g)       promptly following a request by the Administrative Agent, a list of all agreements executed in connection with each Picture included in the Collateral that provide for deferments or Participations, together with copies of such agreements as the Administrative Agent may reasonably request (in each case to the extent available to the Loan Parties in the event none of them is responsible for making payments of such deferments or Participations);

(h)       from time to time such information as may be necessary to keep current each of the applicable Schedules prepared by the Borrowers and attached to this Agreement (other than to the extent any such Schedules relate to representations given as of the Closing Date);

(i)       promptly after the same become available, copies of all monthly operating reports, projections or other information respecting Loan Parties' business or financial condition as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Loan Parties with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee, at the time such

56

document is filed with the Bankruptcy Court, or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any appointed in the Chapter 11 Cases) or the Committee, copies of which shall also be delivered to the Prepetition Agent;

(j)        commencing on the date that is two calendar weeks after the Closing Date, and every two calendar weeks thereafter, a receivable servicing report in form and substance acceptable to the Administrative Agent and the Prepetition Agent, which shall outline the servicing status of the Loan Parties' accounts receivable (including, without limitation, status of (i) delivery of items necessary for the obligors on such receivables to exploit the related rights, (ii) invoicing, and (iii) estimated cash receipt date for such receivables) and outlining the employees of the Loan Parties responsible for completing the servicing and collection process with respect to such receivables, a copy of which shall also be delivered to the Prepetition Agent;

(k)        on or before 7:00 PM on Tuesday of each calendar week (commencing with the Tuesday falling during the first full calendar week after the Petition Date), a weekly line-by-line budget variance report, in form and scope reasonably acceptable to Administrative Agent, which report shall (i) compare actual cash receipts and disbursements of the Loan Parties with amounts provided for in the Approved Budget on a line-by-line basis for the preceding one-week period and the preceding four-week rolling period and (ii) include an explanation of any variances for each line item (the "Variance Report"), a copy of which shall also be delivered to the Prepetition Agent;

(l)        commencing no later than the date that is four (4) weeks after the Closing Date, a supplement to the then-operative Approved Budget setting forth all projected cash receipts and disbursements (by line item) of the Loan Parties and their Subsidiaries on a weekly basis for the four-week period commencing with the calendar week following the last calendar week included in such then-operative Approved Budget, which shall be delivered once every four (4) weeks, copies of which shall also be delivered to the Prepetition Agent (such supplement, if approved by the Administrative Agent and Prepetition Agent, shall thereafter become part of the Approved Budget, and such Approved Budget, as supplemented by such supplement, shall replace the then-operative Approved Budget for all purposes); provided, that although the Loan Parties may submit budget supplements to the Administrative Agent and the Prepetition Agent, until the Administrative Agent and the Prepetition Agent approve any such supplement, such supplement shall not become part of the Approved Budget and the Loan Parties shall continue to comply with the operative Approved Budget (subject to the Permitted Variance); and

(m)        on or before 7:00 PM on Tuesday of each calendar week (commencing with the Tuesday falling during the first full calendar week after the Petition Date), a weekly report with respect to the Sale Process (including, without limitation, full copies of any preliminary and final bids received), in form and scope reasonably acceptable to Administrative Agent, a copy of which shall also be delivered to the Prepetition Agent.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Loan Parties' behalf on an Internet or intranet

website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent, including, without limitation, the Platform); provided that (A) the Loan Parties shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Loan Parties to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (B) the Loan Parties shall notify the Administrative Agent and each Lender (by facsimile or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  If for any reason out of the Loan Parties' control (including, without limitation, malfunction of the Platform) an item posted by the Loan Parties on any website (including the Platform) is not accessible after the Loan Parties have notified the Administrative Agent and each Lender of such posting, the Loan Parties shall promptly upon request deliver the subject item to the Administrative Agent and the Lenders in paper copies, and the failure by the Loan Parties to timely deliver such item shall not constitute a breach by the Loan Parties hereunder.  The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Loan Parties hereby acknowledge that (a) the Administrative Agent and/or the Arranger will make available to the Lenders materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on DebtX, IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Loan Parties or their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Loan Parties hereby agree that if any of the Lenders are Public Lenders, it shall identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that:  (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent, the Arranger and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 13.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

All certificates and other information and reports delivered pursuant to this Section 6.02 shall be in form and with sufficient detail as is acceptable to the Administrative Agent and the Prepetition Agent, in their sole discretion.

**SECTION 6.03**        <u>Notices</u>.    Promptly notify the Administrative Agent and each Lender:

(a)        of the occurrence of any Default, Master Distributor Default or any material breach of the Master Services Agreement;

(b)        of any matter, other than the Chapter 11 Cases, including (i) any breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party, (ii) any dispute, litigation, investigation, arbitration, proceeding or suspension between any Loan Party and any Governmental Authority or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party, including pursuant to any applicable Environmental Laws, in each case that has resulted or would reasonably be expected to result in a Material Adverse Effect; and

(c)        of any material change in accounting policies or financial reporting practices by any Loan Party.

Each notice pursuant to <u>Section 6.03</u> shall be accompanied by a statement of a Responsible Officer of the applicable Loan Party setting forth details of the occurrence referred to therein and stating what action such Loan Party has taken and proposes to take with respect thereto.    Each notice pursuant to <u>Section 6.03(a)</u> shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**SECTION 6.04**        <u>Payment of Obligations</u>.    Pay and discharge as the same shall become due and payable, all its obligations and liabilities except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, including all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets and all lawful claims that, if unpaid, would by law become a Lien upon its property, in each case unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Loan Party; provided, that such Loan Party will pay all such tax liabilities, assessments and governmental charges or levies or lawful claims forthwith upon the commencement of proceedings to foreclose any Lien that may have attached as security therefor, or post a bond or other security therefor acceptable to the Administrative Agent; provided, no Loan Party shall be required to pay any such tax liabilities, assessments and governmental charges or levies the nonpayment of which is permitted by the Bankruptcy Code.

**SECTION 6.05**        <u>Preservation of Existence, Etc</u>.    (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by <u>Section 7.04</u>; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered copyrights, distribution rights, patents, trademarks, trade names and service marks, if any, the non-preservation of which would reasonably be expected to have a Material Adverse Effect.

**SECTION 6.06**        Maintenance of Properties.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted and (b) make all necessary repairs thereto and renewals and replacements thereof, in each case except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

**SECTION 6.07**        Maintenance of Insurance.

(a)        Maintain with financially sound and reputable insurance companies not Affiliates of any Loan Party, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons.

(b)        Maintain, or cause to be maintained, in effect during the period from the date of the initial acquisition of any Picture included in the Collateral through the third anniversary of the date on which such Picture included in the Collateral is released and as otherwise required by applicable contracts, a so-called "Errors and Omissions" policy covering all such Pictures included in the Collateral, and cause such Errors and Omissions policy to provide coverage to the extent and in such manner as is customary for Pictures of like type, but at a minimum to the extent and in such manner as is required under all applicable Domestic Distribution Agreements and Foreign Distribution Agreements and other contracts relating thereto.

(c)        To the extent practicable, use commercially reasonable efforts to cause all such above-described insurance (excluding worker's compensation insurance) to:  (i) provide for the benefit of the Lenders that at least 30 days' prior written notice of cancellation, termination, non-renewal or lapse or material change of coverage shall be given to the Administrative Agent; (ii) name the Administrative Agent for the benefit of the Secured Parties as a loss payee (except for "Errors and Omissions" insurance and other third party liability insurance); provided, that so long as no Event of Default has occurred or is continuing, property insurance proceeds may be used to repair damage in respect of which such proceeds were received; and (iii) to the extent that none of the Secured Parties shall be liable for premiums or calls, name the Administrative Agent (for the benefit of the Secured Parties) as an additional insured pursuant to an additional insured endorsement reasonably acceptable to the Administrative Agent, including, without limitation, under any "Errors and Omissions" policy.

(d)        Render to the Administrative Agent upon the request of the Administrative Agent a broker's report in form and substance reasonably satisfactory to the Administrative Agent as to all such insurance coverage including such detail as the Administrative Agent may reasonably request.

**SECTION 6.08**        Compliance with Laws.  Comply in all respects with the requirements of all Laws (including all Environmental Laws) and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which: (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and such contest would not reasonably be

expected to have a Material Adverse Effect; or (b) the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

**SECTION 6.09**    Books and Records.  Maintain true and complete books of record and account, in which entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Loan Party.

**SECTION 6.10**    Inspection and Audit Rights.  Permit representatives and independent contractors of the Administrative Agent and each Lender (coordinated through the Administrative Agent) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to the customary policies and procedures of such independent public accountants), all at the reasonable expense of such Loan Party and during normal business hours upon reasonable advance notice to such Loan Party.  The Loan Parties shall provide the Administrative Agent copies of all audit reports prepared with respect to the semi-annual audit of Eligible Receivables included in the Borrowing Base under and as defined in the Prepetition Agreement concurrently with delivery of such reports to the Prepetition Agent pursuant to the terms of the Prepetition Agreement.

**SECTION 6.11**    Use of Proceeds.  Use the proceeds of the Borrowings solely for: (i) working capital purposes of the Loan Parties from and after the Closing Date, (ii) current interest and fees due to the Administrative Agent and the Lenders pursuant to the terms of this Agreement, (iii) the payment of adequate protection payments to the Prepetition Agent and the Prepetition Lenders and (iv) the allowed administrative costs and expenses of the Chapter 11 Cases (including, without limitation, costs and expenses associated with the Collection Proceedings), in each case of clauses (i) through (iv), solely in accordance with the Approved Budget (subject to the Permitted Variance) and the Financing Orders.  The Loan Parties shall not be permitted to use the Carve-Out, the Cash Collateral or the proceeds of the Loans to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation challenging the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the Obligations, the Prepetition Obligations, or the security interests or Liens securing any of the Obligations or the Prepetition Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against the Administrative Agent, any Lender, the Prepetition Agent or any Prepetition Lender (in each case, other than to seek a determination that an Event of Default under this Agreement or under the Prepetition Credit Agreement has not occurred or is not continuing); provided that an amount to be set forth in the Financing Orders shall be made available to the Committee for investigation costs in respect of the stipulations set forth in the Financing Orders.

**SECTION 6.12**    Further Assurances.  Promptly upon the reasonable request of the Administrative Agent, or any Lender through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable Law, subject such Loan Party's properties, assets, rights or interests to

the Liens now or hereafter intended to be covered by any of the Loan Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Loan Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which such Loan Party is or is to be a party.

**SECTION 6.13**    Material Contracts.    Perform and observe all the terms and provisions of each contract (including any Domestic Distribution Agreement and any Foreign Distribution Agreement) to be performed or observed by it, maintain each such contract in full force and effect, enforce each such contract in accordance with its terms, take all such action to such end as may be from time to time reasonably requested by the Administrative Agent and, upon the reasonable request of the Administrative Agent, make to each other party to each such contract such demands and requests for information and reports or for action as such Loan Party is entitled to make under such contract except, in each case, where the failure to do so, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

**SECTION 6.14**    Copyrights.    Obtain instruments of transfer or other documents evidencing the interest of TWC Domestic with respect to the copyright and distribution rights relating to Qualifying Pictures in which TWC Domestic owns a copyrightable interest and promptly record, or cause to be recorded, if such interest may be recorded with the U.S. Copyright Office or such other jurisdictions, such instruments of transfer on the United States Copyright Register and such other jurisdictions as the Administrative Agent may reasonably specify.

**SECTION 6.15**    Audit Rights.    Promptly notify the Administrative Agent of, and at all times allow the Administrative Agent or its designee access to the results of, all audits conducted (a) by such Loan Party of any Domestic Distributor under any Domestic Distribution Agreement or any Foreign Distributor under any Foreign Distribution Agreement with respect to any Picture included in the Collateral, other third party distributor, partnership or joint venturer, or (b) by any other contract counterparty of such Loan Party.  Upon the reasonable request of the Administrative Agent, subject to the reasonable approval of such Loan Party, to the extent that such Loan Party shall have the right to conduct such audits, such Loan Party will exercise its audit rights against any Domestic Distributor or any Foreign Distributor, other third party distributor, partnership or joint venturer in accordance with its current business practices.  If an Event of Default shall have occurred and be continuing, then the Administrative Agent shall have the right to exercise directly such Loan Party's audit rights under any agreement with respect to any Picture included in the Collateral to the extent such rights are provided for in the Domestic Distribution Agreement or Foreign Distribution Agreement or otherwise agreed to by the related Domestic Distributor or Foreign Distributor, as applicable.

**SECTION 6.16**    Laboratories.    To the extent TWC Domestic has control over, or rights to receive, any of the Physical Materials relating to any Qualifying Picture, deliver or cause to be delivered to a Laboratory or Laboratories all negative and preprint material, master tapes and all sound track materials with respect to each such Picture and deliver, or cause to be

delivered, to the Administrative Agent a copy of the fully executed Laboratory Access Letter delivered to the Prepetition Agent under the Prepetition Credit Agreement covering such materials.  Promptly upon delivery, but in no event later than thirty (30) days from such delivery, of any negative or other preprint or sound track material or master tapes to another Laboratory, TWC Domestic shall provide the Administrative Agent a copy of the fully executed Laboratory Access Letter delivered to the Prepetition Agent under the Prepetition Credit Agreement executed by such other Laboratory and all other parties to such Laboratory Access Letter (including the Prepetition Agent).  TWC Domestic hereby agrees not to deliver or remove or cause the delivery or removal of the original negative and film or sound materials or master tapes with respect to any Qualifying Picture in which TWC Domestic has an interest to a location outside the United States without the prior written consent of the Administrative Agent and the Prepetition Agent.

**SECTION 6.17**     <u>Distribution Agreements and Other Receivables Contracts</u>.

(a)     From time to time (i) furnish to the Administrative Agent such information and reports in the possession of or reasonably available to such Loan Party regarding the Domestic Distribution Agreements, the Foreign Distribution Agreements and Other Receivables Contracts, in each case, relating to the Collateral as the Administrative Agent may reasonably request, and (ii) upon the occurrence and during the continuance of an Event of Default, at the request of the Administrative Agent, make such demands and requests to the other parties to such Domestic Distribution Agreements, Foreign Distribution Agreements or Other Receivables Contracts for information and reports or for action as such Loan Party is entitled to make under each such Domestic Distribution Agreement, Foreign Distribution Agreement and Other Receivables Contracts, in each case, relating to the Collateral.

(b)     Promptly upon receipt thereof, deliver to the Administrative Agent (but not subject to its approval unless otherwise required pursuant to <u>Section 7.19(a)</u>) any material proposed amendments to (i) the Domestic Output Agreements and (ii) the economic terms of the existing Domestic Distribution Agreements, Foreign Distribution Agreements or Other Receivables Contracts, in each case, relating to the Collateral.

(c)     Cause each Domestic Distribution Agreement, Foreign Distribution Agreement and Other Receivables Contract, in each case, relating to the Prepetition Collateral (or an interparty agreement, Notice of Assignment or Direction to Pay entered into in accordance therewith) to provide that any and all payments to be made in favor of TWC Domestic thereunder shall be remitted directly (i) to the Collection Account, (ii) if payments thereunder constitute both Collateral and non-Collateral and the applicable obligor will only remit payments to a single account, to the Escrow Account or the HSBC Collection Account or (iii) if payments are from Netflix under the Netflix Agreement with respect to the Prepetition Collateral, to the Netflix Collection Account.

(d)     Promptly upon receipt thereof by such Loan Party, deliver to the Administrative Agent to be held as part of the Collateral, the original of all letters of credit (including any amendments thereto) to the extent such letters of credit are related to the Collateral and the face amounts thereof exceed $100,000 individually or in the aggregate that are issued for the benefit of such Loan Party (whether pursuant to a Domestic Distribution

Agreement, Foreign Distribution Agreement, Other Receivables Contract or otherwise) after the date hereof; provided, that, so long as no Event of Default shall have occurred and be continuing, the Administrative Agent shall, upon written request by such Loan Party, release any such letter of credit to such Loan Party in order to permit such Loan Party to present such letter of credit at the time of a drawing.

(e)    Take all commercially reasonable action on its part to be performed necessary to effect timely payments under all letters of credit that are issued for the benefit of such Loan Party, including, without limitation, timely preparation, acquisition and presentation of all documents, drafts or other instruments required to effect payment thereunder.

**SECTION 6.18**    Sale Process.

(a)    Cause the following actions (collectively, the "Sale Process") to occur no later than the applicable date set forth below:

(i)    At all times on and after the Closing Date, the Borrowers shall continue to retain the Investment Bank to conduct a process to market and sell the assets of the Loan Parties; provided, that so long as the Borrowers have filed an application to retain the Investment Bank on or before the Closing Date, the Investment Bank shall be deemed to be retained for purposes of this Agreement unless such application is denied by the Bankruptcy Court or the Borrowers or the Investment Bank otherwise terminates the Investment Bank's engagement;

(ii)    The Investment Bank shall (i) be authorized to communicate directly with the Administrative Agent and each Lender regarding each Loan Party, each of their Subsidiaries, the Collateral and the Sale Process; (ii) have weekly calls with the Administrative Agent and the Lenders to discuss the Loan Parties' financial performance and operations, the Approved Budget and the progress of the Sale; and (iii) provide the Administrative Agent with such information as shall be requested by the Administrative Agent in connection with the consultation or consent rights, as applicable, of the Administrative Agent with respect to the Sale Process set forth in the Approved Bidding Procedures;

(iii)    No later than thirty-five (35) calendar days after the Petition Date, obtain Bankruptcy Court approval of the Bidding Procedures Motion, pursuant to an order (the "Bidding Procedures Order") in form and substance acceptable to Administrative Agent and the Prepetition Agent;

(iv)    No later than sixty (60) calendar days after the entry of the Bidding Procedures Order, commence and complete, subject to the supervision of the Bankruptcy Court and in accordance with the Approved Bidding Procedures, the Auction;

(v)    No later than ten (10) Business Days after the conclusion of the Auction, obtain Bankruptcy Court approval of the Sale of all or substantially all of the Loan Parties' assets to one or more buyers on the terms of the successful bid (the "Approved Sale") pursuant to a sale order in form and substance acceptable to the Administrative Agent and the Prepetition Agent (the "Sale Order"); and

(vi)     No later than 125 calendar days after entry of the Petition Date, consummate the Approved Sale pursuant to the Sale Order;

provided, that the Sale Order shall provide that the net proceeds of the Approved Sale shall be paid concurrently with the consummation of the Approved Sale, first, to the Administrative Agent, on behalf of the Lenders, to be applied against and in full satisfaction and indefeasible payment of the Obligations, subject to and in accordance with the terms hereof (but only to the extent of the amount of such Obligations); and second, to be paid to the Prepetition Agent on behalf of the Prepetition Lenders, to be applied against and in full satisfaction and indefeasible payment of the Prepetition Obligations, subject to and in accordance with the terms of the Prepetition Loan Documents (but only to the extent of the amount of such Prepetition Obligations); provided, further that neither the Approved Bidding Procedures Order nor the Sale Order nor any of the other approvals described in this section shall be amended or otherwise modified without the consent of the Administrative Agent and the Prepetition Agent.

(b)     (i) If the Loan Parties elect not to proceed with a sale of substantially all of their assets or do not receive any acceptable bids for the sale of substantially all of their assets in accordance with the Sale Process, the Loan Parties shall nonetheless proceed with a sale of the Prepetition Collateral in a manner that complies with the deadlines (as may be extended by the Administrative Agent and the Prepetition Agent, in their reasonable discretion) and the other provisions of the Sale Process, with the sole modification thereto being the scope of the assets being auctioned and sold; subject to the Administrative Agent's and the Prepetition Agent's credit bid rights under Section 363(k) of the Bankruptcy Code and all other applicable laws.

**SECTION 6.19**     Continuous Engagement of Professional Advisors.

(a)     From and after the date the related retention order is entered, the Borrowers shall continuously retain the Chief Restructuring Officer at all times, as chief restructuring officer of the Borrowers, on terms and scope of authority acceptable to the Administrative Agent, the Prepetition Agent, the Required Lenders and the Prepetition Required Lenders, which Chief Restructuring Officer shall have financial and legal control and report to the Board of Directors, or similar body, of each Loan Party; and

(b)     the Borrowers shall continuously retain the Investment Bank at all times, as investment bank, on terms reasonably acceptable to the Administrative Agent, the Prepetition Agent, the Required Lenders and the Prepetition Required Lenders, to market the assets of the Loan Parties in connection with obtaining a Stalking Horse Bidder and assist the Borrowers with obtaining Bankruptcy Court approval of the related sale pursuant to Section 363 of the Bankruptcy Code.

**SECTION 6.20**     Delinquent Receivables.

(a)     Commence, within ten (10) Business Days after receipt of a written request from the Administrative Agent (a "Request for Delinquency Proceeding"), one or more adversary proceedings against each Delinquent Party by filing one or more complaints, in form and substance reasonably acceptable to the Administrative Agent and the Prepetition Agent, demanding payment by such Delinquent Party of all delinquent amounts owed by such

Delinquent Party to the Loan Parties pursuant to the Loan Parties' agreements with such Delinquent Party (collectively, the "<u>Collection Proceedings</u>"), with the costs associated with the Collection Proceedings to be funded using the proceeds of the Loans;

(b)    Continue to prosecute the Collection Proceedings and use such Loan Parties' respective best efforts to collect all amounts due to the Loan Parties' estates from the Delinquent Parties; and

(c)    Not file any pleadings in the Collection Proceedings that are not reasonably acceptable to the Administrative Agent and the Prepetition Agent;

<u>provided</u> <u>that</u>, notwithstanding any provisions of this Agreement to the contrary, including, without limitation, <u>Section 2.03(b)(ii)</u>, all recoveries obtained by the Loan Parties in any Collection Proceeding constituting a recovery of a receivable attributable to Prepetition Collateral under the Prepetition Loan Documents shall be applied in their entirety by the Loan Parties to repayment of the Prepetition Obligations.

## ARTICLE VII
## NEGATIVE COVENANTS

From the date hereof and for so long as the Commitments shall be in effect, any amount shall remain outstanding under any Note, or any other Obligation shall remain unpaid or unsatisfied, each Loan Party agrees that, unless the Required Lenders shall otherwise consent in writing, it will not, nor will it permit its Subsidiaries to:

**SECTION 7.01**    <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or file or suffer to exist under the UCC of any jurisdiction a financing statement that names such Loan Party or any of its Subsidiaries as debtor, or assign any accounts or other right to receive income, other than the following:

(a)    Liens pursuant to any Loan Document and the Financing Orders;

(b)    Liens pursuant to the Prepetition Credit Agreement;

(c)    Prepetition Third-Party Liens in existence on the Closing Date;

(d)    Liens permitted under the Prepetition Credit Agreement and in existence on the Closing Date;

(e)    Liens permitted under all Prepetition Third-Party Indebtedness and in existence on the Closing Date;

(f)    Liens for Taxes not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted, if appropriate reserves with respect thereto are maintained on the books of such Loan Party in accordance with GAAP; and

(g)    Permitted Third-Party DIP Liens.

**SECTION 7.02**      <u>Indebtedness</u>.   Incur, create, assume or suffer to exist any Indebtedness other than:

(a)      Indebtedness under the Loan Documents;

(b)      Indebtedness pursuant to the Prepetition Credit Agreement;

(c)      Prepetition Third-Party Indebtedness in existence on the Closing Date;

(d)      Indebtedness permitted under the Prepetition Credit Agreement and in existence on the Closing Date;

(e)      Indebtedness permitted under all Prepetition Third-Party Indebtedness and in existence on the Closing Date;

(f)      Guaranties permitted pursuant to <u>Section 7.03</u> hereof to the extent constituting Indebtedness;

(g)      Permitted Third-Party DIP Indebtedness; and

(h)      Indebtedness otherwise permitted under the Approved Budget.

**SECTION 7.03**      <u>Limitation on Guaranties</u>.   Incur, create, assume or suffer to exist any Guaranty (including any obligation as a general partner of a partnership or as a joint venturer of a joint venture in respect of Indebtedness of such partnership or joint venture), either directly or indirectly, except:

(a)      Guaranties required under the Loan Documents;

(b)      Guaranties pursuant to the Prepetition Credit Agreement;

(c)      Guaranties of Prepetition Third-Party Indebtedness in existence on the Closing Date;

(d)      Guaranties permitted under the Prepetition Credit Agreement and in existence on the Closing Date; and

(e)      Guaranties permitted under all Prepetition Third-Party Indebtedness and in existence on the Closing Date.

**SECTION 7.04**      <u>Limitations on Investments</u>.   Create, make or incur any Investment after the date hereof, except:

(a)      Investments permitted under the Prepetition Credit Agreement and in existence on the Closing Date;

(b)      Investments permitted under all Prepetition Third-Party Indebtedness and in existence on the Closing Date;

(c)    Investments held by such Loan Party in the form of cash or Cash Equivalents;

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(e)    Guaranties permitted under Section 7.03 hereof to the extent constituting Investments;

(f)    Investments constituting non-cash proceeds of sales, transfers and other dispositions of assets to the extent permitted by Section 7.07 hereof; and

(g)    Investments otherwise permitted under the Approved Budget.

**SECTION 7.05**    Restricted Payments.  Pay or declare or enter into any agreement to pay or otherwise become obligated to make any Restricted Payment.

**SECTION 7.06**    Consolidation, Merger or Disposition of Assets, etc.  Whether in one transaction or a series of transactions, wind up, liquidate or dissolve its affairs, or enter into any transaction of merger or consolidation, or sell or otherwise make a Disposition of all or substantially all of its property, stock, Equity Interests or assets or agree to do or suffer any of the foregoing other than pursuant to an Approved Sale.

**SECTION 7.07**    Dispositions.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions without recourse of accounts receivable solely for the purpose of collection thereof in the ordinary course of business, the proceeds of which shall be directed to the Collection Account for application in accordance with Section 2.03(b);

(b)    Dispositions expressly permitted or required under any Loan Document; and

(c)    Dispositions pursuant to the Approved Sale.

**SECTION 7.08**    Places of Business; Change of Name, Jurisdiction.  Change the location of its chief executive office or principal place of business, its name as it appears in official filings in its jurisdiction of organization, its entity type, its jurisdiction of organization or its organizational identification number.

**SECTION 7.09**    Limitations on Capital Expenditures.   Make, or incur any obligation to make, any expenditures which would be treated as capital expenditures in accordance with GAAP.

**SECTION 7.10**    Transactions with Affiliates.  Except for transactions between or among the Loan Parties, enter into any transaction of any kind with any Affiliate of such Loan

Party whether or not in the ordinary course of business, other than (i) as contemplated by and in accordance with the Loan Documents, the Prepetition Loan Documents and the Prepetition Third-Party Indebtedness, (ii) on fair and reasonable terms substantially as favorable to such Loan Party as would be obtainable by such Loan Party at the time in a comparable arm's length transaction with a Person other than an Affiliate or (iii) as approved by the Required Lenders (which approval shall not be unreasonably withheld, conditioned or delayed).

SECTION 7.11    Change in Nature of Business.  Engage in any business activities other than businesses of the type conducted by such Loan Party and its Subsidiaries on the date of execution of this Agreement.

SECTION 7.12    Bank Accounts.  Maintain any bank account other than (a) the Collateral Accounts and (b) accounts maintained at a Lender or other financial institution approved by the Administrative Agent and the Prepetition Agent (not to be unreasonably withheld, conditioned or delayed), in each case of clauses (a) and (b), subject to Section 10.01 hereof, as to which the Administrative Agent and Prepetition Agent shall have received notice, and over which the Administrative Agent shall have control, or if such account is subject to a Prepetition Third-Party Lien, with respect to which the control by the creditor on such account shall be held for the benefit of the Administrative Agent as well (in each case, either pursuant to an Account Control Agreement which has been delivered to the Administrative Agent or pursuant to the Financing Orders).

SECTION 7.13    ERISA Compliance.  Engage in a "prohibited transaction", as defined in Section 406 of ERISA or Section 4975 of the Code, with respect to any Plan or Multiemployer Plan or knowingly consent to any other "party in interest" or any "disqualified person", as such terms are defined in Section 3(14) of ERISA and Section 4975(e)(2) of the Code, respectively, engaging in any "prohibited transaction" with respect to any Plan or Multiemployer Plan; or permit any Plan to fail to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code), unless such failure shall have been waived in advance by the Internal Revenue Service; or terminate any Plan in a manner which would result in the imposition of a Lien on any property of such Loan Party pursuant to Section 4068 of ERISA; or breach or knowingly permit any employee or officer or any trustee or administrator of any Plan to breach any fiduciary responsibility imposed under Title I of ERISA with respect to any Plan; engage in any transaction which would result in the incurrence of a liability under Section 4069 of ERISA; or fail to make contributions to a Plan or Multiemployer Plan which would result in the imposition of a Lien on any property of such Loan Party pursuant to Section 303(k) of ERISA or Section 430(k) of the Code, other than where any such circumstance would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 7.14    Hazardous Materials.  Cause or permit any of its properties or assets to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce or process Hazardous Materials, except in compliance in all material respects with all applicable Environmental Laws, nor release, discharge, dispose of or permit or suffer any release or disposal as a result of any intentional act or omission on its part of any Hazardous Materials onto any such property or asset in violation of any Environmental Law, in each case, except where the same would not reasonably be expected to result in a Material Adverse Effect.

**SECTION 7.15**          Use of Proceeds of Loans.  Use the proceeds of Loans hereunder other than for the purposes set forth in, and as permitted by, Section 6.11 hereof.

**SECTION 7.16**          Hedge Agreements.  Enter into any Hedge Agreement other than those in existence on the Closing Date.

**SECTION 7.17**          Subsidiaries.  Acquire or create any new direct or indirect Subsidiary.

**SECTION 7.18**          Accounting Changes.  Make (a) any material change in accounting policies or reporting practices, except as required by GAAP, or (b) any change to its fiscal year.

**SECTION 7.19**          Modification or Termination of Material Agreements.  (a) Make or permit to be made any modification to or termination of (i) any of such Loan Party's material agreements, the Domestic Distribution Agreements (including the identity of the Persons acting as Domestic Distributors thereunder), the Foreign Distribution Agreements (including the identity of the Persons acting as Foreign Distributors thereunder), or any material agreements entered into in connection with any of the foregoing agreements to which such Loan Party is party, in each case, in any manner that (A) would materially increase the conditions to, delay the timing of or decrease the amount of any payments, contributions or loans to be made to such Loan Party, as applicable, thereunder, (B) would materially decrease the conditions to, shorten the timing of or increase the amount of any payments, contributions or loans to be made by such Loan Party, as applicable, thereunder, or (C) is otherwise materially adverse to any Secured Party or its rights under the Loan Documents, in each case of clauses (A), (B) and (C), without the prior written consent of the Required Lenders, and (ii) the Master Distribution Agreement, the Master Services Agreement, and the Organizational Documents, in each case, in a manner that is adverse in any material respect to any Secured Party or its rights under the Loan Documents, or to such Loan Party, without the prior written consent of the Required Lenders.

          (b)          Upon the occurrence and during the continuance of an Event of Default, exercise any material remedies available to such Loan Party under the Loan Documents or the Prepetition Loan Documents without the prior written consent of the Administrative Agent and the Prepetition Agent.

**SECTION 7.20**          No Negative Pledge.  Enter into any agreement (i) prohibiting the creation or assumption of any Lien in favor of the Administrative Agent (for the benefit of the Secured Parties) or any Person(s) refinancing the Facility upon the properties or assets of any Loan Party, whether now owned or hereafter acquired, or (ii) requiring an obligation to be secured as a result of any Lien being granted to the Administrative Agent (for the benefit of the Secured Parties), except this Agreement and the other Loan Documents.

**SECTION 7.21**          Chapter 11 Claims.  Incur, create, assume, suffer to exist or permit any other super priority administrative claim (including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code) which is pari passu with or senior to the claims of the Administrative Agent and the Lenders against the Loan Parties, except with respect to the Carve-Out, the Permitted Third-Party DIP Indebtedness or as set forth in the Financing Order.

**SECTION 7.22**    <u>Repayment of Indebtedness</u>.  Except pursuant to a confirmed reorganization plan, the "first day" orders or any other order consented to by the Administrative Agent and the Required Lenders and except as specifically permitted hereunder, no Loan Party shall, without the express prior written consent of the Required Lenders, make any payment or transfer with respect to any Lien, Indebtedness or other obligation incurred or arising prior to the filing of the Chapter 11 Cases that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

**SECTION 7.23**    <u>Variance Covenant</u>.  For any four-week rolling period, the Loan Parties' actual total disbursements (excluding disbursements with respect to professional and advisor fees) shall not exceed the budgeted total disbursements for the same four-week period by more than $600,000 in the aggregate for such four-week period, which requirement shall be tested, initially, upon the completion of three (3) calendar weeks following the Petition Date, and thereafter, on a weekly basis.  The foregoing permitted variance from the Approved Budget is the "<u>Permitted Variance</u>".  The Loan Parties shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions thereof (subject to the Permitted Variance).

## ARTICLE VIII
## EVENTS OF DEFAULT

**SECTION 8.01**    <u>Events of Default</u>.  Any of the following shall constitute an "<u>Event of Default</u>":

(a)    <u>Non-Payment</u>.  Any Borrower fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan, or (ii) pay within three (3) Business Days after the same becomes due, any interest on any Loan, or any fee due hereunder, or (iii) pay within five (5) Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)    <u>Specific Covenants</u>.  (i) Any Loan Party or any Subsidiary fails to perform or observe any term, covenant or agreement contained in any of <u>Sections 6.01</u>, <u>6.02</u> (other than <u>Sections 6.02(c)</u>, <u>(e)</u>, <u>(g)</u> and <u>(h)</u>), <u>6.03</u>, <u>6.05</u>, <u>6.11</u>, <u>6.18</u>, <u>6.19</u> or <u>6.20</u> or <u>Article VII</u>; or (ii) any Loan Party or any Subsidiary fails to perform or observe any term, covenant or agreement contained in any of <u>Sections 6.02 (c)</u> or <u>(e)</u>, and such failure continues for ten (10) Business Days after the earlier of the date on which (A) any Loan Party or any Subsidiary receives notice thereof or (B) a Responsible Officer of any Loan Party obtains or, with the exercise of reasonable diligence, should have obtained, knowledge thereof; or

(c)    <u>Other Defaults</u>.  Any Loan Party or any Subsidiary fails to perform or observe any other covenant or agreement (not specified in <u>Sections 8.01(a)</u> or <u>(b)</u> above) contained in any Loan Document (other than, for the avoidance of doubt, the Financing Orders) on its part to be performed or observed and such failure continues for 30 days after the earlier of the date on which (i) any Loan Party or any Subsidiary receives notice thereof or (ii) a Responsible Officer of any Loan Party obtains or, with the exercise of reasonable diligence, should have obtained, knowledge thereof; or

(d)    <u>Representations and Warranties</u>.    Any representation, warranty, certification or statement of fact made by or on behalf of any Loan Party herein, in any other Loan Document (other than, for the avoidance of doubt, the Financing Orders), or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>.    (i) Except as occasioned by the filing of the Chapter 11 Cases and obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, any Loan Party or any Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guaranty (other than Indebtedness hereunder and Indebtedness under Hedge Agreements) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guaranty or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guaranty (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guaranty to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Hedge Agreement an Early Termination Date (as defined in such Hedge Agreement) resulting from (A) any event of default under such Hedge Agreement as to which any Loan Party is the Defaulting Party (as defined in such Hedge Agreement) or (B) any Termination Event (as so defined) under such Hedge Agreement as to which any Loan Party is an Affected Party (as so defined) and, in either event, the Hedge Termination Value owed by any Loan Party as a result thereof is greater than the Threshold Amount; or

(f)    <u>Bankruptcy Matters.</u>

(i)    At any time prior to entry of the Final Order, the Interim Order shall cease to be in full force and effect, or the Bankruptcy Court shall enter any order amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order without the prior written consent of the Administrative Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders;

(ii)    The Final Order (x) shall not have been entered within thirty-five (35) days after the Petition Date (or such later date as the Administrative Agent and the Prepetition Agent may agree) or (y) shall, at any time, cease to be in full force and effect, or the Bankruptcy Court shall enter any order amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Final Order without the prior written consent of the Administrative Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders;

72

(iii)    Any Loan Party fails to comply with the Financing Orders and such failure continues for 5 days after the earlier of the date on which (A) any Loan Party or any Subsidiary receives notice thereof and (B) a Responsible Officer of any Loan Party obtains or, with the exercise of reasonable diligence, should have obtained, knowledge thereof;

(iv)    The Bankruptcy Court shall enter any order (A) dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case, (B) appointing a Chapter 11 trustee, a receiver, or an examiner with enlarged powers relating to the operation of the business of any Loan Party under Section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases or (C) granting or allowing any other superpriority claim (other than the Carve-Out or with respect to the Prepetition Third-Party Liens or the Permitted Third-Party DIP Liens) or granting any other lien (including any adequate protection lien, but excluding any Permitted Third-Party DIP Liens) having a priority equal or superior to the claims and Liens in favor of the Administrative Agent securing the Obligations or of the Prepetition Agent  securing the Prepetition Obligations in any of the Chapter 11 Cases;

(v)    The filing of any motion seeking the appointment of a Chapter 11 trustee, a receiver, or an examiner with enlarged powers relating to the operation of the business of any Loan Party under Section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases, or the filing by any Loan Party of any pleading seeking or otherwise consenting to or supporting any of the matters set forth in clauses (A) or (B) of clause (iv);

(vi)    Other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget (subject to the Permitted Variance) in respect of (A) accrued payroll and related expenses as of the commencement of the Chapter 11 Cases, (B) adequate protection payments set forth herein or in the Financing Order and consented to by the Administrative Agent and the Required Lenders, and (C) certain critical vendors and other creditors, in each case to the extent authorized by one or more "first day" or other orders reasonably satisfactory to the Administrative Agent, any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Third-Party Indebtedness or Prepetition payables (including, without limitation, reclamation claims);

(vii)    The filing of any motion seeking an order from the Bankruptcy Court substantively consolidating any of the Loan Parties' estates;

(viii)    The Bankruptcy Court shall enter an order granting relief from the automatic stay to any Person holding or asserting a Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Loan Party or any Subsidiary which have an aggregate value in excess of $[100,000];

(ix)    The occurrence of the Termination Date without the prior or substantially concurrent indefeasible payment in full in cash of all Obligations;

(x)    (A) The filing by any Loan Party of any plan of reorganization or liquidation or the taking of any action in support of the filing of a plan of reorganization or liquidation by a party other than the Loan Parties, in each case, that is not an Acceptable Plan,

without the prior written consent of the Administrative Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders or (B) the termination of the Loan Parties' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

(xi)    Any Loan Party shall file a motion in any of the Chapter 11 Cases to obtain additional financing, other than the Permitted Additional DIP Financing, under Sections 364(c) or (d) of the Bankruptcy Code *pari passu* with, or senior to, the Obligations;

(xii)    (i) Any Loan Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Loan Documents or the Prepetition Loan Documents or the Liens securing the Obligations or the Prepetition Obligations (other than to seek a determination that an Event of Default has not occurred or is not continuing), including without limitation seeking to equitably subordinate or avoid the Liens securing such obligations; or (ii) any Loan Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly supports assertion of the same) against the Administrative Agent, any Lender, the Prepetition Agent or any Prepetition Lenders; provided, however, that it shall not constitute an Event of Default if the Loan Parties provide information with respect to the Prepetition Loan Documents to a party in interest, or are compelled to provide information by an order of the Bankruptcy Court so long as the Administrative Agent has been served with the request for such an order or, if no such service has been made prior to the time the Loan Parties are required to provide information, so long as the Loan Parties provide prior written notice to the Administrative Agent and the Prepetition Agent of any intention or requirement to do so;

(xiii)    Any Person shall obtain a Section 506(a) judgment or similar determination with respect to the Prepetition Obligations that is adverse to the Prepetition Agent and Prepetition Required Lenders;

(xiv)    The allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral;

(xv)    The consummation of a sale of any material portion of the Collateral (other than a sale in the ordinary course of business that is contemplated by the Approved Budget) other than pursuant to the Approved Sale or as otherwise permitted under the Loan Documents;

(xvi)    The allowance of any claim or claims under Section 546(c) or 503(b)(9) of the Bankruptcy Code that is not contemplated in the Approved Budget (subject to the Permitted Variance) or is otherwise unacceptable to the Administrative Agent and the Required Lenders;

(xvii)    The filing with the Bankruptcy Court, prior to the consummation of the Approved Sale and indefeasible payment in full in cash of all Obligations and Prepetition Obligations, of any disclosure statement or plan of reorganization or liquidation that has not been approved, in form and substance, by the Administrative Agent, the Prepetition Agent, the Required Lenders and the Prepetition Required Lenders;

(xviii) The Committee or any other party in interest shall file a complaint or pleading or initiate any other action against the Administrative Agent, any Lender, the Prepetition Agent or any Prepetition Lender, or otherwise file any objection to the claims, or engage in any challenge to the validity, perfection, priority, extent or enforceability of any of the Loan Documents, the Prepetition Loan Documents or the Liens securing any of the Obligations or the Prepetition Obligations; or

(g)     Judgments.  There is entered against any Loan Party (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect or (C) such judgment or order has not been satisfied, vacated or discharged; or

(h)     ERISA.  The occurrence of any of the following:  (i) the termination of a Pension Plan or Multiemployer Plan that has resulted or would reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(i)     Invalidity of Loan Documents.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in writing in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document in writing; or

(j)     Change of Control.  All of the Equity Interests of (i) TWC Domestic shall cease to be owned by TWC or (ii) TWC shall cease to be owned by TWC Holdings; or

(k)     Failure of Liens.  Any applicable Loan Document after delivery thereof pursuant to Section 4.01 or 6.12 shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien (prior to all Liens other than Specified Permitted Encumbrances) on the Collateral purported to be covered thereby.

**SECTION 8.02**     Remedies Upon Event of Default.  If any Event of Default occurs and is continuing, notwithstanding the provisions of Section 362 of the Bankruptcy Code but subject to the Financing Orders, without any application, motion or notice to, hearing before or

notice from, the Bankruptcy Court, the Administrative Agent shall, upon the direction of the Required Lenders, or may, with the consent of the Required Lenders, take any or all of the following actions:

(a)     declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Loan Party;

(c)     declare the right of the Loan Parties to use the Cash Collateral (other than the Carve-Out) to be terminated, whereupon such right to use the Cash Collateral (other than the Carve-Out) shall be terminated; and

(d)     exercise on behalf of itself and the Lenders all rights and remedies (including without limitation, with respect to the Liens in favor of the Administrative Agent on behalf of the Secured Parties) available to it and the Lenders under the Loan Documents and applicable Law;

provided, that in the case of the enforcement of Liens or other remedies with respect to the Collateral pursuant to clause (d) above, the Administrative Agent shall provide the Loan Parties (with a copy to any counsel for the Committee and to the U.S. Trustee) with five (5) calendar days' prior written notice during which time any such party must file a pleading seeking an emergency hearing in opposition to the Administrative Agent's exercise of its rights and remedies; and provided further, that in any hearing following such notice, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the Administrative Agent shall be whether, in fact, an Event of Default has occurred and is continuing.  Unless during such five (5) calendar day-period the Bankruptcy Court determines that an Event of Default has not occurred, upon the expiration of such five (5) calendar day period, the Administrative Agent shall have relief from the automatic stay without further notice or order and may foreclose on all or any portion of the Collateral or otherwise exercise remedies against the Collateral available under the Loan Documents, the Financing Orders and applicable law.

# ARTICLE IX
# GRANT OF SECURITY INTEREST; REMEDIES

**SECTION 9.01**     Security Interests.  Each Loan Party, as security for the due and punctual payment of the Obligations, hereby mortgages, pledges, assigns, transfers, sets over, conveys and delivers to the Administrative Agent (for the benefit of the Administrative Agent and the Secured Parties) and grants to the Administrative Agent (for the benefit of the Secured Parties) a first priority security interest in the Collateral (prior to all Liens other than Specified Permitted Encumbrances).

**SECTION 9.02**    Collection Account; Escrow Account; Netflix Collection Account.

(a)    Pursuant to the terms of the Prepetition Credit Agreement, TWC Domestic has established the Collection Account, and has directed, by a Notice of Assignment or Direction to Pay (or by other substantially similar instructions satisfactory to the Prepetition Agent contained within an Interparty Agreement or other applicable agreement), all account debtors of TWC Domestic, including, without limitation, Domestic Distributors and Foreign Distributors, to make payments under or in connection with the applicable agreements and other documentation directly to the Collection Account, unless the Prepetition Agent has, prior to the date hereof, in its discretion, approved any such remittances to occur through a financial intermediary.

(b)    Subject to Sections 9.02(c), to the extent that an account debtor of TWC Domestic pursuant to the applicable agreement is obligated to remit payments on account of Collateral and non-Collateral or otherwise will not accept direction to remit payments to TWC Domestic to the Collection Account, TWC Domestic has directed, by a Notice of Assignment or Direction to Pay (or by other substantially similar instructions satisfactory to the Prepetition Agent contained within an Interparty Agreement or other applicable agreement), such account debtors of TWC Domestic to make payments under or in connection with the applicable agreements and other documentation directly to the Escrow Account.

(c)    Notwithstanding Sections 9.02(a) and (b) above, TWC Domestic has directed Netflix to make payments under the Netflix Agreement directly to the Netflix Collection Account.

(d)    Each Loan Party will execute such documentation as may be required by the Administrative Agent in order to effectuate the provisions of this Section 9.02.

(e)    In the event any Loan Party receives payment from any Person or proceeds under a letter of credit or otherwise, which payment should have been remitted directly to the Collection Account, the Escrow Account, the Netflix Collection Account or another account subject to a Lien in favor of the Administrative Agent, such Loan Party shall hold such payment or proceeds in trust for the Administrative Agent (for the benefit of the Secured Parties) and shall promptly remit such payment or proceeds to the Collection Account, Escrow Account, Netflix Collection Account or such other account, as applicable, to be applied in accordance with the terms of this Agreement.

**SECTION 9.03**    Loan Parties to Hold in Trust.  Upon the occurrence and during the continuance of an Event of Default, each Loan Party will, upon receipt by it of any revenue, income, profits or other sums in which a security interest is granted by this Article IX, payable pursuant to any agreement or otherwise, or of any check, draft, note, trade acceptance or other instrument evidencing an obligation to pay any such sum, hold the sum or instrument in trust for the Administrative Agent (for the benefit of the Secured Parties), segregate such sum or instrument from their own assets and forthwith, without any notice, demand or other action whatsoever (all notices, demands, or other actions on the part of the Secured Parties being expressly waived), endorse, transfer and deliver any such sums or instruments or both, to the Administrative Agent to be applied to the repayment of the Obligations in accordance with the provisions of this Agreement.

**SECTION 9.04**    Collections, etc.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, in its sole discretion, in its name (on behalf of the Secured Parties) or in the name of any Loan Party or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any commercially reasonable compromise or settlement deemed desirable with respect to, any of the Collateral, but shall be under no obligation to do so, or the Administrative Agent may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, or release, any of the Collateral, without thereby incurring responsibility to, or discharging or otherwise affecting any liability of, such Loan Party.  The Administrative Agent will not be required to take any steps to preserve any rights against prior parties to the Collateral.  If any Loan Party fails to make any payment or take any action required hereunder, the Administrative Agent may make such payments and take all such actions as the Administrative Agent reasonably deems necessary to protect the Administrative Agent's (on behalf of the Secured Parties) security interests in the Collateral and/or the value thereof, and the Administrative Agent is hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest or compromise any Liens that in the judgment of the Administrative Agent appear to be equal to, prior to or superior to the security interests of the Administrative Agent (on behalf of the Secured Parties) in the Collateral (other than Specified Permitted Encumbrances) and any Liens not expressly permitted by this Agreement.

**SECTION 9.05**    Possession, Sale of Collateral.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and the other Secured Parties may enter upon the premises of any Loan Party or wherever the Collateral may be, and take possession of the Collateral, and may demand and receive such possession from any Person who has possession thereof, and the Administrative Agent and the other Secured Parties may take such measures as they deem necessary or proper for the care or protection thereof, including the right to remove all or any portion of the Collateral, and with or without taking such possession may sell or cause to be sold, whenever the Administrative Agent and the other Secured Parties shall decide, in one or more sales or parcels, at such prices as the Administrative Agent and the other Secured Parties may deem appropriate, and for cash or on credit or for future delivery, without assumption of any credit risk, all or any portion of the Collateral, at any broker's board or at public or private sale, without demand of performance but with ten (10) days' prior written notice to the Loan Parties of the time and place of any such public sale or sales (which notice each Loan Party hereby agrees is reasonable) and with such other notices as may be required by applicable Law and cannot be waived, and none of the Administrative Agent and the other Secured Parties shall have any liability should the proceeds resulting from a private sale be less than the proceeds realizable from a public sale, and the Administrative Agent (on behalf of the Secured Parties) or any other Person may be the purchaser of all or any portion of the Collateral so sold and thereafter hold the same absolutely, free (to the fullest extent permitted by applicable Law) from any claim or right of whatever kind, including any equity of redemption, of any Loan Party, any such demand, notice, claim, right or equity being hereby expressly waived and released.  At any sale or sales made pursuant to this Article IX, the Administrative Agent (on behalf of the Secured Parties) may bid for or purchase, free (to the fullest extent permitted by applicable Law) from any claim or right of whatever kind, including any equity of redemption, of any Loan Party, any such demand, notice, claim, right or equity being hereby expressly waived and released, any part of or all of the Collateral offered for sale, and may make any payment on account thereof by using any claim for moneys then due and payable to the

Administrative Agent and the other Secured Parties by the Loan Parties hereunder as a credit against the purchase price.  The Administrative Agent shall in any such sale make no representations or warranties with respect to the Collateral or any part thereof, and none of the Administrative Agent and the other Secured Parties shall be chargeable with any of the obligations or liabilities of the Loan Parties.  Each Loan Party hereby agrees:  (i) that it will, jointly and severally with the other Loan Parties, indemnify and hold the Administrative Agent and the other Secured Parties harmless from and against any and all claims with respect to the Collateral asserted before the taking of actual possession or control of the relevant Collateral by the Administrative Agent pursuant to this Article IX, or arising out of any act of, or omission to act on the part of, any Person (other than the Administrative Agent or any other Secured Party) prior to such taking of actual possession or control by the Administrative Agent (whether asserted before or after such taking of possession or control), or arising out of any act on the part of such Loan Party or its Affiliates or agents before or after the commencement of such actual possession or control by the Administrative Agent, but excluding therefrom all claims with respect to the Collateral resulting from (x) the gross negligence or willful misconduct of any of the Administrative Agent or any other Secured Party or (y) any claims with respect to the Collateral asserted against an indemnified party by such Loan Party in which such Loan Party is the prevailing party; and (ii) none of the Administrative Agent and the other Secured Parties shall have any liability or obligation to such Loan Party arising out of any such claim except for acts of willful misconduct or gross negligence of such Person as finally determined by a court of competent jurisdiction.  Subject only to the lawful rights of third parties, any Laboratory that has possession of any of the Collateral is hereby constituted and appointed by such Loan Party as pledgeholder for the Administrative Agent (on behalf of the Secured Parties) and, upon the occurrence and during the continuation of an Event of Default, each such pledgeholder is hereby authorized (to the fullest extent permitted by applicable Law) to sell all or any portion of the Collateral upon the order and direction of the Administrative Agent, and such Loan Party hereby waives any and all claims, for damages or otherwise, for any action taken by such pledgeholder in accordance with the terms of the UCC not otherwise waived hereunder.  In any action hereunder, the Administrative Agent shall be entitled, if permitted by applicable Law, to the appointment of a receiver without notice, to take possession of all or any portion of the Collateral and to exercise such powers as a court shall confer upon the receiver.

**SECTION 9.06**      Power of Attorney.  Each Loan Party does hereby (a) irrevocably make, constitute and appoint the Administrative Agent or any of its officers or designees its true and lawful attorney-in-fact with full power in the name of the Administrative Agent, such other Person or such Loan Party to receive, open and dispose of all mail addressed to such Loan Party, and to endorse any notes, checks, drafts, money orders or other evidences of payment relating to the Collateral that may come into the possession of the Administrative Agent with full power and right to cause the mail of such Persons to be transferred to the Administrative Agent's own offices or otherwise, and to do any and all other acts necessary or proper to carry out the intent of this Agreement and the grant of the security interests hereunder and under the Loan Documents, and such Loan Party hereby ratifies and confirms all that the Administrative Agent or its designees shall properly do by virtue hereof, and (b) further irrevocably make, constitute and appoint the Administrative Agent or any of its officers or designees its true and lawful attorney-in-fact in the name of the Administrative Agent or such Loan Party (i) to enforce all of such Loan Party's rights under and pursuant to all agreements with respect to the Collateral, all for the sole benefit of the Administrative Agent (for the benefit of the Secured Parties) as contemplated

79

hereby and under the other Loan Documents and to enter into such other agreements as may be necessary or appropriate in the judgment of the Administrative Agent to complete the distribution or exploitation of any Picture that is included in the Collateral, (ii) to enter into and perform such agreements as may be necessary in order to carry out the terms, covenants and conditions of the Loan Documents that are required to be observed or performed by such Loan Party, (iii) to execute such other and further mortgages, pledges and assignments of the Collateral, and related instruments or agreements, as the Administrative Agent may reasonably require for the purpose of perfecting, protecting, maintaining or enforcing the security interests granted to the Administrative Agent (for the benefit of the Secured Parties) hereunder and under the other Loan Documents, and (iv) to do any and all other things necessary or proper to carry out the intention of this Agreement and the grant of the security interests hereunder and under the other Loan Documents; provided, that the power of attorney set forth in this Section 9.06 may only be exercised upon the occurrence and during the continuance of an Event of Default that is not waived in writing by the Required Lenders.  Such Loan Party hereby ratifies and confirms in advance all that the Administrative Agent as such attorney-in-fact or its substitutes shall properly do by virtue of this power of attorney.

    SECTION 9.07    Financing Statements, Direct Payments.  Each Loan Party hereby authorizes the Administrative Agent to file UCC-1 financing statements and any amendments thereto or continuations thereof, and any other appropriate security documents or instruments and to give any notices necessary or desirable as determined by the Administrative Agent to perfect the Lien of the Administrative Agent (for the benefit of the Secured Parties) in the Collateral, in all cases without the signature of such Loan Party, or to execute such items as attorney-in-fact for such Loan Party; provided, that the Administrative Agent shall provide to such Loan Party copies of any such documents or instruments executed by the Administrative Agent.  Such Loan Party authorizes the Administrative Agent to use the description "all assets" or a similar description in any such UCC-1 financing statement.  Such Loan Party further authorizes the Administrative Agent, at the time that any Event of Default shall have occurred and be continuing, to notify any account debtors that all sums payable to such Loan Party relating to the Collateral shall be paid directly to the Administrative Agent.

    SECTION 9.08    Further Assurances.   Upon the request of the Administrative Agent, each Loan Party hereby agrees to duly and promptly execute and deliver, or cause to be duly executed and delivered, at the cost and expense of such Loan Party, such further instruments as may be necessary or proper, in the reasonable judgment of the Administrative Agent, to carry out the provisions and purposes of this Article IX or to perfect and preserve the Liens of the Administrative Agent (for the benefit of the Secured Parties) hereunder and under the other Loan Documents in the Collateral or any portion thereof.

    SECTION 9.09    Termination and Release.  The security interests granted under this Article IX shall terminate upon the Termination Date.  Upon request by a Loan Party (and at the sole expense of the Loan Parties) after such termination, the Administrative Agent will promptly take all reasonable action and do all things reasonably necessary, including authorizing UCC-3 termination statements, termination letters to account debtors, terminations of Account Control Agreements and Laboratory Access Letters, and copyright and trademark releases, to terminate any security interest granted to the Administrative Agent (for the benefit of the Secured Parties)

hereunder; provided that the Administrative Agent shall only be required to deliver such documents to such Loan Party and shall have no obligation to file or record any such document.

**SECTION 9.10**        Remedies Not Exclusive.    The remedies conferred upon or reserved to the Administrative Agent in this Article IX are intended to be in addition to, and not in limitation of, any other remedy or remedies available to the Administrative Agent. Without limiting the generality of the foregoing, the Administrative Agent and the other Secured Parties shall have all rights and remedies of a secured creditor under Article 9 of the UCC and under any other applicable Law.

**SECTION 9.11**        Quiet Enjoyment.    The Administrative Agent and the other Secured Parties acknowledge and agree that their security interest hereunder is subject to the rights of Quiet Enjoyment (as defined below) of the Domestic Distributors under Domestic Distribution Agreements, whether existing on the date hereof or hereafter executed. For the purpose hereof, "Quiet Enjoyment" means, in connection with the rights of a Domestic Distributor under a Domestic Distribution Agreement, the Administrative Agent's and each other Secured Party's agreement that their rights under this Agreement and the other Loan Documents and in the Collateral are subject to the rights of such Distributor to distribute, exhibit and/or to exploit the Pictures included in the Collateral licensed to it under such Domestic Distribution Agreement and to receive prints or tapes and other delivery items or have access to preprint material or master tapes and other items to which they are entitled in connection therewith, and that even if any Secured Party shall become the owner of the Collateral in case of an Event of Default, such Secured Party's ownership rights shall be subject to the rights of such Distributor, under such agreement; provided, however, that such Domestic Distributor shall not be in default with respect to its obligations to pay any amounts payable to any Loan Party or any Affiliate or Subsidiary thereof under the applicable Domestic Distribution Agreement; provided, further, that, except as set forth above, neither the Administrative Agent nor any other Secured Party shall be responsible for any liability or obligation of such Loan Party or Affiliate or Subsidiary thereof or such Domestic Distributor under the applicable Domestic Distribution Agreement. The Administrative Agent agrees that, upon the reasonable request of a Loan Party, it will provide written confirmation (in a customary form reasonably acceptable to the Administrative Agent) of such rights of Quiet Enjoyment to Domestic Distributors under the Domestic Distribution Agreements.

**SECTION 9.12**        Continuation and Reinstatement.    The security interest granted hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment of any Obligation or any part thereof is rescinded or must otherwise be restored by the Administrative Agent or any other Secured Party upon the bankruptcy or reorganization of any Loan Party or otherwise.

## ARTICLE X
## COLLATERAL ACCOUNTS

**SECTION 10.01**        Collateral Accounts.    Prior to the Closing Date, the Borrowers have established with the Prepetition Agent (a) the Borrowing Base Collateral Account and (b) the Participations and Residuals Reserve Account, in each case, into which the Prepetition Agent and/or the Loan Parties may from time to time deposit amounts pursuant to the express

provisions of this Agreement and the Prepetition Credit Agreement requiring or permitting such deposits. The Borrowing Base Collateral Account, the Collection Account, the Netflix Collection Account, the Participations and Residuals Reserve Account and the HSBC Collection Account shall be under the sole dominion and control of the Administrative Agent (for the benefit of the Secured Parties). All of the Collateral Accounts shall at all times be subject to an Account Control Agreement unless otherwise expressly agreed by the Administrative Agent in writing; provided, that the Account Control Agreements in existence on the date hereof to which the Prepetition Agent is party are deemed sufficient to satisfy this requirement if so acknowledged in the Financing Orders.

SECTION 10.02    Grant of Security Interest. Each Loan Party, as security for the due and punctual payment in full of the Obligations (including interest accruing on and after the filing of any petition in bankruptcy or of reorganization of any Loan Party whether or not post filing interest is allowed in such proceeding), hereby assigns to the Administrative Agent (for the benefit of the Secured Parties) and grants to the Administrative Agent (for the benefit of the Secured Parties), a first and prior Lien upon (i) all of such Loan Party's rights in and to the Collateral Accounts and (ii) each other account held by a Loan Party (subject, solely with respect to this clause (ii), to the Specified Permitted Encumbrances), (iii) all cash, documents, instruments and securities from time to time held in the accounts described in clauses (i) and (ii), (iv) all rights pertaining to investments of funds in the accounts described in clauses (i) and (ii), and (v) all products and proceeds of any of the foregoing. All cash, documents, instruments and securities from time to time on deposit in all such accounts, and all rights pertaining to investments of funds in all such accounts shall immediately and without any need for any further action on the part of such Loan Party, the Administrative Agent or any Lender become subject to the Lien set forth in this Section 10.02, be deemed Collateral for all purposes hereof and be subject to the provisions of this Agreement.

SECTION 10.03    Remittances from the Netflix Collection Account. The Account Control Agreement covering the Netflix Collection Account shall require the Account Bank with respect thereto to remit the amount on deposit therein directly to the Escrow Account at the times specified in such Account Control Agreement.

SECTION 10.04    Escrow Account. At any time, TWC shall be entitled to deliver a statement to the Administrative Agent and the Prepetition Agent identifying the amounts on deposit in the Escrow Account constituting Collateral Proceeds and Non-Collateral Proceeds (each as defined in the Escrow Agreement), and the Administrative Agent and Prepetition Agent shall either deliver such instructions to the Escrow Agent or object thereto, in accordance with the terms of the Escrow Agreement.

SECTION 10.05    HSBC Collection Account. TWC Domestic shall cause TWC to provide direction to the depository bank of the HSBC Collection Account to sweep all funds on deposit therein to the Escrow Account.

## ARTICLE XI
## THE ADMINISTRATIVE AGENT

SECTION 11.01    Appointment and Authority.

(a)      Each of the Lenders hereby irrevocably appoints Union Bank to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and no Loan Party shall have any rights as a third party beneficiary of any of such provisions.

(b)      The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by the Loan Parties or any of their respective Subsidiaries to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.06 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Loan Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article XI and Article XIII (including Section 13.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

**SECTION 11.02**      Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**SECTION 11.03**      Exculpatory Provisions.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law;

(c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of their Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)     (i) shall not be liable for any action taken or not taken by it (A) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 13.01) or (B) in the absence of its own gross negligence or willful misconduct, and (ii) shall be deemed not to have knowledge of any Default, Event of Default or Master Distributor Default unless and until notice describing such Default is given to the Administrative Agent by a Borrower or a Lender; and

(e)     shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, Event of Default or Master Distributor Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Loan Documents, (v) the value or the sufficiency of any Collateral, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

    **SECTION 11.04**     Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

    **SECTION 11.05**     Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and

exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

**SECTION 11.06**     Resignation of the Administrative Agent.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor, which shall be either a Lender or a commercial bank organized under the laws of the United States of America or of any State thereof and shall have a combined capital and surplus of at least $250,000,000 and shall be experienced and sophisticated in entertainment industry lending.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that if the Administrative Agent shall notify the Borrowers and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 13.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**SECTION 11.07**     Non-Reliance on Administrative Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make

its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**SECTION 11.08**    No Other Duties, Etc.    Anything herein to the contrary notwithstanding, none of the Bookrunner or the Arranger listed on the cover page hereof, or any Lender appointed as a "Syndication Agent" on or after the date hereof, shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

**SECTION 11.09**    Administrative Agent May File Proof of Claims.    In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Loan Party) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.07 and 13.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.07 and 13.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

**SECTION 11.10**    Collateral Matters.    Each Lender irrevocably authorizes the Administrative Agent, at its option and in its discretion:

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon payment in full of the Obligations on the Termination Date, (ii) that is sold or to be sold as part of or in connection with any sale expressly permitted hereunder or under any other Loan Document, under the Financing Orders or

as part of an Approved Sale, or (iii) if approved, authorized or ratified in writing in accordance with <u>Section 13.01</u>;

(b)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Specified Permitted Encumbrance on such property or any other Lien to the extent approved by the Required Lenders hereunder; and

(c)    to determine that the cost to any Loan Party is disproportionate to the benefit to be realized by the Secured Parties by perfecting a Lien in a given asset or group of assets included in the Collateral and that such Loan Party should not be required to perfect such Lien in favor of the Administrative Agent (for the benefit of the Secured Parties.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property pursuant to this <u>Section 11.10</u>.  In each case as specified in this <u>Section 11.10</u>, the Administrative Agent will, at the Borrowers' expense, execute and deliver to the Borrowers such documents as the Borrowers may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Loan Documents or to subordinate its interest in such item, in each case in accordance with the terms of the Loan Documents and this <u>Section 11.10</u>.

## ARTICLE XII

## GUARANTY

**SECTION 12.01**    <u>Guaranty</u>.

(a)    Each Guarantor hereby agrees that it is jointly and severally liable for, as primary obligor and not merely as surety, and absolutely and unconditionally guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations (collectively the "Guarantor Guaranteed Obligations").  Each Guarantor further agrees that the Guarantor Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.

(b)    Each Borrower hereby agrees that it is jointly and severally liable for, as primary obligor and not merely as surety, and absolutely and unconditionally guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations, which Obligations shall continue to be the primary obligations of the Borrowers (collectively the "Borrower Guaranteed Obligations" and, together with the Guarantor Guaranteed Obligations, the "Guaranteed Obligations").  Each Borrower further agrees that the Borrower Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  The provisions of this Article XII (other than <u>Section 12.10</u>) shall apply equally to each Borrower as guarantor of the Borrower Guaranteed Obligations as to each Guarantor as guarantor of the Guarantor Guaranteed Obligations.

**SECTION 12.02**    Guaranty of Payment.   This Loan Guaranty is a guaranty of payment and not of collection.  Each Loan Party waives any right to require the Administrative Agent or any Lender to sue any Borrower, any Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

**SECTION 12.03**    No Discharge or Diminishment of Loan Guaranty.

(a)    Except as otherwise provided for herein, the obligations of each Loan Party hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including, and without limiting the generality of the foregoing, (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Loan Party or any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Party may have at any time against any Obligated Party, the Administrative Agent, any Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Loan Party hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

The obligations of any Loan Party hereunder are not discharged or impaired or otherwise affected by:  (i) the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of any Loan Party for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

**SECTION 12.04**    Defenses Waived.  To the fullest extent permitted by applicable law, each Loan Party hereby waives any defense based on or arising out of any defense of any Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed

88

Obligations from any cause, or the cessation from any cause of the liability of any Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Loan Party irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person.  The Administrative Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Party under this Agreement except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent permitted by applicable law, each Loan Party waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Party against any Obligated Party or any security.

**SECTION 12.05**    Rights    of    Subrogation;    Subordination    of    Intercompany Indebtedness.

(a)    Rights of Subrogation.  No Loan Party will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties have fully performed all their obligations to the Administrative Agent and the Secured Parties.  Should any Loan Party have the right, notwithstanding the foregoing, to exercise its subrogation rights, each Loan Party hereby expressly and irrevocably (A) subordinates any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off that such Loan Party may have to the payment in full in cash of the Guaranteed Obligations until the Guaranteed Obligations are indefeasibly paid in full in cash and (B) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until the Guaranteed Obligations are indefeasibly paid in full in cash.  Each Loan Party acknowledges and agrees that this subordination is intended to benefit the Administrative Agent and the Secured Parties and shall not limit or otherwise affect such Loan Party's liability hereunder or the enforceability of this Loan Guaranty, and that the Administrative Agent, the Secured Parties and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 12.05.

(b)    Subordination of Intercompany Indebtedness. Each Loan Party agrees that any and all claims of such Loan Party against any Borrower or any other Loan Party hereunder (each an "Obligor") with respect to any "Intercompany Indebtedness" (as hereinafter defined), any endorser, obligor or any other guarantor of all or any part of the Guaranteed Obligations, or against any of its properties shall be subordinate and subject in right of payment to the prior payment, in full and in cash, of all Guaranteed Obligations.  Notwithstanding any right of any Loan Party to ask, demand, sue for, take or receive any payment from any Obligor, all rights, liens and security interests of such Loan Party, whether now or hereafter arising and howsoever existing, in any assets of any other Obligor shall be and are subordinated to the rights of the

Secured Parties and the Administrative Agent in those assets. No Loan Party shall have any right to possession of any such asset or to foreclose upon any such asset, whether by judicial action or otherwise, unless and until all of the Guaranteed Obligations shall have been fully paid and satisfied (in cash) and all financing arrangements pursuant to any Loan Document have been terminated.  If all or any part of the assets of any Obligor, or the proceeds thereof, are subject to any distribution, division or application to the creditors of such Obligor, whether partial or complete, voluntary or involuntary, and whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding, or if the business of any such Obligor is dissolved or if substantially all of the assets of any such Obligor are sold, then, and in any such event (such events being herein referred to as an "Insolvency Event"), any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable upon or with respect to any indebtedness of any Obligor to any Loan Party ("Intercompany Indebtedness") shall be paid or delivered directly to the Administrative Agent for application on any of the Guaranteed Obligations, due or to become due, until such Guaranteed Obligations shall have first been fully paid and satisfied (in cash).  Should any payment, distribution, security or instrument or proceeds thereof be received by the applicable Loan Party upon or with respect to the Intercompany Indebtedness after any Insolvency Event and prior to the satisfaction of all of the Guaranteed Obligations and the termination of all financing arrangements pursuant to any Loan Document among any Loan Party and the Secured Parties, such Loan Party shall receive and hold the same in trust, as trustee, for the benefit of the Secured Parties and shall forthwith deliver the same to the Administrative Agent, for the benefit of the Secured Parties, in precisely the form received (except for the endorsement or assignment of such Loan Party where necessary), for application to any of the Guaranteed Obligations, due or not due, and, until so delivered, the same shall be held in trust by such Loan Party as the property of the Secured Parties.  If any such Loan Party fails to make any such endorsement or assignment to the Administrative Agent, the Administrative Agent or any of its officers or employees is irrevocably authorized to make the same.  Each Loan Party agrees that until the Guaranteed Obligations have been paid in full (in cash) and satisfied and all financing arrangements pursuant to any Loan Document among any Loan Party and the Secured Parties have been terminated, no Loan Party will assign or transfer to any Person (other than the Administrative Agent) any claim any such Loan Party has or may have against any Obligor.

**SECTION 12.06**    Continuing Guarantee; Discharge Only Upon Payment in Full; Reinstatement; Stay of Acceleration.   Each of the Loan Parties' obligations hereunder shall constitute a continuing and irrevocable guarantee of all Guaranteed Obligations now or hereafter existing and shall remain in full force and effect until all Guaranteed Obligations shall have been paid in full in cash, at which time, subject to the foregoing condition, the guarantees made hereunder shall automatically terminate.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of any Borrower or otherwise, each Loan Party's obligations under this Agreement with respect to that payment shall be reinstated at such time as though the payment had not been made.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Loan Party, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Parties forthwith on demand by the Lender.

**SECTION 12.07**      Information.  Each Loan Party assumes all responsibility for being and keeping itself informed of each Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Party assumes and incurs under this Loan Guaranty, and agrees that neither the Administrative Agent nor any Lender shall have any duty to advise any Loan Party of information known to it regarding those circumstances or risks.

**SECTION 12.08**      Maximum Liability.   The provisions of this Article XII are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Loan Party under this Article XII would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Loan Party's liability under this Article XII, then, notwithstanding any other provision of this Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Loan Parties or the Lenders, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Loan Party's "Maximum Liability").   This Section 12.08 with respect to the Maximum Liability of each Loan Party is intended solely to preserve the rights of the Lenders to the maximum extent not subject to avoidance under applicable law, and no Loan Party nor any other Person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Loan Party hereunder shall not be rendered voidable under applicable law. Each Loan Party agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Loan Party without impairing this Article XII or affecting the rights and remedies of the Lenders hereunder; provided that nothing in this sentence shall be construed to increase any Loan Party's obligations hereunder beyond its Maximum Liability.

**SECTION 12.09**      Contribution.  In the event any Loan Party (a "Paying Guarantor") shall make any payment or payments under this Loan Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Article XII, each other Loan Party (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Guarantor Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Article XII, each Non-Paying Guarantor's "Guarantor Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Borrowers after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Loan Parties hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Loan Party, the aggregate amount of all monies received by such Loan Parties from the Borrowers after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Loan Party's several liability for the entire amount of the Guaranteed Obligations (up to such Loan Party's Maximum Liability).  Each of the Loan Parties

covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations. This provision is for the benefit of the Administrative Agent, the Lenders and the Loan Parties and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

**SECTION 12.10** Liability Cumulative. The liability of each Loan Party as a Loan Party under this Article XII is in addition to and shall be cumulative with all liabilities of each Loan Party to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## ARTICLE XIII
## MISCELLANEOUS

**SECTION 13.01** Amendments. No amendment or waiver of any provision of this Agreement and no consent to any departure by any Loan Party, as applicable, from either of the foregoing agreements, shall be effective unless in writing signed by the Required Lenders and the Loan Parties, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a) extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(b) postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment;

(c) reduce the principal of, or the rate of interest specified herein on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to such amount; provided, however, that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein);

(d) change the order of application of any reduction in the Commitments or any prepayment of Loans from the application thereof set forth in the applicable provisions of Section 2.03(b), in any manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender;

(e) change any provision of this Section 13.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify the provisions of this Agreement without the written consent of each Lender; or

(f)       release any material portion of the Collateral in any transaction or series of related transactions, without the written consent of each Lender, <u>provided</u>, that the release of one of the Domestic Output Agreements during the term of this Agreement may be approved by the Required Lenders rather than each Lender;

<u>provided</u>, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders, the Borrowers may replace such non-consenting Lender in accordance with <u>Section 13.13</u>; <u>provided</u> that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrowers to be made pursuant to this paragraph).

**SECTION 13.02**       <u>Notices; Effectiveness; Electronic Communications</u>.

(a)       <u>Notices Generally</u>.     Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)       if to the Loan Parties or the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on <u>Schedule 13.02</u> (as the same may be updated from time to time in accordance with <u>Section 6.02(h)</u>); and

(ii)       if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)       <u>Electronic Communications</u>.     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent,

provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrowers (on behalf of the Guarantors) may, in their respective discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes or as otherwise provided in the third to last paragraph of Section 6.02, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of such Loan Party's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc. Each Loan Party and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Loan Parties and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record

(i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Loan Parties or their securities for purposes of United States Federal or state securities laws.

(e)     Reliance by Administrative Agent and Lenders.  The Administrative Agent and the other Secured Parties shall be entitled to rely and act upon any notices (including telephonic Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall jointly and severally indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of any Loan Party.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**SECTION 13.03**     No Waiver; Cumulative Remedies; Enforcement.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 13.08 (subject to the terms of Section 2.11), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in

addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**SECTION 13.04**      Expenses; Indemnity; Damage Waiver; Costs and Expenses.  (a) Subject to the terms of the Financing Orders, the Loan Parties shall jointly and severally pay on demand all reasonable and documented expenses incurred by the Administrative Agent and its Affiliates and the Lenders, including the reasonable fees, charges and disbursements of outside counsel for the Administrative Agent and the Arranger (Sidley Austin LLP and Young Conaway Stargatt & Taylor, LLP) and other professionals engaged thereby (including Houlihan Lokey), in connection with the syndication of the Facility, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and any and all aspects of the Chapter 11 Cases (the foregoing to include all unpaid prepetition fees, costs and expenses incurred by the Administrative Agent in connection with the Loan Documents) and (ii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any outside counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)      Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify the Administrative Agent (and any sub-agent thereof), each Lender, the Arranger, the Bookrunner and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of counsel for any Indemnitee), incurred by any Indemnitee or asserted or awarded against any Indemnitee (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by a Loan Party or any Subsidiary, or any Environmental Liability related in any way to a Loan Party or any Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by a Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, except to the extent determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities

or related expenses are attributable to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.  In the case of an investigation, litigation or other proceeding to which the indemnity in this clause (b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Loan Parties, any of their respective directors, security holders or creditors, an Indemnitee or any other Person or an Indemnitee is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  All such indemnity obligations shall constitute Obligations entitled to the priority and security described in this Agreement and in the Financing Orders.

(c)    Reimbursement by Lenders.  To the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.10(d).

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    Payments.  All amounts due under this Section shall be payable not later than ten (10) Business Days after demand therefor.

(f)    Survival.  The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Total Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**SECTION 13.05**    Payments Set Aside.  To the extent that any payment by or on behalf of any Loan Party is made to the Administrative Agent or any other Secured Party, or the Administrative Agent or any other Secured Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be

fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**SECTION 13.06**    <u>Successors and Assigns</u>.

(a)    <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>Section 13.06(b)</u>, (ii) by way of participation in accordance with the provisions of <u>Section 13.06(d)</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 13.06(g)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void ab initio). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the other Secured Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    <u>Minimum Amounts</u>.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of

the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000, unless the Administrative Agent consents (such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)    Required Consents.    No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition, the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    No Assignment to Borrowers.  No such assignment shall be made to any Borrower or any Affiliate of any Borrower.

(vi)    No Assignment to Natural Persons.  No such assignment shall be made to a natural Person.

(vii)    No Assignment to Competitors or Industry Related Parties.  For the avoidance of doubt, no such assignment shall be made to a Competitor or an Industry Related Party unless otherwise consented by the Borrowers.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04 and 3.05 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon

request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.06(d).

(c)     Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and, with respect to each Loan, all principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by any Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person or any Borrower or any Affiliates or Subsidiaries of any Borrower) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent, the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 13.01 that affects such Participant.  Subject to subsection (e) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 13.06(b).

(e)     Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' and the Administrative Agent's prior written consent.  A Participant shall not be entitled to the benefits of Section 3.01 unless the Borrowers and the Administrative Agent are notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers and the Administrative Agent, to comply with Sections 3.01(e), 3.01(f) and 3.06 as though it were a Lender.

(f)     Participant Register.  The applicable Lender, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain a register that is substantially similar to

100

the Register on which it enters the name and address of each Participant to which such Lender has sold participating interests and the amount of each Participant's interest in such Lender's rights and/or obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive, and such Lender shall treat each Person whose name is recorded in the Participant Register as the economic owner of the related rights and/or obligations, subject to the provisions of Sections 13.06(d) and (e).

(g)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**SECTION 13.07**    Treatment of Certain Information; Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); provided, that unless prohibited by applicable laws, the Administrative Agent shall use commercially reasonable efforts to furnish prior written notice of such disclosure to the Borrowers as soon as practicable in order to afford the Borrowers an opportunity to seek a protective order; it being understood and agreed that (i) any failure to so furnish such notice shall not be deemed a breach by the Administrative Agent of this Agreement, and (ii) if the Borrowers are unable to obtain or does not seek a protective order prior to such time that disclosure of such Information (or any portion thereof) is due from the disclosing party, the disclosure of such Information (or such portion, and only that portion) as to which legal counsel has advised in writing is legally required to be disclosed may be made; provided, further, that before any Information is provided to any third Person under law, court order or similar process, the Administrative Agent or applicable Lender (subject to such provision of law, court order or similar process) shall use commercially reasonable efforts to notify the Borrowers and obtain reliable assurance that confidential treatment will be accorded any Information so disclosed and cooperate with the Borrowers to maintain the confidentiality of such Information, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations, (g) with the consent of the Borrowers or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis

from a source other than the Borrowers not known by the Administrative Agent or such Lender, as applicable, to be bound by an obligation of confidentiality.

For purposes of this Section, "Information" means all information received from any Loan Party or any Affiliate thereof relating to any Loan Party or their respective Subsidiaries or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by such Loan Party or any Affiliate thereof.   Any Person required to maintain the confidentiality of Information as provided in this Section 13.07 shall be considered to have complied with the standard of care with which it must do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning such Loan Party or an Affiliate thereof, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

SECTION 13.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of the Loan Parties now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Loan Parties may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Loan Parties and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 13.09    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than

interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 13.10    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Notwithstanding the foregoing, however, the Financing Orders shall continue to govern the terms and conditions of the transactions contemplated hereby to the extent inconsistent with, or address matters not addressed in, this Agreement.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 13.11    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

SECTION 13.12    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 13.13    Replacement of Lenders.  If (a) any Lender requests compensation under Section 3.04, (b) the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (c) any Lender is a Defaulting Lender, (d) any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by 75% of the Lenders or (e) any other circumstance exists hereunder that gives the Borrowers the right to replace a Lender as a party hereto, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in

103

accordance with and subject to the restrictions contained in, and consents required by, <u>Section 13.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

        (a)     the Borrowers shall have paid to the Administrative Agent the assignment fee specified in <u>Section 13.06(b)</u>;

        (b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

        (c)     in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

        (d)     such assignment does not conflict with applicable Laws.

        A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**SECTION 13.14    <u>GOVERNING LAW; JURISDICTION</u>.**

        **(a)    <u>GOVERNING LAW</u>.    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW OTHER THAN NEW YORK GENERAL OBLIGATION LAW SECTION 5-1401) AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE)).**

        **(b)    <u>SUBMISSION TO JURISDICTION</u>.    EACH LOAN PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE LOAN PARTIES, THE ADMINISTRATIVE AGENT AND THE LENDERS PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; PROVIDED, THAT THE ADMINISTRATIVE AGENT, THE LENDERS AND EACH LOAN PARTY ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER,   THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE ADMINISTRATIVE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE ADMINISTRATIVE AGENT.   EACH LOAN PARTY**

**EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH LOAN PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH LOAN PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.**

**(c)    WAIVER OF VENUE.    EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.**

**(d)    SERVICE OF PROCESS.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 13.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.**

**SECTION 13.15    WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**SECTION 13.16**    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that:   (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Arranger are arm's-length commercial transactions between such Loan Party and its Affiliates, on the one hand, and the Administrative Agent and the Arranger, on the other hand,

(B) such Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) such Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and the Arranger each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for such Loan Party or any of its Affiliates, or any other Person and (B) none of the Administrative Agent or the Arranger has any obligation to such Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Arranger and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such Loan Party and its Affiliates, and none of the Administrative Agent or the Arranger has any obligation to disclose any of such interests to such Loan Party or any of its Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

      **SECTION 13.17**     <u>Electronic Execution of Assignments and Certain Other Documents</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

      **SECTION 13.18**     <u>USA PATRIOT Act</u>.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the Act. Each Loan Party shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and the year first written.

                                        **THE WEINSTEIN COMPANY HOLDINGS LLC**, as a Borrower


                                        By _____
                                        Name:
                                        Title:


                                        **THE WEINSTEIN COMPANY LLC**, as a Borrower


                                        By _____
                                        Name:
                                        Title:


                                        **TWC DOMESTIC LLC**, as a Borrower


                                        By _____
                                        Name:
                                        Title:


                                        **WEINSTEIN GLOBAL FILM CORP.**, as a Guarantor


                                        By _____
                                        Name:
                                        Title:


                                        **WEINSTEIN TELEVISION LLC**, as a Guarantor


                                        By _____
                                        Name:
                                        Title:

**[OTHER GUARANTORS TBD]**, as a Guarantor

By _____
Name:
Title:

**MUFG UNION BANK, N.A.,** as Administrative
Agent and a Lender


By _____
Name:
Title:

**[OTHER LENDERS TO COME]**, as a Lender

By _____
Name:
Title:

# **EXHIBIT B**

**Interim DIP and Cash Collateral Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
In re:                                                      :      Chapter 11
:
THE WEINSTEIN COMPANY HOLDINGS           :      Case No. 18-_____ (___)
LLC, *et al.*,                                              :
:      Joint Administration Requested
Debtors.[1]                               :
:      Re: Docket No. ____
---------------------------------------------------------------x

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) AND 364(e) AND (B) UTILIZE CASH COLLATERAL OF PRE-PETITION SECURED ENTITIES, (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED ENTITIES, (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c), AND (IV) GRANTING RELATED RELIEF

This matter is before the Court on the motion dated March 19, 2018 (the "Motion")[2] of The Weinstein Company Holdings LLC ("TWC Holdings") and its affiliated debtors, as debtors-in-possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (collectively, the "Chapter 11 Cases"), for entry of an interim order (this "Interim Order") and a final order ("Final Order"), under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and Rule 4001-2 and 9103-1 of the Local

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

[2] All defined terms shall have the meaning ascribed to them in the Motion or DIP Credit Agreement (as defined below) unless otherwise defined herein.

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

(1)      authorization for TWC Holdings, The Weinstein Company LLC ("TWC"), and TWC Domestic LLC ("TWCD"), as debtors and debtors-in-possession (each a "DIP Borrower" and, collectively, the "DIP Borrowers"), to obtain post-petition financing (the "DIP Facility") and for the remaining Debtors (each a "DIP Guarantor" and collectively, the "DIP Guarantors"), as debtors and debtors-in-possession, to guarantee unconditionally the DIP Borrower obligations under the DIP Facility, consisting of a delayed draw term loan facility (the "DIP Facility Loans") in the aggregate maximum principal amount of up to $25 million, of which up to $7,500,000 (the "Interim Advance") shall be advanced upon the entry of this Interim Order, with MUFG Union Bank, N.A., formerly known as Union Bank, N.A. ("MUFG"), as administrative agent (in such capacity, the "DIP Agent") for itself and the DIP Lenders (as defined below), subject and pursuant to the terms of this Interim Order, that certain Debtor-In-Possession Loan and Security Agreement by and among the DIP Borrowers, the DIP Guarantors, the DIP Agent, and the lenders party thereto (the "DIP Lenders"), which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders and substantially similar to the form attached hereto as Exhibit A (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement") and any related documents and instruments delivered pursuant to or in connection therewith (collectively, and together with the DIP Credit Agreement, the "DIP Loan Documents").

(2)      authorization for the Debtors to (i) execute and enter into the DIP Loan Documents and (ii) perform such other and further acts as may be required in connection with the DIP Loan Documents;

(3)     authorization for the Debtors to grant (i) valid, enforceable, nonavoidable and fully perfected security interests and liens (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and consensual priming liens pursuant to section 364(d) of the Bankruptcy Code on Pre-Petition Collateral (as defined below)) to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (collectively, the "DIP Secured Parties") on all DIP Collateral (as defined below) to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "DIP Obligations"), subject and subordinate only to any Permitted Third-Party DIP Liens (as defined below) and those security interests in and liens on DIP Collateral (other than the Pre-Petition Liens (as defined below)) that, as of the Petition Date, were valid, enforceable and nonavoidable (collectively, "Pre-Petition Third-Party Liens") and (ii) subject to the Carve-Out (as defined below) and any Permitted Third-Party DIP Indebtedness (as defined below), superpriority claims (including a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Secured Parties, having recourse to all pre-petition and post-petition property of the Debtors' estates, now owned or hereafter acquired, including, solely upon entry of the Final Order, proceeds of Avoidance Actions (as defined below), whether received by judgment, settlement or otherwise;

(4)     authorization for the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (but excluding any cash collateral subject to Pre-Petition Third-Party Liens) ("Cash Collateral") solely in accordance with the DIP Loan Documents (including, with respect to the proceeds of the DIP Facility Loans comprising Cash Collateral, the Approved Budget (as defined below) then in effect (the initial version of which is attached hereto as Exhibit B), subject to the Permitted Variance (as defined below)), and the

collection and application of Cash Collateral, in each case pursuant to the terms and conditions set forth in this Interim Order and the DIP Credit Agreement;

(5)      authorization to provide adequate protection of the liens and security interests (i) granted by TWCD and TWC (collectively, the "Pre-Petition Obligors") for the benefit of the pre-petition secured lenders holding loans (such lenders in such capacities, the "Pre-Petition Lenders") under that certain Second Amended and Restated Credit and Security Agreement, dated as of September 30, 2013 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "Pre-Petition Credit Agreement"), among TWCD, as Borrower, the Pre-Petition Lenders, and MUFG as Agent (in such capacity, the "Pre-Petition Agent") and (ii) securing the obligations of the Pre-Petition Obligors under the Pre-Petition Credit Agreement, the Pre-Petition Security Documents (as defined below) and all collateral and ancillary documents executed or delivered in connection therewith, including without limitation the Master Distribution Agreement and the Master Services Agreement (each as defined in the Pre-Petition Credit Agreement) (the "Pre-Petition Loan Documents"), as more fully set forth in this Interim Order;

(6)      subject to entry of a Final Order, the waiver by the Debtors of any right to surcharge the Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(7)      an emergency interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of this Interim Order, which, among other things, (i) authorizes TWC Holdings to obtain from the DIP Lenders under the DIP Facility up to $7,500,000 of DIP Facility Loans, on an interim basis, (ii) authorizes the Debtors' use of the Cash Collateral solely in accordance with the DIP Loan Documents (including, with respect to the proceeds of the DIP Facility Loans comprising Cash Collateral, the Approved Budget), subject to the Permitted

4

Variance, on an interim basis; (iii) grants the adequate protection in the relative priorities set forth herein; and (iv) grants the superpriority administrative claims as described herein;

(8)     the scheduling of a final hearing (the "Final Hearing") on the Motion no later than 35 days after the Petition Date, to consider entry of a Final Order granting the relief requested in the Motion on a final basis in form and substance acceptable to the DIP Agent (as to the DIP Facility) and the Pre-Petition Agent (as to the use of Cash Collateral);

(9)     modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the (i) Debtors, (ii) DIP Agent and DIP Lenders, and (iii) Pre-Petition Agent and Pre-Petition Lenders to implement the terms of this Interim Order; and

(10)     waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order.

The initial hearing on the Motion having been held by this Court on March [●], 2018; and this Court having found that, under the circumstances, due and sufficient notice of the Motion and Interim Hearing was provided by the Debtors as set forth in Paragraph [C] below, and this Court having considered all the pleadings filed with this Court; and having overruled all unresolved objections to the relief granted in this Interim Order; and upon the record made by the Debtors at the Interim Hearing, and after due deliberation and consideration and good and sufficient cause appearing therefor:

**BASED ON THE FOREGOING AND THE RECORD MADE AT THE HEARINGS AND PURSUANT TO PAPERS FILED IN THESE CHAPTER 11 CASES, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]:**

        A.    **Petition Date**. On March 19, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") with this Court commencing the Chapter 11 Cases. The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

        B.    **Jurisdiction; Venue**.   This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(b) and 9014 and Local Rule 4001-2. Venue of the Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

        C.    **Notice**. The Interim Hearing was held pursuant to the authorization of Bankruptcy Rule 4001. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, on March [●], 2018, to certain parties-in-interest, including: (i) the Office of the United States Trustee for the District of Delaware, (ii) the 30 largest non-insider unsecured creditors of the Debtors on a consolidated basis, (iii) MUFG, as DIP Agent and Pre-Petition Agent, (iv) Sidley Austin, LLP, as counsel to MUFG, (v) the Internal Revenue Service, (vi) the Securities and Exchange Commission and (vii) the United States Attorney for the District

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

of Delaware.  Under the circumstances, such notice of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

        D.      **Debtors' Stipulations With Respect to Pre-Petition Obligations**. Subject to the limitations described below in Paragraph 15, the Debtors hereby admit, acknowledge, agree and stipulate that:

        (i)      As of the Petition Date, the Pre-Petition Obligors were truly and justly indebted, to the Pre-Petition Agent and the Pre-Petition Lenders (collectively, the "Pre-Petition Secured Parties"), without defense, counterclaim or offset of any kind, pursuant to the Pre-Petition Loan Documents in the aggregate principal amount of $156,411,347 in respect of the loans made under the pre-petition revolving credit facility (the "Pre-Petition Loans"), *plus* accrued and unpaid interest at the default rate with respect thereto and any additional fees, costs and expenses (including any fees and expenses of attorneys, financial advisors, and other professionals that are chargeable or reimbursable under the Pre-Petition Loan Documents) now or hereafter due under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents (collectively, together with all other obligations of the Pre-Petition Obligors arising under the Pre-Petition Loan Documents (including, without limitation, the "Obligations" as defined in the Pre-Petition Credit Agreement and the Pre-Petition ), the "Pre-Petition Obligations").

        (ii)      pursuant to certain security agreements, blocked account, lockbox and pledged account control agreements, assignments, equity pledge agreements, escrow agreements, Pledgeholder Agreements (as defined in the Pre-Petition Credit Agreement), Laboratory Access Letters (as defined in the Pre-Petition Credit Agreement), and other

collateral documents and agreements (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, collectively, the "Pre-Petition Security Documents"), and the other Pre-Petition Loan Documents, TWCD granted to and/or for the benefit of the Pre-Petition Secured Parties first priority (subject only to Permitted Priority Liens (as defined below)), valid, perfected and enforceable security interests and liens (the "Pre-Petition Liens") in and on substantially all of TWCD's personal property, both tangible and intangible, including *inter alia*, all Transferred Assets (as defined in the Pre-Petition Credit Agreement), all goods, accounts, instruments, intercompany obligations, partnerships and joint venture interests, contract rights (including, without limitation, any rights of TWCD to demand and receive any committed but unfunded equity and the rights of TWCD under the Pre-Petition Loan Documents), documents, chattel paper, general intangibles, goodwill, equipment, machinery, inventory, investment property, copyrights, trademarks, trade names, insurance policies, insurance proceeds, cash, the Collateral Accounts (as defined in the Pre-Petition Credit Agreement), any Hedge Agreements (as defined in the Pre-Petition Credit Agreement), deposit accounts, all items on deposit in or otherwise held in or credited to any Collateral Account, money, commercial tort claims, letters of credit, letter of credit rights, and the proceeds of and recoveries received on account of the foregoing, all as more particularly described in the Pre-Petition Security Documents and other Pre-Petition Loan Documents (the "Pre-Petition Collateral");

(iii)    (a) the Pre-Petition Obligations constitute legal, valid and binding Obligations (as defined in the Pre-Petition Credit Agreement) of TWCD (and TWC under that certain Amended and Restated Guaranty, dated as of March 30, 2012, by TWC, as

8

Guarantor, in favor of and for the express benefit of the Pre-Petition Agent); (b) no offsets, defenses or counterclaims to the Pre-Petition Obligations exist; (c) no portion of the Pre-Petition Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Pre-Petition Loan Documents are valid and enforceable by the Pre-Petition Agent for the benefit of the Pre-Petition Secured Parties against each of the applicable Debtors; (e) the liens and security interests of the Pre-Petition Secured Parties constitute valid, binding, enforceable and perfected liens in and to the Pre-Petition Collateral, having the priority set forth in the Pre-Petition Loan Documents and subject and subordinate only to (after giving effect to any applicable intercreditor or subordination agreement) Permitted Priority Liens;[4] (f) the Pre-Petition Obligations constitute allowed secured claims against the applicable Debtors' estates; and (g) no claim of or cause of action held by the Debtors exists against the Pre-Petition Agent, any of the Pre-Petition Lenders, or any of their respective agents, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Pre-Petition Loan Documents (or the transactions contemplated thereunder), the Pre-Petition Obligations or the Pre-Petition Liens, including without limitation, any right to assert any disgorgement or recovery; and

---

[4] Nothing shall prejudice the rights of any party-in-interest including, but not limited to, the Debtors, the Pre-Petition Agent and the Pre-Petition Lenders to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such liens and/or security interests.

(iv)    all of TWCD's cash, including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Pre-Petition Collateral, constitutes Cash Collateral of the Pre-Petition Secured Parties.

E.    **Budget for DIP Facility**.    Attached hereto as <u>Exhibit B</u> is a cash-flow budget setting forth all projected unencumbered and unrestricted cash receipts and cash disbursements (by line item) on a weekly basis for the 18-week period commencing on the Petition Date (the "<u>Initial Approved Budget</u>").    The Initial Approved Budget may be modified or supplemented from time to time by additional budgets prepared by the Debtors and consented to in advance by the DIP Agent, the Majority DIP Lenders, the Pre-Petition Agent, and the Required Lenders, in their respective sole and absolute discretion, without subsequent notice to or order of the Court (each such additional budget, a "<u>Supplemental Approved Budget</u>" and together with the Initial Approved Budget, the "<u>Approved Budget</u>"); <u>provided</u>, <u>however</u>, that the Debtors shall provide a supplement to the Approved Budget every four calendar weeks as set forth in section 6.02(l) of the DIP Credit Agreement, and any such supplement, if approved by the DIP Agent and the Pre-Petition Agent shall become part of the Approved Budget without subsequent notice to or order of the Court.  The Initial Approved Budget is an integral part of this Interim Order and has been relied upon by the DIP Secured Parties to provide the DIP Facility and consent to this Interim Order and by the Pre-Petition Secured Parties to permit the use of the Cash Collateral and consent to this Interim Order.  The Debtors represent and warrant to the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders and this Court that the Initial Approved Budget includes and contains the Debtors' best estimate of all operational receipts that are unencumbered and unrestricted and all operational disbursements,

fees, costs and other expenses that will be payable, incurred and/or accrued by any of the Debtors during the period covered by the Initial Approved Budget and that such operational disbursements, fees, costs and other expenses will be timely paid in the ordinary course of business solely pursuant to and in accordance with the Initial Approved Budget unless such operational disbursements, fees, costs and other expenses are not incurred or otherwise payable. The Debtors further represent that the Initial Approved Budget is achievable and will allow the Debtors to operate in the Chapter 11 Cases, sell substantially all of their assets, as authorized by the Court, and pay postpetition obligations as they come due.  Pursuant to the terms of the DIP Credit Agreement, the Debtors shall provide on a weekly basis to the DIP Agent and the Pre-Petition Agent a report, in form and scope reasonably acceptable to the DIP Agent, comparing the actual disbursements and receipts of the Debtors for the preceding week with the disbursements and receipts contained in the Approved Budget, on a line-by-line basis, for the preceding one-week period and the preceding four-week period and include an explanation of any variances for each line item.  The Debtors shall be permitted a variance between the Approved Budget and the actual cash flow without triggering the occurrence of an Event of Default (as defined in the DIP Credit Agreement) as follows: for any four-week rolling period, the Debtors' actual total disbursements, excluding disbursements with respect to professional and advisor fees, shall not exceed the budgeted total disbursements in the Approved Budget by more than $600,000, in the aggregate, which requirement shall be tested, initially, upon the completion of three calendar weeks following the Petition Date and, thereafter, on a weekly basis (the "Permitted Variance").  The Debtors shall operate solely in accordance with the Approved Budget and all disbursements of the Debtors shall be consistent with the provisions of the Approved Budget, subject to the Permitted Variance.

11

F.    **Immediate Need for Funding**.    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility and authorized use of Cash Collateral.    As a result of the Debtors' financial condition, the use of Cash Collateral alone will be insufficient to meet the Debtors' immediate postpetition liquidity needs. The Debtors' ability to maintain business relationships with their vendors, suppliers and distributors, pay their employees, consummate the sale process described to the Court at the Interim Hearing and otherwise finance their operations prior to the consummation of such sale is essential to the Debtors' continued viability and to their ability to maximize the value of their assets.    In the absence of the DIP Facility and the authorization by this Court to use Cash Collateral, the Debtors' businesses and estates would suffer immediate and irreparable harm, including, without limitation, a cessation of substantially all of their operations.    The preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful restructuring or going concern sale of assets of the Debtors under chapter 11 of the Bankruptcy Code.    Use of Cash Collateral and the DIP Facility will also permit the Debtors to preserve the enterprise value of their businesses pending the sale of their assets.

G.    **No Credit on More Favorable Terms**.    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Loan Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.    The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2)

and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Credit Agreement without the Debtors (i) granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out, any Permitted Third-Party DIP Indebtedness and any Permitted Third-Party DIP Liens, (a) the DIP Superpriority Claims (as defined below) and (b) the DIP Liens (as defined below) in the DIP Collateral (as defined below), in each case under the terms and conditions set forth in this Interim Order and the DIP Loan Documents and (ii) providing the Pre-Petition Secured Parties the adequate protection as provided herein.

H.     **Reasonable; Good Faith**.  The DIP Lenders have indicated a willingness to provide post-petition secured financing to the Debtors but solely on the terms and conditions set forth in this Interim Order and the DIP Loan Documents.   After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Facility to be provided by the DIP Lenders and the authorization to use the Cash Collateral to be provided by the Pre-Petition Agent, on behalf of the Pre-Petition Lenders, represents the best financing presently available to the Debtors.  Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Lenders have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

I.     **Use of DIP Proceeds and Cash Collateral**.   An immediate and critical need exists for the Debtors to use the proceeds of the DIP Facility to continue to operate their businesses, pay wages, maintain business relationships with vendors, suppliers and distributors, and generally conduct their business affairs so as to avoid immediate and irreparable harm to their estates and the value of their assets and to use Cash Collateral to make adequate protection payments.

J.     **Consent by Pre-Petition Secured Parties**.   The Pre-Petition Secured Parties have consented to (i) the financing arrangements contemplated by this Interim Order and the DIP Loan Documents and (ii) Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order and the DIP Credit Agreement, and such consent is binding on all Pre-Petition Secured Parties.

K.     **Adequate Protection**.   The adequate protection provided to the Pre-Petition Secured Parties on account of any diminution in the value of such parties' respective interests in the Pre-Petition Collateral from and after the Petition Date, including, without limitation, resulting from the DIP Facility, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Pre-Petition Collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code.   The consent of the Pre-Petition Secured Parties to the priming of their liens by the DIP Liens (i) does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Pre-Petition Secured Parties that their respective interests in the Pre-Petition Collateral are adequately protected pursuant to this Interim Order or otherwise, and (ii) is conditioned upon entry of this Interim Order and does not and shall not be deemed to constitute consent to the priming of the Pre-Petition Liens other than pursuant to this Interim Order and the terms set forth herein.   The

adequate protection provided herein and other benefits and privileges contained herein are necessary in order to protect the Pre-Petition Secured Parties from the diminution in value of their Pre-Petition Collateral and obtain the foregoing consents and agreements. Nothing herein shall prevent the Pre-Petition Secured Parties from seeking additional adequate protection to the extent permitted by law.

L.    **Good Cause Shown; Best Interest**.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2(b).    Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  This Court concludes that good cause has been shown and that entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for either a successful reorganization or the sale of all or substantially all of their assets pursuant to any subsequent orders of this Court.

M.    **No Liability to Third Parties**.  The Debtors stipulate and the Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in accepting the Interim Approved Budget or any future Supplemental Approved Budget or in taking any other actions permitted by this Interim Order or the DIP Loan Documents, none of the DIP Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

N.    **Section 552**.  In light of the subordination of their liens and super-priority administrative claims (i) in the case of the DIP Secured Parties, to the Carve-Out, the Pre-

Petition Third-Party Liens and any Permitted Third-Party DIP Liens and (ii) in the case of the Pre-Petition Secured Parties to the Carve-Out and the DIP Liens, each of the DIP Secured Parties and the Pre-Petition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply to any of the DIP Secured Parties or the Pre-Petition Secured Parties with respect to the proceeds, products, rents, issues or profits of any of the DIP Collateral or the Pre-Petition Collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral or the Pre-Petition Collateral under section 552(b) of the Bankruptcy Code.  Subject to and immediately upon entry of the Final Order, the Debtors shall be deemed to have irrevocably waived, and to have agreed not to assert, any claim or right under sections 552 or 726 of the Bankruptcy Code seeking to avoid the imposition of the DIP Liens, Pre-Petition Liens or the Adequate Protection Liens on any property acquired by any of the Debtors or any of their estates.

O.    **Findings Regarding Corporate Authority**.  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

P.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      **Approval of Interim Order**.  The Motion is approved on the terms and conditions set forth in this Interim Order.  Any objections to the relief granted in this Interim Order that have not previously been withdrawn are hereby overruled.  This Interim Order shall become effective immediately upon its entry.

2.      **Approval of DIP Loan Documents; Authority Thereunder**.    The Debtors are hereby authorized to enter into the DIP Loan Documents, including the DIP Credit Agreement, and such additional documents, instruments and agreements as may be required or requested by the DIP Agent and the DIP Lenders to implement the terms or effectuate the purposes of this Interim Order.  The Debtors are authorized to comply with and perform all of the terms and conditions contained in the DIP Loan Documents, and directed to repay amounts borrowed, together with interest and fees thereon (including, without limitation, the fees in section 2.07 of the DIP Credit Agreement), as well as any other outstanding DIP Obligations to the DIP Lenders in accordance with and subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.

3.      **Authorization to Borrow DIP Facility Loans and Use Cash Collateral**.  Upon finalizing and executing the DIP Credit Agreement and the other DIP Loan Documents, the DIP Borrowers are immediately authorized to borrow from the DIP Lenders, and the Guarantors are immediately authorized to guaranty, initial borrowings under the DIP Facility of up to an aggregate principal amount of $7,500,000 of DIP Facility Loans, subject to and in accordance with the terms of this Interim Order and the DIP Credit Agreement.   The Debtors are authorized to use the proceeds of the DIP Facility Loans and the Cash Collateral solely in accordance with the terms of the DIP Loan Documents (including, with respect to the proceeds of the DIP Facility Loans comprising Cash Collateral, the Approved Budget) and this Interim

17

Order. Authorization to use the Proceeds of the DIP Facility Loans and the Cash Collateral will terminate upon the earliest to occur of (a) the Scheduled Termination Date (as defined in the DIP Credit Agreement); (b) the date of acceleration of the DIP Loans or termination of the commitments under the DIP Credit Agreement pursuant to an Event of Default; (c) the date of termination of the commitments under the DIP Credit Agreement in accordance with Section 2.04 thereof; (d) the first business day on which this Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto; (e) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent and the "Required Lenders" under the DIP Credit Agreement (the "Majority DIP Lenders"); (f) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the DIP Agent and the Majority DIP Lenders; (g) the date of consummation of the sale of substantially all assets of the Borrowers and the Guarantors or the sale of substantially all assets of the Borrowers and the Guarantors comprising Pre-Petition Collateral; and (h) the effective date of any Debtor's plan of reorganization or liquidation confirmed in the Chapter 11 Cases (the "Termination Date"), unless extended pursuant to the terms of the DIP Credit Agreement.

4.    **Collections and Disbursements.** From the Petition Date until the DIP Obligations have been paid in full in cash, all cash receipts, Cash Collateral and all proceeds from the sale or other disposition of, or other revenue of any kind attributable to, any DIP Collateral that is now in, or shall hereafter come into, the possession or control of any of the Debtors, or to which any of the Debtors is now or shall hereafter become entitled shall be (i) subject to the DIP Liens and the Adequate Protection Liens (and shall be treated in accordance with this Interim Order and the DIP Credit Agreement) and (ii) to the extent related to or arising

from or in connection with Pre-Petition Collateral, promptly deposited only into the Collection Account. All such amounts arising from or in connection with the Pre-Petition Collateral shall be applied to the payment of outstanding DIP Obligations in accordance with the DIP Credit Agreement; provided, however, that, subject to the DIP Agent's right, at the direction of the Majority DIP Lenders, to revoke in writing its consent to such application (as set forth in the Credit Agreement) and subject to disgorgement to the extent of a final and non-appealable Challenge, on each Settlement Date (as defined below) 50% (or, at the election of the Majority DIP Lenders, a greater percentage) of all amounts on deposit in the Collection Account shall be applied, as adequate protection, to repayment of the Pre-Petition Obligations in accordance with the Pre-Petition Loan Documents and this Interim Order.

5.    **Perfection in Cash.** Subject to the Carve Out and the other provisions of this Interim Order, all financial institutions with which the Debtors maintain accounts containing Cash Collateral are authorized and directed to comply with any request of the DIP Agent to turn over to the DIP Agent all Cash Collateral therein without offset or deduction of any kind. The DIP Agent shall enjoy the benefit of (i) all deposit account control agreements, escrow agreements (including the Escrow Agreement (as defined in the Pre-Petition Credit Agreement)), Pledgeholder Agreements, and Laboratory Access Letters to which the Pre-Petition Agent is a party and (ii) subject and subordinate to the rights of the holders of any Third-Party Pre-Petition Liens and any Permitted Third-Party DIP Liens, all other deposit account control agreements, escrow agreements, Pledgeholder Agreements, and laboratory access letters to which any Debtor is a party. Notwithstanding and without minimizing the force of the foregoing, the Debtors are authorized and directed to enter into, and cause the financial institutions servicing the Debtors' deposit accounts to enter into, such deposit account control agreements and other collateral

agreements with the DIP Agent and such financial institutions as the DIP Agent may require, or alternatively, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the Debtor is a party, as set forth above, without the need to enter into any such new agreements.

6.    **Interest on DIP Facility Loans**.    The rate of interest to be charged for the DIP Facility Loans and any other extensions of credit to the Debtors pursuant to the DIP Credit Agreement shall be the rates set forth in the DIP Credit Agreement and shall be payable at the times set forth in the DIP Credit Agreement.

7.    **Payment of DIP Fees and Expenses**.    The Debtors are authorized and directed to pay (i) all fees when due under the DIP Credit Agreement (including, without limitation, any fees provided for under section 2.07 of the DIP Credit Agreement) in the amounts set forth in the DIP Credit Agreement and (ii) all costs, expenses and any other fees or other amounts payable under the terms of the DIP Loan Documents and all other reasonable, documented, out-of-pocket costs and expenses of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents (including, without limitation, the reasonable, out-of-pocket fees, costs and expenses of Sidley Austin LLP ("Sidley"), Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), Houlihan Lokey, and any other legal counsel, financial advisors and third-party appraisers, advisors and consultants advising the DIP Secured Parties), whether incurred before or after the Petition Date.    Subject to the review procedures set forth below, none of such fees, costs and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.    Copies of any invoices of legal counsel, including Sidley and Young Conaway, with respect to such fees, expenses and costs shall be provided (in

summary form and redacted, as necessary, to protect any applicable privilege) to the U.S. Trustee, which shall have ten (10) days from the date of such notice within which to object in writing to such payment. In addition, the Debtors are hereby authorized and directed to indemnify the DIP Agent and the other DIP Secured Parties (and each of their respective directors, officers, employees, agents, representatives, attorneys, consultants, advisors and controlling persons) against any liability arising in connection with the DIP Loan Documents, to the extent set forth in the DIP Loan Documents. All such unpaid fees, costs, expenses and indemnities of the DIP Agent and DIP Lenders shall (i) constitute DIP Obligations, (ii) be secured by the DIP Collateral, and (iii) be afforded all of the priorities and protections afforded to DIP Obligations under this Interim Order and the DIP Loan Documents.

8.    **Validity of DIP Loan Documents**. Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute, and are hereby deemed to be the legal, valid and binding obligations of the Debtors, enforceable against each Debtor in accordance with the terms thereof for all purposes during the Chapter 11 Cases, in any subsequently converted case of any Debtor under chapter 7 of the Bankruptcy Code, or after dismissal of any of the Chapter 11 Cases. Any DIP Facility Loans advanced under the DIP Credit Agreement pursuant to the Interim DIP Order will be made only to fund post-petition administrative expenses, the Debtors' working capital, and the Debtors' sale efforts to the extent permitted under the DIP Credit Agreement, and to pay such other amounts as are required or permitted to be paid pursuant to the DIP Credit Agreement, this Interim Order and any other orders of this Court, including, without limitation, the fees, costs, expenses and indemnities described in Paragraph 7 hereof, all subject to and solely in accordance with the Approved Budget. No obligation, payment, transfer or grant of security under the DIP Loan Documents or

21

this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

9.    **DIP Superpriority Claims**.  In accordance with Bankruptcy Code section 364(c)(1), the DIP Obligations shall constitute superpriority administrative expense claims (the "DIP Superpriority Claims") against each of the Debtors with priority in payment over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, any and all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to, and upon entry of, the Final Order), 507(a), 507(b), 546, 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the Carve-Out and any Permitted Third-Party DIP Indebtedness.  The DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors, including, subject to and upon entry of the Final Order, proceeds of the Avoidance Actions.  Except as set forth in this Interim Order and the Final Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

RLF1 19033896v.1

10.    **DIP Priming Liens**.  As security for the DIP Obligations, the DIP Agent on behalf and for the benefit of the DIP Secured Parties is hereby granted (effective upon the date of this Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise) valid, binding and fully perfected, security interests in and liens upon (the "DIP Liens") all present and after-acquired property of the Debtors of any nature whatsoever (including, without limitation, "Collateral," as defined in the DIP Credit Agreement) and all cash and cash equivalents contained in any account maintained by any of the Debtors, and, subject to entry of a Final Order, all proceeds of Avoidance Actions of the Debtors or their estates (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral"), subject only to any Permitted Third-Party DIP Liens and the payment of the Carve-Out, which shall consist of:

(a)    Liens Priming Pre-Petition Secured Parties' Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected, first priority, senior priming liens upon and security interest in all of the Debtors' right, title and interest in, to, and under all DIP Collateral that is subject to Pre-Petition Liens, subject and subordinate only to any liens on the Pre-Petition Collateral (other than the Pre-Petition Liens) that (a) are valid, enforceable and nonavoidable as of the Petition Date, (b) under applicable law, are senior to, and have not been subordinated to, the Pre-Petition Liens, and (c) are not subject to avoidance, reduction, allowance disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (each, a "Permitted Priority Lien").

(b)    <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a junior, perfected "silent second" lien and security interest upon all of the Debtors' right, title and interest in, to and under all DIP Collateral (other than the DIP Collateral described in Subparagraphs (a) or (c) of this Paragraph 10, as to which the liens and security interests in favor of the DIP Agent will be as described in such Subparagraphs), whether now existing or hereafter acquired, that is subject to (i) any Pre-Petition Third-Party Lien that was validly perfected prior to the Petition Date, or is validly perfected subsequent to the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code, and is not subject to section 552(a) of the Bankruptcy Code or (ii) any Permitted Third-Party DIP Liens.

(c)    <u>First Priority Lien on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a continuing, enforceable, first priority, fully-perfected lien and security interest upon all of the Debtors' right, title and interest in, to, and under all DIP Collateral that was not, as of the Petition Date, encumbered by a validly perfected, enforceable, and nonavoidable security interest or lien (collectively, the "<u>Unencumbered Property</u>"), subject and subordinate only to any Permitted Third-Party DIP Liens.  Subject only to and effective upon entry of the Final Order, Unencumbered Property shall also include the proceeds of estate causes of action under Chapter 5 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code, whether now existing or hereafter acquired or arising and whether pursuant to federal law or applicable state law, and all proceeds thereof, recoveries related thereto, and property received thereby, whether by judgment, settlement, or otherwise (collectively, "<u>Avoidance Actions</u>").

24

(d)    <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens and the

Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security

interest that is avoidable for the benefit of the Debtors and their estates under section 551

of the Bankruptcy Code or (ii) any intercompany or affiliate liens of the Debtors or liens,

if any, granted to insiders of the Debtors.

11.    **Pre-Petition Secured Parties' Adequate Protection**.    Until the

indefeasible repayment in full in cash of the Pre-Petition Obligations, the Pre-Petition Secured

Parties are entitled to adequate protection of their interests in the Pre-Petition Collateral on

account of the diminution in the value thereof as a result of (a) the provisions of this Interim

Order granting priming liens on such Pre-Petition Collateral to the DIP Agent for the benefit of

the DIP Secured Parties; (b) the authorization of the use of Cash Collateral and other Prepetition

Collateral; (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy

Code; and/or (d) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy

Code.   The Pre-Petition Agent, on behalf and for the benefit of the Pre-Petition Lenders, is

hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"):

(a)    <u>Payment of Pre-Petition Interest</u>.  Upon closing of the DIP Facility,

the Debtors are authorized and directed to pay, from the proceeds

of the DIP Loans, all accrued and unpaid pre-petition interest

owing under the Pre-Petition Credit Agreement as of the closing of

the DIP Facility, calculated at the non-default rate (<u>provided</u>, for

the avoidance of doubt, that default interest has and shall continue

to accrue pursuant to the terms of the Pre-Petition Credit

Agreement notwithstanding the payment, as adequate protection, of pre-petition interest at the non-default rate).

(b)   <u>Payment of Pre-Petition Secured Parties' Fees and Expenses</u>.  The Debtors are authorized and directed to pay, from the proceeds of the DIP Loans, and in accordance with the Pre-Petition Loan Documents, the reasonable, documented, pre-petition and post-petition fees, costs and expenses incurred or accrued by the Pre-Petition Secured Parties in connection with any and all aspects of the Chapter 11 Cases, including without limitation (i) the fees and disbursements of counsel, appraisers, financial advisors and other professionals hired by or on behalf of the Pre-Petition Agent or the Pre-Petition Lenders (including Sidley Austin LLP, Young Conaway Stargatt & Taylor, LLP, and Houlihan Lokey), promptly upon receipt of written invoices therefor (<u>provided</u> that copies of any invoices of legal counsel, in summary form and redacted, as necessary, to protect any applicable privilege, shall be provided to the U.S. Trustee and counsel to any Committee (as defined below), and each such party shall have ten (10) days from the date of such notice within which to object in writing to such payment) and (ii) the costs and expenses of enforcing the Adequate Protection Liens and Pre-Petition Liens via a credit bid for all or part of the Debtors' assets.

26

(c)     <u>Monthly Adequate Protection Payments</u>.  On the last Friday of each month (each, a "<u>Settlement Date</u>"), the DIP Agent shall apply all amounts on deposit in the Collection Account (as defined in the Pre-Petition Credit Agreement) at such time (i) 50% (or, at the election of the Majority DIP Lenders, a lesser percentage) to the repayment of outstanding DIP Obligations in accordance with the provisions of the DIP Credit Agreement and this Interim Order, and (ii) 50% (or, at the election of the Majority DIP Lenders, a greater percentage) to the repayment of outstanding Pre-Petition Obligations as set forth in subparagraphs (A) and (B) of this Paragraph 11(c) (such repayment described in clause (ii), the "<u>Monthly Adequate Protection Payment</u>"); <u>provided</u>, <u>however</u>, that the payment of the Monthly Adequate Protection Payment shall be subject to (x) the DIP Agent's right, at the direction of the Majority DIP Lenders, to revoke in writing its consent to such application (as further set forth in the DIP Credit Agreement), such that 100% of the amounts on deposit in the Collection Account shall be applied to the outstanding DIP Obligations and (y) disgorgement to the extent of a final and non-appealable Challenge.  At least four (4) calendar days prior to each Settlement Date, the DIP Agent shall deliver to the Debtors (by email or otherwise, directly or through counsel) a Settlement Report (as defined in the DIP Credit Agreement) for the corresponding calendar month reflecting the

27

amounts on deposit in the Collection Account and the amounts to be applied therefrom to the DIP Obligations and the Pre-Petition Obligations, respectively, and (ii) at least one (1) calendar day prior to such Settlement Date, each of the Pre-Petition Agent and TWCD shall provide their written consent to such Settlement Report (and, as to TWCD, a confirmatory Borrowing Base Certificate (as defined in the Pre-Petition Credit Agreement)), as more fully set forth in the DIP Credit Agreement; provided, however, that the failure of TWCD to (x) provide such written consent to such Settlement Report on or prior to the Settlement Date, or (y) deliver a confirmatory Borrowing Base Certificate, in each case, shall not prohibit the application of all amounts on deposit in the Collection Account in accordance with Section 2.03(b) of the DIP Credit Agreement.  On each Settlement Date, the Pre-Petition Agent shall apply the Monthly Adequate Protection Payment, if any, to the Pre-Petition Obligations, pursuant to the terms of, and as more fully set forth in, the Pre-Petition Credit Agreement, including, without limitation, to the following:

> (A)    payment of all fees and expenses not otherwise paid pursuant to paragraph 11(b) hereof;

> (B)    payment of all accrued and unpaid post-petition interest owing under the Pre-Petition Credit Agreement,

28

calculated at the non-default rate (<u>provided</u>, for the avoidance of doubt, that default interest has and shall continue to accrue pursuant to the terms of the Pre-Petition Credit Agreement notwithstanding the payment, as adequate protection, of postpetition interest at the non-default rate); and

(C)     repayment of outstanding principal amounts of the Pre-Petition Loans and any other Pre-Petition Obligations.

For the avoidance of doubt, nothing in this Paragraph 11 shall affect or limit the obligation of the Debtors to pay the fees, costs and expenses incurred by the DIP Secured Parties as provided in the DIP Loan Documents.

(b)     <u>Adequate Protection Liens</u>.   Valid, enforceable, unavoidable and fully perfected replacement liens and security interests in all DIP Collateral (the "<u>Adequate Protection Liens</u>"), which shall be (i) junior only to the DIP Liens, the Pre-Petition Third-Party Liens and any Permitted Third-Party DIP Liens, (ii) senior to the Pre-Petition Liens, and (iii) subject to the Carve-Out.   The Adequate Protection Liens shall be deemed to be legal, valid, binding, enforceable, perfected liens, not subject to subordination or avoidance, for all purposes in the Chapter 11 Cases.   Except as otherwise set forth in this Paragraph 11 or otherwise in this Interim Order, the Adequate Protection Liens shall not be subordinated to or be made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise.   The Adequate Protection Liens shall be deemed to be perfected automatically upon the entry of this Interim Order, without the need for (x) filing any UCC-1 financing statement, state or federal notice, or

29

other similar instrument or document in any state or public record or office, (y) taking possession or control of any collateral, or (z) further action of any kind (including entry into any security agreements, pledge agreements, control agreements, lockbox agreements, escrow agreements, Pledgeholder Agreements or laboratory access letters); provided, however, that, upon the request of the Pre-Petition Agent, the Debtors shall enter into any such agreement, and, if the Pre-Petition Agent determines, in its sole discretion, to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in such filings and the automatic stay shall be lifted without the need for further order of this Court to allow such filings.  Without limiting the foregoing, but subject and subordinate to the rights of the DIP Secured Parties and the holders of any Third-Party Pre-Petition Liens and any Permitted Third-Party DIP Liens, in respect of the Adequate Protection Liens, the Pre-Petition Agent shall enjoy the benefit of all deposit account control agreements, escrow agreements, Pledgeholder Agreements, and laboratory access letters to which any Debtor is a party.

(c)     Adequate Protection Super Priority Claims.   To the extent the Adequate Protection Liens do not adequately protect against the diminution in value of the Pre-Petition Collateral, the Pre-Petition Agent, on behalf and for the benefit of the Pre-Petition Secured Parties, is hereby granted superpriority administrative expense claims (the "Adequate Protection Superpriority Claims") under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates, including, subject to and upon entry of the Final Order, proceeds of Avoidance Actions, which Adequate Protection Superpriority Claims, if any, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the

Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; provided, however, that at all times while such claim is in full force and effect pursuant to this Interim Order, Adequate Protection Superpriority Claims shall be junior in all respects to the DIP Superpriority Claims, the claims secured by Pre-Petition Third-Party Liens, any Permitted Third-Party DIP Indebtedness and the Carve-Out;

        (d)    <u>Financial Reporting</u>.  The Debtors shall provide the Pre-Petition Agent with the financial and other reporting as described in the DIP Credit Agreement; and

        (e)    <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Pre-Petition Agent or the other Pre-Petition Secured Parties to seek additional forms of adequate protection at any time.

12.    **<u>No Waiver of Pre-Petition Credit Agreement Provisions; Reservation of Rights</u>**.  Except as otherwise specifically provided in this Interim Order, nothing contained in this Interim Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Pre-Petition Credit Agreements by the Pre-Petition Secured Parties, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors.

13.    **<u>Rights of Access and Information</u>**.  Without limiting the rights of access and information afforded the DIP Secured Parties under the DIP Loan Documents, the Debtors

shall be, and hereby are, required to afford the representatives, agents, employees, attorneys, financial advisors, and investment bankers of the DIP Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the DIP Loan Documents and the Pre-Petition Security Documents, as applicable, and shall reasonably cooperate, consult with, and provide to such persons all such information as may reasonably be requested.  The DIP Secured Parties may participate in any such visit or inspection at the expense of the Debtors as set forth in the DIP Loan Documents.  In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the DIP Secured Parties all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors.

14.    **Carve-Out**.  Upon the delivery (by email or otherwise) by the DIP Agent of written notice to the Debtors, the Debtors' bankruptcy counsel, the United States Trustee, and lead counsel for the Committee of the occurrence and continuance of an Event of Default (the "Carve-Out Trigger"), the DIP Liens, DIP Superpriority Claims, Adequate Protection Superpriority Claims, Adequate Protection Liens, and Pre-Petition Liens shall be subject to the payment of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United State Code (plus any applicable interest at the statutory rate) for the period up to the occurrence of a Carve-Out Trigger (as defined below), (ii) the, documented and unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Trigger by each person or firm retained by the Debtors and the Committee as an estate professional (collectively, the "Professionals") for the benefit of such Professional and payable under sections 330 and 331 of the Bankruptcy Code, to

the extent allowed by an order of this Court (whether allowed prior to or after the occurrence of

the Carve-Out Trigger), subject to the terms of this Interim Order and any other orders entered

by this Court (including limits imposed on use of the proceeds of the DIP Facility Loans and

Cash Collateral for payment of fees and expenses incurred in connection with the investigation,

assertion and/or prosecutions of claims and defenses against any of the DIP Agent, the DIP

Lenders, the Pre-Petition Agent or the Pre-Petition Lenders) in an amount not to exceed the

respective line item amounts set forth for such Professional for the applicable period prior to the

Carve-Out Trigger in the Approved Budget; and (iii) up to a maximum amount of [$250,000] of

unpaid documented fees, costs and expenses accrued or incurred by Professionals following the

occurrence of the Carve-Out Trigger, payable under sections 330 and 331 of the Bankruptcy

Code and subsequently allowed by order of this Court (and, if applicable, in compliance with the

Approved Budget (subject to the Permitted Variance)) (collectively, the "Carve-Out"); provided,

however, that no portion of the Carve-Out, DIP Facility, DIP Collateral, Pre-Petition Collateral

or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred

by any party, including the Debtors or any Committee, in connection with (a) the initiation or

prosecution of any claims, causes of action, adversary proceedings, or other litigation against any

of the DIP Secured Parties or the Pre-Petition Secured Parties, including, without limitation, (i)

challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any

defense, counterclaim, or offset to the DIP Loan Documents, DIP Obligations, DIP Superpriority

Claims or DIP Liens in respect thereof, (ii) challenging the amount, validity, extent, perfection,

priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Pre-Petition

Loan Documents, Pre-Petition Obligations, Adequate Protection Superpriority Claims or the

Adequate Protection Liens of the Pre-Petition Secured Parties in respect thereof or (iii) asserting

any claims or causes of action, including, without limitation, claims or actions to hinder or delay the DIP Agent's or DIP Lenders' assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Loan Documents or this Interim Order; provided, further, however, that no more than $50,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral shall be made available, in the aggregate, to any Committee appointed in these Chapter 11 Cases to fund a reasonable investigation in respect of the stipulations set forth in Paragraph D of this Interim Order (and its subparagraphs).  So long as a Carve-Out Trigger has not occurred: (i) the Debtors shall be permitted to pay, subject to and solely in accordance with the Approved Budget, administrative expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable; and (ii) such payments shall not be applied to reduce the Carve-Out (to the extent such payments are ultimately permitted by the Court); provided, however, that following a Carve-Out Trigger any amounts actually paid to Professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis. Notwithstanding the foregoing, nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, any Committee, the U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested.  Furthermore, none of the Carve-Out, DIP Collateral, Pre-Petition Collateral, Cash Collateral or any proceeds of the DIP Facility shall be used to prevent, hinder or delay the DIP Secured Parties from enforcing or realizing upon the DIP Collateral once an Event of Default has been determined by the Court to have occurred and to be continuing under the DIP Loan Documents or this Interim Order.

RLF1 19033896v.1

15.    **Investigation Rights**.    The official committee of creditors holding unsecured claims appointed in these Chapter 11 Cases, if any, pursuant to section 1102 of the Bankruptcy Code (the "Committee") shall have until the earlier of sixty (60) days from the date of the Committee's appointment or seventy-five (75) days from the Petition Date, and all other non-debtor parties-in-interest (including a trustee, if appointed or elected prior to the Investigation Termination Date, as defined herein) shall have seventy-five (75) days from the Petition Date (each, as applicable, the "Investigation Termination Date") to investigate the validity, perfection and enforceability of the Pre-Petition Liens and the Pre-Petition Obligations, and to assert any other claims or causes of action against the Pre-Petition Secured Parties.  If any Committee, or any non-debtor party-in-interest hereafter granted authority and standing by this Court, determines that there may be a challenge to the Pre-Petition Secured Parties by the Investigation Termination Date, then upon five (5) days' written notice to the Debtors and the Pre-Petition Secured Parties, such Committee or other non-debtor party-in-interest hereafter granted authority and standing by this Court shall be permitted to file and prosecute an objection or claim related thereto (each, a "Challenge"), and shall have only until the applicable Investigation Termination Date to file such objection or claim (or otherwise initiate an appropriate action on behalf of the Debtors' estates) setting forth the basis of any such challenge, claim or cause of action; provided, however, that nothing contained in the DIP Loan Documents or this Interim Order shall be deemed to confer standing on any Committee or any other party-in-interest to commence a challenge.  If a Challenge is not filed on or before the Investigation Termination Date, then, without further action by any party or any further order of this Court: (a) the agreements, acknowledgements and stipulations contained in Paragraph D of this Interim Order and its subparagraphs shall be deemed to be immediately and irrevocably binding on the

Debtors and the Debtors' estates, the Committee and all parties-in-interest and any and all successors-in-interest thereto shall thereafter be forever barred from bringing any Challenge; (b) the liens and security interests of the Pre-Petition Secured Parties shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Pre-Petition Obligations shall be deemed to be finally allowed claims for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, in the amounts set forth in Paragraph D and its subparagraphs and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged each of the Pre-Petition Secured Parties (whether in their prepetition or postpetition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Pre-Petition Obligations or their prepetition relationship with such Debtor or any affiliate thereof relating to any of the Pre-Petition Loan Documents or any transaction contemplated thereby, including, without limitation, any claims or defenses as to the extent, validity, priority, or enforceability of the Pre-Petition Liens or the Pre-Petition Obligations, any claims or defenses under chapter 5 of the Bankruptcy Code or any other causes of action.  The Pre-Petition Agent shall cooperate in all reasonable requests for information in order to assist the Committee in its investigation under this Paragraph 15.  Notwithstanding anything to the contrary herein: (a) if any such Challenge is timely commenced, the stipulations contained in Paragraph D of this Interim Order and its subparagraphs shall nonetheless remain binding on all parties-in-interest and preclusive except with respect to the party asserting the Challenge and to the extent that such stipulations are

36

expressly and successfully challenged in such Challenge; and (b) the Pre-Petition Secured Parties reserve all of their rights to contest on any grounds any Challenge. For the avoidance of doubt, any trustee appointed or elected in these cases shall, until the Investigation Termination Date (and thereafter, if a Challenge is commenced on or prior to the Investigation Termination Date) for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph with respect to a Challenge (whether commenced by such trustee or commenced by any other party-in-interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Order.

16.    **Protection of DIP Lenders' Rights**.  So long as there are any DIP Facility Loans or DIP Obligations outstanding or the DIP Lenders have any outstanding commitments under the DIP Credit Agreement, the Pre-Petition Secured Parties (i) shall not take any action to foreclose upon or recover in connection with their respective liens and security interests, other agreements, or operation of law of this Interim Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized herein or by any other order of this Court, (ii) shall be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, (iii) shall not file any further financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, enter into any control agreement, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Agent files financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security

interests as of the Petition Date and (iv) shall not seek to terminate or modify the use of Cash Collateral.

17.     **Permitted Third-Party DIP Indebtedness**.    Notwithstanding any other provision of this Order, the Debtors shall be entitled, solely in accordance with the provisions of the DIP Credit Agreement, to seek authority to incur and incur additional senior secured, superpriority debtor-in-possession indebtedness in an aggregate principal amount not to exceed $10,000,000, which indebtedness may have superpriority administrative claim status ("Permitted Third-Party DIP Indebtedness") and may be secured solely by security interests in and liens on any Permitted Third-Party DIP Collateral (as defined below), which such security interest or liens may have priority over any liens on Permitted Third-Party DIP Collateral securing the DIP Obligations ("Permitted Third-Party DIP Liens").    The term "Permitted Third-Party DIP Collateral" means all of Weinstein Television LLC's right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, Weinstein Television LLC (including under any trade name or derivations thereof), and whether owned or consigned by or tow, or leased from or to, Weinstein Television LLC, and regardless of where located.

18.     **Asset Dispositions**.    Subject to authorization from the Court (and, as applicable, Paragraph 14 of this Interim Order), the Debtors shall immediately pay, or cause to be paid, to the DIP Agent for application to the DIP Obligations, all of the proceeds of any sale, lease or other disposition of any DIP Collateral (an "Asset Disposition") to the extent required by and in the order set forth in the DIP Credit Agreement, as a condition to approval of such Asset Disposition, and shall comply with all other provisions in the DIP Loan Documents and this Interim Order in connection with any such Asset Disposition; provided, that any such proceeds,

to the extent related to or arising from or in connection with Pre-Petition Collateral, shall promptly be deposited into the Collection Account and be subject to the provisions of Paragraph 11(c) hereof.  All proceeds of any Asset Disposition shall be applied in accordance with the terms and conditions of the DIP Credit Agreement.

19.    **Further Assurances**.  The Debtors shall execute and deliver to the DIP Agent, the DIP Lenders, the Pre-Petition Agent, and the Pre-Petition Lenders all such agreements, financing statements, instruments and other documents as the DIP Agent, DIP Lenders, Pre-Petition Agent, and Pre-Petition Lenders may reasonably request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens granted pursuant hereto.  Further, the Debtors are authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of additional security agreements, pledge agreements, control agreements, escrow agreements, Pledgeholder Agreements, laboratory access letters, and financing statements), and to pay all fees and expenses that may be required or necessary for the Debtors' performance under the DIP Loan Documents, including, without limitation, (i) the execution of the DIP Loan Documents and (ii) the payment of the fees, costs and other expenses described in the DIP Loan Documents as such become due.

20.    **506(c) Waiver**.  Upon the entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Secured Parties or the Pre-Petition Secured Parties (collectively, "Secured Lending Entities") upon the DIP Collateral or the Pre-Petition Collateral (as applicable).  In no event shall the Secured Lending

Entities be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Pre-Petition Collateral (as applicable).

21.    **Restrictions on Granting Post-Petition Liens**.  Other than the Carve-Out and the Permitted Third-Party DIP Indebtedness, or as otherwise provided in this Interim Order or the DIP Credit Agreement, no claim having a priority superior or *pari passu* with those granted by this Interim Order to the DIP Secured Lending Entities shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, while (i) any portion of the DIP Facility (or refinancing thereof), any DIP Facility Loan, or any other DIP Obligations are outstanding or (ii) the DIP Lenders have any outstanding DIP Facility Loan commitment under the DIP Credit Agreement.  Except as expressly permitted by the DIP Loan Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

22.    **Automatic Effectiveness of Liens**.  Automatically upon entry of this Interim Order, the DIP Liens and the Adequate Protection Liens shall be deemed to be valid, perfected, enforceable, nonavoidable and effective by operation of law, and not subject to challenge as of the Petition Date, without the need for (x) filing any UCC-1 financing statements, security agreements, vehicle lien applications, filings with the U.S. Patent and Trademark Office, the United States Copyright Office, or the Library of Congress, state or federal notice, or any other similar instrument or document in any state or public record or office, (y) taking possession or control of any collateral, or (z) further action of any kind (including execution of any security agreements, pledge agreements, control agreements, lockbox agreements, escrow agreements, Pledgeholder Agreements or laboratory access letters); provided, <u>however</u>, that, upon the request

of the DIP Agent or the Pre-Petition Agent, as applicable, the Debtors shall enter into any such agreement, and, if the DIP Agent or the Pre-Petition Agent, as applicable, determines, in its sole discretion, to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in such filings and the automatic stay shall be lifted without the need for further order of this Court to allow such filings. All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except the Pre-Petition Liens, the Third-Party Pre-Petition Liens, and the Adequate Protection Liens. If the DIP Agent or the Pre-Petition Agent hereafter requests that the Debtors execute and deliver to the DIP Agent or the Pre-Petition Agent financing statements, security agreements, collateral assignments, or other instruments and documents considered by such agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or the Adequate Protection Liens, as applicable, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, collateral assignments, instruments, and documents, and the DIP Agent or the Pre-Petition Agent is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

23.    **Automatic Stay**.  As provided herein, subject only to the provisions of the DIP Credit Agreement and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions, so long as the DIP Agent has provided five (5) calendar

41

days' prior written notice to the Debtors, their bankruptcy counsel, counsel to the Committee, counsel to the respective Secured Lending Entities and the U.S. Trustee: (a)  immediately terminate the Debtors' authority to use Cash Collateral and cease making any advances or issuing any letters of credit under the DIP Facility and to cease authorizing the use thereof; (b) declare all DIP Obligations to be immediately due and payable; (c) charge the default rate of interest provided for under the DIP Credit Agreement; (d) freeze monies or balances in the Debtors' accounts; (e) immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Secured Parties against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of any of the DIP Secured Parties for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations.  Following the giving of written notice by the DIP Agent of the occurrence of an Event of Default, the Debtors and any Committee in the Chapter 11 Cases shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether an Event of Default has occurred.  Upon entry of this Interim Order, no party-in-interest shall have the right to contest the enforcement of the remedies set forth in this Interim Order and the DIP Loan Documents on any basis other than an assertion that no Event of Default has occurred, and, except with respect to such an assertion, no party-in-interest shall have the right to enjoin any such enforcement under section 105 of the Bankruptcy Code or otherwise, or to seek any injunctive relief inconsistent with the provisions of this Interim Order or the DIP Loan Documents.  The rights and remedies of the DIP Agent and DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and the DIP Secured Parties may have under the DIP Loan Documents or

otherwise.  The Debtors shall cooperate fully with the DIP Agent and the DIP Secured Parties in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

24.    **Additional Events of Default**.  In addition to the Events of Default set forth in the DIP Credit Agreement, it shall be an Event of Default under the DIP Credit Agreement and this Interim Order entitling the DIP Agent to exercise the remedies under the DIP Credit Agreement and the Interim Order if the Debtors shall fail to do any of the following:

(a)    file a motion, on the Petition Date, under Section 363 of the Bankruptcy Code (a "Sale Motion") to sell all or substantially all of the Debtors' assets in one transaction or a series of transactions to a purchaser or purchasers under purchase agreement(s), in form and substance acceptable to the DIP Agent and the requisite DIP Lenders, subject to the receipt of  higher and better bids, together with a motion ("Bid Procedures Motion") for approval of bidding procedures (the "Bidding Procedures"), in each case, in form and substance acceptable to the DIP Agent and the requisite DIP Lenders;

(b)    obtain Bankruptcy Court approval, pursuant to an order (the "Bidding Procedures Order") in form and substance acceptable to the DIP Agent, of the Bidding Procedures no later than 35 days after filing the Sale Motion and the Bid Procedures Motion;

(c)        conduct, subject to the Bidding Procedures Motion, an auction in accordance with the Bidding Procedures (the "Auction") no later than 60 days after entry of the Bidding Procedures Order;

(d)        obtain an order from the Bankruptcy Court (the "Sale Order"), in form and substance acceptable to the DIP Agent and the DIP Lenders, authorizing the sale of the assets of the Debtors (the "Asset Sale(s)") no later than 10 business days after completion of the Auction;

(e)        consummate the Asset Sale(s) by no later than 125 days after the Petition Date (clauses (a) through (e), collectively, the "Sale Process Covenants");

(f)        if the Debtors elect not to proceed with a sale of substantially all of their assets or do not receive any acceptable bids for the sale of substantially all of their assets, the Debtors shall nonetheless proceed with a sale, subject to the DIP Agent's and the Pre-Petition Agent's credit bid rights under section 363(k) of the Bankruptcy Code and all other applicable laws, of all of the Pre-Petition Collateral in a manner that complies with the foregoing deadlines (as may be extended by the DIP Agent and the Pre-Petition Agent, in their reasonable discretion) and the other provisions of the Sale Process Covenants, with the sole modification thereto being the scope of the assets being auctioned and sold; and

(g)        (i) commence, within ten (10) business days of receipt of a written request by the DIP Agent (each a "Request for Collection Proceeding") one or more adversary proceedings against any third party identified in the Request for Collection Proceeding (each, a "Delinquent Party") who has failed to make material payment when due to the Debtors of monies comprising Pre-Petition Collateral by filing one or more

complaints, in form and substance reasonably acceptable to the DIP Agent and the Pre-Petition Agent, demanding payment by the Delinquent Parties of all delinquent amounts owed by the Delinquent Parties to the Debtors pursuant to the Debtors' agreements with such parties, with the costs associated with the Collection Proceedings to be funded using the proceeds of the DIP Facility Loans; (ii) continue to prosecute and use their respective best efforts to collect all amounts due to the Debtors' estates from the Delinquent Parties; and (iii) consult with the DIP Agent and the Pre-Petition Agent in respect of any pleadings to be filed by the Debtors in the Collection Proceedings prior to filing such pleadings.  For the avoidance of doubt, all recoveries obtained by the Debtors in any Collection Proceeding constituting a recovery of a receivable attributable to the Pre-Petition Collateral under the Pre-Petition Loan Documents shall be applied by the Debtors to repayment of the Pre-Petition Obligations.

25.    **<u>Credit Bid</u>**.

(a)    The DIP Agent, at the direction of the Majority DIP Lenders (as defined in the DIP Credit Agreement), shall have the right to credit bid up to the full amount of the DIP Facility Loans in any sale of the DIP Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

(b)    The Pre-Petition Agent, at the direction of the Requisite Lenders (as defined in the Pre-Petition Credit Agreement), shall have the right to credit bid up to the full amount of any remaining Pre-Petition Obligations in any sale of DIP Collateral or Pre-Petition Collateral, as applicable, subject to the satisfaction of all DIP Obligations

45

and all obligations secured by Third-Party Pre-Petition Liens and any Additional Permitted DIP Liens on such assets, or as otherwise consented to by the DIP Lenders and such other holders of Third-Party Pre-Petition Liens and Additional Permitted DIP Liens, as applicable, under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

26.    **Binding Effect**.  To the extent permitted by law and subject to Paragraph 14, the provisions of this Interim Order shall be binding upon and inure to the benefit of the Secured Lending Entities, the Debtors, any Committee appointed in these Chapter 11 Cases, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors). To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

27.    **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases (and, to the extent not satisfied in full in cash, the DIP Obligations shall not be discharged by the entry of any such order, pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge); (ii)

converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Loan Documents (and with respect to the entry of any order as set forth in (ii) or (iii) herein, the Adequate Protection Liens and Adequate Protection Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order.  Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Loan Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged.  In no event shall any plan of reorganization or liquidation be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Loan Documents.

28.     **Reallocation.**     For the avoidance of doubt, in the event that it is determined by this Court that the Pre-Petition Secured Parties did not maintain valid, perfected and enforceable liens on the Pre-Petition Collateral, the Court reserves the right to reallocate any payments made to the Pre-Petition Secured Parties and modify any liens and claims granted pursuant to this Order, including the grant of adequate protection to the Pre-Petition Secured Parties.

29.     **Modifications of DIP Loan Documents**  The Debtors, DIP Agent and DIP Secured Parties are hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders) of the DIP Loan Documents without further Order of this Court; provided, however, that notice of any non-material modification or amendment to the DIP Loan Documents shall be provided to counsel to any Committee, to the

U.S. Trustee, and to the Pre-Petition Agent, each of whom shall have three (3) days from the date of such notice within which to object in writing to such modification or amendment.  If any Committee or the U.S. Trustee timely objects to any non-material modification or amendment to the DIP Loan Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

30.     **Limits on Lender Liability**.  Nothing in this Interim Order, any of the DIP Loan Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Pre-Petition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases. The DIP Secured Parties shall not, solely by reason of having made loans under the DIP Facility, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or any of the Pre-Petition Lenders of any liability for any claims arising from the pre-petition or post-petition activities of any of the Debtors.

31.     **Insurance Policies**.  Upon entry of this Interim Order, the DIP Agent and DIP Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained now or in the future by any of the Debtors which in any way relates to the DIP Collateral.

Notwithstanding the foregoing, the Debtors are authorized and directed to take any actions that the DIP Agent shall request, in its sole and absolute discretion, to have the DIP Agent, on behalf of the DIP Secured Parties, added as an additional insured and loss payee on each insurance policy.

32.    **Restriction on Use of DIP Lenders' Funds**.    The proceeds of the DIP Facility shall be used exclusively for the working capital of the Debtors, subject to and solely in accordance with the Approved Budget.    Except as expressly set forth herein, including in Paragraph 15 above, none of the Debtors shall be permitted to use the proceeds of the DIP Facility Loans: (a) for the payment of interest and principal with respect to any indebtedness that is subordinated to the DIP Facility (including the Adequate Protection Obligations) except as expressly set forth herein, (b) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion, other litigation, examination or investigation of any type relating to or in connection with the DIP Loan Documents, including, without limitation, any challenges to the Pre-Petition Obligations, or the validity, perfection, priority, or enforceability of any Pre-Petition Lien securing such claims or any payment made thereunder, (c) to finance in any way any action, suit, arbitration, proceeding, application, motion, other litigation, examination or investigation of any type adverse to the interests of the DIP Secured Parties or their rights and remedies under the DIP Credit Agreement, the other DIP Loan Documents, this Interim Order or the Final Order without the prior written consent of the DIP Agent, (d) to make any distribution under a plan of reorganization or liquidation in any Chapter 11 Case without the prior written consent of the DIP Agent, and (e) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent.    Notwithstanding anything herein to the contrary, for so long

49

as the Debtors are authorized to use the Pre-Petition Secured Parties' Cash Collateral with the consent of the Pre-Petition Secured Parties, no Cash Collateral of the Pre-Petition Secured Parties may be used directly or indirectly by any of the Debtors, any Committee or any other person or entity to object to or contest in any manner the Pre-Petition Obligations or Pre-Petition Liens, or to assert or prosecute any actions, claims or causes of action against any of the Pre-Petition Secured Parties without the consent of the applicable Pre-Petition Secured Parties.

33.    **Release of Claims and Defenses**.    Each Debtor hereby releases and discharges each of the DIP Secured Parties together with their respective affiliates, agents, attorneys, officers, directors and employees (collectively, the "<u>Released Parties</u>"), from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the DIP Loan Documents or any loans under the DIP Facility, any aspect of the relationship between the Debtors, on the one hand, and any or all of the Released Parties, on the other hand, relating to any of DIP Loan Documents or any transaction contemplated thereby or any other acts or omissions by any or all of the Released Parties in connection with the DIP Facility or any of the DIP Loan Documents or their prepetition relationship with such Debtor or any affiliate thereof relating to any of the DIP Loan Documents or any transaction contemplated thereby, including, without limitation, any claims or defenses under chapter 5 of the Bankruptcy Code or any other causes of action (collectively, the "<u>Claims and Defenses</u>").

34.    **Protection Under Section 364(e)**.    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the validity or enforceability of any DIP Obligation, DIP Lien, Adequate Protection Superpriority Claim, or Adequate Protection Lien, or any other claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents

50

or Adequate Protection Obligations incurred prior to the actual receipt by the DIP Agent or the Pre-Petition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay.   Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or Adequate Protection Obligations owing to the  Pre-Petition Secured Parties by the Debtors prior to the actual receipt by the DIP Agent or Pre-Petition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the Pre-Petition Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and Adequate Protection Obligations owing to the Pre-Petition Secured Parties.

35.    **Effect of Dismissal of Chapter 11 Cases**.  If the Chapter 11 Cases are dismissed, converted or substantively consolidated, such dismissal, conversion or substantive consolidation of these Chapter 11 Cases shall not affect the rights of the Secured Lending Entities under their respective DIP Loan Documents, Pre-Petition Loan Documents or this Interim Order, and all of the respective rights and remedies thereunder of the Secured Lending Entities shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Agent and DIP Secured Parties and the protections afforded to the DIP Agent and the DIP Secured Parties pursuant to this Interim Order and the DIP Loan Documents shall

51

continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (ii) those Pre-Petition Liens, Adequate Protection Liens and Adequate Protection Superpriority Claims granted to and conferred upon the Pre-Petition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Pre-Petition Indebtedness shall have been paid and satisfied in full (and that such Adequate Protection Liens, Adequate Protection Superpriority Claims, and other adequate protection granted to or conferred on the Pre-Petition Secured Parties shall, notwithstanding such dismissal, remain binding on all interested parties); and (iii) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, the Pre-Petition Liens, the Adequate Protection Liens, the DIP Superpriority Claims and the Adequate Protection Superpriority Claims referred to herein.

36.    **Discharge**.  The DIP Obligations and the Adequate Protection Obligations provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted), on or before the effective date of such confirmed plan, unless each of the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders, as applicable, has agreed in writing.

37.    **Findings of Fact and Conclusions of Law**.    This Interim Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the execution thereof.

38.    **Choice of Law; Jurisdiction**.    The DIP Facility and the DIP Loan Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code.    The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or the DIP Loan Documents.

39.    **Authorized Signatories**.    The signature of any Authorized Officer (as defined in the Debtor's corporate resolutions filed with the Petition) or Debtors' attorneys, appearing on any one or more of the DIP Loan Documents shall be sufficient to bind the Debtors.  No board of directors or other approval shall be necessary.

40.    **Order Effective**.    This Interim Order shall be effective as of the date of the signature by the Court.

41.    **No Requirement to Accept Title to Collateral**. The Secured Lending Entities shall not be obligated to accept title to any portion of the Pre-Petition Collateral or DIP Collateral in payment of the indebtedness owed to such party by the Debtors, in lieu of payment in cash or cash equivalents, nor shall any of the Secured Lending Entities be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity other than the Secured Lending Entities.

42.    **Controlling Effect of Interim Order**.  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion, any prepetition agreement or any DIP Loan Document, the provisions of this Interim Order shall control.

43.    **Final Hearing**.  A final hearing on the Motion shall be heard before this Court on [●], 2018 at [__:____] [_.m.] in Courtroom [__] at the United States Bankruptcy Court, 824 Market Street, Wilmington, DE 19801.  Any objections shall be filed with the Bankruptcy Court on or before [●], 2018 at [__:____] [_.m.] and served upon counsel for the Debtors and the Pre-Petition Secured Parties.

Dated:  March __, 2018

_____
United States Bankruptcy Judge

**<u>EXHIBIT C</u>**

**Approved Budget**
**(To Be Filed)**