**Exhibit 1**

**Bidding Procedures**

# BIDDING PROCEDURES

Set forth below are the bidding procedures (the "**Bidding Procedures**") to be employed in connection with the proposed sale, in bulk or by asset or segment, of all or substantially all of the assets (which includes, among other things, the television business, the film library and the unreleased film portfolio (including undeveloped scripts and other projects in production or pre-production stages of development, in each case relating to motion pictures) (collectively, the "**Assets**")) owned by The Weinstein Company Holdings LLC ("**TWCH**") and certain subsidiaries of TWCH (collectively in such capacity, the "**Seller Parties**"), in connection with the Debtors' jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), lead case number 18-10601 (MFW).

The Seller Parties entered into that certain asset purchase agreement, dated March 19, 2018, with Lantern Entertainment LLC (the "**Stalking Horse Bidder**"), pursuant to which the Stalking Horse Bidder will acquire the Purchased Assets (as defined in the Stalking Horse Agreement) on the terms and conditions specified therein (together with the schedules and related documents thereto, the "**Stalking Horse Agreement**," a copy of which is attached to the Motion as Exhibit B). The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein.

By the motion (the "**Motion**"),[1] dated March 19, 2018, the Debtors sought, among other things, approval of the Bidding Procedures for soliciting bids for, conducting an auction (the "**Auction**"), and consummating a sale, in bulk or by asset or segment, of all or substantially all of the Debtors' Assets (the "**Sale**").

## ASSETS TO BE SOLD

The Debtors seek to consummate the Sale pursuant to the terms of the Stalking Horse Agreement. The sale of the Assets is on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Seller Parties, their agents or estates, except to the extent set forth in the Stalking Horse Agreement or the purchase agreement of such other Successful Bidder (as defined below) and as approved by the Bankruptcy Court. Except as otherwise provided in such approved purchase agreement, all of the Seller Parties' right, title and interest in and to each Asset to be acquired shall be sold free and clear of all liens, claims, interests and encumbrances (other than permitted liens), with such liens, claims, interests and encumbrances to attach to the proceeds of the Sale with the same force, effect and priority as such liens, claims, interests and encumbrances have on the Assets.

## THE BIDDING PROCEDURES

In order to ensure that the Debtors receive the maximum value for the Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Purchased Assets set forth therein. The Debtors shall carry out these Bidding Procedures in accordance with and in faithful exercise of their fiduciary obligations.

### Provisions Governing Qualifications of Bidders

Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, prior to the Bid Deadline (as defined below), each person other than the Stalking Horse Bidder, who wishes to

---

[1] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion or the Stalking Horse Agreement, as applicable.

participate in the bidding process (a "**Potential Bidder**") must deliver the following to the Notice Parties (as defined below):

> (i)        a written disclosure of the identity of each entity, including identification of primary affiliated entities and principals, that will be bidding for the Assets or otherwise participating in connection with such bid;

> (ii)        an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Seller Parties to a Potential Bidder) in form and substance reasonably satisfactory to the Debtors (without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions); and

> (iii)        a Potential Bidder that delivers the documents and information described above or that the Debtors determine, in consultation with Union Bank, N.A., now known as MUFG Union Bank, N.A., in its capacity as "**DIP Agent**" (as defined in the Interim DIP Order) and Agent (the "**Pre-Petition Agent**") under that certain Second Amended and Restated Credit and Security Agreement, dated as of September 30, 2013 (the "**Pre-Petition Credit Agreement**"), and the official committee of unsecured creditors appointed in these chapter 11 cases (the "**Committee**," and, together with the DIP Agent and Pre-Petition Agent, the "**Consultation Parties**"), is (based on evidence of available financing, experience and other considerations) able to consummate the Sale, and whose Qualified Bid is received by the Notice Parties no later than the Bid Deadline is deemed qualified (a "**Qualified Bidder**").  The Consultation Parties (and the Debtors) shall be permitted and authorized to provide the information available from any Qualified Bidder to their counsel, advisors, the Majority DIP Lenders (as defined in the Interim DIP Order), the Required Lenders (as defined in the Interim DIP Order) and to an authorized representative applicable guilds, unions, trade associations or collectives that are party to collective bargaining agreements with the Debtors (collectively, the "**Union Entities**"), on a confidential basis, and, subject to an appropriate non-disclosure agreement, the committee members.

### Due Diligence

The Debtors will provide any Potential Bidder such due diligence access or additional information as the Debtors deem appropriate, which will be substantially the same information for all Potential Bidders interested in the same Assets or segment(s) but may include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information.  The due diligence period will extend through and including the Bid Deadline.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors.

### Aggregate Bids

For the avoidance of doubt, the Debtors, in consultation with the Consultation Parties, will consider bids for individual assets, any combination of assets and/or all or substantially all of the Assets.  Potential Bidders wishing to combine their bids on the Assets (or a subset thereof) need not be affiliated persons; *provided*, *however*, that all Potential Bidders shall be subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding and any combined bids shall be disclosed to the Debtors and the Consultation Parties.

RLF1 19105311v.1

### Provisions Governing Qualified Bids

A bid will be considered a "**Qualified Bid**" only if the bid is submitted by a Qualified Bidder and the Debtors determine, in consultation with the Consultation Parties, such bid complies with all of the following:

    a.   it is received by the Notice Parties prior to the Bid Deadline;

    b.   it states that the applicable Qualified Bidder offers to purchase, in cash or, if applicable, through a credit bid meeting the requirements of section 363(k) of the Bankruptcy Code, all or a portion of the Assets;

    c.   it includes a signed writing stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder (each, as defined below), its offer shall remain irrevocable until the earlier of (i) the closing of the Sale to the Successful Bidder or the Back-Up Bidder and (ii) the date that is thirty (30) days after the Sale Hearing, subject to any rights of termination by the Successful Bidder contained in the Successful Bid;

    d.   it includes confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the submission of the bid;

    e.   it contains no due diligence or financing contingencies of any kind;

    f.   it includes a duly authorized and executed copy of an asset purchase agreement (which shall be substantially similar to the Stalking Horse Agreement), including the purchase price for the Assets (or a subset thereof) expressed in U.S. Dollars (the "**Purchase Price**"), together with all exhibits and schedules thereto, together with a copy marked to show any amendments and modifications to the Stalking Horse Agreement (an "**Asset Purchase Agreement**");

    g.   it specifies the liabilities proposed to be paid or assumed by such Qualified Bid;

    h.   if the bid (including a combination of Qualified Bids submitted jointly prior to the Bid Deadline from one or more Qualified Bidders, subject to Section 363(n) of the Bankruptcy Code) seeks to purchase a portion of the Assets from two different segments or two or more entire segments of the Assets, it provides an allocation of its cash consideration among such Assets or Asset segment(s), as applicable;

    i.   if the bid (including a combination of Qualified Bids submitted jointly prior to the Bid Deadline from one or more Qualified Bidders, subject to 363(n)) seeks to purchase all or substantially all of the Assets, (i) it provides an allocation of its cash consideration among the key Asset segments (e.g. the television business, the film library and the unreleased film portfolio) and (ii) it has a value to the Debtors, determined in the Debtors' reasonable business judgment after consultation with the Consultation Parties, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (a) $1,000,000 plus (b) the Stalking Horse Protections (as defined in the Motion) (the "**Minimum Initial Overbid Amount**");

3

j.   it includes financial statements or other written evidence, including (if applicable) a firm, irrevocable commitment for financing, establishing the ability of the Qualified Bidder to consummate the proposed Sale and pay the Purchase Price in cash, or, if applicable, through a credit bid meeting the requirements of section 363(k) of the Bankruptcy Code, such as will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

k.   it identifies with particularity which Contracts and Leases the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related Cure Amounts and the provision of adequate assurance of future performance to the Counterparties to such Contracts and Leases, which, for the avoidance of doubt, the Debtors may provide to such Counterparties;

l.   it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

m.   it includes evidence, in form and substance reasonably satisfactory to the Debtors, in consultation with the Consultation Parties, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

n.   it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to five percent (5%) of the purchase price provided for in the bid (a "**Good Faith Deposit**");

o.   it states that the bidder (a) waives any right to a jury trial in connection with, and consents and submits to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of such parties, (b) agrees to bring any such action or proceeding in the Bankruptcy Court, and (c) consents to the Bankruptcy Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law; and

p.   it contains such other information as may be reasonably requested by the Debtors, in consultation with the Consultation Parties.

Notwithstanding the foregoing, (i) the Stalking Horse Bidder is deemed to be a Qualified Bidder and the Stalking Horse Bid shall be deemed to be a Qualified Bid, such that the Stalking Horse Bidder shall not be required to submit an additional Qualified Bid, and (ii) the DIP Agent and Pre-Petition Agent shall each be deemed to be a Qualified Bidder and may submit a credit bid at any time during the auction.  In the event that any Consultation Party or the member thereof elects to submit a Qualified Bid, from and after the submission of any such bid, the term "Consultation Parties" shall not include such party (or the member of such party) until such time, if ever, as such party withdraws such additional Qualified Bid.

The Debtors reserve the right, in consultation with the Consultation Parties, to negotiate with any Qualified Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid.

As soon as reasonably practicable after the Bid Deadline, the Debtors shall notify the Consultation Parties, the Stalking Horse Bidder, and all Qualified Bidders in writing as to whether or not any bids (other than the Stalking Horse Agreement) constitute Qualified Bids, and will notify each Qualified Bidder that has submitted a bid (other than the Stalking Horse Bidder), whether such Qualified Bidder's bid constitutes a Qualified Bid promptly after such determination has been made.  The Debtors shall also provide copies of the asset purchase agreement accompanying any Qualified Bid to any Union Entity that has requested such materials (and the advisors to any such Union Entity) promptly after such determination has been made.

Nothing in the foregoing shall be deemed to limit any party's right to credit bid in accordance with section 363(k) of the Bankruptcy Code.

### Bid Deadline

A Potential Bidder that desires to make a bid shall deliver written copies of its bid to the following parties (collectively, the "**Notice Parties**"):  (1) proposed co-counsel to the Debtors, Cravath, Swaine & Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, New York 10019, Attn: Paul H. Zumbro, pzumbro@cravath.com, George E. Zobitz, jzobitz@cravath.com and Andrew Elken, aelken@cravath.com; (2) proposed co-counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, collins@rlf.com, and Paul N. Heath, heath@rlf.com; (3) co-counsel to the DIP Agent and the Pre-Petition Agent, Sidley Austin LLP, 555 West Fifth Street, Los Angeles, California 90013, Attn: Jennifer C. Hagle, jhagle@sidley.com, and Sidley Austin LLP, 1 S. Dearborn Street, Chicago, IL 60603, Attn: Annie Wallis, awallis@sidley.com; (4) co-counsel to the DIP Agent and the Pre-Petition Agent, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Robert S. Brady, rbrady@ycst.com, and Sean M. Beach, sbeach@ycst.com; (5) proposed counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067, Attn: James I. Stang, Esq., jstang@pszjlaw.com, and 919 N. Market Street, 17th Floor, Wilmington, DE 19801, Attn: Bradford J. Sandler, Esq., bsandler@pszjlaw.com;, and (6) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801, Attn: Jane M. Leamy, Jane.M.Leamy@usdoj.gov, and Hannah Mufson McCollum, Hannah.McCollum@usdoj.gov, so as to be received by the foregoing parties no later than **5:00 p.m. Eastern Daylight Time on April 30, 2018** (the "**Bid Deadline**").  The Bid Deadline may be extended by the Debtors in consultation with the Consultation Parties, subject to the Stalking Horse Agreement.

**Evaluation of Competing Bids**

A Qualified Bid will be valued by the Debtors, in consultation with the Consultation Parties, based upon several factors including, without limitation, (1) the amount of the Purchase Price provided by such bid, (2) the nature of the consideration provided by such bid, (3) the risks and timing associated with consummating such bid, (4) any proposed revisions to the Stalking Horse Agreement, (5) whether any Qualified Bid contains a sufficient cash component to ensure that the Debtors' estates are not rendered administratively insolvent, (6) whether such bid contemplates the continuation of the Debtors' business as a going concern, (7) the impact on employees and trade creditors and other claimants and stakeholders, and (8) any other factors deemed relevant by the Debtors, in consultation with the Consultation Parties.

**No Qualified Bids**

If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, or receive Qualified Bids on portions of the Assets which do not have purchase prices which, in the aggregate, equal or exceed the Minimum Initial Overbid Amount, the Debtors will not conduct an auction for the Assets and shall request at the Sale Hearing that the Stalking Horse Bidder be deemed the Successful Bidder and that the Bankruptcy Court approve the Stalking Horse Agreement and the transaction contemplated thereunder.

**Auction Process**

If the Debtors receive one or more Qualified Bids with purchase prices which, individually or in the aggregate, equal or exceed the Minimum Initial Overbid Amount, in addition to the Stalking Horse Agreement, the Debtors will conduct the Auction, which shall take place at 10:00 a.m. Eastern Daylight Time on May 4, 2018, at the office of Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 or such other date, time and location as shall be timely communicated to all entities entitled to attend the Auction.  The Auction, which shall be recorded and transcribed, shall run in accordance with the following procedures:

    a.    only the Debtors, the Stalking Horse Bidder, any other Qualified Bidder that has timely submitted a Qualified Bid, the Consultation Parties, Committee members and the advisors to each of the foregoing shall be permitted to attend the Auction in person; *provided, however*, that any Union Entity and any other party in interest may attend (but not participate in) the Auction if any such party in interest provides the Debtors with written notice of its intention to attend the Auction on or before one (1) Business Day prior to the Auction, which written notice shall be sent to proposed co-counsel for the Debtors via electronic mail, to Zachary I. Shapiro, at shapiro@rlf.com;

    b.    only the Stalking Horse Bidder and such other Qualified Bidders who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction;

    c.    each Qualified Bidder shall be required to confirm that it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code, with respect to any bids submitted or not submitted in connection with the Sale;

    d.    at least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in

attendance at the Auction in person; *provided* that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the selection of the Successful Bidder and Back-Up Bidder (each, as defined below) at the conclusion of the Auction. At least twenty-four (24) hours prior to the time scheduled for the commencement of the Auction (as provided in these Bidding Procedures), the Debtors will provide the Qualified Bid(s), which the Debtors believe, after consultation with the Consultation Parties, is the highest or otherwise best offer (the "**Starting Bid**") to the Stalking Horse Bidder and all other Qualified Bidders who have timely submitted Qualified Bids;

e.   all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

f.   the Debtors, in consultation with the Consultation Parties, may modify, employ and announce at the Auction additional or amended procedural rules that are reasonable under the circumstances for conducting the Auction, *provided* that such rules (i) are not materially inconsistent with the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, (ii) do not purport to abrogate or modify the Stalking Horse Protections and (iii) are disclosed to each Qualified Bidder attending the Auction; *provided*, *further*, that no such rules shall in any way modify or be deemed to modify the Stalking Horse Agreement or the rights of the Stalking Horse Bidder under the Stalking Horse Agreement;

g.   bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each, a "**Subsequent Bid**") providing a net value to the Debtors' estates of at least $1,000,000 above the prior bid or collection of bids (the "**Continuing Minimum Overbid Amount**"), subject to modification in accordance with paragraph (f) above. After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with the Consultation Parties, shall announce the bid or collection of bids (and the value of such bid(s)) that they believe to be the highest or otherwise best bid(s) (each, the "**Leading Bid**");

h.   a round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid;

i.   except as specifically set forth herein, for the purpose of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the Debtors shall give effect to the Stalking Horse Protections as well as any additional liabilities to be assumed by a Qualified Bidder, and any additional costs which may be imposed on the Debtors; and

j.   the Debtors in consultation with the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors in consultation with the Consultation Parties to make a reasonable determination as to an Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors, in consultation with the Consultation Parties, believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction.

7

**Selection of Successful Bid**

Prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, will review and evaluate each Qualified Bid submitted at the Auction (including by the Stalking Horse Bidder) in accordance with the procedures set forth herein and determine which offer(s) is the highest or otherwise best offer or collection of offers (one or more such bids, collectively the "**Successful Bid**" and the bidder(s) making such bid(s), collectively, the "**Successful Bidder**"), and communicate to the Stalking Horse Bidder and the other Auction participants the identity of the Successful Bidder and the material details of the Successful Bid.  The determination of the Successful Bid by the Debtors, in consultation with the Consultation Parties, at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

The Qualified Bidder(s) with the next highest or otherwise best Qualified Bid or collection of Qualified Bids, as determined by the Debtors at the time of the Auction, in consultation with the Consultation Parties, will be required to serve as a back-up bidder (each, a "**Back-Up Bidder**") and keep its bid open and irrevocable until the earlier to occur of (i) thirty (30) days after the Sale Hearing and (ii) closing on the Successful Bid(s) with the Successful Bidder(s).  If the Successful Bidder(s) fail(s) to consummate the Sale, the Debtors will be authorized and directed to consummate the Sale with the Back-Up Bidder(s) without further order of the Bankruptcy Court.

Within one (1) Business Day after conclusion of the Auction, the Successful Bidder(s) shall complete and execute all agreements, contracts, instruments and other documents necessary to consummate the Successful Bid(s).  Within one (1) Business Day after conclusion of the Auction, the Debtors shall file a notice with the Bankruptcy Court identifying the Successful Bidder(s) and the Back-Up Bidder(s).

The Debtors will sell the Assets to the Successful Bidder(s) pursuant to the terms of the Successful Bid(s) upon the approval of such Successful Bid(s) by the Bankruptcy Court at the Sale Hearing.

**Return of Deposits**

All Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder no later than five (5) Business Days following the entry of the Sale Order.

**THE STALKING HORSE PROTECTIONS**

In recognition of its expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Bidder is not the Successful Bidder, the Debtors will pay, subject to the Bidding Procedures Order and the Stalking Horse Agreement, to the Stalking Horse Bidder the Stalking Horse Protections.  The Break-Up Fee is $9,300,000 and Expense Reimbursement is up to $4,650,000, subject to the rights of the Stalking Horse Bidder to seek to increase the Expense Reimbursement to up to $6,200,000 if the Sale Hearing does not begin on or before May 8, 2018.

**SALE HEARING**

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "**Sale Hearing**") to begin on or before May 8, 2018 at 11:30 a.m. (Eastern Daylight Time), subject to the availability of the Bankruptcy Court, to approve and authorize the Sale to the Successful Bidder.  Subject to the express written consent of the Stalking Horse Bidder (such consent not to be unreasonably withheld, conditioned or delayed), or as otherwise required by order of the Bankruptcy Court, but subject to the rights of the Stalking Horse Bidder under the Stalking Horse Agreement, the Debtors reserve the right to change the

RLF1 19105311v.1

date and/or time of the Sale Hearing (or any other dates related to the Sale) in order to achieve the maximum value for the Assets.