**Exhibit 1**

**APA**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**THE WEINSTEIN COMPANY HOLDINGS LLC**

**THE PERSONS LISTED ON SCHEDULE 1 HERETO**

**AND**

**LANTERN ENTERTAINMENT LLC**

**Dated as of March 19, 2018**

# TABLE OF CONTENTS

**Page**

ARTICLE I         DEFINITIONS ................................................................................ 1

    Section 1.1    Definitions ................................................................................ 1

ARTICLE II        PURCHASE AND SALE OF PURCHASED ASSETS AND
ASSUMPTION OF ASSUMED LIABILITIES ................................ 1

    Section 2.1    Purchase and Sale of Purchased Assets ................................... 1

    Section 2.2    Excluded Assets ........................................................................ 2

    Section 2.3    Assumption of Liabilities .......................................................... 2

    Section 2.4    Excluded Liabilities .................................................................. 2

    Section 2.5    Closing ...................................................................................... 4

    Section 2.6    Deposit ...................................................................................... 4

    Section 2.7    Aggregate Purchase Price ......................................................... 5

    Section 2.8    Cure Amount; Right to Exclude Contracts ............................... 5

    Section 2.9    Payment of Aggregate Purchase Price; Escrow Amount ......... 7

    Section 2.10   Closing Deliverables ................................................................ 8

ARTICLE III       REPRESENTATIONS AND WARRANTIES OF THE SELLER
PARTIES .................................................................................. 8

    Section 3.1    Corporate Organization, Qualification, Power and Authority ... 8

    Section 3.2    Capitalization ............................................................................ 9

    Section 3.3    Consents and Approvals; No Violations ................................... 9

    Section 3.4    No Conflict ................................................................................ 9

    Section 3.5    Title to Assets ........................................................................... 9

    Section 3.6    Labor Matters .......................................................................... 10

    Section 3.7    Employee Benefit Plans and Agreements ............................... 11

    Section 3.8    Real Property ........................................................................... 11

    Section 3.9    Environmental Laws and Regulations .................................... 11

    Section 3.10   Covered Titles ......................................................................... 12

    Section 3.11   Other Intellectual Property ..................................................... 14

    Section 3.12   Material Contracts ................................................................... 15

    Section 3.13   Taxes ....................................................................................... 16

    Section 3.14   Undue Influence ...................................................................... 16

    Section 3.15   Brokers and Finders ................................................................ 16

i

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE IV      REPRESENTATIONS AND WARRANTIES OF BUYER ......................... 16

     Section 4.1      Corporate Organization, Qualification, Power, Authority and Nationality ................................................................................. 16

     Section 4.2      Consents and Approvals; No Violations ................................. 17

     Section 4.3      Financing ................................................................................ 17

     Section 4.4      Brokers and Finders ............................................................... 18

     Section 4.5      Solvency ................................................................................. 18

     Section 4.6      Other Agreements .................................................................. 18

ARTICLE V      PRE-CLOSING COVENANTS AND AGREEMENTS ............................ 19

     Section 5.1      Affirmative Covenants ........................................................... 19

     Section 5.2      Negative Covenants ............................................................... 19

     Section 5.3      Permitted Pre-Closing Actions .............................................. 20

     Section 5.4      Access; Books and Records ................................................... 20

     Section 5.5      Notice of Developments ........................................................ 21

     Section 5.6      Competition Filings ............................................................... 21

     Section 5.7      Financing ................................................................................ 21

     Section 5.8      Reasonable Best Efforts ......................................................... 23

     Section 5.9      Transition of Business ........................................................... 23

     Section 5.10      Acquisition Proposals ............................................................ 23

ARTICLE VI      POST-CLOSING COVENANTS AND AGREEMENTS ........................... 24

     Section 6.1      Guild Matters ......................................................................... 24

     Section 6.2      Employee Matters .................................................................. 25

     Section 6.3      WARN ..................................................................................... 25

     Section 6.4      Certain Tax Matters ............................................................... 25

     Section 6.5      Further Assurances ................................................................. 27

     Section 6.6      Access to Books and Records for the Seller Parties .............. 27

     Section 6.7      Announcements ...................................................................... 28

     Section 6.8      No Obligation to Continue Existence ..................................... 28

ARTICLE VII      BANKRUPTCY COURT MATTERS ......................................... 28

     Section 7.1      Sale Motion, Bankruptcy Procedures Hearing and Bidding Procedures Order ................................................................... 28

# TABLE OF CONTENTS
## (continued)

Page

Section 7.2    Auction ................................................................ 29

Section 7.3    Sale Order .......................................................... 29

Section 7.4    Bankruptcy Filings ............................................ 29

Section 7.5    Sale Free and Clear .......................................... 30

ARTICLE VIII    CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES AND BUYER ............................................................ 30

Section 8.1    No Injunction .................................................... 30

Section 8.2    HSR Waiting Period .......................................... 30

Section 8.3    Bankruptcy Court Approval ............................... 30

ARTICLE IX    CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES ............. 30

Section 9.1    Representations and Warranties of Buyer ................ 30

Section 9.2    Performance of the Obligations of Buyer ............... 30

ARTICLE X    CONDITIONS TO OBLIGATIONS OF BUYER ....................... 31

Section 10.1    Representations and Warranties of the Seller Parties ........... 31

Section 10.2    Performance of the Obligations of the Seller Parties .............. 31

ARTICLE XI    TERMINATION ....................................................... 31

Section 11.1    Conditions of Termination ................................ 31

Section 11.2    Effect of Termination ....................................... 33

ARTICLE XII    REMEDIES ........................................................... 33

Section 12.1    Non-Survival of Representations, Warranties, Covenants and Agreements; Remedies ........................ 33

Section 12.2    Specific Performance ....................................... 33

Section 12.3    Release of Escrow Amount ............................... 33

Section 12.4    Expense Reimbursement and Break-Up Fee .......... 34

ARTICLE XIII    MISCELLANEOUS PROVISIONS ............................... 35

Section 13.1    Notices ............................................................. 35

Section 13.2    Amendments; Waivers ...................................... 36

Section 13.3    Assignment and Parties in Interest ................... 36

Section 13.4    Expenses .......................................................... 37

Section 13.5    Entire Agreement ............................................. 37

Section 13.6    GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL ............... 37

iv

## TABLE OF CONTENTS
### (continued)

Page

Section 13.7    No Other Seller Representations and Warranties ..................................... 38

Section 13.8    Disclosure Schedule................................................................................. 38

Section 13.9    Confidentiality ........................................................................................ 39

Section 13.10  Headings .................................................................................................. 39

Section 13.11  References ................................................................................................ 39

Section 13.12  General Interpretative Provisions .......................................................... 39

Section 13.13  Currency.................................................................................................. 40

Section 13.14  Construction............................................................................................ 40

Section 13.15  Severability ............................................................................................. 40

Section 13.16  Rights Cumulative .................................................................................. 40

Section 13.17  Counterparts ............................................................................................ 40

EXHIBIT A - DEFINITIONS

EXHIBIT B - FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT C - FORM OF BILL OF SALE

EXHIBIT D - FORM OF ESCROW AGREEMENT

EXHIBIT E - BIDDING PROCEDURES ORDER

EXHIBIT F - FORM OF INTELLECTUAL PROPERTY ASSIGNMENT
              AGREEMENT

EXHIBIT G – DIP FINANCING TERM SHEET

SCHEDULE 1 - SELLER PARTIES

SCHEDULE 2.1 - PURCHASED ASSETS

SCHEDULE 2.2 - EXCLUDED ASSETS

SCHEDULE 2.2(H) - OTHER EXCLUDED CONTRACTS

SCHEDULE 2.3 – ASSUMED LIABILITIES

ANNEX 1 - COVERED TITLES

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of March 19, 2018 (the "Execution Date"), by and between The Weinstein Company Holdings LLC, a Delaware limited liability company ("TWCH"), certain subsidiaries of TWCH signatories hereto listed on Schedule 1 (TWCH and each such subsidiary, a "Seller Party" and, collectively, the "Seller Parties") and Lantern Entertainment LLC, a Delaware limited liability company ("Buyer").  Each of the foregoing may be referred to herein as a "Party" and collectively as the "Parties".

### RECITALS

A.     The Seller Parties are engaged in the Business.

B.     Buyer desires to buy the Business as a going concern and currently anticipates hiring most of the employees of the Business.

C.     The Seller Parties desire to sell to Buyer, and Buyer desires to purchase from the Seller Parties, all of the Purchased Assets, and Buyer desires to assume all of the Assumed Liabilities pursuant to the Sale Order approving such sale, free and clear of all Liens (other than Permitted Liens), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which order will include the authorization for the assumption by the Seller Parties and assignment to Buyer of the Assumed Contracts and the Liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.1     Definitions.  Unless otherwise defined in this Agreement, all capitalized terms used in this Agreement have the meanings given to them on Exhibit A.

### ARTICLE II

### PURCHASE AND SALE OF PURCHASED ASSETS
### AND ASSUMPTION OF ASSUMED LIABILITIES

Section 2.1     Purchase and Sale of Purchased Assets.  Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Seller Parties shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, acquire

and accept from the Seller Parties, free and clear of all Liens (except for Permitted Liens), all of the Seller Parties' direct or indirect right, title and interest in, to or under the Business and all of the Seller Parties' properties, rights, Claims and assets (other than the Excluded Assets) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed, used or held for use in or relating to the Business, whether or not reflected on the books and records of the Seller Parties, as the same shall exist on the Closing Date (collectively, the "Purchased Assets"). Without limiting the generality of the prior sentence, such Purchased Assets shall include, whether they relate exclusively to the Business or not, all of the assets set forth on Schedule 2.1.

Section 2.2    Excluded Assets.  Notwithstanding anything contained in this Agreement to the contrary, the Seller Parties will retain, and Buyer will not acquire, any of the Seller Parties' rights, title and interest in those assets set forth on Schedule 2.2 (collectively, the "Excluded Assets"). Notwithstanding anything contained herein to the contrary, if any of the interests in the Seller JVs owned by the Seller Parties (the "JV Equity Securities") are not transferred to Buyer at the Closing pursuant to an Order and the Seller Parties have used good-faith efforts to obtain an Order authorizing the transfer to Buyer of such JV Equity Securities (any such JV Equity Securities, a "Non-Transferred JV Securities"), then such Non-Transferred JV Securities shall be deemed an Excluded Asset and Buyer shall nonetheless remain obligated to fulfill its obligations hereunder (including to consummate the Closing and pay the Aggregate Purchase Price and the Escrow Amount, in full, to TWCH at the Closing, in accordance with this Agreement).

Section 2.3    Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall (a) assume from the Seller Parties and thereafter pay, perform or discharge when due those Liabilities of the Seller Parties arising out of the operation of the Purchased Assets (including the Assumed Contracts) for periods following the Closing Date, (b) pay the Cure Amounts associated with Assumed Contracts; in each case, except for those Liabilities that are Excluded Liabilities and (c) subject to the following sentence, assume the Liabilities set forth on Schedule 2.3 (collectively, the Liabilities to be assumed pursuant to the foregoing clauses (a), (b) and (c), the "Assumed Liabilities"). Notwithstanding anything contained in this Agreement to the contrary, at Closing, if any of the Liabilities set forth on Schedule 2.3 relate to Covered Titles that are, either, (x) designated as Excluded Assets or (y) Excluded Contracts (collectively, the "Non-Transferred Covered Titles"), such Liabilities, solely to the extent related to such Non-Transferred Covered Titles, if any, shall be designated as Excluded Liabilities (as defined below) and shall be removed from Schedule 2.3.

Section 2.4    Excluded Liabilities.  Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability of any Seller Party of whatever nature, whether presently in existence or arising hereafter.   All such other Liabilities shall be retained by and remain Liabilities of the Seller Parties (all such Liabilities not being assumed being herein referred to as the "Excluded Liabilities"), including, without limitation:

(a)    any and all Liabilities for Taxes (i) of or imposed on the Seller Parties (or any member or Affiliate of the Seller Parties) or (ii) related or attributable to the Purchased Assets or the Business for any Pre-Closing Tax Period;

2

(b)     any amounts due to Affiliates of any Seller Party, including any declared dividends or distributions;

(c)     any indebtedness for borrowed money, bank loans or facilities or any other debt instruments;

(d)     any Liabilities related to any pending litigation to which any Seller Party is a party and relating to the Business;

(e)     any Liabilities related to any Harassment Claims;

(f)     all Liabilities arising under any Contract that is not an Assumed Contract;

(g)     any Liability under any (i) collective bargaining agreement and (ii) "employee benefit plans" within the meaning of Section 3(3) of ERISA, and all equity, severance, employment, consulting, change-of-control, bonus, incentive, deferred compensation and other benefit plans, agreements, programs, policies or commitments, whether or not subject to ERISA, (A) under which any current or former director, officer, employee or consultant of any Seller Party has any right to payments or benefits from any Seller Party; (B) which are maintained, sponsored or contributed to by any Seller Party, or (C) with respect to which any Seller Party has any actual or contingent liability or makes or is required to make contributions with respect to such directors, officers, employees or consultants (each such plan, agreement, program, policy and commitment is referred to as a "Benefit Plan");

(h)     any Liabilities of the Seller Parties related to the Seller Parties' current or former employees, officers, directors, retirees, independent contractors or consultants arising based on any act or omission of the Seller Parties or any Seller Related Party (or any predecessor of any Seller), including any Liability associated with any Claims arising under any law or regulation respecting employment and employment practices, including with respect to vacation, payroll, sick leave, unemployment benefits, retirement benefits, severance, retention, termination, pension benefits, employee stock option, equity compensation, employee stock purchase, or profit sharing plans, health care and other welfare plans or benefits (including COBRA), or any other employee plans or arrangements or benefits, payments or other compensation of any kind to any current or former employee, including under any benefit plans, programs and arrangements of any Seller, and, to the extent set forth in Section 6.3, Liabilities or obligation of the Seller Parties (and their predecessors) pursuant to the WARN Act;

(i)     any and all Liabilities arising under the sublicense agreements regardless of whether such Liabilities relate to a period before or after the Closing, except where a licensee or sublicensee elects to retain its rights under the applicable sublicense agreement pursuant to section 365(n) of the Bankruptcy Code within the time period set forth in the Bidding Procedures Order;

(j)     any and all Guild Residuals and/or Participations for any period prior to the Closing Date (including any payment obligations that were due and payable prior to such time regardless of whether such payment obligations relate to a period before or after the Closing Date);

(k)    any damages arising from the rejection of the Assumed Contracts and subject to allowance or disallowance as provided in section 502(g) of the Bankruptcy Code;

(l)    any indemnity obligations owed by the Seller Parties under any Assumed Contracts arising from a breach of a representation or warranty of the Seller Parties or any other indemnity claim that arises from any act or omission of the Seller Parties under the Assumed Contracts or any other indemnity claim or obligation of the Seller Parties asserted by or otherwise owed to any current or former employees, officers, directors, retirees, independent contractors or consultants of the Seller Parties (or any predecessor of any Seller), whether under contract or applicable Laws, or that otherwise that relate to a period on or prior to the Closing Date;

(m)    any insurance payables and trade payables and expenses arising prior to the Closing Date;

(n)    any costs or expenses payable by the Seller Parties in connection with the transactions contemplated by this Agreement, other than as specifically set forth herein;

(o)    any Liability of any Seller with respect to workers compensation;

(p)    any brokerage, commission, finders or similar fees, which in connection with the transactions contemplated by this Agreement or otherwise, pursuant to any arrangement with any Seller, subsidiary or any Affiliate thereof;

(q)    Liabilities to the extent arising under or related to any Non-Transferred Covered Titles; and

(r)    any other Liability, including Liabilities for Taxes related to the Excluded Assets.

Section 2.5    Closing.  On the terms and subject to the conditions set forth in this Agreement, the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place at the offices of Cravath, Swaine & Moore LLP at Worldwide Plaza, 825 Eighth Avenue, New York, New York commencing at 9:00 a.m. New York Time, on the date that is no later than three (3) Business Days after the last of the closing conditions set forth in Article VIII, Article IX and Article X is satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other location, date or time as TWCH and Buyer may mutually agree in writing.  The date the Closing actually occurs is referred to in this Agreement as the "Closing Date".

Section 2.6    Deposit.  Buyer, TWCH and Wilmington Trust, N.A., as escrow agent (in such capacity, the "Escrow Agent"), have entered into that certain escrow agreement, dated as of the Execution Date (the "Escrow Agreement"), in the form attached hereto as Exhibit , pursuant to which, concurrently with the execution of this Agreement, Buyer has deposited $15,500,000 (together with any interest thereon, the "Escrow Amount") in cash with the Escrow Agent to be held in accordance with the terms of the Escrow Agreement.

4

Section 2.7    Aggregate Purchase Price.    The total purchase price for the Purchased Assets shall be, in addition to the assumption of the Assumed Liabilities at Closing, an amount equal to the sum of (a) $310,000,000 (the "Cash Purchase Price"), plus (b) the Cure Amounts required to be paid at the Closing pursuant to Section 2.8(b) (collectively, the "Aggregate Purchase Price"), subject to adjustment pursuant to Section 2.9. Each of Buyer and each Seller Party hereby acknowledges and agrees that the Cash Purchase Price shall be allocated such that (i) the value of the Purchased Assets that comprise the TWC Domestic Collateral is greater than the sum of (v) the TWC Domestic Debt (in the amount, as of the date hereof, of approximately $175 million (inclusive of the Pre-Petition Agent's financial advisor's deferred fee)), plus (w) the principal amount outstanding under the DIP Financing Agreement, in the form filed on the Petition Date for approval by the Bankruptcy Court, provided that such principal amount, for purposes of this Section 2.7, shall not be in excess of $26 million, plus (x) all Guild Residuals secured by the TWC Domestic Collateral and accrued prior to the Petition Date (in the amount, as of the date hereof, of approximately $8 million), plus (y) the amount of all interest accrued and unpaid after the Petition Date through the Closing Date on the amounts described in the preceding clauses (i)(v) through (i)(x), minus (z) any principal payments on the amounts described in the preceding clauses (i)(v) through (i)(x) after the Petition Date and through the Closing Date; and (ii) the value of the Purchased Assets that comprise the BAML Collateral is greater than the sum of the (w) BAML Debt (in the amount, as of the date hereof, of approximately $18.5 million), plus (x) all Guild Residuals secured by the BAML Collateral and accrued prior to the Petition Date, if any, plus (y) the amount of all interest accrued and unpaid after the Petition Date through the Closing Date on the amounts described in the preceding clauses (ii)(w) and (ii)(x), minus (z) any principal payment(s) on the amounts described in the preceding clauses (ii)(w) and (ii)(x) after the Petition Date through the Closing Date; and (iii) such allocated amounts of the Cash Purchase Price will be so allocated to such Purchased Assets.

Section 2.8    Cure Amount; Right to Exclude Contracts.

(a)    Available Contracts.    Section 2.8(a) of the Disclosure Schedule sets forth a list of all executory Contracts relating to the Business or the Purchased Assets to which one or more of Seller Parties are party (the "Available Contracts"), which Section 2.8(a) of the Disclosure Schedule may not be complete as of the Execution Date (but, nonetheless, as of the Execution Date shall include all Material Contracts) and which may be updated from time to time after the Execution Date by the Seller Parties to add any Contracts not included on such schedule as of the Execution Date.    Notwithstanding the foregoing, Section 2.8(a) of the Disclosure Schedule shall be completed and delivered to Buyer on or before the date that is one (1) Business Day prior to the Bid Deadline.    Prior to the Closing Date, Buyer, in its sole discretion by written notice to the Seller Parties, shall designate in writing which Available Contracts from Section 2.8(a) of the Disclosure Schedule (as updated from time to time in accordance with this Section 2.8(a)) relating to the Business or the Purchased Assets that Buyer wishes to "assume" (the "Assumed Contracts") and subject to the right of Buyer, at any time prior to the Closing Date, Buyer may, in its sole discretion, determine not to "assume" any Available Contracts previously designated as an Assumed Contract.    All Contracts of the Seller Parties that are listed on Section 2.8(a) of the Disclosure Schedule as of the Closing Date and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed "Excluded Contracts" (and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs related to any

Excluded Contracts). Upon Buyer's reasonable request, the Seller Parties shall provide additional detailed information as to the Liabilities under the Contracts sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such Contract hereunder.  The Seller Parties shall cause notices to be delivered reasonably promptly to any counterparties to Contracts that are designated as Excluded Contracts from time to time pursuant to this Section 2.8(a).

(b)    Buyer Commitment to Cure Amounts.  The Seller Parties shall use reasonable best efforts to establish and verify all Cure Amounts for the Contracts set forth on Section 2.8(a) of the Disclosure Schedule prior to entry of the Sale Order.  Subject to the other provisions of this Section 2.8, Buyer agrees to pay all Cure Amounts required to assume the Assumed Contracts pursuant to this Section 2.8 at the Closing; provided that, prior to the Closing Date, Buyer shall have the option to (x) pay the Cure Amounts required to assume all such Contracts or (y) remove certain Contracts (other than, for the avoidance of doubt, Disputed Contracts) from Section 2.8(a) of the Disclosure Schedule.  At Closing, Buyer shall promptly pay all Cure Amounts in connection with the assumption and assignment of the Assumed Contracts (as set forth in this Agreement, as agreed to by Buyer and the contract counterparty or as determined by the Bankruptcy Court).  The Seller Parties shall cooperate with Buyer to facilitate the payment of the Cure Amounts to the Contract counterparties. The Seller Parties shall take all actions required to assume and assign the Assumed Contracts to Buyer (other than payment of Cure Amounts, if so required), including taking all actions required to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(c)    Determination of Cure Amounts.  Upon objection by the non-debtor Contract counterparty to the Cure Amount asserted by the Seller Parties with regard to any Assumed Contract (such contract, a "Disputed Contract"), the Seller Parties, with the consent of Buyer, shall either settle the objection of such party or shall litigate such objection under procedures as the Bankruptcy Court shall approve and proscribe. In no event shall any of the Seller Parties settle a Cure Amount objection with regard to any Assumed Contract without the express written consent of Buyer. In the event that a dispute regarding the Cure Amount with respect to an Assumed Contract has not been resolved as of the Closing Date, the Parties shall nonetheless remain obligated to consummate the Transactions. Upon an Order determining any Cure Amount regarding any Disputed Contract after the Closing, Buyer shall have the option to (x) pay the Cure Amount with respect to such Disputed Contract and assume the Disputed Contract as an "Assumed Contract" or (y) designate the Disputed Contract as an "Excluded Asset", in which case, for the avoidance of doubt, Buyer shall not assume the Disputed Contract and shall not be responsible for the associated Cure Cost.

(d)    Adequate Assurance.  Buyer shall use commercially reasonable efforts to provide the Bankruptcy Court any evidence reasonably necessary to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts.

(e)    Transfer Consent.  The Seller Parties shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from the Seller Parties, as of the Closing Date pursuant to the Sale Order and Section 365 of the Bankruptcy

Code.  Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Agency (each, a "Transfer Consent"), would constitute a breach or in any way adversely affect the rights of Buyer or the Seller Parties thereunder after giving effect to the entry of the Sale Order.  Buyer and the Seller Parties shall cooperate together in good faith and use reasonable best efforts to obtain such Transfer Consents as soon as reasonably practicable and shall promptly inform each other of any discussions and communications with the counterparties from whom a Transfer Consent is required.  If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, the Seller Parties and Buyer will cooperate in a mutually agreeable arrangement under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

(f)    Post-Closing Assumption and Assignment of Contracts to Buyer.  At any time after the Closing, the Seller Parties and Buyer may (but shall have no obligation to) mutually agree to seek authorization from the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code, to assume and assign a Contract that was not identified as an Assumed Contract as of Closing; provided that Buyer will be solely responsible to pay the Cure Amount required to assume such Contract.

Section 2.9    Payment of Aggregate Purchase Price; Escrow Amount.

(a)    At the Closing, Buyer shall pay the Final Cash Purchase Price to TWCH by wire transfer of immediately available funds, to an account designated in writing by TWCH at least two (2) Business Days prior to the Closing. The Cash Purchase Price shall be adjusted by deducting (i) the Escrow Amount and (ii) the aggregate sum of all payments received by the Seller Parties (net of (x) any applicable secured Guild Residuals actually paid by the Seller Parties prior to the Closing with respect to such payments and (y) any portion of such payments actually used to repay in whole or in part any Liabilities set forth on Schedule 2.3 to the extent such Liabilities are either (1) assumed at Closing in accordance with Section 2.3 or (2) non-recourse production loans relating to Purchased Assets which are acquired in connection with Section 2.1 and Section 2.8 and which have been repaid in full prior to the Closing Date) with respect to (A) the Title Rights during the Interim Period and (B) without duplication, any other receivables during the period from the Execution Date to the Closing Date (the Cash Purchase Price, as so adjusted, the "Final Cash Purchase Price"). Sellers shall prepare a closing statement (the "Closing Statement") showing the adjustments to the Cash Purchase Price required by this Section 3(b)(i).  No later than five (5) Business Days prior to the Closing, Sellers shall deliver a preliminary Closing Statement to Buyer for its approval. A final Closing Statement shall be delivered to Buyer on the Closing Date. Any reasonable objections to the foregoing statements shall be resolved in good faith as promptly as practicable prior to Closing.

(b)    At the Closing, each of Buyer and TWCH shall duly execute and deliver to one another, and the Escrow Agent, a joint instruction to the Escrow Agent (in the form exhibited to the Escrow Agreement) instructing the Escrow Agent to pay to TWCH the Escrow Amount by wire transfer of immediately available funds in accordance with the Escrow Agreement.

Section 2.10    <u>Closing Deliverables</u>.

(a)    At the Closing, TWCH shall deliver, or cause to be delivered to Buyer:

(i)    a duly executed counterpart to each Ancillary Agreement (other than the Escrow Agreement) to which a Seller Party is a party; and

(ii)    a certificate dated as of the Closing Date and executed by a duly authorized representative of TWCH, certifying that the conditions set forth in <u>Section 10.1</u> and <u>Section 10.2</u> have been satisfied.

(b)    At the Closing, in addition to compliance in full with the payment and delivery obligations of Buyer set forth in <u>Section 2.9</u>, Buyer shall deliver to TWCH:

(i)    a duly executed counterpart to each Ancillary Agreement (other than the Escrow Agreement) to which Buyer is a party; and

(ii)    a certificate dated as of the Closing Date and executed by a duly authorized representative of Buyer, certifying that the conditions set forth in <u>Section 9.1</u> and <u>Section 9.2</u> have been satisfied.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES

Except for the exceptions and disclosures set forth on the Disclosure Schedule, and subject to the limitations in <u>Section 13.8</u>, the Seller Parties represent and warrant to Buyer:

Section 3.1    <u>Corporate Organization, Qualification, Power and Authority</u>.

(a)    Each Seller Party is duly formed and validly existing under the Laws of its jurisdiction of incorporation or formation, as applicable. Each Seller Party has all requisite entity power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, subject to the provisions of the Bankruptcy Code, except where the failure to have such power and authority would not, individually or in the aggregate, be reasonably likely to have  a Material Adverse Effect.

(b)    Except for such authorization as is required from the Bankruptcy Court, each Seller Party has the requisite limited liability company power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution and delivery by each Seller Party of this Agreement and the Escrow Agreement and, at the Closing each Ancillary Agreement (other than the Escrow Agreement) to which it is a party and the performance by it of its obligations hereunder and thereunder, and the consummation by each Seller Party of the Transactions, have been (or at the Closing will be) duly and validly authorized by each Seller Party, and no other requisite corporate proceeding on the part of any Seller Party is (or at the Closing, will be) necessary to authorize the execution,

delivery or performance hereof or thereof or to consummate the Transactions. This Agreement and each Ancillary Agreement to which any Seller Party is a party has been (or when delivered, will be) duly and validly executed and delivered by such Seller Party and, assuming this Agreement and the Ancillary Agreements constitute the valid and binding agreement of the other parties hereto or thereto, and the entry of the Bidding Procedures Order and Sale Order, constitutes the valid and binding agreement of such Seller Party, enforceable against such Seller Party in accordance with its terms, except as such enforcement may be limited by (i) applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar Laws now or hereinafter in effect relating to or affecting creditors' rights generally and (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity) (the "Bankruptcy and Equity Exception").

Section 3.2    Capitalization.    Section 3.2 of the Disclosure Schedule sets forth the capitalization of each Seller JV.  All of the interests of the applicable Seller Party in any such entity have been duly authorized, are validly issued, fully paid and non-assessable (other than for *de minimis* amounts), and are owned of record and beneficially by the applicable Seller Party, free and clear of all Liens (other than Permitted Liens).

Section 3.3    Consents and Approvals; No Violations.    Except for (i) the filing of notification and report forms with the FTC and the Antitrust Division under the HSR Act and the expiration or termination of any applicable waiting period thereunder, (ii) the issuance of Consents of such applications by such agencies, if required, and the expiration or termination of any applicable waiting periods thereunder and (iii) the entry of the Bidding Procedures Order and Sale Order, no applications, notices to, Consents of, or filings with, any Governmental Agency are necessary in connection with the execution and delivery by the Seller Parties of this Agreement and the Ancillary Agreements or the consummation by the Seller Parties of the Transactions, except where failure to provide, obtain or make, as applicable, any such any applications, notices, Consents or filings, would individually or in the aggregate, not be reasonably likely to have a Material Adverse Effect.  The notices, notifications, filings, Consents, and expirations or terminations of waiting periods referred to in Section 3.3(i), Section 3.3(ii) and Section 3.3(iii) are hereinafter referred to as the "Requisite Regulatory Approvals".

Section 3.4    No Conflict. Except as set forth on Section 3.4 of the Disclosure Schedule and subject to obtaining the Requisite Regulatory Approvals, the execution, delivery and performance by the Seller Parties of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate (A) any provision of law, statute, rule or regulation,  (B) any applicable Order of any court or any rule, regulation or Order of any Governmental Agency, where any such conflict, violation, breach or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (C) any provision of or result in the termination of any Material Contract without consent from the counter-party to such Material Contract or (ii) result in the creation or imposition of any Lien upon or with respect to any Purchased Assets, other than the Permitted Liens.

Section 3.5    Title to Assets.  Each Seller Party has valid title to, a leasehold interest in, or a license to use all material items of tangible property owned, leased, licensed or otherwise held by such Seller Party (except as sold or disposed of subsequent to the Execution Date not in violation of this Agreement), free and clear of all Liens other than Permitted Liens (other than

Leased Real Property, which is covered by <u>Section 3.8</u>, Tangible Materials, which are covered by <u>Section 3.10(e)</u>, Owned Other Intellectual Property, which is covered by <u>Section 3.11</u> and the Covered Titles, which are covered by <u>Section 3.10</u>) except where the failure to have title, leasehold or license would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.  Other than (x) the Excluded Assets (including the Excluded Contracts designated by Buyer pursuant to <u>Section 2.8(a)</u>) and (y) any Seller Party Employees who do not become "Buyer Employees" after the Closing, the Purchased Assets are sufficient for the continued conduct of the Business after Closing in a manner consistent with past practice of the Seller Parties and the Business as conducted immediately prior to the Closing.

Section 3.6    <u>Labor Matters</u>.

(a)    Except as set forth on <u>Section 3.6(a)</u> of the Disclosure Schedule and except as would not be reasonably likely to have a Material Adverse Effect: (i) to the Seller Parties' Knowledge, during the past (3) years, each person or entity classified by any each Seller Party as an "independent contractor", consultant, volunteer, leased employee, or other contingent worker is properly classified under all governing Laws, and each Seller Party has fully and accurately reported all payments to all independent contractors and other contingent workers on IRS Form 1099s or as otherwise required by applicable Laws; (ii) during the past three (3) years, each employee classified as "exempt" from overtime under the Fair Labor Standards Act ("<u>FLSA</u>") and any state or local laws governing wages, hours, and overtime pay has been properly classified as such, and each Seller Party has not incurred any Liabilities under the FLSA or any state or local wage and hour laws; (iii) during the past three (3) years, each Seller Party has provided advance notice of layoffs or terminations (or payment in lieu of such notice) as required by the Worker Adjustment and Retraining Notification Act or analogous state or local Laws, or any applicable Law regarding termination or layoff of employees for employees outside the United States (collectively the "<u>WARN Act</u>") and has not incurred any Liability under such Laws; (iv) except with respect to the Harassment Claims, each Seller Party is in compliance with all applicable Laws relating to labor and employment, including but not limited to all Laws relating to employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; equal employment opportunities; labor relations; wages and hours; immigration; workers' compensation; employee benefits; background and credit checks; occupational safety and health; family and medical leave; (v) except with respect to the Harassment Claims, there are no pending or threatened Actions or grievances against any Seller Party brought by or on behalf of any applicant for employment, any current or former employee, representative, agents, consultant, independent contractor, subcontractor, or leased employee, volunteer, or "temp" of any Seller Party, or any group or class of the foregoing, or any Governmental Agency, in each case in connection with his or her affiliation with, or the performance of his or her duties to, any Seller Party; and (vi) each of the employees of each Seller Party has all work permits, immigration permits, visas, or other authorizations required by Law for such employee given the duties and nature of such employee's employment.

(b)    Except as set forth on <u>Section 3.6(b)</u> of the Disclosure Schedule, (i) no Seller Party is a party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, and other agreements (each a "<u>Collective Bargaining Agreement</u>") with any union, works council, or labor organization (each a "<u>Union</u>" and collectively "<u>Unions</u>") with respect to its employees; (ii) during the past three (3)

10

years, no union or group of employees of any Seller Party has sought to organize any employees for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with any Seller Party, or filed a petition for recognition with any Governmental Agency; (iii) as of this date, no Collective Bargaining Agreement is being negotiated by any Seller Party; and (iv) during the past three (3) years there have been no actual or threatened strikes, lockouts, slowdowns, work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs or other forms of organized labor disruption with respect to any Seller Party.

Section 3.7    Employee Benefit Plans and Agreements.    Each Benefit Plan is in compliance with ERISA, the Code and other applicable Law in all material respects.    No plan currently or at any time during the past six (6) years maintained, sponsored, contributed to or required to be contributed to by any Seller Party or any of their respective ERISA Affiliates is or was (a) a Multiemployer Plan, (b) a plan described in Section 413 of the Code, (c) a plan subject to Title IV of ERISA or (d) a plan subject to the minimum funding standards of Section 412 of the Code or Section 302 of ERISA.

Section 3.8    Real Property.

(a)    No Seller Party owns any real property.

(b)    The Seller Parties have a valid leasehold interest, free and clear of all Liens, other than Permitted Liens, to all of the material Leased Real Property used in the conduct of the Business.

(c)    Each material Real Property Lease is a legal, valid and binding agreement, enforceable against the Seller Party thereto, and, to the Seller Parties' Knowledge, enforceable against the other party or parties thereto, in accordance with its terms (except that the enforcement thereof may be limited by the Bankruptcy and Equity Exception).

(d)    To the Seller Parties' Knowledge, there is no, nor has any Seller Party received written notice of any, material default by any Seller Party under any material Real Property Lease that has not been remedied.

Section 3.9    Environmental Laws and Regulations.

(a)    To the Seller Parties' Knowledge and except as would not be reasonably likely to have a Material Adverse Effect:

(i)    Each Seller Party is in compliance with all applicable Environmental Laws, including possessing all Permits required for the operation of the Business under applicable Environmental Laws.

(ii)    There is no pending Action, or written notice from a Governmental Agency of threatened Action, against any Seller Party under or pursuant or related to any Environmental Law.

(iii)    There is no unresolved civil, criminal or administrative Action ending or threatened in writing against any Seller Party relating to any Environmental Law.

(b)    Notwithstanding any other provision of this Agreement, this Section 3.9 sets forth the sole representations and warranties in this Agreement with respect to environmental matters, including (i) compliance by the Seller Parties with Environmental Law and (ii) Actions under or pursuant to any Environmental Law.

Section 3.10    Covered Titles.

(a)    Rights and Entitlements.  The Seller Parties collectively own all right, title and interest in and to the Title Rights necessary to Exploit the Covered Titles to the same extent, and in the same manner, that the Seller Parties Exploited the Title Rights (or, to the extent that the Seller Parties had the Title Rights to Exploit such Covered Title) immediately prior to the Closing Date free and clear of all Liens, other than Permitted Liens. As of the Closing Date, subject to the Assumed Contracts, no Seller Party has,  prior to the Closing Date, sold, assigned, conveyed or hypothecated all or any portion of the Title Rights or granted to any third party and present or future right to acquire any such rights. After the Closing, neither the Seller Parties nor any of their Affiliates shall have any ownership interest in any of the Title Rights or the Covered Titles, whether at law or in equity, other than any rights pursuant to any Excluded Contracts designated by Buyer pursuant to Section 2.8(a).

(b)    Availabilities Database.   TWCH has provided to Buyer the Availabilities Database which sets forth the pay television and free television "availabilities" (as such term is commonly understood in the U.S. motion picture industry) of each of the motion pictures from the Seller Parties' film library, which Availabilities Database is to the Seller Parties' Knowledge true and correct in all material respects with respect to such rights in the Covered Titles. The Seller Parties have the right to Exploit all of the Covered Titles in the manner currently Exploited by the Seller Parties.   TWCH has provided to Buyer the Program Rights Chart which sets forth a summary of the Material Contracts relating to each Top Program, including: (i) the distribution rights of the Seller Parties subsisting in each such Top Program under such Material Contracts and (ii) to the extent such rights have been granted by any Seller Party to a third party pursuant to a Material Contract, the distribution rights granted and the territory. The Program Rights Chart is to the Seller Parties' Knowledge true and correct in all material respects with respect to such Top Program.

(c)    Copyright Protection/Terminations. Except as set forth on Section 3.10(c)(i) of the Disclosure Schedule, each applicable Seller Party has duly recorded or caused to be duly recorded (or, with respect to pending applications for registration, has submitted for recordation) the commercially Exploited version of each Covered Title with the U.S. Copyright Office.   Section 3.10(c)(ii) of the Disclosure Schedule lists, as of the Execution Date, all copyrights registered or filed with the United States Copyright Office by a Seller Party for the Top Pictures.

(d)    No Infringement.   Except as set forth on Section 3.10(d) of the Disclosure Schedule, to the Seller Parties' Knowledge, no Covered Title, Title Rights nor any

12

underlying materials on which any Covered Title and/or Title Rights are based, nor any literary, dramatic or musical works or any other materials contained therein or synchronized therewith, nor the exercise of any right, license or privilege herein granted, in each case, to the extent Exploited to the same extent, and in the same manner, that Sellers Exploited same immediately prior to the Closing Date violates (or will violate), invalidates (or will invalidate), infringes upon (or will infringe upon) or dilutes (or will dilute) any Intellectual Property right, including any literary, dramatic, comedic, musical, "droit moral", personal, distribution, exhibition or photoplay right of any Person.  Except as set forth on Section 3.10(d) of the Disclosure Schedule, to the Seller Parties' Knowledge, there has been no infringement or misappropriation or dilution by any third party of any Covered Title or Title Rights, and no Seller Party has made or asserted any written complaint or claim alleging any such material infringement or misappropriation has occurred since January 1, 2016.  Since January 1, 2016, no Title Rights or rights relating to any of the Covered Titles have been disposed of, assigned, abandoned or canceled.  No Title Rights or rights relating to any of the Covered Titles are the subject of any invalidation, opposition or cancellation proceeding. Except as disclosed on Section 3.10(d) of the Disclosure Schedule, and except to the extent the period to assert a claim therefor has expired, (i) there are no judgments, debts, deductions, offsets, claims, overpayments or other basis (collectively, "Reductions") for reducing any of the payments or other compensation payable under the Assumed Contracts, nor (ii) has any party (including, without limitation, any distributor) asserted the existence of any Reductions that have not been resolved as of the Closing Date.

(e)    Tangible Materials.    The locations of the Tangible Materials in which a Seller Party has any right title or interest are set forth on Section 3.10(e) of the Disclosure Schedule.  To the extent such locations are owned or controlled by a third party, the Seller Parties have access to such Tangible Materials and the contact information for, and amounts payable (as of March 13, 2018) to, such third party are set forth on Section 3.10(e) of the Disclosure Schedule.  The Tangible Materials that exist for each of the Covered Titles in which a Seller Party has any right title or interest are, to the Seller Parties' Knowledge, in first class technical and commercial quality and condition, sufficient to permit the Buyer's Exploitation of the Covered Titles and Title Rights in a manner consistent with the present commercial Exploitation thereof.

(f)    Material Obligations.    Other than the Cure Amounts under the Available Contracts and except as set forth in Section 3.10(f) of the Disclosure Schedule, the Seller Parties have paid or performed all material obligations of the Seller Parties (including the payment of Participations and Guild Residuals due and owing prior to the Closing Date).  The Seller Parties are in compliance in all material respects with all of their obligations under each of the Assumed Contracts.  The Seller Parties have received no notice alleging any claimed breaches or defaults by a Seller Party under the Assumed Contracts which have not been discharged, cured or otherwise satisfied by the Seller Parties, and to the Seller Parties' Knowledge, none of the sub-distributors are in default thereunder.  Except as set forth on Section 3.10(f) of the Disclosure Schedule, all artists, actors, musicians and persons rendering services in connection with the production or other Exploitation of each Covered Title have been paid the sums required to be paid to them by Seller Parties under applicable agreements up to the Closing Date, and the sums required to be paid pursuant to any applicable pension or similar trusts by Seller Parties have been made in a due and timely manner.

(g)    Consents.  Except for the Transfer Consents and subject to obtaining the Requisite Regulatory Approvals, no consent, approval or agreement of or other action by any third party, and no notice of filing with any third party, is required for the due execution, delivery and performance by Seller Parties of this Agreement and the consummation of the transactions provided for herein.   Other than with respect to claims that have been discharged, cured or otherwise satisfied, no third party has notified Sellers of, and, to the Seller Parties' Knowledge, no circumstances warrant the assertion by any third party of, any right to receive all or any portion of the Title Rights of any Seller Parties.  No further consent by any Seller Parties with respect to the Title Rights shall be required to be provided by the Seller Parties as a condition to the exercise of any right of Buyer with respect to the Title Rights.

(h)    Audits.  Except as set forth on Section 3.10(h) of the Disclosure Schedule, to the Seller Parties' Knowledge, none of the parties to any of the Assumed Contracts relating to any of Participations have given notice of an intention to commence, or otherwise indicated an intention to commence, any audit. No Seller Party has waived or modified any of the audit rights provided for in the Assumed Contracts giving rise to the Participations with respect to audit periods that remain contestable as of the Closing Date.  To the Seller Parties' Knowledge, there are no facts or circumstances existing  that  provide a right of any distributor to adjust the Program Participations payable to the Seller Parties or claim a refund of any amount previously paid, except to the extent the period to assert a claim therefor has expired.

Section 3.11    Other Intellectual Property.

(a)    Section 3.11(a) of the Disclosure Schedule sets forth a list of all applications, registrations and filings for Owned Other Intellectual Property that have been registered, filed, certified or otherwise perfected or recorded or are the subject of a pending application for such, with or by any Governmental Agency (other than in connection with any internet domain names), by or on behalf of or in the name of any Seller Party, excluding any items that are cancelled, expired, abandoned, withdrawn, or finally refused (without right of appeal) (the listed Owned Other Intellectual Property, the "Registered Owned Other Intellectual Property").   The applicable Seller Party exclusively owns the Registered Owned Other Intellectual Property and other Intellectual Property that is owned by, used, or held for use by a Seller Party (together with Registered Owned Other Intellectual Property, "Material Owned Other Intellectual Property").   The Registered Owned Other Intellectual Property is valid and subsisting and in full force and effect except where such failure to be so valid and subsisting and in full force and effect would not be material to the Business.

(b)    Except as set forth on Section 3.11(b) of the Disclosure Schedule, since January 1, 2016, no Seller Party has received any written notice of infringement or misappropriation from any third party with respect to any Material Owned Other Intellectual Property.  To the Seller Parties' Knowledge, there has been no infringement or misappropriation by any Person of any Material Owned Other Intellectual Property, and no Seller Party has made or asserted any written complaint or claim alleging any such infringement or misappropriation has occurred since January 1, 2016.

(c)    Each Seller Party has taken commercially reasonable measures to maintain in confidence all confidential information owned or possessed by such Seller Party

14

included in Purchased Assets ("Trade Secret").    To the Seller Parties' Knowledge, no such Trade Secret has been disclosed by the Seller Parties to any person other than employees, consultants or contractors who had a need to know and who used such Trade Secret in the ordinary course of employment or contract performance subject to a confidentiality agreement or obligation.  No Trade Secret has been the subject of any unauthorized disclosure or access by third parties.

Section 3.12    Material Contracts.

(a)    Section 3.12(a) of the Disclosure Schedule sets forth a list of the following executory Contracts to which a Seller Party is a party or by which any of them or their respective assets or properties are bound (but excluding Contracts that are Excluded Assets and excluding this Agreement) (collectively, the "Material Contracts"):

(i)    Contracts entered into after January 1, 2016 that provide for the consummation of the acquisition or disposition of any business, a material amount of stock or all or substantially all of the assets of any other Person (other than a special purpose vehicle used to develop, produce, finance, or Exploit a particular Project) or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(ii)    Contracts pursuant to which a Seller Party licenses or grants any distribution rights in the United States in the Top Titles (on a Top-Title-by-Top Title basis other than as noted therein with respect to Contracts pertaining to multiple Top Titles) to a third party, and (A) with respect to any Top Title that is a Top Picture, which TWCH reasonably expects to result in payments to the Seller Parties in excess of $100,000 in respect of any such individual Top Picture between the Execution Date and December 31, 2019 and (B) with respect to Top Titles that are Top Programs, all such Contracts;

(iii)    Contracts pursuant to which a third party licenses or grants to any Seller Party any distribution rights in the Top Titles or any Intellectual Property rights in the underlying source material (as opposed to the completed Top Title) upon which any Top Title is based (in each case, on a Top Title-by-Top Title basis), but excluding, for clarity, any Contract with personnel, writers or talent for services;

(iv)    all "output" Contracts that provide a third party the right to distribute any Top Titles in the United States, Canada, Australia, the United Kingdom, France, Spain, Italy, Benelux, Germany or Japan the output term of which has not expired; and

(v)    Contracts by which a Seller Party is made a partner or joint venturer in an entity that is a general or limited partnership under the Laws of its jurisdiction of formation.

(b)    Each Material Contract is, in all material respects, (i) in full force and effect and is a valid and binding obligation of the applicable Seller Party which is a party

15

thereto and (ii) enforceable against the applicable Seller Party, and, to the Seller Parties' Knowledge, enforceable against the other party or parties thereto, in accordance with its terms (except that the enforcement thereof may be limited by the Bankruptcy and Equity Exception).

Section 3.13    Taxes.  Each Seller Party has timely filed all material Tax Returns that it was required to file.  All such Tax Returns were correct and complete in all material respects. All material Taxes owed by each Seller Party (whether or not shown or required to be shown on any Tax Return) have been paid.  No Claim has ever been made by an authority in a jurisdiction where any Seller Party does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no Liens on any of the assets of any Seller Party that arose in connection with any failure (or alleged failure) to pay any Tax.

Section 3.14    Undue Influence.  In connection with the operation of the Business, no Seller Party or, to the Knowledge of the Seller Parties, any director, officer, agent, employee or Affiliate of the Seller Parties, has taken any action, directly or indirectly, with respect to the Business that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "FCPA"). The Seller Parties, and, to the Knowledge of the Seller Parties, their Affiliates, have conducted the Business in compliance with the FCPA in all material respects and maintain procedures which are reasonably expected to ensure compliance therewith.

Section 3.15    Brokers and Finders.  Except for Moelis & Company, Houlihan Lokey, Inc. and FTI Consulting, no investment banker, broker, finder or intermediary or other Person in connection is or will be entitled to any investment banking, brokerage, finder's, financial advisory or similar fee or commission in connection with this Agreement, any Ancillary Agreement or the Transactions as a result of any arrangement made by any Seller Party.


# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants as follows:

Section 4.1    Corporate Organization, Qualification, Power, Authority and Nationality.

(a)    Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.

(b)    Buyer has the requisite entity power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Transactions.  The execution and delivery by Buyer of this Agreement and the Escrow Agreement, at the Closing each Ancillary Agreement (other than the Escrow Agreement) to which Buyer will be a party and the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the Transactions, have been (or at the Closing will be) duly and validly authorized by the governing body of Buyer, and no other requisite corporate proceeding

on the part of Buyer is (or at the Closing, will be) necessary to authorize the execution, delivery and performance hereof or thereof or to consummate the Transactions.  This Agreement and each Ancillary Agreement to which Buyer is a party has been (or when delivered, will be) duly and validly executed and delivered by Buyer and, assuming this Agreement and the Ancillary Agreements constitute the valid and binding agreement of the other parties hereto or thereto, and the entry of the Bidding Procedures Order and Sale Order, constitutes the valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as such enforcement may be limited by the Bankruptcy and Equity Exception.

Section 4.2    Consents and Approvals; No Violations.

(a)    Subject to the giving of notices and obtaining the Requisite Regulatory Approvals and the entry of the bidding Procedures Order and Sale Order, no applications, notices to, Consents of, or filings with, any Government Agency, self-regulatory authority or third party are necessary in connection with the execution and delivery by Buyer of this Agreement and the Ancillary Agreements or the consummation by Buyer of the Transactions.

(b)    Neither the execution, delivery or performance of this Agreement and the Ancillary Agreements by Buyer, nor the consummation by Buyer of the Transactions, does or will (i) violate in any material respect, or result in any material breach of any material provisions of the Organizational Documents of Buyer; (ii) violate in any material respect, result in or constitute a material default under, any of the material terms, conditions or provisions of any material Contract to which Buyer is a party or by which it or any of its properties or assets may be bound; (iii) violate in any material respect, or result in or constitute a material default under, any of the material terms, conditions or provisions of any Permit applicable to Buyer; or (iv) subject to giving the notices and obtaining the Requisite Regulatory Approvals, and the entry of the Bidding Procedures Order and Sale Order, violate in any material respect any material Law applicable to Buyer or any of its material properties or assets.

Section 4.3    Financing.

(a)    Buyer has available, and will have available through the Closing, cash and existing debt commitment letters (the "Debt Commitment Letters") which are sufficient, assuming the Debt Financing is funded in accordance with the Debt Commitment Letters, to satisfy all of obligations under this Agreement, including its obligations to pay the Aggregate Purchase Price and to make any other payment required to be made by Buyer under this Agreement or the Debt Commitment Letters.

(b)    Buyer has delivered to TWCH true, correct and complete copies of the fully-executed Debt Commitment Letters dated on or about the Execution Date together with true, correct and complete copies of the executed fee letters referenced therein (except that the fee amounts, pricing caps and other economic terms (none of which would adversely affect the amount or availability of the Debt Financing) set forth therein, but not the references to the subject of the flex terms, if any, have been redacted) from the financial institutions identified therein ("Debt Financing Sources"). Buyer has fully paid (or caused to be paid) any and all commitment fees or other fees under the Debt Commitment Letters that are due and payable on

or prior to the Execution Date and will fully pay (or cause to be paid) any and all commitment fees or other fees under the Debt Commitment Letters that are due and payable after the Execution Date and prior to the Closing. The Debt Commitment Letters have not been amended or modified, and the respective obligations and commitments contained in such letters have not been withdrawn, terminated, rescinded, amended or modified. The Debt Commitment Letters are in full force and effect as of the Execution Date, and the Debt Commitment Letters constitute valid and binding obligations of Buyer and, to Buyer's Knowledge, each other party thereto, enforceable against such party in accordance with its terms, except as such enforcement may be limited by the Bankruptcy and Equity Exceptions. No event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to (A) constitute a default or breach on the part of Buyer or, to Buyer's Knowledge, any other party thereto, under the Debt Commitment Letters, (B) to Buyer's Knowledge result in a failure of any condition to the Debt Financing or (C) to Buyer's Knowledge otherwise result in any portion of the Debt Financing being unavailable on the Closing Date. There are no conditions precedent or contingencies to the obligations of the parties under the Debt Commitment Letters (including pursuant to any "flex" provisions or otherwise) to make the full amount of the Debt Financing available to Buyer or otherwise related to the funding of the full amount of the financing contemplated by the Debt Commitment Letters, except as expressly set forth in the Debt Commitment Letters. There are no side letters or other agreements, contracts or arrangements to which Buyer or any of its Affiliates is a party related to the funding or investing, as applicable, of the full amount of the Debt Financing that could adversely affect the availability of the Debt Financing, other than as set forth in the Debt Commitment Letters. Notwithstanding anything in this Agreement to the contrary, Buyer understands, acknowledges and agrees that under the terms of this Agreement, Buyer's obligation to consummate the Transactions is not in any way contingent upon or otherwise subject to Buyer's consummation of any financing arrangements.

Section 4.4    <u>Brokers and Finders</u>.    No investment banker, broker, finder or intermediary or other Person is or will be entitled to any investment banking, brokerage, finder's, financial advisory or similar fee or commission in connection with this Agreement, the Ancillary Agreements or the Transactions as a result of any arrangement made by or on behalf of Buyer.

Section 4.5    <u>Solvency</u>.  Buyer shall (a) be able to pay its debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay their respective debts (including a reasonable estimate of the amount of all contingent Liabilities) and (b) have adequate capital to carry on the Business and its business as contemplated to be conducted following the Closing. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Buyer.

Section 4.6    <u>Other Agreements</u>.    Other than this Agreement and the Ancillary Agreements, there are no Contracts, nor any agreement, arrangement or understanding (whether oral or written) to enter into any Contracts, between, on the one hand, Buyer or any Buyer Related Party, and, on the other hand, the Seller Parties and/or any Seller Related Party, (a) that relate to the Transactions, (b) pursuant to which any Seller Party or any Seller Related Party would be entitled to receive consideration with respect to the Transactions (other than as may be expressly provided in this Agreement), (c) pursuant to which any Seller Party or any Seller Related Party has agreed to approve this Agreement or the Transactions or (d) pursuant to which

18

any Seller Party or any Seller Related Party has agreed to provide, directly or indirectly, consideration to Buyer or any Buyer Related Party to finance, in whole or in part, the Transactions.

## ARTICLE V

## PRE-CLOSING COVENANTS AND AGREEMENTS

Section 5.1    Affirmative Covenants.  The Seller Parties covenant and agree that, except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), after the Execution Date and prior to the Closing Date, the Seller Parties shall:

(a)    maintain their books, accounts and records in accordance with past custom and practice as in effect immediately prior to the Execution Date;

(b)    use reasonable best efforts to pay all post-petition trade payables, including all payments to the Guilds incurred post-petition, and collect all accounts receivable after the Petition Date; provided that paying such trade payables or collecting such accounts receivable is in the Ordinary Course of Business;

(c)    use reasonable best efforts to (A) retain employees who are in good standing and are necessary to conduct the Business as it is currently being conducted and (B) maintain their relationships with and preserve for the Business the goodwill of their key suppliers and customers; and

(d)    use reasonable best efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of the Seller Parties or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation, in each case except (A) as contemplated by the Bidding Procedures Order or (B) any actions with respect to any Acquisition Proposal to the extent not prohibited by Section 5.10.

Section 5.2    Negative Covenants.  Except as may be approved or required by the Bankruptcy Court, from the date hereof until the Closing Date, the Seller Parties shall conduct the Business in the Ordinary Course of Business. Without limiting the generality of the foregoing, from the date hereof until the Closing Date, the Seller Parties will not, without the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned or delayed):

(a)    purchase or otherwise acquire any material properties or assets (tangible or intangible);

(b)    sell, lease, license or otherwise dispose of any Purchased Assets or any material assets except (A) pursuant to pre-existing contracts or commitments or (B) as required by law;

(c)      except as required by Law, Contract or Benefit Plan, hire, enter into a bonus agreement with, dismiss without cause (as determined by the applicable Seller Party in its reasonable discretion), or transfer any employee or engage or terminate the contract of any consultant or independent contractor of any Seller Party that provides services primarily to the Business, in each case other than with respect to any employee, consultant or independent contractor who received in the past year or is expected to receive in the current year an annual salary less than or equal to $75,000;

(d)      assume, reject or assign any Assumed Contract other than pursuant to Section 2.8;

(e)      enter into, renew, amend or modify any Material Contract without the approval of the Bankruptcy Court in accordance with section 363(b) of the Bankruptcy Code; or

(f)      agree or commit to do any of the foregoing.

Section 5.3      Permitted Pre-Closing Actions.

(a)      Notwithstanding anything to the contrary in Section 5.1, Section 5.2 or any other provision of this Agreement, from the Execution Date until the Closing Date, the Seller Parties shall have the sole and absolute discretion to take all Permitted Pre-Closing Actions.  "Permitted Pre-Closing Actions" means (i) actions required to comply with applicable Law, the Orders of the Bankruptcy Court or the Bankruptcy Code, (ii) actions required to comply with the agreement entered into by the Seller Parties for post-petition financing, which financing is on substantially similar terms to those provided in the term sheet attached as Exhibit G and otherwise acceptable to Buyer (the "DIP Financing Agreement"), (iii) actions contemplated by this Agreement or (iv) paying any management fees, consulting fees, service fees, director's fees or professional advisor's fees in the Ordinary Course of Business or as approved by the Bankruptcy Court.

(b)      For the avoidance of doubt, the terms and conditions of this Section 5.3 are in addition, and without prejudice, to the right of the Seller Parties to take any actions not otherwise prohibited by Section 5.2.

Section 5.4      Access; Books and Records.  Subject to (a) non-disclosure of information that is Privileged Material and (b) applicable Law, during the period from and after the Execution Date and continuing until the earlier of the Closing Date and a Party's receipt of a notice in connection with Section 11.1 notifying a Party hereto of the termination of this Agreement, upon reasonable prior written notice, the Seller Parties shall permit Buyer and a reasonable number of Buyer's attorneys, accountants, representatives and agents to have reasonable access, at Buyer's sole expense, during normal business hours at a location determined at the reasonable discretion of TWCH, in such manner as to not disrupt or interfere with the normal operation of the Business, to the books, records, Tax Returns and other information with respect to the Purchased Assets and the Assumed Liabilities, and to the then-current officers and employees of the Seller Parties, as Buyer may from time to time reasonably

request.  All information provided or obtained pursuant to the preceding sentence shall be held by Buyer in accordance with, and subject to the terms of, the Confidentiality Agreement.

Section 5.5    Notice of Developments.  Prior to the Closing, each Party shall notify, as promptly as is reasonably practicable, the other Party, in writing, of any events, circumstances, facts and occurrences arising subsequent to the Execution Date which would result in the impossibility of the satisfaction of any such Party's conditions precedent to Closing; provided, nothing set forth in this Section 5.5 shall require any Party to provide any notice if such notice would reasonably be expected to contravene applicable Law, or any Seller Party to provide any notice if such notice would reasonably be expected to (a) jeopardize any Privileged Material or (b) result in the disclosure of any Privileged Material.

Section 5.6    Competition Filings.

(a)    TWCH and Buyer shall, as promptly as practicable but in any event not more than five (5) Business Days after the Execution Date, file, or cause to be filed, all required notification and report forms under the HSR Act with the FTC and the Antitrust Division of the United States Department of Justice (the "Antitrust Division") in connection with the Transactions, file requests for early termination and shall use their respective reasonable best efforts to respond as promptly as practicable to all inquiries received from the FTC or the Antitrust Division for additional information or documentation and to cause the waiting period under the HSR Act to terminate or expire at the earliest possible date (and, in any event, prior to the End Date). Buyer shall pay one hundred percent (100%) of all filing fees payable in respect of any such filings.

(b)    The Seller Parties, on the one hand, and Buyer, on the other hand, will each furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filings or submission that necessary under the provisions of the HSR Act; provided that each of TWCH and Buyer shall have the right to review and comment in advance on any such filings or submissions made by the other Party; provided, however, that any of the foregoing information may be redacted as necessary to address reasonable privilege, contractual or confidentiality concerns. TWCH and Buyer shall keep each other apprised of the status and content of any communications with, and any inquiries or requests for additional information from, any Governmental Agency (provided that neither the Seller Parties nor Buyer shall have any substantive contact with any Governmental Agency with respect to any filing or proceeding contemplated by this Section 5.6 unless it consults with the other Party in advance and, to the extent permitted by such Governmental Agency, gives the other Party opportunity to participate). In furtherance of and not in limitation of the foregoing, each of the Seller Parties and Buyer shall not, absent the prior written agreement of the other Party, extend any waiting period or comparable period under the HSR Act or enter into any agreement with any Governmental Agency not to consummate the Transactions.

Section 5.7    Financing.

(a)    Buyer shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary, proper or

advisable to arrange and obtain the debt financing described in the Debt Commitment Letters (the "Debt Financing") at Closing on the terms and conditions described therein including (i) to maintain in effect the Debt Commitment Letters until the consummation of the Transactions, (ii) to negotiate and enter into definitive agreements with respect to the Debt Commitment Letters (collectively, the "Debt Financing Agreements") on the terms and conditions consistent in all material respects with the terms and conditions of the Debt Commitment Letters or, if available, on other terms (to the extent they are less favorable to Buyer) that are acceptable to Buyer and would not adversely affect the ability of Buyer to timely consummate the Transactions or make the timely funding of the Debt Financing or satisfaction of the conditions to obtaining the Debt Financing less likely to occur, (iii) to satisfy on a timely basis all conditions and covenants applicable to Buyer in the Debt Commitment Letters and Debt Financing Agreements (other than any condition or covenant where the failure to be so satisfied is a direct result of the Seller Parties' failure to comply with their obligations under Section 5.7(b)) and otherwise comply with its obligations thereunder to consummate the Debt Financing at or prior to the Closing, (iv) to enforce its rights (including through litigation) under or with respect to the Debt Commitment Letters and the Debt Financing Agreements and (v) to consummate the Debt Financing at or prior to the Closing.  Buyer shall not enter into any amendments or modifications to or replacement of, or grant any waivers of, any condition or other provision or remedy under, or exercise its right to terminate any commitment under, the Debt Commitment Letters or the Debt Financing Agreements without the prior written consent of TWCH if such amendments, modifications, replacements, terminations or waivers would or would reasonably be expected to (A) reduce the aggregate amount of cash proceeds available from the Debt Financing below the amount which, together with cash on hand at Buyer, in the aggregate is sufficient for Buyer to, on the Closing Date, make payments required to be made pursuant to this Agreement, or (B) impose new or additional conditions or otherwise expand, amend or modify any of the conditions to the receipt of the Debt Financing in a manner that would reasonably be expected to adversely affect the ability of Buyer to timely consummate the Transactions or adversely impact the ability of Buyer to enforce its rights (including through litigation) against the other parties to the Debt Commitment Letters or the Debt Financing Agreements or make the timely funding of the Debt Financing or satisfaction of the conditions to obtaining the Debt Financing less likely to occur.  Buyer shall keep TWCH informed on a reasonably current basis in reasonable detail of all material activity concerning the status of its efforts to arrange the Debt Financing.

(b)     Prior to the Closing, each Seller Party shall use its respective reasonable best efforts to provide to Buyer, at Buyer's expense, cooperation reasonably requested by Buyer that is customary or necessary in connection with arranging, obtaining and syndicating the Debt Financing and causing the conditions in the Debt Commitment Letters to be satisfied. Buyer acknowledges and agrees that, prior to the Closing, the Seller Parties, their Affiliates, and each of the foregoing Persons' respective directors, officers, employees, attorneys, accountants, agents and other representatives shall not have any responsibility for, or incur any Liabilities to any Person under, any Debt Financing in connection with the Transactions or any cooperation provided pursuant to this Section 5.7 and that Buyer shall indemnify and hold harmless all such Persons from and against any and all Liabilities, losses, damages, claims, costs, expenses (including attorneys' fees), interest, awards, judgments and penalties suffered or incurred in connection with the financing contemplated by the Debt Commitment Letters, except to the extent arising or resulting from such Persons' gross negligence or willful misconduct as

determined by a Final Order of a court of competent jurisdiction.  Whether or not the Closing occurs, Buyer shall, promptly upon request by the TWCH, reimburse the Seller Parties for all reasonable out-of-pocket costs (including reasonable attorneys' fees, reasonable accounting fees and other reasonable fees and expenses) incurred by any of them, their respective Affiliates and their respective directors, officers, employees, attorneys, accountants, agents and other representatives in connection with this Section 5.7(b).

(c)     None of the Seller Parties shall be required under the provisions of this Section 5.7 or otherwise in connection with the Debt Commitment Letters (i) to pay any commitment or other similar fee prior to the Closing or (ii) to incur any expense unless such expense is to be promptly reimbursed by Buyer. Notwithstanding the foregoing, no obligation of the Seller Parties under any certificate, document or instrument delivered in connection with the Debt Financing shall be effective until the Closing, and none of the Seller Parties shall be required to take any action under any such certificate, document or instrument that is not contingent upon the Closing.

Section 5.8    Reasonable Best Efforts.    Without limiting any other provision of this Agreement, upon the terms and subject to the conditions of this Agreement, each of the Parties shall act in good faith and use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable, consistent with applicable Law, to consummate the Transactions as soon as reasonably practicable, including such actions or things as, with respect to any of the Seller Parties, Buyer, and with respect to Buyer, TWCH, may reasonably request to satisfy any of the conditions to such other Party's (or Parties', as applicable) obligation to consummate the Transactions.

Section 5.9    Transition of Business.    The Seller Parties shall use reasonable best efforts to assist Buyer (to the extent Buyer reasonably requests) in accomplishing a smooth transition of the Business from the Seller Parties to Buyer, including holding discussions with respect to personnel policies and procedures, and other operational matters relating to the Business. Subject to Section 10.2 and notwithstanding anything else in this Agreement to the contrary, the Parties acknowledge that it is not a condition to the Closing that such a transition has been accomplished.    True, correct and complete copies of all of the Material Contracts shall be delivered to Buyer prior to the Closing.

Section 5.10    Acquisition Proposals.

(a)     Except as permitted by Section 5.10(b), from the Execution Date until the earlier of (x) the date that is fifteen (15) days after the Execution Date and (y) the entry of the Bidding Procedures Order by the Bankruptcy Court, the Seller Parties shall not, and shall not authorize or direct any of their Affiliates or their respective Representatives to, directly or indirectly, (i) knowingly encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. From the Execution Date until the earlier of (x) the date that is fifteen (15) days after the Execution Date and (y) the entry of the Bidding Procedures Order by the Bankruptcy Court, the Seller Parties shall cease, and shall cause its Affiliates and all of its and their Representatives to immediately cease, all existing discussions or

23

negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal; provided that the Seller Parties may continue to provide information (including through the electronic data room) concerning the Seller Parties and the Business to any Person that received information regarding the Seller Parties or the Business or data room access prior to the Execution Date with respect to an Acquisition Proposal. "Acquisition Proposal" shall mean any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning an Alternative Transaction, in each case, other than pursuant to the Bidding Procedures following entry of the Bidding Procedures Order.

(b)    Notwithstanding anything contained in Section 5.10(a) or any other provision of this Agreement to the contrary, if at any time after the Execution Date any of the Seller Parties receives an inquiry regarding an Acquisition Proposal (which inquiry did not result from any breach of Section 5.10(a)), the Seller Parties may furnish information relating to the Seller Parties and the Business to the Person making such inquiry; provided that the Seller Parties may not engage in or otherwise participate in negotiations concerning the terms of a proposed Acquisition Proposal with any such Person prior to the earlier of (x) the date that is fifteen (15) days after the Execution Date and (y) the entry of the Bidding Procedures Order by the Bankruptcy Court.

(c)    In addition to the other obligations under this Section 5.10, until the earlier of (i) the date that is fifteen (15) days after the Execution Date and (ii) the entry of the Bidding Procedures Order by the Bankruptcy Court, the Seller Parties shall promptly (and in any event within two (2) Business Days after receipt thereof by the Seller Parties or their Representatives) advise Buyer orally and in writing of any Alternative Transaction, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to, or which could reasonably be expected to result in, an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same, in each case.

(d)    The Seller Parties agree that the rights and remedies for noncompliance with this Section 5.10 shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

## ARTICLE VI
## POST-CLOSING COVENANTS AND AGREEMENTS

Section 6.1    Guild Matters.    Following the Closing, Buyer shall assume obligations under any Collective Bargaining Agreement between any Seller Party and a Guild with respect to Guild Secured Titles; provided that Buyer will do so: (i) as a new company, and shall not be deemed to be a successor employer of any Seller Party; (ii) with respect only to post-Closing obligations, and shall not assume or accept any Liabilities arising prior to Closing or attributable to any Seller Party; and (iii) only as to Collective Bargaining Agreements associated with the Guild Secured Titles that are Covered Titles. Buyer shall, within a reasonably practicable time following any request by TWCH or any Guild, as applicable, engage in discussions with the corresponding Guild regarding entering into a Guild Assumption Agreement, provided that any

such Guild Assumption Agreement shall be in a form agreeable to Buyer and shall include a release of all claims of successorship with respect to Buyer.

Section 6.2    Employee Matters. Buyer anticipates offering employment to most Seller Party Employees and such offers are anticipated to include substantially similar, in the aggregate, wages and benefits, including honoring of all accrued, unused vacation and providing credit for years of service, as in place for the Seller Party Employees prior to Closing; provided, however, that Buyer shall have sole discretion to determine which Seller Party Employees to offer employment to, and on what terms.  With respect to all individuals who are, immediately prior to the Closing, employed by any Seller Party (as to the individuals, the "Seller Party Employees"), the Seller Parties shall terminate all such Seller Party Employees immediately prior to the Closing.  Except as otherwise required by Law or as otherwise provided in this Section 6.2, Buyer shall not be obligated to provide any severance, separation pay, or other payments or benefits, including any employee retention payments, to any Seller Party Employee on account of any termination of such Seller Party Employee's employment on or before the Closing Date, and such benefits (if any) shall remain obligations of the Seller Parties. Prior to the Closing, Buyer shall set terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignment for purposes of operating the Purchased Assets after the Closing. Further, all such offers shall be conditioned upon each Seller Party Employee waiving, as part of such offer, any and all potential claims against Buyer of any type or nature relating in any way to any period prior to Closing, and provided further that all such offers shall require the express written consent of the Seller Party Employee, as a condition of acceptance, for Buyer to honor accrued but unused vacation of such individual with the Seller Parties as of the Closing. Only those employees who are offered and accept such offers of employment with Buyer based on the terms and conditions set by Buyer and then actually commence employment with Buyer will become "Buyer Employees" after the Closing. Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment. The employment of each Buyer Employee with Buyer will commence immediately after the Closing. Further, Buyer shall not be deemed to be a successor employer with respect to any claim by or Liabilities associated with any Seller Party Employee or Buyer Employee. After the Closing, Buyer will have in place (a) human resources policies and practices in compliance with all laws, (b) human resources employees and advisors or consultants with experience and training in diversity and inclusion and (c) at least annual training with respect to anti-harassment and non-discrimination.

Section 6.3    WARN. With respect to Seller Party Employees, including those that become Buyer Employees, the Seller Parties shall be solely responsible for compliance with and Liabilities relating in any way to all applicable Laws with respect to the WARN Act, for any act or omission of any Seller Party prior to or on the Closing Date. With respect to Buyer Employees, Buyer shall be solely responsible for compliance with and Liabilities relating in any way to the WARN Act for any act or omission of Buyer after the Closing. With respect to Seller Party Employees, but excluding any individuals that become Buyer Employees, the Seller Parties shall be solely responsible for compliance with and Liabilities relating in any way to the WARN Act for any act or omission of any Seller Party after the Closing.

Section 6.4    Certain Tax Matters.

(a)    <u>Liability for Taxes</u>.  Buyer shall be responsible for and pay, or shall promptly reimburse the Seller Parties for their payment of, all Taxes attributable to the ownership or operation of the Purchased Assets for any Post-Closing Tax Period (or portion thereof); <u>provided</u>, <u>however</u>, that the amount of any such reimbursement shall be reduced to the extent Buyer or its Affiliates are liable for or have paid Taxes attributable to the ownership or operation of the Purchased Assets for any Pre-Closing Tax Period (or portion thereof).  If any Seller Party makes a payment for which it is entitled to reimbursement under this <u>Section 6.4(a)</u>, Buyer will make such reimbursement promptly after the Seller Parties present a statement stating the amount of reimbursement to which the Seller Party is entitled along with supporting evidence (and in no event later than twenty (20) days thereafter).  Except as provided in <u>Section 6.4(b)</u>, the Seller Parties shall be responsible for and pay all other Taxes imposed on the Seller Parties.  In the case of any taxable period that includes (but does not end on) the Closing Date, all real property, personal property and similar ad valorem Taxes levied with respect to the Purchased Assets for any such period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period on a per diem basis.

(b)    <u>Transfer Taxes</u>.  Buyer shall pay when due, be responsible for, and promptly reimburse the Seller Parties for their payment of (i) all Transfer Taxes and (ii) all fees, costs and expenses incurred by Buyer and the Seller Parties in complying with this <u>Section 6.4(b)</u>.  Buyer and the Seller Parties shall, and shall cause their respective Affiliates to, cooperate to timely prepare and file any Tax Returns or other filings relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

(c)    <u>Tax Cooperation</u>.  Buyer and the Seller Parties shall cooperate fully, as and to the extent reasonably requested by Buyer or the Seller Parties, as applicable, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the request of, with respect to any of the Seller Parties, Buyer, and with respect to Buyer, TWCH) the provision of records and information that are reasonably relevant to the preparation of any such Tax Return or any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Buyer and the Seller Parties further agree, upon request, to use their reasonable best efforts to obtain any certificate or other document from any Taxing Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the Transactions).

(d)    <u>Purchase Price Allocation</u>.  Within thirty (30) days of the Closing Date, Buyer shall prepare and deliver to TWCH a statement allocating the sum of the Aggregate Purchase Price (and all other amounts comprising the "seller's consideration" as such term is defined in Treasury Regulations Section 1.1060-1(c)(1)) among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (and any similar provisions of state, local or foreign Law) (such statement, the "<u>Allocation Statement</u>").  If, within sixty (60) days after the delivery of the initial Allocation Statement, TWCH notifies Buyer in writing that TWCH objects to the initial Allocation Statement, Buyer and TWCH shall use reasonable best efforts to resolve such dispute within twenty (20) days.  In the event that Buyer and TWCH are unable to resolve such dispute within twenty (20) days,

Buyer and TWCH shall jointly retain a mutually agreed independent accounting firm (the "Accounting Firm") (which may in turn select an appraiser if needed) to resolve only such items that remain in dispute. Upon resolution of the disputed items, the Allocation Statement shall be adjusted to reflect such resolution. The costs, fees and expenses of the Accounting Firm shall be borne equally by TWCH and Buyer. The Allocation Statement shall become final upon mutual agreement of the Parties or as determined by the Accounting Firm pursuant to this Section 6.4(d). If the IRS or any other taxation authority proposes a different allocation, TWCH or Buyer, as the case may be, shall promptly notify the other Party of such proposed allocation. TWCH or Buyer, as the case may be, shall provide the other Party with such information and shall take such actions (including executing documents and powers of attorney in connection with Tax proceedings) as may be reasonably requested by such other Party to carry out the purposes of this Section 6.2(d). Except as otherwise required by any Law or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by this Agreement shall be reported for all Tax purposes in a manner consistent with the final Allocation Statement; and (ii) the Parties shall follow the final Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith in any Tax Return, in any refund claim, in any Tax litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets in any plan or reorganization or liquidation that may be proposed.

Section 6.5    Further Assurances. Following the Closing, from time to time, subject to the terms and conditions of this Agreement, each Party shall, at the other's reasonable request, (a) furnish such further information, (b) execute and deliver such other documents, and (c) do such other acts and things, all as the other may reasonably request for the purpose of carrying out the intent of this Agreement and the Ancillary Agreements; provided, however, that subject to the terms and conditions of this Agreement, none of the foregoing shall require any Party to take any action it reasonably believes would increase its Liabilities or responsibility, or adversely affect its rights under this Agreement, any Ancillary Agreement or applicable Law.

Section 6.6    Access to Books and Records for the Seller Parties. Until the third (3rd) anniversary of the Closing Date (or, in the case of any Tax Returns (and books and records and other documents relating thereto), the seventh (7th) anniversary of the Closing Date), Buyer shall provide each Seller Party and a reasonable number of their respective attorneys, accountants, representatives and agents, at the Seller Parties' cost and expense, during ordinary business hours and upon reasonable prior notice, at a location determined at the reasonable discretion of Buyer, in such manner as to not disrupt or interfere with the normal operation of the business by Buyer, with reasonable access to the books, records, Tax Returns and other information (including supporting documents) of the Business relating to all periods through the Closing (including periods commencing prior to and concluding after the Closing) to the extent reasonably requested for accounting, audit, legal or Tax matters, or performing any of the Seller Parties' obligations under this Agreement or any Ancillary Agreement; provided, that Buyer shall not be required to disclose any information if such disclosure would violate applicable Law. All information provided or obtained pursuant to the preceding sentence shall be held by the Seller Parties in accordance with the provisions of Section 13.9. If, at any time within three (3) years

after the Closing Date (or within seven (7) years after the Closing Date with respect to Tax Returns (and books and records and other documents relating thereto)), Buyer proposes to dispose of any of such books or records (including supporting documents), Buyer shall first offer to deliver the same to the Seller Parties (or their respective representatives) at the sole cost and expense of the Seller Parties.

Section 6.7   <u>Announcements</u>.  Neither the Seller Parties nor Buyer shall, nor shall any such Party authorize or permit any of its Affiliates or representatives to, orally or in writing publicly disclose, issue any press release or make any other public statement, or otherwise communicate with the media, concerning the existence of this Agreement, any Ancillary Agreement or any of the Transactions, concerning Buyer or the Seller Parties, as applicable, or any of their respective current, future or former officer, directors or employees, or the terms or subject matter of any of the foregoing, without obtaining the prior written approval of, with respect to any of the Seller Parties, Buyer, and with respect to Buyer, TWCH (which approval may be granted or withheld in the applicable Party's sole discretion); <u>provided</u> that no Party nor any of its Affiliates or representatives shall be prevented from issuing any press release or making any public disclosure that it is required, in such Party's sole discretion, to make under any applicable Law (which the Parties agree they shall provide an opportunity for the other(s) to review in advance of such disclosure to the extent practicable and permitted by applicable Law) or with respect to any filing by or on behalf of such Party with the Bankruptcy Court (or any other court or administrative tribunal). The Seller Parties may freely communicate with any employees or officers regarding this Agreement and the sale of the Purchased Assets; <u>provided</u> that, prior to making any general written communications to its employees pertaining to compensation or benefit matters that are affected by the Transactions, the Seller Parties shall provide Buyer with a copy of the intended communication and provide Buyer a reasonable opportunity to review and comment on such communication.

Section 6.8   <u>No Obligation to Continue Existence</u>.   Notwithstanding anything contained in this Agreement or any Ancillary Agreement to the contrary, following the Closing nothing set forth herein or therein shall, nor shall be deemed to, prohibit any of the Seller Parties from dissolving, liquidating, winding-up or otherwise ceasing their respective existence and taking any actions deemed reasonably necessary by any Seller Party in connection therewith.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1   <u>Sale Motion, Bankruptcy Procedures Hearing and Bidding Procedures Order</u>. On or prior to the date that is one (1) day after the Petition Date, the Seller Parties shall file with the Bankruptcy Court (a) an application or motion (the "<u>Sale and Bidding Procedures Motion</u>") and shall use their reasonable best efforts to seek entry of (i) the Bidding Procedures Order (which Bidding Procedures Order shall approve the Break-Up Fee and the Expense Reimbursement) on or prior to the date that is fifteen (15) days after the Petition Date, and (ii) the Sale Order, in each case, in form and substance acceptable to the Seller Parties and the Buyer and which identifies Buyer as the "stalking horse" for the Purchased Assets and (b) appropriate supporting declarations. The Seller Parties shall use their reasonable best efforts to seek entry of the Sale Order on or prior to the date that is forty-seven (47) days after the Petition Date.  The

Seller Parties shall affix a true and complete copy of this Agreement to the Sale and Bidding Procedures Motion filed with the Bankruptcy Court (which, for the avoidance of doubt, shall be filed without the Disclosure Schedules).

Section 7.2    Auction. Pursuant to the Bidding Procedures Order, any and all Qualified Bids shall have been submitted at least two Business Days prior to the commencement of the auction contemplated by the Bidding Procedures (the "Bid Deadline"). If any Qualified Bid is submitted prior to the Bid Deadline, the Seller Parties shall have commenced the auction contemplated by the Bidding Procedures on or prior to the date that is forty-five (45) days after the Petition Date.

Section 7.3    Sale Order. On or prior to the date that is forty-seven (47) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to Buyer in its sole discretion.  The Sale Order shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Seller Parties of this Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Liens (other than included in the Assumed Liabilities and Permitted Liens) and find that Buyer is not a successor of any of the Seller Parties, and (iii) the performance by the Seller Parties of their respective obligations under this Agreement, (b) authorize and empower the Seller Parties to assume and assign to Buyer the Assumed Contracts and (c) find that Buyer is a "good faith" buyer within the meaning of  Section 363(m) of the Bankruptcy Code and grant Buyer the protections of Section 363(m) of the Bankruptcy Code.  Buyer agrees that it will use its commercially reasonable efforts take such actions as are reasonably requested by the Seller Parties to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.  From and after the Execution Date, Buyer shall not take any action that is intended to result in or might reasonably be expected to result in, or fail to take any action the intent of which failure to act would result in, or might reasonably be expected to result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

Section 7.4    Bankruptcy Filings.  From and after the Execution Date and until the Closing Date, to the extent reasonably practicable, the Seller Parties shall deliver to Buyer drafts of any material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement and the operation of the Seller Parties' Business for Buyer's prior review and comment at least two (2) Business Days prior to the filing or submission thereof, and such filings shall be acceptable to Buyer to the extent they relate to the Purchased Assets, any Assumed Liabilities or any of Buyer's obligations hereunder. The Seller Parties agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order.  In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, the Seller Parties shall use their reasonable best efforts to defend such appeal.  The Seller Parties shall comply with all notice requirements (a) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (b) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

Section 7.5    Sale Free and Clear.  The Seller Parties acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liens (other than Permitted Liens) of, against or created by the Seller Parties or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, upon the Closing Date the Seller Parties shall be fully released from and with respect to the Purchased Assets. On the Closing Date, the Purchased Assets shall be transferred to Buyer free and clear of all Liens (other than Permitted Liens), to the fullest extent permitted by Section 363 of the Bankruptcy Code.

## ARTICLE VIII

## CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES AND BUYER

The respective obligations of the Seller Parties and Buyer to consummate the Transactions shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by each of TWCH (on behalf of all of the Seller Parties) and Buyer (in TWCH's and Buyer's respective sole discretion):

Section 8.1    No Injunction.  No Law shall have been enacted, entered, or promulgated and remain in effect that would prohibit, enjoin or otherwise restrain the consummation of the Transactions.

Section 8.2    HSR Waiting Period.  The waiting period (and any extensions thereof) under the HSR Act shall have expired or been terminated.

Section 8.3    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Bidding Procedures Order and Sale Order (as provided in Article VII) and such Orders shall be in effect and shall not have been reversed, modified, amended or stayed.

## ARTICLE IX

## CONDITIONS TO OBLIGATIONS OF THE SELLER PARTIES

In addition to the conditions set forth in Article VIII, the obligation of the Seller Parties to consummate the Transactions is further subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by TWCH (in its sole discretion):

Section 9.1    Representations and Warranties of Buyer.   The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date with the same effect as though made on and as of the Closing Date (except that representations and warranties which speak as of a specified date or period of time shall be true and correct only as of such date or period of time).

Section 9.2    Performance of the Obligations of Buyer.  Buyer shall have performed or complied in all material respects with all obligations, agreements and covenants required under this Agreement and each Ancillary Agreement to be performed or complied with by it on or

before the Closing Date (except for such obligations, agreements and covenants that by their nature may only be performed at the Closing, but subject to the performance of such obligations, agreements and covenants).

## ARTICLE X

## CONDITIONS TO OBLIGATIONS OF BUYER

In addition to the conditions set forth in Article VIII, the obligation of Buyer to consummate the Transactions is further subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (if permitted by applicable Law) in writing by Buyer (in its sole discretion):

Section 10.1   Representations and Warranties of the Seller Parties.  The representations and warranties of the Seller Parties contained in this Agreement shall be true and correct at and as of the Closing Date with the same effect as though made on and as of the Closing Date (except that representations and warranties which speak as of a specified date or period of time shall be true and correct only as of such date or period of time); provided, however, that all representations and warranties of the Seller Parties shall be deemed to be true and correct unless the failure or failures of such representations and warranties to be so true and correct, without regard to any "material", "materiality" or "Material Adverse Effect" qualifiers set forth therein, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect.

Section 10.2   Performance of the Obligations of the Seller Parties.  The Seller Parties shall have performed or complied in all material respects with all obligations, agreements and covenants required under this Agreement to be performed or complied with by any of them at or prior to Closing (except for such obligations, agreements and covenants that by their nature may only be performed at the Closing, but subject to the performance of such obligations, covenants and agreements).

## ARTICLE XI

## TERMINATION

Section 11.1   Conditions of Termination.  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated and the Transactions abandoned at any time prior to the Closing Date by written notice from the terminating Party to the other Party only as follows:

(a)      by mutual written agreement of TWCH and Buyer;

(b)      by TWCH or Buyer if (i) any court of competent jurisdiction or other Governmental Agency shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the Transactions, and such Order shall have become final and nonappealable; provided, however, that the Party seeking to terminate this Agreement pursuant to this clause (i) shall have used all reasonable best efforts to have such Order vacated; or (ii) the Closing shall not have occurred before the date that is seventy-five (75) days after the Petition Date (the "End Date"); provided, however, that the right to terminate this Agreement under this

clause (ii) shall not be available to any Party whose breach or failure to fulfill any obligation under this Agreement (and, with respect to TWCH, any other Seller Party) has been the cause of, or resulted in, the failure of the Closing to be consummated by the End Date;

(c)     by Buyer, if (i) the Seller Parties shall have breached in any material respect any of their respective representations or warranties or shall have breached or failed to perform or comply with any of their respective covenants or agreements in this Agreement in any material respect, (ii) such breach or failure cannot be cured or has not been cured within thirty (30) days after the giving of written notice by Buyer to TWCH specifying such breach or failure, and (iii) such breach or failure, individually or in the aggregate together with all other such breaches and failures by the Seller Parties, makes or will make the satisfaction of one or more of the conditions in Article VIII and Article X impossible; provided, Buyer may not terminate this Agreement pursuant to this Section 11.1(c) if Buyer is then in breach of this Agreement in any material respect;

(d)     by TWCH, if (i)(A) Buyer shall have breached in any material respect any of its representations or warranties or shall have breached or failed to perform or comply with any of its covenants or agreements in this Agreement in any material respect, (B) such breach or failure cannot be cured or has not been cured within thirty (30) days after the giving of written notice by TWCH to Buyer specifying such breach or failure, and (C) such breach or failure, individually or in the aggregate together with all other such breaches and failures by Buyer, makes or will make the satisfaction of one or more of the conditions in Article VIII and Article IX impossible; provided, TWCH may not terminate this Agreement pursuant to this clause (i) if any Seller Party is then in breach of this Agreement in any material respect; or (ii)(W) Buyer makes a general assignment for the benefit of its creditors, (X) Buyer commences a voluntary case or proceeding under any applicable bankruptcy, insolvency or reorganization law seeking to be adjudicated bankrupt or insolvent, (Y) Buyer consents to the entry of an Order for relief in respect of Buyer in an involuntary case or proceeding under any applicable bankruptcy, insolvency or reorganization Law or (Z) a court of competent jurisdiction enters an Order, which Order remains unstayed and in effect for sixty (60) days, under any Law relating to bankruptcy, insolvency or reorganization that is for relief against Buyer in an involuntary case, that appoints a custodian of Buyer or for a substantial part of its property or that orders the winding up or liquidation of Buyer;

(e)     by Buyer if any of the Chapter 11 Cases is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of the Seller Parties is appointed in the Chapter 11 Cases;

(f)     by Buyer, if (i) the Bidding Procedures Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on the date that is twenty-one (21) days after the Petition Date or (ii) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on the date that is forty-seven (47) days after the Petition Date or (ii) following the entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fourteen (14) days or (D) have been modified or amended in any manner materially adverse to Buyer without the prior written consent of Buyer; or

(g)     by Buyer or the Seller Parties upon (i) any resolution by the board of representatives of TWCH to enter into an Alternative Transaction, (ii) any announcement by the Seller Parties at an auction held in accordance with the Bidding Procedures Order that the final bid of Buyer at such auction is not the successful bid (unless such bid by Buyer is the back-up bid in accordance with the Bidding Procedures Order), or (iii) the consummation of an Alternative Transaction.

Section 11.2   Effect of Termination.  In the event of the termination of this Agreement, this Agreement shall become void and have no further force and effect, and the Transactions shall be abandoned without any further action or Liabilities of any Party; provided, however, the following provisions shall survive such termination, subject to any limitations set forth therein: **Error! Reference source not found.**this Section 11.2, Section 12.1, Section 12.3, Section 12.4 and Article XIII and any related definitions set forth in Exhibit A.

## ARTICLE XII

## REMEDIES

Section 12.1   Non-Survival of Representations, Warranties, Covenants and Agreements; Remedies.  The Parties agree that the representations and warranties of the Parties contained in this Agreement shall expire automatically and immediately upon the Closing Date.  None of the covenants and agreements of the Parties contained in this Agreement shall survive the Closing, other than the covenants and agreements contained in Section 2.2, Section 2.8, Article VI, this Article XII and Article XIII.  For the avoidance of doubt, the Parties agree that the remedies specified in the last sentence of this Section 12.1, Section 12.2, Section 12.3, Section 12.4 and/or the termination of this Agreement in accordance with the provisions of Article XI shall be the sole and exclusive remedy of the Seller Parties (if the breaching party is Buyer) or Buyer (if the breaching party is a Seller Party) under this Agreement for any breach of representation and warranty made or any covenant or agreement to be performed on or prior to Closing.

Section 12.2   Specific Performance.  The Parties agree that irreparable damage for which monetary damages (including, without limitation, any damages to which the Seller Parties are entitled pursuant to Section 12.3(b)), even if available, would not be an adequate remedy, would occur in the event that any Party does not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the Transactions) in accordance with its specified terms or otherwise breaches such provisions. It is accordingly agreed that Buyer shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by the Seller Parties and to enforce specifically the terms and provisions hereof, and the Seller Parties shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which a non-breaching Party is entitled at Law or in equity, including without limitation, any damages to which the Seller Parties are entitled pursuant to Section 12.3(b).

Section 12.3   Release of Escrow Amount.

33

(a)    In the event that, prior to the Closing, Buyer has complied in all respects with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement and this Agreement is validly terminated pursuant to Section 11.1(a), Section 11.1(b), Section 11.1(c), Section 11.1(e), Section 11.1(f) or Section 11.1(g), then TWCH shall promptly, and in any event within two (2) Business Days of Buyer's request, duly execute and deliver to Buyer and the Escrow Agent an authorization instructing the Escrow Agent to disburse (in accordance with the terms and conditions of the Escrow Agreement) to Buyer the Escrow Amount.

(b)    In the event that, prior to the Closing, this Agreement is validly terminated by the Seller Parties pursuant to Section 11.1(d), without prejudice to the Seller Parties' right to seek an injunction or other equitable relief pursuant to Section 12.2, Buyer acknowledges and agrees that the Seller Parties will suffer substantial economic damages and losses of types which are impossible to compute and ascertain with certainty as a basis for recovery by Seller Parties of actual damages and that the Escrow Amount is a fair, reasonable and appropriate approximation of damages and is not intended as a penalty. Accordingly, in the event of any termination of this Agreement described in the immediately preceding sentence, the Seller Parties shall be entitled to receive, and the Seller Parties shall be entitled to unilaterally instruct the Escrow Agent in writing to disburse (in accordance with the terms and conditions of the Escrow Agreement) to TWCH, as liquidated damages (without the Seller Parties being required to present any evidence of the amount or character of actual damages sustained by reason thereof) and not as a penalty, the Escrow Amount. The Parties acknowledge and agree that the agreements contained in this Section 12.3(b) are an integral part of the Transactions, and that without these agreements, the other Parties would not enter into this Agreement.

Section 12.4    Expense Reimbursement and Break-Up Fee.

(a)    In the event that Buyer has complied, in all material respects, with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement, the Bidding Procedures Order has been entered and this Agreement is terminated pursuant to Section 11.1(g), then the Seller Parties shall pay to Buyer, to a bank account designated in writing by Buyer on at least two (2) Business Days' prior written notice, the Break-Up Fee. The obligations of the Seller Parties to pay the Break-Up Fee (a) shall be entitled to super-priority administrative expense claim status under Sections 503 and 507 of the Bankruptcy Code and (b) shall not be subordinate to any other administrative expense claim against the Seller Parties.

(b)    Notwithstanding anything in this Agreement to the contrary, the Seller Parties agree to pay Buyer the Expense Reimbursement in the event this Agreement is terminated (other than a termination by TWCH pursuant to Section 11.1(d)).  The Seller Parties shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds promptly (and in any event no later than one (1) Business Day following notice from Buyer to the Seller Parties of such event) upon the termination of this Agreement; provided that, if the Seller Parties fail to pay any amounts due to Buyer pursuant to this Section 12.4(b) within the time period specified herein, the Seller Parties shall pay the costs and expenses (including reasonable legal fees and expenses) incurred by Buyer in connection with any action or proceeding taken to collect payment of such amounts.  The obligations of the Seller Parties to

pay the Expense Reimbursement (a) shall be entitled to super-priority administrative expense claim status under Sections 503 and 507 of the Bankruptcy Code and (b) shall not be subordinate to any other administrative expense claim against the Seller Parties.

(c)    The Parties acknowledge and agree that any payment of the Break-Up Fee and the Expense Reimbursement described in this Section 12.4 shall be the sole and exclusive remedy of Buyer and any other Person against the Seller Parties for any and all losses or damages suffered or incurred in connection with this Agreement and the transactions contemplated hereby. The Parties acknowledge and agree that the agreements contained in this Section 12.4 are an integral part of this Agreement and the transactions contemplated hereby.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

Section 13.1  Notices.    All notices, requests, demands, waivers and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the Party to whom notice is to be given, (b) on the day of transmission if sent via email (with proof of delivery which may be electronic) prior to 5:00 P.M. in the place of receipt on a Business Day, and otherwise on the next succeeding Business Day, (c) on the Business Day after timely delivery to a reputable next-day courier service if next Business Day delivery is properly requested, or (d) on the third (3rd) day after mailing by first class mail, registered or certified, postage prepaid, to the Party as follows:

|  |  |
|---|---|
| If to Buyer: | Lantern Entertainment LLC<br>300 Crescent Court<br>Suite 1100<br>Dallas, Texas 75201<br>Attn:  Chris Halpin<br>Email:  chris.halpin@lanternam.com |
| With a copy to:<br>(which shall not<br>constitute notice) | Akin Gump Strauss Hauer & Feld LLP<br>1 Bryant Park<br>New York, New York 10036<br>Attn:  Stephen B. Kuhn<br>Email:  skuhn@akingump.com |
| And with a copy to:<br>(which shall not<br>constitute notice) | Akin Gump Strauss Hauer & Feld LLP<br>1 Bryant Park<br>New York, New York 10036<br>Attn:  Meredith A. Lahaie<br>Email:  mlahaie@akingump.com |
| If to any Seller Party: | The Weinstein Company Holdings LLC<br>99 Hudson Street, Fourth Floor<br>New York, New York 10013<br>Attn: Tarak Ben-Ammar |

Email: tarak@tarak.us

With a copy to:         Cravath, Swaine & Moore LLP
(which shall not       Worldwide Plaza
constitute notice)     825 Eighth Avenue
New York, New York 10019
Attn:  Paul Zumbro and Andrew Elken
Email:  pzumbro@cravath.com; aelken@cravath.com

And with a copy to:   Richards, Layton & Finger, P.A.
(which shall not       One Rodney Square
constitute notice)     920 North King Street
Wilmington, Delaware 19801
Attn:  Mark D. Collins and Paul N. Heath
Email:  collins@rlf.com; heath@rlf.com

Any Party may change its address or email for the purpose of this <u>Section 13.1</u> by giving the other Parties written notice of its new address or email address, as applicable, in the manner set forth above.  The Parties acknowledge and agree that any notice that is timely delivered to the then current address of a particular Party prior to the receipt of a notice of change of contact information in accordance with this <u>Section 13.1</u> shall be deemed to have been duly given in accordance with this <u>Section 13.1</u>.

Section 13.2   <u>Amendments; Waivers</u>.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, in the case of an amendment or modification, only by a written instrument executed by TWCH and Buyer, or, in the case of a waiver by any Seller Party, by TWCH and, in the case of a waiver by Buyer, Buyer.  No other course of dealing between the Parties or any delay in exercising any rights pursuant to this Agreement shall operate as a waiver of any rights of any Party.  Any waiver by Buyer or the Seller Parties, as applicable, of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 13.3   <u>Assignment and Parties in Interest</u>.

(a)     No Party shall be entitled to assign this Agreement or any rights or obligations hereunder without the prior written consent of, with respect to any assignment by Buyer, TWCH, and, with respect to any assignment by any Seller Party, Buyer, which consent may be withheld by the applicable Party in its sole and absolute discretion, and any such attempted assignment without such prior written consent shall be void and of no force and effect, <u>provided</u>, <u>however</u>, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior written consent of the Seller Parties so long as prior to such assignment such Buyer Designee agrees in writing in favor of the Seller Parties to be bound by the provisions of this Agreement, it being agreed that no such assignment shall relieve Buyer of any of its obligations hereunder.

36

(b)    This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the Parties or their respective successors and permitted assigns, any rights, remedies, obligations, or Liabilities under or by reason of this Agreement.

Section 13.4    <u>Expenses</u>.  Except as otherwise set forth in this Agreement, each Party shall bear all of its legal, accounting, investment banking and other costs, fees and expenses (including all brokerage and finder's fees) incurred by it or on its behalf in connection with the execution and negotiation of this Agreement, any Ancillary Agreement and the consummation of the Transactions, whether or not such Transactions are consummated.

Section 13.5    <u>Entire Agreement</u>.    This Agreement (including the Exhibits, the Disclosure Schedule and the other Schedules), the Confidentiality Agreement and the Ancillary Agreements (including any exhibits or schedules thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede and are in full substitution for any and all prior agreements and understandings between them relating to such subject matter, and no Party shall be liable or bound to any other Party in any manner with respect to such subject matter by any warranties, representations, indemnities, covenants, or agreements except as specifically set forth herein or therein.  For the avoidance of doubt, the existence and the terms of this Agreement, the Ancillary Agreements and the Transactions shall constitute "Evaluation Material" under the Confidentiality Agreement.  The Exhibits, the Annexes, the Disclosure Schedule and the other Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 13.6    <u>GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL</u>.

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(b)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(c)     EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.7    <u>No Other Seller Representations and Warranties</u>.  Buyer has conducted its own independent review and analysis of the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities and otherwise in connection with the Transaction and has relied solely on its own review and analysis in determining to proceed with the Transactions.  Buyer acknowledges that, without limiting the generality of any other exclusion or qualification set forth in this Agreement, (a) none of the Seller Parties nor any Seller Related Party, is making, has made, or shall be deemed to make, at or as of any past, current or future date, any representation or warranty of any kind, express or implied, at Law or in equity, to Buyer or any Buyer Related Party, with respect to the Seller Parties or any of their respective Affiliates, or any Seller Related Party, the Business, the Transactions, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or any other matter (including with respect to any information or materials made available to Buyer or its representatives (in any format) during the course of their due diligence investigation of the Seller Parties, including any budget, projection, forecast or plans whether before or after the Closing), except for the representations and warranties specifically set forth in <u>Article III</u> of this Agreement (as modified by the Disclosure Schedule), (b) there are no, Buyer has not relied on any, and the Seller Parties hereby expressly disclaim any such other, representation or warranty of any kind, expressed or implied, at Law or in equity, whether by a Seller Party or any Seller Related Party and (c) Buyer is willing to accept the Purchased Assets at the Closing "as is", "where is" and "with all faults".

Section 13.8    <u>Disclosure Schedule</u>.  The exceptions and disclosures set forth in the Disclosure Schedule are arranged in sections corresponding to the Section numbers contained in <u>Article III</u> for convenience only and Buyer acknowledges and agrees that each such exception and disclosure in any particular section of the Disclosure Schedule shall be deemed to be disclosed in (and otherwise qualify) each other section of the Disclosure Schedule to which the applicability of such disclosure or exception to such other section of the Disclosure Schedule is reasonably apparent.  The inclusion of information in the Disclosure Schedule shall not be construed as, and shall not constitute, an admission or agreement that a violation, right of termination, default, Liabilities or other obligation of any kind exists with respect to any item, nor shall it be construed as, or constitute, an admission or agreement that such information is material to the Seller Parties or any Seller Related Party.  In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  Neither the specifications of any dollar amount in any representation, warranty or covenant contained in this Agreement, nor the inclusion of any specific item in the Disclosure Schedule, is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no Person shall use the fact of the setting forth of any such amount, or the inclusion of any such item, in any dispute or controversy involving any of the Parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is, or is not, material for purposes of this Agreement.  Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement

38

nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no Person shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy involving any of the Parties as to whether any obligation, item or matter not described herein, or included in the Disclosure Schedule, is, or is not, in the ordinary course of business for purposes of this Agreement.

Section 13.9   <u>Confidentiality</u>.  For a period commencing as of the Execution Date with respect to confidential information concerning Buyer contained in this Agreement, and as of the Closing Date with respect to confidential information concerning the Business, and expiring on the fifth (5th) anniversary of the Closing Date, the Seller Parties shall treat any such confidential information concerning Buyer or the Business (excluding, for the avoidance of doubt, any Privileged Material, which are and shall be solely the property of the Seller Parties) as confidential in nature, and will not disclose such information to any other Person or use such information for any purpose except for complying with the Seller Parties' obligations hereunder, except (a) to the extent disclosure of any such information is required by Law; <u>provided</u> that if TWCH believes that it (or any Seller Party, or any of its or their Affiliates) is required by Law to disclose any such information, TWCH will provide Buyer with notice before such disclosure (to the extent reasonably practicable) to allow Buyer (at its sole cost and expense) to attempt to obtain a protective order or other assurance that confidential treatment will be accorded to such information; <u>provided</u>, <u>further</u>, that any failure to give such notice shall not otherwise prohibit any such required disclosure hereunder, (b) to any of its attorneys, accountants, employees or other advisors or representatives who reasonably require such information for purposes of performing their duties for TWCH, or any other Seller Party or Seller Related Party, who TWCH directs to comply with the terms of this <u>Section 13.9</u>, (c) as reasonably necessary to consummate the Transactions and enforce rights and remedies, or assert defenses, under this Agreement or the Ancillary Agreements or otherwise, (d) to the extent such information is public other than as a result of a disclosure by a Seller Party in breach of this Agreement or (e) to the extent any such information related to any Excluded Liability or Excluded Asset.

Section 13.10   <u>Headings</u>.  The headings and subheadings in this Agreement are included for convenience and identification only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any of its provisions.

Section 13.11   <u>References</u>.   All references to "Articles", "Sections", "Exhibits", "Annexes", "Schedules" or the "Disclosure Schedule" shall be references to the Articles, Sections, Exhibits, Annexes, Schedules and Disclosure Schedule to this Agreement, as may be amended, modified, supplemented or restated from time to time.

Section 13.12   <u>General Interpretative Provisions</u>.  Terms for which meanings are defined in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine and feminine forms.  Words such as "herein", "hereafter", "hereto", "hereby" and "hereunder", when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.  The words "include", "includes", "included", "including" and "such as" shall be construed as if followed by the phrase "without limitation".  No distinction in interpretation shall be made between the terms "shall" and "will".  A reference to a particular

gender means a reference to any gender.  A reference to any Person shall include such Person's successors and permitted assigns, unless expressly provided to the contrary.  Unless the context of this Agreement otherwise requires, references to agreements and other documents shall be deemed to include all subsequent amendments and other notifications thereto.

Section 13.13  <u>Currency</u>.  All sums of money expressed in this Agreement are in the lawful money of the United States of America.

Section 13.14  <u>Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.

Section 13.15  <u>Severability</u>.  The invalidity, illegality or unenforceability of any provision of this Agreement shall not affect the validity, legality or enforceability of any other provisions of this Agreement, each of which shall remain in full force and effect.  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect.  Furthermore, in lieu of any such invalid, illegal or unenforceable term or provision, the Parties intend that there shall be substituted as a part of this Agreement a provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible that will be valid, legal and enforceable.

Section 13.16  <u>Rights Cumulative</u>.  All rights, powers and privileges conferred hereunder upon the Parties, unless otherwise provided, shall be cumulative and shall not be restricted to those given by Law.  Failure to exercise any power given any Party or to insist upon strict compliance by any other Party shall not constitute a waiver of any Party's right to demand exact compliance with the terms hereof.

Section 13.17  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts (including by means of PDF or other electronic transmission), each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Seller Parties and Buyer have executed and delivered this Agreement as of the Execution Date.

**SELLER PARTIES**

The Weinstein Company Holdings LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Avenging Eagle SPV, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Branded Partners LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Check Hook LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

CTHD 2 LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Cues TWC (ASCAP), LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Current War SPV, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

DRT Films, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

DRT Rights Management LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

FFPAD, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

HRK Films, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

[*Signature Page to Asset Purchase Agreement*]

InDirections LLC,
a Delaware limited liability company

By: _____
Name: Robert Del Genio
Title: Authorized Signatory

InteliPartners LLC,
a Delaware limited liability company

By: _____
Name: Robert Del Genio
Title: Authorized Signatory

ISED, LLC,
a Delaware limited liability company

By: _____
Name: Robert Del Genio
Title: Authorized Signatory

MarcoTwo, LLC,
a Delaware limited liability company

By: _____
Name: Robert Del Genio
Title: Authorized Signatory

One Chance LLC,
a Delaware limited liability company

By: _____
Name: Robert Del Genio
Title: Authorized Signatory

PA Entity 2017, LLC,
a Delaware limited liability company

By: _____
Name: Robert Del Genio
Title: Authorized Signatory

Paddington 2, LLC,
a Delaware limited liability company

By: _____
     Name: Robert Del Genio
     Title: Authorized Signatory

PS Post LLC,
a Delaware limited liability company

By: _____
     Name: Robert Del Genio
     Title: Authorized Signatory

Scream 2 TC Borrower LLC,
a Delaware limited liability company

By: _____
     Name: Robert Del Genio
     Title: Authorized Signatory

Small Screen Productions LLC,
a Delaware limited liability company

By: _____
     Name: Robert Del Genio
     Title: Authorized Signatory

Small Screen Trades LLC,
a Delaware limited liability company

By: _____
     Name: Robert Del Genio
     Title: Authorized Signatory

Spy Kids TV Borrower, LLC,
a Delaware limited liability company

By: _____
     Name: Robert Del Genio
     Title: Authorized Signatory

*[Signature Page to Asset Purchase Agreement]*

Team Players LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

The Actors Group LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

The Giver SPV, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

The Weinstein Company LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Tulip Fever LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

TWC Borrower 2016, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

TWC Domestic LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

TWC Fearless Borrower, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

TWC Library Songs (BMI), LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

TWC Loop LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

TWC Mist, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

TWC Polaroid SPV, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

TWC Production-Acquisition Borrower 2016, LLC,
a Delaware limited liability company

By: _____
      Name: Robert Del Genio
      Title: Authorized Signatory

TWC Production, LLC,
a Delaware limited liability company

By: _____
      Name: Robert Del Genio
      Title: Authorized Signatory

TWC Replenish Borrower, LLC,
a Delaware limited liability company

By: _____
      Name: Robert Del Genio
      Title: Authorized Signatory

TWC Short Films, LLC,
a Delaware limited liability company

By: _____
      Name: Robert Del Genio
      Title: Authorized Signatory

TWC Untouchable SPV, LLC,
a Delaware limited liability company

By: _____
      Name: Robert Del Genio
      Title: Authorized Signatory

TWC Waco SPV, LLC,
a Delaware limited liability company

By: _____
      Name: Robert Del Genio
      Title: Authorized Signatory

Twenty O Five Holdings, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

W Acquisition Company LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

WC Film Completions, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Weinstein Books, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Weinstein Development LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Weinstein Global Funding Corp.,
a Delaware corporation

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Weinstein Global Film Corp.,
a Delaware corporation

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Weinstein Productions LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

Weinstein Television LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

WTV Guantanamo SPV, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

WTV JCP Borrower 2017, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

WTV Kalief Browder Borrower, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

WTV Scream 3 SPV, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

WTV Yellowstone SPV, LLC,
a Delaware limited liability company

By: _____
    Name: Robert Del Genio
    Title: Authorized Signatory

**BUYER**

LANTERN ENTERTAINMENT LLC

By:_____

Name:    Christopher Halpin
Title:     Chief Financial Officer

## EXHIBIT A

### DEFINITIONS

"Accounting Firm" has the meaning set forth in Section 6.4(d).

"Acquisition Proposal" has the meaning set forth in Section 5.10(a).

"Action" means any action, cause of action, claim, complaint, charge, investigation, suit, arbitration or other proceeding, whether civil or criminal, in Law or in equity, or before any arbitrator or Governmental Agency.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person.  As used in this definition, "control" means, directly or indirectly, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Aggregate Purchase Price" has the meaning set forth in Section 2.7.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 6.4(d).

"Alternative Transaction" means (a) a transaction involving a sale or sales of all or substantially all or a portion of the Purchased Assets to a Person or Persons other than Buyer (other than any sale, lease, license or other disposition of any Purchased Assets permitted under Section 5.2(b)) or (b) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to Buyer in accordance with the terms hereof.

"Ancillary Agreements" means each agreement, document, instrument or certificate, other than this Agreement, to be executed and delivered in connection with the consummation of the Transactions, including the Assignment and Assumption Agreement, the Bill of Sale, the Intellectual Property Assignment Agreement, the Guild Assumption Agreements, bills of sale, any other instruments of transfer as requested by Buyer, and the other documentation required by Section 6.1.

"Antitrust Division" has the meaning set forth in Section 5.6(a).

"Assignment and Assumption Agreement" means that certain Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit B.

"Assumed Contracts" has the meaning set forth in Section 2.8(a).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Available Contracts" has the meaning set forth in Section 2.8(a).

"<u>Availabilities Database</u>" means those certain charts entitled "Project Widescreen – International Avails" and "Project Widescreen – Domestic TV Avails" made available to Buyer in the electronic dataroom established and maintained by or on behalf of TWCH and hosted by Ansarada in connection with the Transactions.

"<u>BAML Collateral</u>" means "Collateral" as defined in the BAML Credit Agreement.

"<u>BAML Credit Agreement</u>" has the meaning set forth in the definition of BAML Debt.

"<u>BAML Debt</u>" means all indebtedness outstanding under the Term Loan Agreement, dated as of May 24, 2016, by and among Weinstein Television LLC, on the one hand, and Bank of America, N.A. and Wilshire Bank, on the other hand, as amended (the "<u>BAML Credit Agreement</u>").

"<u>Bankruptcy and Equity Exception</u>" has the meaning set forth in <u>Section 3.1(b)</u>.

"<u>Bankruptcy Code</u>" means Chapter 11 of the Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

"<u>Benefit Plan</u>" has the meaning set forth in <u>Section 2.4(g)</u>.

"<u>Bid Deadline</u>" has the meaning set forth in <u>Section 7.2</u>.

"<u>Bidding Procedures</u>" means bid procedures in the form attached hereto as <u>Exhibit E</u> (with other changes approved by Buyer in its sole discretion), to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, which shall be in form and substance acceptable to Buyer.

"<u>Bidding Procedures Order</u>" means an order substantially in the form attached hereto as <u>Exhibit E</u> of the Bankruptcy Court approving the Bidding Procedures (including the approval of the Break-Up Fee and Expense Reimbursement).

"<u>Bill of Sale</u>" means that certain Bill of Sale, substantially in the form attached hereto as <u>Exhibit B</u>.

"<u>Break-Up Fee</u>" means a cash amount equal to three percent (3%) of the Cash Purchase Price.

"<u>Business</u>" means the business of developing, producing, distributing and otherwise Exploiting motion pictures, television programs and other audio visual content as currently conducted by the Seller Parties.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or a day on which banking institutions in the City of New York, New York are authorized or required by law to close.

"<u>Buyer</u>" has the meaning set forth in the Preamble.

"Buyer Designee" means any Persons designated by Buyer to purchase any of the Purchased Assets pursuant to the terms of this Agreement.

"Buyer Employee" has the meaning set forth in Section 6.2.

"Buyer Related Party" or "Buyer Related Parties" means any officers, managers, employees, directors, agents, stockholders, equityholders, members, partners, other beneficial owners, controlling persons, subsidiaries, Affiliates, representatives, financial advisors, accountants, lawyers, investment bankers or other consultants of Buyer, or of any of its Affiliates.

"Buyer's Knowledge" or "Knowledge" when used with respect to Buyer means the actual knowledge of Milos Brajovic and Nicolas Darsa.

"Cash Purchase Price" has the meaning set forth in Section 2.7.

"Chapter 11 Cases" means the cases to be commenced by the Seller Parties under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware.

"Claim" has the meaning set forth in the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.5.

"Closing Date" has the meaning set forth in Section 2.5.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" has the meaning set forth in Section 3.6(b).

"Confidentiality Agreement" means that certain Non-Disclosure Agreement dated as of December 3, 2017, between TWCH and Lantern Asset Management LLC.

"Consent" means any consent, approval, authorization, clearance, exemption, waiver, or similar affirmation by, or filing with or notification to, a Person pursuant to any Contract, Law, Order or Permit.

"Contract" means any written contract, lease, license, agreement, arrangement, understanding, commitment, instrument, guarantee, undertaking, bid or proposal.

"Covered Titles" means, respectively and collectively, each and every Top Title and Other Title.

"Cure Amounts" means any amounts necessary to cure any monetary default as required by Section 365 of the Bankruptcy Code with respect to an Assumed Contract.

"Debt Commitment Letters" has the meaning set forth in Section 4.3.

"Debt Financing" has the meaning set forth in Section 5.7(a).

"Debt Financing Agreements" has the meaning set forth in Section 5.7(a).

"Debt Financing Sources" has the meaning set forth in Section 4.3.

"DIP Financing Agreement" has the meaning set forth in Section 5.3(a).

"Disclosure Schedule" means the disclosure schedule, dated as of the Execution Date, provided by the Seller Parties to Buyer in connection with the execution and delivery of this Agreement.

"Disputed Contract" has the meaning set forth in Section 2.8(c).

"Employment Contract" means any Contract between any employee of a Seller Party, on the one hand, and a Seller Party, on the other hand, memorializing the terms of employment or severance of such employee.

"End Date" has the meaning set forth in Section 11.1(b).

"Environmental Law" means any applicable Laws or Orders in effect at or prior to the Closing Date relating to the protection of the environment or natural resources or human health and safety as it relates to environmental protection, and relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials in the environment and including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), and the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), to the extent each is applicable and as each has been amended and the regulations promulgated pursuant thereto.

"Equity Securities" mean any stock or similar security, certificate of interest or participation in any profit sharing agreement, preorganization certificate or subscription, transferable share, voting trust certificate or certificate of deposit for an equity security, limited partnership interest, limited liability company interest, interest in a joint venture, or certificate of interest in a business trust; any security future on any such security; or any security convertible, with or without consideration into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any put, call, straddle, or other option or privilege of buying such a security from or selling such a security to another without being bound to do so.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any Person that, together with any Seller Party, would be treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"Escrow Agent" has the meaning set forth in Section 2.6.

"Escrow Agreement" has the meaning set forth in Section 2.6.

"Escrow Amount" has the meaning set forth in Section 2.6.

"Excluded Actions" has the meaning set forth in Schedule 2.2.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Schedule 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the Preamble.

"Expense Reimbursement" means an amount equal to the reasonable and documented out-of-pocket costs, fees and expenses of Buyer (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses and all filing fees under the HSR Act) related to the transactions contemplated by this Agreement, which amount shall constitute a superpriority administrative expense of the Seller Parties with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code and over the debtor-in-possession financing obligations; provided, however, that the aggregate amount of the Expense Reimbursement shall not exceed two percent (2%) of the Cash Purchase Price.

"Exploit" means, with respect to a Covered Title, the exhibition, distribution, reproduction, development, subdistribution, transmission, display, broadcast, performance, dissemination, publication, production, co-production, promotion, publicizing, advertising, reproduction, rental, leasing, subleasing, selling, licensing, sublicensing, transfer, disposal of, commercializing, marketing, usage, trading in, turning to account, dealing with and in and otherwise exploiting such Covered Title by any and all means, methods, processes, media devices and delivery systems of every kind or character, whether now known or hereafter created, including, without limitation, the right to exercise the ancillary rights relating thereto and to produce and develop such Covered Titles (including derivative rights therein), to the extent included in the Title Rights. The meaning of the term "Exploitation" shall be correlative to the foregoing.

"Final Order" means an Order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the Order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing

has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending.

"FLSA" has the meaning set forth in Section 3.6(a).

"FTC" means the United States Federal Trade Commission.

"FTI Consulting" means FTI Consulting, Inc. and its Affiliates.

"Governmental Agency" means (a) any federal, state, county, local or municipal government or administrative agency or political subdivision thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality thereof, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction, or (e) any arbitration tribunal with applicable jurisdiction.

"Guild" means any and all of the Screen Actors Guild, American Federation of Television and Radio Artists, American Federation of Musicians, Directors Guild of America, Writers Guild of America, British Equity, British Musicians Union, Alliance of Canadian Cinema Television and Radio Artists, Directors Guild of Canada, and all other applicable guilds, unions, trade associations or collectives.

"Guild Assumption Agreements" means, collectively, assumption agreements, in a form agreeable to Buyer and to be negotiated between Buyer and the applicable Guilds in connection with the Transactions or to evidence Buyer's assumption of certain Liabilities under any Collective Bargaining Agreement in place with such Guilds with respect to Guild Secured Titles.

"Guild Residuals" means all amounts that have accrued and are payable prior to the Closing Date and/or accruing after the Closing Date required to be paid to third parties pursuant to collective bargaining, union or guild agreements (in all applicable jurisdictions) by reason of, in connection with, as a condition to or arising from the use or Exploitation of such Covered Title, or any part thereof, or any use or reuse thereof, in any media, including residuals, supplemental market payments, pension, health and welfare payments, and employer share of taxes.

"Guild Secured Titles" means the Covered Titles listed on Section 6.1 of the Disclosure Schedule.

"Harassment Claims" means any Actions or Liabilities, whether known or unknown, asserted or unasserted, suspected or unsuspected, which arise out of or relate to any actual or alleged sexual misconduct, nonconsensual interactions, harassment (including sexual harassment), uninvited or unwelcome conduct, predatory conduct, inappropriate conduct, degrading conduct, coercive or intimidating behavior, humiliation, tort, hostile work environment, sexual assault, sexual misconduct, rape, intentional infliction of emotional distress, negligent infliction of emotional distress, battery, assault, gender violence, false imprisonment, sexual abuse, negligent hiring, negligent supervision, negligent retention, failure to prevent harassment, discrimination based on sex or gender or any similar or related Actions, whether based on intentional or negligent conduct, including but not limited to allegations of failure to

prevent or remedy, failure to disclose, or efforts or conspiracy to prevent the disclosure of or cover up, any of the preceding, against any of the Seller Parties or any Seller Related Party or any of their Affiliates or any other independent contractor or any other Person who renders services for, or provides goods to, any of the Seller Parties or any Seller Related Party.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, together with the rules and regulations promulgated thereunder.

"Insurance Policies" means any and all insurance policies of the Seller Parties, including any directors and officers insurance policies, any employee practices liability insurance policies of the Seller Parties or any other insurance policies providing coverage for events occurring in the course of any of the Seller Parties' respective managers', directors' or officers' duties and actions taken on behalf of such Seller Parties (including fiduciary liability, employed lawyers, crime, excess directors and officers and excess employment practices liability), commercial general liability, non-owned hired auto liability, commercial property, electronic data processing, umbrella liability, Guild, travel accident, errors & omissions, workers compensation, foreign general liability, foreign auto liability, foreign workers compensation, UK coverage, ERISA bond and New York disability.

"Intellectual Property" means any or all of the following as they exist in any jurisdiction throughout the world: (i)  patents, patent applications, continuations-in-part, divisions or reissues; (ii) trade names, d/b/a's, trademarks, service marks and trade dress, logos, and other indica or origin, and registrations and applications for registration thereof, together with the goodwill connected with the use of and symbolized by any of the foregoing; (iii) any and all copyrightable works of authorship, including but not limited to registered copyrights in both published works and unpublished works, unregistered copyrights in both published works and unpublished works, and applications to register copyrightable works of authorship; (iv)  trade secrets, including, confidential business information, know-how, concepts, methods, processes, specifications, inventions, formulae, reports, data, customer lists, mailing lists, business plans or other material confidential and proprietary information; (v) all registered domain names; and (vi) proprietary computer software, including all source code, object code, and documentation related thereto.

"Intellectual Property Assignment Agreement" means that certain Intellectual Property Assignment Agreement, substantially in the form attached hereto as Exhibit.

"Interim Period" means the period commencing on January 1, 2018 and ending on the earlier of (i) 11:59 P.M. (New York Time) on the day prior to the Closing Date and (ii) termination of this Agreement in accordance with the terms hereof, if the Closing does not occur.

"IRS" means the Internal Revenue Service.

"JV Equity Securities" has the meaning set forth in Section 2.2.

"Laws" means all laws, codes, statutes, common laws, rules, regulations, ordinances, codes, plans, Permits and Orders of any Governmental Agency.

"Leased Real Property" means all parcels of and interests in real property leased by any

Seller Party pursuant to a Real Property Lease.

"Liabilities" means all claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of any bankruptcy proceeding) of or against the Seller Parties or any of the Purchased Assets.

"Lien" means any charge, lien, Claim, Harassment Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, license, sublicense, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third party interest or other restriction or limitation of any kind, whether imposed by Contract, legal requirement, equity or otherwise, including any "interest" as that term is used in Section 363(f) of the Bankruptcy Code.

"Material Adverse Effect" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (x) the Purchased Assets or the assets, properties, financial condition or results of operations of the Business (excluding the Excluded Assets and the Excluded Liabilities), in each case taken as a whole or (y) the ability of the Seller Parties to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but, with respect to clause (x), excluding (a) any change or effect to the extent that it results from or arises out of (i) the commencement of the Bankruptcy Cases, including the impact thereof on the relationships of the Seller Parties with employees, customers, distributors, financing sources, service providers and other business partners; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the Transactions; (iii) changes in Law or accounting regulation or (iv) any specific action required to be taken by this Agreement or taken at the written request of Buyer after the Execution Date; and (b) any change or effect of economic or political conditions (including acts of terrorism or war) to the extent that such conditions do not disproportionately affect the Seller Parties, taken as a whole, as compared to other companies in the same industry as the Seller Parties, or the securities or financial markets in any country or region.

"Material Contracts" has the meaning set forth in Section 3.12.

"Multiemployer Plan" means any "multiemployer plan", as defined in Section 3(37) of ERISA.

"Non-Assumed Contract" has the meaning set forth in Section 2.8(f).

"Non-Transferred Covered Titles" has the meaning set forth in Section 2.3.

"Non-Transferred JV Securities" has the meaning set forth in Section 2.2.

"Order" means any judgment, order, injunction, decree, writ, permit or license issued or entered by a court of competent jurisdiction, including the Bankruptcy Court, whether interlocutory or final.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of Seller and the Business, consistent with past practice occurring prior to the Chapter 11 Cases.

"Organizational Documents" means, with respect to any Person, the articles of incorporation, certificate of incorporation, certificate of formation, certificate of limited partnership, bylaws, limited liability company agreement, operating agreement, partnership agreement, stockholders' agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organization of such Person, including any amendments and other modifications thereto.

"Other Titles" mean, collectively and respectively, each and every Project in which any Seller Party has any right, title or interest other than the Top Titles.  The Other Titles include, without limitation, those motion pictures and television programs set forth as "Other Titles" in Annex 1.

"Owned Other Intellectual Property" means all Intellectual Property owned by any Seller Party that is material to the Business, but excluding any Seller Party's rights, title and interest of any kind or nature in and to the Excluded Assets or the Covered Titles (whether tangible or intangible), including the Exploitation rights and Tangible Materials relating thereto.

"Participations" means, with respect to any Covered Title, any contractually required amounts (excluding Guild Residuals) payable to or on behalf of any third party involved in the development and/or production of such Covered Title, including all third parties who rendered services or granted rights in connection with such Covered Title, which are (a) a contingent amount determined in whole or in part based on the financial performance or other performance of such Covered Title, including amounts contingent upon or determined by box office receipts, gross receipts, net receipts, or a percentage of such gross receipts or net receipts however defined, denominated or calculated, or are otherwise determined by reference to the performance of the Covered Title however measured or determined, and are payable in a fixed or allocable amount or as a percentage of such receipts; and/or (b) payable in a fixed amount upon the occurrence of contingent events commencing after the Exploitation of such Covered Title such as receipt of an award or the sale of a specified number of video devices or the attainment of a specified level of receipts or contingent proceeds from, or other financial performance of the Exploitation of such Covered Title.

"Party" and "Parties" shall have the meaning set forth in the Preamble.

"Permit" means any license, permit, certificate of occupancy, franchise, certificate of authority, approval or Order, or any waiver of the foregoing, required to be issued by any Governmental Agency, in connection with the operation of the Business.

"Permitted Liens" means any Liens (a) with respect to Guild Residuals, (b) with respect to Participations, (c) which are Liens for Taxes owed by the Seller Parties that are not yet due

and payable or which are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP and which are listed in <u>Section 3.5</u> of the Disclosure Schedule, (d) with respect to Assumed Liabilities and which are listed in <u>Section 3.5</u> of the Disclosure Schedule and (e) which are mechanic's, materialman's, carrier's, supplier's, vendor's, repairer's or other similar Liens arising in the ordinary course of business and securing amounts that are not delinquent or are being contested in good faith.

"<u>Person</u>" means any individual, partnership, corporation, trust, association, limited liability company, joint venture, an unincorporated organization, a division or operating group of any of the foregoing, a Governmental Agency or any other entity.

"<u>Petition Date</u>" means the date on which the Chapter 11 Cases are commenced by the filing of voluntary petitions with the U.S. Bankruptcy Court for the District of Delaware, which the Seller Parties anticipate will occur on or about March 19, 2018.

"<u>Post-Closing Tax Period</u>" means any taxable period (or portion thereof) beginning after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any taxable period (or portion thereof) ending on or before the Closing Date.

"<u>Prepetition Credit Agreement</u>" has the meaning set forth in the definition of TWC Domestic Debt.

"<u>Privileged Material</u>" means any information, in written, oral, electronic or other tangible or intangible form, including any communications by, to or otherwise involving attorneys (including attorney-client privileged communications) or memoranda and other materials protected by the work product doctrine, with respect to which any Seller Party, or any Seller Related Party would be entitled to assert or have asserted a privilege or other protection, including the attorney-client and work product privileges, in each case, as such privilege relates to the Excluded Assets or Excluded Liabilities.

"<u>Program Rights Chart</u>" means those certain charts entitled "Widescreen – Program Rights Chart (Rights-In)" and "Widescreen – Program Rights Chart (Rights-Out)" made available to Buyer in the electronic dataroom established and maintained by or on behalf of TWCH and hosted by Ansarada in connection with the Transactions.

"<u>Project</u>" means any audio, visual, literary, or audiovisual product or program of every kind and character whatsoever, including all present and future technological developments, whether published in book, audiobook or ebook form, or produced for theatrical, non-theatrical, live stage, home video or television Exploitation or for Exploitation in any other medium, whether produced by means of photographic, digital, electrical, electronic, mechanical or other processes or devices now known or hereafter devised, whether pictures, images, visual and aural representations, and whether recorded or otherwise preserved for projection, reproduction, exhibition, or transmission by any means or media now known or hereafter devised, including, film, videotape, cassette, cartridge, or disc, and devised in such manner as to appear to be in motion or sequence, including computer-generated pictures and graphics.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Real Property Lease" means any lease, sublease, use and occupancy or other similar arrangements under which any Seller Party is the lessee.

"Reductions" has the meaning set forth in Section 3.10(d).

"Registered Owned Other Intellectual Property" has the meaning set forth in Section 3.11(a).

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Requisite Regulatory Approvals" has the meaning set forth in Section 3.3.

"Sale Order" means an Order of the Bankruptcy Court approving and authorizing the sale of the Purchased Assets to Buyer, free and clear of all Liens (other than Assumed Liabilities and Permitted Liens), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, the assignment of the Assumed Contracts, to Buyer on the terms set forth herein, which Order shall include as a finding of fact and conclusion of law that Buyer is not a successor of any of the Seller Parties, and shall otherwise be in form and substance satisfactory to Buyer in its sole discretion.

"Seller JVs" means each of TWC Gold SPV, LLC, Butler Films LLC, Kristy Films LLC, Breaking and Entering SPV, LLC and Come Drink With Me SPV, LLC.

"Seller Party" and "Seller Parties" has the meaning set forth in the Preamble.

"Seller Party Employees" has the meaning set forth in Section 6.2.

"Seller Parties' Knowledge" or "Knowledge" or "Known" when used with respect to the Seller Parties means the actual knowledge of Robert Weinstein, Tarak Ben Ammar, Lance Maerov and Frank Rainone.

"Seller Related Party" or "Seller Related Parties" means any current or former officers, managers, employees, directors, agents, stockholders, equityholders, members, partners, other beneficial owners, controlling persons, subsidiaries, Affiliates, representatives, financial advisors, accountants, lawyers, investment bankers or other consultants of a Seller Party, or of any of their Affiliates.

"Tangible Materials" means, with respect to any Covered Title, collectively, all physical embodiments of such Covered Title or its elements in whatever state of completion, wherever located (including in any film laboratory or storage facility owned or controlled by a Seller Party or any other Person), in any video, audio or other format, including: (a) all positive, negative, fine grain and answer prints; (b) all exposed or developed film, pre-print materials (including positives, interpositives, negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of pre-print elements which may be

necessary or useful to produce prints or other copies or additional pre-print elements), subtitles, special effects, cutouts, stock footage, outtakes, tabs and trims; (c) tapes, discs, hard drives, computer memory, or other electronic media of any nature; (d) all sound and music tracks, audio and video recordings of all types and gauges (whether analog, digital or otherwise) in all languages; and (f) electronic copies of any of the foregoing stored on any media.

"Tax" and, with correlative meaning, "Taxes", means all forms of U.S. federal, state, local and non-U.S. taxes, assessments or other government charges, in each case in the nature of a tax, including income, gross receipts, excise, employment, ad valorem, sales, use, transfer, license, payroll, franchise, severance, stamp, withholding, Social Security, unemployment, disability, real property, personal property, registration, alternative or add-on minimum, estimated, admission, amusement or other taxes of any kind whatsoever, including any interest, penalties or additions thereto, imposed by any Taxing Authority.

"Tax Return" means any report, return, declaration, claim for refund or other statement relating to Taxes, including any schedules or attachments thereto and any amendment thereof.

"Taxing Authority" means the IRS and any other Governmental Agency responsible for the administration or collection of any Tax.

"Title Rights" means the following:

(a)     the Covered Titles and any and all versions existing thereof, and all elements thereof (including the screenplay and story) and all trailers, "bloopers", footage, trims and outtakes thereof (including, without limitation, the director's cut and the final cut and any and all versions of each of the foregoing (in any and all languages), all versions rated by the Motion Picture Association of America or any other rating association and unrated versions of each Covered Title, "behind the scenes", "making of", and any and all other documentary or short form content concerning each Covered Title, and all footage, "bloopers", trims and outtakes of each of the foregoing);

(b)     all of the Tangible Property relating to each Covered Title;

(c)     the Assumed Contracts and all other contract rights with respect to each Covered Title;

(d)     all right, title and interest of the Seller Parties and their respective Affiliates as an owner of each Covered Title under and pursuant to any and all existing contracts and other agreements to distribute, exhibit or otherwise Exploit any Covered Title in any and all media (including, without limitation, pursuant to the Assumed Contracts), including, without limitation, the right to receive: (i) 100% of all sums otherwise payable (but not paid as of the Closing Date) to each Seller Party under the Assumed Contracts in respect of the Covered Titles ("Program Participations") and (ii) all of Seller Parties' individual and collective rights to accounting or participation statements from distributors under the Assumed Contracts with respect to the monies and any other consideration payable to any Seller Party under the Assumed Contract for all accounting periods and to exercise all of Sellers Parties' and their Affiliates' related rights under the Assumed Contracts for all such accounting periods, including, without limitation, all audit and inspection rights provided for in the Assumed Contracts, or otherwise held by the

Exhibit A- 12

Seller Parties or any of their respective Affiliates in connection with the Covered Titles for any such accounting periods;

(e)      all of the Seller Parties' rights with respect to all trademarks related to the Covered Titles;

(f)      all rights to manufacture, distribute, license, exhibit, market, promote, reissue, and otherwise Exploit each Covered Title, in all languages, by any and all means and devices now known or hereafter devised, and howsoever accessed by the viewer, and to otherwise Exploit each Covered Title in all media, whether now known or hereafter existing and howsoever accessed, including, without limitation, theatrical, home video, pay, cable and free television, computers, hand held devices, cell phones and other accessing devices; and all rights to license and Exploit each Covered Title in all ancillary markets (including, without limitation, hotels, airlines, ships, military bases, etc.);

(g)      all merchandising rights with respect to each Covered Title, including, without limitation, the right to merchandise and license each Covered Title (including its characters and elements) in connection with the manufacture, distribution, license, sale, advertising, promotion and other Exploitation of products, goods, services and commercial activities, co-promotions and tie-ins (and the advertising and promotion thereof) that use, embody or are based on each Covered Title (including its characters and elements), including, without limitation, apparel, accessories, toys, activities, games, video games, wireless games, wireless downloads, electronics, interactive software, collectibles, novelties, souvenirs, household items, jewelry, food products and services, stationary, posters and other paper goods, office and school supplies; and

(h)      all other rights to Exploit each Covered Title and any and all elements thereof not expressly provided for hereunder, including, but not limited to, electronic publishing, print publication, music publishing, soundtrack separate from each Covered Title, live-television, radio and dramatic rights, legitimate theater, novelization and publication rights, commercial sponsorships and other ancillary or allied rights, and the underlying literary, dramatic and musical material contained in each Covered Title or upon which any Covered Title is based.

"Top Pictures" means, collectively and respectively, those motion pictures set forth as "Top Pictures" on Annex 1.

"Top Programs" means, collectively and respectively, those television programs (whether such Top Program is in the development stage, pre-production, production or post-production stage) set forth as "Top Programs" on Annex 1.

"Top Titles" means, collectively and respectively, those Top Pictures, Top Unreleased Pictures and Top Programs set forth on Annex 1.

"Top Unreleased Pictures" means, collectively and respectively, those motion pictures (whether such Top Unreleased Picture is in the development stage, pre-production, production or post-production stage) set forth as "Top Unreleased Pictures" in Annex 1.

"Transactions" means the purchase and sale of the Purchased Assets to Buyer and the

assumption by Buyer of the Assumed Liabilities, and all other transactions contemplated by, and set forth and described in, this Agreement and the Ancillary Agreements.

"<u>Transfer Consent</u>" has the meaning set forth in <u>Section 2.8(e)</u>.

"<u>Transfer Taxes</u>" means any and all sales, use, transfer, value-added, documentary, recording or similar Taxes, fees or charges and all interest and penalties due in connection therewith imposed on or in connection with the purchase, sale or transfer of the Purchased Assets and the other Transactions (including the assumption by Buyer of the Assumed Liabilities).

"<u>TWC Domestic Collateral</u>" means "Collateral" as defined in the Prepetition Credit Agreement.

"<u>TWC Domestic Debt</u>" means all indebtedness outstanding under (i) the Second Amended and Restated Credit and Security Agreement, dated as of September 30, 2013, by and among TWC Domestic LLC, as borrower, the lenders party thereto as referenced therein and Union Bank, N.A., as amended (the "<u>Prepetition Credit Agreement</u>") and (ii) the Credit and Security Agreement, dated as of October 9, 2015, by and between TWC Domestic LLC, as borrower, the lenders party thereto as referenced therein and UnionBanCal Equities, Inc., as amended.

"<u>TWCH</u>" has the meaning set forth in the Preamble.

"<u>Union</u>" has the meaning set forth in <u>Section 3.6(b)</u>.

"<u>WARN Act</u>" has the meaning set forth in <u>Section 3.6</u>.

## **EXHIBIT B**

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

[*See Attached*]

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Agreement"), effective as of [●], 2018, is by and between THE WEINSTEIN COMPANY HOLDINGS LLC, a Delaware limited liability company ("TWCH"), and each Seller Party listed on Schedule 1 to the Purchase Agreement, on the one hand, and LANTERN ENTERTAINMENT LLC, a Delaware limited liability company ("Buyer"), on the other hand. Capitalized terms used herein but not otherwise defined shall have the meanings set forth in that certain Asset Purchase Agreement, dated as of March 19, 2018 (the "Purchase Agreement"), by and between Buyer, on the one hand, and TWCH and each of the other Seller Parties party thereto, on the other hand.

WHEREAS, upon the terms and conditions set forth in the Purchase Agreement, each Seller Party has agreed, among other things, to assign all of its rights, title and interests in, and Buyer has agreed to assume all of such Seller Party's Liabilities for periods following the Closing Date under, the Assumed Contracts.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth in the Purchase Agreement and herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Assignment and Assumption. Subject to the terms and conditions of the Purchase Agreement, each Seller Party hereby sells, assigns, grants, conveys and transfers to Buyer all of such Seller Party's right, title and interest in and to the Assumed Contracts. Buyer hereby accepts such assignment and assumes such Seller Party's Liabilities for periods following the Closing Date under the Assumed Contracts and agrees to pay, perform and discharge, as and when due, (i) all obligations of such Seller Party under the Assumed Contracts accruing on and after the Closing and (ii) subject to the provisions of the Purchase Agreement, those Liabilities set forth on Schedule 2.3 of the Purchase Agreement.

2.     Terms of the Purchase Agreement. The terms and conditions of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants and agreements relating to the Assumed Contracts, are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants and agreements contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

3.     Binding Effect.  This Agreement is and shall be binding upon the parties hereto, their heirs, executors, administrators, representatives, agents, employees, affiliates, officers, and principals of the parties and their successors and assigns.

4.     Miscellaneous.  This Agreement is subject to the applicable sections of the Purchase Agreement which are incorporated herein by reference as if set forth in full herein. Any capitalized terms not specifically defined herein shall have the meaning assigned to them in the Asset Purchase Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first written above.

LANTERN ENTERTAINMENT LLC,
a Delaware limited liability company

By: _____
Name:
Title:

_____ [1]

By_____

Its_____

---

[1] Each Seller Party listed on Schedule 1 of the Asset Purchase Agreement to be listed as a party, as applicable.

## EXHIBIT C

FORM OF BILL OF SALE

[*See Attached*]

Exhibit C

# BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to the terms and conditions of that certain Asset Purchase Agreement, dated as of March 19, 2018 (the "***Asset Purchase Agreement***"), by and between The Weinstein Company Holdings LLC, a Delaware limited liability company ("***Seller***"), certain subsidiaries of Seller listed therein (Seller and each subsidiary, a "***Seller Party***" and, collectively, the "***Seller Parties***") and Lantern Entertainment LLC, a Delaware limited liability company ("***Buyer***"). Pursuant to the Sale Order, each of the Seller Parties hereby unconditionally and irrevocably grants, bargains, transfers, sells, assigns, conveys, and delivers to Buyer, its successors and assigns forever, all of each Seller Parties' rights, titles, and interests, in, to and under the Purchased Assets, including but not limited to the assets listed on Schedule A attached hereto[1], pursuant to this bill of sale, dated as of [●], 2018 (this "***Bill of Sale***") and subject to the terms of the Asset Purchase Agreement, free and clear of all Liens other than Permitted Liens, TO HAVE AND TO HOLD the Purchased Assets with all appurtenances thereto.

A.      Undefined capitalized terms herein are defined in the Asset Purchase Agreement.

B.      Notwithstanding anything to the contrary contained herein, none of the Excluded Assets shall be included in the Purchased Assets.

C.      This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns.

D.      This Bill of Sale is being executed solely pursuant to the Asset Purchase Agreement to give effect to the transactions contemplated by the Asset Purchase Agreement. Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Asset Purchase Agreement. To the extent that any provisions of this Bill of Sale conflicts or is inconsistent with the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

E.      Nothing in this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to, any person, firm or corporation other than Buyer and its successors and assigns any remedy or claim under or by reason of this instrument or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements in this instrument shall be for the sole and exclusive benefit of Buyer and its successors and assigns.

F.      At any time or from time to time, at Buyer's request and without further consideration (but without any requirement that Seller expend any out of pocket funds), Seller shall execute and deliver to Buyer such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign the Purchased Assets to Buyer.

---

[1] To include Schedule 2.1 and Annex 1 from the Asset Purchase Agreement.

G.      The provisions of Article XIII of the Asset Purchase Agreement are hereby incorporated into this Bill of Sale, *mutatis mutandis*.

IN WITNESS WHEREOF, this Bill of Sale is being executed and delivered by each Seller Party as of the date first written above.

[●]

By: _____
Name:
Title:

# __EXHIBIT D__

FORM OF ESCROW AGREEMENT

[*See Attached*]

[EXECUTION VERSION]

## ESCROW AGREEMENT

THIS AGREEMENT is made this 19 day of March, 2018 (this "Escrow Agreement"), by and among THE WEINSTEIN COMPANY HOLDINGS LLC ("Seller"), LANTERN ENTERTAINMENT LLC ("Buyer" and together with the Seller, collectively, the "Parties" and individually, a "Party"), and WILMINGTON TRUST, NATIONAL ASSOCIATION ("Escrow Agent.")

### RECITALS

WHEREAS, Seller, certain affiliates of Seller and Buyer are parties to that certain Asset Purchase Agreement, dated as of March 19, 2018 (the "Purchase Agreement"); and

WHEREAS, in accordance with Section 2.6 of the Purchase Agreement, Buyer has agreed to place in escrow certain funds, and Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement.

NOW, THEREFORE, in consideration of the premises, and further consideration of the covenants set forth hereafter, it is hereby agreed mutually as follows:

**I.      Designation as Escrow Agent.**

Subject to the terms and conditions hereof, the Parties hereby appoint Wilmington Trust, National Association as Escrow Agent and Wilmington Trust, National Association hereby accepts such appointment.

**II.     Deposit of Escrow Funds.**

(a)  Upon execution of this Escrow Agreement, Buyer shall deposit the sum of $15,500,000 (the "Escrow Property") into an account (the "Escrow Account") established with Escrow Agent. The Escrow Property shall remain uninvested. The Escrow Account is set forth below:

> Manufacturers & Traders Trust Co.
> ABA# 031100092
> A/C# 128 43-000
> A/C Name: Project Widescreen Escrow
> Attn: Corporate Capital Markets/Joseph Clark

(b)  Escrow Agent will hold the Escrow Property in the Escrow Account upon the terms and conditions set forth in this Escrow Agreement and shall not disburse funds from the Escrow Account except as provided herein.

**III.    Disbursement of Escrow Account.**

(a)      Upon the receipt by Escrow Agent of joint written instructions executed by Buyer and Seller, substantially in the form of **Exhibit A** attached hereto (the "Joint Written Direction"), that states (i) the party under the Purchase Agreement that is entitled to the Escrow Property, (ii) to whom the Escrow Property shall be distributed, and (iii) the applicable wire instructions for the distribution of the Escrow Property, Escrow Agent shall release the Escrow Property in accordance with such Joint Written Direction.  In addition, in the

event that Seller and Buyer jointly instruct in writing Escrow Agent to disburse the Escrow Property to any party other than Seller or Buyer, Escrow Agent shall comply with such instructions, notwithstanding any provision to the contrary in this Escrow Agreement.  Promptly (and in any event within two Business Days) following Escrow Agent's receipt of a Joint Written Direction, Escrow Agent shall disburse such Escrow Property from the Escrow Account, by wire transfer to the account on the Joint Written Direction. As used in this Escrow Agreement, "<u>Business Day</u>" means any day other than a Saturday, Sunday or a day on which banking institutions in the City of New York, New York are authorized or required by law to close.

(b)        If Escrow Agent receives written instructions of either Buyer or Seller, substantially in the form of **Exhibit B** attached hereto and attaching (A) a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Property in a fashion consistent with such instructions and (B) evidence of delivery of such instructions to whichever Party is not giving such instructions ("<u>Written Direction Following Order</u>" and, each of a Written Direction Following Order and a Joint Written Direction, a "<u>Written Direction</u>"), and Escrow Agent does not receive a written objection to such Written Direction Following Order from whichever Party did not deliver such Written Direction Following Order within five (5) Business Days after Escrow Agent's receipt of such Written Direction Following Order, Escrow Agent shall release the Escrow Property in accordance with such Written Direction Following Order.  If, within five (5) Business Days after receipt of any Written Direction Following Order, Escrow Agent receives an objection to such Written Direction Following Order from whichever Party did not deliver such Written Direction Following Order, Escrow Agent may submit such dispute to a court of competent jurisdiction (in accordance with Section XIII(b)), by interpleader or otherwise and Escrow Agent shall be entitled to recover attorneys' fees, expenses and other costs incurred in commencing and maintaining any such action, as provided for in Section V(e) of this Escrow Agreement.

(c)        Each Party understands and agrees that Escrow Agent shall have no obligation or duty to act upon a Written Direction delivered to Escrow Agent for the disbursement of Escrow Property under this Escrow Agreement if such Written Direction is not (i) in writing, (ii) signed by, in the case of Buyer, any individual designated by Buyer on **Exhibit C-1** hereto or, in the case of Seller, an individual designated by Seller on **Exhibit C-2** hereto (in each case, each such individual an "<u>Authorized Representative</u>" of such Party), (iii) delivered to, and able to be authenticated by, Escrow Agent in accordance with Section IV and (iv) otherwise in conformity with the requirements set forth in Section III(a) or (b), as applicable.

(d)        Escrow Agent will furnish monthly statements to the Parties setting forth the activity in the Escrow Account.

## IV.    <u>Security Procedure for Funds Transfer</u>

(a)        Concurrent with the execution of this Escrow Agreement, the Parties shall deliver to Escrow Agent authorized signers' form in the form of Exhibit C-1 and C-2 to this Escrow Agreement.  Escrow Agent shall confirm each funds transfer instruction received in the name of the Parties, by confirming with an Authorized Representative as evidenced in Exhibit C-1 and C-2.  Once delivered to Escrow Agent, Exhibit C-1 and C-2 may be revised or rescinded only in writing signed by an Authorized Representative of the applicable Party.  Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford Escrow Agent a reasonable opportunity to act on it.  If a revised Exhibit C-1 or C-2 or a rescission of an existing Exhibit C-1 or C-2 is delivered to Escrow Agent by an entity that is a successor-in-interest to a Party, such document shall be accompanied by additional documentation

2

satisfactory to Escrow Agent showing that such entity has succeeded to the rights and responsibilities of such Party.  The Parties understand that Escrow Agent's inability to receive or confirm funds transfer instructions may result in a delay in accomplishing such funds transfer, and agree that Escrow Agent shall not be liable for any loss caused by any such delay.

(b)     Escrow Agent may disburse the Escrow Account pursuant to this Section IV, either by wire transfer or certified or bank check, at the sole discretion of Escrow Agent.  It is understood, however, that Escrow Agent may disburse any funds in the Escrow Account without any separate instructions, if such disbursements are in accordance with the terms of this Escrow Agreement.

## V.     Authority of Escrow Agent and Limitation of Liability.

(a)     In acting hereunder, Escrow Agent shall have only such duties as are specified herein and no implied duties shall be read into this Escrow Agreement, and Escrow Agent shall not be liable for any act done, or omitted to be done, by it in the absence of its gross negligence or willful misconduct.

(b)     Escrow Agent may act in reliance upon any writing or instrument or signature which it, in good faith, believes to be genuine, and may assume the validity and accuracy of any statement or assertion contained in such a writing or instrument and may assume that any person purporting to give any writing, notice, advice or instruction in connection with the provisions hereof has been duly authorized to do so.

(c)     Escrow Agent shall be entitled to consult with legal counsel in the event that a question or dispute arises with regard to the construction of any of the provisions hereof, and shall incur no liability and shall be fully protected in acting in accordance with the written advice or opinion of such counsel.

(d)     Escrow Agent shall not be required to use its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in Escrow Agent's sole and absolute judgment, could involve it in expense or liability unless furnished with security and indemnity which it deems, in its sole and absolute discretion, to be satisfactory.

(e)     Buyer shall pay to Escrow Agent compensation for its services hereunder as set forth in Exhibit D. In the event Escrow Agent renders any extraordinary services in connection with the Escrow Account at the request of Buyer, Escrow Agent shall be entitled to reasonable additional compensation therefor, which shall be paid by Buyer.  Escrow Agent shall have a first lien against the Escrow Account to secure the obligations of Buyer hereunder.  The terms of this paragraph shall survive termination of this Escrow Agreement.

(f)     The Parties hereby agree, jointly and severally, to indemnify Escrow Agent, its directors, officers, employees and agents (collectively, the "Indemnified Parties"), and hold the Indemnified Parties harmless from any and against all liabilities, losses, actions, suits or proceedings at law or in equity, and any other expenses, fees or charges of any character or nature, including, without limitation, attorney's fees and expenses, which an Indemnified Party may incur or with which it may be threatened by reason of acting as or on behalf of Escrow Agent under this Escrow Agreement or arising out of the existence of the Escrow Account, except to the extent the same shall be caused by Escrow Agent's gross negligence or willful misconduct.  Escrow Agent shall have a first lien against the Escrow Account to secure the obligations of the parties hereunder.  The terms of this paragraph shall survive termination of this Escrow Agreement.

(g)      In the event Escrow Agent receives conflicting instructions hereunder, Escrow Agent shall be fully protected in refraining from acting until such conflict is resolved to the satisfaction of Escrow Agent.

(h)      Escrow Agent may resign as Escrow Agent, and, upon its resignation, shall thereupon be discharged from any and all further duties and obligations under this Escrow Agreement by giving notice in writing of such resignation to the Parties, which notice shall specify a date upon which such resignation shall take effect, which shall not be earlier than sixty (60) Business Days after the Parties receive such notice. Upon the resignation of Escrow Agent, the Parties shall, within sixty (60) Business Days after receiving the foregoing notice from Escrow Agent, designate a substitute escrow agent (the "<u>Substitute Escrow Agent</u>"), which Substitute Escrow Agent shall, upon its designation and notice of such designation to Escrow Agent, succeed to all of the rights, duties and obligations of Escrow Agent hereunder. In the event the Parties shall not have delivered to Escrow Agent a written designation of Substitute Escrow Agent within the aforementioned sixty (60) Business Day period, together with the consent to such designation by the Substitute Escrow Agent, Escrow Agent may apply to a court of competent jurisdiction to appoint a Substitute Escrow Agent, and the costs of obtaining such appointment shall be reimbursable from the Parties and from the Escrow Property.

## VI.    <u>Notices</u>.

All notices, requests, demands, waivers and other communications under this Escrow Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the Party or Escrow Agent to whom notice is to be given, (b) on the day of transmission if sent via email (with proof of delivery which may be electronic) prior to 5:00pm in the place of receipt on a Business Day, and otherwise on the next succeeding Business Day, (c) on the Business Day after timely delivery to a reputable next-day courier service if next Business Day delivery is properly requested, or (d) on the third (3rd) day after mailing by first class mail, registered or certified, postage prepaid, to the Party or Escrow Agent as follows:

| | |
|---|---|
| If to Buyer: | Lantern Entertainment LLC<br>300 Crescent Court<br>Suite 1100<br>Dallas, Texas 75201<br>Attn:  Chris Halpin<br>Email:  chris.halpin@lanternam.com |
| With a copy to:<br>(which shall not<br>constitute notice) | Akin Gump Strauss Hauer & Feld LLP<br>1 Bryant Park<br>New York, New York 10036<br>Attn:  Stephen B. Kuhn<br>Email:  skuhn@akingump.com |
| And with a copy to:<br>(which shall not<br>constitute notice) | Akin Gump Strauss Hauer & Feld LLP<br>1 Bryant Park<br>New York, New York 10036<br>Attn:  Meredith A. Lahaie<br>Email:  mlahaie@akingump.com |

4

| If to Seller: | The Weinstein Company Holdings LLC |
| | 99 Hudson Street, Fourth Floor |
| | New York, New York 10013 |
| | Attn: Robert Del Genio |
| | Email: Robert.DelGenio@fticonsulting.com |
| | |
| With a copy to: | Cravath, Swaine & Moore LLP |
| (which shall not | Worldwide Plaza |
| constitute notice) | 825 Eighth Avenue |
| | New York, New York 10019 |
| | Attn:  Paul Zumbro and Andrew Elken |
| | Email:  pzumbro@cravath.com; aelken@cravath.com |
| | |
| And with a copy to: | Richards, Layton & Finger, P.A. |
| (which shall not | One Rodney Square |
| constitute notice) | 920 North King Street |
| | Wilmington, Delaware 19801 |
| | Attn:  Mark D. Collins and Paul N. Heath |
| | Email:  collins@rlf.com; heath@rlf.com |
| | |
| If to Escrow Agent: | Wilmington Trust, National Association |
| | 166 Mercer Street, Suite 2R |
| | New York, NY 10012 |
| | Tel. No.: (212) 941-4439 |
| | Attention: Joseph Clark |
| | Email: JHClark@wilmingtontrust.com |

**VII.**    **Amendment.**

This Escrow Agreement may not be amended, modified, supplemented or otherwise altered except by an instrument in writing signed by the parties hereto.

**VIII.**    **Termination.**

This Escrow Agreement will terminate upon the disbursement of all funds in the Escrow Account, as provided above, by Escrow Agent.

**IX.**    **Tax Reporting.**

With respect to any payments made under this Escrow Agreement, Escrow Agent shall not be deemed the payor and shall have no responsibility for performing tax reporting. Escrow Agent's function of making such payments is solely ministerial and upon express direction of the Parties.

**X.**    **Entire Agreement.**

This Escrow Agreement and the exhibits hereto set forth the entire agreement and understanding of the parties hereto related to the Escrow Property and supersedes all prior agreements and understandings, oral or written.  In the event of any direct conflict of the terms of this Escrow Agreement with the terms of

the Purchase Agreement, as with respect to the rights of the Buyer and Seller, the terms of the Purchase Agreement shall control and prevail; provided that in no event shall Escrow Agent be bound by the terms of the Purchase Agreement.  This Escrow Agreement is not intended to confer upon any Person other than the parties hereto any rights or remedies.

**XI.**    **Headings.**

Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

**XII.**    **Anti-Terrorism/Anti-Money Laundering Laws.**

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT - To help the United States government fight the funding of terrorism or money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens a new account.  What this means for the parties to this Escrow Agreement:  Escrow Agent will ask for your name, address, date of birth, and other information that will allow Escrow Agent to identify you (*e.g.*, your social security number or tax identification number.)  Escrow Agent may also ask to see your driver's license or other identifying documents (*e.g.,* passport, evidence of formation of corporation, limited liability company, limited partnership, etc., certificate of good standing.).

**XIII.**    **Governing Law; Jurisdiction.**

(a)    This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to any laws relating to choice of laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(b)    Without limiting any Party's right to appeal any order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Escrow Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Escrow Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section VI of this Escrow Agreement.  The parties hereto hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. To the fullest extent permitted by applicable law, each of the parties hereto hereby consents to process being served by any other party hereto in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section VI of this Escrow Agreement.

**XIV.**    **Counterparts.**

This Escrow Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, and such counterparts together shall constitute and be one and the same instrument.

XV.    **<u>Successor Escrow Agent</u>**.

Any business entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which Escrow Agent shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of Escrow Agent, shall be the successor of Escrow Agent hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

[The remainder of this page left intentionally blank.]

**IN WITNESS WHEREOF**, this Escrow Agreement has been duly executed as of the date first written above.

<u>BUYER:</u>

LANTERN ENTERTAINMENT, LLC

By: _____
Name:_____
Title: _____

<u>SELLER:</u>

THE WEINSTEIN COMPANY HOLDINGS LLC

By: _____
Name:
Title:

<u>ESCROW AGENT</u>:

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____
Name:_____
Title: _____

8

<u>EXHIBIT A</u>

FORM OF JOINT WRITTEN DIRECTION

_____ __, 20__
Wilmington Trust, National Association
166 Mercer Street, Suite 2R
New York, NY 10012
Attention: Joseph Clark
   **Re:  Escrow Account No.: _____**


   Ladies and Gentlemen:

   Reference is made to that certain Escrow Agreement, dated as of March [●], 2018 entered into by and among THE WEINSTEIN COMPANY HOLDINGS LLC, a Delaware limited liability company ("<u>Seller</u>"), LANTERN ENTERTAINMENT LLC, a Delaware limited liability company (the "<u>Buyer</u>", and together with Seller, collectively, the "<u>Parties</u>," and individually, a "<u>Party</u>"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, as escrow agent ("<u>Escrow Agent</u>").  Capitalized terms defined in the Escrow Agreement shall have the same meanings when used herein.

   This letter is the Joint Written Direction referred to in Section III(a) of the Escrow Agreement. Seller and Buyer hereby jointly instruct Escrow Agent to release the funds in the Escrow Account in the amounts, and to the account(s), as follows:

| | |
|---|---|
| AMOUNT: | |
| BENEFICIARY BANK NAME: | |
| BENEFICIARY BANK ADDRESS LINE 1: | |
| BENEFICIARY BANK ADDRESS LINE 2: | |
| BENEFICIARY BANK ADDRESS LINE 3: | |
| ABA#: | |
| SWIFT#: | |
| BENEFICIARY ACCOUNT TITLE: | |
| BENEFICIARY ACCOUNT NO./IBAN: | |

9

| | |
|---|---|
| BENEFICIARY ADDRESS LINE 1: | |
| BENEFICIARY ADDRESS LINE 2: | |
| BENEFICIARY ADDRESS LINE 3: | |
| ADDITIONAL INFORMATION: | |

THE WEINSTEIN COMPANY HOLDINGS LLC


By:_____
Name:
Title:
Date:

LANTERN ENTERTAINMENT LLC


By:_____
Name:
Title:
Date:

<u>EXHIBIT B</u>

FORM OF WRITTEN DIRECTION FOLLOWING ORDER

_____ __, 20__

Wilmington Trust, National Association
166 Mercer Street, Suite 2R
New York, NY 10012
Attention: Joseph Clark

      **Re:  Escrow Account No.:** _____

Ladies and Gentlemen:

Reference is made to that certain Escrow Agreement, dated as of March [●], 2018 entered into by and among THE WEINSTEIN COMPANY HOLDINGS LLC, a Delaware limited liability company ("Seller"), LANTERN ENTERTAINMENT LLC, a Delaware limited liability company (the "Buyer", and together with Seller, collectively, the "Parties," and individually, a "Party"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, as escrow agent ("Escrow Agent").  Capitalized terms defined in the Escrow Agreement shall have the same meanings when used herein.

This letter is the Written Direction Following Order referred to in Section III(b) of the Escrow Agreement.  Attached hereto are (A) a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Property in a fashion consistent with the instructions set forth herein and (B) evidence of delivery of this Written Direction Following Order to [Seller]/[Buyer].

[Buyer]/[Seller] hereby instructs Escrow Agent to release the funds in the Escrow Account in the amounts, and to the account(s), as follows:

| | |
|---|---|
| AMOUNT: | |
| BENEFICIARY BANK NAME: | |
| BENEFICIARY BANK ADDRESS LINE 1: | |
| BENEFICIARY BANK ADDRESS LINE 2: | |
| BENEFICIARY BANK ADDRESS LINE 3: | |
| ABA#: | |
| SWIFT#: | |
| BENEFICIARY ACCOUNT TITLE: | |

11

| BENEFICIARY ACCOUNT NO./IBAN: | |
| --- | --- |
| BENEFICIARY ADDRESS LINE 1: | |
| BENEFICIARY ADDRESS LINE 2: | |
| BENEFICIARY ADDRESS LINE 3: | |
| ADDITIONAL INFORMATION: | |

[THE WEINSTEIN COMPANY HOLDINGS LLC


By:_____
Name:
Title:
Date:]

[LANTERN ENTERTAINMENT LLC


By:_____
Name:
Title:
Date:]

EXHIBIT C-1

CERTIFICATE AS TO AUTHORIZED REPRESENTATIVES OF BUYER

LANTERN ENTERTAINMENT LLC, a Delaware limited liability company ("Buyer"), hereby designates each of the following persons as its Authorized Representatives for purposes of the agreement to which this Exhibit C-1 is attached, and confirms that the title, contact information and specimen signature of each such person as set forth below is true and correct.  Each such Authorized Representative is authorized to initiate and approve transactions of all types for the Escrow Account established under the agreement to which this Exhibit C-1 is attached, on behalf of Buyer.                .

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required):<br><br>*If more than one, list all applicable telephone numbers.* | Office:<br><br>Cell: |
| **E-mail** (required):<br><br>*If more than one, list all applicable email addresses.* | Email 1:<br><br>Email 2: |

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** | Office: |

13

| (required):<br><br>*If more than one, list all applicable telephone numbers.* | Cell: |
|---|---|
| **E-mail** (required):<br><br>*If more than one, list all applicable email addresses.* | Email 1:<br><br>Email 2: |

| **Name** (print): | |
|---|---|
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required):<br><br>*If more than one, list all applicable telephone numbers.* | Office:<br><br>Cell: |
| **E-mail** (required):<br><br>*If more than one, list all applicable email addresses.* | Email 1:<br><br>Email 2: |

Additional Email Addresses:

The following additional email addresses also may be used by Escrow Agent to verify the email address used to send any Written Direction to Escrow Agent:

Email 1: _____

Email 2:_____

Email 3:_____

**COMPLETE BELOW TO UPDATE EXHIBIT C-1**

If Buyer wishes to update this Exhibit C-1, Buyer must complete, sign and send to Escrow Agent an updated copy of this Exhibit C-1 with such changes.  Any updated Exhibit C-1 shall be effective once signed by Buyer and Escrow Agent and shall entirely supersede and replace any prior Exhibit C-1 to this Escrow Agreement.

LANTERN ENTERTAINMENT LLC

By:_____

Name:

Title:

Date:

WILMINGTON TRUST, NATIONAL ASSOCIATION (as Escrow Agent)

By:_____

Name:

Title:

Date:

 Remittance Instructions:

EXHIBIT C-2

CERTIFICATE AS TO AUTHORIZED REPRESENTATIVES OF SELLER

THE WEINSTEIN COMPANY HOLDINGS LLC, a Delaware limited liability company ("Seller"), hereby designates each of the following persons as its Authorized Representatives for purposes of the agreement to which this Exhibit C-2 is attached, and confirms that the title, contact information and specimen signature of each such person as set forth below is true and correct.  Each such Authorized Representative is authorized to initiate and approve transactions of all types for the Escrow Account established under the agreement to which this Exhibit C-2 is attached, on behalf of Seller.

| | |
|---|---|
| **Name** (print): | Robert Del Genio |
| **Specimen Signature:** | |
| **Title:** | Chief Restructuring Officer |
| **Telephone Number** (required): <br><br> *If more than one, list all applicable telephone numbers.* | Office: (212) 813-1640 <br><br> Cell: |
| **E-mail** (required): <br><br> *If more than one, list all applicable email addresses.* | Email 1: Robert.DelGenio@fticonsulting.com <br><br> Email 2: |

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |

| | |
|---|---|
| **Telephone Number** (required):  *If more than one, list all applicable telephone numbers.* | Office:  Cell: |
| **E-mail** (required):  *If more than one, list all applicable email addresses.* | Email 1:  Email 2: |

<br>

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required):  *If more than one, list all applicable telephone numbers.* | Office:  Cell: |
| **E-mail** (required):  *If more than one, list all applicable email addresses.* | Email 1:  Email 2: |

Additional Email Addresses:

The following additional email addresses also may be used by Escrow Agent to verify the email address used to send any Written Direction to Escrow Agent:

Email 1: _____

Email 2:_____

Email 3:_____

**COMPLETE BELOW TO UPDATE EXHIBIT C-2**

If Seller wishes to update this Exhibit C-2, Seller must complete, sign and send to Escrow Agent an updated copy of this Exhibit C-2 with such changes.  Any updated Exhibit C-2 shall be effective once signed by Seller and Escrow Agent and shall entirely supersede and replace any prior Exhibit C-2 to this Escrow Agreement.


THE WEINSTEIN COMPANY HOLDINGS LLC

By:_____

Name:

Title:

Date:


WILMINGTON TRUST, NATIONAL ASSOCIATION (as Escrow Agent)

By:_____

Name:

Title:

Date:


 Remittance Instructions:

EXHIBIT D

FEES OF THE ESCROW AGENT

**Acceptance Fee:**                                                                                    **Waived**


This is a one-time fee payable at the time of closing for initial services including examination of the Escrow Agreement, acceptance of the account, execution and delivery of the Escrow Agreement, and establishment of the necessary records.

**Escrow Agent Annual Administration Fee:**                                         **$4,500**


This is an annual fee payable at the time of closing, and annually thereafter, for ordinary services of the Escrow Agent, including normal account administration and monthly statement generation.  This charge is not prorated for the first year or any subsequent year.

**Fees and Expenses:**

The company shall reimburse Wilmington Trust on demand for all loss, liability, damage, disbursements, advances or expenses paid or incurred by it in the administration of its duties under the Escrow Agent Agreement, including, but not limited to, all counsel, advisors' and agents' fees and disbursements and all taxes or other governmental charges. Out of pocket expenses are billed at cost.

## **EXHIBIT E**

BIDDING PROCEDURES ORDER

[*See Attached*]

Subject to FRE 408
Privileged and Confidential

# BIDDING PROCEDURES

Set forth below are the bidding procedures (the "**Bidding Procedures**") to be employed in connection with the proposed sale, in bulk or by asset or segment, of all or substantially all of the assets (which includes, among other things, the television business, the film library and the unreleased film portfolio (including undeveloped scripts and other projects in production or pre-production stages of development, in each case relating to motion pictures) (collectively, the "**Assets**")) owned by The Weinstein Company Holdings LLC ("**TWCH**") and certain subsidiaries of TWCH (collectively in such capacity, the "**Seller Parties**"), in connection with the Debtors' jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), lead case number 18-[●].

The Seller Parties entered into that certain asset purchase agreement, dated March 19, 2018, with Lantern Entertainment LLC (the "**Stalking Horse Bidder**"), pursuant to which the Stalking Horse Bidder will acquire the Purchased Assets (as defined in the Stalking Horse Agreement) on the terms and conditions specified therein (together with the schedules and related documents thereto, the "**Stalking Horse Agreement**," a copy of which is attached to the Motion as <u>Exhibit B</u>).  The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein.

By the motion (the "**Motion**"),[1] dated March 19, 2018, the Debtors sought, among other things, approval of the Bidding Procedures for soliciting bids for, conducting an auction (the "**Auction**"), and consummating a sale, in bulk or by asset or segment, of all or substantially all of the Debtors' Assets (the "**Sale**").

## ASSETS TO BE SOLD

The Debtors seek to consummate the Sale pursuant to the terms of the Stalking Horse Agreement.  The sale of the Assets is on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Seller Parties, their agents or estates, except to the extent set forth in the Stalking Horse Agreement or the purchase agreement of such other Successful Bidder (as defined below) and as approved by the Bankruptcy Court.  Except as otherwise provided in such approved purchase agreement, all of the Seller Parties' right, title and interest in and to each Asset to be acquired shall be sold free and clear of all liens, claims, interests and encumbrances (other than permitted liens), with such liens, claims, interests and encumbrances to attach to the proceeds of the Sale.

## THE BIDDING PROCEDURES

In order to ensure that the Debtors receive the maximum value for the Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Purchased Assets set forth therein.  The Debtors shall carry out these Bidding Procedures in accordance with and in faithful exercise of their fiduciary obligations.

### Provisions Governing Qualifications of Bidders

Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, prior to the Bid Deadline (as defined below), each person other than the Stalking Horse Bidder, who wishes to participate in the bidding process (a "**Potential Bidder**") must deliver the following to the Notice Parties (as defined below):

---

[1] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion or the Stalking Horse Agreement, as applicable.

(i)      a written disclosure of the identity of each entity, including identification of primary affiliated entities and principals, that will be bidding for the Assets or otherwise participating in connection with such bid;

(ii)      an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Seller Parties to a Potential Bidder) in form and substance satisfactory to the Debtors (without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions); and

(iii)      a Potential Bidder that delivers the documents and information described above or that the Debtors determine, in consultation with Union Bank, N.A., now known as MUFG Union Bank, N.A., in its capacity as "**DIP Agent**" (as defined in the Interim DIP Order) and Agent (the "**Pre-Petition Agent**") under that certain Second Amended and Restated Credit and Security Agreement, dated as of September 30, 2013 (the "**Pre-Petition Credit Agreement**"), and the official committee of unsecured creditors, if any, appointed in these chapter 11 cases (the "**Committee**," and, together with the DIP Agent and Pre-Petition Agent, the "**Consultation Parties**"), is (based on evidence of available financing, experience and other considerations) able to consummate the Sale, and whose Qualified Bid is received by the Notice Parties no later than the Bid Deadline is deemed qualified (a "**Qualified Bidder**").  The Consultation Parties shall be permitted and authorized to provide the information available from any Qualified Bidder to their counsel, advisors, the Majority DIP Lenders (as defined in the Interim DIP Order), the Required Lenders (as defined in the Interim DIP Order), on a confidential basis, and, subject to an appropriate non-disclosure agreement, the committee members.

## Due Diligence

The Debtors will provide any Potential Bidder such due diligence access or additional information as the Debtors deem appropriate, which will be substantially the same information for all Potential Bidders interested in the same Assets or segment(s) but may include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information.  The due diligence period will extend through and including the Bid Deadline.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors.

## Aggregate Bids

For the avoidance of doubt, the Debtors, in consultation with the Consultation Parties, will consider bids for individual assets, any combination of assets and/or all or substantially all of the Assets.  Potential Bidders wishing to combine their bids on the Assets (or a subset thereof) need not be affiliated persons; *provided*, *however*, that all Potential Bidders shall be subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding and any combined bids shall be disclosed to the Debtors and the Consultation Parties.

## Provisions Governing Qualified Bids

A bid will be considered a "**Qualified Bid**" only if the bid is submitted by a Qualified Bidder and the Debtors determine, in consultation with the Consultation Parties, such bid complies with all of the following:

a.   it is received by the Notice Parties prior to the Bid Deadline;

b.  it states that the applicable Qualified Bidder offers to purchase, in cash or, if applicable, through a credit bid meeting the requirements of section 363(k) of the Bankruptcy Code, all or a portion of the Assets;

c.  it includes a signed writing stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder (each, as defined below), its offer shall remain irrevocable until the earlier of (i) the closing of the Sale to the Successful Bidder or the Back-Up Bidder and (ii) the date that is thirty (30) days after the Sale Hearing, subject to any rights of termination by the Successful Bidder contained in the Successful Bid;

d.  it includes confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the submission of the bid;

e.  it contains no due diligence or financing contingencies of any kind;

f.  it includes a duly authorized and executed copy of an asset purchase agreement (which shall be substantially similar to the Stalking Horse Agreement), including the purchase price for the Assets (or a subset thereof) expressed in U.S. Dollars (the "**Purchase Price**"), together with all exhibits and schedules thereto, together with a copy marked to show any amendments and modifications to the Stalking Horse Agreement (an "**Asset Purchase Agreement**");

g.  it specifies the liabilities proposed to be paid or assumed by such Qualified Bid;

h.  if the bid (including a combination of Qualified Bids submitted jointly prior to the Bid Deadline from one or more Qualified Bidders, subject to Section 363(n) of the Bankruptcy Code) seeks to purchase a portion of the Assets from two different segments or two or more entire segments of the Assets, it provides an allocation of its cash consideration among such Assets or Asset segment(s), as applicable, and such cash consideration shall be in an amount sufficient to satisfy in full in cash all indebtedness of the applicable Seller Parties that is secured by all or substantially all of the Assets so sought to be purchased (or in the case of indebtedness secured by such Assets of such segment(s), sufficient to repay the value thereof), except for any portion of such bid that is for one or more Covered Titles secured by non-recourse project level debt in Schedule 2.3 of the Stalking Horse Agreement and provides for the assumption of such debt;

i.   if the bid (including a combination of Qualified Bids submitted jointly prior to the Bid Deadline from one or more Qualified Bidders, subject to 363(n)) seeks to purchase all or substantially all of the Assets, (i) it provides an allocation of its cash consideration among the key Asset segments (e.g. the television business, the film library and the unreleased film portfolio) and such cash consideration allocated to each segment shall be in an amount sufficient to satisfy in full in cash all indebtedness of the applicable Seller Parties that is secured by all or substantially all of the Assets of each such segment (except for any portion of such bid that is for one or more Covered Titles secured by non-recourse project level debt (as described in Schedule 2.3 of the Stalking Horse Agreement) and the bid provides for the assumption of such debt) and (ii) it has a value to the Debtors, determined in the Debtors' reasonable business judgment after consultation with the Consultation Parties, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (a) $1,000,000 plus (b) the Stalking Horse Protections (as defined in the Motion) (the "**Minimum Initial Overbid Amount**");

j.   it includes financial statements or other written evidence, including (if applicable) a firm, irrevocable commitment for financing, establishing the ability of the Qualified Bidder to consummate the proposed Sale and pay the Purchase Price in cash, or, if applicable, through a credit bid meeting the requirements of section 363(k) of the Bankruptcy Code, such as will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

k.   it identifies with particularity which Contracts and Leases the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related Cure Amounts and the provision of adequate assurance of future performance to the Counterparties to such Contracts and Leases, which, for the avoidance of doubt, the Debtors may provide to such Counterparties;

l.   it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

m.   it includes evidence, in form and substance reasonably satisfactory to the Debtors, in consultation with the Consultation Parties, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

n.  it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to five percent (5%) of the purchase price provided for in the bid (a "**Good Faith Deposit**");

o.  it states that the bidder (a) waives any right to a jury trial in connection with, and consents and submits to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of such parties, (b) agrees to bring any such action or proceeding in the Bankruptcy Court, and (c) consents to the Bankruptcy Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law; and

p.  it contains such other information as may be reasonably requested by the Debtors, in consultation with the Consultation Parties.

Notwithstanding the foregoing, (i) the Stalking Horse Bidder is deemed to be a Qualified Bidder and the Stalking Horse Bid shall be deemed to be a Qualified Bid, such that the Stalking Horse Bidder shall not be required to submit an additional Qualified Bid, and (ii) the DIP Agent and Pre-Petition Agent shall each be deemed to be a Qualified Bidder and may submit a credit bid at any time during the auction.  In the event that the DIP Agent or the Pre-Petition Agent elects to submit a Qualified Bid, from and after the submission of any such bid, such party shall not receive any information as a Consultation Party that the Debtors in their sole discretion deem competitive or would otherwise create a conflict if received by such party, until such time, if ever, as such party withdraws such additional Qualified Bid.

The Debtors reserve the right, in consultation with the Consultation Parties, to negotiate with any Qualified Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid.

As soon as reasonably practicable after the Bid Deadline, the Debtors shall notify the Consultation Parties, the Stalking Horse Bidder, and all Qualified Bidders in writing as to whether or not any bids (other than the Stalking Horse Agreement) constitute Qualified Bids, and will notify each Qualified Bidder that has submitted a bid (other than the Stalking Horse Bidder), whether such Qualified Bidder's bid constitutes a Qualified Bid promptly after such determination has been made.

### Bid Deadline

A Potential Bidder that desires to make a bid shall deliver written copies of its bid to the following parties (collectively, the "**Notice Parties**"):  (1) proposed co-counsel to the Debtors, Cravath, Swaine & Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, New York 10019, Attn: Paul H. Zumbro, pzumbro@cravath.com, George E. Zobitz, jzobitz@cravath.com and Andrew Elken, aelken@cravath.com; (2) proposed co-counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, collins@rlf.com, and Paul N. Heath, heath@rlf.com; (3) co-counsel to the DIP Agent and the Pre-Petition Agent, Sidley Austin LLP, 555 West Fifth Street, Los Angeles, California 90013, Attn: Jennifer C. Hagle, jhagle@sidley.com, and Sidley Austin LLP, 1 S. Dearborn Street, Chicago, IL 60603, Attn: Annie Wallis, awallis@sidley.com; (4) co-counsel to the DIP Agent and the Pre-Petition Agent, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Robert S. Brady, rbrady@ycst.com, and Sean M. Beach, sbeach@ycst.com; (5) counsel to the Committee, if any, and (6) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801, Attn: Jane M. Leamy, Jane.M.Leamy@usdoj.gov, and Hannah Mufson McCollum, Hannah.McCollum@usdoj.gov, so as to be received by the foregoing parties no later than **5:00 p.m. Eastern Daylight Time on [_____], 2018**[2] (the "**Bid Deadline**").  The Bid Deadline may be extended by the Debtors in consultation with the Consultation Parties, subject to the Stalking Horse Agreement.

### Evaluation of Competing Bids

A Qualified Bid will be valued by the Debtors, in consultation with the Consultation Parties, based upon several factors including, without limitation, (1) the amount of the Purchase Price provided by such bid, (2) the nature of the consideration provided by such bid, (3) the risks and timing associated with consummating such bid, (4) any proposed revisions to the Stalking Horse Agreement, (5) whether any Qualified Bid contains a sufficient cash component to ensure that the Debtors' estates are not rendered administratively insolvent, (6) whether such bid contemplates the continuation of the Debtors' business as a going concern, (7) the impact on employees and trade creditors and other claimants and stakeholders, and (8) any other factors deemed relevant by the Debtors, in consultation with the Consultation Parties.

### No Qualified Bids

If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, or receive Qualified Bids on portions of the Assets which do not have purchase prices which, in the aggregate, equal or exceed the Minimum Initial Overbid Amount, the Debtors will not conduct an auction for the Assets and shall request at the Sale Hearing that the Stalking Horse Bidder be deemed the Successful Bidder and that the Bankruptcy Court approve the Stalking Horse Agreement and the transaction contemplated thereunder.

### Auction Process

If the Debtors receive one or more Qualified Bids with purchase prices which, individually or in the aggregate, equal or exceed the Minimum Initial Overbid Amount, in addition to the Stalking Horse Agreement, the Debtors will conduct the Auction, which shall take place at [10:00] a.m. Eastern Daylight Time on [_____], 2018,[3] at the office of Richards, Layton & Finger, P.A., One Rodney Square, 920

---

[2] To be the date that is at least two (2) Business Days prior to the date of the Auction.

[3] To be the date that is on or prior to the date that is forty-five (45) days after the Petition Date.

North King Street, Wilmington, Delaware 19801 or such other date, time and location as shall be timely communicated to all entities entitled to attend the Auction. The Auction, which shall be recorded and transcribed, shall run in accordance with the following procedures:

a. only the Debtors, the Stalking Horse Bidder, any other Qualified Bidder that has timely submitted a Qualified Bid, the Consultation Parties, and the advisors to each of the foregoing shall be permitted to attend the Auction in person; *provided, however,* that any party in interest may attend (but not participate in) the Auction with the prior approval of the Debtors if any such party in interest provides the Debtors with written notice of its intention to attend the Auction on or before one (1) Business Day prior to the Auction, which written notice shall be sent to proposed co-counsel for the Debtors via electronic mail, to Zachary I. Shapiro, at shapiro@rlf.com;

b. only the Stalking Horse Bidder and such other Qualified Bidders who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction;

c. each Qualified Bidder shall be required to confirm that it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code, with respect to any bids submitted or not submitted in connection with the Sale;

d. at least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person; *provided* that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the selection of the Successful Bidder and Back-Up Bidder (each, as defined below) at the conclusion of the Auction. At least twenty-four (24) hours prior to the time scheduled for the commencement of the Auction (as provided in these Bidding Procedures), the Debtors will provide the Qualified Bid(s), which the Debtors believe, after consultation with the Consultation Parties, is the highest or otherwise best offer (the "**Starting Bid**") to the Stalking Horse Bidder and all other Qualified Bidders who have timely submitted Qualified Bids;

e. all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

f. the Debtors, in consultation with the Consultation Parties, may modify, employ and announce at the Auction additional or amended procedural rules that are reasonable under the circumstances for conducting the Auction, *provided* that such rules (i) are not materially inconsistent with the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, (ii) do not purport to abrogate or modify the Stalking Horse Protections and (iii) are disclosed to each Qualified Bidder attending the Auction; *provided, further,* that no such rules shall in any way modify or be deemed to modify the Stalking Horse Agreement or the rights of the Stalking Horse Bidder under the Stalking Horse Agreement;

7

g. bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each, a "**Subsequent Bid**") providing a net value to the Debtors' estates of at least $1,000,000 above the prior bid or collection of bids (the "**Continuing Minimum Overbid Amount**"), subject to modification in accordance with paragraph (f) above. After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with the Consultation Parties, shall announce the bid or collection of bids (and the value of such bid(s)) that they believe to be the highest or otherwise best bid(s) (each, the "**Leading Bid**");

h. a round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid;

i. except as specifically set forth herein, for the purpose of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the Debtors shall give effect to the Stalking Horse Protections as well as any additional liabilities to be assumed by a Qualified Bidder, and any additional costs which may be imposed on the Debtors; and

j. the Debtors in consultation with the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors in consultation with the Consultation Parties to make a reasonable determination as to an Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors, in consultation with the Consultation Parties, believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction.

**Selection of Successful Bid**

Prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, will review and evaluate each Qualified Bid submitted at the Auction (including by the Stalking Horse Bidder) in accordance with the procedures set forth herein and determine which offer(s) is the highest or otherwise best offer or collection of offers (one or more such bids, collectively the "**Successful Bid**" and the bidder(s) making such bid(s), collectively, the "**Successful Bidder**"), and communicate to the Stalking Horse Bidder and the other Auction participants the identity of the Successful Bidder and the material details of the Successful Bid. The determination of the Successful Bid by the Debtors, in consultation with the Consultation Parties, at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

The Qualified Bidder(s) with the next highest or otherwise best Qualified Bid or collection of Qualified Bids, as determined by the Debtors at the time of the Auction, in consultation with the Consultation Parties, will be required to serve as a back-up bidder (each, a "**Back-Up Bidder**") and keep its bid open and irrevocable until the earlier to occur of (i) thirty (30) days after the Sale Hearing and (ii) closing on the Successful Bid(s) with the Successful Bidder(s). If the Successful Bidder(s) fail(s) to consummate the Sale, the Debtors will be authorized and directed to consummate the Sale with the Back-Up Bidder(s) without further order of the Bankruptcy Court.

Within one (1) Business Day after conclusion of the Auction, the Successful Bidder(s) shall complete and execute all agreements, contracts, instruments and other documents necessary to consummate the Successful Bid(s). Within one (1) Business Day after conclusion of the Auction, the Debtors shall file a notice with the Bankruptcy Court identifying the Successful Bidder(s) and the Back-Up Bidder(s).

The Debtors will sell the Assets to the Successful Bidder(s) pursuant to the terms of the Successful Bid(s) upon the approval of such Successful Bid(s) by the Bankruptcy Court at the Sale Hearing.

### Return of Deposits

All Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder no later than five (5) Business Days following the entry of the Sale Order.

## THE STALKING HORSE PROTECTIONS

In recognition of its expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Bidder is not the Successful Bidder, the Debtors will pay, subject to the Bidding Procedures Order and the Stalking Horse Agreement, to the Stalking Horse Bidder the Stalking Horse Protections.  The Break-Up Fee is $9,300,000 and Expense Reimbursement is up to $6,200,000.

## SALE HEARING

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "**Sale Hearing**") to begin on or before [●], 2018[4] at [●] a/p.m. (Eastern Daylight Time), subject to the availability of the Bankruptcy Court, to approve and authorize the Sale to the Successful Bidder.  Subject to the express written consent of the Stalking Horse Bidder (such consent not to be unreasonably withheld, conditioned or delayed), the Debtors reserve the right to change the date and/or time of the Sale Hearing (or any other dates related to the Sale) in order to achieve the maximum value for the Assets.

---

[4] To be the date that is on or before the date that is 47 days after the Petition Date.

# **EXHIBIT F**

FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

[*See Attached*]

# INTELLECTUAL PROPERTY ASSIGNMENT

This Intellectual Property Assignment (the "Assignment") is made and entered into as of [●], 2018 (the "Effective Date"), by and among, THE WEINSTEIN COMPANY HOLDINGS LLC, a Delaware limited liability company ("TWCH"), and each of the Seller Parties listed on Exhibit A attached hereto (each individually, "Assignor" and collectively, with TWCH, "Assignors"), on the one hand, and LANTERN ENTERTAINMENT LLC, a Delaware limited liability company ("Assignee"), on the other hand, pursuant to that certain Asset Purchase Agreement, dated as of March 19, 2018 (the "Asset Purchase Agreement"), by and among Assignors, on the one hand, and Assignee, on the other hand.

WHEREAS, under the terms of the Asset Purchase Agreement, Assignors have conveyed, transferred, and assigned to Assignee or one or more of its applicable designees, among other assets, certain intellectual property of Assignors, and have agreed to execute and deliver this Assignment, for recording with the United States Patent and Trademark Office, and corresponding entities or agencies in any applicable jurisdictions.

1.      Assignment.  For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Assignor hereby assigns and transfers to Assignee, absolutely and forever, all of its right, title, and interest, whether statutory or at common law, in and to, respectively, all of its rights, title, and interests pertaining to all the intellectual property and intangible property included in Purchased Assets, including the following :

a.      patents and patent applications set forth on Schedule 1 hereto and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, and renewals thereof;

b.      trademarks and service marks, trade names and business names, trade dress, logos, social media handles and domain names together with the part of the goodwill of the business connected with the use of and symbolized by the foregoing, and all corresponding registrations and applications for the registration of the foregoing, including the marks set forth in Schedule 2 hereto;

c.      copyright rights in all original works of authorship, including registered and unregistered copyrights in both published and unpublished works, and aplications to register any copyrights, including the copyrights set forth in Schedule 3 hereto;

d.      trade secrets, including, confidential business information, know-how, concepts, methods, processes, reports, data, client lists, business plans, and other confidential and/or proprietary business information;

e.       any and all statutory royalties, fees, income, payments, and other statutory proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

f.       claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

g.       rights of any kind whatsoever of such Assignor accruing under any of the foregoing, including all rights under applicable Contracts, provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world (collectively, the "Assigned IP");

2.       <u>Terms of the Asset Purchase Agreement</u>. The parties hereto acknowledge and agree that this Assignment is entered into pursuant to the Asset Purchase Agreement, to which reference is made for a further statement of the rights and obligations of Assignors and Assignee with respect to the Assigned IP. The representations, warranties, covenants and agreements contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

3.       <u>Binding Effect</u>.  This Assignment is and shall be binding upon the parties hereto, their heirs, executors, administrators, representatives, agents, employees, affiliates, officers, and principals of the parties and their successors and assigns.

4.       <u>Miscellaneous</u>.  This Assignment is subject to the applicable sections of the Asset Purchase Agreement, which are  incorporated herein by reference as if set forth in full herein.  Any capitalized terms not specifically defined herein shall have the meaning assigned to them in the Asset Purchase Agreement.

*[Remainder of This Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties hereto have each caused this Assignment to be executed as of the Effective Date.

The Weinstein Company LLC,
a Delaware limited liability company

By: _____
Name:
Title:

Weinstein Television LLC,
a Delaware limited liability company
By: _____
Name:
Title:

Lantern Entertainment LLC,
a Delaware limited liability company
By: _____
Name:
Title:

**EXHIBIT A**

**ASSIGNORS**

The Weinstein Company LLC
Weinstein Television LLC

## SCHEDULE 1

## ASSIGNED PATENTS AND PATENT APPLICATIONS

<u>Patents</u>

None.

<u>Patent Applications</u>

None.

**SCHEDULE 2**

**ASSIGNED TRADEMARK REGISTRATIONS AND APPLICATIONS**

**1.      Trademarks:**

See attached.

**2.      Trade Names, Fictitious Business Names:**

THE WEINSTEIN COMPANY

THE WEINSTEIN COMPANY Logo

Weinsteinco.com

**Schedule 3**

**ASSIGNED COPYRIGHTS**

## **EXHIBIT G**

DIP FINANCING TERM SHEET

[*See Attached*]

*Subject to Rule 408 of the Federal Rules of Evidence – Not Admissible in Court*

**SUMMARY OF PROPOSED TERMS AND CONDITIONS
FOR DIP FINANCING AND USE OF CASH COLLATERAL
(Confidential - For Discussion Purposes Only; Not a Commitment)**

The Weinstein Company Holdings LLC <u>et al</u>.,
Debtors and Debtors in Possession
March [●], 2018

*The terms and conditions summarized below are intended as a summary outline of a proposed financing commitment which is conditioned in all respects upon completion of due diligence, negotiation of definitive documentation and final credit approval and do not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation. No DIP Lender (as defined herein) is under any obligation to make a loan or make any commitment to lend and any such commitment would be subject to, among other conditions, such DIP Lender obtaining any necessary final credit authorizations and approvals and negotiation and execution of definitive documentation in form and substance satisfactory to such DIP Lender. This document is delivered to you with the understanding that neither it nor its substance shall be disclosed to any third party. Any provision of financial accommodations under such debtor-in-possession credit facility shall be further subject to the terms and conditions, and Bankruptcy Court approval, set forth below.*

*Capitalized terms used in this term sheet and not otherwise defined shall have the meaning given to such terms in the Second Amended and Restated Credit and Security Agreement, dated as of September 30, 2013 (as amended, supplemented, and otherwise modified from time to time, the "**<u>Pre-Petition Credit Agreement</u>**"), among TWC Domestic LLC, the Pre-Petition Lenders (as defined below) and the Pre-Petition Agent (as defined below).*

| | |
|---|---|
| **<u>Borrowers</u>:** | The Weinstein Company Holdings LLC, The Weinstein Company LLC, and TWC Domestic LLC, as debtors and debtors in possession (collectively, the "**<u>Borrowers</u>**") under Chapter 11 of the United States Bankruptcy Code (the "**<u>Bankruptcy Code</u>**") in jointly administered cases (collectively, the "**<u>Cases</u>**") in the United States Bankruptcy Court for the District of Delaware (the "**<u>Bankruptcy Court</u>**") |
| **<u>Guarantors</u>:** | Each of the entities listed on <u>Schedule 1</u> hereto (collectively, the "**<u>Debtors</u>**"), other than the Borrowers, shall be "**<u>Guarantors</u>**" of the DIP Obligations (as defined below). |
| **<u>Pre-Petition Agent</u>:** | MUFG Union Bank, N.A., formerly known as Union Bank, N.A., ("**<u>MUFG</u>**"), in its capacity as Agent under the Pre-Petition Credit Agreement and related pre-petition loan documents (the "**<u>Pre-Petition Loan Documents</u>**" and the loans made thereunder, the "**<u>Pre-Petition Loans</u>**"). |
| **<u>Pre-Petition Lenders</u>:** | Those lenders who are parties to the Pre-Petition Credit |

*TWC DIP Credit Facility Term Sheet*

Agreement, as of the Petition Date.

**DIP Agent:**          MUFG, in its capacity as Agent under the DIP Credit Agreement.

**DIP Lenders:**        Those Pre-Petition Lenders who elect to participate in the DIP Facility pursuant to the respective commitments set forth on Schedule 2 hereto.  Participation in the DIP Facility will be open to all Pre-Petition Lenders on a pro rata basis.

**Majority DIP Lenders:**   DIP Lenders holding more than 50% of the loan exposure under the DIP Facility.

**Petition Date:**      The date the Debtors file their Chapter 11 petitions.

**DIP Facility:**       The DIP Lenders will provide to the Debtors a priming (solely with respect to the Pre-Petition Loans), senior secured, superpriority debtor-in-possession credit facility (the "**DIP Facility**") comprising loans to be advanced and made available to the Borrowers under a delayed draw term loan with disbursements to be made in accordance with the Approved Budget (as defined below) (the "**DIP Facility Loans**") in the aggregate maximum principal amount of up to $25,000,000 (the "**Delayed Draw Commitment**").  All of the DIP Obligations and DIP Liens (each as defined below) shall have the benefit of Section 364(e) of the Bankruptcy Code.  Upon the making of any DIP Facility Loan, the commitments of the DIP Lenders shall be permanently reduced by the aggregate principal amount of the DIP Facility Loan so made.  Amounts of DIP Facility Loans repaid or prepaid may not re reborrowed.

An amount of up to approximately $7,500,000 (the "**Interim Advance**") of DIP Facility Loans approved by the Bankruptcy Court pursuant to the Interim Order (as defined below) shall be made available during the period from the date of entry of the Interim Order (the date of the initial funding of the DIP Facility Loans, the "**Closing Date**") by the Bankruptcy Court through the date of entry of the Final Order (as defined below) by the Bankruptcy Court, and the balance of the Delayed Draw Commitment shall be available only upon and after entry of the Final Order, at intervals and in amounts that correspond to the Approved Budget.  Pending the entry of the Final Order, the DIP Agent and the DIP Lenders shall be afforded all of the protections contained in the Interim Order.

The DIP Facility Loans, subject to the foregoing and other applicable conditions and consistent with past ordinary course processing procedures, must be requested no later than 11:00 AM New York time (i) three (3) business days

*TWC DIP Credit Facility Term Sheet*

prior to the requested date of funding for borrowings at LIBOR, or (ii) on the requested date for borrowings at the base rate.

The DIP Agent shall have the benefit of all deposit account control agreements to which the Pre-Petition Agent is a party as though it is the controlling party thereto on behalf of the DIP Lenders, all deposit account control agreements pursuant to Pre-Petition Third-Party Liens as a subordinated agent on behalf of the DIP Lenders, and t he benefit of a first priority perfected security interest in any unencumbered accounts on behalf of the DIP Lenders.

As further set forth in the DIP Credit Agreement, on the last Friday of each month (each, a "<u>Settlement Date</u>"), the DIP Agent shall apply all amounts on deposit in the Collection Account (as defined in the Pre-Petition Credit Agreement) at such time (i) 50% (or, at the election of the Majority DIP Lenders, a lesser percentage) to the repayment of outstanding DIP Obligations in accordance with the provisions of the DIP Credit Agreement and the Interim Order, and (ii) 50% (or, at the election of the Majority DIP Lenders, a greater percentage) to the repayment of outstanding Pre-Petition Obligations (such repayment described in clause (ii), the "**Monthly Adequate Protection Payment**"); provided, however, at the direction of the Majority DIP Lenders, on each Settlement Date, 100% of all amounts on deposit in the Collection Account shall be applied to the outstanding principal of the DIP Facility Loans.[1] Notwithstanding the foregoing, any amounts paid pursuant to the Monthly Adequate Protection Payment shall be subject to disgorgement to the extent provided by any final and non-appealable Challenge (as defined below).

All outstanding DIP Facility Loans and other outstanding DIP Obligations shall be due and payable on the Termination Date.

**Use of Proceeds:**     The DIP Facility Loans may be used only for post-petition working capital purposes of the Debtors, current interest and fees under the DIP Facility, the payment of adequate protection payments to the Pre-Petition Agent and the Pre-Petition Lenders, and the allowed administrative costs and expenses of the Cases (including, without limitation, costs associated with the Collection Proceedings), in each case, solely in accordance with the Approved Budget (subject to the Permitted Variance (as defined below)) and the Financing

---

[1] Funds will be distributed pursuant to a report prepared by the Pre-Petition Agent and agreed in advance by TWC Domestic LLC and the DIP Agent.

*TWC DIP Credit Facility Term Sheet*

Orders (as defined below) incorporating the terms hereof.

**DIP Facility Interest Rate and Fees:**

See Schedule 3 hereto.

**Priority and Security:**

All obligations of the Debtors under the DIP Facility (the "**DIP Obligations**") shall, subject to the Carve-Out (as defined below) be:

(i)  entitled to superpriority claim status under Section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code, including, without limitation, the pre-petition claims and adequate protection claims of the Pre-Petition Agent on behalf of the Pre-Petition Lenders, subject only to any Permitted Third-Party DIP Indebtedness (as defined below) and the Carve-Out.  The superpriority claims of the DIP Lenders may be repaid from any cash of the Debtors, including without limitation, Cash Collateral and any proceeds from Avoidance Actions (as defined below);

(ii)  secured, pursuant to Section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, first priority, priming, fully perfected, security interests in and liens upon all DIP Collateral (as defined below) comprising Pre-Petition Collateral (as defined below), subject and subordinate only to those liens on the Pre-Petition Collateral that, under applicable law, are senior to, and have not been subordinated to, the liens of the Pre-Petition Agent  (for the benefit of itself and the Pre-Petition Lenders) securing the Debtors' obligations under the Pre-Petition Loan Documents (the "**Pre-Petition Liens**"), but only to the extent that such liens are valid, enforceable and nonavoidable liens as of the Petition Date (collectively, "**Permitted Priority Liens**");

(iii)  secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens upon all of the DIP Collateral that is not encumbered by any of the Pre-Petition Liens or the Pre-Petition Third-Party Liens or any Permitted Third-Party DIP Liens; and

(iv)  secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected security interests in and liens on all of the DIP Collateral that, as of the Petition Date, was subject to any Pre-Petition Third-Party Lien that was perfected prior to the Petition Date or is perfected subsequent to the Petition Date as

*TWC DIP Credit Facility Term Sheet*

4

permitted by Section 546(b) of the Bankruptcy Code, subject and subordinate, with limited rights, only to such Pre-Petition Third-Party Liens and any Permitted Third-Party DIP Liens.[2]

The "**DIP Collateral**" comprises all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired post-petition (including, without limitation, subject to entry of the Final Order, the proceeds of all estate causes of action under Chapter 5 of the Bankruptcy Code (the "**Avoidance Actions**")), whether now existing or hereafter acquired or arising. DIP Collateral shall also include, and the DIP Liens shall automatically attach to, any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Agent or the DIP Lenders in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.

The "**DIP Liens**" comprise the liens and security interests granted to the DIP Agent for the benefit of the DIP Lenders in respect of the DIP Facility, as described in clauses (ii), (iii), and (iv) above.

The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of the Interim Order without the requirement of any further action by the DIP Agent or the DIP Lenders. The DIP Collateral shall, subject to the Carve-Out and any Permitted Third-Party DIP Liens, be free and clear of other liens, claims and encumbrances, except Pre-Petition Third-Party Liens. The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) subject to entry of the Final Order, any liens arising after the Petition Date (other than any Permitted Third-Party DIP Liens) including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, or (iii) any intercompany or affiliate liens of the Debtors.

"**Pre-Petition Third-Party Liens**" are valid, enforceable and nonavoidable security interests in and liens on DIP Collateral existing as of the Petition Date other than the Pre-Petition Liens (but including, for the avoidance of doubt,

---

[2] NTD: Awaiting information from the Company regarding available unencumbered assets and assets securing non-MUFG liens. The mechanics of adding liens on unencumbered assets and junior liens on encumbered non-TWCD assets remain TBD pending receipt of such information.

*TWC DIP Credit Facility Term Sheet*

Permitted Priority Liens).

**Use of Cash Collateral:**  All cash and cash equivalents of the Debtors comprising DIP Collateral, whenever or wherever acquired, and the proceeds of all DIP Collateral constitute cash collateral, as contemplated by Section 363 of the Bankruptcy Code ("**Cash Collateral**").  Cash Collateral may be used only for the working capital purposes of the Debtors, interest, fees and principal due under the DIP Facility, payment of adequate protection payments to the Pre-Petition Agent and Pre-Petition Lenders and the allowed costs and expenses of the Cases, in each case, solely in accordance with the Approved Budget (subject to the Permitted Variance) and the Financing Orders incorporating the terms hereof; <u>provided</u>, that (i) Cash Collateral in connection with the Pre-Petition Loan Documents may be used only for payment of adequate protection payments to the Pre-Petition Agent and Pre-Petition Lenders and interest, fees and principal due under the DIP Facility, and (ii) Cash Collateral in connection with collateral pledged to the holder of any other Pre-Petition Third-Party Lien shall be permitted to be used by such holder of the relevant Pre-Petition Third-Party Lien to repay the obligations secured by such Pre-Petition Third-Party Lien.

**Conditions Precedent:**  The closing of the DIP Facility and the Debtors' right to use Cash Collateral pursuant to the terms hereof will be subject to the satisfaction of all conditions precedent deemed necessary or appropriate by the DIP Agent and (as to the use of Cash Collateral) the Pre-Petition Agent, as applicable, including but not limited to:

(i)  Satisfactory completion of legal and collateral due diligence and transaction structuring, including due diligence concerning the DIP Collateral;[3]

(ii)  The receipt of all required court approvals of the DIP Facility and any other motions of the Debtors of concern to the DIP Lenders;[4]

(iii)  the DIP Agent shall have received sufficient commitments for the DIP Facility from the DIP Lenders;

(iv)  no later than 5 days prior to the Petition Date, the DIP Agent and the Pre-Petition Agent shall have received a cash forecast for the 18-week period commencing on the Petition Date setting forth projected cash flows and disbursements, in form, scope and substance acceptable

---

[3] NTD: This CP to be addressed prior to execution of the DIP Credit Agreement.
[4] NTD: To include, without limitation, any motions filed with respect to cash management, motions to use cash collateral of other creditors, KEIP/KERP, critical vendor, etc.

*TWC DIP Credit Facility Term Sheet*

to the DIP Agent and the Majority DIP Lenders and the Pre-Petition Agent and Required Lenders (as defined in the Pre-Petition Credit Agreement) (the "**Initial Approved Budget**");

(v) an interim debtor-in-possession financing/use of cash collateral order, in form and substance acceptable to the DIP Agent and the Majority DIP Lenders (as to the DIP Facility) and the Pre-Petition Agent and Required Lenders (as to the use of Cash Collateral), incorporating the terms hereof and containing such other provisions not inconsistent with the terms of the DIP Loan Documents as the DIP Agent and Majority DIP Lenders (as to the DIP Facility) and the Pre-Petition Agent and Required Lenders (as to the use of Cash Collateral) may require (the "**Interim Order**"), shall have been entered by the Bankruptcy Court within 5 days following the Petition Date (or such later date as the DIP Agent and the Pre-Petition Agent may agree) and shall not have been stayed, appealed, modified, reversed, or vacated. Notwithstanding anything to the contrary contained herein, funding of any Interim Advance shall be subject to entry of the Interim Order and funding of the balance of the commitments under the DIP Facility and continued authority to use Cash Collateral shall be subject to entry, within 35 days following the Petition Date (or such later date as the DIP Agent and the Pre-Petition Agent may agree), of a final debtor-in-possession financing/use of cash collateral order, in form and substance acceptable to the DIP Agent and Majority DIP Lenders (as to the DIP Facility) and the Pre-Petition Agent and Required Lenders (as to the use of Cash Collateral), incorporating the terms hereof and containing such other provisions not inconsistent with the terms of the DIP Loan Documents as the DIP Agent and Majority DIP Lenders (as to the DIP Facility) and the Pre-Petition Agent and Required Lenders (as to the continued use of Cash Collateral) may require (the "**Final Order**" and, together with the Interim Order, collectively, the "**Financing Orders**"), which has not been stayed, appealed, modified, reversed, or vacated;

(vi) all "first day" motions and proposed orders shall be reasonably acceptable to the DIP Agent and the Pre-Petition Agent, and orders approving such motions shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the DIP Agent and the Pre-Petition Agent;

(vii) the continued retention by the Debtors of Robert Del Genio (individually or through his firm, FTI Consulting)

*TWC DIP Credit Facility Term Sheet*

(or another individual or firm selected by Debtors and acceptable to the DIP Agent, the Pre-Petition Agent, the Majority DIP Lenders and the Required Lenders) as chief restructuring officer of the Debtors ("**CRO**") (subject to a period after the Closing Date for the related retention order to be entered),  on terms and scope of authority acceptable to the DIP Agent, the Pre-Petition Agent, Majority DIP Lenders and Required Lenders, which CRO shall have financial and legal control and report to the Board of Directors, or similar body, of each Debtor;

(viii)   the continued retention by the Debtors of Moelis & Company (or another investment bank selected by Debtors and acceptable to the DIP Agent, the Pre-Petition Agent, the Majority DIP Lenders and the Required Lenders) as investment bank (the "**Investment Bank**"), on terms reasonably acceptable to the DIP Agent, the Pre-Petition Agent, the Majority DIP Lenders and the Required Lenders, to market the assets of the Debtors in connection with obtaining a Stalking Horse Bidder (as defined below) and assist the Debtors with obtaining Bankruptcy Court approval of such sale pursuant to Section 363 of the Bankruptcy Code;

(ix) the execution and delivery, in form and substance acceptable to the DIP Agent and the DIP Lenders, of a definitive credit agreement (the "**DIP Credit Agreement**") and related security agreement(s), guarantees, pledge agreements, mortgages, and other agreements, opinions, instruments and documents required by the DIP Agent and the DIP Lenders (collectively, and together with the DIP Credit Agreement, the "**DIP Loan Documents**");

(x) reimbursement in full in cash of the professional fees, costs and expenses of the Pre-Petition Agent, the Pre-Petition Lenders, the DIP Agent and the DIP Lenders (it being understood that the reimbursement of fees and expenses may be subject to a court-imposed review period);

(xi) there shall have been, since the Petition Date: (a) other than those customarily resulting from the commencement of the Cases, no material adverse change, individually or in the aggregate, in the business, prospects, operations, property, assets, or condition, financial or otherwise, of the Debtors or any Borrower, or the DIP Collateral, (b) no material increase in the liabilities which could be expected to have a material impact on the DIP Liens or the Pre-Petition Liens,

including without limitation liquidated or contingent liabilities, of the Loan Parties or any Borrower, or material decrease in the assets of the Loan Parties, and (c) other than those resulting from the commencement of the Cases, no adverse change in the ability of the DIP Agent and the DIP Lenders to enforce the DIP Loan Documents and the obligations of the Loan Parties thereunder; and

(xii) such other deliverables as the DIP Agent and the Pre-Petition Agent may reasonably require.

Modifications of the Financing Orders shall require approval of the DIP Agent and, with respect to the use of Cash Collateral, the Pre-Petition Agent.

**Representations and Warranties:**

The DIP Loan Documents will contain the representations and warranties made by the Debtors under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents, modified as necessary to reflect the filing of the Cases and the Debtors' financial condition, other customary carve-outs and exceptions for debtor-in-possession financing, and with such other modifications and such other representations and warranties as the DIP Agent may require.

**Sale Process Covenants:**

The Debtors shall take the following actions (or obtain the following approvals, as applicable) promptly, and in no event later than the following dates (each, a "**Sale Process Covenant**"):

(i) On the Petition Date, file a motion under Section 363 of the Bankruptcy Code ("**Sale Motion**") to sell all or substantially all of their respective assets to a purchaser reasonably acceptable to the DIP Agent, the Majority DIP Lenders, the Pre-Petition Agent, and the Required Lenders (the "**Stalking Horse Bidder**") under an asset purchase agreement, in form and substance reasonably acceptable to the DIP Agent, the Majority DIP Lenders, the Pre-Petition Agent, and the Required Lenders, subject to the receipt of "higher and better" bids (the "**Approved Sale**")[5], together with a motion ("**Bidding Procedures Motion**") for approval of bidding procedures (the "**Bidding Procedures**"), in each case, in form and substance reasonably acceptable to the DIP Agent and the Pre-Petition Agent. The Bidding Procedures shall specifically provide that the Debtors shall solicit bids on their assets in bulk and by asset, specifically allowing bidders to bid solely on the film

---

[5] NTD: Asset value allocation of the Pre-Petition Collateral to be determined prior to the time of sale approval.

*TWC DIP Credit Facility Term Sheet*

library serving as Pre-Petition Collateral (without necessity to bid on the entirety of the Debtors' business or any other assets). The Stalking Horse Bidder may be the Pre-Petition Agent or its designee pursuant to a credit bid, which credit bid right shall be expressly reserved for the benefit of the Pre-Petition Agent in the Financing Orders, whether pursuant to an Auction (as defined below) or plan of reorganization under Section 1129 of the Bankruptcy Code;

(ii) obtain Bankruptcy Court approval, pursuant to an order (the "**Bidding Procedures Order**") in form and substance reasonably acceptable to the DIP Agent and the Pre-Petition Agent, of the Bidding Procedures no later than 35 days after the Petition Date;

(iii) conduct, subject to Bankruptcy Court approval, an auction in accordance with the Bidding Procedures (the "**Auction**") no later than 60 days after entry of the Bidding Procedures Order;

(iv) obtain Bankruptcy Court approval, in form and substance acceptable to the DIP Agent and the Pre-Petition Agent, of the Approved Sale to the successful bidder (the "**Approved Sale Order**") no later than 10 business days after completion of the Auction; and

(v) consummate the Approved Sale by no later than 125 after the Petition Date.

Neither the Bidding Procedures nor the Approved Sale Order nor any of the other approvals described above shall be amended or otherwise modified without the consent of the DIP Agent and the Pre-Petition Agent.

The Sale Order shall provide that any and all net proceeds of the Approved Sale shall be paid concurrently with the consummation of the Approved Sale, first to the DIP Agent, on behalf of the DIP Lenders, to be applied against and in full satisfaction and indefeasible payment of the DIP Obligations, subject to and in accordance with the DIP Credit Agreement; and second, to be paid to the Pre-Petition Agent, on behalf of the Pre-Petition Lenders, to be applied against and in full satisfaction and indefeasible payment of the Pre-Petition Loans, subject to and in accordance with the Pre-Petition Credit Agreement.

**Reporting and Information:**   The DIP Loan Documents will contain (i) the reporting and information covenants made by the Debtors under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents, including, without limitation, the provision to

*TWC DIP Credit Facility Term Sheet*

the DIP Agent of all reports currently provided by the Debtors to the Pre-Petition Agent related to the Borrowing Base (as defined in the Pre-Petition Credit Agreement), and (ii) such other reporting and information covenants as the DIP Agent may require, taking into account the debtor-in-possession status of the Debtors, to include, without limitation, weekly updates on the auction process (including, without limitation, full copies of any preliminary and final bids received), and a receivable servicing report provided every two weeks to the DIP Agent and the Pre-Petition Agent in a form to be agreed outlining the servicing status of the Borrowers' and Guarantors' accounts receivable (including, but not limited to, status of (i) delivery of items necessary for the obligor to exploit, (ii) invoicing, and (iii) estimated cash receipt date) and outlining Borrowers' and Guarantors' employees responsible for completing the servicing and collection process.

Without limiting the generality of the foregoing, the Debtors shall (i) deliver to the DIP Agent and the Pre-Petition Agent, no later than Tuesday of each week for the week ended on the previous Saturday, a Variance Report (as defined below), and (ii) provide such other information (including access to the Debtors' books, records, personnel and advisors) as the DIP Agent or the Pre-Petition Agent may reasonably request. All such reporting shall be in form and with sufficient detail as is acceptable to the DIP Agent and the Pre-Petition Agent in their respective sole discretion.

**Budget; Variance Covenant:**     The Initial Approved Budget may be modified or supplemented from time to time by additional budgets prepared by the Debtors and consented to in advance, in their respective sole and absolute discretion, by the DIP Agent, the Majority DIP Lenders, the Pre-Petition Agent, and the Required Lenders, without subsequent notice to or order of the Court (each such additional budget, a "Supplemental Approved Budget" and together with the Initial Approved Budget, the "Approved Budget"). No later than the date that is the four-week anniversary of the Closing Date, the Debtors shall deliver to the DIP Agent and the Pre-Petition Agent a supplement to the Initial Approved Budget setting forth all projected cash receipts and disbursements (by line item) of the Debtors and their subsidiaries on a weekly basis for the upcoming four-week period, which shall be delivered once every four weeks (and such supplement, if approved by the Administrative Agent and Pre-Petition Agent, shall thereafter become part of the Approved Budget, and such Approved Budget, as supplemented, shall replace the then-operative Approved Budget for all purposes weeks (each, a "**Proposed Budget**"). Upon the Debtors' receipt of the DIP Agent's and the Prep-Petition Agent's consent to a Proposed Budget, such

budget shall become an "**Approved Budget**" and shall replace the then operative Approved Budget for all purposes. The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance). The Debtors may submit additional Proposed Budgets to the DIP Agent and the Pre-Petition Agent, but until the DIP Agent and the Pre-Petition Agent consent to such Proposed Budget, no Proposed Budget shall become an Approved Budget and the Debtors shall continue to comply with the then operative Approved Budget (subject to the Permitted Variance).

No later than 4:00 p.m. Pacific time on Tuesday of each week (commencing with the Tuesday falling during the first full calendar week after the Petition Date), the Debtors shall provide to the DIP Agent and the Prepetition Agent a report detailing the actual disbursements and receipts by the Debtors for the preceding week versus the line items contained in the Approved Budget for such period, as well as an explanation of any variances for each line item (a "**Variance Report**").

The Debtors shall comply with the following (collectively, the "**Variance Covenant**"):

For any four-week rolling period, the Debtors' actual total disbursements excluding disbursements with respect to professional and advisor fees shall not exceed the budgeted total disbursements in the Approved Budget for the same four-week period by more than $600,000 in the aggregate, which requirement shall be tested, initially, upon the completion of three calendar weeks following the Petition Date and, thereafter, on a weekly basis. The foregoing permitted variances from the Approved Budget are collectively referred to herein as the "**Permitted Variance**".

**Affirmative and Negative Covenants:**

The DIP Loan Documents will contain the affirmative and negative covenants made by the Debtors under the Pre-Petition Credit Agreement and the other Loan Documents, with such modifications thereto and such other affirmative and negative covenants as the DIP Agent and the DIP Lenders shall require, taking into account the nature of the assets, operations and condition of the Debtors (including changes and modifications to remove any terms and provisions related to a borrowing base and requirements

*TWC DIP Credit Facility Term Sheet*

associated therewith).

Without limiting the foregoing, the DIP Credit Agreement shall provide that (i) at the written request of the DIP Agent (each a "**Request for Delinquency Proceeding**"), the Debtors shall (a) commence, within ten (10) business days of receipt of such Request for Delinquency Proceeding, one or more adversary proceedings against any third party identified in the Request for Delinquency Proceeding who has failed to make material payment when due to the Debtors of monies comprising Pre-Petition Collateral (collectively, the "**Delinquent Parties**") by filing one or more complaints, in form and substance reasonably acceptable to the DIP Agent and the Pre-Petition Agent, demanding payment by the Delinquent Parties of all delinquent amounts owed by the Delinquent Parties to the Debtors pursuant to the Debtors' agreements with the Delinquent Parties (the "**Collection Proceedings**"), with the costs associated with the Collection Proceedings to be funded using the proceeds of the DIP Facility Loans, (b) continue to prosecute the Collection Proceedings and use their respective best efforts to collect all amounts due to the Debtors' estates from the Delinquent Parties, and (c) consult with the DIP Agent and the Pre-Petition Agent in respect of any pleadings to be filed by the Debtors in the Collection Proceedings prior to filing such pleadings, provided that, for the avoidance of doubt, all recoveries obtained by the Debtors in any Collection Proceeding constituting a recovery of a receivable attributable to Pre-Petition Collateral under the Pre-Petition Loan Documents shall be applied by the Debtors to repayment of the Pre-Petition Obligations (as defined below);[6] and (ii) if the Debtors elect not to proceed with a sale of substantially all of their assets or do not receive any acceptable bids for the sale of substantially all of their assets, the Debtors shall nonetheless proceed with a sale, subject to the DIP Agent's and the Pre-Petition Agent's credit bid rights under section 363(k) of the Bankruptcy Code and all other applicable laws, of all of the Pre-Petition Collateral in a manner that complies with the deadlines (as may be extended by the DIP Agent and the Pre-Petition Agent, in their reasonable discretion) and the other provisions of the Sale Process Covenants, with the sole modification thereto being the scope of the assets being auctioned and sold.

Although the DIP Loans shall not include a borrowing base component, the DIP Loan Documents shall include borrowing base reporting, as required under the Pre-Petition

---

[6] NTD: Need to discuss interaction with Stalking Horse bid, and allow for selection of counsel and diligence for filing.

*TWC DIP Credit Facility Term Sheet*

Credit Agreement.

| | |
|---|---|
| **Events of Default**: | "**Events of Default**" shall include the occurrence of the usual and customary events of default for debtor-in-possession credit facilities administered by the DIP Agent of this size, type, and purpose, which shall be acceptable to the DIP Agent and the Majority DIP Lenders, including but not limited to the following: |

(i)   The Interim Order at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended without the prior written consent of the DIP Agent, the Majority DIP Lenders, the Pre-Petition Agent, and the Required Lenders;

(ii)  The Final Order shall not have been entered within 35 days after the Petition Date (or such later date as the DIP Agent and the Pre-Petition Agent may agree) or at any time after its entry ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended without the prior written consent of the DIP Agent, the Majority DIP Lenders, the Pre-Petition Agent, and the Required Lenders;

(iii) Breach by any Debtor of (a) compliance with the Approved Budget (subject to the Permitted Variance), (b) any Sale Process Covenant, (c) the affirmative and negative covenants specifically set forth herein, or (d) any other covenant or agreement contained in the DIP Loan Documents or in the Financing Orders, subject, in the case of the foregoing clauses (c) and (d), to a grace period to be agreed;

(iv) (a) Any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (b) a Chapter 11 Trustee, a receiver, or an examiner with enlarged powers relating to the operation of the business of any Debtor shall be appointed in any of the Cases, (c) any other superpriority claim (other than the Carve-Out or with respect to Pre-Petition Third-Party Liens or any Permitted Third-Party DIP Indebtedness) or grant of any other lien (including any adequate protection lien) which is *pari passu* with or senior to the claims and liens of the DIP Agent or the Pre-Petition Agent shall be granted in any of the Cases, or (d) the filing of any motion seeking the appointment of a Chapter 11 Trustee, a receiver, or an examiner with enlarged powers relating to the operation of the business of any Debtor, or the filing by any Debtor of any pleading seeking or otherwise consenting to or supporting any of the matters set forth

*TWC DIP Credit Facility Term Sheet*

in clause (a) or clause (b) of this subsection (iv);

(v) Other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget (subject to the Permitted Variance) (A) in respect of accrued payroll and related expenses as of the commencement of the Cases, (B) in respect of adequate protection payments set forth herein and consented to by the DIP Agent and the Majority DIP Lenders, and (C) in respect of certain critical vendors and other creditors, in each case to the extent authorized by one or more "first day" or other orders reasonably satisfactory to the DIP Agent, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables (including without limitation, reclamation claims);

(vi) The filing of any motion seeking an order from the Bankruptcy Court substantively consolidating any of the Debtors' estates;

(vii) The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor that have an aggregate value in excess of $[●];

(viii)    The Termination Date (as defined below) shall have occurred;

(ix) An "Event of Default" under the DIP Loan Documents shall have occurred (such "Events of Default" to include certain events of default under the Pre-Petition Loan Documents (other than events of default arising solely as a result of the filing of the Cases or the Debtors' financial condition), and such other events of default as the DIP Agent and DIP Lenders shall require);

(x) The filing by the Debtors of any plan of reorganization or liquidation, or the taking of any action in support of the filing of a plan of reorganization or liquidation by a party other than the Debtors, in each case other than in respect of an Acceptable Plan (as defined below), without the prior written consent of the DIP Agent, the Pre-Petition Agent, the Majority DIP Lenders and the Required Lenders or the termination of the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

*TWC DIP Credit Facility Term Sheet*

(xi) Any Debtor petitions the Bankruptcy court to obtain additional financing *pari passu* or senior to the DIP Facility, other than any Permitted Third-Party DIP Indebtedness;

(xii)(A) The Debtors engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Pre-Petition Loan Documents or the liens on or security interest in the assets of the Debtors securing the DIP Obligations or the obligations of the Debtors under the Pre-Petition Loan Documents (the "**Pre-Petition Obligations**") (other than to seek a determination that an Event of Default has not occurred or is not continuing), including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (B) the Debtors engage in or support any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Agent, any DIP Lender, the Pre-Petition Agent or any Pre-Petition Lender; provided, however, that it shall not constitute an Event of Default if any of the Debtors provides information with respect to the Pre-Petition Loan Documents to a party in interest or is compelled to provide information by an order of the Bankruptcy Court and provides prior written notice to the DIP Agent and the Pre-Petition Agent of any intention or requirement to do so;

(xiii)   Any person shall obtain a Section 506(a) judgment or similar determination with respect to the Pre-Petition Obligations that is adverse to the Pre-Petition Agent and Required Lenders;

(xiv)   The allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the DIP Collateral;

(xv) The consummation of a sale of any material portion of the DIP Collateral (other than a sale in the ordinary course of business that is contemplated by the Approved Budget) other than pursuant to an Approved Sale or as otherwise permitted under the DIP Loan Documents;

(xvi)   The allowance of any claim or claims under Section 546(c) or 503(b)(9) of the Bankruptcy Code that is not contemplated in the Approved Budget (subject to the Permitted Variance) or is otherwise unacceptable to the DIP Agent and Majority DIP Lenders;

*TWC DIP Credit Facility Term Sheet*

(xvii)   The filing with the Bankruptcy Court, prior to the consummation of the Approved Sale and indefeasible payment in full in cash of all DIP Obligations and Pre-Petition Obligations, of any disclosure statement or plan of reorganization or liquidation that has not been approved, in form and substance, by the DIP Agent, the Pre-Petition Agent, the Majority DIP Lenders and the Required Lenders;

(xviii)   the statutory committee of unsecured creditors (the "**Creditors' Committee**"), if any, appointed in the Cases, or any other party in interest, shall file a complaint or pleading or initiate any other action against the DIP Agent, any of the DIP Lenders, the Pre-Petition Agent or any of the Pre-Petition Lenders, or otherwise file an objection to the claims, or seek to avoid the liens, held by any such party; or

(xix)   Such other events of default as the DIP Agent may require.

Upon the occurrence and during the continuance of any Event of Default beyond the applicable grace period (if any) set forth above, upon the direction of the Majority DIP Lenders, the DIP Agent shall accelerate the DIP Obligations and, thereafter, may take all or any of the following actions without further order of or application to the Bankruptcy Court, underlined provided that in the case of the enforcement of liens or other remedies with respect to DIP Collateral pursuant to clause (2) below, the DIP Agent shall provide the Debtors (with a copy to any counsel for the Creditors' Committee appointed in the Cases and to the United States Trustee) with five (5) calendar days prior written notice (the "**Remedies Notice Period**") during which time any such party must file a pleading seeking an emergency hearing in opposition to the DIP Agent's exercise of its rights and remedies and provided further, that in any hearing following such notice, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the DIP Agent shall be whether, in fact, an Event of Default has occurred and is continuing:

(1)   declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable, terminate, as applicable, any further commitments under the DIP Facility, and/or terminate, as applicable, the right of the Debtors to use Cash Collateral (other than the Carve-Out); and

(2)   charge the default rate of interest under the DIP Facility and take any other action or exercise any other right or

*TWC DIP Credit Facility Term Sheet*

remedy (including without limitation, with respect to the liens in favor of the DIP Agent on behalf of the DIP Lenders) permitted under the DIP Loan Documents or applicable law.

Unless during the Remedies Notice Period the Bankruptcy Court determines that an Event of Default has not occurred (or that no Event of Default that has occurred is continuing), the DIP Agent shall have relief from the automatic stay without further notice or order and may foreclose on all or any portion of the DIP Collateral or otherwise exercise remedies against the DIP Collateral.

Without limiting the foregoing, subject to the Remedies Notice Period, upon the occurrence and during the continuation of an Event of Default, each DIP Lender (and its respective affiliates, including its various branches and offices) shall have the authority, subject to obtaining the prior written consent of the DIP Agent and to the fullest extent permitted by applicable law, to set off and apply any and all deposits (of whatever type and in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such DIP Lender (or its affiliate) to or for the credit or account of any Borrower against any and all of the DIP Obligations of such Borrower to such Lender. The foregoing right of setoff shall apply irrespective of whether such DIP Lender has made any demand under the DIP Loan Documents and even if the DIP Obligations of the Borrower are contingent or unmatured.

"**Acceptable Plan**" shall mean a plan of reorganization or liquidation for each of the Cases, acceptable in form and substance to the DIP Agent, the Majority DIP Lenders, the Pre-Petition Agent and the Required Lenders, that (i) provides for the termination of the unused commitments under the DIP Facility, (ii) provides for the indefeasible payment in full in cash of the DIP Obligations and the Pre-Petition Loan Documents, in exchange for full discharge thereof, on or prior to the effective date of the plan as a condition to the effectiveness thereof, and (iii) contains releases and other exculpatory provisions for the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders in form and substance satisfactory to the DIP Agent and the Majority DIP Lenders (as to the DIP-related release and exculpation) and the Pre-Petition Agent and the Pre-Petition Required Lenders (as to the DIP-related release and exculpation).

**Maturity/Termination Date:**   The DIP Facility and the Debtors' right to use Cash Collateral (as applicable) shall automatically terminate without further notice or court proceedings on the earliest to occur of (i) 125 days after the Petition Date (the "**Scheduled**

*TWC DIP Credit Facility Term Sheet*

**Maturity Date**"); (ii) the date of acceleration of any outstanding borrowings under the DIP Facility pursuant to an Event of Default; (iii) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto; (iv) conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent and Majority DIP Lenders; (v) dismissal of any of the Cases, unless otherwise consented to in writing by the DIP Agent and the Majority DIP Lenders; (vi) the date of consummation of the sale of substantially all assets of the Debtors or the sale of substantially all assets of the Debtors comprising Pre-Petition Collateral; and (vii) the effective date of any Debtor's plan of reorganization confirmed in the Cases (the "**Termination Date**"), unless extended pursuant to the terms of the DIP Credit Agreement.

**Permitted Third-Party DIP Indebtedness:**

The Debtors shall be entitled to seek authority to incur, and incur, additional senior secured, superpriority debtor-in-possession indebtedness in an aggregate principal amount not to exceed $10,000,000, which indebtedness may be secured solely by Permitted Third-Party DIP Liens (as defined below) and may have administrative claim status ("**Permitted Third-Party DIP Indebtedness**").

"**Permitted Third-Party DIP Liens**" shall mean security interests in and liens on any Permitted Third-Party DIP Collateral (as defined below) in favor of the providers of any Permitted Third-Party DIP Indebtedness and their Related Parties (as defined in the DIP Credit Agreement) to secure the obligations of one or more Debtors in respect of such Permitted Third-Party DIP Indebtedness, which such security interest or liens may have priority over any liens on Permitted Third-Party DIP Collateral securing the DIP Obligations.

"**Permitted Third-Party DIP Collateral**" shall mean all of Weinstein Television LLC's right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, Weinstein Television LLC (including under any trade name or derivations thereof), and whether owned or consigned by or tow, or leased from or to, Weinstein Television LLC, and regardless of where located.

**Adequate Protection:**

The Pre-Petition Agent shall receive the following as adequate protection for the benefit of the Pre-Petition Lenders:

*TWC DIP Credit Facility Term Sheet*

(i)    a superpriority claim under Section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or hereafter arising, provided, however, that such superpriority claim shall be junior and subject to the superpriority claim of the DIP Agent for the benefit of the DIP Lenders in respect of the DIP Facility, the Carve-Out, and any Permitted Third-Party DIP Indebtedness;

(ii)    valid, enforceable, fully perfected security interests in and replacement liens on the DIP Collateral, subordinate only to (a) the DIP Liens, (b) the Pre-Petition Third-Party Liens, (c) the Carve-Out, and (d) any Permitted Third-Party DIP Liens;

(iii)    the reasonable, documented fees, costs and expenses incurred or accrued by the Pre-Petition Agent (the foregoing to include all unpaid prepetition fees, costs and expenses) in connection with any and all aspects of the Debtors' Cases, and including the reasonable fees and expenses of all the legal and financial advisors to the Pre-Petition Agent and the Pre-Petition Lenders (including Sidley Austin LLP, Young Conaway Stargatt & Taylor, LLP and Houlihan Lokey) and other professionals, hired by or on behalf of the Pre-Petition Agent; and

(iv) (a) upon closing of the DIP Facility, payment of all accrued and unpaid non-default interest and fees then owing under the Pre-Petition Credit Agreement, and (b) subject to the DIP Agent's right, at the direction of the Majority DIP Lenders, to revoke in writing its consent to such application (which revocation shall be effective immediately upon delivery thereof to the Pre-Petition Agent and the Borrowers, by email or otherwise) and disgorgement to the extent of a final and non-appealable Challenge, payment of the Monthly Adequate Protection payment, to be applied by the Pre-Petition Agent to repayment of the Pre-Petition Obligations (including, without limitation, outstanding principal and the current monthly payment of post-petition non-default interest and fees (to the extent not covered in clause (iii) above) under the Pre-Petition Credit Agreement (provided, for the avoidance of doubt, that default interest will continue to accrue pursuant to the terms of the Pre-Petition Credit Agreement)) in accordance with the Pre-Petition Loan Documents;

provided, however, that (x) the adequate protection claims and liens described in the preceding clauses (i) and (ii) shall be granted only to the extent of any diminution in the value of any Cash Collateral or other collateral arising as a result of (A) the use, sale, or lease of Cash Collateral or other

*TWC DIP Credit Facility Term Sheet*

collateral, (B) the granting of priming liens to secure the DIP Facility or (C) the imposition of the automatic stay, and (y) the adequate protection claim described in the preceding clause (i) and the adequate protection liens described in the preceding clause (ii) shall not attach to the proceeds of any Avoidance Actions until entry of the Final Order.[7]

The foregoing adequate protection liens shall be deemed automatically perfected as of the Petition Date without further action, although if the DIP Agent and/or the Pre-Petition Agent determine to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be lifted to allow such filings.

**Carve-Out:**

The "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United State Code (plus any applicable interest at the statutory rate) for the period up to the occurrence of a Carve-Out Trigger (as defined below), (ii) the budgeted (subject to the Permitted Variance), documented and unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Trigger by the persons or firms retained by the Debtors as estate professionals (collectively, the "**Professionals**") and payable under sections 330 and 331 of the Bankruptcy Code, to the extent allowed by an order of the Bankruptcy Court (whether allowed prior to or after the occurrence of the Carve-Out Trigger), subject to the terms of the Financing Orders and any other compensation and other orders entered by the Bankruptcy Court (including limits imposed on use of the proceeds of the DIP Facility Loans and Cash Collateral for payment of fees and expenses incurred in connection with the investigation, assertion and/or prosecutions of claims and defenses against any of the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the DIP Lenders); and (iii) up to a maximum amount of $100,000 of unpaid documented fees, costs and expenses accrued or incurred by Professionals following the occurrence of the Carve-Out Trigger, payable under sections 330 and 331 of the Bankruptcy Code and subsequently allowed by order of the Bankruptcy Court (and, if applicable, in compliance with the Approved Budget (subject to the Permitted Variance));

A "**Carve-Out Trigger**" occurs upon delivery (by email or otherwise) by the DIP Agent of written notice to the Debtors, the Debtors' lead bankruptcy counsel, the United States

---

[7] In the event of an objection, the Pre-Petition Agent shall have authority from the Pre-Petition Lenders to negotiate regarding the treatment of the Avoidance Actions.

Trustee, and lead counsel for the Creditor's Committee of the occurrence and continuance of an Event of Default.

Nothing herein shall be construed to impair the ability of any party in interest to object to any of the fees, expenses, reimbursement or compensation sought by the Professionals retained by the Debtors or any statutory committee appointed in the Cases.[8]

None of the Carve-Out, any Cash Collateral, the DIP Facility Loans, the DIP Collateral, or the Pre-Petition Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility Documents, the Pre-Petition Loan Documents, the DIP Obligations, the Pre-Petition Obligations, or the security interests and liens securing any of the DIP Obligations or the Pre-Petition Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Agent, any DIP Lender, the Pre-Petition Agent or any Pre-Petition Lender (in each case, other than to seek a determination that an Event of Default has not occurred or is not continuing), <u>provided</u> that up to $50,000 shall be made available to the official statutory unsecured creditors' committee, if any, appointed in the Cases (the "**Creditors' Committee**") for investigation costs in respect of the stipulations contemplated below or otherwise set forth in the Financing Orders.

**Section 506(c) Waiver:**   The Final Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any collateral pursuant to Section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent and the Pre-Petition Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders.  In no event shall any of the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Facility Loans or the Pre-Petition Loans.

**Section 552(b):**   Upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders shall be entitled to all of the rights and benefits of Section

---

[8] The DIP Agent to have authority to negotiate an additional small carve-out for Creditors Committee professionals, if a Committee is appointed.

*TWC DIP Credit Facility Term Sheet*

552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under Section 552(b) of the Bankruptcy Code.

Furthermore, upon entry of the Final Order, the Debtors and their estates shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders on any property acquired by any of the Debtors or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders upon the DIP Collateral or the Pre-Petition Collateral, as applicable.

**No Priming or Pari Passu Liens:**

No order shall be entered authorizing or approving any liens or encumbrances (i) on the DIP Collateral senior or *pari passu* with the liens of the DIP Agent, for the benefit of the DIP Lenders other than in respect of the Carve-Out, the Pre-Petition Third-Party Liens, and any Permitted Third-Party DIP Liens, or (ii) except for the liens of the DIP Agent, on the Pre-Petition Collateral senior to or *pari passu* with the liens of the Pre-Petition Agent for the benefit of the Pre-Petition Lenders, other than in respect of the Carve-Out.

**Acknowledgement/Stipulations:**

The Debtors shall stipulate and acknowledge (i) to the amount, validity, priority and enforceability of the Obligations under the Pre-Petition Loan Documents, (ii) that the Pre-Petition Agent for the benefit of the Pre-Petition Lenders has a valid, enforceable and fully perfected first priority lien in all of the collateral under the Pre-Petition Loan Documents (the "**Pre-Petition Collateral**"), including Cash Collateral, and all proceeds thereof, subject only to the DIP Liens, the Permitted Priority Liens and the Carve-Out, and (iii) that the Pre-Petition Collateral is declining in value. The Debtors shall provide a full release to the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders, which would not bind the Creditors' Committee or other party in interest until the expiration of the period described in the paragraph below titled "Challenge Period".

*TWC DIP Credit Facility Term Sheet*

**Reservation of Rights:** The adequate protection provisions contained herein shall be without prejudice to the rights of the Pre-Petition Agent on behalf of the Pre-Petition Lenders to seek any other, further or additional adequate protection. Nothing herein or in the Financing Orders shall be deemed to waive, modify or otherwise impair the rights of the Pre-Petition Agent or the Pre-Petition Lenders, and the Pre-Petition Agent and the Pre-Petition Lenders expressly reserve all of their respective rights and remedies under the Pre-Petition Loan Documents and applicable law in connection with all defaults and Events of Default. Without limiting the foregoing, nothing herein shall have the effect of, or shall be construed as having the effect of, amending or waiving any covenant, term or provision of the Pre-Petition Credit Agreement or any Pre-Petition Loan Document, or any rights or remedies of the Pre-Petition Agent and the Pre-Petition Lenders thereunder, including (without limitation) any right to require strict compliance with such covenant, term or provision despite any consent or agreement contained herein.

**Challenge Period:** The Financing Orders shall establish a deadline that (i) in the case of a Creditors' Committee, is within the earlier of sixty (60) days from the date of the appointment of the Creditors' Committee and seventy-five (75) days from the Petition Date, or (ii) in the case of any other party in interest, is within seventy-five (75) days[9] of the entry of the Interim Order, by which the Creditors' Committee, creditor or other party-in-interest (in any case, which has obtained the requisite standing) must commence an adversary proceeding, if at all, against the Pre-Petition Agent or the Pre-Petition Lenders for the purpose of challenging the validity, extent, priority, perfection and enforceability of the pre-petition secured debt under the Pre-Petition Credit Agreement or the other Pre-Petition Loan Documents, or the liens, claims and security interests in the Pre-Petition Collateral in favor of the Pre-Petition Agent or the Pre-Petition Lenders or otherwise asserting any claims or causes of action against the Pre-Petition Agent or such Pre-Petition Lenders on behalf of the Debtors' estates (the "Challenge"); provided, however, that nothing contained in this term sheet, the DIP Loan Documents or the Financing Orders shall be deemed to confer standing on the Creditors' Committee or any other party in interest to commence such an adversary proceeding. If such an adversary proceeding is not commenced within such period, then the Pre-Petition Agent and the Pre-Petition Lenders shall automatically receive full waivers and releases provided in the Financing Orders and the liens of the Pre-Petition Agent on behalf of the Pre-Petition Lenders shall be

---

[9] Deadlines to be coordinated with Sale Process Covenants in order to provide that liens of Pre-Petition Agent are validated prior to auction, which will provide for an adequate challenge period.

*TWC DIP Credit Facility Term Sheet*

valid, perfected, enforceable and unavoidable without any further action by the Pre-Petition Agent or Pre-Petition Lenders under the terms of the Financing Orders.

**Expenses**:

The reasonable, documented fees, costs and expenses incurred or accrued by the DIP Agent and the DIP Lenders (the foregoing to include all unpaid prepetition fees, costs and expenses incurred by the DIP Agent in connection with the DIP Facility) in connection with any and all aspects of the Debtors' Cases,   including, without limitation, the reasonable, documented fees and expenses of legal counsel (Sidley Austin LLP and Young Conaway Stargatt & Taylor, LLP) and other professionals (including Houlihan Lokey) hired by or on behalf of the DIP Agent or any DIP Lender, shall be payable by the Debtors under the DIP Facility on a monthly basis, promptly upon submission by such professional of a summary invoice setting forth such fees, costs and expenses, subject to the terms of the Financing Orders.

**Indemnification**:

The Debtors shall agree to indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other Person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.   All such indemnity obligations shall constitute DIP Obligations entitled to the priority and security described in the paragraph above entitled "Priority and Security."

**Confidentiality**:

Except as required by law or in connection with the implementation of this Term Sheet, the terms hereof will be kept strictly confidential by each of the Debtors and may only be disclosed to such Debtor's affiliates, legal counsel,

*TWC DIP Credit Facility Term Sheet*

financial advisors and consultants who have been informed of, and agree to abide by, the confidentiality of this Term Sheet. To the extent that any disclosure becomes legally required, the DIP Agent shall be notified promptly and before the required disclosure is made.

**Governing Law:**

The laws of the State of New York (excluding the laws applicable to conflicts or choice of law other than New York General Obligation Law Section 5-1401), except as governed by the Bankruptcy Code.

**Miscellaneous:**

This summary of terms and conditions does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Agent and the DIP Lenders, taking into account the debtor-in-possession status of the Debtors.

**Schedule 1**

**Debtors**

Avenging Eagle SPV, LLC
Branded Partners LLC
Check Hook LLC
CTHD 2 LLC
Cues TWC (ASCAP), LLC
Current War SPV, LLC
DRT Films, LLC
DRT Rights Management LLC
FFPAD, LLC
HRK Films, LLC
InDirections LLC
InteliPartners LLC
ISED, LLC
MarcoTwo, LLC
One Chance LLC
PA Entity 2017, LLC
Paddington 2, LLC
PS Post LLC
Scream 2 TC Borrower, LLC
Small Screen Productions LLC
Small Screen Trades LLC
Spy Kids TV Borrower, LLC
Team Players LLC
The Actors Group LLC
The Giver SPV, LLC
The Weinstein Company Holdings LLC
The Weinstein Company LLC
Tulip Fever LLC
TWC Borrower 2016, LLC
TWC Domestic LLC
TWC Fearless Borrower, LLC
TWC Library Songs (BMI), LLC
TWC Loop LLC
TWC Mist, LLC
TWC Polaroid SPV, LLC
TWC Production-Acquisition Borrower 2016, LLC
TWC Production, LLC
TWC Replenish Borrower, LLC

TWC Short Films, LLC
TWC Untouchable SPV, LLC TWC Waco SPV, LLC Twenty O Five Holdings, LLC
W Acquisition Company LLC
WC Film Completions, LLC
Weinstein Books, LLC
Weinstein Development LLC
Weinstein Global Funding Corp.
Weinstein Global Film Corp.
Weinstein Productions LLC
Weinstein Television LLC
WTV Guantanamo SPV, LLC
WTV JCP Borrower 2017, LLC
WTV Kalief Browder Borrower, LLC
WTV Scream 3 SPV, LLC
WTV Yellowstone SPV, LLC

**Schedule 2**

**DIP Lender Commitments**[10]

| Lender | Commitment |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

---

[10] Pending delivery of financial projections.

**Schedule 3**

**<u>Interest Rate and Fees</u>**

DIP Interest Rate = LIBOR + 950 bps (150 bps LIBOR floor)

Default Interest Rate = DIP Interest Rate + 300 bps

Upfront Fee = 200 bps

Exit Fee = 200 bps

DIP Agency Fee = $50,000 per month

DIP Backstop Fee (PIK) = 400 bps

## SCHEDULE 1

### SELLER PARTIES

Avenging Eagle SPV, LLC
Branded Partners LLC
Check Hook LLC
CTHD 2 LLC
Cues TWC (ASCAP), LLC
Current War SPV, LLC
DRT Films, LLC
DRT Rights Management LLC
FFPAD, LLC
HRK Films, LLC
InDirections LLC
InteliPartners LLC
ISED, LLC
MarcoTwo, LLC
One Chance LLC
PA Entity 2017, LLC
Paddington 2, LLC
PS Post LLC
Scream 2 TC Borrower LLC
Small Screen Productions LLC
Small Screen Trades LLC
Spy Kids TV Borrower, LLC
Team Players LLC
The Actors Group LLC
The Giver SPV, LLC
The Weinstein Company Holdings LLC
The Weinstein Company LLC
Tulip Fever LLC
TWC Borrower 2016, LLC
TWC Domestic LLC
TWC Fearless Borrower, LLC
TWC Library Songs (BMI), LLC
TWC Loop LLC
TWC Mist, LLC
TWC Polaroid SPV, LLC
TWC Production-Acquisition Borrower 2016, LLC
TWC Production, LLC
TWC Replenish Borrower, LLC
TWC Short Films, LLC
TWC Untouchable SPV, LLC
TWC Waco SPV, LLC
Twenty O Five Holdings, LLC
W Acquisition Company LLC

WC Film Completions, LLC
Weinstein Books, LLC
Weinstein Development LLC
Weinstein Global Funding Corp.
Weinstein Global Film Corp.
Weinstein Productions LLC
Weinstein Television LLC
WTV Guantanamo SPV, LLC
WTV JCP Borrower 2017, LLC
WTV Kalief Browder Borrower, LLC
WTV Scream 3 SPV, LLC
WTV Yellowstone SPV, LLC

# SCHEDULE 2.1

## PURCHASED ASSETS

(a)     all JV Equity Securities;

(b)     all of the Seller Parties' right, title and interest of any kind or nature in and to the Title Rights and the Covered Titles (whether tangible or intangible), including, for the avoidance of doubt, all Tangible Materials;

(c)     the right to receive and retain all sums payable from the Exploitation of the Title Rights and the Covered Titles pursuant to the Assumed Contracts in respect of the Covered Titles for all accounting periods commencing on or after the Closing Date;

(d)     any right to receive any sums payable on or after the date hereof by a licensor (together with its successors and assigns) in connection with any claim, action, demand, suit, lawsuit, arbitration, proceeding or litigation, whether arising prior to, on or after the date hereof, to collect or recover any unrecouped and outstanding amounts of any advance, license fee, guaranteed payment or similar amount paid by any of the Seller Parties, or with respect to expenses or other amounts incurred by any of the Seller Parties, pursuant to the terms of the Assumed Contracts;

(e)     all Assumed Contracts;

(f)     subject to clause (c) of Schedule 2.2, all tangible personal property of the Seller Parties, including furniture, office equipment, computers, telephones and communications equipment;

(g)     subject to clause (h) of Schedule 2.2, all Real Property Leases and other interests in real property;

(h)     all accounts, notes and other receivables;

(i)     other than the Excluded Actions, all rights, claims, causes of action against third parties relating to or arising from the Business or the Purchased Assets;

(j)     all goodwill associated with the Business or Purchased Assets;

(k)     all claims and Actions of Seller Parties arising under Sections 544, 547, 548, 549, and 550 of the United States Bankruptcy Code relating to the Purchased Assets which any Seller Party has or may have against any customers, clients, vendors and contract counterparties of any Seller Party (the "Purchased Actions"); and

(k)     subject to clause (c) of Schedule 2.2, copies of the minute books, Organizational Documents, partnership records and other books and records (excluding records relating to Taxes paid or payable by the Seller Parties) of the Seller Parties, in each case solely to the extent related to the Purchased Assets and Assumed Liabilities, available and in the

possession and control of the Seller Parties and not subject to attorney-client privilege or other privilege from disclosure.

## SCHEDULE 2.2

### EXCLUDED ASSETS

(a)     all Tax assets and benefits of the Seller Parties (including refunds, credits and amounts in respect of any prepayments of Taxes and other governmental charges of whatever nature);

(b)     all rights of the Seller Parties under this Agreement and the Ancillary Agreements;

(c)     (i) all corporate seals, minute books, Organizational Documents, partnership records, records relating to Taxes paid or payable by the Seller Parties and other books and records of the Seller Parties (provided that the Seller Parties will provide to Buyer copies of such minute books, Organizational Documents, partnership records and other books and records (other than Tax records) of the Seller Parties reasonably requested by Buyer and solely to the extent related to the Purchased Assets and Assumed Liabilities, available and in the possession and control of the Seller Parties and not subject to attorney-client privilege or other privilege from disclosure) and (ii) Privileged Material;

(d)     all cash and cash equivalents of the Seller Parties;

(e)     All claims and Actions of Seller Parties arising under Sections 544, 547, 548, 549, and 550 of the United States Bankruptcy Code (other than the Purchased Actions) and all Actions which any Seller Party has or may have against any other Seller Party and any Seller Related Party and any of its or their respective directors, officers, employees, agents, advisors, members, stockholders, other beneficial owners, or other representatives, including all Harassment Claims (the "Excluded Actions");

(f)     all Insurance Policies;

(g)     the Harassment Claims;

(h)     all Contracts that are not Assumed Contracts including (i) all Employment Contracts and all other employment, severance or similar Contracts with any employee or service provider of the Seller Parties and (ii) all Contracts set forth in Schedule 2.2(h) (collectively, the "Excluded Contracts");

(i)     all assets of any Benefit Plans; and

(j)     subject to clause (a) of Schedule 2.1, all Equity Securities of the Seller Parties and all Non-Transferred JV Equity Securities.

## SCHEDULE 2.2(H)

OTHER EXCLUDED CONTRACTS

1. Indenture of Lease, dated as of January 1, 2016 by and between 375 Greenwich Partners LLC and The Weinstein Company LLC, for the premises located at 375 Greenwich Street, New York, NY 10013

## SCHEDULE 2.3

ASSUMED LIABILITIES

Non-recourse project level debt related to the following Covered Titles and represented by the credit facilities described below, the outstanding balances as of February 28, 2018 of which are set forth on Appendix I to this Schedule 2.3.

1. <u>Multiple Titles</u>: Credit and Security Agreement, dated as of August 6, 2014, among TWC Production LLC, the lenders and guarantors referred to therein, and MUFG Union Bank, N.A., as Administrative Agent

    a. Scream TV Season 1

    b. Scream TV Season 2

    c. Tulip Fever

    d. The Upside

    e. The Current War

2. <u>Project Runway</u>: Loan and Security Agreement, dated as of April 26, 2017, between WTV JCP Borrower 2017, LLC and Bank Hapoalim B.M.

3. <u>Marco Polo Season 2</u>: Loan and Security Agreement, dated as of September 21, 2015, between MARCOTWO, LLC and East West Bank

4. <u>Polaroid</u>: Loan and Security Agreement, dated as of April 14, 2017, between TWC Polaroid SPV, LLC and First Republic Bank

5. <u>Spy Kids TV</u>: Loan and Security Agreement, dated as of August 12, 20165, between Spy Kids TV Borrower, LLC and MUFG Union Bank, N.A.

6. <u>The Mist</u>: Loan and Security Agreement, dated as of November 29, 2016, between TWC Mist, LLC and Comerica Bank

7. <u>The Upside</u>: Loan and Security Agreement, dated as of March 20, 2017, between TWC Untouchable WPV, LLC and First Republic Bank

8. <u>Waco</u>: Loan and Security Agreement, dated as of August 11, 2017, between TWC Waco SPV, LLC and Opus Bank

9. <u>Fearless</u>: Loan and Security Agreement, dated as of August 3, 2017, between TWC Fearless Borrower, LLC and First Republic Bank

10. <u>The Current War</u>: Loan and Security Agreement, dated as of December 23, 2016, between Current War SPV, LLC and East West Bank

11. <u>Scream TV Season 3</u>: Term Sheet, dated as of October 5, 2017, between Next Take Productions, Inc., The Weinstein Company LLC and C&C Financial Services Lending, LLC

12. <u>Crouching Tiger, Hidden Dragon 2: The Green Destiny</u>: Loan and Security Agreement, dated as of September 18, 2014, by and among CTHD 2 LLC, the lenders referred to therein and East West Bank, as Administrative Agent*

*Denotes a liability that has been repaid in full prior to the Execution Date.

## APPENDIX I TO SCHEDULE 2.3

[*See attached*]

| *($ in thousands)* | Amount |
|---|---|
| **Television Project-Level Production Debt** | |
| Scream TV S1 (TWCP) | $3,691 |
| Scream TV S2 (TWCP) | 7,711 |
| Scream TV S3 (Cast & Crew) | 3,232 |
| Crouching Tiger, Hidden Dragon 2 | -- |
| Fearless | 2,778 |
| Marco Polo S2 | 8,705 |
| Spy Kids | 13,468 |
| The Mist | 12,334 |
| Waco | 5,295 |
| JC Penney | 2,095 |
| **Total Television Project-Level Production Debt** | **$59,309** |
| | |
| **Film Project-Level Production Debt** | |
| *Foreign Rights Debt* | |
| Tulip Fever (TWCP) | $ -- |
| The Upside (TWCP) | 22,398 |
| The Current War (TWCP) | 10,854 |
| Polaroid | 5,318 |
| Total Foreign Rights Debt | $38,570 |
| | |
| *Domestic Rights Debt* | |
| The Upside | $8,851 |
| The Current War | 7,768 |
| Total Domestic Rights Debt | $16,619 |
| **Total Film Project-Level Production Debt** | **$55,189** |
| **Total Assumed Project-Level Production Debt** | **$114,498** |

<u>**ANNEX 1**</u>

COVERED TITLES

<u>**Top Pictures:**</u>

1.    Amityville: Lost Tapes
2.    Apollo 18
3.    Army of One
4.    August Osage County
5.    Before We Go
6.    Begin Again
7.    Big Eyes
8.    Burnt
9.    Carol
10.   Clown
11.   Dark Skies
12.   Demonic (aka HOH)
13.   Disappearance of Eleanor Rigby
14.   Django Unchained
15.   Escape From Planet Earth
16.   Fed Up
17.   Fruitvale Station
18.   Gold
19.   Grand Masters
20.   Hands of Stone
21.   Hateful Eight
22.   Horns
23.   I Don't Know How She Does It
24.   Imitation Game
25.   Inglourious Basterds
26.   Iron Lady
27.   It Follows
28.   Killing Them Softly
29.   King's Speech
30.   Lawless
31.   Leap (Ballerina)
32.   Lion
33.   Long Walk to Freedom
34.   Nine
35.   No Escape (The Coup)
36.   Our Idiot Brother
37.   Paddington Bear
38.   Philomena
39.   Piranha 3-D
40.   Piranha 3DD
41.   Quartet

42. Railway Man
43. Regression
44. Sapphires
45. Satanic
46. Scary Movie 5
47. Scream 4
48. Silver Linings Playbook
49. Sin City 2
50. Sing Street
51. Snowpiercer
52. Southpaw
53. Spy Kids 4
54. St. Vincent
55. Suite Francaise
56. The Butler
57. The Founder
58. The Giver
59. The Immigrant
60. The Master
61. Three Generations
62. Tulip Fever
63. Undefeated
64. Underdogs
65. Vampire Academy
66. Viral
67. Wind River
68. Woman in Gold

**Top Unreleased Pictures:**

1. Current War
2. Hotel Mumbai
3. Mary Magdalene
4. The Upside

**Top Programs:**

1. Crouching Tiger Hidden Dragon 2: Sword of Destiny
2. Fearless
3. Gomorrah: Season Three
4. Guantanamo
5. Kalief Browder Documentary (a.k.a. TIME: The Kalief Browder Story)
6. Little Door Gods (a.k.a. Guardian Brothers)
7. Marco Polo: Season One
8. Marco Polo: Season Two
9. Mist, The
10. Project Runway: Season Fifteen
11. Project Runway: Season Sixteen

12. Project Runway All Stars: Season Six
13. Project Runway Junior: Season Two
14. Project Runway Junior: Season Three
15. Scream TV: Season One
16. Scream TV: Season Two
17. Scream TV: Season Three
18. Seal Team Six aka Six
19. Spy Kids TV
20. Trapped
21. United States of Song
22. Untitled David O. Russell Project
23. Untitled Trayvon Martin Project
24. Waco
25. Yellowstone

**Other Titles:**

1. 13 Sins
2. 14 Blades
3. 3 Generations
4. 6 Souls aka Shelter
5. A Lego Brickumentary
6. Above the Law
7. Adult Beginners
8. Aftershock
9. Ain't Them Bodies Saints
10. All Good Things
11. Apollo 18
12. Army of One
13. Art of the Steal
14. Artist, The
15. Bachelorette
16. Baxter, The
17. Before We Go
18. Blue Ruin
19. Blue Valentine
20. Boston Strangler
21. Box, The
22. Brothers Bloom, The
23. Bully Project
24. Butter
25. Cinema Paradiso
26. Citizen #4 aka Snowden
27. Clown
28. Come Drink With Me
29. Come Early Morning
30. Company Men, The

31. Concert, The
32. Concussion
33. Coriolanus
34. Crime Story
35. Cutie & The Boxer
36. Dark Skies
37. Details, The
38. Devil's Knot
39. Dirty Girl
40. Dirty Sanchez
41. Disappearance of Eleanor Rigby
42. Dragon aka Wu Xia
43. Easy Money
44. Erased
45. Escape From Planet Earth
46. Escobar: Paradise Lost
47. Eva
48. Everly
49. Fed Up
50. Fighter
51. Fighter, The
52. Following
53. Fruitvale Station
54. Goodnight Mommy
55. Grand Masters
56. Great Invisible, The
57. Happy Here and Now
58. Harsh Times
59. Hateship, Friendship, Courtship
60. Haute Cuisine
61. Heaven Knows What
62. Heroes of the East
63. Hollywoodland (aka Truth…)
64. Horns
65. His House
66. Hunting Ground, The
67. I Don't Know How She Does It
68. Igor
69. Immigrant, The
70. In The Deep
71. Indie Sex
72. Inequality for All
73. Inglourious Basterds
74. Intouchables
75. Iron Lady
76. Jackie Woodman, The Minor

77. Jane Got a Gun
78. Keep On Keepin On
79. Killing Them Softly
80. King's Speech, The
81. Kite
82. Kon Tiki
83. Last 5 Years, The
84. Lay The Favorite
85. Libertine, The
86. Lovelace
87. Macbeth
88. Man of Tai Chi
89. Manic
90. Master, The
91. Miral
92. Monsters: Dark Continent
93. Murder Mystery
94. My Life Directed by Refn
95. My One and Only
96. My Week with Marilyn
97. My Young Auntie
98. Nine
99. Not Fade Away
100.      Nut Job
101.      Nut Job 2
102.      On the Other Side of the Tracks
103.      One Armed Swordsman
104.      One Chance
105.      One I Love
106.      Only God Forgives
107.      Our Idiot Brother
108.      Paper Chasers
109.      Piranha 3-D
110.      Piranha 3DD
111.      Players, The
112.      Polaroid
113.      Populaire
114.      Power Yoga
115.      Pusher
116.      Quartet
117.      Queen, The
118.      Railway Man
119.      Riddle
120.      Robert Klein Still Can't Stop His Leg
121.      Sacred, The
122.      Salinger

| | |
|---|---|
| 123. | Sapphires |
| 124. | Sarah's Key |
| 125. | Scream 4 |
| 126. | Shanghai |
| 127. | Shanghai Express |
| 128. | Short Circuit |
| 129. | Sing Street |
| 130. | Six Billion Dollar Man |
| 131. | Snowpiercer |
| 132. | Solomon Kane |
| 133. | Somebody |
| 134. | Spring Forward |
| 135. | Spy Kids 4 |
| 136. | Submarine |
| 137. | Supermensch |
| 138. | Surfer, Dude |
| 139. | Thief and the Cobbler, The |
| 140. | This Must be the Place |
| 141. | This So Called Disaster |
| 142. | Tillman Story, The |
| 143. | Tracks |
| 144. | Twenty Feet from Stardom |
| 145. | Undefeated |
| 146. | Unfinished Song |
| 147. | Unknown Known |
| 148. | Unknown, The |
| 149. | W.E. |
| 150. | War of the Buttons |
| 151. | What Love Is |
| 152. | When Animals Dream |
| 153. | Whitest Kids U Know |
| 154. | Young & Prodigious Spivet |
| 155. | Yves Saint Laurent |
| 156. | 1408 |
| 157. | 13: Game of Death |
| 158. | Afterwards |
| 159. | Alex Rider: Operation Stormbreaker |
| 160. | All the Boys Love Mandy Lane |
| 161. | An Evening with Kevin Smith |
| 162. | Arthur & the Invisibles |
| 163. | Automaton Transfusion |
| 164. | Awake |
| 165. | Azur and Asmar |
| 166. | Bands Visit |
| 167. | Battle of Wits |
| 168. | Beseiged Fortress |

| | |
|---|---|
| 169. | Black Christmas |
| 170. | Black Sheep |
| 171. | Blue Elephant aka Khan Kluay |
| 172. | Bobby |
| 173. | Born To Fight |
| 174. | Boy A |
| 175. | Breaking & Entering |
| 176. | Broken |
| 177. | Captain Mike (Slacker Tour) |
| 178. | Casper Scare School |
| 179. | Cassandra's Dream |
| 180. | Chestnut |
| 181. | City of Violence |
| 182. | Clerks 2 |
| 183. | Closing the Ring |
| 184. | Control |
| 185. | Crossing Over |
| 186. | Dante 01 |
| 187. | Days of Glory |
| 188. | Dead in Three Days |
| 189. | Death Defying Acts |
| 190. | Dedication |
| 191. | Derailed |
| 192. | Deuxieme Souffle |
| 193. | Diary of the Dead |
| 194. | Dirty Movie (Extreme Movie) |
| 195. | DOA: Dead or Alive |
| 196. | Dog Bite Dog |
| 197. | Doogal (Magic Roundabout) |
| 198. | Dorthy Mills |
| 199. | Dragon Heat |
| 200. | Eden Lake |
| 201. | King of the Hill [El Rey De La Montana] |
| 202. | Elvis and Annabelle |
| 203. | Empress and her Warriors |
| 204. | Everything Put Together |
| 205. | Factory Girl |
| 206. | Fan Boys |
| 207. | Fatal Contact |
| 208. | Feast |
| 209. | Feast 2 |
| 210. | Feast 3 |
| 211. | Grace is Gone |
| 212. | Great Music Caper (Pic Sax) |
| 213. | Grindhouse |
| 214. | Halloween |

215.    Halloween 2
216.    Hannibal Rising
217.    Have No Fear: Pope J2
218.    Hellride (QT Presents)
219.    Hoodwinked
220.    Hoodwinked 2
221.    Hunting Party (Bosnia)
222.    Hurricane Season
223.    I Could Never Be Your Women
224.    I Want Someone to Eat Cheese W
225.    I'm Not There
226.    Infernal Affairs 2
227.    Infernal Affairs 3
228.    Inside
229.    Invisible Target
230.    Janky Promoters
231.    Joy Division
232.    Kill Buljo
233.    Kill Shot
234.    Kill Zone
235.    Killing Grounds, the
236.    Last Legion
237.    Legacy
238.    Legend of the Black Scorpion
239.    Lesbian Vampire Killers
240.    Live!
241.    Lou Reed's Berlin
242.    Lovewrecked
243.    Lucky Number Slevin
244.    Make It Happen
245.    Marie and Bruce
246.    Martyrs
247.    Matador
248.    Meerkat Manor
249.    Meerkats
250.    Miss Potter
251.    Mistress of Spices
252.    Mother of Tears
253.    Mrs. Henderson Presents
254.    Murderous Intent
255.    New Police Story
256.    Night of the Living Dead
257.    Nightmare Detective
258.    No Restraint
259.    Nomad
260.    Nowhere Boy

261.    Nutty Professor
262.    Operation Valkyrie
263.    Orphanage
264.    Out of the Blue
265.    Outlander
266.    Persepolis
267.    Pete Seeger: The Power of Song
268.    Pirates of the Great Salt Lake
269.    Prey
270.    Protégé
271.    PTU  Police Tactical Unit
272.    Pulse
273.    Pulse 2
274.    Pulse 3
275.    Purple Violets
276.    Razzle Dazzle
277.    Revenge
278.    Richard Pryor: Live and Smokin
279.    River Queen
280.    Rob-B-Hood
281.    Rogue
282.    Roman Polanski
283.    Roundhouse (M. Moore)
284.    Scary Movie 4
285.    School for Scoundrels
286.    Seven Swords
287.    Shut Up and Sing
288.    Sicko
289.    Single Man
290.    Slingshot
291.    Snow Cake
292.    Solstice
293.    Soul Men
294.    Standing Still
295.    Steel Trap
296.    Steppin: The Movie
297.    Storm Warning
298.    Suburban Mayhem
299.    Superhero Movie
300.    Teeth
301.    The Business
302.    The Deal
303.    The Ex (aka Fast Track)
304.    The Flight Before Christmas
305.    The Flock
306.    The Gathering

307.    The Girl in the Park
308.    The Great Debaters
309.    The Hammer
310.    The Killing Gene aka Waz
311.    The Longshots
312.    The Mist
313.    The Nanny Diaries
314.    The Promotion (fka Quebec)
315.    The Protector (aka TYG)
316.    The Reader
317.    The Rebel
318.    The Reef (Shark Bait)
319.    The Road
320.    The Silence
321.    Thunderpants
322.    TMNT (Turtles)
323.    Tournament
324.    Towelhead aka Nothing is Private
325.    Toxic
326.    Transamerica
327.    Triloquist
328.    True Lie
329.    Under the Same Moon
330.    Unstable Fable (3 Pigs & Baby)
331.    Unstable Fable (Goldilocks)
332.    Unstable Fable (Tortoise & Hare)
333.    Vicky Cristina Barcelona
334.    Walk All Over Me
335.    Wasted aka Farwell Bender
336.    Welcome to the Jungle
337.    Where…Osama Bin Laden?
338.    Who's Your Caddy
339.    Wizard of Gore
340.    Wolf Creek
341.    Wolfhound
342.    Wordplay
343.    Young Victoria
344.    Youth in Revolt
345.    Zack and Miri
346.    Zombie Diaries
347.    8 Diagram Pole Fighter
348.    12-12-12 Concert Film
349.    36th Chamber of Shaolin
350.    A Chinese Odyssey (1 & 2)
351.    Alone With Her
352.    Attacking the Devil

| | |
|---|---|
| 353. | Avenging Eagle |
| 354. | Better Tomorrow (unreleased) |
| 355. | Big Ang: Season One |
| 356. | Blindsided |
| 357. | Blood Brother |
| 358. | Bridezilla Season One |
| 359. | Bridezilla Season Two |
| 360. | Buried Alive |
| 361. | Business, The S1 |
| 362. | Cement Head (f/k/a Concrete Kings) |
| 363. | Cheech & Chong |
| 364. | Children of the Corn DTV |
| 365. | Chronicles of an Escape |
| 366. | Demonic (aka HOH) |
| 367. | Disciples of the 36th Chamber |
| 368. | Dr. Thorne |
| 369. | Eichmann Show, The |
| 370. | Elite Squad |
| 371. | Esio Trot |
| 372. | Executioners from Shaolin |
| 373. | Fashion Inc. |
| 374. | Five Deadly Venoms, The |
| 375. | Five Shaolin Masters |
| 376. | Flying Guillotine |
| 377. | Flying Guillotine 2 |
| 378. | Gang Story |
| 379. | Geeking Out with Greg Grunberg |
| 380. | Golden Swallow |
| 381. | Gomorrah: Season One |
| 382. | Gomorrah: Season Two |
| 383. | Grace of Monaco |
| 384. | Graham Norton Show, The: Season Sixteen |
| 385. | Graham Norton Show, The: Season Seventeen |
| 386. | Graham Norton Show, The: Season Eighteen |
| 387. | Graham Norton Show, The: Season Nineteen |
| 388. | Graham Norton Show, The: Season Twenty |
| 389. | Graham Norton Show, The: Season Twenty-One |
| 390. | Graham Norton Show, The: Season Twenty-Two |
| 391. | Hellraiser DTV |
| 392. | Henry Rollins Show, The |
| 393. | Inquiring Minds (JonBenet) |
| 394. | Jennifer Lopez: Dance Again |
| 395. | Killer Clans |
| 396. | Killer, The |
| 397. | King Boxer |
| 398. | Ladies Pilot |

| 399. | LASSIE |
|------|--------|
| 400. | Leo the Lion |
| 401. | Les Miserables |
| 402. | Little Gobie |
| 403. | Lost Bladesman |
| 404. | Love Nina |
| 405. | Mad Monkey Kung Fu |
| 406. | Mafiya |
| 407. | Martial Arts of Shaolin |
| 408. | Miami Monkey (Big Ang 2) |
| 409. | Million Dollar Shoppers |
| 410. | Mob Wives: Season One |
| 411. | Mob Wives: Season Two |
| 412. | Mob Wives: Season Three |
| 413. | Mob Wives: Season Four |
| 414. | Mob Wives: Season Five |
| 415. | Mob Wives: Season Six |
| 416. | Mob Wives: Chicago |
| 417. | Models of the Runway: Season One |
| 418. | Models of the Runway: Season Two |
| 419. | Musa the Warrior |
| 420. | National Enquirer Investigates S2 (Final Reveal) |
| 421. | On the Road with Austin and Santino |
| 422. | Outlaw Brothers |
| 423. | Peaky Blinders: Season One |
| 424. | Peaky Blinders: Season Two |
| 425. | Peaky Blinders: Season Three |
| 426. | Peaky Blinders: Season Four |
| 427. | Project Accessory |
| 428. | Project Catwalk |
| 429. | Project Jay |
| 430. | Project Runway: Season One |
| 431. | Project Runway: Season Two |
| 432. | Project Runway: Season Three |
| 433. | Project Runway: Season Four |
| 434. | Project Runway: Season Five |
| 435. | Project Runway: Season Six |
| 436. | Project Runway: Season Seven |
| 437. | Project Runway: Season Eight |
| 438. | Project Runway: Season Nine |
| 439. | Project Runway: Season Ten |
| 440. | Project Runway: Season Eleven |
| 441. | Project Runway: Season Twelve |
| 442. | Project Runway: Season Thirteen |
| 443. | Project Runway: Season Fourteen |
| 444. | Project Runway All Stars: Season One |

| | |
|---|---|
| 445. | Project Runway All Stars: Season Two |
| 446. | Project Runway All Stars: Season Three |
| 447. | Project Runway All Stars: Season Four |
| 448. | Project Runway All Stars: Season Five |
| 449. | Project Runway Junior: Season One |
| 450. | Protect and Defend (development) |
| 451. | Reaper, The (development) |
| 452. | Reign of Assassins |
| 453. | Return of the 5 Deadly Venoms |
| 454. | Return of the One Armed Swordsman |
| 455. | Return to the 36th Chamber |
| 456. | Rodeo Girls |
| 457. | Santapprentice |
| 458. | Santapprentice 2 (a.k.a. The Magic Snowflake) |
| 459. | Satanic |
| 460. | Saving Santa |
| 461. | Seal Team Six aka Code Name Geronimo |
| 462. | Shaolin Mantis |
| 463. | Suite Francaise |
| 464. | Titanic |
| 465. | Trailer Park: Welcome to Myrtle Manor: Season One |
| 466. | Trailer Park: Welcome to Myrtle Manor: Season Two |
| 467. | Trailer Park: Welcome to Myrtle Manor: Season Three |
| 468. | Under the Gunn |
| 469. | Underdogs |
| 470. | War and Peace |
| 471. | Wild Oats |
| 472. | Zombie Diaries 2 |
| 473. | Zulu |
| 474. | Brothers Bloom |
| 475. | My Enemy's Enemy |
| 476. | My One and Only |
| 477. | Untouchable |
| 478. | Livid |
| 479. | What Maisie Knew |
| 480. | UWantMe2KillHim? |
| 481. | Genius |
| 482. | Austin Mahone: The Journey - A Documentary |
| 483. | Russell Publishing Documentary |
| 484. | 21 Years: Quentin Tarantino |
| 485. | Hampstead |
| 486. | Lexus Short Films Series 1-4 |
| 487. | Sex Traffic |
| 488. | The Savage Five |
| 489. | New One Armed Swordsman |
| 490. | Dragon Tiger Gate |

491.    Penelope
492.    Happy Accidents
493.    The Business of Strangers
494.    Bruce Lee, My Brother
495.    Threads
496.    HHHH
497.    SS-GB

EXECUTION VERSION

# FIRST AMENDMENT TO
# ASSET PURCHASE AGREEMENT

This First Amendment to Asset Purchase Agreement (this "Amendment") is made as of the 13th day of April, 2018, by and among The Weinstein Company Holdings LLC, a Delaware limited liability company ("TWCH") and Lantern Entertainment LLC, a Delaware limited liability company ("Buyer").

WHEREAS, Buyer, TWCH and certain subsidiaries of TWCH (TWCH and each such subsidiary, a "Seller Party" and, collectively, the "Seller Parties") entered into that certain Asset Purchase Agreement, dated March 19, 2018 (the "Purchase Agreement"), pursuant to which the Seller Parties will sell to Buyer and Buyer will purchase from the Seller Parties all of the Purchased Assets and assume the Assumed Liabilities, pursuant to the Sale Order approving such sale, free and clear of all Liens (other than Permitted Liens), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which Sale Order will include the authorization for the assumption by the Seller Parties and assignment to Buyer of the Assumed Contracts and the Liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Amendment, the Purchase Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court; and

WHEREAS, the Parties desire to amend the Purchase Agreement in accordance with the terms set forth in this Amendment.

NOW THEREFORE, in consideration of the mutual promises contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Capitalized Terms.    All capitalized terms used herein shall have the same meanings ascribed to them in the Purchase Agreement, unless otherwise defined in this Amendment.

2.    Sale Motion, Bankruptcy Procedures Hearing and Bidding Procedures Order.  The reference in the second sentence of Section 7.1 of the Purchase Agreement to "the date that is forty-seven (47) days after the Petition Date" is hereby deleted and replaced with:

"May 8, 2018."

3.    Auction.

(a)    The reference in the first sentence of Section 7.2 of the Purchase Agreement to "at least two Business Days prior to the commencement of the auction contemplated by the Bidding Procedures" is hereby deleted and replaced with:

"on or prior to April 30, 2018."

(b)    The reference in the first sentence of <u>Section 7.2</u> of the Purchase Agreement to "the date that is forty-five (45) days after the Petition Date" is hereby deleted and replaced with:

"May 4, 2018."

4.    <u>Sale Order</u>.    The reference in the first sentence of <u>Section 7.3</u> of the Purchase Agreement to "the date that is forty-seven (47) days after the Petition Date" is hereby deleted and replaced with:

"May 8, 2018."

5.    <u>Payment of the Purchase Price</u>.    The reference in <u>Section 11.1(f)</u> of the Purchase Agreement to "the date that is forty-seven (47) days after the Petition Date" is hereby deleted and replaced with:

"May 8, 2018."

6.    <u>Expense Reimbursement and Break-Up Fee</u>.

(a)    The last sentence of <u>Section 12.4(a)</u> of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

"The obligations of the Seller Parties to pay the Break-Up Fee shall be entitled to administrative expense claim status under Section 503 of the Bankruptcy Code."

(b)    The last sentence of <u>Section 12.4(b)</u> of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

"The obligations of the Seller Parties to pay the Expense Reimbursement shall be entitled to administrative expense claim status under Section 503 of the Bankruptcy Code."

7.    <u>Definitions</u>.

(a)    The word "superpriority" in the definition of "Expense Reimbursement" contained in <u>Exhibit A</u> of the Purchase Agreement is hereby deleted.

(b)    The phrase "with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code and over the debtor-in-possession financing obligations" in the definition of "Expense Reimbursement" contained in <u>Exhibit A</u> of the Purchase Agreement is hereby deleted.

(c)    The reference in the definition of "Expense Reimbursement" contained in <u>Exhibit A</u> of the Purchase Agreement to "two percent (2%)" is hereby deleted and replaced with:

"one and one half percent (1.5%)."

(d)     The definition of "Expense Reimbursement", contained in <u>Exhibit A</u> of the Purchase Agreement is hereby amended to read as follows:

"; <u>provided further,</u> <u>however</u>, that if the Bankruptcy Court hearing to approve the Sale Order shall not have commenced on or prior to May 8, 2018, Buyer shall have the right to seek to increase the Expense Reimbursement to up to two percent (2%) of the Cash Purchase Price."

14.     <u>Effect</u>.  Except to the extent expressly amended herein, the Purchase Agreement is hereby ratified and confirmed in all respects and will remain unmodified and in full force and effect.  The Purchase Agreement is hereby amended so that any reference therein to the Purchase Agreement shall mean a reference to the Purchase Agreement as amended by this Amendment; <u>provided</u>, <u>however</u>, that the Execution Date or words of like import shall refer to March 19, 2018.

15.     <u>Counterparts</u>.  This Amendment may be executed in one or more counterparts, (including by means of .pdf or other electronic transmission), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signatures on Following Page]*

3

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed on the day and year first above written.

**BUYER:**

LANTERN ENTERTAINMENT LLC

By: _____
Name:  Chris Halpin
Title:  Chief Financial Officer


THE WEINSTEIN COMPANY HOLDINGS LLC


By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed on the day and year first above written.

**BUYER:**

LANTERN ENTERTAINMENT LLC


By: _____
Name:
Title:


THE WEINSTEIN COMPANY HOLDINGS LLC


By: _Robert A. Del Genio_____
Name: ROBERT A. DEL GENIO
Title: CRO