**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*, | ) ) | Case No. 18-10601 (MFW) (Jointly Administered) |
| | ) | |
| Debtors. | ) ) | |
| | ) | **Hearing Date: May 22, 2018 @ 11:30** |
| | ) | **a.m. (ET)** |

**AMENDED OBJECTION OF THE IN THE HEIGHTS OWNERS TO THE
DEBTORS' PROPOSED ASSUMPTION AND ASSIGNMENT OF THE OPTION/
PURCHASE AGREEMENT AND THE PRODUCER AGREEMENT**

5000 Broadway Productions, Inc. ("**5000 BP**"), Bario Grrrl Productions, Inc. ("**BGP**"), Lin-Manuel Miranda, Scott Sanders Productions, and Quiara Alegría Hudes (collectively with the foregoing, the "**Owners**"), submit this Objection (the "**Objection**")[1] to the Debtors' (the "**Debtors**") *Notice of Supplemental Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts* (the "**Supplemental Notice of Assumption and Assignment**")[2] [Dkt. No. 282]. In support of this Objection, the In the Heights Owners respectfully state the following:

**PRELIMINARY STATEMENT**

1. In January 2015, the Owners entered into an Option/Purchase Agreement (the "**Option/Purchase Agreement**") with The Weinstein Company LLC (the "**Weinstein Company**, or the "**Company**"), under which The Weinstein Company purchased the option to produce one movie and one remake based on the well-known Broadway show, "In the Heights"

---

[1] The Objection has been amended to reflect that certain exhibits are now being filed partially redacted or not under seal.
[2] Capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Supplemental Notice of Assumption and Assignment or the Sale Order, as applicable.

1

(the "**Motion Picture Rights**" to the "**In the Heights Motion Pictures**"). On May 2, 2017, The Weinstein Company exercised that option.

2. The rights the Company purchased were subject to an important limitation. The Option/Purchase Agreement expressly provides that if The Weinstein Company did not commence principal photography on the first In the Heights Motion Picture in the nine (9) months after exercise of the option, the Motion Picture Rights would revert back to the Owners.

3. By February 2, 2018, nine (9) months after the Company's exercise of the option, it had not begun principal photography. On February 5, 2018, the Owners notified the Company that the Motion Picture Rights had therefore reverted to the Owners.

4. Simply put, the Debtors cannot assume and assign rights they do not own. In addition, the Option/Purchase Agreement is no longer executory, and cannot be assumed and assigned by the Debtors to the potential buyer of their assets.

5. In addition to the Option/Purchase Agreement, The Weinstein Company, Lin-Manuel Miranda and Scott Sanders Productions (on behalf of Scott Sanders and Mara Jacobs) also executed a Producer Agreement (the "**Producer Agreement**"). The Producer Agreement specifically requires Lin-Manuel Miranda and Scott Sanders Productions (collectively, the "**Producers**") to ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ As such, the Producer Agreement is a personal services agreement. Such an agreement cannot be assumed and assigned without the Producers' consent, which has never been sought or granted.

## BACKGROUND

6. The Debtors filed these chapter 11 proceedings (the "**Chapter 11 Cases**") on March 19, 2018 [Dkt. No. 1].

2

7. On March 20, 2018, the Debtors filed a motion to sell substantially all of their assets [Dkt. No. 8] (the "**Sale Motion**"). The Sale Motion sought approval of certain sale and bid procedures (the "**Sale Procedures**"). Sale Motion, at 12-13, 23-27. On April 6, 2018, the Court entered an order that, among other things, approved the Sale Procedures and scheduled a final sale hearing (the "**Sale Order**") [Dkt. No. 190].

8. As part of the Sale Motion, the Debtors propose to assume and assign substantially all of their executory contracts to the Stalking Horse Bidder, or an as-yet unidentified other Successful Bidder. Sale Motion, § 35. On April 13, as contemplated by the Sale Order, the Debtors filed a Notice of Assumption and Assignment, listing all contracts that the Debtors intended to assume and assign to the Successful Bidder under the Sale Procedures. On April 20, the Debtors filed a Notice of Supplemental Potential Assumption and Assignment, listing additional contracts the Debtors intend to assume and assign.

9. The Supplemental Notice of Assumption and Assignment includes the following contracts which "may potentially be assumed and assigned as part of the Sale":

|    | DEBTOR(S) | CONTRACT COUNTERPARTY | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|----|-----------|----------------------|----------------------------------|-------------|
| 81 | THE WEINSTEIN COMPANY LLC | 5000 BROADWAY PRODUCTIONS INC | DEAL MEMO<br>EFFECTIVE DATE: 1/7/2015 | $0.00 |
| 82 | THE WEINSTEIN COMPANY LLC | 5000 BROADWAY PRODUCTIONS INC | ITH OPTION PURCHASE AMENDMENT<br>EFFECTIVE DATE: 9/19/2016 | $0.00 |
| 83 | THE WEINSTEIN COMPANY LLC | 5000 BROADWAY PRODUCTIONS INC | OPTION/PURCHASE AGREEMENT<br>EFFECTIVE DATE: 1/19/2016 | $0.00 |
| 84 | THE WEINSTEIN COMPANY LLC | 5000 BROADWAY PRODUCTIONS INC | OPTION/PURCHASE AGREEMETN<br>EFFECTIVE DATE: 1/7/2015 | $0.00 |
| 85 | THE WEINSTEIN COMPANY LLC | 5000 BROADWAY PRODUCTIONS INC & BARIO GRRRL PRODUCTIONS | ITH OPTION PURCHASE AMENDMENT<br>EFFECTIVE DATE: 9/19/2016 | $0.00 |

| | DEBTOR(S) | CONTRACT COUNTERPARTY | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|---|---|---|---|---|
| 86 | THE WEINSTEIN COMPANY LLC | 5000 BROADWAY PRODUCTIONS INC & BARIO GRRRL PRODUCTIONS IN | OPTION/PURCHASE AGREEMENT EFFECTIVE DATE: 1/19/2016 | $0.00 |
| 13936 | THE WEINSTEIN COMPANY LLC | SCOTT SANDERS PRODUCTIONS | DEAL MEMO EFFECTIVE DATE: 1/7/2015 | $0.00 |

10. Contracts 82, 83, 84, 85, and 86 appear to refer to the Option/Purchase Agreement and its amendments. Contracts 81 and 13936 appear to refer to the Producer Agreement.

11. The deadline to object to the Supplemental Notice of Assumption and Assignment was 4:00 P.M., Eastern Standard Time, on May 3, 2018. The In the Heights Owners accordingly filed this Objection to assumption and assignment of the Option/Purchase Agreement and the Producer Agreement, concurrently with a Motion to Seal. Upon request of the U.S. Trustee, the Owners accordingly file this amended Objection to assumption and assignment of the Option/Purchase Agreement and the Producer Agreement, amended only to attach certain partially redacted Exhibits previously filed under seal.

The Option/Purchase Agreement

12. On January 7, 2015, the Company and the Owners entered into the Option/Purchase Agreement.[3] The Option/Purchase Agreement granted the Company the option to acquire certain rights relating to the well-known musical production "In the Heights," written by Lin-Manuel Miranda and Quiara Alegría Hudes. Among these were rights to produce the In the Heights Motion Picture and one remake, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ Option/Purchase Agreement, § 8.

---

[3] The Option/Purchase Agreement was amended on January 19, 2016, to extend the Option Period through February 3, 2017, for an additional fee. The Option/Purchase Agreement was further amended on September 19, 2016, to extend the Option Period through May 3, 2017.

4

The Company had the ability to purchase the Motion Picture Rights during the Option Period (the "**Option Period**"), which extended one year after execution of the Option/Purchase Agreement. The second amendment of the Option/Purchase Agreement extended the Option Period through May 3, 2017. A copy of the amended and restated Option/Purchase Agreement is attached hereto as **Exhibit A**.

13. On May 2, 2017, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Company exercised the option and purchased the Motion Picture Rights specified in the Option/Purchase Agreement.

14. The Option/Purchase Agreement expressly required the Company to begin principal photography of the In the Heights Motion Picture within nine (9) months of the exercise of the option:

> TWC shall commence principal photography of the Picture within nine (9) months following the exercise of the option (the "**Commencement Period**").

Option/Purchase Agreement, § 2. The Commencement Period could be extended by the Company for up to six (6) months for "force majeure event(s), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*.

15. If the Company did not begin principal photography by the end of this nine (9) month Commencement Period, the Option/Purchase Agreement expressly provided that all rights it granted would revert to the Owners. In particular, Section 4 provides that:

> In the event that TWC fails to exercise the option during the Option Period or to commence principal photography of the Picture during the Commencement Period (as the same may be extended), all rights in and to the Picture shall revert to Owner in accordance with BGP and 5000 BP's respective ownership interests, including, without limitation, all new material (e.g. screenplay revisions and songs) written in connection with the Picture, subject to a lien in favor of TWC in an amount equal to

        TWC's direct, out of pocket, third party costs and expenses incurred in connection with the Picture, plus interest charges in accordance with TWC's standard terms and conditions to be negotiated in good faith.

Option/Purchase Agreement, § 4.

The Producer Agreement

16. Simultaneously with execution of the Option/Purchase Agreement, the Producers and the Company entered into the Producer Agreement. A copy of the Producer Agreement is attached hereto as **Exhibit B**. The Producer Agreement specifically requires Lin-Manuel Miranda and Scott Sanders Productions (collectively, the "Producers") ███████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████ ██████████████████ ████████████

Reversion of the Motion Picture Rights

17. The Option was exercised on May 2, 2017. Accordingly, the nine (9) month Commencement Period ended on February 2, 2018. The Debtor never sought to extend the nine-month period under Section 4 nor provided notice of a force majeure event.

18. Accordingly, on February 5, 2017, the Owners wrote to the Company (the "**February 5 Letter**"), notifying it that because principal photography had not begun by the end of the Commencement Period, all rights acquired under the Option/Purchase Agreement had reverted to the under Section 4 of the Option/Purchase Agreement. A copy of the February 5 Letter is attached hereto as **Exhibit C.**

19. The Company never responded to the February 5 Letter. The Owners then sent a second letter on March 9, 2018 (the "**March 9 Letter**"), requesting an accounting statement of the Company's costs expended in production of the In the Heights Motion Picture. The Company never responded to the March 9 Letter either. A copy of the March 9 Letter is attached hereto as **Exhibit D.**

20. The Debtors filed these cases on March 19, 2018.

## OBJECTION

21. The Debtors cannot assume and assign the Option/Purchase Agreement or the Producer Agreement for the following reasons. First, all rights granted under the Option/Purchase Agreement reverted to the Owners prepetition. Under Sections 365 and 541 of the Bankruptcy Code, the Option/Purchase Agreement and the rights it conveyed are therefore not property of the Debtors' estate and cannot be assumed or assigned. Second, the Option/Purchase Agreement, having lapsed, is no longer an executory contract under Section 365 of the Bankruptcy Code, and cannot be assumed and assigned. Finally, the Producer Agreement requires the provision of personal services by the Producers. Under Section 365(c)(1) and applicable state law, it cannot be assumed or assigned without the consent of the Producers, which the Debtor has never sought or obtained.

**A. The Rights Purchased Under the Option/Purchase Agreement Cannot Be Assigned Because They Are Not Property of the Debtors' Estate.**

22. The Option/Purchase Agreement granted an option to purchase certain "Rights" to, among other things, produce one motion picture and one remake, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ relating to "In the Heights." The Debtor exercised that option in May 2017 and purchased the rights. The Option/Purchase Agreement expressly required the Company to begin principal photography of the first In the Heights Motion Picture within nine

7

months of the exercise of the option, or February 2, 2018. It did not do so and, as a result, all rights it acquired under the Option/Purchase Agreement have reverted to the Owners under Section 4 of that agreement.

23. Reversion provisions protect an author or creator from having their work put "on the shelf" by a licensor and thereby being deprived of "the opportunity to get revenue from the picture" or "making arrangements with another motion picture producer for production of a motion picture." *Mailer v. RKO Teleradio Pictures, Inc*., 213 F. Supp. 294 (S.D.N.Y. 1963), *aff'd*. 332 F.2d 747 (2d Cir. 1964). Thus, where contractual progress standards are not met, the rights revert to the original owner, who can then exploit them.

24. It is black letter law that to assume or reject an executory contract, the Debtor must first prove that there is a contract to assume or reject. "A contract may not be assumed under § 365 if it has already expired according to its terms." *Counties Contracting & Const. Co. v. Constitution Life Ins. Co*., 855 F.2d 1054, 1061 (3d Cir. 1988) (internal citations omitted). For example, the Court in *Miller v. Romberger (In re Romberger),* 150 B.R. 125, 126-27 (Bankr. M.D. Pa. 1992) rejected a debtor's attempt to assume and assign a lease that had terminated by its own terms prepetition. Even if the debtor continued to perform its obligations under the lease postpetition, the court held, it was beyond the "court's power to prevent forfeiture that had existed prior to the bankruptcy." *Id*., at 127. Once terminated prepetition, the contract "cannot be resurrected." *Id.; see also, Intermet Realty P'ship v. First Pa. Bank N.A. (In re Intermet Realty P'ship),* 26 B.R. 383 (Bankr. E.D. Pa. 1983)*; Princes Point L.L.C. v. AKRF Eng'g, P.C.,* 968 N.Y.S.2d 868 (table), 42 Misc. 3d 1219(A (Sup. Ct.), *aff'd,* 983 N.Y.S.2d 727 (Mem) (App. Div. 2014); *see also Twitchell v. Town of Pittsford*, 483 N.Y.S.2d 524 (App. Div. 1984), *aff'd,* 98 N.Y.S.2d 363 (Mem) (1985).

25. The prepetition reversion of the "Rights" purchased under the Option/Purchase Agreement terminated that agreement. All the "Rights" the Debtor previously held revested in the Owners no later than February 3, 2018, more than a month before these Chapter 11 Cases filed. As a result, they never became property of the estate under Section 541 and the Debtors never had any "legal or equitable interest" in them. The reversion also eliminated any remaining obligations the Debtors may have had under the Option/Purchase Agreement. 11 U.S.C. §§ 365(a), 541(a)(1); *see also In re Romberger,* 150 B.R. at 126-27.

26. Neither the "Rights" nor the Option/Purchase Agreement are property of the Debtors' estate, and listing it on the Supplemental Notice of Assumption and Assignment cannot make it so. *Kopelman v. Halvajian (In re Triangle Labs., Inc.),* 663 F.2d 463, 468 (3d Cir. 1981) (if the debtor does not have an interest in a lease at the time of filing, there is no interest of the debtor in the lease, and there is nothing to assume).

**B.  The Option/Purchase Agreement is No Longer an Executory Contract, and Cannot be Assumed and Assigned.**

27. The prepetition reversion of rights under the Option/Purchase Agreement also dictates that the Option/Purchase Agreement is no longer an executory contract. As such, it cannot be assumed by the Debtors pursuant to Section 365. "If a contract is terminated pre-petition it is no longer executory and section 365 is not applicable." *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 638 (Bankr. D. Del. 2006) (citing *In re C & S Grain Co.*, 47 F.3d 223, 237 (7th Cir. 1995)).

28. In the Third Circuit, "[a]n executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Enter. Energy Corp. v. United States (In re Columbia Gas Sys. Inc.),*

9

50 F.3d 233, 239 (3d Cir. 1995). Pursuant to Section 4 of the Option/Purchase Agreement, the In the Heights Motion Picture Rights have reverted to the Owners, subject to "a lien in favor of TWC in an amount equal to TWC's direct, out of pocket, third party costs and expenses incurred in connection with the Picture, plus interest charges in accordance with TWC's standard terms and conditions to be negotiated in good faith." Option/Purchase Agreement, § 4.

29. The only remaining obligation under the Option/Purchase Agreement which survives reversion of the Motion Picture Rights is the obligation of the to repay the Company's direct, out of pocket costs and expenses, plus interest. The Company has no remaining obligations under the Option/Purchase Agreement for which the failure to perform "would constitute a material breach excusing performance of the other." *In re Columbia Gas*, 50 F.3d. at 239. Every obligation that the Company had arose in connection with its production and development of the In the Heights Motion Picture, which it no longer has the right to produce or develop. Because there are no "material unperformed obligations on both sides," the Option/Purchase Agreement is no longer an executory contract. *In re Exide Techs.*, 607 F.3d 957, 963 (3d Cir. 2010). Accordingly, it cannot be assumed pursuant to Section 365. *See In re EBC I,* 356 B.R. at 637-38.

**C.  The Producer Agreement is a Non-Assignable Personal Services Contract under Section 365(c) of the Bankruptcy Code.**

30. Section 365(c)(1) of the Bankruptcy Code limits a debtor's ability to non-consensually assume and assign certain types of contracts which are not assignable under applicable non-bankruptcy law:

> **(c)** The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
> **(1)**

> **(A)** applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
> **(B)** such party does not consent to such assumption or assignment; or

11 U.S.C. § 365(c)(1).

31. The limitation in Section 365(c)(1) "is aimed at protecting non-debtor parties to personal services contracts from being forced to accept service from or render service to an entity other than the entity with whom it originally contracted. . ." *In re Aerobox Composite Structures, LLC*, 373 B.R. 135, 141 (Bankr. D. N.M. 2007). "Personal service contracts synthesize into those consensual agreements of ineluctable genre and distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment, and taste." *In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1011 (Bankr. E.D.N.Y. 1986). As such, personal services contracts rely on the personal services of a specific individual, and performance under a personal services contract cannot be delegated. *In re Compass Van*, 65 B.R. at 1011.

*The Producer Agreement is a Personal Services Contract*

32. The Producer Agreement is a personal services contract, and cannot be assigned without the Producers' consent. New York law defines personal services contracts as agreements which involve a personal relationship of confidence between the parties, have express terms indicating reliance on the character and personal ability of the parties, or provide for the delivery of unique services.[4] *See, e.g., In re Compass Van*, 65 B.R. at 1011. "[T]he duty [under the contract] is so unique that the duty is thereby rendered nondelegable" and requires performance by a specific person due to that person's "special knowledge, unique skill or talent" and other attributes. *Id*. Contracts to provide personal services include "a contract to paint a

---
[4] The Producer Agreement is governed by New York law. *See* Producer Agreement, § 7.

picture; a contract between an author and his publisher; an agreement to sing; an agreement to render service as a physician. *Id.* (internal citations omitted). A contract requiring a celebrity athlete to make personal appearances at a club or restaurant and lend their name and appearance to marketing materials, such that the "image and reputation of each Athlete is inextricably intertwined with the image and reputation" of the restaurant, is a contract for personal services, as the contract was founded specifically on the unique attributes and personal celebrity of the athlete. *In re Planet Hollywood Int'l, Inc.,* No. 99-3612 (JJF), 2000 WL 36118317, *5 (D. Del. Nov. 21, 2000). This rule has been extended to apply to contracts with corporations as well as with individuals. *See N.Y. Bank Notes Co. v. Hamilton Bank Note Engraving & Printing Co.*, 73 N.E. 48, 52 (N.Y. 1905).

33. Here, the Producer Agreement requires the Producers to provide such unique and creative artistic services as part of the production of the In the Heights Motion Picture. The production of a musical motion picture is an inherently creative and artistic exercise, which involves, among other tasks, making casting decisions, scoring and overseeing production of the motion picture soundtrack, composing additional songs, and other tasks premised on the creativity and vision of the selected producers. These services are "not merely mechanical [and] capable of successful completion by someone picked at random, or necessarily by other firms engaged in the same type of business." *Ford, Bacon & Davis, Inc. v. Holahan*, 311 F.2d 901, 904 (5th Cir. 1962). The Producer Agreement expressly requires the Producers' unique skills and creates a relationship of personal credit and confidence.

34. The purpose of the Producer Agreement is to capture the intangible qualities that Lin-Manuel Miranda has become known for, and the personal services of the Producers are of the essence to the Producer Agreement. Lin-Manuel Miranda is an internationally renowned

musical theater lyricist and composer. He has written the lyrics and music for a number of popular on and off-Broadway shows, including Hamilton, and of course, In the Heights. He has won three Tony Awards, three Grammies, two Olivier Awards, and a Pulitzer Prize. He has been nominated for an Academy Award, and has won four Drama Desk Awards. Scott Sanders is an awarding winning film, television and theatrical producer. He has produced The Color Purple, the revival of Evita, After Midnight, and Up Here. He has won two Tony Awards, an Emmy Award, and a Grammy Award.

35. The Producer Agreement requires Lin-Manuel Miranda's services as the lyricist, composer and creator of In the Heights. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

36. The Producers have additional contractual duties which are premised on their creative and artistic services, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

▮▮▮ These obligations clearly implicate Lin-Manuel Miranda's unique artistic skills and knowledge of In the Heights, and the Producers' unique creative skills.

37. No party to the Producer Agreement can delegate their performance. Lin-Manuel Miranda cannot delegate his producing services to another person, who would necessarily lack his unique talents and familiarity with In the Heights. Scott Sanders and Mara Jacobs cannot delegate their duty to provide ▮▮▮ producing services. Similarly, the Owners chose to contract with the Weinstein Brothers because of their unique expertise and film production capabilities. The Producer Agreement is therefore a personal services contract.

*The Producer Agreement Cannot be Non-Consensually Assigned*

38. A personal services contract cannot "be assigned under New York law without the other party's consent." *Creator's Way Associated Labels, Inc. v. Mitchell (In re Mitchell),* 249 B.R. 55, 57-58 (Bankr. S.D.N.Y. 2000). "No bilateral contract for personal services can be assigned by either party to it, without the consent of the other." *Paige v. Faure*, 127 N.E. 898, 899 (N.Y. 1920) (internal citations omitted). The reason for this is straightforward. Compelling performance of a personal service would violate the "Thirteenth Amendment's prohibition of involuntary servitude" and therefore the public policy of the State. *In re Noonan*, 17 B.R. 793, 798-99 (Bankr. S.D.N.Y. 1982) (citation omitted).

39. Because the Producer Agreement is a personal services contract, under New York law, the Debtor cannot assign it without the consent of the Producers. *See Paige*, 127 N.E. at 899; *see also In re Mitchell*, 249 B.R. at 55. They have never, however, sought or obtained that consent.

40. Because applicable law therefore forbids the assignment of Producer Agreement, the Debtor may not assume and assign that contract under Section 365(c)(1) of the Bankruptcy Code.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the Owners respectfully request that the Court deny the Debtors' proposed assumption of the Option/Purchase Agreement and the Producer Agreement.

Dated: May 10, 2018							BIELLI & KLAUDER, LLC

*/s David M. Klauder*
David M. Klauder (No. 5769)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Facsimile: (302) 397-2557
Email: dklauder@bk-legal.com

*- and -*

KRAMER LEVIN NAFTALIS & FRANKEL LLP

P. Bradley O'Neill*
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: boneill@kramerlevin.com

*admitted *pro hac vice*

*Counsel to the In the Heights Owners*