### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| THE WEINSTEIN COMPANY HOLDINGS | : | Case No. 18-10601 (MFW) |
| LLC, *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors.[1] | : | |
| | : | **Obj. Deadline: July 9, 2018 at 12:00 p.m. (ET)** |
| | : | **Hr'g Date: July 11, 2018 at 10:00 a.m. (ET)** |

------------------------------------------------------------x

## DEBTORS' MOTION FOR AN ORDER APPROVING AMENDMENT TO ASSET PURCHASE AGREEMENT ENTERED INTO BY AND BETWEEN THE DEBTORS AND LANTERN ENTERTAINMENT LLC

The Weinstein Company Holdings LLC and its affiliated debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") respectfully request entry of an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") (i) approving and authorizing the Debtors' entry into the Second Amendment to Asset Purchase Agreement (the "**Second Amendment**"), by and between the Debtors and Lantern Entertainment LLC ("**Lantern**", and together with the Debtors, the "**Parties**"), a proposed form of which is annexed to the Proposed Order (as defined herein) as **Exhibit 1**,[2] which amends the Asset Purchase Agreement, dated March 19, 2018, as amended by the First Amendment to Asset Purchase Agreement, dated April 13, 2018, by and between the Parties (as amended, supplemented or

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

[2] The Parties have agreed to the Second Amendment in the form attached to the Proposed Order as **Exhibit 1**. The Parties will file an executed copy of the Second Amendment as soon as possible.

otherwise modified from time to time in accordance with the terms thereof, the "**APA**" and, as amended by the Second Amendment, the "**Amended APA**")[3]; (ii) authorizing the Debtors to consummate the transactions contemplated under the Amended APA; (iii) approving the settlement embodied by the Second Amendment made by and between the Parties; and (iv) granting related relief.  In support of this motion (the "**Motion**"), the Debtors, by and through their undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.    By this Motion, the Debtors seek approval of a settlement with Lantern that will enable the Debtors to close—with certainty—the Sale of substantially all their assets. The settlement, taking the form of a Second Amendment to the APA, is necessary to resolve an ongoing dispute with Lantern that poses great risk to the estate in circumstances where the Debtors are running out of time, liquidity and options.  Failure to close the Sale would force the Debtors into liquidation, working substantial harm on the Debtors and their creditors.  The settlement would resolve this risk by securing Lantern's commitment to (i) close, (ii) pay specified operating costs of the Debtors after June 29 and (iii) assume responsibility for the payment of millions of dollars in disputed amounts, in exchange for which the Debtors have agreed to an approximately 7.4% reduction in the base cash purchase price (from $310 million to $287 million).    Although the Debtors wish there were another option to ensure the consummation of this Sale, there is not.  Thus, in the exercise of their business judgment, the Debtors have agreed to this settlement because it is in best interests of the estate and the creditors to close the Sale.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended APA or the First Day Declaration (as defined herein), as applicable.

RLF1 19577947v.1

2.      Following the Company's financial collapse last fall and its inability to complete an out-of-court sale, the Company concluded that the best way to maximize value was through a sale of substantially all its assets under the supervision of this Court.  To that end, concurrently with filing these Chapter 11 cases, the Debtors entered into the APA by which Lantern agreed to purchase the Company's businesses as a going concern for a cash purchase price of $310 million, subject to certain adjustments, and to be designated as the "stalking horse" in an expedited auction of the Company's assets.  As the Debtors explained to the Court at the First Day Hearing, one of the most important considerations for the Debtors in entering into the stalking horse APA was the need for deal certainty for the estate and their creditors.

3.      The Debtors conducted a competitive sale process in accordance with Bidding Procedures approved by this Court.  At the conclusion of that process, however, no other qualified bids for substantially all the Debtors' assets were received, and therefore on May 1, 2018, Lantern was declared the prevailing bidder.  Because Lantern had submitted the only qualified bid for substantially all the Debtors' assets, the Debtors do not have the benefit of a backup bid.

4.      As the Debtors have worked to close the Sale, several disputes have arisen between the Debtors and Lantern under the APA.  Most significantly, the Parties disagreed about who—as between the Debtors and Lantern—is required to pay, at closing, Cure Amounts potentially in the tens of millions of dollars owed on Contracts that may be assumed and assigned to Lantern.  In addition, the Debtors have asserted that Lantern breached the APA by failing to close the Sale within the time permitted, and Lantern has accused the Debtors of breaching various representations, warranties and covenants, taking the position that such alleged

breaches have had a "Material Adverse Effect" excusing Lantern from consummating the Sale and preventing the Debtors from satisfying the closing conditions.

5.      Those disputes have raised a significant risk that the Sale will not close at all.  Indeed, Lantern expressly stated on multiple occasions that it would not close the transaction if it were required to pay the disputed Cure Amounts.  The Debtors have threatened to sue Lantern for specific performance under the APA, and Lantern has threatened to bring counterclaims against the Debtors for their refusal to pay the Cure Amounts and for other alleged breaches.

6.      The Parties' disputes have come to a head at a perilous time for the Debtors.  To put it bluntly, the Debtors are running out of both time and money.  The Debtors will be in default of their DIP financing if the Sale is not consummated by July 17, 2018—three weeks from now.  Even if the DIP lenders waived that default, the DIP facility matures just six days later on July 23.  Moreover, Lantern's own debt financing commitment terminates on July 15, 2018 (even before the default and maturity dates of the Debtors' DIP financing), putting at risk Lantern's ability to consummate the Sale.

7.      The failure to close the Sale to Lantern would have disastrous consequences for the Debtors and their creditors.  Without a backup bidder and with only weeks left on their DIP financing, the failure to close would leave the Debtors with no choice but to liquidate, resulting in significantly reduced recovery for all stakeholders.

8.      Given this dire situation, the Debtors have used their best efforts to save the Sale.  Specifically, to resolve the disputes between the Parties and avoid the risk, cost and uncertainty inherent in litigation, the Debtors entered into arm's length discussions with Lantern to see if a settlement could be reached.  As a result of those negotiations, the Debtors and

Lantern have arrived at a settlement that offers the Debtors certainty of closing in the coming weeks, as well as Lantern's commitments to pay the Debtors' costs of operations after June 29, to pay all Cure Amounts and to close regardless of the resolution of any pending objections to the assumption and assignment of contracts.   In return, the Debtors have agreed to an approximately 7.4% reduction in the base cash purchase price.  The settlement is embodied in the Second Amendment, which the Debtors are submitting to this Court for approval.

9.       To be clear, the Debtors are not happy about this outcome.  While a sale at the reduced purchase price would still result in a significant distribution to the Debtors' creditors, the Debtors would have preferred that Lantern consummate the transactions at the original agreed-upon price and pay all Cure Amounts.  The Debtors spent weeks working to achieve that outcome.  The Debtors even sent Lantern a draft complaint setting forth the Debtors' claims, although the Debtors recognized that litigation could never provide certainty of anything. Ultimately, the Debtors reached the conclusion in the exercise of their business judgment that the Sale to Lantern at a reduced price was a better alternative than commencing expensive litigation that, even if successful, would raise the prospect of liquidation due to a failed transaction—all to the detriment of the Debtors' creditors.  The decision to enter into the settlement agreement was unanimously supported by the Debtors' Chief Restructuring Officer, their outside financial and legal advisors, and their Board of Representatives, and it was reached after careful consideration of the facts and circumstances.

10.       The Court should approve the Second Amendment on two grounds.  *First*, the Second Amendment should be approved pursuant to Section 363 of the Bankruptcy Code as a sound exercise of the Debtors' business judgment in selling their assets.  The Debtors understand that some parties may claim they would have reached a different decision.  Under

governing law, however, the Debtors' good faith business judgment—that entering into the settlement agreement was the best available option under the circumstance—is entitled to deference.

11.     *Second*, the Second Amendment should be approved as a settlement agreement pursuant to Bankruptcy Rule 9019.  Settlements are favored in bankruptcy and are approved so long as they fall within the "range of reasonableness."  This settlement undoubtedly falls within that range, as it avoids (i) the need for costly and uncertain litigation, as well as (ii) the real risk that the only available sale transaction would not close.  It also provides the Debtors and their creditors with significant benefits in the form of (i) closing certainty, (ii) Lantern's agreement to cover millions of dollars in Cure Amounts and (iii) Lantern's agreement to cover certain of the Debtors' operating costs from June 30 to the Closing Date.

12.     For these reasons and the additional reasons that follow, the Court should grant this Motion and authorize and approve the Second Amendment to the APA.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

RLF1 19577947v.1

## BACKGROUND

14.     On March 19, 2018, each of the Debtors filed a voluntary petition with this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108.  On March 28, 2018, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in these Chapter 11 cases (the "**Committee**").  No trustee or examiner has been appointed.  The Debtors' Chapter 11 cases have been jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

15.     As stated in the *Declaration of Robert Del Genio in Support of First Day Relief* [D.I. 7] (the "**First Day Declaration**"), the Company is a "mini-major" film and television production studio that creates, produces, and distributes feature films and premium television content for the U.S. and international markets.  The Company's assets consist primarily of intellectual property, distribution rights, and cash flows related to its film library, television productions and portfolio of unreleased films.  The Company has produced numerous critically acclaimed and commercially successful films, receiving 113 Academy Award Nominations and 23 Academy Awards, including Academy Awards for Best Picture for *The Artist* and *The King's Speech*.

16.     Additional information on the Debtors' business and capital structure, as well as a description of the events precipitating the filing of these cases, is set forth in the First Day Declaration.

### A.     The Asset Purchase Agreement

17.     Following its widely publicized financial collapse in October 2017, the Company has been focused on selling substantially all its assets.  From October 2017 through

March 2018, the Company engaged in a series of failed, public attempts to complete an out-of-court sale or reorganization.  After those efforts proved unsuccessful, on March 19, 2018, the Company filed for bankruptcy protection to seek a court-approved sale pursuant to section 363 of the Bankruptcy Code.  The Company's efforts to sell its assets are detailed more fully in the First Day Declaration and in the Sale Motion (defined herein).

18.     The same day it filed for bankruptcy protection, on March 19, 2018, the Company entered into the APA for the sale (the "**Sale**") of substantially all its assets to Lantern, as the stalking horse bidder and prospective purchaser.  The APA specified a purchase price of $310 million in cash, plus the payment of Cure Amounts required to assume and assign certain Contracts, and subject to adjustment for certain payments received by the Company prior to the Closing.  In addition, Lantern agreed to assume certain liabilities.

19.     On March 20, 2018, the Debtors filed a sale motion [D.I. 8] (the "**Sale Motion**") seeking approval of proposed bidding procedures (the "**Bidding Procedures**") and approval to sell their assets to the party making the "highest or otherwise best" offer pursuant to the Bidding Procedures.  The Debtors also filed a motion [D.I. 11] seeking authority to enter into a debtor-in-possession credit agreement to obtain postpetition financing (the "**DIP Financing**").  On April 6, 2018, the Court entered an order approving the Debtors' proposed Bidding Procedures and designating Lantern as the stalking horse bidder [D.I. 190] (the "**Bidding Procedures Order**").  On April 19, 2018, the Court entered an order [D.I. 267] (the "**DIP Order**") approving the DIP Financing on a final basis.  Under the Bidding Procedures Order, the deadline for submitting Qualified Bids (as defined in the Bidding Procedures Order) was April 30, 2018.

20.     By the bid deadline, the Debtors did not receive any Qualified Bids for substantially all their assets other than Lantern's stalking horse bid.  As a result, on May 1, 2018, the Debtors cancelled the auction that had been scheduled for May 4, 2018, and declared Lantern's bid the winning bid.  [D.I. 653.]  Because Lantern's bid was the only Qualified Bid received by the bid deadline (other than certain credit bids for specific subsets of the Debtors' assets), the Debtors did not designate a backup bid.

21.     On May 8, 2018, the Court approved the Sale Motion and on May 9, 2018, the Court entered an order [D.I. 846] (the "**Sale Order**") approving the Sale to Lantern and authorizing the Debtors to consummate the transactions contemplated under the APA.

### B.     The Disputes Arising Under the Asset Purchase Agreement

22.     As the Debtors have worked to close the Sale, disputes have arisen between the Debtors and Lantern that have put the transaction at risk.

23.     One of the more consequential disputes has concerned the payment of Cure Amounts required to assume and assign certain of the Debtors' Contracts to Lantern at Closing.  Section 2.8 of the APA provides that Lantern must "pay all Cure Amounts required to assume the Assumed Contracts."  In reliance on certain other provisions of the APA, however, Lantern has taken the position that if any Cure Amounts consist of Participations that were due on Contracts before Closing, the Debtors, and not Lantern, must pay those Cure Amounts.  Prior to negotiating the settlement embodied in the Second Amendment, representatives of Lantern informed the Debtors on several occasions that Lantern would not close the transactions contemplated by the APA if Lantern were required to pay Cure Amounts that consist of Participations.

24.     At the same time, dozens of objections remain outstanding concerning Cure Amounts and the assumption and assignment of Contracts.  Pursuant to the Bidding

Procedures Order, the Debtors filed and served notices identifying Contracts that may be assumed and assigned to Lantern [D.I. 216, 282, 482 and 860]. In response, the Debtors received over one hundred objections relating to, among other things, Cure Amounts, including Participations, set forth in such notices. Although the Debtors have worked with Lantern in an effort to resolve those objections, many of them remain outstanding.

25.    In addition to the disputes regarding Cure Amounts, Lantern also has taken the position that the Debtors have breached various representations and warranties in the APA in material respects and accordingly that the closing conditions set forth in the APA have not been satisfied (and cannot be satisfied). Lantern has asserted that those alleged breaches constitute a "Material Adverse Effect" under the APA, excusing Lantern from closing the transactions.

26.    These disputes have resulted in multiple exchanges of correspondence, breach notices and threatened legal action between the Parties. On June 1, 2018, counsel for the Debtors sent an email to Lantern attaching a draft complaint against Lantern and demanding that Lantern retract its statements that the Debtors were required to pay certain Cure Amounts and that Lantern would not close if it were required to pay those amounts. In response, Lantern asserted that the Debtors had made material misrepresentations regarding Cure Amounts relating to Participations. Lantern did, however, reaffirm its commitment to close the Sale and re-engage with the Debtors to resolve the issues surrounding payment of Cure Amounts under the APA. Accordingly, in consultation with the Committee, the DIP Agent and the Pre-Petition Agent, the Debtors agreed not to file the complaint.

27.    On June 12, 2018, counsel for the Debtors issued a notice to Lantern that Lantern was in breach of section 2.5 of the APA for failing to close the Sale by June 7, the date

by which the Debtors believed that all conditions precedent to Closing had occurred.   The

Debtors followed up by letter on June 18, demanding that Lantern advise this Court that it was

prepared to close the transactions contemplated by the APA by June 29, 2018.

28.    On June 20, 2018, counsel for Lantern responded by letter, reasserting

Lantern's position on Cure Amounts and further asserting that the Debtors were in breach of

certain representations, warranties and covenants provided for under the APA.  Lantern asserted

that such breaches prevented the conditions to closing the transactions from being met and that

Lantern "reserves all rights and remedies that it may have under the [APA] or otherwise with

respect to such breaches."   Lantern separately made clear the same day that it would assert

counterclaims in any litigation commenced by the Debtors.

### C.    Proposed Settlement and the Second Amendment to the APA[4]

29.    Also on June 20, 2018, in anticipation of the Court's June 22 conference

on the status of the Sale, representatives of the Debtors and Lantern held an in-person meeting

and a series of telephone calls concerning the outstanding disputes under the APA.  Following

several rounds of negotiations led by the Debtors' Chief Restructuring Officer Robert Del Genio

and Lantern's CEO Andy Mitchell, the Parties arrived at a settlement agreement in principle by

which the Debtors agreed to a purchase price reduction of $23 million and Lantern agreed, in

resolution of all disputes with the Debtors over Cure Amounts and all other alleged breaches

under the APA, (i) to assume responsibility for the payment of all Cure Amounts, (ii) that all of

the conditions for closing the transaction had been satisfied, (iii) to close regardless of the

resolution of any pending objections to the assumption and assignment of contracts, (iv) to an

---

[4] The descriptions and summaries of the terms of the Second Amendment provided in this Motion are qualified in their entirety by reference to the provisions of the Second Amendment.  In the event of any conflict between the descriptions in this Motion and the terms of the Second Amendment, the language of the Second Amendment shall control.

outside closing date of July 14, 2018, and (v) to cover the Debtors' costs of operations after June 29 (i.e., from June 30 to the Closing Date).  In deciding to enter into the settlement agreement, the Debtors consulted with the Committee, the Pre-Petition Agent and the DIP Agent, as well as their own outside advisors.  The decision to enter into the settlement agreement with Lantern reflected the unanimous business judgment of the Debtors' advisors, their Chief Restructuring Officer and their Board of Representatives.

30.    An important factor in the Debtors' decision to enter into the Second Amendment was the need to resolve the disputes and ensure closing before the Debtors' DIP Financing or Lantern's debt financing commitment terminated (collectively, the "**Financing Deadlines**"), with the likely result that the transaction could *never* close and the Debtors would be forced into liquidation.  *First*, pursuant to paragraph 25(e) of the DIP Order, an event of default occurs if the Sale is not consummated by July 17, 2018.  *Second,* pursuant to paragraph 4 of the DIP Order, the Debtors' authorization to use the proceeds of the DIP Financing and cash collateral terminates on July 23, 2018.  In other words—and most importantly—the Debtors soon will run out of money and be forced to liquidate their assets if the Sale has not closed.  *Third*, to ensure that Lantern had the necessary financing to consummate the Sale, Lantern entered into a debt financing commitment letter with a third-party financial institution.  If the Sale does not close by July 15, 2018, the commitment letter terminates and Lantern's ability to put up the money to close the Sale will be in doubt.

31.    A summary chart listing key terms of the Second Amendment is set forth below:

| MATERIAL TERMS OF THE SECOND AMENDMENT[5] | |
|---|---|
| **Purchase Price**<br>Section 2.7 | The reference to "$310,000,000" in Section 2.7 of the Agreement is hereby deleted and replaced with the following: "$287,000,000." |
| **Assumed Liabilities**<br>Section 2.3 | The first sentence of <u>Section 2.3</u> of the Agreement is hereby amended and restated in its entirety as follows:<br><br>"On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall (a) assume from the Seller Parties and thereafter pay, perform or discharge when due those Liabilities of the Seller Parties arising out of the operation of the Purchased Assets (including the Assumed Contracts) for periods following the Closing Date, except for those Liabilities that are Excluded Liabilities and (b) subject to the following sentence, assume the Liabilities set forth on <u>Schedule 2.3</u> (collectively, the Liabilities to be assumed pursuant to the foregoing <u>clauses (a)</u> and <u>(b)</u>, the "<u>Assumed Liabilities</u>")." |
| **Excluded Liabilities**<br>Section 2.4 | The first sentence of <u>Section 2.4</u> of the Agreement is hereby amended and restated in its entirety as follows:<br><br>"Notwithstanding any provision in this Agreement or any other writing to the contrary, other than the payment of Cure Amounts in accordance with <u>Section 2.8</u>, Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability of any Seller Party of whatever nature, whether presently in existence or arising hereafter." |
| **Expense Reimbursement** | "<u>Expense Reimbursement</u>. (a)    Regardless    of whether the Amendment Effective Date occurs, in the event that either (i) the Transactions are consummated or (ii) the Agreement is terminated by TWCH pursuant to <u>Section 11.1(b)</u> or <u>Section 11.1(d)</u> of the Agreement (the "<u>Trigger Date</u>"), Buyer shall be obligated to pay to TWCH the Reimbursable Expenses Amount.    No later than twenty (20) Business Days after the Trigger Date, TWCH shall deliver to Buyer TWCH's good faith    calculation    of    the    Reimbursable    Expenses Amount.    The    calculation    of    the    Reimbursable Expenses Amount shall be based upon the books and records of the Seller Parties, maintained in a manner |

---

[5] Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribe to them in the Second Amendment.

consistent with the policies and practices of the Seller Parties prior to the Closing and shall in any event be prepared in accordance with the illustrative calculations set forth on Annex I to Exhibit A. Until the Reimbursable Expenses Amount is finally determined pursuant to this Section 4, the Seller Parties shall afford Buyer (and its representatives and advisors) reasonable access to all books and records and all personnel used to prepare, or otherwise relevant to the calculation of, the Reimbursable Expenses Amount that are under control of or in the possession of Seller Parties (or their respective representatives and advisors), in each case subject to the limitations set forth in Section 5.4 of the Agreement.

(b)     The calculation of the Reimbursable Expenses Amount shall be final and binding on the Parties unless Buyer shall, prior to five (5) Business Days following the delivery of the calculation of Reimbursable Expenses Amount, deliver to Seller Parties written notice of disagreement with such calculation (a "Dispute Notice"), which Dispute Notice shall describe the nature of any such disagreement in reasonable detail.  If the Seller Parties and Buyer are unable to resolve all disagreements with respect to the calculation of Reimbursable Expenses Amount within ten (10) Business Days of receipt by the Seller Parties of a Dispute Notice with respect to such calculation, or such longer period as may be agreed by the Seller Parties and Buyer, then, within five (5) Business Days after the end of such period, the Seller Parties and Buyer shall jointly submit the dispute to the Bankruptcy Court for resolution.

(c)     Upon final resolution of the calculation of the Reimbursable Expense Amount, Buyer shall within two (2) Business Days after such final determination, pay to TWCH, by wire transfer of immediately available funds to an account designated in writing by TWCH, an amount in cash equal to the Reimbursable Expenses Amount."

| | |
|---|---|
| **Reimbursable Expenses Amount** | "As used in this Amendment, "Reimbursable Expenses Amount" means the aggregate amount of the Reimbursable Expenses. |

| | |
|---|---|
| | As used in this Amendment, "Reimbursable Expenses" means any costs, fees and expenses incurred by any Seller Party as a result of the Seller Parties' continued operation of the Business during the period beginning on June 30, 2018 and ending on the Trigger Date, as outlined on Exhibit A. For the avoidance of doubt, none of the following shall be included in the Reimbursable Expenses Amount: (v) any costs, fees and expenses (including all legal, investment banking, brokerage, finder's, financial advisory or similar fees or commissions) which are payable in connection with the Closing, (x) any severance, separation pay, or other payments or benefits payable to any Seller Party Employee on account of any termination of such Seller Party Employee's employment on or before the Trigger Date, (w) any costs, fees and expenses related to the Bankruptcy Cases (including all legal, investment banking, brokerage, finder's, financial advisory or similar fees or commissions), (y) except as set forth in item 4 of Exhibit A, any costs, fees and expenses related to Excluded Assets or Excluded Liabilities and (z) any repayments of principal on any outstanding loans." |
| **Previously Omitted Contracts; Cooperation** Section 2.8 | Section 2.8 of the Agreement is hereby amended by adding the following provisions:<br><br>"(g) Previously Omitted Contracts.  If prior to or following Closing, it is discovered that an executory Contract should have been listed on Schedule 2.8(a) but was not listed on Schedule 2.8(a) (any such Contract, a "Previously Omitted Contract"), Buyer or the Seller Parties, as the case may be, shall promptly following the discovery thereof notify the Seller Parties or Buyer, as applicable, of such omission and Buyer shall provide written notice to the Seller Parties designating such Previously Omitted Contract as an "Assumed Contract" or an "Excluded Contract". The Seller Parties shall, promptly following Buyer's written notice, serve a notice (the "Previously Omitted Contract Notice") on the counterparties to any such Previously Omitted Contract designated as "Assumed" by Buyer, notifying such counterparties of the Cure Amounts with respect to such Previously Omitted Contract and Seller Parties' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.8. The Previously |

Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fourteen (14) Business Days to object, in writing to the Seller Parties and Buyer, to the Cure Amounts or the assumption of its Contract. If the counterparties, Seller Parties and Buyer are unable to reach a consensual resolution with respect to the objection, the Seller Parties will seek an expedited hearing before the Bankruptcy Court to determine the Cure Amounts and approve the assumption (it being understood and agreed that Buyer shall be responsible for the resolution of any such objection and Buyer shall cooperate with counsel to the Seller Parties on briefing and arguing all matters relating to any such objection). If no objection is served on the Seller Parties and Buyer, the Seller Parties shall (on behalf of Buyer) seek an order of the Bankruptcy Court fixing the Cure Amounts and approving the assumption of the Previously Omitted Contract, and no further order or approval shall be required. Any Previously Omitted Contract that is assumed and assigned pursuant to this Section 2.8(g) shall be deemed an Assumed Contract and Buyer shall be liable for all Cure Amounts associated with such Assumed Contract and any Previously Omitted Contract that is not assumed and assigned pursuant to this Section 2.8(g) shall not be considered an Assumed Contract or Purchased Asset and shall be deemed Excluded Contracts. Buyer shall promptly reimburse the Seller Parties by wire transfer of immediately available funds for any reasonable and documented out-of-pocket expenses (including reasonable legal fees and expenses; provided, however, that any such legal fees and expenses shall be reimbursed by TWCH to Buyer to the extent subsequently disallowed by the Bankruptcy Court) incurred by the Seller Parties in connection with any of the foregoing.

(h) Cooperation.    The Seller Parties shall use reasonable best efforts to cooperate with and assist Buyer in determining and negotiating any Cure Amounts for Assumed Contracts. The Seller Parties shall take, or cause to be taken, and cooperate with Buyer to take, or cause to be taken, all actions, do or cause to be done all things as may be reasonably requested by Buyer in order to determine and negotiate

| | any Cure Amounts for Assumed Contracts.   The Parties acknowledge that neither the outcome of any such negotiation nor the final determination of the amount of any Cure Amount is a condition to the Closing." |
|---|---|
| **Closing**<br>Section 2.5 | Section 2.5 of the Agreement is hereby amended and restated in its entirety as follows:<br><br>"Closing.  On the terms and subject to the conditions set forth in this Agreement, the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place at the offices of Cravath, Swaine & Moore LLP at Worldwide Plaza, 825 Eighth Avenue, New York, New York commencing at 9:00 a.m. New York Time, on July 13, 2018, or at such other location, date or time as TWCH and Buyer may mutually agree in writing.   The date the Closing actually occurs is referred to in this Agreement as the "Closing Date"." |
| **Termination**<br>Section 11.1(b) | Section 11.1(b) of the Agreement is hereby amended and restated in its entirety as follows:<br><br>"by TWCH if (i) TWCH has given notice to Buyer in writing that it is ready, willing and able to consummate the Transactions in accordance with the terms of the Agreement and this Amendment and (ii) Buyer fails to consummate the Transactions on or before July 14, 2018 (the "End Date"); provided, however, that the right to terminate this Agreement under this Section 11.1(b) shall not be available to TWCH if its or any other Seller Party's breach or failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated by the End Date;" |
| **Equity Contribution** | "Buyer shall, and shall cause its Affiliates to, take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary, proper or advisable to cause $115,000,000.00 (which amount includes the Escrow Amount) to be funded, by wire transfer of immediately available funds, to Buyer on or prior to June 29, 2018, including (i) initiating any "capital calls" and (ii) if necessary, enforcing Buyer's (or its Affiliates') rights under the existing equity commitment letter.   Buyer shall provide to TWCH documentation evidencing the receipt and amount of any such capital contributions promptly following |

> receipt thereof. From the date of this Amendment until the earlier of (i) the Closing, (ii) the indefeasible payment in full by Buyer of the Reimbursable Expenses Amount pursuant to Section 4 of this Amendment or (iii) the date of termination of the Agreement (other than any termination pursuant to Section 11.1(b) or Section 11.1(d)), Buyer shall not be permitted to make or pay any returns of capital or other payments to (or for the benefit of) any Affiliate or any holder of any equity interests of Buyer or make any other payments except in connection with the consummation of the Transactions."

32.     The Second Amendment is necessary to resolve the disputes between the Parties. In addition, under the circumstances of these cases, in the absence of entering into the Second Amendment, there is significant risk that the Sale to Lantern would not close, forcing the Debtors into liquidation, which would be detrimental to their creditors.

**RELIEF REQUESTED**

33.     By this Motion, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019, the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), (i) approving and authorizing the Debtors' entry into the Second Amendment, (ii) authorizing the Debtors to consummate the transactions contemplated under the Amended APA, and (iii) approving the settlement embodied by the Second Amendment agreed to by and between the Parties.

**BASIS FOR RELIEF REQUESTED**

I.     **THE DEBTORS' ENTRY INTO THE SECOND AMENDMENT SHOULD BE APPROVED PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE**

    A.     **Under Section 363(b)(1), the Debtors' Business Judgment Is Entitled to Deference.**

34.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in this Circuit and elsewhere have held that the decision to sell assets outside the ordinary course of business, when arrived at in good faith, is committed to the sound business judgment of the debtors. *See In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions."). As a bankruptcy court in this district recently explained, "where the debtor articulates a reasonable basis for its business decision . . . courts will generally not entertain objections to the debtors' conduct," and '[i]f a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and in the best interests of the estate." *In re Filene's Basement, LLC*, No. 11–13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (*quoting In re MF Global, Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012)).

35.     Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that the bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its

creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

      **B.**      **The Debtors Have Exercised Sound Business Judgment in Agreeing to Enter the Second Amendment.**

      36.     There can be no genuine dispute that the Debtors' decision to enter into the Second Amendment has "a valid business justification" and therefore is entitled to deference under the business judgment standard.  *In re Filene's Basement*, 2014 WL 1713416, at *12.  The Debtors entered into the Second Amendment to avoid a material risk that the Sale would not close, which could force the Debtors into liquidation and damage their creditors.  In reaching that judgment, the Debtors considered many relevant factors.

      37.     *First*, as set forth in the First Day Declaration and the Sale Motion, and as has been established by the record of these cases, in the absence of a prompt sale, the Debtors do not have the ability to operate as a going concern.  Additionally, the Debtors have exhaustively marketed their assets both pre- and post-petition, and, as a result of that process, Lantern has emerged as the only viable purchaser.  Without the Sale to Lantern, the Debtors will be forced to liquidate their assets.  Such a result, in the Debtors' business judgment, would be a significantly worse outcome for their creditors and other stakeholders than agreeing to the Second Amendment.

      38.     *Second*, the Financing Deadlines are quickly approaching and, if either Party loses its ability to access its financing, the ability to consummate the Sale is at substantial risk.  With respect to the Debtors, if they lose the ability to access the DIP Financing and use cash collateral, their ability to operate would be gravely at risk and it would be unlikely that they could find alternative financing in time and/or be able to use any secured lenders' cash collateral. With respect to the purchaser, if Lantern's debt financing commitment letter expires, Lantern,

which is a special purpose entity that was created to acquire the Debtors' assets, may not be able to obtain alternative funding in order to consummate the Sale.  Accordingly, in either circumstance, the Debtors may be forced to liquidate their assets and/or convert their cases.

39.     *Third*, in the absence of the consensual resolution embodied in the Second Amendment, the Debtors simply do not have the time or money to resolve the dispute with Lantern through litigation.  Litigation is never without risk, and even if the Debtors were to prevail in such a dispute, there is a significant risk that the dispute could not be resolved before the Financing Deadlines—which are only a few weeks away—so as to avoid jeopardizing the Sale.  Moreover, the litigation itself would impose significant costs on the estate.

40.     In sum, the Debtors have evaluated their Chapter 11 strategy, their financing and liquidity position, and the disputes with Lantern, and have determined that the best way to maximize value for their creditors under the current circumstances is to ensure the Sale's consummation by amending the APA pursuant to the Second Amendment.  In the exercise of their business judgment, and in light of the material risk of not closing the Sale and the consequences of such an outcome for the estate, the Debtors have determined that the benefits achieved by the Second Amendment outweigh the costs.

41.     Accordingly, for the reasons set forth above, the Debtors' entry into the Second Amendment is a sound exercise of the Debtors' business judgment, and the Court should approve the Debtors' entry into the Second Amendment and authorize the Debtors to consummate the transactions provided under the Amended APA.

II.    **THE COURT SHOULD APPROVE THE SETTLEMENT UNDER RULE 9019 BECAUSE IT IS FAIR, REASONABLE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES**

A.    **Under Rule 9019, Settlements Are Approved So Long as they Fall Above the Lowest Point in the "Range of Reasonableness"**

42.    Bankruptcy Rule 9019 governs the prerequisites to approval of a settlement that the debtor is party to and provides that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Taken together, Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a) grant a bankruptcy court the power to approve a proposed settlement when it is in the best interests of the debtor's estate and its creditors. *See In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998); *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).

43.    The Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (second alteration in original) (internal quotation marks omitted) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); *see also In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding that settlements are "generally favored in bankruptcy"). Furthermore, the decision to accept or reject a compromise or settlement is within the sound discretion of the Court. *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010); *In re Coram Healthcare Corp.*, 315 B.R. 321, 329 (Bankr. D. Del. 2004).

44.    Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate." *Marvel Entm't Grp.*, 222 B.R. at 249 (quoting *In re Louise's, Inc.*, 211 B.R. at 801). Fundamental to the process of evaluating proposed settlements is "the need to compare the terms of the compromise

with the likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968). The court need not be convinced that the settlement is the best possible compromise in order to approve it. *Coram Healthcare Corp.*, 315 B.R. at 330. Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Travelers Cas. & Sur. Co. v. Future Claimants Representative*, Civ. No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing *Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.)*, 258 B.R. 119 (D.N.J. 2000)); *see also World Health Alts., Inc.*, 344 B.R. at 296; *Coram Healthcare Corp.*, 315 B.R. at 330.

45.     When determining whether a settlement falls within the range of reasonableness, courts in this district generally consider one or more of the following four factors:  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393 (citing *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986)); *see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *In re eToys, Inc.*, 331 B.R. 176, 198 (Bankr. D. Del. 2005).  "[A] court generally gives deference to a Debtor['s] business judgment in deciding whether to settle a matter." *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005).

## B.    The Settlement Is Necessary to Close the Sale and Falls Well Within the Range of Reasonableness

46.     The terms of the settlement are the result of good faith, arm's length negotiations and compromises on both sides.   After a series of discussions, which culminated in a marathon day of negotiations on June 21, 2018, involving the principals of the Debtors and

23

Lantern, as well as their legal advisors, the Parties agreed to the following terms (in resolution of all disputes over Cure Amounts and all other alleged breaches under the APA):

- The Debtors agreed to a $23 million reduction in the Purchase Price under the APA.

- In exchange, Lantern agreed (i) to assume responsibility for the payment of all Cure Amounts (ii) that all of the conditions for closing the transaction have been satisfied, (iii) to close regardless of the resolution of any pending objections to the assumption and assignment of contracts, (iv) to an outside closing date of July 14, 2018, and (v) to cover the Debtors' costs of operations from June 30 to the Closing Date.

47.    The compromise reached is reasonable given the facts and circumstances of these Chapter 11 cases.  The amount of the purchase price reduction represents less than 10% of the base cash purchase price.  It is justified further by the external pressures on the Debtors to close the Sale—namely, the Debtors' lack of time and resources to pursue litigation against Lantern.  The closing certainty that the Debtors bargained for will protect the estate from the prospect of liquidation, which would harm creditors.  The trade-off for that certainty is reasonable.

48.    For these reasons, and the reasons set forth below, the Debtors respectfully submit that the settlement embodied by the Second Amendment falls within the range of reasonableness necessary for approval under Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code and, accordingly, that the Debtors' entry into the Second Amendment should be approved by the Court.

(i)    The Probability of Success in Litigation

49.    Litigation against Lantern would be protracted and, at this point, prohibitively costly for the estate.  Any litigation would involve claims from both Parties.  Both Parties have asserted that the other Party has breached its obligations under the APA.  Lantern's claim that the Debtors breached their representations and warranties would likely require

expensive and time-consuming discovery.  While the Debtors believe that they would prevail in any litigation with Lantern, the inherit risk of litigation, combined with the Debtors' limited liquidity and the impending Financing Deadlines, strongly support entering into the Second Amendment.  Accordingly, this factor weights in favor of approval of the settlement.

(ii)      <u>The Likely Difficulties in Collection</u>

50.     In the event that the Debtors could successfully pursue legal action against Lantern, a full recovery is less than certain.   Section 12.3(b) of the APA provides for liquidated damages in favor of the Debtors in the event of a breach by Lantern in an amount equal to the $15.5 million good faith deposit provided by Lantern when the APA was signed.  Even if the Debtors succeeded in obtaining a judgment in their favor in excess of the liquidated damages amount, collecting any amounts from Lantern, which, as noted above, is a special purpose entity that was formed to acquire the Debtors' assets, may be difficult, and in any event may take significant time, which the Debtors do not have.

51.     In addition, as discussed above, Lantern has alleged that the Debtors have breached the APA and that Lantern has claims against the Debtors.  Where parties may hold potential counterclaims against the debtor, courts have determined that this increases the difficulty in collection.  *See In re Washington Mut. Inc.*, 442 B.R. 314, 344 (Bankr. D. Del. 2011).  As such, this factor also weighs in favor of approval of the settlement.

(iii)     <u>The Complexity of the Litigation Involved, and the Expense,<br>Inconvenience and Delay Necessarily Attending It</u>

52.     There can be little doubt that any potential litigation between the Parties would be complex and time consuming.  Both Parties have alleged that the other Party has breached the APA.  In order for the Court to find that such a breach has occurred, a factual record must be established, which necessarily requires the Parties to engage in time consuming

25

and expensive fact discovery.  Moreover, once the requisite factual record has been established, the issues will need to be briefed and decided.  Under ordinary circumstances, such a process may take months if not years.  As noted above, the Debtors cannot continue to operate on such a protracted timeline, particularly in light of the looming Financial Deadlines in July. Accordingly, this factor weighs in favor of approval of the settlement.

(iv)      <u>The Paramount Interest of Creditors</u>

53.      The Debtors' entry into the Second Amendment is in the best interest of creditors because it ensures that the Sale to Lantern closes.  Without the Sale to Lantern, the Debtors do not believe that there are any potential purchasers that would be willing to acquire the Debtors' assets at a purchase price that is near the price set forth in the Amended APA. Moreover, even if the Debtors were able to find such a purchaser, it is unlikely that such a purchaser would be able to close such sale as promptly as the circumstances of these cases would require.  As such, in the absence of the Sale to Lantern, the Debtors may be forced to convert their cases and/or liquidate their assets.  The Debtors believe that the value of their assets is greater in the context of a going concern sale than a piecemeal liquidation.  Accordingly, if the Debtors' assets are liquidated piecemeal, the Debtors believe that their creditors will receive a reduced recovery.  Further, while the Debtors believe that they would prevail in litigation with Lantern, for the reasons set forth above, time is not on the Debtors' side.  And, even if the Debtors' prevail, if Lantern's commitment letter expires, Lantern may simply be unable to close the Sale even if the Court orders it to do so.  Moreover, the costs of pursuing the Debtors' claims against Lantern would also reduce creditors' recovery.  As such this factor weighs in favor of approval of the settlement.

54.     Accordingly, for the reasons set forth above, there can be little doubt that the settlement embodied in the Second Amendment falls above the lowest point in the range of reasonableness and should be approved.

## WAIVER OF BANKRUPTCY RULE 6004(h)

55.     The Debtors also request that this Court waive, to the extent applicable, the requirements of Bankruptcy Rule 6004(h), which stays orders authorizing the use of property by fourteen (14) days "unless the court orders otherwise." See Fed. R. Bank. P. 6004(h).  Here, the immediate implementation of the Second Amendment is critically important so that the Parties can consummate the Sale.

56.     If the waiver of Bankruptcy Rule 6004(h) is not granted, the Sale will be imperiled.  The Debtors will be in default under the DIP Order on July 17, 2018 and Lantern's debt commitment financing expires on July 15, 2018.  In addition, the DIP Financing and the Debtors' ability to use cash collateral terminates on July 23, 2018.  If either Party loses its financing, there is a significant risk that the Sale cannot close.  Currently, the Court is scheduled to hear this Motion on July 11, 2018 at 10:00 a.m.  Even if the Court enters an order approving this Motion on that date, unless the Court grants a waiver of the stay provided by Bankruptcy Rule 6004(h), such order will not take effect until *July 25, 2018*, which is after expiration of all of the Financing Deadlines.  Therefore, without a waiver of the requirements of Bankruptcy Rule 6004(h), the Sale may not close, to the detriment of the Debtors, their estates, creditors, and all parties in interest.

57.     Accordingly, the Debtors respectfully request that this Court waive the stay imposed by Bankruptcy Rule 6004(h), to the extent applicable, as the exigent nature of the relief sought herein justifies such relief.

RLF1 19577947v.1

## NOTICE

58.     The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to the DIP Agent and the Pre-Petition Agent; (iv) counsel to Lantern; (v) the New York Attorney General and the California Attorney General; (vi) the Office of the United States Attorney for the District of Delaware; and (vii) all parties that have requested service of notices pursuant to Bankruptcy Rule 2002.  In addition, the Debtors will serve notice of the hearing on this Motion on all of the Debtors' creditors.  A copy of the Motion is also available on the Debtors' case website at http://dm.epiq11.com/twc.

## NO PRIOR REQUEST

59.     The Debtors have not made any prior request for the relief sought herein to this Court or any other court.

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the

relief requested and any other further relief as is just and proper.

Dated:      June 27, 2018
            Wilmington, Delaware

                                        */s/ Zachary I. Shapiro*
                                        **RICHARDS, LAYTON & FINGER, P.A.**
                                        Mark D. Collins (No. 2981)
                                        Paul N. Heath (No. 3704)
                                        Zachary I. Shapiro (No. 5103)
                                        Brett M. Haywood (No. 6166)
                                        David T. Queroli (No. 6318)
                                        One Rodney Square
                                        920 North King Street
                                        Wilmington, DE  19801
                                        Telephone:   (302) 651-7700
                                        Facsimile:    (302) 651-7701

                                        - and -

                                        **CRAVATH, SWAINE & MOORE LLP**
                                        Paul H. Zumbro (admitted *pro hac vice*)
                                        George E. Zobitz (admitted *pro hac vice*)
                                        Karin A. DeMasi (admitted *pro hac vice*)
                                        David A. Herman (admitted *pro hac vice*)
                                        Worldwide Plaza
                                        825 Eighth Avenue
                                        New York, NY 10019
                                        Telephone: (212) 474-1000
                                        Facsimile: (212) 474-3700

                                        *Attorneys for the Debtors*
                                        *and Debtors in Possession*