IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
: 
In re: : Chapter 11
:
THE WEINSTEIN COMPANY HOLDINGS, : Case No. 18-10601 (MFW)
LLC, *et al.*, :
: (Jointly Administered)
Debtors.[1] :
: **Re: Docket Nos. 1115 & 1187**
:
---------------------------------------------------------------- x

### DECLARATION OF ROBERT DEL GENIO IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER APPROVING AMENDMENT TO ASSET PURCHASE AGREEMENT ENTERED INTO BY AND BETWEEN THE DEBTORS AND LANTERN ENTERTAINMENT LLC

I, Robert Del Genio, declare as follows:

1. I am the Chief Restructuring Officer ("**CRO**") of The Weinstein Company Holdings LLC ("**TWCH**"), the direct or indirect owner of each of its subsidiaries (together with TWCH, the "**Debtors**" or the "**Company**").

2. I submit this declaration (the "**Declaration**") in support of the *Debtors' Motion for an Order Approving Amendment to Asset Purchase Agreement Entered Into By and Between the Debtors and Lantern Entertainment LLC* [D.I. 1115] (the "**Motion**"),[2] filed by the Debtors on June 27, 2018.

3. On March 19, 2018 (the "**Petition Date**"), the Debtors commenced their respective bankruptcy cases by filing voluntary petitions for relief under Chapter 11 of Title 11

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, the Amended APA (as defined herein) or the First Day Declaration (as defined herein), as applicable.

of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware.  The purpose of the Debtors' bankruptcy proceedings is to permit an orderly sale of substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code (the "**Asset Sale**") in order to maximize the value of the estate for the benefit of creditors and other stakeholders.  On the Petition Date, I submitted the *Declaration of Robert Del Genio in Support of First Day Relief* [D.I. 7] (the "**First Day Declaration**"), which provided a detailed account of the Debtors' state of affairs and the events leading up to the Petition Date, including a description of the Debtors' pre-petition efforts to consummate an out-of-court sale.  I fully incorporate the First Day Declaration by reference herein.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition or information provided to me by the Debtors' employees.  If I were called upon to testify, I could and would testify to each of the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

**Qualifications**

5. As a Senior Managing Director for Corporate Finance and Restructuring at FTI Consulting, Inc. ("**FTI**"), I was retained by the Company to act as a financial advisor to the Company on October 26, 2017; my retention was expanded to CRO on or about December 1, 2017.  I have more than 30 years of experience in restructuring and mergers and acquisitions and have advised companies, lenders, creditors, corporate boards and equity sponsors across a diverse range of industries both domestically and internationally.  I have assisted clients both in and outside of Chapter 11, designed and evaluated financing packages and presentations to

various types of lenders and equity investors and acted as financial advisor to boards of directors and/or principal shareholders in the purchase or sale of numerous businesses.

6. In particular, I have advised companies and lenders/investors in entertainment and media-related reorganizations, including Panavision (interim CEO), Penton Media, F+W (CRO), RHI Entertainment (CRO), LodgeNet, Dial Global, Black Crow Media, ICBC Broadcast Holdings and International Management Group (which owned IMG Media). I also advised the following companies and lenders/investors: A&P, Buffets/Ovation, Carauster Inc., Central Products Corporation, CEVA Group, CHC Group, Dial Global, Factory Card Outlet Corp., Ferro Corp., Finish Line, Hostess Brands, IMG Worldwide, Logan's Roadhouse, Noranda Aluminum, Malden Mills, Meridian Automotive, MicroAge, Milacron, Panolam, Reichhold, Sangamon, Inc., Sbarro, Sequa Corporation, Sharper Image, Sydran (Burger King/Chili's), Talley Industries, Transtar, UCI International, Unisource, USinternetworking, Inc., Verso Paper, Vertis, Inc., Washington Group International, Wheeling-Pittsburgh Steel and X-Rite, Inc. I currently serve on the board of directors of Panavision, Inc. and have previously served on the board of Washington Group International, Inc., CHC Group Ltd., Lazare Kaplan International, Inc. and Buffets, Inc. I also serve on the University of Notre Dame Undergraduate Experience Advisory Council. Further information on my professional background is available on FTI's website at *http://www.fticonsulting.com/our-people/robert-del-genio*.

**The Company's Chapter 11 Filing & Execution of the APA With Lantern**

7. The widely-publicized allegations against the Company's co-founder reported in October 2017 led to significant disruption at the Company and overwhelmed the Company's ability to conduct business as usual.

8. Since then, the Company has been focused on selling substantially all of its assets. From October 2017 through March 2018, the Company engaged in a series of failed public

attempts to complete an out-of-court sale or reorganization. Those efforts are described in detail in paragraphs 45-62 of the First Day Declaration, which I incorporate herein by reference.

9. After the Company's efforts to complete an out-of-court sale or reorganization proved unsuccessful, on March 19, 2018, the Company filed for bankruptcy protection to seek a court-approved sale. The same day, on March 19, 2018, the Company entered into an Asset Purchase Agreement with Lantern Entertainment LLC ("**Lantern**"), an affiliate of Lantern Capital, for the postpetition sale of substantially all the Company's assets (the "**APA**" or "**Stalking Horse Agreement**"), and selected Lantern as the Stalking Horse Bidder. The events leading to the Chapter 11 filing, the execution of the APA and Lantern's selection as the Stalking Horse Bidder are detailed in paragraphs 63-74, of the First Day Declaration, which I incorporate herein by reference.

## The Board's Delegation of Authority to Effectuate the Sale

10. During a Board Meeting on March 19, 2018, the Board designated me as an "Authorized Person" with full authority to take any steps necessary to carry out the sale of the Company's assets. The Board approved several resolutions delegating that authority, including a resolution providing that I was:

> authorized, directed and empowered, in the name of and on behalf of the Company, to (a) take actions and negotiate, or cause to be prepared and negotiated, and, subject to Bankruptcy Court approval as required, to execute, deliver, perform and cause the performance of any other agreements (including asset purchase agreements), certificates, instruments, receipts, petitions, motions or other papers or documents in furtherance of, and necessary to effectuate, any Potential Sale Transactions to which the Company is or will be a party and (b) request the Bankruptcy Court to approve any Potential Sale Transaction (including the Potential Sale Transaction contemplated by the Stalking Horse Agreement) and for any related relief.

4

RLF1 19619645v.1

Since the Petition Date, I have led the Debtors' efforts to consummate a sale of substantially all their assets, including by (in consultation with the Board and the Debtors' financial and legal advisors, and subsequently with the Debtors' Consultation Parties) selecting Lantern as the winning bidder and by leading the efforts to close the sale to Lantern.

### Designation of Lantern as the Successful Bidder and the Court's Approval of the Sale Motion

11. On April 6, 2018, the Court entered an order [D.I. 190] (the "**Bidding Procedures Order**") which, among other things, (i) approved the Bidding Procedures; (ii) designated the Stalking Horse Agreement as the Stalking Horse Bid and Lantern as the Stalking Horse Bidder; (iii) scheduled the Auction for May 4, 2018; and (iv) scheduled the hearing on approval of the sale to the Stalking Horse Bidder or such other Successful Bidder for May 8, 2018.

12. Pursuant to the Bidding Procedures Order, the deadline to submit a bid for the assets was April 30, 2018, at 5:00 p.m. (Eastern Daylight Time) (the "**Bid Deadline**").

13. No party submitted a Qualified Bid that provided for a purchase price that individually or, in the aggregate, equaled or exceeded the consideration provided for in the Stalking Horse Agreement. As a result, pursuant to and in accordance with the terms of the Bidding Procedures Order and the Bidding Procedures, the Debtors designated the Stalking Horse Bid as the Successful Bid and cancelled the Auction. [D.I. 653.] Because Lantern's bid was the only Qualified Bid (other than certain credit bids for specific subsets of the Debtors' assets), the Debtors did not designate a backup bid.

14. On May 8, 2018, the Court approved the Sale Motion and on May 9, 2018, the Court entered an order [D.I. 846] (the "**Sale Order**") approving the sale to Lantern and authorizing the Debtors to consummate the transactions contemplated under the APA.

**The Disputes Arising Under the Asset Purchase Agreement**

15. As the Debtors worked to close the sale, disputes arose between the Debtors and Lantern that put the transaction at risk. I have been the principal business negotiator on behalf of the Debtors in connection with those disputes and have participated in numerous conversations concerning those disputes with representatives of Lantern, the Board and the Debtors' other advisors.

16. One of those disputes concerned the payment of Cure Amounts required to assume and assign certain of the Debtors' Contracts to Lantern at Closing. The Debtors have taken the position that the APA requires Lantern to pay all Cure Amounts. In contrast, Lantern has taken the position that, if any Cure Amounts consist of Participations that were due on Contracts before Closing, the APA provides that the Debtors, and not Lantern, must pay those Cure Amounts. Representatives of Lantern stated on several occasions that Lantern would not close the transactions contemplated by the APA if Lantern were required to pay Cure Amounts that consist of Participations.

17. At the same time, many objections remain outstanding concerning Cure Amounts, including Participations, and the assumption and assignment of Contracts. The Debtors have worked with Lantern in an effort to resolve those objections, but many remain outstanding.

18. Lantern also took the position that the Debtors had breached various representations, warranties and covenants in the APA such that the closing conditions set forth in the APA had not been satisfied (and could not be satisfied). Lantern asserted that those alleged breaches of representations and warranties constituted a "Material Adverse Effect" under the APA, excusing Lantern from closing the transactions.

19. These disputes have resulted in multiple exchanges of correspondence, breach notices and threatened legal action between the Parties. On June 1, 2018, counsel for the

Debtors sent an email to Lantern, a true and correct copy of which is attached hereto as **Exhibit A**, attaching a draft complaint against Lantern and demanding that Lantern retract its statements that the Debtors were required to pay certain Cure Amounts and that Lantern would not close if it were required to pay those amounts.  On June 4, 2018, counsel for Lantern provided a response, a true and correct copy of which is attached hereto as **Exhibit B**, asserting that the Debtors had made material misrepresentations regarding Cure Amounts relating to Participations.  During the intervening weekend, however, Lantern reaffirmed its commitment to closing the sale and re-engaged with the Debtors to resolve the issues surrounding payment of Cure Amounts under the APA.  Accordingly, in consultation with the Committee, the DIP Agent and the Pre-Petition Agent, the Debtors agreed not to file the complaint against Lantern at such time.

20. On June 12, 2018, counsel for the Debtors issued a notice to Lantern that Lantern was in breach of the APA for failing to close the sale by June 7, the date by which the Debtors believed that all conditions precedent to Closing had been satisfied.  The Debtors followed up by letter on June 18, demanding that Lantern advise this Court that it was prepared to close the transactions contemplated by the APA by June 29, 2018.  True and correct copies of the Debtors' June 12 notice and June 18 letter are attached, respectively, as **Exhibits C** and **D**.

21. On June 20, 2018, counsel for Lantern responded by letter, reasserting Lantern's position on Cure Amounts and further asserting that the Debtors were in breach of certain representations, warranties and covenants provided for under the APA.  A true and correct copy of that letter is attached hereto as **Exhibit E**.

### Negotiations Leading to the Second Amendment

22. After weeks of back-and-forth between the Debtors and Lantern concerning Cure Amounts and the Debtors' relationships with key business partners, representatives of Lantern

7

communicated to me that Lantern was questioning whether closing the sale made economic sense for Lantern absent an adjustment to the purchase price. Lantern's principals expressed to me on several occasions that Lantern was considering abandoning the sale and litigating against the Debtors. I regularly updated the Debtors' legal advisors and the Board of these statements.

23. On June 20, 2018, the Debtors' counsel at Cravath, Swaine & Moore LLP ("**Cravath**"), and Lantern's legal counsel held an in-person meeting, and I participated in a series of telephone calls with Lantern principals, in particular Lantern Capital's CEO Andy Mitchell, concerning the outstanding disputes under the APA. Initially on June 20, Mr. Mitchell demanded that the Debtors agree to a purchase price reduction of more than $46 million. He cited as the basis for that demand the outstanding Cure Amounts and various disputes with key business partners, which Lantern alleged the Debtors failed to disclose adequately prior to the execution of the APA, causing Lantern to overvalue the Company. Lantern further asserted that it had valuable legal claims against the Debtors, and I was informed that Lantern's legal advisors had communicated to the Debtors' legal advisors the same day that Lantern would assert counterclaims in any litigation commenced by the Debtors.

24. Over the course of June 20, I spent several hours negotiating with Mr. Mitchell concerning his demand for a reduction in the purchase price. I informed Mr. Mitchell that a purchase price reduction in the range of $46 million was a non-starter for the Debtors. After several rounds of negotiations and discussions of the outstanding issues, we discussed working toward a settlement involving a reduction in the purchase price of approximately $23 million, in exchange for Lantern's agreement (i) to assume responsibility for the payment of all Cure Amounts; (ii) that all closing conditions had been satisfied; (iii) to close regardless of the resolution of any pending objections to the assumption and assignment of contracts; (iv) to an

8

outside closing date of July 14, 2018; and (v) to cover the Debtors' costs of operations from June 30 to the closing date.

25. Later that evening, however, Lantern proposed a settlement by which the Debtors would agree to a purchase price reduction of around $20-25 million but that the Debtors would also agree to assume responsibility for payment of certain Cure Amounts and other costs associated with third-party disputes. That proposal effectively would have decreased the sale's value (from the Debtors' perspective) by around $40-50 million. I advised Mr. Mitchell that this proposal was unacceptable to the Debtors.

26. That same evening, Cravath informed representatives of the Official Committee of Unsecured Creditors (the "**Committee**") and the Debtors' DIP Lender of how negotiations had unfolded over the course of the day between the Parties' legal advisors and between Mr. Mitchell and me. Cravath also invited representatives of the Committee, the DIP Agent and the Pre-Petition Agent to meet at Cravath's offices on June 21, 2018, to hear the proposal from Lantern's representatives and to discuss the economic impact of Lantern's proposal on the Debtors' creditors. While various parties met throughout the day, Lantern did not meet directly with the Committee at any point on June 21.

27. Over the course of June 21, 2018, Lantern re-evaluated the proposal I had initially discussed with Andy Mitchell on June 20, involving the Debtors' agreement to a purchase price reduction of $23 million in exchange for closing certainty and Lantern's agreement, among other things, to assume responsibility for all Cure Amounts and costs associated with various third-party relationships. Ultimately, in the evening of June 21, 2018, Lantern told the Debtors that it would agree to settle all disputes under the APA on the terms Mr. Mitchell and I had discussed on June 20 (with certain modifications). That same evening, the Debtors informed the

Committee, the DIP Agent and the Pre-Petition Agent that Lantern and the Debtors had reached an agreement on a global settlement of their disputes.

28. Later in the evening of June 21, 2018, representatives of the Committee made a proposal to the Debtors' representatives, which included a smaller purchase price reduction and certain adjustments concerning Cure Amounts. The Debtors' counsel conveyed the Committee's proposal to Lantern's counsel that same evening. However, the next morning, shortly before a telephone meeting of the Debtors' Board of Representatives, Lantern's representatives informed the Debtors' counsel that Lantern had rejected the Committee's proposal.

29. During the June 22, 2018 Board meeting, prior to the Court's status conference, the Board approved in principle the settlement with Lantern. Debtors' counsel also described to the Board, and the Board then discussed, the proposal made by the Committee, which Lantern had rejected shortly before the meeting. The Board concluded that the settlement with Lantern was the best available option to ensure the sale's closing and to preserve value. Accordingly, the Debtors' counsel informed the Court at the June 22, 2018 status conference that the Parties had agreed to the settlement. At the same status conference, the Committee's counsel expressed its disapproval of the settlement.

30. On June 25, 2018, the Parties participated in a status conference before Judge Christopher S. Sontchi to set a schedule in advance of the July 11, 2018 hearing related to the Parties' proposed settlement. At that status conference, the Committee provided additional details as to its reasons for disapproving the proposed settlement, and also stated its intention to take discovery of Lantern and the Debtors.

31. On June 27, 2018, the Debtors filed the Motion to approve the terms of the settlement, which took the form of a Second Amendment to the APA.

32. Over the course of the ensuing two and a half weeks, the Debtors, Lantern and the Committee continued to negotiate proposed revisions to the Second Amendment and additional agreements that would address the Committee's concerns, ensure the sale's closing and maximize value for all stakeholders. I, along with the Debtors' legal advisors, have participated in numerous discussions with the parties in the course of those negotiations in an effort to resolve the Committee's objection to the settlement agreement and Second Amendment. The Debtors and their professionals worked tirelessly to address and resolve each of the Committee's economic and non-economic concerns.

33. On July 5, the Debtors, Lantern and the Committee agreed to revise the purchase price reduction from $23 million to $21 million. In addition, certain of the Company's financial advisors agreed to reduce their success-based fees relating to the transaction by an aggregate of $1 million. The agreement reached with Lantern and the Committee also included Lantern's agreement to (i) adopt a "cure floor" of $8.75 million (*i.e.*, a commitment by Lantern to pay cures with face amounts aggregating to no less than $8.75 million), (ii) leave behind with the estate avoidance actions relating to the pre-petition sales of the films *Paddington 2* and *The War With Grandpa* and (iii) set an outside deadline of 120 days for their decision to assume or reject the Debtors' Contracts. These agreements were embodied in a revised Second Amendment to the APA, which was filed with the Court on July 9, 2018 (the "**Revised Second Amendment**"). [D.I. 1187]. The resolution with the Committee also included certain non-economic matters, including cooperation and other agreements related to plan process matters. The resolution of the Committee's concerns with the settlement not only avoided the expense and risk of litigation, but also provided all stakeholders with greater certainty that the sale will close.

34. Together with Cravath and Richards, Layton & Finger, P.A., I participated in numerous calls with the Board to review and discuss the settlement proposals from Lantern and the Committee. The Board approved the final settlement terms on July 5.

**Proposed Settlement and the Revised Second Amendment to the APA[3]**

35. As detailed above, following several rounds of negotiations among the Debtors, Lantern and the Committee, the Parties and the Committee arrived at a settlement by which the Debtors agreed to a purchase price reduction of $21 million and certain of the Debtors' financial advisors agreed to reduce their success-based fees by an aggregate of $1 million. In exchange, Lantern agreed, in resolution of all disputes under the APA, (i) to assume responsibility for the payment of all Cure Amounts, (ii) to adopt a "cure floor" of $8.75 million, (iii) to leave behind with the estate avoidance actions relating to the pre-petition sales of the films *Paddington 2* and *The War With Grandpa*, (iv) to set an outside deadline of 120 days for their decision to assume or reject the Debtors' Contracts, (v) that all of the conditions for closing the transaction had been satisfied, (vi) to close regardless of the resolution of any pending objections to the assumption and assignment of contracts, (vii) to an outside closing date of July 14, 2018, and (viii) to cover the Debtors' costs of operations after June 29 (*i.e.*, from June 30 to the Closing Date). In deciding to enter into the Revised Second Amendment to the APA, the Debtors consulted with the Committee, the Pre-Petition Agent and the DIP Agent, as well as their own outside advisors. The decision to enter into the Revised Second Amendment to the APA with Lantern reflected the unanimous business judgment of the Debtors' advisors and their Board, as well as my business judgment as CRO.

---

[3] The descriptions and summaries of the terms of the Revised Second Amendment provided in this Declaration are qualified in their entirety by reference to the provisions of the Revised Second Amendment. In the event of any conflict between the descriptions in this Declaration and the terms of the Revised Second Amendment, the language of the Revised Second Amendment shall control.

RLF1 19619645v.1

36. An important factor in the Debtors' decision to enter into the Second Amendment was the need to resolve the disputes and ensure closing before the Debtors' DIP Financing or Lantern's debt financing commitment terminated (collectively, the "**Financing Deadlines**"). Failure to close by the Financing Deadlines would likely mean that the transaction could *never* close and the Debtors would be forced into a value-destructive liquidation. Pursuant to paragraph 25(e) of the DIP Order, an event of default occurs if the sale is not consummated by July 17, 2018. In addition, pursuant to paragraph 4 of the DIP Order, the Debtors' authorization to use the proceeds of the DIP Financing and cash collateral terminates on July 23, 2018. In other words—and most importantly—the Debtors soon will run out of money and be forced to liquidate their assets if the sale has not closed, which I believe will result in significantly lower recovery for the Debtors' stakeholders. If the sale does not close by July 15, 2018, Lantern's commitment letter terminates and its ability to put up the money to close the sale will be in doubt.

**The Revised Second Amendment is Reasonable and Shows Sound Business Judgment**

37. I believe that the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for entering the Second Amendment with Lantern.

38. The Second Amendment is necessary to close the sale and to preserve and maximize the value of the Purchased Assets for the benefit of the Debtors' estates and creditors. The reduced purchase price constitutes fair and reasonable consideration for the Purchased Assets and is clearly preferable to any alternative, including liquidation and/or litigation against Lantern and/or the Committee. The Debtors considered a variety of factors in making this determination, including the risks of litigation against Lantern and/or the Committee, the Financing Deadlines and the viability of alternatives to closing the sale to Lantern, such as liquidation. Ultimately, it is clear that without a backup bidder, the failure to close would leave

the Debtors with no choice but to liquidate, resulting in significantly reduced recovery for all stakeholders.

39. Based on my experience in prior cases, the economic analysis my team has conducted, the fact that the only pre-petition bid other than Lantern's was substantially lower than even Lantern's reduced purchase price of $289 million, and the fact that no other Qualified Bids for substantially all of the Debtors' assets were received by the Bid Deadline, I am confident that the sale to Lantern will yield more value than any alternatives, including a piecemeal liquidation of the Debtors' assets.  This conclusion is further supported by the administrative costs associated with liquidation, and the reality that if the sale to Lantern were to collapse, it would be highly publicized, and the Debtors' assets would likely suffer a major decline in value.

40. Moreover, at this stage, litigation against Lantern is not a viable alternative because it would significantly increase the prospect of a value-destructive liquidation.  The Debtors are running out of both time and money.  The Debtors will be in default of their DIP financing if the sale is not consummated by July 17, 2018.  Even if the DIP lenders waived that default, the DIP facility matures just six days later on July 23.  Lantern's own debt financing commitment terminates on July 15, 2018, jeopardizing Lantern's ability to consummate the sale after that date.  Therefore, there would be a significant risk that, before any lawsuit's conclusion, either the Debtors would run out of money or Lantern's financing would expire, making Lantern unable to consummate the sale even if the Debtors prevailed on their claims.  For these reasons, as well as the inherent uncertainty and significant costs associated with litigation, I believe the Revised Second Amendment is far superior to litigation against Lantern.

41. After considering the limited alternatives available to the Debtors, as well as all of the considerations detailed above, I believe the Second Amendment represents the best option for the Debtors and their creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 9, 2018

                                          */s/ Robert Del Genio*
                                          Robert Del Genio
                                          Chief Restructuring Officer