**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x

In re:

THE WEINSTEIN COMPANY HOLDINGS
LLC, *et al.*,

                             Debtors.[1]

-------------------------------------------------------------x

   :
   :     Chapter 11
   :
   :     Case No. 18-10601 (MFW)
   :
   :     (Jointly Administered)
   :
   :     **Re: Docket No. 1430**

**DEBTORS' OBJECTION TO
HARVEY WEINSTEIN'S RULE 2004 MOTION**

The Weinstein Company Holdings LLC (the "**Company**" or "**TWC**") and its affiliated

debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this Objection to

*Harvey Weinstein's Motion for Entry of an Order Compelling Discovery Under (I) Rule 2004 of*

*the Federal Rules of Bankruptcy Procedure and (II) This Court's Previous 2004 Order* (D.I.

1430) (the "**Motion**").  In support of this Objection, the Debtors respectfully state as follows:

**<u>INTRODUCTION</u>**

1.      On May 8, 2018, this Court ordered the Debtors to produce to Harvey Weinstein

("**Weinstein**" or "**HW**") emails on the Debtors' servers between Weinstein and individuals who

are alleged to have been victims of his sexual misconduct.  The Debtors have complied with that

order in all respects.  In accordance with the protocol agreed-upon between the parties and

ordered by the Court (D.I. 976 (the "**2004 Order**")), the Debtors have searched for emails based

upon email addresses provided by Weinstein and have produced 2,216 documents in fifteen

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837).  The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

separate productions over the course of three months.  Those searches continue, paid for by Weinstein pursuant to the Court's order.

2.      In addition to those searches, the 2004 Order also required the Debtors to "meet and confer in good faith with respect to any additional *reasonable* searches as may be requested by HW; provided, however, that the Debtors are under no obligation to run any searches or produce any documents other than pursuant to the 2004 Order".  (*Id.* at ¶ 16 (emphasis added).)  Consistent with that Order, the Debtors have met and conferred with counsel for Weinstein in good faith and have provided certain additional documents, including documents not related to Weinstein's alleged victims or otherwise relevant to his criminal defense.

3.      Now, however, Weinstein is seeking far-reaching, burdensome discovery that is not reasonable and goes far beyond what is contemplated in the 2004 Order.  The search terms he has demanded the Debtors employ would yield more than *one million* documents, including families (*i.e.* parent emails and attachments), and the topics to which those searches relate have nothing to do with communications between Weinstein and any alleged victims.  Rather, Weinstein is seeking broad discovery, ostensibly in his capacity as a creditor, of documents related to a variety of films and projects in which he claims to have an interest.

4.      The Motion should be denied because there is no good cause for the requested discovery.  *First*, the requested discovery has nothing to do with Weinstein's defense of the civil or criminal cases pending against him.  All of the emails Weinstein has requested between himself and alleged victims have been produced, and are continuing to be produced, in accordance with the 2004 Order.

5.      *Second*, any discovery related to a proof of claim Weinstein may one day file should be denied as premature.  A proof of claim is *prima facie* valid as a matter of law until

an objection is filed.  Accordingly, if and when Weinstein files a proof of claim, and that proof of claim is objected to—which may or may not happen—Weinstein can seek discovery as to those matters that are actually in dispute in connection with his claim.  There is no basis for Weinstein to seek broad discovery preemptively, at the expense of all creditors, when a bar date has not yet been set, no proof of claim has been filed, and no objections have been lodged.  Moreover, even if such discovery requests were not premature, other than generic statements that the documents he seeks are "essential to his ability to investigate and analyze" his claims, Weinstein does not draw any actual connection between the discovery he seeks and any proof of claim he may one day file.

6.    *Third*, Weinstein does not need any discovery to "ensure that his property has not been improperly transferred to Lantern".  Weinstein's film rights are specified in Schedule I to his employment agreement, which is attached to Weinstein's motion (D.I. 1430-5 at 4-5; Exhibit 1.).  The film rights that were transferred in the sale to Lantern are set forth in the publicly-filed Asset Purchase Agreement between the Debtors and Lantern—and necessarily only consist of those assets that were owned by the Debtors, not assets owned by Weinstein personally or by other third parties—and Weinstein agreed not to press his objection to that sale.  Moreover, the Debtors have disclosed in multiple public filings the list of executory contracts that may be assumed and assigned to Lantern, Weinstein has not filed any objection to such assumption and assignment, and the time to file such an objection has passed.  Finally, the discovery sought is of the Debtors' records predating the sale to Lantern, and Weinstein has done nothing to establish that there is any connection between that discovery and the alleged transfer of his rights.

7.     Even if Weinstein could demonstrate "good cause" for the production that he seeks, the benefits to Weinstein in obtaining the requested production now are far outweighed by the burden that would be imposed on the Debtors, which would include reviewing more than one million documents for production.  The Debtors are working cooperatively with the Committee to formulate a Chapter 11 plan for the benefit of all of the estate's creditors, as well as addressing the massive litigation that has followed from Weinstein's alleged sexual abuse.  Engaging in the broad discovery that Weinstein seeks will distract the Debtors from those critical tasks and impose substantial unnecessary costs on the Debtors' estates.  In contrast, no harm will come to Weinstein if the Motion is denied because, if and when he files a proof of claim on some day in the future and the Debtors or another party objects, Weinstein will be entitled to seek discovery that is properly tailored to resolve that objection.  The Motion should be denied.

## BACKGROUND

8.     On March 19, 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of the Bankruptcy Code.  Also on the Petition Date, the Debtors filed a motion (the "**Sale Motion**") seeking the approval of a sale of substantially all of their assets, with Lantern Entertainment LLC ("**Lantern**") designated as a stalking horse bidder. (D.I. 8.)  The Court held a hearing on the Sale Motion on May 8, 2018, and subsequently issued an order (the "**Sale Order**") approving the sale.  (*See* Exhibit 2 (May 8, 2018 hearing transcript); D.I. 846 (Sale Order).)  On July 13, 2018, the sale closed and Lantern acquired substantially all of the Debtors' assets.

A.     Weinstein's Prior Motion to Compel.

9.     On April 20, 2018, Weinstein filed a *Motion for Entry of an Order Compelling Limited Discovery Under Rule 2004 of the Federal Rules of Bankruptcy Procedure* (D.I. 275) (the "**First 2004 Motion**").  The motion sought two classes of documents.  *First*, it sought "All

Documents and Communications relating to messages sent or received by all e-mail accounts of Harvey Weinstein during his employment by any of the Debtors". (D.I. 275-3 at 2.) *Second*, it sought "All Documents representing the personal papers, files, letters, messages and effects belonging to Mr. Weinstein that are in the Debtors' possession, custody or control". (*Id.*) The Debtors objected to the First 2004 Motion. (*See* D.I. 477.)

10. At oral argument on May 8, 2018, Counsel for Weinstein stated on the record that Weinstein had agreed to "modify" the First 2004 Motion and "limit . . . the breadth of what we're requesting". (Exhibit 2 at 75:11-14.) Rather than seeking "the entire mirror image of the server", counsel for Weinstein explained that Weinstein was seeking only two categories of information: "emails between my client and the victims so that he can defend himself" (*id.* at 75:21-25) and "some type of cooperation with the debtors to help Mr. Weinstein understand what his interests are and whether they're being sold or impaired" (*id.* at 76:8-14.) Weinstein also made clear on the record that he had agreed to reimburse the Debtors for the costs of any discovery and to "keep the estate neutral" as to the costs to produce both requested categories of documents. (*See id.* at 79: 10-11; *id.* at 77:14-17 ("Mr. Weinstein is proposing to keep the estate whole, reimburse the estate for the costs associated with searches" regarding "the victim-related emails and the debtor, asset-related emails").)

11. Although Weinstein sought both "victim-related emails" and "asset-related emails", the Court granted only that aspect of Weinstein's motion that sought emails between Weinstein and his alleged victims. With respect to that first category of documents, the Court held that "Mr. Weinstein is entitled to a copy of emails", noting that "it has been limited to emails between him and the alleged victims", which would "limit the information provided to him to information that may, in fact, provide a benefit to the estate". (*Id.* at 96:1-48.) The Court

held that, with respect to those documents, "a protocol has to be established . . . including the payment [by Weinstein] of an estimate of the cost in advance of production". (*Id.* at 96:9-12.)

12.     With respect to the second category of information, Weinstein had asked the Court to authorize him to "provide those search terms based on what he thinks his assets are with the language in the sale order protecting and preserving that right, that would help him determine what property interests . . . he owns that the debtor might be trying to sell or trying to assume and assign". (*Id.* at 79:2-8.)  The Court, however, did not authorize any production of documents in connection with that request.   The Debtors nevertheless agreed to meet and confer with Weinstein's counsel in good faith to determine what he was looking for and whether it was easily accessible and appropriate to provide.

B.     Weinstein Agrees Not to Press His Sale Objection and Does Not File an Objection to the Assumption and Assignment of Contracts.

13.     On April 30, 2018, Weinstein filed an objection (the "**Sale Objection**") to the Debtors' Sale Motion. (*See* D.I. 594.)   Weinstein objected to the sale "to the extent that the Sale proposed by the Sale Motion purports to sell assets which are the property of Mr. Weinstein and not the property of the Debtors or their estates and assume and assign contracts to which he or an entity owned by him is a counterparty". (*Id.* at 2.)  Weinstein claimed a need to "(i) evaluate his claims against the Debtors and (ii) ensure that the Sale will not include any property that belongs to Mr. Weinstein and not the Debtors". (*Id.* at 3.)  Weinstein contended that "[t]his Court should not permit the Sale to go forwards until it is clear that the Debtors have met th[eir] burden and demonstrated that they do not propose to sell any assets that are actually the property of Mr. Weinstein or any other party in interest". (*Id.* at 7.)  Weinstein further repeated his claim that the Debtors were withholding from him his emails and his "personal files and effects". (*Id.* at 5-6.)

14. As Weinstein acknowledges in the present Motion, however, "[a]t the May 8 Hearing . . . Mr. Weinstein agreed not to press the Sale Objection". (D.I. 1430 ¶ 9.)

15. In a series of public filings in these bankruptcy cases, the Debtors and Lantern have disclosed lists of those executory contracts that may be assumed and assigned to Lantern in connection with the Sale. (*See* D.I. 216, 282, 482, 846, 860.) Weinstein has not filed an objection to the assumption and assignment of any contracts, and the time for him to do so has passed.

C. The 2004 Order.

16. Following the Sale Hearing, the parties met and conferred on a protocol for the limited discovery the Court had ordered—emails between Weinstein and alleged victims—and, on June 5, 2018, this Court entered the 2004 Order (D.I. 976). The 2004 Order provides that the Debtors must produce to Weinstein "emails by and between (i) HW's two custodial email accounts from The Weinstein Company LLC . . . and (ii) the email address for any alleged victim of misconduct identified by counsel for HW". (*Id.* ¶ 1.) Weinstein agreed to "bear the full cost of the Searches, Privilege Review, Production and all other expenses related thereto, including reasonable and necessary attorneys' fees". (*Id.* ¶ 12.)

17. In addition, pursuant to the agreed-upon 2004 Order, counsel for the Debtors and counsel for Weinstein "agree[d] to meet and confer in good faith with respect to any additional reasonable searches as may be requested by HW; provided, however, that Debtors are under no obligation to run any searches or produce any documents, other than pursuant to the 2004 Order." (*Id.* ¶ 16.) Weinstein agreed, and this Court ordered, "that any additional searches shall be at the sole expense of HW". (*Id.*)

18. In accordance with the Protocol, the Debtors have produced to Weinstein 2,216 documents (2,908 pages) in fifteen separate productions over the course of more than three

months.  (Herman Decl.[2] ¶ 3.)  The Debtors have not refused to produce any documents that consist of emails between Weinstein and any alleged victim whose e-mail address he has identified to the Debtors in accordance with the protocol.

D.    <u>Weinstein Seeks New Broad Discovery Unrelated to His Defense of Civil or Criminal Cases.</u>

19.    In the months following the entry of the 2004 Order, the Debtors have met and conferred with Weinstein's counsel and have provided documents and information beyond the emails contemplated in the 2004 Order.

20.    On June 7, 2018, counsel for Weinstein requested copies of certain of TWC's tax returns for 2014 through 2017, purportedly so that his accountants could "determine Harvey's tax basis and track other important tax-related items for him".  (<u>Exhibit 3</u>.)  The Debtors provided the available tax returns on August 16, 2018.  (<u>Exhibit 4</u>.)

21.    On June 14, 2018, at Weinstein's request, counsel for the Debtors participated in a telephone call with Weinstein and his counsel.  (*See* Herman Decl. ¶ 4.)  On the call, Weinstein insisted that not all of his personal belongings had been returned to him.  (*Id*.)  Counsel for the Debtors explained that everything that was in Weinstein's former office at 375 Greenwich Street was packed into boxes by a professional moving company, loaded onto moving trucks, and delivered to Weinstein's accountant back in December 2017, as he had requested through counsel, such that nothing remained in those offices other than some surplus office supplies like paper clips.  (*Id*.)  Weinstein was not satisfied with that response.  (*Id*. ¶ 5.)  When asked to specify what he believed had not been returned to him, Weinstein asserted that he was missing tapes from Oscar parties he had attended, unspecified "personal papers" and "personal notes",

---

[2] References to "Herman Decl." are to the *Declaration of David A. Herman in Support of the Debtors' Objection to Harvey Weinstein's Motion for Entry of an Order Compelling Discovery Under (I) Rule 2004 of the Federal Rules of Bankruptcy Procedure and (II) This Court's Previous 2004 Order*, filed contemporaneously herewith.

tapes and a script for the film Finding Neverland, other unspecified scripts he had worked on, and everything that was on his desk. (*Id.* ¶ 5.) Counsel for the Debtors explained that nothing was left at Weinstein's former office, but that the Debtors were not seeking to withhold from Weinstein any of his personal belongings and that if Weinstein provided a list of the specific items he believed were missing, the Debtors would look for those items.[3] (*Id.*)

22.     The next day, June 15, 2018, counsel for Weinstein responded by letter to the Debtors' request for a list of the specific belongs Weinstein contended had not been returned. (*See* Exhibit 5.) The letter did not identify any specific items. Rather, it states: "Mr. Weinstein seeks, among other things, the personal files, scripts, DVDs, tapes, related to the projects identified as 'Excluded Projects' on the attached Schedule I to his employment agreement, in which TWC doesn't have an interest." (*Id.*)

23.     On July 20, 2018, at the request of Weinstein's counsel, Debtors' counsel participated in another call with Harvey Weinstein and his counsel to address open questions that Mr. Weinstein and his counsel had raised as part of the ongoing meet and confer discussions. (DeMasi Decl.[4] ¶ 2.) In advance of the call, Weinstein's counsel stated in an email that "the broad view is that Harvey needs an accounting of the amounts owed to him, as well as his personal effects and records". (Exhibit 6.)

---

[3] In his Motion, Weinstein complains that David Anderson, a TWC consultant, did not join this telephone call, going so far as to accuse the Debtors of bad faith. (*See* D.I. 1430 ¶ 17.) While Debtors maintain that the attendees on this call are irrelevant, the facts are as follows. At the request of Weinstein's counsel, Debtors agreed to have David Anderson, who had overseen the delivery of Weinstein's personal effects in December, join the call to confirm to Weinstein's counsel (as Debtors had done many times before) that all of Weinstein's personal belongings had been sent to him and that Weinstein's former office at 375 Greenwich was empty. On June 12 (two days before the call was scheduled to occur), counsel for Mr. Weinstein suggested that Weinstein would speak to Mr. Anderson directly. Debtors declined that arrangement, making clear that the call should occur through counsel. Upon learning that Weinstein would be joining the call in any event, Debtors determined that it would not be productive or appropriate to have Mr. Anderson on the call as well.

[4] References to "DeMasi Decl." are to the *Declaration of Karin A. DeMasi in Support of the Debtors' Objection to Harvey Weinstein's Motion for Entry of an Order Compelling Discovery Under (I) Rule 2004 of the Federal Rules of Bankruptcy Procedure and (II) This Court's Previous 2004 Order*, filed contemporaneously herewith.

24.     On the July 20 call, Weinstein again renewed his request for personal effects and unspecified documents relating to assets to which he claims ownership.  (DeMasi Decl. ¶ 4.) Debtors' counsel asked if Weinstein could identify the documents he wanted counsel to search for, but Weinstein was unable to do so.  (*Id.* ¶ 5.)  Weinstein's counsel, therefore, proposed that Weinstein provide to the Debtors a list of documents that Weinstein was seeking.  (*Id.*)  Because the Debtors' document database is maintained by Debtors' counsel Seyfarth Shaw LLP ("**Seyfarth**"), Debtors' counsel proposed that Weinstein prepare a list to be discussed directly with Seyfarth in order to assess burden.  (*Id.*)

25.     On August 3, 2018, Weinstein's counsel asked to be put in touch with Debtors' counsel at Seyfarth concerning "electronic copies of Harvey's personal effects and records". (*See* Exhibit 7.)  Weinstein's counsel added that "[w]hile securing copies of electronic records in TWC's custody doesn't address . . . Harvey's physical personal effects (DVDs and master prints, etc.), it might be a start".  Debtors' counsel connected Weinstein's counsel with the relevant attorneys at Seyfarth.  (*Id.*)

26.     Later on August 3, Weinstein's counsel provided Debtors' counsel, including Seyfarth, with a list of topics as to which Weinstein was seeking documents.  (*Id.*)  The list called for the Debtors to produce "business records (whether tangible or electronically stored) related to" a list of topics, including the "Excluded Activities and Rights identified in" Schedule I to Weinstein's employment agreement, "Cinema Paradiso and other theatrical stage activities detailed in Schedule I" and a list of nine films that Weinstein's counsel contended were created by him.  (*Id.*)  Weinstein's counsel noted that "at some point we will also need to prepare a proof of claim in the chapter 11 cases" and accordingly that

> "it would be helpful if we received business records related to
> Mr. Weinstein's rights, claims and interests in the Debtors,

including fees (including 'distribution fees'), loan repayments, and bonuses that TWC or any other Debtor received in connection with the sale or distribution of any of the Excluded Activities and Rights (including sequels), whether paid to Mr. Weinstein or otherwise". (*Id*.)

27.     On August 6, Weinstein's counsel conveyed an "urgent request" for an electronic copy of the Firework Maker's Daughter script, asking that it be provided "today". (Exhibit 8.) As Weinstein's counsel acknowledged, Firework Maker's Daughter is not listed on Schedule I as a film in which Weinstein has an interest. (*See id*; *see also* Exhibit 1.) On August 7, 2018, Weinstein's criminal attorney Benjamin Brafman sent an e-mail to Debtors' counsel conveying that "HW is requesting that he be permitte[d] to simply 'read' the script he wrote many years ago for The [F]irework Maker's Daughter", explaining that "[i]t has been many years since he wrote it and [he] simply wants to read it again." (Exhibit 9.) After Seyfarth had engaged in efforts to locate the script and Debtors' counsel had responded to multiple calls and emails from Weinstein's counsel about it, the Debtors ultimately responded that "Debtors are not at liberty to share scripts, such as this one, that no longer belong to the estate and that are not on the schedule of personal assets belonging to your client". (*Id*.)

28.     On August 16, 2018, the Debtors informed Weinstein's counsel that they had located some additional personal belongings in Weinstein's former Los Angeles office, including photographs, and that the Debtors were sending those items to Weinstein's counsel. (*See* Exhibit 10.)

29.     On August 21, Weinstein's counsel provided a list of proposed search terms "for Harvey Weinstein's personal effects, including business records, emails, scripts and projects listed on Schedule I to his employment agreement." (*See* Exhibit 11.) The list includes 74 separate terms, including broadly written terms such as "Kids", "Dog*", and "Quick". (*See*

Exhibit 12.)  A search for the full list of terms in the Debtors' document database yields 759,671

documents, or 1,093,446 documents including families.  (*See* Herman Decl. ¶ 7.)

30.     On August 23, 2018, the Debtors explained that "[t]he estate does not have the

funds or authority to run those kinds of broad searches for your client's benefit" and advised that

if Weinstein was seeking "that kind of broad discovery, he has to proceed with a motion in the

bankruptcy court".  (Exhibit 13.)  On August 30, 2018, Weinstein filed the instant motion.

## ARGUMENT

31.     In this Motion, Weinstein is seeking precisely the same discovery that the Court

declined to grant him at the May 8 hearing in connection with his First 2004 Motion.  At that

hearing, Weinstein's counsel asked the Court for authorization to provide to the Debtors "search

terms based on what we think his assets are . . . that would help him determine what property

interests . . . he owns that the debtor might be trying to sell or trying to assume and assign" (Tr.

79:2-9).  The Court declined to authorize Weinstein to obtain that discovery on May 8, and

Weinstein's second attempt to obtain the same discovery similarly should be denied.

A.     Weinstein Cannot Show Good Cause for the Requested Discovery.

32.     Rule 2004 is discretionary and a party must show "good cause" for the requested

discovery.  *See, e.g.*, Fed. R. Bankr. P. 2004(a) ("the court *may* order the examination of any

entity" (emphasis added)); *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex.

1998) ("[T]he one seeking to conduct a 2004 examination has the burden of showing good cause

for the examination which it seeks."); *see also Freeman v. Seligson*, 405 F.2d 1326, 1336 (D.C.

Cir. 1968) ("[T]he burden of showing good cause is an affirmative one in that it is not satisfied

merely by showing that justice would not be impeded by the production of the documents.")

(quoting *Boeing Airplane Co. v. Coggeshall*, 280 F.2d 654, 659 (D.C. Cir. 1960)).  Weinstein has

not shown, and cannot show, good cause here.

33.    *First*, the requested discovery has nothing to do with Weinstein's need to "defend himself from the numerous criminal and civil allegations currently asserted against him" (D.I. 1430 at 2.)  In accordance with this Court's 2004 Order, the Debtors have produced all of the emails Weinstein has requested between himself and alleged victims, and Weinstein does not contend otherwise.  The discovery he seeks now is of a completely different nature—documents responsive to a broad set of search terms related to films in which he claims to have an interest. There is no relationship between that discovery and Weinstein's ability to defend himself in criminal or civil proceedings, and although Weinstein claims he "requires access to his personal files from his time at TWC" in order to "defend himself," he identifies no connection between the discovery he is currently seeking and his defense of those claims.  Indeed, at times Weinstein has not even articulated any legitimate basis for seeking documents; in his most recent request for The Firework Maker's Daughter script, for example, his stated purpose for seeking it was so that he could read it.  (*See* Exhibit 9.)

34.    Contrary to Weinstein's contention that he "has received only minimal production of documents" following this Court's 2004 Order, the Debtors have fully complied with that Order.  The 2004 Order provides that the Debtors would provide Weinstein with "emails by and between (i) HW's two custodian email accounts from The Weinstein Company LLC . . . and (ii) the email address for any alleged victim of misconduct identified by counsel for HW". (D.I. 976 ¶ 1.)  It further provides that counsel for the Debtors and Weinstein would "meet and confer in good faith with respect to any additional *reasonable* searches as may be requested by HW" (emphasis added) but specified that "Debtors are under no obligation to run any searches or produce any documents, other than pursuant to the 2004 Order".  (*Id.* at ¶ 16.)  In accordance with the 2004 Order, the Debtors have produced to Weinstein 2,216 documents (in fifteen

separate productions over the course of more than three months.  (Herman Decl. ¶ 3.)  That production is ongoing.  Weinstein does not contest the fact that those documents have included all of the "emails by and between (i) HW's two custodian email accounts . . . and (ii) the email addresses for any alleged victim of misconduct identified by counsel for HW".  Indeed, on both the June 14 and July 20 calls, Weinstein himself expressed gratitude to Debtors' counsel for promptly complying with the 2004 Order.  (*See* Herman Decl. ¶ 6; DeMasi Decl. ¶ 3.)  If Weinstein identifies any other email address in that category, the Debtors will search for and produce the corresponding emails (at Weinstein's expense) in accordance with the 2004 Order.

35.    *Second*, Weinstein draws no connection between the requested discovery and his formulation of a proof of claim, and any discovery for that purpose would be premature.  No claims process has been established in these cases and no bar date has been set.  Even once all that has happened and Weinstein has filed a proof of claim, that claim would be deemed valid unless a party objects to it.  *See* 11 U.S.C. § 502(a) (providing that a proof of claim is deemed allowed unless the Debtors or another party in interest objects to the claim).  If and when a party objects to a proof of claim Weinstein files at some point in the future, there will be a contested matter under Bankruptcy Rule 9014 and Weinstein can engage in discovery pursuant to, and with the benefit of the procedural protections governed by, the Federal Rules of Bankruptcy Procedure—and such discovery could be targeted to those matters that are in dispute.  *See In re Washington Mut., Inc.*, 408 B.R. 45, 49-51 (Bankr. D. Del. 2009) (holding that once a contested matter has been commenced, discovery is made pursuant to Bankruptcy Rule 7026 *et seq.*, rather than by a Rule 2004 examination).  Moreover, Weinstein would have the right to amend his proof of claim if after the discovery process he determines it has been understated.

36.     All of that may be in the future.  At present, however, Rule 2004 should not be used as a pre-emptive device to prepare the defense of a proof of claim that may or may not be objected to in the future.  *Cf.  In re Texaco Inc.*, 79 B.R. 551, 555 (Bankr. S.D.N.Y. 1987) (denying as premature a request for a Rule 2004 examination relating to the development, preparation or content of restructuring the debtor's operations or a plan of reorganization).  If all creditors had a right to far-ranging 2004 discovery to file a proof of claim, before a claims process is established or bar date is set, as Weinstein contends, no estate could bear the associated costs—and this one certainly cannot.  No party has yet been provided discovery from the Debtors for the purpose of formulating a proof of claim, and there is no reason Weinstein should be granted broad and expensive discovery ahead of all other creditors.

37.     Moreover, beyond generic statements that the documents he seeks are supposedly "essential to his ability to investigate and analyze the acts of the Debtors and his rights to property he owns" (D.I. 1430 at 2), Weinstein draws no practical connection between the discovery he seeks and any proof of claim he may file.  Even if Weinstein believes he is owed money in connection with films in which he has an interest, he offers no explanation of how a broad email search could yield information relevant to such claims that he does not already have.

38.     *Third*, Weinstein does not need any of the requested discovery to "ensure that his property has not been improperly transferred to Lantern" (*id.*).  Weinstein's film rights are specified in Schedule I to his employment agreement, which Weinstein attached to his motion.  (*See* D.I. 1430-5; Exhibit 1.)  The rights that were transferred in the sale are set forth in the Asset Purchase Agreement (*see* D.I. 8 at 90-91, 233-35), and any executory contracts that have been or may be assumed and assigned to Lantern have been identified in public filings (*see* D.I. 216, 282, 482, 846, 860).  Although Weinstein vaguely asserts that Lantern "may have acquired certain

interests from the Debtors related to the Excluded Activities and Rights, as well as certain rights with respect to the Movie Rights" (D.I. 1430 ¶ 19), nowhere does he specify any basis to believe such a transfer could have occurred, let alone what rights he believes Lantern "may have acquired". Moreover, Weinstein does not explain how or why any of the requested discovery—which is directed at TWC records pre-dating the sale to Lantern—could possibly shed light on this issue.

39.     Moreover, Weinstein has waived any right to challenge the transfer of assets to Lantern. Weinstein previously filed an objection to the Lantern sale but agreed not to press it at the Sale Hearing. (*See* D.I. 1430 ¶ 9.) In addition, Weinstein did not object to the assumption and assignment of any contract, and the time to do so has passed. Weinstein should not be permitted to use a 2004 motion to press alleged rights he has already waived.

40.     What Weinstein has made clear, both personally and through counsel, is that he wants copies of scripts, videos and other similar items because he has a personal desire to read or watch them. (*See* Exhibit 9 (Weinstein counsel Benjamin Brafman candidly acknowledging that Weinstein's "urgent" demand for The Firework Maker's Daughter script had been made because "[i]t has been many years since he wrote it and [he] simply wants to read it again"); Herman Decl. ¶ 5 (describing Weinstein's request for scripts and videos of Oscar parties he attended).) Needless to say, Weinstein's desire to read scripts or watch videos of himself at parties is not a basis to impose on the estates the time and expense associated with discovery.

B.     The Requested Discovery Is Unduly Burdensome

41.     The discovery should be denied for the additional reason that it is unduly burdensome. Although the scope of discovery permitted under Rule 2004 is broader than what is allowed under the Federal Rules of Civil Procedure, Rule 2004 "may not be used for purposes of abuse or harassment and it cannot stray into matters which are not relevant to the basic inquiry."

*In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (internal quotations omitted). In exercising its discretion, the Court may "restrict discovery that appears unduly intrusive or burdensome". *In re Roman Catholic Church of Diocese of Gallup*, 513 B.R. 761, 766 (Bankr. D.N.M. 2014); *see also In re E. W. Resort Dev. V, L.P., L.L.L.P.*, No. 10-10452 (BLS), 2014 WL 4537500, at *7 (Bankr. D. Del. Sept. 12, 2014) ("there are limits, such as when a 2004 examination is used to abuse or harass"); *In re Farris-Ellison*, No. 2:11-BK-33861-RK, 2015 WL 5306600, at *3 (Bankr. C.D. Cal. Sept. 10, 2015) ("Rule 2004 examination must be both relevant and reasonable and may not be used to annoy, embarrass or oppress the party being examined") (internal citations omitted).

42.     The broad search terms Weinstein has demanded would yield 759,671 documents, or 1,093,446 including families.  (*See* Herman Decl. ¶ 7.)  Were this Motion granted, the Debtors would have to review each of those documents for attorney-client privilege or attorney work product, and apply any necessary redactions of such privileged or protected information.  Thus, granting the motion would cause the estate to incur substantial costs at the creditors' expense for Weinstein's benefit.  When weighed against the unsubstantiated benefits Weinstein claims, the balance heavily tips in favor of the Debtors.  *See In re Eagle-Picher Indus., Inc.*, 169 B.R. 130, 134-35 (Bankr. S.D. Ohio 1994) (denying Rule 2004 motion where "the discovery proposed . . . is extremely broad and would clearly be disruptive and costly for the debtors, while the benefit to the movants . . . is far from clear").

C.     Weinstein's Personal Effects Were Returned Months Ago At His Request.

43.     Finally, the Motion should be denied as moot to the extent Weinstein is requesting, yet again, that the Debtors produce his "personal files and effects".  As the Debtors explained in response to Weinstein's First 2004 Motion, and have repeated to him and his counsel many times since, Weinstein's personal property was returned to him at his own request

through his counsel in December 2017.  (*See* <u>Exhibit 14</u>.)  That delivery cost the Company $5,200, which Weinstein initially refused to reimburse but which ultimately he paid in accordance with this Court's 2004 Order.  (*See* <u>Exhibit 15</u>; *see also* D.I. 976 ¶ 15.)  Indeed, the 2004 Order, to which Weinstein consented and which consists of language negotiated by his counsel, specifies that Weinstein is "responsible for the reasonable and necessary fees, costs and *actual* expenses *incurred* by the Debtors in connection with moving HW's personal effects in December 2017" and acknowledges that "Debtors have submitted to HW an invoice for the amount of such moving expenses, which HW has paid in full".  (D.I. 976 ¶ 15 (emphasis added.)  Moreover, the lease for Weinstein's former TWC office (375 Greenwich) was rejected and surrendered upon approval of the Court and no further Company property remains at that location.  (*See* D.I. 261).  Last month, the Debtors located a small set of additional items, including some photographs, in Weinstein's former Los Angeles office, which were also returned to him.  (*See* <u>Exhibit 10</u>.)  As Weinstein and his counsel have been told numerous times, the Debtors are not aware of any personal effects that remain in their possession. Although the Debtors have asked Weinstein repeatedly to identify any specific items he believes the Debtors still possess, Weinstein has been unable (or unwilling) to do so.  Accordingly, this aspect of the Motion should be denied.

> D.    <u>Weinstein Should Pay the Cost of Any Discovery that Is Required, in Accordance with this Court's Prior Order.</u>

44.    If the Court grants Weinstein the discovery he seeks, or any portion of it, Weinstein should be ordered to pay all costs associated with that discovery in accordance with this Court's prior 2004 Order.  Although Weinstein asserts that this discovery would "continue the process begun with entry of the 2004 motion, which has likely already saved significant expense that might otherwise be borne by the Debtors' estates", it is unclear from Weinstein's

submission whether he is agreeing to pay the costs of any new discovery.  Should the Court order any discovery to be provided, the Court should order that it be provided in accordance with the prior 2004 Order, which provides that "HW shall bear the full cost of the Searches, Privilege Review, Production and all other expenses related thereto, including reasonable and necessary attorneys' fees of the Debtors", and that HW shall pay an estimate of those costs "[i]n advance". (D.I. 976 ¶¶ 12, 13.)

## **CONCLUSION**

45.    WHEREFORE, the Debtors respectfully request that the Court deny Harvey Weinstein's Rule 2004 Motion in full, or, in the alternative, order Harvey Weinstein to "bear the full cost" of such discovery, and grant such other and further relief as may be appropriate.

Dated:     September 20, 2018
           Wilmington, Delaware

/s/ David T. Queroli
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
David T. Queroli (No. 6318)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:   (302) 651-7700
Facsimile:    (302) 651-7701

- and -

**CRAVATH, SWAINE & MOORE LLP**
Paul H. Zumbro (admitted *pro hac vice*)
George E. Zobitz (admitted *pro hac vice*)
Karin A. DeMasi (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for the Debtors*
*and Debtors in Possession*