EXHIBIT A

## Levy, Carol Weiner

| | |
|---|---|
| **From:** | Catriela Cohen <ccohen@cravath.com> |
| **Sent:** | Friday, May 25, 2018 4:43 PM |
| **To:** | Sabin, Jeffrey S.; Owens, Keith C.; O'Brien, Daniel A. |
| **Cc:** | David Herman; Paul Sandler; Andrew Wark; David Kumagai; Daniel Silver |
| **Subject:** | TWC - Venable Counterparty Contracts |
| **Attachments:** | 22nd and Indiana & Bradley Cooper.zip; Amityville Horror.zip; 7318 _SINGLEMAN.LF.FE.PDF |

Counsel,

In response to your objection regarding inadequate identification of the agreements, attached please find the first part of the set of contracts currently attributed to the counterparties represented by Venable. We would appreciate if you could provide us with the *Polaroid* agreements referenced in your objection.

We have also reviewed your document requests, which request certain information regarding the counterparties' films. It would be helpful if you would provide us with a list of the films or other products for which you believe such information is needed at this time.

Regards,
Cat


Catriela Cohen
Not Admitted
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1121 | ccohen@cravath.com

This e-mail is confidential and may be privileged. Use or disclosure of it by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please delete this e-mail from the computer on which you received it.

## CONFIRMATION DEAL MEMO

**Date:**        As of September 23, 2011

**Artist:**        Bradley Cooper
SSN: ▮▮▮▮▮▮
c/o Creative Artists Agency
2000 Avenue of the Stars
Los Angeles, California 90067
Attn:    Dave Bugliari and Steven Brookman
Fax:     (424) 288-2900

**Lender:**        22nd and Indiana Inc.
Federal I.D. No: ▮▮▮▮▮▮

**Producer:**        SLP Films, Inc.
1818 Market Street, 12th Floor
Philadelphia, Pennsylvania 19103
Attn:    George Parra
Fax:     (215) 563-6353

**cc:**        The Weinstein Company LLC
9100 Wilshire Boulevard, Suite 700W
Beverly Hills, CA 90212
Attn:    Adrian Lopez, Vice President, Business & Legal Affairs
Fax:     (310) 550-5759

**Role/Picture:**    The role of "PAT" in the motion picture tentatively entitled, "SILVER LININGS PLAYBOOK" (the "**Picture**").

**1.        Conditions Precedent:** Producer has no obligation under this Confirmation Deal Memo (this "**Agreement**") unless and until: (i) Producer receives a fully-executed copy of this Agreement, the Certificate of Engagement and the Inducement Letter attached hereto as Exhibits "B" and "C," respectively; and (ii) Producer receives all documents which may be required by any governmental agency or otherwise for Lender to provide Artist to render services hereunder, including, without limitation, visas, work permits and an INS Form I-9 (Employment Eligibility Verification Form) completed to Producer's reasonable satisfaction, together with Lender and Artist's submission to Producer of original documents establishing Artist's employment eligibility. The aforementioned subparagraphs 1.(i) – 1.(ii) shall be collectively referred to herein as the "**Conditions Precedent.**" Producer shall have the right to waive the aforementioned Conditions Precedent at any time in its sole discretion.

**2.        Services:**

        (a)        Lender shall furnish all services of Artist required by Producer in the Role in connection with the Picture. The Fixed Compensation (as such term is defined below) shall constitute full compensation for Artist's exclusive services as set forth herein, including: (i) Artist's pre-production services, including, without limitation, travel, wardrobe, a reasonable amount of rehearsal, hair and

1

SLP / Bradley Cooper
v.6

makeup, at such times and places as Producer may reasonably require; (ii) Artist's ingoing scheduled period of principal photography services on the Picture commencing on or about October 10, 2011 (i.e., two [2] weeks either side) (the "**Start Date**") (which Start Date is subject to change by Producer in its sole discretion); (iii) plus five (5) "free" days of Artist's services ("**Additional Photography Services**") which may be used for additional photography, added scenes, re-shoots and post-production services, including, without limitation, ADR, dubbing and looping. Three (3) of the "free" days of Additional Photography Services must be consecutive to the period of principal photography of the Picture (exclusive of holidays and regularly scheduled breaks between work weeks) and the other two (2) "free" days of Additional Photography Services need not be consecutive to the period of principal photography, or each other, but which, if non-consecutive to principal photography, are subject to Artist's then-existing prior professional conflicting contractual commitments; (iv) plus five (5) "free" days of Artist's services ("**Additional Post-Production Services**") which may be used for post-production services (i.e., dubbing, looping, ADR, etc.), which "free" days may be consecutive or non-consecutive to the period of Artist's principal photography services or to each other, at Producer's sole discretion, but subject to Artist's then-existing prior professional conflicting contractual commitments in either event; (v) use of Artist's name and approved (i.e., in accordance with below paragraph 8) photograph and likeness in connection with the Picture and any and all marketing and/or promotional materials (including, without limitation, trailers, TV spots, one-sheets, outdoor, etc.) subject to the terms herein; and (vi) Artist's reasonable publicity services in connection with the Picture (i.e., attending the national press junket and premiere of the Picture, appearing on national late night and daytime television talk shows, and being available for radio, newspaper and magazine interviews). Artist shall have the right to disapprove particular publicity and promotional services to be rendered by Artist, provided that Artist exercises such right in good faith and not in a manner designated to frustrate or delay the timely promotion of the Picture, and provided further that Artist renders a reasonable number of publicity interviews and sittings for publicity photographs and other publicity activities reasonably required by Producer, including alternative publicity and promotional services of comparable amount, stature and importance (in Producer's good faith business judgment) to the publicity and promotional services that Artist may disapprove of rendering pursuant to this paragraph. If Artist is required by Producer to render publicity services hereunder at a Location (as defined below), then Artist will be entitled to the following in connection with Artist's publicity services at such Location: (a) one (1) first-class (or best available) round-trip air transportation (if used) between Artist's primary residence (or Artist's then-current location, if closer) and the Location; (b) exclusive first-class (but not necessarily a limousine) ground transportation to and from airports and Artist's primary residence/hotel and to and from the location at which Producer requests that Artist render publicity services and hotel; (c) first-class hotel accommodations (i.e., a one [1] bedroom hotel suite); and (d) an all-inclusive, non-accountable reasonable per diem for Artist. All of the foregoing items shall be in accordance with Producer's then existing policy and the budgetary parameters of the Picture (if and as applicable). All travel and related arrangements will be made by Producer. The aforementioned publicity services shall be subject to Artist's then-existing prior professional conflicting contractual commitments. Notwithstanding anything to the contrary contained herein, Producer agrees to release Artist from rendering exclusive services to Producer on the Picture on or before January 1, 2012.

(b)     Lender shall provide Artist to render all services herein on an exclusive basis during the period of Artist's services in connection with principal photography of the Picture. Lender and Artist agree that Artist shall render all services described herein in a competent, conscientious and professional manner, having due regard for the production of the Picture within the budget, and as reasonably instructed by Producer in all matters, including those involving artistic taste and judgment; but there shall be no obligation on Producer to actually utilize Artist's services or to include any of Artist's work in the Picture, or to produce, release, or continue the production or distribution of the Picture at any time, provided that the foregoing shall not relieve Producer of its obligations hereunder, including Producer's

obligation to pay Lender any Fixed Compensation in connection with Artist's acting services to which Lender may become entitled, if any, pursuant to the terms set forth in Paragraph 3. herein.

(c)    The provisions of Schedule F of the applicable SAG Agreement will apply to Artist's services hereunder. Except as otherwise required by the SAG Agreement: (i) no compensation will be payable for services rendered in connection with any "hold" days or weeks, "free" days or weeks, travel time, publicity interviews, personal appearances or stills, or other periods of service for which this Agreement specifies that no additional compensation is payable, inasmuch as the Fixed Compensation set forth above is deemed to include compensation for all such services; and (ii) no increased or additional compensation will be payable by reason of Artist's rendition of services at night, on Saturdays, Sundays or holidays, after the expiration of any particular number of hours on any one day, or for any "hold" days. The Fixed Compensation shall be deemed an advance against and credited against any compensation for which Producer may be liable under or pursuant to the SAG Agreement or any other applicable collective bargaining agreement, if any, by reason of this Agreement and Artist's performance hereunder, to the maximum extent permitted by any such SAG Agreement or any other applicable collective bargaining agreement, if any. Any payments required by the SAG Agreement or any other applicable collective bargaining agreement, if any, in excess of the payment expressly provided for herein will be payable at the minimum required by the SAG Agreement or such applicable collective bargaining agreement, if any. Any Fixed Compensation, Contingent Compensation (as defined below; if any) and/or Box Office Bonuses (as defined below; if any) paid to Lender shall not be credited against any residuals which may become due to Lender or Artist in connection with the Picture.

(d)    Overages:  Notwithstanding anything to the contrary contained herein, in the event Artist's Additional Photography Services are required for a period of time beyond the five (5) "free" days, or Artist's Additional Post-Production Services are required for a period of time beyond the five (5) "free" days, overages for any such services in excess of the five (5) days of Additional Photography Services and/or five (5) days of Additional Post-Production Services, if any, shall be payable to Lender at the weekly rate equal to the Fixed Compensation divided by the number of weeks of principal photography of the Picture, based on the ingoing schedule of principal photography as of the first day of principal photography ("**Overages**"). All Overages shall be prorated: (i) based on a six (6) day work week when services are rendered on Location; or (ii) based on a five (5) day work week when services are rendered at Producer's studio or its vicinity.

(e)    Working Conditions: For the avoidance of doubt, it is acknowledged and agreed that all work rules applicable to Artist's services in connection with the Picture, including, but not limited to, portal to portal work and rest periods, shall be pursuant to the SAG Agreement.

3.    **Fixed Compensation:**  Subject to Artist's performance of all material services and material obligations hereunder, and provided that Artist is not otherwise in material breach or default hereof, Lender shall be entitled to receive the flat sum of ███████████████████ ($███████) (the "**Fixed Compensation**"), payable in equal weekly installments over the course of Artist's ingoing scheduled period of principal photography services on Producer's regular pay day, one (1) week in arrears. Neither Lender nor Artist shall be entitled to any further sum, rights, or consideration in connection with Artist's services hereunder except as specifically provided for herein, and Lender and Artist acknowledge that no use or exploitation of the Picture shall entitle Lender or Artist to any sums or compensation except as expressly provided for herein. Subject to Artist's failure to fully perform services hereunder as a result of material breach, default, death, disability, and/or force majeure, Artist shall be, on a non-citable and non-precedential basis, deemed "pay or play" and Lender shall be entitled to the foregoing Fixed Compensation, in accordance with the terms of this paragraph, upon Producer having received a copy of this Agreement executed by Lender and Artist.

3

SLP / Bradley Cooper
v.6

4.    **Talent Pool Participations**. Subject to Artist's performance of all material services and material obligations hereunder, provided that Artist appears recognizably in the Role in the Picture as first generally released theatrically, and is not otherwise in material breach or default hereof, Lender shall be entitled to receive, if at all, the following:

(a)    Contingent Compensation: Thirty-three and one-third percent (33 1/3%) of one hundred percent (100%) of the contingent compensation (if any) payable (if ever) pursuant to Paragraph 1. of Exhibit "A" attached hereto and incorporated herein by this reference (the "**Contingent Compensation**") (it being acknowledged by Producer that ▮▮▮▮▮▮ ["▮▮▮▮▮"] and ▮▮▮ ["▮▮▮▮"] shall each be entitled to ▮▮▮▮▮ percent [▮▮▮%] of one hundred percent [100%] of the Contingent Compensation), less any Box Office Bonuses; and

(b)    Contingent Box Office Bonus(es): ▮▮▮▮▮▮▮▮▮▮ percent (▮▮▮%) of the Contingent Box Office Bonus(es) (if any) payable (if ever) pursuant to Paragraph 2. of Exhibit "A" (it being acknowledged by Producer that ▮▮▮▮ and ▮▮▮▮ shall each be entitled to ▮▮▮▮▮▮▮▮ ▮▮▮ percent [▮▮▮%] of any such Contingent Box Office Bonus[es]).

5.    **Award Bonus(es)**: Subject to Artist's performance of all material services and material obligations hereunder, provided that Artist appears recognizably in the Role in the Picture as first generally released theatrically, and is not otherwise in material breach or default hereof, Lender shall be entitled to receive, if at all, the following amounts for each of the following: (i) ▮▮▮▮▮▮ Dollars ($▮▮▮▮) if Artist is nominated for an Academy Award for "Best Actor" or "Best Supporting Actor" in connection with the Picture; (ii) an additional ▮▮▮▮▮▮Dollars ($▮▮▮▮) if Artist wins an Academy Award for "Best Actor" or "Best Supporting Actor" in connection with the Picture; (iii) ▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ($▮▮▮▮) if Artist is nominated for a Golden Globe for "Best Performance by an Actor in a Motion Picture" or "Best Performance by a Supporting Actor in a Motion Picture" in connection with the Picture; and (iv) an additional ▮▮▮▮▮▮▮Dollars ($▮▮▮▮) if Artist wins a Golden Globe for "Best Performance by an Actor in a Motion Picture" or "Best Performance by a Supporting Actor in a Motion Picture" in connection with the Picture.

6.    **Credit**: Subject to the standard exclusions of Producer and the Picture's domestic distributor (including artwork title exceptions), provided Artist appears recognizably in the Role in the Picture as theatrically released, Artist shall be accorded credit in substantially the form of "Bradley Cooper" as follows:

(a)    On Screen: On screen, on a separate card, in the main titles (i.e., where the "Directed by" credit appears, which may be at the beginning or end of the Picture subject to Producer's sole discretion), above or before the title of the Picture, in first (1st) position of all on screen cast credits, on all positive prints of the Picture, in an average size of type no smaller than seventy-five percent (75%) of the average size of type used to display the regular title of the Picture on screen. No individual shall receive a larger credit on screen than Artist.

(b)    Paid Ads: In paid ads issued or controlled by Producer ("**Paid Ads**") (which Paid Ads, for clarity, shall include video/DVD packaging , soundtrack album packaging and theater displays), above or before the "artwork" title (if any) of the Picture in such Paid Ad, in first (1st) position of all cast members accorded credit in such Paid Ad, in an average size of type no smaller than twenty-five percent (25%) of the size of type used for the artwork title of the Picture, if any, in such Paid Ad. No other individual shall receive a larger credit above or before the "artwork" title (if any) of the Picture in such Paid Ad than Artist. In addition, Artist shall be accorded credit above or before the regular (i.e., not artwork) title of the

4

Picture in such billing block, in first (1st) position of all cast credits in such billing block. No other individual shall receive a larger credit in such billing block than Artist.

    (c)    <u>Excluded Ads</u>: In the billing block portion of any so-called excluded ads issued or controlled by Producer (other than award, nomination, congratulatory ads or special ads naming only the person so nominated, congratulated or otherwise honored, special ads under Section 8203D, 8203F and 8203G of the Directors Guild of America collective bargaining agreement, ads announcing a personal appearance in which no person other than the person appearing is mentioned) ("**Excluded Ads**") and in which any other principal cast members of the Picture is also accorded credit in such billing block, above or before the regular (<u>i.e.</u>, not artwork) title of the Picture in such billing block, in first (1st) position of all cast credits in such billing block, in an average size of type no smaller than seventy-five percent (75%) of the average size of type used to display the regular title of the Picture in such billing block. In addition, if Producer accords any other cast member credit above or otherwise in connection with the "artwork" title in the artwork portion (as opposed to the billing block portion) of the key art for the Picture in any Excluded Ads for the Picture, then Producer shall also include Artist's credit above or otherwise in connection with the "artwork title" (as applicable) in such artwork portion of the key art for the Picture in no less than first (1st) position of all cast members accorded credit in such artwork portion of the key art for the Picture, in an average size of type no smaller than twenty-five percent (25%) of the size of type used for the artwork title of the Picture, if any, in the artwork portion of the key art of such Excluded Ad. If Artist is accorded credit in conjunction with the "artwork" title portion of any Excluded Ads, then Producer shall be deemed to have satisfied its obligation, if any, to accord Artist credit in the billing block portion (if any) of such Excluded Ad (i.e., Producer shall have no obligation to accord Artist a repeat credit in the billing block portion of such Excluded Ad). Notwithstanding the foregoing, if any cast member of the Picture is accorded both "artwork" credit and billing block credit in an Excluded Ad, then Artist shall receive both "artwork" credit and billing block credit in such Excluded Ad. No other individual shall receive a larger credit above or otherwise in connection with the "artwork" title (if any) of the Picture in, or in the billing block of, such Excluded Ad than Artist.

    (d)    <u>Likeness</u>: If the likeness of any other cast member appears in the artwork portion of the key art for the Picture in any Paid Ad or, if applicable, in any Excluded Ad, then Producer shall also include Artist's approved (pursuant to Paragraph 8.[b] below) likeness therein (as applicable). Artist's likeness in such key art shall be no less prominent than the likeness of any other cast member appearing in such key art; provided, however, that without frustrating the purpose of the foregoing, in depicting the likeness of Artist and such other cast member, Producer may take into account the relative physical characteristics of Artist and such other cast member and the appropriate proportion and perspective of the key art. Producer's use in Paid Ads or Excluded Ads of an "icon" (i.e., an image of a particular part of the body, such as a stomach, a hand, a close-up of eyes) or the depiction of a non-human character does not constitute the use of a cast likeness for purposes of this Agreement. The foregoing likeness tie shall not apply to any so-called "series" or "showcase" Paid Ads (i.e., a separate advertising featuring principal cast members alone or with a non-recognizable human or with a non-human character), provided that Artist's likeness shall appear on substantially the same number of ads as any other cast member in such series or showcase advertising.

    (e)    <u>Audio Ads</u>: If the name of any other cast member is audibly mentioned in connection with a television advertisement, radio advertisement or trailer ("**Audio Ads**") issued or controlled by Producer with respect to the Picture (other than award, nomination, congratulatory ads or special ads naming only the person so nominated, congratulated or otherwise honored, special ads under Section 8203D, 8203F and 8203G of the Directors Guild of America collective bargaining agreement, ads announcing a personal appearance in which no person other than the person appearing is mentioned), then

5

Artist's name shall also be audibly mentioned in connection with such Audio Ad in first (1st) position of all cast members in such Audio Ad.

(f)    Miscellaneous:  As used herein, "size" means height, width, thickness and boldness of type.  All other matters pertaining to such credit (including, without limitation, the size, style, nature and placement thereof [subject to the restrictions set forth hereinabove]) shall be as Producer in its sole discretion shall determine.  No casual or inadvertent failure by Producer, nor any failure by any third party, to comply with the foregoing credit provisions shall constitute a breach hereof, provided that if Producer materially fails to accord Artist credit pursuant to the terms of this paragraph, upon Producer's receipt of written notice from Artist setting forth such material failure in detail, Producer agrees to use reasonable good faith efforts to prospectively cure such material failure with regard to ads created and/or positive prints manufactured after the date of Producer's receipt of such notice of material failure, but nothing herein shall require Producer to cease using or to replace prints, negatives, masters or other material then in existence.

7.    **Transportation; Location Perquisites:**  If Artist's services in connection with the Picture are required by Producer on location more than fifty (50) miles from Artist's primary residence (currently, Los Angeles, California) (each, a "**Location**"), then Artist will be entitled to the following in connection with Artist's services at such Location:

(a)    Transportation:

(i)    Air Transportation:  One (1) first-class (or best available) round-trip air transportation (if used) between Artist's primary residence and the Location.

(ii)    Additional Air Transportation:  On a one-time only basis, one (1) additional first-class (or best available) round-trip air transportation (if used) for Artist or Artist's guest ("**Artist's Additional Ticket**"); provided, however, Artist acknowledges and agrees that Artist's use of Artist's Additional Ticket shall be subject to Artist's scheduling requirements hereunder and Producer's prior written approval thereof.

(iii)    Ground Transportation:  Exclusive ground transportation to and from airports and Artist's primary residence/location residence and exclusive ground transportation to and from Artist's location residence and sets.  Producer shall consult with Artist with respect to the individual engaged by Producer to drive the vehicle in which Producer will provide Artist with the ground transportation set forth in this paragraph, provided that in the event of disagreement or if Artist is unavailable for such consultation, Producer's decision with respect thereto is final and binding.

(iv)    Rental Car:  During the period that Artist is rendering services on Location, Artist shall be entitled to the use of an exclusive insured full-size rental car as provided by Producer and Producer shall reimburse Artist for the reasonable costs of parking such rental car at the place of Artist's accommodations, upon Producer's receipt of written substantiation of such charges. Notwithstanding the foregoing and for the avoidance of doubt, in connection with any rental car provided by Producer to Artist, Producer shall not reimburse Artist for parking tickets or any other such citations and Producer shall not be responsible for any costs related to maintenance or repairs. In the event that unpaid parking violations or any other citations are reported to Producer while Artist is rendering services for Producer or after Artist has concluded employment with Producer, Artist shall be responsible for any bail amount and/or processing fees with respect to such parking tickets and citations.

6

(b)    _Per Diem_: An all-inclusive, non-accountable per diem in the amount of Two Hundred Dollars ($200) for Artist.

(c)    _Accommodations_: One (1) hotel suite, ███████████████████ ███████████████████████ when Artist renders services at Producer's request in or around ████████ provided that if the "███████████" is unavailable, then Producer shall provide Artist with a comparable hotel suite, subject to Artist's reasonable approval.

(d)    _Trailer_: Exclusive use of one (1) first-class trailer equipped with customary first-class amenities, provided that such trailer and amenities shall be no less favorable than the trailer and amenities provided to any other cast member in connection with the Picture, other than ██████.

(e)    _Assistant_: While Artist renders services in connection with principal photography of the Picture at Producer's request at a Location, Producer shall engage the services of Artist's assistant at the rate of ███████████ ($████) per five (5)-day week (pro-rated at 1/5th thereof per day), with such sum being inclusive of compensation for any idle time. In connection with such engagement, Producer shall provide such individual with one (1) coach-class round-trip air transportation (if used) between such individual's primary residence and the Location, crew accommodations, a rental car and a crew per diem.

(f)    _Training/Food Supplements/Nutrition_: On a one-time only basis, Producer shall provide Lender with an all-inclusive non-accountable payment in the amount of ████████████ ██████ ($████) to cover the costs of Artist's nutrition, food supplements and training in connection with Artist's preparation for the Role.

8.    **Approvals:**

(a)    _Photo/Likeness Approvals_: Lender and Artist will have a right to approve any still photographs or any artistic rendering or likeness of Artist which Producer intends to use in connection with advertising, merchandising, publicity or other exploitation of the Picture, provided that Lender and/or Artist will approve not less than fifty percent (50%) of those stills in which Artist appears (whether alone or with other cast member(s)), and Lender and Artist will have three (3) passes with respect to likeness approval, all of the foregoing in accordance with the domestic distributor's customary provisions (i.e., deemed approved if not specifically disapproved in writing within five [5] business days [reducible to two (2) business days in the event of marketing exigencies of which Artist is notified at the time of submission] of Artist's or Artist's agent's receipt). All still photographs approved or deemed approved by Artist shall be approved or deemed approved for all purposes permitted hereunder, except as otherwise set forth herein.

(b)    _Key Art Resubmission_: Producer shall resubmit to Artist any stills and/or artistic renderings in which Artist appears recognizably that have been previously approved by Artist or deemed approved pursuant to Paragraph 8.(a) (the **"Resubmitted Approved Art"**) which Producer intends to use in the "key art" for the Picture (including the "key art" used for covers of novelizations, soundtrack records, home video packaging, magazine covers and merchandising [subject to paragraph 9.(b) below]). Artist shall have five (5) business days from receipt of the Resubmitted Approved Art (which five [5] business day period shall be reduced to three [3] business days if Producer requires Artist's response in such shorter time period and Producer notifies Artist thereof) within which to approve no less than fifty percent (50%) of such Resubmitted Approved Art for Producer's intended use in connection with the Picture. If Artist shall fail or refuse to approve, within the aforesaid period, the requisite amount of Resubmitted Approved Art, Producer shall have the right to select from the Resubmitted Approved Art

7

the requisite amount, including the Resubmitted Approved Art approved by Artist, if any, for use in the "key art" for the Picture. Producer's submission of the Resubmitted Approved Art to Creative Artists Agency as specified in Paragraph 18. shall satisfy Producer's submission requirements under this Paragraph 8.(b) and any inadvertent failure by Producer (or its representatives) to comply with the provisions of this Paragraph 8.(b) shall not constitute a breach of this Agreement. Once the requisite amount of the Resubmitted Approved Art has been approved or deemed approved in accordance with the provisions of this Paragraph 8.(b), Producer shall have the right, in its sole discretion and without any further submission obligation to Artist, to use any or all of said approved Resubmitted Approved Art in the "key art" for the Picture and any use thereof, subject to the terms and conditions set forth herein.

(c)    Screenplay Approval: Artist shall have the right to approve any material changes to the "Screenplay" for the Picture that materially diminish or alter the importance or the essential characteristics of Artist's Role, provided that Artist shall exercise such approval in good faith and not so as to frustrate the timely progress to production or production of the Picture. Artist acknowledges that Artist has pre-approved the screenplay dated October 11, 2011 ("Screenplay").

(d)    Director Replacement: If for any reason it becomes necessary to replace the director of the Picture (i.e., Russell, who Artist hereby pre-approves), then Artist shall have the right to approve any replacement, provided that Artist shall approve no less than one (1) of three (3) available replacement directors suggested by Producer to Artist and further provided that after the date which is six (6) weeks prior to the commencement of principal photography of the Picture, Producer shall designate a replacement director after good faith consultation with Artist, but in the event of any disagreement, Producer's decision shall be final and binding. Any replacement director approvals shall be made within two (2) business days of the date of receipt by Artist or Artist's representatives of any submission by Producer hereunder. Subject to the foregoing, all decisions relating to the engagement (if any) of a replacement director including, without limitation, the compensation payable to a replacement director, shall be made in Producer's sole election.

(e)    Co-Star Replacement: If for any reason it becomes necessary to replace either of the co-stars of the Picture (i.e., the individuals portraying the roles of "Tiffany" and "Mr. Peoples"; Artist hereby pre-approves ███████████ ["█████████"] and ███████ for such respective roles), then Artist shall have the right to approve any replacement, provided that Artist shall approve no less than two (2) of five (5) available replacement co-stars suggested by Producer to Artist and further provided that after the date which is four (4) weeks prior to the commencement of principal photography of the Picture, Producer shall designate a replacement co-star after good faith consultation with Artist, but in the event of any disagreement, Producer's decision shall be final and binding. All replacement co-star approvals shall be made within two (2) business days of the date of receipt by Artist or Artist's representatives of any submission by Producer hereunder. Subject to the foregoing, all decisions relating to the engagement (if any) of a replacement co-star including, without limitation, the compensation payable to a replacement director, shall be made in Producer's sole election.

(g)    Tabloids: Producer and/or The Weinstein Company ("TWC") shall not submit any stills and/or likeness in which Artist appears to the following publications: "The National Enquirer"; "The Star"; "The Globe"; "The Sun"; "The Examiner"; "The Weekly World News" or other similar publications. Notwithstanding the foregoing, (i) Producer shall not be in breach of this Agreement if any of such publications obtain stills and/or any likenesses in which Artist appears from parties other than Producer or if any of such publications contain advertising for the Picture which includes Artist's stills and/or likeness therein, and (ii) Lender and Artist hereby acknowledge and agree that Producer cannot make any guarantees (and will not be in breach hereof) regarding the unauthorized use of stills, likeness or electronic press kits by any publications or media outlets which were legitimately serviced by any

publicity companies engaged or performing services in the normal course of business in connection with the publicizing and promotion of the Picture.

(h)    Biography: Artist may furnish Producer with Artist's biography. Provided that Artist timely furnishes such biography to Producer following Producer's request therefor, Producer shall not have the right to use any biographical information about Artist other than as contained in such biography (other than references to Artist's prior professional credits and Artist's services on the Picture) without the prior approval of Artist, which approval shall not be unreasonably withheld.

9.    **Ownership and Distribution**:

(a)    The results and proceeds of Artist's services hereunder in connection with the Picture shall be deemed works-made-for-hire specially ordered or commissioned by Producer for use in connection with an audiovisual work(s). Artist acknowledges and agrees that Producer shall exclusively own all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to such results and proceeds, and all elements therein for all now known or hereafter existing uses, media, and forms, including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, video cassette and video or laser disc, any computer-assisted media (including, but not limited to CD-ROM, CD-I and similar disc systems, interactive cable and any other devices or methods now existing or hereinafter devised), video-on-demand, character, prequel, sequel, remake, merchandising (subject to paragraph 9.[b] below), soundtrack (including, without limitation, the further exclusive right to use and to license the use of Artist's voice from the soundtrack of the Picture on commercial phonograph record(s), album(s), and similar devices, with no additional remuneration inasmuch as the compensation set forth herein shall be deemed to include remuneration for the foregoing [subject to paragraph 9.[c] below]), commercial tie-ins (subject to paragraph 9.[b] below), behind-the-scenes promotional films (subject to the restrictions contained herein), bloopers (subject to the restrictions contained herein), outtakes (subject to the restrictions contained herein), stage play, theme park, Internet and any and all allied and ancillary rights therein, and the foregoing is inclusive of a full, irrevocable assignment to Producer thereof. Artist further acknowledges and agrees that Producer will be the sole and exclusive owner of all rights in the role and character played by Artist, including the name, voice, likeness and/or distinctive characterizations of the role and character, and that Artist shall have no right at any time to portray, exploit, merchandise or make any use of such role or character. In connection with the foregoing rights granted to Producer, Producer shall have the right, in perpetuity and throughout the universe, to exploit such role and character, and to use, and to authorize others to use, Artist's name, approved image, voice, approved likeness, attributes and/or approved biography, in connection with the production, exhibition, advertising, publicity, merchandising, commercial tie-ins, promotion and/or other exploitation of the Picture, and/or subsidiary and ancillary rights of any nature relating to the Picture or Artist's services hereunder, in any and all media, whether now known or hereinafter devised, including, without limitation, in and in connection with the Picture, excerpts from the Picture, trailers for the Picture, television advertisements for the Picture, new footage shot in connection with any trailers or television advertisements, one sheets and other posters furnished exhibitors for display or promotion, packaging/jackets of videodiscs, cassettes and phonorecords, videogames, wireless content (including, without limitation, ring tones, voice tones and wall paper) printed programs, press books, and novelizations of the story of the Picture and other commercial publications relating to the Picture, and soundtrack recordings relating to the Picture embodied in any form now known or hereinafter devised (including the packaging therefor and in sheet music and song books relating thereto) (subject to the restrictions contained herein). Notwithstanding anything to the contrary contained herein, Producer shall not use the results and proceeds of Artist's services hereunder in any motion picture or other production, other than in the Picture (which may be exploited in any manner now known or hereafter devised) and in any advertising and publicity therefor, without Artist's prior written consent.

9

(b)    Notwithstanding the foregoing or anything to the contrary contained herein, Artist shall have the right to approve, in each instance, the use of Artist's name (outside of credit lists, including without limitation, billing blocks, which are pre-approved), voice and/or likeness in connection with any merchandising with respect to the Picture and the use of Artist's name, voice and/or likeness (except for clips or other footage from the Picture, the key art of the Picture and credit lists, including without limitation, billing blocks, which are pre-approved) in connection with any commercial tie-in for the Picture; provided, however, that such approval shall be deemed given if not denied by Artist in writing within five (5) business days (or such shorter period as is reasonably designated by Producer if Producer advises Artist in writing that business or marketing exigencies require a quicker response from Artist) after Producer's request therefor and further provided that, with respect to the pre-approved uses of Artist's name voice and/or likeness, Producer shall not use Artist's name, voice or likeness in connection with commercial tie-ins involving weapons (other than toy weapons), feminine hygiene products, prescription pharmaceuticals, undergarments (excluding t-shirts), gambling, religious or political items, tobacco or alcohol without Artist's prior written approval. If Producer exercises the foregoing merchandising rights under Paragraph 9.(a) following Artist's approval (or deemed approval) then with respect to merchandise actually sold, Producer shall pay to Lender a royalty in an amount to be negotiated in good faith.

(c)    Producer shall not use Artist's voice on a soundtrack album without Lender's or Artist's prior written consent and without negotiating a royalty therefor in good faith within Producer's customary parameters, taking into account Artist's major studio contractual precedent and stature in the motion picture industry. The foregoing shall not apply to either (i) Artist's spoken voice performance; or (ii) musical material which is ad-libbed or improvised as part of Artist's acting services; provided that such spoken voice performance and/or ad-libbed or improvised musical material does not exceed an aggregate of fifteen (15) seconds in length in connection with any such soundtrack album.

**10.    Promotional Film/Outtakes/Bloopers:**  Producer contemplates filming and exploiting films, including, without limitation, music videos for the Picture, "behind the scenes" or "making of" productions about the Picture ("Promotional Film") in connection with the advertising, marketing and publicity of the Picture. Producer shall use reasonable efforts to provide Artist with prior notice of any production of a Promotional Film; provided, however, Producer's inadvertent failure to provide such notice shall not be a breach of this Agreement. Artist hereby agrees and consents to such filming and exploitation (including, without limitation, use of any film clip footage from the Picture and behind the scenes photography and filmed interviews with Artist) and hereby grants to Producer the right to use Artist's name, voice and likeness in connection with such Promotional Films for no additional consideration. In addition, Artist hereby agrees and consents to the use by Producer of outtakes in connection with (i) the end credits of the Picture; (ii) any "compilations" or "special editions" of the Picture for inclusion on DVD's, laser discs, and/or other devices now known or hereafter devised and (iii) any "compilation" or "special edition" types of motion pictures issued or controlled by the distributor of the Picture. Artist shall have the right to approve all "bloopers", screen test footage and behind-the-scenes footage in which Artist appears used in connection with such Promotional Films or other programs under Producer's control; provided that at Producer's request, in connection with (i) the end credits of the Picture; (ii) any "compilations" or "special editions" of the Picture for inclusion on DVD's laser discs, and/or other devices now known or hereafter devised and (iii) any "compilation or "special edition" types of motion pictures issued or controlled by Producer, Artist shall approve a sufficient amount of such behind-the-scenes footage embodying Artist's appearance in a manner that a reasonable audience would conclude that Artist was featured in the Picture. Notwithstanding the foregoing, Artist shall have absolute approval of any use of any so-called "bloopers" in which Artist appears, which approval may be withheld in Artist's sole discretion, and Artist is not obligated to approve any minimum amount thereof.

10

11.    **Hair/Make-Up/Wardrobe/Stand-In/Stunt Double Consultation**: Producer shall consult with Artist with respect to the "look" of Artist's hair and make-up and wardrobe (but not with respect to any personnel in connection therewith, it being understood, however, that Producer engaged the individuals approved by Artist to furnish hair, make-up and wardrobe services for Artist, on a non-exclusive but first priority basis to Artist, which Artist hereby acknowledges) and the individuals to be engaged by Producer as Artist's stand-in and stunt double; provided, however, that: (a) said consultation rights shall be personal to Artist and shall not be delegated to any third party; (b) Artist is available for such consultation(s) when and where Producer reasonably requests; (c) any such consultation(s) with Artist shall be at no cost to Producer; and (d) in the event of disagreement or if Artist is unavailable for such consultation, Producer's decision with respect thereto is final and binding

12.    **Premiere/DVD/Soundtrack**:  Provided that Lender and Artist fully perform all material services and obligations hereunder and are not otherwise in material breach hereof and that Artist appears recognizably in the Role in the Picture as theatrically released, Artist will be entitled to the following:  (i) an invitation for Artist and a non-business related guest to all celebrity premieres and festivals, if any, and if one (1) celebrity premiere in the U.S. of Producer's choice is held at a Location, first-class (or best available) round-trip travel (for Artist and Artist's guest, by air if appropriate, if used) between such Location and Artist's primary residence, first-class accommodations (i.e., a one [1] bedroom hotel suite) (for Artist only), exclusive ground transportation (for Artist only) and a reasonable per diem (for Artist only), all in accordance with Producer's then existing policy and the budgetary parameters of the Picture; (ii) a DVD copy of the Picture in standard format or a DVD copy of the Picture in Blu-ray format (if and when commercially available), provided that Artist executes Producer's then applicable use-restriction agreement in connection therewith; and (iii) a CD of the soundtrack of the Picture (if and when commercially available), provided that Artist executes Producer's then applicable use-restriction agreement in connection therewith.

Notwithstanding the foregoing, Artist shall be treated no less favorably than De Niro with respect to the entitlement to the number of invitations, air transportation, ground transportation, accommodations and an expense allowance with respect to any U.S. premieres and U.S. film festivals in connection with the Picture.

13.    **Nudity**:  Artist shall not be required to appear, and may not be doubled in any scene, in the nude, or in any simulated sex scene without the express written consent of Artist, in accordance with the SAG Agreement.

14.    **Dubbing/Doubling**:  Subject to Section 33 of Schedule C of the SAG Agreement, Producer shall have the right to use the services of persons other than Artist (with or without the services of Artist) to "dub" or "double" Artist's acts, poses, appearance, voice or sound effects attributed to the character portrayed by Artist and to use the name, likeness, voice or other sound effects of Artist in connection therewith. Such doubling or dubbing of Artist's voice may be in English or any other language, provided, however, that: (i) Producer shall not "double" Artist without Artist's prior written consent (which consent shall not be unreasonably withheld or delayed); and (ii) Producer shall first give Artist the opportunity to dub in English provided that Artist is available as, when and where reasonably required by Producer and that there is no additional cost to Producer in connection with such dubbing services of Artist.

15.    **Insurance**:  Lender and Artist shall be listed as additional insureds on Producer's errors and omissions insurance policy in connection with the Picture and to the extent Artist is deemed an employee of Producer, Artist shall be listed as an additional insured on Producer's general liability insurance policy in connection with the Picture hereunder during customary periods of production and distribution of the Picture, subject to the limitations, restrictions and terms of said policies.  The provisions of this paragraph

11

shall not be construed so as to limit or otherwise affect any obligation, representation, warranty or agreement of Lender and/or Artist hereunder.

**16.   Medical Examination:**  In any proper case (such as for purposes of insurance or if Artist claims to be ill, disabled or incapacitated), Producer shall have the right to have Artist examined at any time or times prior to the completion of all of Artist's required services hereunder by such physician(s) as Producer may designate. Artist shall make himself available for and shall submit to such examinations and tests and shall otherwise cooperate as may be reasonably requested. Artist may have Artist's own physician present at such examinations at Lender and Artist's own cost and expense, provided that there is no interference with or delay in making such examination.

**17.   SAG Agreement:**  Producer hereby represents and warrants that it is a SAG signatory. Producer shall pay, on Lender's behalf, to the SAG Pension, Health and Welfare Plan, Lender's contributions required by the SAG Agreement with respect to Artist's engagement hereunder, but not exceeding those which Producer would have been obligated to pay if Producer had employed Artist directly. Except as expressly provided to the contrary herein, Producer shall be entitled to the maximum benefits and maximum rights permitted under the SAG Agreement. To the extent the SAG Agreement requires additional payments to Lender or Artist hereunder, such additional payments shall be paid at the minimum rate required. As used herein, the term "SAG Agreement" refers to the current Producer Screen Actors Guild Codified Basic Agreement applicable to Artist's services hereunder.

**18.   Notices:**  Any notice pertaining hereto shall be in writing. Any such notice and any payment due hereunder shall be served by delivering said notice or payment personally or by sending it by mail, cable, or telex (postage or applicable fee prepaid), addressed as follows (or as subsequently designated in writing):

| | |
|---|---|
| To Lender and/or Artist: | c/o Creative Artists Agency<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn:   Dave Bugliari and Steven Brookman<br>Fax:    (424) 288-2900 |
| To Producer: | SLP Films, Inc.<br>1818 Market Street, 12th Floor<br>Philadelphia, PA 19103<br>Attn:   George Parra<br>Fax:    (215) 563-6353 |
| With a Copy to: | The Weinstein Company LLC<br>9100 Wilshire Boulevard, Suite 700W<br>Beverly Hills, CA 90212<br>Attn:   Adrian Lopez, Vice President, Business & Legal Affairs<br>Fax:    (310) 550-5759 |
| With a Copy to: | Reder & Feig LLP<br>421 South Beverly Drive, 8th Floor<br>Beverly Hills, CA 90212<br>Attn.: Benjamin R. Reder and Mike Park<br>Fax: (310) 789-4771 |

SLP / Bradley Cooper
v.6

The date of personal delivery, or delivery to the cable or telex office of such notice or payment shall be deemed the date of service of such notice payment and a notice sent by mail shall be deemed to be served five business days after the date of mailing. Any notice from Lender and/or Artist, on the one hand, or Producer, on the other hand, which commences the running of any period of time for Producer's, on the one hand, or Lender and/or Artist's, on the other hand, exercise of any option or Producer's, on the one hand, or Lender's and/or Artist's, on the other hand, performance of any other act shall be deemed to be served only when actually received by Producer, on the one hand, or Lender or Artist, on the other hand. If the last day on which the parties hereto are empowered to give notice pursuant to any provisions of this Agreement or to perform any other act which parties are required or may desire to perform under or in connection with this Agreement should fall on a Saturday, Sunday or holiday, then the parties hereto shall have until the end of the first full business day following said Saturday, Sunday or holiday within which to give such notice or to perform such act.

19.    **Visa Requirements/Work Permits:**  Lender and Artist agree to cooperate with Producer to secure such labor permits and visas as may be required by any governmental agency for the purpose of enabling Artist to render services hereunder wherever such services are required by Producer. If, in spite of such cooperation, Producer is unable to secure such labor permits and visas, Producer shall have the right to postpone the commencement of any services hereunder or the start date or to suspend the operation hereof with respect to the running of time and the rendition of Artist's services and/or payment of compensation hereunder until one (1) week after a final determination is made concerning such labor permits and visas by the applicable authority. In addition, Producer shall have the right to terminate this Agreement and all of Producer's obligations hereunder at any time during such suspension or upon Producer discovering that the labor permits and visas cannot be secured.

20.    **No Injunctive Relief:**  The rights and remedies of Lender and Artist in the event of any breach by Producer of the provisions of this Agreement shall be limited to Lender and Artist's right, if any, to recover damages in an action at law, and Lender and Artist irrevocably waive any right to seek and/or obtain equitable or injunctive relief. In no event shall Lender and Artist be entitled by reason of any such breach to terminate this Agreement or to enjoin or restrain the exhibition, distribution, advertising, exploitation, or marketing of the Picture (and/or any rights therein).

21.    **Assignment:**  Producer may assign, transfer, license, delegate and/or grant all or any part of its rights, privileges and property hereunder to any person, or entity. Upon such assignment by Producer, Producer shall be relieved of any and all obligations and liability hereunder if such assignment is to: (a) a person or entity into which Producer merges or is consolidated; (b) a person or entity which acquires all or substantially all of Producer's business and assets; (c) a person or entity which is controlled by, under common control with, or controls Producer; (d) any major or "mini-major" motion picture company, United States television network; or (e) other financially responsible party who assumes all of Producer's obligations in writing. Neither Lender nor Artist shall have the right at any time to assign any of its/his/her rights hereunder or to delegate any of its/his/her obligations hereunder.

22.    **Suspensions, Etc:**  Notwithstanding anything to the contrary contained in Producer's standard terms and conditions for an actor, the parties hereto hereby agree to the following: (i) Producer may not suspend or terminate Lender's engagement or Artist's services for an event of force majeure unless it has also suspended or terminated (as applicable) all other affected cast members for such reason; (ii) if Producer terminates this Agreement due to an event of force majeure and within one (1) year reinstates any other cast member for the Picture, Producer shall so notify Artist. If Artist is available when Producer requires, Artist may reinstate this Agreement subject to its terms by so notifying Producer in writing within five (5) business days. If the Agreement is so reinstated, Producer shall have no further obligations as a result (e.g., Producer shall receive full credit for all sums previously paid under this

13

Agreement). If the Agreement is not so reinstated, Producer shall have no further obligation to Artist with respect thereto. Notwithstanding any other provision of this Agreement, this paragraph shall cease to apply if Producer assigns its rights in the Picture; (iii) if Artist fails, refuses or neglects to fully perform Artist's services or to fulfill any of Artist's obligations hereunder for any reason other than due to Artist's accident, illness or mental or physical disability (a "**Default**") and in the event such Default is subject to correction, on a one time only basis (i.e., with regard to only one instance of Default), Producer agrees to notify Artist of such Default and Artist shall have forty-eight (48) hours (twenty-four [24] hours during principal photography) to cure the same; (iv) during any suspension, Artist shall not render any services for others, for Lender, or for himself, except that during a suspension predicated on an event of force majeure, Artist shall have the right to render such other services, subject to recall by Producer on twenty-four (24) hours notice; and (v) if Producer suspends Artist's services due to an event of force majeure (excluding a strike or labor controversy by a guild or union which Artist is a member) for a period of eight (8) consecutive weeks or longer, Artist shall have the right to terminate the Agreement on ten (10) days written notice unless Producer resumes payment of Lender's compensation within ten (10) days of receipt of such notice.

[the remainder of this page is intentionally left blank]

23.     **Miscellaneous:** In the event that there is any conflict between any provision of this Agreement and any statute, law, regulation, or any applicable provision of the SAG Agreement, or other applicable collective bargaining agreement, if any, the latter will prevail; provided, however, that in such event the provision of this Agreement so affected will be curtailed and limited only to the minimum extent necessary to permit compliance with the minimum requirement, and no other provision of this Agreement will be affected thereby and all other provisions of this Agreement will continue in full force and effect. This Agreement (including Producer's standard terms and conditions for an actor, and the Rider thereto, both of which are attached hereto and incorporated herein by this reference), the Talent Pool Participation, the Certificate of Engagement, the Inducement Letter and the Guarantee, attached hereto as Exhibits "A," "B," "C" and "D," respectively, contain the full and complete understanding between the parties and supersede all prior and contemporaneous written or oral agreements and understandings pertaining hereto, and cannot be modified except by a writing signed by each party. As between Producer, on the one hand, and Lender and Artist, on the other hand, Producer shall have full creative, administrative, business, budgetary, and other controls with respect to the Picture, and neither Lender nor Artist shall have any rights of approval whatsoever except as expressly set forth herein. This Agreement shall be governed and construed in accordance with the laws of the State of New York applicable to contracts as if entered into and fully performed therein. Only the New York courts (state and federal) shall have jurisdiction over controversies regarding this Agreement, and any proceeding involving such a controversy shall be brought in those courts, in New York, NY, and not elsewhere. The parties hereto expressly waive any objection to such jurisdiction based on personal jurisdiction or venue.

**SLP FILMS, INC. ("Producer")**

By: _____

Its: _____

**ACCEPTED AND AGREED TO:**

**22ND AND INDIANA INC.**

("Lender")

By: _____

Its: _____

Federal I.D. No.: _____

**BRADLEY COOPER** ("Artist")

Social Security No.: _____

SLP / Bradley Cooper
v.6

<u>Exhibit A</u>

<u>Talent Pool Participation</u>

1.  <u>Contingent Compensation:</u>



(i)  ███████████████ percent (███%) of one hundred percent (100%) of the "Adjusted Defined Receipts" of the Picture, if any, payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across the board zero percent (0%) distribution fee (it being understood and acknowledged, however, that one percent [1%] of the foregoing percentage shall be deducted so that Producer may accord such percentage of the Adjusted Defined Receipts to ████████████████████████████████████████████████████████████████████████████████████████

(ii)  ███████████████████ percent (███%) of one hundred percent (100%) of the "Adjusted Defined Receipts" (as defined below) of the Picture, if any, payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across the board ██████ percent (██%) distribution fee; escalating prospectively to

(iii)  ███████████████ percent (███%) of one hundred percent (100%) of the "Adjusted Defined Receipts" (as defined below) of the Picture, if any, payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across the board ████████ percent (██%) distribution fee.

For the purposes hereof, **"Adjusted Defined Receipts"** shall be defined, computed, paid and accounted for in accordance with the terms and conditions of Producer's Exhibit "DRCB," as modified only by Producer's Rider to Exhibit "DRCB." **"Cash Breakeven"** shall mean the point at which **"Contingent Proceeds"** (to be defined, computed, paid and accounted for in accordance with the terms of Producer's Exhibit "CB," as modified only by Producer's Rider to Exhibit "CB") are first achieved, but utilizing the applicable across the board distribution fee referred to in subparagraph (i) – (iii) above. Exhibit "CB" (which includes among its provisions a ████████ percent [██%] overhead charge, a ████ percent [██%] advertising overhead charge, plus charges for any Producer facilities used in accordance with Producer's then current rate card), Producer's Rider to Exhibit "CB," Exhibit "DRCB" and Producer's Rider to Exhibit "DRCB", are herein incorporated in their entirety by reference. Furthermore, for the purposes of calculating each Cash Breakeven point in subparagraph (i) – (iii) above and for the purposes of paying Lender the Contingent Compensation, if any, hereunder: (a) with respect to Video Devices (as defined in said Exhibits), the percentages set forth in Paragraph 1.1.A.3.(B) of Exhibit "DRCB" and Exhibit "CB" shall be ███████████ (██%) in lieu of the percentage set forth therein; (b) the overhead charge set forth in Exhibit "CB" shall be capped at ███ percent (██%) of the budget of the Picture; (c) the advertising overhead charge set forth in Exhibit "CB" shall be capped at ███ percent (██%) of the amount the distributor of the Picture (i.e., TWC) spends or causes to be spent in connection with the advertising and promotion of the Picture; and (d) any location- or labor-based rebates, tax credits or subsidies when actually received by TWC shall be used to reduce the production costs for the purposes of calculating "Cash Breakeven" hereunder.

Producer confirms that the amount and the definition of Contingent Compensation and all other terms related thereto, including Adjusted Defined Receipts, Cash Breakeven and Contingent Proceeds, afforded to Artist hereunder shall be no less favorable than the amount and the definition of Contingent Compensation and all other terms related thereto, including Adjusted Defined Receipts, Cash Breakeven and Contingent Proceeds, provided to Russell, De Niro or any other participant in the profits of the Picture.

2.    **Contingent Box Office Bonus ("Box Office Bonus[es]"):**



(i) ███████████████████ ($████) if and when the United States theatrical box office receipts of the Picture as reported by Rentrak and confirmed by Producer ("USTBOR") achieve (if ever) ████████████ (USD$████);

(ii)    An additional ███████████████ ($████) if and when the USTBOR achieve (if ever) ████████████ (USD$████);

(iii)    An additional ████████████ ($████) if and when the USTBOR achieve (if ever) ████████ (USD$████);

(iv)    An additional ████████████ ($████) if and when the USTBOR achieve (if ever) ████████████ (USD$████);

(v)    An additional ████████████ ($████) if and when the USTBOR achieve (if ever) ████████████ (USD$████);

(vi)    An additional ████████████████ ($████) if and when the USTBOR achieve (if ever) (USD$████);

(vii) An additional ████████████████ ($████) if and when the USTBOR achieve (if ever) (USD$████); and

(viii)    An additional ████████████████ ($████) if and when the USTBOR achieve (if ever) (USD$████).

Lender's share of the foregoing Box Office Bonus(es) shall be payable, if at all, within thirty (30) business days following the date on which the applicable USTBOR set forth above are reported by Rentrak and shall be a nonrefundable advance of, and applicable against, the Contingent Compensation set forth in Paragraph 4 (a) of the Agreement and Paragraph 1 of this Exhibit A. Producer confirms that the Box Office Bonuses, if any, payable to Lender hereunder shall be no less favorable (i.e., as to the amount and USTBOR threshold at which any such bonuses are paid) than the box office bonuses payable to any other cast member of the Picture.

2

## Exhibit B

### Certificate of Engagement

SLP FILMS, INC. ("Producer"), whose address is 9100 Wilshire Blvd., Suite 700W, Beverly Hills, California 90212, has engaged 22ⁿᵈ AND INDIANA INC. (Fed. ID# ▮▮▮▮▮▮▮ ) ("Lender") to furnish the services of BRADLEY COOPER ("Artist"), whose address is c/o Creative Artists Agency, Inc., 2000 Avenue of the Stars, Los Angeles, California 90067, Attention: Dave Bugliari and Steven Brookman, in connection with the motion picture currently referred to as "SILVER LININGS PLAYBOOK" (the "Picture"). Reference is hereby made to that certain Confirmation Deal Memo (the "Agreement") between the parties hereto, for the subject matter hereof, dated as of the date hereof. To the extent there is any conflict between the provisions of this Certificate of Engagement and the provisions of the Agreement, the provisions of the Agreement shall control.

For good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Lender and Artist hereby acknowledge, certify and agree that all results and proceeds of every kind of the services heretofore and hereafter to be rendered by Lender and/or Artist in connection with the Picture, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Lender and/or Artist which in any way relate to the Picture or to the material on which the Picture will be based (collectively, the "Material"), are and shall be deemed to be works "made for hire" and/or "made in the course of employment" specially ordered and commissioned by Producer for use and/or exploitation in an audiovisual work, for purposes of copyright protection throughout the world for Producer. Accordingly, Producer is and shall be considered the author and, at all stages of completion, the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights"). The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including, by way of illustration, production, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public, and the right to exploit the Material throughout the universe in perpetuity in all media, markets and languages and in any manner now known or hereafter devised. If under any applicable law the fact that the Material is a work "made for hire" and/or "made in the course of employment" is not effective to place authorship and ownership of the Material and the Picture and all rights therein in Producer, then to the fullest extent allowable and for the full term of protection otherwise accorded to Lender and/or Artist under such applicable law, Lender and Artist hereby exclusively and irrevocably assign and transfer to Producer the Rights and, in connection therewith, any and all right, title and interest of Lender or Artist in the Picture and any other works now or hereafter created containing the Material.

Lender and Artist hereby grant Producer the right to change, add to, take from, translate, reformat or reprocess the Material in any manner Producer may in its sole discretion determine. To the fullest extent allowable under any applicable law, Lender and Artist hereby exclusively and irrevocably waive or assign to Producer, Artist's so-called "moral rights" or *"droit moral"*. Lender and Artist expressly acknowledge that many parties will contribute to the Picture and other works that will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Lender or Artist of "moral rights" or *"droit moral"* is not

3

effective, then Lender and Artist agree to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

Lender and Artist will, upon request, execute, acknowledge and deliver to Producer any and all documents consistent herewith which Producer may deem reasonably necessary to evidence and effectuate all or any of Producer's rights hereunder. Lender and Artist hereby irrevocably appoint Producer as attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office or elsewhere any and all such documents Lender and/or Artist fails to execute, acknowledge and deliver after Artist's reasonable opportunity to review and negotiation said documents (not to exceed seven (7) business days of Producer's request therefor). The appointment shall be a power coupled with an interest. Producer shall provide Lender with copies of any documents that Producer executes on behalf of Lender or Artist, provided that an inadvertent failure to do so shall not be a breach hereof or affect the validity of such documents.

Subject to the terms of the Agreement, Lender and Artist hereby grant to Producer the right to issue and authorize publicity concerning Artist, and to use Artist's name, voice, approved likeness and approved biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture.

Lender and Artist warrant that, to the best of Artist's knowledge (in the exercise of reasonable prudence and due diligence), the Material is or will be original with Artist or is in the public domain throughout the world, and is not and will not be based in whole or in part on the life of any real person except as approved in writing by Producer, and does not and will not infringe upon or violate any copyright of, or, to the best of Artist's knowledge (in the exercise of reasonable prudence and due diligence), infringe upon or violate the right of privacy or any other right of, any person; and that Lender and Artist are free to grant all rights granted and make all agreements made by them herein; and that Lender is a corporation duly organized and existing under the laws of the state of its incorporation. Lender and Artist agree to hold Producer and its successors, licensees and assigns harmless from and against all damages, losses, costs, and expenses (including reasonable outside attorneys' fees and costs) which Producer or any of its successors, licensees or assigns may suffer or incur by reason of a third party claim or action arising from the material breach of any of the warranties made in this paragraph. If Producer so elects, Producer shall have the absolute right to control the litigation or resolution of any claim, demand or action to which this indemnity applies. Producer shall have the sole right to control the legal defense of any such claims, litigation, etc. including, the right to select counsel of its choice and to compromise or settle any such claims, demands or litigation. The party receiving notice of any such claim, demand or action shall promptly notify the other party hereof.

Producer shall defend, indemnify and hold harmless Lender and Artist against any and all liability, damages, costs and expenses, including reasonable outside attorneys' fees, in connection with any third party claim or action (other than those arising out of a material breach of Lender's and/or Artist's warranties hereunder or out of any criminal, intentionally tortious or willful acts by Artist) respecting material supplied to Lender and/or Artist by Producer or solely in connection with the development, production, distribution or exploitation of the Picture or any element thereof, provided that: (i) Artist cooperates fully with Producer in the defense of any such claim or legal action at no cost or charge to Producer other than the reimbursement to Artist of reasonable out-of-pocket costs and expenses incurred in connection with the defense of any such claim or legal action, excluding attorneys' fees in connection with any legal counsel engaged by Lender and/or Artist to render legal services on Lender and/or Artist's own behalf; (ii) Producer shall have the right to select and retain any legal counsel in connection with the

4

defense of any such claim or legal action and shall pay the attorneys' fees associated therewith; and (iii) Producer, in its sole discretion, shall have the right to defend, compromise and/or settle any such claim or legal action.

Lender and Artist shall be covered as additional insureds under any Errors and Omissions insurance policy and general liability insurance policy which Producer may obtain for the Picture, subject to the limitations, restrictions and terms of said policies.

Lender and Artist hereby covenant and agree that Lender and/or Artist shall not have or be deemed to have any lien, charge or other encumbrance upon any of the rights conveyed to Producer herein or proceeds derived therefrom, and that no act of or omission by Producer, nor any other act, omission or event of any kind, shall terminate or otherwise adversely affect Producer's ownership of the rights conveyed herein. Lender's and Artist's sole remedy for any such breach or alleged breach shall be an action at law to recover such damages as may have been actually suffered by Lender and/or Artist as a result thereof.

Executed as of September 23, 2011.

<u>**ACCEPTED AND AGREED TO:**</u>

**22ND AND INDIANA INC.**

By:_____

Its: President

_____

BRADLEY COOPER ("Artist")

**SLP FILMS, INC.**

By:_____

Its:_____

SLP / Bradley Cooper
v.6

**Exhibit C**

**INDUCEMENT**

Reference is hereby made to that certain Confirmation Deal Memorandum and Certificate of Engagement (the "Agreement") dated as of September 23, 2011, by and between, on the one hand, SLP Films, Inc. ("Producer") and, on the other hand, 22nd and Indiana Inc. ("Lender") for the services of Bradley Cooper ("Artist") in the role of "Pat" in the motion picture currently referred to as "SILVER LININGS PLAYBOOK."

A.      I am familiar with all of the terms, covenants and conditions of the Agreement and I hereby consent to the execution thereof.  I shall perform and comply with all of the terms, covenants, conditions and obligations of the Agreement in so far as they relate to me, even if the employment between me and Lender should hereafter expire, terminate or be suspended.  I hereby confirm all grants, representations, warranties and agreements made by the Lender under the Agreement.

B.      Unless I am deemed substituted for the Lender as a direct party to the Agreement pursuant to Paragraph D below, I shall look solely to Lender and not to Producer for the payment of compensation for my services and for the discharge of all other obligations of my employer with respect to my services under the Agreement.

C.      In the event of a breach or threatened breach of the Agreement by Lender or by me, Producer may join me in any action against Lender without being first required to resort to or exhaust any rights or remedies against Lender.

D.      I represent that Lender is a duly qualified and existing corporation under the laws of its state of incorporation.  If Lender or its successors in interest should be dissolved or should otherwise cease to exist, or for any reason should fail, refuse or neglect to perform, observe or comply with the terms, covenants and conditions of the Agreement, I shall, at Producer's election, be deemed to be employed directly by Producer for the balance of the term of the Agreement upon the terms, covenants and conditions set forth therein.

E.      I will indemnify Producer for and hold it harmless from and against any and all taxes which Producer may have to pay and any and all liabilities (including judgments, penalties, fines, interest, damages, costs and expenses, including reasonable attorney's fees) which may be obtained against, imposed upon or suffered by Producer or which Producer may incur by reason of its failure to deduct and withhold from the compensation payable under the Agreement, any amounts required or permitted to be deducted and withheld from the compensation of any employee under the laws of any state or province or otherwise pursuant to U.S. or Canadian law, and/or any amendments thereof and/or any other applicable statutes heretofore or hereafter enacted requiring the withholding of any amount from the compensation of an employee.

F.      If Producer shall serve Lender with any notices, demands or instruments relating to the Agreement, or to the rendition of my services thereunder, service upon Lender shall also constitute service upon me.

G.      For purposes of any and all Workers' Compensation statutes, laws or regulations ("Workers' Compensation"), I acknowledge that an employment relationship exists between Producer and me, Producer being my special employer under the Agreement.  Accordingly, I

6

SLP / Bradley Cooper
v.6

acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Workers' Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Producer or Producer's affiliated companies and their respective officers, agents, and employees (including without limitation, any other special employee and corporation or other entity furnishing to Producer or an affiliate producer the services of any such other special employee) shall be governed by and limited to those provided by Workers' Compensation.

BRADLEY COOPER ("Artist")

SLP / Bradley Cooper
v.6

**Exhibit D**

## GUARANTEE

1.      As an inducement to 22ND AND INDIANA INC. for the services of BRADLEY COOPER ("**Beneficiary**") to enter into the CONFIRMATION DEAL MEMO, dated as of September 23, 2011 (the "**Agreement**"), by and between SLP FILMS, INC. ("**Company**") and Beneficiary pertaining to the motion picture tentatively entitled, "SILVER LININGS PLAYBOOK" (the "**Picture**") and in consideration of the benefits the undersigned guarantor ("**Guarantor**") will derive from the execution of the Agreement, Guarantor guarantees full and faithful performance of all of Company's obligations pursuant to the Agreement with respect to: (a) the payment obligations of Company in connection with the Contingent Compensation and Box Office Bonuses payable to Beneficiary pursuant to Paragraph 4 of the Agreement; (b) the credit obligations of Company in the U.S. territory pursuant to Paragraph 6 of the Agreement; (c) the insurance obligations of Company pursuant to Paragraph 15 of the Agreement; and (d) the indemnity obligations pursuant to the Certificate of Engagement (the obligations referred to in the foregoing [a] – [d] shall be referred to collectively as the "**Guaranteed Obligations**").

2.      The obligations of Guarantor hereunder are independent of the obligations of Company and a separate action or actions may be brought against Guarantor whether or not Company is joined in any such action or actions. Guarantor agrees that its obligations hereunder shall not be exhausted by (i) any number of actions until the Guaranteed Obligations have been fully paid and performed; or (ii) any failure or omission or delay by Beneficiary to exercise any right or remedy under the Agreement or otherwise except to the extent that such failure, omission or delay constitutes a waiver under the Agreement (e.g., statute of limitations, laches, etc.). This Guarantee shall continue to be effective or reinstated, as the case may be, if at any time payment of any amount paid under the Agreement is rescinded or otherwise returned by Beneficiary upon the insolvency, bankruptcy or reorganization of Company as if such amount has not been paid. Except as set forth in Paragraph 4. below, Guarantor's obligations under this Guarantee are subject to all defenses which Company may have against Beneficiary with respect to enforcement by Beneficiary of the Guaranteed Obligations.

3.      Guarantor agrees that any modification of the Agreement shall not affect this Guarantee and authorizes Beneficiary and Company upon their mutual agreement without notice or demand and without diminishing its liability hereunder, from time to time to renew, compromise, extend, accelerate or modify the Agreement or otherwise change the terms of Guaranteed Obligations or any part thereof.

4.      Subject to the demand requirement set forth in Paragraph 5 below, Guarantor waives any right to require Beneficiary to (i) proceed against Company; or (ii) pursue any other remedy in Beneficiary's power whatsoever prior to proceedings against Guarantor. Guarantor waives any defense arising by reason of (a) the insolvency or bankruptcy of Company, (b) lack of authority of Company and/or (c) any disability or incapacity of Company. Guarantor waives all presentments; notice of or right to consent to any modification, extension, or alteration; notices of non-performance (except as provided in Paragraph 5 below); protests, notice of protest; notices of dishonor; and notices of acceptance of this Guarantee and of the existence, creation or incurring of new or additional obligations.

8

SLP / Bradley Cooper
v.6

5.     Guarantor shall have no obligation to Beneficiary hereunder with respect to any compensation unless and until such compensation shall have accrued and been payable to Beneficiary in accordance with the provisions of the Agreement and Company shall have failed to pay said compensation as and when due and Beneficiary shall have given Guarantor notice thereof and a period of five (5) business days shall have elapsed from the date Guarantor shall have been so notified.

6.     Any notice pertaining hereto shall be in writing. Any such notice and any payment due hereunder shall be served by delivering said notice or payment personally or by sending it by mail, cable, telex or telecopier (postage or applicable fee prepaid), addressed as follows (or subsequently designated in writing):

To Beneficiary:                   c/o Creative Artists Agency
                                  2000 Avenue of the Stars
                                  Los Angeles, CA 90067
                                  Attn: Dave Bugliari and Steven Brookman
                                  Fax: (424) 288-2900


To Guarantor:                     The Weinstein Company LLC
                                  375 Greenwich Street
                                  New York, NY 10013
                                  Attn: General Counsel
                                  Fax: (917) 368-7007


With a Copy to:                   The Weinstein Company LLC
                                  9100 Wilshire Boulevard, Suite 700W
                                  Beverly Hills, CA 90212
                                  Attn: Andrew Kramer, President, Business & Legal Affairs
                                  Adrian Lopez, Vice President, Business & Legal Affairs
                                  Fax: (310) 550-5759

        The date of personal delivery, mailing or delivery to the cable or telecopier office of such notice or payment shall be deemed the date of service of such notice or payment, unless otherwise specified herein; provided, however, that any notice which commences the running of any period of time for exercise of any option or performance of any other act shall be deemed to be served only when actually received.

7.     This Guarantee contains the full and complete understanding between the parties hereto and supersedes all prior and contemporaneous agreements and understandings pertaining hereto and cannot be modified except by a writing signed by each party. Beneficiary's sole and exclusive remedy for Guarantor's breach, termination, or cancellation of this Guarantee or any term hereof (including any term pertaining to credit) shall be an action for damages and Beneficiary irrevocably waives any right to equitable or injunctive relief.

8.     This Guarantee shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in said State and the laws of the United States of America as the same would be applied by a federal court sitting in the State of New York. Beneficiary and Guarantor each hereby consents to the jurisdiction of the

9

SLP / Bradley Cooper
v.6

State Courts of New York and the Federal Courts located in the State of New York with respect to any matter relating to this Guarantee.

IN WITNESS WHEREOF, the undersigned have executed this Guarantee as of September 23, 2011.

**THE WEINSTEIN COMPANY LLC**
**("Guarantor")**

By: _____

Its: _____
          Andrew J. Kramer
          President
          Business & Legal Affairs

APPROVED BY:

22ND AND INDIANA INC.

By: _____

Its: _____

_____
          BRADLEY COOPER

10

SLP / Bradley Cooper
v.6

## CONFIRMATION DEAL MEMO

<u>Date:</u>          As of September 23, 2011

<u>Artist:</u>        Bradley Cooper
            SSN: ████████
            c/o Creative Artists Agency
            2000 Avenue of the Stars
            Los Angeles, California 90067
            Attn:   Dave Bugliari and Steven Brookman
            Fax:    (424) 288-2900

<u>Lender:</u>       22nd and Indiana Inc.
            Federal I.D. No: ████████

<u>Producer:</u>     SLP Films, Inc.
            1818 Market Street, 12th Floor
            Philadelphia, Pennsylvania 19103
            Attn:   George Parra
            Fax:    (215) 563-6353

<u>cc:</u>           The Weinstein Company LLC
            9100 Wilshire Boulevard, Suite 700W
            Beverly Hills, CA 90212
            Attn:   Adrian Lopez, Vice President, Business & Legal Affairs
            Fax:    (310) 550-5759

<u>Role/Picture:</u>  The role of "PAT" in the motion picture tentatively entitled, "SILVER LININGS
            PLAYBOOK" (the "**Picture**").

1.      **Conditions Precedent:** Producer has no obligation under this Confirmation Deal Memo (this
"**Agreement**") unless and until: (i) Producer receives a fully-executed copy of this Agreement, the
Certificate of Engagement and the Inducement Letter attached hereto as Exhibits "B" and "C,"
respectively; and (ii) Producer receives all documents which may be required by any governmental
agency or otherwise for Lender to provide Artist to render services hereunder, including, without
limitation, visas, work permits and an INS Form I-9 (Employment Eligibility Verification Form)
completed to Producer's reasonable satisfaction, together with Lender and Artist's submission to
Producer of original documents establishing Artist's employment eligibility. The aforementioned
subparagraphs 1.(i) – 1.(ii) shall be collectively referred to herein as the "**Conditions Precedent.**"
Producer shall have the right to waive the aforementioned Conditions Precedent at any time in its sole
discretion.

2.      **Services:**

        (a)      Lender shall furnish all services of Artist required by Producer in the Role in connection
with the Picture. The Fixed Compensation (as such term is defined below) shall constitute full
compensation for Artist's exclusive services as set forth herein, including: (i) Artist's pre-production
services, including, without limitation, travel, wardrobe, a reasonable amount of rehearsal, hair and

1

makeup, at such times and places as Producer may reasonably require; (ii) Artist's ingoing scheduled period of principal photography services on the Picture commencing on or about October 10, 2011 (i.e., two [2] weeks either side) (the "**Start Date**") (which Start Date is subject to change by Producer in its sole discretion); (iii) plus five (5) "free" days of Artist's services ("**Additional Photography Services**") which may be used for additional photography, added scenes, re-shoots and post-production services, including, without limitation, ADR, dubbing and looping. Three (3) of the "free" days of Additional Photography Services must be consecutive to the period of principal photography of the Picture (exclusive of holidays and regularly scheduled breaks between work weeks) and the other two (2) "free" days of Additional Photography Services need not be consecutive to the period of principal photography, or each other, but which, if non-consecutive to principal photography, are subject to Artist's then-existing prior professional conflicting contractual commitments; (iv) plus five (5) "free" days of Artist's services ("**Additional Post-Production Services**") which may be used for post-production services (i.e., dubbing, looping, ADR, etc.), which "free" days may be consecutive or non-consecutive to the period of Artist's principal photography services or to each other, at Producer's sole discretion, but subject to Artist's then-existing prior professional conflicting contractual commitments in either event; (v) use of Artist's name and approved (i.e., in accordance with below paragraph 8) photograph and likeness in connection with the Picture and any and all marketing and/or promotional materials (including, without limitation, trailers, TV spots, one-sheets, outdoor, etc.) subject to the terms herein; and (vi) Artist's reasonable publicity services in connection with the Picture (i.e., attending the national press junket and premiere of the Picture, appearing on national late night and daytime television talk shows, and being available for radio, newspaper and magazine interviews). Artist shall have the right to disapprove particular publicity and promotional services to be rendered by Artist, provided that Artist exercises such right in good faith and not in a manner designated to frustrate or delay the timely promotion of the Picture, and provided further that Artist renders a reasonable number of publicity interviews and sittings for publicity photographs and other publicity activities reasonably required by Producer, including alternative publicity and promotional services of comparable amount, stature and importance (in Producer's good faith business judgment) to the publicity and promotional services that Artist may disapprove of rendering pursuant to this paragraph. If Artist is required by Producer to render publicity services hereunder at a Location (as defined below), then Artist will be entitled to the following in connection with Artist's publicity services at such Location: (a) one (1) first-class (or best available) round-trip air transportation (if used) between Artist's primary residence (or Artist's then-current location, if closer) and the Location; (b) exclusive first-class (but not necessarily a limousine) ground transportation to and from airports and Artist's primary residence/hotel and to and from the location at which Producer requests that Artist render publicity services and hotel; (c) first-class hotel accommodations (i.e., a one [1] bedroom hotel suite); and (d) an all-inclusive, non-accountable reasonable per diem for Artist. All of the foregoing items shall be in accordance with Producer's then existing policy and the budgetary parameters of the Picture (if and as applicable). All travel and related arrangements will be made by Producer. The aforementioned publicity services shall be subject to Artist's then-existing prior professional conflicting contractual commitments. Notwithstanding anything to the contrary contained herein, Producer agrees to release Artist from rendering exclusive services to Producer on the Picture on or before January 1, 2012.

(b)   Lender shall provide Artist to render all services herein on an exclusive basis during the period of Artist's services in connection with principal photography of the Picture. Lender and Artist agree that Artist shall render all services described herein in a competent, conscientious and professional manner, having due regard for the production of the Picture within the budget, and as reasonably instructed by Producer in all matters, including those involving artistic taste and judgment; but there shall be no obligation on Producer to actually utilize Artist's services or to include any of Artist's work in the Picture, or to produce, release, or continue the production or distribution of the Picture at any time, provided that the foregoing shall not relieve Producer of its obligations hereunder, including Producer's

2.

SLP / Bradley Cooper
v.6

obligation to pay Lender any Fixed Compensation in connection with Artist's acting services to which Lender may become entitled, if any, pursuant to the terms set forth in Paragraph 3. herein.

(c)    The provisions of Schedule F of the applicable SAG Agreement will apply to Artist's services hereunder. Except as otherwise required by the SAG Agreement: (i) no compensation will be payable for services rendered in connection with any "hold" days or weeks, "free" days or weeks, travel time, publicity interviews, personal appearances or stills, or other periods of service for which this Agreement specifies that no additional compensation is payable, inasmuch as the Fixed Compensation set forth above is deemed to include compensation for all such services; and (ii) no increased or additional compensation will be payable by reason of Artist's rendition of services at night, on Saturdays, Sundays or holidays, after the expiration of any particular number of hours on any one day, or for any "hold" days. The Fixed Compensation shall be deemed an advance against and credited against any compensation for which Producer may be liable under or pursuant to the SAG Agreement or any other applicable collective bargaining agreement, if any, by reason of this Agreement and Artist's performance hereunder, to the maximum extent permitted by any such SAG Agreement or any other applicable collective bargaining agreement, if any. Any payments required by the SAG Agreement or any other applicable collective bargaining agreement, if any, in excess of the payment expressly provided for herein will be payable at the minimum required by the SAG Agreement or such applicable collective bargaining agreement, if any. Any Fixed Compensation, Contingent Compensation (as defined below; if any) and/or Box Office Bonuses (as defined below; if any) paid to Lender shall not be credited against any residuals which may become due to Lender or Artist in connection with the Picture.

(d)    Overages:  Notwithstanding anything to the contrary contained herein, in the event Artist's Additional Photography Services are required for a period of time beyond the five (5) "free" days, or Artist's Additional Post-Production Services are required for a period of time beyond the five (5) "free" days, overages for any such services in excess of the five (5) days of Additional Photography Services and/or five (5) days of Additional Post-Production Services, if any, shall be payable to Lender at the weekly rate equal to the Fixed Compensation divided by the number of weeks of principal photography of the Picture, based on the ingoing schedule of principal photography as of the first day of principal photography ("**Overages**"). All Overages shall be prorated: (i) based on a six (6) day work week when services are rendered on Location; or (ii) based on a five (5) day work week when services are rendered at Producer's studio or its vicinity.

(e)    Working Conditions: For the avoidance of doubt, it is acknowledged and agreed that all work rules applicable to Artist's services in connection with the Picture, including, but not limited to, portal to portal work and rest periods, shall be pursuant to the SAG Agreement.

3.    **Fixed Compensation:**  Subject to Artist's performance of all material services and material obligations hereunder, and provided that Artist is not otherwise in material breach or default hereof, Lender shall be entitled to receive the flat sum of ▮▮▮▮▮▮▮▮▮▮ ($▮▮▮▮) (the "**Fixed Compensation**"), payable in equal weekly installments over the course of Artist's ingoing scheduled period of principal photography services on Producer's regular pay day, one (1) week in arrears.  Neither Lender nor Artist shall be entitled to any further sum, rights, or consideration in connection with Artist's services hereunder except as specifically provided for herein, and Lender and Artist acknowledge that no use or exploitation of the Picture shall entitle Lender or Artist to any sums or compensation except as expressly provided for herein. Subject to Artist's failure to fully perform services hereunder as a result of material breach, default, death, disability, and/or force majeure, Artist shall be, on a non-citable and non-precedential basis, deemed "pay or play" and Lender shall be entitled to the foregoing Fixed Compensation, in accordance with the terms of this paragraph, upon Producer having received a copy of this Agreement executed by Lender and Artist.

3

SLP / Bradley Cooper
v.6

4.    **Talent Pool Participations**. Subject to Artist's performance of all material services and material obligations hereunder, provided that Artist appears recognizably in the Role in the Picture as first generally released theatrically, and is not otherwise in material breach or default hereof, Lender shall be entitled to receive, if at all, the following:

(a)    Contingent Compensation: Thirty-three and one-third percent (33 1/3%) of one hundred percent (100%) of the contingent compensation (if any) payable (if ever) pursuant to Paragraph 1. of Exhibit "A" attached hereto and incorporated herein by this reference (the "**Contingent Compensation**") (it being acknowledged by Producer that ▓▓▓▓ ["▓▓▓▓"] and ▓▓▓▓▓▓ ["▓▓▓▓"] shall each be entitled to ▓▓▓▓ percent [▓▓▓▓%] of one hundred percent [100%] of the Contingent Compensation), less any Box Office Bonuses; and

(b)    Contingent Box Office Bonus(es): ▓▓▓▓▓▓ percent (▓▓▓%) of the Contingent Box Office Bonus(es) (if any) payable (if ever) pursuant to Paragraph 2. of Exhibit "A" (it being acknowledged by Producer that ▓▓▓ and ▓▓▓ shall each be entitled to ▓▓▓ percent [▓▓▓%] of any such Contingent Box Office Bonus[es]).

5.    **Award Bonus(es)**: Subject to Artist's performance of all material services and material obligations hereunder, provided that Artist appears recognizably in the Role in the Picture as first generally released theatrically, and is not otherwise in material breach or default hereof, Lender shall be entitled to receive, if at all, the following: (i) ▓▓▓▓▓▓ Dollars ($▓▓▓) if Artist is nominated for an Academy Award for "Best Actor" or "Best Supporting Actor" in connection with the Picture; (ii) an additional ▓▓▓▓▓▓ Dollars ($▓▓▓) if Artist wins an Academy Award for "Best Actor" or "Best Supporting Actor" in connection with the Picture; (iii) ▓▓▓▓▓▓ ($▓▓▓) if Artist is nominated for a Golden Globe for "Best Performance by an Actor in a Motion Picture" or "Best Performance by a Supporting Actor in a Motion Picture" in connection with the Picture; and (iv) an additional ▓▓▓▓▓▓ Dollars ($▓▓▓) if Artist wins a Golden Globe for "Best Performance by an Actor in a Motion Picture" or "Best Performance by a Supporting Actor in a Motion Picture" in connection with the Picture.

6.    **Credit**:  Subject to the standard exclusions of Producer and the Picture's domestic distributor (including artwork title exceptions), provided Artist appears recognizably in the Role in the Picture as theatrically released, Artist shall be accorded credit in substantially the form of "Bradley Cooper" as follows:

(a)    On Screen: On screen, on a separate card, in the main titles (i.e., where the "Directed by" credit appears, which may be at the beginning or end of the Picture subject to Producer's sole discretion), above or before the title of the Picture, in first (1st) position of all on screen cast credits, on all positive prints of the Picture, in an average size of type no smaller than seventy-five percent (75%) of the average size of type used to display the regular title of the Picture on screen. No individual shall receive a larger credit on screen than Artist.

(b)    Paid Ads: In paid ads issued or controlled by Producer ("**Paid Ads**") (which Paid Ads, for clarity, shall include video/DVD packaging , soundtrack album packaging and theater displays), above or before the "artwork" title (if any) of the Picture in such Paid Ad, in first (1st) position of all cast members accorded credit in such Paid Ad, in an average size of type no smaller than twenty-five percent (25%) of the size of type used for the artwork title of the Picture, if any, in such Paid Ad. No other individual shall receive a larger credit above or before the "artwork" title (if any) of the Picture in such Paid Ad than Artist. In addition, Artist shall be accorded credit above or before the regular (i.e., not artwork) title of the

4

Picture in such billing block, in first (1st) position of all cast credits in such billing block. No other individual shall receive a larger credit in such billing block than Artist.

(c)    Excluded Ads: In the billing block portion of any so-called excluded ads issued or controlled by Producer (other than award, nomination, congratulatory ads or special ads naming only the person so nominated, congratulated or otherwise honored, special ads under Section 8203D, 8203F and 8203G of the Directors Guild of America collective bargaining agreement, ads announcing a personal appearance in which no person other than the person appearing is mentioned) ("**Excluded Ads**") and in which any other principal cast members of the Picture is also accorded credit in such billing block, above or before the regular (i.e., not artwork) title of the Picture in such billing block, in first (1st) position of all cast credits in such billing block, in an average size of type no smaller than seventy-five percent (75%) of the average size of type used to display the regular title of the Picture in such billing block. In addition, if Producer accords any other cast member credit above or otherwise in connection with the "artwork" title in the artwork portion (as opposed to the billing block portion) of the key art for the Picture in any Excluded Ads for the Picture, then Producer shall also include Artist's credit above or otherwise in connection with the "artwork title" (as applicable) in such artwork portion of the key art for the Picture in no less than first (1st) position of all cast members accorded credit in such artwork portion of the key art for the Picture, in an average size of type no smaller than twenty-five percent (25%) of the size of type used for the artwork title of the Picture, if any, in the artwork portion of the key art of such Excluded Ad. If Artist is accorded credit in conjunction with the "artwork" title portion of any Excluded Ads, then Producer shall be deemed to have satisfied its obligation, if any, to accord Artist credit in the billing block portion (if any) of such Excluded Ad (i.e., Producer shall have no obligation to accord Artist a repeat credit in the billing block portion of such Excluded Ad).  Notwithstanding the foregoing, if any cast member of the Picture is accorded both "artwork" credit and billing block credit in an Excluded Ad, then Artist shall receive both "artwork" credit and billing block credit in such Excluded Ad. No other individual shall receive a larger credit above or otherwise in connection with the "artwork" title (if any) of the Picture in, or in the billing block of, such Excluded Ad than Artist.

(d)    Likeness: If the likeness of any other cast member appears in the artwork portion of the key art for the Picture in any Paid Ad or, if applicable, in any Excluded Ad, then Producer shall also include Artist's approved (pursuant to Paragraph 8.[b] below) likeness therein (as applicable). Artist's likeness in such key art shall be no less prominent than the likeness of any other cast member appearing in such key art; provided, however, that without frustrating the purpose of the foregoing, in depicting the likeness of Artist and such other cast member, Producer may take into account the relative physical characteristics of Artist and such other cast member and the appropriate proportion and perspective of the key art. Producer's use in Paid Ads or Excluded Ads of an "icon" (i.e., an image of a particular part of the body, such as a stomach, a hand, a close-up of eyes) or the depiction of a non-human character does not constitute the use of a cast likeness for purposes of this Agreement. The foregoing likeness tie shall not apply to any so-called "series" or "showcase" Paid Ads (i.e., a separate advertising featuring principal cast members alone or with a non-recognizable human or with a non-human character), provided that Artist's likeness shall appear on substantially the same number of ads as any other cast member in such series or showcase advertising.

(e)    Audio Ads: If the name of any other cast member is audibly mentioned in connection with a television advertisement, radio advertisement or trailer ("**Audio Ads**") issued or controlled by Producer with respect to the Picture (other than award, nomination, congratulatory ads or special ads naming only the person so nominated, congratulated or otherwise honored, special ads under Section 8203D, 8203F and 8203G of the Directors Guild of America collective bargaining agreement, ads announcing a personal appearance in which no person other than the person appearing is mentioned), then

5

Artist's name shall also be audibly mentioned in connection with such Audio Ad in first (1ˢᵗ) position of all cast members in such Audio Ad.

(f) <u>Miscellaneous</u>: As used herein, "size" means height, width, thickness and boldness of type. All other matters pertaining to such credit (including, without limitation, the size, style, nature and placement thereof [subject to the restrictions set forth hereinabove]) shall be as Producer in its sole discretion shall determine. No casual or inadvertent failure by Producer, nor any failure by any third party, to comply with the foregoing credit provisions shall constitute a breach hereof, provided that if Producer materially fails to accord Artist credit pursuant to the terms of this paragraph, upon Producer's receipt of written notice from Artist setting forth such material failure in detail, Producer agrees to use reasonable good faith efforts to prospectively cure such material failure with regard to ads created and/or positive prints manufactured after the date of Producer's receipt of such notice of material failure, but nothing herein shall require Producer to cease using or to replace prints, negatives, masters or other material then in existence.

7. <u>Transportation; Location Perquisites</u>: If Artist's services in connection with the Picture are required by Producer on location more than fifty (50) miles from Artist's primary residence (currently, Los Angeles, California) (each, a "**Location**"), then Artist will be entitled to the following in connection with Artist's services at such Location:

(a) <u>Transportation</u>:

(i) <u>Air Transportation</u>: One (1) first-class (or best available) round-trip air transportation (if used) between Artist's primary residence and the Location.

(ii) <u>Additional Air Transportation</u>: On a one-time only basis, one (1) additional first-class (or best available) round-trip air transportation (if used) for Artist or Artist's guest ("**Artist's Additional Ticket**"); provided, however, Artist acknowledges and agrees that Artist's use of Artist's Additional Ticket shall be subject to Artist's scheduling requirements hereunder and Producer's prior written approval thereof.

(iii) <u>Ground Transportation</u>: Exclusive ground transportation to and from airports and Artist's primary residence/location residence and exclusive ground transportation to and from Artist's location residence and sets. Producer shall consult with Artist with respect to the individual engaged by Producer to drive the vehicle in which Producer will provide Artist with the ground transportation set forth in this paragraph, provided that in the event of disagreement or if Artist is unavailable for such consultation, Producer's decision with respect thereto is final and binding.

(iv) <u>Rental Car</u>: During the period that Artist is rendering services on Location, Artist shall be entitled to the use of an exclusive insured full-size rental car as provided by Producer and Producer shall reimburse Artist for the reasonable costs of parking such rental car at the place of Artist's accommodations, upon Producer's receipt of written substantiation of such charges. Notwithstanding the foregoing and for the avoidance of doubt, in connection with any rental car provided by Producer to Artist, Producer shall not reimburse Artist for parking tickets or any other such citations and Producer shall not be responsible for any costs related to maintenance or repairs. In the event that unpaid parking violations or any other citations are reported to Producer while Artist is rendering services for Producer or after Artist has concluded employment with Producer, Artist shall be responsible for any bail amount and/or processing fees with respect to such parking tickets and citations.

6

SLP / Bradley Cooper
v.6

(b)    Per Diem: An all-inclusive, non-accountable per diem in the amount of Two Hundred Dollars ($200) for Artist.

(c)    Accommodations: One (1) hotel suite, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when Artist renders services at Producer's request in or around ▮▮▮▮▮▮▮, provided that if the "▮▮▮▮▮" is unavailable, then Producer shall provide Artist with a comparable hotel suite, subject to Artist's reasonable approval.

(d)    Trailer: Exclusive use of one (1) first-class trailer equipped with customary first-class amenities, provided that such trailer and amenities shall be no less favorable than the trailer and amenities provided to any other cast member in connection with the Picture, other than ▮▮▮▮▮.

(e)    Assistant: While Artist renders services in connection with principal photography of the Picture at Producer's request at a Location, Producer shall engage the services of Artist's assistant at the rate of ▮▮▮▮▮▮▮▮▮▮▮▮ ($▮▮▮) per five (5)-day week (pro-rated at 1/5th thereof per day), with such sum being inclusive of compensation for any idle time. In connection with such engagement, Producer shall provide such individual with one (1) coach-class round-trip air transportation (if used) between such individual's primary residence and the Location, crew accommodations, a rental car and a crew per diem.

(f)    Training/Food Supplements/Nutrition: On a one-time only basis, Producer shall provide Lender with an all-inclusive non-accountable payment in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ($▮▮▮) to cover the costs of Artist's nutrition, food supplements and training in connection with Artist's preparation for the Role.

8.    **Approvals:**

(a)    Photo/Likeness Approvals: Lender and Artist will have a right to approve any still photographs or any artistic rendering or likeness of Artist which Producer intends to use in connection with advertising, merchandising, publicity or other exploitation of the Picture, provided that Lender and/or Artist will approve not less than fifty percent (50%) of those stills in which Artist appears (whether alone or with other cast member(s)), and Lender and Artist will have three (3) passes with respect to likeness approval, all of the foregoing in accordance with the domestic distributor's customary provisions (i.e., deemed approved if not specifically disapproved in writing within five [5] business days [reducible to two (2) business days in the event of marketing exigencies of which Artist is notified at the time of submission] of Artist's or Artist's agent's receipt). All still photographs approved or deemed approved by Artist shall be approved or deemed approved for all purposes permitted hereunder, except as otherwise set forth herein.

(b)    Key Art Resubmission: Producer shall resubmit to Artist any stills and/or artistic renderings in which Artist appears recognizably that have been previously approved by Artist or deemed approved pursuant to Paragraph 8.(a) (the "**Resubmitted Approved Art**") which Producer intends to use in the "key art" for the Picture (including the "key art" used for covers of novelizations, soundtrack records, home video packaging, magazine covers and merchandising [subject to paragraph 9.(b) below]). Artist shall have five (5) business days from receipt of the Resubmitted Approved Art (which five [5] business day period shall be reduced to three [3] business days if Producer requires Artist's response in such shorter time period and Producer notifies Artist thereof) within which to approve no less than fifty percent (50%) of such Resubmitted Approved Art for Producer's intended use in connection with the Picture. If Artist shall fail or refuse to approve, within the aforesaid period, the requisite amount of Resubmitted Approved Art, Producer shall have the right to select from the Resubmitted Approved Art

the requisite amount, including the Resubmitted Approved Art approved by Artist, if any, for use in the "key art" for the Picture. Producer's submission of the Resubmitted Approved Art to Creative Artists Agency as specified in Paragraph 18. shall satisfy Producer's submission requirements under this Paragraph 8.(b) and any inadvertent failure by Producer (or its representatives) to comply with the provisions of this Paragraph 8.(b) shall not constitute a breach of this Agreement. Once the requisite amount of the Resubmitted Approved Art has been approved or deemed approved in accordance with the provisions of this Paragraph 8.(b), Producer shall have the right, in its sole discretion and without any further submission obligation to Artist, to use any or all of said approved Resubmitted Approved Art in the "key art" for the Picture and any use thereof, subject to the terms and conditions set forth herein.

(c)     Screenplay Approval: Artist shall have the right to approve any material changes to the "Screenplay" for the Picture that materially diminish or alter the importance or the essential characteristics of Artist's Role, provided that Artist shall exercise such approval in good faith and not so as to frustrate the timely progress to production or production of the Picture. Artist acknowledges that Artist has pre-approved the screenplay dated October 11, 2011 ("Screenplay").

(d)     Director Replacement: If for any reason it becomes necessary to replace the director of the Picture (i.e., Russell, who Artist hereby pre-approves), then Artist shall have the right to approve any replacement, provided that Artist shall approve no less than one (1) of three (3) available replacement directors suggested by Producer to Artist and further provided that after the date which is six (6) weeks prior to the commencement of principal photography of the Picture, Producer shall designate a replacement director after good faith consultation with Artist, but in the event of any disagreement, Producer's decision shall be final and binding. Any replacement director approvals shall be made within two (2) business days of the date of receipt by Artist or Artist's representatives of any submission by Producer hereunder. Subject to the foregoing, all decisions relating to the engagement (if any) of a replacement director including, without limitation, the compensation payable to a replacement director, shall be made in Producer's sole election.

(e)     Co-Star Replacement: If for any reason it becomes necessary to replace either of the co-stars of the Picture (i.e., the individuals portraying the roles of "Tiffany" and "Mr. Peoples"; Artist hereby pre-approves⬛⬛⬛⬛⬛⬛⬛⬛["⬛⬛⬛⬛"] and⬛⬛⬛ for such respective roles), then Artist shall have the right to approve any replacement, provided that Artist shall approve no less than two (2) of five (5) available replacement co-stars suggested by Producer to Artist and further provided that after the date which is four (4) weeks prior to the commencement of principal photography of the Picture, Producer shall designate a replacement co-star after good faith consultation with Artist, but in the event of any disagreement, Producer's decision shall be final and binding. All replacement co-star approvals shall be made within two (2) business days of the date of receipt by Artist or Artist's representatives of any submission by Producer hereunder. Subject to the foregoing, all decisions relating to the engagement (if any) of a replacement co-star including, without limitation, the compensation payable to a replacement director, shall be made in Producer's sole election.

(g)     Tabloids: Producer and/or The Weinstein Company ("TWC") shall not submit any stills and/or likeness in which Artist appears to the following publications: "The National Enquirer"; "The Star"; "The Globe"; "The Sun"; "The Examiner"; "The Weekly World News" or other similar publications. Notwithstanding the foregoing, (I) Producer shall not be in breach of this Agreement if any of such publications obtain stills and/or any likenesses in which Artist appears from parties other than Producer or if any of such publications contain advertising for the Picture which includes Artist's stills and/or likeness therein, and (ii) Lender and Artist hereby acknowledge and agree that Producer cannot make any guarantees (and will not be in breach hereof) regarding the unauthorized use of stills, likeness or electronic press kits by any publications or media outlets which were legitimately serviced by any

8

publicity companies engaged or performing services in the normal course of business in connection with the publicizing and promotion of the Picture.

(h)    Biography: Artist may furnish Producer with Artist's biography. Provided that Artist timely furnishes such biography to Producer following Producer's request therefor, Producer shall not have the right to use any biographical information about Artist other than as contained in such biography (other than references to Artist's prior professional credits and Artist's services on the Picture) without the prior approval of Artist, which approval shall not be unreasonably withheld.

9.    **Ownership and Distribution**:

(a)    The results and proceeds of Artist's services hereunder in connection with the Picture shall be deemed works-made-for-hire specially ordered or commissioned by Producer for use in connection with an audiovisual work(s). Artist acknowledges and agrees that Producer shall exclusively own all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to such results and proceeds, and all elements therein for all now known or hereafter existing uses, media, and forms, including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, video cassette and video or laser disc, any computer-assisted media (including, but not limited to CD-ROM, CD-I and similar disc systems, interactive cable and any other devices or methods now existing or hereinafter devised), video-on-demand, character, prequel, sequel, remake, merchandising (subject to paragraph 9.[b] below), soundtrack (including, without limitation, the further exclusive right to use and to license the use of Artist's voice from the soundtrack of the Picture on commercial phonograph record(s), album(s), and similar devices, with no additional remuneration inasmuch as the compensation set forth herein shall be deemed to include remuneration for the foregoing [subject to paragraph 9.[c] below]), commercial tie-ins (subject to paragraph 9.[b] below), behind-the-scenes promotional films (subject to the restrictions contained herein), bloopers (subject to the restrictions contained herein), outtakes (subject to the restrictions contained herein), stage play, theme park, Internet and any and all allied and ancillary rights therein, and the foregoing is inclusive of a full, irrevocable assignment to Producer thereof. Artist further acknowledges and agrees that Producer will be the sole and exclusive owner of all rights in the role and character played by Artist, including the name, voice, likeness and/or distinctive characterizations of the role and character, and that Artist shall have no right at any time to portray, exploit, merchandise or make any use of such role or character. In connection with the foregoing rights granted to Producer, Producer shall have the right, in perpetuity and throughout the universe, to exploit such role and character, and to use, and to authorize others to use, Artist's name, approved image, voice, approved likeness, attributes and/or approved biography, in connection with the production, exhibition, advertising, publicity, merchandising, commercial tie-ins, promotion and/or other exploitation of the Picture, and/or subsidiary and ancillary rights of any nature relating to the Picture or Artist's services hereunder, in any and all media, whether now known or hereinafter devised, including, without limitation, in and in connection with the Picture, excerpts from the Picture, trailers for the Picture, television advertisements for the Picture, new footage shot in connection with any trailers or television advertisements, one sheets and other posters furnished exhibitors for display or promotion, packaging/jackets of videodiscs, cassettes and phonorecords, videogames, wireless content (including, without limitation, ring tones, voice tones and wall paper) printed programs, press books, and novelizations of the story of the Picture and other commercial publications relating to the Picture, and soundtrack recordings relating to the Picture embodied in any form now known or hereinafter devised (including the packaging therefor and in sheet music and song books relating thereto) (subject to the restrictions contained herein). Notwithstanding anything to the contrary contained herein, Producer shall not use the results and proceeds of Artist's services hereunder in any motion picture or other production, other than in the Picture (which may be exploited in any manner now known or hereafter devised) and in any advertising and publicity therefor, without Artist's prior written consent.

9

SLP / Bradley Cooper
v.6

(b)      Notwithstanding the foregoing or anything to the contrary contained herein, Artist shall have the right to approve, in each instance, the use of Artist's name (outside of credit lists, including without limitation, billing blocks, which are pre-approved), voice and/or likeness in connection with any merchandising with respect to the Picture and the use of Artist's name, voice and/or likeness (except for clips or other footage from the Picture, the key art of the Picture and credit lists, including without limitation, billing blocks, which are pre-approved) in connection with any commercial tie-in for the Picture; provided, however, that such approval shall be deemed given if not denied by Artist in writing within five (5) business days (or such shorter period as is reasonably designated by Producer if Producer advises Artist in writing that business or marketing exigencies require a quicker response from Artist) after Producer's request therefor and further provided that, with respect to the pre-approved uses of Artist's name voice and/or likeness, Producer shall not use Artist's name, voice or likeness in connection with commercial tie-ins involving weapons (other than toy weapons), feminine hygiene products, prescription pharmaceuticals, undergarments (excluding t-shirts), gambling, religious or political items, tobacco or alcohol without Artist's prior written approval. If Producer exercises the foregoing merchandising rights under Paragraph 9.(a) following Artist's approval (or deemed approval) then with respect to merchandise actually sold, Producer shall pay to Lender a royalty in an amount to be negotiated in good faith.

(c)      Producer shall not use Artist's voice on a soundtrack album without Lender's or Artist's prior written consent and without negotiating a royalty therefor in good faith within Producer's customary parameters, taking into account Artist's major studio contractual precedent and stature in the motion picture industry. The foregoing shall not apply to either (i) Artist's spoken voice performance; or (ii) musical material which is ad-libbed or improvised as part of Artist's acting services; provided that such spoken voice performance and/or ad-libbed or improvised musical material does not exceed an aggregate of fifteen (15) seconds in length in connection with any such soundtrack album.

10.    **Promotional Film/Outtakes/Bloopers**:  Producer contemplates filming and exploiting films, including, without limitation, music videos for the Picture, "behind the scenes" or "making of" productions about the Picture ("Promotional Film") in connection with the advertising, marketing and publicity of the Picture. Producer shall use reasonable efforts to provide Artist with prior notice of any production of a Promotional Film; provided, however, Producer's inadvertent failure to provide such notice shall not be a breach of this Agreement. Artist hereby agrees and consents to such filming and exploitation (including, without limitation, use of any film clip footage from the Picture and behind the scenes photography and filmed interviews with Artist) and hereby grants to Producer the right to use Artist's name, voice and likeness in connection with such Promotional Films for no additional consideration. In addition, Artist hereby agrees and consents to the use by Producer of outtakes in connection with (i) the end credits of the Picture; (ii) any "compilations" or "special editions" of the Picture for inclusion on DVD's, laser discs, and/or other devices now known or hereafter devised and (iii) any "compilation" or "special edition" types of motion pictures issued or controlled by the distributor of the Picture. Artist shall have the right to approve all "bloopers", screen test footage and behind-the-scenes footage in which Artist appears used in connection with such Promotional Films or other programs under Producer's control; provided that at Producer's request, in connection with (i) the end credits of the Picture; (ii) any "compilations" or "special editions" of the Picture for inclusion on DVD's laser discs, and/or other devices now known or hereafter devised and (iii) any "compilation or "special edition" types of motion pictures issued or controlled by Producer, Artist shall approve a sufficient amount of such behind-the-scenes footage embodying Artist's appearance in a manner that a reasonable audience would conclude that Artist was featured in the Picture. Notwithstanding the foregoing, Artist shall have absolute approval of any use of any so-called "bloopers" in which Artist appears, which approval may be withheld in Artist's sole discretion, and Artist is not obligated to approve any minimum amount thereof.

10

11.    **Hair/Make-Up/Wardrobe/Stand-In/Stunt Double Consultation**: Producer shall consult with Artist with respect to the "look" of Artist's hair and make-up and wardrobe (but not with respect to any personnel in connection therewith, it being understood, however, that Producer engaged the individuals approved by Artist to furnish hair, make-up and wardrobe services for Artist, on a non-exclusive but first priority basis to Artist, which Artist hereby acknowledges) and the individuals to be engaged by Producer as Artist's stand-in and stunt double; provided, however, that: (a) said consultation rights shall be personal to Artist and shall not be delegated to any third party; (b) Artist is available for such consultation(s) when and where Producer reasonably requests; (c) any such consultation(s) with Artist shall be at no cost to Producer; and (d) in the event of disagreement or if Artist is unavailable for such consultation, Producer's decision with respect thereto is final and binding

12.    **Premiere/DVD/Soundtrack**: Provided that Lender and Artist fully perform all material services and obligations hereunder and are not otherwise in material breach hereof and that Artist appears recognizably in the Role in the Picture as theatrically released, Artist will be entitled to the following: (i) an invitation for Artist and a non-business related guest to all celebrity premieres and festivals, if any, and if one (1) celebrity premiere in the U.S. of Producer's choice is held at a Location, first-class (or best available) round-trip travel (for Artist and Artist's guest, by air if appropriate, but used) between such Location and Artist's primary residence, first-class accommodations (i.e., a one [1] bedroom hotel suite) (for Artist only), exclusive ground transportation (for Artist only) and a reasonable per diem (for Artist only), all in accordance with Producer's then existing policy and the budgetary parameters of the Picture; (ii) a DVD copy of the Picture in standard format or a DVD copy of the Picture in Blu-ray format (if and when commercially available), provided that Artist executes Producer's then applicable use-restriction agreement in connection therewith; and (iii) a CD of the soundtrack of the Picture (if and when commercially available), provided that Artist executes Producer's then applicable use-restriction agreement in connection therewith.

Notwithstanding the foregoing, Artist shall be treated no less favorably than De Niro with respect to the entitlement to the number of invitations, air transportation, ground transportation, accommodations and an expense allowance with respect to any U.S. premieres and U.S. film festivals in connection with the Picture.

13.    **Nudity**: Artist shall not be required to appear, and may not be doubled in any scene, in the nude, or in any simulated sex scene without the express written consent of Artist, in accordance with the SAG Agreement.

14.    **Dubbing/Doubling**: Subject to Section 33 of Schedule C of the SAG Agreement, Producer shall have the right to use the services of persons other than Artist (with or without the services of Artist) to "dub" or "double" Artist's acts, poses, appearance, voice or sound effects attributed to the character portrayed by Artist and to use the name, likeness, voice or other sound effects of Artist in connection therewith. Such doubling or dubbing of Artist's voice may be in English or any other language, provided, however, that: (i) Producer shall not "double" Artist without Artist's prior written consent (which consent shall not be unreasonably withheld or delayed); and (ii) Producer shall first give Artist the opportunity to dub in English provided that Artist is available as, when and where reasonably required by Producer and that there is no additional cost to Producer in connection with such dubbing services of Artist.

15.    **Insurance**: Lender and Artist shall be listed as additional insureds on Producer's errors and omissions insurance policy in connection with the Picture and to the extent Artist is deemed an employee of Producer, Artist shall be listed as an additional insured on Producer's general liability insurance policy in connection with the Picture hereunder during customary periods of production and distribution of the Picture, subject to the limitations, restrictions and terms of said policies. The provisions of this paragraph

11

shall not be construed so as to limit or otherwise affect any obligation, representation, warranty or agreement of Lender and/or Artist hereunder.

16.     **Medical Examination:** In any proper case (such as for purposes of insurance or if Artist claims to be ill, disabled or incapacitated), Producer shall have the right to have Artist examined at any time or times prior to the completion of all of Artist's required services hereunder by such physician(s) as Producer may designate. Artist shall make himself available for and shall submit to such examinations and tests and shall otherwise cooperate as may be reasonably requested. Artist may have Artist's own physician present at such examinations at Lender and Artist's own cost and expense, provided that there is no interference with or delay in making such examination.

17.     **SAG Agreement:** Producer hereby represents and warrants that it is a SAG signatory. Producer shall pay, on Lender's behalf, to the SAG Pension, Health and Welfare Plan, Lender's contributions required by the SAG Agreement with respect to Artist's engagement hereunder, but not exceeding those which Producer would have been obligated to pay if Producer had employed Artist directly. Except as expressly provided to the contrary herein, Producer shall be entitled to the maximum benefits and maximum rights permitted under the SAG Agreement. To the extent the SAG Agreement requires additional payments to Lender or Artist hereunder, such additional payments shall be paid at the minimum rate required. As used herein, the term "SAG Agreement" refers to the current Producer Screen Actors Guild Codified Basic Agreement applicable to Artist's services hereunder.

18.     **Notices:** Any notice pertaining hereto shall be in writing. Any such notice and any payment due hereunder shall be served by delivering said notice or payment personally or by sending it by mail, cable, or telex (postage or applicable fee prepaid), addressed as follows (or as subsequently designated in writing):

| | |
|---|---|
| To Lender and/or Artist: | c/o Creative Artists Agency<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn:   Dave Bugliari and Steven Brookman<br>Fax:     (424) 288-2900 |
| To Producer: | SLP Films, Inc.<br>1818 Market Street, 12th Floor<br>Philadelphia, PA 19103<br>Attn:   George Parra<br>Fax:     (215) 563-6353 |
| With a Copy to: | The Weinstein Company LLC<br>9100 Wilshire Boulevard, Suite 700W<br>Beverly Hills, CA 90212<br>Attn:   Adrian Lopez, Vice President, Business & Legal Affairs<br>Fax:     (310) 550-5759 |
| With a Copy to: | Reder & Feig LLP<br>421 South Beverly Drive, 8th Floor<br>Beverly Hills, CA 90212<br>Attn.: Benjamin R. Reder and Mike Park<br>Fax: (310) 789-4771 |

SLP / Bradley Cooper
v.6

The date of personal delivery, or delivery to the cable or telex office of such notice or payment shall be deemed the date of service of such notice payment and a notice sent by mail shall be deemed to be served five business days after the date of mailing. Any notice from Lender and/or Artist, on the one hand, or Producer, on the other hand, which commences the running of any period of time for Producer's, on the one hand, or Lender and/or Artist's, on the other hand, exercise of any option or Producer's, on the one hand, or Lender's and/or Artist's, on the other hand, performance of any other act shall be deemed to be served only when actually received by Producer, on the one hand, or Lender or Artist, on the other hand. If the last day on which the parties hereto are empowered to give notice pursuant to any provisions of this Agreement or to perform any other act which parties are required or may desire to perform under or in connection with this Agreement should fall on a Saturday, Sunday or holiday, then the parties hereto shall have until the end of the first full business day following said Saturday, Sunday or holiday within which to give such notice or to perform such act.

19.    **Visa Requirements/Work Permits:** Lender and Artist agree to cooperate with Producer to secure such labor permits and visas as may be required by any governmental agency for the purpose of enabling Artist to render services hereunder wherever such services are required by Producer. If, in spite of such cooperation, Producer is unable to secure such labor permits and visas, Producer shall have the right to postpone the commencement of any services hereunder or the start date or to suspend the operation hereof with respect to the running of time and the rendition of Artist's services and/or payment of compensation hereunder until one (1) week after a final determination is made concerning such labor permits and visas by the applicable authority. In addition, Producer shall have the right to terminate this Agreement and all of Producer's obligations hereunder at any time during such suspension or upon Producer discovering that the labor permits and visas cannot be secured.

20.    **No Injunctive Relief:** The rights and remedies of Lender and Artist in the event of any breach by Producer of the provisions of this Agreement shall be limited to Lender and Artist's right, if any, to recover damages in an action at law, and Lender and Artist irrevocably waive any right to seek and/or obtain equitable or injunctive relief. In no event shall Lender and Artist be entitled by reason of any such breach to terminate this Agreement or to enjoin or restrain the exhibition, distribution, advertising, exploitation, or marketing of the Picture (and/or any rights therein).

21.    **Assignment:** Producer may assign, transfer, license, delegate and/or grant all or any part of its rights, privileges and property hereunder to any person, or entity. Upon such assignment by Producer, Producer shall be relieved of any and all obligations and liability hereunder if such assignment is to: (a) a person or entity into which Producer merges or is consolidated; (b) a person or entity which acquires all or substantially all of Producer's business and assets; (c) a person or entity which is controlled by, under common control with, or controls Producer; (d) any major or "mini-major" motion picture company, United States television network; or (e) other financially responsible party who assumes all of Producer's obligations in writing. Neither Lender nor Artist shall have the right at any time to assign any of its/his/her rights hereunder or to delegate any of its/his/her obligations hereunder.

22.    **Suspensions, Etc:** Notwithstanding anything to the contrary contained in Producer's standard terms and conditions for an actor, the parties hereto hereby agree to the following: (i) Producer may not suspend or terminate Lender's engagement or Artist's services for an event of force majeure unless it has also suspended or terminated (as applicable) all other affected cast members for such reason; (ii) if Producer terminates this Agreement due to an event of force majeure and within one (1) year reinstates any other cast member for the Picture, Producer shall so notify Artist. If Artist is available when Producer requires, Artist may reinstate this Agreement subject to its terms by so notifying Producer in writing within five (5) business days. If the Agreement is so reinstated, Producer shall have no further obligations as a result (e.g., Producer shall receive full credit for all sums previously paid under this

13

SLP / Bradley Cooper
v.6

Agreement).  If the Agreement is not so reinstated, Producer shall have no further obligation to Artist with respect thereto.  Notwithstanding any other provision of this Agreement, this paragraph shall cease to apply if Producer assigns its rights in the Picture; (iii) if Artist fails, refuses or neglects to fully perform Artist's services or to fulfill any of Artist's obligations hereunder for any reason other than due to Artist's accident, illness or mental or physical disability (a "**Default**") and in the event such Default is subject to correction, on a one time only basis (i.e., with regard to only one instance of Default), Producer agrees to notify Artist of such Default and Artist shall have forty-eight (48) hours (twenty-four [24] hours during principal photography) to cure the same; (iv) during any suspension, Artist shall not render any services for others, for Lender, or for himself, except that during a suspension predicated on an event of force majeure, Artist shall have the right to render such other services, subject to recall by Producer on twenty-four (24) hours notice; and (v) if Producer suspends Artist's services due to an event of force majeure (excluding a strike or labor controversy by a guild or union which Artist is a member) for a period of eight (8) consecutive weeks or longer, Artist shall have the right to terminate the Agreement on ten (10) days written notice unless Producer resumes payment of Lender's compensation within ten (10) days of receipt of such notice.

[the remainder of this page is intentionally left blank]

23.    **Miscellaneous:** In the event that there is any conflict between any provision of this Agreement and any statute, law, regulation, or any applicable provision of the SAG Agreement, or other applicable collective bargaining agreement, if any, the latter will prevail; provided, however, that in such event the provision of this Agreement so affected will be curtailed and limited only to the minimum extent necessary to permit compliance with the minimum requirement, and no other provision of this Agreement will be affected thereby and all other provisions of this Agreement will continue in full force and effect. This Agreement (including Producer's standard terms and conditions for an actor, and the Rider thereto, both of which are attached hereto and incorporated herein by this reference), the Talent Pool Participation, the Certificate of Engagement, the Inducement Letter and the Guarantee, attached hereto as Exhibits "A," "B," "C" and "D," respectively, contain the full and complete understanding between the parties and supersede all prior and contemporaneous written or oral agreements and understandings pertaining hereto, and cannot be modified except by a writing signed by each party. As between Producer, on the one hand, and Lender and Artist, on the other hand, Producer shall have full creative, administrative, business, budgetary, and other controls with respect to the Picture, and neither Lender nor Artist shall have any rights of approval whatsoever except as expressly set forth herein. This Agreement shall be governed and construed in accordance with the laws of the State of New York applicable to contracts as if entered into and fully performed therein. Only the New York courts (state and federal) shall have jurisdiction over controversies regarding this Agreement, and any proceeding involving such a controversy shall be brought in those courts, in New York, NY, and not elsewhere. The parties hereto expressly waive any objection to such jurisdiction based on personal jurisdiction or venue.

**SLP FILMS, INC. ("Producer")**

By: _____

Its: _____

**ACCEPTED AND AGREED TO:**

**22ND AND INDIANA INC.**

**("Lender")**

By: _____

Its: _____

Federal I.D. No.: _____

_____
**BRADLEY COOPER ("Artist")**

Social Security No.: _____

**Exhibit A**

**Talent Pool Participation**

1.  **Contingent Compensation:**

(i) ████████ percent (██%) of one hundred percent (100%) of the "Adjusted Defined Receipts" of the Picture, if any, payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across the board zero percent (0%) distribution fee (it being understood and acknowledged, however, that one percent [1%] of the foregoing percentage shall be deducted so that Producer may accord such percentage of the Adjusted Defined Receipts to ██████████

████████████████████████████████████████████████
████████████████████████████████████████████████

(ii) ████████ percent (██%) of one hundred percent (100%) of the "Adjusted Defined Receipts" (as defined below) of the Picture, if any, payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across the board ████ percent (██%) distribution fee; escalating prospectively to

(iii) ████████████ percent (██%) of one hundred percent (100%) of the "Adjusted Defined Receipts" (as defined below) of the Picture, if any, payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across the board ████████ percent (██%) distribution fee.

For the purposes hereof, **"Adjusted Defined Receipts"** shall be defined, computed, paid and accounted for in accordance with the terms and conditions of Producer's Exhibit "DRCB," as modified only by Producer's Rider to Exhibit "DRCB." **"Cash Breakeven"** shall mean the point at which **"Contingent Proceeds"** (to be defined, computed, paid and accounted for in accordance with the terms of Producer's Exhibit "CB," as modified only by Producer's Rider to Exhibit "CB") are first achieved, but utilizing the applicable across the board distribution fee referred to in subparagraph (i) – (iii) above. Exhibit "CB" (which includes among its provisions a ████ percent [██%] overhead charge, a ████ percent [██%] advertising overhead charge, plus charges for any Producer facilities used in accordance with Producer's then current rate card), Producer's Rider to Exhibit "CB," Exhibit "DRCB" and Producer's Rider to Exhibit "DRCB", are herein incorporated in their entirety by reference. Furthermore, for the purposes of calculating each Cash Breakeven point in subparagraph (i) – (iii) above and for the purposes of paying Lender the Contingent Compensation, if any, hereunder: (a) with respect to Video Devices (as defined in said Exhibits), the percentages set forth in Paragraph 1.1.A.3.(B) of Exhibit "DRCB" and Exhibit "CB" shall be ████████████ (██%) in lieu of the percentage set forth therein; (b) the overhead charge set forth in Exhibit "CB" shall be capped at ████ percent (██%) of the budget of the Picture; (c) the advertising overhead charge set forth in Exhibit "CB" shall be capped at ████ percent (██%) of the amount the distributor of the Picture (i.e., TWC) spends or causes to be spent in connection with the advertising and promotion of the Picture; and (d) any location- or labor-based rebates, tax credits or subsidies when actually received by TWC shall be used to reduce the production costs for the purposes of calculating "Cash Breakeven" hereunder.



Producer confirms that the amount and the definition of Contingent Compensation and all other terms related thereto, including Adjusted Defined Receipts, Cash Breakeven and Contingent Proceeds, afforded to Artist hereunder shall be no less favorable than the amount and the definition of Contingent Compensation and all other terms related thereto, including Adjusted Defined Receipts, Cash Breakeven and Contingent Proceeds, provided to Russell, De Niro or any other participant in the profits of the Picture.

2.    **Contingent Box Office Bonus ("Box Office Bonus[es]"):**



(i) ███████████████ ($████) if and when the United States theatrical box office receipts of the Picture as reported by Rentrak and confirmed by Producer ("USTBOR") achieve (if ever) ███████████████ (USD$████);

(ii)   An additional ███████████ ($████) if and when the USTBOR achieve (if ever) ██████████ (USD$████);

(iii)   An additional ███████████ ($████) if and when the USTBOR achieve (if ever) ██████████ (USD$████);

(iv)   An additional ███████████ ($████) if and when the USTBOR achieve (if ever) ██████████ (USD$████);

(v)   An additional ███████████ ($████) if and when the USTBOR achieve (if ever) ██████████ (USD$████);

(vi)   An additional ███████████ ($████) if and when the USTBOR achieve (if ever) ██████████ (USD$████);

(vii) An additional ███████████ ($████) if and when the USTBOR achieve (if ever) ██████████ (USD$████); and

(viii)   An additional ███████████ ($████) if and when the USTBOR achieve (if ever) ██████████ (USD$████).

Lender's share of the foregoing Box Office Bonus(es) shall be payable, if at all, within thirty (30) business days following the date on which the applicable USTBOR set forth above are reported by Rentrak and shall be a nonrefundable advance of, and applicable against, the Contingent Compensation set forth in Paragraph 4 (a) of the Agreement and Paragraph 1 of this Exhibit A. Producer confirms that the Box Office Bonuses, if any, payable to Lender hereunder shall be no less favorable (i.e., as to the amount and USTBOR threshold at which any such bonuses are paid) than the box office bonuses payable to any other cast member of the Picture.

SLP / Bradley Cooper
v.6

## Exhibit B

### Certificate of Engagement

SLP FILMS, INC. ("Producer"), whose address is 9100 Wilshire Blvd., Suite 700W, Beverly Hills, California 90212, has engaged 22nd AND INDIANA INC. (Fed. ID# ███████ ) ("Lender") to furnish the services of BRADLEY COOPER ("Artist"), whose address is c/o Creative Artists Agency, Inc., 2000 Avenue of the Stars, Los Angeles, California 90067, Attention: Dave Bugliari and Steven Brookman, in connection with the motion picture currently referred to as "SILVER LININGS PLAYBOOK" (the "Picture"). Reference is hereby made to that certain Confirmation Deal Memo (the "Agreement") between the parties hereto, for the subject matter hereof, dated as of the date hereof. To the extent there is any conflict between the provisions of this Certificate of Engagement and the provisions of the Agreement, the provisions of the Agreement shall control.

For good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Lender and Artist hereby acknowledge, certify and agree that all results and proceeds of every kind of the services heretofore and hereafter to be rendered by Lender and/or Artist in connection with the Picture, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Lender and/or Artist which in any way relate to the Picture or to the material on which the Picture will be based (collectively, the "Material"), are and shall be deemed to be works "made for hire" and/or "made in the course of employment" specially ordered and commissioned by Producer for use and/or exploitation in an audiovisual work, for purposes of copyright protection throughout the world for Producer. Accordingly, Producer is and shall be considered the author and, at all stages of completion, the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights"). The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including, by way of illustration, production, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public, and the right to exploit the Material throughout the universe in perpetuity in all media, markets and languages and in any manner now known or hereafter devised. If under any applicable law the fact that the Material is a work "made for hire" and/or "made in the course of employment" is not effective to place authorship and ownership of the Material and the Picture and all rights therein in Producer, then to the fullest extent allowable and for the full term of protection otherwise accorded to Lender and/or Artist under such applicable law, Lender and Artist hereby exclusively and irrevocably assign and transfer to Producer the Rights and, in connection therewith, any and all right, title and interest of Lender or Artist in the Picture and any other works now or hereafter created containing the Material.

Lender and Artist hereby grant Producer the right to change, add to, take from, translate, reformat or reprocess the Material in any manner Producer may in its sole discretion determine. To the fullest extent allowable under any applicable law, Lender and Artist hereby exclusively and irrevocably waive or assign to Producer, Artist's so-called "moral rights" or *droit moral*. Lender and Artist expressly acknowledge that many parties will contribute to the Picture and other works that will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Lender or Artist of "moral rights" or *droit moral* is not

3

effective, then Lender and Artist agree to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

Lender and Artist will, upon request, execute, acknowledge and deliver to Producer any and all documents consistent herewith which Producer may deem reasonably necessary to evidence and effectuate all or any of Producer's rights hereunder. Lender and Artist hereby irrevocably appoint Producer as attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office or elsewhere any and all such documents Lender and/or Artist fails to execute, acknowledge and deliver after Artist's reasonable opportunity to review and negotiation said documents (not to exceed seven (7) business days of Producer's request therefor). The appointment shall be a power coupled with an interest. Producer shall provide Lender with copies of any documents that Producer executes on behalf of Lender or Artist, provided that an inadvertent failure to do so shall not be a breach hereof or affect the validity of such documents.

Subject to the terms of the Agreement, Lender and Artist hereby grant to Producer the right to issue and authorize publicity concerning Artist, and to use Artist's name, voice, approved likeness and approved biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture.

Lender and Artist warrant that, to the best of Artist's knowledge (in the exercise of reasonable prudence and due diligence), the Material is or will be original with Artist or is in the public domain throughout the world, and is not and will not be based in whole or in part on the life of any real person except as approved in writing by Producer, and does not and will not infringe upon or violate any copyright of, or, to the best of Artist's knowledge (in the exercise of reasonable prudence and due diligence), infringe upon or violate the right of privacy or any other right of, any person; and that Lender and Artist are free to grant all rights granted and make all agreements made by them herein; and that Lender is a corporation duly organized and existing under the laws of the state of its incorporation. Lender and Artist agree to hold Producer and its successors, licensees and assigns harmless from and against all damages, losses, costs, and expenses (including reasonable outside attorneys' fees and costs) which Producer or any of its successors, licensees or assigns may suffer or incur by reason of a third party claim or action arising from the material breach of any of the warranties made in this paragraph. If Producer so elects, Producer shall have the absolute right to control the litigation or resolution of any claim, demand or action to which this indemnity applies. Producer shall have the sole right to control the legal defense of any such claims, litigation, etc. including, the right to select counsel of its choice and to compromise or settle any such claims, demands or litigation. The party receiving notice of any such claim, demand or action shall promptly notify the other party hereof.

Producer shall defend, indemnify and hold harmless Lender and Artist against any and all liability, damages, costs and expenses, including reasonable outside attorneys' fees, in connection with any third party claim or action (other than those arising out of a material breach of Lender's and/or Artist's warranties hereunder or out of any criminal, intentionally tortious or willful acts by Artist) respecting material supplied to Lender and/or Artist by Producer or solely in connection with the development, production, distribution or exploitation of the Picture or any element thereof, provided that: (i) Artist cooperates fully with Producer in the defense of any such claim or legal action at no cost or charge to Producer other than the reimbursement to Artist of reasonable out-of-pocket costs and expenses incurred in connection with the defense of any such claim or legal action, excluding attorneys' fees in connection with any legal counsel engaged by Lender and/or Artist to render legal services on Lender and/or Artist's own behalf; (ii) Producer shall have the right to select and retain any legal counsel in connection with the

4

defense of any such claim or legal action and shall pay the attorneys' fees associated therewith; and (iii) Producer, in its sole discretion, shall have the right to defend, compromise and/or settle any such claim or legal action.

Lender and Artist shall be covered as additional insureds under any Errors and Omissions insurance policy and general liability insurance policy which Producer may obtain for the Picture, subject to the limitations, restrictions and terms of said policies.

Lender and Artist hereby covenant and agree that Lender and/or Artist shall not have or be deemed to have any lien, charge or other encumbrance upon any of the rights conveyed to Producer herein or proceeds derived therefrom, and that no act of or omission by Producer, nor any other act, omission or event of any kind, shall terminate or otherwise adversely affect Producer's ownership of the rights conveyed herein. Lender's and Artist's sole remedy for any such breach or alleged breach shall be an action at law to recover such damages as may have been actually suffered by Lender and/or Artist as a result thereof.

Executed as of September 23, 2011.

**ACCEPTED AND AGREED TO:**

22ND AND INDIANA INC.                           SLP FILMS, INC.

By:_____                      By:_____

Its: President                                   Its:_____


BRADLEY COOPER ("Artist")

SLP / Bradley Cooper
v.6

## Exhibit C

## INDUCEMENT

Reference is hereby made to that certain Confirmation Deal Memorandum and Certificate of Engagement (the "Agreement") dated as of September 23, 2011, by and between, on the one hand, SLP Films, Inc. ("Producer") and, on the other hand, 22nd and Indiana Inc. ("Lender") for the services of Bradley Cooper ("Artist") in the role of "Pat" in the motion picture currently referred to as "SILVER LININGS PLAYBOOK."

A.       I am familiar with all of the terms, covenants and conditions of the Agreement and I hereby consent to the execution thereof. I shall perform and comply with all of the terms, covenants, conditions and obligations of the Agreement in so far as they relate to me, even if the employment between me and Lender should hereafter expire, terminate or be suspended. I hereby confirm all grants, representations, warranties and agreements made by the Lender under the Agreement.

B.       Unless I am deemed substituted for the Lender as a direct party to the Agreement pursuant to Paragraph D below, I shall look solely to Lender and not to Producer for the payment of compensation for my services and for the discharge of all other obligations of my employer with respect to my services under the Agreement.

C.       In the event of a breach or threatened breach of the Agreement by Lender or by me, Producer may join me in any action against Lender without being first required to resort to or exhaust any rights or remedies against Lender.

D.       I represent that Lender is a duly qualified and existing corporation under the laws of its state of incorporation. If Lender or its successors in interest should be dissolved or should otherwise cease to exist, or for any reason should fail, refuse or neglect to perform, observe or comply with the terms, covenants and conditions of the Agreement, I shall, at Producer's election, be deemed to be employed directly by Producer for the balance of the term of the Agreement upon the terms, covenants and conditions set forth therein.

E.       I will indemnify Producer for and hold it harmless from and against any and all taxes which Producer may have to pay and any and all liabilities (including judgments, penalties, fines, interest, damages, costs and expenses, including reasonable attorney's fees) which may be obtained against, imposed upon or suffered by Producer or which Producer may incur by reason of its failure to deduct and withhold from the compensation payable under the Agreement, any amounts required or permitted to be deducted and withheld from the compensation of any employee under the laws of any state or province or otherwise pursuant to U.S. or Canadian law, and/or any amendments thereof and/or any other applicable statutes heretofore or hereafter enacted requiring the withholding of any amount from the compensation of an employee.

F.       If Producer shall serve Lender with any notices, demands or instruments relating to the Agreement, or to the rendition of my services thereunder, service upon Lender shall also constitute service upon me.

G.       For purposes of any and all Workers' Compensation statutes, laws or regulations ("Workers' Compensation"), I acknowledge that an employment relationship exists between Producer and me, Producer being my special employer under the Agreement. Accordingly, I

6

SLP / Bradley Cooper
v.6

acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Workers' Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Producer or Producer's affiliated companies and their respective officers, agents, and employees (including without limitation, any other special employee and corporation or other entity furnishing to Producer or an affiliate producer the services of any such other special employee) shall be governed by and limited to those provided by Workers' Compensation.

_____
BRADLEY COOPER ("Artist")

Exhibit D

## GUARANTEE

1.     As an inducement to 22ND AND INDIANA INC. for the services of BRADLEY COOPER ("**Beneficiary**") to enter into the CONFIRMATION DEAL MEMO, dated as of September 23, 2011 (the "**Agreement**"), by and between SLP FILMS, INC. ("**Company**") and Beneficiary pertaining to the motion picture tentatively entitled, "SILVER LININGS PLAYBOOK" (the "**Picture**") and in consideration of the benefits the undersigned guarantor ("**Guarantor**") will derive from the execution of the Agreement, Guarantor guarantees full and faithful performance of all of Company's obligations pursuant to the Agreement with respect to: (a) the payment obligations of Company in connection with the Contingent Compensation and Box Office Bonuses payable to Beneficiary pursuant to Paragraph 4 of the Agreement; (b) the credit obligations of Company in the U.S. territory pursuant to Paragraph 6 of the Agreement; (c) the insurance obligations pursuant to Paragraph 15 of the Agreement; and (d) the indemnity obligations pursuant to the Certificate of Engagement (the obligations referred to in the foregoing [a] – [d] shall be referred to collectively as the "**Guaranteed Obligations**").

2.     The obligations of Guarantor hereunder are independent of the obligations of Company and a separate action or actions may be brought against Guarantor whether or not Company is joined in any such action or actions. Guarantor agrees that its obligations hereunder shall not be exhausted by (i) any number of actions until the Guaranteed Obligations have been fully paid and performed; or (ii) any failure or omission or delay by Beneficiary to exercise any right or remedy under the Agreement or otherwise except to the extent that such failure, omission or delay constitutes a waiver under the Agreement (e.g., statute of limitations, laches, etc.). This Guarantee shall continue to be effective or reinstated, as the case may be, if at any time payment of any amount paid under the Agreement is rescinded or otherwise returned by Beneficiary upon the insolvency, bankruptcy or reorganization of Company as if such amount has not been paid. Except as set forth in Paragraph 4. below, Guarantor's obligations under this Guarantee are subject to all defenses which Company may have against Beneficiary with respect to enforcement by Beneficiary of the Guaranteed Obligations.

3.     Guarantor agrees that any modification of the Agreement shall not affect this Guarantee and authorizes Beneficiary and Company upon their mutual agreement without notice or demand and without diminishing its liability hereunder, from time to time to renew, compromise, extend, accelerate or modify the Agreement or otherwise change the terms of Guaranteed Obligations or any part thereof.

4.     Subject to the demand requirement set forth in Paragraph 5 below, Guarantor waives any right to require Beneficiary to (i) proceed against Company; or (ii) pursue any other remedy in Beneficiary's power whatsoever prior to proceedings against Guarantor. Guarantor waives any defense arising by reason of (a) the insolvency or bankruptcy of Company, (b) lack of authority of Company and/or (c) any disability or incapacity of Company. Guarantor waives all presentments; notice of or right to consent to any modification, extension, or alteration; notices of non-performance (except as provided in Paragraph 5 below); protests, notice of protest; notices of dishonor; and notices of acceptance of this Guarantee and of the existence, creation or incurring of new or additional obligations.

8

5.      Guarantor shall have no obligation to Beneficiary hereunder with respect to any compensation unless and until such compensation shall have accrued and been payable to Beneficiary in accordance with the provisions of the Agreement and Company shall have failed to pay said compensation as and when due and Beneficiary shall have given Guarantor notice thereof and a period of five (5) business days shall have elapsed from the date Guarantor shall have been so notified.

6.      Any notice pertaining hereto shall be in writing. Any such notice and any payment due hereunder shall be served by delivering said notice or payment personally or by sending it by mail, cable, telex or telecopier (postage or applicable fee prepaid), addressed as follows (or subsequently designated in writing):

To Beneficiary:            c/o Creative Artists Agency
                           2000 Avenue of the Stars
                           Los Angeles, CA 90067
                           Attn: Dave Bugliari and Steven Brookman
                           Fax: (424) 288-2900

To Guarantor:              The Weinstein Company LLC
                           375 Greenwich Street
                           New York, NY 10013
                           Attn: General Counsel
                           Fax: (917) 368-7007

With a Copy to:            The Weinstein Company LLC
                           9100 Wilshire Boulevard, Suite 700W
                           Beverly Hills, CA 90212
                           Attn: Andrew Kramer, President, Business & Legal Affairs
                           Adrian Lopez, Vice President, Business & Legal Affairs
                           Fax: (310) 550-5759

        The date of personal delivery, mailing or delivery to the cable or telecopier office of such notice or payment shall be deemed the date of service of such notice or payment, unless otherwise specified herein; provided, however, that any notice which commences the running of any period of time for exercise of any option or performance of any other act shall be deemed to be served only when actually received.

7.      This Guarantee contains the full and complete understanding between the parties hereto and supersedes all prior and contemporaneous agreements and understandings pertaining hereto and cannot be modified except by a writing signed by each party. Beneficiary's sole and exclusive remedy for Guarantor's breach, termination, or cancellation of this Guarantee or any term hereof (including any term pertaining to credit) shall be an action for damages and Beneficiary irrevocably waives any right to equitable or injunctive relief.

8.      This Guarantee shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in said State and the laws of the United States of America as the same would be applied by a federal court sitting in the State of New York. Beneficiary and Guarantor each hereby consents to the jurisdiction of the

9

SLP / Bradley Cooper
v.6

State Courts of New York and the Federal Courts located in the State of New York with respect to any matter relating to this Guarantee.

IN WITNESS WHEREOF, the undersigned have executed this Guarantee as of September 23, 2011.

**THE WEINSTEIN COMPANY LLC**
**("Guarantor")**

By: _____

Its: _____
      Andrew J. Kramer
          President
  Business & Legal Affairs

APPROVED BY:

22ND AND INDIANA INC.

By: _____

Its: _____

_____
BRADLEY COOPER

SLP / Bradley Cooper
v.6

## CONFIRMATION DEAL MEMO

**Date:**        As of September 23, 2011

**Artist:**       Bradley Cooper
              SSN: ████████
              c/o Creative Artists Agency
              2000 Avenue of the Stars
              Los Angeles, California 90067
              Attn:    Dave Bugliari and Steven Brookman
              Fax:     (424) 288-2900

**Lender:**      22nd and Indiana Inc.
              Federal I.D. No: ████████

**Producer:**    SLP Films, Inc.
              1818 Market Street, 12th Floor
              Philadelphia, Pennsylvania 19103
              Attn:    George Parra
              Fax:     (215) 563-6353

              The Weinstein Company LLC
              9100 Wilshire Boulevard, Suite 700W
              Beverly Hills, CA 90212
              Attn:    Adrian Lopez, Vice President, Business & Legal Affairs
              Fax:     (310) 550-5759

**Role/Picture:**    The role of "PAT" in the motion picture tentatively entitled, "SILVER LININGS
              PLAYBOOK" (the **"Picture"**).

**1.  Conditions Precedent:** Producer has no obligation under this Confirmation Deal Memo (this
**"Agreement"**) unless and until: (i) Producer receives a fully-executed copy of this Agreement, the
Certificate of Engagement and the Inducement Letter attached hereto as Exhibits "B" and "C,"
respectively; and (ii) Producer receives all documents which may be required by any governmental
agency or otherwise for Lender to provide Artist to render services hereunder, including, without
limitation, visas, work permits and an INS Form I-9 (Employment Eligibility Verification Form)
completed to Producer's reasonable satisfaction, together with Lender and Artist's submission to
Producer of original documents establishing Artist's employment eligibility. The aforementioned
subparagraphs 1.(i) – !(ii) shall be collectively referred to herein as the **"Conditions Precedent."**
Producer shall have the right to waive the aforementioned Conditions Precedent at any time in its sole
discretion.

**2.    Services:**

      (a)     Lender shall furnish all services of Artist required by Producer in the Role in connection
with the Picture. The Fixed Compensation (as such term is defined below) shall constitute full
compensation for Artist's exclusive services as set forth herein, including: (i) Artist's pre-production
services, including, without limitation, travel, wardrobe, a reasonable amount of rehearsal, hair and

makeup, at such times and places as Producer may reasonably require; (ii) Artist's ingoing scheduled period of principal photography services on the Picture commencing on or about October 10, 2011 (i.e., two [2] weeks either side) (the **"Start Date"**) (which Start Date is subject to change by Producer in its sole discretion); (iii) plus five (5) "free" days of Artist's services (**"Additional Photography Services"**) which may be used for additional photography, added scenes, re-shoots and post-production services, including, without limitation, ADR, dubbing and looping. Three (3) of the "free" days of Additional Photography Services must be consecutive to the period of principal photography of the Picture (exclusive of holidays and regularly scheduled breaks between work weeks) and the other two (2) "free" days of Additional Photography Services need not be consecutive to the period of principal photography, or each other, but which, if non-consecutive to principal photography, are subject to Artist's then-existing prior professional conflicting contractual commitments; (iv) plus five (5) "free" days of Artist's services (**"Additional Post-Production Services"**) which may be used for post-production services (i.e., dubbing, looping, ADR, etc.), which "free" days may be consecutive or non-consecutive to the period of Artist's principal photography services or to each other, at Producer's sole discretion, but subject to Artist's then-existing prior professional conflicting contractual commitments in either event; (v) use of Artist's name and approved (i.e., in accordance with below paragraph 8) photograph and likeness in connection with the Picture and any and all marketing and/or promotional materials (including, without limitation, trailers, TV spots, one-sheets, outdoor, etc.) subject to the terms herein; and (vi) Artist's reasonable publicity services in connection with the Picture (i.e., attending the national press junket and premiere of the Picture, appearing on national late night and daytime television talk shows, and being available for radio, newspaper and magazine interviews). Artist shall have the right to disapprove particular publicity and promotional services to be rendered by Artist, provided that Artist exercises such right in good faith and not in a manner designated to frustrate or delay the timely promotion of the Picture, and provided further that Artist renders a reasonable number of publicity interviews and sittings for publicity photographs and other publicity activities reasonably required by Producer, including alternative publicity and promotional services of comparable amount, stature and importance (in Producer's good faith business judgment) to the publicity and promotional services that Artist may disapprove of rendering pursuant to this paragraph. If Artist is required by Producer to render publicity services hereunder at a Location (as defined below), then Artist will be entitled to the following in connection with Artist's publicity services at such Location: (a) one (1) first-class (or best available) round-trip air transportation (if used) between Artist's primary residence (or Artist's then-current location, if closer) and the Location; (b) exclusive first-class (but not necessarily a limousine) ground transportation to and from airports and Artist's primary residence/hotel and to and from the location at which Producer requests that Artist render publicity services and hotel; (c) first-class hotel accommodations (i.e., a one [1] bedroom hotel suite); and (d) an all-inclusive, non-accountable reasonable per diem for Artist. All of the foregoing items shall be in accordance with Producer's then existing policy and the budgetary parameters of the Picture (if and as applicable). All travel and related arrangements will be made by Producer. The aforementioned publicity services shall be subject to Artist's then-existing prior professional conflicting contractual commitments. Notwithstanding anything to the contrary contained herein, Producer agrees to release Artist from rendering exclusive services to Producer on the Picture on or before January 1, 2012.

(b)      Lender shall provide Artist to render all services herein on an exclusive basis during the period of Artist's services in connection with principal photography of the Picture. Lender and Artist agree that Artist shall render all services described herein in a competent, conscientious and professional manner, having due regard for the production of the Picture within the budget, and as reasonably instructed by Producer in all matters, including those involving artistic taste and judgment; but there shall be no obligation on Producer to actually utilize Artist's services or to include any of Artist's work in the Picture, or to produce, release, or continue the production or distribution of the Picture at any time, provided that the foregoing shall not relieve Producer of its obligations hereunder, including Producer's

SLP / Bradley Cooper
v.6

obligation to pay Lender any Fixed Compensation in connection with Artist's acting services to which Lender may become entitled, if any, pursuant to the terms set forth in Paragraph 3. herein.

(c)      The provisions of Schedule F of the applicable SAG Agreement will apply to Artist's services hereunder. Except as otherwise required by the SAG Agreement: (i) no compensation will be payable for services rendered in connection with any "hold" days or weeks, "free" days or weeks, travel time, publicity interviews, personal appearances or stills, or other periods of service for which this Agreement specifies that no additional compensation is payable, inasmuch as the Fixed Compensation set forth above is deemed to include compensation for all such services; and (ii) no increased or additional compensation will be payable by reason of Artist's rendition of services at night, on Saturdays, Sundays or holidays, after the expiration of any particular number of hours on any one day, or for any "hold" days. The Fixed Compensation shall be deemed an advance against and credited against any compensation for which Producer may be liable under or pursuant to the SAG Agreement or any other applicable collective bargaining agreement, if any, by reason of this Agreement and Artist's performance hereunder, to the maximum extent permitted by any such SAG Agreement or any other applicable collective bargaining agreement, if any. Any payments required by the SAG Agreement or any other applicable collective bargaining agreement, if any, in excess of the payment expressly provided for herein will be payable at the minimum required by the SAG Agreement or such applicable collective bargaining agreement, if any. Any Fixed Compensation, Contingent Compensation (as defined below; if any) and/or Box Office Bonuses (as defined below; if any) paid to Lender shall not be credited against any residuals which may become due to Lender or Artist in connection with the Picture.

(d)      Overages: Notwithstanding anything to the contrary contained herein, in the event Artist's Additional Photography Services are required for a period of time beyond the five (5) "free" days, or Artist's Additional Post-Production Services are required for a period of time beyond the five (5) "free" days, overages for any such services in excess of the five (5) days of Additional Photography Services and/or five (5) days of Additional Post-Production Services, if any, shall be payable to Lender at the weekly rate equal to the Fixed Compensation divided by the number of weeks of principal photography of the Picture, based on the ingoing schedule of principal photography as of the first day of principal photography **("Overages")**. All Overages shall be prorated: (i) based on a six (6) day work week when services are rendered on Location; or (ii) based on a five (5) day work week when services are rendered at Producer's studio or its vicinity.

(e)      Working Conditions: For the avoidance of doubt, it is acknowledged and agreed that all work rules applicable to Artist's services in connection with the Picture, including, but not limited to, portal to portal work and rest periods, shall be pursuant to the SAG Agreement.

**3.      Fixed Compensation:** Subject to Artist's  performance of all material services and material obligations hereunder, and provided that Artist is not otherwise in material breach or default hereof, Lender shall be entitled to receive the flat sum of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the **"Fixed Compensation"),** payable in equal  weekly installments over the course of Artist's ingoing scheduled period of principal photography services on Producer's regular pay day, one (1) week in arrears. Neither Lender nor Artist shall be entitled  to any further sum, rights, or consideration in connection with Artist's services hereunder except as specifically provided for herein, and Lender and Artist acknowledge that no use or exploitation of the Picture shall entitle Lender or Artist to any sums or compensation except as expressly provided for herein. Subject to Artist's failure to fully perform services hereunder as a result of material breach, default, death, disability, and/or force majeure, Artist shall be, on a non-citable and non-precedential basis, deemed "pay or play" and Lender shall be entitled to the foregoing Fixed Compensation, in accordance with the terms of this paragraph, upon Producer having received a copy of this Agreement executed by Lender and Artist.

3

4.     **Talent Pool Participations.** Subject to Artist's performance of all material services and material obligations hereunder, provided that Artist appears recognizably in the Role in the Picture as first generally released theatrically, and is not otherwise in material breach or default hereof, Lender shall be entitled to receive, if at all, the following:

(a)     Contingent Compensation: Thirty-three and one-third percent (33 1/3%) of one hundred percent (100%) of the contingent compensation (if any) payable (if ever) pursuant to Paragraph 1. of Exhibit "A" attached hereto and incorporated herein by this reference (the **"Contingent Compensation"**) (it being acknowledged by Producer that ███████████████████████████████████████ shall each be entitled to ███████████████████████ of one hundred percent [100%] of the Contingent Compensation), less any Box Office Bonuses; and

(b)     Contingent Box Office Bonus( es): ██████████████████████████ of the Contingent Box Office Bonus(es) (if any) payable (if ever) pursuant to Paragraph 2. of Exhibit "A" (it being acknowledged by Producer that ████████████████ shall each be entitled to █████ ████████████████ of any such Contingent Box Office Bonus[es]).

5.     **Award Bonus(es):** Subject to Artist's performance of all material services and material obligations hereunder, provided that Artist appears recognizably in the Role in the Picture as first generally released theatrically, and is not otherwise in material breach or default hereof, Lender shall be entitled to receive, if at all, the following amounts for each of the following: (i) ███████████ ██████████ if Artist is nominated for an Academy Award for "Best Actor" or "Best Supporting Actor" in connection with the Picture; (ii) an additional ████████████████████████ if Artist wins an Academy Award for "Best Actor" or "Best Supporting Actor" in connection with the Picture; (iii)███ ████████████ if Artist is nominated for a Golden Globe for "Best Performance by an Actor in a Motion Picture" or "Best Performance by a Supporting Actor in a Motion Picture" in connection with the Picture; and (iv) an additional ████████████████████████████ if Artist wins a Golden Globe for "Best Performance by an Actor in a Motion Picture" or "Best Performance by a Supporting Actor in a Motion Picture" in connection with the Picture.

6.     **Credit:** Subject to the standard exclusions of Producer and the Picture's domestic distributor (including artwork title exceptions), provided Artist appears recognizably in the Role in the Picture as theatrically released, Artist shall be accorded credit in substantially the form of "Bradley Cooper" as follows:

(a)     On Screen: On screen, on a separate card, in the main titles (i.e., where the "Directed by" credit appears, which may be at the beginning or end of the Picture subject to Producer's sole discretion), above or before the title of the Picture, in first ('1' position of all on screen cast credits, on all positive prints of the Picture, in an average size of type no smaller than seventy-five percent (75%) of the average size of type used to display the regular title of the Picture on screen. No individual shall receive a larger credit on screen than Artist.

(b)     Paid Ads: In paid ads issued or controlled by Producer (**"Paid Ads"**) (which Paid Ads, for clarity, shall include video/DVD packaging , soundtrack album packaging and theater displays), above or before the "artwork" title (if any) of the Picture in such Paid Ad, in first (1' position of all cast members accorded credit in such Paid Ad, in an average size of type no smaller than twenty-five percent (25%) of the size of type used for the artwork title of the Picture, if any, in such Paid Ad. No other individual shall receive a larger credit above or before the "artwork" title (if any) of the Picture in such Paid Ad than Artist. Inaddition, Artist shall be accorded credit above or before the regular (i.e., not artwork) title of the

4

Picture in such billing block, in first (I") position of all cast credits in such billing block. No other individual shall receive a larger credit in such billing block than Artist.

(c)     Excluded Ads: In the billing block portion of any so-called excluded ads issued or controlled by Producer (other than award, nomination, congratulatory ads or special ads naming only the person so nominated, congratulated or otherwise honored, special ads under Section 8203D, 8203F and 8203G of the Directors Guild of America collective bargaining agreement, ads announcing a personal appearance in which no person other than the person appearing is mentioned) ("Excluded Ads") and in which any other principal cast members of the Picture is also accorded credit in such billing block, above or before the regular (!&, not artwork) title of the Picture in such billing block, in first (!") position of all cast credits in such billing block, in an average size of type no smaller than seventy-five percent (75%) of the average size of type used to display the regular title of the Picture in such billing block. In addition, if Producer accords any other cast member credit above or otherwise in connection with the "artwork" title in the artwork portion (as opposed to the billing block portion) of the key art for the Picture in any Excluded Ads for the Picture, then Producer shall also include Artist's credit above or otherwise in connection with the "artwork title" (as applicable) in such artwork portion of the key art for the Picture in no less than first (I") position of all cast members accorded credit in such artwork portion of the key art for the Picture, in an average size of type no smaller than twenty-five percent (25%) of the size of type used for the artwork title of the Picture, if any, in the artwork portion of the key art of such Excluded Ad. If Artist is accorded credit in conjunction with the "artwork" title portion of any Excluded Ads, then Producer shall be deemed to have satisfied its obligation, if any, to accord Artist credit in the billing block portion (if any) of such Excluded Ad (i.e., Producer shall have no obligation to accord Artist a repeat credit in the billing block portion of such Excluded Ad). Notwithstanding the foregoing, if any cast member of the Picture is accorded both "artwork" credit and billing block credit in an Excluded Ad, then Artist shall receive both "artwork" credit and billing block credit in such Excluded Ad. No other individual shall receive a larger credit above or otherwise in connection with the "artwork" title (if any) of the Picture in, or in the billing block of, such Excluded Ad than Artist.

(d)     Likeness: If the likeness of any other cast member appears in the artwork portion of the key art for the Picture in any Paid Ad or, if applicable, in any Excluded Ad, then Producer shall also include Artist's approved (pursuant to Paragraph 8.[b] below) likeness therein (as applicable). Artist's likeness in such key art shall be no less prominent than the likeness of any other cast member appearing in such key art; provided, however, that without frustrating the purpose of the foregoing, in depicting the likeness of Artist and such other cast member, Producer may take into account the relative physical characteristics of Artist and such other cast member and the appropriate proportion and perspective of the key art. Producer's use in Paid Ads or Excluded Ads of an "icon" (i.e., an image of a pa,rticular part of the body, such as a stomach, a hand, a close-up of eyes) or the depiction of a non-human character does not constitute the use of a cast likeness for purposes of this Agreement. The foregoing likeness tie shall not apply to any so-called "series" or "showcase" Paid Ads (i.e., a separate advertising featuring principal cast members alone or with a non-recognizable human or with a non-human character), provided that Artist's likeness shall appear on substantially the same number of ads as any other cast member in such series or showcase advertising.

(e)     Audio Ads: If the name of any other cast member is audibly mentioned in connection with a television advertisement, radio advertisement or trailer ("Audio Ads") issued or controlled by Producer with respect to the Picture (other than award, nomination, congratulatory ads or special ads naming only the person so nominated, congratulated or otherwise honored, special ads under Section 8203D, 8203F and 8203G of the Directors Guild of America collective bargaining agreement, ads announcing a personal appearance in which no person other than the person appearing is mentioned), then

Artist's name shall also be audibly mentioned in connection with such Audio Ad in first (I") position of all cast members in such Audio Ad.

(f)      Miscellaneous: As used herein, "size" means height, width, thickness and boldness of type. All other matters pertaining to such credit (including, without limitation, the size, style, nature and placement thereof [subject to the restrictions set forth hereinabove]) shall be as Producer in its sole discretion shall determine. No casual or inadvertent failure by Producer, nor any failure by any third party, to comply with the foregoing credit provisions shall constitute a breach hereof, provided that if Producer materially fails to accord Artist credit pursuant to the terms of this paragraph, upon Producer's receipt of written notice from Artist setting forth such material failure in detail, Producer agrees to use reasonable good faith efforts to prospectively cure such material failure with regard to ads created and/or positive prints manufactured after the date of Producer's receipt of such notice of material failure, but nothing herein shall require Producer to cease using or to replace prints, negatives, masters or other material then in existence.

7.      **Transportation; Location Pergnisites:** If Artist's services in connection with the Picture are required by Producer on location more than fifty (50) miles from Artist's primary residence (currently, Los Angeles, California) (each, a **"Location"**), then Artist will be entitled to the following in connection with Artist's services at such Location:

(a)      Transportation:

(i)      Air Transportation: One (!) first-class (or best available) round-trip air transportation (if used) between Artist's primary residence and the Location.

(ii)     Additional Air Transportation: On a one-time only basis, one (1) additional first-class (or best available) round-trip air transportation (if used) for Artist or Artist's guest (**"Artist's Additional Ticket"**); provided, however, that Artist acknowledges and agrees that Artist's use of Artist's Additional Ticket shall be subject to Artist's scheduling requirements hereunder and Producer's prior written approval thereof.

(iii)    Ground Transportation: Exclusive ground transportation to and from airports and Artist's primary residence/location residence and exclusive ground transportation to and from Artist's location residence and sets. Producer shall consult with Artist with respect to the individual engaged by Producer to drive the vehicle in which Producer will provide Artist with the ground transportation set forth in this paragraph, provided that in the event of disagreement or if Artist is unavailable for such consultation, Producer's decision with respect thereto is final and binding.

(iv)     Rental Car: During the period that Artist is rendering services on Location, Artist shall be entitled to the use of an exclusive insured full-size rental car as provided by Producer and Producer shall reimburse Artist for the reasonable costs of parking such rental car at the place of Artist's accommodations, upon Producer's receipt of written substantiation of such charges. Notwithstanding the foregoing and for the avoidance of doubt, in connection with any rental car provided by Producer to Artist, Producer shall not reimburse Artist for parking tickets or any other such citations and Producer shall not be responsible for any costs related to maintenance or repairs. In the event that unpaid parking violations or any other citations are reported to Producer while Artist is rendering services for Producer or after Artist has concluded employment with Producer, Artist shall be responsible for any bail amount and/or processing fees with respect to such parking tickets and citations.

(b)    Per Diem: An all-inclusive, non-accountable per diem in the amount of Two Hundred Dollars ($200) for Artist.

(c)    Accommodations: One (!) hotel suite, ███████████████████████████ ██████████████████████ when Artist renders services at Producer's request in or around ████████████ provided that if the ██████████is unavailable, then Producer shall provide Artist with a comparable hotel suite, subject to Artist's reasonable approval.

(d)    Trailer: Exclusive use of one (!) first-class trailer equipped with customary first-class amenities, provided that such trailer and amenities shall be no less favorable than the trailer and amenities provided to any other cast member in connection with the Picture, other than████████

(e)    Assistant: While Artist renders services in connection with principal photography of the Picture at Producer's request at a Location, Producer shall engage the services of Artist's assistant at the rate of██████████████████████ per five (5)-day week (pro-rated at l/5th thereof per day), with such sum being inclusive of compensation for any idle time. In connection with such engagement, Producer shall provide such individual with one (!) coach-class round-trip air transportation (if used) between such individual's primary residence and the Location, crew accommodations, a rental car and a crew per diem.

(f)    Training/Food Supplements/Nutrition: On a one-time only basis, Producer shall provide Lender with an all-inclusive non-accountable payment in the amount of ██████████████████████ ████████████ to cover the costs of Artist's nutrition, food supplements and training in connection with Artist's preparation for the Role.

## 8.    Approvals:

(a)    Photo/Likeness Approvals: Lender and Artist will have a right to approve any still photographs or any artistic rendering or likeness of Artist which Producer intends to use in connection with advertising, merchandising, publicity or other exploitation of the Picture, provided that Lender and/or Artist will approve not less than fifty percent (50%) of those stills in which Artist appears (whether alone or with other cast member(s)), and Lender and Artist will have three (3) passes with respect to likeness approval, all of the foregoing in accordance with the domestic distributor's customary provisions (i.e., deemed approved if not specifically disapproved in writing within five [5] business days [reducible to two (2) business days in the event of marketing exigencies of which Artist is notified at the time of submission] of Artist's or Artist's agent's receipt). All still photographs approved or deemed approved by Artist shall be approved or deemed approved for all purposes permitted hereunder, except as otherwise set forth herein.

(b)    Key Art Resubmission:   Producer shall resubmit to Artist any stills and/or artistic renderings in which Artist appears recognizably that have been previously approved by Artist or deemed approved pursuant to Paragraph 8.(a) (the **"Resubmitted Approved Art"**) which Producer intends to use in the "key art" for the Picture (including the "key art" used for covers of novelizations, soundtrack records, home video packaging, magazine covers and merchandising [subject to paragraph 9.(b) below]). Artist shall have five (5) business days from receipt of the Resubmitted Approved Art (which five [5] business day period shall be reduced to three [3] business days if Producer requires Artist's response in such shorter time period and Producer notifies Artist thereof) within which to approve no less than fifty percent (50%) of such Resubmitted Approved Art for Producer's intended use in connection with the Picture. If Artist shall fail or refuse to approve, within the aforesaid period, the requisite amount of Resubmitted Approved Art, Producer shall have the right to select from the Resubmitted Approved Art

7

the requisite amount, including the Resubmitted Approved Art approved by Artist, if any, for use in the "key art" for the Picture. Producer's submission of the Resubmitted Approved Art to Creative Artists Agency as specified in Paragraph 18. shall satisfy Producer's submission requirements under this Paragraph 8.(b) and any inadvertent failure by Producer (or its representatives) to comply with the provisions of this Paragraph 8.(b) shall not constitute a breach of this Agreement. Once the requisite amount of the Resubmitted Approved Art has been approved or deemed approved in accordance with the provisions of this Paragraph 8.(b), Producer shall have the right, in its sole discretion and without any further submission obligation to Artist, to use any or all of said approved Resubmitted Approved Art in the "key art" for the Picture and any use thereof, subject to the terms and conditions set forth herein.

(c)     Screenplay Approval: Artist shall have the right to approve any material changes to the "Screenplay" for the Picture that materially diminish or alter the importance or the essential characteristics of Artist's Role, provided that Artist shall exercise such approval in good faith and not so as to frustrate the timely progress to production or production of the Picture. Artist acknowledges that Artist has pre-approved the screenplay dated October 11, 2011 ("**Screenplay**").

(d)     Director Replacement: If for any reason it becomes necessary to replace the director of the Picture (i.e., Russell, who Artist hereby pre-approves), then Artist shall have the right to approve any replacement, provided that Artist shall approve no less than one (l) of three (3) available replacement directors suggested by Producer to Artist and further provided that after the date which is six (6) weeks prior to the commencement of principal photography of the Picture, Producer shall designate a replacement director after good faith consultation with Artist, but in the event of any disagreement, Producer's decision shall be final and binding. Any replacement director approvals shall be made within two (2) business days of the date of receipt by Artist or Artist's representatives of any submission by Producer hereunder. Subject to the foregoing, all decisions relating to the engagement (if any) of a replacement director including, without limitation, the compensation payable to a replacement director, shall be made in Producer's sole election.

(e)     Co-Star Replacement: If for any reason it becomes necessary to replace either of the co-stars of the Picture (i.e., the individuals portraying the roles of "Tiffany" and "Mr. Peoples"; Artist hereby pre-approves ███████████████████ and █████████ for such respective roles), then Artist shall have the right to approve any replacement, provided that Artist shall approve no less than two (2) of five (5) available replacement co-stars suggested by Producer to Artist and further provided that after the date which is four (4) weeks prior to the commencement of principal photography of the Picture, Producer shall designate a replacement co-star after good faith consultation with Artist, but in the event of any disagreement, Producer's decision shall be final and binding. All replacement co-star approvals shall be made within two (2) business days of the date of receipt by Artist or Artist's representatives of any submission by Producer hereunder. Subject to the foregoing, all decisions relating to the engagement (if any) of a replacement co-star including, without limitation, the compensation payable to a replacement director, shall be made in Producer's sole election.

(g)     Tabloids: Producer and/or The Weinstein Company ("**TWC**") shall not submit any stills and/or likeness in which Artist appears to the following publications: "The National Enquirer"; "The **Star**"; "**The Globe**"; "**The Sun**"; "**The Examiner**"; "**The Weekly World News**" **or other similar** publications. Notwithstanding the foregoing, (i) Producer shall not be in breach of this Agreement if any of such publications obtain stills and/or any likenesses in which Artist appears from parties other than Producer or if any of such publications contain advertising for the Picture which includes Artist's stills and/or likeness therein, and (ii) Lender and Artist hereby acknowledge and agree that Producer cannot make any guarantees (and will not be in breach hereof) regarding the unauthorized use of stills, likeness or electronic press kits by any publications or media outlets which were legitimately serviced by any

8

publicity companies engaged or performing services in the normal course of business in connection with the publicizing and promotion of the Picture.

(h) Biography: Artist may furnish Producer with Artist's biography. Provided that Artist timely furnishes such biography to Producer following Producer's request therefor, Producer shall not have the right to use any biographical information about Artist other than as contained in such biography (other than references to Artist's prior professional credits and Artist's services on the Picture) without the prior approval of Artist, which approval shall not be unreasonably withheld.

9.    **Ownership and Distribution:**

(a)    The results and proceeds of Artist's services hereunder in connection with the Picture shall be deemed works-made-for-hire specially ordered or commissioned by Producer for use in connection with an audiovisual work(s). Artist acknowledges and agrees that Producer shall exclusively own all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to such results and proceeds, and all elements therein for all now known or hereafter existing uses, media, and forms, including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, video cassette and video or laser disc, any computer-assisted media (including, but not limited to CD-ROM, CD-I and similar disc systems, interactive cable and any other devices or methods now existing or hereinafter devised), video-on-demand, character, prequel, sequel, remake, merchandising (subject to paragraph 9.[b] below), soundtrack (including, without limitation, the further exclusive right to use and to license the use of Artist's voice from the soundtrack of the Picture on commercial phonograph record(s), album(s), and similar devices, with no additional remuneration inasmuch as the compensation set forth herein shall be deemed to include remuneration for the foregoing [subject to paragraph 9.[c] below]), commercial tie-ins (subject to paragraph 9.[b] below), behind-the-scenes promotional films (subject to the restrictions contained herein), bloopers (subject to the restrictions contained herein), outtakes (subject to the restrictions contained herein), stage play, theme park, Internet and any and all allied and ancillary rights therein, and the foregoing is inclusive of a full, irrevocable assignment to Producer thereof. Artist further acknowledges and agrees that Producer will be the sole and exclusive owner of all rights in the role and character played by Artist, including the name, voice, likeness and/or distinctive characterizations of the role and character, and that Artist shall have no right at any time to portray, exploit, merchandise or make any use of such role or character. In connection with the foregoing rights granted to Producer, Producer shall have the right, in perpetuity and throughout the universe, to exploit such role and character, and to use, and to authorize others to use, Artist's name, approved image, voice, approved likeness, attributes and/or approved biography, in connection with the production, exhibition, advertising, publicity, merchandising, commercial tie-ins, promotion and/or other exploitation of the Picture, and/or subsidiary and ancillary rights of any nature relating to the Picture or Artist's services hereunder, in any and all media, whether now known or hereinafter devised, including, without limitation, in and in connection with the Picture, excerpts from the Picture, trailers for the Picture, television advertisements for the Picture, new footage shot in connection with any trailers or television advertisements, one sheets and other posters furnished exhibitors for display or promotion, packaging/jackets of videodiscs, cassettes and phonorecords, videogames, wireless content (including, without limitation, ring tones, voice tones and wall paper) printed programs, press books, and novelizations of the story of the Picture and other commercial publications relating to the Picture, and soundtrack recordings relating to the Picture embodied in any form now known or hereinafter devised (including the packaging therefor and in sheet music and song books relating thereto) (subject to the restrictions contained herein). Notwithstanding anything to the contrary contained herein, Producer shall not use the results and proceeds of Artist's services hereunder in any motion picture or other production, other than in the Picture (which may be exploited in any manner now known or hereafter devised) and in any advertising and publicity therefor, without Artist's prior written consent.

(b)     Notwithstanding the foregoing or anything to the contrary contained herein, Artist shall have the right to approve, in each instance, the use of Artist's name (outside of credit lists, including without limitation, billing blocks, which are pre-approved), voice and/or likeness in connection with any merchandising with respect to the Picture and the use of Artist's name, voice and/or likeness (except for clips or other footage from the Picture, the key art of the Picture and credit lists, including without limitation, billing blocks, which are pre-approved) in connection with any commercial tie-in for the Picture; provided, however, that such approval shall be deemed given if not denied by Artist in writing within five (5) business days (or such shorter period as is reasonably designated by Producer if Producer advises Artist in writing that business or marketing exigencies require a quicker response from Artist) after Producer's request therefor and further provided that, with respect to the pre-approved uses of Artist's name voice and/or likeness, Producer shall not use Artist's name, voice or likeness in connection with commercial tie-ins involving weapons (other than toy weapons), feminine hygiene products, prescription pharmaceuticals, undergarments (excluding t-shirts), gambling, religious or political items, tobacco or alcohol without Artist's prior written approval. If Producer exercises the foregoing merchandising rights under Paragraph 9.(a) following Artist's approval (or deemed approval) then with respect to merchandise actually sold, Producer shall pay to Lender a royalty in an amount to be negotiated in good faith.

(c)     Producer shall not use Artist's voice on a soundtrack album without Lender's or Artist's prior written consent and without negotiating a royalty therefor in good faith within Producer's customary parameters, taking into account Artist's major studio contractual precedent and stature in the motion picture industry. The foregoing shall not apply to either (i) Artist's spoken voice performance; or (ii) musical material which is ad-libbed or improvised as part of Artist's acting services; provided that such spoken voice performance and/or ad-libbed or improvised musical material does not exceed an aggregate of fifteen (15) seconds in length in connection with any such soundtrack album.

**10.     Promotional Film/Outtakes/Bloopers:** Producer contemplates filming and exploiting films, including, without limitation, music videos for the Picture, "behind the scenes" or "making of ' productions about the Picture ("Promotional Film") in connection with the advertising, marketing and publicity of the Picture. Producer shall use reasonable efforts to provide Artist with prior notice of any production of a Promotional Film; provided, however, Producer's inadvertent failure to provide such notice shall not be a breach of this Agreement. Artist hereby agrees and consents to such filming and exploitation (including, without limitation, use of any film clip footage from the Picture and behind the scenes photography and filmed interviews with Artist) and hereby grants to Producer the right to use Artist's name, voice and likeness in connection with such Promotional Films for no additional consideration. In addition, Artist hereby agrees and consents to the use by Producer of outtakes in connection with (i) the end credits of the Picture; (ii) any "compilations" or "special editions" of the Picture for inclusion on DVD's, laser discs, and/or other devices now known or hereafter devised and (iii) any "compilation" or "special edition" types of motion pictures issued or controlled by the distributor of the Picture. Artist shall have the right to approve all "bloopers", screen test footage and behind-the-scenes footage in which Artist appears used in connection with such Promotional Films or other programs under Producer's control; provided that at Producer's request, in connection with (i) the end credits of the Picture; (ii) any "compilations" or "special editions" of the Picture for inclusion on DVD's laser discs, and/or other devices now known or hereafter devised and (iii) any "compilation or "special edition" types of motion pictures issued or controlled by Producer, Artist shall approve a sufficient amount of such behind-the-scenes footage embodying Artist's appearance in a manner that a reasonable audience would conclude that Artist was featured in the Picture. Notwithstanding the foregoing, Artist shall have absolute approval of any use of any so-called "bloopers" in which Artist appears, which approval may be withheld in Artist's sole discretion, and Artist is not obligated to approve any minimum amount thereof.

10

**11.    Hair/Make-Up/Wardrobe/Stand-In/Stunt Double Consultation:** Producer shall consult with Artist with respect to the "look" of Artist's hair and make-up and wardrobe (but not with respect to any personnel in connection therewith, it being understood, however, that Producer engaged the individuals approved by Artist to furnish hair, make-up and wardrobe services for Artist, on a non-exclusive but first priority basis to Artist, which Artist hereby acknowledges) and the individuals to be engaged by Producer as Artist's stand-in  and stunt double; provided, however, that: (a) said consultation rights shall be personal to Artist and shall not be delegated to any third party; (b) Artist is available for such consultation(s) when and where Producer reasonably requests; (c) any such consultation(s) with Artist shall be at no cost to Producer; and (d) in the event of disagreement or if Artist is unavailable for such consultation, Producer's decision with respect thereto is fmal and binding

**12.    Premiere/DVD/Soundtrack:** Provided that Lender and Artist fully perform all material services and obligations hereunder and are not otherwise in material breach hereof and that Artist appears recognizably in the Role in the Picture as theatrically released, Artist will be entitled to the following: (i) an invitation for Artist and a non-business related guest to all celebrity premieres and festivals, if any, and if one (1) celebrity premiere in the U.S. of Producer's choice is held at a Location, first-class (or best available) round-trip travel (for Artist and Artist's guest, by air if appropriate, if used) between such Location and Artist's primary residence, first-class accommodations (i.e., a one [l] bedroom hotel suite) (for Artist only), exclusive ground transportation (for Artist only) and a reasonable per diem (for Artist only), all in accordance with Producer's then existing policy and the budgetary parameters of the Picture; (ii) a DVD copy of the Picture in standard format or a DVD copy of the Picture in Blu-ray format (if and when commercially available), provided that Artist executes Producer's then applicable use-restriction agreement in connection therewith; and (iii) a CD of the soundtrack of the Picture (if and when commercially available), provided that Artist executes Producer's then applicable use-restriction agreement in connection therewith.

Notwithstanding the foregoing, Artist shall be treated no less favorably than De Niro with respect to the entitlement to the number of invitations, air transportation, ground transportation, accommodations and an expense allowance with respect to any U.S. premieres and U.S. film festivals in connection with the Picture.

**13.    Nudity:** Artist shall not be required to appear, and may not be doubled in any scene, in the nude, or in any simulated sex scene without the express written consent of Artist, in accordance with the SAG Agreement.

**14.    Dubbing/Doubling:** Subject to Section 33 of Schedule C of the SAG Agreement, Producer shall have the right to use the services of persons other than Artist (with or without the services of Artist) to "dub" or "double" Artist's acts, poses, appearance, voice or sound effects attributed to the character portrayed by Artist and to use the name, likeness, voice or other sound effects of Artist in connection therewith. Such doubling or dubbing of Artist's voice may be in English or any other language, provided, however, that: (i) Producer shall not "double" Artist without Artist's prior written consent (which consent shall not be unreasonably withheld or delayed); and (ii) Producer shall first give Artist the opportunity to dub in English provided that Artist is available as, when and where reasonably required by Producer and that there is no additional cost to Producer in connection with such dubbing services of Artist.

**15.    Insurance:** Lender and Artist shall be listed as additional insureds on Producer's errors and omissions insurance policy in connection with the Picture and to the extent Artist is deemed an employee of Producer, Artist shall be listed as an additional insured on Producer's general liability insurance policy in connection with the Picture hereunder during customary periods of production and distribution of the Picture, subject to the limitations, restrictions and terms of said policies.  The provisions of this paragraph

11

shall not be construed so as to limit or otherwise affect any obligation, representation, warranty or agreement of Lender and/or Artist hereunder.

**16.** **Medical Examination:** In any proper case (such as for purposes of insurance or if Artist claims to be ill, disabled or incapacitated), Producer shall have the right to have Artist examined at any time or times prior to the completion of all of Artist's required services hereunder by such physician(s) as Producer may designate. Artist shall make himself available for and shall submit to such examinations and tests and shall otherwise cooperate as may be reasonably requested. Artist may have Artist's own physician present at such examinations at Lender and Artist's own cost and expense, provided that there is no interference with or delay in making such examination.

**17.** **SAG Agreement:** Producer hereby represents and warrants that it is a SAG signatory. Producer shall pay, on Lender's behalf, to the SAG Pension, Health and Welfare Plan, Lender's contributions required by the SAG Agreement with respect to Artist's engagement hereunder, but not exceeding those which Producer would have been obligated to pay if Producer had employed Artist directly. Except as expressly provided to the contrary herein, Producer shall be entitled to the maximum benefits and maximum rights permitted under the SAG Agreement. To the extent the SAG Agreement requires additional payments to Lender or Artist hereunder, such additional payments shall be paid at the minimum rate required. As used herein, the term "SAG Agreement" refers to the current Producer Screen Actors Guild Codified Basic Agreement applicable to Artist's services hereunder.

**18.** **Notices:** Any notice pertaining hereto shall be in writing. Any such notice and any payment due hereunder shall be served by delivering said notice or payment personally or by sending it by mail, cable, or telex (postage or applicable fee prepaid), addressed as follows (or as subsequently designated in writing):

| | |
|---|---|
| To Lender and/or Artist: | c/o Creative Artists Agency<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn:   Dave Bugliari and Steven Brookman<br>Fax:    (424) 288-2900 |
| To Producer: | SLP Films, Inc.<br>1818 Market Street, 12th Floor<br>Philadelphia, PA 19103<br>Attn:   George Parra<br>Fax:    (215) 563-6353 |
| With a Copy to: | The Weinstein Company LLC<br>9100 Wilshire Boulevard, Suite 700W<br>Beverly Hills, CA 90212<br>Attn:   Adrian Lopez, Vice President, Business & Legal Affairs<br>Fax:    (310) 550-5759 |
| With a Copy to: | Reder & Feig LLP<br>421 South Beverly Drive, 8th Floor<br>Beverly Hills, CA 90212<br>Attn.: Benjamin R. Reder and Mike Park<br>Fax: (310) 789-4771 |

The date of personal delivery, or delivery to the cable or telex office of such notice or payment shall be deemed the date of service of such notice payment and a notice sent by mail shall be deemed to be served five business days after the date of mailing. Any notice from Lender and/or Artist, on the one hand, or Producer, on the other hand, which commences the running of any period of time for Producer's, on the one hand, or Lender and/or Artist's, on the other hand, exercise of any option or Producer's, on the one hand, or Lender's and/or Artist's, on the other hand, performance of any other act shall be deemed to be served only when actually received by Producer, on the one hand, or Lender or Artist, on the other hand. If the last day on which the parties hereto are empowered to give notice pursuant to any provisions of this Agreement or to perform any other act which parties are required or may desire to perform under or in connection with this Agreement should fall on a Saturday, Sunday or holiday, then the parties hereto shall have until the end of the first full business day following said Saturday, Sunday or holiday within which to give such notice or to perform such act.

**19.    Visa Reguiremeuts/Work Permits:** Lender and Artist agree to cooperate with Producer to secure such labor permits and visas as may be required by any governmnental agency for the purpose of enabling Artist to render services hereunder wherever such services are required by Producer. If in spite of such cooperation, Producer is unable to secure such labor permits and visas, Producer shall have the right to postpone the commencement of any services hereunder or the start date or to suspend the operation hereof with respect to the running of time and the rendition of Artist's services and/or payment of compensation hereunder until one (!) week after a final determination is made concerning such labor permits and visas by the applicable authority. In addition, Producer shall have the right to terminate this Agreement and all of Producer's obligations hereunder at any time during such suspension or upon Producer discovering that the labor permits and visas cannot be secured.

**20.    No Injunctive Relief:** The rights and remedies of Lender and Artist in the event of any breach by Producer of the provisions of this Agreement shall be limited to Lender and Artist's right, if any, to recover damages in an action at law, and Lender and Artist irrevocably waive any right to seek and/or obtain equitable or injunctive relief. Inno event shall Lender and Artist be entitled by reason of any such breach to terminate this Agreement or to enjoin or restrain the exhibition, distribution, advertising, exploitation, or marketing of the Picture (and/or any rights therein).

**21.    Assignment:** Producer may assign, transfer, license, delegate and/or grant all or any part of its rights, privileges and property hereunder to any person, or entity. Upon such assignment by Producer, Producer shall be relieved of any and all obligations and liability hereunder if such assignment is to: (a) a person or entity into which Producer merges or is consolidated; (b) a person or entity which acquires all or substantially all of Producer's business and assets; (c) a person or entity which is controlled by, under common control with, or controls Producer; (d) any major or "mini-major" motion picture company, United States television network; or (e) other financially responsible party who assumes all of Producer's obligations in writing. Neither Lender nor Artist shall have the right at any time to assign any of its/his/her rights hereunder or to delegate any of its/his/her obligations hereunder.

**22.    Suspensions, Etc:** Notwithstanding anything to the contrary contained in Producer's standard terms and conditions for an actor, the parties hereto hereby agree to the following: (i) Producer may not suspend or terminate Lender's engagement or Artist's services for an event of force majeure unless it has also suspended or terminated (as applicable) all other affected cast members for such reason; (ii) if Producer terminates this Agreement due to an event of force majeure and within one (1) year reinstates any other cast member for the Picture, Producer shall so notify Artist. If Artist is available when Producer requires, Artist may reinstate this Agreement subject to its terms by so notifying Producer in writing within five (5) business days. If the Agreement is so reinstated, Producer shall have no further obligations as a result (e.g., Producer shall receive full credit for all sums previously paid under this

13

Agreement). If the Agreement is not so reinstated, Producer shall have no further obligation to Artist with respect thereto. Notwithstanding any other provision of this Agreement, this paragraph shall cease to apply if Producer assigns its rights in the Picture; (iii) if Artist fails, refuses or neglects to fully perform Artist's services or to fulfill any of Artist's obligations hereunder for any reason other than due to Artist's accident, illness or mental or physical disability (a **"Default"**) and in the event such Default is subject to correction, on a one time only basis (i.e., with regard to only one instance of Default), Producer agrees to notify Artist of such Default and Artist shall have forty-eight (48) hours (twenty-four [24] hours during principal photography) to cure the same; (iv) during any suspension, Artist shall not render any services for others, for Lender, or for himself, except that during a suspension predicated on an event of force majeure, Artist shall have the right to render such other services, subject to recall by Producer on twenty-four (24) hours notice; and (v) if Producer suspends Artist's services due to an event of force majeure (excluding a strike or labor controversy by a guild or union which Artist is a member) for a period of eight (8) consecutive weeks or longer, Artist shall have the right to terminate the Agreement on ten (10) days written notice unless Producer resumes payment of Lender's compensation within ten (10) days of receipt of such notice.

[the remainder of this page is intentionally left blank]

23.    Miscellaneous: In the event that there is any conflict between any provision of this Agreement and any statute, law, regulation, or any applicable provision of the SAG Agreement, or other applicable collective bargaining agreement, if any, the latter will prevail; provided, however, that in such event the provision of this Agreement so affected will be curtailed and limited only to the minimum extent necessary to permit compliance with the minimum requirement, and no other provision of this Agreement will be affected thereby and all other provisions of this Agreement will continue in full force and effect. This Agreement (including Producer's standard terms and conditions for an actor, and the Rider thereto, both of which are attached hereto and incorporated herein by this reference), the Talent Pool Participation, the Certificate of Engagement, the Inducement Letter and the Guarantee, attached hereto as Exhibits "A," "B," "C" and "Q" respectively, contain the full and complete understanding between the parties and supersede all prior and contemporaneous written or oral agreements and understandings pertaining hereto, and cannot be modified except by a writing signed by each party. As between Producer, on the one hand, and Lender and Artist, on the other hand, Producer shall have full creative, administrative, business, budgetary, and other controls with respect to the Picture, and neither Lender nor Artist shall have any rights of approval whatsoever except as expressly set forth herein. This Agreement shall be governed and construed in accordance with the laws of the State of New York applicable to contracts as if entered into and fully performed therein. Only the New York courts (state and federal) shall have jurisdiction over controversies regarding this Agreement, and any proceeding involving such a controversy shall be brought in those courts, In New York, NY, and not elsewhere. The parties hereto expressly waive any objection to such jurisdiction based on personal jurisdiction or venue.

SLP FILMS, INC. ("Producer")

By:  

Its:  

ACCEPTED AND AGREED TO:

22ND AND INDIANA INC.

("Lender")

_____

Its:  _____

Federal 1.0.No.: _____

BRADLEY COOPER ("Artist")

Social Security No.: _____

15

**Exhibit A**

**Talent Pool Participation**

1. **Contingent Compensation:**

(i) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ of one hundred percent (100%) of the "Adjusted Defined Receipts" of the Picture, if any, payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across the board zero percent (0%) distribution fee (it being understood and acknowledged, however, that one percent [1%] of the foregoing percentage shall be deducted so that Producer may accord such percentage of the Adjusted Defined Receipts to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(ii) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ of one hundred percent (100%) of the "Adjusted Defined Receipts" (as defined below) of the Picture, if any, payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across the board ▓▓▓▓▓▓▓▓▓▓▓▓ distribution fee; escalating prospectively to

(iii) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ of one hundred percent (100%) of the "Adjusted Defined Receipts" (as defined below) of the Picture, if any, payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across the board ▓▓▓▓▓▓▓▓▓▓▓ distribution fee.



For the purposes hereof, **"Adjusted Defined Receipts"** shall be defined, computed, paid and accounted for in accordance with the terms and conditions of Producer's Exhibit "DRCB," as modified only by Producer's Rider to Exhibit "DRCB." **"Cash Breakeven"** shall mean the point at which **"Contingent Proceeds"** (to be defined, computed, paid and accounted for in accordance with the terms of Producer's Exhibit "CB," as modified only by Producer's Rider to Exhibit "CB") is first achieved, but utilizing the applicable across the board distribution fee referred to in subparagraph (i) – (iii) above. Exhibit "CB" (which includes among its provisions a ▓▓▓▓ percent ▓▓▓ overhead charge, a ▓▓▓▓▓▓▓ ▓▓▓▓ advertising overhead charge, plus charges for any Producer facilities used in accordance with Producer's then current rate card), Producer's Rider to Exhibit "CB," Exhibit "DRCB" and Producer's Rider to Exhibit "DRCB", are herein incorporated in their entirety by reference. Furthermore, for the purposes of calculating each Cash Breakeven point in subparagraph (i) – (iii) above and for the purposes of paying Lender the Contingent Compensation, if any, hereunder: (a) with respect to Video Devices (as defined in said Exhibits), the percentages set forth in Paragraph 1.1.A.3.(B) of Exhibit "DRCB" and Exhibit "CB" shall be ▓▓▓▓▓▓▓▓▓▓▓▓ in lieu of the percentage set forth therein; (b) the overhead charge set forth in Exhibit "CB" shall be capped at ▓▓▓▓▓▓▓▓ of the budget of the Picture; (c) the advertising overhead charge set forth in Exhibit "CB" shall be capped at ▓▓▓▓▓▓ of the amount the distributor of the Picture (i.e., TWC) spends or causes to be spent in connection with the advertising and promotion of the Picture; and (d) any location- or labor-based rebates, tax credits or subsidies when actually received by TWC shall be used to reduce the production costs for the purposes of calculating "Cash Breakeven" hereunder.

Producer confirms that the amount and the definition of Contingent Compensation and all other terms related thereto, including Adjusted Defined Receipts, Cash Breakeven and Contingent Proceeds, afforded to Artist hereunder shall be no less favorable than the amount and the definition of Contingent Compensation and all other terms related thereto, including Adjusted Defined Receipts, Cash Breakeven and Contingent Proceeds, provided to Russell, De Niro or any other participant in the profits of the Picture.

2.   **Contingent Box Office Bonus ("Box Office Bonus[es!"):**



(i)   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ if and when the United States theatrical box office receipts of the Picture as reported by Rentrak and confirmed by Producer ("**USTBOR**") achieve (if ever)▇▇▇▇▇,

(ii)   An additional ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ if and when the USTBOR achieve (if ever)▇▇▇▇▇▇▇▇▇,

(iii)   An additional ▇▇▇▇▇▇▇▇▇▇▇▇▇ if and when the USTBOR achieve (if ever)▇▇▇;

(iv)   An additional ▇▇▇▇▇▇▇▇▇▇▇ if and when the USTBOR achieve (if ever)▇▇▇;

(v)   An additional ▇▇▇▇▇▇▇▇▇▇▇ if and when the USTBOR achieve (if ever)▇▇▇▇▇▇▇▇▇;

(vi)   An additional ▇▇▇▇▇▇▇▇▇▇▇ if and when the USTBOR achieve (if ever)▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇;

(vii)  An additional ▇▇▇▇▇▇▇▇▇▇▇▇▇ if and when the USTBOR achieve (if ever) ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇; and

(viii)  An additional ▇▇▇▇▇▇▇▇▇▇▇▇ if and when the USTBOR achieve (if ever) ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇.

Lender's share of the foregoing Box Office Bonus(es) shall be payable, if at all, within thirty (30) business days following the date on which the applicable USTBOR set forth above are reported by Rentrak and shall be a nonrefundable advance of, and applicable against, the Contingent Compensation set forth in Paragraph 4 (a) of the Agreement and Paragraph 1 of this Exhibit A. Producer confirms that the Box Office Bonuses, if any, payable to Lender hereunder shall be no less favorable (i.e., as to the amount and USTBOR threshold at which any such bonuses are paid) than the box office bonuses payable to any other cast member of the Picture.

2

## Exhibit B

### Certificate of Engagement

SLP FILMS, INC. ("Producer"), whose address is 9100 Wilshire Blvd., Suite 700W, Beverly Hills, California 90212, has engaged 22°d AND INDIANA INC. (Fed. ID: ⬛⬛⬛⬛⬛⬛) ("Lender") to furnish the services of BRADLEY COOPER ("Artist"), whose address is c/o Creative Artists Agency, Inc., 2000 Avenue of the Stars, Los Angeles, California 90067, Attention: Dave Bugliari and Steven Brookman, in connection with the motion picture currently referred to as "SILVER LININGS PLAYBOOK" (the "Picture"). Reference is hereby made to that certain Confirmation Deal Memo (the "Agreement") between the parties hereto, for the subject matter hereof, dated as of the date hereof. To the extent there is any conflict between the provisions of this Certificate of Engagement and the provisions of the Agreement, the provisions of the Agreement shall control.

For good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Lender and Artist hereby acknowledge, certify and agree that all results and proceeds of every kind of the services heretofore and hereafter to be rendered by Lender and/or Artist in connection with the Picture, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Lender and/or Artist which in any way relate to the Picture or to the material on which the Picture will be based (collectively, the "Material"), are and shall be deemed to be works "made for hire" and/or "made in the course of employment" specially ordered and commissioned by Producer for use and/or exploitation in an audiovisual work, for purposes of copyright protection throughout the world for Producer. Accordingly, Producer is and shall be considered the author and, at all stages of completion, the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights"). The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including, by way of illustration, production, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public, and the right to exploit the Material throughout the universe in perpetuity in all media, markets and languages and in any manner now known or hereafter devised. If under any applicable law the fact that the Material is a work "made for hire" and/or "made in the course of employment" is not effective to place authorship and ownership of the Material and the Picture and all rights therein in Producer, then to the fullest extent allowable and for the full term of protection otherwise accorded to Lender and/or Artist under such applicable law, Lender and Artist hereby exclusively and irrevocably assign and transfer to Producer the Rights and, in connection therewith, any and all right, title and interest of Lender or Artist in the Picture and any other works now or hereafter created containing the Material.

Lender and Artist hereby grant Producer the right to change, add to, take from, translate, reformat or reprocess the Material in any manner Producer may in its sole discretion determine. To the fullest extent allowable under any applicable law, Lender and Artist hereby exclusively and irrevocably waive or assign to Producer, Artist's so-called "moral rights" or *"droit moral"*. Lender and Artist expressly acknowledge that many parties will contribute to the Picture and other works that will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Lender or Artist of "moral rights" or *"droit moral"* is not

3

effective, then Lender and Artist agree to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

Lender and Artist will, upon request, execute, acknowledge and deliver to Producer any and all documents consistent herewith which Producer may deem reasonably necessary to evidence and effectuate all or any of Producer's rights hereunder. Lender and Artist hereby irrevocably appoint Producer as attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office or elsewhere any and all such documents Lender and/or Artist fails to execute, acknowledge and deliver after Artist's reasonable opportunity to review and negotiation said documents (not to exceed seven (7) business days of Producer's request therefor). The appointment shall be a power coupled with an interest. Producer shall provide Lender with copies of any documents that Producer executes on behalf of Lender or Artist, provided that an inadvertent failure to do so shall not be a breach hereof or affect the validity of such documents.

Subject to the terms of the Agreement, Lender and Artist hereby grant to Producer the right to issue and authorize publicity concerning Artist, and to use Artist's name, voice, approved likeness and approved biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture.

Lender and Artist warrant that, to the best of Artist's knowledge (in the exercise of reasonable prudence and due diligence), the Material is or will be original with Artist or is in the public domain throughout the world, and is not and will not be based in whole or in part on the life of any real person except as approved in writing by Producer, and does not and will not infringe upon or violate any copyright of, or, to the best of Artist's knowledge (in the exercise of reasonable prudence and due diligence), infringe upon or violate the right of privacy or any other right of, any person; and that Lender and Artist are free to grant all rights granted and make all agreements made by them herein; and that Lender is a corporation duly organized and existing under the laws of the state of its incorporation. Lender and Artist agree to hold Producer and its successors, licensees and assigns harmless from and against all damages, losses, costs, and expenses (including reasonable outside attorneys' fees and costs) which Producer or any of its successors, licensees or assigns may suffer or incur by reason of a third party claim or action arising from the material breach of any of the warranties made in this paragraph. If Producer so elects, Producer shall have the absolute right to control the litigation or resolution of any claim, demand or action to which this indemnity applies. Producer shall have the sole right to control the legal defense of any such claims, litigation, etc. including, the right to select counsel of its choice and to compromise or settle any such claims, demands or litigation. The party receiving notice of any such claim, demand or action shall promptly notify the other party hereof.

Producer shall defend, indemnify and hold harmless Lender and Artist against any and all liability, damages, costs and expenses, including reasonable outside attorneys' fees, in connection with any third party claim or action (other than those arising out of a material breach of Lender's and/or Artist's warranties hereunder or out of any criminal, intentionally tortious or willful acts by Artist) respecting material supplied to Lender and/or Artist by Producer or solely in connection with the development, production, distribution or exploitation of the Picture or any element thereof, provided that: (i) Artist cooperates fully with Producer in the defense of any such claim or legal action at no cost or charge to Producer other than the reimbursement to Artist of reasonable out-of-pocket costs and expenses incurred in connection with the defense of any such claim or legal action, excluding attorneys' fees in connection with any legal counsel engaged by Lender and/or Artist to render legal services on Lender and/or Artist's own behalf; (ii) Producer shall have the right to select and retain any legal counsel in connection with the

defense of any such claim or legal action and shall pay the attorneys' fees associated therewith; and (iii) Producer, in its sole discretion, shall have the right to defend, compromise and/or settle any such claim or legal action.

Lender and Artist shall be covered as additional insureds under any Errors and Omissions insurance policy and general liability insurance policy which Producer may obtain for the Picture, subject to the limitations, restrictions and terms of said policies.

Lender and Artist hereby covenant and agree that Lender and/or Artist shall not have or be deemed to have any lien, charge or other encumbrance upon any of the rights conveyed to Producer herein or proceeds derived therefrom, and that no act of or omission by Producer, nor any other act, omission or event of any kind, shall terminate or otherwise adversely affect Producer's ownership of the rights conveyed herein. Lender's and Artist's sole remedy for any such breach or alleged breach shall be an action at law to recover such damages as may have been actually suffered by Lender and/or Artist as a result thereof.

Executed as of September 23, 2011.

ACCEPrED **AND** AGREED TO:

SLP FILMS, IN

By:

Its:

Its: President

Federal I.D. No.

BRADLEY COOPER ("Artist")

### Exhibit C

### INDUCEMENT

Reference is hereby made to that certain Confirmation Deal Memorandum and Certificate of Engagement (the "Agreement") dated as of September 23, 2011, by and between, on the one hand, SLP Films, Inc. ("Producer") and, on the other hand, 22nd and Indiana Inc. ("Lender") for the services of Bradley Cooper ("Artist") in the role of "Pat" in the motion picture currently referred to as "SILVER LININGS PLAYBOOK."

A.      I am familiar with all of the terms, covenants and conditions of the Agreement and I hereby consent to the execution thereof. I shall perform and comply with all of the terms, covenants, conditions and obligations of the Agreement in so far as they relate to me, even if the employment between me and Lender should hereafter expire, terminate or be suspended. I hereby confirm all grants, representations, warranties and agreements made by the Lender under the Agreement.

B.      Unless I am deemed substituted for the Lender as a direct party to the Agreement pursuant to Paragraph D below, I shall look solely to Lender and not to Producer for the payment of compensation for my services and for the discharge of all other obligations of my employer with respect to my services under the Agreement.

C.      In the event of a breach or threatened breach of the Agreement by Lender or by me, Producer may join me in any action against Lender without being first required to resort to or exhaust any rights or remedies against Lender.

D.      I represent that Lender is a duly qualified and existing corporation under the laws of its state of incorporation. If Lender or its successors in interest should be dissolved or should otherwise cease to exist, or for any reason should fail, refuse or neglect to perform, observe or comply with the terms, covenants and conditions of the Agreement, I shall, at Producer's election, be deemed to be employed directly by Producer for the balance of the term of the Agreement upon the terms, covenants and conditions set forth therein.

E.      I will indemnify Producer for and hold it harmless from and against any and all taxes which Producer may have to pay and any and all liabilities (including judgments, penalties, fines, interest, damages, costs and expenses, including reasonable attorney's fees) which may be obtained against, imposed upon or suffered by Producer or which Producer may incur by reason of its failure to deduct and withhold from the compensation payable under the Agreement, any amounts required or permitted to be deducted and withheld from the compensation of any employee under the laws of any state or province or otherwise pursuant to U.S. or Canadian law, and/or any amendments thereof and/or any other applicable statutes heretofore or hereafter enacted requiring the withholding of any amount from the compensation of an employee.

F.      If Producer shall serve Lender with any notices, demands or instruments relating to the Agreement, or to the rendition of my services thereunder, service upon Lender shall also constitute service upon me.

G.      For purposes of any and all Workers' Compensation statutes, laws or regulations ("Workers' Compensation"), I acknowledge that an employment relationship exists between Producer and me, Producer being my special employer under the Agreement. Accordingly, I

6

acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Workers' Compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Producer or Producer's affiliated companies and their respective officers, agents, and employees (including without limitation, any other special employee and corporation or other entity furnishing to Producer or an affiliate producer the services of any such other special employee) shall be governed and limited to those provided by Workers'Compensation.

BRADLEY COOPER ("Artist")

**Exhibit D**

**GUARANTEE**

1.  As an inducement to 22ND AND INDIANA INC. for the services of BRADLEY COOPER (**"Beneficiary"**) to enter into the CONFIRMATION DEAL MEMO, dated as of September 23, 2011 (the **"Agreement"**), by and between SLP FILMS, INC. (**"Company"**) and Beneficiary pertaining to the motion picture tentatively entitled, "SILVER LININGS PLAYBOOK" (the **"Picture"**) and in consideration of the benefits the undersigned guarantor (**"Guarantor"**) will derive from the execution of the Agreement, Guarantor guarantees full and faithful performance of all of Company's obligations pursuant to the Agreement with respect to: (a) the payment obligations of Company in connection with the Contingent Compensation and Box Office Bonuses payable to Beneficiary pursuant to Paragraph 4 of the Agreement; (b) the credit obligations of Company in the U.S. territory pursuant to Paragraph 6 of the Agreement; (c) the insurance obligations pursuant to Paragraph 15 of the Agreement; and (d) the indemnity obligations pursuant to the Certificate of Engagement (the obligations referred to in the foregoing [a] – [d] shall be referred to collectively as the **"Guaranteed Obligations"**).

2.      The obligations of Guarantor hereunder are independent of the obligations of Company and a separate action or actions may be brought against Guarantor whether or not Company is joined in any such action or actions. Guarantor agrees that its obligations hereunder shall not be exhausted by (i) any number of actions until the Guaranteed Obligations have been fully paid and performed; or (ii) any failure or omission or delay by Beneficiary to exercise any right or remedy under the Agreement or otherwise except to the extent that such failure, omission or delay constitutes a waiver under the Agreement (e.g., statute of limitations, laches, etc.). This Guarantee shall continue to be effective or reinstated, as the case may be, if at any time payment of any amount paid under the Agreement is rescinded or otherwise returned by Beneficiary upon the insolvency, bankruptcy or reorganization of Company as if such amount has not been paid. Except as set forth in Paragraph 4. below, Guarantor's obligations under this Guarantee are subject to all defenses which Company may have against Beneficiary with respect to enforcement by Beneficiary of the Guaranteed Obligations.

3.      Guarantor agrees that any modification of the Agreement shall not affect this Guarantee and authorizes Beneficiary and Company upon their mutual agreement without notice or demand and without diminishing its liability hereunder, from time to time to renew, compromise, extend, accelerate or modify the Agreement or otherwise change the terms of Guaranteed Obligations or any part thereof.

4.      Subject to the demand requirement set forth in Paragraph 5 below, Guarantor waives any right to require Beneficiary to (i) proceed against Company; or (ii) pursue any other remedy in Beneficiary's power whatsoever prior to proceedings against Guarantor. Guarantor waives any defense arising by reason of (a) the insolvency or bankruptcy of Company, (b) lack of authority of Company and/or (c) any disability or incapacity of Company. Guarantor waives all presentments; notice of or right to consent to any modification, extension, or alteration; notices of non-performance (except as provided in Paragraph 5 below); protests, notice of protest; notices of dishonor; and notices of acceptance of this Guarantee and of the existence, creation or incurring of new or additional obligations.

8

5.    Guarantor shall have no obligation to Beneficiary hereunder with respect to any compensation unless and until such  compensation shall have accrued and been payable to Beneficiary in accordance with the provisions of the Agreement and Company shall have failed to pay said compensation as and when due and Beneficiary shall have given Guarantor notice thereof and a period of five (5) business days shall have elapsed from the date Guarantor shall have been so notified.

6.    Any notice pertaining hereto shall be in writing. Any such notice and any payment due hereunder shall be served by delivering said notice or payment personally or by sending it by mail, cable, telex or telecopier (postage or applicable fee prepaid), addressed as follows (or subsequently designated in writing):

| | |
|---|---|
| To Beneficiary: | c/o Creative Artists Agency<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn: Dave Bugliari and Steven Brookman<br>Fax: (424) 288-2900 |
| To Guarantor: | The Weinstein Company LLC<br>375 Greenwich Street<br>New York, NY 10013<br>Attn: General Counsel<br>Fax: (917) 368-7007 |
| With a Copy to: | The Weinstein Company LLC<br>9100 Wilshire Boulevard, Suite 700W<br>Beverly Hills, CA 90212<br>Attn: Andrew Kramer, President, Business & Legal Affairs<br>Adrian Lopez, Vice President, Business & Legal Affairs<br>Fax: (310) 550-5759 |

The date of personal delivery, mailing or delivery to the cable or telecopier office of such notice or payment shall be deemed the date of service of such notice or payment, unless otherwise specified herein; provided, however, that any notice which commences the running of any period of time for exercise of any option or performance of any other act shall be deemed to be served only when actually received.

7.    This Guarantee contains the full and complete understanding between the parties hereto and supersedes all prior and contemporaneous agreements and understandings pertaining hereto and cannot be modified except by a writing signed by each party. Beneficiary's sole and exclusive remedy for Guarantor's breach, termination, or cancellation of this Guarantee or any term hereof (including any term pertaining to credit) shall be an action for damages and Beneficiary irrevocably waives any right to equitable or injunctive relief.

8.    This Guarantee shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in said State and the laws of the United States of America as the same would be applied by a federal court sitting in the State of New York. Beneficiary and Guarantor each hereby consents to the jurisdiction of the

SLP / Bradley Cooper
v.6

State Courts of New York and the Federal Courts located in the State of New York with respect to any matter relating to this Guarantee.

IN WITNESS WHEREOF, the undersigned have executed this Guarantee as of September 23, 2011.

**THE** WEINSTEIN **COMPANY LLC**

APPROVED BY:

Its:   c                     er
          P1esieleM
       Business & Legal Affairs

22ND AND INDIANA INC.

By:_____

Its:_____

_____

BRADLEY COOPER

10

EXHIBIT B

6/18/2018                                          Re: TWC - Roye Zur

# Re: TWC


### Daniel Lin <dlin@cravath.com>

Mon 6/11/2018 7:41 AM

To:Michael Gottfried <mgottfried@lgbfirm.com>;

Cc:'awark@cravath.com' <awark@cravath.com>; 'pzumbro@cravath.com' <pzumbro@cravath.com>; Roye Zur <rzur@lgbfirm.com>;

📎  3 attachments (2 MB)

03.03.03.04.02.26.07 6. One Picture License to SLPTWC.pdf; 03.03.03.04.02.26.08 7. SLP - Production Services Agmt - Security Agmt.PE.pdf; 03.03.03.04.02.26.10 SLP_FORMCA_REGISTER.pdf;


Michael,

We can provide further detail on the other films but wanted to get back to you on your inquiry.

I have attached for reference documents showing the chain of title and the relationship between the various legal entities involved in the production of *Silver Linings Playbook*, which we understand are indicative of the structure used for the other films (although there may be some variations for films that were co-financed by third parties).  As you will see in the attached, the rights to produce the film, including the rights in the literary source material, were acquired by The Weinstein Company LLC and licensed to SLPTWC Films, LLC, which was a wholly-owned subsidiary of TWC, through a "One Picture License Agreement."

SLPTWC in turn entered into a Production Services Agreement with SLP Films, Inc., a production services entity that is a non-debtor entity and is not a subsidiary of TWC.  Pursuant to that Production Services Agreement, SLP Films, Inc. assigned to SLPTWC all rights and benefits flowing to SLP Films, Inc. under any contracts entered into in connection with production of the film.  Further, SLPTWC retained ownership of the film (including copyright therein) and copyright was registered in the name of SLPTWC.  Subsequent to the release of the film, copyright was transferred intragroup to the applicable distribution entities within TWC's corporate structure.

Note that, to the extent a contract is with a non-Debtor production entity, those contracts would not be executory contracts of the debtors' estates in any event and therefore cannot be assumed and assigned by the debtors by operation of section 365.

Best,
Dan

Daniel Lin
Cravath, Swaine & Moore LLP
825 Eight Avenue | New York, NY 10019
Office: (212) 474-1364 | Mobile: (248) 250-1881


| | |
|---|---|
| From: | Michael Gottfried <mgottfried@lgbfirm.com> |
| To: | Daniel Lin <dlin@cravath.com>, "'awark@cravath.com'" <awark@cravath.com> |
| Cc: | Roye Zur <rzur@lgbfirm.com>, "'pzumbro@cravath.com'" <pzumbro@cravath.com> |
| Date: | 06/08/2018 08:33 PM |
| Subject: | TWC |


Dan & Andrew,

6/18/2018                                      Re: TWC - Roye Zur

Not surprisingly, most, if not all of the agreements with my clients are with production entities, not the Debtors.  Please provide me with chain of title documents showing how the Debtors acquired the following films and rights related thereto:

1408
August: Osage County
Derailed
Grace Is Gone
Killing Them Softly
Scary Movie 4
Scary Movie 5
Scream 4
Shanghai
Silver Linings Playbook
Southpaw
St. Vincent
The Butler
The Giver

Based on Lantern's position that through the sale it obtained the rights under agreements with my clients (despite the fact that all of my clients' rights expressly were reserved at the sale hearing and under the sale order), I need to understand the basis for that position in order to even try to negotiate a settlement.

Thanks,
Michael

Michael Gottfried
Attorney

**Landau Gottfried & Berger LLP**
1801 Century Park East, Suite 700
Los Angeles, CA 90067
Main: 310-557-0050
Direct:  310-557-0052
Fax: 310-557-0056
E-mail:  mgottfried@lgbfirm.com
Web:  www.lgbfirm.com
Please consider the environment before printing.
This e-mail is a confidential communication and may also be legally privileged. If you are not the intended recipient, immediately you should: (1) reply via e-mail to sender; (2) destroy this communication and all copies thereof, including deletion of all associated text files from individual and network storage devices; and (3) refrain from disseminating this communication by any means whatsoever.
Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This e-mail is confidential and may be privileged. Use or disclosure of it by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please delete this e-mail from the computer on which you received it.

EXHIBIT C

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                          .   Chapter 11
                                     .
 4   THE WEINSTEIN COMPANY HOLDINGS  .
     LLC, et al.,                    .
 5                                   .   Case No. 18-10601 (CSS)
                                     .
 6                                   .
                                     .   Courtroom No. 6
 7                                   .   824 Market Street
                                     .   Wilmington, Delaware 19801
 8                                   .
                                     .   July 11, 2018
 9                    Debtors.       .   10:00 A.M.
     . . . . . . . . . . . . . . .
10

11                      TRANSCRIPT OF HEARING
            BEFORE HONORABLE CHRISTOPHER S. SONTCHI
12             UNITED STATES BANKRUPTCY JUDGE

13   APPEARANCES:

14
     For the Debtors:          Paul Heath, Esquire
15                             Mark Collins, Esquire
                               Zachary Shapiro, Esquire
16                             Joseph Barsalona, III, Esquire
                               Brett Haywood, Esquire
17                             David Queroli, Esquire
                               RICHARDS LAYTON & FINGER
18                             One Rodney Square
                               920 North King Street
19                             Wilmington, Delaware 19801

20
     ECRO:                     Leslie Murin
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone:  (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1   whether they're assumed or assigned and what the cure amounts

2   will be.  We routinely preserve those arguments for post-

3   closing.

4           The contract in front of the court today is

5   actually better than the last one in that there's a deadline

6   set for that to occur.  You probably -- the person you

7   probably didn't check with was Judge Walrath who now has to

8   make decisions over complex issues and perhaps hundreds of

9   contracts in 120 days.  She will probably not forgive me for

10  approving that provision, but I'm going to do so.

11          So, I think the reservations are preserved in the

12  first order.  The changes benefit executory contract parties,

13  don't hurt executory contract parties.  There is this issue

14  of who's responsible for post-closing pre-assumption or

15  rejection breaches.  Well, if it's an assumption it's going

16  to be cured.  So, it only comes down to whether there's an

17  issue of rejection.  I think the Judge can deal with that at

18  the appropriate time if and when that occurs.

19          This deal that there may be some property that is

20  related to an executory contract, but is an asset that is

21  being sold prior to the assumption or rejection of the

22  executory contract.  You know, look, if Lantern is taking the

23  assets it's buying and assuming the risk associated with

24  those assets.  So, if there's a risk they buy something that

25  somehow it violates the contracts that they bought that asset

1    without taking on other liabilities under some sort of other

2    contract and there's a state law reason to proceed against

3    Lantern they're not getting a release here.  They're buying

4    what they're buying. That includes the risks associated with

5    buying something that might be subject to other rights that

6    they're not buying.

7              So, I don't think I need to say anything more than

8    that.  It is what it is.  It's what it is under the contract.

9    So, I will overrule the objection.  I looked at the blackline

10   you sent over or maybe you didn't send it over.  I looked at

11   the blackline of something this morning and now I forget.

12             MR. ZUMBRO:  I think we merely added Paragraph 4

13   to the form of proposed order which had the reservation of

14   rights.

15             THE COURT:  All right.  Are there any other

16   changes?

17             MR. ZUMBRO:  No, sir.

18             THE COURT:  Okay.

19             MR. ZUMBRO:  I have the form of order if I could

20   approach.

21             THE COURT:  Yes, please.

22             Oh, look at that.  Thank you for the chief

23   designation on the signature block.  I'll send it to my

24   mother.

25             (Laughter)

EXHIBIT D

VENABLE LLP

2049 CENTURY PARK EAST   SUITE 2300   LOS ANGELES, CA 90067
T 310.229.9900   F 310.229.9901   www.Venable.com

August 20, 2018

Keith C. Owens

T (310) 229-9900
F 310.229.9901
kowens@venable.com

**Via Email and Overnight Mail**

Kevin M. Eide, Esq.
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building, 1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564

Re:    The Weinstein Company Holdings, LLC, et al. (Case No. 18-10601, Bankr. D. Del.)
       22nd and Indiana, Inc. / Bradley Cooper

Dear Mr. Eide:

I am writing you in your capacity as counsel Lantern Entertainment LLC ("Lantern"), the purchaser of substantially all of the assets of The Weinstein Company Holdings, LLC and related debtor affiliates (the "Debtors") in the above referenced, jointly administered Chapter 11 bankruptcy cases (the "Bankruptcy Cases").

As you know, Venable LLP represents Bradley Cooper and his loan-out entity, 22nd Street and Indiana Inc. (collectively, the "Objecting Parties") in connection with the Bankruptcy Cases. The Objecting Parties are parties to a Confirmation Deal Memo and Certificate of Engagement dated September 23, 2011 (collectively, the "Contracts") entered into with a non-debtor producer, SLP Films, Inc. ("SLP"), for services to be performed by the Objecting Parties in connection with the motion picture entitled Silver Linings Playbook (the "Picture"). Although the Debtors are not a party to the Contracts, the Debtors have identified such Contracts at various times as executory contracts with both SLP and The Weinstein Company LLC ("TWC"). Despite repeated inquiries to both the Debtors and Lantern regarding the existence of a valid pre-petition assignment from SLP to a Debtor, no such assignment has ever been produced.[1]

As you are aware, the Objecting Parties have objected to, among other things, any attempt by the Debtors to sell the Picture acts to Lantern free and clear of the Objecting Parties' contractual and legal rights under applicable law, or to assume and assign the Contracts to Lantern and related cure objections. The Objecting Parties have also objected to the Debtors' Statement Regarding Contracts to be Transferred Pursuant to the Asset Purchase Agreement with Lantern Entertainment LLC, which alleges that the Contracts are non-executory and can be sold to Lantern free and clear of the Objecting Parties' contractual and legal rights. As we discussed

---

[1] The Objecting Parties reserve the right to challenge the validity of any pre-petition or post-petition assignment.

# VENABLE LLP

---

Akin Gump Strauss Hauer & Feld LLP
August 20, 2018
Page 2

several times including by phone with your colleague Galit Knotz on August 16, and as more particularly described in the Objecting Parties' objections scheduled for hearing on September 5, 2018, we vehemently disagree with Lantern's position that the Picture or Contracts can be sold by the Debtors to Lantern free and clear of the Objecting Parties' contractual and legal rights, and that the Contracts are not executory.

As Judge Sontchi made clear at the final hearing on the Sale Motion on July 11, 2018, Lantern's exploitation, if any, of the Picture is subject to the Objecting Parties' rights notwithstanding the sale of the Picture to Lantern.

Please confirm not later than **11:00 a.m. (ET) on Wednesday August 23, 2018** that Lantern has not used or otherwise exploited the Picture which, among other things, incorporates Mr. Cooper's name and likeness, after the Closing Date, and does not intend to do so pending the Bankruptcy Court's resolution of the Objecting Parties' objections. The Objecting Parties expressly reserve all of their rights, remedies and claims against Lantern under applicable law including, among other things, claims arising from Lantern's unauthorized use of Mr. Cooper's name and likeness.

Sincerely,

Keith C. Owens

CC:    Andrew Wark, Esq. (awark@cravath.com) (via electronic mail)
       Jeffrey S. Sabin, Esq. (jssabin@venable.com) (via electronic mail)
       Carol Weiner-Levy, Esq. (CWeinerLevy@venable.com) (via electronic mail)

EXHIBIT E

# LANDAU GOTTFRIED & BERGER LLP

ATTORNEYS AT LAW
1801 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 557-0050
FACSIMILE (310) 557-0056
www.LGBFIRM.com

Email: mgottfried@lgbfirm.com

July 17, 2018

**VIA EMAIL**

Meredith A. Lahaie
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036

Re:    *In re The Weinstein Company Holdings LLC, et al.*, Case No. 18-10601 (MFW)

Dear Ms. Lahaie:

As you know, my firm, Landau Gottfried & Berger LLP, and Tom Geher's firm, Jeffer Mangels
Butler & Mitchell LLP, represent numerous actors, directors, producers, writers, and distribution
companies (the "Counterparties"), each of which entered into participation agreements or
distribution agreements in connection with various films purportedly transferred to Lantern
Entertainment LLC ("Lantern") that include: (i) Silver Linings Playbook; (ii) August: Osage
County; (iii) Southpaw; (iv) St. Vincent; (v) Scream 4 and Scream TV; (vi) Scary Movie 5; (vii)
The Giver; (viii) Killing Them Softly; (ix) Grace Is Gone; (x) Shanghai; (xi) The Butler; and (xii)
The Company Men. This letter is sent by me and Mr. Geher, who is copied, on behalf of the
Counterparties, our collective clients.

Notwithstanding the purported transfer of the films to Lantern, the Debtors have not assumed and
assigned to Lantern any of the agreements relating to and concerning such films, including
agreements with the Counterparties which delineate the ongoing rights, remedies, and obligations
of the parties to those agreements, including, but not limited to, the ability to (i) use the
Counterparties' names, likenesses and images for profit and exploitation, (ii) distribute a film in
certain territories; and (iii) enter into agreements with third party distributors to exploit or
distribute films. At present, such agreements have not been assumed and assigned to Lantern and,
therefore, Lantern has not obtained any of the rights contained in such agreements. Further,
Debtors have failed to demonstrate that they are parties to all of the relevant agreements, or that
all of the relevant agreements were properly transferred to them.

Meredith A. Lahaie
Akin Gump Strauss Hauer & Feld LLP
July 17, 2018
Page 2

As you know, our clients contend that the agreements are executory, and that the Bankruptcy Court has so determined. As such, it is well settled law in the Third Circuit that Lantern cannot obtain any of the rights under the agreements with the Counterparties pursuant to the sale provisions of Section 363 of the Bankruptcy Code. In re Access Beyond Techs., Inc., 237 B.R. 32 (Bankr. D. Del. 1999) (Walrath, J.). Instead, as a matter of law, the only way for Lantern to obtain the rights under the agreements is pursuant to Section 365 of the Bankruptcy Code whereby (i) Debtors must assume the agreements, (ii) Debtors and/or Lantern must cure all defaults under the agreements, and (iii) the Debtors must assign the agreements to Lantern. Of course, the Debtors' ability to assume and assign the agreements to Lantern presupposes that the Debtors are parties to the agreements, or that the agreements appropriately have been assigned to them.

Unless and until Debtors assume and assign to Lantern, by order of the Bankruptcy Court, the agreements with the Counterparties, or alternatively, Lantern can demonstrate that it obtained the rights to such agreements at closing (which Counterparties dispute, and which cannot be demonstrated absent a judicial adjudication that, notwithstanding the Bankruptcy Court's contrary determination in Paragraph 35 of the Sale Order, the agreements are non-executory), Lantern does not hold the rights to (i) exploit, among other things, the images of those actor/actress Counterparties, or (ii) distribute the films.

Counterparties hereby demand that Lantern immediately confirm that it will take no action to exploit the films in derogation of the agreements with the Counterparties (to which Lantern is not a party) providing for the underlying rights. Additionally, pending a determination regarding Lantern's rights, if any, to the use and exploitation of the films, please confirm that all funds received by Lantern resulting from third-party licensing agreements for the above-referenced films will be placed in escrow, with an accounting to be provided to the Counterparties upon request. Absent such assurance, the Counterparties reserve all of their respective rights and remedies to bring actions against Lantern for its unauthorized use, exploitation and distribution of the films.

Nothing contained herein is a waiver of any rights or remedies, all of which are, as set forth in the Court's July 11, 2018 Order [docket no. 1220], reserved.

Very truly yours,

Michael I. Gottfried

cc:    Roye Zur
       Thomas M. Geher