**Exhibit B**

**Lantern Certification [Docket No. 1567] and Stipulated Order [Docket No. 1574]**

**<u>Docket No. 1567</u>**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:

The Weinstein Company Holdings LLC, *et al.*,

Debtors.[1]

: Chapter 11
:
: Case No. 18-10601 (MFW)
:
: (Jointly Administered)
:
: **Related Docket Nos.: 8, 190, 216, 282, 668, 846, 860, 1003, 1220, and 1247**
:

---------------------------------------------------------------- x

## CERTIFICATION OF COUNSEL REGARDING STIPULATION AMONG THE DEBTORS, LANTERN ENTERTAINMENT LLC, VERTIGO PRIME, INC. <u>AND GOOD FEAR FILM, INC.</u>

I, Evelyn J. Meltzer, counsel to Lantern Entertainment LLC ("<u>Lantern</u>"), hereby certify as follows:

1.      The Weinstein Company LLC ("**TWC**") and its affiliated debtors and debtors in possession (collectively, with TWC, the "**Debtors**") and Vertigo Prime, Inc. f/s/o Roy Lee ("**Lee**"), and (iv) Good Fear Film, Inc. f/s/o Chris Bender ("**Bender**" and together with Lee, the "**Producers**") entered into that certain Producing Services Agreement dated January 6, 2017, and amended March 10, 2017 (together with the exhibits and amendments thereto, the "**Producing Services Agreement**"), pursuant to which the Producers agreed to provide producing services in connection with the motion picture entitled "Polaroid" (the "**Picture**").

2.      On March 19, 2018, the Debtors commenced these voluntary chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

---

[1]      The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837).  The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013.  Due to the large number of Debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of this information may be obtained on the website of the Debtors' noticing and claims agent at http://dm.epiq11.com/twc.

3.      On March 20, 2018, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 8].

4.      On April 6, 2018, the Court entered the *Order (I) (A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief* (the "**Bid Procedures Order**") [Docket No. 190].

5.      On April 13, 2018, the Debtors filed the *Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts* (the "**April 13 Notice**") [Docket No. 216], which attached an exhibit listing certain contracts and leases that the Debtors may potentially assume and assign as part of the sale contemplated by the Bid Procedures Order (the "**Sale**"), together with associated asserted cure amounts.  The April 13 Notice did not include the Producing Services Agreement.

6.      On April 20, 2018, the Debtors filed the *Notice of Supplemental Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts* (the

"**April 20 Notice**") [Docket No. 282], which attached an exhibit listing certain additional contracts and leases that the Debtors may potentially assume and assign as part of the Sale, together with associated asserted cure amounts.  The April 20 Notice did not include the Producing Services Agreement.

7.       On May 2, 2018, the Producers, together with certain other contract counterparties (collectively, the "**Other Contract Counterparties**"), filed the *Objection of Contract Counterparties to the Debtors' Sale Motion, Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases and Proposed Cure Amount* (the "**Objection**") [Docket No. 668].

8.       On May 9, 2018, the Court entered its *Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* (the "**Sale Order**") [Docket No. 846], which, *inter alia*, approved the Sale of substantially all of the Debtors' assets to Lantern.

9.       On May 10, 2018, the Debtors filed the *Notice of Final List of Potentially Assumed Contracts and Leases* (the "**May 10 Notice**") [Docket No. 860], which attached an exhibit listing certain contracts and leases that the Debtors may potentially assume and assign as part of the Sale, together with associated asserted cure amounts.  The May 10 Notice did not include the Producing Services Agreement.

10.       On June 8, 2018, the Debtors filed the *Debtors' Statement Regarding Contracts To Be Transferred Pursuant to the Asset Purchase Agreement with Lantern Entertainment LLC* (the "**June 8 Statement**") [Docket No. 1003], which attached an exhibit

-3-

listing certain contracts that the Debtors, in consultation with Lantern, determined were not executory contracts under applicable law.  The June 8 Statement did not include the Producing Services Agreement.

11.     On July 11, 2018, the Court entered its *Order Approving Amendment to Asset Purchase Agreement Entered into by and Between the Debtors and Lantern Entertainment LLC* [Docket No. 1220].

12.     On July 17, 2018, the Debtors filed the *Notice of Closing of Sale to Lantern Entertainment LLC* [Docket No. 1247].

13.     The Debtors, Lantern and the Producers have engaged in good faith discussions regarding the disputes between them.  As a result of those discussions, the Debtors, Lantern and the Producers have entered into the *Stipulation Among the Debtors, Lantern Entertainment LLC, Vertigo Prime, Inc. and Good Fear Film, Inc.* (the "Stipulation").

14.     Attached hereto as **Exhibit A** is a proposed order (the "Order") approving the Stipulation.  The Stipulation is attached to the Order as **Exhibit 1**.

WHEREFORE, Lantern respectfully requests the entry of the Order attached hereto as **Exhibit A** approving the Stipulation at the earliest convenience of the Court.

Dated: October 4, 2018
Wilmington, DE

Respectfully Submitted,

 /s/ Evelyn J. Meltzer
David B. Stratton (No. 960)
Evelyn J. Meltzer (No. 4581)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, Delaware 19801
Tel: (302) 777-6500

*and*

-4-

#50370268 v1

Michael S. Stamer
Abid Qureshi
Meredith A. Lahaie
Jennifer L. Woodson
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

*Counsel for Lantern Entertainment LLC*

#50370268 v1

**<u>EXHIBIT A</u>**

**PROPOSED ORDER**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                                    :
In re:                              :      Chapter 11
                                    :
THE WEINSTEIN COMPANY HOLDINGS      :      Case No. 18-10601 (MFW)
LLC, *et al.*,                      :
                                    :      (Jointly Administered)
                        Debtors.[1] :
                                    :      **Re: Docket No. ___**
------------------------------------------------------------x

### ORDER APPROVING STIPULATION AMONG
### THE DEBTORS, LANTERN ENTERTAINMENT LLC,
### VERTIGO PRIME, INC. AND GOOD FEAR FILM, INC.

Upon consideration of the *Stipulation Among the Debtors, Lantern Entertainment LLC, Vertigo Prime, Inc. and Good Fear Film, Inc.* (the "Stipulation"),[2] a copy of which is attached to this Order as **Exhibit 1**, as agreed to by and among the above-captioned debtors and debtors-in-possession (the "Debtors"), Lantern Entertainment LLC (together with its affiliates, "Lantern"), Vertigo Prime, Inc. f/s/o Roy Lee ("Lee") and Good Fear Film, Inc. f/s/o Chris Bender ("Bender" and together with Lee, the "Producers"), dated October 4, 2018.

### IT IS HEREBY ORDERED THAT:

1.      The Stipulation is approved in its entirety and is incorporated here by reference.

2.      The Debtors are authorized to take any and all actions reasonably necessary to effectuate the terms of this Order and the Stipulation.

---

[1]  The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837).  The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

[2]  Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Stipulation.

3.      Subject to the terms of the Stipulation, any and all rights, title or interests under the Producing Services Agreement, including, without limitation, the results and proceeds of the Producers' services shall be deemed to have been transferred to Lantern free and clear of any liens, claims interests, or encumbrances pursuant to the Sale Order.

4.      Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

5.      This Court retains jurisdiction over any and all matters arising from or related to the implementation of the Stipulation and this Order.

2

**EXHIBIT 1**

**STIPULATION**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------x
                                              :
In re:                                        :   Chapter 11
                                              :
THE WEINSTEIN COMPANY HOLDINGS                :   Case No. 18-10601 (MFW)
LLC, *et al.*,                                :
                                              :   Jointly Administered
                     Debtors.[1]              :
                                              :
                                              :
                                              :
------------------------------------------------------------x

## STIPULATION AMONG THE DEBTORS, LANTERN ENTERTAINMENT LLC, VERTIGO PRIME, INC. AND GOOD FEAR FILM, INC.

This stipulation (this "**Stipulation**"), dated October 4, 2018, is made and entered into between and among (i) The Weinstein Company LLC ("**TWC**") and its affiliated debtors and debtors in possession (collectively, with TWC, the "**Debtors**"), (ii) Lantern Entertainment LLC (together with its affiliates, "**Lantern**"), (iii) Vertigo Prime, Inc. f/s/o Roy Lee ("**Lee**"), and (iv) Good Fear Film, Inc. f/s/o Chris Bender ("**Bender**" and together with Lee, the "**Producers**"). The Debtors, Lantern, and the Producers may each be referred to individually as a "**Party**" and, collectively, be referred to herein as the "**Parties**."

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

## <u>RECITALS</u>

**WHEREAS**, TWC and the Producers entered into that certain Producing Services Agreement dated January 6, 2017, and amended March 10, 2017 (together with the exhibits and amendments thereto, the "**Producing Services Agreement**"), pursuant to which the Producers agreed to provide producing services in connection with the motion picture entitled "Polaroid" (the "**Picture**").

**WHEREAS**, on March 19, 2018, the Debtors commenced these voluntary chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

**WHEREAS**, on March 20, 2018, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 8].

**WHEREAS**, on April 6, 2018, the Court entered the *Order (I) (A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief* (the "**Bid Procedures Order**") [Docket No. 190].

2

#50395113 v1

**WHEREAS**, on April 13, 2018, the Debtors filed the *Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts* (the "**April 13 Notice**") [Docket No. 216], which attached an exhibit listing certain contracts and leases that the Debtors may potentially assume and assign as part of the sale contemplated by the Bid Procedures Order (the "**Sale**"), together with associated asserted cure amounts.  The April 13 Notice did not include the Producing Services Agreement.

**WHEREAS**, on April 20, 2018, the Debtors filed the *Notice of Supplemental Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts* (the "**April 20 Notice**") [Docket No. 282], which attached an exhibit listing certain additional contracts and leases that the Debtors may potentially assume and assign as part of the Sale, together with associated asserted cure amounts.  The April 20 Notice did not include the Producing Services Agreement.

**WHEREAS**, on May 2, 2018, the Producers, together with certain other contract counterparties (collectively, the "**Other Contract Counterparties**"), filed the *Objection of Contract Counterparties to the Debtors' Sale Motion, Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases and Proposed Cure Amount* (the "**Objection**") [Docket No. 668].

**WHEREAS**, on May 9, 2018, the Court entered its *Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* (the "**Sale Order**") [Docket No. 846], which, *inter alia*, approved the Sale of substantially all of the Debtors' assets to Lantern.

**WHEREAS**, on May 10, 2018, the Debtors filed the *Notice of Final List of Potentially Assumed Contracts and Leases* (the "**May 10 Notice**") [Docket No. 860], which attached an exhibit listing certain contracts and leases that the Debtors may potentially assume and assign as part of the Sale, together with associated asserted cure amounts.  The May 10 Notice did not include the Producing Services Agreement.

**WHEREAS**, on June 8, 2018, the Debtors filed the *Debtors' Statement Regarding Contracts To Be Transferred Pursuant to the Asset Purchase Agreement with Lantern Entertainment LLC* (the "**June 8 Statement**") [Docket No. 1003], which attached an exhibit listing certain contracts that the Debtors, in consultation with Lantern, determined were not executory contracts under applicable law.  The June 8 Statement did not include the Producing Services Agreement.

**WHEREAS**, on July 11, 2018, the Court entered its *Order Approving Amendment to Asset Purchase Agreement Entered into by and Between the Debtors and Lantern Entertainment LLC* [Docket No. 1220].

**WHEREAS**, on July 17, 2018, the Debtors filed the *Notice of Closing of Sale to Lantern Entertainment LLC* [Docket No. 1247].

**WHEREAS**, the Parties desire to enter into this Stipulation to resolve the disputes between the Parties.

**NOW, THEREFORE**, it is hereby stipulated and agreed to by and among the Parties:

1.     The foregoing recitals are hereby fully incorporated into and made an express part of this Stipulation.

#50395113 v1

2.     This Stipulation shall be effective upon (i) its execution by the Parties hereto and (ii) the entry by the Court of an Order approving this Stipulation (such date, the "**Effective Date**").

3.     The Parties acknowledge and agree to treat the Producing Services Agreement as a non-executory contract under applicable law.

4.     The Parties acknowledge and agree to treat any rights, title or interests under the Producing Services Agreement, including, without limitation, the results and proceeds of the Producers' services, as having been transferred to Lantern free and clear of any liens, claims interests, or encumbrances pursuant to the Sale Order.

5.     Notwithstanding the foregoing, and in consideration for entry into this Stipulation, Lantern acknowledges and agrees that Lantern will honor certain of the Debtors' former obligations under the Producing Services Agreement, which shall consist solely of the following: (i) the obligation to accord each of the Producers the credits as set forth in paragraph 7 thereof; (ii) the obligation to pay each of the Producers the Contingent Compensation, Contingent Box Office Bonuses, and contingent streaming bonus, in accordance with paragraphs 6 and 5 (respectively) thereof and paragraphs 2 and 3 of the March 10, 2017 amendment, if and to the extent such amounts shall become payable; (iii) the obligation to cover each of the Producers under any errors and omissions insurance policy obtained in connection with the Picture as set forth in paragraph 18 of the Producing Services Agreement; (iv) the obligation to indemnify each of the Producers as set forth in paragraph 14 of the Producing Services Agreement; and (v) the obligation to provide the Producers with the first opportunity to provide producing services in connection with any sequels, remakes or television productions, as set forth in paragraph 16 of the Producing Services Agreement.  For the avoidance of doubt, this Stipulation does not amend,

5

supplement, or otherwise modify the terms and conditions of the Producing Services Agreement, and the obligations which Lantern has agreed to honor pursuant to this Stipulation are governed in their entirety by the terms and conditions of the Producing Services Agreement.

6.      In light of the agreements by the Debtors and Lantern in connection with the Producing Services Agreement and the Picture, the Objection, solely with respect to the Producers, is deemed resolved and/or withdrawn.  For the avoidance of doubt, none of the acknowledgments or agreements contained in this Stipulation shall apply to, or otherwise affect or impair, any objection asserted by an Other Contract Counterparty.

7.      The Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Stipulation.

[<em>Remainder of page intentionally blank</em>]

Dated: October 4, 2018

**RICHARDS, LAYTON & FINGER, P.A.**

/s/ *Zachary I. Shapiro*
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
David T. Queroli (No. 6318)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

**CRAVATH , SWAINE & MOORE LLP**
Paul H. Zumbro (admitted *pro hac vice*)
George E. Zobitz (admitted *pro hac vice*)
Karin A. DeMasi (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Plaza
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for the Debtors and Debtors in Possession*

**PEPPER HAMILTON LLP**

/s/ *Evelyn J. Meltzer*
David B. Stratton (No. 960)
David M. Fournier (No. 2812)
Evelyn J. Meltzer (No. 4581)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
Email: stratton@pepperlaw.com
         fournierd@pepperlaw.com
         meltzere@pepperlaw.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Abid Qureshi, Esq. (admitted *pro hac vice*)
Meredith A. Lahaie, Esq. (admitted *pro hac vice*)
One Bryant Park
Bank of America Tower
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: aqureshi@akingump.com
         mlahaie@akingump.com

*Attorneys for Lantern Entertainment LLC*

8

**VENABLE LLP**

/s/ *Jeffrey S. Sabin*
Jamie L. Edmonson (No. 4247)
Daniel A. O'Brien (No. 4897)
1201 N. Market St.
Suite 1400
Wilmington, Delaware 19801
Tel: (302) 298-3535
Fax: (302) 298-3550
jledmonson@venable.com
daobrien@venable.com

-and-

Jeffrey S. Sabin, Esq.
1270 Avenue of the Americas
New York, New York 10020
Tel: (212) 503-0672
jssabin@venable.com

-and-

Keith C. Owens, Esq.
2049 Century Park East Suite 2300
Los Angeles, California 90067
Tel: (310) 229-0370
kcowens@venable.com

*Attorneys for the Producers*

#50395113 v1

**<u>Docket No. 1574</u>**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
                                          :
In re:                                    :      Chapter 11
                                          :
THE WEINSTEIN COMPANY HOLDINGS            :      Case No. 18-10601 (MFW)
LLC, et al.,                              :
                                          :      (Jointly Administered)
                    Debtors.[1]           :
                                          :      Re: Docket No. 1567
-------------------------------------------------------------x
```

## ORDER APPROVING STIPULATION AMONG
## THE DEBTORS, LANTERN ENTERTAINMENT LLC,
## VERTIGO PRIME, INC. AND GOOD FEAR FILM, INC.

Upon consideration of the *Stipulation Among the Debtors, Lantern Entertainment LLC, Vertigo Prime, Inc. and Good Fear Film, Inc.* (the "Stipulation"),[2] a copy of which is attached to this Order as **Exhibit 1**, as agreed to by and among the above-captioned debtors and debtors-in-possession (the "Debtors"), Lantern Entertainment LLC (together with its affiliates, "Lantern"), Vertigo Prime, Inc. f/s/o Roy Lee ("Lee") and Good Fear Film, Inc. f/s/o Chris Bender ("Bender" and together with Lee, the "Producers"), dated October 4, 2018.

## IT IS HEREBY ORDERED THAT:

1.      The Stipulation is approved in its entirety and is incorporated here by reference.

2.      The Debtors are authorized to take any and all actions reasonably necessary to effectuate the terms of this Order and the Stipulation.

---

[1]  The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837).  The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

[2]  Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Stipulation.

3.      Subject to the terms of the Stipulation, any and all rights, title or interests under the Producing Services Agreement, including, without limitation, the results and proceeds of the Producers' services shall be deemed to have been transferred to Lantern free and clear of any liens, claims interests, or encumbrances pursuant to the Sale Order.

4.      Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

5.      This Court retains jurisdiction over any and all matters arising from or related to the implementation of the Stipulation and this Order.

**Dated: October 9th, 2018**
**Wilmington, Delaware**

2

**MARY F. WALRATH**
**UNITED STATES BANKRUPTCY JUDGE**

#50395117 v1

**<u>EXHIBIT 1</u>**

**STIPULATION**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-----------------------------------------------------------x
:
In re:                         :   Chapter 11
:
THE WEINSTEIN COMPANY HOLDINGS   :   Case No. 18-10601 (MFW)
LLC, *et al.*,                 :
:   Jointly Administered
Debtors.[1]          :
:
:
-----------------------------------------------------------x

## STIPULATION AMONG THE DEBTORS, LANTERN ENTERTAINMENT LLC, VERTIGO PRIME, INC. AND GOOD FEAR FILM, INC.

This stipulation (this "**Stipulation**"), dated October 4, 2018, is made and entered into between and among (i) The Weinstein Company LLC ("**TWC**") and its affiliated debtors and debtors in possession (collectively, with TWC, the "**Debtors**"), (ii) Lantern Entertainment LLC (together with its affiliates, "**Lantern**"), (iii) Vertigo Prime, Inc. f/s/o Roy Lee ("**Lee**"), and (iv) Good Fear Film, Inc. f/s/o Chris Bender ("**Bender**" and together with Lee, the "**Producers**"). The Debtors, Lantern, and the Producers may each be referred to individually as a "**Party**" and, collectively, be referred to herein as the "**Parties**."

---

[1]   The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

## RECITALS

**WHEREAS**, TWC and the Producers entered into that certain Producing Services Agreement dated January 6, 2017, and amended March 10, 2017 (together with the exhibits and amendments thereto, the "**Producing Services Agreement**"), pursuant to which the Producers agreed to provide producing services in connection with the motion picture entitled "Polaroid" (the "**Picture**").

**WHEREAS**, on March 19, 2018, the Debtors commenced these voluntary chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

**WHEREAS**, on March 20, 2018, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 8].

**WHEREAS**, on April 6, 2018, the Court entered the *Order (I) (A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief* (the "**Bid Procedures Order**") [Docket No. 190].

2

**WHEREAS**, on April 13, 2018, the Debtors filed the *Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts* (the "**April 13 Notice**") [Docket No. 216], which attached an exhibit listing certain contracts and leases that the Debtors may potentially assume and assign as part of the sale contemplated by the Bid Procedures Order (the "**Sale**"), together with associated asserted cure amounts.  The April 13 Notice did not include the Producing Services Agreement.

**WHEREAS**, on April 20, 2018, the Debtors filed the *Notice of Supplemental Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts* (the "**April 20 Notice**") [Docket No. 282], which attached an exhibit listing certain additional contracts and leases that the Debtors may potentially assume and assign as part of the Sale, together with associated asserted cure amounts.  The April 20 Notice did not include the Producing Services Agreement.

**WHEREAS**, on May 2, 2018, the Producers, together with certain other contract counterparties (collectively, the "**Other Contract Counterparties**"), filed the *Objection of Contract Counterparties to the Debtors' Sale Motion, Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases and Proposed Cure Amount* (the "**Objection**") [Docket No. 668].

**WHEREAS**, on May 9, 2018, the Court entered its *Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* (the "**Sale Order**") [Docket No. 846], which, *inter alia*, approved the Sale of substantially all of the Debtors' assets to Lantern.

**WHEREAS**, on May 10, 2018, the Debtors filed the *Notice of Final List of Potentially Assumed Contracts and Leases* (the "**May 10 Notice**") [Docket No. 860], which attached an exhibit listing certain contracts and leases that the Debtors may potentially assume and assign as part of the Sale, together with associated asserted cure amounts.  The May 10 Notice did not include the Producing Services Agreement.

**WHEREAS**, on June 8, 2018, the Debtors filed the *Debtors' Statement Regarding Contracts To Be Transferred Pursuant to the Asset Purchase Agreement with Lantern Entertainment LLC* (the "**June 8 Statement**") [Docket No. 1003], which attached an exhibit listing certain contracts that the Debtors, in consultation with Lantern, determined were not executory contracts under applicable law.  The June 8 Statement did not include the Producing Services Agreement.

**WHEREAS**, on July 11, 2018, the Court entered its *Order Approving Amendment to Asset Purchase Agreement Entered into by and Between the Debtors and Lantern Entertainment LLC* [Docket No. 1220].

**WHEREAS**, on July 17, 2018, the Debtors filed the *Notice of Closing of Sale to Lantern Entertainment LLC* [Docket No. 1247].

**WHEREAS**, the Parties desire to enter into this Stipulation to resolve the disputes between the Parties.

**NOW, THEREFORE**, it is hereby stipulated and agreed to by and among the Parties:

1.      The foregoing recitals are hereby fully incorporated into and made an express part of this Stipulation.

2.      This Stipulation shall be effective upon (i) its execution by the Parties hereto and (ii) the entry by the Court of an Order approving this Stipulation (such date, the "**Effective Date**").

3.      The Parties acknowledge and agree to treat the Producing Services Agreement as a non-executory contract under applicable law.

4.      The Parties acknowledge and agree to treat any rights, title or interests under the Producing Services Agreement, including, without limitation, the results and proceeds of the Producers' services, as having been transferred to Lantern free and clear of any liens, claims interests, or encumbrances pursuant to the Sale Order.

5.      Notwithstanding the foregoing, and in consideration for entry into this Stipulation, Lantern acknowledges and agrees that Lantern will honor certain of the Debtors' former obligations under the Producing Services Agreement, which shall consist solely of the following: (i) the obligation to accord each of the Producers the credits as set forth in paragraph 7 thereof; (ii) the obligation to pay each of the Producers the Contingent Compensation, Contingent Box Office Bonuses, and contingent streaming bonus, in accordance with paragraphs 6 and 5 (respectively) thereof and paragraphs 2 and 3 of the March 10, 2017 amendment, if and to the extent such amounts shall become payable; (iii) the obligation to cover each of the Producers under any errors and omissions insurance policy obtained in connection with the Picture as set forth in paragraph 18 of the Producing Services Agreement; (iv) the obligation to indemnify each of the Producers as set forth in paragraph 14 of the Producing Services Agreement; and (v) the obligation to provide the Producers with the first opportunity to provide producing services in connection with any sequels, remakes or television productions, as set forth in paragraph 16 of the Producing Services Agreement.  For the avoidance of doubt, this Stipulation does not amend,

supplement, or otherwise modify the terms and conditions of the Producing Services Agreement, and the obligations which Lantern has agreed to honor pursuant to this Stipulation are governed in their entirety by the terms and conditions of the Producing Services Agreement.

6.       In light of the agreements by the Debtors and Lantern in connection with the Producing Services Agreement and the Picture, the Objection, solely with respect to the Producers, is deemed resolved and/or withdrawn.   For the avoidance of doubt, none of the acknowledgments or agreements contained in this Stipulation shall apply to, or otherwise affect or impair, any objection asserted by an Other Contract Counterparty.

7.       The Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Stipulation.

*[Remainder of page intentionally blank]*

#50395113 v1

Dated: October 4, 2018

**RICHARDS, LAYTON & FINGER, P.A.**

/s/ *Zachary I. Shapiro*
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
David T. Queroli (No. 6318)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

**CRAVATH , SWAINE & MOORE LLP**
Paul H. Zumbro (admitted *pro hac vice*)
George E. Zobitz (admitted *pro hac vice*)
Karin A. DeMasi (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Plaza
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for the Debtors and Debtors in Possession*

**PEPPER HAMILTON LLP**

/s/ *Evelyn J. Meltzer*
David B. Stratton (No. 960)
David M. Fournier (No. 2812)
Evelyn J. Meltzer (No. 4581)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
Email: stratton@pepperlaw.com
       fournierd@pepperlaw.com
       meltzere@pepperlaw.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Abid Qureshi, Esq. (admitted *pro hac vice*)
Meredith A. Lahaie, Esq. (admitted *pro hac vice*)
One Bryant Park
Bank of America Tower
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: aqureshi@akingump.com
       mlahaie@akingump.com

*Attorneys for Lantern Entertainment LLC*

#50395113 v1

**VENABLE LLP**

/s/ *Jeffrey S. Sabin*
Jamie L. Edmonson (No. 4247)
Daniel A. O'Brien (No. 4897)
1201 N. Market St.
Suite 1400
Wilmington, Delaware 19801
Tel: (302) 298-3535
Fax: (302) 298-3550
jledmonson@venable.com
daobrien@venable.com

-and-

Jeffrey S. Sabin, Esq.
1270 Avenue of the Americas
New York, New York 10020
Tel: (212) 503-0672
jssabin@venable.com

-and-

Keith C. Owens, Esq.
2049 Century Park East Suite 2300
Los Angeles, California 90067
Tel: (310) 229-0370
kcowens@venable.com

*Attorneys for the Producers*

**<u>Exhibit C</u>**

**November 6, 2018 Hearing Transcript**

```
 1                  UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                          .  Chapter 11
                                     .
 4   THE WEINSTEIN COMPANY HOLDINGS  .  Case No. 18-10601 (MFW)
     LLC, et al.,                    .
 5                                   .
                   Debtors.          .
 6   . . . . . . . . . . . . . . . . .
     AI INTERNATIONAL HOLDINGS (BVI) .
 7   LTD.,                           .
                                     .
 8              Plaintiff,           .
                                     .
 9     vs.                           .  Adv. Case No. 18-50486
                                     .
10   MUFG UNION BANK, N.A., as       .
     Administrative and collateral   .  Courtroom No. 4
11   agent and UNION BANCAL          .  824 Market Street
     EQUITIES, INC.,                 .  Wilmington, Delaware 19801
12                                   .
                   Defendants.       .  November 6, 2018
13   . . . . . . . . . . . . . . . .    2:00 P.M.

14                    TRANSCRIPT OF HEARING
                BEFORE HONORABLE MARY F. WALRATH
15               UNITED STATES BANKRUPTCY JUDGE

16   APPEARANCES:

17
     For the Debtors:          Paul Heath, Esquire
18                             Mark Collins, Esquire
                               Zachary Shapiro, Esquire
19                             Joseph Barsalona, III, Esquire
                               Brett Haywood, Esquire
20                             David Queroli, Esquire
                               RICHARDS LAYTON & FINGER
21                             One Rodney Square
                               920 North King Street
22                             Wilmington, Delaware 19801

23
     ECRO:                     Brandon McCarthy, ECRO
24

25
```

```
 1   Transcription Service:    Reliable
                               1007 N. Orange Street
 2                             Wilmington, Delaware 19801
                               Telephone:  (302) 654-8080
 3                             E-Mail:  gmatthews@reliable-co.com

 4   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
 5


 6
     APPEARANCES (Continued):
 7
     For the Debtors:          Paul Zumbro, Esquire
 8                             Karin DeMasi, Esquire
                               George Zobitz, Esquire
 9                             CRAVATH SWAINE & MOORE LLP
                               Worldwide Plaza
10                             825 Eighth Avenue
                               New York, New York
11
     For Lantern:             Abid Qureshi, Esquire
12                             AKIN GUMP STRAUSS HAUER & FELD LLP
                               One Bryant Park
13                             Bank of America Tower
                               New York, New York 10036
14
                               - and -
15
                               David Stratton, Esquire
16                             PEPPER HAMILTON LLP
                               1313 North Market Street
17                             Wilmington, Delaware 19801

18   For Netflix:              David Stern, Esquire
                               KLEE TUCHIN BOGDANOFF & STERN LLP
19                             1999 Avenue of the Stars, 39th Floor
                               Los Angeles, California 90067
20
     For Viacom:               Stephan Hornung, Esquire
21                             LUSKIN, STERN & EISLER LLP
                               8th Avenue & 41st Street
22                             Eleven Times Square
                               New York, New York 10036
23
     For the Committee:        Colin Robinson, Esquire
24                             PACHULSKI STANG ZIEHL & JONES LLP
                               919 North Market Street, 17th Floor
25                             Wilmington, Delaware 19801
```

```
 1  APPEARANCES (Cont'd)

 2  For First Republic:        Andrew Tenzer, Esquire
                               PAUL HASTINGS LLP
 3                             200 Park Avenue
                               New York, New York 10166
 4
    For Portfolio Funding      Kevin Shaw, Esquire
 5  Company, LLC:              WHITEFORD TAYLOR & PRESTON
                               The Renaissance Centre, Suite 500
 6                             405 North King Street
                               Wilmington, Delaware 19801
 7
    For Portfolio Funding      Edward McNeilly, Esquire
 8  Company, LLC:              AKIN GUMP STRAUSS HAUER & FELD LLP
                               1999 Avenue of the Stars, Suite 600
 9                             Los Angeles, California 90067

10  For Screen Actor Guild     Joseph Kohanski, Esquire
    American Federation of     BUSH GOTTLIEB
11  Television and Radio       801 N. Brand Boulevard, Suite 950
    Artists:                   Glendale, California 91203
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                  INDEX

2                                                        PAGE

3    #8) Motion of the Debtors and Lantern Entertainment, LLC
     Pursuant to Fed. R. Bankr. P. 9019 for Approval of
4    Stipulation Regarding the Assumption and Assignment of
     Netflix Contracts [Docket No. 1350 - filed August 13, 2018
5

6    **RULING:**                                          63

7    #9) Motion to File Under Seal Portions of Objection of Viacom
8    International Inc. to Settlement Agreement among the Debtors,
     Lantern and Netflix [Docket No. 1417 - filed August 29, 2018]
9

10   #10) Motion to File Under Seal Portions of the Reply in
     Support of Motion of the Debtors and Lantern Entertainment,
11   LLC Pursuant to Fed. R. Bankr. P. 9019 for Approval of
     Stipulation Regarding the Assumption and Assignment of
12   Netflix Contracts [Docket No. 1515 - filed September 20,
     2018]
13

14   **RULING:**                                          67

15   #11) Motion of Certain Contract Counterparties to Compel
16   Assumption of Executory Contracts [Docket No. 1540 - filed
     September 25, 2018]
17

18   #12) Motion to File Under Seal Portions of the Declaration of
     Robert A. Del Genio in Support of Motion of the Debtors and
19   Lantern Entertainment, LLC Pursuant to Fed. R. Bankr. P. 9019
     for Approval of Stipulation Regarding the Assumption and
20   Assignment of Netflix Contracts [Docket No. 1598 - filed
     October 12, 2018]
21

22   #13) Motion of First Republic Bank for Order Granting Relief
23   from Automatic Stay for Cause and Granting Related Relief
     [Docket No. 1635 - filed October 30, 2018]
24   Case

25

1

DEBTORS' WITNESS(s)

2

    **ROBERT DEL GENIO**

3

    Direct examination by Mr. Qureshi     8

4

    Cross examination by Mr. Hornung     22

5

6

| EXHIBITS: | ID | Rec'd |
|---|---|---|
| Debtors' Exhibit 1 - Contracts | | 43 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 2:02 p.m.)

2        (Call to order of the Court)

3              THE COURT:  Good afternoon.

4              MR. SHAPIRO:  Good afternoon, Your Honor; for the

5    record Zach Shapiro of Richards Layton & Finger, here today

6    on behalf of the debtors.

7              If I may, Your Honor, I'll get right into the

8    agenda.

9              THE COURT:  Okay.

10             MR. SHAPIRO:  As my colleague, Mr. Heath, likes to

11   say we have a fairly ambitious agenda for an afternoon

12   hearing; though, I think we should be able to get it done.

13             The first item is the debtors' and Lantern's joint

14   motion to approve a stipulation with Netflix regarding the

15   assumption and assignment of the Netflix contracts.  That is

16   item number 8 on the second amended agenda.

17             What I would propose to do, Your Honor, is now

18   hand the podium over to Mr. Qureshi of Akin Gump who will

19   present that motion.  I would, however, reserve the right to

20   be heard at the conclusion of argument if necessary.  And at

21   the conclusion of the hearing on that motion I will come back

22   up and walk Your Honor through the balance of the agenda.

23             THE COURT:  All right.  Thank you.

24             MR. SHAPIRO:  Thank you.

25             MR. QURESHI:  Good afternoon, Your Honor; for the

1  record Abid Qureshi, Akin Gump Strauss Hauer & Feld, on

2  behalf of Lantern Entertainment.

3          Your Honor, we are here to present the 9019 motion

4  concerning Netflix.  As Your Honor is aware there is one

5  objection to that motion on behalf of Viacom.  Your Honor, we

6  have conferred ahead of time.  We have -- we and the debtors

7  have one witness, Robert Del Genio --

8          THE COURT:  Excuse me.  Could the party on the

9  line please mute your line?

10          Thank you.  Go ahead.

11          MR. QURESHI:  Thank you.  Your Honor, we have one

12  witness to offer in support of the settlement; that is Robert

13  Del Genio.  There is a declaration from Mr. Del Genio in the

14  record.

15          What we would propose to do, Your Honor, and I

16  think it makes sense to just get right into it, is I intend

17  to do a relatively brief direct of Mr. Del Genio, then make

18  him available for cross and then we can jump right into

19  argument.

20          THE COURT:  Are you also proffering the

21  declaration as part of the record?

22          MR. QURESHI:  We would like to offer the

23  declaration in as part of the record.  I don't believe there

24  is any objection to that.

25          MR. HORNUNG:  No objection.

1            THE COURT:  Subject to cross, of course.

2            MR. QURESHI:  Right.

3            THE COURT:  All right.  You may call your witness.

4            MR. QURESHI:  Okay.  We call Robert Del Genio.

5            THE COURT:  Please remain standing so you can be

6  sworn.

7                 ROBERT DEL GENIO, WITNESS, SWORN

8            THE CLERK:  Please state your full name and spell

9  your last name for the record.

10            THE WITNESS:  Robert Anthony Del Genio, its

11  capital D-E-L, capital G-E-N-I-O.

12            THE CLERK:  Thank you.

13            THE WITNESS:  You're welcome.

14                      DIRECT EXAMINATION

15  BY MR. QURESHI:

16  Q    Mr. Del Genio, the court is already familiar with you

17  and your firm from prior testimony in this case.  So, can you

18  just briefly, please, give the court your background and

19  where you're employed?

20  A    I'm a senior managing director at FTI and I'm co-head

21  of the New York Restructuring & Corporate Finance Group.

22  Q    And how long approximately have you been a

23  restructuring professional?

24  A    Over 30 years now.

25  Q    Okay.  Can you just very quickly and generally describe

1  your experience?

2  A     I spent 17 years at Ernst & Young.  My last position as

3  a partner and national director.  Then I started my own firm

4  CDG Group, which we had for 19 years and then I sold that to

5  FTI about 18 months ago.

6  Q     Mr. Del Genio, I know that your role with these debtors

7  has evolved over time.  Can you please walk the court through

8  what your role was when you were first retained by the

9  debtors and how that's changed through present day.

10 A     Yes.  Our initial role was in October, I want to say

11 financial advisor to the company.  Then around December 1st

12 became the chief restructuring officer.  Our initial

13 activities was really to stabilize the situation and manage

14 the company's liquidity to create a runway so that we could

15 pursue a sales process because of the professionals involved;

16 the board and myself felt that that was the best way to

17 maximize value.

18       So, we spent time working with Moelis, the investment

19 bank group, preparing the company for sale, working through

20 their liquidity forecast to make sure there was an

21 appropriate runway and then what's involved in that process

22 as well as just dealing with some of the business aspects and

23 the restructuring aspects you have in a process like this.

24 Q     And what is your role with the debtors today?

25 A     I'm still the chief restructuring officer, but my role

1  is much more limited.  After the sale to preserve expenses

2  for the estate we really skinny down the effort for our team.

3  We have Bob Peck who's a former chief financial officer who

4  is now working for the estate in that capacity.  Then there

5  was a board put in place after the sale with experienced

6  restructuring professionals, and they're doing some more of

7  the legwork in that to minimize the burn of the cash in the

8  estate.

9  Q     Now, Mr. Del Genio, I'd like to take you back in time

10 to the period prior to the sale when you were serving as the

11 chief restructuring officer for the debtors and ask you to

12 describe to the court in a little more detail, again prior to

13 the sale closing, what was your principal focus as CRO?

14 A     Well, prior to the sale closing what we were first and

15 foremost trying was to maximize the liquidity within the

16 estate, making sure that the sales process was moving

17 efficiently and into a point where we could select a

18 potential, in this case, a buyer through this process that

19 Moelis was running.  Then just dealing with the business

20 issues of the company.

21       The other thing is I had signing authority.  So, I was

22 approving any disbursement that was made out of the estate

23 from the day that I was the chief restructuring officer,

24 again, with the eye of trying to minimize the expenditures as

25 much as possible and maintain the business so that we could

1  sell it as a going concern.

2  Q    Can you please describe your understanding of the

3  nature of the relationship that existed prior to the sale

4  between the debtors and Netflix?

5  A    Netflix was Weinstein's largest customer.  They had an

6  agreement with Netflix where they exhibited a number of the

7  films and programs that the Weinstein Company developed and

8  it was by far the most significant customer.  We had a lot of

9  other customers, but it was a very important customer to the

10 Weinstein Company.

11 Q    Mr. Del Genio, are you able to describe on a revenue

12 basis an approximate percentage that Netflix accounted for of

13 Weinstein's business?

14 A    In 2017 it was approximately 70 percent of the

15 company's revenues, the business relationship with Netflix.

16 Q    And that fact served the size of the debtors' business

17 relationship with Netflix; how did that relate to the sale

18 process that you were involved in?

19 A    Well, it was important.  Obviously, Weinstein's largest

20 customers were important because the relationships that they

21 had with those, and the library, and those films and programs

22 that were being exhibited the customers were one of the

23 reasons why buyers were interested to develop relationships

24 with those and be able to exploit some of the properties that

25 the Weinstein Company developed over the years.

1   Q     And did there come a time, sir, when you became aware

2   of a dispute between Netflix and the debtors?

3   A     Yes.

4   Q     Please describe for the court your understanding of the

5   nature of that dispute?

6   A     From a business person's perspective Netflix

7   prepetition had terminated, alleged that it terminated the

8   agreement.  The company had a different view of that and we

9   were trying, like we did with a lot of the customers, to try

10  to resolve some of the disputes to see if we could work those

11  out.

12  Q     Now, Mr. Del Genio, we'll come back to the specific

13  nature of those disputes, but what I would like you to

14  address now, sir, is at the time that you became aware of

15  those disagreements between Netflix and the debtors did you

16  consider the possibility of litigating with Netflix?

17  A     There was a lot of conversations regarding litigation

18  with Netflix as well as other customers we had disputes on.

19  My personal opinion, after listening to advice of counsel and

20  then talking to the other advisors, is that we were trying to

21  sell a business and when you're trying to sell a business

22  litigating with your largest customers as well as other

23  customers didn't seem to be a good strategy to maximize

24  value.

25        In addition, the estate had limited resources and

1  litigation, as you well know, is very expensive.  We factored

2  that into consideration as well when we were making that

3  decision not to pursue a litigation.

4  Q    Now, let's focus in a little more detail on the nature

5  of the objection to the settlement.  Do you have an

6  understanding, first, of what program is involved?

7  A    Yes.  The objection, and its being discussed, is Scream

8  3.

9  Q    Can you describe your understanding from a business

10 perspective of the specific nature of the dispute regarding

11 Scream 3?

12 A    Well, Netflix didn't take delivery of Scream 3.  Their

13 argument was that they had terminated the agreement

14 prepetition because there were certain contingencies that

15 weren't met.  One was that Scream 3 was not exhibited or

16 shown on one of Viacom's networks MTV.  There was also a key

17 man provision and Harvey and Bob Weinstein weren't actively

18 involved in the business.  Then a dispute over a personal

19 service contract and ability to actually initiate that under

20 the Netflix agreement.

21 Q    Now, in evaluating those issues, sir, without getting

22 into substance did you have the benefit of legal advice?

23 A    I did.

24 Q    Okay.  You mentioned a so-called key man provision in a

25 contact.  Can you describe for the court your understanding

1  of that provision?

2  A    The key man provision was an agreement where they

3  wanted Harvey and Bob Weinstein involved in the business.

4  That was key to the relationship and that's why it was called

5  out in the contract.

6  Q    And as of the agreement on the terms of the sale with

7  Lantern Entertainment did you have an understanding of

8  whether Harvey and Bob Weinstein would have any go-forward

9  role with the purchase of these assets?

10 A    They would not.

11 Q    And, sir, you also mentioned, I believe, an obligation

12 to air season three of Scream.  Can you tell a little bit

13 more about your understanding of that issue?

14 A    Yes.  My understanding was that prior to Netflix

15 showing that Scream 3 would be shown on an MTV Network and

16 that was a condition, and they did not air that program on

17 MTV.

18 Q    And do you know who controls MTV Network?

19 A    Viacom.

20 Q    Notwithstanding Netflix's reported termination of the

21 contract prepetition did the debtors take any steps to try to

22 require Netflix to accept delivery of season three of Scream?

23 A    Yes.

24 Q    And what did you do?

25 A    First we tried to deliver it electronically, but they

1  didn't accept it.  Then we had a discussion was there any way

2  to deliver it.  So, then we delivered it physically by

3  basically FedEx'ing it and then they FedEx'd it back to us.

4  Q    And once the show was FedEx'd back to the debtors what

5  happened next?

6  A    Well, there wasn't any other method that we could use

7  to deliver that.  So, we were at a stalemate.

8  Q    So, is that approximately the time at which settlement

9  discussions began?

10 A    It was during that time, yes.

11 Q    Okay.  Can you describe for the court, please, your

12 involvement in the settlement discussions?

13 A    I didn't lead the settlement discussions.  They were

14 led by counsel.  I was aware of them. I was supportive of the

15 fact to try to work something out, as I said before, with the

16 company's largest customer.

17 Q    Mr. Del Genio, over the course of your lengthy career I

18 take it you've had numerous opportunities to be involved in

19 negotiating settlements and various litigation claims; is

20 that fair?

21 A    Yes.

22 Q    Can you describe generally for the court the type of

23 factors that you take into consideration when making a

24 judgment as to whether to settle or whether to litigate?

25 A    First and foremost the impact on the business and what

1  we're actually trying to accomplish through the

2  restructuring, whether it's a standalone restructuring or the

3  sale of the business.  Secondly, who the counterparty is; the

4  sophistication, the financial resources.  Then thirdly the

5  financial resources and the drain on the estate, and what the

6  likelihood or the probability of being successful.  Those are

7  the types of things that I look at when evaluating whether to

8  pursue that and the probabilities of success.

9  Q    And were those the types of factors that you considered

10 in this case?

11 A    I did with the advice of counsel.

12 Q    Okay.  So, let's take them one by one.  Impact on the

13 business was the first that you mentioned.  In your judgment,

14 sir, as the CRO what would the impact on the debtors'

15 business have been had there been a failure to reach a

16 settlement with Netflix?

17 A    Well, Netflix was the company's largest customer and we

18 were trying to sell the business.  So, not having agreement

19 with Netflix we believe, myself, the advisors that that will

20 have an impact on that.  I think also any type of litigation

21 with other customers I wasn't supportive of that because,

22 again, that could be damaging to the overall business and the

23 sales process.

24 Q    Okay.  Second consideration that you mentioned is that

25 you take into account when deciding whether to settle is the

1  counterparty.  How is Netflix as the counterparty here

2  relevant to your judgment, the debtors' judgment to enter

3  into this settlement?

4  A    Netflix is a very sophisticated company. They're well

5  advised.  They have significant resources.  So, from my

6  perspective it would be a counterparty that could put up a

7  reasonable fight and have a lot of resources to have an

8  extended litigation.

9  Q    Finally, sir, the other factor that you mentioned is

10  financial resources and drain on the estate of having to

11  litigate.  How did that factor weigh in this case?

12  A    That was a significant factor in really a lot of the

13  discussions or disagreements we had with customers.  I didn't

14  think litigation was a good option because we only have

15  limited resources within the estate.

16  Q    Now, at the time that the settlement with Netflix was

17  being negotiated what was the status vis-à-vis Lantern

18  Entertainment and its efforts to acquire certain assets of

19  the debtors?

20  A    Well, when we were having discussions, settlement

21  discussions with Netflix, again, they were engaged in those

22  discussions, but in all the discussions we were having with

23  customers it was difficult to get anyone to go to a final

24  decision because they wanted to see who the buyer was and

25  what was really the end of this process.  So, when Lantern

1  became involved then it became more of a three-party

2  negotiation.

3  Q    And did you come, sir, to form an understanding as to

4  what the impact would have been on Lantern's ability to buy

5  the business had there not been a settlement with Netflix?

6  A    I don't believe Lantern would have closed because they

7  would have had difficulty raising their bank financing

8  without having the agreement with Netflix.

9  Q    And what is the basis for your belief that Lantern

10 would not have closed absent the settlement agreement with

11 Netflix?

12 A    It was based on conversations I had with Andy Mitchell,

13 the managing partner or managing director, CEO of Lantern.

14 Also, basically, it's supposed to be a confidential process.

15 It's not particularly confidential.  So, what I was hearing

16 in the financing community is that was something that was

17 important to their financing source, SunTrust.

18 Q    And, Mr. Del Genio, from a business perspective did you

19 doubt whether failure to settle with Netflix or litigation

20 with Netflix would impair the ability of Lantern to close?

21 A    That made sense to me that the financing sources would

22 want them to have an agreement with Netflix.  They're a major

23 player in the industry and Weinstein's most important

24 customer.

25 Q    And what would the impact on the debtors have been, and

1   more specifically on the debtors' creditors have been had the

2   sale to Lantern not closed?

3   A     Well, Lantern was the highest and best.  We didn't have

4   a back-up bid.  To have to go back out to market if you could

5   resurrect another bid, my sense is it would be significantly

6   lower if we were able to do that.  I had conversations with

7   Carlos Jimenez who is the managing director, led the sales

8   process, at Moelis.  I think the recoveries would have been

9   crushed if we didn't do this deal.

10  Q     Did that weigh into your decision to enter into the

11  settlement?

12  A     Absolutely.

13  Q     And did you also, sir, consider the revenue that would

14  have come into the debtors' estate had season three of Scream

15  been accepted by Netflix?

16  A     Yes.  We were aware of the amount of revenue that would

17  have come in.

18  Q     And how, if at all, did that weigh in your

19  consideration of whether or not it made sense to proceed with

20  the settlement?

21  A     The sale of this company was absolutely the best

22  alternative and to maximize value for the estate.  It really

23  kind of overwhelmed any of the other issues here.

24  Q     Sir, do you believe that the settlement that the

25  debtors reached with Netflix is in the best interest of the

1  estate?

2  A      I do.

3  Q      Can you explain why?

4  A      We had a settlement with the largest customer.  Lantern

5  was able to close.  They had their financing in place and to

6  me it was an important part which we were negotiating right

7  to the last minutes of the closing.

8  Q      Was it a difficult decision for the debtors to enter

9  into the settlement?

10  A      No.

11  Q      Why not?

12  A      Because it was the largest customer and if we didn't

13  have a deal with them then we wouldn't have had a closing.

14  The closing provided significant proceeds to the estate which

15  repaid the senior lenders and provided a return to unsecured

16  creditors.  Without that I'm convinced that the closing

17  wouldn't have been the kind of recovery that we've seen to

18  date.

19  Q      Now, Mr. Del Genio, you described earlier the debtors'

20  failed attempt to deliver season three of Scream to Netflix.

21  Having been unable to deliver it what happens to this title

22  now?

23  A      Well --

24  Q      Does it have any value for the estate?

25  A      November 8th is an important date and besides Netflix

1  there could be other assets that come back to the estate.

2  We've talked about a process that we're going to market test

3  these assets. The board is very focused on that and developed

4  protocol to make sure that any asset that comes back gets

5  market tested to see if we can get additional value and

6  create additional proceeds for the estate.

7          MR. QURESHI:  Thank you.  Your Honor, that's all I

8  have.

9          THE COURT:  Thank you.

10         Cross?

11         MR. HORNUNG:  Stephan Hornung, Luskin Stern &

12 Eisler, on behalf of the objecting party Viacom International

13 Inc.

14                    CROSS EXAMINATION

15 BY MR. HORNUNG:

16 Q    Good afternoon, Mr. Del Genio.  Nice to see you again.

17 A    Good afternoon.  Nice to see you as well.

18 Q    On direct you discussed coming into the role as CRO for

19 the Weinstein Company.  That was in the fall of 2017?

20 A    No.  I started off as a financial advisor in the fall

21 and I became the CRO around December 1st.

22 Q    Okay.  So, 2017 you were -- late 2017 you were actively

23 involved in the Weinstein Company?

24 A    Yes.

25 Q    Prior to the petition date Viacom and the debtors, they

1  were parties to a number of contracts?

2  A     Yes.

3  Q     Some of those contracts were license agreements where

4  Viacom exhibited pictures that it produced by the Weinstein

5  Company?

6  A     Yes.

7  Q     And then another basket of agreements were production

8  agreements where the Weinstein Company produced an original

9  scripted television series for a show on the Viacom original

10  scripted television series for a show on the Viacom Networks?

11  A     That's correct.

12  Q     Okay.  In the fall of 2017 is it fair to say the

13  debtors experienced a liquidity crisis?

14  A     Liquidity was constrained, yes.

15  Q     Okay.  And because of those liquidity constraints they

16  had trouble meeting their financial commitments in their

17  agreements with Viacom?

18  A     That is correct.

19  Q     So, as a result of that Viacom made a series of

20  advances to the Weinstein Company and the affiliated debtors

21  to help finalize and finish production of some of these

22  series?

23  A     That is correct.

24  Q     In particular Viacom funded some money with respect to

25  the mini-series Waco?

1  A      Yes.

2  Q      And also funded $20 million dollars plus for the series

3  Yellowstone?

4  A      Yes.

5  Q      And as relevant here they also funded about

6  approximately $9 million dollars in connection with season

7  three of Scream?

8  A      A little less, but with professional fees and accrued

9  interest it added up to nine million.

10 Q      Okay.  Now, in exchange for making those advances

11 Viacom took a security interest, right?

12 A      In Scream 3?

13 Q      Well, just generally they took a security interest --

14 I'll ask the question again.

15        In exchange for funding $9 million dollars or

16 approximately $9 million dollars to finish Scream 3 the

17 debtors pledged an asset to Viacom?

18 A      Yes.

19 Q      Okay.  I wasn't trying to trick you there.  And that

20 was the international distribution rights from Netflix as it

21 relates to season three of Scream?

22 A      That's correct.

23 Q      Okay.  Now the proceeds from season three of Scream

24 under the Netflix contract it's your understanding that would

25 have amounted to approximately $12 million dollars?

1    A      Just slightly under, yes.  Approximately 12 million.

2    Q      So, the revenue from the Netflix -- what revenue from

3    the Netflix deal would have been more than sufficient to pay

4    back Viacom's claim related to Scream 3 in full, right?

5    A      Yes.

6    Q      Okay.  But now as a result of the settlement with

7    Netflix there's' going to be an additional $9 million dollar

8    unsecured claim against the debtors' estates, is that

9    correct?

10   A      Yes.

11   Q      Okay.  Switching gears, now the debtors have argued

12   that the settlement with Netflix is good for the estates

13   because had the debtors not reached an agreement there might

14   have been additional higher potential unsecured claims.  Do

15   you agree with that statement?

16   A      Can you repeat that again?

17   Q      Well, the debtors in their papers have argued that

18   without a settlement with Netflix there could have been

19   higher unsecured claims asserted against the estate.  I'm

20   asking if you agree with that statement.

21   A      Yes.

22   Q      Okay.  So, let's talk about some of those claims.  In

23   the settlement, itself, one of the claims that is being

24   addressed is a $326,000 dollar audit claim related to

25   confidential Crouching Tiger Hidden, Hidden Dragon: The Green

1  Legend term sheet.  Are you aware of that?

2  A    Its Crouching Tiger, Hidden Dragon.  Yes, I am familiar

3  with that.

4  Q    Okay.  And one of the things that's being accomplished

5  in the settlement stipulation is that Netflix is waiving that

6  $326,000 dollar audit claim, correct?

7  A    Correct.

8  Q    Okay.  But the waiver of that claim doesn't actually

9  have a direct benefit to the estate, does it?

10  A    It would be a cure payment.

11  Q    And the cure payment -- excuse me.

12  A    That is my understanding.

13  Q    And the cure payment would be paid by Lantern, correct?

14  A    If they assume the contract, yes.

15  Q    Okay.  So, now let's look at some of the other possible

16  claims.  You're generally familiar with Section 365 of the

17  Bankruptcy Code?

18  A    General.

19  Q    Governs the assumption and rejection of executory

20  contracts.

21  A    From a business person perspective, yes.

22  Q    Okay. Now, you have been working in the bankrutpcy

23  filed for approximately 30 years?

24  A    That's correct.

25  Q    And you've worked in other cases where there was other

1  intellectual property licenses?

2  A    Yes.

3  Q    Okay.  And you're familiar, generally, with Section

4  365(n) of the Bankruptcy Code?

5  A    Yes.

6  Q    And that governs what happens if a debtor rejects an

7  intellectual property license?

8  A    Yes.

9  Q    And superficially it governs what happens when the

10  debtor is the licensor and the non-debtor is the licensee?

11  A    I'm generally familiar, yes.

12  Q    Okay.  Now, it's your understanding that under 365(n)

13  of the Bankruptcy Code the non-debtor licensee then has to

14  make a choice if the contract is rejected, right?

15  A    Can you state that again?

16  Q    Well, 365(n) provides the non-debtor counterparty two

17  choices in the event their license agreement is rejected,

18  correct?

19  A    Yes.

20  Q    One of those --

21       MR. QURESHI:  Your Honor, while Mr. Del Genio is

22  doing great in this quiz on 365 he's not here as a lawyer.  I

23  think this goes a little --

24       THE COURT:  I think this goes to argument.  You

25  can make the argument.  I don't think as a fact witness

1  you're going to get anything out of him on 365(n), are you?

2          MR. HORNUNG:  Not looking for his legal opinion,

3  just setting the groundwork to ask my -- I'll move quickly

4  through.

5          THE COURT:  You can move forward.

6  BY MR. HORNUNG:

7  Q     My question to you is simple.  As part of the analysis

8  to whether or not to enter into this settlement did the

9  debtors do any analysis of potential royalty streams under

10 365(n) of the Bankruptcy Code?

11 A     We didn't think that was viable because you're assuming

12 you have a standalone business here.  Clearly, it was obvious

13 to us that the feedback from the customers is that they

14 didn't want to do business with Weinstein as an entity

15 because of the issues surrounding the company.  They, the

16 banks, were very supportive of the sales process so we can

17 sell it as a going concern.

18        The message to the company and to me was if these

19 assets were on a different platform with different ownership

20 and then we'll talk about doing business with you.  So, the

21 idea that we looked at 365 and tried to find a standalone and

22 say that this would work was not something that we thought

23 was realistic, that I thought was realistic.

24 Q     Okay.  So, you didn't do any analysis of 365(n) royalty

25 streams?

1  A    We did not because we didn't think that that was a

2  viable alternative.

3  Q    Okay.  Now, let's talk about other creditors.  Now, the

4  debtors have argued that the settlement would avoid other

5  potentially higher unsecured claims against the estate, is

6  that right?

7  A    Yes.

8  Q    Now, the debtors didn't actually do any analysis of

9  those claims in the absence of a Netflix agreement, did they?

10 A    We did a claims analysis.

11 Q    I'm asking as it relates to the stipulation that we're

12 here on today.  The debtors didn't do any analysis of what

13 possible other unsecured claims might show-up without this

14 agreement, did they?

15 A    If we had a failed sales process, we'd have all kinds

16 of unsecured claims.

17 Q    That was tied to the sales process. I'm asking about

18 this stipulation by itself.  The debtors didn't do any

19 analysis of other potential unsecured claims that would be

20 asserted in the absence of a settlement with Netflix.  Yes or

21 no?

22 A    I don't want to be argumentative, but if this sales

23 process didn't occur there will be additional claims.  So,

24 again, the significance of not closing this deal outweighed

25 this.  If you're asking me did we analyze one specific claim

1  as it relates to Netflix and its impact; no.  Did we analyze

2  the fact that there would be a significant meltdown if we

3  didn't sell this company; yes.  That is the reason we pushed

4  to have the sale.

5  Q     Okay.  So, your analysis was tied to the closing of the

6  sale, but it was not at all tied to finalizing a settlement

7  with Netflix?

8  A     We looked at the value of finalizing the settlement

9  which was driving the closing of the sale.  We did claims

10  analysis.  We understood the claims pool.  Quite frankly,

11  this claim, although very significant to your client, is

12  pretty small in comparison to the total claims pool.  When

13  you hear about what the tort claims estimates are as well as

14  just the general trade claims that exist that we look.

15  Q     Okay.  So, you didn't quantify the amount of claims

16  that would be asserted in the absence of a settlement?

17  A     I don't understand your question.

18  Q     Well, you keep talking about that you looked at whether

19  or not the sale closed.  I am asking whether or not you ever

20  bisected, and took apart and looked at the settlement

21  separate from the sale?

22  A     I was aware of the loan that Viacom had against Scream

23  3, but again thinking about the settlement with Netflix the

24  focus was settle with Netflix, have a successful sale, don't

25  settle with Netflix your sale craters and then it impacts

1  both secured and unsecured creditors.

2  Q    Okay.  You've said a few times that you believe one of

3  the primary benefits of the settlement with Netflix is that

4  it allows the sale to close.  Is that a fair statement?

5  A    Yes.

6  Q    Okay.  And you learned this from Andy Mitchell?

7  A    That was one of the sources, yes.

8  Q    What other sources were there?

9  A    As I testified before I also heard in the bank

10 community that that was important for them to have their bank

11 financing in place.

12 Q    Okay.  And you understood from Andy, he told you that

13 Lantern would not close the transaction without funding from

14 its banks?

15 A    What he told me was that he wouldn't write an equity

16 check for the entire amount that he needed to have bank

17 financing.

18 Q    So, that was a fairly significant financial contingency

19 to the closing of the sale, wasn't it?

20 A    What is your definition of financial contingency?

21 Q    Well, how about a financing contingency.  That is a

22 fairly significant financing contingency, isn't it?

23 A    I think it was more of a statement of fact versus a

24 financing contingency.

25 Q    Okay.  Now, is there anything in the APA that addresses

1  this financing contingency we just discussed?

2           MR. QURESHI:  Objection, Your Honor; calls for a

3  legal conclusion.

4           THE COURT:  Overruled.

5           THE WITNESS:  There was not a financing out in the

6  APA.

7  BY MR. HORNUNG:

8  Q    I'm sorry.

9  A    It was not a financing out in the APA.

10 Q    Okay.  So, let's talk about some guideposts.  So, early

11 on in the bankruptcy I think it might have been on the first

12 day the debtors filed a motion to approve some bid

13 procedures.

14 A    Yes.

15 Q    All right.  And as part of that they also asked that

16 Lantern be approved as the stalking horse bidder?

17 A    Yes.

18 Q    Okay.  And you're familiar with the term qualified

19 bidder?

20 A    I am.

21 Q    Okay.  One of the -- in order to be a qualified bidder,

22 the bidder had to have its financing in place, is that right?

23 A    Yes.

24 Q    Okay.  No financing contingencies?

25 A    That is correct.

1  Q     Okay.  Now, April 6th the court entered the order

2  approving the bid procedures and approved the stalking horse

3  bidder as a qualified bidder.  At that hearing did the

4  debtors disclose to the court that Lantern had this

5  significant financing contingency?

6  A     There wasn't a financing contingency at that time.  It

7  wasn't a financing contingency.  What we spent a fair amount

8  of time discussing with counsel, I'm not going to go into

9  privileged conversations, but at the end of the day the way

10 these agreements work is commitment letters aren't what they

11 used to be when I first started my career.  There is lots of

12 language in there that gives you room to wiggle.  And whether

13 it's issues that the financing sources believe or not as what

14 they thought they were that there is an ability for them to

15 not come forward with the financing.  How you enforce that is

16 you litigate, and you bring out all this, and was this a hard

17 commitment, did they have the right to do that.  We didn't

18 have resources to do that.  The decision, obviously, everyone

19 is well aware there was a purchase price adjustment here

20 which was agreed to.

21     At the end of the day until you have a closing you have

22 no deal.

23 Q     Okay.  But my question is simply did you or anyone else

24 from the debtors disclose this issue to the court.

25 A     Because this issue didn't exist at that time.

1   Q      Okay.  So, it hadn't existed at the beginning of April.

2          May 1st Lantern is declared the successful bidder?

3   A      Yes.

4   Q      Okay.  May 9th the court holds a hearing and approves

5   the sale to Lantern?

6   A      Correct.

7   Q      Okay.  You testified at that hearing?

8   A      I did.

9   Q      Okay.  Did you tell the court then at that hearing that

10  the closing of the transaction was contingent upon resolution

11  of the Netflix objections?

12  A      It wasn't an issue.

13  Q      Okay.  After May 9th issues did arise between Lantern

14  and the debtors about the closing of the deal?

15  A      There were a number of issues, yes.

16  Q      Okay.  The parties sent letters back and forth to each

17  other?

18  A      There was an avid writing campaign.

19  Q      The debtors threatened to sue Lantern?

20  A      There was discussion about that.

21  Q      And Lantern also threatened to assert counterclaims

22  against the debtors?

23  A      Yes.

24  Q      Now, eventually the debtors did reach a settlement

25  agreement with Lantern, isn't that right?

1  A      Yes.

2  Q      And that resulted in an amendment to the asset purchase

3  agreement?

4  A      That is correct.

5  Q      And ultimately it resulted in a motion to the court?

6  A      That is correct.

7  Q      Okay.  So, on June 27th the debtors filed a motion to

8  amend the APA with the court?

9  A      Yes, that is correct.

10  Q     Okay.  And in that motion one of the things that the

11  debtors argued is that this amendment to the -- excuse me,

12  this amendment to the APA was important because it would

13  ensure that the sale to Lantern closes.  Do you agree with

14  that?

15  A     I remember that statement, yes.

16  Q     Okay.  And in that motion, you also -- the debtors also

17  stated that parties had agreed that all conditions for

18  closing the transaction had been satisfied.

19  A     Yes.

20  Q     Okay.  And the motion also stated that Lantern is

21  required to close regardless of the resolution of any pending

22  objections to the assumption and assignment of the contracts.

23  A     Yes.

24  Q     Okay.  And that motion -- excuse me, one of the reasons

25  that it was so important to do this amendment was because

1 Lantern's financing commitment was going to expire on July

2 15th.

3 A     That is correct.

4 Q     So, in that motion on June 27th you didn't disclose to

5 the court that the closing of the sale was contingent upon

6 resolution of the Netflix objections; did you?

7 A     That argument wasn't made.  There was still active

8 conversations going on to try to resolve the Netflix --

9 Q     Okay.  So, you didn't disclose it to the court?

10 A     No.  There wasn't anything to disclose.

11 Q     What you knew about -- you knew that Mr. Mitchell had

12 told you weeks earlier that -- excuse me, around that time

13 that he wasn't going to close without a resolution to the

14 Netflix objections.

15 A     He told me that was important.  He didn't give me an

16 ultimatum at that point in time.

17 Q     When was the ultimatum given?

18 A     It was pretty close to closing.

19 Q     Now, July 9th you submitted a declaration in support of

20 the motion to amend the APA?

21 A     Yes.

22 Q     Okay.  And, again, in that declaration you didn't

23 disclose to the court that the closing of the sale was

24 contingent upon the Netflix objections?

25 A     It was still very fluid at that time.

1  Q      Okay.  But you didn't disclose it?

2  A      There wasn't anything to disclose.

3  Q      Again, didn't tell the court about it in that

4  declaration?

5  A      Look, I think what you need to understand there was

6  multiple conversations, some going on with your client as

7  well.  And at one point in time I was told that your client

8  was very important to have on board.  Netflix was very

9  important.  There were other customers.  Ultimately the

10  decision was made I think after talking to the financing

11  source that if they could lockdown Netflix, they could close

12  the deal even though they didn't have other arrangements

13  locked down.  I think the financing source and their

14  syndicate got comfortable with that.  That was all going on

15  real time as we went into the closing.

16  Q      Okay.  In that declaration you put out on July 9th you

17  again testified that all conditions for closing the

18  transaction have been satisfied, didn't you?

19  A      Our position all along was that they had a hard

20  commitment and they had to close.  We weren't backing down

21  from that.  We had some pretty interesting conversations

22  regarding that particular topic.  There is legal conclusions

23  and then there's reality.  I happen to live in reality

24  because I'm a business person.  And until somebody is ready

25  to fund I don't have anything.

1    So, I'm staring at my DIP blowing up, their financing

2 conditions blowing up.  We're coming into the week of July

3 13th and I'm trying to figure out how to hold this deal

4 together.  And on the 13th, the night of the 12th, late into

5 the night I was told there was no way that they could close

6 on the 13th.  You can imagine the response that I gave them

7 after I heard that.

8    So, I physically willed the closing on the 13th because

9 I didn't want this financing contingency or financing

10 commitment to blow-up as well as the DIP to blow-up.  And we

11 closed on the 13th.  Everyone told me it was impossible.  So,

12 if you've been involved in a lot of transactions, and I'm

13 sure you have, there's always these last minute, what I would

14 call, gymnastics that go on before you close and that was

15 going on here.

16 Q    Okay.  No one is doubting the great efforts that you

17 put towards getting a sale closing, its --

18 A    It wasn't just me; myself and a large team of people

19 that were working day and night.

20 Q    Absolutely. I'm sure that lots of people did lots of

21 hard work, but my question is really a simple question.  On

22 July 9th you submitted a declaration to the court in support

23 of a motion to amend the APA and in that declaration, you did

24 not disclose that the closing of a sale to Lantern was

25 contingent upon resolution of the Netflix objections, did

1 you?

2 A    I'm very comfortable with the declaration I made.  What

3 I'm telling you is our positon was that they have to close

4 and we continue, myself, legal counsel continue to say that.

5 Reality was he wasn't going to write an equity check if he

6 didn't bring his banks in.  He was negotiating and,

7 ultimately, he brought his banks in, there was a deal cut

8 with Netflix.

9     Look, there is a negotiation going on between a pretty

10 significant counterparty.  I'm sure that if Netflix rolled

11 over, they could have cut a deal a couple of months before,

12 but they were trying to do what they should do which is

13 trying to get the best deal they can for their shareholders.

14 Q    You're going to great lengths --

15 A    You have to understand this is a negotiation.  Things

16 are fluid.  Our view was they had a commitment, they had to

17 close.

18 Q    -- not to answer my question.  So, I am going to answer

19 it one more time and see if we can get a yes or no to the

20 question.  Did you disclose it to the court; yes or no?

21 A    I disclosed to the court what I believed was the truth

22 and what was proper.  At that point in time I wasn't

23 convinced that that was a contingency because there was still

24 active negotiations going on.  We were still involved.  Quite

25 frankly, we had other issues to that we were working through.

1  Q    Okay.  So, then there's a hearing on the 11th.  You

2  were at that hearing?  To be clear, the hearing on the motion

3  to approve the amendment to the asset purchase agreement.

4  A    I don't remember if I was at that hearing.

5  Q    Okay.  But you were cross-examined at the hearing.

6  Does that ring a bell?

7  A    I went to a lot of hearing.  I'm not great with dates.

8  Q    Okay.  Well --

9  A    I remember the 13th at 5:30 when we closed.  That I

10  remember.

11  Q    Okay.  Well, we'll get to that.  Just going back to

12  this July 11th hearing, you didn't tell the court at that

13  hearing this deal is going to blow-up if the Netflix

14  objection is not resolved, did you?

15  A    Look, in 30 years if I would run to the court and tell

16  them every deal that would blow-up when people threaten me

17  I'd be in here every five minutes.  That is the nature of

18  negotiations.  It's not closed until it's closed.

19  Q    Didn't disclose it to the court then?

20  A    I disclosed what I disclosed.  I feel very comfortable

21  with the disclosures we made.  This was a fluid and active

22  negotiation.  And until 5:30 on July 13th I didn't know if

23  this was going to close or not, but we made every effort to

24  close it.

25  Q    Okay.  So, July 13th the sale closes.  So, Lantern has

1  paid the purchase price for the assets?

2  A     Yes.  Wires came in.

3  Q     Okay.  The banks and the Union Bank facility they were

4  paid in full?

5  A     Yes.

6  Q     Bank of America facility that was also paid in full?

7  A     Not at the closing.

8  Q     But, ultimately, they were paid in full?

9  A     Yes, after significant conversations with both Bank of

10  America and the unsecured creditors.  Yes, they were paid in

11  full.

12  Q     Okay.

13  A     Mr. Tenzer here can tell you about those discussions.

14  Q     The mezzanines that was also paid in full?

15  A     Yes.

16  Q     Okay.  Now, the stipulation that we're here on today

17  you're aware that to be effective it has to be approved by

18  the court?

19  A     I'm very well aware of that.

20  Q     Okay.  And it hasn't been approved by the court yet.

21  A     I'm aware of that as well.

22  Q     The sale has already closed?

23  A     The sales have closed, yes.

24  Q     Okay.  There is nothing in the APA that allows Lantern

25  to undo the closing if the settlement with Netflix is not

1  approved, is there?

2  A    Not that I'm aware of, but you got a lot of lawyers in

3  here and you can ask them their legal opinion.

4  Q    Okay.  To your knowledge nothing in the sale order that

5  allows Lantern to undo the closing if this settlement is not

6  approved?

7  A    Again, not that I'm aware of.

8          MR. HORNUNG:  Nothing further.

9          THE COURT:  Thank you.

10          Any redirect?

11          MR. QURESHI:  No redirect, Your Honor.

12          THE COURT:  All right.  Thank you, Mr. Del Genio.

13  You may step down.

14      (Witness excused)

15          THE COURT:  Any other testimony?

16          MR. QURESHI:  No other testimony, Your Honor.  I

17  believe there are some documents that you wanted to admit

18  into the record which I think are just the underlying

19  contracts.  They have been attached to prior pleadings.  So,

20  I am not sure that there is a need to do anything with those.

21          MR. HORNUNG:  Your Honor, we'd agree to stipulate

22  to the admissibility of these contracts.

23          THE COURT:  Okay.

24          MR. HORNUNG:  The Netflix agreements, I believe,

25  are in with the Viacom agreements.  I don't believe ours.

1  So, for a complete record we think the court should have it.

2        THE COURT:  All right.  You may hand them up and

3  they'll be admitted.

4        (Debtors Exhibit 1, admitted into evidence)

5        MR. QURESHI:  So, Your Honor, I think that

6  completes the evidentiary record.  So, if I can just very

7  briefly turn to argument.

8        THE COURT:  You may.

9        MR. QURESHI:  Thank you, Your Honor.

10       I can be brief because, frankly, with this record

11 I don't think on the 9019 standard that this is very much of

12 a close call.

13       Your Honor, it's clear that Viacom is not

14 objecting to this settlement because of any good faith

15 allegation that the settlement is not in the best interest of

16 the debtors' estate.  Viacom is quite transparent that they

17 object to the settlement because they don't think it's good

18 for Viacom.

19       Viacom is arguing that the debtors should have

20 rejected a settlement, that Mr. Del Genio has testified, that

21 enabled a going concern sale in favor of the debtors pursuing

22 protracted and expensive litigation that would have been only

23 to Viacom's benefit.

24       This line of cross examination about, well, a

25 suggestion that unsecured claims are not materially benefited

1  as a result of the settlement or are worse because of the

2  dilution associated with the additional claim that Viacom

3  has.  Your Honor, the testimony is that that would be

4  absolutely crushed by the increased secured and unsecured

5  claims that would have resulted if this went into a forced

6  liquidation.

7        We all recall the difficulty of the circumstances

8  around the sale at the time and the record is very clear from

9  Mr. Del Genio that in his judgment, in the debtors' business

10  judgment, that the choice that they had at the time was

11  litigate with the company's most significant customer 70

12  percent of the revenue the year prior and imperil the ability

13  to consummate a going concern sale.  Given the dollars at

14  issue in the settlement and the benefit to the estate of

15  consummating that sale that's not a close balance, Your

16  Honor.

17        In addition, Your Honor, if one completely ignores

18  the economics, which weigh so heavily in favor of this

19  settlement, and focus solely on the merits of the actual

20  litigation further justification for the settlement. The key

21  man provision that was testified to, the so-called key man

22  provision of the contract, there's no dispute that both

23  Harvey and Bob Weinstein were to have no role whatsoever in

24  Lantern Entertainment following this acquisition; that was a

25  breach of the contract, that would have been.

1        There's also no dispute, Your Honor, that a

2   condition precedent for Netflix's obligation to license and

3   pay for season three of Scream is that it first air on MTV.

4   Somewhat ironic that Viacom, in control of MTV and,

5   therefore, in control of satisfying that condition, elected

6   not to air season three on MTV.  So, again, when one looks at

7   the actual merits the litigation, had it occurred, not a

8   very favorable position for the debtors to be litigating that

9   issue?

10       Your Honor, it also, I think, is worth reminding

11  the court of the chronology here.  The initial notice by

12  Netflix to purportedly terminate any further obligation to

13  license or to pay for new content from the debtors that

14  notice was filed prepetition.  So, this dispute was in

15  existence prior to the petition date.  They had a number of

16  grounds that were alleged prepetition for their right to do

17  that.  So, there was a history, Your Honor, of back and forth

18  between the parties, vigorous negotiations to see if there

19  was any way that that dispute could be resolved earlier.

20  Ultimately, it came down to what Your Honor heard from Mr.

21  Del Genio, this being an issue as to whether the sale would

22  be consummated or not.

23       So, in light of that record, Your Honor, and in

24  light of the 9019 standard and having to demonstrate that the

25  business judgment of the debtor in entering into this

1  settlement was reasonably exercised I think, Your Honor, that

2  this settlement is well within the range.  Again, given the

3  vastly disproportionate benefit of entering into the

4  settlement and consummating the sale, and the consequences of

5  failing to consummate the sale and litigating with Netflix

6  instead are so one-sided and so lopsided that the 9019

7  standard is satisfied.

8       And, Your Honor, Mr. Del Genio's testimony also

9  establishes that he was very properly focused not on the

10  parochial interest of a specific creditor, but on what was in

11  the best interest of the debtors' estates as a whole and what

12  was in the best interest of all of the debtors' creditors

13  both secured and unsecured.

14       So, for those reasons, Your Honor -- also, I think

15  it bears mentioning, and I'll end with this, that there are

16  other terms of the settlement that we haven't discussed on

17  the record, Your Honor, but that also provide benefit here.

18  So, Netflix agreed to accept delivery of a couple of other

19  programs, Spy Kids 2; Crouching Tiger, Hidden Dragon.  The

20  other audit issue was mentioned.

21       Finally, Your Honor, we don't know whether season

22  three of Scream, which is property of the estate, will have

23  any value, whether there is any way for the estate to

24  monetize it.  Irrespective of that issue, Your Honor, again,

25  I think on this record the 9019 standard is easily satisfied.

1  So, unless the court has any questions, I think Netflix may

2  want to be heard.

3          THE COURT:  Okay.

4          MR. QURESHI:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. STERN:  Good afternoon, Your Honor; David

7  Stern appearing on behalf of Netflix.  I will be very brief.

8          On the merits I think Mr. Qureshi has adequately

9  covered it as to the pleadings.  I would only rise to respond

10  to what amounted to a last question that had to do with now

11  that the sale has closed if the court were to disapprove the

12  9019 the sale wouldn't be undone.  My reaction to that is

13  that that's a heck of a way to run a system, results in a lot

14  of *ex parte's* on an order shortening time, but the bottom

15  line is that if the sale, if the deal is not approved all

16  that would happen is that we would return, at best for the

17  estate, to a situation in which it now had the ability to

18  litigate against Netflix with limited resources

19          We feel that we have an extremely strong case, as

20  Mr. Qureshi said and debtors don't often say that, but if one

21  takes a look at the various defenses, not all of which we

22  have articulated and there are more that we have since

23  articulated to them including specific facts relating to

24  Scream 3, the simple fact is all their going to get is a

25  piece of litigation that has a low likelihood of success.

1  From Netflix's standpoint we don't want that for the simple

2  reason that we're happy to be done with the Weinstein

3  Company, happy to be done with litigation.

4        My clients would rather pay the money to Netflix

5  or Lantern -- excuse me, to TWC or Lantern then to our firm,

6  but the end result would be that we would wind-up litigating,

7  Your Honor would wind-up hearing a bunch of stuff and I think

8  at the end of the comments that Mr. Qureshi adverted to would

9  come true.  The end result would not be a very happy one for

10  the Weinstein Company, its creditors or Lantern.

11        Viacom is, obviously, trying to do the best it can

12  under the circumstances.  It would like to have a shot at the

13  revenues.  That is simply not a basis to undo a deal that was

14  made in good faith among the parties at a time that is a

15  little different from the present, but that remains the

16  relevant testing point.

17        Thank you.

18        THE COURT:  Okay.  Thank you.

19        Viacom?

20        MR. HORNUNG:  Thank you, Your Honor.  Stephan

21  Hornung once again, Luskin Stern & Eisler, on behalf of

22  Viacom International, Inc.

23        Viacom is one of the largest, if not the largest,

24  commercial creditors in this bankruptcy with a claim that

25  exceeds $50 million dollars.  Now, the burden is on the

1  debtors to prove that the agreement reached with Netflix is

2  fair and reasonable and in the best interest of the debtors'

3  estates and the creditors.

4         While we recognize that the burden on a motion to

5  approve a settlement, such as this is low, we believe this is

6  one of those rare cases where they have not met their burden.

7  There does not appear to be any benefit to the estate from

8  the settlement and nothing in the ever changing growing list

9  of justifications for the settlement changes that conclusion.

10         In support of the debtors'' motion we were first

11  told that the settlement would avoid costly litigation,

12  uncertain protracted and it would also result in the waiver

13  of a $326,000 dollar claim.  The debtors' offer nothing in

14  support of this claim other than vague generalities and the

15  audit claim is a cure cost under the Netflix agreements to

16  benefit to Lantern, not the debtors.

17         On reply the debtors added a new reason.  They

18  said the Netflix agreement would avoid potential other higher

19  unsecured claims, but sitting here today we still don't know

20  what those other unarticulated claims are; we don't know who

21  is going to assert them, we don't know how high they were, we

22  don't know anything about them other them rampant

23  speculation.

24         Finally, Mr. Del Genio told us for the first time,

25  two weeks ago in a declaration that was submitted after the

1  first hearing on this matter, that actually notwithstanding

2  everything else to the contrary the real benefit of the

3  settlement is that it allowed the sale of Lantern to close.

4          Now, this new justification wasn't disclosed to

5  the court when the court approved the sale.  It wasn't

6  disclosed to the court when the court approved the

7  modification to the sale agreement.  It was only first

8  revealed to the court and everyone else just two weeks ago in

9  a redacted declaration.

10          Now, the stipulation with Netflix and the

11  undisputed facts in this case actually belie this new claim.

12  The stipulation itself states that the settlement was

13  contingent on closing, not the other way around, and the

14  sale, the one we're told that could not close without a deal

15  with Netflix, well, it closed; it came and went, and it can't

16  be unwound.  It was all done without an effective settlement

17  with Netflix.

18          Neither Lantern nor Netflix had an incentive to

19  protect Viacom's collateral, the millions of dollars in

20  license fees related to Season 3 of Scream.  Netflix was able

21  to avoid a multi-million dollar liability and Lantern was

22  able to use Viacom's collateral to secure a lucrative cash

23  stream from the Netflix deals, but the debtors they did or

24  should have had an incentive to see that Viacom's secured

25  claim, the claim collateralized by season three of Scream,

1  was paid.  And failing to do so resulted in a $9 million

2  dollar unsecured claim by Viacom against the debtors'

3  estates.

4         Now, there is nothing in the record indicating the

5  debtors considered any alternatives to this settlement or to

6  any analysis as to how this settlement would affect claims

7  against the estate or recoveries to unsecured creditors.

8  Instead, they appeared to have rubberstamped whatever

9  agreement Lantern and Netflix reached so that they could

10  close the deal.

11         Simply put, the record is devoid of facts that

12  would allow this court to evaluate the debtors' cost-benefit

13  analysis or allow the court to make a determination that this

14  settlement is fair and reasonable and in the best interest of

15  the debtors' estate.

16         I am not going to go into too much length, but

17  just by way of background Viacom's claim against the debtors

18  is $9 million dollars.  It came about in the fall of 2017

19  when the debtors were experiencing significant cash-flow.

20  Viacom stepped up to the plate and funded $30 million dollars

21  to continue and complete various series.  As it relates to

22  Netflix the debtors pledged the revenues streaming from the

23  international distribution of Scream 3.  Repayment was due by

24  December 30th, 2017 and if it was not repaid by the maturity

25  date Weinstein Television was required to pay interest at 10

1  percent per annum and reimburse Viacom for its cost and

2  expenses.

3         You heard from Mr. Del Genio the revenue stream

4  from this deal was $12 million dollars.  If Netflix accepted

5  season three of Scream Viacom's claim is paid in full and

6  there's actually some money left over.  There is no increased

7  claims against the estate.

8         Now, Mr. Del Genio also pointed out that there was

9  three parties involved in this settlement; you have Netflix,

10 you have Lantern and you have the debtors.  And I think it's

11 important to look at each of those three constituencies

12 separately.

13         The benefit to Netflix is clear; the output

14 periods were terminated as of July 11th, Netflix is relieved

15 of its obligation to accept season three of Scream and

16 Netflix gets to cherry-pick other content that it wants.  For

17 example, season two of Spy Kids and Chronicles of an Escape.

18 But there is no explanation in the record of the cost and

19 benefits of this trade-up for the debtors or why these

20 programs were treated differently than season three or how

21 this trade benefits the estate at all.  In exchange for doing

22 all this Netflix gave-up nothing.

23         The benefits to Lantern are equally clear.  They

24 get to take an assignment of the Netflix contracts without

25 litigation.  Netflix waives the $326,000 dollar audit claim;

1   otherwise, payable as a cure cost.  They receive lucrative

2   license fees for content that was delivered prior to July

3   11th, 2018.  Again, they gave-up virtually nothing to do this

4   because it was Viacom's collateral that they used to buy the

5   settlement.

6          The benefits to the estate, they're not so clear.

7   First, we were told that the settlement would avoid costly

8   protracted litigation, but we don't have anything in the

9   record supporting that.  These were garden variety contract

10  claims that are litigated every day in the bankruptcy court

11  across the country.

12         Scream 3 was completed before the closing.  There

13  is no dispute that the Weinstein's were still involved, at

14  least Bob Weinstein was still involved when it was completed.

15  They tried to deliver it and Netflix improperly rejected it.

16         The $326,000 dollar audit claim was the next thing

17  we're told that saves the estate, but, again, this is a cure

18  cost.  It's bored by Lantern and Mr. Del Genio conceded that

19  there was no direct benefit to the estate.

20         Finally, we get to the avoidance of other

21  unsecured claims.  Debtors argued that the settlement is in

22  the best interest of the estate because it avoids other

23  potential unsecured claims that may have been higher, but,

24  again, we will have to guess what those claims are, who has

25  them or how high they might be.  They are not identified in

1   the papers, in the motion, in the reply or in Mr. Del Genio's

2   direct examination.  And there is nothing in the record

3   except speculation that any such claims exist or that if they

4   do these claims exceed the $9 million dollar claim which is a

5   certainty.

6           Now, Viacom does not seek to interfere with the

7   debtors' rights to reject executory contracts.  Viacom only

8   asked the debtors to actually exercise their discretion and

9   to explain the rational to the court.  There is no analysis

10  that was done regarding how this settlement with Netflix

11  effects claims against the estate or how it would affect

12  returns to creditors.  You heard from Mr. Del Genio, it was

13  all tied to the sale agreement and closing of the sale.

14          There wasn't any analysis about what would happen

15  if, for example, the Netflix contracts were rejected.  It's

16  hard to imagine that Netflix would have any serious rejection

17  damages.  They claim that they terminated the output period

18  prepetition and they would have to -- any damage claim would

19  be reduced by the amount of the license fees they'd have to

20  pay.  In fact, it's entirely possible that rejection of the

21  Netflix deals would actually benefit the estate.

22          Under 365(n) if there was a rejection Netflix has

23  to make a choice, do we terminate the agreement and put in a

24  rejection claim or do we continue to exercise our license

25  rates.  Where do those fees go?  They go to the estate

1  pursuant to the contract; not to Lantern.  There is a very

2  real possibility that not reaching a deal and not approving

3  this deal with Netflix actually benefits the estates, but the

4  debtors didn't consider that.

5        Finally, we're told by Mr. Del Genio that the sale

6  could not have closed without a deal with Lantern because

7  without -- excuse me, could not have closed the sale with

8  Lantern because without a deal with Netflix Lantern could not

9  get financing.  Of course, this financial contingency was

10  never disclosed to the court.  It wasn't disclosed at the

11  time they were seeking to approve the stalking horse bidder,

12  it wasn't approved at the sale hearing.  It wasn't approved

13  when they asked the court to approve a modification to the

14  APA.  That is notwithstanding representations to the court

15  that all conditions for closing had been satisfied and that

16  Lantern is required regardless of the resolution of any

17  pending objections to the assumption and assignment of

18  contracts.  That is right in docket number 1115 at Paragraph

19  29, and Mr. Del Genio's supporting declaration at 1188,

20  Paragraph 35.

21        The debtors addressed Lantern's financing

22  contingency in those papers, but they didn't bring this up.

23  They said, Your Honor, you have to approve this settlement

24  now because we need to close by the 15th; that was it.

25        Now, we have no reason to doubt that Mr. Mitchell

1  told Mr. Del Genio that Lantern needed a deal with Netflix to

2  close the sale, but the stipulation and the undisputed

3  factual record established that really wasn't the case, was

4  it?  The stipulation with Netflix was signed on July 13th the

5  date of the closing of the sale.  The stipulation, itself,

6  states that one of the conditions precedent to the

7  effectiveness of the closing of the sale to Lantern is --

8  excuse me, one of the conditions to the effectiveness of the

9  stipulation is closing of the sale to Lantern.  In other

10 words, the sale had to happen first not the other way around.

11          Finally, most importantly, the sale is already

12 closed without an effective deal with Netflix.  The debtors'

13 estates have already received the sale proceeds.  Senior

14 secured creditors and mezzanine debt have been paid in full.

15 The sale can't be unwound.  If the parties wanted to make the

16 closing of the sale contingent upon a deal with Netflix they

17 could have done.  Sophisticated parties represented by able

18 counsel.

19          The APA contains a whole list of closing

20 conditions. If it was a condition precedent to the sale, they

21 should have disclosed this months ago. Instead, on June 27th,

22 the debtors and Lantern told the court that all closing

23 conditions were satisfied and on that basis the court

24 approved amendment to the APA.

25          Now, the debtors and Lantern try to portray Viacom

1  as nothing more than a creditor looking out for itself and,

2  of course, there's nothing wrong with that.  Variance to a

3  major creditor is a valid and appropriate consideration in

4  deciding whether to approve a settlement.  Viacom's motives

5  do not relieve the debtors of their obligation to disclose

6  their cost benefit analysis of and improve the reasonableness

7  of the fairness of the settlement.  The debtors have utterly

8  failed to do so.

9        What we have is generalizations about the

10 complexity and cost of garden variety contract claims versus

11 certainty of a $9 million dollar unsecured claim with no new

12 assets to cover it.  We don't know why certain programs are

13 being picked up by Netflix, for example, Spy Kids season two

14 or Chronicles of an Escape and season three is not.  We don't

15 know whether Netflix created other key man clauses in their

16 other agreements, whether any other party's collateral is

17 being impaired by this settlement.  The actual monetary

18 benefits to Lantern as a result of the settlement.

19       Most importantly, we don't know what the tangible

20 benefit to the estate is now at this point in time after the

21 sale was closed.  The debtors do not appear to have

22 considered alternatives to a settlement with Netflix such as

23 rejecting Netflix contracts, but have analyzed how the

24 settlement with Netflix might affect the claim pool for the

25 return to unsecured creditors.

1        As I discussed before it's entirely possible that

2   a rejection of the Netflix contracts could actually result in

3   a substantial royalty stream to the debtors' estates.  Now,

4   we recognize that the burden for approving a settlement is

5   not high; however, there has to be some tangible benefit to

6   the estate. They have not and cannot articulate one here.  It

7   would be one thing if the debtors had disclosed in May, June

8   or July before the sale closed that the sale was contingent

9   upon the resolution of the Netflix objections, but they did

10  just the opposite; hiding the supposed condition from the

11  court all the while claiming that the amendment resulted in

12  the certainty of closing.

13        It was not until the debtors' fourth bite at the

14  apple on this stipulation that we were told that closing of

15  the sale was contingent upon this settlement; however, the

16  stipulation and the record prove just the opposite.  At this

17  point the sale is closed, the purchase price has been paid,

18  the debtors' senior secured creditors have been paid off all

19  before the settlement was approved and there's no mechanism

20  to undo the sale.

21        The only thing that is certain about this

22  settlement is that it will destroy Viacom's collateral and

23  will dilute the pool of unsecured creditors by $9 million

24  dollars.  The debtors get nothing out of this deal.

25              THE COURT:  But how is it destroying your

1   collateral?  Scream is still available.

2             MR. HORNUNG:  Well, our collateral is not the

3   actual project.  It's the revenue stream from the Netflix

4   deal.

5             THE COURT:  All right.  There's no evidence before

6   me that there won't be a revenue stream from the Scream

7   product.

8             MR. HORNUNG:  Well, it's a specific contract right

9   that's our collateral, so I can't say what the debtors might

10  offer up down the road.  But the actual security interest

11  and, Your Honor, it's in the binder that I gave you.  I

12  believe it's Exhibit 7 is the UCC-1 financing statement.  And

13  it's also in -- the security is, I think, in Exhibit 6. But

14  it's a specific contract that has been pledged.

15            THE COURT:  Only in the Netflix deal?

16            MR. HORNUNG:  That's right.  The Netflix deal for

17  international distribution --

18            THE COURT:  And the secured party's distribution

19  rights in the project.  And on-site projections.

20            MR. HORNUNG:  Sorry; you're looking at Exhibit 7,

21  the UCC?

22            THE COURT:  I'm looking at 7, your UCC-1, yes.

23            MR. HORNUNG:  So, I recognize that I'm not certain

24  that clause two is worth very much, but that security

25  interest -- if the debtors right in the secured party's

1  distribution rights, it has nothing to do with the Netflix

2  deal.

3          THE COURT:  So why is that destroyed by

4  eliminating the Netflix deal?

5          MR. HORNUNG:  Well, the secured party's

6  distribution rights in the project, the value of this deal is

7  in the distribution rights from the Netflix deal.  That's

8  where the money is.  That's where the $12 million dollar is

9  and that's clause one of the security interest.

10          THE COURT:  Well, I'm not sure I know that.  And

11  you say it's increased your unsecured claim, but without this

12  you'd have a secured claim.

13          MR. HORNUNG:  Excuse me; without what?

14          THE COURT:  With the settlement.  So, converting

15  your secured claim to an unsecured claim, I mean, I'm not

16  sure that's a negative from the debtors' perspective, is it?

17          MR. HORNUNG:  Well, the collateral -- there's no

18  more value to the collateral.  When we have -- if Scream 3

19  is accepted, we have $12 million dollar revenue stream

20  against a $9 million dollar claim that can be paid in full.

21          THE COURT:  Well, you're assuming that the debtor

22  would win that litigation.

23          MR. HORNUNG:  Well, it's a possibility.  I

24  recognize that there's uncertainty in litigation.  But I

25  would also point out that even if there's another option that

1   no one's, that only Viacom has addressed which is that it may

2   be more beneficial to the estate to simply reject these

3   agreements.   There's a huge revenue stream available there

4   that would actually benefit all unsecured creditors including

5   Viacom, but that hasn't been even analyzed by the debtors.

6           THE COURT:   Okay.   I hear your argument. Go ahead.

7           MR. HORNUNG:   I would point out as Mr. Del Genio

8   testified, 70 percent of the revenue was the Netflix deal.

9   So, I don't know what those proceeds are going to look like,

10  but, presumably, it begins with the millions and that could

11  be a huge revenue stream that goes to unsecured creditors.

12  But, again, we don't know. And, at this point, there's

13  nothing in the record to show the debtors looked into that.

14          THE COURT:   But you're also assuming that Netflix

15  will elect to keep that product. We don't know what

16  percentage Weinstein's projects were for Netflix.

17          MR. HORNUNG:   No that's certain; that's true.   We

18  don't know what Netflix would do.   But they've agreed to

19  assume these contracts here.   So, I think it's a fair

20  assumption that there's value in the content.

21          They're continuing to pay whatever is due under

22  the contract for all content delivered prior to July 11th.

23  The contracts themselves aren't terminated.   It's just the

24  output period that allows what was Weinstein to deliver a new

25  content.   So, the contract is still in existence, but it's

1 | just that delivery of new content that's cut off.

2 |      THE COURT:  Well, respectfully, I think you're

3 | trying to substitute your business judgment for that of the

4 | debtors.  And I don't think that's your or my role here.

5 |      MR. HORNUNG:  Well, Your Honor, we, obviously,

6 | disagree.  The last thing I would say is that the sale is

7 | closed. At this point, there is no benefit to the estate.

8 |      We're told that the important point of this

9 | Netflix deal was that it could get the sale closed.  Well,

10 | it's closed. And lo and behold the settlement is still not

11 | effective.  So, clearly, it wasn't.

12 |      THE COURT:  Well, but the sale has closed and the

13 | Netflix contract has been assigned to Lantern, correct?

14 |      MR. HORNUNG:  No, I believe that's exactly what

15 | we're here on now.

16 |      THE COURT:  It's subject to the settlement.

17 |      MR. HORNUNG:  It's subject to the settlement.  So,

18 | if Your Honor were to deny this motion, the Netflix agreement

19 | is still with the estate.

20 |      THE COURT:  Let me hear from the debtor on that.

21 |      MR. SHAPIRO:  Your Honor, Lantern -- one of the

22 | rights that Lantern bargained for in its asset purchase

23 | agreement was the right to select contracts that it wanted.

24 | And this was one of them.

25 |      So, if we decided to reject the contract before

1  today rather than entering the stipulation before closing,

2  notwithstanding their designation of the contract as one that

3  should be assumed and assigned, we would be trading

4  litigation with Viacom for litigation with Lantern.

5          So, respectfully, Your Honor, frankly, when given

6  the choice of closing or not closing the sale, I don't think

7  that's a difficult decision.

8          THE COURT:  Okay.  I'm sorry; did Viacom have

9  anything more to argue?

10          MR. HORNUNG:  Just, Your Honor, very quickly in

11  response.

12          I want to be clear.  I'm not suggesting that -- we

13  haven't suggested that the debtor should have rejected these

14  agreements prior.  What I'm saying is if the settlement is

15  not approved today and they're not able to assign those

16  agreements, at least, you know, Netflix has taken the

17  position that they can't be assumed and assigned without

18  their consent.

19          If those agreements are not assumed and assigned,

20  then this is going to be a liquidating plan, I believe, in

21  the future.  The logical thing to do is to reject these

22  agreements.  And the debtor should consider whether that's

23  actually better for their estate.

24          THE COURT:  All right, I hear you.

25          Anybody else?

1         MR. SHAW:  Good afternoon, Your Honor.  Kevin Shaw

2  from Whiteford Taylor & Preston, co-counsel with Akin Gump

3  Strauss Hauer & Feld for Portfolio Funding Company.

4         And I'm here to introduce co-counsel who's on the

5  phone telephonically, Edward J. McNeilly of Akin Gump.

6         THE COURT:  Yes.

7         MR. SHAW:  And with that, I'll give the --

8         THE COURT:  Thank you.

9         MR. MCNEILLY:  Good afternoon, Your Honor, Edward

10  McNeilly for Akin Gump Strauss Hauer & Feld on behalf of

11  Portfolio Funding Company, LLC I PFC.

12         PFC filed an objection to the original 9019 motion

13  and is party to the amended stipulation.  Your Honor, this

14  stipulation was the product of hard-fought commercial

15  negotiations and PFC supports the settlement.

16         Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MR. SHAW:  Nothing further, Your Honor.

19         THE COURT:  All right.  Well, let me do this.  Let

20  me render my ruling.

21         I do think that the debtor and Lantern have met

22  the standard for approval of this settlement with Netflix.

23  Everybody knows that the standard under the Third Circuit for

24  approval of settlements is a low threshold.

25         A court should deny approval of a settlement only

1    if the value to the estate is less than the worst it could

2    get if it did not enter into the settlement. And I think that

3    threshold has been met.

4            The settlement with -- from the debtors'

5    perspective at the time it entered into this settlement, the

6    benefits were that the settlement with Netflix allowed the

7    debtor to close the sale of its business as a going concern

8    with Lantern and realize the sale proceeds which allowed the

9    payment in full of senior secured debt and also resulted in a

10   recovered for unsecureds.

11           Per the testimony, at that time, the debtor had

12   concluded it was not able to reorganize as a going concern

13   and, therefore, the Netflix contract as to it was not

14   valuable.  It was only valuable if it could be sold as part

15   of the sale to Lantern.

16           The Lantern sale also eliminated many rejection

17   damage claims, as well as resulted in payment to creditors.

18   Although there was no financing contingency in the Lantern

19   asset purchase agreement, the testimony was that apparently

20   Lantern was not willing to close without a settlement with

21   Netflix which was the debtors' largest customer.

22           If it had not closed, there clearly would have

23   been a liquidation of this company and a considerable

24   litigation not only with possibly Netflix, but, certainly,

25   with Lantern.  So, considering the settlement from the

1   debtors' vantage point as of the time it agreed to it, it

2   clearly provided benefits to the estate.  But even if I were

3   to consider it from the vantage point of today, I still think

4   it is in the best interest of the estate.

5         An alternative to approval of this settlement is

6   to litigate with Netflix over whether or not the contract was

7   terminated; possibly to litigate with Lantern over whether or

8   not the debtors in breach of its sale agreement.

9         With respect to the first issue, I think

10  substantial defenses have been raised by Netflix as to

11  whether or not it had properly terminated the contract

12  prepetition because of the key man provision and also,

13  because of the fact that a condition to it accepting Scream 3

14  had not been met.

15        In addition, though, Viacom argues that the

16  litigation would be garden variety.  But, again, I think that

17  the debtor stands a high likelihood of losing that

18  litigation.

19        Viacom also argues that if I deny the settlement,

20  the debtor could then reject the Netflix contract, but that

21  begs a question about whether or not the contract was still

22  executory. There's a dispute as to whether or not the

23  contract was terminated prepetition which might eliminate the

24  debtors' ability to reject the Netflix contract under 365 and

25  may eliminate any rights under 365.

1          And I also am not sure if Viacom is correct that

2    Netflix would certainly elect to continue to receive revenues

3    under 365.  There are a lot of if's in that argument.  And

4    the debtor would have to win all of them in order to result

5    in any recovery for the estate.  And that is before I even

6    consider comparing that recovery against the recovery that

7    resulted from the sale of the debtor as a going concern.

8          I just think that -- I agree with the debtor and

9    Lantern that this is not a close call. The settlement

10   certainly provided substantial benefits to the estate by

11   allowing the sale to close and still provide substantial

12   benefits to the estate by eliminating the need to litigate

13   issues that, without considering all of the testimony, at

14   least, that first appeared to be losers for the debtors.

15         So, I will approve the Netflix settlement.

16         MR. SHAPIRO:  Thank you, Your Honor.  I think

17   we'll submit an order under certification, if we haven't done

18   so.

19         THE COURT:  Okay.

20         MR. SHAPIRO:  Next are items 9 --

21         UNIDENTIFIED SPEAKER:  Your Honor, may we be

22   excused as counsel for Netflix.

23         THE COURT:  You may.  Thank you.

24         UNIDENTIFIED SPEAKER:  Thank you very much.

25         MR. HORNUNG:  Also, counsel for Viacom as well.

1          THE COURT:  You may.

2          MR. HORNUNG:  Thank you.

3          THE COURT:  All right, where are we going next?

4          MR. SHAPIRO:  Items 9 and 10 are motions to seal.

5          THE COURT:  Seal motions.  There have been no

6  objections?

7          MR. SHAPIRO:  Yeah, so I would suggest that the

8  movants file their orders under COC after the hearing, if

9  that's okay with Your Honor.

10          THE COURT:  That's fine and I will approve them.

11          MR. SHAPIRO:  Okay.  The next item is item number

12  11.  That is a motion to compel the assumption and assignment

13  of certain contracts.

14          I would turn the podium over to the movant, Your

15  Honor.

16          THE COURT:  Thank you.

17          MR. SABIN:  Good afternoon, Your Honor.  Jeff

18  Sabin from Venable on behalf of Tom Ford and his wholly-owned

19  entity Fade to Black Productions as the copyright owner and

20  licensor of various rights to a movie called, A Single Man,

21  purchased by Lantern under the APA.

22          And also, as movant, for Kevin Williamson and his

23  wholly-owned company, Outerbanks Entertainment as a producer

24  and writer of multiple works of movies and TV including

25  Scream 4 and Scream TV Season one, two, three, purchased by

1  Lantern.

2        Your Honor, in connection with this motion to

3  compel, there are a number of documents as opposed to any

4  kind of testimony today that are in the public record and

5  that if I can approach now, it might be easier to follow my

6  argument.

7        THE COURT:  You may.

8        MR. SABIN:  Thank you, Your Honor.

9        THE COURT:  Thank you.

10       MR. SABIN:  Your Honor, we filed this motion,

11  Docket Number 1540, on September 25th.  There is a

12  supplemental declaration which simply attaches public

13  documents which is 1572.  And that simply attaches public

14  documents in the record.  Those attachments to my declaration

15  only relate to movant, Tom Ford.

16       The only timely objection has been filed by

17  Lantern.  Although it was filed as a joint objection on

18  behalf of Lantern and the debtors filed yesterday, we have

19  made clear that although we granted an extension to the

20  debtors until October 30, and they did not file any objection

21  by then, we never received, in writing or orally, any

22  requests for the debtors for an extension past October 30.

23  So, at this point, the only objection, in our view, is that

24  one filed by Lantern.

25       Your Honor, as we did this weekend, we turned back

1  the clocks.  I'd like to turn back the clocks because it's

2  been quite a while since this court first, otherwise,

3  entertained the sale motion on May 8th, to a courtroom that

4  was standing room only, if you remember.

5          And, of course, the record will show that although

6  the petition was filed on March 19th and the APA was signed

7  on March 19th, a day later the bid procedures and sale motion

8  were filed and the bid procedures order was entered on April

9  6th.

10         Those orders set a return date of October 2 in the

11 first instance. And our clients, together with other of our

12 clients, at the time, filed objections to the sale --

13         THE COURT:  October 2?

14         MR. SABIN:  Excuse me; May 2.

15         THE COURT:  May 2.  Thank you.

16         MR. SABIN:  May 2.  Filed objections to the sale

17 and to the cure procedures.

18         We're here today on the very limited piece of our

19 objections that relate to the sale, and I'll be talking about

20 that initial version of the APA and, in particular, Sections

21 2.8(a) and 2.8(c).  And, indeed, Your Honor, that is Tab 1 in

22 your binder.

23         In addition, as we turn back the clocks, the first

24 sale order was entered on May 9th.  And as you may recall, it

25 took an awful long time before the parties in the courtroom

1   got to a form of order that instead of occupying days of

2   litigation at a point in time when the only game in town was

3   to earn the value that became inherent in the APA.

4           That there was effectively a preservation of

5   rights of all of the then people who had filed objections to

6   the sale and/or to the cure procedures.  And, indeed, Your

7   Honor, as you turn to Tab 1, those preservation of rights on

8   page 17 of Tab 1, recital 00 or OO.  And, again, --

9           MR. QURESHI:  Excuse me; Mr. Sabin, can I have a

10  copy of the binder, please?

11          THE COURT:  Excuse me; can you contact the

12  operator and have her mute whoever is -- has us on hold.

13  Thank you.

14          MR. SABIN:  So, as I was saying, recital OO in

15  paragraph 61.  Preserved, among other objections, the

16  objection of May 2, which I believe is next in your binder,

17  and, in particular, on May 2 objections, paragraphs 37 and

18  38; otherwise, objected --

19          THE COURT:  Paragraph 37 and 38.  Paragraph 37 and

20  38, you're saying?

21          MR. SABIN:  Yes.  Our objection of May 2.

22          THE COURT:  Oh paragraph 37 and 38 of your

23  objection?

24          MR. SABIN:  Correct.

25          THE COURT:  Okay.

1    MR. SABIN:  And we, otherwise, focused on the

2  aggregate reading of three sections; the bid procedures order

3  and we focused on paragraph 28 of that bid procedures order

4  which the second sentence thereof, in our view, said, But

5  just prior to the closing date, the final list of contracts

6  to be assumed was to be made public.

7    That section 28 of this court's bid procedure

8  order when we first read the APA said to us, gee, so we will,

9  at least, find out, just prior to closing, which contracts

10  will be designated for assumption.

11    So, we went back and looked at Section 2.8(a).

12  And in, I believe it's Tab 1, Your Honor, about the middle of

13  that section 2.8(a), it reads in relevant part, Prior to --

14    THE COURT:  Where are you again?  You're jumping

15  around.

16    MR. SABIN:  Tab 1 and it's attached to the

17  original order.

18    THE COURT:  2.1(a), yes.

19    MR. SABIN:  2.8(a), about the middle of the

20  paragraph, being in the line, one business day prior to the

21  bid deadline --

22    THE COURT:  Hold on one second.  Are you on the

23  attachment to the sale order?

24    MR. SABIN:  Yes.  To the sale order which is the

25  actual APA.

1          THE COURT:  Yes.

2          MR. SABIN:  And it's the original version.

3          THE COURT:  And 2.8(a).

4          MR. SABIN:  2.8(a), as in apple.

5          THE COURT:  Have it.

6          MR. SABIN:  And if you start about middle of the

7   paragraph down with the line that begins open parens, Arabic

8   one, business date prior to the bid deadline.

9          THE COURT:  Yes.

10         MR. SABIN:  The next sentence is the operative

11  sentence.  Prior to the closing date, the buyer, in its

12  discretion -- then comes to the mandatory word -- shall

13  designate, in writing, subject to dispute resolution that can

14  take place later with the counterparty to the contracts.

15         We then also looked at, if you flip the page to

16  2.8(c) as in car, the last sentence of 2.8(c) and effectively

17  that language created an internal conflict between 2.8(a) the

18  bid procedures order and 2.8(c).

19         That language appeared to give Lantern, the

20  negotiator, and I assume primary draftsman of this document,

21  a right to say, okay.  We'll give you the final closing list.

22  We'll designate which contracts go on that list, but if it

23  turns out that we don't like the result of an adjudication of

24  disputes relating to those contracts, the estate can have the

25  problem. We don't want it.  And we raised that objection the

1  very first time that we could on May 2 in our objection.

2          We continued to push objections, in particular

3  this objection, because as we watched the case unfold, as we

4  turn back the clocks not as far as May, but now we turn back

5  the clocks to June.

6          And on June 27th, there was a motion to amend the

7  APA.  On July 9th, the debtors filed a notice of an amended

8  APA. And what we said to ourselves, gee, behind the curtain

9  there's been an awful lot of toing and froing between the

10 seller and the buyer that related to what eventuated as a $21

11 million dollar purchase price reduction and some additional

12 rights with respect to what is now the 120-day free option.

13         And we, again, on July 10th -- and I apologize, I

14 didn't have an extra line in, but it's also in our objection.

15         On July 10th and July 9th in paragraphs five and

16 six of July 10th and July 9th, again, articulated our

17 preserved objection based upon our reading of 2.8(a); based

18 upon our reading of paragraph 28 of the bid procedures order;

19 and based upon our understanding of the law that the

20 contract, if there is an ambiguity internally, is going to be

21 construed against effectively the author of the contract.

22         And so, we made the argument and in the second

23 sale order, once again, in this court, I hope enjoyed your

24 vacation well earned while you were away.  Once again in

25 paragraph four of that second sale order is a full

1  reservation of rights, not only with respect to the original

2  APA, but with respect to the provisions that effectively

3  tried but didn't, again, change our argument.

4       2.8(a) if you agree with our reading in

5  conjunction with the Bid Procedures Act, the bid procedures

6  order does not contain any language about notwithstanding

7  anything in this agreement or in any order.  It is mandatory

8  language.

9       The sentence I read to you says they shall

10  designate just prior to closing the contract, even if they're

11  in dispute.  And ours was certainly in dispute.

12       And the record will show, and it's also in your

13  binder, that by a final closing list dated May 10th they,

14  otherwise, told us, both of us that our contracts were on

15  that list, even though they were in dispute.

16       And we viewed the effort of the amendment to say,

17  we still have our preserved rights. We wanted out day in

18  court earlier and we still have not yet had our day in court.

19  But we clearly likened this through a poker game where the

20  rules of the poker game are no checking, no raising.

21       And we think that analogy is very apt here as

22  Lantern was a prepetition bidder, allegedly having done

23  significant due diligence on all of the assets including the

24  executory contracts; that Lantern was the first day stalking

25  horse; that Lantern turned out to be the only bidder; that

1  Lantern said it would pay or perform cure; and that Lantern

2  certainly understood the effect of the May 10th final list

3  which was not changed with respect to either of the movants

4  until two months after closing -- two months after closing on

5  September 5th.

6          At that point, the record shows that our clients

7  and the movants' contracts were simply removed without a

8  discussion of why.  So, from our perspective, having been the

9  beneficiary of a $21 million dollar reduction, having pushed

10 off any hearing on sale objections now, at least until

11 December 17th, our clients being more than frustrated said,

12 look it's time to call the ball.  It's time to say a court

13 should hear what we've attempted to articulate in which we

14 were preserved in the sale orders, at least, with respect to

15 the two of our clients. And that is that there is nothing in

16 the record that takes away those preserved objections.

17          We think there's little, if anything, in the

18 record that contradicts our construction of 2.8(a), 2.8(c)

19 and the bid procedures order. And efforts to say that 2.8(i),

20 which was not added to the amended APA, until July 9th or

21 July 10th.  Again, our rights were preserved.  2.8(i), even

22 when they amended it, still didn't amend 2.8(a) in terms of

23 addressing this issue which they knew about since May 2.

24          And so, from our perspective, they knew about the

25 document.  They controlled the final list.  They waited two

1  months even after closing to take us off the list. And it

2  would be not only a wrongful construction of the relevant

3  order and agreements, but inequitable to our clients to have

4  this court's countenance the efforts that says no, no, no.

5  That isn't what was intended, that isn't what was required,

6  and tough luck Mr. Counterparty.

7           I'll reserve additional comments to their papers

8  after I hear argument, if that is all right, Your Honor, as I

9  know time is at a premium today.

10          THE COURT:  Well, let me ask you a question.  In

11 what manner are you prejudiced?

12          MR. SABIN:  Sure.

13          At this point, having spent all the dollars we

14 have spent, the issue is what's going to happen with these

15 contracts and when.

16          And so, instead of having unilateral extensions,

17 which is what's happened since May, we are forced to continue

18 out objections and forced to appear at hearings like this,

19 and forced to bring this motion because, otherwise, even with

20 the 120-days, it could be another six months.  It could be a

21 year.

22          And we are also prejudiced because we don't know

23 whether the buyer is using the film, by way of example,

24 Scream 4, and otherwise collecting revenue that, otherwise,

25 that if this contract were assumed, in part, would be our

1  clients.

2         So, for those reasons, Your Honor, we have brought

3  this motion and we ask this court to approve it.

4         THE COURT:  Okay.

5         MR. SABIN:  Thank you.

6         MR. QURESHI:  Thank you, Your Honor.  For the

7  record, Abid Qureshi, Akin Gump Strauss Hauer & Feld on

8  behalf of Lantern Entertainment.

9         I don't readily do this, but confess, Your Honor,

10 to being rather confused by the motion and the relief the

11 movants are seeking.

12        As I understand it what the movants are seeking,

13 Your Honor, is two things.  One to compel the debtors to

14 assume certain contracts, but that's not all.  They go

15 further and seek an order from this court requiring that

16 Lantern, as purchaser, accept assignment of such contracts

17 against its will and irrespective of what the cure cost might

18 be.

19        So, the starting point before we get to the

20 language of the various orders that Mr. Sabin took Your Honor

21 through is that there is absolutely no legal authority for

22 that proposition to require parties to accept against their

23 will not only that a debtor assume a contract against its

24 will, but that the purchaser take assignment of that contract

25 against its will is quite contrary to the case law.  So,

1  there is no legal support for the relief that they are

2  seeking.

3         Separate and apart from that and Your Honor, I

4  think, asked exactly the right question which is what is the

5  prejudice.  As Mr. Sabin is well aware and we, Lantern, has

6  told the court and all of the parties on more than one

7  occasion, on November 8th, which is just two days from now,

8  we will be filing on the docket and serving on all of the

9  relevant parties a list of assumed contracts.

10        And so, in just two days from now the world will

11 know whether their contracts are being assumed or not and, to

12 the extent they're being assumed, if there are disputes with

13 respect to cure costs that can't be resolved, those, I'm

14 sure, will be brought before Your Honor.  And, likewise, to

15 the extent parties whose contracts are not assumed, have

16 arguments that somehow, they are required to be assumed,

17 those issues too will be brought before the court.

18        So why we are here on this motion two days before

19 that deadline, I'm unclear on, Your Honor, but certainly I

20 don't see any prejudice to the movants.

21        THE COURT:  Am I correct that you filed an

22 amendment that took them off the list, so they're not on the

23 list?  Can you still assume them -- excuse me -- have them

24 assumed and assigned to you?

25        MR. QURESHI:  My understanding, Your Honor, is

1  that November 8th is the deadline by which we must finally

2  indicate what we're assuming and what we're leaving behind.

3         And the thrust of the motion, Your Honor, as I

4  understand it, is that that is something that, in their view,

5  was required to have been done prior to or contemporaneously

6  with the closing date.

7         And, here, Your Honor, we get to the various court

8  orders, the sale orders, the bid procedures order and one

9  thing that we cite in our objection that I'd like to drive

10 the court's attention to is the hearing that Your Honor was,

11 obviously, not at that Judge Sontchi handled where these

12 various issues were raised before Judge Sontchi and where

13 Judge Sontchi ruled on.

14        So, starting, Your Honor, with the bid procedures

15 order.  In paragraph 26 of the bid procedures order -- I'm

16 sorry.  I think it's actually paragraph 28 of the bid

17 procedures orders, it expressly contemplates that disputes

18 with respect to the assumption and assignment of contracts

19 may be resolved after the sale hearing.  And it does not in

20 the bid procedures order set any deadline for those disputes

21 to be resolved.

22        And not inconsistent with that, Your Honor, if we

23 then go to the sale order and the sale order is in Tab 1 of

24 the binder Mr. Sabin handed up, Your Honor, there are

25 multiple provisions in the sale order that express

1  contemplate that assumption and assignment disputes can be

2  resolved post-closing.

3         And if I could refer Your Honor to three

4  paragraphs in that sale order: 31, 32, and 33.  Thirty-one of

5  the sale orders, the first sentence, says, Notwithstanding

6  any other provision of this order, the unresolved contract

7  objection shall be heard at the contract assumption hearing.

8  And it goes on to say, Dependency of a dispute relating to a

9  particular assumed contract or lease shall not prevent or

10  delay the assumption or assignment of any other assumed

11  contract and leases unless, otherwise, determined by the

12  purchaser or the closing.  So, 31 says those disputes shall

13  not delay the closing.

14         Thirty-two.  On the closing date or as soon as

15  reasonably practicable thereafter.  So, again, there's a

16  contemplation in the sale order that these disputes can be

17  resolved post-closing.

18         And, similarly, paragraph 33, Your Honor.  In the

19  event of a dispute as of or after the closing date regarding

20  assumption or assignments or cure of any assumed contract.

21  And it goes on from there.  So, all of these provisions, Your

22  Honor, expressly contemplate that these types of disputes can

23  be resolved post-closing.

24         Now, Your Honor, this very argument was raised by

25  Mr. Sabin at the hearing that was handled by Judge Sontchi at

1  which the amendment to the asset purchase agreement was

2  heard.  And we cite, Your Honor, in our objection, a portion

3  of the transcript.

4          And what Judge Sontchi plainly ruled in connection

5  with that hearing, he said and I quote, "There may have been

6  an understanding or hope that these cure objections would be

7  dealt with prior to closing."  That has not occurred.  That

8  wasn't required in the previous order.  That order was a

9  final order.  No appeal was taken.  It's been final for

10 almost two months.

11         Your Honor, Judge Sontchi also went onto to note

12 that it is rather standard that the closing will occur prior

13 to executory contracts being definitely determined, whether

14 they're assumed or assigned, and what the cure amounts will

15 be.  To quote Judge Sontchi, we routinely preserve those

16 arguments for post-closing.  And that's what happened here.

17         So, Your Honor, Mr. Sabin's clients, I think, are

18 no differently situated than any others.  As I said at the

19 outset, the world will know in just two days with precision

20 which contracts are being assumed and which are being left

21 behind.

22         And, again, to the extent disputes arise in

23 connection with that process, Your Honor, that we are unable

24 to resolve consensually with the parties, none of those

25 parties have waived their right to bring those disputes

1 before Your Honor.

2          So, in closing, Your Honor, there simply is no

3 legal footing, no legal basis for the relief that the movants

4 here seek.

5          If that were the case, Your Honor, with 30,000 or

6 more contracts out there, whatever the number may be, the

7 notion that a court could simply require that those be

8 assumed and assigned without the consent of the parties is

9 clearly not the state of the law.

10          Unless the court has any questions, that's all I

11 have.

12          THE COURT:  No, thank you.

13          MR. QURESHI:  Thank you.

14          MR. SABIN:  May I respond briefly, Your Honor?

15          THE COURT:  Yes.  Unless the debtor wishes to be

16 heard first.

17          MR. SHAPIRO:  Your Honor, just very briefly.  I

18 wanted to give Your Honor a little context.

19          When the sale order was entered, I believe on May

20 9th, we were then required to file a notice of contracts that

21 may potentially be assumed and assigned.  And that list, if

22 memory serves me correctly, identified something like 30,000

23 contracts.

24          And so, I don't think, from anyone's perspective,

25 we thought we were going to be assuming and assigning all of

1  them. It was not until after the sale closed that we were

2  required to file the list of contracts that were, indeed,

3  assumed and assigned.

4          And, at that point, we removed the contracts that

5  were subject of pending objection, mostly at our suggestion,

6  so that we wouldn't get a lot of people complaining, even

7  though it was very clear that those objections were

8  preserved.

9          So, I just wanted to make sure Your Honor

10  understood exactly the procedure that was put in place.

11          THE COURT:  Well then if they're removed from the

12  list of contracts that may be assumed and assigned, can they

13  still be assumed and assigned?

14          MR. SHAPIRO:  So, they were -- so, I managed to

15  confuse you.

16          So, there are two notices that were filed.  Well,

17  there were subsequent ones, but two key notices.

18          There was the notice that was filed after the sale

19  order was entered.  That was the notice that listed the

20  contracts --

21          THE COURT:  I understand that.

22          MR. SHAPIRO:  Yeah.  And then, thereafter, was the

23  list of contracts at that time that were assumed and

24  assigned.  That was the one filed initially after closing. It

25  took a while.  It was, you know, language in the sale order

1  that says as soon as reasonably practical, but that for us

2  was as soon as reasonably practical.

3         But the language in the amendment that Lantern

4  negotiated for was it had 120 days to pick which contracts

5  that it wanted.  That's November 8th.  So, it was always

6  contemplated that it could decide, up until then, which

7  contracts that it wants.

8         So, with that, hopefully with that background,

9  that explains a little better how it was supposed to work.

10        THE COURT:  So, your second notice was just a list

11 of those that Lantern had already determined would be assumed

12 and assigned.

13        MR. SHAPIRO:  Correct, Your Honor.

14        THE COURT:  Okay.  I understand.

15        MR. SABIN:  Briefly, Your Honor.

16        It is clear in our own motion, paragraph 28, that

17 what we're seeking is this court to compel the debtors to

18 assume and then to assign, pending resolution, of any cure

19 objections that still exist.

20        So, we're not seeking what Mr. Qureshi we're

21 seeking.  We understand that if there are disputes re cure,

22 and cure comes in two fashions -- non-monetary obligations

23 that have not been met, if any, and monetary obligations.

24 Our request is subject to a later adjudication.

25        Point number two --

1          THE COURT:  Well, but, again, tell me why you

2   think that is --

3          MR. SABIN:  Because in our view prior to closing

4   on July 13th, Lantern had to make a decision.  They could

5   have put off --

6          THE COURT:  I know, but there is a conflict

7   between 2.8(a) and 2.8(c).

8          MR. SABIN:  Correct, correct.

9          THE COURT:  You think there's a conflict between

10  the two.

11         MR. SABIN:  I do; I do.  And I think that 2.8(a),

12  when read in conjunction with paragraph 28 of the bid

13  procedures --

14         THE COURT:  Well read in conjunction with the sale

15  order that approved it. The sale order made it clear that

16  determinations would be made after the closing date.

17         MR. SABIN:  That's not my concern.

18         THE COURT:  Well, the sale order is binding.

19         MR. SABIN:  I understand that.  But what it

20  preserved is our argument, okay, that there should have been,

21  pursuant to their own contract and pursuant to the bid

22  procedures order, a cutoff date for making that

23  determination.

24         And as I said, our argument is that certainly

25  having done their diligence prepetition, having had months

1  post-petition, even with respect to disputed contracts of

2  which both of ours were disputed, they could have simply

3  prior to the closing date, as we argue to you, and as they

4  may well do again on November 8th, even though we don't think

5  that's the applicable date, they could have, prior to

6  closing, put those disputed contracts on their list and not

7  had, okay, because our objections were preserved, not had a

8  free option to do it again after closing.

9         And so, what you heard, publicly now, is that two

10 days from now they're going to tell us what the final

11 collection of agreements are, even if they're disputed.  And

12 I will bet you that if we had testimony, our contracts are

13 going to go back on the list subject to adjudication of any

14 issues regarding cure.  And that's what we're objecting to.

15        We are seeking this court to compel the debtors

16 and Lantern --

17        THE COURT:  You're seeking to have me rule in

18 favor of your objection to the sale order.

19        MR. SABIN:  As to that aspect of it, yes.  As to

20 that aspect, yes, Your Honor.  Absolutely right; absolutely

21 right.

22        And the reference to the colloquy before Judge

23 Sontchi had to do with an effort that said, Judge, one way

24 additionally which is not in our motion, one way additionally

25 that we thought you could argue was to say we need our

1  hearing date before closing.  I lost that.  I understand

2  that, I lost it.  That's not the objection that we're arguing

3  in our motion was preserved that's relevant for this hearing.

4         So, it is the argument related to paragraph 28 of

5  the bid procedures order, paragraph 2.8(a) and the

6  inconsistency with paragraph 2.8(c) in terms of the free

7  option that may, again, be exercised on or before two days

8  from now.

9         And our argument is no.  The game and the ball

10  stop.  The clock ran out.  And it ran out under your own

11  terms just prior to closing.

12         Thank you, Your Honor.

13         MR. ROBINSON:  Your Honor, Colin Robinson.  If I

14  may, Your Honor.

15         THE COURT:  Yes.

16         MR. ROBINSON:  I rise for either myself and my

17  colleague on the phone, Jason Rosell, rise for a

18  clarification as to the November 8th deadline.

19         Just to make clear, Your Honor, that's the date to

20  designate and exclude a contract.  Lantern has to assume

21  contracts not previously identified as assumed contracts by

22  November 8.

23         I just want to make that clear on the record, Your

24  Honor.

25         THE COURT:  Say that again?

1          MR. ROBINSON:  Your Honor, I have the language of

2   the sale in front of me.  November 8th is a hard date to

3   assume contracts, not previously identified. We just want to

4   make sure that was clear on the record. I think there was

5   some --

6          THE COURT:  Oh, okay.

7          MR. ROBINSON:  Okay.

8          THE COURT:  All right.  Anything else?

9          MR. MCNEELY:  Your Honor, Edward McNeilly, Akin,

10  Gump, Strauss, Howard, & Feld on behalf of Portfolio Funding

11  Company.

12          May I briefly address the Court, Your Honor?

13          THE COURT:  You may.

14          MR. MCNEILLY:  Your Honor, ownership of TWC's

15  rights in A Single Man, which is one of the agreements that

16  is the subject of the motion being discussed was transferred

17  to PFC to Portfolio Funding Company in March 2010 and we just

18  want to put on the record that nothing in this motion should

19  affect any rights that PFC has and that all rights are

20  reserved.  Thank you, Your Honor.

21          MR. SABIN:  Your Honor, on behalf of Tom for the

22  record, that is not in the record there.  Was service on PFC.

23  There was no objection filed and, quite frankly, if we're

24  going to open up this record, the 2010 agreement and the

25  transactions related to it, in our view, do not result in the

1  conclusion that was just stated.  Thank you.

2          MR. MCNEILLY:  Your Honor, this is -- on behalf of

3  PFC -- Edward McNeilly.

4          PFC filed an objection to the sale.  We've been

5  discussing the sale order.  At Paragraph 58 to the sale

6  order, I think that extensively preserves PFC's rights to all

7  of the arguments that PFC asserted in its sale objection,

8  including, in relation to the ability of the debtors to

9  transfer rights to assets that belong to PFC.

10          So, Your Honor, PFC has reserved those rights in

11  the record already.  We've been discussing the sale order and

12  it's at Paragraph 58.

13          THE COURT:  Well, I'm not going to make any

14  determination as to who have the rights in A Single Man, if

15  that's what you're asking me to determine?

16          MR. MCNEILLY:  No, Your Honor.

17          THE COURT:  All right.  Well, let me make this

18  ruling.  As I understand, I'm being asked to really determine

19  the merits of the objecting parties' rights raised by their

20  objections to both, the bid procedures and to the sale

21  itself, which are -- which the objection, which is the

22  argument that 2.88 and 2.8(c) are in conflict and that,

23  therefore, 2.8(a) should control and that 2.8(a) required the

24  buyer to determine, prior to the closing, what contract was

25  to be assumed to it.

1          And I would determine that 2.8(c) governs oh not

2   to 2.8(a) -- and that 2.8(c) clearly allows the buyer to have

3   the option not to have a contract assumed and assigned to it

4   if there is a dispute or it does not agree to the resolution

5   of the dispute, with respect to any cure objections.  So, I

6   do not believe that at this time, the debtor must assume and

7   assign the contracts of the objecting party to Lantern.  I

8   note that Lantern still has a few days left to decide whether

9   or not that contract should be assumed and assigned to it.

10          So, I think, procedurally, I will simply deny the

11  motion of the contract counterparties.  So, somebody should

12  submit a form of order.

13          MR. SABIN:  Thank you, Your Honor, we'll do that.

14          MR. MCNEILLY:  Okay.  Thank you.

15          MR. SABIN:  One more identity, I think, on the

16  agenda and that's Item Number 13, which was a motion for

17  relief from the automatic stay filed by First Republic Bank

18  and I will turn the podium over to the movant's counsel.

19          MR. TENZER:  Good afternoon, Your Honor.  Andrew

20  Tenzer, of Paul Hastings, LLP, on behalf of First Republic

21  Bank.

22          Your Honor, it is my sincere hope that this motion

23  will be the least ambitious part of today's ambitious agenda

24  and that we can get this done relatively quickly oh.

25          THE COURT:  You settled, then -- okay.

1      (Laughter)

2           MR. TENZER:  Actually, Your Honor, the relief

3  requested in the motion is uncontested.  There were three

4  reservation of rights that were -- slash objections -- that

5  were filed to the motion, all of which, with I think one

6  exception, have been resolved and the point on the one that's

7  unresolved, I think we can address.  And I think there's some

8  comments that need to be made about each of those.

9           But, unless Your Honor has any questions about the

10  substantive relief that we are seeking -- again, the stay

11  relief is not contested -- I would move to addressing the

12  issues raised by the reservation of rights.

13           THE COURT:  You may.

14           MR. TENZER:  Thank you, Your Honor.

15           So, the first reservation of rights is filed by

16  the Guilds.  I'm not proceeding in the order of the docket,

17  but in the order that I think is best to address them for the

18  Court.  And what the Guilds ask for in their reservation of

19  rights was, essentially, assuming the Court grants the relief

20  that we're seeking as we move forward through an exercise of

21  remedies (indiscernible) -- which might include a foreclosure

22  or something else -- that any rights that they wish to assert

23  in that process are reserved.

24           And we have agreed to their language almost

25  entirely as it was proposed to the Court.  The only thing

1  that we did, with the Guilds' agreement, was to add a proviso

2  that effectively makes the language say, The guilds assert

3  they have rights A, B, C, but neither the debtors, Lantern,

4  or First Republic are agreeing that they have rights A, B,

5  and C and rights A, B, and C will be determined at some

6  future point or resolved by agreement.

7             So, I guess before I move to the next matter -- I

8  don't know if counsel for the Guilds is in the courtroom or

9  on the phone and if they want to comment.

10            MR. KOHANSKI:  May I be heard, Your Honor -- Joe

11 Kohanski, for the Guilds.

12            THE COURT:  Yes.

13            MR. TENZER:  Mr. Tenzer has correctly stated the

14 situation.  We are satisfied with the language as it stands

15 here.  We want to thank the counterparties for their efforts

16 to get to this resolution.

17            THE COURT:  All right.

18            MR. KOHANSKI:  Your Honor, the next reservation of

19 rights/objection that I wanted to deal with is the one that

20 was filed by Lantern and the buyer.  I have had conversations

21 with counsel to Lantern and they have indicated to me that

22 they do not contest the relief that we are seeking today

23 regarding the lifting of the stay.

24            In our pleadings, Your Honor, we noted that there

25 have been certain monies paid to Lantern.  There has been

1  information that we have requested from Lantern.  We need to

2  make it obviously clear that First Republic will own the

3  film, you know, when its remedies are done being exercised.

4         And while I have gotten assurances from counsel

5  that they will cooperate -- which are helpful -- we've known

6  about this money for some time.  We've had questions asking

7  for some time, and while our order, the form of order that we

8  provided with the motion, doesn't say anything about their

9  cooperation -- again, I don't -- they have agreed to that; I

10  would hope that they would state it on the record and I would

11  want the record ordered -- we believe that the money that

12  they are holding is proceeds of our collateral.

13         We're trying to figure out, you know, what was

14  done with our collateral, the proceeds of collateral before

15  this motion was brought and, obviously, we're respecting our

16  rights with respect to that.

17         But simply because the order that we presented to

18  the Court -- again, a lot of, which was submitted to the

19  Court before some of the conduct outlined in our pleadings

20  were known -- I just want to make sure it's clear that we

21  will get Lantern's cooperation, that Lantern will do what it

22  said it would do and what it's supposed to do, and that is to

23  turn over the money and cooperate with us on our information

24  requests.

25         THE COURT:  I'll hear from Lantern.

1          MR. QURESHI:  Your Honor, again, Abid Qureshi --

2    Akin Gump Strauss Howard & Feld -- on behalf of Lantern

3    Entertainment.

4          First, we, indeed, have no objection to the relief

5    that is requested.  We understand there are these additional

6    pending requests and we certainly undertake to work

7    cooperatively with First Republic in hopes of resolving

8    everything consensually.  Thank you, Your Honor.

9          THE COURT:  Okay.

10          MR. TANZER:  Last but not least, Your Honor, is

11    the objection filed by Vertigo and Good Fear.  And the

12    objection/reservation of rights, again, doesn't contest the

13    stay relief.  Their request is a request for a reservation of

14    rights.

15          And what they're pleading essentially says is that

16    I believe it is in paragraph eight of their pleading.  Yes,

17    they have outlined that they have rights (a) through (e).

18          And then in paragraph 10 of their pleading, they

19    said that by filing their response they request that if the

20    court enters an order granting stay relief, and then here's

21    the language, Such order may clear that the bank's right to

22    foreclose on the project collateral are and be subject to the

23    producing services agreement and the producer's rights

24    therein.

25          Your Honor, we, again, like we did with the

1    Guilds, are happy to say that Vertigo and Good Fear assert

2    certain rights.  And we would reserve in whatever process

3    that we would undertake, assuming the court grants the

4    relief, to preserve those rights as they need to be preserved

5    under law.  And, obviously, we would have our rights with

6    regarding whatever rights they assert.

7           What is a little bit troubling to me, Your Honor,

8    and what I don't think is an appropriate reservation is that

9    the rights be subject to the producing services agreement and

10   the rights that are being sought herein.

11          The way that we read that language is that it is a

12   request not merely to reserve those rights, but to ensure

13   that whatever happens those rights are preserved.  And that's

14   not acceptable to us.

15          Our view is that the status quo, as to the party's

16   respective rights, should be maintained.  We're First

17   Republic Bank.  We will, obviously, comply with our legal

18   obligations.  But it may well be that in a foreclosure, if

19   they have rights, that foreclosure will affect them.  And if

20   it's within our rights within a foreclosure to affect them,

21   we shouldn't be prejudiced in doing so.

22          If they want to contest that, they're free to do

23   that.  But I want to make clear that it's our view that

24   nothing beyond what rights exist today are being preserved.

25   And if those rights can be altered by later action then they

1  are subject to alteration.

2          THE COURT:  All right.

3          MR. SABIN:  Good afternoon, Your Honor, Jeff

4  Sabin, Venable, on behalf Vertigo Prime and Good Fear.

5          Let the record show that, I think, the relief

6  that's being requested, otherwise, runs straight into relief

7  that this court has already ordered on October 9th, Docket

8  Number 1574, on notice to the bank and approved and final.

9          That stipulation with the debtors and with Lantern

10  related to the production services agreement with our

11  clients.  And that stipulation, by agreement, on notice, said

12  the debtors and Lantern are going to treat that as if it were

13  not an executory contract and Lantern would, as the owner of

14  the asset purchased, at least to our knowledge, take subject

15  to and recognize the rights in paragraph eight.

16          What's unclear to us is whether the relief

17  requested in the context of a lift stay motion has the effect

18  of, in essence, getting out from jurisdiction of this court,

19  likely into a State Court, without jurisdiction to answer

20  that question as to the effect of their motion and this

21  ruling if you were to answer it.

22          And as a second issue, there's nothing in the

23  record that we as yet to tell us that the bank has properly

24  perfected in the producing services agreement and would be

25  entitled to relief from stay with respect to that agreement

1   and/or the stipulation itself.

2           We've endeavored to say to the bank why not lift

3   the stay and make a very pragmatic decision.  Your collateral

4   includes cash collateral which I'm sure you want to get your

5   hands on if you're going to lift the stay.  Your collateral

6   includes cash that may be or may be not near disputes with

7   Lantern.  Lantern's already collected from Polaroid and from

8   showing it post-closing.

9           But as to our clients, you, if you're the credit

10  bidder and owner, or any other bidder, should take subject to

11  the producing services agreement.  Make no mistake about it,

12  we had no idea and no way of knowing whether there had been a

13  voluntary consent to an assumption of indebtedness in

14  connection with the picture Polaroid.

15          And so, we were quite shocked when we read this

16  motion.  And even more shocked when we read the supplemental

17  declaration that the film and Lantern has been acting as if

18  the stipulation was correct, as if it was correct that they

19  are buyer.  And I think all of those questions need to be

20  answered before we simply lift the stay and adversely affect

21  our client's rights.

22          Thank you, Your Honor.

23          THE COURT:

24          MR. SHAPIRO:  Just briefly, Your Honor.

25          On the order that Your Honor entered, pursuant to

1  the sale order, we have the authority to settle objections

2  without, you know, further court order and without approval

3  from the court, but we did submit this stipulation under

4  certification of counsel.

5         It was not on notice.  I think from the

6  perspective of the debtors and Lantern, it would be our

7  position that you should not consider that order for purposes

8  of the relief that you're seeking.

9         We would, if necessary, seek to vacate it, but it

10 was not our content to abrogate any party's rights.  That we

11 didn't realize that that was going to be the case, obviously.

12 It was submitted under certification of counsel, but, in our

13 view, that shouldn't be considered for purposes of --

14        THE COURT:  Well, I've gotten a handful of

15 additional stipulations and my question to you before I sign

16 those is whether or not they should go out on notice?

17        MR. SHAPIRO:  No, Your Honor.  And I was, believe

18 me that was my primary concern.  I did, you know -- we take

19 this certification of counsel process very seriously.  That's

20 something that I know Your Honor didn't use, this court would

21 come to a grinding halt.

22        So, I could say with confidence that, no.  I think

23 this is a very unusual circumstance.  When we found out about

24 it, we immediately thought about ways to get it done.  It was

25 up to, of course, the counterparties.

1              I don't know what conversations took place, but it

2    was, of course, the debtors' position that we should

3    immediately vacate that order.  And if we were to seek

4    approval, do it on notice.

5              THE COURT:  Well and the debtor is not objecting

6    to relief from the stay.  So, do you think that that issue

7    will be addressed by the State Court?

8              MR. SHAPIRO:  Of your court's prior --

9              THE COURT:  Yes.

10             MR. SHAPIRO:  Of your prior order?

11             THE COURT:  Right.

12             MR. SHAPIRO:  It's difficult to say, Your Honor.

13   I really don't know what that court will consider.  More than

14   happy to move to vacate it in order to ensure that that

15   doesn't happen, but it would be our position that that's what

16   should be done.

17             Ordinarily, when stuff like this happens, we would

18   do it under certification of counsel and ask Your Honor to

19   enter an order vacating a prior order explaining what

20   happened.  I don't know whether the counterparty would be

21   okay with that.  It sounds like that's not the case.

22             THE COURT:  I don't think they're going to be

23   agreeable to that.

24             MR. SHAPIRO:  I don't think so.  That would have

25   been my preference from the beginning, but what we can do to

1  make sure that there's no confusion in any other court is we

2  can move to vacate and explain what happened.

3          THE COURT:  Well, if you're going to do that, I

4  think the relief from the stay has to await resolution of

5  that for all the parties.

6          MR. TENZER:  Your Honor, a couple of things.

7  First, I appreciate counsel saying that that order was

8  improper.  We, obviously, didn't know about it until after it

9  was actually signed.  It was not discussed with us.  I would

10 respectfully request that all of the relief from stay not be

11 delayed.  That would, among other things, I think, impinge on

12 our ability to start trying to monetize the asset which,

13 obviously, will benefit us and may actually end up benefiting

14 the estate.

15         Second, that is --

16         THE COURT:  Well, how are you going to monetize

17 it?  You're going to foreclose on it.

18         MR. TENZER:  But we would start marketing.  If the

19 stay is lifted, we could start.  We would be able to start

20 marketing the asset.  We would be able to say it's clear that

21 these are assets that we own.  There wouldn't be any

22 confusion in the marketplace and as counsel to the debtor

23 just stated --

24         THE COURT:  Well, I'm not clear.  Has Lantern

25 agreed that they didn't buy the film?

1        MR. TENZER:  Yes.

2        THE COURT:  Okay.

3        MR. TENZER:  And Mr. Bowden must have read my

4   mind, which is probably scary.  If need be, at least for the

5   time being, we could either carve-out from the order until

6   the other order is vacated.  Again, that was not a situation

7   of our making; this piece of collateral.  There has to --

8   there should be some other way that we can do it, but there

9   should not be an absolute bar on us doing what we need to do

10  to monetize, to seek to foreclose because an order was

11  entered in a way it shouldn't have been entered on something

12  that impacts the value of our collateral.  It's a hardship

13  that we didn't know of and didn't create.

14        THE COURT:  Well, can you come up with language

15  that will carve this out?

16        MR. SABIN:  I wish we could, Your Honor, but

17  having now heard that Lantern, effectively, admits that it's

18  not the buyer of the asset that it had been negotiating for

19  months, assuming it was buyer, any kind of motion to vacate

20  the stipulation is likely to bring back and bring with it

21  counterclaims against Lantern and/or the debtor for not

22  telling us what was up.

23        As for carving out there are two important things.

24  What we don't know independent of whether our contract is or

25  is not collateral.  We don't know whether the cash collateral

1  that's referred to in the motion and/or the additional post-

2  closing dollars, if we were right, might be subject to a

3  portion thereof going to our clients.

4           MR. TENZER:  Your Honor, I can address those

5  points.  Your Honor, I can address each of those points.

6           The first one is easy.  On the cash collateral

7  that's referred to in the motion is money that First Republic

8  has held for months and that is a result of certain tax

9  breaks and tax incentives that are part of its collateral.

10  They have absolutely nothing to do with what Mr. Sabin

11  addressed regarding whatever rights he has against the --

12           MR. SABIN:  As to that, Your Honor -- I'm sorry to

13  interrupt my colleague.  That one is easy.  If that is the

14  representation and that's true, we have no problem carving

15  that out and having you lift the stay for the purpose of

16  going out after cash collateral.

17           MR. TENZER:  Unless something has happened, Your

18  Honor, while we're all here in the courtroom today First

19  Republic does not have currently possession of the money that

20  Mr. Sabin, I think, is referring to that we mentioned in our

21  papers.

22           Second, Your Honor, with respect to whether or not

23  it's our collateral we did attach to our motion our loan

24  agreement, our credit documents and our UCC-1 filings on

25  other perfection documents which make clear that we have an

1  all asset lien on the assets of the debtors as they relate to

2  this film regardless of which debtor it is.

3         So, I think that his argument that it's not

4  collateral; no one has objected in any of their pleadings as

5  to whether it's collateral.  It's just not something that the

6  court needs to deal with.  I think that the record shows that

7  it is.

8         MR. SABIN:  I don't believe the record is clear,

9  Your Honor.  I believe that it would be necessary for this

10 court to consider arguments as to what is the debtors' asset

11 and what is the meaning of 9203 of the UCC.  And we would

12 probably argue, when that issue is teed up properly, that

13 Polaroid, the film, is otherwise encumbered by, if you will,

14 and subject to the rights of the producing services

15 agreement.

16        So, as I said to summarize, we have no problem

17 trying to reach agreement on the exact words pursuant to

18 which we carve-out and allow a lifting of the stay to go

19 after the cash collateral that Mr. Tenzer referred to.  As to

20 all other items for the lifting of the stay I think it needs

21 to await the issues as they're properly teed up and responded

22 to.

23        MR. TENZER:  I guess I would disagree with that

24 last statement, Your Honor, because the reservation of rights

25 that I would propose the court approve does not prejudice Mr.

1  Sabin's right or his client's right to argue that his client

2  has an interest of those described in his motion.  So, there

3  is nothing that you would do today that would prejudice his

4  right to make that argument and there is nothing that you

5  would do today that would prejudice First Republic's right to

6  say you do or you don't.

7            Again, Your Honor, I guess --

8            THE COURT:  Well, who is going to decide that?

9            MR. TENZER:  Whether or not he has an interest?

10           THE COURT:  Right.  Who is going to decide that?

11           MR. TENZER:  That will be decided by a court, I

12  assume, that --

13           THE COURT:  Which court, because you're just going

14  to try and market these and sell them subject to his rights?

15           MR. TENZER:  If we sell them subject to his

16  rights, if somebody does not want to buy them subject to

17  whatever rights he may have then either the issues will have

18  to be settled or adjudicated; yes.  As to whether he --

19           THE COURT:  Well, who is going to decide that?

20  What court?

21           MR. TENZER:  I would assume that it would be any

22  court that would conduct a foreclosure sale or another court

23  that would determine the rights between these two non-debtor

24  parties.

25           THE COURT:  So, before you market the assets

1  you're going to foreclose on them?

2          MR. TENZER:  That decision has not been made, Your

3  Honor.  A foreclosure, right, has to be conducted in a

4  commercially reasonable manner.  That takes time.  So, I

5  would assume that we would start talking to people about the

6  assets.  And if they have questions about what we own or what

7  Mr. Sabin's clients own those questions will have to be

8  addressed and they may require a foreclosure, but, no, we do

9  not intend to wait for a foreclosure to happen to market the

10  assets.  That is, in fact, one of the reasons we asked for

11  expedited relief which the court was kind enough to grant.

12          As we noted in our papers certain steps were taken

13  with respect to the film that have caused confusion in the

14  marketplace because --

15          THE COURT:  But that can be clarified by Lantern.

16          MR. TENZER:  Well yes and no, Your Honor.  There

17  is a lot of press out there and they did say that they would

18  cooperate with us, but in so far as whether -- we need to be

19  able to go to the market and say the bankruptcy court has

20  ruled that the stay has lifted, that we can market the

21  property, that we can, subject to doing whatever we need to

22  do under state law, transfer the property as such property

23  may exist to you and interested party.

24          We should not be put in the position where there

25  is an issue not of our making where we are delayed in trying

1  to realize on our collateral -- take the initial steps in

2  realizing on our collateral in a way that doesn't affect

3  anybody's rights.

4          MR. KOHANSKI:  Your Honor, may I be heard, please?

5          THE COURT:  Yes.

6          MR. KOHANSKI:  Again, Joe Kohanski for the Guilds.

7          We're lodging the same position as the bank is

8  here.  This is not an issue, frankly, was on our radar.  It

9  is rather novel.  For what it's worth I do think that, you

10  know, based on our experience with the industry, we think

11  that what Mr. Tenzer is suggesting is certainly a sensible

12  solution.

13          THE COURT:  I'm not sure I agree.  I think that

14  somehow the interest that he is foreclosing on should be

15  clarified of what can be sold.

16          MR. TENZER:  If we're talking about -- if all

17  we're talking about, Your Honor, is carving out from the stay

18  relief pending the motion to vacate on the assets that Mr.

19  Sabin is referring to I don't think that's the right answer,

20  but if that is where the court ends up, obviously, we will

21  live with the court's ruling, but with respect to the rest of

22  the collateral none of those issues are relevant.

23          THE COURT:  And I think -- Mr. Sabin, are you

24  willing to carve-out those assets to which your interests

25  could not possibly attach?

1    MR. SABIN:  I think that's pretty easy to do, Your

2  Honor.

3    THE COURT:  Okay.

4    MR. SABIN:  I made it very clear that from our

5  perspective it is this court that has jurisdiction, this

6  court that should exercise jurisdiction and that the

7  jurisdiction may or may not get teed up by a motion to vacate

8  or anything else, but 541 says property of the estate.  You

9  can only have a security interest if they have it, if they

10  properly perfected property of the estate.

11    MR. TENZER:  Again, Your Honor, I don't think that

12  those issues are even contested today.  Again, our motion

13  describes our security interests and our perfection thereof.

14  So, I don't think there is any question.  And none of the

15  reservations of rights that were filed on the record contest

16  our liens.

17    What was stated in Mr. Sabin's client's objection

18  was that they have interest.  And if they have interest,

19  we're not trying to take them away.  All we're trying to say

20  is that if there is a process that complies with the laws not

21  of this court, but in exercising remedies, if there is a

22  process that takes them away they can be taken away.  What we

23  don't want to say is that no matter what happens they can't

24  be taken away.

25    So, I do think the record is clear that we have a

1  security interest.  And if he has a senior security interest

2  and we have to foreclose subject to that that may be an

3  outcome.  If he has a junior security interest and we could

4  foreclose it away that may be an outcome.  All we're trying

5  to do and all we think the court should do today is say that

6  we can go ahead with that process.  It's the same exact thing

7  we're doing with the Guilds.  The Guilds have said we have

8  certain rights.  We have said you may have those rights, you

9  may not have those rights.  And as we go through the process

10 those rights will be dealt with.

11        The idea that we don't have a security interest,

12 again, I think the record clearly establishes on an

13 uncontested basis that we do and so the question is only what

14 happens to Mr. Sabin's client if we move forward.  My very

15 easy answer to that, which I don't think should trouble

16 anybody, is all of his rights are reserved.

17        THE COURT:  Well, here's the problem that I have

18 with that; unlike the Guilds, apparently, I entered an order

19 that muddied the waters and that if that order should not

20 have been entered I ought to decide that before you proceed

21 as to assets that are affected by that order.

22        MR. TENZER:  Well, Your Honor --

23        THE COURT:  And if I instead determine that I

24 should have entered that order then, at least, you will have

25 clarity on that before you transfer that asset.

1           MR. TENZER:  I guess, Your Honor, the question

2    then becomes what become what process, if Your Honor can

3    provide some guidance, would you like the parties to take to

4    seek to vacate that order or, otherwise, clarify these rights

5    because we have a debtor standing up in front of the court

6    saying it shouldn't have been entered.  I'm not quite sure --

7    and we didn't know about it.  I think you've heard at least

8    one other party say they didn't know about it.  I'm not quite

9    sure what it is that we should do other then make a motion to

10   vacate.

11          THE COURT:  I think the debtor has stated they are

12   going to file a motion to vacate.  Am I correct?

13          MR. SHAPIRO:  Your Honor, we would probably file

14   it jointly with Lantern, but if that's the process Your Honor

15   wants us to follow, we'll follow that.

16          THE COURT:  I think that ought to be.  To be clear

17   if, in fact, the debtor -- if, in fact, I vacate the order I

18   think that I'm out of it at that point.  I'm not looking to

19   decide the rights of two non-debtor parties.

20          MR. TENZER:  Well, the debtor can, obviously, do

21   what it wants.  Is it acceptable to the court if we file that

22   order -- file that motion?

23          THE COURT:  That you file it?

24          MR. TENZER:  Yes.

25          THE COURT:  You can file a motion to vacate that

1   order as well.

2          MR. TENZER:  Okay.  Is the relief in the motion,

3   other than with respect to the contracts that Mr. Sabin is --

4   I just want to be clear, is it, otherwise, granted?

5          THE COURT:  Yes.

6          MR. TENZER:  Okay.  Thank you, Your Honor.

7          MR. SABIN:  Just to be clear, though, Your Honor,

8   I would expect that the bank, hearing the ruling today, would

9   not start a marketing process that in any way, shape or form

10  tells the world or any interested buyer that there's been any

11  decision and that there's any effort to foreclose on

12  contracts that are still subject to dispute.

13         MR. TENZER:  We understand the court's ruling,

14  Your Honor.

15         THE COURT:  All right.  Then get me a form of

16  order that says that.

17         MR. TENZER:  Thank you.

18         MR. STRATTON:  Good afternoon, Your Honor.  I

19  think we're done.  I was asked to raise a few housekeeping

20  matters.

21         First, on the two motions to seal we have uploaded

22  orders granting the motion.  Those are agenda items 10 and

23  12.

24         THE COURT:  Yes.

25         MR. STRATTON:  Then with respect to the

1  stipulations that Your Honor eluded to -- I'm sort of afraid

2  to go back there, but there is three; one wild bunch,

3  whatever that means, Orange Studio in West Bank.  If we could

4  get those entered, we would really appreciate it.  They're

5  going to help us resolve this whole November 8th --

6        THE COURT:  I will sign those three orders now.

7        MR. STRATTON:  Thank you very much, Your Honor.

8        THE COURT:  All right. We'll stand adjourned.

9     (Proceedings concluded at 3:20 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6    /s/Mary Zajaczkowski                    November 7, 2018

7    Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT D**

***In re Luxeyard*, Jan. 16, 2015 Hearing Transcript**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | . | Chapter 7 |
| IN RE: | . | |
| | . | Case No. 14-12170 (LSS) |
| LUXEYARD, INC., | . | |
| | . | Courtroom No. 2 |
| | . | 824 Market Street |
| | . | Wilmington, Delaware 19801 |
| | . | |
| Debtor. | . | Friday, January 16, 2015 |

. . . . . . . . . . . . . . . . .

TRANSCRIPT OF COURT DECISION ON PENDING MOTIONS:
DEBTOR'S MOTION FOR RECONSIDERATION
AND PETITIONING CREDITORS' MOTION RE: RULE 1014(b) STAY
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                Joseph D. Wright, Esq.
                               LANDIS, RATH & COBB, LLP
                               919 Market Street, Suite 1800
                               Wilmington, Delaware 19801

                               Wayne Greenwald, Esq.
                               WAYNE GREENWALD, PC
                               475 Park Avenue South, 26th Floor
                               New York, New York 10016

For the U.S. Trustee:          David L. Buchbinder, Esq.
                               OFFICE OF THE U.S. TRUSTEE
                               844 King Street, Suite 2207
                               Wilmington, Delaware 19801

(Appearances Continued)

Audio Operator:                Electronically Recorded
                               by Michael Miller, ECRO

Transcription Company:         Reliable
                               1007 N. Orange Street
                               Wilmington, Delaware 19801
                               (302)654-8080
                               Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES:   (Continued)

For the Petitioning
Creditors:                 Dennis A. Meloro, Esq.
                           GREENBERG TRAURIG, LLP
                           The Nemours Building
                           1007 North Orange Street
                           Suite 1200
                           Wilmington, Delaware 19801


For the Interim
Chapter 7 Trustee:         Susan E. Kaufman, Esq.
                           COOCH AND TAYLOR
                           The Brandywine Building
                           1000 West Street, 10th Floor
                           Wilmington, Delaware 19801


ALSO APPEARING:

Chapter 7 Trustee:         Jeoffrey L. Burtch
```

1      (Proceedings commence at 8:35 a.m.)

2      (Call to order of the Court.)

3      THE COURT:  Please be seated.

4      Thank you, Counsel, for coming today.  I appreciate

5  it.  There a few people I don't know, so I'm happy to take some

6  introductions.

7      MR. WRIGHT:  Good morning, Your Honor.  Joseph Wright

8  from Landis, Rath & Cobb, on behalf of the alleged debtor

9  LuxeYard.

10     First, congratulations, Your Honor, on your recent

11  investiture.

12     THE COURT:  Thank you.

13     MR. WRIGHT:  And also, thank you for accommodating us

14  today on hearing this motion.

15     I would like to introduce my colleague Wayne Greenwald

16  of Wayne Greenwald, PC, who is at counsel table with me today.

17  Mr. Greenwald has been admitted *pro hac vice* in this case.

18     THE COURT:  Welcome, Mr. Greenwald.

19     MR. GREENWALD:  Thank you, Your Honor.  And

20  congratulations; I hope you have a lot of fun.

21     THE COURT:  Thank you.  I'm hoping so, too.

22     MR. WRIGHT:  Unless you would like anyone else to get

23  up for an introduction, I would move to the agenda.

24     THE COURT:  Go ahead.

25     MR. WRIGHT:  On the agenda, there are two matters

4

1    pending today:  The first is the petitioning creditors' motion

2    for entry of an order confirming that the 1014(b) stay does not

3    apply, and the second matter is LuxeYard's motion for

4    reconsideration of the order for relief.

5         Both motions have been argued before Judge Walsh, and

6    I guess -- I don't want to burden the Court by repeating the

7    arguments that Your Honor may already be familiar with, and so

8    I'd ask if you'd give us a little direction on how you'd like

9    to proceed.

10        THE COURT:  Well, I think that Mrs. Johnson indicated,

11   when she set up this conference, that I may have some

12   questions, but that I would most likely rule today.  And I have

13   reviewed the matter, and I don't have any questions, and I am

14   prepared to rule.  So I will do that first, and then we can

15   talk about where we go from here, given my ruling.

16        MR. WRIGHT:  Great.  Thank you, Your Honor.

17        THE COURT:  Okay.  Thank you.

18        As Mr. Wright indicated, we are here on two, I would

19   say interrelated motions:  The petitioning creditors' motion to

20   confirm that Rule 1014(b) does not apply to this case, and for

21   related relief; and LuxeYard's motion for reconsideration of

22   the entry of the order for relief in this case.

23        Since I'm going to grant the motion for

24   reconsideration, the 1014(b) motion is moot, and I will give my

25   reasoning.

1        From my review of the submissions, the following facts

2  are uncontested:

3        This is not the first involuntary case filed against

4  LuxeYard or one of its affiliates.  An involuntary case was

5  filed against LuxeYard in the Central District of California on

6  December 27th, 2012.  The involuntary case against LuxeYard was

7  dismissed on April 22nd, 2013, and the case was closed by the

8  Clerk of the Court on August 14th, 2013.

9        An involuntary case was filed against LY Retail, Inc.,

10  an affiliate of LuxeYard, on March 20th, 2013, also in the

11  Central District of California.  That involuntary case was

12  resolved by settlement, approved by the California Court, Judge

13  Russell, and the case was dismissed.  The docket for the LY

14  Retail case, as of November 4th, 2014, reflected that it was

15  not closed by the Clerk of the Court.

16        This involuntary bankruptcy case was filed by the

17  petitioning creditors in this Court on September 19th, 2014.

18  Thereafter, the parties executed a stipulation extending the

19  time to respond to the involuntary petition until November 4th,

20  2014.

21        On November 4th, LuxeYard filed a motion to transfer

22  venue in the LY Retail case in the Central District of

23  California.  On November 5th, LuxeYard filed in this Court a

24  notice of filing of the motion to transfer venue.  Attached to

25  the notice of filing was the motion to transfer venue in the LY

1   Retail case.  The motion to transfer venue asserts, among other

2   things, that the Delaware involuntary petition was filed in bad

3   faith by the petitioning creditors, and suggests that LuxeYard

4   intends to defend itself against the involuntary petition filed

5   in Delaware.

6           Also on November 5th, the petitioning creditors filed

7   with this Court their certification of counsel requesting entry

8   of order for relief.  The certification did indicate that the

9   notice of filing of the motion to change venue had been filed

10  in the LY Retail case, but it did not indicate that LuxeYard

11  asserted in that motion to change venue that the Delaware case

12  was filed in bad faith, or that LuxeYard intended to defend

13  against the involuntary petition.

14          On November 6th, 2014, the Court entered the order for

15  relief.  There is nothing on the record to indicate that the

16  Court was expressly informed of LuxeYard's intent to contest

17  the involuntary petition prior to the entry of the order for

18  relief.

19          On December 17th of 2014, LuxeYard filed its

20  provisional answer to involuntary petition.  In the provisional

21  answer, LuxeYard repeats its allegations that the petition was

22  filed for an improper purpose, states it will vigorously defend

23  against the petition, and asserts other defenses, including

24  that the petitioning creditors are not eligible to file the

25  petition because they are not holders of claims against

1    LuxeYard, any claims are contingent as to liability and/or

2    subject to a *bona fide* dispute, and LuxeYard is generally

3    paying its debts as they become due.  In all, LuxeYard asserts

4    17 of what it termed "affirmative defenses."

5         LuxeYard has moved for reconsideration of the order

6    for relief under both Rules 59 and 60, applicable to this

7    contested matter by virtue of Bankruptcy Rules 9023 and 9024.

8    The thrust of the motion is that the Court erred in entering

9    the order for relief because, by virtue of Bankruptcy Rule

10   1014(b), the filing of the motion to change venue in the

11   California Bankruptcy Court stayed any and all proceedings in

12   this case, including the entry of the order for relief.

13   Further, LuxeYard argues that, if it was wrong in this

14   conclusion, sufficient grounds exist to vacate the order.

15        The petitioning creditors object to the motion for

16   reconsideration.  Their main argument is that the LY Retail

17   bankruptcy case was not pending, but rather was closed.  They

18   argue that, because the case was not pending, Rule 1014 could

19   not apply.

20        They further argue that, even if Rule 1014 could

21   apply, the simple filing of a motion to change venue does not

22   trigger the automatic stay of the second filed case.  Rather,

23   the petitioning creditors argue that Rule 1014(b), whether as

24   in existence when the motion to change venue was filed or as

25   subsequently amended, required an order of the California Court

1   to impose the stay in the Delaware case.  Finally, the

2   petitioning creditors argue that relief is not appropriate

3   because LuxeYard has not shown a meritorious defense to the

4   involuntary petition.

5       This Court will not revisit whether the LY Retail case

6   was pending or not.  This issue was thoroughly briefed and ably

7   argued before Judge Russell in the LY Retail case.  While it is

8   true that Judge Russell struggled with the decision and

9   believed reasonable minds could differ, he ultimately concluded

10  that the LY Retail case was pending.

11      Judge Russell did not, however, determine whether

12  Bankruptcy Rule 1014 imposed an automatic stay on proceedings

13  before this Court, or whether some action was necessary to

14  effect a stay.

15      As to this issue, the majority of courts to address

16  Bankruptcy Rule 1014, as it existed at the relevant times here,

17  have ruled that the stay is automatic.  The disagreement

18  appears to be whether the triggering event is the filing of the

19  subsequent case or the filing of a motion to transfer venue.

20  The one outlier appears to the Bagel Brothers Court.

21      Bankruptcy Rule 1014(b) was recently amended to

22  address the triggering point for a stay.  The report on the

23  Committee on Rules of Practice and Procedure to the Judicial

24  Conference of the United States explains that, quote:

25      "The current rule has led to uncertainty about whether

1    the stay goes into effect immediately upon the filing

2    of the second petition, or only upon the filing of a

3    motion to determine where the case should proceed.

4    Rather than selecting either of these options, the

5    advisory committee decided that an order by the first

6    court should be required."

7    Thus, the advisory committee appears to agree with

8 LuxeYard's position.

9    Given Judge Russell's decision and the relevant case

10 law, it was reasonable for LuxeYard to conclude both that the

11 LY Retail case was pending, and that Rule 1014, as it existed

12 in November 2014, automatically stayed proceedings in this case

13 when the motion to transfer venue was filed in the LY Retail

14 case.

15    At the very least, the disagreement of the courts

16 regarding the triggering event for a stay of these proceedings,

17 together with the failure of the parties to expressly notify

18 Judge Walsh of the contested nature of the involuntary

19 petition, serves as a basis to grant the motion for

20 reconsideration.

21    While LuxeYard might have better protected its

22 position in this case, it appears clear that LuxeYard intended,

23 from the inception of this case, to contest the involuntary

24 filing.  Both LuxeYard and LY Retail contested the previously

25 filed involuntary bankruptcy cases, and there are statements,

1    albeit not fulsome, in the motion to change venue that LuxeYard

2    intended to contest the involuntary petition filed in this

3    Court.  These statements were sufficient to put the petitioning

4    creditors on notice that LuxeYard intended to contest the

5    involuntary filing.  The contested nature of the petition was

6    not specifically noted in the certification of counsel.

7            In granting the motion for reconsideration, I am

8    guided by two overriding concerns:

9            First, cases should be decided on the merits when

10    possible.  As both the Third Circuit and this Court have stated

11    on numerous occasions, as a general matter, this Court does not

12    favor defaults; and, in a close case, doubts should be resolved

13    in favor of setting aside the default and reaching a decision

14    on the merits.

15            Second, the filing of an involuntary petition is

16    extreme and carries serious consequences for the subject of the

17    petition.  Accordingly, the policy and favor of reaching

18    decisions on the merits, where possible, rather than by

19    default, is particularly appropriate here.

20            Finally, I am finding, without making any decisions on

21    the merits, that LuxeYard has raised sufficient issues which,

22    if proven at trial might merit a defense to the bankruptcy

23    petition, I note that at least one court within the Third

24    Circuit has held that a Bankruptcy Court is justified in

25    dismissing an involuntary petition when it is filed in bad

1  faith.

2          Further, LuxeYard asserts that litigation in Texas,

3  which does appear to involve some of the petitioning creditors,

4  creates an issue as to whether the petitioning creditors are,

5  in fact, creditors of LuxeYard, and/or whether any debts that

6  do exist are disputed.  Again, I make no ruling on the merits

7  of any of LuxeYard's allegations or legal theories.

8          For these reasons, I am vacating the order.

9          Does counsel have any questions?

10          MR. WRIGHT:  Thank you, Your Honor.  I have an order

11  prepared that would -- it's modified from -- well, I'll step

12  over here.  It is modified from the order that we submitted

13  with the motion to reflect the fact that the parties are going

14  to need to agree on a schedule to respond to the involuntary

15  petition.  And I have a black-line from the original order to

16  the order I have now, which I would propose the order be

17  entered.  And I can pass up a copy for Your Honor, if you'd

18  like, and then pass a copy out to the parties here in the

19  courtroom.

20          THE COURT:  Please.

21          MR. WRIGHT:  This is the clean and black-line.

22          THE COURT:  Thank you.

23      (Participants confer.)

24          MR. WRIGHT:  Your Honor, I believe the trustee has a

25  comment she would like to make on the proposed order.

1          THE COURT:  Yes.

2          MS. KAUFMAN:  Good morning, Your Honor.  Susan Kaufman

3   for Jeoffery Burtch, the Interim Chapter 7 Trustee.

4          It's my understanding that vacating, I believe,

5   doesn't necessarily vacate the trustee's appointment.

6   Apparently, it is possible under some circumstances to have a

7   trustee in an involuntary bankruptcy, as well.  I would like

8   some direction from the Court as to how we can handle that

9   because I assume that was Your Honor's intention, that the

10  trustee's appointment would be vacated with the order of

11  relief.

12         THE COURT:  Ms. Kaufman, you are correct.  And I

13  hadn't specifically -- I had thought about the fact that we

14  have a trustee, but not specifically how we handle it.

15         The trustee is appointed by the Office of the United

16  States Trustee.  Mr. Buchbinder, do you have a suggestion for

17  how we handle this?

18         MR. BUCHBINDER:  Good morning, Your Honor.  Dave

19  Buchbinder on behalf of the United States Trustee.

20         I did not bring my code with me, but it is correct

21  that Section 303 does permit the appointment of an interim

22  trustee in a pending involuntary case.

23         I don't know what the underlying facts are here, in

24  terms of whether we have an operating debtor or not.  But I

25  would think that we can adopt a practical solution for the

1    appropriate circumstances.  If, operationally, the case does

2    not need a trustee at this point in time, the Court could

3    vacate the order.  On the other hand, the Court could keep the

4    interim trustee in place pending the outcome of the involuntary

5    proceedings.

6         We probably ought to hear from counsel what the

7    operational issues of this debtor are, and then we can make an

8    appropriate determination.

9         MR. GREENWALD:  If I can help, Your Honor, the --

10   first of all, I apologize for hacking before, I don't know what

11   was going on.

12        Number one, the trustee was appointed under 701, not

13   under 303.  701 is basically automatically appointment as an

14   interim trustee.  303, you have to have cause for the

15   appointment of a trustee.

16        THE COURT:  Uh-huh.

17        MR. GREENWALD:  No cause has been shown.  So that,

18   right there -- and the only reason the trustee was appointed is

19   because of the order of relief.  So, since a stay was in

20   effect, anything that happened afterwards should not have

21   occurred, and no cause has been shown for retaining the

22   trustee.

23        Additionally, very much to the trustee's credit, the

24   trustee has withheld from doing anything in this case,

25   something that I think all the parties should very much

1    respect.  But by that same token, the trustee is not entrenched

2    in this case, either.  So that, until cause is shown under 303,

3    or somebody makes a case under 303, there is no reason for the

4    trustee to be here.

5         THE COURT:  Mr. Meloro do you have any position?

6         MR. MELORO:  Your Honor, good morning.  Dennis Meloro

7    from Greenberg Traurig on behalf of the petitioning creditors,

8    Your Honor.

9         I believe Mr. Greenwald is correct.  The petitioning

10   creditors have not separately moved for the appointment of a

11   trustee, given Your Honor's vacating of the order for relief,

12   which I believe was the premise for the appointment in the

13   first instance.  I think, as it stands now, I would agree with

14   Mr. Greenwald.

15        THE COURT:  Very well.  Then I think we have

16   consensus.

17        MR. BUCHBINDER:  Your Honor, we should probably have

18   something in the record.  I would suggest whatever makes the

19   most sense to the Court.  We could either have an order

20   vacating the interim trustee's appointment, or we could have

21   the trustee file a one-page resignation, and simply recite in

22   the resignation the Court's vacation of the order for relief.

23        THE COURT:  I actually think it makes sense to vacate

24   the order, given the posture that we are in here --

25        MR. GREENWALD:  If I may --

1          THE COURT:  -- in this case.

2          MR. GREENWALD:  If I may suggest?  We have the order

3     vacating the order for relief.  That same order can include the

4     vacation of the order appointing the trustee; and that way, it

5     saves every time --

6          MR. MELORO:  There we go.

7          MR. GREENWALD:  -- and effort and --

8          THE COURT:  I concur.

9          MR. GREENWALD:  -- preserves clarity.

10         THE COURT:  And I would also like that order to

11    indicate that the petitioning creditors' motion under 1014 has

12    been, I guess denied as moot, so that we've wrapped up

13    everything in one order with respect to the two motions and the

14    order appointing Mr. Burtch.

15         And Mr. Burtch, I did see your status report and did

16    appreciate that you had held off, for practical purposes, if no

17    other reason.  And I had assumed that, really, you had not done

18    anything in the case.

19         MR. BURTCH:  That's correct.

20         MR. WRIGHT:  Thank you, Your Honor.  I believe that

21    concludes our matters.  I will prepare a form of order and I

22    will circulate it to everybody in the room, and then I will

23    submit it under certification of counsel.

24         THE COURT:  That's fine.  And as long as it's

25    consensual, I will enter the order with respect to scheduling,

1    submissions of pleadings, and we'll determine at some point,

2    after you have consulted, when we might have a trial on this

3    matter.

4              MR. GREENWALD:  Thank you very much, Your Honor.

5              THE COURT:  Is there anything else I can do?

6         (No verbal response.)

7              THE COURT:  Thank you.

8              MR. WRIGHT:  Thank you, Your Honor.

9              COUNSEL:  Thank you, Your Honor.  Thank you, Thank

10    you.

11              THE COURT:  We'll stand adjourned.

12              MR. GREENWALD:  Thank you.

13         (Proceedings concluded at 10:22 a.m.)

14                           *****

1           <u>CERTIFICATION</u>

2           I certify that the foregoing is a correct transcript

3   from the electronic sound recording of the proceedings in the

4   above-entitled matter to the best of my knowledge and ability.

5

6

7

8   <u>/s/ Coleen Rand            </u>            January 16, 2015

9   Coleen Rand, AAERT Cert. No. 341

10  Certified Court Transcriptionist

11  For Reliable

**Exhibit E**

**November 9, 2018 Email**

{01386517;v2 }

**From:** Williams, Susan
**Sent:** Friday, November 9, 2018 10:29 PM
**To:** Burke, John
**Cc:** Maynard, Douglass; Greenberg, Lauren; Lahaie, Meredith; HGevondyan@firstrepublic.com; Flaster, Lisa; Heaphy, Charles; Tenzer, Andrew V.
**Subject:** RE: Polaroid

John:

FRB has been waiting 10 days for Lantern to remit the proceeds of FRB's collateral that it is holding.  Andrew informed me prior to the court hearing earlier this week that Meredith called him and she provided assurances to him that Lantern would cooperate.  At no time did Andrew reports did she state that cooperation would be conditioned on Lantern being provided with an indemnity from FRB. Moreover, in court, Andrew further advises that your bankruptcy partner, on Lantern's behalf, neither contested the stay relief motion nor the factual assertions set forth therein and informed the bankruptcy court that it would cooperate with First Republic.  Lantern did not inform the court that it required an indemnity from FRB in order to do so.   Your insistence now that Lantern be indemnified for actions it took is unreasonable and flies in the face of what Lantern led the court to believe.

Insofar as asking what the bank needs, other than immediate payment of the proceeds from Lantern, you seem to be delaying providing answers and information for reasons that we can't quite fathom.  We have asked for information repeatedly and since we don't know what Lantern actually did, and have only been able to piece things together, it is difficult for us to know exactly what is needed.  It would appear that Lantern has taken and continues to exercise complete control of the film, although you have said Lantern has no interest in the assets.  For now, below is a preliminary list which we will supplement as necessary once we have responses to the following:

1.  All invoices sent to distributors under the existing license agreements and all communications from any such distributors in relation to the film.
2.  List of all distributors who have made payment to Lantern or 13 Films and the amounts and dates of payment other than those listed in the attached spreadsheet you provided to us on 10/31.
3.  Status of delivery to all distributors.  To whom has delivery been made and when?  If commenced and not completed, please provide commencement date and the status.  Have any objection notices or QC reports been provided?  Also, please advise as to whether delivery is being made by Lantern or by 13 Films.  If delivery has been accepted by a distributor, please advise.
4.  What are the release dates for the foreign distributors that have been discussed with or notified to Lantern?
5.  Copy of the latest draft Netflix agreement.  Who at Netflix is handling these negotiations?
6.  Specifics as to what delivery has commenced to Netflix and is this being handled by Lantern or by 13 Films?
7.  Location of all film materials and how Lantern and/or 13 Films has access to same.
    a.  Please list all materials held location by location.  Are any materials being held in Lantern's name?  On what basis?  Has Lantern signed lab/storage agreements?
    b.  How does Lantern intend to give these materials back?

    c.  Please confirm that 13 Films does not have any materials to the film and has ceased representing itself as a sales agent for the film. As of this email, 13 Films continues to list the film with marketing materials on its website together with the erroneous press announcement regarding its partnership with Lantern for international distribution for the film.

    d.  Are there signed access letters with Lantern? Please provide copies of same.

    e.  Has Lantern signed access letters with any distributors? Please provide copies.

8.  Location of all contracts, paper materials and other books and records related to the film.

    a.  Please provide a list of all such materials.

    b.  Where does Lantern have access to such materials? Is it holding them at its offices?

    c.  How does Lantern plan to return all of them? Will it electronically deliver the materials?

9.  All communications with the producers of Polaroid related to the producing services agreements.

10.  All communications with any other third parties taken by Lantern or 13 Films or anyone else acting under Lantern's instructions with respect to marketing or exploitation of the picture.

Per the email below, FRB has consented to Lantern servicing delivery to Wild Bunch. We have been apprised of this by FRB already. Please be sure that Charles Heaphy is copied on all correspondence between Lantern and Wild Bunch (or 13 Films, if it is 13 Films that is servicing delivery) related to the film.

First Republic would prefer not to seek relief in the bankruptcy court compelling Lantern to comply with FRB's requests. But, as you may know, First Republic and other parties are preparing a motion to vacate the bankruptcy court's order assigning the Vertigo producing services agreement to Lantern. Supplementing that motion with a demand that Lantern turn over all cash and other First Republic collateral in its possession or control and provide all information on agreements that Lantern entered into with respect to the picture or other actions Lantern has taken regarding Polaroid imposes little burden on First Republic. We would prefer to resolve this consensually and have Lantern honor its duty to cooperate and thus expect that your client will comply with these requests no later than Tuesday, November 13.

Susan

---



**Susan Z. Williams | Co-Chair Entertainment and Media Finance Group**
Paul Hastings LLP | 1999 Avenue of the Stars, Twenty-Seventh Floor, Los Angeles, CA 90067 | Direct: +310-620-5763| Main: +1.310-620-5700 | Fax: +310-620-5863 | susanwilliams@paulhastings.com| www.paulhastings.com

---

**From:** Burke, John [mailto:jburke@AkinGump.com]
**Sent:** Friday, November 9, 2018 2:19 PM
**To:** Williams, Susan; HGevondyan@firstrepublic.com
**Cc:** Maynard, Douglass; Greenberg, Lauren; Lahaie, Meredith
**Subject:** [EXT] FW: Polaroid

Susan/Hillary:

We have previously advised both of you that Lantern has no interest in this asset and is willing to cooperate with FRB in taking control of the asset as appropriate. We have repeatedly asked for direction and all we get in response is a demand to wire the deposit funds to FRB. Given FRB allegations that Lantern violated the automatic stay, Lantern is

reluctant to wire funds to anyone other than the distributors who sent the funds without a court order or an indemnity from FRB.

We have received emails from FRB regarding the lack of a conflict waiver.

Please see the exchange below where FRB is asking Lantern to service delivery of the film which Lantern is prepared to do provided you can confirm as legal counsel on behalf of FRB .

Thanks.

John


Begin forwarded message:

>**From:** "Heaphy, Charles" <cheaphy@firstrepublic.com>
>**Date:** November 9, 2018 at 11:09:56 AM PST
>**To:** Marc Gabizon <mgabizon@wildbunch.eu>
>**Cc:** "Nicolas Darsa (Nicolas.Darsa@lanternam.com)" <Nicolas.Darsa@lanternam.com>, "Chris Papavasiliou (chris.papavasiliou@lanternent.com)" <chris.papavasiliou@lanternent.com>, "Flaster, Lisa" <lflaster@firstrepublic.com>
>**Subject: RE: Polaroid**
>
>Hi Marc,
>
>I am looping Lantern into this email chain.  This email serves as First Republic's authorization for Lantern to complete the delivery process of Polaroid to Wild Bunch.  I will send you payment instructions separately.
>
>Best,
>
>Charles M. Heaphy
>Senior Managing Director
>First Republic Bank
>
>1888 Century Park East | Los Angeles, CA 90067-1702
>Office: (310) 407-7119 | Mobile: (310) 922-0573 | Email: cheaphy@firstrepublic.com
>
>
>-----Original Message-----
>From: Marc Gabizon [mailto:mgabizon@wildbunch.eu]
>Sent: Friday, November 09, 2018 9:28 AM
>To: Heaphy, Charles
>Subject: AW: Polaroid
>
>Hi Charles,
>Just checking in, apparently Lantern hasn't received the authorization from your counsel. Maybe you can speed up the process as we are getting closer to our time limit...
>Thanks again!
>Best
>Marc

-----Ursprüngliche Nachricht-----
Von: Marc Gabizon
Gesendet: Donnerstag, 8. November 2018 20:56
An: 'Heaphy, Charles' <cheaphy@firstrepublic.com>
Betreff: AW: Polaroid

Hi Charles,
Perfect, thank you.
Best
Marc


-----Ursprüngliche Nachricht-----
Von: Heaphy, Charles <cheaphy@firstrepublic.com>
Gesendet: Donnerstag, 8. November 2018 20:50
An: Marc Gabizon <mgabizon@wildbunch.eu>
Betreff: RE: Polaroid

Hi Marc,

No problem.  I believe we already gave Lantern the green light, but I will confirm with the
bank's counsel.

Best,
Chares

-----Original Message-----
From: Marc Gabizon [mailto:mgabizon@wildbunch.eu]
Sent: Thursday, November 08, 2018 11:48 AM
To: Heaphy, Charles
Subject: AW: Polaroid

Hi Charles,

Greatly appreciated, thank you.
Once again, sorry to be so pushy and maybe it's all happening already but just in case, is there
any chance you could press on the go button towards Lantern today...?
Otherwise, awaiting your payment instructions.
Best
Marc

-----Ursprüngliche Nachricht-----
Von: Heaphy, Charles <cheaphy@firstrepublic.com>
Gesendet: Donnerstag, 8. November 2018 19:48
An: Marc Gabizon <mgabizon@wildbunch.eu>
Betreff: RE: Polaroid

Hi Marc,

The bank is fine having Lantern service delivery as a courtesy to Wild Bunch.  I will get back to
you with respect to payment instructions.

Best,

Charles M. Heaphy
Senior Managing Director
First Republic Bank

1888 Century Park East | Los Angeles, CA 90067-1702
Office: (310) 407-7119 | Mobile: (310) 922-0573 | Email: cheaphy@firstrepublic.com


-----Original Message-----
From: Marc Gabizon [mailto:mgabizon@wildbunch.eu]
Sent: Thursday, November 08, 2018 10:26 AM
To: Heaphy, Charles
Subject: AW: Polaroid

Hi Charles,
Sorry for the bother and following-up so quickly but again, the timing is so tight and the
potential damage so substantial that we have no choice.
Did you have a chance to review and seek acceptance for authorizing Lantern to initiate the
Delivery process? Is there anything we can do to facilitate FRB doing so?
Sitting in a train now for another hour but available anytime to speak on the phone.
Thanks
Marc

-----Ursprüngliche Nachricht-----
Von: Marc Gabizon
Gesendet: Donnerstag, 8. November 2018 00:39
An: Charles Heaphy <cheaphy@firstrepublic.com>
Betreff: Polaroid

Hi Charles,
This is Marc from Wild Bunch.
It looks like you have taken over the above title.
Can we have a conversation as we are under high pressure since we have set the release the date
and pulling the plug would be a disaster?
You can reach me under +491729016877.
Thanks
Marc


Von meinem iPhone gesendet

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer. This message cannot be guaranteed to be secure or error-free.
First Republic Bank and its related entities do not take responsibility for, or accept time-sensitive instructions sent by email including orders, funds transfer instructions or stop payments on checks. All instructions of this nature must be handled by direct communication, not email. We reserve the right to monitor and review the content of all email communications sent or received. Emails sent to or from this address may be stored in accordance with regulatory requirements.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer. This message cannot be guaranteed to be secure or error-free.
First Republic Bank and its related entities do not take responsibility for, or accept time-sensitive instructions sent by email including orders, funds transfer instructions or stop payments on checks. All instructions of this nature must be handled by direct communication, not email. We reserve the right to monitor and review the content of all email communications sent or received. Emails sent to or from this address may be stored in accordance with regulatory requirements.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer. This message cannot be guaranteed to be secure or error-free.
First Republic Bank and its related entities do not take responsibility for, or accept time-sensitive instructions sent by email including orders, funds transfer instructions or stop payments on checks. All instructions of this nature must be handled by direct communication, not email. We reserve the right to monitor and review the content of all email communications sent or received. Emails sent to or from this address may be stored in accordance with regulatory requirements.

Note: Privileged/Confidential information may be contained in this message and may be subject to legal privilege. This electronic communication, including any information transmitted with it, is intended only for the use of the addressee(s) and is strictly confidential. Access to or use of this e-mail by anyone other than the intended recipient is unauthorized. If you are not the intended recipient (or responsible for delivery of the message to such person), you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it. In such case, you should destroy this message, and notify us immediately. The views, opinions, conclusions and other information expressed in this electronic mail are not given or endorsed by the company unless otherwise indicated by an authorized representative independent of this message.

Note: Privileged/Confidential information may be contained in this message and may be subject to legal privilege. This electronic communication, including any information transmitted with it, is intended only for the use of the addressee(s) and is strictly confidential. Access to or use of this e-mail by anyone other than the intended recipient is unauthorized. If you are not the intended recipient (or responsible for delivery of the message to such person), you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it. In such case, you should destroy this message, and notify us immediately. The views, opinions, conclusions and other information expressed in this electronic mail are not given or endorsed by the company unless otherwise indicated by an authorized representative independent of this message.
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.