**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
: 
In re: : Chapter 11
: 
The Weinstein Company Holdings LLC, *et al.*, : Case No. 18-10601 (MFW)
: 
Debtors.[1] : (Jointly Administered)
: 
: **Proposed Obj. Deadline:**
: **December 26, 2018 at 4:00 p.m. (ET)**
: 
: **Proposed Hr'g Date:**
: **December 27, 2018 at 10:30 a.m. (ET)**
---------------------------------------------------------------- x

**DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 AND
11 U.S.C. § 363 FOR APPROVAL OF SETTLEMENT AND MUTUAL RELEASE
AGREEMENT WITH BUNIM/MURRAY PRODUCTIONS, LLC**

The Weinstein Company Holdings LLC and its affiliated debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") respectfully request entry of an order, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and, to the extent implicated, section 363 of the Bankruptcy Code, authorizing the Debtors to enter into the Settlement and Mutual Release Agreement, dated December 18, 2018, (the "**Settlement Agreement**") made by and between the Debtors and Bunim/Murray Productions, LLC ("**Bunim/Murray**" and, together with the Debtors, the "**Parties**") resolving the Dispute (as defined herein) between the Parties. A proposed form of order granting the relief requested herein is attached hereto as **Exhibit A** (the "**Proposed Order**"). A true and correct copy of the Settlement Agreement is annexed to the Proposed Order as **Exhibit 1**.

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of Debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of this information may be obtained on the website of the Debtors' noticing and claims agent at http://dm.epiq11.com/twc.

## PRELIMINARY STATEMENT[2]

1. The Dispute between the Parties concerns the pre-production of the seventeenth season of the television show *Project Runway* ("**Project Runway**"), the interpretation of the Parties' agreements relating to Project Runway, and the value provided to the Debtors' estates by Bunim/Murray in connection with the seventeenth season of Project Runway ("**Season 17**").

2. Bunim/Murray began pre-production of Season 17 in early March 2018 and continued though the Petition Date and the sale of the Debtors' assets. However, Lantern sold Project Runway to Bravo in mid-May 2018, pre-production of Season 17 stopped, and Bunim/Murray was informed that it would no longer be producing Season 17. Bunim/Murray then filed a motion requesting payment of its production services fee and certain costs for Season 17 as an administrative expense. Bunim/Murray alleged that after the Petition Date the Debtors had locked Bunim/Murray to produce Season 17 on a "pay or play" basis.

3. The Debtors objected to Bunim/Murray's claim. The Debtors asserted, among other things, that the "pay or play" provision only was effective to the extent that Season 17 was being produced for A&E. Accordingly, because Project Runway will not air on A&E, the Debtors asserted that the pay or play provision is inapplicable and Bunim/Murray should not be entitled to its asserted administrative expense claim.

4. The Dispute has now been pending before this Court for six months. During that time, the Parties have expended considerable time, energy and expense in discovery and preparing to litigate the dispute before the Court. The Parties also engaged in settlement discussions, in consultation with the Committee. And while the Parties disagree as to whether Bunim/Murray is entitled to an administrative expense claim, the Parties agree that litigating the

---

[2] Capitalized terms used in the Preliminary Statement but not otherwise defined shall have the meanings ascribed to such terms as in the Motion.

2

Dispute will be complex, will continue to involve significant time and resources to properly prepare and present the Dispute to the Court, and that resolving the Dispute pursuant to, and in accordance with, the Settlement Agreement provides an optimal path forward for resolving the Dispute and bringing closure to the Parties' relationship.

5. Specifically, the Debtors believe that the Settlement Agreement provides four benefits to their estates: <u>First</u>, the Settlement Agreement reduces the Debtors' litigation risk and provides the Debtors with certainty regarding the amount of Bunim/Murray's Administrative Claim; <u>second</u>, the Debtors will save time and avoid significant expenses in connection with litigating the Dispute by entering into the Settlement Agreement; <u>third</u>, the savings from settling the Dispute and avoiding substantial litigation costs will inure to the benefit of the Debtors' estates and creditors; and <u>fourth</u>, the Settlement Agreement provides mutual global releases, terminates and deems rejected the Parties' agreements and provides finality to the Dispute. What is more, the Committee supports the Debtors' entry into the Settlement Agreement. Accordingly, for the reasons more fully set forth below, the Debtors believe that their entry into the Settlement Agreement is the prudent path forward for resolving the Dispute, is in their estates' and creditors' best interests, and should be approved.

## **JURISDICTION**

6. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties,

cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL BACKGROUND

7. On March 19, 2018 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108.  On March 28, 2018, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in these Chapter 11 cases (the "**Committee**").  As of this date, no trustee or examiner has been appointed in these Chapter 11 cases.  The Debtors' Chapter 11 cases have been jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

8. Additional information on the Debtors' business and capital structure, as well as a description of the events precipitating the filing of these cases, is set forth in the *Declaration of Robert Del Genio in Support of First Day Relief* [Docket No. 7] (the "**First Day Declaration**").[3]

## BACKGROUND REGARDING THE DISPUTE

9. Prior to the Petition Date, Bunim/Murray produced Project Runway for the Debtors pursuant to that certain *"Project Runway" and "Models" / Production Services Agreement*, dated July 23, 2008, made by and between Debtor The Weinstein Company LLC ("**TWC**")[4] and Bunim/Murray (the "**Project Runway Production Services Agreement**").[5]

---

[3] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the First Day Declaration.

[4] In 2015, the Company implemented an internal restructuring to separate its television business from the Company's other businesses.  As part of such restructuring, TWC assigned all of its rights and obligations under the Project Runway Production Services Agreement, as amended by the Amendment, to Debtor Weinstein Television

After Bunim/Murray successfully produced seasons six through eleven of Project Runway, the Parties negotiated an amendment to the Project Runway Production Services Agreement dated April 18, 2013 (the "**Amendment**").  The Amendment locked Bunim/Murray for production of Project Runway for the twelfth and all subsequent seasons of Project Runway that were produced for A&E or any of its networks.  The lock provision of the Amendment included a "pay or play" provision, which provided that, so long as the Bunim/Murray was locked to produce Project Runway, Bunim/Murray was entitled to its production services fee (the "**Production Services Fee**").

10.    As set forth in the First Day Declaration, prior to the Petition Date, the Debtors' financial position and business prospects came under pressure after the publication of certain articles related to Harvey Weinstein's alleged misconduct.  In light of these pressures, Bunim/Murray approached the Debtors regarding the seventeenth season of Project Runway. The Parties engaged in discussions concerning certain protections that Bunim/Murray sought in an effort to be "locked" regardless of which network ultimately aired Project Runway.  By letter dated March 22, 2018 (the "**Pick-Up Letter**"), the Debtors exercised their option to lock Bunim/Murray for Season 17.  Bunim/Murray asserts that the Pick-Up Letter locked it for Season 17 irrespective of network.

11.    On March 20, 2018, the Debtors filed a motion [Docket No. 8] (the "**Sale Motion**") seeking, among other things, approval to sell substantially all of their assets to the party making the "highest or otherwise best" offer.  On April 6, 2018, the Court entered an order

---

LLC pursuant to an assignment document, dated June 15, 2015, which was acknowledged and agreed to by Bunim/Murray.

[5] At that time, Project Runway was produced for Lifetime Entertainment Services ("**Lifetime**"). Subsequent to Bunim/Murray and Debtors entering into the Project Runway Production Services Agreement, Lifetime was acquired by A&E Networks ("**A&E**") and is now a subsidiary of A&E.

approving the Debtors' proposed bidding procedures (the "**Bidding Procedures**") and designating Lantern Entertainment LLC ("**Lantern**") as the stalking horse bidder [Docket No. 190] (the "**Bidding Procedures Order**").

12.     Pursuant to the Bidding Procedures Order, the Debtors filed certain notices of potential assumption and assignment [Docket Nos. 216, 282, and 482] identifying certain executory contracts with Bunim/Murray (including, but not limited to, the Project Runway Production Services Agreement) for potential assumption and assignment, and proposing cure amounts of $0.00 for these contracts. On May 2, 2018, Bunim/Murray filed an objection to the proposed cure amounts, asserting estimated cure amounts totaling $924,278.00 arising from the Debtors' alleged breaches of the subject agreements (the "**Prepetition Unsecured Claim**") [Docket No. 688].

13.     As the Debtors did not receive any Qualified Bids (as defined in the Bidding Procedures) other than Lantern's by the Bid Deadline (as defined in the Bidding Procedures), the Debtors cancelled the auction that had been scheduled for May 4, 2018, and declared Lantern's bid the winning bid [Docket No. 653]. On July 13, 2018, the Sale to Lantern closed [Docket No. 1247]. The Debtors' rights in Project Runway were among the assets sold to Lantern.

14.     On May 14, 2018, Lantern informed the Debtors that it had sold the right to air Project Runway to Bravo Media LLC ("**Bravo**"). On approximately June 4, 2018 Bravo announced that it would not be using Bunim/Murray's production services for Project Runway.

15.     On June 19, 2018, Bunim/Murray filed *Bunim/Murray Productions, LLC's Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)* [Docket No. 1075] (the "**Administrative Expense Motion**") and the *Declaration of Noah Solomon* [Docket No. 1076] (the "**Solomon Declaration**") in support thereof, seeking, among other

requested relief, its Production Services Fee for season seventeen of Project Runway, in the amount of $1,064,309.40 (the "**Fee Claim**"), and reimbursement of expenses incurred, in the amount of $285,602.04 (the "**Rent Claim**"), for a total administrative claim of not less than $1,349,911.44 (the "**Administrative Claim**").

16.     As set forth more fully in the Administrative Expense Motion and in the Solomon Declaration, Bunim/Murray asserts that the Pick-Up Letter was intended to, and in fact did, lock Bunim/Murray to produce Season 17 on a pay or play basis regardless of which network Project Runway was produced for. Accordingly, because the Debtors executed and delivered the Pick-Up Letter post-petition, Bunim/Murray asserts that it is entitled to its Production Services Fee on an administrative expense basis. Bunim/Murray further asserts that the Debtors induced Bunim/Murray to continue to perform under the Project Runway Agreements after the Petition Date, to its detriment. According to Bunim/Murray, this inducement led Bunim/Murray to incur expenses maintaining a lease of real property on Sherman Way (the "**Sherman Lease**") to be used in connection with producing season seventeen of Project Runway, which gave rise to the Rent Claim.

17.     On July 27 2018, the Debtors filed an objection to the Administrative Expense Motion [Docket No. 1275] (the "**Administrative Expense Objection**" and, together with the Administrative Expense Motion and the Solomon Declaration, the "**Administrative Expense Pleadings**") seeking an order denying the Administrative Expense Motion in its entirety. As set forth more fully in the Administrative Expense Objection, the Debtors dispute that the Pick-Up Letter locks Bunim/Murray to produce Season 17 regardless of the network for which the season is produced. The Debtors also dispute any liability for the Rent Claim, because Bunim/Murray entered into Sherman Lease prior to the Petition Date, Bunim/Murray was obligated to make

payments under the Sherman Lease regardless of whether the Debtors exercised their option to lock Bunim/Murray, and as such, Bunim/Murray is not entitled to the Rent Claim on an administrative expense basis.

18. Since the filing of the Administrative Expense Pleadings, the Parties have engaged in, and substantially completed, (i) producing and exchanging documents, (ii) answering interrogatories and (iii) responding to requests for admission (the "**Document and Written Discovery**"). In addition, each of the Parties has noticed depositions that are currently pending and scheduled to be conducted within the next four weeks (the "**Deposition Discovery**" and, together with the Document and Written Discovery, the "**Discovery**" and, together with the Administrative Expense Pleadings, the "**Dispute**").

19. The Debtors have evaluated the Discovery already taken, the Project Runway Agreements, the Administrative Expense Pleadings, and have considered their discussions with Bunim/Murray and the Committee regarding the Dispute. After evaluating the facts and circumstances of the Dispute, the Debtors believe that it is unclear how the Court would construe the materials and documents to be presented before it. Moreover, the Parties disagree on the admissibility and relevance of certain documents and correspondence, as well as the interpretation of the Project Runway Agreements (collectively, the "**Evidentiary Issues**"). Adding further uncertainty to the litigation, the Court's potential rulings on certain of the Evidentiary Issues could increase the scope of litigating the Dispute.

20. In light of these risks, while the Parties have continued to engage in Discovery, the Parties, in consultation with the Committee, also have engaged in settlement discussions. After engaging in such settlement discussions, the Parties, with the agreement of the Committee,

have determined that resolving the Dispute pursuant to, and in accordance with, the Settlement Agreement provides the optimal resolution for the Dispute and provides a fair and just result.

## THE SETTLEMENT AGREEMENT

21.   In an exercise of their sound and prudent business judgment, in consultation with their professionals and the Committee, the Debtors have determined that entering into the Settlement agreement is in the best interest of their estates, creditors and all parties in interest. The material terms of the Settlement Agreement include:[6]

   i.   Not later than three (3) days after the date that the Parties have executed the Settlement Agreement, the Debtors shall have filed a motion that seeks the entry of an order (the "**Approval Order**") in substantially the form attached as Exhibit A to the Settlement Agreement;

   ii.  The Approval Order shall provide for the allowance of an administrative expense claim in the Debtors' chapter 11 cases for Bunim/Murray in the amount of six hundred five thousand dollars ($605,000) (the "Allowed Administrative Claim"), which shall be payable in two installments (each, a "Settlement Payment") as provided in paragraph 4 of the Settlement Agreement. Pursuant to paragraph 4 of the Settlement Agreement, on or before December 28, 2018, the Debtors shall pay Bunim/Murray one hundred fifty thousand dollars ($150,000) in immediately available funds, pursuant to wire instructions to be provided by Bunim/Murray. The Debtors (or their successor) shall also pay Bunim/Murray four hundred fifty-five thousand dollars ($455,000) in immediately available funds, pursuant to wire instructions to be provided by Bunim/Murray, and such further payment shall be made on the effective date of the chapter 11 plan that is confirmed in the Chapter 11 Cases (or, if no plan is confirmed, then at the time that other allowed administrative claims against the Debtors are paid). The Allowed Administrative Claim and the Settlement Payments are in (i) full compromise and settlement of the Claims set forth in the Administrative Expense Request and any other Claims that Bunim/Murray may have against the Debtors (including, without limitation, any Claims that may arise in connection with the rejection

---

[6] Capitalized terms used in this summary that are not otherwise defined shall have the meanings ascribed to such terms in the Settlement Agreement. This summary of the Settlement Agreement is qualified in its entirety by reference to the provisions of the Settlement Agreement.

9

        and termination of the BMP Production Services Agreements pursuant to this Agreement) and (ii) consideration for the mutual releases between the Debtor Parties and Bunim/Murray under this Agreement. Time is of the essence with respect to payment of the Settlement Payments.

   iii.   On the Effective Date, Debtors shall fully, finally, and completely remise, release, acquit, and forever discharge the Bunim/Murray Parties from any and all Claims, complaints, rights, manner of action or actions, Avoidance Actions, causes of action, suits, debts, dues, demands, obligations, charges, costs, expenses (including but not limited to attorneys' fees), sums of money, controversies, damages, accounts and liabilities of every kind and nature whatsoever of the Debtors and their bankruptcy estates, whether at law or in equity, arising from the beginning of time until the Execution Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, or foreseen or unforeseen.

   iv.   On the Effective Date (but subject to the condition subsequent of the timely receipt of the Settlement Payments), Bunim/Murray shall fully, finally, and completely remises, releases, acquit, and forever discharges the Debtor Parties from any and all Claims, complaints, rights, manner of action or actions, causes of action, suits, debts, dues, demands, obligations, charges, costs, expenses (including but not limited to attorneys' fees), sums of money, controversies, damages, accounts and liabilities of every kind and nature whatsoever of Bunim/Murray, whether at law or in equity, arising from the beginning of time until the Execution Date, whether liquidated or unliquidated, fixed or contingent, matured or un-matured, known or unknown, or foreseen or unforeseen.

   v.   On the Effective Date, the BMP Production Services Agreements shall be deemed terminated and no longer in force and effect and shall be deemed to be rejected by the Debtors pursuant to section 365 of the Bankruptcy Code.

22. For those reasons set forth below, the Debtors believe that their entry into the Settlement Agreement should be approved in all respects.

## **BASIS FOR RELIEF REQUESTED**

23. Federal Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Pursuant to Bankruptcy Rule 9019(a), the authority to approve a compromise settlement is within the sound

discretion of the bankruptcy court. *In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005). In exercising this discretion, courts consider whether the compromise and settlement is fair and equitable, reasonable, and in the best interests of the debtor's estate. *See, e.g.*, *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979); *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).

24. The Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (second alteration in original) (internal quotation marks omitted) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); *see also In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding that settlements are "generally favored in bankruptcy"). Furthermore, the decision to accept or reject a compromise or settlement is within the sound discretion of the Court. *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010); *In re Coram Healthcare Corp.*, 315 B.R. 321, 329 (Bankr. D. Del. 2004).

25. A settlement should be approved by a court so long as the settlement is above "the lowest point in the range of reasonableness." *In re Washington Mutual Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Key3Media Group, Inc.*, 336 B.R. 87, 92-93 (Bankr. D. Del. 2005). In deciding whether a particular settlement falls within the range of reasonableness, courts consider the following factors: (a) the probability of success in the litigation; (b) the difficulties in collection; (c) the complexity, expense, inconvenience and delay of the litigation; and (d) the paramount interests of creditors. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.*

11

*v. Anderson*, 390 U.S. 414, 424 (1968); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

26.     Here, the Settlement Agreement falls well above the lowest point in the range of reasonableness and should be approved for at least five reasons.  First, in consultation with their professionals and Committee, the Debtors have determined that the inherent uncertainty and risk of a significant adverse judgment associated with litigating the Dispute outweighs any perceived benefits provided thereby.  While the Debtors dispute the appropriate amount, if any, of the Administrative Claim, the Debtors believe that it is difficult, if not impracticable, to predict the outcome of litigating the Dispute because of several factors, including, among others, that the Court would be required to consider and construe the Project Runway Agreements, deposition testimony, and documentary evidence, and make certain evidentiary rulings regarding the Evidentiary Issues that may influence the outcome of the litigation. In addition to this uncertainty, an adverse judgment against the Debtors could result in the Debtors being liable for the entire Administrative Claim of over one million dollars.  Given the issues that the Court must consider and the value of the Administrative Claim, the Debtors believe that litigating the Dispute involves significant uncertainty, is high risk, and may expose the Debtors to a significant adverse judgment.  Accordingly, the Debtors believe that entering into the Settlement Agreement provides certainty, mitigates risk, and reduces the Debtors' exposure to the full amount of the Administrative Claim.

27.     Second, the Debtors have determined that the costs to be incurred in connection with litigating the Dispute outweigh the benefits, if any.  In order for the Debtors to be in a position to finalize their preparations and adequately litigate the Dispute, the Debtors would need to invest significant time and resources finalizing Document and Written Discovery, preparing

for and conducting Deposition Discovery, and preparing for and conducting a full evidentiary hearing once Discovery has been completed. These preparations would be time consuming and would cause the Debtors to incur substantial legal fees on an administrative expense basis. The Debtors have evaluated the time and expense required to adequately prepare to litigate the Dispute and the benefits to be received therefrom. In an exercise of their sound business judgment, the Debtors have determined that it is in their estates' best interests to enter into the Settlement Agreement and avoid incurring the significant costs associated with litigating the Dispute where, as aforementioned, the litigation is uncertain and may result in a significant adverse judgment.

28.    <u>Third</u>, resolving the Dispute pursuant to the Settlement Agreement provides immediate, tangible benefits to the Debtors in the form of cost savings and limiting their payment exposure on the Administrative Claim. By entering into the Settlement Agreement, the Debtors limit their payment exposure at $605,000.00, resulting in a tangible savings of more than $700,000.00 when compared against the full value of the Administrative Claim. In addition, as part of the mutual release of claims, Bunim/Murray will waive its Prepetition Unsecured Claim. Finally, the Debtors will also avoid spending significant time preparing to litigate the Dispute, which will save their estates from incurring significant legal fees on an administrative basis. By resolving the Dispute in accordance with the Settlement Agreement, the Debtors believe that that these cost savings will inure to the benefit of their estates and creditors, and is in their best interests.

29.    <u>Fourth</u>, the Debtors believe that entering into the Settlement Agreement will provide the Debtors with a final resolution of the Dispute. By virtue of the mutual releases embodied in the Settlement Agreement, the Settlement Agreement will fully and finally resolve

the Dispute and the Parties will waive any other causes of action relating thereto. In addition, the Project Runway Agreements, and certain other Bunim/Murray production agreements, will be terminated and deemed rejected, terminating the relationship between the Parties. This closure will allow the Debtors and their professionals to focus their time, energy and limited resources on working towards a final resolution for these chapter 11 cases. Accordingly, the Debtors believe that resolving the Dispute pursuant to, and in accordance with, the Settlement Agreement is in the best interests of their estates.

30.    **Fifth**, the Committee supports the Debtors' entry into the Settlement Agreement. Throughout the course of settlement negotiations, the Debtors have consulted with the Committee. After discussing the Settlement Agreement with the Debtors and conducting an independent evaluation of the facts and circumstances surrounding the Dispute, the Committee has informed the Debtors that the Committee supports the Debtors' entry into the Settlement Agreement.

31.    Accordingly, for those reasons set forth above, the Debtors submit that their entry into the Settlement Agreement is an exercise of their sound business judgment and should be approved.

32.    As the Court knows, debtors-in-possession are permitted to operate the debtors' business. *See* 11 U.S.C. § 1108. This includes the right of the debtors-in-possession to use the debtors' assets to operate the business and to make payments in the ordinary course of the debtors' business. *See* 11 U.S.C. § 363(c)(1). Accordingly, a court's authorization is not necessary for such payments. *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *In re Nutall Equip. Co., Inc.*, 188 B.R. 732, 737 (Bankr. W.D.N.Y. 1995). Here, the Debtors intend to make the initial payment of $150,000 to Bunim/Murray on December 28, 2018. The Debtors

believe that the payment is an ordinary course administrative payment that does not require further approval from the Court.  However, to the extent that Bankruptcy Code section 363 is implicated in connection with the compromise embodied in the Settlement Agreement, out of an abundance of caution the Debtors seek authority to execute and perform the obligations thereunder, including approval of the releases set forth in the Settlement Agreement.  The Debtors submit that the terms of the Settlement Agreement have a sound business purpose and represent the exercise of sound business judgment for the reasons set forth in paragraphs 26-30, *supra*.  Accordingly, any actions required to effectuate the terms of the Settlement Agreement should be authorized and approved pursuant to Bankruptcy Code section 363(b).  *See In re Lionel Corp.*, 722 F. 2d 1063, 1071 (2d Cir. 1983); *In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

33. Finally, authorizing the Debtors to enter into and effectuate the terms of the Settlement Agreement is well within the equitable powers of this Court.  *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."); *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

34. Accordingly, for those reasons set forth above, the Settlement Agreement should be approved under Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code.

## **NOTICE**

35. The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to Bunim/Murray; and (iv) all parties that have requested service of notices pursuant to Bankruptcy Rule 2002. A copy of the Motion is also available on the Debtors' case website at http://dm.epiq11.com/twc.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: December 18, 2018
      Wilmington, Delaware

    */s/ Robert C. Maddox*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Robert C. Maddox (No. 5356)
Brett M. Haywood (No. 6166)
David T. Queroli (No. 6318)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

**CRAVATH, SWAINE & MOORE LLP**
Paul H. Zumbro (admitted *pro hac vice*)
George E. Zobitz (admitted *pro hac vice*)
Karin A. DeMasi (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for the Debtors
and Debtors in Possession*