# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| The Weinstein Company Holdings LLC, *et al*., | : | Case No. 18-10601 (MFW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : | **Re: Docket Nos. 846, 1664, 1695, 1724, 1771** |

------------------------------------------------------- x

|  |  |  |
|---|---|---|
| Lantern Entertainment LLC, | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | Adv. Pro. No. 18-50924 (MFW) |
|  | : |  |
|  | : | **Re: Adv. Pro. Docket Nos. 1, 6, 7, 8, 10, 11** |
| Bruce Cohen Productions, and Bruce Cohen, | : |  |
|  | : |  |
| Defendants. | : |  |

------------------------------------------------------- x

**OMNIBUS OBJECTION OF LANTERN ENTERTAINMENT LLC
TO (I) SUPPLEMENTAL OBJECTION AND JOINT MOTION OF SLP
CONTRACT COUNTERPARTIES TO CLARIFY SALE ORDER; (II) MOTION
OF EXECUTORY CONTRACT COUNTERPARTIES FOR ORDER CONFIRMING
THAT COUNTERPARTIES' AGREEMENTS HAVE BEEN DESIGNATED BY
LANTERN FOR ASSUMPTION AND ASSIGNMENT; AND (III) THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS' (A) OBJECTION TO
SUPPLEMENTAL NOTICE OF FILING OF LIST OF ASSUMED
CONTRACTS PURSUANT TO SALE ORDER AND (B) JOINDER TO THE
MOTION OF EXECUTORY CONTRACT COUNTERPARTIES FOR ORDER
CONFIRMING THAT COUNTERPARTIES' AGREEMENTS HAVE BEEN
<u>DESIGNATED BY LANTERN FOR ASSUMPTION AND ASSIGNMENT</u>**

R. Craig Martin, Esq.
Maris J. Kandestin, Esq.
DLA PIPER LLP (US)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  craig.martin@dlapiper.com
          maris.kandestin@dlapiper.com

Thomas R. Califano, Esq.
Rachel Ehrlich Albanese, Esq.
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
Email:  thomas.califano@dlapiper.com
          rachel.albanese@dlapiper.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

RELEVANT BACKGROUND ........................................................................................4

THE TALENT PARTIES' CONTENTIONS AND MOTIONS ....................................9

ARGUMENT ...............................................................................................................11

    **A.**    Lantern Entertainment Purchased the Underlying Copyrights Under the APA ..........12

        **1.**    The Debtors owned the intellectual property in the Covered Titles independent of the Talent Agreements. ......................................................................................14

        **2.**    The Debtors' intellectual property rights in the Covered Titles can be, and were, transferred separately and independently from the ancillary Talent Agreements. ......................................................................................................16

    **B.**    The Talent Agreements Are Not Executory Contracts Because the Outstanding Performance Items are Immaterial, the Talent Agreements Have Been Substantially Performed, and Certain of the Performance Items are no Longer Extant ....................................................................................................................18

    **C.**    The Talent Agreements Were Property of the Estates on the Petition Date and Lantern Entertainment Purchased the Debtors' Rights Under Those Agreements Free and Clear of All Liens, Claims, and Encumbrances ...........................................28

    **D.**    The Court's Ruling on the Summary Judgment Pleadings May Moot the Talent Party Motions and Their Other Pleadings ........................................................32

CONCLUSION............................................................................................................34

## EXHIBITS AND APPENDICES

APPENDIX 1

APPENDIX 2 (filed under seal)

EXHIBIT A – Talent Agreements (filed under seal)

EAST\163464966.12

Lantern Entertainment LLC ("Lantern Entertainment"), by and through its undersigned counsel, DLA Piper LLP (US), files this omnibus objection (the "Objection") to (I) the *Supplemental Objection and Joint Motion of SLP Contract Counterparties to Clarify Sale Order* [Docket No. 1664] (the "Motion to Clarify"); (II) the *Motion of Executory Contract Counterparties for Order Confirming That Counterparties' Agreements Have Been Designated by Lantern for Assumption and Assignment* [Docket No. 1724] (the "Motion to Confirm"); and (III) *The Official Committee of Unsecured Creditors' (A) Objection to Supplemental Notice of Filing of List of Assumed Contracts Pursuant to Sale Order and (B) Joinder to the Motion of Executory Contract Counterparties for Order Confirming That Counterparties' Agreements Have Been Designated by Lantern for Assumption and Assignment* [Docket No. 1771] (the "Joinder" and, together with the Motion to Clarify and the Motion to Confirm, the "Talent Party Motions").[1]  In support of this Objection, Lantern Entertainment relies upon the accompanying Declaration of Irwin Reiter[2] and respectfully states as follows:

## PRELIMINARY STATEMENT[3]

Before Lantern Entertainment agreed to act as stalking horse purchaser for the Debtors' assets, the prospects for a successful resolution of these cases were dim, as indicated by a series of

---

[1]     As the Joinder filed by the Official Committee of Unsecured Creditors (the "Committee") echoes or joins the arguments of the Talent Parties (as defined below), Lantern Entertainment addresses the Committee's Joinder in tandem with the Talent Party Motions in this Objection.  The only separate issue raised by the Committee relates to the *Waco* project, which is the subject of ongoing discussions between those parties and Lantern Entertainment.  In addition, there are other talent parties that have filed objections with similar arguments to those set forth in the Talent Party Motions, but those objections are not before the Court at this time.

[2]     *Declaration of Irwin Reiter in Support of Omnibus Objection of Lantern Entertainment LLC to (I) Supplemental Objection and Joint Motion of SLP Contract Counterparties to Clarify Sale Order; (II) Motion of Executory Contract Counterparties For Order Confirming That Counterparties' Agreements Have Been Designated by Lantern for Assumption and Assignment; and (III) The Official Committee of Unsecured Creditors' (A) Objection to Supplemental Notice of Filing of List of Assumed Contracts Pursuant to Sale Order and (B) Joinder to the Motion of Executory Contract Counterparties for Order Confirming That Counterparties' Agreements Have Been Designated by Lantern for Assumption and Assignment* (the "Declaration"), filed contemporaneously herewith.

[3]     Capitalized terms are defined elsewhere in this Objection.

failed pre-petition sale efforts by the Debtors.  No other bidder came forward with a higher or better offer, and Lantern Entertainment purchased substantially all of the Debtors' assets.  There is no dispute that Lantern Entertainment purchased certain "Covered Titles" including, as specifically relevant here, four films: *Silver Linings Playbook, St. Vincent, August: Osage County, and Scary Movie* 5.  Lantern Entertainment, along with substantially all of the Debtors' assets, acquired the Debtors' rights under the Talent Agreements and agreed to pay post-closing amounts that may come due under such agreements.

The Talent Party Motions are an attempt by counterparties to certain contracts with the Debtors[4] to recover from a third party (Lantern Entertainment) amounts allegedly due them from the Debtors prior to the closing of the sale to Lantern Entertainment.  Lantern Entertainment did not agree to assume these obligations.  In an attempt to impose these obligations on Lantern, the Talent Parties  claim that their contracts are executory, that Lantern Entertainment is bound to assume them and, consequently, that by way of "cure" under section 365 of the Bankruptcy Code, Lantern Entertainment is obligated to pay the Talent Parties amounts that may have been owed to them by the Debtors as of the Petition Date.

The contracts in question are not executory under any credible legal analysis.  These contracts are standard "work for hire" contracts that were incident to the production of certain films.  All material obligations due from the Talent Parties were performed long before the Debtors' chapter 11 filing when these films were completed.  The only material obligation due under these contracts is the right of the Talent Parties to receive a share of the net profits from

---

[4]    Those counterparties are referred to in this Objection as the "Talent Parties" and include Bill Murray and Willie Lump Enterprises, Inc.; Bruce Cohen and Bruce Cohen Productions; David O. Russell and Kanzeon Corp.; David Zucker and Jerry's Brother, Inc.; Donna Gigliotti; George Clooney and Dynamic '88 Productions, Inc.; Grant Heslov and Good Lie, Inc.; Jon Gordon and Jon Gordon Productions, Inc.; Julia Roberts and Sabajka Productions II, Inc.; Meryl Streep; Robert De Niro and Canal Productions, Inc.; Smoke House Pictures; Bradley Cooper and 22nd and Indiana, Inc.; and Jennifer Lawrence and Floffin, Inc.

these films, and Lantern Entertainment has agreed to pay any such amounts that may come due post-closing through the second amendment to the APA.   The contracts in question are straightforward:  the Talent Parties agreed to perform services in connection with the production of a particular film, they agreed they would not assert any rights of authorship that would interfere with the distribution of the film, and the Debtors agreed that the Talent Parties would receive certain payments, including a participation in future potential profits of the production.   To point to certain incidental provisions in these contracts as establishing that *material* performance remains on both sides of the contract simply ignores the economic realities of the underlying agreements.   Neither Lantern Entertainment nor the Debtors needs (or needed) the cooperation of the Talent Parties to make economic use of their rights to the "Covered Titles" (as defined in the APA).[5]   In fact, the very terms of the agreements in question make clear that, as drafted, a future breach by TWC would not impact either the ownership rights to, or the ability to make use of, the underlying intellectual property.   The true economic aims of these agreements were accomplished at the time performance was rendered by the Talent Parties, the Debtors owned the rights to the Covered Titles and were able to sell them to Lantern Entertainment.   These transferred rights, of necessity, included the rights the Debtors enjoyed under the non-executory, disputed Talent Agreements.    As the agreements through which the Debtors acquired the rights that were subsequently transferred to Lantern Entertainment were not executory, any discussion of assignment or assumption or cure amounts is completely irrelevant.   Accordingly, the Talent Party Motions should be denied.

---

[5]      *See Asset Purchase Agreement by and among The Weinstein Company Holdings LLC, The Persons Listed on Schedule 1 Hereto and Lantern Entertainment LLC dated as of March 19, 2018* (as amended, the "APA"), at § 3.10.

## RELEVANT BACKGROUND

1.      The above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company," as applicable) filed these chapter 11 cases (the "Chapter 11 Cases") with the purpose of consummating a sale of substantially all of the Company's assets under section 363 of title 11 of the United States Code (the "Bankruptcy Code").  *See* Docket No. 7, at ¶ 4.  Indeed, the Debtors filed a bid procedures and sale motion on the first day of these Chapter 11 Cases [Docket No. 8] (the "Sale Motion").  The reasons the Company sought bankruptcy protection have been widely reported and are well-known, and need not be repeated here.  Suffice it to say, the Debtors were in a unique crisis situation, facing a real possibility that the value of their estates would totally evaporate.  While there was value deterioration due to the crisis, Lantern Entertainment paid a substantial sum to acquire the Covered Titles and even took the unusual step of agreeing to pay future amounts to the Talent Parties, which means the Talent Parties may fare better in these cases than other similarly situated creditors.  Additional facts relevant to the Talent Party Motions are summarized below.

2.      Prior to filing these Chapter 11 Cases, the Company was in negotiations with Mediaco Acquisition, LLC ("Mediaco")[6] regarding the sale of the Company's assets and entered into an asset purchase agreement on March 1, 2018.  *See* Sale Motion, at ¶ 20.  However, one week later, Mediaco terminated the asset purchase agreement due to the Company's failure to secure additional funding to finance the Company through the closing of the proposed sale.  *See id.* Immediately following this failed pre-petition sale attempt, on March 8, 2018, Lantern Entertainment submitted a bid and offered to serve as the stalking horse bidder for the Company's

---

[6]      Mediaco was a consortium of investors that includes the Yucipa Companies, Lantern Asset Management LLC, Maria Contreras-Sweet, and other investors.  *See* Docket No. 8, at ¶ 13.

assets, thereby setting a floor for the value of the Company's assets as well as serving as a catalyst for bringing other potential bidders to the table to secure the highest and best offer for the Company's assets. *See* Sale Motion, ¶¶ 21-22. On March 19, 2018 (the "Petition Date"), the Debtors filed these Chapter 11 Cases with the Sale Motion and Lantern Entertainment as the stalking horse bidder for substantially all of the Debtors' assets.

3.     Lantern Entertainment's offer remained the highest and best offer received by the Debtors for their assets even after the post-petition sale process. *See* Docket No. 653.

4.     This Court approved the sale of substantially all of the Debtors' assets (the "Section 363 Sale") to Lantern Entertainment on May 9, 2018 (the "Sale Order") for $287 million pursuant to the APA. As a result of the Section 363 Sale, the Debtors were able to maximize the value of their assets. Under the APA, through the second amendment thereof, and in exchange for a reduction in the purchase price for the assets, Lantern Entertainment agreed to pay cure amounts for executory contracts that it chose to take assignment of from the Debtors. *See* Docket No. 1202, Ex. A, § 2.7. Through the second amendment to the APA, Lantern Entertainment also agreed to pay post-closing amounts that may come due under the Talent Agreements to the Talent Parties. APA, § 2.3. Pre-closing obligations under the Talent Agreements remain the responsibility of the Debtors, however. *See* APA, §§ 2.4(j), 3.10(f).

5.     On July 13, 2018, the Section 363 Sale to Lantern Entertainment closed. *See* Docket No. 1247.

6.     Included in the Debtors' assets were the rights provided under certain agreements with various parties related to services that had previously been provided in connection with the production of certain films. The agreements were "work for hire" agreements that provided that, among other things, (a) the talent parties would participate with respect to the applicable film, (b)

5

acknowledge that all intellectual property rights to the materials belonged to the Debtors, and (c) a contingent share of net profits derived from the exploitation of the film after payment of all relevant expenses are paid would be due the Talent Parties.  The participation/talent agreements at issue here (collectively, the "Talent Agreements") relate to films that were released for distribution between five and seven years ago:  *St. Vincent* (2014), *August: Osage County* (2013), *Scary Movie 5* (2013), and *Silver Linings Playbook* (2012).[7]

7.    On November 8, 2018, in accordance with the terms of the APA, Lantern Entertainment filed a final list of contracts and leases (the "Notice") designating, among others, disputed contracts to be assumed subject to the outcome of litigation (the "Disputed Contracts").  *See* Docket No. 1695.  The Talent Agreements were listed in the Notice as Disputed Contracts as a precaution, with the Debtors' assumption and assignment of such agreements to Lantern Entertainment being expressly contingent upon the outcome of litigation.  Lantern Entertainment specifically reserved all rights regarding assumption of the Talent Agreements as assumption was contingent upon whether the Talent Agreements were executory on the Petition Date.  *See* Notice, n.3.

8.    The Talent Parties are the counterparties to the Talent Agreements designated as Disputed Contracts in the Notice.  Some or all of the Talent Parties are movants with respect to each of the Talent Party Motions.

---

[7]    Copies of the Talent Agreements are attached to this Objection as Exhibit A and are the subject of the *Motion of Lantern Entertainment LLC to File Under Seal Exhibits to the Omnibus Objection of Lantern Entertainment LLC to (I) Supplemental Objection and Joint Motion of SLP Contract Counterparties to Clarify Sale Order; (II) Motion of Executory Contract Counterparties For Order Confirming That Counterparties' Agreements Have Been Designated by Lantern for Assumption and Assignment; and (III) The Official Committee of Unsecured Creditors' (A) Objection to Supplemental Notice of Filing of List of Assumed Contracts Pursuant to Sale Order and (B) Joinder to the Motion of Executory Contract Counterparties for Order Confirming That Counterparties' Agreements Have Been Designated by Lantern for Assumption and Assignment*, which Lantern Entertainment is filing contemporaneously with this Objection.

6

9.      The Debtors received a significant number of objections and other filings in connection with their proposed assumption and assignment of executory contracts to Lantern Entertainment, with the Talent Parties and other similarly-situated parties, alone filing over 100 pleadings, including the two Talent Party Motions.  This Objection only addresses the Talent Agreements that are the subject of the Talent Party Motions.  The remaining objections are subject to further proceedings or negotiated resolutions.  It is likely, however, that due to the similarity of the contracts and issues presented in the Talent Party Motions, a ruling on the Talent Party Motions will apply generally in these cases, as more fully discussed in Section D below.

10.     In an attempt to streamline the resolution of these objections, on August 1, 2018, Lantern Entertainment filed its Motion for Order Establishing Streamlined Procedures to Resolve Objections to the Potential Assignment of Certain Executory Contracts and Unexpired Leases to Lantern Entertainment LLC [Docket No. 1282] (the "Procedures Motion").[8]  The Court declined to grant the relief requested in the Procedures Motion and instructed Lantern Entertainment to initiate a contested matter or an adversary proceeding to litigate the issues at the heart of the contract disputes—whether the Talent Agreements are executory.

11.     On October 17, 2018, Lantern Entertainment filed an adversary proceeding against Bruce Cohen Productions and Bruce Cohen, effectively to serve as a test case, seeking a declaratory judgment that the Talent Agreement at issue was not executory and that Lantern Entertainment purchased the rights appurtenant to the Talent Agreement (along with the Covered Titles) free and clear of all liens, claims and encumbrances through the Section 363 Sale (the

---

[8]      Following the closing of the Section 363 Sale, Lantern Entertainment discovered that the Debtors' books and records were not as organized as it had expected.  This fact precipitated Lantern Entertainment's request for streamlined procedures and also contributed to the delay in delivering the statements due under the Participation Agreements.  As noted below, Lantern Entertainment prepared those statements in advance of the mediation, however, and delivered them to counsel to the Talent Parties at the mediation.

7

"Adversary Proceeding"). *See* Adv. Pro. No. 18-50924 (MFW). The material terms of the Talent Agreements are essentially the same, and in relation to the core issue underlying the Talent Party Motions—whether the Talent Agreements are executory—the relevant provisions and the impact thereof is the same, although each Talent Agreement necessarily has certain distinguishing factors not relevant to the issues presented by these motions (i.e., different films, different actors, producers, and the like).

12.     On October 18, 2018, Lantern Entertainment filed a motion for summary judgment [Adv. Pro. Docket No. 6] (the "Summary Judgment Motion"). Briefing on the Summary Judgment Motion was completed on November 19, 2018, and Lantern Entertainment requested that the Court hear arguments in connection with the Summary Judgment Motion and all of the related briefing (collectively, the "Summary Judgment Pleadings"). *See* Adv. Pro. Docket Nos. 13 & 16.

13.     Additionally, on November 5, 2018, some of the Talent Parties related to the film *Silver Linings Playbook* filed the Motion to Clarify, and on November 16, 2018, all of the Talent Parties filed the Motion to Confirm.

14.     On November 29, 2018, in connection with the pre-trial conference in the Adversary Proceeding, Lantern Entertainment requested that argument on the Summary Judgment Motion occur on the same date as the hearing on the related Talent Party Motions. The Court agreed that the matters should be heard concurrently, but urged Lantern Entertainment and the Talent Parties to try to mediate their disputes.

15.     On December 18, 2018, Lantern Entertainment and its counsel, and the Talent Parties' representatives and counsel, participated in a mediation session in Los Angeles, California before former bankruptcy judge Randall Newsome that ultimately was unsuccessful. At the mediation, Lantern Entertainment provided to the Talent Parties the most recent statements of

8

monies, if any, owed under the Talent Agreements based on their respective shares of net profits derived from the exploitation of the films after payment of all relevant expenses in the second quarter of 2018.  In the majority of cases, the amounts owed are *de minimis*.

### THE TALENT PARTIES' CONTENTIONS AND MOTIONS[9]

16.    In the Motion to Clarify, the Talent Parties generally acknowledge that the Debtors sold all of their assets to Lantern Entertainment free and clear of all liens and claims, including their copyright interest in *Silver Linings Playbook*, and that the Talent Agreements associated with that film were transferred to Lantern Entertainment, free and clear of "any going forward payment obligations and non-Monetary Obligations contained in the contracts."  Motion to Clarify, at 2. Notwithstanding the facts that the Section 363 Sale closed months ago and the Sale Order is clear on its face, they assert that the Court must "clarify" the Sale Order to state that "the Sale Order did not sell [*Silver Linings Playbook*] to Lantern free and clear of the SLP counterparties' rights in, and SLP Film's obligations under, the non-debtor, executory SLP Contracts."  *Id*. at 3-4.  As justification, the Talent Parties argue that the Talent Agreements relating to *Silver Linings Playbook* are not property of the estates because the Debtors did not prove the chain of title and they belong to special purpose, non-debtor entities.

17.    The Talent Parties' Motion to Confirm ignores the language of the APA and argues that the language of the Notice (despite the aforementioned reservation of rights) constitutes a commitment by Lantern Entertainment to take assignment of the Talent Agreements (which necessarily they argue would make them executory).  The Motion to Confirm asks the Court to order the Debtors to assume the allegedly executory contracts and then force Lantern

---

[9]    As the movants have the same counsel and assert substantially similar arguments in the Talent Party Motions, and the Committee filed its joinder to the Motion to Confirm, the arguments are addressed collectively for purposes of this Objection.

Entertainment to take assignment of them and consequently pay any relevant "cures".  Apparently

motivated to reduce the amount of unsecured claims in the estate, the Committee's Joinder takes

the same position.

18.     Thus, the issues raised in the Talent Party Motions can be concisely summarized as

follows:

- ■    *Whether the Talent Agreements are executory.*

  **Short Answer:**  The Talent Agreements are not executory because they
  were fully performed.    Neither party has any material outstanding
  obligations.  The law provides that the mere payment of money under an
  otherwise fully performed contract does not make the contract executory,
  and the Talent Parties have not identified any remaining material
  obligations.  Indeed, the Covered Titles have been produced and shown in
  theaters.  No amount of non-performance of whatever incidental, residual
  obligations which may remain on their part would have any impact on the
  principal aim of these agreements, i.e., the creation and production of the
  film, and the "executory" argument must fail.

- ■    *If the Talent Agreements are determined to be executory, is Lantern
  Entertainment required to take assignment of the agreements if the
  parties cannot agree on the proper cure amount.*

  **Short Answer:**  Lantern Entertainment is under no obligation to take
  assignment of an executory contract if the cure amount cannot be agreed
  upon.  It is routine for a sale order and an asset purchase agreement to afford
  the purchaser the ability to designate agreements to be rejected after the sale
  has been approved under section 363 of the Bankruptcy Code.

- ■    *Whether the Talent Agreements are property of the Debtors' estates under
  section 541(a) of the Bankruptcy Code such that the Debtors' rights in the
  Talent Agreements were sold to Lantern Entertainment under section 363
  of the Bankruptcy Code.*

  **Short Answer:**  As set forth in detail below, the Debtors owned the rights
  under Talent Agreements on the Petition Date, and thus, the Talent
  Agreements rights under these agreements, which were part of the bundle
  of rights the Debtors had in the Covered Titles, were property of the estate
  capable of being sold through the Section 363 Sale.  *See* APA, § 2.8(c)(y)
  and ¶ 33 of the Sale Order.

- ■    *If the rights under the Talent Agreements are property of the Debtors'
  estates and are not executory, and the Debtors' rights  were transferred to*

*Lantern Entertainment, is Lantern Entertainment required make any payments under the Talent Agreements.*

**Short Answer:**   Except with respect to the payment of post-closing amounts thereunder, Lantern Entertainment is not required to perform under the Talent Agreements.[10]   Lantern Entertainment purchased the Talent Agreements free and clear of the Liens and Claims (each as defined in the APA) of the Talent Parties.

Each of these points in addressed below.

## ARGUMENT[11]

19.      The issue at the heart of the Adversary Proceeding and the Talent Party Motions is whether the Talent Agreements are executory or whether Lantern Entertainment purchased the rights granted under the Talent Agreements, along with the Covered Titles, under section 363 of the Bankruptcy Code.  For the reasons set forth below, irrespective of the outcome of the litigation regarding the executory nature of the Talent Agreements, Lantern Entertainment owns the underlying rights to the Covered Titles and the movants have no rights with respect to the exploitation of the Covered Titles—indeed, the Talent Parties do not take the position that Lantern Entertainment cannot use or benefit from the intellectual property it purchased from the Debtors. They simply have crafted an argument that Lantern Entertainment is obligated to pay them amounts that the Debtors failed to pay pre-closing.

20.      The rights granted under the Talent Agreements were property of the Debtors' estates under section 541(a) of the Bankruptcy Code on the Petition Date, and Lantern Entertainment purchased the Debtors' rights, along with all other interests the Debtors had in the

---

[10]      Through the second amendment to the APA, Lantern Entertainment agreed to make post-closing payments, if any, due to the Talent Parties.

[11]      In lieu of repeating the detailed arguments set forth in its Summary Judgment Pleadings, Lantern Entertainment incorporates the arguments set forth therein into this Objection.

Covered Titles, pursuant to section 363 of the Bankruptcy Code, free and clear of all liens, claims, and encumbrances.

21.     The Talent Agreements are not executory, and thus, the cure provisions of section 365 of the Bankruptcy Code are inapplicable (but even if they are, if Lantern Entertainment does not agree with the asserted or Court-imposed cure amount, it may designate those contracts as Excluded Assets under the APA subsequent to closing).

**A.   Lantern Entertainment Purchased the Underlying Copyrights Under the APA**

22.     While the Talent Parties focus their arguments on the allegedly executory nature of the Talent Agreements, they fail to recognize that Lantern Entertainment owns the underlying copyrights of the films relevant to the Talent Agreements.  As these agreements clearly provide, the Talent Parties contracted to perform certain services in connection with the subject film, the Talent Parties were paid according to those terms, and the Talent Parties agreed that the Debtors would own all rights with respect to the intellectual property free and clear of any claim of authorship by the Talent Parties.[12]  Thus, through the Talent Agreements the Talent Parties acknowledged that they had no right of ownership to the works in question and consequently agreed not to interfere with the Debtors' rights to use and exploit the work in question, even if the Debtors breached their obligations to make payments under the agreements in the future.

23.     The intellectual property related to the films in which the Talent Parties participated was sold to Lantern Entertainment as part of the sale, free and clear of all liens, claims and encumbrances (and while the Talent Parties have raised an issue with respect to the assignment of the subject contracts from the original contract parties to the Debtors, as explained below, there is

---

[12]     Attached to this Objection as <u>Appendix 2</u> is a chart summarizing the contentions of the Talent Parties with respect to the alleged executory nature of the Talent Agreements and the corresponding responses of Lantern Entertainment.

12

no merit to their position).  The APA provides that Lantern Entertainment acquired from the Seller Parties free and clear of all Liens the "Purchased Assets," which included all "direct or indirect right, title and interest in, to or under the Business and all of Seller Parties' property, rights, Claims and assets of every kind and description, wherever situation or located, real, personal or mixed, tangible or intangible, wither identifiable or contingent, owned, leased, licenses, used or held for use in or relating to the Business, whether or not reflected on the books and records of the Seller Parties, as the same shall exist on the Closing Date."  *See* APA, § 2.1.  Schedule 2.1 to the APA identified certain specific assets that were included in the "Purchase Assets," which included "Covered Titles."  These Covered Titles were then listed on Annex 1 to the APA.  The films that relate to the Talent Agreements are all "Covered Titles" under the APA.  *See* APA, § 3.10, Schedule 2.1(b), and Annex 1.

24.    No one has contended that prior to the Section 363 Sale, the Talent Agreements were not used in or part of the Debtors' "Business," which was defined in the APA as "the business of developing, producing, distributing and otherwise *Exploiting*[13] motion pictures, television programs and other audio visual content as currently conducted by the Seller Parties."  *Id.*, Ex. A-2 (emphasis added).  Instead, notwithstanding that Lantern Entertainment purchased the Covered Titles and that the APA gives Lantern Entertainment the right to Exploit the Covered Titles, the Talent Parties in essence are arguing that is not what the APA says and the Sale Order should be modified to provide that unless the Talent Agreements were either property of the estate or were

---

[13]    The term "Exploit" is defined in the APA to mean "with respect to a Covered Title, the exhibition, distribution, reproduction, development, subdistribution, transmission, display, broadcast, performance, dissemination, publication, production, co-production, promotion, publicizing, advertising, reproduction, rental, leasing, subleasing, selling, licensing, sublicensing, transfer, disposal of, commercializing, marketing, usage, trading in, turning to account, dealing with and in and otherwise exploiting such Covered Title by any and all means, methods, processes, media devices and delivery systems of every kind or character, whether now known or hereafter created, including, without limitation, the right to exercise the ancillary rights relating thereto and to produce and develop such Covered Titles (including derivative rights therein), to the extent included in the Title Rights.  The meaning of the term 'Exploitation' shall be correlative to the foregoing."

13

assumed, Lantern Entertainment does not actually have the right to Exploit the films at issue in the

Talent Party Motions.  This position is not supported by applicable law, the APA or the Sale Order,

and is instead an attempt by the Talent Parties to undermine the Section 363 Sale and the finality

of the Sale Order, including the protections of section 363(m) of the Bankruptcy Code.

25.     Below is an outline of the rights Lantern Entertainment acquired through the

Section 363 Sale as relate to the Talent Party Motions.[14]

### 1. The Debtors owned the intellectual property in the Covered Titles independent of the Talent Agreements.

26.     The Debtors' copyrights in each of the Covered Titles does not derive from the

work-made-for-hire ("WMFH") and assignment clauses in the Talent Agreements.  Securing such

agreements from individual film participants is an industry-standard approach to minimizing the

risk that an individual will attempt to interfere with a filmmaker's distribution rights.  But a film

producer need not obtain a WMFH agreement or assignment from each individual contributor in

order to be the film's sole copyright owner, as both the Ninth Circuit Court of Appeals and the

Second Circuit Courts of Appeals have recently recognized.  Such a regime would "make[] Swiss

cheese of copyrights" and create a "logistical and financial nightmare" for film producers.  *Garcia*

*v. Google, Inc.*, 786 F.3d 733, 742-43 (9th Cir. 2015) ("Treating every acting performance as an

independent work would not only be a logistical and financial nightmare, it would turn cast of

thousands into a new mantra: copyright of thousands.").

27.     In *Garcia v. Google*, an actress sought to enjoin a film publication on YouTube,

asserting infringement of an alleged copyright in her individual performance.  Sitting *en banc*, the

Ninth Circuit rejected Garcia's copyright ownership claim.  The court noted, as is evident here,

---

[14]     A review of the rights granted to Lantern Entertainment is helpful to put the provisions of the Talent Agreements in their proper context as the Court considers whether the provisions thereof, render them executory.

EAST\163464966.12

that "contracts and the [WMFH] doctrine govern much of the big-budget Hollywood performance and production world." *Id.* at 743.  But in the absence of such contracts, *Garcia* confirms that individual performers do not retain copyright protection in their performances.

28.     Relying on *Garcia*, the Second Circuit similarly rejected a film director's copyright ownership claim in *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247 (2d Cir. 2015).  In that case, each cast and crew member entered into an "Independent Contractor" and WMFH agreement with producer Casa Duce, except for the film's director, Merkin.  In the context of Casa Duce and Merkin's ownership dispute, the Second Circuit held that "[i]n cases in which none of the multiple-author scenarios specifically identified by the Copyright Act applies, but multiple individuals lay claim to the copyright in a single work, the dispositive inquiry is which of the putative authors is the 'dominant author.'"  *Id.* at 260-61.

29.     The Second Circuit resolved this issue in producer Casa Duce's favor.  The court recognized relevant "factual indicia of ownership and authorship" relevant to the "dominant author" inquiry, "including decisionmaking authority, billing, and written agreements with third parties." *Id.*  Decisionmaking authority "refers to the parties' relative control 'over what changes are made and what is included in a work.'"  *Id.*  In *Casa Duce*, "[t]he [WMFH] agreements also stated that Casa Duse would retain 'complete control' of the film's production and 'own all of the results and proceeds of [the cast and crew's] services in connection with the [film]…including, but not limited to, all [copyrights] throughout the world…." *Id.*  Similarly, here, for *Silver Linings Playbook*, it is beyond dispute that "in the context of the project as a whole, [The Weinstein Company LLC ("TWC")] exercised far more decisionmaking authority" than Cohen or others, as it "initiated the project; acquired the rights to the screenplay; selected the cast, crew and director;

controlled the production schedule; and coordinated (or attempted to coordinate) the film's publicity and release." *Id.* at 260-61; Cohen Contract ¶ 6.

30.     Moreover, the inquiry concerning "the parties' agreements with outsiders…points decisively in [TWC's] favor," because producer TWC "obtained written [WMFH] agreements from every cast and crew member," and "[TWC] executed all of the relevant third-party agreements." *Id.* Thus, although the WMFH clauses in the Talent Agreements are not required to grant TWC ownership rights, they nonetheless show that TWC is the "dominant author" of the Covered Titles and that all parties involved in the production understood TWC was the sole copyright owner.  And, in conducting the business sold under the APA, TWC had the right to Exploit the copyright and that right was sold to Lantern Entertainment.

31.     Finally, any potential claim to name, image or likeness rights associated with the film is subsumed within the film's copyright.  Thus, any potential state law right of publicity violation claim asserted by contracting film participants would be preempted by the Copyright Act.  *See, e.g, Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911, 1924 ("A claim asserted to prevent nothing more than the reproduction, performance, distribution, or display of a dramatic performance captured on film is subsumed by copyright law and preempted.").  Again, as a result of entry into the work-for-hire agreements, the Debtors had an unrestricted right to exploit the Covered Titles, independent of the terms of the Talent Agreements.

> ## 2.  *The Debtors' intellectual property rights in the Covered Titles can be, and were, transferred separately and independently from the ancillary Talent Agreements.*

32.     The Talent Agreements are, in essence, tangential services agreements.  Those agreements trigger fixed compensation obligations, with the remaining obligations being wholly contingent, by the Debtors to the individual talent in consideration for their services.  With respect to Lantern Entertainment's purchase of the Debtors' assets under section 363 of the Bankruptcy

16

Code, the payment rights and obligations under the Talent Agreements are separate and apart from the transferred intellectual property in the Covered Titles. To the extent that the obligations did travel with the Talent Agreements to Lantern Entertainment, because the obligations are immaterial and because the contracts under which they arise have been substantially performed, this would not make the Talent Agreements executory.

33.     *In re CellNet Data Sys., Inc.,* 327 F.3d 242 (3d Cir. 2003), is analogous and instructive. In that case, debtor CellNet Data Systems ("CellNet") sold its intellectual property assets to buyer Schlumberger, but the parties expressly excluded from the asset purchase agreement certain specified royalty-bearing license agreements relating to the transferred intellectual property. CellNet subsequently rejected the excluded license agreements, and the third-party licensees elected to continue using the licensed intellectual property and to pay the agreed-upon royalties, pursuant to Section 365(n) of the Bankruptcy Code. With CellNet having rejected the licenses, buyer Schlumberger argued that it was entitled to the continued royalty payments due under the licenses, as the current intellectual property owner. The Third Circuit rejected this argument, and held that the debtor CellNet, *not* the buyer Schlumberger, was entitled to the royalties generated under the excluded license agreements. *See also In re Crumbs Bake Shop, Inc*., 522 B.R. 766, 779-80 (Bankr. D.N.J. 2014) (addressing essentially the same issue with respect to third party trademark license agreements and contracts excluded from an intellectual property asset sale, ruling that payment rights under those contracts belonged to the debtor, and not the buyer).

34.     Thus, under Third Circuit precedent, a debtor's royalty payment rights under a third-party license agreement can be "severed" from the sale of the intellectual property asset underlying the license. Likewise, a debtor's payment obligations under a third-party services

17

contract are severable from the sale of the intellectual property asset to which that contract tangentially relates.

35.     In sum, it seems to be the understanding of the Talent Parties that the intellectual property and the Talent Agreements are inextricably tied together such that Lantern Entertainment is unable to purchase or take possession of the intellectual property absent an assumption of the Talent Agreements.  Or, put another way, the Talent Parties mistakenly believe that the Debtors' sale to Lantern Entertainment of the intellectual property in the Covered Titles will somehow revert to the estate absent assumption and assignment of the Talent Agreements to Lantern Entertainment.  Lantern Entertainment owns the intellectual property related to the Covered Titles independent of the Talent Agreements, and it owns the right to Exploit those Covered Titles irrespective of any Talent Agreement's particular status.  The Talent Parties entered into work-for-hire agreements that in no way impacted the Debtors' copyrights or their right to exploit the films at issue.

**B.   The Talent Agreements Are Not Executory Contracts Because the Outstanding Performance Items are Immaterial, the Talent Agreements Have Been Substantially Performed, and Certain of the Performance Items are no Longer Extant**

36.     The films at issue were completed and distributed, and the Talent Agreements were substantially performed, several years ago.  The handful of contract provisions that the Talent Parties collectively point to as rendering the Talent Agreements executory (not all of the provisions appear in each of the Talent Agreements) are: (1) TWC's contingent payment obligations in the event the film at issue makes sufficient additional money to trigger such obligations; (2) a right of first refusal to produce a sequel or the like, if any; (3) a right to approve the use of one's likeness, which, as discussed above, is subsumed within the copyright; (4) potential indemnification

18

obligations; and (5) an agreement not to seek an injunction against the exploitation of the film.[15]

These contingent obligations are of insufficient materiality to render a substantially performed

agreement executory under Third Circuit law.

37.      To wit, all material obligations under the Talent Agreements were performed years

ago, and in most cases, the only potential remaining obligation is one of contingent payment or an

ancillary or contingent obligation that lacks the import and materiality to render the Talent

Agreements executory, and the performance rendered by both parties under the Talent Agreements

outweighs any contingent performance remaining.  The "continuing" obligations referenced by the

Talent Parties (other than the obligation to pay monies, which is not a basis to find a contract

executory) are incidental to the principal economic aim of the Talent Agreements.  Thus, under

the substantial performance test adopted by the Third Circuit in *In re Exide Technologies*, the

Talent Agreements are not executory.  Alternatively, as discussed in detail below, even if the

Talent Agreements had not been substantially performed years ago (which they were), Lantern

Entertainment purchased the Debtors' rights in the non-executory agreements free and clear of

certain restrictions that are contained in certain of the Talent Agreements.

38.      Courts in this District apply the "Countryman" test for determining whether a

contract is executory under section 365 of the Bankruptcy Code.  *In re Waste Sys. Int'l, Inc.*, 280

B.R. 824, 826 (Bankr. D. Del. 2002) (citation omitted).  "The Countryman definition states that a

contract is executory only where the obligations of both the bankrupt and the other party to the

contract are *so far unperformed* that the failure of either to complete performance would

constitute a material breach excusing the performance of the other."  *Id*. (quotations omitted)

---

[15]      In one of the Talent Agreements, there is an obligation for SLP Films, Inc. to add that Talent Party as an
additional insured under applicable insurance policies.  This obligation was completed long ago and does not remain
extant.  As there is no outstanding performance on this obligation, it has no bearing on the executory nature of the that
Talent Agreement.

(emphasis added).  Further, failure to perform the allegedly extant obligation must constitute a "material breach" of the contract if unperformed for a contract to be executory.  *Id.; see also In re Columbia Gas System, Inc.,* 50 F.3d 233, 244 n.20 (3d Cir. 1995).[16]

39.     In determining whether a contract obligation makes an agreement executory, the Third Circuit, in *In re Exide Technologies*, 607 F.3d 957, 963 (3d Cir. 2010), analyzed the "substantial performance doctrine" promulgated by the New York Supreme Court in *Hadden v. Consolidated Edison Co.*, 34 N.Y.2d 88, 356 N.Y.S.2d 249, 312 N.E.2d 445, 449 (1974).  Under this doctrine, when a party has substantially performed before breaching a contract, the non-breaching party is not excused from performance, rendering the breach of an obligation non-material.  *Exide*, 607 F.3d at 963.  In the *Exide Technologies* case, the Third Circuit determined that Exide's substantial performance outweighed, among three other minor obligations, the indemnification obligations under the contract in question.  *Id.*

40.     Even a cursory review of the Talent Agreements reveals that they have been substantially performed, there are no outstanding obligations on *both* sides that, if not performed, would constitute a *material* breach thereof, and that, in most cases, the only obligation remaining is the Debtors' obligation to make future payments, if they accrue.  Further, under the *Exide Technologies* case, the Talent Agreements have been substantially performed by all parties thereto, and on balance, any contingent, unperformed obligations do not outweigh the fact that the Talent Agreements were substantially performed several years ago.

41.     Even if the Talent Agreements had not been substantially performed years ago, and such performance did not outweigh what the Talent Parties cite to as obligations so material as to

---

[16]     The Talent Parties may be conflating the materiality of a single contingent obligation with the alleged executory nature of the entire Talent Agreement.

render their agreement executory, the provisions of the Talent Agreements relied upon by the Talent Parties for demonstrating the executory nature of their agreements are insufficient. Taking in turn the four provisions touted by the Talent Parties as rendering the Talent Agreements executory, it is clear that these contingent provisions are too immaterial to make the agreements executory.

42.     First, the Talent Parties allege that the Debtors' obligation to make payments several years after the films were distributed, payments that are contingent upon the films making a certain amount of money, is sufficient to make the Talent Agreements executory. However, it is well settled that a contract is not executory if the sole remaining obligation is payment by the debtor. *In re Waste Sys. Int'l, Inc.*, 280 B.R. at 827.

43.     Second, the Talent Parties argue that the ability of a Talent Party to approve the use of his or her likeness is a material obligation that renders the agreement executory. However, any potential claim regarding name, image, and likeness rights associated with the Covered Titles is subsumed within each film's copyright. Thus, as discussed above, any state law right of publicity violation claim asserted by contracting film participants is preempted by the Copyright Act. *See, e.g, Fleet,* 50 Cal. App. 4th at 1924, 58 Cal. Rptr. 2d at 653. In other words, the Talent Parties lost this right before the Petition Date, and therefore, a provision such as this cannot render the Talent Agreements executory. In any event, to the extent that such a right survived, there is no evidence that any such future use (as the right does not relate to uses in the past) is even contemplated or that this provision would ever be relevant again, years after the film's release, and the Talent Parties could explore their state law remedies.

44.     Third, Bruce Cohen and Bruce Cohen Productions argue that the right of first refusal in their Talent Agreement to produce a sequel, prequel, or related film or television feature,

if ever made, renders the Talent Agreement executory. *See* Cohen Talent Agreement, ¶ 13 ("if [SLP Films, Inc.] (or its successors, assigns or licensees)" elects to produce a "subsequent production" related to *Silver Linings Playbook*, Cohen has the first opportunity to act as producer of such project.).  No such sequel or related production is currently contemplated for this film or any of the others at issue.

45.    As stated, Lantern Entertainment has the unfettered right to exploit the Covered Titles as it chooses, including to make a prequel, sequel, or produce a television show based on one of the Covered Titles, without first offering Bruce Cohen or his production company the opportunity to produce the project; the Debtors and SLP Films, Inc. do not.  Lantern Entertainment purchased all rights in the Covered Titles without the Talent Parties' rights of first refusal.

46.    Further, only SLP Films, Inc. or its successors, assigns or licensees (*i.e.*, the Debtors) are obligated to extend an offer to Cohen.  The Sale Order makes clear that Lantern Entertainment is not a successor of the Debtors. *See* Sale Order, ¶¶ I, 22 ("Neither the Purchaser nor any of its affiliates is a successor to any of the Debtors or their estates, and none of the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts and Leases amounts to a consolidation, merger, or *de facto* merger of the Purchaser or any of its affiliates with or into any of the Debtors.").  Therefore, by virtue of the Section 363 Sale, the entities responsible for extending the right of first refusal are incapable of doing so, because they no longer own the right to exploit the film:  non-successor Lantern Entertainment now owns these exploitation rights.

47.    Moreover, Lantern Entertainment purchased the right to exploit these films free and clear of any rights of first refusal.  More specifically, the definition of "Lien" in the APA includes "rights of first refusal." *See* APA, Ex. A-8.  And, the Purchased Assets were bought free and clear

22

of "Liens." Thus, as there is no dispute that the Covered Titles, including *Silver Linings Playbook,* are Purchased Assets, those Covered Titles are free and clear of rights of first refusal. The Sale Order also specifically provides that "[t]he transfer of the Purchased Assets to the Purchaser (including the assignment of the Assumed Contracts and Leases) was free and clear of all claims, which include "rights of first refusal" . . . "whether imposed by agreement, understanding, law, equity or otherwise, including, without limitation, claims otherwise arising under any theory, law or doctrine of successor or transferee liability or related theories." *See* Sale Order, ¶¶ AA, 22 (rights of first refusal, among other things, are defined as "Claims" in the Sale Order). Therefore, when Lantern Entertainment acquired the rights appurtenant to the Cohen Talent Agreement through the Section 363 Sale, it did so without the "Claim" or "Lien" of Cohen's right of first refusal. Any argument to the contrary would constitute a collateral attack of the Sale Order, which became final and non-appealable months ago and would be tantamount to depriving Lantern Entertainment of the benefit of its bargain—a sale under section 363 of the Bankruptcy Code free and clear of all claims, liens, and encumbrances.[17]

48.    Even if Lantern Entertainment had not acquired the rights under the Talent Agreements free and clear of all rights of first refusal, such rights are so incidental, contingent, and immaterial to the Talent Agreements that the right of first refusal provisions in this and some of the other Talent Agreements do not render the agreements executory. As noted above, no sequel is currently contemplated, and regardless, this agreement was so substantially performed years ago that even if the right of first refusal remained, it would be insufficient to make the agreement executory under the test employed by the Third Circuit in *Exide Technologies*.

---

[17]    There is a reservation of rights in the order approving the second amendment to the APA that reserves the rights of the Talent Parties to make all arguments regarding whether their agreements are executory. The reservation of rights does not preserve arguments that would invalidate the sale of the Debtors' assets free and clear of liens under section 363 of the Bankruptcy Code.

49.    Lastly, the Talent Parties rely on several inapposite and distinguishable cases to support their argument that a right of first refusal automatically renders a contract executory.  For example, the facts surrounding the Section 363 Sale, which is a sale of substantially all of the Debtors' assets, are much different from the sale of a single liquor license and related right of first refusal at issue in *In re CB Holding Corp.*, 448 B.R. 684 (Bankr. D. Del. 2011) (Walrath, J.).  The Talent Parties' reliance on *In re Kellstrom Industries, Inc.*, 286 B.R. 833 (Bankr. D. Del. 2002) (Walrath, J.) is similarly misplaced.  The sale in *Kellstrom* involved a single piece of real estate and a right of refusal running with that property, not the sale of substantially all of a debtor's non-real estate assets free and clear of all claims.  286 B.R. at 834.  Thus, the Talent Parties' reliance on these cases is unavailing, based on the facts of the Section 363 Sale.

50.    Fourth, certain of the Talent Parties allege that their obligations to indemnify TWC under the Talent Agreements render those agreements executory.  As noted above, where the outstanding obligation under a contract is the obligation of a non-debtor counterparty to pay a debtor counterparty, the agreement is not executory.  *In re Waste Sys. Int'l, Inc.*, 280 B.R. at 827.  The same is true of an indemnification obligation where the sole remaining obligation is for the one party to indemnify the other party, which indemnification necessarily takes the form of a monetary payment.  *See Exide*, 607 F.3d at 963 (finding that the agreement had been substantially performed and that indemnification provisions, among three other provisions, did not render the agreement executory); *see also In re THC Fin. Corp.*, 686 F.2d 799 (9th Cir. 1982) (finding agreement was not executory because debtor's agreement to indemnify counterparty only contained one obligation, for debtor to pay counterparty if it incurred any loss); *see also In re Van Dyk Research Corp.*, 13 B.R. 487, 506 (Bankr. D.N.J. 1981) (same); *In re Chateaugay Corp.*, 102 B.R. 335, 348-49 (Bankr. S.D.N.Y. 1989) (same); *In re Gayson-Robinson Stores, Inc.*, 321 F.2d

24

500, 501 (2d Cir. 1963) (same); *see also In re Stein & Day Inc.*, 81 B.R. 263, 266 (Bankr. S.D.N.Y. 1988) (finding written book agreement was not executory when outstanding obligation was for author to indemnify publisher in the event that the author's warranties as to ownership of the books is not sustained or the author's material violates any copyrights).

51.      For the following reasons, and using the Cohen Talent Agreement as an example, the obligation in certain of the Talent Agreements, that the Talent Parties indemnify and hold harmless TWC (or one of its special purpose vehicles, as applicable), is not sufficiently material as to render the Talent Agreements executory.  Indeed, such obligations are incidental to the Talent Parties' performance under the Talent Agreements and constitute "belt and suspenders" for the principal economic transaction, which is a work-for-hire arrangement.  The indemnification provisions are the mechanism by which the representations, made by the Talent Parties were entered into at the time the Talent Agreements were executed, are enforced.

52.      The *Stein & Day* court analyzed indemnification clauses with respect to whether an agreement was executory in the context of a written book publishing agreement.  With regard to the indemnification clause within the agreement, the *Stein & Day* court explained, "The author's agreement, in paragraph #10, to indemnify the publisher in the event that the author's warranties as to ownership of the books is not sustained, or the author's material violates any copyrights, is an obligation that is imposed by law and *does not* constitute a significant independent obligation which would cause the author's performance under the agreements to be viewed as incomplete and executory." 81 B.R. at 266 (emphasis added).

53.      The Cohen Talent Agreement contains a very similar indemnification provision:  it provides, in part, that "Lender and Artist hereby agree to fully and effectively indemnify Company… from and against any loss, liability… incurred directly or indirectly by reason of a

third party claim arising from any breach of the foregoing representations, warranties or covenants by Lender or Artist." Cohen Talent Agreement, ¶ 15. The representations and warranties in question refer to the Artist's ownership of the works, the lack of any violation of copyrights, publicity violations, etc., and acknowledgement of the Federal Communications Act. *Id.* at ¶ 14. Accordingly, as in *Stein & Day*, because these are obligations that are imposed by law, and do not constitute a significant independent obligation, this clause, alone, cannot render the contract executory.[18]

54.     Further, the Cohen Talent Agreement is not executory under the substantial performance doctrine employed by the Third Circuit in *Exide*. Applying that analysis here, the Debtors (or their Affiliates) substantially performed under the Cohen Talent Agreement years before the Petition Date occurred. The only remaining obligation of the Debtors (or their Affiliates) is a contingent obligation to make payments if the film continues to make money and an obligation by the Cohen Talent Parties to hold the Debtors (or their Affiliates) harmless. Thus, as in *Exide*, the fact that the Debtors (or their Affiliates) substantially performed under the Cohen Talent Agreement outweighs any minor obligations remaining under the Cohen Talent Agreement, such as the indemnification provision.

55.     Fifth, the Talent Parties point to provisions in some of the Talent Agreements where the Talent Parties agreed not to seek injunctive relief in connection with the distribution of the films. This obligation is akin to any indemnification obligations under the Talent Agreements in that it is irrelevant following the parties' substantial performance of the Talent Agreements. The Talent Parties surrendered the right to seek injunctive relief upon execution of the Talent

---

[18]     The Talent Agreements that contain indemnification clauses have substantially similar if not identical language.

Agreements.  There is no remaining performance due.  Indeed, at this point, several years after distribution, it is difficult to fathom what injunctive relief the Talent Parties could seek.

56.     Additionally, the facts of this case can be distinguished from the facts of *In re Philip Services (Delaware), Inc.*, 284 B.R. 541 (Bankr. D. Del. 2002).  In the *Philip Services* case, this Court found that a merger agreement was executory because "neither side has completed performance and both sides have monetary and non-monetary obligations remaining."  *Id.* at 550. With respect to the Cohen Talent Agreement, the parties do not both have material monetary and non-monetary obligations outstanding.  Following the Section 363 Sale, all that remained extant under the Cohen Talent Agreement was a contingent obligation of the Debtors to pay the Cohen Talent Parties in the event *Silver Linings Playbook* made sufficient money to trigger the payment obligation, and the Cohen Talent Parties had an obligation to indemnify and hold the Debtors harmless.  Thus, unlike the obligations under the merger agreement in *Philips Services*, under the Cohen Talent Agreement, any obligations that remained outstanding after the Section 363 Sale were too immaterial to render the agreement executory.

57.     In sum, the contingent obligations the Talent Parties rely on in the Talent Agreements, including any rights of first refusal, are immaterial and insufficient to make the contracts executory.

58.     Moreover, there can be no argument that the Talent Agreements are executory simply by virtue of having been listed on the Notice.  The Talent Agreements were designated as Disputed Contracts in order to provide the Talent Parties with sufficient due process and notice of a *potential* assumption, and the Notice specified that all rights were reserved with respect to the Disputed Contracts.  Inclusion on a notice cannot change the nature of an agreement under applicable law.

59.     Further, even if the Talent Agreements were deemed executory by the Bankruptcy Court, Lantern has no obligation to assume those agreements if the parties cannot reach an agreement on the amount of any cure payment.  Notwithstanding the Committee's insistence to the contrary, there is nothing in the Bankruptcy Code, applicable Bankruptcy Rules, the APA, or the Sale Order that *requires* Lantern to take assignment of the Talent Agreements.  Indeed, section 2.8(c)(y) of the APA and paragraph 33 of the Sale Order give Lantern Entertainment the right to decline to assume any Disputed Contract and treat it as "Excluded" under the APA if Lantern Entertainment is dissatisfied with the adjudicated cure amount, thereby making the Disputed Contract an Excluded Asset under the APA.

60.     Therefore, in the event that the Parties are unable to reach an agreement on the appropriate cure amounts, if any (the cure amounts were listed as $0), the Talent Agreements would constitute Excluded Assets under the APA, even though the rights to the underlying copyrighted works belong to Lantern Entertainment and can be Exploited by them.

## C. The Talent Agreements Were Property of the Estates on the Petition Date and Lantern Entertainment Purchased the Debtors' Rights Under Those Agreements Free and Clear of All Liens, Claims, and Encumbrances

61.     The Talent Parties rely heavily on the fact that the Debtors were not parties to the Talent Agreements at the time they were entered into, and argue that this means that the Debtors never owned the rights related to the Talent Agreements and therefore could not sell them to Lantern Entertainment.  This argument is a red herring meant to muddy the straightforward legal issues and distract the Court from the fact that the Talent Agreements are not executory.

62.     To wit, it is common knowledge in the industry that movie studios create a special purpose company or special purpose vehicle for each film project.  *See* Declaration, at ¶ 3; *see generally RKA Film Fin., LLC v. Kavanaugh,* Case No. 652592/15, 2018 N.Y. Misc. LEXIS 3550, at *2 (N.Y. 2018) (describing use of special purpose vehicles in connection with the production of

films); *Marathon Structured Fin. Fund, LP v. Paramount Pictures Corp.*, Case No. 14-4455, 2015 U.S. App. LEXIS 21526, at *2 (2d Cir. 2015) (same); *Aramid Entm't Fund Ltd. v. Bergstein*, Case No. 10-1881-JFW, 2011 U.S. Dist. LEXIS 164392, at *3 (C.D. Cal. Mar. 10, 2011) (same); *Gen. Star Int'l Indem., Ltd. v. Chase Manhattan Bank*, Case Nos. 11379/11380 (AGS), 01 Civ. 11520/11521, 2002 U.S. Dist. LEXIS 7980, at *6 (S.D.N.Y. May 2, 2002) (same); *A&E TV Networks, LLC v. Pivot Point Entm't, LLC*, Case No. 10 Civ. 9422 (PGG), 2011 U.S. Dist. LEXIS 4337, at *2-3 (S.D.N.Y. Jan. 18, 2011) (describing use of special purpose vehicles for television production).[19]

63.    The special purpose entities exist for a *limited period of time* in order to accomplish certain goals, including (a) for tax purposes, (b) to provide structure to the financing of the film, (c) to keep films separated to avoid cross-collateralization and accounting issues, (d) to provide uniformity for administration and ownership, (e) to limit the liability of the owner of the film, and (f) for labor reasons, such as the separation of union and non-union workers. *See* Declaration, at ¶ 3. Each special purpose vehicle would maintain its own books, have its own assets and liabilities, and have separate taxing, accounting, and production lending. *See id.* This process is employed throughout the industry to keep separate the production-related activities from the acquisition- and distribution-related activities and to maintain the independence and autonomy of each separate production. *See id.*

64.    Along with the creation of each set of special purpose entities, the entities would enter into a series of agreements that, in the end, would result in TWC taking title of the particular

---

[19]    It is surprising that the Talent Parties have taken the position that TWC's use of special purpose entities to produce its films equates to a lack of ownership by TWC in the underlying project, given their respective experience in the entertainment industry. There is no dispute that TWC owned the films at issue, had the right to exploit them, and sold those rights to Lantern Entertainment. The financing and use of special purpose vehicles is so common in the industry that the only reasonable explanation for the Talent Parties' position must be that they are trying to distract the Court from the deficiencies of their legal argument.

film for which the special purpose entity was created.  *See id.*, at ¶ 4.  Taking *Silver Linings Playbook* as an example, TWC used or formed the following special purpose entities: Team Players, LLC, SLPTWC Films, LLC, and SLP Films, Inc.  Further, with respect to *Silver Linings Playbook*, a series of agreements were entered into to govern the production, distribution, financing, and exploitation of the film.  *See id.*, at ¶ 4.

65.    These agreements also follow the chain of title of *Silver Linings Playbook* (or SLP), which is summarized below:

- **Step 1:**  TWC acquires the rights to a particular piece of art, for example, a novel or screenplay.  With respect to SLP, this was accomplished through the Letter Agreement.

- **Step 2:**  TWC uses one or more (or forms new) special purpose vehicles for a specific project.  In the case of SLP—Team Players LLC, SLPTWC Films LLP, and SLP Films, Inc.

- **Step 3:**  TWC's special purpose vehicle enters into an agreement with a party to write the script related to the film or project.  For SLP, Team Players LLC contracted with Kanzeon Corp. for the services of David O. Russell to author the script for the film.

- **Step 4:**  TWC enters into one or more license agreements that provides the special purpose vehicle the "right to produce, distribute and otherwise exploit" the production at issue, but that "[a]ll other rights in and to the Underlying Literary Material are hereby reserved by [TWC as] Licensor."  In the case of SLP, Team Players, LLC entered into the TP License Agreement, where Team Players, LLC licensed to TWC the rights to produce, distribute and exploit SLP on September 13, 2011.  The next day, on September 14, 2011, TWC granted SLPTWC Films, LLC a more extensive license.  This license covers all distribution and exploitation of SLP.

- **Step 5:**  Also on September 14, 2011, SLPTWC Films, LLC granted an exclusive license for SLP to a TWC affiliate, Weinstein Global Film Corp. ("WGFC")—a Debtor in these cases—that governs the foreign distribution and exploitation of SLP.  In addition, SLPTWC Films, LLC grants an exclusive license for SLP to TWC—a Debtor in these cases—that governs the domestic distribution and exploitation of SLP.  In sum, TWC and WGFC, two Debtors in these Chapter 11 Cases, have exclusive, permanent licenses for the foreign and domestic distribution of SLP.

30

> ▪ **Step 6:** TWC enters into a production services agreement with the special purpose vehicle, which provides for the return or reversion of the rights granted under the license back to TWC. For SLP, SLPTWC Films, LLC (as "Producer") entered into the Production Services Agreement with SLP Films, Inc. (as "Contractor"). Similar to the Talent Agreements, the Production Services Agreement is a "work for hire" agreement, with the Producer and all successor and assigns owning all elements and components of the film. The Production Services Agreement is also the agreement through which the funding for the film is funneled and which governs the production of the film as a whole.
>
> ▪ **Step 7:** The special purpose entities enter into talent agreements with various parties, including directors, actors, producers, and the like. For SLP, SLP Films, Inc., which was a mere "Contractor" under the Production Services Agreement, entered into those agreements.
>
> ▪ **Step 8:** The film is produced, distributed, and exploited. With respect to SLP, the film was first distributed in 2012.
>
> ▪ **Step 9:** After a period, typically two or three years, the special purpose vehicles are dissolved unless there is a reason to keep the entities open; e.g., for tax purposes.[20]
>
> ▪ **Step 10:** SLPTWC Films, LLC holds all rights to the films, including those held by SLP Films, Inc., its "Contractor" under the Production Services Agreement. SLPTWC Films, LLC licensed those rights to Debtors TWC and WGFC through the Domestic License Back Agreement the Foreign License Back Agreement, respectively. Therefore, the Debtors held all rights to SLP on the Petition Date.

*See id.*, at ¶ 5.

66. TWC undertook the same or a substantially similar process with respect to the other films at issue. *See id.*, at ¶ 6.

67. The films relevant to the Talent Party Motions and the Summary Judgment Pleadings were completed and distributed between five and seven years ago, and the special purpose entities created for each of those films were dissolved. *See id.*, at ¶ 7. Upon dissolution, consistent with the process described above, all rights were taken back or transferred to Debtor

---

[20] SLPTWC Films, LLC and SLP Films, Inc., were both dissolved. *See* Declaration, at Ex. 10.

TWC or another Debtor or Debtor-Affiliate.  *See id.*  Debtors TWC and WGFC sold their rights in SLP to Lantern Entertainment.

68.     Based on the foregoing, TWC is the owner of the films and all rights related thereto. Therefore, under the APA,[21] Lantern Entertainment purchased all rights, interests and title to the Covered Titles through the Section 363 Sale, free and clear of liens, claims and encumbrances. These rights included the rights of the Debtors' Affiliates, if any, in the Covered Titles.  Thus, even if a non-Debtor special purpose vehicle held any rights in the Covered Titles—which they do not, as those rights were ultimately owned by the parent Debtor entities—the rights of these Affiliates were transferred to Lantern Entertainment through the Section 363 Sale, making the argument of the Talent Parties that the Talent Agreements are not saleable assets of the Debtors' estates even more of a red herring.  Further, the second amendment demonstrates that Lantern Entertainment only agreed to pay cure amounts and post-closing amounts in specific circumstances that may come due under the Talent Agreements.  There is no such provision for the payment of pre-closing amounts in the APA, which indicates that the Talent Parties' claims for pre-closing amounts were intended by the Debtors and Lantern Entertainment to be excluded liabilities under the APA.

**D.   The Court's Ruling on the Summary Judgment Pleadings May Moot the Talent Party Motions and Their Other Pleadings**

69.     As noted above, Lantern Entertainment filed one adversary proceeding, because the ruling of the Court on the executory contract issue in the Adversary Proceeding likely would constitute "law of the case" due to the overriding similarities among the Talent Agreements.

---

[21]     *See* Appendix 1, attached to this Objection.

70.     The "law of the case" doctrine "is a discretionary policy of deference under which 'a court should not reopen issues decided in earlier stages of the same litigation.'" *Myers v. Raynor (In re Raynor)*, 406 B.R. 375, 379 (B.A.P. 8th Cir. 2009).  The purpose of the doctrine is to promote the judicial system's interest in finality and in efficient administration." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1982).

71.     Most cases dealing with the doctrine relate to an appellate court's final ruling on an issue and how it must apply in the lower court proceedings across the board.  In the context of a bankruptcy case, law of the case should apply to other matters that come before the court with the same facts and legal issues.  For a decision of the bankruptcy court to be considered final, it must have core jurisdiction over the issue.  Whether a contract is executory and whether it is property of the estate capable of disposition through a sale are core proceedings.  *See Point Blank Sols., Inc. v. Robbins Geller Rudman & Dowd LLP (In re Point Blank Sols., Inc.*), 449 B.R. 446, 449-50 (Bankr. D. Del. 2011) ("It is well established that proceedings to determine what constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code are core proceedings" and "the rejection and assignment of leases and executory contracts are fundamental issues of bankruptcy law unique to the Bankruptcy Code" and therefore are "core").

72.     If this Court renders a case-specific legal conclusion in connection with the Adversary Proceeding that would effectively render moot or require the court to waste resources relitigating the same issue, the Court should find that such conclusion is the law of the case.  *Cf. In re Tri-State Ethanol Co. LLC*, Case No. 03-10194, 2007 Bankr. LEXIS 5012, at *22 (declining to apply law of the case where the previous judge did not "reach any case-specific legal conclusion that must be applied to all claims against the Debtor's Chapter 7 estate").  Based on the facts before

the Court, the Court should exercise its discretion to apply that ruling to the other, similarly situated Talent Parties.

## CONCLUSION

73.    The Talent Agreements ceased being executory years ago; any remaining obligations are immaterial and insufficient to render the Talent Agreements executory.  Lantern Entertainment purchased as part of the Section 363 Sale all of the intellectual property underlying the Covered Titles, and separate and apart from that, all rights to the Covered Titles, including all rights appurtenant to the Talent Agreements.  As such, the Court should deny the Talent Party Motions, overrule the Joinder filed by the Committee, and grant summary judgment in the Adversary Proceeding in favor of Lantern Entertainment.

Dated: January 7, 2018  
       Wilmington, Delaware

    */s/ R. Craig Martin*  
    R. Craig Martin (DE No. 5032)  
    Maris J. Kandestin (DE No. 5294)  
    DLA PIPER LLP (US)  
    1201 N. Market Street, Suite 2100  
    Wilmington, DE 19801  
    Telephone:  (302) 468-5700  
    Facsimile:  (302) 394-2341  
    Email: craig.martin@dlapiper.com  
          maris.kandestin@dlapiper.com

   - and -

    Thomas R. Califano (admitted *pro hac vice*)  
    Rachel Ehrlich Albanese (admitted *pro hac vice*)  
    DLA PIPER LLP (US)  
    1251 Avenue of the Americas  
    New York, NY 10020  
    Telephone:  (212) 335-4500  
    Facsimile: (212) 335-4501  
    Email: thomas.califano@dlapiper.com  
          rachel.albanese@dlapiper.com

    *Counsel for Lantern Entertainment LLC*