# Exhibit A

```
1                 UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
2

3    IN RE:                        .  Chapter 11
                                   .
4    THE WEINSTEIN COMPANY HOLDINGS .  Case No. 18-10601 (MFW)
     LLC, et al.,                  .
5                                  .
                      Debtors.     .
6    LANTERN ENTERTAINMENT LLC,    .  Adv. Case No. 18-50924
                                   .
7                      Plaintiff,  .
                                   .
8       vs.                        .
                                   .  Courtroom No. 4
9    BRUCE COHEN PRODUCTIONS, AND  .  824 Market Street
     BRUCE COHEN,                  .  Wilmington, Delaware 19801
10                                 .
                      Defendants.  .  November 29, 2018
11   . . . . . . . . . . . . . . . . .  11:30 A.M.

12                      TRANSCRIPT OF HEARING
                   BEFORE HONORABLE MARY F. WALRATH
13                 UNITED STATES BANKRUPTCY JUDGE

14   APPEARANCES:

15   For the Debtors:        Paul Heath, Esquire
                             Mark Collins, Esquire
16                           Zachary Shapiro, Esquire
                             Joseph Barsalona, III, Esquire
17                           Brett Haywood, Esquire
                             David Queroli, Esquire
18                           RICHARDS LAYTON & FINGER
                             One Rodney Square
19                           920 North King Street
                             Wilmington, Delaware 19801
20
     ECRO:                   Electronically Recorded
21                           by Brandon McCarthy, ECRO

22   Transcription Service:  Reliable
                             1007 N. Orange Street
23                           Wilmington, Delaware 19801
                             Telephone:  (302) 654-8080
24                           E-Mail:  gmatthews@reliable-co.com

25   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
```

```
 1  APPEARANCES (Continued):

 2  For the Debtors:          Paul Zumbro, Esquire
                              Karin DeMasi, Esquire
 3                            George Zobitz, Esquire
                              CRAVATH SWAINE & MOORE LLP
 4                            Worldwide Plaza
                              825 Eighth Avenue
 5                            New York, New York

 6  For Lantern:              Abid Qureshi, Esquire
                              AKIN GUMP STRAUSS HAUER & FELD LLP
 7                            One Bryant Park
                              Bank of America Tower
 8                            New York, New York 10036

 9                            - and -

10                            David Stratton, Esquire
                              PEPPER HAMILTON LLP
11                            1313 North Market Street
                              Wilmington, Delaware 19801
12
    For J.C. Penney           Gregory Taylor, Esquire
13  Corporation, Inc.:        ASHBY & GEDDES, P.A.
                              500 Delaware Avenue, Suite 8
14                            Wilmington, Delaware 19801

15                            - and -

16                            Jason Binford, Esquire
                              FOLEY & LARDNER LLP
17                            2021 McKinney Avenue, Suite 1600
                              Dallas, Texas 75201
18
    For the Committee:        Colin Robinson, Esquire
19                            PACHULSKI STANG ZIEHL & JONES LLP
                              919 North Market Street, 17th Floor
20                            Wilmington, Delaware 19801

21  For Vertigo Prime, Inc.   Jeffrey Sabin, Esquire
    and Good Fear Film,       VENABLE LLP
22  Inc.:                     1270 6th Avenue
                              New York, New York 10020
23

24

25
```

1  APPEARANCES (Continued):

2  For First Republic        Andrew Tenzer, Esquire
   Bank:                     PAUL HASTINGS LLP
3                            200 Park Avenue
                             New York, New York 10166
4
                             - and -
5
                             William Bowden, Esquire
6                            ASHBY & GEDDES, P.A.
                             500 Delaware Avenue, Suite 8
7                            Wilmington, Delaware 199801

8  For Bank Hapoalim B.M.:   Morgan Patterson, Esquire
                             WOMBLE BOND DICKINSON (US) LLP
9                            222 Delaware Avenue, 15th Floor
                             Wilmington, Delaware 19801
10
                             - and -
11
                             Stephen Selbst, Esquire
12                           HERRICK FEINSTEIN LLP
                             Two Park Avenue
13                           New York, New York 10016

14 For Bruce Cohen and       Christopher Simon, Esquire
   Bruce Cohen Productions:  CROSS & SIMON, LLC
15                           1105 North Market Street
                             Wilmington, Delaware 19801
16
                             - and -
17
                             Michael Gottfried, Esquire
18                           LANDAU GOTTFRIED & BERGER LLP
                             1801 Century Park East, Suite 700
19                           Los Angeles, California 90067

20 For Lantern               Kevin Eide, Esquire
   Entertainment:            AKIN GUMP STRAUSS HAUER & FELD LLP
21                           Robert S. Strauss Building
                             1333 New Hampshire Avenue, N.W.
22                           Washington, DC 20036

23                           - and -

24                           Maris Kandestin, Esquire
                             DLA PIPER LLP (US)
25                           1201 North Market Street, Suite 2100
                             Wilmington, Delaware

INDEX

                                                          PAGE

#2)  Motion of J.C. Penney Corporation, Inc. to Compel Assumption
or Rejection of Licensing Agreement [Docket No. 1627 - filed
October 24, 2018]

**RULING:**                                                        **24**


#3)  First Republic Bank's Motion for Order (I) Vacating Docket
Number 1574, (II) Lifting Stay with Respect to Producing Services
Agreement, and (III) Enforcing Prior Orders and Rulings [Docket No.
1716 - filed November 15, 2018]

1          (Proceedings commence at 11:32 a.m.)

2          (Call to order of the Court)

3               MR. HEATH:  Good morning, Your Honor.

4               THE COURT:  Good morning.

5               MR. HEATH:  Paul Heath of Richards Layton on

6    behalf of the debtors.

7               Your Honor, we will just turn to the agenda.  Item

8    number 1 is continued.  The remaining motions, none of which

9    are debtor motions, the first of which is the motion of J.C.

10   Penney to compel assumption and rejection.  I will turn the

11   podium over to J.C. Penney's counsel.

12              MR. TAYLOR:  Good morning, Your Honor; may I

13   please the court, Greg Taylor of Ashby & Geddes on behalf of

14   J.C. Penney.

15              I would like to introduce to the court my co-

16   counsel, Mr. Jason Binford of the Foley Firm, who will be

17   handling the argument this morning.

18              THE COURT:  All right.  Thank you.

19              MR. TAYLOR:  Thank you, Your Honor.

20              THE COURT:  Good morning.

21              MR. BINFORD:  Good morning, Your Honor; Jason

22   Binford on behalf of J.C. Penney Corporation from Foley &

23   Lardner.

24              I don't intend to spend a lot of time taking up

25   the court's time this morning.  I am going to have a short

1  presentation and then really answer any questions, then sit

2  down.

3         THE COURT:  All right.

4         MR. BINFORD:  As set forth in our reply to the

5  objection that was filed to our matter the facts in this

6  matter really aren't in dispute.  We're really looking at

7  legal issues here.

8         J.C. Penney is a licensee under our February 27th,

9  2017 license agreement with Weinstein Television.  By that

10  agreement Weinstein Television licensed intellectual property

11  that it owned at the time including a trademark to J.C.

12  Penney in relation to their Project Runway television show.

13  J.C. Penney put Weinstein Television's trademark on products

14  for sale and paid royalties under the agreement.

15         Following the bankrutpcy filing J.C. Penney was

16  diligent as to its rights.  It filed an objection on April

17  30th, that's docket number 515, making it clear its position

18  that it did not believe the license agreement was assignable

19  under Bankruptcy Code Section 365(c)(1)(a).

20         In the meantime J.C. Penney kept products

21  available for sale.  Why; because it had to.  Assuming any

22  conclusion on these legal issues and removing the products

23  from sale would have been a violation of the automatic stay.

24  Let me say these products are not money makers for J.C.

25  Penney.  The show has been off the air for many years and, in

1  fact, there were negotiations with Weinstein Television right

2  up to the petition date to have a license agreement

3  terminated because it no longer made economic sense to both

4  parties.

5          The sale of Lantern closed on July 13th 2018.

6  That is another undisputed fact; it's at docket number 1247.

7  The sale included substantially all the assets of the debtors

8  of the debtors and that included the Weinstein Television

9  trademark.  Let me repeat that; today the owner of this IP is

10 not the debtor, its Lantern Entertainment.

11          Afterwards we continued our diligence.  We

12 contacted the parties after the sale of that I should say.

13 We contacted the parties to inquire as to whether Lantern was

14 actually going to seek assignment of the agreement.  In other

15 words, we wanted to know were we going to fight about the

16 Section 365(c)(1)(a) issue or not.

17          It took some doing, but we finally received an

18 answer that Lantern was not seeking assignment of the license

19 agreement.  At that point we filed a motion seeking relief in

20 this court to compel rejection.  We noted, in the objection,

21 that there is great uncertainty for J.C. Penney as to its

22 post-sale obligations.  That is not just advocacy bluster.

23 The fact is that J.C. Penney is currently a party to a

24 license agreement with another party who doesn't own the

25 trademark that's a subject to the agreement.  J.C. Penney

1  wants to cut-off any confusion by immediately stopping the

2  sale of products.  The motion, via rejection, is the rational

3  way to do that.

4          The important thing to keep in mind here with

5  respect to whether the license should be rejected is its

6  effect on the estate.  That is what the debtors' business

7  judgment is all about.  The effects on J.C. Penney and the

8  uncertainty I mentioned are relevant, but the debtors'

9  business judgment is the primary issue.

10          Here, the debtors have not objected.  The

11  committee has not objected.  That should be the end of the

12  analysis on that point.  The debtors have demonstrated by not

13  opposing the relief that a continuation of the license

14  agreement is of no benefit to the estate.

15          Who has objected; it's Bank Hapoalim.  They have a

16  security interest that allegedly gives them a right to the

17  proceeds.  Rejection necessarily means those payments will

18  stop and they don't like that.  But, again, the effect this

19  rejection may have on Bank Hapoalim is not an issue.  It's an

20  estate issue.

21          Bank Hapoalim raises an argument that the license

22  agreement is not executory.  We addressed that in our reply

23  and I don't think it merits a lot of court time today.

24  First, we believe that Bank Hapoalim waived the argument by

25  failing to raise it back when the notice of assumption and

1  rejection was filed in April.  Second, the legal standard

2  clearly provides that a trademark license such as the one

3  here was executory as of the petition date.  There were

4  obligations by both sides including they're forebeared by

5  taking actions in relation to those agreements.  We believe

6  the HQ Global Holdings case is on all fours on that issue.

7         Bank Hapoalim takes issue with the fact that J.C.

8  Penney continued to sell the products post-petition including

9  up to today on J.C. Penney's website.  That is true, but it's

10 not the reason we're here today.  We don't want to be selling

11 products with trademarks owned by somebody else.  In fact, we

12 wanted the agreement terminated months ago.  Now that the

13 sale has closed Lantern has made its wishes known and we're

14 here in court seeking relief on the issue.

15        Bank Hapoalim says J.C. Penney has continued to

16 benefit from this license agreement.  We dispute that.  We're

17 paying the minimum amounts coming due under the agreements

18 because, again, these products aren't big sellers.  But even

19 if J.C.P. were realizing some benefit that's not really

20 relevant.

21        The issue here is whether there is a benefit to

22 the estate and there's not.  Continuing to allow an executory

23 contract to go forward just so a non-debtor party can keep

24 cashing checks is really not the proper analysis in our mind

25 for this court.

 1              THE COURT:  Well, but the non-debtor party is a

 2    creditor of these estates.  So, why would that not benefit

 3    the estates by continuing that?

 4              MR. BINFORD:  Well, Your Honor, it's an issue that

 5    the debtor hasn't raised.  They haven't objected to our

 6    relief.

 7              THE COURT:  But the matter is before me and I'm

 8    raising it.

 9              MR. BINFORD:  Yes, Your Honor.

10              THE COURT:  Why isn't it a benefit to the estate?

11              MR. BINFORD:  I don't see it as a benefit to the

12    estate going forward because all the money that -- my

13    understanding of the facts, and Mr. Heath can confirm this,

14    is that all the money being paid under the agreement is being

15    paid to Bank Hapoalim.

16              THE COURT:  Who is a creditor of the estate?

17              MR. BINFORD:  Right.

18              THE COURT:  So, it would reduce the claims against

19    the estate.

20              MR. BINFORD:  Well, Your Honor, let's push out

21    that logic.  Does that mean that in this situation that no

22    decision should be made regarding the assumption or rejection

23    of the contract and we should be continued to be in this

24    untenable situation from our standpoint of selling products

25    for a trademark when the debtor doesn't own that trademark.

1  So, that is a really material issue to us under the law, we

2  believe, that we're a party to an agreement that under the

3  law doesn't make sense anymore post-sale.

4          I don't want to give anybody ideas, Your Honor,

5  but I think that Lantern could come in here and say that we

6  are infringing on their trademark that they own.  We don't

7  have an agreement with Lantern.

8          So, the rational solution to that, Your Honor, I

9  think, is to have this lease rejected which is the effect of

10 the sale.  The way the sale works, as you know better than

11 anyone, is that Lantern had the choice to select agreements

12 or not select agreements and post-following that choice we

13 believe that the rational solution is to reject agreements

14 that were left behind.

15         THE COURT:  Well, I'm not as familiar with the

16 APA.  Does the APA require if Lantern does not take the

17 agreement that the debtor must reject them? I don't think

18 that provision is in this APA.

19         UNIDENTIFIED SPEAKER:  It is not.

20         THE COURT:  It is not.  Okay.

21         MR. BINFORD:  Your Honor, I will just finish up.

22 Again, I said I'm not going to spend a lot of court time on

23 this.

24         One issue that's come up is really the effect of

25 the rejection if the court grants the motion and what's going

1  to happen.  I am happy to say from the lectern today what

2  J.C. Penney's intentions are.  J.C. Penney's intentions are

3  to immediately stop selling these products.  They are

4  currently only being sold online as I think I mentioned.

5         There is a six month sell-off period in the

6  agreement under the terms, but if you look at the plain

7  language of that agreement it says that J.C. Penney may

8  continue selling during that six month sell-off period and

9  would pay royalties associated with those sales.  It's not

10  required to.  So, it's clear that sell-off period was

11  designed to protect J.C. Penney, not any other party, so that

12  if we wanted to get rid of product that's laying around we

13  could.

14         Your Honor, that finally brings us to the

15  effective date of the rejection.  Again, I am assuming the

16  conclusion a little bit here, but if the court does grant the

17  motion then the issues becomes, well, what's the effective

18  date of the rejection.  Now, we requested in our motion that

19  it be *nunc pro tunc* to the petition date.  Interestingly, no

20  one has objected to that relief including the debtor or Bank

21  Hapoalim.  I understand that folks are probably going to

22  raise oral objections here today.

23         Let me explain why I think that's a just result

24  *nunc pro tunc* to the petition date.  It's my understanding

25  that the debtors in this case have sought and have been

1  granted *nunc pro tunc* relief when it suits the debtors
2  interest, the estates interest in this case.  We do believe
3  that we shouldn't be treated differently from that respect
4  under the law.  There is a case, the <u>Chi-Chi's</u> case out of
5  this court, and I can cite the --

6        THE COURT:  Is it *nunc pro tunc* to the petition
7  date because the motion to reject was filed on the petition
8  date?  My understanding is *nunc pro tunc* is to the date of
9  the filing of a motion to reject, not before then.

10       MR. BINFORD:  Well, Your Honor, it has -- my point
11 being that that relief has been sought under the law in other
12 cases and been granted once consideration of the equities is
13 considered and whether it's consistent with Section 365.

14       Now, we, again, believe that the reason that this
15 -- this was always a sale case from the beginning.  The
16 reason these executory contracts were kept alive was to give
17 the opportunity for Lantern to take them or leave them.  Once
18 that decision was made to leave it, we believe that does,
19 under the equities of the case, provide us with a basis for
20 going *nunc pro tunc* back to the petition date.

21       If I'm being too aggressive on that I do believe
22 that it does make sense to have it *nunc pro tunc* back to the
23 sale closing date in July.  The reason for that is, again,
24 Your Honor, it really comes down to the point of the fact
25 that that's when the trademark was assigned and that's when

1  this executory contract no longer really made sense because

2  we're a party to an agreement that doesn't actually own the

3  thing that's subject to the agreement.  So, as an alternative

4  we would seek to have it *nunc pro tunc* back to July 13th.

5       So, Your Honor, again, I believe that the facts

6  are clear cut on this.  I will mention that there is an

7  alternative that Bank Hapoalim has put forth regarding the

8  abandonment.  We don't think that's proper.  We think it

9  would affect assignment of this agreement and we fall back on

10  our arguments made in our motion regarding the fact that this

11  is not an assignable executory contract.  Also, we do believe

12  that there is case law that says that parties generally have

13  to have a possessory interest in the subject of their lien in

14  order to take it as an abandonment when they're a third-

15  party.

16       I will refer the court to In Re American Tissue,

17  215 W.L. 151 -- sorry, 2015 Westlaw 1516973; that's a March

18  31st, 2015 case.  It does make that point that the creditor

19  truly has to have a possessory interest even to be considered

20  to have something abandoned to it and that's not even the

21  dispositive fact.  In that case there was an argument that

22  they did have possessory interest.  What was before the court

23  in that case were corporate records.  Even when they had an

24  argument that they had a possessory interest the court

25  determined that the abandonment was not proper.

1          In this case I don't think an argument can be made

2   that Bank Hapoalim has a possessory interest in the subject

3   of this license agreement.  Rather, they just have a security

4   interest in the proceeds.  But, again, we do believe that

5   this is rather clear-cut that this is an executory contract.

6   It is not benefiting the estate in the balance of the

7   equities given the fact that the trademark has been assigned

8   and that J.C. Penney is entitled to the relief sought in its

9   motion.

10          THE COURT:  Thank you.

11          Let me ask you a question about the suggestion

12  that even if the contract is rejected you're still obligated

13  to continue to make the minimum guaranteed payments.

14          MR. BINFORD:  Well, Your Honor, I don't understand

15  the basis for that argument.  If the contract is rejected it

16  operates -- again, I understand the sort of law professor

17  analysis sometimes that the rejection and termination aren't

18  the same thing.

19          THE COURT:  They aren't the same thing.

20          MR. BINFORD:  In this situation rejection would

21  clearly be a material breach of the agreement.  That's how

22  rejection is treated.  And we would be entitled to terminate

23  it.

24          THE COURT:  But does terminate eliminate your

25  obligation to make the minimum guaranteed payments?  They

1  suggest it does not.

2  　　　　　MR. BINFORD:  It does and they're wrong on that.

3  The basis is that the sell-off period might impose some sort

4  of go-forward obligation for J.C. Penney to pay; it's Section

5  10.1 of the agreement.  It's clear that in that section of

6  the agreement that J.C. Penney may continue to sell during

7  that six month sell-off period.  We are absolutely not

8  required to continue to sell.  It really is spelled out in

9  black and white the effect of termination which is to we can

10  immediately stop selling this product which is what we want

11  to do.

12  　　　　　THE COURT:  Well, but doesn't the last statement -

13  - oh, okay.  You're saying it's only liable for the

14  guaranteed minimum royalty accrued to the date -- well, in

15  the event it's terminated per 13.4.  Is this a termination

16  pursuant to 13.4 which is only if the obligations are

17  prevented from performing the obligations due to government

18  regulation or order strikes, civil, et cetera.  I don't think

19  that applies, does it?

20  　　　　　MR. BINFORD:  Well, it's anything beyond the

21  control of the party.  Essentially, my read of Section 13.4

22  is when the agreement becomes un-performable for things

23  outside the control of the parties.  I think that fits

24  squarely.  And where we are is, Your Honor, it was outside

25  the control of J.C. Penney, certainly, that the trademark

1 license was assigned to a party that determined not to take

2 the license.  Therefore, just like if there was, you know, an

3 act of God or terrorist act that made the agreement un-

4 performable we think that the agreement as of July has been

5 un-performable.

6          Now, we've continued to sell, like I said, because

7 of the imposition of the automatic stay, but we certainly

8 didn't sleep on our rights.  We were burning up the phone

9 lines trying to figure out the position of Lantern during

10 that time period.

11          THE COURT:  All right.  I understand your

12 argument.

13          MR. BINFORD:  Thank you, Your Honor.

14          MS. PATTERSON:  Good morning, Your Honor; Morgan

15 Patterson of Womble Bond Dickinson on behalf of Bank

16 Hapoalim.

17          I just wanted to rise to introduce my co-counsel,

18 Stephen Selbst from the Herrick Feinstein Firm.  He will

19 present, Your Honor, with our argument.  Thank you.

20          THE COURT:  Thank you.

21          MR. SELBST:  Good morning, Your Honor.

22          As Penney's counsel said the facts here are really

23 not in dispute.  We made our arguments as to why we believe

24 this contract is, in fact, not executory. I wanted to just

25 briefly address the waiver issue.  At the time the contract

1  was released for assumption and rejection by Lantern, in

2  fact, the debtor was current on its obligations.  There was

3  nothing to object to at that time including whether the

4  contract was executory or not.

5       Beyond that, Your Honor, as Penney's counsel as

6  acknowledge, Penney's is selling the goods.  They entered

7  into a license agreement in February of 2017.  They have had

8  continuous sales of the goods.  This morning on the train

9  down here I looked at Penney's website, they are still

10 selling Project Runway goods.

11      What you heard from counsel for Penney's was a

12 variety of arguments as to why it should be relieved of the

13 obligation to pay royalties.  I don't think that that's

14 right.  I don't think its right as a matter of equity and I

15 also don't think its right as a matter of bankruptcy law.

16 The agreement today has neither been terminated nor rejected.

17      As Your Honor is well aware pending termination

18 and pending rejection the non-debtor party has an obligation

19 to perform.  Now, Penney's -- here is what Penney's counsel

20 did not tell you, Penney's is in default of a $360,000 dollar

21 payment that was due September 18th for the period from May

22 6th through August 4th of this year.  There is also another

23 payment obligation that comes due on December 12th for an

24 additional $450,000 dollars for the period from August 5th

25 through November 3rd.  In other words, Your Honor, that is a

1  fully mature payment obligation.  We're in another 25 days

2  into the next selling period which obligates Penney's for

3  another $125,000 dollars.

4         You heard Penney's say that this is a bad

5  agreement from their perspective.  I have sympathy for that,

6  but they signed an agreement that said guaranteed minimum

7  royalty payments.  They should not, even if this court finds

8  that this is an executory contract, be given retroactive

9  relief because all that really is, is a payment windfall;

10  that's all it is.  That is really all that Penney's is

11  fighting about.

12         As I said, I have sympathy for Penney's having

13  made a bad agreement, but my client lent money in reliance on

14  the royalty stream from this payment.  The debtor clearly

15  benefited from this.

16         The second point, and Your Honor raised a question

17  whether this effects the estate.  The answer is it absolutely

18  does.  Not only does every single payment reduce the claims

19  dollar for dollar, but Bank Hapoalim had a parent gaurantee.

20  It absolutely effects the estate here.  So, to grant Penney

21  retroactive relief, which we don't think they're entitled to

22  under any circumstances, again, harms all other creditors so

23  that Penney's can get something that it's just not entitled

24  to.

25         That is really what this is about, Your Honor.  I

1  understand they want to stop selling the goods, but they

2  shouldn't be allowed to do so at other people's expense.  My

3  client, but it's not just my client it's also the estate's

4  expense.

5          THE COURT:  Well, they can stop selling goods as

6  long as they make the minimum payments, right?

7          MR. SELBST:  Absolutely, Your Honor.  As I said,

8  as of this morning there is still Project Runway goods on the

9  J.C. Penney Website.  What they are asking you to do is say

10 all the way back to July we're not on the hook for those

11 royalties.  We don't think that's right.  We don't think its

12 right as a matter of bankruptcy law and it's certainly not

13 equitable.

14         THE COURT:  Thank you.

15         MR. SELBST:  Thank you, Your Honor.

16         THE COURT:  What about -- is my reading of the

17 termination, effect of termination correct?  I think you

18 raised that in your response.

19         MR. SELBST:  The most generous reading on Penney's

20 behalf is that as long as they continue to sell the goods

21 they're subject to the royalties.  Our position, of course,

22 is they're on the hook for the guaranteed minimum royalties

23 because it's not a 13.4 termination.  This is not the kind of

24 act of God that was contemplated by 13.4.  Our view is

25 they're on the hook for the guaranteed minimum royalties, but

1  at a minimum if Your Honor is sympathetic to Penney's

2  position they shouldn't be granted any form of retroactive

3  relief.

4         THE COURT:  Okay.

5         MR. SELBST:  Thank you, Your Honor.

6         THE COURT:  Thank you.

7         MR. HEATH:  Just briefly, Your Honor; Paul Heath

8  on behalf of the debtors.

9         The debtors share the concern about retroactive

10 effectiveness of rejection to the petition date and

11 primarily, Your Honor, because we're not sure what the

12 objective of that request is.  It's clear that they continue

13 to sell goods post-petition and they even made a payment

14 post-petition, the minimum payment under the agreement.

15 There's one payment that would have been due in September

16 that hasn't been paid and as you've heard goods are

17 continuing to be sold.

18        So, to the extent an order is entered today which

19 provides for an effective date of rejection as of the

20 petition date and that's used later to bootstrap an argument

21 that either the payment that was made post-petition can be

22 called back and in support of an argument that the payment

23 that was due in September doesn't have to be paid I want to

24 be mindful of that because I don't want to support that kind

25 of argument.  I think that the rights of parties should be

1  preserved to make whatever arguments they need to make in

2  connection with any further motion that may come before the

3  court with respect to payments that have to be made.

4          I don't want to put parties in a position where

5  they can point to a court order and say, Judge, but you

6  already entered an order that said the effective date was the

7  petition date and that supports the position that payments

8  didn't have to be made and can be called back where further

9  payments don't have to be made.

10         THE COURT:  Well, let me ask you a question; do

11  you agree that this is an executory contract that there are

12  obligations still on the debtors' side?

13         MR. HEATH:  I don't believe that there are

14  obligations remaining on the debtors' side, but, Your Honor,

15  we haven't taken the time to analyze or consider whether it's

16  an executory contract or not because we intentionally were

17  trying to avoid the cost associated with litigating that

18  issue.

19         The only benefit to the estate from continued

20  payments would be reducing the claim of Bank Hapoalim.  That

21  claim, to the extent it's a secured creditor with an

22  unsecured deficiency claim, given how enormous the claim pool

23  will be here, I don't think would justify, and I think the

24  committee agreed with us would not justify litigating issues

25  like that.

1          So, I can't give you a legal conclusion with

2   respect to the debtors' position.  It's my understanding and

3   believe, as I stand here, that the debtors -- there was no

4   further performance remaining on behalf of the debtors, but I

5   do think that parties have pointed to case law which might

6   suggest that there could be.

7          THE COURT:  Well, at a minimum the debtor is not

8   doing anything to adversely affect the trademark.

9          MR. HEATH:  Your Honor, the debtors were in a

10  difficult position with respect to weighing-in on the motion

11  and whether or not we have continued rights because we don't

12  own the mark anymore.  So, the continued sale of these

13  products, arguably, may affect the rights of, you know, a

14  non-debtor party; Lantern who actually owns the mark.

15         THE COURT:  And certainly, although it's

16  characterized as a motion to compel assumption or rejection

17  because the debtor no longer owns the trademark it's not in a

18  positon to assume that.

19         MR. HEATH:  The one thing that we will not do and

20  cannot do is assume it.

21         THE COURT:  Okay.  How much remains on the initial

22  term for which the guaranteed minimum payments?

23         MR. SELBST:  Your Honor, the initial term ran

24  through August of 2019.  So, the payments were a million-

25  eight per year.  As I indicated from the lectern the final

1  payment from the first year, which is $360,000 dollars had

2  not been paid.  The full one-eight of guaranteed payments for

3  2019 no portion of that has been made.

4          Of course, were those payments made they would not

5  only fully satisfy Bank Hapoalim, but there would be some

6  spill-over benefit for the debtors' estate.  There would be a

7  small excess beyond the amount due to Bank Hapoalim if all

8  the guaranteed payments were made by Penney's.

9          THE COURT:  Okay.  Well, let me make my ruling.

10         First, as to the bank's assertion that the

11 contracts should be abandoned to it I agree that that is not

12 an option.  Abandonment per the express language of the code

13 is to the debtor or courts have said to a secured creditor

14 which has a possessory interest in the collateral and neither

15 of those apply here.

16         So, the issue I must decide is whether or not J.C.

17 Penney has made a compelling case to require the debtor to

18 reject the licensing agreement.  The debtor clearly is not in

19 a position to assume the licensing agreement.  So, the issue

20 is whether the debtor should be compelled to reject the

21 licensing agreement.  I have to consider it only from the

22 estates perspective and doing so, although this may cause

23 harm to J.C. Penney, I think that there is a benefit to the

24 estate to deny that motion because the longest the executory

25 contract remains in place there is a benefit to the estate

1  and that is by the requirement that J.C. Penney make the

2  guaranteed minimum payments under -- well, I don't have the

3  section in front of me.

4        At any rate, the guaranteed minimum payments under

5  the agreement while J.C. Penney asserts that it is not no

6  longer economically a good deal for it, I think that the

7  terms of the agreement were what was agreed to.  The debtor

8  has not, on the evidence presented to me, done anything to

9  give J.C. Penney the right to terminate the agreement.

10        I think that section referred to, Section 10, the

11  effect of expiration of termination would not -- even if I

12  ordered the debtor to reject the licensing agreement the

13  effect of that would in some instances, some cases, suggest

14  it's not even a termination.  It's just a breach of the

15  agreement.  But whether it's a breach of the agreement or a

16  termination I think the provision requiring guaranteed

17  minimum payments would still require that J.C. Penney make

18  those guaranteed payments in full.

19        So, from the debtors' perspective, again,

20  requiring J.C. Penney to continue to perform the agreement

21  benefits the estate because it does reduce claims against the

22  estate.  While it is reducing an unsecured deficiency claim,

23  perhaps, and is not worth litigating I think it does provide

24  a benefit to the estate by having that paid.  So, I am going

25  to deny the motion.

1          MR. BINFORD:  Your Honor, I just had a point of

2    clarity --

3          THE COURT:  Yes.

4          MR. BINFORD:  -- on the record since I think the

5    relevant parties are here.  I believe everyone is under the

6    understanding that minimum payments are due regardless of

7    whether the products are currently being offered for sale.

8    Again, they are not being sold to a sufficient amount to

9    break through that minimum payment.

10          My client -- there really is -- it's not just some

11   lawyer trying to make a point.  My client really does have

12   heartburn about offering for sale things that have trademarks

13   that's owned by another party.  I would like to advise my

14   client that they're free to take those products down and not

15   be in violation of the automatic stay.

16          I think given your ruling it's not going to effect

17   the obligations as the court has determined under the minimum

18   royalties.

19          THE COURT:  Okay. I think the debtor does not

20   object to that.  Lantern didn't take a position one way or

21   the other.  So, you may not have that problem, but I

22   understand I don't think that you're required to continue to

23   sell the goods given the sale of the trademark.

24          MR. BINFORD:  Thank you, Your Honor.

25          MR. HEATH:  Your Honor, counsel for J.C. Penney

1  will prepare a form of order.

2          THE COURT:  Okay.  Thank you.

3          MR. HEATH:  Your Honor, the next item on the

4  agenda is First Republic's motion to vacate.

5          MR. TENZER:  Good afternoon, Your Honor; Andrew

6  Tenzer of Paul Hastings representing First Republic Bank.

7          Your Honor, we're here on agenda item number 3

8  which is First Republic's motion from the order vacating the

9  order entered at docket number 1574.  The stipulated order

10 which was the subject of much discussion at the prior hearing

11 of this matter on November 6th on our motion to lift the

12 automatic stay.

13         What I wanted to do, Your Honor, is just walk

14 through where I think we are procedurally, where we are I

15 think on the substance and the merits of our requests and

16 then just briefly address the objections that were filed to

17 the motion.

18         The motion to vacate the docket number 1574, the

19 stipulated order, is listed on today's agenda at item number

20 3 as a contested matter.  It is, in fact, not contested.

21 There have been two responses filed to that motion; one was

22 by Vertigo Prime and Good Fear, who I will just generally

23 refer to as the producers.  And what they said in their

24 pleading was we don't object to that relief so long as

25 whatever rights they have against the debtors and Lantern are

1  preserved.

2  That is, obviously, fine with me.  They did object

3  to the way that we characterize what Your Honor did at the

4  November 6th hearing which, as I will go through, whatever

5  Your Honor did at the November 6th hearing I don't think is

6  necessarily relevant for what we're here for today, but they

7  don't object to the vacating of the stipulated order.

8  Lantern's objection also expressly states that it

9  does not object to the vacating of the stipulated order.

10 They walked through, in their pleadings, essentially, how

11 despite what we said in our pleadings that they were, in

12 fact, cooperating with us.  I will go through a little bit

13 why that is not true.  It really is the reason that drives

14 the filing of the proposed form of order that we gave to the

15 court this morning because if Your Honor is inclined to grant

16 the stay relief we're going to need some assistance from the

17 court because, candidly, our collateral is in unknown places

18 and unknown things have been done with it.

19 Last but not least, Your Honor, if you recall at

20 the November 6th hearing debtors' counsel stood up and said

21 that the stipulated order they thought should be vacated

22 immediately.  So, there is no objection to the vacating of

23 the stipulated order; that relief if uncontested.

24 So, where does that leave us?  The issue sort of

25 then becomes what to do with First Republic's motion for

1 relief from stay which, again, at the November 6th hearing

2 only one party, the producers, objected to that.  What we

3 said that we would do at that hearing was we didn't want to

4 fight about the rights of two non-debtor parties in front of

5 Your Honor.  Whatever rights they have are reserved.  That

6 was our position then, that is our position today; that

7 hasn't changed.

8        What we specifically pointed out at that hearing

9 was that in the same way we were reserving rights for the

10 Guilds we would reserve rights for the producers.  What Your

11 Honor said at that hearing was that Your Honor did not feel

12 comfortable doing theat.  The exact phrase Your Honor used

13 was the fact that the stipulated order had been entered

14 muddied the waters with respect to the rights of the

15 producers.

16        Your Honor then noted that if you, in fact,

17 vacated the stipulated order in the courts words you're out

18 of it, you don't want to be deciding the rights of two non-

19 debtor parties.  Your Honor, the motion to vacate the

20 stipulated order, again, is uncontested.  So, we are now

21 exactly where I think we should have been at the November 6th

22 hearing.  The motion to lift the stay should be granted.  All

23 of the parties rights, the producers, anybody else who wants

24 to reserve rights are reserved and First Republic should be

25 allowed to proceed with whatever secured creditor rights it

1   has with respect to its cash collateral, what the papers call

2   the Polaroid collateral and all of its other rights.

3           Where we shouldn't be is where I think the

4   producers are suggesting that we be which is that the stay is

5   lifted, but the court makes an affirmative statement about

6   what the rights that my client is willing to reserve are.  A

7   reservation of rights is just that, a reservation of rights

8   without a decision.  For reasons I'll go through a little bit

9   later in the hearing, Your Honor, it would be wildly

10  inappropriate in this case to reserve those rights.

11          The rights that they are asserting should be

12  reserved; some of them, not all of them, but some of the

13  rights that they want Your Honor to reserve actually exists

14  under contracts that have not been signed.  Other rights that

15  they say exist are inconsistent with what they've put in

16  their own pleadings.  Again, they may be right, I may be

17  wrong, but, again, I'm not telling you they can't have those

18  rights.  All I am asking the court to do is say they're

19  reserved, not that they are what the producers say they are.

20          In addition, Your Honor, with regard to the merits

21  of the lift stay motion I guess I would like to remind the

22  court why the lift stay motion in part was filed and in

23  particular why neither the debtors nor the creditors

24  committee opposed it.  Polaroid, notwithstanding some of the

25  stuff that's gone on here, is a film that the debtors didn't

1  sell to Lantern.

2      The debtors and the committee can, obviously,

3  speak for themselves, but I think that they realize that the

4  only way for the estate to ever potentially benefit from

5  whatever value there is in Polaroid is to allow the lift stay

6  motion to go through, allow First Republic to exercise its

7  rights and whatever it can recover on those rights to the

8  extent there is excess of what we're owed we will pay it to

9  the debtors, absent that we are going to embroil that

10  litigation that is going to do nothing more than drive down

11  the value of the collateral and drive up the costs to the

12  estates.

13      Now, in connection with, you know, the motion to

14  lift the stay, Your Honor, what we would do, obviously, is we

15  would want to exercise our rights with respect to our

16  collateral, but those rights have been compromised and the

17  nature of the collateral has been impeded, maybe even damaged

18  by virtue of the fact that prior to our filing the motion to

19  lift stay Lantern was acting as if it was the owner of the

20  film.  We went through some of that at the lift stay hearing.

21  I won't repeat that all here, but contrary to what they've

22  said in their pleading and its statement on the record at the

23  last hearing about the fact that Lantern would cooperate with

24  us they have, in fact, not been cooperating.

25      For instance, Lantern has not provided First

1   Republic with information about the physical collateral,

2   where it is, what you actually need to display the film.  We

3   don't know where that is.  We have asked for that

4   information.  It has not been provided.  Lantern also made a

5   lot in its pleading about payments that it had received and

6   returned.  From where I sit, Your Honor, that's actually the

7   exact opposite of cooperation.

8           First of all, Your Honor, those payments were,

9   obviously, made under distribution agreements or other

10  agreements between whoever made the payment and the debtor

11  which means that Lantern had property in its possession that

12  if it wasn't theirs belonged to the debtor, was my client's

13  collateral and certainly without consulting my client, they

14  informed us after the fact, they decided to return that

15  money.  I don't know why they did that.  They can speak for

16  themselves, but they didn't come to.  I don't think they came

17  to the debtors or the committee, and they certainly didn't

18  come to the court with an explanation or request as to what

19  they should do with that money.  Now our client, assuming

20  stay relief is granted, needs to go chase that down.

21          In addition, we haven't received -- as I

22  mentioned, were not getting, sort of, full and complete

23  information.  We're not getting information about those

24  payments.  In the pleading that it filed Lantern referenced

25  that there were six payments; four that it received and given

1 | back, and two that it was in the process of giving back.

2 | Until that pleading was filed we had only been informed about

3 | four of the payments.  We didn't know about the other two.

4 |    I will also note, Your Honor, that the information

5 | that we get only seems to flow after we file a pleading.

6 | Other than that we really are not getting the information

7 | that we need about our collateral.

8 |    In addition, we know that Lantern has marketed the

9 | film and tried to realize value from the film, at least, in

10 | the United States which, again, may have potentially damaged

11 | the films value.  We know that Lantern made arrangements with

12 | a distribution known as 13 Films that as of yesterday 13

13 | Films still had on its website that Polaroid was available

14 | for sale by 13 Films.  Now, the fact that the film is still

15 | listed on the website may not be Lantern's doing, but the

16 | fact that it got there at all is.  That has created

17 | tremendous confusion in the marketplace.

18 |    There was a deal that Lantern was in the process

19 | of negotiating with Netflix.  And as soon as we said you

20 | don't own the film that stopped.  That has impeded my

21 | client's ability to potentially realize value from Netflix.

22 | We need to get all of the information about what's going on

23 | with all of these transactions.  We need to have a clear

24 | statement that we can show to distributors that rights in

25 | Polaroid were not transferred to Lantern.  For instance, we

1 have a bill of sale. The bill of sale may --

2          THE COURT:  All right.  Enough.  You're asking for

3 relief from the stay, you're not asking for all of this other

4 relief from me.

5          MR. TENZER:  What I am asking for, Your Honor, is

6 that with respect to our collateral Lantern provide the

7 information that we requested.

8          THE COURT:  I understand.

9          MR. TENZER:  okay.  With regard to the producers'

10 objection, again, I am willing to fully reserve their rights.

11 Again, I would note that they have not put the agreements

12 that they want Your Honor to say they have rights X, Y and Z

13 under on the record.  They are not here.  One of the reasons

14 for that is that, at least, one of the agreements has not

15 been executed.

16          Things are done in the film industry sometimes

17 where there are agreements to agreeing; we'll do this that

18 and the other thing, but at least one of the agreements that

19 they want you to find that rights exist under to my knowledge

20 is not final.  So, the idea that you would put in an order

21 that they have rights under an agreement that's not final

22 when, candidly, whatever rights those are we're willing to

23 reserve is not appropriate.

24          THE COURT:  I understand.

25          MR. TENZER:  Second, Your Honor, in their

1 pleading, I believe it's in Paragraph 17 of their pleading,

2 they acknowledge that they transferred a copyright to the

3 debtors.  The debtors own that copyright.  We have a lien on

4 all the assets of the debtors.  That copyright, whatever it

5 is, is our collateral.  If they say that they have other

6 rights or they want to assert they have other rights I am not

7 taking them away.  I am reserving them.

8            All I don't want to do is if we are going to have

9 a dispute with them later about what those rights are that's

10 fine, but there is nothing in the record today nor would it

11 be appropriate for the court to find that those rights are A,

12 B and C or whatever they would like to say.  The stay should

13 be lifted.  All of their rights should be reserved and we

14 should be able to move on; otherwise, we will be harmed

15 because our collateral will continue to decline in value, we

16 won't have the information about where it is, any hope for

17 the estate to recover from Polaroid will be gone and we will

18 be embroiled, I guess, in litigation, Your Honor, about who

19 owes what obligation to who that will cost the estate money.

20            It is better to the extent there are disputes, and

21 I don't know that there will be disputes.  We haven't' made

22 any decisions about what we're going to do with the

23 collateral assuming the stay is lifted.  We may foreclose, we

24 may negotiate with the producers.  I have no idea, but those

25 disputes don't need to take place here.  They can go in the

1  process of us marketing the collateral, or exercising

2  remedies, whatever it is we may choose to do.

3           Thank you.

4           THE COURT:  Thank you.

5           MR. BOWDEN:  Your Honor, before Mr. Tenzer leaves

6  the podium, may I have just one moment with him, if I may?

7           THE COURT:  You may.

8      (Participants confer)

9           MR. BOWDEN:  Your Honor, thank you.  Bill Bowden,

10  Ashby & Geddes, for First Republic.

11          As Mr. Tenzer alluded to you, we filed a revised

12  proposed form of order on the docket first thing this

13  morning.

14          THE COURT:  I don't have it.

15          MR. BOWDEN:  I was going to ask if I might approach

16  and hand Your Honor --

17          THE COURT:  You may.

18          MR. BOWDEN:  -- a copy of it.  Thank you.  Your

19  Honor, this is the redline, this is the (indiscernible) field

20  the redline (indiscernible) --

21          THE COURT:  Thank you.  All right.  Thank you.  I

22  have it.

23          MR. BOWDEN:  And Your Honor, that was provided to

24  counsel for Lantern, the debtors, the creditors' committee,

25  the producers, and (indiscernible)

1    (Pause in proceedings)

2         MR. SABIN:  Good afternoon, Your Honor.

3         THE COURT:  Good afternoon.

4         MR. SABIN:  Jeffrey Sabin from Venable on behalf of

5    Vertigo Prime and its wholly owned and controlled person, Roy

6    Lee and Good Fear Film and its wholly owned owner Chris

7    Bender, each of whom as I collectively refer to as the

8    "producers" of a film called Polaroid, which, as they say in

9    the industry, is "in the can," ready for distribution, and

10   which our clients believed was sold to Lantern; and,

11   accordingly, thereafter spent a fair amount of time

12   negotiating and entering into a stip to protect their rights

13   under what I'll call the good -- the producing services

14   agreement at Docket Number 1574, and the order approving that

15   stipulation.

16        That stipulation, Your Honor, contains two basic

17   things that go to the heart of the difference between our

18   position and the bank's position.  The whereas clause --

19   okay?  Number one, which is part of the record.  That

20   basically says the debtors entered into -- entered into --

21   that producing services agreement, all of it; the original

22   agreement, January 6th, as amended, and all the exhibits,

23   including what Mr. Tenzer is referring to as a "certificate

24   of engagement" that may or may not have been fully executed,

25   if it had to be executed as a matter of law; pursuant to

1  which that producer services agreement, labeled as a "work

2  for hire," our clients, the producers, gave rights to their

3  work and their contributions on the film to become part of a

4  copyright that this debtor owns, and that this debtor could

5  hypothecate, as it may have done so, to the bank, and/or

6  transfer to others, as it purportedly did to Lantern, but in

7  each case we believe subject to the rights of our clients,

8  the producers, under the producing services agreement.

9          That issue; i.e., what we believe, subject to the

10  rights of our clients, has not been decided by any court, and

11  was the subject of much discussion on Pages 104 and 105 of

12  the transcript that is now part of this record, at the

13  hearing on November 6th.

14          And in particular, as I'll paraphrase, to refresh

15  your recollection and mine, the Court asked, well, who's

16  going to decide that.  And Mr. Tenzer said, whether or not he

17  has an interest, referring to the subject of --

18          THE COURT:  Yeah.

19          MR. SABIN:  -- the producing services agreement.

20          "The Court:  Right.  Who's going to decide that?

21          "Well, that will be decided by a court, I assume.

22          "Which Court?  Because you're going to try and

23  market this, and then sell it?"

24          And as the record goes on, it's not clear any

25  court, and today it's not clear any court, for two reasons:

1        As part of their original lift-stay motion, they

2   have three kinds of rights once there's a default, which

3   there is:  They can do a judicial foreclosure, which maybe

4   there will be a court to decide the issue; or they can

5   exercise their rights under Section 8.05 of the credit

6   agreement and simply have the power appointed as attorney-in-

7   fact, which will never have a decision; or they can do a non-

8   judicial foreclosure, and we'll never get a decision.

9        And in any event, as our papers indicate, that

10  decision, if it is made by a court, may otherwise affect the

11  integrated issues of rights that are not here for today, that

12  -- rights that we have reserved as against Lantern and the

13  debtor for misleading us in connection with the stipulation

14  itself.

15       Now at the heart of the matter, Your Honor, is what

16  we've been trying to negotiate consensually, which is

17  protection of the following rights under those agreements.

18       THE COURT:  Well, let me ask you a question.  How -

19  - I guess you're suggesting I have to decide those rights.

20       MR. SABIN:  That is correct, Your Honor.

21       THE COURT:  This is a dispute between two non-

22  debtors.  Why do I have to decide these rights?

23       MR. SABIN:  Because the debtor is a necessary party

24  with respect to what is it that the debtor thinks it owned,

25  and what is it that the debtor believes, did it hypothecate

1   it, and whether the debtor believes it is subject -- that its

2   ownership of what the lift-stay would give -- okay?  Included

3   -- this is not a security interest.  Okay?  Unlike a the

4   guild issues.  Our issues, effectively, think about it as a

5   covenant running with the land.  That the producer services

6   agreement -- okay?  If you were to lift the stay means that,

7   when they market it, when they take title to it, that any

8   buyer -- okay?  Needs to take subject to the rights under

9   those agreements.

10          THE COURT:  But --

11          MR. SABIN:  That's the essence of our argument,

12   Your Honor.

13          THE COURT:  All right.  But why do I have to decide

14   that?

15          MR. SABIN:  Because if you were to lift the stay,

16   it's highly likely that, given three options, and given the

17   failure to answer which of the options they're going to go,

18   no court may ever decide it.

19          THE COURT:  Well --

20          MR. SABIN:  And we may not have standing --

21          THE COURT:  That --

22          MR. SABIN:  -- to go to a court --

23          THE COURT:  Why wouldn't --

24          MR. SABIN:  -- to the answer.

25          THE COURT:  -- you have standing --

1          MR. SABIN:  Because --

2          THE COURT:  -- to file an action to prevent them

3    from --

4          MR. SABIN:  Because the --

5          THE COURT:  -- exercising rights over the

6    collateral in which you assert you have rights?

7          MR. SABIN:  Because the copyright is owned by the

8    debtor, and the right to protect that copyright is owned by

9    the debtor.  I wish we had the rights, Your Honor, and maybe

10   we'd have some other claims, but the copyright itself it

11   owned by the debtor.

12          That's what the producer services agreement is, a

13   work-for-hire, where, in essence, the film is an integrated

14   copyright.  Okay?  A copyright is an aggregation of all the

15   contributions to the film:  Actors, producers, et cetera.

16   And in fact, the debtor says, go lift the stay, we're not

17   going to protect those rights, notwithstanding what the

18   stipulation otherwise did, which is the debtor said, hi, yes,

19   we entered into the agreement, yes, you have rights, and yes,

20   the buyer -- or the alleged buyer at the time, Lantern, said

21   we'll take, subject to those rights.

22          THE COURT:  Okay.  But this new buyer is not buying

23   it from the debtor; it's exercising other rights.  You would

24   still have your rights against the debtor.

25          MR. SABIN:  That's correct.

1          THE COURT:  But you are asserting you would not

2   have any rights --

3          MR. SABIN:  We may --

4          THE COURT:  -- against a judicial -- a non-judicial

5   foreclosing buyer.

6          MR. SABIN:  That's -- we wouldn't even know.  If

7   they exercised rights under the attorney-in-fact provisions

8   under Section 8.04, or if they exercised rights to go the

9   route of a non-judicial foreclosure, we may not even know.

10          THE COURT:  But would you have any rights?

11          MR. SABIN:  Don't know for sure, Your Honor.

12          THE COURT:  Well --

13          MR. SABIN:  I know that this Court would have

14   jurisdiction to decide that issue; that I do know today.

15          THE COURT:  Why do I have --

16          MR. SABIN:  Because --

17          THE COURT:  -- jurisdiction to --

18          MR. SABIN:  Because it --

19          THE COURT:  -- decide that?

20          MR. SABIN:  Because today it's an asset of this

21   estate.  Before you lift the stay, it's an asset of this

22   estate.

23          THE COURT:  But what effect does it have on the

24   bankruptcy estate?  None.

25          MR. SABIN:  It may otherwise have an effect

1  because, quite frankly, if you were to decide that our

2  position is correct, then we may very well forego our rights

3  to otherwise burden this estate with an administrative claim

4  that we would assert, and the litigation associated with it,

5  for what otherwise was visited upon us.

6       (Pause in proceedings)

7       THE COURT:  Well, does the debtor have a position

8  on that?

9       MR. HEATH:  I'm not sure what I'm being asked to

10  respond to, but if it's the following, his -- what he has set

11  forth in his papers, that he believes he was fraudulent --

12  his client was fraudulently induced to enter into the

13  stipulation; and now, through the motion to vacate, the

14  expense and time that his client was obligated to pay should

15  now be borne by the debtor for its conduct, obviously, we

16  disagree with that.  We don't think that's before you today.

17       To the extent the copyright is property of the

18  debtor, it's collateral of Mr. Tenzer's client, and he can

19  foreclose on it.  So I'm not sure -- I think, if I'm being

20  asked to respond to the threat about whatever conduct we

21  engaged in, that's not before you today, and we'll address --

22  suffice, for the record, we disagree.  We don't think it's an

23  issue for today.

24       MR. SABIN:  I'm not asking the Court to decide a

25  claim that we have not asserted.  Yes, we reserve those

1  rights against the debtor; yes, against Lantern.

2          THE COURT:  But --

3          MR. SABIN:  And I'm --

4          THE COURT:  But why -- if the copyright is the

5  collateral that First Republic will be foreclosing on, why is

6  that not subject to the agreement by which you conveyed the

7  copyright?  So why are your rights not able to be protected

8  in another forum?

9          MR. SABIN:  If people would otherwise admit to

10 standing -- okay?  In another forum.  And if people would

11 admit right now that a court is going to decide that issue

12 before marketing begins, before payments start to flow, that

13 would be a different story.  They haven't agreed to do that.

14 They specifically said, we haven't decided what we want to do

15 yet.  They said it on November 6th, on Page 105 of the

16 transcript; they're saying it today.  We've been fooled once,

17 and as the song goes, we won't be fooled again.

18         THE COURT:  Well, I don't see any effect on the

19 estate or any necessity for me to make that decision.  And I

20 think that, in November, my concern was that the proper place

21 for this dispute to be decided was not in my court, and that

22 the concern I had was that my entering a stipulation somehow

23 impinged upon another court being able to decide these rights

24 because I had entered an order that everybody agreed should

25 not have been entered.  I did not suggest that I was the one

1  that was going to decide rights of two non-debtor parties.

2       MR. SABIN:  And I'm not asserting that, Your Honor.

3  I'm asserting that, at this point, because it's not anywhere

4  clear that a court will ever decide the issue, that this

5  Court does have rights and does have jurisdiction; that's the

6  argument.  And if -- you know, respectfully, if you decide

7  otherwise, we understand that.  Okay?

8       THE COURT:  Well, I think any court could decide

9  these rights.  I am not sure that the fact that they do a

10  non-judicial foreclosure is going to preclude your clients

11  from taking action to protect themselves.  And a reservation

12  of rights in this order, reserving all your rights --

13       MR. SABIN:  Would the Court consider a modification

14  to the proposed order that would require, in connection with

15  lifting the stay, to have a judicial foreclosure?

16       THE COURT:  Well, how -- I don't know that I can

17  require that.

18     (Participants confer)

19       THE COURT:  But what is the position of First

20  Republic on that?

21       MR. TENZER:  Your Honor, Andrew Tenzer of Paul

22  Hastings, on behalf of First Republic.

23       I don't know how many different ways I can say

24  this.  Whatever Mr. Sabin's clients' rights are under the

25  law, they will be reserved, full stop.  If he has the right

1   to notice, he will get it; if he doesn't have the right to

2   notice, then I'm not taking anything away from him.  If I do

3   a judicial foreclosure or a non-judicial foreclosure,

4   whatever rights he wants to assert are reserved.

5          MR. SABIN:  If he's not going to commit one way,

6   the next question I have, Your Honor, is whether or not the

7   order would require, if he's using a method other than

8   judicial foreclosure, that we get prior notice of any effort

9   to exercise rights under Section 8.05, or to exercise rights

10  in a non-judicial forum.

11         MR. TENZER:  Again, Your Honor, Andrew Tenzer of

12  Paul Hastings, on behalf of First Republic.

13         I apologize for sounding like a broken record.  If

14  he's entitled to notice, he'll get notice.  If he's not

15  entitled to notice, I don't know why the secured creditor

16  rights that I negotiated with the debtor have to be modified

17  to provide notice to someone who may or may not be entitled

18  to it.

19         MR. SABIN:  I would submit, Your Honor, that, as a

20  court of equity, this Court could otherwise draft and enter

21  an order lifting the stay with that kind of additional relief

22  that would be equitable, certainly, to our clients, if this

23  Court is declining to exercise jurisdiction to decide the

24  issue.

25         THE COURT:  Well, Im not going to require that.  I

1    am not going to interject this Court into anything, any

2    matter that is solely between two non-debtor parties.  I

3    think I will -- because the parties have no objection, I will

4    vacate the stipulation, which, in my opinion, might have

5    muddied or confused any other court as to rights of the

6    parties.  That is vacated.  And other than that, all the

7    parties rights are reserved, whatever they are.  I'm not

8    going to muddy the waters further by trying to articulate

9    what they might be.

10              MR. SABIN:  Thank you, Your Honor.

11              MR. EIDE:  Good afternoon, Your Honor.  Kevin Eide

12   of Akin, Gump, Strauss, Hauer & Feld, on behalf of Lantern

13   Entertainment.

14              Your Honor, we had just a few remarks that we

15   wanted to make with respect to the motion to vacate.  First,

16   as already noted, we don't actually oppose the motion, but

17   you know, we do have a few responses.

18              So, you know, first, just to clarify the record, we

19   have, in fact, tried to cooperate by returning the funds that

20   were received to the distributors.  Prior to doing that, we

21   did ask for -- notwithstanding the representations of Mr.

22   Tenzer to the contrary, we did reach out to First Republic

23   for some sort of, you know, input as to what they wanted us

24   to, and we received none, and at that point decided that the

25   best course of action was to simply give the money back to

1  the people that it came from.

2         Now, you know, as to the proposed form of order

3  that was submitted earlier this morning, you know, we first

4  saw it when it was filed.  We did have a couple of issues

5  with the revised terms of the order.  We are perfectly happy

6  to return any funds that are in our possession, or any other

7  Polaroid collateral that are -- that is in our possession.

8  However, the time frame that they have set out for returning

9  is a little bit short.  We'll probably need at least five

10 business days, rather than, I think, the three days that they

11 have set forth in the order, just, you know, as -- purely as

12 a matter of getting everything organized and sent out.

13        And then we also need, from either First Republic

14 or the debtors, somebody needs to provide us with the

15 location to which we should deliver any of this collateral.

16 We have never -- we have never been given that information,

17 so we don't really know where to send it to.

18        And then, beyond that, there are a number of

19 provisions in this proposed form of order that would require

20 us to respond to basically information requests or some

21 quasi-discovery requests.  From our perspective, those go

22 well beyond what they -- what First Republic needs in order

23 to foreclose upon or monetize this collateral and --

24        THE COURT:  Which part are you talking about?

25        MR. EIDE:  So, in -- so paragraphs --

1          THE COURT:  (iii)?

2          MR. EIDE:  Paragraph 6, yeah, (iii), and then also

3  partly in (ii).  But in Paragraph (iii) they ask for, you

4  know, responses to the preliminary requested information of

5  First Republic.

6          THE COURT:  What was that?

7          MR. EIDE:  You know, that -- I haven't -- I have

8  not fully reviewed them.  A colleague of our -- of mine in LA

9  has been handling it.  But my understanding is it goes to a

10  number of different issues of various communications with

11  distributors or other parties, which, in my view, go beyond -

12  - or, as I understand it, go beyond anything that they would

13  need to sort of foreclose upon their collateral or anything

14  else, and really go to discussions between Lantern and

15  various third parties, which I think would --

16          THE COURT:  Well, isn't -- don't you think they're

17  entitled to that, since Lantern was apparently acting as if

18  it owned the rights?  And shouldn't they get whatever

19  information is necessary to know what you might have told

20  other people?

21          MR. EIDE:  Well, the -- there is no agreement with

22  Netflix, for example.  There is no --

23          THE COURT:  I don't know that --

24          MR. EIDE:  Right.

25          THE COURT:  -- and they don't know that.

 1              MR. EIDE:  Right.

 2              THE COURT:  They don't know what you've said to

 3    Netflix.

 4              MR. EIDE:  Uh-huh.

 5              THE COURT:  Aren't they entitled to know what you

 6    said to Netflix and others?

 7              MR. EIDE:  Well, I'm not sure that it's within the

 8    scope of a lift-stay motion or a motion to vacate the

 9    stipulation that has been entered.  So they asked for relief

10    from the stay in order to foreclose upon our collateral.

11    They did not ask for, you know, just -- they did not make a

12    2004 request for information from Lantern as to any

13    communications it's had with other third parties.  And it's

14    also not something that's, you know, necessary to vacating

15    the stip -- the order -- the stipulation that was approved.

16              THE COURT:  Do you really want them to be filing

17    for damages against Lantern --

18              MR. EIDE:  No, I --

19              THE COURT:  -- in this Court?

20              MR. EIDE:  No, I do not want them to be filing for

21    damages in this Court, and I do not believe -- you know, we

22    have, at all times, acted in good faith.  We have not

23    objected to their motion for stay relief, we have not

24    objected to their motion for --

25              THE COURT:  I haven't decided any of those issues.

1           MR. EIDE:  Right.  So -- right.

2           THE COURT:  Do you want me to decide these issues,

3    or do you want to work cooperatively --

4           MR. EIDE:  We have been --

5           THE COURT:  -- with them?

6           MR. EIDE:  We have been attempting to work

7    cooperatively with them, and we intend to continue to work

8    cooperatively with them.  But we think that, you know,

9    cooperation without the -- we think the provisions of the

10   order are unnecessary, and we intend to cooperate with them.

11          THE COURT:  Well, to make it clear, you are going t

12   provide the itemization of payments you've received and

13   returned.

14          MR. EIDE:  Uh-huh.  Correct.

15          THE COURT:  And you are going to deliver all

16   Polaroid collateral --

17          MR. EIDE:  Correct.

18          THE COURT:  -- to them.

19          MR. EIDE:  Correct.  Although, as noted, we

20   probably need five business days to make sure we get

21   everything together.  And we need the delivery location.

22          THE COURT:  Let me hear from First Republic.

23          MR. TENZER:  Your Honor, Andrew Tenzer of Paul

24   Hastings on behalf of First Republic.

25          Very briefly, if Your Honor wants to strike three

1  business days and put five business days, I have no

2  objection.  And we will commit to within, you know, three

3  business days provide -- and I'm going to probably get it to

4  them today -- but we will provide Lantern with an address as

5  to where everything they need to be -- deliver needs to go.

6          THE COURT:  Do you really need (iii)?

7          MR. TENZER:  Yes, Your Honor, and let me explain

8  why.  Your Honor hinted at it in your colloquy with counsel

9  to Lantern.  There is no deal with Netflix.  And the reason I

10  understand there is no deal with Netflix is because Lantern

11  had been negotiating one, and upon knowing that it wasn't

12  going to acquire the film, effectively -- and I'm

13  paraphrasing, based on what I know -- said you know, you

14  can't have the film.  Well, we would have been happy to

15  negotiate with them.  And so we need to know what said, we

16  need to know what was done.  Again, I don't have any

17  intention of pursuing whatever remedies I may have against

18  Lantern in this Court, but that doesn't mean I don't have

19  them, and so I need to know.

20          If Your Honor is -- wants to modify (iii) in some

21  way, you know, I'm certainly willing to discuss that with the

22  Court.  But to suggest that we're not entitled to any of that

23  information, which goes to the value of what we may be able

24  to recover, either on our collateral or from someone else, is

25  very important to us.

1         THE COURT:  Uh-huh.

2         MR. TENZER:  Your Honor, this -- as I think your --

3  the Court recognizes, this is not a normal way situation for

4  a lift-stay motion.  This is a situation in which someone

5  acted as if they owned our collateral and did things to it,

6  which may have adversely affected its value.  I think we're

7  entitled to know what those things are.  Thank you.

8         THE COURT:  Well, I am not going to order the

9  delivery of the information in (iii), but I do that

10  cautioning Lantern that they do have to cooperate and provide

11  information to First Republic, to allow First Republic to

12  realize on its collateral.

13         MR. TENZER:  Your Honor, Andrew Tenzer again.

14         May I either -- request one clarification.  The

15  language in Paragraph 3, which relates to the -- I believe,

16  the "preliminary requested information" -- which is a defined

17  term -- does, I believe, the way we defined it, overlap with

18  Clause 2, which relates to the payment.  So I just wanted to

19  make sure that nothing in eliminating Clause 3 affects Clause

20  2.

21         THE COURT:  I think that's correct.

22         MR. TENZER:  Thank you, Your Honor.

23         THE COURT:  They've already agreed --

24         MR. TENZER:  Okay.

25         THE COURT:  -- they will give you the information

 1  in Clause 2.

 2          All right.  If you'd revise that and submit it

 3  under certification of counsel and upload it, I will enter

 4  that order.

 5          MR. TENZER:  Thank you very much, Your Honor.

 6          MR. HEATH:  Your Honor, the last item on the agenda

 7  is the pretrial conference for the Lantern v. Cohen adversary

 8  proceeding.  Ms. Kandestin is here to address the Court --

 9          THE COURT:  Yes.

10          MR. HEATH:  -- in connection with that matter.

11          MS. KANDESTIN:  Thank you, Mr. Heath.

12      (Participants confer)

13          MS. KANDESTIN:  Your Honor, I apologize.  If it's

14  difficult to hear me, let me know.

15          THE COURT:  Okay.

16          MS. KANDESTIN:  I have a bit of a "toddler plague,"

17  as I call it.

18          Your Honor, may it please the Court, Maris

19  Kandestin of DLA Piper, on behalf of Lantern.

20          THE COURT:  Yes.

21          MS. KANDESTIN:  In the court with me is my

22  colleague Rachel Albanese from our New York office.

23          We're here today on the pretrial conference on the

24  adversary proceeding that Lantern filed against Bruce Cohen

25  Productions and Bruce Cohen.  I'd like to, with Your Honor's

1   permission, treat this as a status conference.

2           THE COURT:  Okay.

3           MS. KANDESTIN:  So, Your Honor, on October 17th,

4   Lantern initiated this adversary against Bruce Cohen

5   Productions and Bruce Cohen, relating to an agreement in

6   connection with the motion picture Silver Linings Playbook.

7   In the complaint, Lantern asked for a declaratory judgment

8   that the agreement between the parties was non-executory at

9   the petition date, and thus, was properly acquired by Lantern

10  through the asset sale.

11          The next day, Lantern filed a motion for summary

12  judgment.  This motion for summary judgment has been fully

13  briefed, there was a notice of completion of briefing filed,

14  and also a request for oral argument.

15          In addition, Your Honor, on December 17th, there

16  are two matters scheduled to be heard that concern the same

17  issues addressed in the summary judgment proceedings.  The

18  first motion is the supplemental objection and joint motion

19  of SLP contract counterparties to clarify the sale order.

20  I'll refer to this as the "first motion."

21          The moving parties in the first motion are Bruce

22  Cohen, Bruce Cohen Productions, which are the defendants in

23  the adversary, Bradley Cooper, 22nd & Indiana, Inc., Robert

24  DeNiro, Canal Productions, David O. Russell, and Canzian

25  Corp. (phonetic).  The agreements at issue all relate to the

1  motion picture Silver Linings Playbook.

2        The moving parties argue that their contracts are

3  not property of the estate, and therefore, were not assigned

4  to Lantern through the sale; and if the agreements are

5  property of the estate, then they're entitled to cure

6  payments.

7        And then what I refer to as the "second motion" is

8  the motion of executory contract counterparties for order

9  confirming that counterparties' agreements have been

10  designated by Lantern for assumption and assignment.  The

11  moving parties for that second motion include some additional

12  parties, but there is a great deal of overlap between the

13  moving parties in the first motion and the second motion,

14  including Bruce Cohen and Bruce Cohen Productions, David O.

15  Russell, Canzian Corp., Robert DeNiro, Canal Productions,

16  Bradley Cooper, and 22nd & Indiana, Inc.  It also appears

17  that most of the parties moving in the second motion have

18  contracts relating to Silver Linings Playbook.

19        The second motion seeks an order confirming that

20  the movants' agreements have been designated for assumption

21  and assignment; and, in other words, they're asking the Court

22  to decide whether the agreements were executory, whether they

23  were designated; and, if so, order that the agreements must

24  be cured prior to assumption and assignment to Lantern.

25        So what we have, Your Honor, is two motions

1  scheduled for December 17th that -- where the moving parties

2  in the first and second motions are substantially the same,

3  where the agreements at issue relate to the same motion

4  picture, and which raise the same issues that have been

5  already fully briefed in the summary judgment motion.

6         So, as these issues have been fully briefed, and

7  the summary judgment motion could resolve or inform the

8  outcome of the first and second motion, and maybe even in a

9  more organized fashion, we would ask that the Court grant

10 Lantern's request for oral argument on the summary judgment

11 pleadings.  If Your Honor is inclined to do so, subject to

12 the Court's schedule, we'd like to have oral argument heard

13 on December 17th, so that these issues, you know, in the

14 interest of judicial economy, can be heard in tandem.

15        I will cede the podium to Mr. Cohen's counsel.

16        THE COURT:  Okay.

17        MR. SIMON:  May it please the Court.  Good

18 afternoon, Your Honor.  Chris Simon, Cross & Simon, on behalf

19 of Bruce Cohen Productions and Bruce Cohen.

20        THE COURT:  Uh-huh.

21        MR. SIMON:  Your Honor, we're here on a status

22 conference, as counsel mentioned, in the adversary

23 proceeding.  My co-counsel Michael Gottfried is on the

24 telephone, and I believe he would like to address the Court.

25        But I will say, briefly, there are a number of

1  issues and a number of other parties that are involved in the

2  motions mentioned by counsel, and I believe it's our position

3  that the motion for summary judgment -- let me back up.

4         First of all, we'll defer to Your Honor, of course,

5  if you even want to hear oral argument and when you want to

6  hear oral argument.  So I'll make that the caveat of any

7  following statement I or Mr. Gottfried would make.

8         But we would suggest that, A, if we're going to

9  have oral argument on the motion for summary judgment, we be

10  allotted sufficient time to have that argument, and I'm not

11  sure what yet is on the schedule for December 17th, but we

12  certainly don't want to be curtailed in the significant and

13  multiple issues that are set forth in the motion for summary

14  judgment, we don't want our argument curtailed on those

15  issues.

16         Second, it may be that the issues decided by Your

17  Honor in connection with the other motions, which involved

18  other parties who are not parties to the adversary proceeding

19  may very well resolve some, if not all, of the issues in the

20  motion for summary judgment.  And so, in the issue --

21  interest of judicial economy and our clients' time and

22  expense, it may make sense not to have that argument.

23         But Mr. Gottfried is on the phone, and I believe he

24  would like to address the Court, if he has anything further

25  to add.

1         THE COURT:  All right.  Yes?

2         MR. GOTTFRIED:  (Via telephone) Yes, Your Honor.

3  It's Michael Gottfried, Landau, Gottfried & Berger, again, on

4  behalf of Bruce Cohen and Bruce Cohen Productions.  And thank

5  you, Your Honor, for allowing both of us to be heard on this.

6         First of all, we do agree that this should be held

7  as a status conference today, and that it would be premature

8  to be setting any dates today.

9         The argument, generally, made by Lantern's counsel

10  today is that the summary judgment motion should be heard on

11  December 17th with the other motions because, purportedly,

12  the issues are the same, and I would take issue with that.  I

13  don't believe they're the same at all.

14         As counsel stated, the first motion that got filed

15  was whether certain of the contracts that dealt with Silver

16  Linings Playbook were property of the debtors' estate.

17  That's a fundamental question to start out with.  Regardless

18  of the issue of whether the agreements are executory or not

19  executory, it's whether they were actually property of the

20  estate.  And then, if they were property of the estate,

21  whether -- regardless, again, if the agreements are executory

22  or non-executory, if Lantern has ongoing obligations with

23  respect to those agreements post-sale.  So, again, that

24  motion has absolutely nothing to do with the issue of are the

25  agreements executory or not.

1          The second motion that got filed was with respect

2   to Lantern's designation of agreements, and whether or not

3   that designation (indiscernible) the deadline was appropriate

4   or inappropriate, and what the remedies should be, to the

5   extent that that designation was too little, too late.

6   Again, that's regardless of the issue of whether or not the

7   agreements are executory or non-executory.  We did not ask

8   the Court to make that decision; simply what's the effect of

9   the designation that Lantern itself made.

10          The issue with respect to the summary judgment is

11  purely with respect to, as a matter of law, are the -- is the

12  agreement with Mr. Cohen and Bruce Cohen Productions, is that

13  agreement executory or not.  That is an entirely separate

14  issue that can be decided at a separate time.  I would say

15  that Lantern is, number one, putting the cart before the

16  horse because they have made the request to this Court to

17  have oral argument.  The Court has not yet made a decision on

18  that.  And the Court should make a decision on that in the

19  ordinary course, when it makes the decision.

20          The other issue that my co-counsel referred to is

21  whether or not, on December 17th, which is an omnibus hearing

22  date, we would have the time to go forward with it, even if

23  Your Honor decided to go forward with it, if we would have

24  the time to do so.  And I would suggest that that motion will

25  require a substantial amount of time for argument, if the

1  Court wants to or needs to hear argument.

2       So I would suggest that, for of purpose of this

3  status conference, we're merely talking about where the

4  parties are, what dates should be decided, if any.  We're not

5  talking about the summary judgment motion today, and whether

6  or not the Court is going to, ultimately, want to hear

7  argument on that or not.

8       THE COURT:  All right.  Thank you.

9       MR. GOTTFRIED:  Thank you, Your Honor.

10      MS. KANDESTIN:  Your Honor, very briefly.  Once

11  again, Maris Kandestin of DLA Piper for Lantern.

12      The issue of whether the contracts were property of

13  the estate is addressed in the summary judgment pleadings.

14  And also, I do not think that this would take a substantial

15  amount of time; I disagree with opposing counsel.  It's a

16  legal issue.  So I don't think that it will take -- there's

17  not going to be a huge evidentiary hearing.  I don't think it

18  will take as much time as possible.  And I do think that,

19  because the issues are so closely related, and in fact,

20  overlap greatly, that it makes sense to have them heard at

21  the same time.  Thank you, Your Honor.

22      (Pause in proceedings)

23      THE COURT:  All right.  Well, I had a completely

24  different view of what we were doing today and what might

25  happen.  I agree with Lantern's counsel that these three

1    motions are related and really ought to be resolved together.

2    The reason I did not -- I did take a look at the motions for

3    - motion for summary judgment, and did not schedule for oral

4    argument because I knew we'd be here today, and wanted to see

5    what the parties thought about the -- that.

6            But my question is why this -- whether or not this

7    should not proceed to mediation immediately, to see if a

8    resolution can be reached that's acceptable to the parties.

9    Otherwise, I do have to hear, I think, all -- I should hear

10   all of the motions together.  And I don't think it is as

11   simple as perhaps Lantern believes it is.  I think that they

12   overlap; the arguments do overlap and complicate what might

13   be a simple resolution.

14           But unfortunately, the 17th, I have reserved an

15   hour, but I have other time that day, but I do have a T --

16   excuse me -- a preliminary injunction scheduled for the

17   afternoon, so the parties would only have the morning, if

18   that's their desire to proceed then.

19           But I would like to take a break, and have the

20   parties talk about the possibility of mediation, and who

21   might be an appropriate mediator.  If you think that that can

22   be resolved while you're here today.  I have a one o'clock

23   hearing.  If you want to adjourn and talk about this further,

24   and come up with suggested names, I'll give you that.

25           MS. KANDESTIN:  Your Honor, I think we'd like to

 1   discuss it now.

 2             THE COURT:  All right.

 3             MR. SIMON:  Your Honor, for the record, Chris

 4   Simon.  I have two questions that might help:

 5             One, Your Honor stated that the matters were

 6   related.  There are different parties --

 7             THE COURT:  I know, and that --

 8             MR. SIMON:  -- that are not here today.

 9             THE COURT:  They're related parties, but they are

10   different, I appreciate that, and they ought to be consulted,

11   as well.

12             MR. SIMON:  Okay.  So --

13             THE COURT:  So maybe we ought to adjourn and let

14   you talk, and have a teleconference later this week or first

15   thing next week, whatever works.

16             MR. SIMON:  I think what might make sense -- I'm

17   not -- I'm also concerned about the time on the 17th.  So my

18   thoughts would be perhaps we adjourn and we discuss and

19   figure out who needs to be -- who needs to participate.  And

20   then, if we would have leave of the Court to contact

21   chambers, and perhaps look at a date or not for hearing all

22   these motions in a way that makes sense for the Court and the

23   parties.  I just want to be constructive on that front, as

24   well.

25             THE COURT:  All right.

1          MS. KANDESTIN:  Your Honor, as we're going to have

2     to adjourn this with a number of parties, we would suggest

3     that all three motions -- all three issues be adjourned to

4     the January 8th omnibus hearing, while we discuss mediation

5     options.

6          THE COURT:  Okay.  Let me see if I can get it.

7          (Participants confer)

8          MR. SIMON:  And Your Honor, for the record, Chris

9     Simon.

10         I'm not sure we would agree on the motion -- on the

11    other -- the motion that we filed for clarification, so I

12    need to confer with my co-counsel on that.  I'm sorry.

13         MR. SABIN:  Good afternoon, Your Honor.  Jeff Sabin

14    again for someone who is not a party to the Bruce Cohen

15    adversary, but someone who is a party-in-interest, and who

16    has at least moved with respect to the motion for

17    clarification, which is referred to as the "first motion."

18         I am happy to go back to my clients and ask whether

19    they would be part of a mediation.  I'm happy to go back to

20    my clients on whether they would ask and agree to put off

21    their own motion.  But at this point, I certainly can't say

22    anything without getting to the clients --

23         THE COURT:  All right.

24         MR. SABIN:  -- and would try to do it today because

25    my clients have wanted an adjudication of these issues for a

1  very long time.  So I suspect that mediation may very well be

2  something acceptable to them.

3          THE COURT:  Uh-huh.

4          MR. SABIN:  But at this juncture, I can't say, and

5  I can't agree to move the motion itself, in terms of the

6  17th.

7          THE COURT:  All right.  Well, let me tell you, I do

8  have all day on the 8th, and could give the parties all day

9  on the 8th, but I would like to encourage the parties to

10  talk.

11          Anybody else want to chime in?

12          MR. ROBINSON:  Your Honor --

13          MR. GOTTFRIED:  Your Honor, this is Michael

14  Gottfried.

15          I'm happy to try and talk with Lantern, and see

16  whether or not we can agree upon some form of mediation.

17  We've had a number of discussions with respect to settlement

18  that have never gone anyplace, but I'm certainly happy to

19  have the conversation about mediation.

20          I would say that, if we're going to have mediation,

21  I know that my clients have said that they would necessarily

22  have it here in Los Angeles, and they would not go to the

23  east coast for mediation, so I will say that on the record.

24  But I'm happy to talk about who an acceptable mediator would

25  be, and whether or not my clients would agree to what at this

1   stage.

2           THE COURT:  All right.

3           MR. ROBINSON:  Your Honor, Colin Robinson,

4   Pachulski, Stang, Ziehl & Jones, on behalf of the committee.

5           I'll start at the end.  I just want to make sure

6   Your Honor wasn't automatically pushing everything to January

7   8th, because the committee would oppose that.  Okay.

8           THE COURT:  No.

9           MR. ROBINSON:  And then, second, the committee has

10  a significant interest in some of the issues raised in the

11  motion, and we're obviously not a party to the adversary

12  proceeding.  So we'll take Your Honor's recommendation as --

13  to have the parties talk, and we'll discuss it with the

14  committee and reach out.  But I think adjourning today and

15  letting the parties all circle back after today is probably

16  the best course of action.

17          THE COURT:  Yeah.  And I'd like to hear from the

18  parties.  If we're proceeding on the 17th, again, I have, at

19  most, two or three hours on that.  I will reschedule the

20  pretrial until then and schedule oral argument on the motion

21  for summary judgment for then, but I don't think we'll finish

22  that day, if we start.  So I strongly encourage the parties

23  to talk, and see about whether they will agree to move it to

24  January 8th, and/or go to mediation.  And if somebody could

25  alert Ms. Capp, really by Monday, as to what the parties have

1  decided.

2         And given the cold weather, I'm sure any mediator

3  would be happy to go to the west coast these days, although

4  not if the fires are still out of control.

5         MS. KANDESTIN:  Well, Your Honor --

6         MR. GOTTFRIED:  Not where I am, Your Honor.

7         THE COURT:  Okay.

8         MS. KANDESTIN:  I'll take responsibility for

9  informing Ms. Capp of the decision by Monday and --

10        THE COURT:  Okay.

11        MS. KANDESTIN:  Thank you, Your Honor.

12        THE COURT:  All right.  Then this is the end of the

13  --

14        UNIDENTIFIED:  Thank you, Your Honor.

15        THE COURT:  -- Weinstein matters?

16        MR. HEATH:  That's all we have today, Your Honor.

17  Thank you.

18        THE COURT:  All right.  We'll stand adjourned then.

19  Thank you.

20        UNIDENTIFIED:  Thank you, Your Honor.

21     (Proceedings concluded at 1 p.m.)

22

23

24

25

1                              CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6    /s/Mary Zajaczkowski                    November 30, 2018
7    Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25