# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*,[1]<br><br><br>Debtors. | Chapter 11<br><br>Case No. 18-10601 (MFW)<br>Jointly Administered<br><br>Re: Docket Nos. 1930 and 2004<br>Hearing Date: January 28, 2019 at 11:30 a.m. |

### REPLY BRIEF OF TELE MUNCHEN IN SUPPORT OF MOTION FOR RELIEF FROM STAY, *NUNC PRO TUNC* TO JANUARY 3, 2019, TO ALLOW DELIVERY OF NOTICE OF TERMINATION (D.I. 1930)

Tele Munchen Fernsch GmbH & Co. Produktionsgesellschaft ("Tele Munchen") hereby submits its reply brief in support of its motion, dated January 3, 2019 (the "Motion") for an order lifting the automatic stay to permit it to give notice of termination to Weinstein Global Film Corp. ("Weinstein Global"), with respect to the Distribution Agreement and other CW Contracts[2] between Tele Munchen and Weinstein Global, relating to the film *The Current War*.

For the reasons set forth below, the Court should enter an order authorizing Tele Munchen to give notice of termination to Weinstein Global, effective *nunc pro tunc* as of January 3, 2019 or, alternatively, confirming that the Motion itself constitutes that notice.

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

[2] Capitalized terms not otherwise defined in this Reply Brief have the meanings given to them in the Motion.

IMPAC 6063404v.2

**PRELIMINARY STATEMENT**

Tele Munchen acknowledges that in the title and introductory paragraph of the Motion, it appears to ask for authorization to terminate the CW Contracts.[3] But in the text of the Motion, and in the "Wherefore" paragraph at its end, Tele Munchen expressly seeks only to modify the stay to permit it to give notice of termination to Weinstein Global. Tele Muchen apologizes for the inconsistency and any resulting confusion.

The notice of termination that Tele Munchen seeks to give is based on Weinstein Global's failure to deliver a Notice of Availability, relating to *The Current War*, by December 31, 2018. Under the Distribution Agreement, if Weinstein Global fails to meet that deadline, Tele Munchen may notify Weinstein Global of its election to terminate the Distribution Agreement, but must do so within ten business days.[4] If Tele Munchen fails to give that notice within ten days, it arguably waives the right to terminate for that reason.[5] Thus, Tele Munchen must give notice of termination timely, to preserve its argument that Weinstein Global failed to meet the deadline.

In their Objection (D.I. 2004), the Debtors and Lantern contend that Tele Munchen's right to terminate (which they dispute) should be resolved by arbitration.[6] Tele Munchen agrees that the issue should be addressed in an appropriate forum and that, at that time, the parties should address the other issues that Tele Munchen has raised, including (i) that it was

---

[3] As explained in the Motion, the "CW Contracts" include the Distribution Agreement, the Notice of Assignment (the "NOA"), and any other contracts that relate to *The Current War* and to which Tele Munchen and any of the Debtors are parties. The Objection to the Motion, filed by Debtor and Lantern, refer to the same agreements as the "Tele Munchen Agreements." Copies of the Distribution Agreement and the NOA are attached both to the Motion and to the Objection.

[4] *See* Distribution Agreement, Exhibit 2, ¶ 1.A. (if Notice of Availability not delivered by Outside NOD Date, Distributor (Tele Munchen) may terminate within ten business days); *id.* p. 1 ("Outside NOD Date" means December 31, 2017).

[5] *Id.* Exhibit 2, ¶ 1.A.

[6] Objection ¶ 24.

fraudulently induced to enter into the CW Contracts by the Debtors' failure to disclose the looming Harvey Weinstein scandal, and (ii) that the stain of that scandal has destroyed the value of Weinstein films, including *The Current War*, resulting in a failure of consideration.[7]

But in this Motion, Tele Munchen seeks only to preserve its right to argue—in any subsequent negotiation, litigation, arbitration, or other proceeding—that Weinstein Global failed to deliver an effective Notice of Availability by the December 31 deadline.

Granting the Motion would not prejudice the Debtor in any way, except insofar as it would permit Tele Munchen to enforce the Distribution Agreement as written.  In contrast, if Tele Munchen is not permitted to send a notice of termination, it could be deemed to waive the argument.  The automatic stay is a shield, not a sword—it should not be used to eliminate Tele Munchen's potential claims or defenses.

**ARGUMENT**

**I.    Tele Munchen's Right to Terminate Is Not at Issue**

The Objection argues that Tele Munchen does not have the right to terminate the Distribution Agreement, for three different reasons.  As explained above, this argument is not on point. Tele Munchen seeks relief from stay merely to give notice of termination and preserve its right to show—in an appropriate proceeding—that Weinstein Global missed the December 31 deadline.  But Tele Munchen is constrained to respond briefly to the Objection's three points.

---

[7]  Tele Munchen raised these latter arguments in its Limited Objection to the Debtors' bid-procedures and sale motion (D.I. 574).  The hearing on the Limited Objection has been continued.

## II. Tele Munchen Does Not Need Consent to Send a Notice of Termination

Citing section 2.17 of the NOA, the Objection contends that any termination by Tele Munchen requires the consent of the "Agent" and the "Completion Guarantor." But section 2.17 does not apply here.

In relevant part, section 2.17 states that "without the consent of the Agent and Completion Guarantor, the Distributor *and* Lantern shall not: (a) terminate the Distribution Agreement . . ." (emphasis added). Thus, that section prohibits a *joint* termination by Tele Munchen and Weinstein Global. It does not prohibit one party from taking action because of a breach by the other.

Under the Distribution Agreement (page 1), the Notice of Availability "shall occur no later than December 31, 2018." Nothing in section 2.17 or elsewhere in the NOA extends that deadline. Accordingly, Weinstein Global can no longer deliver a timely Notice of Availability. Tele Munchen merely seeks authorization to notify Weinstein Global that the deadline has passed, so as to preserve the argument for use in any future proceeding.[8]

## III. The Purported Notices of Availability Sent in 2017 Were Ineffective.

The Objection contends that Weinstein Global sent effective Notices of Availability in March and April 2018. But as Tele Munchen showed in the Motion, a Notice of Availability purports to state that the film is available and ready to screen.[9] *The Current War*, in a form satisfactory to the Debtors, was not available in March or April 2018. To Tele Munchen's knowledge, a version of *The Current War* has been publicly screened only once—at the Toronto Film Festival in September 2017. Based on the negative, critical reception by the audience at

---

[8] Moreover, Tele Munchen is advised that the original Agent (Union Bank) and Completion Guarantor (Film Finances) are no longer involved in this matter.

[9] *See* Motion ¶ 8. The "Initial Materials," to be referenced in the Notice of Availability, must include a print of the film "suitable for screening in theaters."

that screening and in trade reviews (including Hollywood Reporter and Variety), its producers decided to revise it.  In December 2018, they shot a new scene, for insertion in a new, re-edited version of the film.

The Objection's suggestion that the additional work on the film related only to a "typical "Directors Cut'" is specious.  A "Directors Cut" is a revised version, reflecting the director's original intentions, and released after the first studio version has been released.[10]  Here, no "first studio version" was ever released.  Tele Munchen understands that the *The Current War's* director, re-hired to "fix" his own film, made the December revisions.  Shooting new scenes, adding them to a film and editing it is not creating a "Director's Cut."  It's just getting the movie ready for Delivery, which previously it wasn't.

To Tele Munchen's knowledge, the film is *still* not available.  Obviously, any Notice of Availability sent in early 2018, when the film was unfinished, could not be effective.

## IV. Tele Munchen Is Not Trying to "Sidestep" Arbitration.

As the Debtors are well aware, Tele Munchen would require relief from stay to initiate arbitration against Weinstein Global.  Tele Munchen is prepared to litigate all issues related to the CW Contracts in an appropriate forum.  In this Motion, however, Tele Munchen seeks merely to preserve (and avoid waiving) one argument for use in that forum—that Weinstein Global failed to deliver a Notice of Availability by the contractual deadline.

---

[10]     *See* the definition in the Oxford Dictionaries. "Director's cut – A version of a film that reflects the director's original intentions, released after the first studio version."
*Https://en.oxforddictionaries.com/definition/director's cut.*

**V.    Tele Munchen – Not the Debtors or Lantern – Will be Prejudiced if the Motion Is Denied.**

The Objection contends that the Debtors will be prejudiced if the Motion is granted, because if Tele Munchen is ultimately able to terminate the CW Contracts, it may assert a claim for return of the $600,000 it has already paid. But there is no prejudice. A debtor isn't prejudiced if a creditor has a valid claim and asserts it. That's how bankruptcy works.

The Objection also contends that if the Motion is granted, Lantern "could be deprived of valuable contract rights" that it expected when it purchased the Debtors' assets. But Tele Munchen's Limited Objection to the assumption and assignment of the CW Contracts was filed more than one month before the sale was approved. And Lantern was presumably aware of the terms of Distribution Agreement, including the December 31 deadline. There is no prejudice to Lantern if, after the sale has closed, Tele Munchen continues to assert objections that Lantern was aware of or could have contemplated.

By contrast, if the Motion is not granted, Tele Munchen may be deemed to waive the argument that Weinstein Global failed to deliver a Notice of Availability on time. That's not a proper use of the automatic stay.

Courts regularly explain that the automatic stay acts a shield to protect debtors, not as a sword to prejudice creditors.[11] *See, e.g., In re Residential Capital, LLC,* 2012 Bankr. LEXIS 3624, *2 (Bankr. S.D.N.Y. Aug. 7, 2012) (automatic stay a shield, not a sword). In that case, the court refused to permit the debtor to prosecute claims against a creditor while the creditor's counterclaims were stayed.

---

[11] *See, e.g., In re Residential Capital, LLC,* 2012 Bankr. Lexis 3624, *2, (Bankr. S.D.N.Y. August 7, 2012) (automatic stay a shield, not a sword; debtor may not prosecute claims against creditor while creditor's claims and counterclaims stayed).

Similarly, this Court should not allow the Debtors to rely on the stay to cause Tele Munchen to lose its argument that Weinstein Global failed to meet the December 31 deadline. Instead, the Court should modify the stay, to permit Tele Munchen to give notice of termination, thereby preserving all parties' rights under the CW Contracts.

## CONCLUSION

Tele Munchen does not seek authorization to terminate the CW Contracts, but merely to give notice of termination, based on Weinstein Global's failure to deliver a timely Notice of Availability.

Granting the Motion will not prevent Weinstein Global from arguing that the March and April Notice of Availability were effective, that the CW Contracts remain in effect, or that Tele Munchen's notice of termination was ineffective. It will not prejudice the Debtors or Lantern in any way—it will merely preserve Tele Munchen's right to argue that the deadline has passed. But if the Motion is denied, Tele Munchen may lose the right to make that argument.

*[Remainder of Page Intentionally Left Blank]*

IMPAC 6063404v.2

Accordingly, the Court should grant the Motion and permit Tele Munchen to give notice of termination, *nunc pro tunc* as of January 3, 2019. As an alternative form of relief, the Court could simply order that the filing of the Motion itself constituted the notice of termination provided for in the Distribution Agreement.

Dated: January 23, 2019
Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ R. Stephen McNeill*
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
D. Ryan Slaugh (DE Bar No. 6325)
1313 N. Market Street, Sixth Floor
Wilmington, DE  19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
          rmcneill@potteranderson.com
          rslaugh@potteranderson.com

-and-

**VALLE MAKOFF LLP**
Jeffrey B. Valle, Esq.
Peter Clapp, Esq.
11911 San Vicente Blvd., Suite 324
Los Angeles, CA  90049
Telephone:  (310) 476-0300
Email:  jvalle@vallemakoff.com
          pclapp@vallemakoff.com

*Counsel to Tele Munchen Fernsch GmbH & Co. Produktionsgesellschaft*