## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*, | Case No. 18-10601 (MFW) |
| Debtors.[1] | (Jointly Administered) |
| | **Hearing Date: March 26, 2019 at 11:30 a.m. (ET)**<br>**Objection Deadline: March 6, 2019 at 4:00 p.m. (ET)** |

### MOTION OF Y MOVIE, LLC, Y THEATRICAL, LLC, YFE HOLDINGS, INC., OA3, LLC, AND RMF, LLC TO (A) ENFORCE SALE ORDER, (B) CONFIRM ASSUMPTION OF LIABILITIES BY LANTERN ENTERTAINMENT LLC PURSUANT TO ASSET PURCHASE AGREEMENT, AND (C) COMPEL PERFORMANCE BY LANTERN ENTERTAINMENT LLC <u>UNDER ASSET PURCHASE AGREEMENT</u>

Y Movie, LLC, Y Theatrical, LLC, YFE Holdings, Inc., OA3, LLC, and RMF, LLC

(collectively, the "***Investment Counterparties***") hereby submit this motion (this "***Motion***")[2] for

the entry of an order, substantially in the form attached hereto as <u>**Exhibit A**</u>, (i) enforcing the

Court's Sale Order (defined below), (ii) confirming that Lantern Entertainment LLC ("***Lantern***")

assumed the liabilities under certain investment agreements (collectively, the "***Investment***

***Agreements***") with the Investment Counterparties in connection with Lantern's acquisition of

substantially all of the assets of The Weinstein Company LLC ("***TWC***") and its affiliated debtors

---

[1]  The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013.  Due to the large number of Debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of this information may be obtained on the website of the Debtors' noticing and claims agent at http://dm.epiq11.com/twc.

[2]  The filing of this Motion does not constitute consent or submission by the Investment Counterparties to the jurisdiction of the Court for any relief other than as set forth in the Motion.

and debtors in possession (collectively with TWC, the "**Debtors**") pursuant to the Asset Purchase Agreement dated March 19, 2018 (as amended, the "**APA**") and the corresponding sale order entered on May 9, 2018 [Docket No. 846] (the "**Sale Order**"),[3] and (iii) compelling Lantern to perform under the APA.  In support of this Motion, the Investment Counterparties respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      Lantern acquired substantially all of the Debtors' assets pursuant to the APA and the Sale Order but is now trying to skirt its obligations under the APA with respect to the Investment Counterparties.  The APA defines those assets as the "Purchased Assets," which, in turn, include "Assumed Contracts," "Title Rights," and "Covered Titles," all as defined in the APA.  The Investment Counterparties are parties to the Assumed Contracts and, by the plain terms of the APA, the movies that are the subject of the Assumed Contracts constitute Title Rights and Covered Titles.  As a result, all obligations under the Assumed Contracts constitute "Assumed Liabilities" under the APA, which Lantern has agreed to—and must now—perform post-closing consistent with its obligations thereunder.

2.      Lantern's efforts to reap only the benefits of the Purchased Assets, in breach of the APA, constitutes not only a violation of the Sale Order, but is likewise an improper attempt to deny the Investment Counterparties the benefit of their respective bargains.

3.      The Investment Counterparties fully satisfied their obligations under the Investment Agreements prior to the Petition Date, thereby rendering the Investment Agreements non-executory when these Chapter 11 Cases (defined below) commenced, and Lantern took

---

[3]  The Sale Order also authorized the Debtors' entry into the first amendment to the APA.  For the Court's convenience, a copy of the Sale Order and APA are attached hereto as **Exhibit B**.

assignment of the Investment Agreements under the APA pursuant to section 363 of the

Bankruptcy Code.  Indeed, the Court recently ruled that Lantern must satisfy its post-closing

obligations with respect to agreements similar to the Investment Agreements.[4]  Consequently,

the Investment Counterparties respectfully request that the Court (i) enforce the Sale Order,

(ii) confirm that Lantern assumed the Debtors' liabilities under Investment Agreements pursuant

to the APA and (iii) require Lantern to satisfy the associated post-closing Assumed Liabilities

under the Investment Agreements.

### BACKGROUND

I.    **Bankruptcy Filing and Sale Motion**

4.    On March 19, 2018 (the "***Petition Date***"), the Debtors each filed voluntary

petitions for relief (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States

Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of

Delaware (the "***Court***").

5.    On March 20, 2018, the Debtors filed a motion requesting, among other things,

approval from the Court to sell substantially all of the Debtors' assets to Lantern [Docket No. 8]

(the "***Sale Motion***") on the terms memorialized in the APA.  The Sale Order was entered on May

9, 2018, and the sale approved thereby closed on July 13, 2018 (the "***Closing Date***").

II.    **The APA**

6.    Lantern acquired all "***Purchased Assets***" under the APA, which include all

"rights, Claims and assets (other than Excluded Assets) of every kind and description" of the

Debtors, including the assets listed on Schedule 2.1 to the APA.  APA § 2.1.

---

[4] *See* Docket No. 2013 (the "***Cohen Order***"), a copy of which is attached hereto for the Court's convenience as **Exhibit C**.

### III.    Purchased Assets under the APA

7.      Under the APA, Lantern acquired certain assets and assumed related liabilities. The relevant provisions are discussed below.

#### i.      Assumed Contracts

8.      Schedule 2.1(e) of the APA defines all "Assumed Contracts" as Purchased Assets. The Assumed Contracts are described as those contracts designated by Lantern "prior to the Closing Date" that Lantern "wishes to 'assume.'"  APA § 2.8(a).  Each Investment Agreement was designated an Assumed Contract on the Assumed Contracts Schedule (defined below) prior to the Closing Date.[5]  Therefore, each Investment Agreement was explicitly identified as a Purchased Asset.

#### ii.     Title Rights

9.      Additionally, Schedule 2.1 of the APA includes all "*Title Rights*," which includes all "Assumed Contracts and all other contract rights" with respect to each "*Covered Title*."  APA Schedule 2.1(b).  The definition of "Covered Titles" includes each Investment Movie (defined below), which are the movie titles related to the Investment Agreements.  *See* APA Ex. A; APA Annex 1.  Accordingly, because the Investment Agreements constitute Title Rights, they by definition also constitute Purchased Assets because Title Rights are included on Schedule 2.1 of the APA.

### B.    Excluded Assets under the APA

10.     The Purchased Assets expressly do not include "*Excluded Assets*."  Excluded Assets are identified in Section 2.2 of the APA, which references Schedule 2.2 of the APA.

---

[5]  Please see Section V *infra* for a detailed description of each Investment Agreement.  Additionally, a chart summarizing the Investment Agreements and the contractual references to the APA setting forth the basis for Lantern's post-closing obligations thereunder is attached hereto as **Exhibit E**.

Excluded Assets include "all Contracts that are not Assumed Contracts," and such Assumed Contracts are, therefore, deemed Purchased Assets. *See* APA Schedule 2.2(h).

11.     Additionally, as discussed in more detail below, the Second Amendment to the APA revised Section 2.8(a) of the APA to state that "***executory*** Contracts" that Lantern failed to "designate in writing for assumption" would automatically be deemed "Excluded Contracts" and, therefore, Excluded Assets. There is no provision treating ***non-executory*** contracts similarly. Thus, under the APA (as amended), if a non-executory contract falls within the definition of "Assumed Contracts," it would not "automatically be deemed" an "Excluded Contract" if Lantern failed to explicitly designate it for assumption.

12.     Accordingly, any non-executory contract that remained on the Assumed Contracts Schedule as of the Closing Date is not an Excluded Contract and, therefore, is not an Excluded Asset. The Investment Agreements are neither Excluded Contracts nor Excluded Assets because they remained on the Assumed Contracts Schedule as of the Closing Date. Stated otherwise, they constitute Purchased Assets.

### C.     Assumed Liabilities Under the APA

13.     Under the APA, Lantern assumed and agreed to "pay, perform or discharge when due those Liabilities . . . arising out of the operation of the Purchased Assets (***including the Assumed Contracts***) for periods following the Closing Date, except for those Liabilities that are Excluded Liabilities." APA § 2.3; Second Amendment ¶ 2(a) (emphasis added).

14.     Accordingly, Lantern explicitly assumed all post-closing liabilities arising out of every Assumed Contract—including the Investment Agreements—in addition to other liabilities that arise out of the operation of the Purchased Assets.

**D.      Excluded Liabilities under the APA**

15.      "***Excluded Liabilities***" are defined in Section 2.4 of the APA, which include,

among other things:

> (c)  any indebtedness for borrowed money, bank loans or facilities or any other debt instruments;
>
> . . .
>
> (f)  all Liabilities arising under any Contract that is not an Assumed Contract.

APA § 2.4.

16.      Because the Investment Agreements are not "indebtedness for borrowed money,"

and because each agreement constitutes an Assumed Contract, for the reasons outlined above,

the Investment Agreements are not Excluded Liabilities.

**IV.      Second Amendment to the APA**

17.      On July 11, 2018, the Court entered an order [Docket No. 1220] approving a

second amendment to the APA (the "***Second Amendment***")[6] that, among other things, modified

Lantern's rights and obligations with respect to assumption of ***executory*** contracts.  Specifically,

the Second Amendment made one primary revision to Section 2.8(a) of the APA, inserting the

word "executory" into Section 2.8(a) and in Schedule 2.2(h):

> (e) The fourth sentence of <u>Section 2.8(a)</u> of the [APA] is hereby amended and restated as follows:
>
>> "All ***executory*** Contracts of the Seller Parties that are listed on <u>Section 2.8(a)</u> of the Disclosure Schedule as of the Closing Date and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed "Excluded Contracts" (and for the avoidance of doubt, [Lantern] shall not be responsible for any related Cure Amounts related to any Excluded Contracts)."
>
> . . .

---

[6]  A copy of the Second Amendment is attached hereto as **<u>Exhibit D</u>**.

(r) Clause (h) of <u>Schedule 2.2</u> of the [APA] is hereby amended and restated in its entirety as follows:

> "all ***executory*** Contracts that are not Assumed Contracts including (i) all Employment Contracts and all other employment, severance or similar Contracts with employee or service provider of the Seller Parties and (ii) all Contracts set forth in <u>Schedule 2.2(h)</u> (collectively, the "<u>Excluded Contracts</u>")"

Second Amendment ¶ 2(e), (r) (emphasis added). As a result, the Second Amendment changed and limited the types of contracts that could be deemed Excluded Contracts (as defined in the APA) post-closing and clarified that ***only executory contracts could be deemed Excluded Contracts after the Closing Date***. There is no provision in the APA that allows Lantern to designate a non-executory, Assumed Contract as an Excluded Contract after the Closing Date.

18.     The Second Amendment also provides that until November 8, 2018, Lantern could designate a "***Disputed Contract***" (as defined in the APA) as an Excluded Asset (as defined in the APA), pursuant to Section 2.8(c) of the APA. Second Amendment ¶ 2(i). However, under the APA, a Disputed Contract refers only to a contract where the counterparty has filed an "***objection . . . to the Cure Amount*** . . . ." APA § 2.8(c) (emphasis added). The Investment Counterparties did not file any objections regarding the proposed Cure Amounts of the Investment Agreements. Therefore, the Investment Agreements do not constitute Disputed Contracts or Excluded Assets.

## V.    Sale Order and Assumed Contracts Schedule

19.     The Sale Order provides as follows:

> On the Closing Date or as soon as reasonably practicable thereafter, the Debtors shall file and serve a notice (the "Final Cure Notice"), which identifies which Assumed Contracts and Leases are ***Assumed Contracts (as defined in the APA)*** (the "Assumed Contracts Schedule") and the Cure Amount, if any . . . .

Sale Order ¶ 32 (emphasis added).

20.     The term "Assumed Contracts" as defined in the APA includes executory and non-executory contracts.  APA § 2.8(a); APA Ex. A.  On the other hand, the term "*Assumed Contracts and Leases*" as defined in the Sale Order is more limited and refers only to "*executory* contracts and unexpired leases that are proposed to be assumed and assigned pursuant to the APA . . . ."  Sale Order at 2 (emphasis added).

21.     On May 10, 2018, the Debtors filed the *Final List of Potentially Assumed Contracts and Leases* [Docket No. 860] (the "*Assumed Contracts Schedule*"), which identifies each contract that constitutes an "*Assumed Contract*" as defined in the APA.  Neither the Debtors nor Lantern filed an amended Assumed Contracts Schedule prior to the Closing Date; therefore, the contracts listed on the Assumed Contracts Schedule remained Assumed Contracts on the Closing Date.

## VI.     The Investment Agreements

22.     Prior to the Petition Date, the Investment Counterparties and the Debtors entered into twelve investment agreements (collectively, the "*Investment Agreements*") and related ancillary agreements,[7] pursuant to which the Investment Counterparties agreed to invest in certain movies (collectively, the "*Investment Movies*"), and the Debtors agreed to share a percentage of future profits arising from those movies.  The Investment Counterparties paid all required investment amounts under each Investment Agreement, thereby performing all of their material obligations, prior to the Petition Date.  For the Court's convenience, a chart

---

[7]  True and correct copies of the Investment Agreements and related ancillary agreements are attached to the *Declaration of Robert P. Bermingham in Support of the Investment Counterparties' Motion to (a) Enforce Sale Order, (b) Confirm Assumption of Liabilities By Lantern Entertainment LLC Pursuant to Asset Purchase Agreement, and (c) Compel Performance by Lantern Entertainment LLC Under Asset Purchase Agreement* filed contemporaneously herewith (the "*Bermingham Declaration*").  Concurrently therewith, pursuant to the confidentiality provisions in the Investment Agreements, the Investment Counterparties are filing a motion to file the exhibits to the Bermingham Declaration under seal.

summarizing the following Investment Agreements and the contractual references to the APA

setting forth the basis for Lantern's post-closing obligations thereunder is attached hereto as

**Exhibit E**.

        **A.**    **The Upside Agreement**

        23.      On or about February 13, 2017, Debtor TWC Untouchable SPV, LLC ("***Upside***

***SPV***") and Y Movie, LLC ("***Y Movie***") entered into an agreement (the "***Upside Agreement***"),

pursuant to which Y Movie invested cash into Upside SPV in exchange for a percentage of the

Gross Receipts (as defined in the Upside Agreement) earned by Upside SPV from the

exploitation of the movie now known as *The Upside*.[8]

        24.      The Upside Agreement provides that Upside SPV would repay the Upside

Investment by May 13, 2017 (the "***Repayment Date***").  On or about May 12, 2017, Y Movie,

Upside SPV, and others entered into a letter agreement amending the Upside Agreement and

other Investment Agreements (the "***Omnibus Amendment***").[9]  Pursuant to the Omnibus

Amendment, the parties agreed to amend a single provision of the Upside Agreement, extending

the Repayment Date to May 17, 2017.

        25.      The Debtors listed the Upside Agreement and the Omnibus Amendment on the

Assumed Contracts Schedule.  Assumed Contracts Schedule, Nos. 25765, 25766, 25858.[10]  The

APA also lists *The Upside* as a Covered Title.  APA Annex 1, Top Unreleased Pictures, No. 4.

---

[8]  The Upside Agreement is attached as Exhibit A-1 to the Bermingham Declaration.  The Upside Agreement relates to a motion picture then-titled *Untouchable* but subsequently retitled as *The Upside*.

[9]  The Omnibus Amendment is attached as Exhibit M to the Bermingham Declaration.

[10]  The Assumed Contracts Schedule also lists an "Untouchable Investment Agreement" with an effective date of February 10, 2017.  Assumed Contracts Schedule, No. 25767.  Y Movie submits that this is an error and that no such investment agreement exists in executed form.

B.      **The August OC Agreement**

26.      On or about August 1, 2012, August OC, LLC ("***August OC SPV***") and Y

Theatrical, LLC ("***Y Theatrical***") entered into an agreement (the "***August OC Agreement***"),

pursuant to which Y Theatrical invested cash into August OC SPV in exchange for a percentage

of the Gross Receipts (as defined in the August OC Agreement) earned by August OC SPV from

the exploitation of the movie known as *August Osage County*.[11]  Upon information and belief,

Debtor TWC is the successor in interest and assignee of all of the rights and obligations of

August OC LLC under the August OC Agreement.[12]

27.      Also on or about August 1, 2012, TWC, August OC SPV, Debtor Weinstein

Global Film Corp. and Y Theatrical entered into the Supplement to the August OC Agreement

(the "***August OC Supplement***" and collectively with the August OC Agreement and Omnibus

Amendment, the "***August OC Investment Documents***") to set forth various supplemental

provisions of the August OC Agreement.[13]

28.      Pursuant to the Omnibus Amendment, the parties agreed to amend a single

provision of the August OC Agreement related to the time horizon for Y Theatrical to conduct

audits under the August OC Agreement.[14]

---

[11]   The August OC Agreement is attached as Exhibit B-1 to the Bermingham Declaration.

[12]   The corporate existence of August OC LLC is no longer valid, and TWC is listed as the counterparty to the August OC Agreement on multiple filings in the Chapter 11 Cases, including on the Assumed Contracts Schedule.

[13]   The August OC Supplement is attached as Exhibit B-2 to the Bermingham Declaration.

[14]   The Omnibus Amendment is attached as Exhibit M to the Bermingham Declaration.

29.     The Debtors listed the August OC Investment Documents on the Assumed

Contracts Schedule.  Assumed Contracts Schedule, Nos. 25773, 25780, 25781, 25858.  The APA

also defined *August Osage County* as a Covered Title.  APA Annex 1, Top Pictures, No. 4.

### C.     The Crouching Tiger Agreement

30.     On or about January 3, 2013, TWC and Y Theatrical entered into an agreement

(the "***Crouching Tiger Agreement***"), pursuant to which Y Theatrical invested cash into TWC in

exchange for a percentage of the Gross Receipts (as defined in the Crouching Tiger Agreement)

earned by TWC from the exploitation of the movie known as *Crouching Tiger Hidden Dragon

2: Sword of Destiny*.[15]

31.     The Debtors listed the Crouching Tiger Agreement on the Assumed Contracts

Schedule.  Assumed Contracts Schedule, Nos. 25769, 25770, 25775.  The APA also lists

*Crouching Tiger Hidden Dragon 2: Sword of Destiny* as a Covered Title.  APA Annex 1, Top

Programs, No. 1.

### D.     The Lawless Agreement

32.     On or about May 29, 2012, TWC and OA3, LLC ("***OA3***") entered into an

agreement (the "***Lawless Agreement***"), pursuant to which OA3 invested cash into TWC in

exchange for a percentage of the Gross Receipts (as defined in the Lawless Agreement) earned

by TWC from the exploitation of the movie now known as *Lawless*.[16]

---

[15]  The Crouching Tiger Agreement is attached as Exhibit C-1 to the Bermingham Declaration.

[16]  The Lawless Agreement is attached as Exhibit D-1 to the Bermingham Declaration.  The Lawless Agreement
relates to a motion picture then-titled *The Wettest County* but subsequently retitled as *Lawless*.

33.    On or about June 11, 2012, TWC and OA3 entered into Amendment No. 1 to the Lawless Agreement (the "***First Lawless Amendment***") to amend certain defined terms, movie credit rights, audit protocol, and security interests provisions.[17]

34.    On or about July 2, 2012, OA3 entered into an Assignment Agreement (the "***Lawless Assignment***") with Y Theatrical, pursuant to which OA3 assigned the Lawless Agreement to Y Theatrical.[18]

35.    On or about July 26, 2013, TWC and Y Theatrical entered into Amendment No. 2 to the Lawless Agreement (the "***Second Lawless Amendment***" and together with the First Lawless Amendment and Lawless Agreement, the "***Lawless Investment Documents***") to acknowledge and agree on the final Lawless Investment amount and the final percentage of Gross Receipts to which Y Theatrical is entitled.[19]

36.    The Debtors listed the Lawless Investment Documents on the Assumed Contracts Schedule.  Assumed Contracts Schedule, Nos. 17222, 17223, 17227, 17230, 17236, 25779.  The APA also lists *Lawless* as a Covered Title.  APA Annex 1, Top Pictures, No. 30.

**E.    The Long Walk Agreement**

37.    On or about November 20, 2013, TWC and YFE Holdings, Inc. ("***YFE***") entered into an agreement (the "***Long Walk Agreement***"), pursuant to which YFE invested cash into TWC in exchange for a percentage of the Gross Receipts (as defined in the Long Walk

---

[17]  The First Lawless Amendment is attached as Exhibit D-2 to the Bermingham Declaration.

[18]  The Lawless Assignment is attached as Exhibit D-3 to the Bermingham Declaration.

[19]  The Second Lawless Amendment is attached as Exhibit D-4 to the Bermingham Declaration.

Agreement) earned by TWC from the exploitation of the movie known as *Long Walk to Freedom*.[20]

38.    Also on or about November 20, 2013, TWC and YFE entered into a side letter agreement in connection with the Long Walk Agreement (the "***Long Walk Side Letter***") to modify certain provisions related to the distribution of Gross Receipts (as defined in the Long Walk Agreement) and provisions related to security interests.[21]

39.    On or about December 17, 2013, TWC and YFE entered into the First Amendment to the Long Walk Agreement (the "***First Long Walk Amendment***" and together with the Long Walk Agreement, Long Walk Side Letter and Omnibus Amendment, the "***Long Walk Investment Documents***") to amend the Long Walk Agreement to permit an additional investment by a third-party investor.[22]

40.    On or about May 12, 2017, TWC and YFE entered into the Omnibus Amendment to amend a single provision of the Long Walk Agreement related to the time horizon for YFE to recoup unpaid sums pursuant to audits conducted under the Long Walk Agreement.[23]

41.    The Debtors listed the Long Walk Investment Documents on the Assumed Contracts Schedule.  Assumed Contracts Schedule, Nos. 25854, 25855, 25856, 25857, 25858. The APA also lists *Long Walk to Freedom* as a Covered Title.  APA Annex 1, Top Pictures, No. 33.

---

[20]  The Long Walk Agreement is attached as Exhibit E-1 to the Bermingham Declaration.

[21]  The Long Walk Side Letter is attached as Exhibit E-2 to the Bermingham Declaration.

[22]  The First Long Walk Amendment is attached as Exhibit E-3 to the Bermingham Declaration.

[23]  The Omnibus Amendment is attached as Exhibit M to the Bermingham Declaration.

### F.    The Brother Agreement

42.    On or about April 20, 2011, TWC and OA3 entered into an agreement (the

"***Brother Agreement***"), pursuant to which OA3 invested cash into TWC in exchange for a

percentage of the Gross Receipts (as defined in the Brother Agreement) earned by TWC from the

exploitation of the movie known as *Our Idiot Brother*.[24]

43.    The Debtors listed the Brother Agreement on the Assumed Contracts Schedule.

Assumed Contracts Schedule, Nos. 17229, 17233.  The APA also lists *Our Idiot Brother* as a

Covered Title.  APA Annex 1, Top Pictures, No. 36.

### G.    The Philomena Agreement

44.    On or about November 20, 2013, TWC and Y Theatrical entered into an

agreement (the "***Philomena Agreement***") pursuant to which Y Theatrical invested cash into

TWC in exchange for a percentage of the Gross Receipts (as defined in the Philomena

Agreement) earned by TWC from the exploitation of the movie known as *Philomena*.[25]

45.    Also on or about November 20, 2013, TWC and Y Theatrical entered into a side

letter agreement in connection with the Philomena Agreement (the "***Philomena Side Letter***") to

modify certain provisions related to the distribution of Gross Receipts (as defined in the

Philomena Agreement) and provisions related to security interests.[26]

46.    On or about September 22, 2016, TWC and Y Theatrical entered into a

Supplement to the Philomena Agreement (the "***Philomena Supplement***" and together with the

Philomena Agreement, Philomena Side Letter, and Omnibus Amendment the "***Philomena***

---

[24]   The Brother Agreement is attached as Exhibit F-1 to the Bermingham Declaration.

[25]   The Philomena Agreement is attached as Exhibit G-1 to the Bermingham Declaration.

[26]   The Philomena Side Letter is attached as Exhibit G-2 to the Bermingham Declaration.

***Investment Documents***") to set forth various supplemental provisions of the Philomena Agreement.[27]

47.    Pursuant to the Omnibus Amendment, the parties agreed to amend a single provision of the Philomena Agreement related to the guidelines relating to an audit conducted under the Philomena Agreement.[28]

48.    The Debtors listed the Philomena Investment Documents on the Assumed Contracts Schedule.  Assumed Contracts Schedule, Nos. 25776, 25777, 25782, 25858.  The APA also lists *Philomena* as a Covered Title.  APA Annex 1, Top Pictures, No. 38.

### H.    The Quartet Agreement

49.    On or about May 29, 2012, TWC and Y Theatrical entered into an agreement (the "***Quartet Agreement***"), pursuant to which Y Theatrical invested cash into TWC in exchange for a percentage of the Gross Receipts (as defined in the Quartet Agreement) earned by TWC from the exploitation of the movie known as *Quartet*.[29]

50.    The Debtors listed the Quartet Agreement on the Assumed Contracts Schedule.  Assumed Contracts Schedule, Nos. 25774, 25778.  The APA also lists *The Quartet* as a Covered Title.  APA Annex 1, Top Pictures, No. 41.

### I.    The Details Agreement

51.    On or about April 20, 2011, TWC and OA3 entered into an agreement (the "***Details Agreement***"), pursuant to which OA3 invested cash into TWC in exchange for a

---

[27]  The Philomena Supplement is attached as Exhibit G-3 to the Bermingham Declaration.

[28]  The Omnibus Amendment is attached as Exhibit M to the Bermingham Declaration.

[29]  The Quartet Agreement is attached as Exhibit H-1 to the Bermingham Declaration.

percentage of the Gross Receipts (as defined in the Details Agreement) earned by TWC from the exploitation of the movie known as *The Details*.[30]

52.     The Debtors listed the Details Agreement on the Assumed Contracts Schedule. Assumed Contracts Schedule, No. 17234.  The APA also lists *The Details* as a Covered Title. APA, Annex 1, Other Titles, No. 37.

**J.     The Giver Agreement**

53.     On or about November 5, 2013, TWC and Y Theatrical entered into an agreement (the "***Giver Agreement***"), pursuant to which Y Theatrical invested cash into TWC in exchange for a percentage of the Gross Receipts (as defined in the Giver Agreement) earned by TWC from the exploitation of the movie known as *The Giver*.[31]

54.     On or about February 27, 2015, TWC and Y Theatrical entered into a Supplement to the Giver Agreement (the "***Giver Supplement***" and together with the Giver Agreement and Omnibus Amendment, the "***Giver Investment Documents***") to set forth various supplemental provisions of the Giver Agreement.[32]

55.     Pursuant to the Omnibus Amendment, the parties agreed to amend a single provision of the Giver Agreement related to the guidelines relating to an audit conducted under the Giver Agreement.[33]

---

[30]  The Details Agreement is attached as Exhibit I-1 to the Bermingham Declaration.

[31]  The Giver Agreement is attached as Exhibit J-1 to the Bermingham Declaration.

[32]  The Giver Supplement is attached as Exhibit J-2 to the Bermingham Declaration.

[33]  The Omnibus Amendment is attached as Exhibit M to the Bermingham Declaration.

56.    The Debtors listed the Giver Investment Documents on the Assumed Contracts Schedule.  Assumed Contracts Schedule, Nos. 25768, 25771, 25783, 25784, 25785, 25858.  The APA also lists *The Giver* as a Covered Title.  APA Annex 1, Top Pictures, No. 58.

### K.    The Iron Lady Agreement

57.    On or about May 13, 2011, TWC and OA3 entered into a letter agreement (the "***Iron Lady Agreement***"), pursuant to which OA3 invested cash into TWC in exchange for a percentage of the Gross Receipts (as defined in the Iron Lady Agreement) earned by TWC from the exploitation of the movie known as *The Iron Lady*.[34]

58.    On or about May 7, 2012, OA3 entered into an Assignment Agreement (the "***Iron Lady Assignment***") with RMF LLC ("***RMF***"), pursuant to which OA3 assigned the Iron Lady Agreement to RMF.[35]

59.    The Debtors listed the Iron Lady Agreement on the Assumed Contracts Schedule. Assumed Contracts Schedule, Nos. 17226, 17235.  The APA also lists *The Iron Lady* as a Covered Title.  APA Annex 1, Other Titles, No. 75.

### L.    The Sapphires Agreement

60.    On or about May 29, 2012, TWC and Y Theatrical entered into an agreement (the "***Sapphires Agreement***"), pursuant to which Y Theatrical invested cash into TWC in exchange for a percentage of the Gross Receipts (as defined in the Sapphires Agreement) earned by TWC from the exploitation of the movie known as *The Sapphires*.[36]

---

[34]  The Iron Lady Agreement is attached as Exhibit K-1 to the Bermingham Declaration.

[35]  The Iron Lady Assignment is attached as Exhibit K-2 to the Bermingham Declaration.

[36]  The Sapphires Agreement is attached as Exhibit L-1 to the Bermingham Declaration.

61.     The Debtors listed the Sapphires Agreement on the Assumed Contracts Schedule. Assumed Contracts Schedule, Nos. 25772, 25786.  The APA also lists *The Sapphires* as a Covered Title.  APA Annex 1, Top Pictures, No. 44.

## VII.    Post-Closing Contract Notices

62.     On September 5, 2018 (after the Closing Date), pursuant to the Second Amendment and paragraph 32 of the Sale Order, the Debtors filed a list of purportedly executory contracts that Lantern intended to assume pursuant to the Sale Order ("***Contract Notice No. 1***"). On September 20, 2018 the Debtors filed a second notice ("***Contract Notice No. 2***"), and on November 5, 2018, the Debtors filed a third notice ("***Contract Notice No. 3***"), adding some purportedly executory contracts and removing others from the list of contracts that Lantern intended to assume pursuant to the Sale Order.  Contract Notice No. 2 ¶ 6; Contract Notice No. 3 ¶ 6.

63.     On November 8, 2018, Lantern filed a final Contract Notice ("***Contract Notice No. 4***"), adding some additional, purportedly executory, contracts and removing others from the list of contracts that Lantern intended to assume pursuant to the Sale Order.  Contract Notice No. 4 states that "certain ***Disputed Contracts*** (as defined in the Initial APA) are being deemed Excluded Assets."  Contract Notice No. 4 ¶ 7 (emphasis added).  The exhibit attached to Contract Notice No. 4 includes a chart labeled "Excluded Contracts," which lists, among others, the following Investment Agreements and related agreements:

- The Omnibus Amendment

- The Brother Agreement

- The First Long Walk Amendment

- The Philomena Agreement

- The Philomena Side Letter

- The Quartet Agreement

- The Sapphires Agreement

- The Giver Agreement

- The First Lawless Amendment

- The Iron Lady Agreement

64.    All of the Investment Agreements listed on Contract Notice No. 4 are non-executory contracts and constitute Assumed Contracts.  Pursuant to the APA, the Assumed Contracts Schedule was fixed for non-executory contracts as of the Closing Date (other than Disputed Contracts), and only executory contracts and Disputed Contracts could be removed from the Assumed Contracts Schedule post-closing.  *Compare* APA § 2.8 (requiring Lantern to designated Assumed Contracts prior to the Closing Date) *with* Second Amendment ¶ 2(e) & (i) (allowing only post-closing removal of executory contracts and Disputed Contracts).

## VIII.   Lantern's Refusal to Satisfy the Assumed Liabilities

65.    On January 8, 2019, counsel to the Investment Counterparties sent a letter to Lantern on behalf of Y Movie requesting that Lantern pay to Y Movie its share of the "Gross Receipts" under the Upside Agreement.

66.    On January 14, 2019, counsel to Lantern responded with a letter stating that Lantern refused to satisfy its obligations under the Upside Agreement, arguing (a) Lantern designated the Upside Agreement as an "Excluded Contract" in Contract Notice No. 4 "and, accordingly, the obligations under the [Upside] Agreement have not been assumed by Lantern"; (b) the Upside Agreement "constitutes an agreement to make a loan, or extend other debt financing or financial accommodations, that is not capable of assumption and assignment under section 365(c)(2) of the United States Bankruptcy Code"; and (c) the liabilities under the Upside

Agreement constitute "Excluded Liabilities" under Section 2.4(c) of the APA, which excludes

"any indebtedness for borrowed money, bank loans or facilities or any other debt instruments."

## RELIEF REQUESTED

67.     The Investment Counterparties seek entry of an order, substantially in the form

attached hereto as **Exhibit A**, (a) compelling Lantern to comply with the Sale Order and

(b) confirming that (i) the Investment Agreements are not executory, (ii) the Investment

Agreements are Purchased Assets under the APA, (iii) the liabilities under the Investment

Agreements constitute Assumed Liabilities under the APA, and (iv) Lantern is required to satisfy

all such liabilities that accrue on and after the Closing Date.

## ARGUMENT

### I.      The Investment Agreements Are Not Executory

68.     Under section 365 of the Bankruptcy Code, a contract is deemed executory only if

"the obligation of both the bankrupt and the other party to the contract are so far unperformed

that the failure of either to complete performance would constitute a material breach excusing

performance of the other."  *Enter. Energy Corp. v. United States ex rel. I.R.S.* (*In re Columbia*

*Gas Sys. Inc.*), 50 F.3d 233, 239 (3d Cir. 1995) (citation omitted); *see also In re Waste Sys. Int'l,*

*Inc.*, 280 B.R. 824, 827 (Bankr. D. Del. 2002) (Walrath, J.) ("The Third Circuit has emphasized

that the court must determine whether the failure to perform an obligation under the contract

would constitute a material breach.").  "Thus, unless both parties have unperformed obligations

that would constitute a material breach if not performed, the contract is not executory under

§ 365."  *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010).  "[T]he time for testing whether

there are material unperformed obligations on both sides is when the bankruptcy petition is

filed."  *Id.* (citation omitted).

69.     "In order to determine whether failure to perform the remaining obligations would constitute a material breach, [courts] consider contract principles under the relevant nonbankruptcy law." *In re Columbia Gas*, 50 F.3d at 241 n.10.  Under California law,[37] "the question of whether a breach of an obligation is a material breach . . . is [normally] a question of fact, however, if reasonable minds cannot differ on the issue of materiality, the issue may be resolved as a matter of law." *Boston LLC v. Juarez*, 245 Cal. App. 4th 75, 87 (2016) (citation and internal quotation marks omitted).  California courts have determined that a breach must go "to the root of the contract" to be considered material.  *In re Lewis*, 185 B.R. 66, 67-68 (Bankr. N.D. Cal. 1995) (quoting *Karz v. Dep't of Prof'l & Vocational Standards*, 11 Cal. App. 2d 554, 557 (1936)).

70.     Recently, Lantern commenced an adversary proceeding to determine that an agreement (the "***Cohen Agreement***") was not an executory contract.  *See Lantern Enter. LLC v. Bruce Cohen Prods. (In re Weinstein Co. Holdings LLC)*, Case No. 18-50924 (MFW) (Bankr. D. Del.) (the "***Cohen Litigation***").  As explained by Lantern, the Cohen Agreement required Mr. Cohen to provide certain services, and TWC agreed to pay Mr. Cohen "fixed and contingent compensation, which were both tied directly to the production and success of the Picture." Cohen Litigation, Docket No. 7 ¶ 4.  The Cohen Agreement also gave incidental rights and obligations to Mr. Cohen, such as the "first opportunity to negotiate terms to production another, as-of-yet nonexistent film" and potential indemnification obligations.  *Id.* ¶¶ 6-7, 37.  According to Lantern, these "peripheral contractual provisions" were immaterial.  *Id.* ¶ 43.  TWC and Mr. Cohen "completed production of the Picture" prior to the Petition Date; thus, Mr. Cohen had

---

[37]  Each Investment Agreement is governed by California law.

satisfied his "principal obligations" under the Cohen Agreement.  *Id*. ¶¶ 8, 24.  Accordingly,

Lantern argued that the Cohen Agreement was not an executory contract.  *Id.* ¶ 35.

71.     At a hearing held on January 14, 2019, on Lantern's motion for summary

judgment, the Court agreed with Lantern and found that the Cohen Agreement was not

executory: "I conclude that the contract, using *Exide*, the primary purpose of this contract was

for Cohen to produce the film and that has been completed years ago."  Cohen Litigation, Docket

No. 44, Jan. 14, 2019 Hr'g Tr. at 134:6-8.  The Court held that, although there was "ancillary

performance" due by Mr. Cohen, "that does not mean that it is an executory contract."  *Id.* at

134:14-17.

72.     The Investment Agreements fall squarely within the foregoing authorities and,

like the Cohen Agreement, do not constitute executory contracts.  As explained above, the

Investment Counterparties' only material obligation under the Investment Agreements was to

provide funding for the respective Investment Movie, and they satisfied this obligation—in

full—prior to the Petition Date.  *See supra* Section V.  Thus, under *Exide*, the Investment

Counterparties do not "have unperformed obligations that would constitute a material breach if

not performed" and, therefore, the Investment Agreements and related agreements are "not

executory under § 365."  *In re Exide Techs.*, 607 F.3d at 962.

73.     Additionally, the Investment Agreements are subject to the same analysis that the

Court applied in the Cohen Litigation.  Like the Cohen Agreement, the Investment Agreements

primarily require only one thing from each non-debtor counterparty.  The Cohen Agreement

required Mr. Cohen to provide production services, and the Investment Agreements required the

Investment Counterparties to make a specific financial investment with respect to each

Investment Movie.  Just as Mr. Cohen provided all material services prior to the Petition Date,

the Investment Counterparties likewise completely satisfied their financial commitments under the Investment Agreements prior to the Petition Date.  Thus, the Investment Counterparties do not owe any additional performance under the Investment Agreements.

74.    For these reasons, the Investment Agreements are not executory.

## II.    The Investment Agreements Constitute Purchased Assets Under the APA

75.    Under Delaware law,[38] "[a] court must accept and apply the plain meaning of an unambiguous term in the context of the contract language and circumstances, insofar as the parties themselves would have agreed *ex ante.*"  *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006); *see also Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) ("When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions.").  The "true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."  *Lorillard Tobacco*, 903 A.2d at 740 (quoting *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).  Notably, Lantern was involved in the drafting, negotiation, and approval of the APA and is bound by its express terms.

76.    A flow chart that summarizes the analysis with respect to Purchased Assets and Assumed Liabilities under the APA is attached hereto as **Exhibit F**.

### A.    The Investment Agreements Are Assumed Contracts Under Section 2.8(a) of the APA

77.    Section 2.8(a) of the APA, as amended by the Second Amendment, states that Lantern must identify Assumed Contracts prior to the Closing Date, and Lantern can re-designate only ***executory*** contracts as Excluded Contracts after the Closing Date.  Accordingly, pursuant to

---

[38]   The APA is governed by Delaware law.  APA § 13.6.

Section 2.8(a) of the APA and paragraph 32 of the Sale Order, prior to the Closing Date the

Debtors filed the Assumed Contracts Schedule that contains all of the contracts—executory and

non-executory—identified by Lantern as Assumed Contracts under the APA.  The Assumed

Contracts Schedule listed each Investment Agreement as an Assumed Contract, and neither the

Debtors nor Lantern removed them prior to the Closing Date.

78.    Because the Investment Agreements were listed on the Assumed Contracts

Schedule, they constitute Assumed Contracts under the plain language of Section 2.8(a) of the

APA and, therefore, are Purchased Assets.  Moreover, because the Investment Agreements are

not executory contracts, their designation on the Assumed Contracts Schedule is not subject to

the carve-out under the Second Amendment (to Section 2.8(a) of the APA) that would require

Lantern to expressly "designate [them] in writing for assumption" on or after the Closing Date or

else have them "automatically be deemed 'Excluded Contracts.' . . . ."  Second Amendment

¶ 2(e).

79.    Lantern has argued that it designated the Upside Agreement as an Excluded

Contract in Contract Notice No. 4 "and, accordingly, the obligations under the [Upside]

Agreement have not been assumed by Lantern."  Given the plain and unambiguous language in

Section 2.8(a), this argument is meritless with respect to the Upside Agreement and all other

Investment Agreements.

80.    Moreover, nothing in the APA permits Lantern to amend or re-designate non-

executory contracts that are listed on the Assumed Contracts Schedule as Excluded Contracts

(and therefore Excluded Assets under Section 2.2 of the APA) *after* the Closing Date.  Instead,

the APA specifically requires that Lantern designate the Assumed Contracts that are non-

executory contracts "[p]rior to the Closing Date."  APA § 2.8(a).  The Sale Order and APA

authorize Lantern to identify *after* the Closing Date—until the November 8, 2018 deadline—

only *executory* contracts from the Assumed Contracts that Lantern wished to assume or exclude.

Neither the APA nor the Court authorized Lantern to re-designate non-executory contracts after

the Closing Date.  Therefore, the Investment Agreements are Assumed Contracts, and any

belated attempt by Lantern to designate an Investment Agreement (or related agreement) as an

Excluded Contract after the Closing Date contravenes the terms of the APA and the Sale Order,

and is of no force and effect.

**B.    The Investment Agreements Constitute Title Rights Under Schedule 2.1(b) of the APA**

81.    As discussed above, Lantern acquired all Title Rights, which is defined broadly to

include all "Assumed Contracts *and all other contract rights*" with respect to each "Covered

Title."  APA Schedule 2.1(b) (emphasis added).  The definition of "Covered Titles" includes

each Investment Movie.  *See* APA Ex. A; APA Annex 1.

82.    Thus, in addition to being Purchased Assets by virtue of being included on the

Assumed Contracts Schedule as Assumed Contracts, the Investment Agreements also constitute

Purchased Assets because they fall within the definition of Title Rights under APA Schedule

2.1(b).

**III.   Lantern Must Satisfy the Post-Closing Liabilities Arising Under the Investment Agreements**

83.    A debtor may transfer "its rights *and obligations* under a non-executory contract

pursuant to § 363 of the Bankruptcy Code."  *DB Structured Prods. v. Am. Home Mortg.*

*Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.)*, 402 B.R. 87, 98 (Bankr. D. Del. 2009)

(emphasis added).  Because the Court found that the Cohen Agreement was not executory, the

Court agreed with Lantern that the Cohen Agreement was transferred to Lantern pursuant to

section 363 of the Bankruptcy Code and that Lantern was liable for post-closing obligations

arising thereunder.  Specifically, the Court stated:

> [T]he concept of a sale free and clear of all liens, claims and interests does not mean that you can sell the benefits of a contract, but not its ongoing obligations.  But I think the difference between 365 and 363 transfers is simply that a sale under 363 does not obligate the buyer to cure prior . . . payment defaults that the debtor would have to, otherwise, be obligated to make.  But I think it's bound by the terms of the agreement going forward on an[d] after closing.

Hr'g Tr. at 137:4-13.

84.    At the hearing, Lantern's counsel conceded the point and acknowledged that

Lantern "agreed to make the go forward payments [under non-executory contracts] because that

was part of the second amendment to the APA."  Hr'g. Tr. at 123:12-13.

**A.    Lantern Is Required to Satisfy Post-Closing Liabilities Under the Investment Agreements Because It Acquired the Investment Agreements Pursuant to Section 363 of the Bankruptcy Code**

85.    Because the Investment Agreements are not executory, and because they are each

an Assumed Contract under the APA (and, therefore, a Purchased Asset), Lantern necessarily

acquired the Investment Agreements pursuant to section 363 of the Bankruptcy Code.  And, just

like the Court held with the Cohen Agreement, Lantern is therefore "bound by the terms of the

[Investment Agreements] going forward on an[d] after closing."  Hr'g Tr. at 137:12-13; *see also*

*In re Am. Home Mortg. Holdings*, 402 B.R. at 98 (holding the transfer of a contract under section

363 of the Bankruptcy Code transfers a debtor's rights *and* obligations under a non-executory

contract, not just the debtor's rights).

86.    Therefore, Lantern must satisfy all post-closing obligations under the Investment

Agreements.

**B.     Lantern Expressly Assumed the Liabilities Under the Investment Agreements Because the Investment Agreements Are Both Assumed Contracts and Title Rights Under the APA**

87.     In addition to assuming the Debtors' obligations under the Investment Agreements pursuant to section 363 of the Bankruptcy Code, the APA is also clear that the obligations are Assumed Liabilities:  the Investment Agreements constitute Assumed Contracts and Title Rights (which are both Purchased Assets), and Lantern assumed and agreed to "pay, perform or discharge when due those Liabilities . . . ***arising out of the operation of the Purchased Assets (including the Assumed Contracts)*** for periods following the Closing Date except for those Liabilities that are Excluded Liabilities."  APA § 2.3; Second Amendment ¶ 2(a) (emphasis added).  Further, as described above, the Investment Agreements do not constitute Excluded Liabilities.  Accordingly, Lantern is obligated to satisfy the obligations arising under the Investment Agreements on and after the Closing Date.

88.     Lantern has argued that the liabilities under the Upside Agreement constitute Excluded Liabilities because (i) the Upside Agreement "constitutes an agreement to make a loan, or extend other debt financing or financial accommodations, that is not capable of assumption and assignment under section 365(c)(2) of the United States Bankruptcy Code" and (ii) the obligations under the Upside Agreement are excluded under Section 2.4(c) of the APA, which excludes "any indebtedness for borrowed money, bank loans or facilities or any other debt instruments."  Again, Lantern is incorrect, and it would also be incorrect to make these arguments regarding the other Investment Agreements.

89.     With respect to Lantern's first argument, it is irrelevant because there is no argument that Lantern took assignment of the Investment Agreements pursuant to section 365 of the Bankruptcy Code.  The Investment Agreements are not executory, and the Debtors, therefore,

transferred the Investment Agreements to Lantern pursuant to section 363 of the Bankruptcy Code, just like they did with the Cohen Agreement.

90.     Lantern's second argument can fare no better.  Each Investment Agreement provides for a cash investment by one of the Investment Counterparties in exchange for a percentage of "Gross Receipts" from the respective Investment Movie in addition to some form of repayment of the original investment.  The Investment Counterparties' ultimate recovery is entirely dependent on the success of each Investment Movie.  Thus, the Investment Agreements do not resemble the types of "bank loans" or "debt instruments" described in Section 2.4(c) of the APA.  Moreover, even if the Investment Agreements did fall within the general description of Excluded Liabilities identified in Section 2.4(c) of the APA (they do not), the Investment Agreements constitute Purchased Assets and the associated liabilities are, therefore, Assumed Liabilities.  *Compare* APA § 2.3 *with* APA § 2.4.  This argument is also an impermissible attempt to circumvent the effect of taking assignment pursuant to section 363 of the Bankruptcy Code, even though Lantern acknowledged in Court that it must satisfy such post-closing obligations.

**C.     Lantern Must Satisfy the Liabilities Under the Investment Agreements Because the Liabilities Arise Out of the Operation of the Investment Movies, Which Are Purchased Assets**

91.     In addition to assuming the Debtors' liabilities under the Investment Agreements because the Investment Agreements constitute Assumed Contracts and Title Rights under the APA (and, therefore, Purchased Assets), Lantern is also liable under Section 2.3(a) of the APA, which provides that Lantern assumed "all liabilities arising out of the operation of the Purchased Assets."  APA § 2.3; Second Amendment ¶ 2(a).

92.     Because the Investment Movies are Purchased Assets, and the liabilities under the Investment Agreements are directly tied to, and arise from, the revenue that Lantern generates

from the Investment Movies, Lantern necessarily assumed the post-closing liabilities under the Investment Agreements.  Accordingly, Lantern must pay the Investment Counterparties their share of Gross Receipts under the Investment Agreements from the Investment Movie revenue.

## RESERVATION OF RIGHTS

93.    The Investment Counterparties hereby reserve all rights to assert any and all additional claims for liability against Lantern under the Investment Agreements, including, without limitation, claims for successor liability.

## NOTICE

94.    The Investment Counterparties have provided notice of this Motion to: (a) the Debtors; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel to the Official Committee of Unsecured Creditors; (e) Lantern, and (f) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Investment Counterparties submit that no other or further notice is necessary.


*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Investment Counterparties respectfully request that the Court grant the relief requested herein, and such other and further relief as it deems just and proper.

Dated:   February 20, 2019
           Los Angeles, California

*/s/ Robert A. Klyman*
Robert A. Klyman
Matthew G. Bouslog
Eric T. Haitz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-1512
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsonunn.com
mbouslog@gibsondunn.com
ehaitz@gibsondunn.com

*Counsel to the Investment Counterparties*