## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
|  | : | Case No. 18-10601 (MFW) |
| The Weinstein Company Holdings LLC, *et al*., | : |  |
|  | : | (Jointly Administered) |
| Debtors.[1] | : |  |
|  | : | **Re: Docket Nos. 846, 1695, 1771, & 1843** |

**REPLY OF LANTERN ENTERTAINMENT LLC TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) OBJECTION TO SUPPLEMENTAL NOTICE OF FILING OF LIST OF ASSUMED CONTRACTS PURSUANT TO SALE ORDER AND (B) JOINDER TO THE MOTION OF EXECUTORY CONTRACT COUNTERPARTIES FOR ORDER CONFIRMING THAT COUNTERPARTIES' AGREEMENTS HAVE BEEN DESIGNATED BY LANTERN FOR ASSUMPTION AND ASSIGNMENT; AND (II) JOINDER OF OPUS BANK THERETO**

R. Craig Martin, Esq.
Maris J. Kandestin, Esq.
DLA PIPER LLP (US)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email: craig.martin@dlapiper.com
        maris.kandestin@dlapiper.com

Thomas R. Califano, Esq.
Rachel Ehrlich Albanese, Esq.
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
Email: thomas.califano@dlapiper.com
        rachel.albanese@dlapiper.com

Michael Garfinkel
DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4704
Telephone: (310) 595-3000
Facsimile: (310) 595-3300
Email:  michael.garfinkel@dlapiper.com

---

[1]    The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT BACKGROUND ...................................................................................................4

ARGUMENT ...........................................................................................................................12

      A.     The Plain Language of Paragraph 57 of the Sale Order Governs This Issue ...........12

      B.     The Agreement Between Lantern Entertainment and Opus Bank Is a Written Agreement Under Delaware Law and, Therefore, Satisfies the Sale Order's Requirement....................................................................................................................13

      C.     The Written Agreement Need Only Be "Reached . . . in Respect of" the Project Level Debt.....................................................................................................................20

RESERVATION OF RIGHTS ..................................................................................................22

CONCLUSION.........................................................................................................................23

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Jarvis Deposition Transcript |
| Exhibit A-1 | Jarvis Deposition Exhibits |
| Exhibit B | Darsa Deposition Transcript |
| Exhibit B-1 | Darsa Deposition Exhibits |
| Exhibit C | Sale Hearing Transcript |
| Exhibit D | Agreement |
| Exhibit E | Designated Deposition Transcript Excerpts |
| Exhibit F | Timeline |
| Exhibits G-R | Email Correspondence |

Lantern Entertainment LLC ("Lantern Entertainment"), by and through its undersigned counsel, DLA Piper LLP (US), files this reply (the "Reply") to *The Official Committee of Unsecured Creditors' (A) Objection to Supplemental Notice of Filing of List of Assumed Contracts Pursuant to Sale Order and (B) Joinder to the Motion of Executory Contract Counterparties for Order Confirming That Counterparties' Agreements Have Been Designated by Lantern for Assumption and Assignment* [Docket No. 1771] (the "Committee Objection"),[2] and the *Joinder of Opus Bank to the Committee Objection* [Docket No. 1843] (the "Opus Joinder"). In support of this Reply, Lantern Entertainment relies upon the deposition transcripts of Andrew Jarvis (the "Jarvis Deposition") and Nicolas Darsa (the "Darsa Deposition"), which are attached hereto as Exhibit A and Exhibit B, respectively.[3] In further support of this Reply, Lantern Entertainment respectfully states as follows:

## PRELIMINARY STATEMENT[4]

The sole issue before the Court is whether, in accordance with the plain language of paragraph 57 of the Sale Order, Lantern Entertainment and Opus Bank reached a "written agreement" "in respect of" the project level debt related to the *Waco* television mini-series prior to the Closing of the sale of the Debtors' assets to Lantern Entertainment. The Sale Order does not require Lantern Entertainment to have formally assumed or satisfied any such debt. The Sale Order also does not require Lantern Entertainment to have reduced its agreement with Opus Bank

---

[2]    The Court previously addressed and disposed of the portion of the objection of the Official Committee of Unsecured Creditors (the "Committee") that did not relate to the *Waco* project on January 14, 2019. Accordingly, this Reply pertains only to the Committee's arguments regarding *Waco*.

[3]    The parties agreed that the Deposition Transcripts would be submitted into evidence in lieu of live testimony at a telephonic hearing on Feb. 12, 2019.

[4]    Capitalized terms used in this Preliminary Statement are defined elsewhere in this Reply.

to a formal written contract executed by the parties.  Rather, the Sale Order merely requires Lantern Entertainment to have "reached" a "written agreement . . . in respect of" such debt. The evidence establishes that Lantern Entertainment met the requirements of paragraph 57 of the Sale Order when it reached its Agreement with Opus Bank, and therefore, *Waco* is a Purchased Asset.

It is undisputed that Opus Bank and Lantern entered into an agreement respecting the *Waco* project level debt and that the agreement is reflected in an exchange of emails between the parties prior to the Closing. Further, based on the testimony set forth in the Jarvis Deposition and the Darsa Deposition, there is no dispute that the Parties acted in conformance with that agreement  from the time it was reached on July 12, 2018 through late November 2018 when the Committee filed the Committee Objection.  Throughout that time, Lantern Entertainment and Opus Bank consistently treated *Waco* as a Purchased Asset.  The evidence thus establishes the existence of a written agreement as contemplated under paragraph 57 of the Sale Order.

In support of its Motion, Opus Bank presents the declaration of Andrew Jarvis who states: "As of the date hereof, Lantern Entertainment, LLC and Opus Bank have not reached an agreement on the assumption of the *Waco* indebtedness." This purposefully vague statement is beside the point and Mr. Jarvis conceded at deposition that he, on behalf of Opus Bank, had a telephone conversation with Lantern's counsel on July 12, 2018 and reached an agreement and that the agreement is reflected in an email exchange that same day. This was confirmed by Lantern's Nicolas Darsa at his deposition.

Thus, Opus Bank and the Committee are reduced to arguing that the email exchange is not a sufficient writing. This argument ignores the plain language of paragraph 57 and instead seeks to inject the requirement that the parties must have fully negotiated, documented and signed a written agreement. That is not what paragraph 57 states. The Committee and Opus Bank are

conflating consummation of such an agreement with the existence of an agreement itself contrary to the express language of paragraph 57 of the Sale Order.

The Committee's and Opus Bank's motion arguments should be seen for what they are— an overreaching attempt to claw back a valuable asset of the estates that has been sold to Lantern Entertainment, based on a misreading reading of the plain language of the Sale Order. Accordingly, Lantern Entertainment respectfully submits that the Committee Objection and the Opus Joinder should be overruled.

## RELEVANT BACKGROUND

1.      On March 19, 2018 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company") filed these chapter 11 cases to consummate a sale of substantially all of the Company's assets under section 363 of title 11 of the United States Code (the "Bankruptcy Code").  *See* Docket No. 7, at ¶ 4.  The Debtors filed a bid procedures and sale motion [Docket No. 8] (the "Sale Motion") on the Petition Date, with Lantern Entertainment serving as the stalking horse bidder for substantially all of the Debtors' assets.

2.      Lantern Entertainment's offer remained the highest and best offer received by the Debtors for their assets even after the post-petition sale process.  *See* Docket No. 653.

3.      This Court approved the sale of substantially all of the Debtors' assets (the "Sale") to Lantern Entertainment on May 9, 2018 [Docket No. 846] (the "Sale Order") for $289 million pursuant to that certain Asset Purchase Agreement by and Among The Weinstein Company Holdings LLC, the Persons Listed on Schedule 1 Hereto and Lantern Entertainment LLC, dated as of March 19, 2018 [Docket No. 1201] (as amended, the "APA").

4.      The term "Covered Titles" includes all productions that Lantern Entertainment intended to acquire under the APA.  The Covered Titles are listed on Annex 1 to the APA.  The television mini-series *Waco* is listed as a "Top Program" on Annex 1 to the APA.  *Waco* is also

listed on Schedule 2.3 of the APA as an "Assumed Liability" (as defined in the APA).  ).  Opus Bank financed the production of *Waco* and is the holder of debt secured by the assets related to this title, in the amount of $5,547,447.45 referred to as "project level debt."[5]

5.    Paragraph 57 of the Sale Order provides,

> Notwithstanding any provision of the APA or any other provision of this Order to the contrary, the Purchased Assets shall not include any Covered Title or related Title Rights or tax credits solely to the extent such Covered Title or related Title Rights or tax credits relate to project level debt identified on Schedule 2.3 to the APA that is outstanding as of the Closing Date, *unless, at or prior to the Closing, a written agreement is reached between the Purchaser and the applicable agents or lenders in respect of such project level debt.*

(emphasis added).[6]  Thus, with respect to the Covered Titles or related Tax Rights that were secured by project level debt, Lantern Entertainment was required to reach a written agreement with the applicable project level debt lender at or before Closing in order for such Covered Titles and/or related Tax Rights to constitute "Purchased Assets" under the APA.

6.    The Sale to Lantern Entertainment closed in the evening of July 13, 2018 (the "Closing").  *See* Docket No. 1247.

7.    Prior to Closing, Lantern Entertainment and Opus Bank entered into discussions in respect of the project level debt related to the *Waco* television mini-series.  *See* Jarvis Deposition Tr. at 43:22-25, 44:1-2, 47:20-25, 48:1-25, 50:13-19, 53:19-25, 54:1-25, 55:1.

8.    On July 12, 2018, one day prior to the Closing, Lantern Entertainment and Opus Bank exchanged a series of emails by which the parties agreed to the general terms upon which

---

[5]    *Waco* has an associated New Mexico Film Production Tax Credit under section 7-2F-1 NMSA (1978) in the amount of $6,367,817 (referred to as a "Tax Right" under the APA) (the "Waco Tax Credit").  Accordingly, Opus Bank is oversecured.

[6]    Paragraph 57 was included in the Sale Order at the insistence of certain project level debt lenders, but, upon information and belief, Opus Bank was not one of the lenders who requested the language.  *See* Hr'g Tr. 31:14-15, May 8, 2018 (the "Sale Hr'g Tr."), attached hereto as Exhibit C.

Lantern Entertainment would acquire *Waco* and the related Waco Tax Credit, and assume the Opus Bank debt (the "Agreement").[7]

9.      At this point, therefore, Lantern and Opus Bank had reached a written agreement in respect of the project level debt.  *See e.g.,* Jarvis Deposition Tr. 50:13-20 ("Q:  And therefore, at the time the email exchange on July 12 occurred where they said, 'Lantern is fine with your terms,' and there was an agreement, you understood that no finalized written document signed by all parties was going to be entered into before the close of business on Friday, July 13, correct?" "A: That is correct."); *see also* Exhibit E (Deposition Transcript Excerpts).

10.     In sum, the Agreement reached by representatives of Lantern Entertainment and Opus Bank on July 12, 2018 provided that Lantern Entertainment would (a) assume the Opus Bank debt and (b) bring the loan current and cover the associated costs and fees  (the "Payoff Payment").[8]  *See* Darsa Deposition Tr., 26:15-25.  There was no need to include additional terms regarding how the actual assumption of the *Waco* debt would occur. *See* Darsa Deposition Tr. at 27:7-25, 28:1-2; Jarvis Deposition Tr. at 43:22-25, 44:1-2, 49:9-16, 53:22-25, 54:1-18, 75:24-25, 76:1-3.

11.     Opus Bank believed that Lantern Entertainment intended to roll the Payoff Payment into its existing SunTrust facility and had no objection to this plan; *i.e.*, Opus Bank believed that the Payoff Payment would be made *after* Lantern Entertainment took all the necessary steps to adjust its existing facility with SunTrust to facilitate the assumption of the *Waco* debt.  *See* Jarvis Deposition Tr. at 75:1-9, 85:5-10.  These terms and Lantern Entertainment's purchase of *Waco*

---

[7]      A copy of the Agreement is attached hereto as Exhibit D and was attached as Exhibit A to the Lantern Statement (as defined below) filed on January 13, 2019.

[8]      On date of the Agreement, the Payoff Payment was $254,400.86.

under the APA were contemporaneously acknowledged by Opus Bank's bankruptcy counsel. *See* Email from R. Kinas, counsel for Opus Bank, dated July 24, 2018 at 11:06 AM, attached as Exhibit G. Further, the Parties also had weekly calls with respect to the transaction, which stopped when the Committee Objection was filed.[9]

12.     To be clear, the Agreement was an agreement for Lantern Entertainment to assume the *Waco* project debt and bring the *Waco* loan current by paying the Payoff Payment. Opus Bank and Lantern Entertainment, who are sophisticated parties well-versed in complicated financial transactions, such as the assumption and eventual satisfaction of millions of dollars of debt, understood that effectuating the actual assignment of the loan required additional time and documentation and, accordingly, engaged in follow-up efforts to implement their pre-Closing Agreement.[10] *See* Timeline.[11] In short, there was a meeting of the minds between Opus Bank and Lantern Entertainment in respect of the project level debt, and that Agreement was set forth in an exchange of emails between the Parties, and both Parties undertook actions to facilitate the implementation of the Agreement.

---

[9]     *See* Exhibit H (email from M. Neiman, dated November 26, 2018 at 3:03 p.m., with representatives of Opus Bank, Lantern Entertainment, and their counsel, discussing cessation of weekly calls); *see also* BT000039-40, BT000183.

[10]     *See* July 13, 2018 email stating "Please advise when the docs will be ready."; July 20, 2018 email stating "I can insert the below notes into Meagan's latest draft." (*See* Jarvis Deposition Ex. 14); July 30, 2018 email stating "WME is getting very anxious to close this. Shall I connect you with the team there, or do you want all the comments to go through us as Opus's counsel?" (*See id.* Ex. 17); August 16, 2018 email stating "We recalled that you were going to send us details of the asset sale and the SunTrust structure." (*See id.* Ex. 7); August 31, 2018 email stating "we will send a draft assignment/assumption agreement for you to review." (*See id.* Ex. 8).

[11]     A timeline of the Parties' discussions (the "Timeline") is attached hereto as Exhibit F. Lantern Entertainment is not offering the timeline as evidence, but rather to demonstrate that the Parties' course of conduct subsequent to reaching the Agreement was consistent with the Agreement.

13.     Opus Bank set an internal deadline of September 30, 2018 to complete the loan documentation,[12] but the Agreement took longer to implement than the parties anticipated.[13]  As a result, the final *Waco* loan documentation had not been signed by November 8, 2018 when, in accordance with the terms of the APA, Lantern Entertainment filed its final list of contracts and leases to be assumed by the Debtors and assigned to Lantern Entertainment [Docket No. 1695] (the "Notice").  The Notice designated certain agreements related to *Waco*, among others.

14.     Following the Closing, Lantern Entertainment has been acting under the Agreement and the understanding that *Waco* would be part of the assets it acquired through the Sale.  *See, e.g.,* Exhibits J through K (Post-Closing Work Plan, dated July 17, 2018, which includes *Waco* as an asset acquired through the Sale); (email from C. Kilgore to A. Mitchell, copying M. Brajovic and N. Darsa (all of Lantern Entertainment or its affiliate), dated July 13, 2018 at 1:33 PM, providing a summary of closing, indicating that the *Waco* tax credit would be part of closing and the debt assumption or payoff would be dealt with post-closing, and attaching a source and uses of funds for Closing that included references to *Waco,* Opus Bank, and the Waco Tax Credit); *see also* Timeline; *see also* Exhibits L through O.

15.     In addition, throughout this period, with Opus Bank's direct knowledge,

---

[12]     *See* Jarvis Deposition Tr. 24:2-15, 74:20-25, 80:12-23, 117:20-25-118:1-21, 120:7-21, *see* Darsa Deposition Tr. at 28:8-10,[12] 51:3-13, 55:12-16, 71:1-13; *see also* Exhibit I, (Waco Production Loan Amendment Checklist showing the transactions steps and status of same).

[13]     Specifically, there were delays on the part of Opus Bank (*see* Jarvis Deposition Tr. at 84:8-11), Cravath, Swaine & Moore as counsel for the Debtors (*see* Jarvis Deposition Tr. at 89:12-25, 90:1-6, 90:17-25; Jarvis Deposition Ex. 20), Lantern Entertainment's counsel at the time (*see* Jarvis Deposition Tr. at 84:1-7, 91:21-23), and Lantern Entertainment with respect to facilitating the amendments to its credit facility with SunTrust that were necessary to effectuate Lantern Entertainment's assumption of the *Waco* debt (*see* Darsa Deposition Tr. at 35:18-25, 36:1-25, 36:22-25, 37:1-6, 38:7-15, 39:6-23, 44:17-25, 63:20-25, 64:1-19, 77:4-17, 79:5-12).

involvement, and acceptance, Endeavor Content[14] was marketing *Waco* on behalf of Lantern Entertainment, who Lantern Entertainment brought on in April 2018.[15]  *See* Timeline; *see also* Exhibits K through N; Exhibit P;[16] Jarvis Deposition Tr. at 64:14-25; 65:1-21, 66:4-14, 68:3-13, 69:19-25; 70:1-8, 71:19-25; 72:1-2, 82:17-25; Darsa Deposition Tr. at 85:21-25, 86:1-2.[17]

16.    On November 26, 2018, the Committee filed the Committee Objection in which it asserted for the first time that Lantern Entertainment could not take assignment of any contracts related to *Waco*.  The Committee argues that *Waco* is an "Excluded Asset" under the APA because Lantern Entertainment "did not *satisfy* the project-level debt associated with the *Waco* film [sic] on the Closing Date."  Committee Obj., ¶ 1 (emphasis added).

17.    Opus Bank refused to move forward with implementation of the Agreement after the Committee Objection was filed.[18]  On December 12, 2019, Opus Bank filed the Opus Joinder, in which it adopts the Committee's arguments with respect to *Waco* and contends that Lantern Entertainment "cannot assume the Waco Project assets as it purports to do in the Supplemental Assumption Notice as it has *failed to satisfy the Waco Loan*."  Opus Joinder, ¶ 11 (emphasis added).

---

[14]    Among other things, Endeavor Content finances, markets, packages, and sells television shows and films. http://www.endeavorco.com/expertise/original/

[15]    *See* Darsa Declaration at 14:14-25, 15:1-6.

[16]    Email from Mr. Zaks sent the following email to Mr. Jarvis, Mr. Burke, and Ms. Hunt: "John—congratulations on closing the deal Friday. Shall we arrange a time to circle up on WACO and the go-forward plan?"

[17]    Indeed, Lantern Entertainment retained Endeavor Content before it had entered into negotiations with Opus Bank, because "there was never a doubt in our mind that we would assume—we would take Waco as an IP for Lantern Entertainment. . . ."  *See* Darsa Deposition Tr. at 73:18-25, 74:2-8.  To date, Endeavor Content continues to market *Waco* for Lantern Entertainment.  *See id.*, at 85:18-20.

[18]    *See* Jarvis Deposition Tr. 5:4-10 (indicating that Opus Bank and Lantern were in negotiations to facilitate Lantern Entertainment's assumption of the *Waco* loan up until November, when negotiations were cut off by Opus Bank "based on certain filings").

18.     Then, on January 10, 2019, Opus Bank filed a motion for relief from the stay [Docket No. 1967] (the "Opus Motion") so that it could "exercise its non-bankruptcy law rights and remedies related to the Waco collateral . . . ." *See* Opus Mot. at 1.  Opus Bank argues that, as of the Closing, "Lantern and Opus Bank had not reached any agreement regarding the assumption of the Waco indebtedness.  As of the filing of this Motion, Lantern and Opus Bank have not reached an agreement on the assumption of the Waco indebtedness.  Opus Mot., ¶ 15.  Opus Bank also submitted a declaration of Andrew Jarvis (the "Jarvis Declaration") in support of the Opus Motion, in which Mr. Jarvis states that "[a]s of the date hereof, Lantern Entertainment, LLC and Opus Bank have not reached an agreement on the assumption of the Waco indebtedness." *See* Jarvis Declaration, ¶ 12, attached as Ex. J to the Opus Motion.[19]  There is no reference in the Jarvis Declaration to the Agreement of July 12, 2018 or the discussions that took place over the following months to implement the terms of the Agreement.  The Opus Motion originally was scheduled for a hearing on February 25, 2019.

19.     Upon information and belief, at some point in December 2018, Opus Bank and the Committee had communications that caused Opus Bank to disclaim the Agreement.  *See* Opus Motion, ¶ 21 ("As part of this stay relief process, Opus Bank has already had discussions with the [Committee] regarding the marketing and sale of the Waco Assets to pay off the indebtedness owed to Opus Bank and with any remaining surplus to flow to the bankruptcy estate.").  Further,

---

[19]     Mr. Jarvis clarified in his deposition that through the Jarvis Declaration, he was not suggesting that the Parties had not come to terms in the Agreement, but was referring to the fact that the formal assumption documents had not been completed.  *See* Jarvis Deposition Tr. at 107:17-25, 108:1-12.  *To be clear, Mr. Jarvis conceded that his statement in the Jarvis Declaration was not accurate.*  As such, this clarification is contrary to the positon that Mr. Jarvis took in the Jarvis Declaration and the position that his counsel has repeatedly taken on his behalf since the filing of the Committee Objection, which has emboldened the Committee, exacerbated this dispute, and has forced Lantern Entertainment to incur significant attorneys' fees to get the benefit of the bargain that it struck when it purchased the Debtors' assets, including *Waco*.

upon information and belief, the Committee has threatened to surcharge Opus Bank's collateral under section 506(c) of the Bankruptcy Code.[20]

20.     The Committee originally scheduled the Committee Objection for the special purpose hearing on January 14, 2019.  On January 13, 2019, Lantern Entertainment filed a statement [Docket No. 1979] (the "Lantern Statement") attaching the Agreement which directly contradicts the Jarvis Declaration and arguing that the Committee Objection should be heard in conjunction with the Opus Motion scheduled for February 25, 2019, as both concern the ownership of *Waco* and involve the same witnesses.  At the January 14, 2019 hearing, the Court adjourned the portion of the Committee Objection related to *Waco* to the next omnibus hearing, which was scheduled for February 25, 2019.  *See* Jan. 14 Tr., 99:24-25.

21.     On January 24, 2019, Opus Bank adjourned the Opus Motion to the March 26, 2019 omnibus hearing.  *See* Docket No. 2018.  That same day, the Committee served document requests and deposition notices on Opus Bank, Mr. Jarvis and Lantern Entertainment.  *See* Docket Nos. 2020, 2021, 2022, 2025 & 2026.  Following discussions between Lantern Entertainment and the Committee and a hearing narrowing the scope of the discovery, the Committee conducted a

---

[20]     *See* Exhibit G Email from R. Kinas, counsel for Opus Bank to counsel for Lantern Entertainment, counsel for the Committee, and co-counsel to Opus Bank, dated May 14, 2018 at 12:37 PM, which provides that "Our team has been coordinating with Lantern's counsel about the go-forward process related to Lantern's proposed assumption of the obligations with Opus secured by the WACO assets—we expect to have updated this week regarding the same. At the hearing last week, the Committee took the position that lenders, such as Bank of America, whose collateral packages were being sold for cash might face a surcharge claim against the sale proceeds.  As it relates to WACO, Lantern has proposed a debt assumption with Opus.  I wanted to confirm the Committee position on surcharge as it relates to the debt assumption transactions with the production lenders—not intending to pursue / intending to pursue." *See* Jarvis Deposition Ex. 6; *see also* Email from R. Kinas, counsel for Opus Bank to counsel for Lantern Entertainment, counsel for the Committee, and co-counsel to Opus Bank, dated July 24, 2018 at 11:06 AM, which provides, in part, "For the Committee—does the committee intended to assert a surcharge on the Waco assets acquired by Lantern and on which Opus has a lien—if so, in what amount and what is the litigation timeline." *See* Jarvis Deposition Ex. 6.  Further, on November 7, 2018, Mr. Kinas sent an email to V. Antounian, W. Biro, C. Hunt, J. Zaks, A. Jarvis, M. Neiman, and J. Burke noting that "…the Committee and the Debtor need to release Lantern and Opus (and the assets which serve as collateral for the Waco loan) from any surcharge claims." *See* Jarvis Deposition Ex. 20; Jarvis Deposition Tr. at 54:19-25, 53:1-3 (Jarvis testifies that he was aware of the surcharge issue).

deposition of Mr. Jarvis from Opus Bank on February 15, 2019 and Mr. Darsa from Lantern Entertainment on February 22, 2019.  The Committee has insisted that the Committee Objection go forward separate from the Opus Motion.

## ARGUMENT

22.     The narrow legal issue before the Court is whether the Agreement, reached by representatives of Lantern Entertainment and Opus Bank on July 12, 2018 and prior to Closing, constitutes a "written agreement . . . between the Purchaser and the applicable agents or lenders in respect of such project level debt" within the meaning of paragraph 57 of the Sale Order.  For the reasons set forth herein, the Agreement satisfies the conditions of paragraph 57 of the Sale Order and, accordingly, *Waco* is a Purchased Asset owned by Lantern Entertainment.

### A.   The Plain Language of Paragraph 57 of the Sale Order Governs This Issue

23.     As set forth above, paragraph 57 of the Sale Order requires Lantern Entertainment to have reached a "written agreement" with Opus Bank "in respect of" the project level debt related to *Waco* in order for *Waco* to be a Purchased Asset.[21]  Clearly, Lantern Entertainment and Opus Bank, through the exchange of emails, reached a written agreement on the terms pursuant to which Lantern Entertainment would assume the Opus Bank obligations.[22]  There is no basis for Opus Bank and the Committee to impose different and greater obligations on Lantern Entertainment.

---

[21]     Paragraph 57 of the Sale Order provides,

> Notwithstanding any provision of the APA or any other provision of this Order to the contrary, the Purchased Assets shall not include any Covered Title or related Title Rights or tax credits solely to the extent such Covered Title or related Title Rights or tax credits relate to project level debt identified on Schedule 2.3 to the APA that is outstanding as of the Closing Date, unless, at or prior to the Closing, a written agreement is reached between the Purchaser and the applicable agents or lenders in respect of such project level debt.

[22]     At the time the Agreement was reached, Lantern Entertainment intended to assume the *Waco* loan, but it was also considering paying off the *Waco* loan as an alternative.

24.     Here the plain meaning of paragraph 57 of the Sale Order "governs its interpretation." *In re Biscayne Park, LLC*, 540 F. App'x 952, 956 (11th Cir. 2013) (citing *Belize Telecom, Ltd. v. Belize*, 528 F.3d 1298, 1307 (11th Cir. 2008)). "This Court 'may not go beyond the four corners of the document to look for additional evidence of the drafters' intentions.' Therefore, a post-hoc statement of what a party intended cannot trump an agreement that is sufficiently clear on its face." ." *In re Biscayne Park, LLC*, 540 F. App'x at 956 (citing *Ellinger v. United States*, 470 F.3d 1325, 1338 (11th Cir. 2006)); *see also See In re Dura Auto. Sys., Inc.*, Civ. No. 09–69–SLR, 2010 WL 180249, at *4 (D. Del. Jan. 19, 2010) (explaining that the bankruptcy court can apply contract interpretation mechanisms to the interpretation of its own sale order).

The language of paragraph 57 of the Sale Order is clear—all that Lantern Entertainment was required to do in order to include *Waco* (and any other project with project level debt attached to it) as a Purchased Asset was to "reach" a "written agreement" with "the applicable agents or lenders in respect of such project level debt" at or prior to the Closing of the Sale.  Lantern Entertainment accomplished this through the Agreement with Opus Bank, which, as explained below, is a written agreement as a matter of law.

**B.  The Agreement Between Lantern Entertainment and Opus Bank Is a Written Agreement Under Delaware Law and, Therefore, Satisfies the Sale Order's Requirement**

25.     As stated, all that Lantern Entertainment was required to do under paragraph 57 of the Sale Order was to "reach" a "written agreement" with a project level debt holder in respect of such debt.

26.     Black's Law Dictionary defines the term "agreement" to mean "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." BLACK'S LAW

DICTIONARY, 78 (9th ed. 2009).[23]   "The term 'agreement,' although frequently used as synonymous with the word 'contract,' is really an expression of greater breadth and meaning and less technicality.  Every contract is an agreement, but not every agreement is a contract."  *Id.* (quoting 2 *Stephen's Commentaries on the Laws of England* 5 (L. Crispin Warmington ed., 21st ed. 1950)).  Further, an agreement "'is nothing more than a manifestation of mutual assent' by two or more parties legally competent persons to one another.  Agreement is in some respects a broader term than contract, or even than bargain or promise.  It covers executed sales, gifts, and other transfers of property." *Id.* (quoting Samuel Williston, *A Treatise on the Law of Contracts* § 2, at 6 (Walter H.E. Jaeger ed., 3d ed. 1957)).

27.     Although not dispositive to whether an "agreement" was reached between the Parties, the definition of a "written contract" is also informative.  Black's Law Dictionary defines a "written contract" as "[a] contract whose terms have been reduced to writing."  BLACK'S LAW DICTIONARY, 375 (9th ed. 2009).  "Written contracts are also commonly signed, but a written contract may consist of an exchange of correspondence, of a letter written by the promise and assented to by the promisor without signature, or even of a memorandum or printed document not signed by either party."  *Id.* (citing Restatement (Second) of Contracts § 95 cmt. c. (1979)).  Thus, it is not necessary for a contract to be a formal written document executed by the parties, but may constitute an exchange of correspondence or even an unsigned printed document.

28.     The Agreement contains "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of

---

[23]     "In the context of defining a term, Black's Law Dictionary is among the 'most useful and authoritative for the English language and general for law.'" *Shiffman v. Auto Source Wholesale, LLC*, 2018 Mich App. LEXIS 2997, *9 (Aug. 14, 2018) (Mich. Ct. App. 2018) (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 419 & 424 (St. Paul: Thomson/West 2012)).

mutual assent by two or more persons." BLACK'S LAW DICTIONARY, 78 (9th ed. 2009).  Under the

Agreement Terms, Lantern Entertainment agreed to assume the *Waco* loan held by Opus Bank and

Opus Bank agreed to allow Lantern Entertainment to become a counterparty to the *Waco* loan,

provided that the loan was brought current through the payment of certain fees and expenses.

While the Agreement Terms are simple and straightforward, they nonetheless constitute an

"agreement" under the law.  Both parties understood that, to facilitate the Agreement (i.e.,

accomplish the actual assumption of the *Waco* loan), additional documentation would need to be

prepared and negotiated.  The Agreement was reached on July 12, 2018, the day before the

Closing; accordingly, the Parties had "reached . . . a written agreement . . . in respect of" the project

level debt related to *Waco.*  And as discussed below, the Agreement constitutes such a

*written* agreement.

29.     Dependent on the type of agreement in question, either common law or the Uniform

Commercial Code governs the determination of whether an agreement (or a contract) has been

reached.  *See, e.g.*, *Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 696 F. Supp. 57,

84 (D. Del. 1988), *aff'd*, 988 F.2d 386 (3d Cir. 1993) ("U.C.C. § 2–102 states that article 2 applies

to "transactions in goods" only. Del. Code Ann. tit. 6, § 2–102 (1975).").  The APA is governed

by Delaware law.  *See* APA, § 13.6.

30.     For the following reasons, (1) the email Agreement is a binding, enforceable

agreement under Delaware law, and (2) the email Agreement is also a binding contract under

Delaware law (even though Lantern Entertainment was not required to enter into a contract to meet

the requirements of paragraph 57 of the Sale Order).

31.     *First*, as noted above, an agreement "'is nothing more than a manifestation of

mutual assent' by two or more parties legally competent persons to one another."  BLACK'S LAW

DICTIONARY, 78 (9th ed. 2009) (quoting Samuel Williston, *A Treatise on the Law of Contracts* § 2, at 6 (Walter H.E. Jaeger ed., 3d ed. 1957)).   An agreement need not be signed to be enforceable.  *See id.* (citing Restatement (Second) of Contracts § 95 cmt. c. (1979)).

32.     *Second*, Delaware has adopted the Uniform Electronic Transactions Act, 6 Del. C. §§ 12A-101-117 (the "UETA").[24]  The fundamental purpose of the UETA "is to remove perceived barriers to electronic commerce.  *It insures that electronic transactions are treated legally on par with paper transactions*."  *See* DE B. Summ., 2000 Reg. Sess. H.B. 492 (emphasis supplied).

33.     The UETA applies "to electronic records and electronic signatures relating to a transaction."  6 Del. C. § 12A-103(a).[25]  The statute applies to "transactions between parties each of which has agreed to conduct transactions by electronic means.  Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." *Id.*, § 12A-105.

34.     The UETA defines the term "agreement" to mean "the bargain of the parties in fact, as found in their language or inferred from other circumstances and from the rules, regulations, and procedures given the effect of the agreements under laws otherwise applicable to a particular transaction."  *Id.,* § 12A-102(1).  The UETA defines the term "contract" to mean "the total legal obligation resulting from the parties' agreement as affected by this chapter and other applicable law." *Id.*, § 12A-102(4).  In addition, the term "electronic" covers anything "relating to technology having electrical, digital, magnetic, wireless, optical, electromagnetic, or similar capabilities."  *Id.*, § 12A-102(5).

---

[24]     The majority of states have adopted the Uniform Electronic Transactions Act.  *See Benjamin v. Walker*, 237 W. Va. 181, 190-91 (2016) ("Forty-seven states have adopted the UETA, which establishes that in all situations not specifically exempted… electronic and non-electronic records are equal.").

[25]     There are certain limited exceptions to this rule that do not apply here. *See* 6 Del. C. § 12A-103(b).

35.     Under the UETA, a physical signature is not required to form an agreement or contract by email.  *Id.*, § 12A-105(a).  In fact, "[a] record or signature may not be denied legal effect or enforceability solely because it is in electronic form."  *Id.*, § 12A-107(a).  The same rule applies to contracts.  *Id.,* § 12A-107(b).  The UETA further provides that "[i]f a law requires a record to be in writing, an electronic record satisfies the law," and "[i]f a law requires a signature, an electronic signature satisfies the law."  *Id.* § 12A-107(c) & (d).  The UETA further provides that "evidence of a record or signature may not be excluded [in a proceeding] solely because it is in electronic form," meaning that an email may not be excluded from evidence merely because it lacks a physical or "wet" signature.  *Id.*, at § 12A-113.

36.     Under the UETA, the Agreement, even though it is in electronic form, is a binding agreement.  Any argument that the Agreement does not constitute a "written agreement" under paragraph 57 of the Sale Order is in direct conflict with the policy behind the UETA and the provisions of the UETA itself.  Indeed, the purpose behind Delaware's enactment of the UETA is to give transactions such as the one memorialized in the Agreement legal effect.  *See* DE B. Summ., 2000 Reg. Sess. H.B. 492 (the UETA "insures that electronic transactions are treated legally on par with paper transactions").

37.     *Third*, Delaware courts have found that email agreements or contracts are binding an enforceable, even if additional documentation was required to follow.  *See Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1289 (Del. Ch. 2004).

38.     In the *Loppert* case, the court held that a series of email exchanges constituted a binding contract as a matter of law between the parties thereto.  *Id.* at 1291-92.  The court first noted that determining whether an email agreement formed a binding contract centers on whether the email agreement contains an "'overt manifestation of assent" to enter into a contract and that

subjective intent does not control or change the analysis. *Id.* at 1285 (quoting *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971)).  To assess whether the communication contained such an assent, Delaware courts look at "whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement the concluded negotiations…." *Id.* at 1285 (quoting *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986)) (internal quotations omitted).

39.    At issue in *Loppert* was a series of emails discussing the sole remaining open issue between the parties—the number of options one party would receive in connection with the deal. *Loppert*, 865 A.2d at 1285.  Counsel for the parties exchanged an email with the following exchange: "We have a deal at 1.1 million options," and "good--I'll let the company know." *Id.* Based on that exchange, the court found that "any reasonable negotiator would have concluded that when the parties reached a written agreement on the number of options, the negotiation of the settlement agreement was concluded." *Id.* at 1285-86.

40.    Further, the court found that even if an email agreement contemplated additional or formal documentation, as the email agreement contained the essential terms of the deal, it constituted a contract absent a "'*positive agreement* that the contract should not be binding until so reduced to writing and formally executed.'" *Id.* at 1287 (quoting *Universal Prods. Co. v. Emerson*, 179 A.387, 394 (Del. 1935)) (emphasis in original); *see also Bryant v. Way*, No. 2163606, 2011 WL 2163606, at *4 (Del. Super. Ct. May 25, 2011) ("Once a contract is validly formed, the bare fact that the parties intended to reduce the agreement to a formalized writing does not vitiate the enforceability of the initial agreement.").  In reviewing the email agreement, the *Loppert* court found no positive agreement that the email agreement would not be binding absent

formal documentation. *Loppert*, 865 A.2d at 1287. Finally, the *Loppert* court found that the attorney of record for each party had the power to bind the individual parties to the agreement. *Id.* at 1288 (acknowledging "the legal principle that where 'an attorney of record in a pending action acknowledges that a compromise has been reached, he or she is presumed to have the lawful authority to do so") (quoting *Rowe v. Rowe*, No. 16119, WL 1271679, at *3 (Del. Ch. May 28, 2002)).

41.     Here, once Lantern Entertainment's attorney conveyed to Opus Bank's attorney that Lantern Entertainment agreed with Opus Bank's terms, which were discussed on a phone call and then documented in the Agreement, the Parties reached a written agreement in respect of the project level debt related to *Waco*. Further, there was no positive agreement not to be bound by the email Agreement, nor was there any indication that the email Agreement needed to be reduced to a more formal writing for the parties to consider it binding. The evidence demonstrates that the Parties agreed that the actual assumption of the *Waco* debt would be implemented in subsequent loan documentation, as is customary to effectuate a transaction involving millions of dollars of debt. *See* Timeline; *see also* Jarvis Deposition Tr. at 44:3-11, 65:11-24, 68:1-13, 74:20-25, 76:11-15, 80:12-23, 92:2-9, 117:20-25-118:1-21, *see* Darsa Deposition Tr. at 51:3-13, 55:12-16, 71:1-13; *see also* Exhibit I, (Waco Production Loan Amendment Checklist, LNT-000100-LNT-000103, showing the transactions steps and status of same). Thus, like the parties in *Loppert*, Lantern Entertainment and Opus Bank entered into a binding agreement prior to Closing. Therefore, under Delaware common law, as buttressed by the Delaware UETA, the Parties had a written agreement in respect of the project level debt before the Closing.[26]

---

[26]     The application of Delaware UETA and Delaware common law also forecloses any possible argument that the Agreement is void under the Statute of Frauds. Even if the Statute of Frauds applied, the confirmatory memorandum exception to the rule applies here. *See* 6 Del. C. § 2-201 ("Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it

**C.  The Written Agreement Need Only Be "Reached . . . in Respect of" the Project Level Debt**

42.    Despite the contentions of the Committee and Opus Bank, paragraph 57 of the Sale Order does not require Lantern Entertainment to have actually assumed or satisfied any project level debt as of the Closing in order for the applicable Covered Titles to constitute Purchased Assets.  Neither does it require Lantern Entertainment and Opus Bank to have finalized the loan documentation to effectuate the assumption of the *Waco* debt; indeed, both parties understood that formal documentation of the actual assignment would occur post-Closing (for Opus Bank, ideally before September 30, 2018, and for Lantern Entertainment, after it was able to amend its library facility with its lender).  *See* Timeline; *see also* Jarvis Deposition Tr. at 50:7-23,[27] 65:11-24,[28] 8:1-

---

has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.").  No such objection was made by Opus Bank here, even when Opus Bank became aware that Endeavor Content was marketing *Waco*.  *See* Timeline; *see also* Jarvis Deposition Tr. at 64:14-25, 65:1-21, 66:4-15, 68:3-13, 69:20-25, 70:1-8, 71:19-25, 72:1-2, 82:16-25, 85:21-25, 86:1-2; *see also* Exhibits L through P.

[27]    Where Mr. Jarvis testifies that he understood that effectuating the actual assignment of the *Waco* loan could not occur by the Closing and that Opus Bank had an internal outside date of September 30, 2018 for the completion of the transaction.

[28]    Where Mr. Jarvis reviews Exhibit O (Endeavor Email from Chris Rice) and acknowledges that Endeavor Content was marketing *Waco* "without final paperwork in place" and that this email was sent post-Closing on July 16, 2018.

13,[29]   74:20-25,[30]   76:11-15,[31]   80:12-23,[32]   92:2-9,[33]   117:20-25-118:1-21,   120:7-21;[34]   Darsa

Deposition Tr. at 28:8-10,[35] 51:3-13,[36] 55:12-16,[37] 71:1-13;[38] Exhibit I, (Waco Production Loan

Amendment Checklist showing the transactions steps and status of same), Exhibit Q (emails

regarding checklist prepared by Barnes & Thornburg).   The evidence directly contradicts the

Committee's and Opus Bank's arguments.

---

[29]    Where Mr. Jarvis acknowledges that Endeavor Content was marketing *Waco* notwithstanding the fact that the formal assignment documents had not been finalized or executed; *see also* Exhibit R, (where Opus Bank was commenting on Endeavor Content contract).

[30]    Where Mr. Jarvis acknowledges that additional documentation would be required to effectuate the assumption.

[31]    Where Mr. Jarvis acknowledges that Opus Bank had no issue with Lantern Entertainment refinancing the *Waco* loan as long as there was an inter-creditor agreement with SunTrust.

[32]    Where Mr. Jarvis acknowledges that the Parties had to implement the actual assignment of the *Waco* loan through additional documentation and that the Agreement did not provide a deadline for completing these tasks.

[33]    Where Mr. Jarvis answers "Yes" to the following query: "And that the goal was for Cravath to help move this along, along with Lantern, get the documents, you know, the assumption documents finalized, executed and the assumption to take hold and take place, and you had in your mind that w*ould be consistent with the agreement reached in July in particular on July 12, 2018 with Lantern"* (emphasis added).

[34]    Where Mr. Jarvis explains the series of agreements that need to be entered into and the processes that needed to be taken to effectuate the complicated financial transaction of having Lantern Entertainment take assumption of the *Waco* loan.

[35]    Where Mr. Darsa testifies that "as of July 13th, there was an agreement for the loan to be assigned, but that agreement had not been fully implemented."

[36]    Where Mr. Darsa explains that the actual assignment of the *Waco* loan required additional documentation, but that there was an agreement for Lantern Entertainment to take the *Waco* loan.

[37]    Where Mr. Darsa again explains that the actual assignment of the *Waco* loan required additional documentation, but that there was an agreement for Lantern Entertainment to take the *Waco* loan.

[38]    Where Mr. Darsa, in referring to the Kilgore email about dealing with *Waco* post-closing, explains that additional documentation and work was needed to effectuate the terms of the Agreement.

43.     The Committee and Opus Bank erroneously contend that Lantern Entertainment was required to have entered into a written agreement to *satisfy* the project level debt associated with *Waco*.  Committee Obj., ¶ 1; Opus Joinder, ¶ 11.  Indeed, the Committee spent much of its time during the Jarvis Deposition and the Darsa Deposition trying to refute the Agreement on the grounds that it was never memorialized in final loan documentation.  *See* Jarvis Deposition Tr. at 28-37 and Darsa Deposition Tr. at 26:18-25; 27-43.

44.     Paragraph 57 of the Sale Order directly controverts this contention.  It expressly does not require Lantern Entertainment to have actually assumed or satisfied the project level debt; it merely requires that Lantern Entertainment have "reached" a written agreement with Opus Bank "in respect of" the *Waco* project level debt.

45.     As noted above, the Agreement constitutes a "written agreement in respect of" the *Waco* project level debt, and Lantern Entertainment owns *Waco*.  The Committee Objection and the Opus Joinder should thus be overruled.

## **RESERVATION OF RIGHTS**

46.     Opus Bank refused to continue its efforts toward implementation of the Agreement after the Committee Objection was filed in November 2018.  On December 12, 2018, Opus Bank filed the Opus Joinder in which it adopts the Committee's specious argument, and doubled down when it filed the Opus Motion and the Jarvis Declaration in January 2019.

47.     As demonstrated herein, the Parties had an Agreement for the assumption of the *Waco* debt.  Lantern Entertainment substantially relied upon the Agreement and believed that it owned *Waco*.  Indeed, even Opus Bank's attorney believed that Lantern Entertainment owned *Waco*.[39]  There is no adequate remedy at law with respect to Opus Bank's attempts to renege or

---

[39]     *See* Email from R. Kinas, counsel for Opus Bank, dated July 24, 2018 at 11:06 AM, attached as <u>Exhibit G</u>.

breach the Agreement and Lantern Entertainment is prepared to close the transaction in the very near term.[40]  Lantern Entertainment intends to bring an adversary proceeding against Opus Bank for specific performance in accordance with Bankruptcy Rule 7001 if it continues to refuse to perform under the terms of the Agreement it reached with the Lantern Entertainment.  Nothing contained in this Reply shall be deemed a waiver of any of Lantern Entertainment's arguments in connection with such adversary proceeding.

## **CONCLUSION**

48.     The evidence establishes that Lantern Entertainment and Opus Bank reached a written agreement in respect of the *Waco* project level debt prior to Closing in accordance with paragraph 57 of the Sale Order.  Accordingly, *Waco* and its related contracts constitute Purchased Assets owned by Lantern Entertainment.

---

[40]        *See* Darsa Deposition Tr. at 63:10-17.

Dated: February 28, 2019      ___/s/ R. Craig Martin_____
         Wilmington, Delaware      R. Craig Martin (DE No. 5032)
Maris J. Kandestin (DE No. 5294)
DLA PIPER LLP (US)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email: craig.martin@dlapiper.com
        maris.kandestin@dlapiper.com

- and -

Thomas R. Califano (admitted pro hac vice)
Rachel Ehrlich Albanese (admitted pro hac vice)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 335-4500
Facsimile: (212) 335-4501
Email: thomas.califano@dlapiper.com
        rachel.albanese@dlapiper.com

- and -

Michael Garfinkel (admitted pro hac vice)
DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4704
Telephone: (310) 595-3000
Facsimile: (310) 595-3300
Email:  michael.garfinkel@dlapiper.com

*Counsel for Lantern Entertainment LLC*