# EXHIBIT B

## Darsa Deposition Transcript

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ----------------------------) | |
| In re: ) | |
| ) | Chapter 11 |
| THE WEINSTEIN COMPANY ) | |
| HOLDINGS LLC, et al., ) | Case No. 18-10601 (MFW) |
| ) | |
| Debtors. ) | |
| ) | |
| ----------------------------) | |

DEPOSITION OF NICOLAS DARSA

LOS ANGELES, CALIFORNIA

FEBRUARY 20, 2019

REPORTED BY: PATRICIA Y. SCHULER, CSR NO. 11949

Job No. 156009

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------)
In re: )
) Chapter 11
THE WEINSTEIN COMPANY )
HOLDINGS LLC, et al., ) Case No. 18-10601 (MFW)
)
Debtors. )
)
---------------------------)

Deposition of NICOLAS DARSA, taken on behalf of the Plaintiffs at 2000 Avenue of the Stars, Suite 400, Los Angeles, California, beginning at 10:30 a.m., on February 20, 2019, before PATRICIA Y. SCHULER, Certified Shorthand Reporter No. 11949.

APPEARANCES OF COUNSEL:

FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
PACHULSKI STANG ZIEHL & JONES
BY: ALAN KORNFELD, ESQ.
BY: JASON ROSELL, ESQ.
10100 Santa Monica Boulevard
Los Angeles, California 90067

FOR LANTERN ENTERTAINMENT, LLC:
DLA PIPER
BY: MICHAEL GARFINKEL, ESQ.
BY: MARIS KANDESTIN, ESQ. (VIA PHONE)
BY: RACHEL ALBANESE, ESQ. (VIA PHONE)
2000 Avenue of the Stars
Los Angeles, California 90067

FOR OPUS BANK:
SNELL & WILMER
BY: ROBERT KINAS, ESQ. (VIA PHONE)
3883 Howard Hughes Parkway
Las Vegas Nevada 89169

I-N-D-E-X

WITNESS: PAGE
NICOLAS SARSA
BY MR. KORNFELD 5

E-X-H-I-B-I-T-S

| NO. | | PAGE |
|---|---|---|
| Exhibit 43 | Curriculum Vitae of Nicolas Darsa | 5 |
| Exhibit 24 | Notice of Deposition Upon Oral Examination of Designated Representatives of Lantern Entertainment, LLC | 10 |
| Exhibit 25 | Amended Notice of Deposition Upon Oral Examination of Designated Representatives of Lantern Entertainment, LLC | 10 |
| Exhibit 35 | Document Bates stamped BT1010 | 58 |
| Exhibit 30 | Document Bates stamped LE111 through LE122 | 65 |
| Exhibit 32 | Document Bates stamped LE7 and LE8 | 69 |
| Exhibit 33 | Document Bates stamped LTN1 | 71 |
| Exhibit 39 | Document Bates stamped LTN514 and 515 | 80 |

LOS ANGELES, CALIFORNIA; FEBRUARY 20, 2019
10:30 a.m.

NICOLAS DARSA
called as a witness, having been duly sworn by the court reporter, was examined and testified as follows:

EXAMINATION

BY MR. KORNFELD:
Q. Would you state your full name, please, sir.
A. Nicolas Darsa.
Q. I am going to mark the next exhibit as 43. There is a method to the madness. I have got exhibits in a certain order, so -- I may go out of order, so when I say 43, I actually meant it.
This will be 43.
(Exhibit 43 was marked for identification.)
(Discussion held off the record.)
BY MR. KORNFELD:
Q. Mr. Darsa, I have printed out this morning what we have marked as Exhibit 43.
What is Exhibit 43?

A. My biography.
Q. And that is your summary biography or CV that is on the Lantern website, correct?
A. Correct.
Q. Is that current or is there a more current version of your CV?
A. That is current. The 11 years needs to be adjusted, though, because I started in 2004 going...
Q. You started in investment banking in 2004?
A. Yes.
Q. Have you had experience prior to Lantern in the entertainment field?
A. No.
Q. When did you start at Lantern?
A. In 2015.
Q. Can you summarize what you have done at Lantern since 2015 and bring us up to the present?
A. Sure.
So I joined as a VP, and I basically worked on sourcing new investment opportunities, performing the diligence on investment opportunities, executing -- when we wanted to execute the investment, executing the investment.

And then worked on the onboarding of the investment and deal management.
Q. What do you mean by "onboarding of the investment"?
A. So as an example, Lantern Capital Partners is a private equity firm, and so as part of the investment, there is a period where we work very closely with the management. And that is what I called onboarding. It's more like right at the time of the execution to be close to management and close to the company and make sure things are going the way we think they should.
Q. Prior to Lantern's acquisition of Weinstein Company assets, did you have any experience at Lantern in the entertainment field?
A. No.
Q. What has been your experience at Lantern with respect to Weinstein Company assets that were acquired by Lantern?
A. Can you specify the question?
Q. Sure.
Lantern acquired Weinstein Company assets --
A. Yes.
Q. -- on or about July 13, 2018, correct?

A. Correct.
Q. What has been your experience with respect to those assets? What has been your responsibilities? What have you done with respect to those assets?
A. Okay.
Q. In three ways, I have asked the same question.
A. All right. So I did for Lantern Entertainment exactly what I have done for all the other deals across different industries, so all the other deals that I have been involved in at Lantern, which means I started with the due diligence and evaluation of the investment opportunity, and then we basically got involved through the stalking horse bid. Got involved at the time the company filed for bankruptcy, and we provided a stalking horse bid.
And then during that time frame, from March until July and to a certain extent until November, I was involved in managing the bankruptcy process.
Q. By managing the bankruptcy process, what do you mean?
A. I mean I was in charge of working through

all the objections to the sale holder. And I was in charge of managing the banking -- well, the debt situation, the loan situation of the company.
Q. That would be the debt and loan situation of Lantern Entertainment, right?
A. Correct.
Q. Who do you report to at Lantern with respect to your work for Lantern Entertainment?
A. Andy Mitchell and Milos Brajovic.
Q. And who are those gentlemen?
A. Cofounders of Lantern.
Q. What has been your responsibility with respect to the Waco asset?
A. Making sure that the Waco asset would be part of the acquired assets. So as part of the bankruptcy process, because the media and the entertainment bankruptcy and the assets in the entertainment are a series of contracts, one important part of managing the bankruptcy process was to make sure that we would assume the contract that we wanted to acquire that was part of the APA.
And so with regards to Waco in particular, since basically the stalking horse bid was presented, our view was we wanted to acquire Waco. And so my responsibility was just to make

sure that Waco would be -- the Waco-related contract would be part of the list of contracts that Lantern Entertainment wanted to assume.

(Exhibit 24 was marked for identification.)

BY MR. KORNFELD:

Q. We have put in front of you an exhibit we have marked as Exhibit 24.

Do you have that in front of you?

MR. GARFINKEL: It would be in this book.

MR. KORNFELD: No, it's not in the book. The book has the prior exhibits that were marked last week.

MR. GARFINKEL: Okay. So you're marking --

MR. KORNFELD: So we are marking the notice of deposition upon oral examination of designated representative of Lantern Entertainment.

MR. GARFINKEL: And this is the amended?

MR. KORNFELD: That is a good point. With that friendly amendment, we're going to mark as Exhibit 25 the amended Notice of Deposition.

(Exhibit 25 was marked for identification.)

///

MR. GARFINKEL: For the record, the topic on 5 of the prior are now on 3 -- Page 3 of Exhibit 20 -- what was it?

MR. KORNFELD: Of 25. I was going to get there.

MR. GARFINKEL: Of the booklet.

MR. KORNFELD: Thank you. It is my first deposition, so bear with us.

Let's take a look at Exhibit 25, Page 3.

BY MR. KORNFELD:

Q. Are you Lantern Entertainment's designated representative with respect to the five topics listed on Page 3 of Exhibit 25?

A. Yes.

MR. GARFINKEL: Let me now clarify, since you led me to believe you were going to handle it, but you didn't.

MR. KORNFELD: Sorry to disappoint.

MR. GARFINKEL: Once again.

Page 3, No. -- Exhibit 25, it's our understanding that No. 4 is limited to the Lantern and Opus Bank agreement or note. I'm sorry. The Opus Bank agreement and note.

MR. KORNFELD: As we discussed, that is the -- my understanding of the Court order, and

that is the way the deposition will be conducted.

MR. GARFINKEL: Thank you.

BY MR. KORNFELD:

Q. Sir, what did you do to prepare for your deposition with respect to the topics listed on Page 3 of Exhibit 25?

A. I had a meeting yesterday with Michael. And --

MR. GARFINKEL: Just to be clear, our communications are privileged.

Go ahead.

THE WITNESS: And with regard to Point No. 1, Michael showed me some of the documents that had been provided.

BY MR. KORNFELD:

Q. Did you discuss your deposition with anybody other than Mr. Garfinkel?

A. No.

MR. GARFINKEL: Just to be clear, there were other people not in the room. So we need to be clear who was on the phone.

THE WITNESS: Sorry. Yes. Rachel and Maris was on the phone.

BY MR. KORNFELD:

Q. Who are they?

A. Lawyers from DLA that represent Lantern Entertainment.

Q. Other than lawyers from DLA and you, was there anybody present, either in person or on the phone, during your conversation yesterday?

A. No.

Q. Did you have any other meetings or conversations with respect to your deposition in addition to the conversation that you have told us about that took place yesterday?

A. No.

Q. Did you talk to Mr. Mitchell or Mr. Brajovic about your deposition?

A. I just said "I have a deposition."

Q. Did they ask you about what was the deposition?

A. About Waco.

Q. Did they say anything else about your deposition?

A. No.

Q. Is there anybody at Lantern Entertainment who knows more about the Waco asset than you?

MR. GARFINKEL: Vague and ambiguous, but go ahead.

THE WITNESS: So I want to specify here,

I am separating the Waco assets and the Opus Bank loan. So with regard to the Waco assets, regardless of the Opus Bank loan, yes, there are people that know more about that asset than I do.

BY MR. KORNFELD:

Q. Who are those people?

A. So in particular, I am thinking of a person called Chris Papavasiliou.

MR. GARFINKEL: You'll have to spell the last name.

THE WITNESS: So Chris, and then his last name is Papavasiliou, exactly as it's -- P-A-P-A-V-A-S-I-L-I-O-U.

BY MR. KORNFELD:

Q. And what is Mr. Papavasiliou's area of knowledge with respect to the Waco asset?

MR. GARFINKEL: Known as Chris Papa.

MR. KORNFELD: I wonder why.

MR. GARFINKEL: I thought I would help you out with that one.

BY MR. KORNFELD:

Q. Go ahead.

A. He has been involved since -- first of all, with us since March, so since we formulated the stalking horse bid. He has -- he is -- he is

part of the industry, of the entertainment industry.

And in particular with regards to Waco, he was in charge of negotiating the sales distribution agreement with Endeavor since basically, if I recall correctly, probably around April 2018.

Q. That was the sale distribution agreement with the Endeavor agency, right?

A. Absolutely.

Q. Did Mr. Papavasiliou have any other responsibilities with respect to the Waco asset other than the negotiation of a distribution or sales agency agreement with Endeavor?

A. With regards to Waco, no.

Q. Who else, if anybody besides Mr. Papavasiliou, has been involved with Waco other than, of course, you?

A. So we are a small team, and we always considered Waco as a valuable asset. And the initial estimate that we received on the Waco made it a very tractive IP out of all the assets that we were acquiring.

So in terms of organization, we were so busy, that we had to separate responsibilities. So

I would say Chris was involved in the day-to-day management of the discussion with Endeavor with regards to, one, the completion of that distribution agreement, but two, understanding how the sales was performing.

And Chris reports to Andy and Milos. So everyone at the firm is knowledgeable about how that sale process is going.

Q. What was the initial estimate of the revenue that could be achieved through the sale of Waco?

MR. GARFINKEL: I would just object to the extent we're going beyond the deposition topics. But proceed.

THE WITNESS: I don't see why it is relevant.

MR. GARFINKEL: You can try to answer that question, and then we'll hopefully move on.

THE WITNESS: About 6 million for the international rights.

BY MR. KORNFELD:

Q. What was the initial estimate of domestic rights?

A. Domestic rights were already sold.

Q. What were they sold for?

A. I don't...

Q. Did Lantern acquire the domestic rights or were the domestic rights sold prior to Lantern's acquisition of Waco?

A. So lantern owns all the rights to Waco, international and domestic. That is my understanding, to the best of my knowledge today.

On the domestic rights, they had already been sold to Viacom. Again, the best of my knowledge. So the first cycle had been sold already.

My understanding of the entertainment industry is that from now on -- I don't know at which point in time, but there should be a moment in time where there would be the subsequent window or the subsequent cycle for the domestic rights.

And maybe that is going to lead -- not maybe, actually. I know. And actually, we had a discussion. I'm sorry. Now it is coming back. We already had a discussion for the sale of the subsequent cycle on the domestic rights. But that has never been considered to be a large part of the value. The major part of the value was considered to be the first window sales to the international distributor.

Q. And the sale of the domestic rights are not considered a large part of the value because they are not an initial sale. They are a subsequent sale which generally brings in significantly less revenue than the initial sale of rights; is that correct?
A. That is correct.
Q. Did you see any documents where there was an estimate of what the domestic rights for Waco, albeit the subsequent domestic rights for Waco, would bring?
MR. GARFINKEL: I'm going to object. I think we're now moving further beyond the topics. What topic would this be?
MR. KORNFELD: If you want to instruct him not to answer, instruct him. I think it is a helpful question to understand the answer to.
MR. GARFINKEL: I will allow that, but just to be clear, for the record, if that's how we're going to proceed, that when I ask you where it falls under that, your response is just to make a determination, I'm just going to make a determination. But I would hope that you would be prepared to explain that to me.
But go ahead and answer the question.

MR. KORNFELD: I don't generally talk about relevance on the record. I think it is relevant on all kinds of different levels. I'm happy to have a conversation with you off the record at a break about why it is relevant. But you have let him answer, so let's --
MR. GARFINKEL: If you know the answer.
MR. KORNFELD: There will be a couple of questions in that area, and then we're going to move on.
BY MR. KORNFELD:
Q. So to set the scene again, the question is, have you seen any documents that inform you as to what the amount -- the approximate amount the domestic rights for Waco might bring?
A. So documents, no. Emails, potentially one. And discussion with Chris Papa, yes.
Q. Let's talk about the one email first. What did you see in that one email?
A. Honestly, I think Chris Papa sent an email to the team showing what were the latest estimates of where the international sales were coming at and where the subsequent domestic window was coming out.
So that was an email that was sent to the

team, and I have seen that email. And it was relatively recent.
Q. Do you recall the amount?
A. So I am not 100 percent sure, but from what I recall, I think it was about $300,000 in total. But, you know, I would need to doublecheck on that number.
MR. GARFINKEL: He is just asking for your testimony today, if you know, if you don't know.
BY MR. KORNFELD:
Q. You talked about conversations you had with Mr. Papavasiliou. Was that $300,000 estimate for the sale of domestic rights for Waco discussed in those conversations?
MR. GARFINKEL: Same objection.
THE WITNESS: Not in particular. I mean, it was the whole situation with Waco.
BY MR. KORNFELD:
Q. Moving back to the 6 million in international rights. Was that net of marketing or was that a gross number?
A. That was a gross number.
Q. In terms of getting ready for your deposition, I am not going to ask you about what

was discussed at the meeting with Mr. Garfinkel and his colleagues. That is privileged, and we don't want you to discuss that.
Did you look at any documents in preparation for your deposition that refreshed your recollection about the Waco assets or anything having to do with the Waco asset?
A. Not so much. It was more related to the loan.
Q. Did you look at any documents about the Opus loan made in connection with the Waco asset that refreshed your recollection?
A. Say it again.
Q. Did you look at any documents in preparation for your deposition that helped you recall anything having to do with the Waco loan or the Waco asset or the Waco Opus issue?
A. We did look at some documents.
Q. Do you recall what you looked at?
A. We looked at some email exchanges.
Q. Do you recall any of those emails?
A. Yes.
Q. What emails do you recall?
A. One in particular -- we looked at one email from July 12th between our lawyers at the

time and -- between our lawyers at the time and myself which shows the agreement that we had with Opus prior to closing.

Q. Are you referring to prior to the closing of the sale of the Weinstein assets to Lantern Entertainment?

A. Yes. So prior to July 13th.

Q. Let's go to Exhibit 3 in the book in front of you.

Exhibit 3 is a declaration of Andrew Jarvis in support of a motion filed by Opus Bank in the Bankruptcy Court.

Have you seen Exhibit 3 before?

A. I did.

Q. Paragraph 12 of Mr. Jarvis's -- strike that.

Do you know who Mr. Jarvis is?

A. I do.

Q. Who is Mr. Jarvis?

A. Mr. Jarvis is an employee from Opus Bank, and he is in charge of the special assets at Opus Bank, and he has been given the responsibility of the Opus Bank loan that we have basically with Lantern Entertainment.

Q. Mr. Jarvis is the Opus Bank executive who

is in charge of the TWC Waco loan, correct?

A. No. I would just say -- I have said Lantern Entertainment/Opus, so I guess that's -- let's call it the Opus Bank loan.

Q. And that's the loan secured by the Waco asset, right?

A. Correct.

Q. In paragraph 12 of Mr. Jarvis's declaration that has been marked as Exhibit 3 in a prior deposition, Mr. Jarvis says "As of the date hereof, Lantern Entertainment, LLC and Opus Bank have not reached an agreement on the assumption of the Waco indebtedness." This declaration was filed on January 10, 2019.

Is Mr. Jarvis's statement in paragraph 12 that I just read into the record a true statement?

A. No.

Q. Why not?

A. Because we had an agreement on July 12th which was orally conveyed by my lawyer and confirmed in writing on July 12th.

Q. What writing confirmed the July 12th -- what you call agreement?

A. Email exchanges.

Q. Let's turn to Exhibit 5 in your binder,

another exhibit that was previously marked. Exhibit 5 is a chain of emails.

Do you recognize Exhibit 5?

MR. GARFINKEL: Take a moment to look at it. It is more than one page.

THE WITNESS: Okay.

BY MR. KORNFELD:

Q. Let us know when you are ready to talk about it.

A. Okay. I am ready to speak about it.

Q. Have you seen Exhibit 5 before?

A. I believe so. I believe this is -- I believe I saw it yesterday.

MR. GARFINKEL: It is a question for you. I will just say for the record that there is a couple different exhibits that have a similar text to it, so see if you recognize the text. I don't know if you are being thrown off.

MR. KORNFELD: We're going to get to a couple of different exhibits too. If you want to, since your counsel has raised it, there is another chain of emails at Exhibit 4 that to some degree are duplicative of the emails in Exhibit 5 and to some degree have different emails.

MR. GARFINKEL: And 14 also has some of

this. So there are different emails that have components that -- he may have viewed a different version of it. So I think you should look at the text to see if you recognize it.

THE WITNESS: Yes, I recognize it.

BY MR. KORNFELD:

Q. Let me try to narrow things down.

A. Okay.

Q. You said there was an agreement on July 12th that was an oral agreement.

Did I get that right?

A. No, you did not get that right.

Q. Where did I go wrong?

A. It is -- the agreement was conveyed orally to me by my lawyer and was confirmed in writing. Actually, some of that can be -- seems to be in that exhibit, but it was confirmed in writing.

Q. What was the oral agreement on July 12th that was subsequently confirmed in writing? Tell me the terms of that agreement.

A. Sure. The agreement was that Opus Bank was okay to get the loan assigned -- the Opus loan assigned to Lantern Entertainment under the condition that Lantern Entertainment would make the

loan current.
And by making the loan current, it means paying off the accrued interest, its default interest, and the legal fees.
Q. Let's look at Exhibit 5. In what email -- strike that.
Is there confirmation in Exhibit 5 of those terms?
A. Well, John Burke says here, "Lantern is fine with your terms."
Q. And you pointed to an email from John Burke, an attorney for Lantern, sent to Jeffrey Zaks at Opus Bank and Carolyn Hunt, attorney for Opus Bank, on Thursday July 12, 2018 at 6:40 p.m.; is that right?
A. Yes, that is correct.
Q. Is there anywhere in the email chain that is Exhibit 5 where those terms are set forth?
A. Well, on Friday the 13th, Burke sends an email and sends an invoice for a $250,000 payment. "Send the docs when ready."
Q. That is a request for a payoff, but does that inform you as to anything having to do with assumption or assignment of a loan?
A. On that email?

Q. Yes.
A. Well, it basically says, so "Lantern is fine with your terms," and it says "Please advise when docs will be ready." That is not the invoice. That is basically regarding loan documentation, and sending invoice for $250,000 payment.
Q. I am trying to understand where in Exhibit 5 are the terms of what you call the agreement between Lantern and Opus specifically stated.
A. So the way it works is the following. The question to Opus was, "Would you be okay to have Lantern Entertainment as a credit counter-party and basically have this existing loan assigned to Lantern Entertainment," which means that when we considered the assignment, it is basically you take the loan, and you change the borrower. And the loan should have the same terms.
So you don't need to go into -- again going back into, you know, the terms of the loan here. So the question was, "Would you be okay to have Lantern Entertainment as a counter-party?"
The answer was, "Yes, to the extent to make the deal current with the $250,000." The answer from John Burke was, "We're fine. Please

send the docs when ready and provide the invoice for the 250-." And it's as simple as that.
So to me, "Please advise when docs will be ready" is basically understanding that there needs to be an assignment from -- just of that loan and to send the invoice. And that's it.
Q. As of July 13th, there was no written assignment of the TWC Waco loan to Lantern Entertainment, correct?
MR. GARFINKEL: Vague and ambiguous.
Go ahead and answer.
THE WITNESS: So as of July 13th, there was an agreement for the loan to be assigned, but that agreement had not been fully implemented.
BY MR. KORNFELD:
Q. In fact, there -- other than the emails that you had been referring to, and particularly the one that says "Lantern is fine with your terms," there was no documentation of that agreement whatsoever on July 13th, correct?
A. With regard to the final loan documentation, that is correct.
Q. Is there any documentation as of today with respect to the assignment of the TWC Waco loan to Lantern Entertainment?

A. I have seen a few drafts.
Q. Is there any final documentation that has been executed by Opus and Lantern?
A. As of today, the final documentation has not been executed.
MR. GARFINKEL: Just to be clear, "executed" means signed in this context.
BY MR. KORNFELD:
Q. Correct.
A. Yes. So the document -- so basically, the agreement that we had on July 12th -- so the documentation in relation to that agreement that we had on July 12th has not been signed.
Q. So as of July 13th, the sum total of the written agreement between Lantern and Opus Bank is the email from Mr. Burke to Mr. Zaks and Ms. Hunt on July 12, 2018 where Mr. Burke writes on behalf of Lantern that "Lantern is fine with your terms"?
MR. GARFINKEL: Among other things that he testified to.
THE WITNESS: Among other things that I just mentioned.
BY MR. KORNFELD:
Q. What are the other writings that list those other things as of July 12, 2018?

Page 30

MR. GARFINKEL: I should have just objected. I was trying to -- your question was fine until you got to the end. He testified -- you're misstating the testimony. I'm trying to keep it tight. I'm not suggesting that there is another agreement. I am just objecting to your questioning.
BY MR. KORNFELD:
Q. What I am getting at is, he talked about to keep it tight, an oral agreement that he talked about written confirmation.
Do we all agree about that?
A. Written -- verbal agreement and writing agreement.
Q. What is the written agreement as of July 12, 2018?
MR. GARFINKEL: That is where I have a problem.
BY MR. KORNFELD:
Q. Let's stop there.
MR. GARFINKEL: Okay.
MR. KORNFELD: He just said "oral agreement and writing agreement."
BY MR. KORNFELD:
Q. So now I am asking for what is the

Page 31

written agreement as of July 12, 2018?
A. So the writing agreement -- and I am going to repeat myself, but the writing agreement is that Opus Bank is okay to have Lantern Entertainment as a credit counter party. In other words, you have the loan assigned from the previous borrower to Lantern Entertainment under the condition that Lantern Entertainment makes the loan current and pays the $250,000.
Now --
Q. Go ahead. Go ahead and finish.
A. Now, it is a -- for this long sentence in writing, you only need to know if basically the question to -- the question to Opus was "Would you be okay to have that loan assigned to Lantern Entertainment?" And the answer is, "Yes, to the extent they pay the 250 K. And we agree to these terms."
Q. Is that writing, that you've just described, part of the email chain that is included in Exhibit 5?
A. So when John says, "Please advise when docs will be ready, and also please send invoice for the $250,000 payment," that is basically exactly what I just said. Because otherwise,

Page 32

basically you have two avenues at that point in time. You can either pay off the loan or get the loan signed.
If you pay the loan, you don't need to have any docs ready. You just pay off the loan, you shake hands and "thank you," it's over. If you want to have the loan assigned, Opus needs to provide with the loan documentation and also needs to provide with the invoice of this $250,000.
So yes, it is written here.
Q. So we have -- by "written here," you are referring to an email from Mr. Burke on behalf of Lantern that was sent Thursday, July 12, 2018 at 6:40 p.m. that says "Lantern is fine with your terms," right?
A. Correct.
Q. And by "written here," you also mean another email from Mr. Burke that was sent on Friday, July 13, 2018 at 12:22 a.m. saying "Please advise when docs will be ready. Also, please send invoice for 250 K payment."
Is there any email included as part of Exhibit 5 where Opus Bank says "We have a deal" or something to that effect?
A. So in general, when someone disagrees

Page 33

with someone else in email, they will state it. And you have the answer from Andrew Jarvis from July 13th that basically provides the detail on the $250,000 payment.
Q. Again, my question was not whether Mr. Jarvis provided details. The question is, in the email chain that is included in Exhibit 5, is there any email from Opus Bank where Opus Bank says it agrees to the terms of some agreement?
A. I will tell you that I am not a lawyer, but when I read that email from Andrew Jarvis here -- and actually, subsequently, because you are referring to Exhibit 5 and it starts with an email from Jeffrey Zaks from July 16th, when I read this, for me as a business person, not as a lawyer, it works perfectly.
What I will tell you is these things are very sensitive. And if I have an issue with an email that I received from a lawyer with regards to a 5 million exposure they have on my book and I disagree with basically what is written in the email, I would state it right away. But, again, that is more for counsels and lawyers to decide.
Q. So the email from Mr. Jarvis that you are referring to is the Friday, July 13, 2018,

Page 34

9:54 a.m. email on the first page of Exhibit 5, right?
A. Correct.
Q. And all Mr. Jarvis says in that email is what fees total the approximately $254,000 that Opus Bank contends it is owed in addition to the principal and interest on the loan, correct?
A. Not correct.
Q. Tell me what is wrong with that.
A. It adds "I can get a more formal invoice compiled if needed." So we basically have an email from John Burke that says "Please advise when docs will be ready, and also please send the invoice for the $250,000 payment."
What Jarvis says, "This is the detail. I can get a more formal invoice if needed."
So in a way, he's already started to complete half of the request from John Burke, and he did not provide -- just the timing for getting the loan documentation ready.
Q. As of July 13th, had Opus Bank and Lantern Entertainment discussed how the sale was being structured -- the sale of Waco was being structured at all?
A. When you say "the sale of Waco," you mean

Page 35

the sale of the international rights or you mean the sale of the IP from TWC to Lantern Entertainment?
Q. The latter, the sale of the IP from the Weinstein Company to Lantern Entertainment. That is what I am talking about.
A. I don't believe so. The answer is no.
Q. As of July 13th or anytime prior to July 13, 2018, had Lantern Entertainment discussed the Waco loan with Sun Trust?
A. Yes.
Q. Were you party to those discussions?
A. Yes.
Q. Please, how many discussions were there prior to July 13, 2018 between Lantern Entertainment and Sun Trust with respect to the TWC Waco loan?
A. I have had hundreds of discussions with Sun Trust.
Q. So not all about the TWC Waco loan, right?
A. No. But what I would say is the following. We -- initially, we thought of paying off the Opus Bank loan and to finance the tax credit through the film library. That was the

Page 36

initial plan.
Q. When was that the plan that was being discussed at Lantern Entertainment?
A. Since the beginning. I mean, since March, basically, or April.
Q. Is that still the plan?
A. No. The plan today is actually to execute the July 12th agreement. But the reason we were considering that was just to simplify the capital structure of TWC -- the capital structure of Lantern Entertainment.
Q. When did you stop considering that -- we'll call it simplification of the capital structure.
A. Well, so basically, at the time of closing, we realized that we were starting to max out on our borrowing base with the Sun Trust facility, the library facility. And so we said "You know what, there is this Opus Bank loan. Let's check with Opus Bank if they would be okay to get the loan assigned to Lantern Entertainment. Because if that is the case, then we don't need to put it into the library facility."
So that is why John Burke reached out to Jeff Saks and Andrew Jarvis on July 12th.

Page 37

Q. What did you discuss prior to July 12th in general with Sun Trust with respect to the Waco loan? I am not clear about that from your answer. If you could elaborate, please.
A. I wanted to make sure that the tax credit, which is the collateral of the Opus Bank loan, could be accepted into the library facility.
Q. What did Sun Trust say?
A. From my recollection, they were fine with it.
Q. Was that the structure, taking that tax credit collateral which was -- the tax credit was over $6 million, right?
A. Correct.
Q. Was that structure that was discussed with Opus Bank on July 12th -- that is the terms that Mr. Burke says Lantern is fine with?
A. Specify the question, please.
Q. I am trying to understand -- you are talking about the collateral. And the conversation with Sun Trust, is it -- I am going to try to summarize, and tell me if I get it right.
You are talking with Sun Trust about rolling the collateral into the Sun Trust facility; is that right?

A. That is right.
Q. Did you tell Opus Bank on July 12th or prior that rolling the tax credit collateral into the Sun Trust facility was Lantern's plan?
A. So I did not. And I think it is important to understand the situation around the bankruptcy process and the loans. You have two options. You either have the loan assigned to a new borrower -- and you need the agreement of the loaning bank for that or you just pay off the loan.
And so since the initial plan was to pay off the loan, we did not need to discuss that with Opus. We actually needed to take the payoff letter that they had sent us and pay it off.
The reason we reached out on July 12th is just to get some flexibility. And then we called them and said "Will you guys be okay to have the loan assigned to Lantern Entertainment?" And they said "yes."
And if you look at how all the project level debt had been treated during the bankruptcy process, they were either paid off simply because the bank said "We don't want you as a counter-party" or actually -- well, that was actually the case, you know.

But you don't need an agreement to pay someone off, to pay a bank off in the context of the bankruptcy. But you need the agreement to get the loan assigned. And that is why we had to reach out to Opus. And they said "yes." And we're like "Fine. That is helpful. Cool."
Q. Had you discussed which option you would pursue as of July 12th in the two options that -- of the two options that you have just described?
A. The short answer is -- I would say -- let me think about it. The answer is, at the time of the July 12th agreement, what we needed to make sure is that we could get the loan assigned to Opus. And that is what we agreed upon on July 12th. And that is what we needed an agreement for on July 12th. Because that requires the agreement from Opus.
After July 12th, it was always -- the option of paying off the loan was always on the table, assuming that basically we pay off Opus with their payoff letter. And we knew it was always on the table, since basically Opus had even sent us the payoff letter before and so on.
For that, again, you don't need specific approval. You need the approval for the assignment

of the loan. And that is what we had agreed upon on July 12th.
Q. Let's turn to Exhibit 4 in the book in front of you.
A. Yeah.
MR. GARFINKEL: We have been going over an hour, so when appropriate, let us know. We will take a quick break.
MR. KORNFELD: Let's finish this exhibit, and then we will do that.
MR. GARFINKEL: That's fine.
BY MR. KORNFELD:
Q. Let's turn to the second page of Exhibit 4 so we can put the exhibit in context.
You see the email from Mr. Burke to Mr. Zaks and Ms. Hunt that we have been talking about during our discussion of Exhibit 5. That is the second email on Page 2 of Exhibit 4, correct?
A. The first page, you mean?
Q. No. On the second page of Exhibit 4 --
A. Yes.
Q. -- there is the second email.
A. Yes.
Q. That is the email that we were talking about during our discussion of Exhibit 5, right?

A. Yes.
Q. Now, in that email Mr. Burke says "Lantern is fine with your terms." And then there is subsequent emails about documents, and then there is an email on the first page of Exhibit 4 for Ms. Hunt, the second email which is the Friday, July 13th at 10:07 a.m. email to Mr. Burke where Ms. Hunt writes "Further to the voicemail I just left for you, we called to get a bit of detail on the structure of the sale (parties, et cetera) and the Sun Trust facility."
A. Um-hmm.
Q. You see where I was reading from?
A. Yes.
Q. As of July 13th, did lantern know who the parties that would be acquiring the Waco asset and would become obligors on the Waco loan were?
A. So for me as a business person, I don't consider to be -- this to be my responsibility, but actually, this structuring to be my lawyer's responsibility.
Q. As of July 13, 2018, did you know who the parties would be?
MR. GARFINKEL: To?
///

BY MR. KORNFELD:
Q. To the Waco sale and the Waco loan.
MR. GARFINKEL: Vague and ambiguous. Go ahead.
THE WITNESS: On July 13th, I knew that the Waco IP was owned by SPV. Now, how we were effectuating the sale order, we were buying the SPV and the SPV assets and that side, that is not for me to know.
BY MR. KORNFELD:
Q. Did you see any documents where how the transaction would get done was outlined on July 13th or before?
A. Which transaction?
Q. I am talking about the assumption and assignment of the TWC Waco loan.
A. So I did not. And you need to remember that, as part of the sale order, we also had 120 days to basically finalize the list of the assumed contract. And my recollection is that the Waco contract were including this list of the assumed contract in November.
Q. November 2018, right?
A. Yes.
Q. And the Waco loan was not an assumed

contract until November 2018, correct?
A. It is not a contract.
Q. Strike that. Good point.
The Waco intellectual property was not an assumed asset until November 2018; is that correct?
MR. GARFINKEL: Vague and ambiguous. Go ahead.
THE WITNESS: To the best of my recollection, I think it is correct. I don't think we had included the IP -- all the contracts related to Waco as part of the initial list. And I think that has been included in November.
Now, that is the best of my recollection.
BY MR. KORNFELD:
Q. I think you got that right.
Did you see, in connection with your review of documents and preparation for your deposition, any response to Ms. Hunt's Friday, July 13, 2018 email in which somebody on behalf of Lantern gave her detail on the structure of the sale, the detail that she asked for in her July 13, 2018 email?
A. I don't recall seeing an email with that.
Q. Did you see any documents with that?
A. I don't recall having seen any document.

MR. KORNFELD: Take a break.
MR. GARFINKEL: Okay.
(Recess taken.)
BY MR. KORNFELD:
Q. Back on the record.
You have Exhibit 4 in front of you, sir?
A. Yes.
Q. Let's go to the third page of Exhibit 4, the page stamped BT 1002. And there is an email from John Burke on July 12, 2018 at 10:52 where Mr. Burke, Lantern's counsel, writes to Ms. Hunt and says "We represent Lantern Entertainment in its acquisition of the TWC assets. One of those assets is Waco and tax credit associated with that project. For whatever reason, the documentation is unavailable in the TWC data room. We would appreciate you sending us the loan-related documents as soon as possible. Thanks."
Prior to July 12, 2018, had you looked at the Opus Bank loan documents?
A. No.
Q. To your knowledge, prior to July 12, 2018, had anybody at Lantern Entertainment looked at the TWC Waco -- the Opus Bank loan documents?
MR. GARFINKEL: Objection to the scope,

in light of the notice.
But go ahead.
THE WITNESS: No. And consistent with what I was mentioning earlier, the idea was to pay them off.
BY MR. KORNFELD:
Q. As of July 12, 2018, did you know how much was owed to Opus Bank?
A. Yes.
Q. How much was owed?
A. $5.4 million.
Q. How did you find that out?
A. So first of all, if you look at the bankruptcy, at the APA from March 21, there is the definition for the project level debt, and Waco is included. The Opus Bank loan is included, and it is included for $5.4 million. So it was everywhere, and we knew that the principal was $5.4 million.
Q. So since you had not looked at the loan documents prior to July 12, 2018, did you look at those loan documents once you made the decision to assume -- strike that.
When did you make the decision to assume the Opus Bank loan?

A. So we knew from discussion with the CFO of TWC, from discussion with Bob Burke, and I don't potentially recall having seeing an exhibit with some of the terms related to that loan, so key terms that were provided us to by the company.

So on one side, I didn't look at the actual document, but we knew the key terms. And the most important thing that we knew is that this is a nonrecourse loan. It is a pure project that -- project level debt.

And since we considered that the value of the IP was way greater than the loan exposure, we knew that assuming the loan on an nonrecourse basis was a no-brainer.

Q. Did you know what --

A. I'm sorry. And that is also why we were also ready for considering after the fact -- after July 12th or before to pay them off.

Q. When was the first time you saw the loan-related documents that Mr. Burke requested on July 12, 2018?

A. So after July 13th, our CFO -- so not me, our CFO -- interacted with John Burke for implementing the agreement from July 12th on Opus. And so that meant that he received the

documentation for the assignment of the loan from John Burke later on.

Q. Let's go back to Exhibit 3 in your book.

Do you know why Mr. Jarvis would say in paragraph 12 of his declaration that has been marked as Exhibit 3 that, "As of the date hereof, Lantern Entertainment, LLC and Opus Bank have not reached an agreement on the assumption of the Waco indebtedness"?

MR. GARFINKEL: Objection; calls for speculation.

THE WITNESS: No.

BY MR. KORNFELD:

Q. Did you pick up the phone -- when did you -- strike that.

When did you first read Mr. Jarvis's declaration that was filed on January 10, 2019?

A. I don't recall exactly when it was.

Q. When you read his declaration that we have marked as Exhibit 3, did you pick up the phone and call him and say something to the effect of "How could you say that Lantern Entertainment and Opus Bank have not reached an agreement on the assumption of the Waco indebtedness"?

A. No. I first called my counsel.

MR. GARFINKEL: Don't get into that. He just asked whether you called.

THE WITNESS: Okay. No.

MR. GARFINKEL: I just don't want you to get into attorney-client.

THE WITNESS: Okay.

BY MR. KORNFELD:

Q. Did you talk about paragraph 12 of Mr. Jarvis's declaration with anybody other than attorneys?

A. No.

Q. Did you see any emails that an attorney or somebody at Lantern sent to an attorney for Opus asking "Why did Mr. Jarvis say that there was not an agreement on the assumption of the Waco indebtedness as of January 10, 2019?"

A. I don't recall. What I want to say, though, is that recently, I had three discussions with Mr. Jarvis and Mr. Jeff Zaks, and on these calls, what I basically told Mr. Jarvis and Mr. Zaks was -- one, I apologized because I realized that the implementation of the agreement that we had on July 12th had taken a lot of time.

I also explained why. And I apologized because I understand that there had been some

frustration on their end. And so I wanted to make it clear that this process, the bankruptcy process, had been incredibility intense for everyone. And so -- but, you know, by all means, we wanted to basically execute the agreement on July 12th.

Now, on these discussions, it did not feel appropriate for me to say, "How could you ever write that, because I don't think that is appropriate," but what I told him is that our person -- we were in disagreement with what he had said in this stipulation and, in our opinion, we had an agreement on July 12th which was confirmed in writing through the email exchange that we had on July 12th.

Q. So what did they say in response to that?

A. I don't think they responded to that in particular.

Q. Did they say anything about your statement that "We had an agreement on July 12th?" Did they say anything about "There was no agreement, we agreed there was an agreement," anything whatsoever that you recall?

A. No. They did not disagree with me on the phone.

Q. Did they say they agree with you that

there was an agreement on July 12th?
A. I said they did not comment on this whole thing. The only thing that they said was "We appreciate you saying what you said in relation to the communication because" -- and to confirm their frustration that the agreement from July 12th -- confirmed their frustration around the communication and the lack of communication.
Q. Does the TWC Waco loan require periodic payments by the borrower?
A. Yes.
Q. How often are payments required under the terms of the TWC Waco loan?
A. I don't remember.
Q. Is it monthly?
A. I doubt it, but I don't remember. So I would need to speculate here.
Q. Have there been, since July 12, 2013, payments that are due under the TWC Waco loan to Opus Bank?
A. There should, yes.
Q. Has Lantern Entertainment made any payments on account of the TWC Waco loan to Opus Bank?
A. No. As a matter of fact, we even

received a letter from Opus Bank to Lantern Entertainment indicating that we were in default on the payment.
Q. If I understood your testimony, it was that Lantern Bank had assumed the TWC Waco loan on July 12, 2018.
Did I understand that correctly?
A. So on July 12th, we had the agreement from Opus to get the loan assigned, which was key. They needed to agree to have Lantern Entertainment as a counter-party. That was the one thing that mattered.
They said, "Yes, we are fine financing Lantern Entertainment on that loan." And they said, "But you need to make it current." That is the agreement we had on July 12th. And that is really what we needed. Then we needed to move and implement that July 12th agreement.
Q. So the agreement on July 12, 2013 was only that Opus Bank agreed that Lantern Entertainment could be a counter-party on the TWC Waco loan if the TWC Waco loan was, in fact, assumed by Lantern Entertainment; is that correct?
MR. GARFINKEL: Misstates the testimony.
But go ahead. Don't listen to my

objections, for the record. You can have the question back. You can have it back, but do your best to answer it.
THE WITNESS: Yes, I would like the question back.
BY MR. KORNFELD:
Q. Sure.
The agreement on July 12, 2013 -- strike that.
The agreement -- we are talking about the agreement on July 12, 2018.
A. Yes.
Q. Okay. On July 12, 2018, there is an agreement between Lantern and Opus Bank that is confirmed in writing on July 13.
That is your testimony, right?
A. That is confirmed in writing on July 12th and on July 13th.
Q. And that agreement was that Opus Bank would agree that Lantern could be a counter-party on the TWC Waco loan, correct?
MR. GARFINKEL: Objection. It is vague and it misstates.
But answer the question.
THE WITNESS: So the agreement was that

the Opus Bank loan would be assigned to Lantern -- well, could be assigned to Lantern Entertainment and so that Opus Bank would be okay to have Lantern Entertainment as a counter-party, to the extent that the loan was made current on the past-due interest and on the legal fees that were also past due on that day.
BY MR. KORNFELD:
Q. Since July 12, 2018, the loan has not been brought current, correct?
A. Correct.
Q. Since July 12, 2018, TWC Waco loan has not been paid by Lantern Entertainment to Opus Bank in any manner whatsoever, correct?
A. Correct.
Q. No interest payments and no principal payments, right?
A. Correct.
Q. No fees have been paid by Lantern Entertainment to Opus Bank on account of the TWC Waco loan since July 12, 2018 by Lantern Entertainment to Opus Bank, right?
A. Correct.
Q. As of the present, in fact, Lantern Entertainment has not paid Opus Bank a penny on

account of the TWC Waco loan, correct?
A. That is correct. That is why we received this letter from Opus Bank, and that's why -- yeah.
Q. The letter you are referring to is a letter that has been marked as Exhibit 12; is that correct?
A. Correct.
Q. I would like you to take a look at that letter. If necessary, take your time. Read it carefully. And tell me if there is anything in that October 17, 2018 letter from Opus Bank to Lantern Entertainment that has been marked as Exhibit 12 that is untrue.
MR. GARFINKEL: Before you answer, I'll just state for the record that it exceeds the scope of the notice.
And I believe he is asking for your personal knowledge.
MR. KORNFELD: My silence is not agreement with that objection?
MR. GARFINKEL: You have a running disagreement.
THE WITNESS: So I read this letter. There are a few things here, and some of them are more legal stuff, which I don't want to represent

that they are necessarily correct. But otherwise, I would like you to refine your question, more importantly. I mean, I think it is fair for you to specify which area you want me to really look into.
BY MR. KORNFELD:
Q. I will break it down. Is that what you are asking me to do?
A. Yeah.
Q. Sure.
Let's look at the first paragraph of Exhibit 12, the last sentence, which reads "As part of the sale transaction, Lantern agreed to negotiate with lender to become the obligor of the debt related to the Waco project."
Is that a true statement?
A. Lantern agreed with lender to become obligor of the debt related to the Waco project, not to negotiate. That was really -- the point of the agreement was to have that agreed and then to move into finalizing the documentation.
Q. Did counsel for Lantern respond to Opus Bank's October 17, 2018 letter in an email or letter that said in substance what you just said, which is the statement "Lantern agreed to negotiate with lender to become the objector of the Waco

project debt is not correct."
The correct statement, according to your testimony, is that Lantern and Opus agreed that Lantern would, in fact, become the obligor of the Opus debt.
Is there any such communication in substance made by Lantern or a representative or counsel of Lantern to Opus?
A. So I don't think so. But at the same time, when you receive a letter from the bank to you implicitly that actually puts you as the counter-party -- so it did not come across as Opus is trying to move away from the agreement that we had on July 12th when someone is reaching out to you and say, "Hey," you know, "the loan" -- "our loan is basically in default."
I don't think on October 17th -- again, I'm speculating here, but I don't think Opus Bank sent the exact same letter to the estate. Maybe they did. I don't know. But here, they are basically treating us as the counter-party to the loan.
And so in retrospect, would I have liked John Burke to respond and say "Hey, hey, scratch this to negotiate"? Yes. Maybe we will be hearing

that case. But otherwise, when you read that letter, you receive it, I think it just says that "We need to move forward and implement the agreement from July 12th."
Q. Did Lantern respond to the Opus Bank October 17, 2018 letter marked as Exhibit 12 in any way?
MR. GARFINKEL: I think you're getting beyond the scope of the notice.
But just answer that question.
THE WITNESS: So the short answer is, I don't know if either Lantern or our lawyer responded to that letter. I don't think Lantern did. I would hope our lawyer did. And I don't know for sure.
But that is really part of the reason why I actually called Andrew and Jeff recently, because I basically told them we have been so busy, and communication has not been grate on our end, and we apologize for that.
So the truth is, I don't know. I hope it has happened. And if it has not, it should have happened.
BY MR. KORNFELD:
Q. I will represent to you that we have

Page 58

looked at the documents that have been produced, and we saw no response.

A. Um-hmm.

Q. Did you see any response? I gather your answer is you did not.

A. I did not.

Now --

MR. GARFINKEL: There is no question pending. Just wait for a question.

THE WITNESS: Okay.

(Exhibit 35 was marked for identification.)

BY MR. KORNFELD:

Q. Did you want to expand on one of your answers?

A. No.

Q. We have marked as Exhibit 35 a document stamped BT 1010.

Have you seen Exhibit 35 before?

A. No.

Q. For the record, Exhibit 35 consist of one email from John Burke, counsel for Lantern, to Jeffrey Zaks at Opus Bank and Andrew Jarvis at Opus Bank. It is an email dated February 5, 2019.

In that email, Mr. Burke writes, "Jeff,

Page 59

Lantern asked me to reach out to let you know that Lantern is prepared to repay Opus for an outstanding loan, including the fees previously discussed. I realize that assurance sounds hollow, given the history with Lantern, but they have now sorted out many of the unrelated issues that were distracting them from treating Waco as a priority. Let me know if you are available to discuss if there is a way to move forward."

As of February 5, 2019, had Lantern's strategy with respect to the Opus loan changed from assuming the loan to simply just paying it off?

A. No. Things had always been -- the repayment was always an option. Since March -- I mean since this other deal, it was also an option.

Q. Since the July 12, 2018 and July 13, 2018 time period?

A. Exactly. And by the way, the assignment of the loan was getting Opus into the exact same position it has always been in. So yes, it has always been an option. And --

Q. Well, assignment of the loan -- and correct me if this is wrong, but under the assignment of the loan, that usually means the new obligor is going to take on the obligations under

Page 60

the loan. It does not mean that new obligor is going to immediately repay the loan, correct?

A. That is correct.

Q. So what is being discussed in Exhibit 35 is the immediate repayment of the loan; is that right?

A. That is right. What I want to say is, you know, it is not a contract -- when I see that, what you say is correct. And to me, it doesn't change anything to the fact that on July 12th, the agreement was to have the letter signed, and that we always had the option to repay the loan.

So to make things simpler or cleaner, you know, that was still an option that was on the table, and that could help. And by the way, I'm also happy to get the loan assigned.

MR. KORNFELD: I would move to strike as nonresponsive everything after the sentence "That is right."

BY MR. KORNFELD:

Q. Did lantern respond to Mr. Burke's February 5, 2019 email?

MR. GARFINKEL: The one that he said he did not see before?

THE WITNESS: I'm not copied.

Page 61

BY MR. KORNFELD:

Q. Did you see any response by Lantern to Mr. Burke in February of 2019, this month?

MR. GARFINKEL: I think this is, again, beyond the scope of the notice.

But go ahead.

MR. KORNFELD: I will give you a standing objection to --

MR. GARFINKEL: Oh, I don't know that you are not going to pick out parts, and you are asking questions that are beyond the scope. So I'll just try to make it -- I did not try to -- I suggested he respond. I just stated the objection.

MR. KORNFELD: Right. I will just say for the record that the notice goes to the TWC Waco loan. So we disagree, which we don't have to resolve now.

MR. GARFINKEL: We disagree. And I am just stating my record. That's all.

THE WITNESS: So what is the question exactly here?

BY MR. KORNFELD:

Q. I knew you were going to ask me for that.

Did you see any response by Lantern -- strike that.

Did you see any response by Opus Bank to Lantern with respect to the TWC Waco loan during the month of February 2019?
MR. GARFINKEL: Same objection.
Go ahead.
THE WITNESS: So I had verbal discussions with Opus Bank, but I didn't see anything either in writing or I don't think I've even -- so -- I mean, first of all, I don't recall having seen this email or having seen an email from Opus Bank recently in relation to that.
BY MR. KORNFELD:
Q. Did Lantern ask Opus Bank for a forbearance at any time after October 2018, once Opus Bank sent the default letter?
A. No, I don't think so.
Q. Why not?
A. As I said, communication should have been better. And we could probably the most -- well, a few things. We closed one of the most complex bankruptcies I think of this year. The number of work streams that had to be worked on was enormous for a relatively tight team.
And we always considered that the Waco loan had been agreed, and so we did not see we were

tackling, I would say, the -- some other projects that were distracting us from reaching out to Opus for that purpose. So that is one.
So no, we did not ask for forbearance. But I think the context is important, and I think that is what John Burke is trying to indicate in his email.
Q. Has Lantern assumed the Waco rights as of today?
A. Yes.
Q. When did Lantern assume the Waco rights?
A. So the deadline for the final lease of the assumed contract was at the beginning of November 2018. And I think it is important -- well, I will stop there.
Q. When do you expect the documentation of the assumption of the TWC Waco loan will be completed by Lantern and Opus?
A. You mean today, what is my estimate?
Q. Yes, sir.
A. It can be done very quickly.
Q. What does that mean?
A. A week or even less.
Q. Are there drafts being exchanged at present?

A. I have seen a draft being exchanged between our CFO and John Burke, yes. And one thing which is very important to note is, the assumption of the loan required amending a loan that we have with Sun Trust. And that has been completed on December 17th.
So that is why basically the assumption of the loan was delayed. It does not excuse us on the lack of communication, but technically, for having the loan assumed, we needed an amendment on our production loan, which we did and completed in December 17th.
Q. That is December 17, 2018?
A. That is correct.
Q. And until that assumption with Sun Trust was completed on December 17, 2018, Lantern could not assume the TWC Waco loan, correct?
A. Until the amendment with Sun Trust. Lantern Entertainment, from what I understand, could not assume the Waco loan.
Q. And it is that amendment that was not completed until December 17, 2018, right?
A. Right. So now that it has been done, we stand ready to finalize the documentation in line with the agreement of July 12th.

(Lunch recess.)
(Exhibit 30 was marked for identification.)
BY MR. KORNFELD:
Q. Good afternoon, Mr. Darsa.
A. Good afternoon.
Q. We have marked as Exhibit 30 a document produced by Lantern stamped LE111 through LE122.
Have you seen this document before?
A. Yes.
Q. What is Exhibit 30?
A. It is a to do list in some way, various work streams that the deal team is working on on the various aspects of the deal.
Q. So it was a to do list that was prepared by Lantern as of July 17, 2018?
A. Correct.
Q. Did you have any role in the preparation of Exhibit 30?
A. Yes.
Q. What was your role?
A. As a team member I was looking to that document before it was presented and circulated internally. So I reviewed that document.
Q. The document was produced to us with the

Page 66

redactions that are indicated. What information is redacted, in general?

A. I mean, I'll just tell you what we did from our perspective --

Q. Sure.

A. -- is that there was -- we gave you everything that related to Waco, so all this other stuff had to do with things other than Waco. He was not involved in that process.

Q. So your position would be this was in keeping with the judge's order? Is that fair to say?

A. I would defer to Maris on that, because I wasn't there for that. I know that it does show Waco on the first page, obviously, on Page 3, but Maris, I don't know. I assume so, yes.

MR. GARFINKEL: Can we have Maris just sort of help us out with this?

MS. KANDESTIN: Sure. Can you repeat the question?

MR. KORNFELD: Maris, we're dealing with the redactions, and obviously you don't have it in front of you. This is the post-closing work plan as of July 17, 2018. It's got some pictures of properties like Project Runway, Yellowstone, Waco,

Page 67

et cetera on the first page.

MS. KANDESTIN: I am familiar with it.

MR. KORNFELD: So it's heavily redacted. If you could elucidate why the heavy redactions, we would appreciate it.

MS. KANDESTIN: Sure. It's because the majority of the information related to the financials of Lantern Entertainment, and its other projects. It does not relate to Waco in any way. But the line items that related to Waco we left in there, but everything else we felt was outside the scope and confidential proprietary information.

MR. KORNFELD: Thank you. I am going to reserve whether we have an issue about the redactions for a more appropriate time.

MR. GARFINKEL: That's fine. Happy to take that up with you after.

BY MR. KORNFELD:

Q. The only references, Mr. Darsa, that I see with respect to Waco is No. 1 on the first page where there's a picture of -- a promotional picture of Waco, you see what?

A. Yes.

Q. And then the only other reference to Waco is on the page headed "deck financing," which is

Page 68

the third page of the document, and it's stamped LE114, and under "key tasks" it says No. 3, Opus Bank, owner: Darsa.

You are the owner of task because you are responsible for it, right?

A. Right.

Q. And "additional support," those are people who are going to assist you accomplishing the task, right?

A. Right.

Q. And the due date is a TBD, to be determined, correct?

A. Correct.

Q. And the percentage done is 50 percent. What had been done as of July 17, 2018, with respect to the Opus Bank key task?

A. We had the agreement from Opus Bank to get the loan assigned under the condition that we pay the $250,000, and so we needed to implement that agreement.

Q. So the next -- the notes "next steps" that are highlighted on Page 2 of Exhibit 30 are "LE to assume the Waco tax credit back debt provided by Opus Bank."

That was what Lantern Entertainment, LE,

Page 69

had to do with respect to the Waco tax credit back debt as of July 17, 2018; is that correct?

A. One second, please.

I also read "LE to assume the Waco tax credit back debt provided by Opus Bank."

Q. So that is what Lantern Entertainment had to do as of July 17, 2018; is that correct?

A. Yes.

(Exhibit 32 was marked for identification.)

BY MR. KORNFELD:

Q. We have marked as Exhibit 32 a two-page document stamped LE7 and LE8.

Have you seen Exhibit 32 before?

A. Yes.

Q. Exhibit 32, for the record, is an email from Andy Mitchell, one of Lantern's founders, to Case Killgore with a copy to Milos Brajovic, another Lantern founder and you, right?

A. Right.

Q. Who is Case Killgore?

A. The VP. The VP on the deal.

Q. A VP of Lantern, right?

A. Yup.

Q. The last bullet point of Mr. Mitchell's

email reads "We going to deal with Polaroid, FRB, Waco tax credit, opus, and current or domestic East West post-closing also."

Alongside Polaroid there is (FRB). Is that a bank?

A. Yes, it is.

Q. Is that First Republic Bank?

A. Yes, it is.

Q. Alongside current or domestic, there is the (East West). Is that a bank also?

A. It is.

Q. Is that East West Bank?

A. It is.

Q. When Mr. Mitchell wrote, "We are going to deal with Polaroid, FRB, Waco tax credit, Opus, current or domestic (East West)" --

MR. GARFINKEL: Mr. Killgore.

BY MR. KORNFELD:

Q. I'm sorry. When Mr. -- yeah, this is. I am speaking about the email from Mr. Killgore. I may have misspoke previously when I said it was Mr. Mitchell's bullet point, it is actually Mr. Killgore's bullet point, right?

A. Yes.

Q. Sorry about that.

MR. GARFINKEL: And let him finish his question before you talk so the court reporter doesn't lose her mind.

MR. KORNFELD: It might take more than that.

BY MR. KORNFELD

Q. So do you know what Mr. Killgore meant when he wrote, "We are going to deal with Polaroid, FRB, Waco tax credit, Opus, and current or domestic (East West) post-closing also"?

A. Yes.

Q. What did he mean?

A. That there was still work to be done.

Q. What was the work with respect to Waco?

A. Implement the agreement that we had with Opus Bank.

Q. Implement the agreement and document the agreement, right?

A. Execute the final documentation in relation to our agreement, yes.

MR. GARFINKEL: This will be 33, please.

(Exhibit 33 was marked for identification.)

BY MR. KORNFELD:

Q. We have marked as Exhibit 33 a document

stamped LTN1. This is an email from John Burke to Terrence Dugan with a copy to Mark Neiman and Virginia Longmuir.

Have you seen Exhibit 33 before, sir?

A. Yes.

Q. What is Exhibit 33?

A. It is an email from our lawyer to the lawyers of Sun Trust.

Q. So Mr. Dugan at Morgan Lewis is a lawyer for Sun Trust, right?

A. Right.

Q. He was a lawyer for Sun Trust as of September 13, 2018, the date of this email that we have marked as Exhibit 33, right?

A. Right.

Q. Is Mr. Mark Neiman also a lawyer for Sun Trust?

A. I don't know. I did not interact with Mark Neiman.

MR. GARFINKEL: I believe he is with Akin Gump.

THE WITNESS: Yeah, I think he is with Akin.

BY MR. KORNFELD:

Q. And what about Ms. Longmuir?

A. She is from Lantern Entertainment.

MR. GARFINKEL: She is an attorney.

BY MR. KORNFELD:

Q. Thank you.

In this email, Mr. Burke, who is an attorney for Lantern, writes that Waco is a TWC television series to which Lantern intends to assume the rights from TWC.

As of September 13, 2018, Lantern had not, in fact, assumed the rights from the Weinstein Company with respect to Waco, correct?

MR. GARFINKEL: Objection; it's argumentative.

Go ahead.

THE WITNESS: It refers to the question that we had before, which is, I think, the final list of the assumed contract had not been provided by that time. So it is just -- so at the time from a legal standpoint, yes.

BY MR. KORNFELD:

Q. They had not assumed the rights, correct?

A. At that time.

Q. Lantern had not assumed the rights?

A. Correct.

Q. In the second paragraph Mr. Burke's email

to Mr. Dugan, Mr. Burke writes, "Endeavor is selling the series internationally."

If as of September 13, 2018 Lantern had not assumed the rights from the Weinstein Company, how was it that Endeavor was selling the Waco series?

MR. GARFINKEL: I'll just object to the scope of the notice, but go ahead.

THE WITNESS: Because there was never a doubt in our mind that we would assume -- we would take Waco as an IP for Lantern Entertainment, and since we had the agreement from July 12 with Opus that basically said that Opus was fine getting the loan assigned, we knew that there was no -- nothing preventing us from acquiring the IP.

BY MR. KORNFELD:

Q. In the next paragraph of -- strike that.

Did Lantern ask Opus Bank for permission to sell the Waco series internationally?

A. No.

Q. Did Lantern tell Opus Bank that Endeavor, an agency, was selling the Waco series internationally on behalf of Lantern?

MR. GARFINKEL: Ongoing objection. Go ahead.

THE WITNESS: No.

BY MR. KORNFELD:

Q. Has Opus Bank ever discussed with you Lantern's sale of international rights for the Waco series?

A. No.

Q. To your knowledge, has Opus Bank ever discussed with anyone at Lantern, Lantern's sale through Endeavor of international rights to the Waco series?

A. Not to my knowledge.

Q. In the third paragraph of Mr. Burke's September 13, 2018, email that we have marked as Exhibit 33, he writes, "Our intention is to assign the rights to a new newly formed entity, Waco SPV owned by Lantern Entertainment."

Let's stop right there. Let me ask you, as of today, has a Waco Special Purpose Vehicle, SPV, been formed?

A. I don't know.

Q. SPV does, in fact, stand for Special Purpose Vehicle, correct?

A. Correct.

Q. Have you seen any drafts of documents that contemplate the formation of a Waco SPV?

A. No.

Q. Has Sun Trust agreed to subordinate the Opus loan to a Lantern SPV?

A. So I think they took a different direction from the construct that is indicated below, which was to carve out the existing SPV from the production agreement so that we could get the loan assigned without needing to form that new entity.

So all of these issues -- all of these issues, I guess in short, all of these issues have been resolved, and there has been an agreement with Sun Trust that was an amendment to an existing loan with Sun Trust that was done in December 16, so 17.

Q. Of 2018?

A. Of 2018. To allow these things to be sorted, and I'm not familiar with all the complexity here, but I know it was sorted, yes.

Q. Prior to that amendment that was done in December 2018, had there been any agreement with Sun Trust with respect to the Waco loan?

A. What do you call an agreement?

Q. Any understanding of whether the loan would be part of Sun Trust's facility, any other understanding with Sun Trust with respect to the

loan agreement in the widest definition of the word.

A. I'm sorry. I don't get the question exactly.

Q. Let me try to break it down.

A. Okay.

Q. You testified in December 2018 there was an amendment with respect to the Waco loan entered into with Sun Trust and Lantern?

A. There was an amendment on one of the two Sun Trust facilities that was -- that included a number of things, one of which was to allow a -- was to allow the assumption of the loan by Lantern Entertainment, the assumption of the Opus loan by Lantern Entertainment to be finalized.

Q. Prior to December 2018 had Sun Trust given permission to Lantern Entertainment for Lantern's assumption of the Opus Bank Waco loan?

A. The discussion with Sun Trust were broad and included a number of aspects. So there was never an issue with regards to that, and it was basically finalized in December. But yes, there were discussions before.

Q. I'm not asking whether there were discussions before.

A. Okay.
Q. I am asking about whether there was, to put it in simple terms, prior to December 2018 a deal between Lantern and Sun Trust with respect to the Opus Bank Waco loan?
A. No. Can I go back to maybe what I just said?
Q. Let me ask you, sir, do you need to clarify one of your answers?
A. Yes.
Q. Can you tell us the question to the best of your recollection that you want to clarify your answer to, and then tell us the clarification, please.
A. Okay. The question was, was an agreement with Sun Trust to allow, basically, the Opus Bank loan to be assigned to Lantern Entertainment.
Q. That was not my question.
A. So what was the question exactly?
Q. My question was a very general question. I'll read it to you. Whether there was a, in simple terms, a deal prior to December 2018 between Lantern and Sun Trust with respect to the Opus Bank loan. That was my question.
A. What deal exactly?

Q. Any deal, I'm using the word "deal" in the widest possible sense. A deal, to maybe help, is an understanding, an agreement. An agreement about what is going to be done with respect to the loan. That is what I mean by "deal." So my question was, was there an agreement with Sun Trust with respect to the Opus Bank Waco loan prior to December 2018?
MR. GARFINKEL: It's with respect to, so I'll object as vague and ambiguous, but do the best you can.
THE WITNESS: We discussed with Sun Trust the fact that the loan would be assigned to Lantern Entertainment on July 12th, so it was they always knew that for the Opus Bank loan we were looking to get the loan assigned and to basically implement our agreement from July 12 we had to amend one of the terms of an existing loan that we had with them. And this is what we completed in December.
BY MR. KORNFELD:
Q. Was there any written agreement between Sun Trust and Lantern with respect to the Opus Bank prior to the amendment that you have discussed that was completed in December of 2018?
A. No.

Q. Do you have Exhibit 39 in front of you, sir?
A. Yes.
Q. Have you seen Exhibit 39 before?
A. Yes.
(Exhibit 39 was marked for identification.)
BY MR. KORNFELD:
Q. For the record Exhibit 39 is an email chain that is marked LTN514 and 515.
First of all who is Tarak Ben Ammar, A-M-M-A-R, T-A-R-A-K.
A. Tarak is an industry veteran in the entertainment industry.
Q. In fact, he was on the board of the Weinstein Company, correct?
A. Correct.
Q. Does Mr. Ben Ammar have a role with Lantern Entertainment?
A. No.
Q. Do you know why Andy Mitchell, one of Lantern's founders, was emailing Mr. Ben Ammar on October 7, 2018, with respect to the Waco Endeavor sales update?
MR. GARFINKEL: Do you know?

THE WITNESS: No.
MR. GARFINKEL: I will also object as beyond the scope of this, but that's fine, you've answered.
BY MR. KORNFELD:
Q. Does Mr. Ben Ammar have any role with respect to the sale of Waco?
MR. GARFINKEL: Same objection. Beyond the scope of the notice.
THE WITNESS: No.
BY MR. KORNFELD:
Q. Have you sat in any meetings that Mr. Ben Ammar participated in, either personally or by phone?
A. Yes.
Q. How many meetings of Lantern Entertainment has Mr. Ben Ammar participated in?
MR. GARFINKEL: We are now way off the Notice of Deposition, so I'll object. I'm not going to instruct him not to answer at this point, but I wish you would stick to your notice.
BY MR. KORNFELD:
Q. You may answer.
THE WITNESS: So I have to answer?
MR. GARFINKEL: Do you want to talk?

THE WITNESS: I think it is outside the scope.

MR. GARFINKEL: It is outside the scope. We can talk after, unless you are ...

MR. KORNFELD: So we are talking about Waco?

MR. GARFINKEL: We're talking about the sale of Waco.

MR. KORNFELD: We are talking about the sale of Waco. We are talking about a former director of the Weinstein Company, and ...

MR. GARFINKEL: Which one does that fall under?

MR. KORNFELD: Just instruct him if you want?

MR. GARFINKEL: I will instruct him.

For the record, I have asked counsel to identify which of the five topics this falls under. He did not, so I will instruct him.

MR. KORNFELD: It has to do with the assumption of the Waco assets which hadn't taken place as of that date?

MR. GARFINKEL: You have asked him already about list conversations about Waco, now you've gone further.

MR. KORNFELD: You are interrupting. No. 4, and No. 5 deal with the satisfaction or assumption by Lantern at the project level identified in Section 2.3 of the APA. No. 5 -- that was No. 4. No. 5 deals with the assumption of any indebtedness related to do Waco project. And No. 1 is all documents produced by Lantern in response to the request for production.

So, obviously, Lantern thought this document was relevant to something. So I'm asking questions based on a document that arguably deals with the assumption of the debt as to the project, and is a document produced by Lantern in connection with this litigation, and now you're cutting me off from asking questions about a document that you produced.

MR. GARFINKEL: What was your question?

BY MR. KORNFELD:

Q. My question was, how many meetings did Mr. Ben Ammar sit in at which the Waco debt was discussed?

A. I think none.

Q. How many meetings has Mr. Ben Ammar sat in when anything having to do with Waco was discussed?

MR. GARFINKEL: To your knowledge. It's beyond the scope.

THE WITNESS: Do I need to answer?

MR. GARFINKEL: Do you know?

THE WITNESS: I don't know, actually.

BY MR. KORNFELD:

Q. How many meetings had Mr. Ben Ammar sat in that you've been a participant in?

MR. GARFINKEL: I'll instruct him not to answer for all the foundational -- I won't repeat it unless you want me to.

BY MR. KORNFELD:

Q. Mr. Mitchell writes in his email that is part of Exhibit 39, in the middle of the page, an October 7, 2018, email at 22:05. Mr. Mitchell writes, "Nobody wants to buy a show about a Texas and American problem. You were right."

Did Mr. Mitchell ever say that about Waco in a meeting or telephone conversation that you were a part of?

A. No. And I think here we should specify. We are looking at an email from -- so Andy Mitchell's email is in relation to an initial email, I think from Chris or -- from Chris who is laying out estimates on the sales of the

international rights of Waco. And from what we read here in that email, we are looking at $250,000, that is on Page 2 at the very bottom, if I'm looking at it in the right way. I mean, honestly, I don't know, because the email is -- you know, completely upside down, but it looks like it is showing $250,000. And so that's the estimate, and that is a much lower estimate compared to what we initially thought we would be generating.

Q. So you saved me a lot of questions with that answer. I appreciate it.

Mr. Ben Ammar's response to Mr. Mitchell -- and you provided the context of the discussion and issue that is part of the email. Mr. Ben Ammar's response to Mr. Mitchell and, of course, Endeavor, was, A -- I think he means as usual -- hyping you just to compare my TV series just in Europe did 2.3 million per episode. That's why we have to be in charge with our sales and never go through agents.

And Mr. Mitchell's response to Mr. Ben Ammar saying that was, "yes, sir."

Did Lantern, after October 7, 2018, decide to be in charge of the sale of Waco and to fire Endeavor or to stop Endeavor from selling

Waco?
A. Not to my knowledge.
Q. Is Endeavor still trying to sell Waco for Lantern?
A. Yes, to my knowledge.
Q. And also to your knowledge, you don't know if Opus Bank knows about Endeavor being out in the market trying to sell Waco for Lantern, correct?
A. That, I know they are.
Q. You said you know?
A. I know Opus Bank knows.
Q. But Opus Bank has not said whether that is okay or not okay with them, right?
MR. GARFINKEL: I need to object, because there are documents that contrary as you well know. So I'm going to object to the scope of that question.
MR. KORNFELD: You are coaching.
MR. GARFINKEL: No, you're --
MR. KORNFELD: Saying there are documents to the contrary is coaching.
MR. GARFINKEL: But you know what's out there, and you're asking -- and it's not -- I am saying it because this is a deposition notice, and

you are exceeding on the scope.
MR. KORNFELD: I don't want to argue.
BY MR. KORNFELD:
Q. Has Opus Bank ever communicated to you that it is okay with them that Endeavor on behalf of Lantern is out there selling Waco?
A. No.
MR. KORNFELD: Let's take a short break. We're close to the end.
(Recess taken.)
MR. KORNFELD: I have no further questions at this time.
MR. GARFINKEL: Then I have no further questions, because I haven't asked any. I have no questions.
MR. KORNFELD: Thank you, Nick. We appreciate it.
(The deposition of NICOLAS SARSA concluded at 2:27 p.m.)

I, NICOLAS SARSA, do hereby declare under the penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of _________________, 20____, at ___________________, ________________.
(City) (State)

______________________________
NICOLAS SARSA

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney of party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 27, 2019

______________________________
PATRICIA Y. SCHULER
CSR NO. 11949

ERRATA SHEET

Case Name:

Deposition Date:

Deponent:

Pg. No. Now Reads Should Read Reason

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

___ ___ __________ __________ ____________________

_____________________

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS ____ DAY OF __________, 2019.

____________________

(Notary Public) MY COMMISSION EXPIRES:__________

A

**$250,000 (11)** 26:20 27:6,24 31:9,24 32:9 33:4 34:14 68:19 85:3,7
**$254,000 (1)** 34:5
**$300,000 (2)** 20:5,13
**$5.4 (3)** 45:11,17,19
**$6 (1)** 37:13
**A-M-M-A-R (1)** 80:12
**a.m (5)** 2:12 5:2 32:19 34:1 41:7
**Absolutely (1)** 15:10
**accepted (1)** 37:7
**accomplishing (1)** 68:8
**account (3)** 50:23 53:20 54:1
**accrued (1)** 26:3
**achieved (1)** 16:10
**acquire (3)** 9:21,24 17:2
**acquired (3)** 7:19,22 9:15
**acquiring (3)** 15:23 41:16 74:15
**acquisition (3)** 7:13 17:4 44:13
**action (2)** 89:18,20
**actual (1)** 46:7
**addition (2)** 13:9 34:6
**additional (1)** 68:7
**adds (1)** 34:10
**adjusted (1)** 6:8
**advise (5)** 27:3 28:3 31:22 32:20 34:12
**afternoon (2)** 65:5,6
**agency (3)** 15:9,14 74:22
**agents (1)** 85:20
**agree (5)** 30:12 31:17 49:25 51:10 52:20
**agreed (11)** 39:14 40:1 49:21 51:20 55:12,16,19 55:24 56:3 62:25 76:2
**agreement (87)** 11:22,23 15:5,8,14 16:4 22:2 23:12,19 23:23 25:9,10,14,19 25:21,22 27:9 28:13 28:14,20 29:11,12 29:15 30:6,10,13,14 30:15,23,23 31:1,2 31:3 33:9 36:8 38:9 39:1,3,12,15,17 46:24 47:8,23 48:15 48:22 49:5,12,19,21 49:21 50:1,6 51:8 51:16,18,19 52:8,10 52:11,14,19,25 54:20 55:19 56:13 57:4 60:11 64:25 68:17,20 71:15,17 71:18,20 74:12 76:7 76:12,20,22 77:1 78:15 79:3,3,6,17 79:21
**agrees (1)** 33:9
**ahead (16)** 12:11 13:24 14:22 18:25 28:11 31:11 31:11 42:4 43:7 45:2 51:25 61:6 62:5 73:14 74:8,25
**Akin (2)** 72:20,23
**al (2)** 1:6 2:6
**ALAN (1)** 3:4
**ALBANESE (1)** 3:14
**albeit (1)** 18:10
**allow (5)** 18:18 76:16 77:12,13 78:16
**Alongside (2)** 70:4,9
**ambiguous (5)** 13:23 28:10 42:3 43:6 79:10
**amend (1)** 79:17
**amended (3)** 4:11 10:19,22
**amending (1)** 64:4
**amendment (9)** 10:21 64:10,18,21 76:13,19 77:8,10 79:23
**American (1)** 84:17
**Ammar (10)** 80:11,18,22 81:6,13 81:17 83:20,23 84:7 85:22
**Ammar's (2)** 85:12,15
**amount (3)** 19:14,14 20:3
**Andrew (6)** 22:10 33:2,11 36:25 57:17 58:23
**Andy (5)** 9:9 16:6 69:17 80:21 84:22
**Angeles (5)** 1:11 2:12 3:7,16 5:1
**answer (28)** 16:17 18:16,17,25 19:6,7 27:23,25 28:11 31:16 33:2 35:7 37:3 39:10,11 52:3,24 54:14 57:10 57:11 58:5 78:13 81:20,23,24 84:3,10 85:11
**answered (1)** 81:4
**answers (2)** 58:15 78:9
**anybody (6)** 12:17 13:4,21 15:16 44:23 48:9
**anytime (1)** 35:8
**APA (3)** 9:21 45:14 83:4
**apologize (1)** 57:20
**apologized (2)** 48:21,24
**appear (1)** 88:12
**APPEARANCES (1)** 3:1
**appreciate (5)** 44:17 50:4 67:5 85:11 87:17
**appropriate (4)** 40:7 49:7,9 67:15
**approval (2)** 39:25,25
**approximate (1)** 19:14
**approximately (1)** 34:5
**April (2)** 15:7 36:5
**area (3)** 14:15 19:9 55:4
**arguably (1)** 83:11
**argue (1)** 87:2
**argumentative (1)** 73:13
**asked (7)** 8:7 43:21 48:2 59:1 82:17,23 87:14
**asking (11)** 20:8 30:25 48:14 54:17 55:7 61:10 77:24 78:2 83:10,15 86:24
**aspects (2)** 65:14 77:20
**asset (13)** 9:13,14 13:22 14:4,16 15:12,20 21:7,11,17 23:6 41:16 43:5
**assets (17)** 7:14,18,23 8:3,5 9:15 9:17 14:1,2 15:22 21:6 22:5,21 42:8 44:13,13 82:21
**assign (1)** 75:14
**assigned (22)** 25:23,24 27:15 28:13 31:6,15 32:7 36:21 38:8,18 39:4,13 51:9 53:1,2 60:16 68:18 74:14 76:8 78:17 79:13,16
**assignment (11)** 26:24 27:16 28:5,8,24 39:25 42:16 47:1 59:18,22,24
**assist (1)** 68:8
**associated (1)** 44:14
**assume (12)** 9:20 10:3 45:23,24 63:11 64:17,20 66:16 68:23 69:4 73:8 74:10
**assumed (14)** 42:19,21,25 43:5 51:5 51:23 63:8,13 64:10 73:10,17,21,23 74:4
**assuming (3)** 39:20 46:13 59:12
**assumption (17)** 23:12 26:24 42:15 47:8,24 48:15 63:17 64:3,7,15 77:13,14 77:18 82:21 83:3,5 83:12
**assurance (1)** 59:4
**attached (1)** 88:12
**attorney (7)** 26:12,13 48:12,13 73:2,6 89:19
**attorney-client (1)** 48:5
**attorneys (1)** 48:10
**available (1)** 59:8
**Avenue (2)** 2:11 3:15
**avenues (1)** 32:1

B

**back (12)** 17:19 20:20 27:20 44:5 47:3 52:2,2,5 68:23 69:1,5 78:6
**bank (88)** 3:19 11:22,23 14:1,3 22:11,20,22,23,25 23:4,11 25:22 26:13 26:14 29:15 31:4 32:23 33:8,8 34:6 34:21 35:24 36:19 36:20 37:6,16 38:2 38:10,23 39:2 44:20 44:24 45:8,16,25 47:7,23 50:20,24 51:1,5,20 52:14,19

53:1,3,13,20,22,25 54:3,11 56:10,18 57:5 58:23,24 62:1 62:7,10,13,15 68:3 68:16,17,24 69:5 70:5,7,10,12 71:16 74:18,21 75:3,7 77:18 78:5,16,23 79:7,15,22 86:7,12 86:13 87:4
**Bank's (1)** 55:22
**banking (2)** 6:10 9:2
**bankruptcies (1)** 62:21
**bankruptcy (14)** 1:1 2:1 8:17,21,23 9:16,17,19 22:12 38:7,21 39:3 45:14 49:2
**base (1)** 36:17
**based (1)** 83:11
**basically (32)** 6:21 8:15 9:23 15:6 22:23 27:2,5,14,17 28:4 29:10 31:13,24 32:1 33:3,21 34:11 36:5,15 39:20,22 42:19 48:20 49:5 56:16,21 57:18 64:7 74:13 77:22 78:16 79:16
**basis (1)** 46:13
**Bates (5)** 4:14,15,16,18,19
**bear (1)** 11:8
**beginning (3)** 2:12 36:4 63:13
**behalf (6)** 2:10 29:17 32:12 43:19 74:23 87:5
**believe (7)** 11:16 24:12,12,13 35:7 54:17 72:20
**Ben (12)** 80:11,18,22 81:6,12 81:17 83:20,23 84:7 85:12,15,21
**best (7)** 17:7,9 43:8,13 52:3 78:11 79:10
**better (1)** 62:19
**beyond (8)** 16:13 18:13 57:9 61:5 61:11 81:3,8 84:2
**bid (4)** 8:16,18 9:23 14:25
**binder (1)** 23:25
**biography (2)** 6:1,2
**bit (1)** 41:9
**board (1)** 80:15
**Bob (1)** 46:2
**book (7)** 10:10,11,12 22:8 33:20 40:3 47:3
**booklet (1)** 11:6
**borrower (4)** 27:18 31:7 38:9 50:10
**borrowing (1)** 36:17
**bottom (1)** 85:3
**Boulevard (1)** 3:6
**Brajovic (3)** 9:9 13:13 69:18
**break (6)** 19:5 40:8 44:1 55:6 77:5 87:8
**bring (3)** 6:19 18:11 19:15
**brings (1)** 18:4
**broad (1)** 77:19
**brought (1)** 53:10
**BT (2)** 44:9 58:18
**BT1010 (1)** 4:14
**bullet (3)** 69:25 70:22,23
**Burke (30)** 26:9,12,19 27:25 29:16,17 32:12,18 34:12,18 36:24 37:17 40:15 41:2,7 44:10,11 46:2,20,23 47:2 56:24 58:22,25 61:3 63:6 64:2 72:1 73:5 74:1
**Burke's (3)** 60:21 73:25 75:12
**business (2)** 33:15 41:18
**busy (2)** 15:25 57:18
**buy (1)** 84:16
**buying (1)** 42:7

**C**

**California (6)** 1:11 2:12 3:7,16 5:1 89:2
**call (6)** 23:4,23 27:8 36:13 47:21 76:22
**called (8)** 5:5 7:9 14:8 38:16 41:9 47:25 48:2 57:17
**calls (2)** 47:10 48:20
**capital (4)** 7:5 36:10,10,13
**carefully (1)** 54:10
**Carolyn (1)** 26:13
**carve (1)** 76:6
**case (9)** 1:6 2:6 36:22 38:25 57:1 69:18,21 89:14 90:2
**certain (2)** 5:16 8:20
**Certified (2)** 2:14 89:1
**certify (2)** 89:3,17
**cetera (2)** 41:10 67:1
**CFO (4)** 46:1,22,23 64:2
**chain (6)** 24:2,22 26:17 31:20 33:7 80:10
**change (2)** 27:17 60:10
**changed (1)** 59:11
**Chapter (2)** 1:5 2:5
**charge (7)** 8:25 9:2 15:4 22:21 23:1 85:19,24
**check (1)** 36:20
**Chris (9)** 14:8,11,17 16:1,6 19:17,20 84:24,24
**circulated (1)** 65:23
**City (1)** 88:17
**clarification (1)** 78:13
**clarify (3)** 11:15 78:9,12
**cleaner (1)** 60:13
**clear (7)** 12:9,19,21 18:19 29:6 37:3 49:2
**close (3)** 7:10,11 87:9
**closed (1)** 62:20
**closely (1)** 7:8
**closing (3)** 22:3,4 36:16
**coaching (2)** 86:19,22
**Cofounders (1)** 9:11
**collateral (5)** 37:6,12,20,24 38:3
**colleagues (1)** 21:2
**come (1)** 56:12
**coming (3)** 17:19 19:23,24
**comment (1)** 50:2
**COMMISSION (1)** 90:25
**COMMITTEE (1)** 3:2
**communicated (1)** 87:4
**communication (7)** 50:5,8,8 56:6 57:19 62:18 64:9
**communications (1)** 12:10
**company (14)** 1:5 2:5 7:11,14,18,22 8:17 9:3 35:5 46:5 73:11 74:4 80:16 82:11
**compare (1)** 85:17
**compared (1)** 85:8
**compiled (1)** 34:11
**complete (1)** 34:18
**completed (7)** 63:18 64:5,11,16,22 79:19,24
**completely (1)** 85:6
**completion (2)** 16:3 89:14
**complex (1)** 62:20
**complexity (1)** 76:18
**components (1)** 25:2
**concluded (1)** 87:18
**condition (3)** 25:25 31:8 68:18
**conducted (1)** 12:1
**confidential (1)** 67:12
**confirm (1)** 50:5
**confirmation (2)** 26:7 30:11
**confirmed (9)** 23:21,22 25:15,17,20 49:12 50:7 52:15,17
**connection (3)** 21:11 43:16 83:13
**consider (1)** 41:19
**considered (7)** 15:20 17:22,23 18:2 27:16 46:11 62:24
**considering (3)** 36:9,12 46:17
**consist (1)** 58:21
**consistent (1)** 45:3
**construct (1)** 76:5
**contained (1)**

88:13
**contemplate (1)**
75:25
**contends (1)**
34:6
**context (5)**
29:7 39:2 40:14 63:5 85:13
**contract (10)**
9:20 10:2 42:20,21,22 43:1,2 60:8 63:13 73:17
**contracts (3)**
9:18 10:2 43:10
**contrary (2)**
86:16,22
**conversation (5)**
13:5,9 19:4 37:20 84:19
**conversations (4)**
13:8 20:12,15 82:24
**conveyed (2)**
23:20 25:14
**Cool (1)**
39:6
**copied (1)**
60:25
**copy (2)**
69:18 72:2
**correct (58)**
6:3,4 7:25 8:1 9:6 18:6,7 23:1,7 26:16 28:9,20,22 29:9 32:16 34:3,7,8 37:14 40:18 43:1,5 43:9 51:23 52:21 53:10,11,14,15,18 53:23 54:1,2,6,7 55:1 56:1,2 59:23 60:2,3,9 64:14,17 65:17 68:12,13 69:2 69:7 73:11,21,24 75:22,23 80:16,17 86:9 88:14
**corrected (1)**
88:14
**corrections (1)**
88:11
**correctly (2)**
15:6 51:7
**counsel (8)**
3:1 24:21 44:11 47:25 55:21 56:8 58:22 82:17
**counsels (1)**
33:23
**counter (1)**
31:5
**counter-party (9)**
27:14,22 38:24 51:11 51:21 52:20 53:4 56:12,21
**couple (3)**
19:8 24:16,20
**course (2)**
15:18 85:16
**court (6)**
1:1 2:1 5:6 11:25 22:12 71:2
**credit (14)**
27:13 31:5 35:25 37:6 37:12,12 38:3 44:14 68:23 69:1,5 70:2 70:15 71:9
**CREDITORS (1)**
3:2
**CSR (2)**
1:13 89:25
**current (14)**
6:5,6,7 26:1,2 27:24 31:9 51:15 53:5,10 70:2,9,16 71:9
**Curriculum (1)**
4:8
**cutting (1)**
83:14
**CV (2)**
6:2,6
**cycle (3)**
17:10,16,21

**D**

**Darsa (9)**
1:10 2:10 4:8 5:4,13 5:23 65:5 67:19 68:3
**data (1)**
44:16
**date (7)**
23:10 47:6 68:11 72:13 82:22 89:21 90:3
**dated (2)**
58:24 89:23
**day (3)**
53:7 88:15 90:23
**day-to-day (1)**
16:1
**days (1)**
42:19
**deadline (1)**
63:12
**deal (18)**
7:2 27:24 32:23 59:15 65:13,14 69:22 70:1 70:15 71:8 78:4,22 78:25 79:1,1,2,5 83:2
**dealing (1)**
66:21
**deals (4)**
8:11,12 83:5,11
**debt (14)**
9:2,4 38:21 45:15 46:10 55:14,17 56:1 56:5 68:23 69:2,5 83:12,20
**Debtors (2)**
1:7 2:7
**December (15)**
64:6,12,13,16,22 76:14,20 77:7,16,22 78:3,22 79:8,19,24
**decide (2)**
33:23 85:24
**decision (2)**
45:22,24
**deck (1)**
67:25
**declaration (7)**
22:10 23:9,13 47:5,17 47:19 48:9
**declare (1)**
88:9
**default (4)**
26:3 51:2 56:16 62:15
**defer (1)**
66:13
**definition (2)**
45:15 77:1
**degree (2)**
24:22,24
**DELAWARE (2)**
1:2 2:2
**delayed (1)**
64:8
**Deponent (2)**
90:4,21
**deposition (26)**
1:10 2:10 4:9,11 10:17,22 11:8 12:1 12:5,16 13:8,13,14 13:16,19 16:13 20:25 21:5,15 23:10 43:18 81:19 86:25 87:18 89:13 90:3
**described (2)**
31:20 39:9
**designated (4)**
4:9,12 10:18 11:12
**detail (5)**
33:3 34:15 41:9 43:20 43:21
**details (1)**
33:6
**determination (2)**
18:22,23
**determined (1)**
68:12
**different (8)**
8:11 19:3 24:16,20,24 25:1,2 76:4
**diligence (2)**
6:23 8:14
**direction (2)**
76:5 89:10
**director (1)**
82:11
**disagree (4)**
33:21 49:23 61:16,18
**disagreement (2)**
49:10 54:22
**disagrees (1)**
32:25
**disappoint (1)**
11:18
**discuss (5)**
12:16 21:3 37:1 38:12 59:8
**discussed (16)**
11:24 20:14 21:1 34:22 35:9 36:3 37:15 39:7 59:4 60:4 75:3,8 79:12 79:23 83:21,25
**discussion (11)**
5:21 16:2 17:19,20 19:17 40:17,25 46:1 46:2 77:19 85:14
**discussions (8)**
35:12,14,18 48:18 49:6 62:6 77:23,25
**distracting (2)**
59:7 63:2
**distribution (4)**
15:5,8,13 16:4
**distributor (1)**
17:25
**DISTRICT (2)**
1:2 2:2
**DLA (3)**
3:11 13:1,3
**docs (8)**
26:21 27:4 28:1,3 31:23 32:5,20 34:12
**document (22)**
4:14,15,16,18,19 29:10 43:25 46:7 58:17 65:7,9,23,24 65:25 68:1 69:13 71:17,25 83:10,11 83:13,15
**documentation (15)**
27:5 28:19,22,23 29:2 29:4,12 32:8 34:20 44:15 47:1 55:20 63:16 64:24 71:19
**documents (23)**
12:13 18:8 19:13,16 21:4,10,14,18 41:4 42:11 43:17,24 44:18,20,24 45:21 45:22 46:20 58:1 75:24 83:7 86:16,21
**domestic (18)**
16:22,24 17:2,3,6,8 17:16,21 18:1,9,10 19:15,23 20:14 70:2 70:9,16 71:9
**doublecheck (1)**
20:6
**doubt (2)**
50:16 74:10
**draft (1)**
64:1
**drafts (3)**
29:1 63:24 75:24
**due (4)**
8:13 50:19 53:7 68:11
**Dugan (3)**
72:2,9 74:1
**duly (2)**
5:5 89:7
**duplicative (1)**
24:23

**E**

**E-X-H-I-B-I-T-S (1)**
4:6
**earlier (1)**
45:4
**East (5)**
70:2,10,12,16 71:10
**effect (2)**
32:24 47:21
**effectuating (1)**
42:7
**either (7)**
13:4 32:2 38:8,22 57:12 62:7 81:13

**elaborate (1)**
37:4
**elucidate (1)**
67:4
**email (68)**
19:18,19,21,25 20:1 21:20,25 23:24 26:6 26:11,17,20,25 29:16 31:20 32:12 32:18,22 33:1,7,8 33:11,13,19,22,24 34:1,4,11 40:15,18 40:22,24 41:2,5,6,7 43:19,22,23 44:9 49:13 55:22 58:22 58:24,25 60:22 62:9 62:10 63:7 69:16 70:1,20 72:1,7,13 73:5,25 75:13 80:9 84:13,15,22,23,24 85:2,5,14
**emailing (1)**
80:22
**emails (11)**
19:16 21:21,23 24:2 24:22,23,24 25:1 28:16 41:4 48:12
**employee (2)**
22:20 89:19
**Endeavor (15)**
15:5,9,14 16:2 74:1,5 74:21 75:9 80:23 85:16,25,25 86:3,7 87:5
**enormous (1)**
62:22
**entered (1)**
77:8
**entertainment (71)**
3:10 4:10,13 6:14 7:15 8:10 9:5,8,17 9:18 10:3,18 13:2 13:21 15:1 17:12 22:6,24 23:11 25:24 25:25 27:13,15,22 28:9,25 31:5,7,8,16 34:22 35:3,5,9,16 36:3,11,21 38:18 44:12,23 47:7,22 50:22 51:2,10,14,21 51:23 53:2,4,13,20 53:22,25 54:12 64:19 67:8 68:25 69:6 73:1 74:11 75:16 77:14,15,17 78:17 79:14 80:14 80:19 81:17
**Entertainment's (1)**
11:11
**Entertainment/Opu...**
23:3
**entity (2)**
75:15 76:9
**episode (1)**
85:18
**equity (1)**
7:6
**ERRATA (1)**
90:1
**ESQ (6)**
3:4,5,12,13,14,21
**estate (1)**
56:19
**estimate (8)**
15:21 16:9,22 18:9 20:13 63:19 85:7,8
**estimates (2)**
19:22 84:25
**et (4)**
1:6 2:6 41:10 67:1
**Europe (1)**
85:18
**evaluation (1)**
8:14
**exact (2)**
56:19 59:19
**exactly (9)**
8:10 14:12 31:25 47:18 59:18 61:21 77:4 78:19,25
**examination (4)**
4:9,12 5:9 10:17
**examined (1)**
5:6
**example (1)**
7:5
**exceeding (1)**
87:1
**exceeds (1)**
54:15
**exchange (1)**
49:13
**exchanged (2)**
63:24 64:1
**exchanges (2)**
21:20 23:24
**excuse (1)**
64:8
**execute (4)**
6:25 36:8 49:5 71:19
**executed (4)**
29:3,5,7 88:15
**executing (2)**
6:24,25
**execution (1)**
7:10
**executive (1)**
22:25
**exhibit (87)**
4:8,9,11,14,15,16,18 4:19 5:14,19,24,25 10:4,7,8,22,23 11:3 11:9,13,20 12:6 22:8,10,13 23:9,25 24:1,2,3,11,22,23 25:17 26:5,7,18 27:8 31:21 32:23 33:7,13 34:1 40:3,9 40:14,14,17,18,20 40:25 41:5 44:6,8 46:3 47:3,6,20 54:5 54:13 55:11 57:6 58:11,17,19,21 60:4 65:2,7,11,19 68:22 69:9,12,14,16 71:22 71:25 72:4,6,14 75:14 80:1,4,6,9 84:14
**exhibits (4)**
5:16 10:12 24:16,20
**existing (4)**
27:14 76:6,13 79:18
**expand (1)**
58:14
**expect (1)**
63:16
**experience (4)**
6:13 7:15,17 8:2
**EXPIRES (1)**
90:25
**explain (1)**
18:24
**explained (1)**
48:24
**exposure (2)**
33:20 46:12
**extent (5)**
8:20 16:13 27:23 31:17 53:4

**F**

**facilities (1)**
77:11
**facility (8)**
36:18,18,23 37:7,24 38:4 41:11 76:24
**fact (11)**
28:16 46:17 50:25 51:22 53:24 56:4 60:10 73:10 75:21 79:13 80:15
**fair (2)**
55:3 66:11
**fall (1)**
82:12
**falls (2)**
18:21 82:18
**familiar (2)**
67:2 76:17
**February (9)**
1:12 2:13 5:1 58:24 59:10 60:22 61:3 62:3 89:23
**Federal (1)**
89:14
**feel (1)**
49:7
**fees (5)**
26:4 34:5 53:6,19 59:3
**felt (1)**
67:11
**field (2)**
6:14 7:15
**filed (4)**
8:17 22:11 23:13 47:17
**film (1)**
35:25
**final (6)**
28:21 29:2,4 63:12 71:19 73:16
**finalize (2)**
42:19 64:24
**finalized (2)**
77:15,22
**finalizing (1)**
55:20
**finance (1)**
35:24
**financially (1)**
89:18
**financials (1)**
67:8
**financing (2)**
51:13 67:25
**find (1)**
45:12
**fine (16)**
26:10 27:3,25 28:18 29:18 30:3 32:14 37:9,17 39:6 40:11 41:3 51:13 67:16 74:13 81:3
**finish (3)**
31:11 40:9 71:1
**fire (1)**
85:25
**firm (2)**
7:6 16:7
**first (19)**
11:7 14:23 17:10,24 19:18 34:1 40:19 41:5 45:13 46:19 47:16,25 55:10 62:9 66:15 67:1,20 70:7 80:11
**five (2)**
11:12 82:18
**flexibility (1)**
38:16
**following (2)**
27:11 35:23
**follows (1)**
5:7
**forbearance (2)**
62:14 63:4
**foregoing (5)**
88:10 89:4,6,10,12
**form (1)**
76:8
**formal (2)**
34:10,16
**formation (1)**
75:25
**formed (2)**
75:15,19
**former (1)**
82:10
**formulated (1)**
14:24
**forth (2)**
26:18 89:5
**forward (2)**
57:3 59:9
**foundational (1)**
84:10
**founder (1)**
69:19
**founders (2)**
69:17 80:22
**frame (1)**
8:19
**FRB (4)**
70:1,4,15 71:9
**Friday (5)**
26:19 32:19 33:25 41:6 43:18
**friendly (1)**
10:21

**front (7)**
10:7,9 22:9 40:4 44:6 66:23 80:1
**frustration (3)**
49:1 50:6,7
**full (1)**
5:11
**fully (1)**
28:14
**further (7)**
18:13 41:8 82:25 87:11,13 89:12,17

G

**Garfinkel (83)**
3:12 10:10,14,19 11:1 11:6,15,19 12:2,9 12:17,19 13:23 14:9 14:17,19 16:12,17 18:12,18 19:7 20:8 20:16 21:1 24:4,14 24:25 28:10 29:6,19 30:1,17,21 40:6,11 41:24 42:3 43:6 44:2,25 47:10 48:1 48:4 51:24 52:22 54:14,21 57:8 58:8 60:23 61:4,9,18 62:4 66:17 67:16 70:17 71:1,21 72:20 73:2,12 74:7,24 79:9 80:25 81:2,8 81:18,25 82:3,7,12 82:16,23 83:17 84:1 84:4,9 86:15,20,23 87:13
**gather (1)**
58:4
**general (4)**
32:25 37:2 66:2 78:20
**generally (2)**
18:4 19:1
**generating (1)**
85:9
**gentlemen (1)**
9:10
**getting (6)**
20:24 30:9 34:19 57:8 59:19 74:13
**give (1)**
61:7
**given (4)**
22:22 59:5 77:17 89:11
**go (24)**
5:16 12:11 13:24 14:22 18:25 22:8 25:13 27:19 28:11 31:11,11 42:4 43:7 44:8 45:2 47:3 51:25 61:6 62:5 73:14 74:8,25 78:6 85:20
**goes (1)**
61:15
**going (31)**
5:14 6:9 7:11 10:21 11:4,16 16:8,13 17:17 18:12,20,22 19:9 20:25 24:19 27:20 31:3 37:21 40:6 59:25 60:2 61:10,23 67:13 68:8 70:1,14 71:8 79:4 81:20 86:17
**good (4)**
10:20 43:3 65:5,6
**grate (1)**
57:19
**greater (1)**
46:12
**gross (2)**
20:22,23
**guess (2)**
23:3 76:11
**Gump (1)**
72:21
**guys (1)**
38:17

H

**half (1)**
34:18
**handle (1)**
11:16
**hands (1)**
32:6
**happened (2)**
57:22,23
**happy (3)**
19:4 60:16 67:16
**headed (1)**
67:25
**hearing (1)**
56:25
**heavily (1)**
67:3
**heavy (1)**
67:4
**held (1)**
5:21
**help (4)**
14:19 60:15 66:18 79:2
**helped (1)**
21:15
**helpful (2)**
18:17 39:6
**hereof (2)**
23:11 47:6
**hereto (1)**
88:13
**hey (3)**
56:15,24,24
**highlighted (1)**
68:22
**history (1)**
59:5
**holder (1)**
9:1
**HOLDINGS (2)**
1:6 2:6
**hollow (1)**
59:4
**honestly (2)**
19:20 85:5
**hope (3)**
18:23 57:14,21
**hopefully (1)**
16:18
**horse (4)**
8:16,18 9:23 14:25
**hour (1)**
40:7
**Howard (1)**
3:22
**Hughes (1)**
3:22
**hundreds (1)**
35:18
**Hunt (6)**
26:13 29:16 40:16 41:6,8 44:11
**Hunt's (1)**
43:18
**hyping (1)**
85:17

I

**I-N-D-E-X (1)**
4:1
**idea (1)**
45:4
**identification (8)**
5:20 10:5,24 58:12 65:3 69:10 71:23 80:7
**identified (1)**
83:4
**identify (1)**
82:18
**immediate (1)**
60:5
**immediately (1)**
60:2
**implement (6)**
51:18 57:3 68:19 71:15,17 79:16
**implementation (1)**
48:22
**implemented (1)**
28:14
**implementing (1)**
46:24
**implicitly (1)**
56:11
**important (6)**
9:19 38:6 46:8 63:5 63:14 64:3
**importantly (1)**
55:3
**included (10)**
31:20 32:22 33:7 43:10,12 45:16,16 45:17 77:11,20
**including (2)**
42:21 59:3
**incredibility (1)**
49:3
**indebtedness (5)**
23:13 47:9,24 48:16 83:6
**indicate (1)**
63:6
**indicated (2)**
66:1 76:5
**indicating (1)**
51:2
**industries (1)**
8:11
**industry (5)**
15:1,2 17:13 80:13,14
**inform (2)**
19:13 26:23
**information (3)**
66:1 67:7,12
**initial (9)**
15:21 16:9,22 18:3,5 36:1 38:11 43:11 84:23
**initialed (1)**
88:12
**initially (2)**
35:23 85:9
**ink (1)**
88:12
**instruct (7)**
18:15,16 81:20 82:14 82:16,19 84:9
**intellectual (1)**
43:4
**intends (1)**
73:7
**intense (1)**
49:3
**intention (1)**
75:14
**interact (1)**
72:18
**interacted (1)**
46:23
**interest (5)**
26:3,4 34:7 53:6,16
**interested (1)**
89:18
**internally (1)**
65:24
**international (9)**
16:20 17:6,24 19:22 20:21 35:1 75:4,9 85:1
**internationally (3)**
74:2,19,23
**interrupting (1)**
83:1
**investment (9)**
6:10,22,23,25,25 7:1 7:4,7 8:14
**invoice (11)**
26:20 27:4,6 28:1,6 31:23 32:9,21 34:10 34:13,16
**involved (8)**
8:12,15,16,21 14:23 15:17 16:1 66:9
**IP (8)**
15:22 35:2,4 42:6 43:10 46:12 74:11 74:15
**issue (5)**
21:17 33:18 67:14 77:21 85:14
**issues (4)**
59:6 76:10,11,11
**items (1)**
67:10

J

**January (3)**
23:14 47:17 48:16

**Jarvis (18)**
22:11,17,19,20,25 23:10 33:2,6,11,24 34:4,15 36:25 47:4 48:14,19,20 58:23
**Jarvis's (5)**
22:15 23:8,15 47:16 48:9
**JASON (1)**
3:5
**Jeff (4)**
36:25 48:19 57:17 58:25
**Jeffrey (3)**
26:12 33:14 58:23
**Job (1)**
1:23
**John (15)**
26:9,11 27:25 31:22 34:12,18 36:24 44:10 46:23 47:2 56:24 58:22 63:6 64:2 72:1
**joined (1)**
6:21
**JONES (1)**
3:3
**judge's (1)**
66:11
**July (93)**
7:25 8:20 21:25 22:7 23:19,21,22 25:10 25:19 26:14 28:7,12 28:20 29:11,13,14 29:17,25 30:16 31:1 32:13,19 33:3,14,25 34:21 35:8,9,15 36:8,25 37:1,16 38:2,15 39:8,12,15 39:16,18 40:2 41:7 41:15,22 42:5,13 43:19,21 44:10,19 44:22 45:7,21 46:18 46:21,22,24 48:23 49:5,12,14,19 50:1 50:6,18 51:6,8,16 51:18,19 52:8,11,13 52:15,17,18 53:9,12 53:21 56:14 57:4 59:16,16 60:10 64:25 65:16 66:24 68:15 69:2,7 74:12 79:14,17

**K**

**K (2)**
31:17 32:21
**KANDESTIN (4)**
3:13 66:19 67:2,6
**keep (2)**
30:5,10
**keeping (1)**
66:11
**key (5)**
46:4,7 51:9 68:2,16
**Killgore (5)**
69:18,21 70:17,20 71:7
**Killgore's (1)**
70:23
**KINAS (1)**
3:21
**kinds (1)**
19:3
**knew (10)**
39:21 42:5 45:18 46:1 46:7,8,13 61:23 74:14 79:15
**know (50)**
14:4 17:13,18 19:7 20:6,9,10 22:17 24:8,18 27:20 31:13 36:19 38:25 40:7 41:15,22 42:9 45:7 46:15 47:4 49:4 56:15,20 57:12,15 57:21 59:1,8 60:8 60:14 61:9 66:14,16 71:7 72:18 75:20 76:18 80:21,25 84:4 84:5 85:5,6 86:7,10 86:11,12,16,23
**knowledge (11)**
14:16 17:7,10 44:22 54:18 75:7,11 84:1 86:2,5,6
**knowledgeable (1)**
16:7
**Known (1)**
14:17
**knows (3)**
13:22 86:7,12
**KORNFELD (95)**
3:4 4:4 5:10,22 10:6 10:11,16,20 11:4,7 11:10,18,24 12:3,15 12:24 14:5,14,18,21 16:21 18:15 19:1,8 19:11 20:11,19 24:7 24:19 25:6 28:15 29:8,23 30:8,19,22 30:24 40:9,12 42:1 42:10 43:14 44:1,4 45:6 47:13 48:7 52:6 53:8 54:19 55:5 57:24 58:13 60:17,20 61:1,7,14 61:22 62:12 65:4 66:21 67:3,13,18 69:11 70:18 71:4,6 71:24 72:24 73:3,20 74:16 75:2 79:20 80:8 81:5,11,22 82:5,9,14,20 83:1 83:18 84:6,12 86:19 86:21 87:2,3,8,11 87:16

**L**

**lack (2)**
50:8 64:9
**lantern (151)**
3:10 4:10,12 6:3,13 6:16,19 7:5,15,17 7:19,22 8:9,13 9:5,7 9:8,11 10:3,18 11:11,21 13:1,21 17:2,5 22:5,24 23:3 23:11 25:24,25 26:9 26:12 27:2,9,13,15 27:22 28:8,18,25 29:3,15,18,18 31:4 31:7,8,15 32:13,14 34:22 35:2,5,9,15 36:3,11,21 37:17 38:18 41:3,15 43:20 44:12,23 47:7,22 48:13 50:22 51:1,5 51:10,14,20,23 52:14,20 53:1,2,3 53:13,19,21,24 54:12 55:12,16,21 55:24 56:3,4,7,8 57:5,12,13 58:22 59:1,2,5 60:21 61:2 61:24 62:2,13 63:8 63:11,18 64:16,19 65:8,16 67:8 68:25 69:6,19,23 73:1,6,7 73:9,23 74:3,11,18 74:21,23 75:8,16 76:3 77:9,13,15,17 78:4,17,23 79:13,22 80:19 81:16 83:3,7 83:9,13 85:23 86:4 86:8 87:6
**Lantern's (10)**
7:13 17:3 38:4 44:11 59:10 69:17 75:4,8 77:18 80:22
**large (2)**
17:22 18:2
**Las (1)**
3:23
**latest (1)**
19:21
**lawyer (11)**
23:20 25:15 33:10,15 33:19 57:12,14 72:7 72:9,12,16
**lawyer's (1)**
41:20
**lawyers (6)**
13:1,3 21:25 22:1 33:23 72:8
**laying (1)**
84:25
**LE (3)**
68:23,25 69:4
**LE111 (2)**
4:15 65:8
**LE114 (1)**
68:2
**LE122 (2)**
4:15 65:8
**LE7 (2)**
4:16 69:13
**LE8 (2)**
4:17 69:13
**lead (1)**
17:17
**lease (1)**
63:12
**led (1)**
11:16
**left (2)**
41:9 67:10
**legal (4)**
26:4 53:6 54:25 73:19
**lender (3)**
55:13,16,25
**let's (17)**
11:9 19:6,18 22:8 23:4,25 26:5 30:20 36:20 40:3,9,13 44:8 47:3 55:10 75:17 87:8
**letter (19)**
38:13 39:21,23 51:1 54:3,4,5,9,11,23 55:22,23 56:10,19 57:2,6,13 60:11 62:15
**level (4)**
38:21 45:15 46:10 83:3
**levels (1)**
19:3
**Lewis (1)**
72:9
**library (4)**
35:25 36:18,23 37:7
**light (1)**
45:1
**liked (1)**
56:23
**limited (1)**
11:21
**line (2)**
64:24 67:10
**list (9)**
10:2 29:24 42:19,21 43:11 65:12,15 73:17 82:24
**listed (2)**
11:13 12:5
**listen (1)**
51:25
**litigation (1)**
83:14
**LLC (7)**
1:6 2:6 3:10 4:10,13 23:11 47:7
**loan (130)**
9:3,4 14:2,3 21:9,11 21:16 22:23 23:1,4 23:5 25:23,23 26:1 26:2,24 27:5,14,17 27:18,20 28:5,8,13 28:21,24 31:6,8,15 32:2,3,4,5,7,8 34:7 34:20 35:10,17,20 35:24 36:19,21 37:3 37:7 38:8,10,12,18 39:4,13,19 40:1 41:17 42:2,16,25 44:20,24 45:16,20 45:22,25 46:4,9,12 46:13 47:1 50:9,13 50:19,23 51:5,9,14 51:22,22 52:21 53:1 53:5,9,12,21 54:1 56:15,16,22 59:3,11 59:12,19,22,24 60:1 60:2,5,12,16 61:16 62:2,25 63:17 64:4 64:4,8,10,11,17,20 68:18 74:14 76:3,8 76:13,21,23 77:1,8 77:13,14,18 78:5,17

78:24 79:5,7,13,15 79:16,18
**loan-related (2)** 44:17 46:20
**loaning (1)** 38:10
**loans (1)** 38:7
**long (1)** 31:12
**Longmuir (2)** 72:3,25
**look (15)** 11:9 21:4,10,14,18 24:4 25:3 26:5 38:20 45:13,21 46:6 54:8 55:4,10
**looked (7)** 21:19,20,24 44:19,23 45:20 58:1
**looking (5)** 65:22 79:15 84:22 85:2,4
**looks (1)** 85:6
**Los (5)** 1:11 2:12 3:7,16 5:1
**lose (1)** 71:3
**lot (2)** 48:23 85:10
**lower (1)** 85:8
**LTN1 (2)** 4:18 72:1
**LTN514 (2)** 4:19 80:10
**Lunch (1)** 65:1

M

**machine (1)** 89:9
**madness (1)** 5:15
**major (1)** 17:23
**majority (1)** 67:7
**making (2)** 9:14 26:2
**management (4)** 7:2,8,10 16:2
**managing (4)** 8:21,23 9:2,19
**manner (1)** 53:14
**March (5)** 8:20 14:24 36:5 45:14 59:14
**Maris (6)** 3:13 12:23 66:13,16 66:17,21
**mark (5)** 5:14 10:21 72:2,16,19
**marked (25)** 5:19,24 10:4,8,12,23 23:9 24:1 47:6,20 54:5,12 57:6 58:11 58:17 65:2,7 69:9 69:12 71:22,25 72:14 75:13 80:6,10
**market (1)** 86:8
**marketing (1)** 20:21
**marking (2)** 10:15,16
**matter (1)** 50:25
**mattered (1)** 51:12
**max (1)** 36:16
**mean (19)** 7:3 8:24,25 20:17 32:17 34:25 35:1 36:4 40:19 55:3 59:15 60:1 62:8 63:19,22 66:3 71:12 79:5 85:4
**means (7)** 8:13 26:2 27:15 29:7 49:4 59:24 85:16
**meant (3)** 5:17 46:25 71:7
**media (1)** 9:16
**meeting (3)** 12:7 21:1 84:19
**meetings (6)** 13:7 81:12,16 83:19 83:23 84:7
**member (1)** 65:22
**mentioned (1)** 29:22
**mentioning (1)** 45:4
**method (1)** 5:15
**MFW (2)** 1:6 2:6
**Michael (3)** 3:12 12:7,13
**middle (1)** 84:14
**million (8)** 16:19 20:20 33:20 37:13 45:11,17,19 85:18
**Milos (3)** 9:9 16:6 69:18
**mind (2)** 71:3 74:10
**misspoke (1)** 70:21
**misstates (2)** 51:24 52:23
**misstating (1)** 30:4
**Mitchell (10)** 9:9 13:12 69:17 70:14 80:21 84:13,15,18 85:13,15
**Mitchell's (4)** 69:25 70:22 84:23 85:21
**moment (2)** 17:14 24:4
**Monica (1)** 3:6
**month (2)** 61:3 62:3
**monthly (1)** 50:15
**Morgan (1)** 72:9
**morning (1)** 5:24
**motion (1)** 22:11
**move (8)** 16:18 19:10 51:17 55:20 56:13 57:3 59:9 60:17
**moving (2)** 18:13 20:20

N

**name (5)** 5:11 14:10,12 89:22 90:2
**narrow (1)** 25:7
**necessarily (1)** 55:1
**necessary (1)** 54:9
**need (19)** 12:20 20:6 27:19 31:13 32:4 36:22 38:9,12 39:1,3,24 39:25 42:17 50:17 51:15 57:3 78:8 84:3 86:15
**needed (10)** 34:11,16 38:13 39:12 39:15 51:10,17,17 64:10 68:19
**needing (1)** 76:8
**needs (4)** 6:7 28:5 32:7,8
**negotiate (4)** 55:13,18,24 56:25
**negotiating (1)** 15:4
**negotiation (1)** 15:13
**Neiman (3)** 72:2,16,19
**neither (1)** 89:17
**net (1)** 20:21
**Nevada (1)** 3:23
**never (4)** 17:22 74:9 77:21 85:20
**new (6)** 6:22 38:9 59:24 60:1 75:15 76:8
**newly (1)** 75:15
**Nick (1)** 87:16
**Nicolas (9)** 1:10 2:10 4:3,8 5:4,13 87:18 88:9,20
**no-brainer (1)** 46:14
**nonrecourse (2)** 46:9,13
**nonresponsive (1)** 60:18
**Notary (1)** 90:25
**note (3)** 11:22,23 64:3
**noted (1)** 88:12
**notes (1)** 68:21
**notice (14)** 4:9,11 10:17,22 45:1 54:16 57:9 61:5,15 74:8 81:9,19,21 86:25
**November (7)** 8:21 42:22,23 43:1,5 43:12 63:14
**number (6)** 20:7,22,23 62:21 77:12,20

O

**object (8)** 16:12 18:12 74:7 79:10 81:2,19 86:15 86:17
**objected (1)** 30:2
**objecting (1)** 30:6
**objection (11)** 20:16 44:25 47:10 52:22 54:20 61:8,13 62:4 73:12 74:24 81:8
**objections (2)** 9:1 52:1
**objector (1)** 55:25
**obligations (1)** 59:25
**obligor (5)** 55:13,17 56:4 59:25 60:1
**obligors (1)** 41:17
**obviously (3)** 66:15,22 83:9
**October (8)** 54:11 55:22 56:17 57:6 62:14 80:23 84:15 85:23
**OFFICIAL (1)** 3:2
**Oh (1)** 61:9
**okay (25)** 8:6 10:14 24:6,10 25:8,23 27:12,21 30:21 31:4,15 36:20 38:17 44:2 48:3,6 52:13 53:3 58:10 77:6 78:1,15 86:14 86:14 87:5

**onboarding (3)**
7:1,3,9
**once (3)**
11:19 45:22 62:14
**Ongoing (1)**
74:24
**opinion (1)**
49:11
**opportunities (2)**
6:22,24
**opportunity (1)**
8:15
**option (7)**
39:7,19 59:14,15,21 60:12,14
**options (3)**
38:8 39:8,9
**opus (114)**
3:19 11:22,23 14:1,3 21:11,17 22:3,11,20 22:21,23,25 23:4,11 25:22,23 26:13,14 27:9,12 29:3,15 31:4,14 32:7,23 33:8,8 34:6,21 35:24 36:19,20 37:6 37:16 38:2,13 39:5 39:14,17,20,22 44:20,24 45:8,16,25 46:24 47:7,23 48:13 50:20,23 51:1,9,20 52:14,19 53:1,3,13 53:20,22,25 54:3,11 55:21 56:3,5,8,12 56:18 57:5 58:23,23 59:2,11,19 62:1,7 62:10,13,15 63:2,18 68:2,16,17,24 69:5 70:2,15 71:9,16 74:12,13,18,21 75:3 75:7 76:3 77:14,18 78:5,16,23 79:7,15 79:22 86:7,12,13 87:4
**oral (7)**
4:9,12 10:17 25:10,19 30:10,22
**orally (2)**
23:20 25:15
**order (6)**
5:16,17 11:25 42:7,18 66:11
**organization (1)**
15:24
**original (1)**
89:13
**outlined (1)**
42:12
**outside (3)**
67:11 82:1,3
**outstanding (1)**
59:3
**owed (3)**
34:6 45:8,10
**owned (2)**
42:6 75:16
**owner (2)**
68:3,4
**owns (1)**
17:5

**P**

**P-A-P-A-V-A-S-I-L...**
14:13
**p.m (3)**
26:14 32:14 87:19
**PACHULSKI (1)**
3:3
**page (25)**
4:2,7 11:2,9,13,20 12:6 24:5 34:1 40:13,18,19,20 41:5 44:8,9 66:15,15 67:1,20,25 68:1,22 84:14 85:3
**paid (4)**
38:22 53:13,19,25
**Papa (3)**
14:17 19:17,20
**Papavasiliou (5)**
14:8,12 15:11,17 20:13
**Papavasiliou's (1)**
14:15
**paragraph (9)**
22:15 23:8,15 47:5 48:8 55:10 73:25 74:17 75:12
**Parkway (1)**
3:22
**part (20)**
7:6 9:15,15,19,21 10:2 15:1 17:22,23 18:2 31:20 32:22 42:18 43:11 55:11 57:16 76:24 84:14 84:20 85:14
**participant (1)**
84:8
**participated (2)**
81:13,17
**particular (6)**
9:23 14:7 15:3 20:17 21:24 49:17
**particularly (1)**
28:17
**parties (3)**
41:10,16,23
**Partners (1)**
7:6
**parts (1)**
61:10
**party (3)**
31:5 35:12 89:19
**past-due (1)**
53:5
**PATRICIA (3)**
1:13 2:13 89:24
**pay (13)**
31:17 32:2,4,5 38:10 38:11,14 39:1,2,20 45:4 46:18 68:19
**paying (4)**
26:3 35:23 39:19 59:12
**payment (7)**
26:20 27:6 31:24 32:21 33:4 34:14 51:3
**payments (6)**
50:10,12,19,23 53:16 53:17
**payoff (4)**
26:22 38:13 39:21,23
**pays (1)**
31:9
**penalty (1)**
88:10
**pending (1)**
58:9
**penny (1)**
53:25
**people (4)**
12:20 14:4,6 68:8
**percent (2)**
20:4 68:14
**percentage (1)**
68:14
**perfectly (1)**
33:16
**performing (2)**
6:23 16:5
**period (2)**
7:7 59:17
**periodic (1)**
50:9
**perjury (1)**
88:10
**permission (2)**
74:18 77:17
**person (5)**
13:4 14:8 33:15 41:18 49:10
**personal (1)**
54:18
**personally (1)**
81:13
**perspective (1)**
66:4
**pertains (1)**
89:12
**Pg (1)**
90:5
**phone (10)**
3:13,14,21 12:21,23 13:5 47:14,20 49:24 81:14
**pick (3)**
47:14,20 61:10
**picture (2)**
67:21,21
**pictures (1)**
66:24
**PIPER (1)**
3:11
**place (3)**
13:10 82:22 89:5
**Plaintiffs (1)**
2:11
**plan (7)**
36:1,2,6,7 38:4,11 66:23
**please (16)**
5:11 27:3,25 28:3 31:22,23 32:19,20 34:12,13 35:14 37:4 37:18 69:3 71:21 78:14
**point (10)**
10:20 12:12 17:14 32:1 43:3 55:18 69:25 70:22,23 81:20
**pointed (1)**
26:11
**Polaroid (4)**
70:1,4,15 71:8
**position (2)**
59:20 66:10
**possible (2)**
44:18 79:2
**post-closing (3)**
66:23 70:3 71:10
**potentially (2)**
19:16 46:3
**preparation (4)**
21:5,15 43:17 65:18
**prepare (1)**
12:4
**prepared (3)**
18:24 59:2 65:15
**present (4)**
6:19 13:4 53:24 63:25
**presented (2)**
9:24 65:23
**preventing (1)**
74:15
**previous (1)**
31:6
**previously (3)**
24:1 59:3 70:21
**principal (3)**
34:7 45:18 53:16
**printed (1)**
5:23
**prior (23)**
6:13 7:13 10:12 11:2 17:3 22:3,4,7 23:10 35:8,15 37:1 38:3 44:19,22 45:21 76:19 77:16 78:3,22 79:7,23 89:7
**priority (1)**
59:7
**private (1)**
7:6
**privileged (2)**
12:10 21:2
**probably (2)**
15:6 62:19
**problem (2)**
30:18 84:17
**proceed (2)**
16:14 18:20
**proceedings (4)**
89:4,6,8,14
**process (10)**
8:22,23 9:16,19 16:8 38:7,22 49:2,2 66:9
**produced (6)**
58:1 65:8,25 83:7,13 83:16
**production (3)**
64:11 76:7 83:8
**project (12)**
38:20 44:15 45:15 46:9,10 55:14,17 56:1 66:25 83:3,6 83:12
**projects (2)**

63:1 67:9
**promotional (1)**
67:21
**properties (1)**
66:25
**property (1)**
43:4
**proprietary (1)**
67:12
**provide (4)**
28:1 32:8,9 34:19
**provided (8)**
8:18 12:14 33:6 46:5 68:24 69:5 73:17 85:13
**provides (1)**
33:3
**Public (1)**
90:25
**pure (1)**
46:9
**purpose (3)**
63:3 75:18,22
**pursue (1)**
39:8
**put (4)**
10:7 36:23 40:14 78:3
**puts (1)**
56:11

**Q**

**question (38)**
7:20 8:8 16:18 18:17 18:25 19:12 24:14 27:12,21 30:2 31:14 31:14 33:5,6 37:18 52:2,5,24 55:2 57:10 58:8,9 61:20 66:20 71:2 73:15 77:3 78:11,15,18,19 78:20,20,24 79:6 83:17,19 86:18
**questioning (1)**
30:7
**questions (8)**
19:9 61:11 83:11,15 85:10 87:12,14,15
**quick (1)**
40:8
**quickly (1)**
63:21

**R**

**Rachel (2)**
3:14 12:22
**raised (1)**
24:21
**reach (2)**
39:4 59:1
**reached (5)**
23:12 36:24 38:15 47:8,23
**reaching (2)**
56:14 63:2
**read (13)**
23:16 33:11,14 47:16 47:19 54:9,23 57:1 69:4 78:21 85:2 88:10 90:5
**reading (1)**
41:13
**reads (3)**
55:11 70:1 90:5
**ready (14)**
20:24 24:8,10 26:21 27:4 28:1,4 31:23 32:5,20 34:13,20 46:17 64:24
**realize (1)**
59:4
**realized (2)**
36:16 48:22
**really (4)**
51:17 55:4,18 57:16
**reason (5)**
36:8 38:15 44:15 57:16 90:5
**recall (14)**
15:6 20:3,5 21:16,19 21:21,23 43:23,25 46:3 47:18 48:17 49:22 62:9
**receive (2)**
56:10 57:2
**received (5)**
15:21 33:19 46:25 51:1 54:2
**recess (3)**
44:3 65:1 87:10
**recognize (4)**
24:3,17 25:4,5
**recollection (7)**
21:6,12 37:9 42:20 43:9,13 78:12
**record (18)**
5:21 11:1 18:19 19:2 19:5 23:16 24:15 44:5 52:1 54:15 58:21 61:15,19 69:16 80:9 82:17 89:8,11
**redacted (2)**
66:2 67:3
**redactions (4)**
66:1,22 67:4,15
**reference (1)**
67:24
**references (1)**
67:19
**referring (6)**
22:4 28:17 32:12 33:13,25 54:4
**refers (1)**
73:15
**refine (1)**
55:2
**refreshed (2)**
21:5,12
**regard (3)**
12:12 14:2 28:21
**regarding (1)**
27:5
**regardless (1)**
14:3
**regards (6)**
9:22 15:3,15 16:3 33:19 77:21
**relate (1)**
67:9
**related (9)**
21:8 43:10 46:4 55:14 55:17 66:7 67:7,10 83:6
**relation (5)**
29:12 50:4 62:11 71:20 84:23
**relative (1)**
89:18
**relatively (2)**
20:2 62:23
**relevance (1)**
19:2
**relevant (4)**
16:16 19:3,5 83:10
**remember (3)**
42:17 50:14,16
**repay (3)**
59:2 60:2,12
**repayment (2)**
59:14 60:5
**repeat (3)**
31:3 66:19 84:10
**report (1)**
9:7
**REPORTED (1)**
1:13
**reporter (4)**
2:14 5:6 71:2 89:2
**reports (1)**
16:6
**represent (4)**
13:1 44:12 54:25 57:25
**representative (3)**
10:18 11:12 56:7
**Representatives (2)**
4:10,12
**Republic (1)**
70:7
**request (3)**
26:22 34:18 83:8
**requested (2)**
46:20 89:16
**require (1)**
50:9
**required (2)**
50:12 64:4
**requires (1)**
39:16
**reserve (1)**
67:14
**resolve (1)**
61:17
**resolved (1)**
76:12
**respect (31)**
7:18 8:3,4 9:8,13 11:12 12:5 13:8 14:16 15:12 28:24 35:16 37:2 59:11 62:2 67:20 68:16 69:1 71:14 73:11 76:21,25 77:8 78:4 78:23 79:4,7,9,22 80:23 81:7
**respond (5)**
55:21 56:24 57:5 60:21 61:13
**responded (2)**
49:16 57:13
**response (12)**
18:21 43:18 49:15 58:2,4 61:2,24 62:1 83:8 85:12,15,21
**responsibilities (3)**
8:4 15:12,25
**responsibility (5)**
9:12,25 22:22 41:19 41:21
**responsible (1)**
68:5
**retrospect (1)**
56:23
**revenue (2)**
16:10 18:5
**review (2)**
43:17 89:15
**reviewed (1)**
65:24
**right (45)**
7:9 8:9 9:5 15:9 23:6 25:11,12 26:15 32:15 33:22 34:2 35:21 37:13,22,25 38:1 40:25 42:23 43:15 52:16 53:17 53:22 60:6,7,19 61:14 64:22,23 68:5 68:6,9,10 69:19,20 69:23 70:23 71:18 72:10,11,14,15 75:17 84:17 85:4 86:14
**rights (28)**
16:20,23,24 17:2,3,5 17:8,16,21 18:1,6,9 18:10 19:15 20:14 20:21 35:1 63:8,11 73:8,10,21,23 74:4 75:4,9,15 85:1
**ROBERT (1)**
3:21
**role (4)**
65:18,21 80:18 81:6
**rolling (2)**
37:24 38:3
**room (2)**
12:20 44:16
**ROSELL (1)**
3:5
**running (1)**
54:21
**Runway (1)**
66:25

**S**

**Saks (1)**
36:25
**sale (29)**
9:1 15:8 16:8,10 17:20 18:1,3,4,5 20:14 22:5 34:22,23 34:25 35:1,2,4 41:10 42:2,7,18 43:21 55:12 75:4,8 81:7 82:8,10 85:24
**sales (8)**
15:4,14 16:5 17:24 19:22 80:24 84:25 85:19

**Santa (1)**
3:6
**SARSA (4)**
4:3 87:18 88:9,20
**sat (3)**
81:12 83:23 84:7
**satisfaction (1)**
83:2
**saved (1)**
85:10
**saw (3)**
24:13 46:19 58:2
**saying (5)**
32:19 50:4 85:22 86:21,25
**says (17)**
23:10 26:9 27:2,3 28:18 31:22 32:14 32:23 33:8 34:4,12 34:15 37:17 41:2 44:12 57:2 68:2
**scene (1)**
19:12
**SCHULER (3)**
1:13 2:13 89:24
**scope (14)**
44:25 54:15 57:9 61:5 61:11 67:12 74:8 81:3,9 82:2,3 84:2 86:17 87:1
**scratch (1)**
56:24
**second (7)**
40:13,18,20,22 41:6 69:3 73:25
**Section (1)**
83:4
**secured (1)**
23:5
**see (21)**
16:15 18:8 19:19 24:17 25:4 40:15 41:13 42:11 43:16 43:24 48:12 58:4 60:8,24 61:2,24 62:1,7,25 67:20,22
**seeing (2)**
43:23 46:3
**seen (15)**
19:13 20:1 22:13 24:11 29:1 43:25 58:19 62:9,10 64:1 65:9 69:14 72:4 75:24 80:4
**sell (3)**
74:19 86:3,8
**selling (5)**
74:2,5,22 85:25 87:6
**send (6)**
26:21 28:1,6 31:23 32:20 34:13
**sending (2)**
27:6 44:17
**sends (2)**
26:19,20
**sense (1)**
79:2
**sensitive (1)**
33:18
**sent (10)**
19:20,25 26:12 32:13 32:18 38:14 39:22 48:13 56:19 62:15
**sentence (3)**
31:12 55:11 60:18
**separate (1)**
15:25
**separating (1)**
14:1
**September (4)**
72:13 73:9 74:3 75:13
**series (9)**
9:18 73:7 74:2,6,19 74:22 75:5,10 85:17
**set (3)**
19:12 26:18 89:5
**shake (1)**
32:6
**SHEET (1)**
90:1
**short (4)**
39:10 57:11 76:11 87:8
**shorthand (3)**
2:14 89:1,9
**show (2)**
66:14 84:16
**showed (1)**
12:13
**showing (2)**
19:21 85:7
**shows (1)**
22:2
**side (2)**
42:8 46:6
**Signature (1)**
90:21
**signed (4)**
29:7,13 32:3 60:11
**significantly (1)**
18:5
**silence (1)**
54:19
**similar (1)**
24:16
**simple (3)**
28:2 78:3,22
**simpler (1)**
60:13
**simplification (1)**
36:13
**simplify (1)**
36:9
**simply (2)**
38:22 59:12
**sir (8)**
5:12 12:4 44:6 63:20 72:4 78:8 80:2 85:22
**sit (1)**
83:20
**situation (5)**
9:3,3,4 20:18 38:6
**small (1)**
15:19
**SNELL (1)**
3:20
**sold (5)**
16:24,25 17:3,9,10
**somebody (2)**
43:19 48:13
**soon (1)**
44:18
**sorry (8)**
11:18,22 12:22 17:19 46:16 70:19,25 77:3
**sort (1)**
66:18
**sorted (3)**
59:6 76:17,18
**sounds (1)**
59:4
**sourcing (1)**
6:22
**speak (1)**
24:10
**speaking (1)**
70:20
**special (3)**
22:21 75:18,21
**specific (1)**
39:24
**specifically (1)**
27:9
**specify (5)**
7:20 13:25 37:18 55:4 84:21
**speculate (1)**
50:17
**speculating (1)**
56:18
**speculation (1)**
47:11
**spell (1)**
14:9
**SPV (9)**
42:6,7,8 75:15,19,21 75:25 76:3,6
**stalking (4)**
8:16,18 9:23 14:25
**stamped (11)**
4:14,15,16,18,19 44:9 58:18 65:8 68:1 69:13 72:1
**stand (2)**
64:24 75:21
**standing (1)**
61:7
**standpoint (1)**
73:19
**STANG (1)**
3:3
**Stars (2)**
2:11 3:15
**start (1)**
6:16
**started (4)**
6:8,10 8:13 34:17
**starting (1)**
36:16
**starts (1)**
33:13
**state (6)**
5:11 33:1,22 54:15 88:17 89:2
**stated (2)**
27:10 61:13
**statement (6)**
23:15,16 49:19 55:15 55:24 56:2
**STATES (2)**
1:1 2:1
**stating (1)**
61:19
**steps (1)**
68:21
**stick (1)**
81:21
**stipulation (1)**
49:11
**stop (5)**
30:20 36:12 63:15 75:17 85:25
**strategy (1)**
59:11
**streams (2)**
62:22 65:13
**strike (9)**
22:15 26:6 43:3 45:23 47:15 52:8 60:17 61:25 74:17
**structure (7)**
36:10,10,14 37:11,15 41:10 43:20
**structured (2)**
34:23,24
**structuring (1)**
41:20
**stuff (2)**
54:25 66:8
**subordinate (1)**
76:2
**subscribed (2)**
89:22 90:22
**subsequent (7)**
17:15,16,21 18:4,10 19:23 41:4
**subsequently (2)**
25:20 33:12
**substance (2)**
55:23 56:7
**suggested (1)**
61:12
**suggesting (1)**
30:5
**Suite (1)**
2:11
**sum (1)**
29:14
**summarize (2)**
6:18 37:22
**summary (1)**
6:2
**Sun (34)**
35:10,16,19 36:17 37:2,8,21,23,24 38:4 41:11 64:5,15 64:18 72:8,10,12,16 76:2,13,14,21,24,25 77:9,11,16,19 78:4 78:16,23 79:6,12,22
**support (2)**
22:11 68:7
**sure (16)**
6:20 7:11,21 9:14,20 10:1 20:4 25:22 37:5 39:13 52:7 55:9 57:15 66:5,19 67:6
**sworn (3)**

5:5 89:7 90:22

**T**

**T-A-R-A-K (1)**
80:12
**table (3)**
39:20,22 60:15
**tackling (1)**
63:1
**take (13)**
11:9 24:4 27:17 38:13 40:8 44:1 54:8,9 59:25 67:17 71:4 74:11 87:8
**taken (6)**
2:10 44:3 48:23 82:21 87:10 89:4
**talk (8)**
13:12 19:1,18 24:8 48:8 71:2 81:25 82:4
**talked (3)**
20:12 30:9,10
**talking (11)**
35:6 37:20,23 40:16 40:24 42:15 52:10 82:5,7,9,10
**Tarak (2)**
80:11,13
**task (3)**
68:4,9,16
**tasks (1)**
68:2
**tax (12)**
35:24 37:5,11,12 38:3 44:14 68:23 69:1,4 70:2,15 71:9
**TBD (1)**
68:11
**team (6)**
15:19 19:21 20:1 62:23 65:13,22
**technically (1)**
64:9
**telephone (1)**
84:19
**television (1)**
73:7
**tell (11)**
25:20 33:10,17 34:9 37:22 38:2 54:10 66:3 74:21 78:11,13
**terms (24)**
15:24 20:24 25:21 26:8,10,18 27:3,8 27:18,20 28:19 29:18 31:18 32:15 33:9 37:16 41:3 46:4,5,7 50:13 78:3 78:22 79:18
**Terrence (1)**
72:2
**testified (4)**
5:6 29:20 30:3 77:7
**testifying (1)**
89:7
**testimony (8)**
20:9 30:4 51:4,24 52:16 56:3 88:13 89:11
**Texas (1)**
84:16
**text (3)**
24:16,17 25:4
**thank (6)**
11:7 12:2 32:6 67:13 73:4 87:16
**Thanks (1)**
44:18
**thing (5)**
46:8 50:3,3 51:11 64:2
**things (13)**
7:11 25:7 29:19,21,25 33:17 54:24 59:13 60:13 62:20 66:8 76:16 77:12
**think (37)**
7:12 18:13,16 19:2,20 20:5 25:3 38:5 39:11 43:9,9,11,15 49:8,16 55:3 56:9 56:17,18 57:2,8,13 61:4 62:8,16,21 63:5,5,14 72:22 73:16 76:4 82:1 83:22 84:21,24 85:16
**thinking (1)**
14:7
**third (3)**
44:8 68:1 75:12
**thought (4)**
14:19 35:23 83:9 85:9
**three (2)**
8:7 48:18
**thrown (1)**
24:18
**Thursday (2)**
26:14 32:13
**tight (3)**
30:5,10 62:23
**time (22)**
7:10 8:17,19 17:14,15 22:1,1 32:2 36:15 39:11 46:19 48:23 54:9 56:10 59:17 62:14 67:15 73:18 73:18,22 87:12 89:5
**timing (1)**
34:19
**today (8)**
17:7 20:9 28:23 29:4 36:7 63:9,19 75:18
**told (4)**
13:9 48:20 49:9 57:18
**topic (2)**
11:1 18:14
**topics (5)**
11:13 12:5 16:14 18:13 82:18
**total (3)**
20:6 29:14 34:5
**tractive (1)**
15:22
**transaction (3)**
42:12,14 55:12
**transcribed (1)**
89:10
**transcript (4)**
88:11 89:11,13,15
**treated (1)**
38:21
**treating (2)**
56:21 59:7
**true (4)**
23:16 55:15 88:14 89:11
**Trust (33)**
35:10,16,19 36:17 37:2,8,21,23,24 38:4 41:11 64:5,15 64:18 72:8,10,12,17 76:2,13,14,21,25 77:9,11,16,19 78:4 78:16,23 79:6,12,22
**Trust's (1)**
76:24
**truth (1)**
57:21
**try (6)**
16:17 25:7 37:21 61:12,12 77:5
**trying (8)**
27:7 30:2,4 37:19 56:13 63:6 86:3,8
**turn (3)**
23:25 40:3,13
**TV (1)**
85:17
**TWC (29)**
23:1 28:8,24 35:2,16 35:20 36:10 42:16 44:13,16,24 46:2 50:9,13,19,23 51:5 51:21,22 52:21 53:12,20 54:1 61:15 62:2 63:17 64:17 73:6,8
**two (6)**
16:4 32:1 38:7 39:8,9 77:10
**two-page (1)**
69:12

**U**

**Um-hmm (2)**
41:12 58:3
**unavailable (1)**
44:16
**undersigned (1)**
89:1
**understand (7)**
18:17 27:7 37:19 38:6 48:25 51:7 64:19
**understanding (9)**
11:21,25 16:4 17:7,12 28:4 76:23,25 79:3
**understood (1)**
51:4
**UNITED (2)**
1:1 2:1
**unrelated (1)**
59:6
**UNSECURED (1)**
3:2
**untrue (1)**
54:13
**update (1)**
80:24
**upside (1)**
85:6
**usual (1)**
85:17
**usually (1)**
59:24

**V**

**vague (6)**
13:23 28:10 42:3 43:6 52:22 79:10
**valuable (1)**
15:20
**value (4)**
17:23,23 18:2 46:11
**various (2)**
65:12,14
**Vegas (1)**
3:23
**Vehicle (2)**
75:18,22
**verbal (2)**
30:13 62:6
**verbatim (1)**
89:8
**version (2)**
6:6 25:3
**veteran (1)**
80:13
**Viacom (1)**
17:9
**view (1)**
9:24
**viewed (1)**
25:2
**Virginia (1)**
72:3
**Vitae (1)**
4:8
**voicemail (1)**
41:8
**VP (4)**
6:21 69:22,22,23

**W**

**Waco (129)**
9:13,14,22,25 10:1 13:17,22 14:1,2,16 15:3,12,15,17,20,21 16:11 17:4,5 18:9 18:10 19:15 20:14 20:18 21:6,7,11,16 21:17,17 23:1,5,13 28:8,24 34:23,25 35:10,17,20 37:2 41:16,17 42:2,2,6 42:16,20,25 43:4,11 44:14,24 45:15 47:8 47:24 48:15 50:9,13 50:19,23 51:5,22,22 52:21 53:12,21 54:1 55:14,17,25 59:7 61:15 62:2,24 63:8 63:11,17 64:17,20 66:7,8,15,25 67:9 67:10,20,22,24 68:23 69:1,4 70:2 70:15 71:9,14 73:6 73:11 74:5,11,19,22 75:4,10,15,18,25

76:21 77:8,18 78:5 79:7 80:23 81:7 82:6,8,10,21,24 83:6,20,24 84:18 85:1,24 86:1,3,8 87:6
**Waco-related (1)** 10:1
**wait (1)** 58:9
**want (17)** 13:25 18:15 21:3 24:20 32:7 38:23 48:4,17 54:25 55:4 58:14 60:7 78:12 81:25 82:15 84:11 87:2
**wanted (7)** 6:24 9:21,24 10:3 37:5 49:1,4
**wants (1)** 84:16
**wasn't (1)** 66:14
**way (13)** 7:12 12:1 27:11 34:17 46:12 57:7 59:9,18 60:15 65:12 67:9 81:18 85:4
**ways (1)** 8:7
**we'll (2)** 16:18 36:13
**we're (11)** 10:21 16:13 18:13,20 19:9 24:19 27:25 39:5 66:21 82:7 87:9
**website (1)** 6:3
**week (2)** 10:13 63:23
**Weinstein (11)** 1:5 2:5 7:14,18,22 22:5 35:5 73:10 74:4 80:16 82:11
**West (5)** 70:3,10,12,16 71:10
**whatsoever (3)** 28:20 49:22 53:14
**WHEREOF (1)** 89:21
**widest (2)** 77:1 79:2
**WILMER (1)** 3:20
**window (3)** 17:15,24 19:23
**wish (1)** 81:21
**witness (39)** 4:2 5:5 12:12,22 13:25 14:11 16:15 16:19 20:17 24:6 25:5 28:12 29:21 42:5 43:8 45:3 47:12 48:3,6 52:4 52:25 54:23 57:11 58:10 60:25 61:20 62:6 72:22 73:15 74:9 75:1 79:12 81:1,10,24 82:1 84:3,5 89:21
**witnesses (1)** 89:6
**wonder (1)** 14:18
**word (2)** 77:2 79:1
**words (1)** 31:6
**work (7)** 7:7 9:8 62:22 65:13 66:23 71:13,14
**worked (3)** 6:22 7:1 62:22
**working (2)** 8:25 65:13
**works (2)** 27:11 33:16
**write (1)** 49:8
**writes (9)** 29:17 41:8 44:11 58:25 73:6 74:1 75:14 84:13,16
**writing (15)** 23:21,22 25:16,18,20 30:13,23 31:2,3,13 31:19 49:13 52:15 52:17 62:8
**writings (1)** 29:24
**written (11)** 28:7 29:15 30:11,13 30:15 31:1 32:10,11 32:17 33:21 79:21
**wrong (3)** 25:13 34:9 59:23
**wrote (2)** 70:14 71:8

**X**

**X (1)** 89:15

**Y**

**Y (3)** 1:13 2:13 89:24
**yeah (5)** 40:5 54:3 55:8 70:19 72:22
**year (1)** 62:21
**years (1)** 6:7
**Yellowstone (1)** 66:25
**yesterday (4)** 12:7 13:5,10 24:13
**Yup (1)** 69:24

**Z**

**Zaks (7)** 26:13 29:16 33:14 40:16 48:19,21 58:23
**ZIEHL (1)** 3:3

**0**

**1**

**1 (3)** 12:13 67:20 83:7
**10 (5)** 4:9,11 23:14 47:17 48:16
**10:07 (1)** 41:7
**10:30 (2)** 2:12 5:2
**10:52 (1)** 44:10
**100 (1)** 20:4
**1002 (1)** 44:9
**1010 (1)** 58:18
**10100 (1)** 3:6
**11 (3)** 1:5 2:5 6:7
**11949 (3)** 1:13 2:14 89:25
**12 (33)** 22:15 23:8,15 26:14 29:17,25 30:16 31:1 32:13 44:10,19,22 45:7,21 46:21 47:5 48:8 50:18 51:6,19 52:8,11,13 53:9,12 53:21 54:5,13 55:11 57:6 59:16 74:12 79:17
**12:22 (1)** 32:19
**120 (1)** 42:18
**12th (38)** 21:25 23:19,21,22 25:10,19 29:11,13 36:8,25 37:1,16 38:2,15 39:8,12,15 39:16,18 40:2 46:18 46:24 48:23 49:5,12 49:14,19 50:1,6 51:8,16,18 52:17 56:14 57:4 60:10 64:25 79:14
**13 (14)** 7:25 32:19 33:25 35:9 35:15 41:22 43:19 43:21 52:15 59:16 72:13 73:9 74:3 75:13
**13th (15)** 22:7 26:19 28:7,12,20 29:14 33:3 34:21 35:8 41:7,15 42:5 42:13 46:22 52:18
**14 (1)** 24:25
**156009 (1)** 1:23
**16 (1)** 76:14
**16th (1)** 33:14
**17 (12)** 54:11 55:22 57:6 64:13,16,22 65:16 66:24 68:15 69:2,7 76:14
**17th (3)** 56:17 64:6,12
**18-10601 (2)** 1:6 2:6

**2**

**2 (3)** 40:18 68:22 85:3
**2.3 (2)** 83:4 85:18
**2:27 (1)** 87:19
**20 (5)** 1:12 2:13 5:1 11:3 88:16
**2000 (2)** 2:11 3:15
**2004 (2)** 6:8,11
**2013 (3)** 50:18 51:19 52:8
**2015 (2)** 6:17,19
**2018 (61)** 7:25 15:7 26:14 29:17 29:25 30:16 31:1 32:13,19 33:25 35:9 35:15 41:22 42:23 43:1,5,19,22 44:10 44:19,23 45:7,21 46:21 51:6 52:11,13 53:9,12,21 54:11 55:22 57:6 59:16,16 62:14 63:14 64:13 64:16,22 65:16 66:24 68:15 69:2,7 72:13 73:9 74:3 75:13 76:15,16,20 77:7,16 78:3,22 79:8,24 80:23 84:15 85:23
**2019 (13)** 1:12 2:13 5:1 23:14 47:17 48:16 58:24 59:10 60:22 61:3 62:3 89:23 90:23
**21 (1)** 45:14
**22:05 (1)** 84:15
**24 (3)** 4:9 10:4,8
**25 (8)** 4:11 10:22,23 11:4,9 11:13,20 12:6
**250 (3)** 28:2 31:17 32:21
**27 (1)** 89:23

**3**

**3 (15)** 11:2,2,9,13,20 12:6 22:8,10,13 23:9

47:3,6,20 66:15 68:2
**30 (6)**
4:15 65:2,7,11,19 68:22
**32 (5)**
4:16 69:9,12,14,16
**33 (8)**
4:18 71:21,22,25 72:4 72:6,14 75:14
**35 (6)**
4:14 58:11,17,19,21 60:4
**3883 (1)**
3:22
**39 (6)**
4:19 80:1,4,6,9 84:14

**4**

**4 (11)**
11:21 24:22 40:3,14 40:18,20 41:5 44:6 44:8 83:2,5
**400 (1)**
2:11
**43 (7)**
4:8 5:15,17,18,19,24 5:25

**5**

**5 (26)**
4:4,8 11:2 23:25 24:2 24:3,11,23 26:5,7 26:18 27:8 31:21 32:23 33:7,13,20 34:1 40:17,25 58:24 59:10 60:22 83:2,4 83:5
**50 (1)**
68:14
**515 (2)**
4:19 80:10
**58 (1)**
4:14

**6**

**6 (2)**
16:19 20:20
**6:40 (2)**
26:14 32:14
**65 (1)**
4:15
**69 (1)**
4:16

**7**

**7 (3)**
80:23 84:15 85:23
**71 (1)**
4:18

**8**

**80 (1)**
4:19
**89169 (1)**
3:23

**9**

**9:54 (1)**
34:1
**90067 (2)**
3:7,16

*Exhibit B-1*

**Exhibits Used in Darsa Deposition**[1]

[1] Unless otherwise noted, the exhibits used in the Jarvis Deposition were also used in the Darsa Deposition. It appears as if the Committee's exhibits were not presented in order or sequentially.

**Exhibit 24/25**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| In re:<br><br>THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-10601 (MFW)<br><br>Jointly Administered<br>**Re: Docket No. 2020** |
|---|---|

**AMENDED NOTICE OF DEPOSITION UPON ORAL EXAMINATION OF DESIGNATED REPRESENTATIVE(S) OF LANTERN ENTERTAINMENT, LLC**

**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, made applicable herein by Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, the Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors in possession will take the deposition upon oral examination of the designated representative(s) of Lantern Entertainment, LLC with respect to the subject matters described on Exhibit A annexed hereto.

**PLEASE TAKE FURTHER NOTICE** that the deposition will take place on **February 20, 2019 at 10:30 a.m. (Pacific Time)** at the offices of DLA Piper LLP, 2000 Avenue of the Stars, Suite 400, North Tower, Los Angeles, CA 90067 or such other time and place as may be agreed to by the parties. The deposition will be taken under oath before a notary public or other person authorized by law to administer oaths. The deposition will be recorded by stenographic means, and may be videotaped.

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

Dated: February 15, 2019

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*

James I. Stang (CA Bar No. 94435)
Robert J. Feinstein (NY Bar No. 1767805)
Debra I. Grassgreen (CA Bar No. 169978)
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
E-mail: jstang@pszjlaw.com
rfeinstein@pszjlaw.com
dgrassgreen@pszjlaw.com
bsandler@pszjlaw.com
crobinson@pszjlaw.com

*Counsel for the Official Committee of Unsecured Creditors*

# EXHIBIT A

## DEFINITIONS

1.      "APA" means that certain *Asset Purchase Agreement* attached as Exhibit 1 to the Sale Order.

2.      "Bankruptcy Cases" means the above-captioned bankruptcy cases.

3.      "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any Documents, telephone conversations, discussions, meetings, text messages, e-mails, memoranda, and any other medium through which any information is conveyed or transmitted.

4.      "Concerning" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

5.      "Debtors" means the debtors and debtors in possession in the Bankruptcy Cases and any and all of their directors, managers, officers, agents, advisors, employees, representatives, staff, attorneys, and all other persons or entities acting on their behalf or under their control.

6.      "Document" means and includes all written, recorded, transcribed, or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made.  This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information.

7.      "ESI" has the meaning ascribed to it in Rules 16, 26, and 34(a) of the Federal Rules of Civil Procedure.

8.    "Lantern" means Lantern Entertainment LLC and (a) its present and former officers, directors, partners, associates, employees, servants, agents, divisions, subsidiaries, affiliates and shareholders of such Person or entity; and (b) other persons or legal or business entities acting on behalf of, or in concert with, such Person or entity, including, without limitation, present or former lawyers, accountants, advisors, and consultants.

9.    "Loan Agreement" means that certain Loan and Security Agreement (as amended, supplemented, and modified from time to time) dated August 11, 2017, by and between TWC WACO SPV, LLC, a Delaware limited liability company, and Opus Bank.

10.    "Note" means that certain Note dated August 11, 2017, signed by TWC WACO SPV, LLC, a Delaware limited liability company, in favor of Opus Bank.

11.    "Opus Bank" means Opus Bank and (a) its present and former officers, directors, partners, associates, employees, servants, agents, divisions, subsidiaries, affiliates, and shareholders of such Person or entity; and (b) other persons or legal or business entities acting on behalf of, or in concert with, such Person or entity, including, without limitation, present or former lawyers, accountants, advisors, and consultants.

12.    "Sale Order" means that certain *Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 846] entered in the Bankruptcy Cases on May 9, 2018.

13.    The "RFP" means *The Official Committee of Unsecured Creditors' First Request for Production of Documents to Lantern Entertainment LLC*, dated January 24, 2019.

**RULE 30(b)(6) DEPOSITION TOPICS**

1. All documents produced by Lantern in response to the RFP.

2. All Communications Concerning the Loan Agreement or Note, including but not limited to (a) all internal Communications Concerning the Loan Agreement or Note, (b) all Communications with Opus Bank Concerning the Loan Agreement or Note, and (c) all Communications with the Debtors Concerning the Loan Agreement or Note.

3. All written or oral agreements between Lantern and Opus Bank Concerning the Loan Agreement or Note.

4. The satisfaction or assumption by Lantern of the project level debt identified on Schedule 2.3 to the APA.

5. The assumption of any indebtedness related to the Waco project.

**Exhibit 30**

DRAFT - Private and Confidential

# Lantern Entertainment

## Post-Closing Work Plan

July 17, 2018



Confidential

LE-0000112



DRAFT - Private and Confidential
Leader
N. Darsa

Confidential

LE-0000113

# 2. Debt Financing

DRAFT - Private and Confidential

| Key | Tasks | Owner | Add'l Support | Due Date | % Done | Status | Notes / Next Steps |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| 3 | Opus Bank | Darsa | Killgore/Halpin/AG | TBD | 50% | | LE to assume the Waco tax credit backed debt provided by Opus Bank |
| | | | | | | | |

Confidential



Leader
C. Halpin

Confidential LE-0000115



Leader
C. Killgore

Confidential LE-0000116



Leader
N. Darsa

Confidential LE-0000117



Leader
J. Governale

Confidential LE-0000118



Leaders
C. Halpin/
J. Governale

Confidential LE-0000119



Leader
C. Halpin

Confidential

LE-0000120



Leader
C. Halpin

Confidential
LE-0000121



Leader
C. Halpin

Confidential LE-0000122

**Exhibit 32**

**Kandestin, Maris**

**From:** Andy Mitchell <andy.mitchell@lanterncp.com>
**Sent:** Friday, July 13, 2018 4:38 PM
**To:** Case Killgore
**Cc:** Milos Brajovic; Nicolas Darsa
**Subject:** Re: Closing

Nice work guys. Take a few hours to celebrate this milestone.

Sent from my iPhone

On Jul 13, 2018, at 1:33 PM, Case Killgore <Case.Killgore@lanternam.com> wrote:

> Wanted to provide you both and update and summary of our closing today. It looks like all wires will be crossed shortly after a herculean effort from everyone last night and today.
>
> - We are closing with $115M of funded equity and ~$195M of funded debt (between the library and production facility)
> - Adjusted cash purchase price of $208M + repayment of $56M of project debt + $13.5M of debt costs and buyer closing costs + $8.9M funded into escrow for cures
> - So post-close, we will have $12M of restricted cash and $12.4M of unrestricted cash for a total of $24.4M
> - This cash balance excludes the A&E settlement ($11.5-$12.5M) but also excludes Akin's deferred fees ($1.2M), the interim reimbursement to the estate since June 29th (estimated at $1.7M) and the additional estimated cures of ~$6M to be cleared out over the next few months
> - We are going to deal with Polaroid (FRB), Waco tax credit (Opus) and Current War Domestic (East West) post-closing also.
>
> A detailed sources and uses and funds flow is attached for your reference.
>
> Let us know if you have any questions.
>
> Case M. Killgore
> Vice President
> LANTERN ASSET MANAGEMENT <image001.jpg>
> 300 Crescent Court, Suite 1100, Dallas, TX 75201
> Office: 469-554-7935
> Mobile: 225-978-2280
> case.killgore@lanternam.com
> www.lanternam.com
>
> Note: Privileged/Confidential information may be contained in this message and may be subject to legal privilege. This electronic communication, including any information transmitted with it, is intended only for the use of the addressee(s) and is strictly confidential. Access to or use of this e-mail by anyone other than the intended recipient is unauthorized. If you are not the intended recipient (or responsible for delivery of the message to such

person), you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it. In such case, you should destroy this message, and notify us immediately. All reasonable precautions have been taken to ensure no viruses are present in this e-mail. As our company cannot accept responsibility for any loss or damage arising from the use of this e-mail or attachments we recommend that you subject these to your virus checking procedures prior to use. The views, opinions, conclusions and other information expressed in this electronic mail are not given or endorsed by the company unless otherwise indicated by an authorized representative independent of this message.

<LE Closing Statement + Wiring Instructions FINAL.xlsx>

**Exhibit 33**

**Subject:** WACO/Lantern
**Date:** Thursday, September 13, 2018 at 4:22:13 PM Pacific Daylight Time
**From:** Burke, John
**To:** Dugan, Terrence L. (terrence.dugan@morganlewis.com)
**CC:** Neiman, Marc, Virginia Longmuir

Terry:

Waco is a TWC television series to which Lantern intends to assume the rights from TWC. Opus bank has a loan of approximately $5.8 mm against the rights which includes a New Mexico tax credit of approximately $6.9 mm payable over three years with the first installment due in November 2018. Opus Bank has agreed to permit Lantern to assume the loan subject to paying $250K for accrued and unpaid interest and legal fees. Lantern wants to move ahead.

Endeavor is selling the series internationally.

Our intention is to assign the rights to a newly formed entity ("Waco SPV") owned by Lantern Entertainment and have the Waco SPV assume the Opus Bank loan. We can either (i) leave the rights at Waco SPV so that the collateral is only pledged to Opus Bank outside of the ST facility, or (ii) we can have Waco SPV assign the distribution rights to LE Distribution, the ST borrower, in which case we need ST (a) to subordinate to the Opus loan or (b) exclude the Opus rights from its collateral under the ST facility. Opus will cooperate in either structure.

One wrinkle – LE Distribution is the counterparty to the Endeavor sales agreement so if we go with alternative #1, we need to novate that agreement and replace it with an agreement with Waco SPV.

Let us know if you have a preference and we will check with Lantern.

John

**P. John Burke**
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1999 Avenue of the Stars | Suite 600 | Los Angeles, CA 90067-6022 | USA | Direct: +1 310.229.1038 | Internal: 41038
Fax: +1 310.229.1001 | jburke@akingump.com | akingump.com | Bio

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
Note: Privileged/Confidential information may be contained in this message and may be subject to legal privilege. This electronic communication, including any information transmitted with it, is intended only for the use of the addressee(s) and is strictly confidential. Access to or use of this e-mail by anyone other than the intended recipient is unauthorized. If you are not the intended recipient (or responsible for delivery of the message to such person), you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it. In such case, you should destroy this message, and notify us immediately. The views, opinions, conclusions and other information expressed in this electronic mail are not given or endorsed by the company unless otherwise indicated by an authorized representative independent of this message.

**Subject:** RE: WACO/Lantern
**Date:** Friday, September 14, 2018 at 12:35:01 PM Pacific Daylight Time
**From:** Burke, John
**To:** Dugan, Terrence L.
**CC:** Neiman, Marc, Virginia Longmuir

Okay. We will follow that structure.

**From:** Dugan, Terrence L. <terrence.dugan@morganlewis.com>
**Sent:** Friday, September 14, 2018 11:13 AM
**To:** Burke, John <jburke@AkinGump.com>
**Cc:** Neiman, Marc <mneiman@akingump.com>; Virginia Longmuir <Virginia.Longmuir@lanternent.com>
**Subject:** RE: WACO/Lantern

I connected with Alphonse on this. His preference is just to have Lantern do the acquisition outside of the Loan Parties under the Credit Agreement and then flip it into our structure once the Opus loan is paid off.

**Terrence L. Dugan**
Partner
**Morgan, Lewis & Bockius LLP**
101 Park Avenue | New York, NY 10178-0060
Direct: +1.212.309.6745 | Mobile: +1.908.377.9184 | Fax: 212.309.6001
terrence.dugan@morganlewis.com | www.morganlewis.com
Assistant: Katherine Bak | 212.309.6811 | kbak@morganlewis.com

**From:** Burke, John <jburke@AkinGump.com>
**Sent:** Thursday, September 13, 2018 7:22 PM
**To:** Dugan, Terrence L. <terrence.dugan@morganlewis.com>
**Cc:** Neiman, Marc <mneiman@akingump.com>; Virginia Longmuir <Virginia.Longmuir@lanternent.com>
**Subject:** WACO/Lantern

[EXTERNAL EMAIL]
Terry:

Waco is a TWC television series to which Lantern intends to assume the rights from TWC. Opus bank has a loan of approximately $5.8 mm against the rights which includes a New Mexico tax credit of approximately $6.9 mm payable over three years with the first installment due in November 2018. Opus Bank has agreed to permit Lantern to assume the loan subject to paying $250K for accrued and unpaid interest and legal fees. Lantern wants to move ahead.

Endeavor is selling the series internationally.

Our intention is to assign the rights to a newly formed entity ("Waco SPV") owned by Lantern Entertainment and have the Waco SPV assume the Opus Bank loan. We can either (i) leave the rights at Waco SPV so that the collateral is only pledged to Opus Bank outside of the ST facility, or (ii) we can have Waco SPV assign the distribution rights to LE Distribution, the ST borrower, in which case we need ST (a) to subordinate to the Opus loan or (b) exclude the Opus rights from its collateral under the ST facility. Opus will cooperate in either structure.

One wrinkle – LE Distribution is the counterparty to the Endeavor sales agreement so if we go with alternative #1, we need to novate that agreement and replace it with an agreement with Waco SPV.

Let us know if you have a preference and we will check with Lantern.

John

**P. John Burke**
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1999 Avenue of the Stars | Suite 600 | Los Angeles, CA 90067-6022 | USA | Direct: +1 310.229.1038 | Internal: 41038
Fax: +1 310.229.1001 | jburke@akingump.com | akingump.com | Bio

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
Note: Privileged/Confidential information may be contained in this message and may be subject to legal privilege. This electronic communication, including any information transmitted with it, is intended only for the use of the addressee(s) and is strictly confidential. Access to or use of this e-mail by anyone other than the intended recipient is unauthorized. If you are not the intended recipient (or responsible for delivery of the message to such person), you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it. In such case, you should destroy this message, and notify us immediately. The views, opinions, conclusions and other information expressed in this electronic mail are not given or endorsed by the company unless otherwise indicated by an authorized representative independent of this message.

**Exhibit 35**

**From:** Burke, John <jburke@AkinGump.com>
**To:** Jeffrey Zaks; Andrew Jarvis (ajarvis@opusbank.com)
**CC:** Hunt, Carolyn; Neiman, Marc
**Sent:** 2/5/2019 12:59:39 AM
**Subject:** [EXTERNAL]Lantern/Waco

Jeff:

Lantern asked me to reach out to let you know that Lantern is prepared to repay Opus for the outstanding loan including the fees previously discussed. I realize that assurance sounds hollow given the history with Lantern but they have now sorted out many of the unrelated issues that were distracting them from treating Waco as a priority.

Let me know if you are available to discuss if there is a way to move forward.

john

**P. John Burke**
AKIN GUMP STRAUSS HAUER & FELD LLP
1999 Avenue of the Stars | Suite 600 | Los Angeles, CA 90067-6022 | USA | Direct: +1 310.229.1038 | Internal: 41038
Fax: +1 310.229.1001 | jburke@akingump.com | akingump.com | Bio

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**Exhibit 39**

**From:** Andy Mitchell <andy.mitchell@lanterncp.com>
**Sent:** Sunday, October 7, 2018 8:31 PM
**To:** Tarak Ben Ammar <tarak@tarak.us>
**Subject:** RE: WACO | Endeavor Sales Update

---

Yes sir

Andy Mitchell - CEO/Managing Partner
Lantern Capital Partners
Office: 469-554-7901
Mobile: 214-632-1637
www.lanternam.com<http://www.lanternam.com/>

From: Tarak Ben Ammar [mailto:tarak@tarak.us]
Sent: Sunday, October 7, 2018 3:30 PM
To: Andy Mitchell <andy.mitchell@lanterncp.com>
Subject: Re: [External] WACO | Endeavor Sales Update

Of course Endeavor was a usual hyping you. Just to compare my tv series just in Europe did 2.3 million per episode. That's why we have to be in charge with our sales and never go through agents.
Sent from my iPhone

On 7 Oct 2018, at 22:05, Andy Mitchell <andy.mitchell@lanterncp.com<mailto:andy.mitchell@lanterncp.com>> wrote:
Nobody wants to buy a show about a Texas and American problem? You were right.
Sent from my iPhone

Begin forwarded message:
From: Milos Brajovic <milos.brajovic@lanterncp.com<mailto:milos.brajovic@lanterncp.com>>
Date: October 7, 2018 at 1:12:12 PM CDT
To: Chris Papavasiliou <chris.papavasiliou@lanternent.com<mailto:chris.papavasiliou@lanternent.com>>
Cc: Andy Mitchell <andy.mitchell@lanterncp.com<mailto:andy.mitchell@lanterncp.com>>, Sebastian Levy <Sebastian.Levy@lanternam.com<mailto:Sebastian.Levy@lanternam.com>>, Houston Duncan <Houston.Duncan@lanternam.com<mailto:Houston.Duncan@lanternam.com>>, Steve Beeks <steve.beeks@lanternent.com<mailto:steve.beeks@lanternent.com>>, Lauren Zalaznick <lauren.zalaznick@lanternent.com<mailto:lauren.zalaznick@lanternent.com>>, Nicolas Darsa <Nicolas.Darsa@lanternam.com<mailto:Nicolas.Darsa@lanternam.com>>, Case Killgore <Case.Killgore@lanternam.com<mailto:Case.Killgore@lanternam.com>>, Chris Halpin <Chris.Halpin@lanternam.com<mailto:Chris.Halpin@lanternam.com>>, Josh Governale <josh.governale@lanternent.com<mailto:josh.governale@lanternent.com>>
Subject: Re: [External] WACO | Endeavor Sales Update
Disaster results.
Rgs,
MVB

On Oct 7, 2018, at 1:05 PM, Chris Papavasiliou <chris.papavasiliou@lanternent.com<mailto:chris.papavasiliou@lanternent.com>> wrote:
I spoke with Gary Marenzi at Endeavor and received an update ahead of MIPCOM where they will be pushing the show. They are currently at $249K per episode and still feel confident they will achieve or get close to their base case estimate of $600K per episode. I've attached a spreadsheet they provided which breaks down offers (which are either closed or in negotiations) as well as reflects remaining open territories. Having looked at it in detail, I think it will be difficult to get close to $600K and believe they will likely land somewhere in the region of $450K, possibly $500K if they can close some of the smaller territories. It is important they sell the UK and Scandinavia. In the UK, they currently have a £90,000 (approximately $118,000) offer from ITV - the territory is valued at $100,000 Base and $150,000 High. I've recommended to Gary they move to close on it. Scandinavia is still open with a $65,000 Base and $80,000 High Est.

For a quick glance by region please see below:

SUMMARY

BASE

HIGH

OFFERS+
CLOSED

TOTAL US/CANADA

$0

$0

$0

TOTAL WESTERN/EASTERN EUROPE

$437,500

$667,500

$165,670

TOTAL MIDDLE EAST/ISRAEL/TURKEY/AFRICA

$21,000

$37,500

$5,000

TOTAL LATIN AMERICA/BRAZIL/CARIBBEAN

$50,000

$100,000

$16,667

TOTAL ASIA PACIFIC

$85,000

$175,000

$62,017

TOTAL

$593,500

$980,000

$249,353

All Best,
Chris

Chris Papavasiliou | Lantern Entertainment
T: 424.204.4796 | M: 917.574.1205
chris.papavasiliou@lanternent.com<mailto:chris.papavasiliou@lanternent.com>

Note: Privileged/Confidential information may be contained in this message and may be subject to legal privilege. This electronic communication, including any information transmitted with it, is intended only for the use of the addressee(s) and is strictly confidential. Access to or use of this e-mail by anyone other than the intended recipient is unauthorized. If you are not the intended recipient (or responsible for delivery of the message to such person), you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it. In such case, you should destroy this message, and notify us immediately. The views, opinions, conclusions and other information expressed in this electronic mail are not given or endorsed by the company unless otherwise indicated by an authorized representative independent of this message.
<WACO update for Lantern 10.5.18.xlsx>