## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE WEINSTEIN COMPANY HOLDINGS LLC., *et al.*,[1] | Case No. 18-10601 (MFW) |
| Debtors. | Jointly Administered |
| | Re: Docket No. 3032[2] |

## THIRD AMENDED DISCLOSURE STATEMENT IN SUPPORT OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (DE Bar No. 2981)
Paul N. Heath (DE Bar No. 3704)
Zachary I. Shapiro (DE Bar No. 5103)
Brett M. Haywood (DE Bar No. 6166)
David T. Queroli (DE Bar No. 6318)
One Rodney Square
920 North King Street
Wilmington, DE 19801

**CRAVATH, SWAINE & MOORE LLP**
Paul H. Zumbro (admitted *pro hac vice*)
Lauren A. Moskowitz (admitted *pro hac vice*)
Salah M. Hawkins (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

*Counsel for the Debtors*

-and-

**PACHULSKI STANG ZIEHL & JONES LLP**
James I. Stang (admitted *pro hac vice*)
Robert J. Feinstein (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
Jason H. Rosell (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
Wilmington, DE 19899 (Courier 19801)

*Counsel for the Official Committee of Unsecured Creditors*

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are 3837. The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

[2] On October 16, 2020, the Court entered an order [Docket No. 3032] authorizing the Debtors to file the Coverage Dispute Letters, copies of which are attached to the Disclosure Statement as Exhibit D, under seal.

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   NOTICE TO HOLDERS OF CLAIMS ........................................................ 2

III.  SUMMARY OVERVIEW FOR HOLDERS OF SEXUAL MISCONDUCT CLAIMS .... 4

IV.   EXPLANATION OF CHAPTER 11 .............................................................. 7
      A.    Overview of Chapter 11 ..................................................................... 7
      B.    Chapter 11 Plan .................................................................................. 8
      C.    Confirmation of a Chapter 11 Plan ................................................... 8

V.    OVERVIEW OF THE PLAN ......................................................................... 9
      A.    Summary of the Terms of the Plan .................................................. 10
            1.    Settlement of Sexual Misconduct Claims ............................ 10
            2.    Sexual Misconduct Claims Fund ........................................... 11
            3.    Liquidation Trust ................................................................... 12
            4.    Former Representatives Defense Costs ................................. 12
            5.    Seyfarth Shaw LLP's General Unsecured Claims ................ 12
            6.    Non-Released Parties' Contribution Claims ......................... 12
            7.    Substantive Consolidation ..................................................... 13
      B.    Summary of Distributions Under the Plan ....................................... 13

VI.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN ................................................... 15

VII.  HISTORY OF THE DEBTORS ................................................................... 17
      A.    History, Operations, and Business ................................................... 17
      B.    Prepetition Indebtedness ................................................................. 18
      C.    Events Leading to the Commencement of the Chapter 11 Cases ...... 20
            1.    The Allegations of Sexual Harassment and Sexual Assault Against Harvey Weinstein ........................ 20
            2.    Failed Prepetition Efforts to Sell the Debtors ..................... 21

VIII. THE DEBTORS' CHAPTER 11 CASES ..................................................... 21
      A.    Commencement of the Chapter 11 Cases ........................................ 21

B.      Appointment of the Official Committee of Unsecured Creditors ........................21

C.      Retention of Professionals ...................................................................................22

D.      Significant Business Events after the Petition Date..............................................22

    1.      First Day Motions...................................................................................22

    2.      DIP Facility............................................................................................22

    3.      Sale of Substantially All of the Debtors' Assets.....................................23

    4.      AI International and Union Bank Settlement............................................23

    5.      Assumed Contracts.................................................................................24

    6.      Guild Settlement and Guild Reserved Claims .........................................24

E.      Schedules and Establishment of Bar Dates .........................................................25

IX.     THE SETTLEMENT OF SEXUAL MISCONDUCT CLAIMS .....................................26

A.      Background and Investigation ...............................................................................26

B.      Mediation Efforts and the Initial Settlement .........................................................26

C.      Summary of the Settlement of Sexual Misconduct Claims....................................28

D.      Sexual Misconduct Claims Examiner ....................................................................30

E.      The Insurance Policies ..........................................................................................31

X.      THE CHAPTER 11 PLAN .........................................................................................35

A.      Classification and Treatment of Claims and Interests ..........................................35

    1.      Unclassified Claims – Administrative Expense Claims,  Priority Tax Claims, and Professional Fee Claims ................................................35

    2.      Classification and Treatment of Other Priority Claims (Class 1) .............36

    3.      Classification and Treatment of Secured Tax Claims (Class 2) ..............37

    4.      Classification and Treatment of Secured Claims (Class 3) .....................37

    5.      Classification and Treatment of Sexual Misconduct Claims (Class 4) ................................................................................................38

    6.      Classification and Treatment of General Unsecured Claims (Class 5) ................................................................................................40

    7.      Classification and Treatment of Intercompany Claims (Class 6) .............40

    8.      Classification and Treatment of Interests (Class 7).................................40

B.      Means for Implementation of the Plan ..................................................................41

    1.      Global Settlement...................................................................................41

    2.      The Plan Support Agreement..................................................................41

    3.      Substantive Consolidation .....................................................................41

    4.      Standards for Substantive Consolidation................................................42

|   | 5. | The Liquidation Trust | 44 |
|---|----|------------------------|-----|
|   | 6. | Claims Reconciliation Process | 49 |
|   | 7. | Distribution of Property Under the Plan | 50 |
| C. | | Injunctions and Releases | 51 |
|   | 1. | Term of Certain Bankruptcy Injunctions and Automatic Stay | 51 |
|   | 2. | The Channeling Injunction | 51 |
|   | 3. | Releases | 54 |
|   | 4. | Plan Injunction | 56 |
|   | 5. | Exculpation | 57 |
| D. | | Conditions Precedent to Confirmation and the Effective Date | 57 |
| E. | | Other Material Plan Provisions | 59 |
|   | 1. | Dissolution of the Board of Directors and Committee | 59 |
|   | 2. | Executory Contracts and Unexpired Leases Deemed Rejected | 59 |
|   | 3. | Non-discharge of the Debtors' Debts | 59 |
|   | 4. | No Recourse | 60 |
| XI. | | CONFIRMATION AND CONSUMMATION PROCEDURES | 60 |
| A. | | Overview | 60 |
| B. | | Confirmation of the Plan | 62 |
|   | 1. | Elements of Section 1129 of the Bankruptcy Code | 62 |
|   | 2. | Acceptance | 63 |
|   | 3. | Best Interests of Creditors Test | 64 |
|   | 4. | Feasibility | 65 |
| C. | | Cramdown | 66 |
|   | 1. | No Unfair Discrimination | 66 |
|   | 2. | Fair and Equitable Test | 66 |
| D. | | Effect of Confirmation | 67 |
| XII. | | CONCLUSION | 68 |

**<u>EXHIBITS</u>**

A.    Plan

B.    Liquidation Analysis

C.    Sexual Misconduct Claims Fund Procedures

D.    Coverage Dispute Letters

E.    Curriculum Vitaes of Sexual Misconduct Claims Examiners

## I.

## INTRODUCTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Company") in the above-captioned cases (the "Chapter 11 Cases") pending in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the Official Committee of Unsecured Creditors (the "Committee" and, collectively with the Debtors, the "Plan Proponents"), hereby submit this third amended disclosure statement, dated as of November 4, 2020 (the "Disclosure Statement"), pursuant to section 1125 of Title 11 of the United States Code (the "Bankruptcy Code") with respect to the *Third Amended Joint Chapter 11 Plan of Liquidation* dated as of November 4, 2020 (the "Plan"). This Disclosure Statement, as may be amended or supplemented, is to be used in connection with the solicitation of votes on the Plan by the Plan Proponents. A copy of the Plan is attached to this Disclosure Statement as Exhibit A.

THE PLAN PROPONENTS WILL BE SEEKING APPROVAL OF THIS DISCLOSURE STATEMENT AT A HEARING SCHEDULED FOR NOVEMBER 5, 2020 (THE "HEARING"). ONLY HOLDERS OF ALLOWED CLAIMS IN CLASS 4 (SEXUAL MISCONDUCT CLAIMS) AND CLASS 5 (GENERAL UNSECURED CLAIMS) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, EXCEPT FOR THE DEEMED UNIMPAIRED OTHER PRIORITY CLAIMS, SECURED TAX CLAIMS, AND SECURED CLAIMS AND DEEMED IMPAIRED INTERCOMPANY CLAIMS AND INTERESTS, THE PLAN PROPONENTS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM ALL OTHER HOLDERS OF CLAIMS AGAINST THE DEBTORS. THE PLAN PROPONENTS WILL ONLY SEEK CONFIRMATION OF THE PLAN IF CLASS 4 (SEXUAL MISCONDUCT CLAIMS) VOTES TO ACCEPT THE PLAN IN ACCORDANCE WITH SECTION 1126(C) OF THE BANKRUPTCY CODE.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLAIMS AGAINST THE DEBTORS AND TO RESOLVE THE EXTENSIVE LITIGATION PENDING IN MULTIPLE JURISDICTIONS ARISING FROM OR RELATED TO THE CONDUCT OF THE DEBTORS' FORMER CO-CHAIRMAN, HARVEY WEINSTEIN. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

> **THE COMMITTEE IS A PLAN PROPONENT. THE COMMITTEE HAS FOUR MEMBERS, TWO OF WHOM ARE HOLDERS OF SEXUAL MISCONDUCT CLAIMS. THE COMMITTEE URGES ALL HOLDERS OF SEXUAL MISCONDUCT CLAIMS TO ACCEPT THE PLAN.**

THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS. **TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE BALLOTING AGENT BY 5:00 P.M. (EASTERN TIME), ON DECEMBER 8, 2020 (THE "VOTING DEADLINE").**

**All capitalized terms used in the Disclosure Statement and not defined herein shall have the meanings ascribed thereto in the Plan. Unless otherwise stated, all references herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement**.

## II.

### NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN OR ANY OTHER APPLICABLE DOCUMENT, THE TERMS OF THE PLAN OR ANY SUCH APPLICABLE DOCUMENT SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER**

**LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.**

Each Holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting.  No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  Except for the Plan Proponents (in their capacity as such) and certain of the professionals they have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their business, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Plan Proponents.  You should not rely on any information relating to the Debtors, their business or the Plan other than that contained in this Disclosure Statement and the Exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and return the same to the address set forth on the ballot, in the enclosed, postage prepaid, return envelope so that it is actually received by the Balloting Agent no later than the Voting Deadline.  All votes to accept or reject the Plan must be cast using the appropriate ballot.  Votes which are cast in any other manner will not be counted.  **All ballots must be actually received by Epiq Bankruptcy Solutions, LLC (the "Balloting Agent") no later than December 8, 2020 at 5:00 p.m. (Eastern Time).  In the event you have questions regarding the voting procedures, please contact the Balloting Agent by email at twc@epiqglobal.com.**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You will be bound by the Plan if it is confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan, or if you are the Holder of an unimpaired Claim.

| |
|---|
| **THE PLAN PROPONENTS URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN** |

# III.

## SUMMARY OVERVIEW FOR HOLDERS OF SEXUAL MISCONDUCT CLAIMS

The comprehensive settlement embodied in the Plan is the result of extensive mediation and arm's-length negotiation efforts between the various stakeholders in these Chapter 11 Cases, including significant involvement by representatives of survivors of Harvey Weinstein's alleged sexual misconduct.    Per the Bankruptcy Court's order entered on September 9, 2020 [Docket No. 2966], the Bankruptcy Court established October 31, 2020 as the Tort Claims Bar Date, which is the deadline by which Holders of Sexual Misconduct Claims were required to file proofs of claim in these Chapter 11 Cases.  As of November 1, 2020, **sixty-five (65) Tort Claims** have been filed.  Not all Tort Claims necessarily are Sexual Misconduct Claims.  Thus, while the number of filed Sexual Misconduct Claims may be lower than the number of filed Tort Claims, the number of filed Sexual Misconduct Claims is not higher than the number of filed Tort Claims. Accordingly, for the purposes of reviewing this Disclosure Statement and considering whether or not to vote in favor of the Plan, Holders of Sexual Misconduct Claims should assume that all of the filed Tort Claims are Sexual Misconduct Claims.

The Plan establishes an approximately $17 million fund—the Sexual Misconduct Claims Fund—from which Holders of Sexual Misconduct Claims (Class 4) may seek compensation. In the event the Plan is not confirmed and these Chapter 11 Cases are converted to chapter 7 cases, no such fund will be available and the Insurance Companies likely will contend that they have no responsibility to cover costs and judgments related to Sexual Misconduct Claims.  For example, in response to the Debtors requests for coverage related to certain Sexual Misconduct Claims, the Insurance Companies responded that the Insurance Policies do not cover Sexual Misconduct Claims. Copies of certain letters from the Insurance Companies expressing their position with respect to coverage for the Sexual Misconduct Claims are attached to this Disclosure Statement as <u>Exhibit D</u>.[3]  Absent the settlement embodied in the Plan, it is therefore possible that there could be protracted coverage litigation and the Insurance Companies will not pay any funds to cover Sexual Misconduct Claims.

In addition, without the settlement proceeds, the Debtors primary Assets consist of the Debtors' Cash and the Debtors' potential claims against Harvey Weinstein and against the Former Representatives for, among other things, breach of the duty of loyalty, including a failure to exercise proper oversight of Harvey Weinstein (the "<u>D&O Claims</u>").  As of September 15, 2020, the Debtors have approximately $4.1 million in Cash, and while the Debtors could prosecute the potential D&O Claims, the outcome of such litigation is completely unknown.  In the event the Plan is not confirmed and these Chapter 11 Cases are converted to chapter 7 cases, the Plan Proponents believe that the Debtors' assets would be aggregated into a common distribution fund from which all general unsecured claims (Class 4 and Class 5 in the Plan) would receive pro rata recoveries from the distributable value (if any) of the Debtors' Assets.  The Plan Proponents' Liquidation Analysis reflects that in a chapter 7 liquidation scenario, potential recoveries for Holders of Sexual Misconduct Claims likely will be significantly less than their potential

---

[3]  Certain information in the coverage dispute letters has been redacted to (1) protect the identities of women who have made allegations related to Sexual Misconduct Claims but have done so either anonymously or non-publicly, and (2) maintain the confidentiality of the non-public aspects of criminal investigations.

recoveries under the Plan (with assumed recoveries for Holders of Sexual Misconduct Claims being more than four times higher under the Plan—8.53% under the Plan versus 1.86% under a chapter 7 liquidation that assumes the "High" scenario where the chapter 7 trustee is able to achieve 75% of the settlement economics as those proposed in the Plan). The Liquidation Analysis is attached to this Disclosure Statement as Exhibit B.

For the reasons stated above, among others, the Plan Proponents firmly believe that the Plan is in the best interests of all creditors, especially Holders of Sexual Misconduct Claims, and urge the Holders of Sexual Misconduct Claims to vote to accept the Plan. But the Plan Proponents' views will not decide whether the Plan is presented to the Bankruptcy Court for confirmation. The Plan Proponents will only seek confirmation of the Plan if the Holders of Sexual Misconduct Claims vote to accept the Plan in accordance with the requirements set forth in Section 1126 of the Bankruptcy Code.

If the Holders of Sexual Misconduct Claims vote to accept the Plan and the Bankruptcy Court confirms the Plan, post-confirmation, each Holder of Sexual Misconduct Claims will proceed through the Sexual Misconduct Claims Fund Procedures to determine the amount such Holders may recover from the $17 million Sexual Misconduct Claims Fund. The Sexual Misconduct Claims Fund Procedures are attached to this Disclosure Statement as Exhibit C. Key components of the Sexual Misconduct Claims Fund Procedures are summarized below, but such summary is qualified in its entirety by the Sexual Misconduct Claims Fund Procedures. Holders of Sexual Misconduct Claims should carefully review the Sexual Misconduct Claims Fund Procedures in full.

The Claims review and determination process as set forth in the Sexual Misconduct Claims Fund Procedures will be done on a strictly confidential basis. Neither the identities of the Holders of Sexual Misconduct Claims nor the details of the allegations underlying their Claims will be made public. While the Claims determination process will be strictly confidential, nothing in the Plan, this Disclosure Statement or the Sexual Misconduct Claims Fund Procedures is intended or should be construed to limit the rights of Holders of Sexual Misconduct Claims to speak publicly about the allegations underlying their Sexual Misconduct Claims.

Under the Sexual Misconduct Claims Fund Procedures, the Sexual Misconduct Claims Examiner will review each Sexual Misconduct Claim and the documents and statements offered in support of such Claims to determine a Point Award for such Claims. At the conclusion of the Claims review and determination process, the Sexual Misconduct Claims Fund will be divided by the total of the Point Awards to establish the value of each point (the "Point Value"). The Point Value will be multiplied by the Point Award for each Sexual Misconduct Claim to calculate the monetary amount to be awarded to each Holder of Sexual Misconduct Claims.

Based on the number of filed Tort Claims, assuming the average Point Award is 50, each point will be valued at approximately $4,950. In such circumstances, a Point Award of 25 points would result in a distribution of $123,750; a Point Award of 50 points would result in a distribution of $247,500; a Point Award of 75 points would result in a distribution of $371,250; a Point Award of 100 points would result in a distribution of $495,000. The average Point Award of 50 and resulting estimated distribution amounts are for illustrative purposes only. As of the date of this Disclosure Statement, none of the Sexual Misconduct Claims have been litigated to conclusion or

5

undergone the Claims review process described in the Sexual Misconduct Claims Procedures, the Plan Proponents therefore do not have sufficient information in order to determine the actual average Point Award or actual distribution amounts to Holders of Sexual Misconduct Claims. Actual distributions will vary depending on the outcome of the Claims review and determination process set forth in the Sexual Misconduct Claims Fund Procedures.

After the calculation process, each Holder of Sexual Misconduct Claims will be informed of the determined monetary amount of their Claims and will then have the ability to decide whether they want to release Harvey Weinstein. If a Holder of a Sexual Misconduct Claim does not affirmatively elect to release Harvey Weinstein, such Holder shall be excused from bankruptcy claims process (solely as it relates to Sexual Misconduct Claims against Harvey Weinstein) and may bring or continue to prosecute any causes of action against Harvey Weinstein related such Holder's Sexual Misconduct Claims. Holders of Sexual Misconduct Claims will not have the ability to choose whether or not to release the Debtors and the Former Representatives. The Claims determination process outlined in the Sexual Misconduct Claims Fund Procedures will be the sole method of recovery with respect to Sexual Misconduct Claims against the Debtors and the Former Representatives. Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein will receive 25% of the determined monetary amount of their Sexual Misconduct Claims and such Holders' Sexual Misconduct Claims against the Debtors and the Former Representatives will be released and enjoined. Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein will receive the full determined monetary amount of their Sexual Misconduct Claims and such Holders' Sexual Misconduct Claims against the Debtors, the Former Representatives and Harvey Weinstein will be released and enjoined.

As of November 4, 2020, the Plan Proponents are aware of four lawsuits in which courts have issued rulings related to Sexual Misconduct Claims against the Debtors, the Former Representatives and Harvey Weinstein. The four cases are:

*Loiusette Geiss v. The Weinstein Company Holdings, LCC, et al.*,
     No. 17-cv-9554-AKH (S.D.N.Y. Dec. 6, 2017)

*Alexandra Canosa v. Harvey Weinstein, et al.*,
     No. 18-cv-4115-PAE (S.D.N.Y. May 8, 2018)

*Wedil David v. The Weinstein Company LLC*,
     No. 18-cv-05414-RA-KNF (S.D.N.Y. June 15, 2018)

*Sandeep Rehal v. Harvey Weinstein, et al.*,
     No. 151738-2018E (N.Y. Sup. Ct. Feb. 27, 2018)

In three of the four cases, the courts have dismissed certain claims against the Debtors and all claims against the named Former Representatives. In the *Geiss* case, the court dismissed all of the Sexual Misconduct Claims against the Debtors and the named Former Representatives and ruled that certain Sexual Misconduct Claims against Harvey Weinstein could proceed. In the *Canosa* case, the court dismissed certain Sexual Misconduct Claims against the Debtors, dismissed all of the Sexual Misconduct Claims against the named Former Representatives and ruled that certain Sexual Misconduct Claims against Harvey Weinstein could proceed. In the *David* case, the court dismissed all of the Sexual Misconduct Claims against the named Former Representatives, but has not issued any rulings on the Sexual Misconduct Claims against the Debtors and Harvey

Weinstein.[4]  In the *Rehal* case, the court denied Robert Weinstein's motion to dismiss and has not issued any rulings on the Sexual Misconduct Claims against the Debtors, the other named Former Representatives and Harvey Weinstein.  The courts' rulings in each of the cases are subject to appeal.

Based on, among other things, the courts' rulings in the *Geiss*, *Canosa* and *David* cases dismissing certain Sexual Misconduct Claims against the Debtors and all Sexual Misconduct Claims against the Former Representatives, the Plan Proponents believe the Sexual Misconduct Claims against Harvey Weinstein would constitute the bulk of any judgments awarded to Holders of Sexual Misconduct Claims, and under the Plan, Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein may bring or continue to prosecute any causes of action against Harvey Weinstein related such Holder's Sexual Misconduct Claims.  The Plan Proponents therefore believe it is fair and equitable for Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein to receive 25% of the determined monetary amount of their Claims in consideration of the release of their Sexual Misconduct Claims against the Released Parties.

In the Plan Proponents' opinion, the Plan offers Holders of Sexual Misconduct Claims the best opportunity for a meaningful financial recovery.  The Claims determination process set forth in the Sexual Misconduct Claims Fund Procedures provides Holders of Sexual Misconduct Claims with a path to voluntary resolution of their Claims without having to endure the risks, publicity, costs, uncertainties and challenges of protracted litigation.  The Plan Proponents firmly believe the Plan is in the best interests of the Holders of Sexual Misconduct Claims and urge the Holders of Sexual Misconduct Claims to vote to accept the Plan.

**IV.**

**EXPLANATION OF CHAPTER 11**

A.     **Overview of Chapter 11**

Chapter 11 is the principal chapter of the Bankruptcy Code pursuant to which a debtor in possession may reorganize its business or liquidate in an orderly fashion for the benefit of its creditors, stockholders, and other parties in interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in possession as of the date the petition is filed.  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  In these Chapter 11 Cases, the Debtors remain as debtors in possession.  Additionally, pursuant to section 1102(a) of the Bankruptcy Code, the United States Trustee appointed a committee of creditors holding unsecured claims, which in this case is the Committee.

---

[4]  The referenced court decisions in the *Geiss*, *Canosa*, *David* and *Rehal* cases can be accessed free of charge on the website of the Debtors' claims and noticing, which is **http://dm.epiq11.com/twc**.

The filing of a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect on prepetition claims against a debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by a bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan.

**B.     Chapter 11 Plan**

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in a debtor's estate. A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.

In general, after a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the plan proponents to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to Holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Plan Proponents' solicitation of votes on the Plan.**

**C.     Confirmation of a Chapter 11 Plan**

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. **The Plan Proponents believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a chapter 11 plan for the bankruptcy court to determine that the class has accepted the plan. Rather, a class of claims will be deemed to have accepted the plan if the court determines that the plan has been accepted by more than a majority in number and at least two-thirds in amount of those claims actually voting in such class. **Only the Holders of Allowed Claims who actually vote will be counted as either accepting or rejecting the Plan**.

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. **Class 4 (Sexual**

**Misconduct Claims) and Class 5 (General Unsecured Claims) are impaired under the Plan and entitled to vote on the Plan. Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), and Class 3 (Secured Claims) are deemed unimpaired under the Plan and are deemed to accept the Plan. In addition, Class 6 (Intercompany Claims) and Class 7 (Interests) are not receiving distribution under the Plan and are deemed to reject the Plan.**

In general, a bankruptcy court may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent(s) of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class. **The Plan Proponents believe that the Plan will satisfy the foregoing requirements as to any rejecting class of Claims or Interests, and can therefore be confirmed despite any such rejection by any Class; *provided, however*, as noted above, the Plan Proponents will not seek confirmation of the Plan if Class 4 (Sexual Misconduct Claims) does not vote to accept the Plan in accordance with Section 1126(c) of the Bankruptcy Code.**

V.

<u>**OVERVIEW OF THE PLAN**</u>

The Debtors and the Committee jointly propose the Plan for the resolution and satisfaction of all Claims against and Interests in the Debtors. The Plan contemplates, first and foremost, the comprehensive settlement of various Claims, including those at issue in a multitude of litigations pending in various courts between and among sexual misconduct claimants, the Debtors, Harvey Weinstein, Robert Weinstein, other former members of the board of representatives of and/or directors and officers of the Debtors, the Office of the New York Attorney General (the "<u>NYOAG</u>"), and numerous insurance companies that issued directors and officers and general liability insurance policies to the Debtors prepetition. **The Plan Proponents believe the Plan represents the most favorable recoveries attainable under the circumstances and provides**

9

**for the fair and equitable allocation of the insurance proceeds (which may not be available at all absent the comprehensive settlement embodied in the Plan) and the Debtors' remaining business assets to be distributed to creditors.**

This section summarizes certain key provisions of the Plan. This section is intentionally not a recitation of the entirety of the Plan, a copy of which is attached hereto as Exhibit A. For additional information regarding the Plan not discussed in this section, please refer to the following select Plan provisions:

| TOPIC | PLAN PROVISIONS |
|---|---|
| Classification and Treatment of Claims and Interests | Section 3 |
| The Settlement Embodied in Plan | Section 5 |
| Injunctions and Releases | Section 7 |

## A.  Summary of the Terms of the Plan

### 1.  Settlement of Sexual Misconduct Claims

The comprehensive settlement embodied in the Plan (the settlements embodied therein, the "Settlement") provides mechanisms by which the universe of Tort Claims related directly or indirectly to the alleged misconduct of Harvey Weinstein, including, but not limited to the Sexual Misconduct Claims, shall be resolved, released and enjoined in the manner summarized below and fully described in Section 3 of the Plan.

In summary, Tort Claims consist of either Sexual Misconduct Claims or other Tort Claims:

    a.    **Sexual Misconduct Claims:** Sexual Misconduct Claims (Class 4) are Tort Claims that relate directly or indirectly to the alleged sexual misconduct of Harvey Weinstein and such Claims shall be permanently "channeled" to the Sexual Misconduct Claims Fund, a fund created under the Plan for the purpose of evaluating and compensating all Sexual Misconduct Claims. *The effect of "channeling" the Sexual Misconduct Claims to the Sexual Misconduct Claims Fund is that all Sexual Misconduct Claims against the Released Parties[5] (except the Insurance Companies as it relates to Sexual Misconduct Claims against Harvey Weinstein) can only be pursued through and paid from the Sexual Misconduct Claims Fund, and in exchange for the compensation (if any) provided through the Sexual Misconduct Claims Fund, Holders of Sexual Misconduct Claims must release such Released Parties and will be permanently enjoined from pursuing any action against such Released Parties as it relates to such Holder's Sexual Misconduct Claims.* At the conclusion of the Sexual

---

[5] The Released Parties include the Debtors, certain of the Debtors' former directors and officers and certain of the Debtors' insurance companies. A full definition of Released Parties is provided in the Plan, in Exhibit A, Section 1.94. *The definition of Released Parties does not include Harvey Weinstein.*

Misconduct Claims determination process, Holders of Sexual Misconduct Claims will be informed of the determined monetary amount of their Sexual Misconduct Claims and then will have the option to release Harvey Weinstein or not release Harvey Weinstein and pursue an action against him (but not any Released Party).  Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall receive 25% of the determined monetary amount of their Sexual Misconduct Claims in exchange for the release of their potential Sexual Misconduct Claims against the Released Parties, and Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein shall receive the full determined monetary amount of their Sexual Misconduct Claims.

b.   **Other Tort Claims:**  Other Tort Claims are Tort Claims that are not Sexual Misconduct Claims.  Other Tort Claims will be compensated from the Liquidation Trust, a trust created under the Plan for the purpose of evaluating and compensating all General Unsecured Claims (Class 5). In exchange for the compensation (if any) provided through the Liquidation Trust, Holders of other Tort Claims must release the Released Parties and will be permanently enjoined from pursuing any action against the Released Parties as it relates to such Holder's other Tort Claims.

If the Holders of Sexual Misconduct Claims (Class 4) vote in favor of the Plan in accordance with the Bankruptcy Code and the Bankruptcy Court confirms the Plan, all Claims or Interests will be permanently released and enjoined against the Released Parties pursuant to Section 7 of the Plan irrespective of how such Holders vote on the Plan.

Funds for the Settlement are being provided by certain of the Debtors' Insurance Companies, who are contributing the aggregate amount of $35,214,882.30 (the "Settlement Amount") on behalf of the Released Parties (and Harvey Weinstein, but only with respect to Sexual Misconduct Claims held by Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein).  The Settlement Amount will be allocated as follows: (i) the aggregate Cash amount to the Sexual Misconduct Claims Fund ($17,064,525.30); (ii) the aggregate Cash amount to the Estates in the amount of the Liquidation Trust Settlement Payment ($8,407,305.00); and (iii) the aggregate Cash amount of the Former Representatives Defense Costs ($9,743,052.00). *The Former Representatives Defense Costs do not provide for reimbursement of any defense costs and expenses incurred by Harvey Weinstein.*

2.   **Sexual Misconduct Claims Fund**

The Sexual Misconduct Claims Fund ($17,064,525.30) established by the Plan shall be controlled by the Sexual Misconduct Claims Examiner who shall administer, process, settle, resolve, liquidate, satisfy, and distribute the Sexual Misconduct Claims Fund to Holders of Allowed Sexual Misconduct Claims in accordance with the Sexual Misconduct Claims Fund Procedures.  The Sexual Misconduct Claims Fund is further described in Section IX.C. below and in the Sexual Misconduct Claims Procedures.

3.    **Liquidation Trust**

The Liquidation Trust ($8,407,305.00) established by the Plan shall be controlled by the Liquidation Trustee who shall manage the Liquidation Trust and distributions from the Liquidation Trust to Holders of General Unsecured Claims in accordance with the provisions of the Plan, the Plan Support Agreement and the Liquidation Trust Agreement. In exchange for compensation (if any) provided through the Liquidation Trust, Holders of General Unsecured Claims (including other Tort Claims) must release and will be enjoined against the Released Parties pursuant to the Bankruptcy Injunctions and Releases set forth in the Plan and the Plan Support Agreement.

4.    **Former Representatives Defense Costs**

The Former Representatives have agreed to waive, in part, their entitlement to reimbursement of all defense costs and expenses as a priority to payment of any liability or settlement amount pursuant to the terms of the applicable Insurance Policies. As a result of such waiver, the Former Representatives shall be reimbursed $9,743,052.00, an amount which, in the aggregate, approximates fifty percent (50%) of the fees and expenses incurred by the Former Representatives as of April 25, 2019 and for any other defense costs or expenses incurred by the Former Representatives after such date, the Former Representatives will be reimbursed zero percent (0%) of their fees and expenses. ***The Former Representatives Defense Costs do not provide for reimbursement of any defense costs and expenses incurred by Harvey Weinstein***.

5.    **Seyfarth Shaw LLP's General Unsecured Claims**

Seyfarth Shaw LLP's unpaid fees for services rendered to the Debtors prior to the Petition Date shall be classified as General Unsecured Claims and Seyfarth Shaw LLP will receive its Pro Rata share of Distributable Cash from the Liquidation Trust for the Allowed amount of its General Unsecured Claims. Under Sections 1122 and 1129(b)(1) of the Bankruptcy Code, the Plan Proponents may not discriminate unfairly among similarly situated creditors that are members of a bankruptcy class. Under the Plan, Seyfarth Shaw LLP holds Claims in Class 5 (General Unsecured Claims). Allowed Class 5 Claims are receiving their Pro Rata share of Distributable Cash from the Liquidation Trust. If the Debtors offered Seyfarth Shaw LLP more than its Pro Rata share of Distributable Cash from the Liquidation Trust on account of its Class 5 Claims, such treatment would discriminate unfairly when compared to all other Holders of Allowed Class 5 Claims, which the Plan Proponents believe would be a violation of the Bankruptcy Code. Because Seyfarth Shaw LLP are Bankruptcy Professionals, they are entitled to payment in full of their post-petition services rendered to the Debtors. For its services between the Petition Date and March 31, 2020, Seyfarth Shaw LLP has been paid $1,400,000 and has outstanding fees of approximately $150,000, which as noted above, will be paid in full prior to or on the Effective Date.

6.    **Non-Released Parties' Contribution Claims**

In the event a Tort Claimant has initiated (or initiates in the future) an action against a Non-Released Party related to a Tort Claim, any recovery in such action (or a related action) against a Released Party shall be deemed completely satisfied based on the Released Party's

(and/or such Released Party's Insurance Companies') contribution to the Settlement Amount, regardless of the jurisdiction in which the Tort Claimant brings the Tort Claim or the applicable law that governs such Tort Claim. On and after the Effective Date, all Claims for contribution (including Claims for contribution arising from, related to or connected to Tort Claims) held by a Non-Released Party shall be permanently released and enjoined against all Released Parties.

## 7. Substantive Consolidation

The Plan provides for the substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and consummation. As a result of the substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate identification of the Debtors, and all Claims filed against more than one Debtor either on account of joint and several liability or on account of the same debt shall be deemed a single Claim against the consolidated Estates; *provided*, *however*, in the event the Bankruptcy Court does not approve the substantive consolidation of the Estates, each Class of Claims and Interests will be subdivided by Estate and each Estate's assets will be distributed to the Holders of Allowed Claims in accordance with the absolute priority rule as set forth in the Plan. The Solicitation Procedures Order shall provide that the Debtors will tabulate votes on both a consolidated and unconsolidated basis by Estate for all purposes associated with Confirmation and consummation.

## B. <u>Summary of Distributions Under the Plan</u>

The following is a summary of the proposed distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as <u>Exhibit A</u>. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims, as described in Section 3 of the Plan, have not been classified and thus are excluded from the Classes set forth in the Plan. The following table summarizes the classification of the Classes of Claims and Interests under the Plan and whether you are entitled to vote on the Plan.

| CLASS | DESCRIPTION | ESTIMATE OF TOTAL AMOUNT OF CLAIMS IN CLASS | TREATMENT |
|-------|-------------|---------------------------------------------|-----------|
| **CLASS 1** | Other Priority Claims | ~$500,000 | **Unimpaired** and not entitled to vote; paid in full in Cash on the later of the Effective Date and the date such Claim becomes an Allowed Claim. |
| **CLASS 2** | Secured Tax Claims | ~$6,600 | **Unimpaired** and not entitled to vote; paid in full in Cash on the later of the Effective Date and the date such Claim becomes an Allowed Claim. |

| CLASS | DESCRIPTION | ESTIMATE OF TOTAL AMOUNT OF CLAIMS IN CLASS | TREATMENT |
|---|---|---|---|
| **CLASS 3** | Secured Claims | N/A | **Unimpaired** and not entitled to vote; receive collateral securing Allowed Claim or paid the value of the collateral in full in Cash on the later of the Effective Date and the date such Claim becomes an Allowed Claim. |
| **CLASS 4** | Sexual Misconduct Claims | N/A[6] | **Impaired** and entitled to vote; may obtain Cash recovery (if any) from the Sexual Misconduct Claims Fund. |
| **CLASS 5** | General Unsecured Claims | ~$125 million | **Impaired** and entitled to vote. Holders of Allowed General Unsecured Claim are expected to receive an approximately 2% recovery in Cash on account of such Allowed General Unsecured Claims. |
| **CLASS 6** | Intercompany Claims | Impaired | **Impaired**, deemed to reject, and not entitled to vote. |
| **CLASS 7** | Interests | Impaired | **Impaired**, deemed to reject, and not entitled to vote. |

Except as required by applicable bankruptcy law, post-petition interest shall not accrue or be payable on account of any Claim.

The treatment in the Plan is in full and complete satisfaction of all of the legal, contractual, and equitable rights that each Holder of an Allowed Claim or an Allowed Interest may have in or against the Debtors or their property. This treatment supersedes and replaces any agreements or rights those Holders have in or against the Debtors or their property. All Distributions under the Plan will be tendered to the entity holding the Allowed Claim.

**EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS NOT ALLOWED.**

As discussed in the Liquidation Analysis, the Plan Proponents estimate that recoveries for Holders of Allowed General Unsecured Claims will be greater under the Plan than in a liquidation under chapter 7 of the Bankruptcy Code. In addition, the Plan Proponents believe that distributions under chapter 7 of the Bankruptcy Code would likely be significantly delayed due to the time it will take a chapter 7 trustee to assess the Company's assets, review and analyze claims, and

---

[6] Because, as of the date of this Disclosure Statement, none of the Sexual Misconduct Claims have been litigated to conclusion, the Plan Proponents do not have sufficient information in order to provide a reasonable estimate of the total monetary amount of the Sexual Misconduct Claims that have been asserted.

evaluate and litigate claims against third parties.  Holders of Allowed Claims entitled to vote to accept or reject the Plan should review the Liquidation Analysis (including all footnotes thereto) in assessing whether to vote to accept or reject the Plan.

## VI.

## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

**Why are the Plan Proponents sending me this Disclosure Statement?**

The Plan Proponents are seeking to obtain Bankruptcy Court approval of the Plan.  Prior to soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the preparation and approval of a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, the Plan Proponents believe it is unlikely that the Debtors will be able to achieve the same recoveries for creditors that are available under the Plan.  If the Plan is not confirmed in a timely manner, it is unclear whether the Settlement could be implemented and what, if anything, Holders of Claims would ultimately receive in respect of their Claims against the Debtors.  The Plan is primarily funded by insurance proceeds and this funding will not be available without the Settlement.  Therefore, it is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.  Moreover, non-confirmation of the Plan will likely result in either the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Cases in their entirety.  The Liquidation Analysis attached to this Disclosure Statement as <u>Exhibit B</u> shows that recoveries in a chapter 7 liquidation scenario would be meaningfully lower.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date," and "consummation?"**

"<u>Confirmation</u>" of the Plan refers to the approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution contemplated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and become effective. References to the "<u>Effective Date</u>" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated.

As set forth in the Plan, the Liquidation Trustee shall not make any interim Distributions absent further order of the Bankruptcy Court.  Distributions from the Sexual Misconduct Claims

Fund will begin upon completion of the liquidation process described in the Sexual Misconduct Claims Fund Procedures, and shall in no event occur prior to the Effective Date.

**Where is the cash required to fund the Plan coming from?**

The cash required to fund the Plan will primarily come from (i) insurance proceeds made available as a result of the Settlement; and (ii) remaining cash currently held by the Debtors derived from the sale of the Debtors' film and television production business assets and film and television libraries

**What is the Sexual Misconduct Claims Fund?**

The Sexual Misconduct Claims Fund is a fund created under the Plan for the purpose of evaluating and compensating (if Allowed) all Sexual Misconduct Claims. Distributions from the Sexual Misconduct Claims Fund will be made in accordance with the Sexual Misconduct Claims Procedures (attached to this Disclosure Statement as Exhibit C). Please read the Sexual Misconduct Claims Procedures in full.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. If you are a Holder of Claims in Class 4 (Sexual Misconduct Claims) or Class 5 (General Unsecured Claims) (the "Voting Classes"), you may vote for or against the Plan by completing the ballot and returning it in the envelope provided.

**What is the deadline to vote on the Plan?**

All ballots must be actually sent to the Balloting Agent so as to be received on or before **5:00 p.m. (Eastern Time) on December 8, 2020 (the "Voting Deadline")**.

**Why is the Bankruptcy Court holding a confirmation hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

**When is the confirmation hearing scheduled to occur?**

The Bankruptcy Court has scheduled the confirmation hearing for **December 18, 2020 at 10:00 a.m. (Eastern Time)** before the Honorable Judge Mary F. Walrath, United States Bankruptcy Judge, in the United States Bankruptcy Court, 824 North Market Street, 5th Floor, Wilmington, DE 19801. The confirmation hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the confirmation hearing or any adjournment thereof. Objections to confirmation of the Plan must be filed and served on the Plan Proponents and certain other parties, by no later than **December 8, 2020 at 5:00 p.m. (Eastern Time)** in accordance with the notice of the confirmation hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed

in compliance with the Solicitation Procedures Order, they might not be considered by the Bankruptcy Court.

**What is the purpose of the confirmation hearing?**

The consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case. The confirmation of a plan of reorganization or liquidation by the Bankruptcy Court binds the debtor, any person acquiring property under the plan of reorganization or liquidation, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

**What role does the Bankruptcy Court play after the confirmation hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including disputes over any Claims or Interests arising under the Chapter 11 Cases. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the Plan, as well as all matters described in Section 13 of the Plan.

**Do the Plan Proponents recommend voting in favor of the Plan?**

**Yes**. In the opinion of the Plan Proponents, the Plan is preferable to liquidation under chapter 7 of the Bankruptcy Code, as described in this Disclosure Statement and the Liquidation Analysis, and any other reasonably available alternative because the Plan Proponents believe the Plan provides for a larger distribution to the Debtors' general unsecured creditors than would otherwise result from a liquidation or any other reasonably available alternative. Accordingly, the Plan Proponents recommend that Holders of Claims in Class 4 (Sexual Misconduct Claims) and Class 5 (General Unsecured Claims) support Confirmation of the Plan and vote to accept the Plan.

## VII.

## <u>HISTORY OF THE DEBTORS</u>

### A. <u>History, Operations, and Business</u>

Founded in 2005 by Robert and Harvey Weinstein, the Debtors were a "mini-major" film and television production studio that created, produced, and distributed feature films and premium television content for the U.S. and international markets. The Debtors' assets consisted primarily of intellectual property, distribution rights, and cash flows related to its film library, television productions, and portfolio of unreleased films. The Debtors generated revenue from the exhibition or licensing of films. Each film was distributed theatrically to major and independent exhibitors of motion pictures in the United States and other countries. Home entertainment, subscription and transactional video-on demand, free television, and non-theatrical distribution of each film are generally effected through a major film distribution, pay subscription, or television broadcasting company in the United States. The Debtors operated under longstanding relationships with theatrical exhibitors, and under output agreements with leading home entertainment, Pay TV,

Streaming, Video On-Demand, and non-theatrical providers, including Netflix, Showtime, Amazon Instant Video, Paramount, and Universal.

The Company's film library of 277 films generated a total of over $2 billion in worldwide theatrical box office receipts. The Debtors produced numerous critically acclaimed and commercially successful films, receiving 23 Academy Awards, including Academy Awards for Best Picture for The Artist and The King's Speech, and 113 Academy Award nominations. The revenue streams associated with the film library derived primarily from domestic and international box office receipts, upfront payments related to the sale of distribution rights in foreign markets, direct output deals in selected markets, a multi-year output deal with Netflix that covers virtually all theatrical releases, and ongoing cash flows related to broadcast and cable networks.

The Debtors' television business was one of the fastest growing and most successful television production companies in the industry and created numerous scripted and unscripted television series, including the Project Runway franchise, Scream, Six, War and Peace, Peaky Blinders, and Crouching Tiger, Hidden Dragon.

As of the Petition Date, the Debtors' unreleased film portfolio consisted of five distribution-ready film titles and additional projects in production or pre-production stages of development (including undeveloped scripts).

As discussed below, in the immediate wake of the allegations against Harvey Weinstein in the fall of 2017, the Debtors' relationships with many of its contract counterparties – studios, actors, production companies, and vendors – suffered, and as a result many pending and future business opportunities were lost, ultimately leading to severe liquidity constraints, the commencement of the Chapter 11 Cases, and the sale of substantially all of the Debtors' assets to Lantern Entertainment.

**B.    Prepetition Indebtedness**

As of the Petition Date, the Debtors' prepetition secured and unsecured indebtedness consisted primarily of the following:

Union Bank Senior Credit Facility. TWC Domestic LLC ("TWC Domestic") had outstanding secured debt obligations in the aggregate amount of approximately $156.4 million under that certain Second Amended and Restated Credit and Security Agreement dated as of September 30, 2013, among TWC Domestic, the lenders referred to therein, and Union Bank, N.A. ("Union Bank"), as administrative agent and letter of credit issuer (the "Union Bank Credit Agreement"). The Union Bank Credit Agreement provided for a senior secured revolving credit facility (the "Union Bank Facility"). The collateral securing the Union Bank Facility consisted primarily of a first priority lien on substantially all of TWC Domestic's assets and a senior pledge of The Weinstein Company LLC's ("TWC") equity in TWC Domestic. The obligations of TWC Domestic under the Union Bank Credit Agreement were guaranteed by TWC.

UnionBanCal Junior Credit Facility. TWC Domestic also had outstanding secured debt obligations in the aggregate amount of approximately $15.6 million under that certain Credit and Security Agreement dated as of October 9, 2015, among TWC Domestic, the lenders referred to

therein, and UnionBanCal Equities, Inc. ("UBE"), as administrative agent (the "UBE Credit Agreement").  The UBE Credit Agreement provided for a secured term loan credit facility (the "UBE Facility").  The collateral securing the UBE Facility consisted of a junior lien on substantially all of TWC Domestic LLC's assets.

TWC Production Facility.  TWC Production LLC ("TWC Production") had outstanding secured debt obligations in the aggregate amount of approximately $42.5 million under that certain Credit and Security Agreement dated as of August 6, 2014, among TWC Production, the lenders and guarantors referred to therein, and MUFG Union Bank, N.A. ("MUFG") as Administrative Agent (the "TWC Production Credit Agreement").  The TWC Production Credit Agreement provides for a revolving credit facility (the "TWC Production Facility").  The collateral securing the TWC Production Facility consisted primarily of a first priority lien on substantially all assets of TWC Production.

In accordance with the Final DIP Order and the Final Sale Order, the Debtors used a portion of the proceeds of the sale of substantially all of their assets to satisfy in full their prepetition obligations under the Union Bank Facility, UBE Facility, and TWC Production Facility.

Bank of America Credit Facility.  Weinstein Television LLC ("WTV") had outstanding secured debt obligations in the aggregate amount of approximately $18.1 million under that certain Term Loan Agreement dated as of May 24, 2016, among WTV, the lenders referred to therein, and Bank of America, N.A., as administrative agent (the "BAML Credit Agreement"). The BAML Credit Agreement provided for a term loan facility (the "BAML Facility"). The collateral securing the BAML Facility consisted primarily of the assets of the *Project Runway* franchise and the episodic series *Fashion, Inc.* (the "Project Runway Collateral"), the other assets of WTV and its subsidiaries, as well as certain of TWC's rights in television products and a senior pledge of equity in WTV.  The obligations of WTV under the BAML Credit Agreement are guaranteed by Small Screen Trades LLC, Small Screen Productions LLC, and Marcothree, LLC, the equity interests of which are also pledged to Bank of America, N.A.  Pursuant to the *Order Approving Stipulation Among Debtors, The Official Committee of Unsecured Creditors and Bank of America, N.A., as Administrative Agent, Providing for Payment of Certain Secured Obligations* [Docket No. 1299], the Debtors used a portion of the proceeds from the sale of their assets to pay all outstanding obligations under the BAML Facility.

Access Industries Credit Facility.  TWC Borrower 2016, LLC ("TWC Borrower") has outstanding secured debt obligations in the aggregate amount of approximately $45.5 million under that certain Secured Full Recourse Promissory Note dated as of September 29, 2016, between TWC Borrower and AI International Holdings (BVI) Ltd (the "AI Note").  The collateral securing the AI Note consists of certain foreign distribution rights, a subordinated pledge of equity in WTV, and a pledge of TWC's equity in Weinstein Global Film Corporation.  The obligations of TWC Borrower under the AI Note are guaranteed by TWCH and by Harvey Weinstein.  TWC and certain of its subsidiaries have agreed to reimburse Harvey Weinstein if he is required to make payments on the AI Note.

Single Film Loans.  The Debtors had approximately $66.6 million in outstanding secured debt obligations related to individual film and television projects.

Guild Obligations.   Certain of the Debtors are signatories to collective bargaining agreements (the "Guild Agreements") with one or more of the Directors Guild of America, Inc., Screen Actors Guild–American Federation of Television and Radio Artists, and the Writers Guild of America West, Inc. (collectively, the "Guilds").  Pursuant to the Guild Agreements, these certain Debtors are required to pay compensation to members of the Guilds for services performed in connection with films and television programs produced by these certain Debtors (the "Guild Obligations").  In general, the Guild Obligations are secured through liens on certain personal and intellectual property associated with the films and television programs giving rise to the obligations.

Viacom Advances.  WTV and Next Take Productions, Inc. ("Next Take") are indebted to Viacom Media Networks ("Viacom") in the amount of $8.3 million under an agreement by and among Viacom, On-Site Productions Inc., Next Take, and WTV dated as of March 7, 2013, related to the advancement of expenses for payroll and certain international rights associated with the television series "Scream."  Pursuant to the *Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among the Debtors, Spyglass Media Group, LLC (f/k/a Lantern Entertainment LLC), and Viacom International Inc. Regarding Assumption and Assignment of Certain Viacom Agreements* [Docket No. 2515], Viacom received an allowed $11 million general unsecured claim against WTV for, among other things, any claims related to this agreement.

Cast and Crew Payroll Advance.  TWC is a guarantor of obligations of Next Take in the amount of $3.3 million under an agreement dated as of October 5, 2017, between Cast & Crew Financial Services, LLC, Next Take, and TWC related to the advancement of expenses for payroll associated with the third season of the television series "Scream."

Demand Note.  TWCH is indebted to Robert Weinstein in the amount of $11,187,363 under an unsecured demand note dated as of February 5, 2018.  This balance is reflective of the amount due as of March 16, 2018.  Pursuant to the terms of the Plan Support Agreement, TWCH's obligations under this demand note are waived and released.

## C.    Events Leading to the Commencement of the Chapter 11 Cases

### 1.    The Allegations of Sexual Harassment and Sexual Assault Against Harvey Weinstein

In fall 2017, a series of articles revealed multiple allegations of sexual harassment and sexual assault by multiple women, spanning nearly three decades, against Harvey Weinstein – the Company's co-founder.  After the allegations were asserted, the Company's board undertook an independent investigation of Mr. Weinstein using outside counsel and terminated his employment.

In the ensuing months, numerous lawsuits were filed against Harvey Weinstein, many of them naming the Debtors, Robert Weinstein and other current and former officers, directors, and board representatives of the Debtors.

2.     **Failed Prepetition Efforts to Sell the Debtors**

As stated above, the allegations against Mr. Weinstein produced a swift response from multiple contract counterparties – studios, actors, production companies, and vendors – that hindered the Company's ability to operate and drastically reduced its liquidity.

Faced with the disintegration of its business in the face of the allegations against Harvey Weinstein, the Debtors engaged an investment bank to explore an overall financial restructuring, including a potential sale of substantially all of the Company's assets.  Initial sale and rescue finance efforts were unsuccessful and the Debtors were forced to sell certain film rights to improve liquidity prior to the Petition Date.

In November 2017, the Company attempted to attract additional bidders and expanded its marketing efforts.  At the conclusion of its prepetition sale process, the Company's board of directors moved forward with a bid from a consortium of investors that included, among others, Lantern Asset Management LLC (who would go on to purchase substantially all of the Debtors' assets after the Company filed for bankruptcy).  Because of the potential liability arising from previously filed cases against, *inter alios*, Harvey Weinstein and the Company related to Harvey Weinstein's alleged sexual misconduct and because of the potential liability arising from subsequently filed cases related to the same, the Company was unable to finalize an agreement with the consortium.

## VIII.

## THE DEBTORS' CHAPTER 11 CASES

**A.**     **Commencement of the Chapter 11 Cases**

On March 19, 2018, each of the Debtors voluntarily filed for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases were commenced in the Bankruptcy Court and were assigned to the Honorable Mary F. Walrath, United States Bankruptcy Judge.  On March 20, 2019, the Bankruptcy Court entered an order directing the joint administration of the Chapter 11 Cases.

**B.**     **Appointment of the Official Committee of Unsecured Creditors**

On March 28, 2018, the United States Trustee appointed the Committee to represent the interests of all unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.  The Committee initially consisted of the following five members: (i) Louisette Geiss, (ii) Sandeep Rehal, (iii) Cinedigm Corp.; (iv) William Morris Endeavor Entertainment; and (v) Light Chaser Animation.  Light Chaser Animation resigned from the Committee on or about May 24, 2019.

Since its appointment, the Committee has been actively involved with the Debtors in overseeing the administration of the Chapter 11 Cases as a fiduciary for all unsecured creditors of all Debtors in these Chapter 11 Cases, and has consulted with the Debtors on various matters relevant to the Chapter 11 Cases, including the sale of substantially all of the Debtors' assets to Lantern Entertainment and the Settlement.

### C.      Retention of Professionals

During the Chapter 11 Cases, the Bankruptcy Court approved the retention of: (i) Cravath, Swaine & Moore LLP and Richards, Layton & Finger, P.A. as counsel to the Debtors; (ii) Pachulski Stang Ziehl & Jones LLP as counsel to the Committee; and (iii) Berkeley Research Group, LLC as financial advisor to the Committee.  In addition, the Bankruptcy Court approved the Debtors' retention of Robert Del Genio as Chief Restructuring Officer of the Debtors and authorized the retention of personnel from FTI Consulting, LLC.

### D.      Significant Business Events after the Petition Date

The Debtors operated their businesses as debtors in possession from the Petition Date through the date of the sale of their assets.  As set forth below, during the course of the Chapter 11 Cases, the Debtors sold substantially all of their assets and wound down their operations, including the termination of all employees.

#### 1.      First Day Motions

Immediately after commencing the Chapter 11 Cases, the Debtors filed a number of motions and other pleadings (the "First Day Motions") to stabilize their businesses in the initial days of the Chapter 11 Cases, ensure a smooth transition into chapter 11 with minimal disruptions, and maintain the confidence of creditor constituencies necessary to implement an effective sale and liquidation of the Company's assets.

The orders entered pursuant to the First Day Motions authorized the Debtors to, among other things: (i) pay certain prepetition employee wages, benefits, and reimbursable business expenses [Docket No. 246]; (ii) provide adequate assurance of payment to utility companies and establish procedures for resolving requests by utility companies for additional assurance of payment [Docket No. 245]; and (iii) maintain their existing bank accounts and cash management system [Docket No. 289].

#### 2.      DIP Facility

The Debtors entered bankruptcy with nearly no unencumbered cash on hand and required post-petition financing to sustainably operate until such time that a sale of all or substantially all of the Company's assets could be consummated.  Accordingly, prior to filing for chapter 11 protection, the Debtors conducted a prepetition marketing process to identify potential lenders that might extend post-petition financing to the Debtors.  After such marketing process was completed, the Debtors, in an exercise of their sound business judgment, determined that all competing bids were inferior, either financially or when considering the potential lender's experience in the entertainment industry and/or its understanding of the Debtors' intricate capital structure, to those offered by Union Bank.  Accordingly, on March 16, 2018, the Company determined that Union Bank's $25 million senior secured superpriority debtor in possession delayed draw term loan (the "DIP Facility") was the best available financing.  The DIP Facility was approved on an interim basis at the first day hearing on March 20, 2018 and a final order approving the DIP Facility was entered on April 29, 2018.  On October 9, 2018, the Bankruptcy Court entered an order [Docket No. 1577] extending the maturity date of the DIP Facility to March 31, 2019.  On March 29, 2019, the Bankruptcy Court entered an order [Docket No. 2238] extending the maturity date

of the DIP Facility to December 31, 2019.  A portion of the proceeds of the sale of substantially all of the Debtors' assets were used to satisfy in full the Debtors' obligations under the DIP Facility.

### 3.    Sale of Substantially All of the Debtors' Assets

Section 363 of the Bankruptcy Code grants trustees and debtors in possession the power, subject to approval of the Bankruptcy Court, to use, sell, or lease property of the Estates outside of the ordinary course of business.  Prior to the Petition Date, on March 7, 2018, Lantern Entertainment LLC (n/k/a Spyglass Media Group, LLC) ("Lantern Entertainment") submitted a proposal to acquire substantially all of the Debtors' assets in a post-petition asset sale under section 363 for a cash purchase price of $310 million and the assumption of certain project-level, non-recourse indebtedness.  Lantern Entertainment's proposal indicated an interest to maintain the Company as a going concern and to offer employment to most of the Company's employees.  After negotiating from March 7 through March 19, 2018, the Debtors entered into the Asset Purchase Agreement (the "APA") for the post-petition sale of substantially all of the Debtors' assets with Lantern Entertainment.

On May 9, 2018, the Bankruptcy Court approved the Debtors' sale of substantially all of their assets to Lantern Entertainment for approximately $310 million pursuant to section 363 of the Bankruptcy Code.  The sale to Lantern Entertainment closed on July 13, 2018.

On June 27, 2018, the Debtors filed the Motion for an *Order Approving Amendment to Asset Purchase Agreement Entered Into By and Between the Debtors and Lantern Entertainment LLC* [Docket No. 1115] (the "Sale Amendment Motion").  The Sale Amendment Motion sought the approval of a settlement with Lantern Entertainment that provided for a downward 7.4% purchase price adjustment (from $310 million to $287 million) that was agreed to by the Debtors to resolve an ongoing dispute with Lantern Entertainment that threatened to prevent the sale from closing.

In connection with resolving objections raised by the Committee to the Sale Amendment Motion, the Debtors and the Committee agreed to, among other things, certain terms and conditions regarding the go forward administration of the Chapter 11 Cases.  Specifically, the Debtors and the Committee agreed that the Debtors would not seek to extend their exclusivity periods to file and solicit a chapter 11 plan, that the Debtors' board of directors (the "Board") would be reconstituted, and that the Committee would take the lead role in formulating and drafting a chapter 11 plan.  Moreover, in accordance with the agreement between the Debtors and the Committee, on the closing date of the sale, all members of the Board, other than Ivona Smith (an independent director who had joined the Board in April 2018 at the request of the Committee), resigned.  On August 7, 2018, two Committee-selected independent directors were appointed to the Board, Alan M. Jacobs and Alan D. Halperin.

On July 11, 2018, the Bankruptcy Court entered an order [Docket No. 1220] approving the Sale Amendment Motion, as amended by agreement among the Debtors and Committee.

### 4.    AI International and Union Bank Settlement

As of the Petition Date, TWC Borrower 2016, LLC ("TWC Borrower") had outstanding secured debt obligations in the aggregate amount of approximately $45.5 million under that certain

*Secured Full Recourse Promissory Note* dated as of September 29, 2016, between TWC Borrower and AI International (the "AI Note"). The collateral securing the AI Note consisted of certain foreign distribution rights, a subordinated pledge of TWCH's equity in WTV, and a pledge of TWC's equity in Weinstein Global Film Corporation. The obligations of TWC Borrower under the AI Note are guaranteed by TWCH and by Harvey Weinstein.

Substantially all of the proceeds of the sale of the Debtors' assets to Lantern Entertainment were used to retire the Company's obligations to Union Bank, UBE, and MUFG under the DIP Facility, Union Bank Facility, UBE Facility, and TWC Production Facility. However, under the Sale Order, the Bankruptcy Court reserved the determination of the allocation of the purchase price among the Debtors' estates. During the course of these Chapter 11 Cases, AI International contended that the allocation of proceeds of the sale improperly favored TWC (*i.e.*, the Debtors' film library) over WTV (*i.e.*, the Debtors' television assets), thereby diminishing its recovery on the AI Note.

Based on these contentions, AI International filed an adversary complaint in the Chapter 11 Cases against the Union Bank Parties, captioned *AI International v. MUFG Union Bank, N.A. as administrative and collateral agent, and UnionBanCal Equities, Inc.*, Adversary Proceeding No. 18-50486 (MFW) (the "AI Litigation").

After extended arm's length settlement negotiations, AI International, the Union Bank Parties, the Debtors, and the Committee reached a settlement agreement, whereby AI International waived its claims against the Estates and the Union Bank Parties released any remaining liens, claims, and encumbrances against the Company's cash. On July 16, 2019, the Bankruptcy Court entered an order [Docket No. 2504] approving the settlement agreement.

5.    **Assumed Contracts**

Pursuant to the APA, Lantern Entertainment assumed various executory contracts during these Chapter 11 Cases. The executory contracts assumed by Lantern Entertainment are generally identified on the following notices of assumed contracts: (i) *Supplemental Notice of Filing of List of Assumed Contracts Pursuant to Sale Order* [Docket No. 1457]; (ii) *Supplemental Notice of Filing of List of Assumed Contracts Pursuant to Sale Order* [Docket No. 1512]; (iii) *Supplemental Notice of Filing of List of Assumed Contracts Pursuant to Sale Order* [Docket No. 1665]; and (iv) *Supplemental Notice of Filing of List of Assumed Contracts Pursuant to Sale Order* [Docket No. 1695].

6.    **Guild Settlement and Guild Reserved Claims**

On June 4, 2018, the Directors Guild of America, Inc., The Screen Actors Guild-American Federation of Television and Radio Artists and the Writers Guild of America, West, Inc. (collectively, the "Guilds") commenced an adversary proceeding against MFUG and UBE (Adversary Proceeding No. 18-50487, the "Guild Adversary Proceeding") seeking, among other things, that residual payments owed to directors, performers, and writers under the Guild collective bargaining agreements be paid in the fullest amount possible pursuant to purported security interests held by the Guilds. After extended arm's length settlement negotiations, the Debtors, the Guilds, MUFG, UBE, and the Committee reached a settlement agreement

resolving certain aspects of the Guilds' claims and on January 8, 2019, the Bankruptcy Court entered an order [Docket No. 1956] approving this settlement agreement (the "<u>Guild Settlement Agreement</u>"). [7]

Pursuant to the Guild Settlement Agreement, the Guilds, among other things, dismissed the Guild Adversary Proceeding and certain arbitrations against the Debtors, stipulated to an allowed secured claim against the Estates in the aggregate amount of $11.0 million solely with respect to Guild secured claims accruing through to the closing date of the APA ("<u>Allowed Guild-Pre-Sale Secured Claim</u>"), and the Debtors, MUFG, UBE and the Committee, among other things, agreed that the Guilds reserved a number of additional claims against the Estates (collectively, the "<u>Guild Reserved Claims</u>"), including, among other things, 1) Reserved Unsecured Claims, 2) Reserved Priority and Administrative Claims, and 3) Post-Closing Secured Administrative Claims. The Guild Settlement Agreement also preserves Guild claims, rights and remedies against non-Debtor entities, including but not limited to Portfolio Financing Company.

Per the terms of the Guild Settlement Agreement, the Allowed Guild-Pre-Sale Secured Claim has been paid. The Guilds Settlement Agreement requires that any purchase agreement concerning any motion picture or television project produced subject to a Guild collective bargaining agreement, shall contain a provision consistent in all material respects with Section 6.1 of the APA, as amended by the Sale Order requiring that the purchaser execute standard Guild assumption agreements concerning any future exploitation of such motion picture or television project.

## E.      **Schedules and Establishment of Bar Dates**

On April 23, 2018, the Debtors filed their schedules of assets and liabilities and statements of financial affairs.  By order entered December 27, 2018 [Docket No. 1890] (the "<u>Initial Bar Date Order</u>"), the Bankruptcy Court fixed February 15, 2019 as the deadline for (i) all Holders of alleged non-Tort Claims against the Debtors to file proofs of claim against the Debtors (the "<u>General Bar Date</u>") and (ii) each person or entity that asserts a request for payment of administrative claims arising between the Petition Date and December 31, 2018, other than claims for professional fees and expenses in these proceedings, to file a request for payment of such Administrative Claims (the "<u>Initial Administrative Claims Bar Date</u>").

The Original Bar Date Order also approved the form of notice and the form of the proof of claim which was served on all parties known to the Debtors that may assert a Claim, other than a Tort Claim, against the Debtors.

By order entered September 9, 2020 [Docket No. 2966] (the "<u>Tort Claims Bar Date Order</u>"), the Bankruptcy Court fixed October 31, 2020 as the deadline for all Holders of Tort Claims to file proofs of claim against the Debtors (the "<u>Tort Claims Bar Date</u>").

The Tort Claims Bar Date Order also approved the form of notice and the form of the proof of claim which was served on all parties known to the Debtors that may assert a Tort Claim against

---

[7]  All capitalized terms in this Section VIII.D.6 are as defined in the Guild Settlement Agreement, the terms of which shall govern the Guilds Reserved Claims.

the Debtors. Specifically, the proof of claim form for Holders of alleged Tort Claims required claimants to identify whether their alleged Tort Claim qualified as a Sexual Misconduct Claim. Pursuant to the Solicitation Procedures Order, any Holder of alleged Sexual Misconduct Claims that votes on the Plan shall have their Sexual Misconduct Claims valued at $1 for voting purposes.

## IX.

## THE SETTLEMENT OF SEXUAL MISCONDUCT CLAIMS

### A.   Background and Investigation

On October 6, 2017, immediately following an October 5, 2017 article by *The New York Times*, the Board publicly announced that it took the accusations "extremely seriously" and was launching "a thorough and independent investigation" into Harvey Weinstein's reported misconduct. On October 8, 2017, the Board terminated Harvey Weinstein's employment. Notably, between October 5, 2017 and October 14, 2017, five members of the Board resigned.

The alleged misconduct of Harvey Weinstein produced a plethora of lawsuits against him, the Debtors, certain former officers, directors, and/or board representatives of the Debtors, and a variety of other defendants in state and federal courts in the United States as well as in Canada, the United Kingdom and Ireland. These included the Class Action Lawsuits and at least a dozen other lawsuits by women predicated on alleged sexual misconduct by Harvey Weinstein. Further investigations were undertaken by the Board, the New York State Office of the Attorney General ("NYOAG"), and the New York City District Attorney's Office, among others. Further investigations were conducted after the Company's bankruptcy filing by the Committee's professionals as well as the Debtors' professionals under the supervision of the Debtors' reconstituted Board.

According to publicly filed complaints and media reports, certain of the Company's Former Representatives were alleged to have been aware of and failed to stop Harvey Weinstein's unlawful sexual conduct and failed to properly investigate Harvey Weinstein's repeated and persistent unlawful conduct while at the Company. The Class Action Lawsuits and NYOAG complaint further alleged that Harvey Weinstein, certain of the Former Representatives, and others used settlements that contained nondisclosure agreements and other means to conceal the ongoing misconduct and violations of the law.

### B.   Mediation Efforts and the Initial Settlement

The facts and circumstances described above gave rise to several types of actual and potential litigation claims, including the Sexual Misconduct Claims asserted on behalf of a class of women who came into contact with Harvey Weinstein, the claims asserted by the NYOAG on behalf of Company employees and the people of New York, and individual claims asserted by former employees and non-employee actresses, writers, and other women who were harassed or assaulted by Harvey Weinstein.

Moreover, the Estates have the potential D&O Claims against Harvey Weinstein and against the Former Representatives for, among other things, breach of the duty of loyalty, including a failure to exercise proper oversight of Harvey Weinstein.

Beginning shortly after the Petition Dates, efforts were undertaken to pursue a global, mediated resolution of all of the aforementioned D&O Claims together with claims as well as disputes with insurers who issued directors and officers and general liability coverage to the Debtors which could provide coverage for various of the claims that were made.  As has been publicly reported, throughout the Chapter 11 Cases, confidential mediation proceedings (the "Mediation") took place in lengthy in-person group mediation sessions held on no fewer than five dates and extensive discussions and negotiations by telephone.

After several months of negotiations, the Debtors advised the parties to the Mediation that the Estates were running out of funds and that, accordingly, the Debtors soon would be forced to seek conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  On February 5, 2019, certain Holders of Sexual Misconduct Claims advised the Debtors and the Committee that they had terminated their participation in the Mediation.

On May 14, 2019, the Debtors filed the *Motion for an Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 2357] (the "Conversion Motion").  The Debtors filed the Conversion Motion to preserve the Estates' remaining funds and permit a chapter 7 trustee to pursue, among other things, the D&O Claims.

In an effort to avoid conversion of the Chapter 11 Cases, the parties to the Mediation re-engaged in settlement negotiations.  As a result of these renewed settlement negotiations, the Debtors adjourned the hearing on the Conversion Motion.

Following almost two years of extensive negotiations, a comprehensive settlement of all of the Claims related to Harvey Weinstein's sexual and other misconduct (the "Initial Settlement") was reached and on June 30, 2020, the Plan Proponents filed a joint plan of liquidation embodying the Initial Settlement (the "Initial Plan").  The Initial Settlement required the approval of a United States District Court and the Bankruptcy Court due to the scope of the Initial Settlement, namely, the use of class action litigation mechanisms to resolve Sexual Misconduct Claims predating the creation of TWC.  The Initial Settlement was put before Judge Alvin Hellerstein of the United States District Court for the Southern District of New York shortly after its execution.  On July 14, 2020, Judge Hellerstein rejected the Initial Settlement.  The Plan Proponents believe Judge Hellerstein's decision was largely based on the legal requirements for a class action settlement and lacked a detailed analysis of the potential benefits of the Initial Settlement for Holders of Sexual Misconduct Claims.

Notwithstanding Judge Hellerstein's ruling, the Plan Proponents continued to believe a negotiated settlement was a far better outcome for the Holders of Sexual Misconduct Claims than a chapter 7 liquidation of the Estates.  Immediately after Judge Hellerstein's ruling, the Settlement Parties pivoted to a modified settlement framework in an attempt to maximize recoveries for Holders of Sexual Misconduct Claims under a revised bankruptcy plan with a more limited scope—one that involves only the resolution of Sexual Misconduct Claims that arose after the creation of TWC.  On October 1, 2020, the Plan Proponents filed the Plan embodying the Settlement.

The Plan differs from the Initial Plan in several material respects, including, but not limited to: (1) that Holders of Sexual Misconduct Claims have the option to release Harvey Weinstein or to decline to release Harvey Weinstein and bring or continue to prosecute any causes of action against Harvey Weinstein related such Holder's Sexual Misconduct Claims in any court of competent jurisdiction, and (2) that Harvey Weinstein is not being reimbursed for any of his defense costs. Both modifications were made to address concerns with the Initial Settlement and the Initial Plan raised by Judge Hellerstein and certain Holders of Sexual Misconduct Claims. The Settlement embodied in the Plan is summarized below.

## C.   Summary of the Settlement of Sexual Misconduct Claims

As discussed above, Tort Claims, including the Sexual Misconduct Claims, have been alleged against certain of the Released Parties and Harvey Weinstein. Subject to the entry of the Confirmation Order approving the Settlement and the occurrence of the Effective Date, (i) the Insurance Companies on behalf of the Released Parties (and Harvey Weinstein, but only with respect to Sexual Misconduct Claims held by Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein) will provide the Settlement Amount; (ii) the Sexual Misconduct Claims Fund will be established in accordance with the Plan; and (iii) all Sexual Misconduct Claims shall be permanently resolved, released, and enjoined in the manner described below. The below summary is qualified in its entirety by reference to the Plan and the Sexual Misconduct Claims Fund Procedures.

In exchange for compensation from the Sexual Misconduct Claims Fund, Sexual Misconduct Claims shall be permanently "channeled" to the Sexual Misconduct Claims Fund. *The effect of "channeling" the Sexual Misconduct Claims to the Sexual Misconduct Claims Fund is that all Sexual Misconduct Claims against the Released Parties[8] (except the Insurance Companies as it relates to Sexual Misconduct Claims against Harvey Weinstein) can only be pursued through and paid from the Sexual Misconduct Claims Fund, and in exchange for the compensation (if any) provided through the Sexual Misconduct Claims Fund, Holders of Sexual Misconduct Claims must release such Released Parties and will be permanently enjoined from pursuing any action against such Released Parties as it relates to such Holder's Sexual Misconduct Claims.*

The Sexual Misconduct Claims Fund shall be controlled by the Sexual Misconduct Claims Examiner who shall administer, process, settle, resolve, liquidate, satisfy, and distribute the Sexual Misconduct Claims Fund to Holders of Allowed Sexual Misconduct Claims in accordance with the Sexual Misconduct Claims Fund Procedures.

The Sexual Misconduct Claims Fund will be used to pay: (a) administrative expenses of the Sexual Misconduct Claims Fund; (b) taxes on the Sexual Misconduct Claims Fund; (c) distributions to Holders of Sexual Misconduct Claims. The Sexual Misconduct Claims Fund will not be used to pay any administrative expenses or taxes incurred relating to the Estates.

---

[8] The Released Parties include the Debtors, certain of the Debtors' former directors and officers and certain of the Debtors' insurance companies. A full definition of Released Parties is provided in the Plan, in Exhibit 1, Section 1.94. *The definition of Released Parties does not include Harvey Weinstein.*

Under the Sexual Misconduct Claims Fund Procedures, the Sexual Misconduct Claims Examiner will review each Sexual Misconduct Claim and the documents and statements offered in support of such Claims to determine a Point Award for such Claims. At the conclusion of the Claims review and determination process, the Sexual Misconduct Claims Fund will be divided by the total of the Point Awards to establish the value of each point (the "Point Value"). The Point Value will be multiplied by the Point Award for each Sexual Misconduct Claim to calculate the monetary amount to be awarded to each Holder of Sexual Misconduct Claims.

In accordance with the Sexual Misconduct Claims Fund Procedures, Holders of Sexual Misconduct Claims may make a request for a Point Award to be reconsidered by the Sexual Misconduct Claims Examiner and may seek judicial review of such reconsideration by the District Court. Under federal statutory law, federal constitutional law and corresponding case law precedent, Holders of Sexual Misconduct Claims have the right to a jury trial to determine the existence and amount of liability, if any, of a Sexual Misconduct Claim. Due to the costly and lengthy nature of jury trials, the Sexual Misconduct Claims Fund Procedures provide a right to judicial review by an Article III judge but do not provide Holders of Sexual Misconduct Claims with the right to a jury trial, *provided, however*, the Sexual Misconduct Claims Procedures preserve the rights of Holders of Sexual Misconduct Claims to commence a jury trial against Harvey Weinstein if such Holders elect not to release Harvey Weinstein and pursue an action against him (but not any other Released Party) in another court of competent jurisdiction.

While the effect of being "channeled" to the Sexual Misconduct Claims Fund means that all Sexual Misconduct Claims shall be permanently released and enjoined with respect to the Released Parties, after a Sexual Misconduct Claim is Allowed and its monetary value is determined in accordance with the Sexual Misconduct Claims Fund Procedures, Holders of such Sexual Misconduct Claims shall have the option to release Harvey Weinstein or to not release Harvey Weinstein and pursue an action against him (but not any Released Party). Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall receive 25% of the determined monetary amount of their Sexual Misconduct Claims in consideration of the release of their potential Sexual Misconduct Claims against the Released Parties, and Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein shall receive the full determined monetary amount of their Sexual Misconduct Claims.

The Sexual Misconduct Claims Fund is the sole source of recovery in respect of Sexual Misconduct Claims. Upon the funding of the Sexual Misconduct Claims Fund by the Insurance Companies, the Released Parties shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with the Sexual Misconduct Claims. If a Holder of a Sexual Misconduct Claim affirmatively elects to release Harvey Weinstein, Harvey Weinstein shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with such Holder's Sexual Misconduct Claims.

The Insurance Companies contributed the Settlement Amount, which is being used to fund the Sexual Misconduct Claims Fund, because, among other things, the Settlement embodied in the Plan provides mechanisms by which all Claims held by the Debtors, the Former Representatives, Harvey Weinstein and Holders of Sexual Misconduct Claims against the Insurance Companies may be released and enjoined. As noted above in Section III, based on, among other things, the courts' rulings in the *Geiss*, *Canosa* and *David* cases dismissing certain Sexual Misconduct Claims

against the Debtors and all Sexual Misconduct Claims against the Former Representatives, the Plan Proponents believe the Sexual Misconduct Claims against Harvey Weinstein would constitute the bulk of any judgments awarded to Holders of Sexual Misconduct Claims, and under the Plan, Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein may bring or continue to prosecute any causes of action against Harvey Weinstein related such Holder's Sexual Misconduct Claims.  If a Holder of Sexual Misconduct Claims does not affirmatively elect to release Harvey Weinstein, the Insurance Companies also are not released with respect to such Claims.  As a result, certain Insurance Companies continue to face exposure with respect to the Sexual Misconduct Claims against Harvey Weinstein and do not receive the full benefit of their bargain for each Holder of Sexual Misconduct Claims who does not affirmatively elect to release Harvey Weinstein.

The Plan therefore provides that for each Holder of Sexual Misconduct Claims who does not affirmatively elect to release Harvey Weinstein, such Holders will receive 25% of the determined monetary amount of their Sexual Misconduct Claims in consideration of the release of their Sexual Misconduct Claims against the Debtors and the Former Representatives and 75% of the determined monetary amount of such Holders' Sexual Misconduct Claims shall be allocated to a reversionary fund for the benefit of certain Insurance Companies.  The purpose of the reversionary fund is to return funds to the Insurance Companies that they may use to cover future costs and/or judgments related to Sexual Misconduct Claims held by Holders of Sexual Misconduct Claims who did not affirmatively elect to release Harvey Weinstein.

## D.    Sexual Misconduct Claims Examiner

As noted in the Sexual Misconduct Claims Procedures, the Plan Proponents are requesting that the Bankruptcy Court appoint Simone Lelchuk and Jed Melnick of Melnick ADR, LLP as the Sexual Misconduct Claims Examiners.  The Plan Proponents believe they are immensely qualified for this role.  They have been mediators for a number of years and have extensive experience mediating complex disputes, including cases involving sexual assault and abuse.  The curriculum vitaes of Ms. Lelchuk and Mr. Melnick, which describe their mediation experience, are attached as Exhibit E to this Disclosure Statement.

Ms. Lelchuk and Mr. Melnick served as mediators in these Chapter 11 Cases, as described above in Section IX.B.  Ms. Lelchuk and Mr. Melnick therefore played a key role in helping the Settlement Parties reach the Settlement incorporated in the Plan.  The Plan Proponents believe this familiarity with the Chapter 11 Cases will aid in the efficient and fair administration of the Sexual Misconduct Claims Fund.  Importantly, the mediation did not involve an assessment of the merits of any particular Sexual Misconduct Claim, but instead focused on resolving disputes among the Settlement Parties and obtaining the greatest possible amount of funding for the Settlement.  Ms. Lelchuk and Mr. Melnick have the benefit of understanding the history of these Chapter 11 Cases and such history has no negative impact whatsoever on their ability to evaluate the Sexual Misconduct Claims in a fair and equitable manner.

Notably, notwithstanding their expertise and qualifications, Ms. Lelchuk and Mr. Melnick have generously agreed to forgo other opportunities to be compensated for their services and volunteered to serve as the Sexual Misconduct Claims Examiners on a pro-bono basis. As the fees of any Sexual Misconduct Claims Examiner will be paid from the Sexual Misconduct Claims

Fund, the generosity of Ms. Lelchuk and Mr. Melnick increases the amount of the Sexual Misconduct Claims Fund that is available for distribution to Holders of Sexual Misconduct Claims. While the Plan Proponents believe appointment of Ms. Lelchuk and Mr. Melnick as the Sexual Misconduct Claims Examiners is in the best interest of Holders of Sexual Misconduct Claims, any such Holder who would like to propose an alternative examiner who they believe would be preferable may make such proposal to the Plan Proponents and the Plan Proponents shall consider such proposals in good faith. Holders of Sexual Misconduct Claims making such proposals should be aware that an alternative examiner may charge for their services and that such fees shall be paid from the Sexual Misconduct Claims Fund, thereby reducing the amount available for distribution to Holders of Sexual Misconduct Claims.

## E.    The Insurance Policies

As noted above, the Insurance Companies, on behalf of the Released Parties (and Harvey Weinstein, but only with respect to Sexual Misconduct Claims held by Holders of Sexual Misconduct who affirmatively elect to release Harvey Weinstein) are contributing the Settlement Amount as consideration for the Settlement. The potential availability of coverage under the Insurance Policies for Claims, especially Sexual Misconduct Claims, against the Debtors, the Former Representatives and Harvey Weinstein is an important issue in these Chapter 11 cases. The Plan Proponents are therefore providing (1) the following summary of the Insurance Policies and (2) information on the Insurance Companies' previously asserted coverage positions with respect to certain Claims.

From TWC's founding around June of 2005 through Harvey Weinstein's arrest in May of 2018, TWC possessed various Commercial General Liability ("CGL") insurance policies, CGL Excess and Umbrella insurance policies, joint Director and Officer ("D&O") and Employment Practices Liability ("EPL") insurance policies, and D&O and EPL excess insurance policies that could potentially provide coverage for Claims against the Debtors, the Former Representatives and Harvey Weinstein. Collectively, such insurance policies are defined in the Plan as the Insurance Policies.

The chart below lists the policy number, Insurance Company, policy period, type of coverage and policy limit for each Insurance Policy issued between 2005 and 2018 except for the joint D&O and EPL Insurance Policies in place prior to August 25, 2017.[9] The joint D&O and EPL Insurance Policies are "claims made" policies, meaning that coverage is only available under the policies where claims are made and reported within the policy period of the policy in question. The CGL Insurance Policies on the other hand are "occurrence" based policies, meaning the policy in place at the time of the alleged damage or offense is triggered even if the claim is made after the end of the policy period. To the Debtors' knowledge, the Debtors, the Former Representatives and Harvey Weinstein began requesting coverage for potential Sexual Misconduct Claims against the Debtors, the Former Representatives and Harvey Weinstein, respectively, after August 25, 2017, and as a result, the joint D&O and EPL Insurance Policies predating August 25, 2017 are not available as a potential source of insurance coverage for Sexual Misconduct Claims.

---

[9]  In addition to the Insurance Policies listed in the chart below, the Debtors possessed several international package insurance policies issued by either Fireman's Fund Insurance Company or Federal Insurance Company providing CGL coverage during this period.

Accordingly, the joint D&O and EPL Insurance Policies predating August 25, 2017 are omitted from the chart below.

| | Policy No. | Insurance Company | Coverage Dates | Type of Coverage | Policy Limit |
|---|---|---|---|---|---|
| 1 | E-92-XC 80413900 | The American Insurance Company | 04/07/05 to 04/07/06 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 2 | E-92-XPK 80856487 | Fireman's Fund Insurance Companies | 04/07/06 to 04/07/07 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 3 | E-92-XPK 80872486 | Fireman's Fund Insurance Companies | 04/07/07 to 04/07/08 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 4 | XAU-000-8907-6871 | Fireman's Fund Insurance Companies | 04/07/07 to 04/07/08 | CGL Excess and Umbrella | $15,000,000 |
| 5 | E-92-XPK 80888631 | Fireman's Fund Insurance Companies | 04/07/08 to 04/07/09 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 6 | XAU-6018 1922 | Fireman's Fund Insurance Companies | 04/07/08 to 04/07/09 | CGL Excess and Umbrella | $15,000,000 |
| 7 | E-92-XPK-80904081 | Fireman's Fund Insurance Companies | 04/07/09 to 04/07/10 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 8 | XAU-000-9131-6331 | Fireman's Fund Insurance Companies | 04/07/09 to 04/07/10 | CGL Excess and Umbrella | $15,000,000 |
| 9 | E-92-XPK-80918014 | Fireman's Fund Insurance Companies | 04/07/10 to 04/07/11 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 10 | XAU-000-7393-8094 | Fireman's Fund Insurance Companies | 04/07/10 to 04/07/11 | CGL Excess and Umbrella | $15,000,000 |

| | Policy No. | Insurance Company | Coverage Dates | Type of Coverage | Policy Limit |
|---|---|---|---|---|---|
| 11 | E-92-XPK-80929617 | Fireman's Fund Insurance Companies | 04/07/11 to 04/07/12 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 12 | XAU-000-5757-7165 | Fireman's Fund Insurance Companies | 04/07/11 to 04/07/12 | CGL Excess and Umbrella | $15,000,000 |
| 13 | E-92-XPK-80938734 | Fireman's Fund Insurance Companies | 04/07/12 to 04/07/13 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 14 | XAU-000-2422-0691 | Fireman's Fund Insurance Companies | 04/07/12 to 04/07/13 | CGL Excess and Umbrella | $15,000,000 |
| 15 | E-92-XPK-80947344 | Fireman's Fund Insurance Companies | 04/07/13 to 04/07/14 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 16 | XAU-000-2433-3890 | Fireman's Fund Insurance Companies | 04/07/13 to 04/07/14 | CGL Excess and Umbrella | $15,000,000 |
| 17 | E-92-XPK-80955342 | Fireman's Fund Insurance Companies | 04/07/14 to 04/07/15 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 18 | XAU-000-2400-8957 | Fireman's Fund Insurance Companies | 04/07/14 to 04/07/15 | CGL Excess and Umbrella | $15,000,000 |
| 19 | E-92-XPK-80962380 | Fireman's Fund Insurance Companies | 04/07/15 to 04/07/16 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 20 | XAU-000-5797-7944 | Fireman's Fund Insurance Companies | 04/07/15 to 04/07/16 | CGL Excess and Umbrella | $15,000,000 |
| 21 | 7996-73-58 | Federal Insurance Company | 04/07/16 to 04/07/17 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |

|  | Policy No. | Insurance Company | Coverage Dates | Type of Coverage | Policy Limit |
|---|---|---|---|---|---|
| 22 | 7996-73-60 | Federal Insurance Company | 04/07/16 to 04/07/17 | CGL Excess and Umbrella | $15,000,000 |
| 23 | 7996-73-58 | Federal Insurance Company | 04/07/17 to 04/07/18 | CGL Primary | $1,000,000 per occurrence $2,000,000 policy limit |
| 24 | 7996-73-60 | Federal Insurance Company | 04/07/17 to 04/07/18 | CGL Excess and Umbrella | $15,000,000 |
| 25 | 01-824-40-28 | National Union Fire Insurance Company of Pittsburgh, PA | 08/25/17 to 08/25/18 | D&O and EPL Primary | $10,000,000 |
| 26 | G27085969-005 | Westchester Fire Insurance Company | 08/25/17 to 08/25/18 | D&O Excess (Layer 1) | $10,000,000 |
| 27 | MPL 0182710-02 | Zurich | 08/25/17 to 08/25/18 | D&O Excess (Layer 2) | $10,000,000 |

The Settlement Amount contributed by the Insurance Companies is being used to fund the Sexual Misconduct Claims Fund. The Insurance Companies are providing these funds, because, among other things, the Settlement provides mechanisms by which all Claims held by the Debtors, the Former Representatives, Harvey Weinstein and Holders of Sexual Misconduct Claims against the Insurance Companies may be released and enjoined. In the event the Plan is not confirmed and these Chapter 11 cases are converted to chapter 7 cases, no such fund will be established and the Insurance Companies likely will contend that they have no responsibility to cover costs and judgments related to Sexual Misconduct Claims. For example, in response to the Debtors' requests for coverage related to certain Sexual Misconduct Claims, the Insurance Companies responded that the Insurance Policies do not cover Sexual Misconduct Claims. Copies of certain letters from the Insurance Companies expressing their position with respect to coverage for the Sexual Misconduct Claims are attached to this Disclosure Statement as Exhibit D. Absent the settlement embodied in the Plan, it is therefore possible that the Insurance Companies will not pay any funds to cover Sexual Misconduct Claims.

The dollar amounts specified above represent the policy limits of the applicable policy, and availability of such proceeds is subject to the terms of the applicable policy (including any applicable exclusion such as the exclusion asserted by the Insurance Companies for Sexual Misconduct Claims). *Accordingly, the amounts set forth above should not be viewed as amounts that would, absent the Settlement, be available to provide any recovery in respect of the Sexual Misconduct Claims.*

## X.

## THE CHAPTER 11 PLAN

As a result of the chapter 11 process and through the Global Settlement and the Plan, the Plan Proponents expect that creditors will obtain a greater recovery from the Estates than the recovery that would be available if the Assets had been liquidated under chapter 7 of the Bankruptcy Code.  The Plan is attached to this Disclosure Statement as <u>Exhibit A</u> and forms part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

### A.    Classification and Treatment of Claims and Interests

For the purposes of organization, voting and all confirmation matters, except as otherwise provided in the Plan, all Claims against and all Interests in the Debtors shall be classified as set forth below.

#### 1.    Unclassified Claims – Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims shall not be classified under the Plan, and shall instead be treated separately as unclassified Claims and in accordance with section 1129(a)(9) of the Bankruptcy Code.  Such Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126, or 1129 of the Bankruptcy Code.

#### a.    Administrative Expense Claims

An Administrative Expense Claim must be filed with the Bankruptcy Court so as to be received on or before the Initial Administrative Expense Claims Bar Date or the Supplemental Administrative Expense Claims Bar Date, as applicable, or such other date as may be agreed to by the Liquidation Trustee.

Each Holder of an Allowed Administrative Expense Claim shall receive Cash solely from the Liquidation Trust in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors or liabilities arising under obligations incurred by the Debtors prior to the Effective Date, shall be paid by the Debtors, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including, but not limited to, any applicable orders of the Bankruptcy Court.  In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 incurred prior to the Effective Date shall be paid solely from the Liquidation Trust on the Effective Date by the Debtors, and thereafter, as such fees may thereafter accrue and be due and payable, by the Liquidation Trustee in accordance with the applicable schedule for payment of such fees.

Any Holder of an Administrative Expense Claim that does not timely assert such Administrative Expense Claim in accordance with Section 3.7 of the Plan, or order of the Bankruptcy Court, shall have its Administrative Expense Claim be deemed disallowed under the Plan and be forever barred from asserting such Administrative Expense Claim against the Debtors, their Estates, the Liquidation Trust, or any of their Assets or property. Any such Administrative Expense Claim shall be deemed disallowed without further order of the Bankruptcy Court and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Administrative Expense Claim.

### b.    Professional Fee Claims

Each Bankruptcy Professional requesting compensation for services rendered and reimbursement for expenses incurred during the period from the Petition Date through the Effective Date must (i) file and serve a properly noticed final fee application by no later than 45 days after the Effective Date and (ii) be paid solely from the Liquidation Trust (a) the full unpaid amount as is Allowed by the Bankruptcy Court within 7 days after the date that such Claim is Allowed by Order of the Bankruptcy Court or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Liquidation Trustee. Any Professional Fee Claim that is not asserted in accordance with Section 3.8 of the Plan shall be deemed disallowed under this Plan and shall be forever barred against the Debtors, the Estates, the Liquidation Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup, or recover such Claim. Any Holder of a Claim or Interest (or their representative, including, but not limited to, the Committee) may object to the allowance of Professional Fee Claims, but the Liquidation Trustee may not.

### c.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment of such Claim, each Holder of an Allowed Priority Tax Claim, if any such Claim exists, shall receive Cash solely from the Liquidation Trust in an amount equal to the unpaid portion of such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the date that is 90 calendar days after the Effective Date.

### 2.    Classification and Treatment of Other Priority Claims (Class 1)

(a)    *Classification*. Class 1 consists of all Allowed Other Priority Claims against any of the Debtors that are specified as having priority in section 507(a) of the Bankruptcy Code if any such Claims exist as of the Effective Date.

(b)    *Treatment*. Except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, and release of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between the applicable Debtor or

the Liquidation Trustee and the Holder of the Allowed Other Priority Claim against the applicable Debtor.

3.      **Classification and Treatment of Secured Tax Claims (Class 2)**

(a)      *Classification*.  Class 2 consists of all Allowed Secured Tax Claims against any of the Debtors that, absent the secured status of such Claim, would be entitled to priority in right of payment under section 507(a) of the Bankruptcy Code if any such Claims exist as of the Effective Date.

(b)      *Treatment*.  Each Holder of an Allowed Secured Tax Claim against any of the Debtors shall receive, in full and final satisfaction, settlement, and release of each such Allowed Secured Tax Claim, Cash solely from the Liquidation Trust in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between the applicable Debtor or the Liquidation Trustee and the Holder of the Secured Tax Claim.  The applicable Debtor and the Liquidation Trustee (after the Effective Date) specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid, pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.      **Classification and Treatment of Secured Claims (Class 3)**

(a)      *Classification.*  Class 3 consists of all Secured Claims.

(b)      *Treatment.*  On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Claim will receive, at the election of the Liquidation Trustee, one of the following treatments in full satisfaction of its Allowed Secured Claim:

(1)      The Liquidation Trustee will convey to the Holder of the Allowed Secured Claim the collateral in which such Holder has a security interest;

(2)      The Liquidation Trustee will pay to the Holder of the Allowed Secured Claim, up to the amount of such Allowed Secured Claim, any net proceeds actually received from the sale or disposition of the collateral in which such Holder has a security interest;

(3)      Provided there is Distributable Cash on hand, the Liquidation Trustee will pay Cash to the Holder of the Allowed Secured Claim in the amount of such Allowed Secured Claim;

(4)      Such other distributions or treatment that are necessary to leave the rights of the Holder of the Allowed Secured Claim unimpaired or that are necessary to otherwise satisfy the requirements of Chapter 11 of the Bankruptcy Code; or

(5)     Such other and less favorable distributions or treatments as may be agreed upon by and between the Holder of the Allowed Secured Claim and the Liquidation Trustee.

The Liquidation Trustee may, in his or her discretion, select which of these treatments each Holder of an Allowed Secured Claim will receive and any Cash payments to such Holders will be paid solely from the Liquidation Trust.  The Liquidation Trustee shall have until the later of (a) the Effective Date and (b) 90 days after a Class 3 Claim has become an Allowed Secured Claim to elect which treatment to provide to such Holder of an Allowed Secured Claim.  Notwithstanding the foregoing, any agreement between a Holder of an Allowed Secured Claim and the Debtors approved by the Bankruptcy Court prior to the Effective Date shall remain in full force and effect.

### 5.     Classification and Treatment of Sexual Misconduct Claims (Class 4)

(a)     *Classification.*  Class 4 consists of the Sexual Misconduct Claims.

(b)     *Treatment.*  On the Effective Date, pursuant to the terms and conditions of the Plan, (i) all Sexual Misconduct Claims shall be released and enjoined against the Released Parties pursuant to the terms and conditions of the Plan; and (ii) the Sexual Misconduct Claims Fund shall be administered, processed, settled, resolved, liquidated, satisfied, and distributed in accordance with the terms of the Plan, the Plan Support Agreement, and the Sexual Misconduct Claims Fund Procedures.

Pursuant to the Channeling Injunction, all Sexual Misconduct Claims shall be "channeled" to the Sexual Misconduct Claims Fund, and such Sexual Misconduct Claims may thereafter be asserted exclusively against the Sexual Misconduct Claims Fund and resolved (including, determining the recovery amount, if any, of each Sexual Misconduct Claim and the timing of the payment thereof) in accordance with the Sexual Misconduct Claims Fund Procedures, except that Holders of Sexual Misconduct Claims shall have the option to release Harvey Weinstein or to not release Harvey Weinstein and pursue an action against him (but not any Released Party).  Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall receive 25% of the determined monetary amount of their Sexual Misconduct Claims in consideration of the release of their potential Sexual Misconduct Claims against the Released Parties, and Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein shall receive the full determined monetary amount of their Sexual Misconduct Claims.  Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall be excused from the Channeling Injunction solely for the purpose of pursuing an action against Harvey Weinstein (but not any Released Party).

In the event a Holder of a Sexual Misconduct Claim does not affirmatively elect to release Harvey Weinstein and such Holder obtains any judgment against Harvey Weinstein arising out of, related to or connected to their Sexual Misconduct Claims, such Holder may seek to enforce, collect or otherwise recover on such judgment by any manner or means, whether directly or indirectly, from either Harvey Weinstein or the Insurance Companies (as applicable), *provided, however*, if such Holder seeks to enforce, collect or otherwise recover the judgment from the Insurance Companies, Harvey Weinstein shall not seek

coverage from the Insurance Companies for such judgment; *provided further*, that (i) with respect to such Holder's non-released Sexual Misconduct Claims against Harvey Weinstein, the Insurance Companies reserve their rights to contest coverage, and (ii) nothing in this paragraph shall be read to expand or alter the terms, conditions and provisions of any Insurance Policies.

Pursuant to the terms of the Plan and the Confirmation Order, Holders of all Sexual Misconduct Claims are permanently enjoined from filing any future litigation, Claims, or causes of action arising out of Sexual Misconduct Claims against any of the Released Parties (or any of their respective property), and may not proceed in any manner against any of the Released Parties (or any of their respective property) in any forum whatsoever, including, without limitation, any state, federal, or foreign court or administrative or arbitral forum, and are required to pursue their Sexual Misconduct Claims solely against the Sexual Misconduct Claims Fund pursuant to the Sexual Misconduct Claims Fund Procedures.

Holders of Sexual Misconduct Claims are not entitled to receive distributions or other payment of funds from any portion of the Settlement Amount other than the Sexual Misconduct Claims Fund on behalf of, related to, or with respect to, such Sexual Misconduct Claims, nor shall such Holders receive any other distributions whatsoever under the Plan on behalf of, related to, or with respect to their Sexual Misconduct Claims.

Holders of Sexual Misconduct Claims are Impaired and are entitled to vote on the Plan.

The female former employees of the Debtors whose interests are covered by the NYOAG Lawsuit are (i) Holders of Sexual Misconduct Claims; (ii) permitted to recover from the Sexual Misconduct Claims Fund; and (iii) entitled to vote on the Plan as members of Class 4. The NYOAG is not a Holder of any Claims or Interests in an individual or institutional capacity, and is not entitled to vote on the Plan nor to receive any distributions under the Plan. The NYOAG is also not eligible to vote on the Plan on behalf of any female former employees covered by the NYOAG Lawsuit, nor is the NYOAG eligible to recover from the Sexual Misconduct Claims Fund on behalf of female former employees covered by the NYOAG Lawsuit. On the Effective Date, the NYOAG shall release all of the Sexual Misconduct Claims brought in a representative capacity and any future Sexual Misconduct Claims against the Released Parties the NYOAG could bring in an individual or representative capacity (and such release shall be in a form and substance reasonably acceptable to the Former Representatives), *provided, however*, the NYOAG may in its discretion elect to continue with its pending action against Harvey Weinstein (but may not pursue any such action against any Released Party) in a representative capacity on behalf of Holders of Sexual Misconduct Claims who are covered by the NYOAG Lawsuit and do not affirmatively elect to release Harvey Weinstein.

6.      **Classification and Treatment of General Unsecured Claims (Class 5)**

        **(a)      *Classification.*** Class 5 consists of all General Unsecured Claims (including other Tort Claims). To the extent the Court does not approve the substantive consolidation of the Debtors, the treatment described below will apply to each Class for each of the Debtors.

        **(b)      *Treatment.*** Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, ***in full and final satisfaction, settlement, and release*** of the Allowed General Unsecured Claims against each of the Debtors, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the Distributable Cash from the Liquidation Trust as soon as practicable as determined by the Liquidation Trustee in accordance with the Liquidation Trust Agreement; *provided*, *however*, that each Holder of an Allowed General Unsecured Claim against more than one Debtor shall be entitled to a single distribution on account of each Claim that arises out of the same facts and circumstances regardless of the number of Debtors against which the Claim is asserted. Seyfarth Shaw LLP's unpaid fees for services rendered to the Debtors prior to the Petition Date shall be classified as General Unsecured Claims and Seyfarth Shaw LLP will receive its Pro Rata share of Distributable Cash from the Liquidation Trust for the Allowed amount of its General Unsecured Claims. The Liquidation Trustee reserves its rights to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

        Holders of Allowed General Unsecured Claims are Impaired and are entitled to vote on the Plan.

7.      **Classification and Treatment of Intercompany Claims (Class 6)**

        **(a)      *Classification.*** Class 8 consists of all Intercompany Claims against the Debtors.

        **(b)      *Treatment.*** On the Effective Date, Intercompany Claims against the Debtors shall not be entitled to any Distribution under the Plan and such claims shall be cancelled and released on the Effective Date. Holders of Intercompany Claims will receive no Distributions under the Plan in respect of such Intercompany Claims, are not entitled to vote on the Plan, and are deemed to have rejected the Plan.

8.      **Classification and Treatment of Interests (Class 7)**

        **(a)      *Classification.*** Class 9 consists of all Interests in the Debtors.

        **(b)      *Treatment.*** On the Effective Date, all Interests in the Debtors will be cancelled and terminated. Holders of Interests will receive no Distributions under the Plan in respect of such Interests, are not entitled to vote on the Plan, and are deemed to have rejected the Plan.

**B.**    **Means for Implementation of the Plan.**

    **1.**    **Global Settlement**

The Settlement is the cornerstone of the Plan insofar as it provides a comprehensive settlement of the claims and pending lawsuits arising from Harvey Weinstein's misconduct, and disputes over the Insurance Companies' obligations under various insurance policies potentially providing coverage for such claims. Of the approximate $35,214,882.30 Settlement Amount being paid by the Insurance Companies on behalf of the Released Parties (and Harvey Weinstein, but only with respect to Sexual Misconduct Claims held by Holders of Sexual Misconduct who affirmatively elect to release Harvey Weinstein), approximately $25,471,830.30 will be applied to satisfy claims of creditors, comprised of $17,064,525.30 to be paid to the Sexual Misconduct Claims Fund and $8,407,305 to the Debtors' estates to be distributed to satisfy in full unpaid administrative and priority claims and make a pro rata distribution to general unsecured creditors in Class 5 (including Holders of Tort Claims); *provided, however*, that while the Plan Proponents' estimates and analyses (as of the date of the Plan and this Disclosure Statement) reflect that the Liquidation Trust Assets will be sufficient to satisfy all Administrative Expense Claims in full in Cash, in the event the Liquidation Trust Assets are insufficient to satisfy all Allowed Administrative Expense Claims in full in Cash, the Plan Proponents reserve the right to transfer part of the Sexual Misconduct Claims Fund to the Liquidation Trust only in the amount necessary for the Liquidation Trust to satisfy all Administrative Expense Claims in full in Cash.

    **2.**    **The Plan Support Agreement**

On October 19, 2020 the Debtors, the Former Representatives, the Committee, the Insurance Companies and Harvey Weinstein (the "Settlement Parties") entered into the "Plan Support Agreement". The Plan Support Agreement is a contractually binding document by which, among other things, the Insurance Companies have agreed to contribute the Settlement Amount, the Settlement Parties have granted certain releases and the Settlement Parties have agreed to support the Plan subject to certain conditions. The Plan Support Agreement is conditioned on the occurrence of the Effective Date and also grants certain termination rights to the Settlement Parties. In the event a termination right is triggered and the applicable Settlement Parties exercise their right to terminate the Plan Support Agreement, the Plan will become infeasible. The foregoing summary of the Plan Support in this paragraph is qualified in its entirety by the Plan Support Agreement. The Plan Support Agreement is attached to the Plan as <u>Exhibit 3</u>. Creditors should carefully review the Plan Support Agreement.

    **3.**    **Substantive Consolidation**

The Plan shall serve as a motion by the Plan Proponents seeking entry, pursuant to section 105 of the Bankruptcy Code, of a Bankruptcy Court order, upon the Effective Date, substantively consolidating the Estates into a single consolidated Estate and all of the debts of all of the Debtors, for all purposes associated with Confirmation and substantial consummation. However, in the event that the Court does not approve the substantive consolidation of the Estates, each Class of Claims and Interests will be subdivided by Estate and each Estate's assets will be distributed to the Holders of Allowed Claims in accordance with the absolute priority rule as set forth in the Plan.

On and after the Effective Date, all Assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of The Weinstein Company Holdings LLC (Case No. 18-10601) for all purposes associated with Confirmation and substantial consummation, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors, subject to all rights, claims, defenses, and arguments available to the Debtors or the Liquidation Trust.

Substantive consolidation will not (i) alter the state of incorporation or state of formation of any Debtor for purposes of determining the applicable law for any of the Causes of Action, (ii) alter or impair the legal and equitable rights of the Liquidation Trustee to prosecute any of the Causes of Action, or (iii) otherwise impair, release, extinguish, or affect any of the Causes of Action or issues raised as a part thereof.

Notwithstanding anything in the Plan or in the Confirmation Order to the contrary, the entry of the Confirmation Order ordering substantive consolidation of the Estates shall not have any effect upon the separate and distinct legal entities as they existed at the time of any prepetition transaction that is the subject of any litigation; *provided*, *however*, that the foregoing provision shall not serve to prejudice or compromise whatever rights, if any, the Debtors or the Liquidation Trustee, as applicable, may have to contend in any pending or future adversary proceeding or other lawsuit that the Debtors or the Liquidation Trustee, as applicable, may prosecute claims for fraudulent conveyance or fraudulent transfer arising from transfers made by one or more of the Debtors based on any theory or doctrine, including any federal, state, or common law alter-ego, veil-piercing, or any other theory or doctrine that would permit or require the disregard of corporate separateness or facts as they existed at the time of the transaction in question. Moreover, substantive consolidation shall not affect the obligation of each Debtor or the Liquidation Trustee to pay quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 until the earlier of the time that a particular Case has been closed, dismissed, or converted.

Notwithstanding anything in the Plan or in the Confirmation Order to the contrary, on the Effective Date, all Claims by a Debtor against any other Debtor will be extinguished without any distributions being made on account of such Claims.

## 4.      Standards for Substantive Consolidation

Generally, substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan. The effect of substantive consolidation is the pooling of the assets of, and the claims against, the multiple debtors for the purposes of voting on the plan and satisfying liabilities from a common fund. *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988).

Courts evaluate the propriety of substantive consolidation on a case-by-case basis. *FDIC v. Colonial Realty Co.*, 966 F.2d 57 (2d Cir. 1992). The list of factors relied upon by courts may be distilled into two main factors: "(i) whether creditors dealt with the entities as a single economic

unit; and . . . (ii) whether the affairs of the debtors are so entangled that consolidation is necessary and will benefit all creditors." *In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (citations omitted).

As discussed above, the Plan Proponents believe that substantive consolidation of the Debtors in these Chapter 11 Cases is warranted under the criteria considered by courts in ruling on the propriety of substantive consolidation in other cases. As part of Confirmation, the Plan Proponents are proposing that, on the Effective Date, their Estates be deemed consolidated for all purposes related to the Plan, including for (1) purposes of implementing the Plan, (2) purposes of voting, (3) assessing whether the Confirmation standards have been met, (4) calculating and making distributions under the Plan and (5) filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee. In addition, the Debtors are seeking, pursuant to the Plan, Bankruptcy Court approval of the substantive consolidation of the Debtors' estates. If the Bankruptcy Court grants the Debtors' request for substantive consolidation, pursuant to the Confirmation Order, as of the Effective Date: (1) all assets and liabilities of the Debtors will be deemed merged; (2) all guarantees by one Debtor of the obligations of any other Debtor shall be deemed eliminated, and all guarantees executed by multiple Debtors of the obligations of any other Entity shall be deemed consolidated into a single obligation, so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Debtors; (3) each and every Claim Filed or to be Filed in the Chapter 11 Cases of the Debtors will be deemed Filed against the Debtors and will be deemed one Claim against and a single obligation of the Debtors, and the Debtors may File and the Bankruptcy Court will sustain objections to Claims for the same liability that are Filed against multiple Debtors; and (4) Intercompany Claims between Debtors will be eliminated and extinguished. Such substantive consolidation will not affect (1) the legal and corporate structures of the Debtors, subject to the right of the Debtors to complete dissolution under applicable law; (2) the vesting of assets in the Litigation Trust; (3) the right to distributions from any insurance policies or proceeds of such policies; or (4) the rights of the Debtors or the Litigation Trustee to contest alleged setoff or recoupment efforts by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and otherwise applicable law.

As described further below, substantive consolidation is available in the Third Circuit where the debtors seeking such consolidation show that "prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity. . . ." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). "A prima facie case for [substantive consolidation on this basis] typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity." *Id*. at 212.

In addition, substantive consolidation may be available where "post-petition [the debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id*. at 211.

In connection with Confirmation, the Plan Proponents will present evidence in support of their request for the substantive consolidation of the Estates for the purposes set forth in the Plan. Among other things, the Debtors have operated as a consolidated enterprise for a number of years. Prior to the Petition Date, the Debtors believe that creditors relied on the breakdown of corporate entities in their dealings with the Debtors. For example, the majority of the Company's operations

were conducted by employees of TWC.  Moreover, the Company's payroll, taxes, and health benefit payment obligations were paid from bank accounts controlled by TWC.  The bank accounts used for distribution and general accounts payable were also historically controlled by TWC. Accordingly, the Company's funds used to satisfy the obligations of its film and television business lines were commingled and controlled by a single entity – TWC.

As discussed herein, during these Chapter 11 Cases, the Debtors sold substantially all of their assets.  Accordingly, the principal assets of the Debtors that will be available for distribution to general unsecured creditors consist of cash and proceeds from the remaining Causes of Action. The Plan Proponents believe that it would unduly burdensome and costly to attempt to allocate the Company's assets on a debtor-by-debtor basis as there is no established method for allocating the sale proceeds across the Debtors.  In addition, the proceeds of the Settlement for the benefit of Class 5 (General Unsecured Claims) cannot readily be attributed to a specific Debtor, as the Plan Proponents believe all Debtors were harmed by the actions of Harvey Weinstein and the failure of the Former Representatives to curtail Harvey Weinstein's actions.

For the foregoing reasons, the Debtors believe that they will satisfy applicable legal standards for substantive consolidation as part of Confirmation, which is necessary to effectuate the terms of the Plan and fair and reasonable under the circumstances.

5.      **The Liquidation Trust**

a.      **Establishment and Purpose of the Liquidation Trust**

On or before the Effective Date, the Debtors and the Liquidation Trustee shall execute the Liquidation Trust Agreement and shall have established the Liquidation Trust pursuant to the Plan. The Liquidation Trust shall be established for the primary purpose of Liquidation and distributing the assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the Liquidation purpose of the Liquidation Trust.

b.      **Authority and Role of the Liquidation Trustee**

The authority and role of the Liquidation Trustee shall be in accordance with the provisions of the Liquidation Trust Agreement and the Plan.  In furtherance of and consistent with the purpose of the Liquidation Trust Agreement and the Plan, solely for the purpose of carrying out the Plan and discharging the duties in the Liquidation Trust Agreement, the Liquidation Trustee shall be, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, appointed as the successor-in-interest to, and the representative of, the Estates for the retention, enforcement, settlement, or adjustment of all claims and rights, known and unknown, and all interests belonging to the Debtors or their Estates, which arose prior to the Effective Date, except in connection with any proceeding involving, relating to, or arising out of, in whole or in part, the Sexual Misconduct Claims, as set forth in the Plan.

### c.    Liquidation Trust Assets

On the Effective Date, the Debtors shall transfer the Liquidation Trust Assets to the Liquidation Trust.    Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date, the Debtors shall be deemed to have automatically transferred to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Liquidation Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Liquidation Trust Beneficiaries and the expenses of the Liquidation Trust.    Subsequent to the Effective Date, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

### d.    Appointment of the Liquidation Trustee

The identity of the Liquidation Trustee is set forth in the Liquidation Trust Agreement. The appointment of the Liquidation Trustee shall be approved in the Confirmation Order, and such appointment shall be as of the Effective Date.    In accordance with the Liquidation Trust Agreement, the Liquidation Trustee shall serve in such capacity through the earlier of (i) the date that the Liquidation Trust is dissolved in accordance with the Liquidation Trust Agreement or (ii) the date such Liquidation Trustee resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that the Liquidation Trustee resigns, is terminated, or is unable to serve, then the Court, upon the motion of any party-in-interest, including, but not limited to, counsel to the Liquidation Trust, shall approve a successor to serve as the Liquidation Trustee, and such successor Liquidation Trustee shall serve in such capacity until the Liquidation Trust is dissolved.

### e.    Powers and Authority of Liquidation Trustee

The Liquidation Trustee shall be the exclusive trustee of the Liquidation Trust Assets as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.    The powers, rights, and responsibilities of the Liquidation Trustee are specified in and subject to the terms of the Liquidation Trust Agreement and Section 6.7 of the Plan and include the authority and responsibility to: (i) make Distributions as contemplated in the Plan; (ii) establish and maintain the Cash Reserves in accordance with the terms of the Plan; (iii) conduct an analysis of Administrative Expense Claims, Priority Claims, Secured Claims, and General Unsecured Claims, and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate; (iv) prepare and file post-Effective Date operating reports for the Debtors; (v) file appropriate tax returns with respect to the Liquidation Trust and paying taxes properly payable by the Liquidation Trust, if any, in the exercise of its fiduciary obligations; *provided*, *however*, that for the avoidance of doubt, neither the Liquidation Trust or the Liquidation Trustee shall have any authority or duty to file any tax returns for any of the Debtors; (vi) take such actions as are necessary to wind down and dissolve the Debtors under applicable law; (vii) retain such professionals as are necessary and appropriate in furtherance of its fiduciary obligations; (viii) take such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust; (ix) protect and enforce the rights to the Liquidation Trust Assets vested in the Liquidation Trustee by any method reasonably determined to be appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy,

insolvency, moratorium or similar law and general principles of equity; and (x) terminate the Liquidation Trust and seeking to close the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

### f.        Compensation of Liquidation Trustee

The Liquidation Trustee shall be reasonably compensated out of the Liquidation Trust for his or her services and reimbursed out of the Liquidation Trust Assets for his or her reasonable expenses in accordance with the Liquidation Trust Agreement.  As set forth in the Liquidation Trust Agreement, the Liquidation Trustee has agreed to be compensated for his or her services, including attorneys' fees, for a fixed fee of $1.25 million, plus reimbursement for reasonable out-of-pocket expenses.

### g.        Resignation of Liquidation Trustee

The Liquidation Trustee may resign at any time.  The Liquidation Trustee shall file such written resignation with the Bankruptcy Court and shall serve such written resignation on all parties in interest entitled to receive service.  Any party in interest may request a hearing before the Bankruptcy Court regarding the Liquidation Trustee's resignation.  If no such hearing is requested, the resignation shall take effect 30 days after the filing of the notice of resignation with the Bankruptcy Court.  The Liquidation Trustee shall, by the earliest date possible, deliver to the Liquidation Trustee's successor all of the Liquidation Trust Assets that were in the possession of the Liquidation Trustee along with a complete record and inventory of all such Liquidation Trust Assets.  Any successor Liquidation Trustee will be appointed in accordance with the terms of the Liquidation Trust Agreement.

### h.        Removal of Liquidation Trustee

The Bankruptcy Court may remove a Liquidation Trustee for good cause shown on a motion submitted by a Beneficiary of the Liquidation Trust or the U.S. Trustee following notice to parties in interest, including without limitation, the Liquidation Trustee.  The removal will take effect upon the date the Bankruptcy Court specifies.  Any removed Liquidation Trustee shall, by the earliest date possible, deliver to the Liquidation Trustee's successor all of the Liquidation Trust Assets that were in the possession of the removed Liquidation Trustee along with a complete record and inventory of all such Liquidation Trust Assets.

### i.        Termination of Liquidation Trust

The duties, responsibilities, and powers of the Liquidation Trustee shall terminate in accordance with the terms of the Plan and the Liquidation Trust Agreement after (a) all the Liquidation Trust Assets have been fully administered, (b) all reasonably possible Distributions have been made in accordance with the Plan, and (c) all Disputed Claims have been resolved.

The Liquidation Trust shall terminate not later than the fifth (5th) anniversary of the Effective Date; *provided*, *however*, that, within a period of six (6) months prior to such termination date or any extended termination date, the Liquidation Trustee may, with the consent of the Liquidation Trust Oversight Committee, or by Order of the Bankruptcy Court, extend the term of the Liquidation Trust if it is necessary to facilitate or complete the liquidation of the Liquidation

Trust Assets administered by the Liquidation Trust; *provided*, *further*, *however*, that the aggregate of all such extensions shall not exceed three (3) years without further Order of the Bankruptcy Court.

Upon the termination of the Liquidation Trust, the Liquidation Trustee shall file with the Bankruptcy Court a report thereof, seeking an order discharging the Liquidation Trustee and a final decree closing any open Chapter 11 Cases. The Liquidation Trustee shall not unduly prolong the duration of the Liquidation Trust. As efficiently and expeditiously as possible, the Liquidation Trustee shall endeavor to resolve, settle or otherwise dispose of all Liquidation Trust Assets, effect the distribution of the Liquidation Trust Assets in accordance with the terms of the Plan, and terminate the Liquidation Trust as soon as practicable.

### j.    Records

The Liquidation Trustee shall maintain good and sufficient books and records relating to the Liquidation Trust Assets, Cash, Distributable Cash, Liquidation Trust Reserve, the management thereof, all post-Confirmation transactions undertaken by the Liquidation Trustee, all expenses incurred by or on behalf of the Liquidation Trustee after the Effective Date, and all distributions contemplated or effectuated under the Plan. Subject to further order of the Court, such records shall be maintained and preserved by the Liquidation Trustee until the earlier to occur of (i) entry of the final decree closing the Chapter 11 Cases and (ii) termination of the Liquidation Trust.

### k.    Liability of the Liquidation Trustee

The Liquidation Trustee shall not be personally liable for any claim asserted against the Liquidation Trust or the Liquidation Trustee, except as set forth below. The Liquidation Trustee shall not be liable for any error of judgment made in good faith or with respect to any action taken or omitted to be taken in good faith, unless with respect to the Liquidation Trustee's own respective fraud, gross negligence or willful misconduct. Notwithstanding anything to the contrary set forth herein, in the Plan, or in the Liquidation Trust Agreement, no provision of the Plan or the Liquidation Trust Agreement shall be construed to relieve the Liquidation Trustee from liability for gross negligence, fraud, or willful misconduct.

### l.    Indemnification

From and after the Effective Date, the Liquidation Trustee and the independent contractors, employees, and/or professionals employed by the Liquidation Trust (collectively, the "Indemnified Parties" and each an "Indemnified Party") shall be indemnified by the Liquidation Trust, to the fullest extent permitted under applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees and defense costs, and other assertions of liability arising out of any such Indemnified Parties' good faith exercise of what such Indemnified Party reasonably understands to be its powers or the discharge of what such Indemnified Party reasonably understands to be its duties conferred by the Plan, the Liquidation Trust Agreement, or by any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order of a court of competent jurisdiction to be due to

such Indemnified Party's own respective fraud, gross negligence or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing any Causes of Action or objections to Claims, on and after the Effective Date.

The indemnification of the Liquidation Trustee also extends to matters directly or indirectly, in connection with, arising out of, based on, or in any way related to (i) the Plan; (ii) the services to be rendered pursuant to the Plan; (iii) any document or information, whether verbal or written, referred to herein or supplied to the Liquidation Trustee; or (iv) proceedings by or on behalf of any claimant or Creditor.  Subject to the terms of the Plan and the Liquidation Trust Agreement, the Liquidation Trust shall, on demand, advance or pay promptly, in either case from the Liquidation Trust Reserve, on behalf of each Indemnified Party, reasonable attorneys' fees and other expenses and disbursements which such Indemnified Party would be entitled to receive pursuant to the foregoing indemnification obligation; *provided*, *however*, that any Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance amounts if a court of competent jurisdiction ultimately determines that such Indemnified Party is not entitled to indemnification hereunder due to the gross negligence, fraud, or willful misconduct of such Indemnified Party.

The Liquidation Trustee is authorized, but not required, to obtain and purchase (solely from funds in the Liquidation Trust Reserve) insurance coverage with respect to the responsibilities, liabilities, and obligations of the Indemnified Parties under the Plan.

### m.    Claims Reconciliation Process

From and after the Effective Date, the Liquidation Trust shall be solely responsible for objecting to Claims which are not otherwise Allowed.

### n.    Preservation of Right to Conduct Investigations

Any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtors or the Committee prior to the Effective Date shall vest with the Liquidation Trust upon the Effective Date and shall continue in effect until dissolution or termination of the Liquidation Trust.

### o.    Preservation of Privilege and Defenses

No action taken by the Plan Proponents in connection with the Plan shall be (or be deemed to be) a waiver of any privilege or immunity of the Plan Proponents, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).  The Confirmation Order shall provide that notwithstanding the Plan Proponents providing any privileged information to the Liquidation Trustee, the Liquidation Trust, or any party or Person associated with the Liquidation Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Claim or Cause of Action on behalf of the Estates and shall remain privileged.

p.      **Abandonment of Property**

If and to the extent the Liquidation Trustee determines to abandon any Liquidation Trust Assets, then the Liquidation Trustee may abandon such assets in accordance with the Plan or any further order of the Bankruptcy Court.

q.      **The Non-Debtor Affiliates**

The Debtors' equity interests in the non-debtor affiliates shall be retained and transferred to the Liquidation Trust.

6.      **Claims Reconciliation Process**

The Plan and the Confirmation Order shall be deemed to constitute an objection by the Debtors to the allowance of all Claims (other than Professional Fee Claims) filed against the Debtors in these Chapter 11 Cases

From and after the Effective Date, the Liquidation Trust shall have the exclusive authority to compromise, resolve, and Allow any Disputed Claim without the need to obtain approval from the Bankruptcy Court, subject to the Liquidation Trust Agreement, and any agreement entered into by the Liquidation Trust with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim; *provided*, *however*, that, under the Plan, all Disputed Claims will have no right to receive any Distributions under the Plan unless and until such Claims are affirmatively Allowed by a Final Order.

All objections to Claims (other than Sexual Misconduct Claims and Professional Fee Claims) shall be filed by the Liquidation Trust on or before the Claim Objection Deadline, which date may be extended by filing a motion on or before the then Claim Objection Deadline.  If a timely objection has not been filed to a proof of claim or the Schedules have not been amended with respect to a Claim that was Scheduled by the Debtors but was not Scheduled as contingent, unliquidated, or disputed, then the Claim to which the proof of claim or Scheduled Claim relates will be treated as an Allowed Claim.

The Liquidation Trust may, at any time, move for a Bankruptcy Court order estimating any contingent Claim, Disputed Claim, or unliquidated Claim (in each case, other than Sexual Misconduct Claims) pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction and power to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  The estimated amount of any Claim so determined by the Bankruptcy Court shall constitute the maximum recovery that the Holder thereof may recover after the ultimate liquidation of its Claim, irrespective of the actual amount that is ultimately Allowed.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

7.      **Distribution of Property Under the Plan**

        a.      **Distribution to Holders of Claims**

Payments and distributions to each Holder of a Claim that is not an Allowed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the Plan, including the provisions governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that any Claim is Allowed, in whole or in part, the Liquidation Trustee shall distribute to the Holder of such Claim any Cash that would have been distributed to such Holder if such Claim had been an Allowed Claim on the Effective Date. No distribution shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof. Distribution shall be made as soon as practicable with respect to any portion of a Contingent Claim that becomes fixed or liquidated. Notwithstanding the foregoing, the allowance, liquidation, and payment of Sexual Misconduct Claims, shall be governed by Section 3.13 the Plan.

        b.      **Setoff and Recoupment**

Notwithstanding anything to the contrary in the Plan, the Liquidation Trustee may setoff, recoup, or withhold against distributions on account of any Claim or any Administrative Expense Claim, any claims that a Debtor, the Estates, or the Liquidation Trust may have against the Holder of such Claim or Administrative Expense Claim.

        c.      **No *De Minimis* Distributions**

Notwithstanding anything to the contrary in the Plan, no Cash payments of $100 or less will be made by the Liquidation Trustee to any Holder of an Allowed Claim. No consideration will be provided in lieu of the de *minimis* distributions that are not made under this section.

If, at the time a final Distribution is to be made under the Plan, the aggregate amount of Distributions held by the Liquidation Trustee for the benefit of a Holder of an Allowed Claim total less than $100, then (i) such Distributions shall not be paid to such Holder and such Distributions shall vest in the Liquidation Trust and be distributed to other Holders of Allowed Claims in accordance with the terms of the Plan, and (ii) the Holder of such Claim will be forever barred from receiving such Distribution or asserting any claim against the Liquidation Trust, the Liquidation Trust Assets, or the Liquidation Trustee on account of such Allowed Claim.

        d.      **No Distributions With Respect to Disputed Claims**

Notwithstanding any other Plan provision, distributions will be made on account of a Disputed Claim only after, and only to the extent that, the Disputed Claim becomes an Allowed Claim or is deemed to be an Allowed Claim for Distribution purposes.

        e.      **No Interim Distributions**

Notwithstanding any other Plan provision, the Liquidation Trustee shall not make any interim Distributions absent further order of the Bankruptcy Court; *provided*, *however*, that any

such order shall require the Liquidation Trustee to reserve the full amount of any Disputed Claim unless otherwise authorized by the Bankruptcy Court for cause.

## C.   Injunctions and Releases

The Plan generally provides that subject to the occurrence of the Effective Date, upon confirmation of the Plan, the provisions of the Plan shall bind every holder of a Claim against or Interest in the Debtors and such holders' respective successors and assigns.

**Below is a summary of important provisions in the Plan that may affect your rights as a holder of a Claim against or Interest in the Debtors. Please do not rely solely on this summary to understand how your rights may be impacted, but refer also to the specific provisions of the Plan cross-referenced below and carefully read the relevant Plan provisions in their entirety.**

### 1.   Term of Certain Bankruptcy Injunctions and Automatic Stay

All of the injunctions (which do not include the Bankruptcy Injunctions, as defined in the Plan) and/or automatic stays provided for in or with respect to these Chapter 11 Cases, whether pursuant to section 105, section 362 or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to the Confirmation Date shall remain in full force and effect until the Bankruptcy Injunctions (as defined in the Plan) provided for by the Plan become effective. In addition, on and after the Confirmation Date, the Plan Proponents, may seek such further orders as they deem necessary to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the Bankruptcy Injunctions shall become effective on the Effective Date and shall continue to be effective at all times thereafter. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the Bankruptcy Injunctions shall be enjoined or stayed during the period between the Confirmation Date and the Effective Date.

On and after the Confirmation Date but prior to the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any Claim, debt, right or cause of action of the Debtors which the Debtors retain sole and exclusive authority to pursue in accordance with Section 12.2.4 of the Plan.

### 2.   The Channeling Injunction

As discussed herein, Sexual Misconduct Claims will be subject to the Channeling Injunction, as set forth in Section 5.8 of the Plan, such that from and after the Effective Date: (i) all Sexual Misconduct Claims against the Released Parties will be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order, except that Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall be excused from the Channeling Injunction solely for the purpose of pursuing an action against Harvey Weinstein (but not any Released Party) in another court of competent jurisdiction; (ii) upon the funding of the Sexual Misconduct Claims Fund by the Insurance Companies on behalf of the Released Parties (and Harvey Weinstein, but

only with respect to Sexual Misconduct Claims held by Holders of Sexual Misconduct who affirmatively elect to release Harvey Weinstein), the Released Parties shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with the Sexual Misconduct Claims; (iii) if a Holder of a Sexual Misconduct Claim affirmatively elects to release Harvey Weinstein, Harvey Weinstein shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with such Holder's Sexual Misconduct Claims, *provided*, *however*, that nothing in the Plan shall preclude any action by the Settlement Parties to enforce the Plan, and nothing shall preclude any Holder of a Sexual Misconduct Claim who does not affirmatively elect to release Harvey Weinstein from pursuing an action against him in another court of competent jurisdiction.  Further, nothing in this Section X.C.2 or the Channeling Injunction shall constitute or be deemed a waiver of any claim, right or Cause of Action connected to any Sexual Misconduct Claim by any Settlement Party against any Entity that is not a Released Party.  The Plan Proponents will only seek confirmation of the Plan if the Holders of Sexual Misconduct Claims (Class 4) vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.  Accordingly, the Channeling Injunction shall be binding upon, and enforceable by its terms against, all Holders of Sexual Misconduct Claims, irrespective of whether any such Holder (i) has voted to accept the Plan or (ii) has agreed to be bound by the Channeling Injunction, in both cases, only because the Class consisting of the Holders of Sexual Misconduct Claims (Class 4) has voted to approve the Plan in accordance with section 1126(c) of the Bankruptcy Code.  ***In order to supplement the injunctive effect of the Bankruptcy Injunctions, and pursuant to sections 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date***:

### a.    Channeling Injunction Terms

In order to (i) preserve and promote the Settlement and the Plan and (ii) supplement, where necessary, the effect of the injunctions and the releases described in Sections 7.2 and 7.3 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons and Entities that (a) have held or asserted, or that hold or assert, or that may hold or assert in the future, any Sexual Misconduct Claims against the Released Parties, or any of them or (b) have affirmatively elected to release Harvey Weinstein, each shall have recourse solely to the Sexual Misconduct Claims Fund and each shall be permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Released Party or Harvey Weinstein with respect to any Sexual Misconduct Claims, including, but not limited to:

(1)    commencing or continuing, in any manner, whether directly or indirectly, any suit, actions or other proceedings of any kind with respect to any Sexual Misconduct Claim against any of the Released Parties or Harvey Weinstein or against the property of any of the Released Parties or Harvey Weinstein;

(2)    enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, whether directly or indirectly, from any of the Released Parties or Harvey Weinstein, or the property of the Released Parties or Harvey Weinstein, any judgment, award, decree or other order with respect

to any such Sexual Misconduct Claim against any of the Released Parties, Harvey Weinstein or any other person;

(3)    creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien of any kind relating to any Sexual Misconduct Claim against any of the Released Parties or Harvey Weinstein, or the property of any of the Released Parties or Harvey Weinstein;

(4)    asserting, implementing or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any Sexual Misconduct Claim of any kind, whether directly or indirectly, against (i) any obligation due to any of the Released Parties or Harvey Weinstein, (ii) any of the Released Parties or Harvey Weinstein; or (iii) the property of any of the Released Parties or Harvey Weinstein; and

(5)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any such Sexual Misconduct Claim.

### b.    Channeling Injunction Reservations

Notwithstanding anything to the contrary in Section 5.9 of the Plan, this Channeling Injunction shall not enjoin or affect the rights of any persons or Entities to the treatment afforded to them under the Plan, including the right of Holders of Sexual Misconduct Claims to assert such Claims in accordance with the Plan.

### c.    Channeling Injunction Modifications Not Permitted

Notwithstanding an order by the Bankruptcy Court modifying this Channeling Injunction to comply with the Bankruptcy Code, the scope of this Channeling Injunction may not be amended, modified, or limited in any material respect without the prior consent of the Settlement Parties.

### d.    Authorization for Recognition and Enforcement of Channeling Injunction

The Settlement Parties (and each of them) are authorized to take all necessary or appropriate actions, in accordance with the terms of the Plan and the agreements incorporated herein, to enforce, or otherwise have recognized, the Confirmation Order, the Plan, the Channeling Injunction, or any other related document, in any jurisdiction worldwide and without limitation, *provided*, *however*, the cost of such actions shall be borne by the party seeking enforcement or recognition unless otherwise provided in the Plan or the applicable Plan Document.

### 3.      Releases

Section 7.2 of the Plan provides for the following releases:

#### a.      *Releases by Debtors and Estates.*

Except as otherwise set forth in Section 7.2.5 of the Plan and the Plan Support Agreement, for good and valuable consideration, including without limitation, all payments under the Plan to Holders of Claims, payment of which is critical to the Debtors' ability to obtain confirmation of the Plan and to effectuate distributions to Holders of Claims, as of the Effective Date, each of the Debtors, on behalf of themselves and their respective Estates and their current respective Affiliates, members, officers, directors, and employees, and any person claiming by or through them, shall be deemed to conclusively, absolutely, unconditionally, irrevocably, and forever release, waive, and disclaim the Released Parties, Harvey Weinstein and their respective property to the maximum extent permitted by law from any and all Claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any direct or derivative claims asserted or assertable by or on behalf of any of the Debtors, any Claims or causes of action asserted by or on behalf of any of the Debtors or any Interest that any such Debtor would have been legally entitled to assert in their own right, whether individually or collectively, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law or in equity, based on any matter, cause, thing, conduct, or omission occurring prior to the Effective Date and in any way related to the Debtors, their businesses, operations, activities, or these Chapter 11 Cases.

#### b.      *Releases by the Committee and Holders of Claims and Interests.*

Except as otherwise set forth in Section 7.2.5 of the Plan and the Plan Support Agreement, for good and valuable consideration, including, without limitation, all payments under the Plan to Holders of Claims, payment of which is critical to the Debtors' ability to obtain Confirmation of the Plan and to effectuate distributions to Holders of Claims, as of the Effective Date, (i) the Committee, on behalf of itself and its members (solely in their capacities as members of the Committee) and (ii) each present and former Holder of a Claim or Interest, will be deemed to unconditionally, completely, and forever release, waive, and disclaim the Released Parties of and from any and all Claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any direct or derivative claims asserted or assertable by or on behalf of any member of the Committee or any Holder of a Claim or Interest, any Claims or causes of action asserted by or on behalf of any member of the Committee or any Holder of a Claim or Interest or that any such member of the Committee or any Holder of a Claim or Interest would have been legally entitled to assert in their own right, whether individually or collectively, whether known or unknown, matured or unmatured, accrued or not accrued, foreseen or unforeseen, existing or hereinafter arising, in law or equity, based on any matter, cause, thing, conduct, or omission occurring prior to the Effective Date and in any way related to the Debtors, their businesses, operations, activities, or these Chapter 11 Cases.

c.     ***Releases of Harvey Weinstein by Holders of Sexual Misconduct Claims.***

Except as otherwise set forth in Section 7.2.5 of the Plan and the Plan Support Agreement, for good and valuable consideration, including, without limitation, all payments under the Plan to Holders of Claims, payment of which is critical to the Debtors' ability to obtain Confirmation of the Plan and to effectuate distributions to Holders of Claims, after a Sexual Misconduct Claim is Allowed and liquidated in accordance with the Sexual Misconduct Claims Fund Procedures, Holders of such Allowed and liquidated Sexual Misconduct Claims shall have the option to release Harvey Weinstein or not release Harvey Weinstein and pursue an action against him (but not any Released Party) in another court of competent jurisdiction. If a Holder of a Sexual Misconduct Claim affirmatively elects to release Harvey Weinstein, such Holder will be deemed to unconditionally, completely, and forever release, waive, and disclaim Harvey Weinstein and the Insurance Companies of and from any and all Sexual Misconduct Claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any direct or derivative claims asserted or assertable by or on behalf of any Holder of a Sexual Misconduct Claim, any Sexual Misconduct Claims or causes of action asserted by or on behalf of any Holder of a Sexual Misconduct Claim or that any Holder of a Sexual Misconduct Claim would have been legally entitled to assert in their own right, whether individually or collectively, whether known or unknown, matured or unmatured, accrued or not accrued, foreseen or unforeseen, existing or hereinafter arising, in law or equity, based on any matter, cause, thing, conduct, or omission occurring prior to the Effective Date.

d.     ***Additional Settlement Releases.***

In addition to the general releases in Sections 7.2.1, 7.2.2 and 7.2.3 of the Plan (the "Plan Releases"), the Plan Support Agreement contains certain general and specific releases the Releasing Parties and Harvey Weinstein and certain specified exceptions to such releases (the "Settlement Releases"). The Settlement Releases are set forth in Sections 7.2.4 and 7.2.5 of the Plan. A copy of the Plan is attached to this Disclosure Statement as Exhibit A.

e.     ***Bankruptcy Court Approval of Releases.***

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Releases by Holders of Claims and Interests and the Settlement Releases subsumed thereunder (the "Third-Party Releases"), which includes by reference each of the related provisions and definitions contained in the Plan and the Plan Support Agreement, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of claims released by the Third-Party Releases; (3) in the best interests of the Debtors, the Estates and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim, counterclaims, actions, causes of action, lawsuits, proceedings, adjustments, offsets, contracts, obligations, liabilities, controversies, costs, expenses, attorneys' fees and losses whatsoever, whether in law, in admiralty, in bankruptcy, or in equity, and whether based on any federal law, state law, foreign law, common law or otherwise, foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued based upon any acts, omissions, conduct or other matters in any

way related to the Debtors, their businesses, operations, activities, their Chapter 11 Cases, against any of the Released Parties or their property.

**4.      Plan Injunction**

Except as otherwise provided in the Plan and/or the Plan Documents (including, specifically, the Plan Support Agreement), on and after the Effective Date, all Entities who have held, hold, or may hold Claims or Interests whether or not such parties have voted to accept or reject the Plan, and other parties in interest, along with their respective present or former employers, agents, officers, directors, or principals, shall be and are permanently enjoined from and restrained against taking any of the following actions on account of any such Claims or Interests:

(1)      taking any actions to interfere with the implementation or consummation of the Plan, taking any actions to interfere with the implementation or consummation of the Plan, or otherwise acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan;

(2)      commencing, conducting, or continuing in any manner, directly or indirectly, in any court, proceeding, or other tribunal of any kind, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), or otherwise asserting any Claim or Interest, which has been released pursuant to Sections 7.2 of the Plan or from seeking to hold any Released Party or Harvey Weinstein liable in any such suit, action or proceeding or for any such Claim, or Interest that has been released pursuant to Sections 7.2 of the Plan;

(3)      enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, their Estates, their assets, the Released Parties and/or the property of the Released Parties, the Liquidation Trust Assets, and/or the Sexual Misconduct Claims Fund;

(4)      creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance against the Debtors' assets, their Estates' assets, the Released Parties' assets, the Liquidation Trust Assets, and/or the Sexual Misconduct Claims Fund; and

(5)      asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due any Released Party or against the property of any Released Party with respect to any such claim, demand, or cause of action.

The Releases pursuant to Section 7 of the Plan shall act as a permanent injunction against any party from commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim released under the Plan to the fullest extent authorized by applicable law.

**5.     Exculpation**

Upon the occurrence of the Effective Date, the Exculpated Parties shall not have or incur, and are hereby released from, any claim, obligation, cause of action, and/or liability to any Holder of a Claim, Interest, or any other Entity or any of their respective successors, assigns or Representatives for any act or omission with respect to or arising out of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence, fraud or willful misconduct or any obligations that they have under or in connection with the Plan, the Plan Documents, or any transactions contemplated thereby, and in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**D.     Conditions Precedent to Confirmation and the Effective Date**

The following are the specific conditions precedent to Confirmation of the Plan and the occurrence of the Effective Date of the Plan.

**a.     Conditions Precedent to Confirmation**

Each of the following is a condition precedent to the Confirmation of the Plan, which must be satisfied or waived by each of the Settlement Parties in their sole and absolute discretion in accordance with Section 11.5 of the Plan:

(1)     The Bankruptcy Court shall have ruled that the settlements embodied in the Plan and the Channeling Injunction set forth in Section 5.8 of the Plan and the Plan Injunction set forth in Section 7.3 of the Plan are binding The Bankruptcy Court shall have ruled that the settlements embodied in the Plan and the Channeling Injunction set forth in Section 5.8 of the Plan and the Plan Injunction set forth in Section 7.3 of the Plan are binding upon, and enforceable by their terms against, all Holders of Claims and Interests.

(2)     The Bankruptcy Court shall have entered an order approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(3)     The Bankruptcy Court shall have entered the Confirmation Order, in a form and substance reasonably satisfactory to all of the Settlement Parties, approving, among other things, the Channeling Injunction, the Plan Injunction and the Releases, the Plan Support Agreement, and such Confirmation Order shall not in any way impair, diminish or detract from the terms of the Settlement.

(4)     All documents, instruments, and agreements provided under, or necessary to implement, the Plan, shall have been executed and delivered by the applicable parties.

(5)     The Debtors and the Liquidation Trustee shall have executed the Liquidation Trust Agreement and shall have established the Liquidation Trust pursuant to the Plan and shall be in a form and substance acceptable to the Plan Proponents.

(6)     The Debtors and the Sexual Misconduct Claims Examiner shall have finalized the Sexual Misconduct Claims Fund Procedures and shall have established the Sexual Misconduct Claims Fund pursuant to the Plan that shall be in a form and substance acceptable to the Plan Proponents.

(7)     The substantive consolidation of the Debtors shall have been approved by the Bankruptcy Court.

**b.**    **Conditions Precedent to the Effective Date**

The "substantial consummation," as defined in section 1101 of the Bankruptcy Code, shall not occur, and the Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to satisfaction of each of the following conditions precedent, each of which may be waived by all of the Settlement Parties (as applicable) in their sole and absolute discretion:

(1)     There is no stay in effect with respect to the Confirmation Order, and the Confirmation Order, including the Channeling Injunction, the Plan Injunction and the Releases, shall be in full force and effect.

(2)     The Sexual Misconduct Claims Fund shall have been funded as provided in the Plan and the Plan Support Agreement.

(3)     The Liquidation Trust shall have been funded in accordance with the terms of the Plan.

(4)     The Former Representatives Defense Costs shall have been funded as provided in the Plan.

(5)     The Debtors shall have sufficient funds to satisfy all Allowed Administrative Expense Claims in full, in Cash.

(6)     The Plan Documents necessary or appropriate to implement the Plan, shall have been executed and shall be in full force and effect.

(7)     All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

(8) All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

## E.    Other Material Plan Provisions

### 1.    Dissolution of the Board of Directors and Committee

Upon the Effective Date, the existing board of directors of any Debtor shall be deemed dissolved, and any remaining director, officer, employee, or independent contractor of any Debtor shall be dismissed, and each of the Debtors' directors, officers, employees, independent contractors, members, designated representatives, agents, and Professionals employed pursuant to a Bankruptcy Court order shall be released from any further authority, duties, responsibilities and obligations relating to, arising from, or in connection with the Debtors or the Chapter 11 Cases.

On the Effective Date, the Committee shall thereupon be released of and from all further authority, duties, responsibilities, and obligations arising from and based upon the Chapter 11 Cases, and the Committee shall be deemed dissolved; *provided, however*, that (a) in the event that the Effective Date occurs prior to the Confirmation Order becoming a Final Order, the Committee may, at its option, continue to serve and function for the purpose of participating in any appeal of the Confirmation Order until such time as the Confirmation Order becomes a Final Order, and (b) if the Effective Date occurs prior to the conclusion of any outstanding litigation or adversary proceedings in the Chapter 11 Cases or prior to the entry of a Final Order with respect to final fee applications of Bankruptcy Professionals, the Committee may, at its option, continue to serve until a Final Order is entered with respect to such proceedings and/or applications.

### 2.    Executory Contracts and Unexpired Leases Deemed Rejected

On the Effective Date, all agreements executed by the Debtors before the Effective Date, other than agreements that were previously either assumed and assigned or rejected by a Final Order, to the extent that these agreements constitute executory contracts or unexpired leases under section 365 of the Bankruptcy Code, shall be rejected.

Claims created by the rejection of executory contracts or unexpired leases pursuant to the Plan must be filed with the Bankruptcy Court and served on the Liquidation Trustee, no later than thirty (30) days after the Effective Date. Any Claims for rejection of executory contracts or unexpired leases pursuant to the Plan for which a proof of claim is not filed and served within such time will be forever barred and shall not be enforceable against the Debtors or their Estates, assets, properties, or interests in property, or against the Liquidation Trust. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan. For the avoidance of doubt, nothing in the Plan shall extend any deadline for the filing of any Claims established in a previously entered order of the Bankruptcy Court.

### 3.    Non-discharge of the Debtors' Debts

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge Claims as against the Debtors. Notwithstanding the foregoing, no Person holding a Claim may receive any payment from, or seek recourse against, any Assets that are to

be distributed under the Plan other than Assets required to be distributed to that Person under the Plan unless otherwise ordered by the Court.  As of the Confirmation Date, all Persons are precluded from asserting against any property that is to be distributed under the Second Amended  Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order or other Court order.

### 4.      No Recourse

No Person entitled to receive a payment or Distribution under the Plan will have any recourse against the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Assets, the Sexual Misconduct Claims Fund, the Sexual Misconduct Claims Examiner, the Debtors, or their Estates (as applicable) other than the right to receive Distributions in accordance with the terms of the Plan, the Liquidation Trust Agreement and the Sexual Misconduct Claims Fund Procedures (as applicable).

**XI.**

**<u>CONFIRMATION AND CONSUMMATION PROCEDURES</u>**

### A.      <u>Overview</u>

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets.  In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  **This Disclosure Statement is presented to Holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Plan Proponents' solicitation of votes on the Plan.**

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible."  The "best interests" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.  Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.  **The Plan Proponents believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the best interests of creditors' test and the feasibility requirement.**

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan. Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class. Similarly, a class of equity security holders will have accepted the plan if the bankruptcy court determines that the plan has been accepted by holders of two-thirds of the number of shares actually voting in such class.

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization or liquidation are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity on the effective date of the plan. **Class 4 (Sexual Misconduct Claims) and Class 5 (General Unsecured Claims) are impaired under the Plan and entitled to vote on the Plan.**

A bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims and equity interests accept such plan. For a chapter 11 plan to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property from the estate, unless the senior class receives property having a value equal to the full amount of its allowed claim.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interest in such class.

The Plan Proponents believe that the Plan satisfies the foregoing requirements as to any rejecting class of Claims or Interests, and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims or Interests. **The Plan Proponents, however, will only seek confirmation of the Plan if the Holders of Sexual Misconduct Claims (Class 4) vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, and**

notwithstanding the Plan Proponents' rights under sections 1129(a) and 1129(b) of the Bankruptcy Code, the Plan Proponents will not seek confirmation of the Plan if the Holders of Sexual Misconduct Claims (Class 4) vote to reject the Plan in accordance with section 1126(c) of the Bankruptcy Code.

## B.    Confirmation of the Plan

### 1.    Elements of Section 1129 of the Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied, including the following:

a.    The Plan complies with the applicable provisions of the Bankruptcy Code.

b.    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

c.    The Plan has been proposed in good faith and not by any means proscribed by law.

d.    Any payment made or promised by the Debtors or by an entity issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court; and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

e.    The Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors or a successor to the Debtors under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by such Debtors, and the nature of any compensation for such insider.

f.    With respect to each impaired class of Claims or Interests, each Holder of an impaired Claim or impaired Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such entity, property of a value, as of the applicable consummation date under the Plan, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

g.      In the event that the Plan Proponents do not move to confirm the Plan non-consensually, each class of Claims or Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

h.      Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full on the applicable consummation date and that Tax Claims will be paid in full, in cash, on the applicable consummation date or as soon as practicable thereafter; however, the Debtors shall have the right to make deferred cash payments on account of such Tax Claims over a period not exceeding six (6) years after the date of assessment of such Claims, having a value, as of the applicable consummation date, equal to the allowed amount of such Claims.

i.      At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

j.      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any other successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

k.      All fees payable under section 1930 of Bankruptcy Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

l.      The Plan provides for the continuation after the consummation of the Plan of payment of all retiree benefits at the level established under section 1114(e)(1)(B) or (g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

**The Plan Proponents believe that the Plan will satisfy all the statutory provisions of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.**

### 2.      Acceptance

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims. Each class of Interests will have accepted the Plan if the Plan is accepted with reference to a class of Interests, by at least two-thirds in amount of the Allowed Interests of each class of Interests.

In the event that any Impaired Class of Claims shall fail to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Plan Proponents reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting class, in which case the Plan shall constitute a motion for such relief, or (b) modify the Plan in accordance with Section 6.3 of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, *provided, however,* the Plan Proponents will only seek confirmation of the Plan if the Holders of Sexual Misconduct Claims (Class 4) vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, and notwithstanding the Plan Proponents' rights under sections 1129(a) and 1129(b) of the Bankruptcy Code, the Plan Proponents will not seek confirmation of the Plan if the Holders of Sexual Misconduct Claims (Class 4) vote to reject the Plan in accordance with section 1126(c) of the Bankruptcy Code.

### 3.      Best Interests of Creditors Test

Section l129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date (the "Best Interests Test").  The first step in meeting this test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in the context of a chapter 7 liquidation in which a chapter 7 trustee is appointed and charged with reducing to cash any and all assets of the Debtors.  Accordingly, this is the assumption employed in preparing the Liquidation Analysis.  The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each Class equals or exceeds the value that would be allocated to the Holders of Claims in a liquidation under chapter 7 of the Bankruptcy Code.  The Plan Proponents believe that the Holders of Claims against the Debtors will have an equal or greater recovery as a result of the settlement and liquidation of the Debtors' assets contemplated by the Plan than the recovery that likely would be realized in a chapter 7 liquidation.

Accordingly, the only question is whether the creditors will have recovered more (or at least as much) under the Plan than they would recover through a liquidation by a chapter 7 trustee.

To determine the value that a Holder of a Claim in an Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' Assets if the Chapter 11 Cases had been converted to chapter 7 liquidation cases and the Debtors' Assets were liquidated by a chapter 7 trustee (the "Liquidation Value").  The Liquidation Value would consist of the net proceeds from distribution of the Debtors' Assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 case.

In a chapter 7 liquidation scenario, the Liquidation Value would be determined based on the Debtors' Assets, which primarily are the Debtors' available Cash and the Debtors' potential causes of action against the Former Representatives and Harvey Weinstein.  As of September 15, 2020, the Debtors currently have approximately $4.1 million in Cash, and while the Debtors have the potential D&O Claims against Harvey Weinstein and the Former Representatives, the outcome

of prosecuting the D&O Claims is completely unknown.  The contributions of the Insurance Companies being used to fund the Liquidation Trust and Sexual Misconduct Claims Fund would not be available.  A chapter 7 trustee could seek insurance coverage for Claims against the Debtors that are arguably covered by the Insurance Policies.  Creditors also could attempt to obtain the consent of a chapter 7 trustee or the Bankruptcy Court to lift the automatic stay, litigate their Claims and seek insurance coverage from the Insurance Companies for judgments they obtain in such litigation.  In either case, the possibility of any insurance coverage is unknown and likely would entail lengthy, expensive and protracted litigation against the Insurance Companies regarding insurance coverage.  The Liquidation Value available for satisfaction of Claims against the Debtors also would be reduced by: (a) the costs, fees, and expenses of the liquidation under chapter 7, which would include disposition expenses and the compensation of a trustee and his counsel and other retained professionals, (b) the fees of the chapter 7 trustee, and (c) certain other costs arising from conversion of the Chapter 11 Cases to chapter 7 cases.  Taking all of the above into account, the Plan Proponents completed the Liquidation Analysis, which illustrates that creditors potential recoveries under the Plan likely exceed potential recoveries under a chapter 7 liquidation.  The Liquidation Analysis is attached to this Disclosure Statement as Exhibit B.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in payments being made to creditors.  Bankruptcy Rule 3002(c) provides that conversion of the Chapter 11 Cases to chapter 7 will trigger a new bar date for filing claims against the Estates, and that the new bar date will be more than 90 days after the Chapter 11 Cases convert.  Not only would a chapter 7 liquidation delay distribution to creditors, but it is possible that additional Claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estates.  The Debtors have received and are analyzing late-filed Claims and may file claims objections in the near future.  Reopening the Bar Dates in connection with conversion to chapter 7 would provide these and other claimants an additional opportunity to timely file Claims against the Estates.  Moreover, the Debtors would lose the benefit of having an established the Initial Administrative Claims Bar Date.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including: (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such chapter 7 trustee; (ii) the time and expense of either pursuing D&O Claims or attempting to renegotiate a settlement of the Sexual Misconduct Claims; and (iii) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Plan Proponents have determined that confirmation of the Plan will provide each Holder of a Claim or Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### 4.    Feasibility

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  Because distributions will be made only to the extent of existing assets or future recoveries, the Plan Proponents believe the Plan is feasible.

## C.    <u>Cramdown</u>

In the event that any impaired class does not accept the Plan, the Plan Proponents nevertheless may move for confirmation of the Plan.  To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other classes of Claims that vote to reject the Plan.  The Plan Proponents, however, will only seek confirmation of the Plan if the Holders of Sexual Misconduct Claims (Class 4) vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

A chapter 11 plan "does not discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to the legal rights of the non-accepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its Claims or Interests.  The Plan Proponents believe that under the Plan all impaired classes of Claims and Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Interests in such class.  Accordingly, the Plan Proponents believe the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

### 2.    Fair and Equitable Test

The Bankruptcy Code establishes different "fair and equitable" tests for secured creditors, unsecured creditors, and holders of equity interest as follows:

**a.    *Secured Creditors.*** Either (i) each impaired secured creditor retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

**b.    *Unsecured Creditors.*** Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

**c.    *Holders of Interests.*** Either (i) each holder of an equity interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

**EXCEPT AS OTHERWISE STATED HEREIN, THE PLAN PROPONENTS MAY MOVE FOR CONFIRMATION OF THE PLAN IF LESS THAN THE REQUISITE HOLDERS OF CLAIMS OR INTERESTS IN ANY CLASS VOTE TO ACCEPT THE PLAN.**

D.    **Effect of Confirmation**

Under Section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan.  Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

* * * * *

## XII.

## CONCLUSION

The Plan Proponents believe that the Plan is in the best interest of all Holders of Claims and urge all Holders of impaired Claims against the Debtors to vote to accept the Plan and to evidence such acceptance by returning their ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: November 4, 2020

By:    Paul H. Zumbro
Title: Partner, Cravath, Swaine & Moore LLP

*Authorized Representative of the Debtors and Debtors in Possession*

By:    Robert J. Feinstein
Title: Partner, Pachulski Stang Ziehl & Jones LLP

*Authorized Representative of the Official Committee of Unsecured Creditors*

Submitted by:

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701

- and -

**CRAVATH, SWAINE & MOORE LLP**
Paul H. Zumbro (admitted *pro hac vice*)
Lauren A. Moskowitz (admitted *pro hac vice*)
Salah M. Hawkins (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Counsel to the Debtors*

-and-

**PACHULSKI STANG ZIEHL & JONES LLP**
James I. Stang (CA Bar No. 94435)
Robert J. Feinstein (NY Bar No. 1767805)
Debra I. Grassgreen (CA Bar No. 169978)
Jason H. Rosell (CA Bar No. 269126)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile:  302-652-4400

*Counsel to the Committee*

**<u>EXHIBIT A</u>**

PLAN

**<u>EXHIBIT B</u>**

LIQUIDATION ANALYSIS

# LIQUIDATION ANALYSIS

## Introduction

Pursuant to section 1129(a)(7) of the Bankruptcy Code, each Holder of an impaired Claim or equity interest must either (a) accept a chapter 11 plan or (b) receive or retain under a chapter 11 plan property of a value, as of the plan effective date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (often referred to as the "Best Interests Test").  To demonstrate that the proposed *Third Amended Joint Chapter 11 Plan of Liquidation* (the "Plan") satisfies the Best Interests Test, the Plan Proponents, with the assistance of their restructuring advisors, have prepared the following hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement (as defined herein) and in the accompanying notes to the Liquidation Analysis.

The Plan Proponents believe that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code. This Liquidation Analysis and the conclusions set forth herein represent the Plan Proponents' best judgment regarding the results of such a liquidation. This Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court and Holders of impaired Claims or Interests in making this determination and should not be used for any other purpose. Nothing contained in this Liquidation Analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical chapter 7 liquidation analysis for purposes of meeting the requirements of section 1129(a)(7) of the Bankruptcy Code.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement, as applicable.

The Liquidation Analysis is shown on a consolidated basis and reflects the estimated cash proceeds, net of liquidation-related costs, that would be realized if the Debtors liquidated under chapter 7 of the Bankruptcy Code commencing on December 31, 2020. Also reflected for purposes of comparison is an analysis of estimated cash proceeds available under the Plan.

There are certain estimates and assumptions underlying the analysis that, while considered reasonable, are inherently subject to significant uncertainties and contingencies beyond the control of the Plan Proponents and their advisors. Independent accountants have not examined or reviewed the Liquidation Analysis. **THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO LIQUIDATE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

## Methodology / Global Notes & Assumptions

The Plan Proponents prepared the Liquidation Analysis assuming that each of the Debtors' current chapter 11 cases convert to chapter 7 cases on December 31, 2020.  The cash values referenced in this liquidation analysis are based on the unaudited book values of the Debtors as of September 15, 2020.

The Liquidation Analysis assumes that the Debtors' liquidation would commence under the direction of a chapter 7 trustee.  As the vast majority of the value is derived from cash on the Debtors' balance sheet and potential litigation proceeds, there would be minimal "liquidation of assets" activities prior to moving on directly to claims analysis, prosecution of the litigation claims, and distribution of value to creditors in accordance with the priorities established under the Bankruptcy Code.  It is assumed that those latter activities would occur over an 18-to-36 month period, with the variability depending on the success of the litigation efforts.

The litigation outcomes illustrated in the Liquidation Analysis are not exhaustive of all potential litigation outcomes in a hypothetical chapter 7 liquidation of the Debtors, as it is not possible to predict all potential outcome permutations.  Additionally, while the Plan contemplates a negotiated settlement of all Claims against the Released Parties, in a hypothetical chapter 7 liquidation scenario, the only significant unliquidated asset would be the Estates' claims against the Debtors' former directors and officers (the "<u>D&O Claims</u>").  The Plan Proponents have no way of predicting or estimating the actual outcome of a litigation regarding the D&O Claims.  Because the D&O Claims are a much narrower set of Claims than those Claims being settled under the Plan, the Liquidation Analysis assumes three liquidation scenarios: (1) the "High" scenario assumes that the chapter 7 trustee is able to achieve 75% of the settlement economics as those proposed in the Plan; (2) the "Medium" scenario assumes settlement economics at 50% of those in the Plan; and (3) the "Low" scenario assumes settlement economics at 25% of those in the Plan. The three liquidation scenarios are intended solely for the purpose of analysis and do not represent the actual views or beliefs of the Plan Proponents with respect to the potential results of any litigation that may be pursued by a Chapter 7 trustee related to or regarding the D&O Claims.

> **THE OUTCOME OF ANY LITIGATION CONCERNING
> THE D&O CLAIMS IN A CHAPTER 7 SCENARIO IS
> <u>HIGHLY SPECULATIVE AND UNCERTAIN</u> AND THERE IS NO
> GUARANTEE THAT A CHAPTER 7 TRUSTEE WILL BE ABLE TO
> RECOVER ANY FUNDS ON ACCOUNT OF THE D&O CLAIMS**

In the Liquidation Analysis it is assumed that proceeds realized from the liquidation of the Debtors' unrestricted assets would be aggregated into a common distribution fund from which all General Unsecured Claims receive *pari passu* recoveries from the distributable value, regardless of the basis of their claim.  This is contrary to the Plan scenario where Holders of Allowed Sexual Misconduct Claims receive an amount certain from the Settlement and Holders of all other Allowed General Unsecured Claims (*e.g.*, trade claims) receive recoveries from a portion of the Settlement and the proceeds from the sale of the Debtors' remaining assets.

The Liquidation Analysis contains an estimate of the value of Claims that ultimately will become Allowed Claims based on the Debtors' Schedules and Statements and the Debtors' books and records as of September 15, 2020. The Debtors have not evaluated, nor has the Bankruptcy Court determined, the amount of each such Claim. Accordingly, the final amount of Allowed Claims may differ from the Claim amounts presented in this Liquidation Analysis. Priority and administrative claims against the bankruptcy estate, including unpaid operating expenses and accrued and unpaid professional fees allowed in these Chapter 11 Cases, are assumed to be fully satisfied prior to satisfaction of any general unsecured claims in this Liquidation Analysis.

Per the Bankruptcy Court's order entered on September 9, 2020 [Docket No. 2966], the Bankruptcy Court established October 31, 2020 as the Tort Claims Bar Date, which is the deadline by which Holders of Sexual Misconduct Claims were required to file proofs of claim in these Chapter 11 Cases. As of November 1, 2020, **sixty-five (65) Tort Claims** have been filed. The Liquidation Analysis assumes that all Tort Claims that have been filed are Sexual Misconduct Claims with an average liquidated value of $2 million. Accordingly, the Liquidation Analysis assumes a Sexual Misconduct Claims pool of $130 million.

The Liquidation Analysis further assumes that there are no recoveries from (1) the pursuit of any potential preferential payments, fraudulent conveyances, or any other causes of action, or (2) proceeds from the sale of remaining assets, both of which are expected to be the same under either a chapter 7 or a chapter 11 scenario, and at any rate are believed to have *de minimis* value to the Debtors' estates.

The Liquidation Analysis assumes that all asset proceeds and creditor recoveries are nominal amounts and does not consider the discounting of values over time, although it should be reiterated that should the estates convert to a chapter 7, there will be an additional delay in realizing any distributable value.

| The Weinstein Company Liquidation Analysis (Amounts in USD) | | | | | | |
|---|---|---|---|---|---|---|
| | | Chapter 7 Liquidation Recoveries | | | Chapter 11 Plan Recoveries | |
| | | All Unsecured Claims | | | Sexual Misconduct | General Unsecured |
| Estimated Realizable Value of Debtor Entities | Notes | Low | Medium | High | Claims (Class 4) | Claims (Class 5) |
| D&O Claim Settlement or Judgment | (a) | $ 6,367,958 | $ 12,735,915 | $ 19,103,873 | $ 17,064,525 | $ 8,407,305 |
| Anticipated Contract Counterparty Settlements | (b) | 340,000 | 340,000 | 340,000 | - | 680,000 |
| Cash on Hand | (c) | 3,751,280 | 3,751,280 | 3,751,280 | - | 3,751,280 |
| | | $ 10,459,238 | $ 16,827,196 | $ 23,195,153 | $ 17,064,525 | 12,838,586 |
| Less: | | | | | | |
| Chapter 7 Trustee Plaintiff Counsel Contingency Fee | (d) | $ (1,910,387) | $ (3,820,775) | $ (5,731,162) | $ - | $ - |
| Claims Administrator Fees | (e) | - | - | - | (250,000) | - |
| Accrued & Unpaid Professional Fees | (f) | (5,418,106) | (5,418,106) | (5,418,106) | - | (4,418,106) |
| **Estimated Net Proceeds Available for Distribution** | | **$ 3,130,745** | **$ 7,588,315** | **$ 12,045,886** | **$ 16,814,525** | **$ 8,420,480** |
| Less: | | | | | | |
| Remaining Payments on Settled Administrative Claims | (g) | $ (1,055,000) | $ (1,055,000) | $ (1,055,000) | $ - | $ (1,055,000) |
| Other Estimated Administrative Claims | (h) | (2,000,000) | (2,000,000) | (2,000,000) | - | (2,000,000) |
| Estimated Priority Claims | (h) | (500,000) | (500,000) | (500,000) | - | (500,000) |
| Chapter 7 Trustee Expenses | (i) | (2,313,777) | (2,504,816) | (2,695,855) | - | - |
| Tort Claim Judicial Review Expense | (j) | - | - | - | (1,000,000) | - |
| Chapter 11 Liquidating Trust Expenses | (k) | - | - | - | - | (2,517,000) |
| **Net Recovery for General Unsecured Creditors** | | **$ (2,738,032)** | **$ 1,528,499** | **$ 5,795,031** | **$ 15,814,525** | **$ 2,348,480** |
| Estimated General Unsecured Claims | (l) | $ 125,000,000 | $ 125,000,000 | $ 125,000,000 | $ - | $ 125,000,000 |
| Estimated Sexual Misconduct Claims | (m) | 130,000,000 | 130,000,000 | 130,000,000 | 130,000,000 | - |
| **Total Estimated General Unsecured Claims** | | **$ 255,000,000** | **$255,000,000** | **$ 255,000,000** | **$ 130,000,000** | **$ 125,000,000** |
| *Estimated General Unsecured Claims Recovery %* | | *-1.07%* | *0.60%* | *2.27%* | *12.17%* | *1.88%* |
| *Average Sexual Misconduct Claim Award (65 Filed Claims)* | | *n/a* | *$ 11,988* | *$ 45,451* | *$ 243,300* | *n/a* |

## Specific Notes to the Liquidation Analysis

a) Whereas the Plan scenario allocates funds to Sexual Misconduct Claims and the Debtors' estates per the terms of the Settlement, the Liquidation Analysis aggregates any settlement for the benefit of all general unsecured claims, as discussed in the Global Notes above. Taking into account the strengths and weaknesses of the potential claims and causes of action, as well as the substantial risks, costs and time delays associated with litigating these

matters, the Liquidation Analysis assumes that the chapter 7 trustee will be able to recover 25%, 50%, or 75%, of the aggregate direct consideration received by the Debtors under the Settlement on account of the D&O Claims, respectively, in Low, Medium, or High scenarios.

b) The Plan scenario assumes full collection via settlement of approximately $680,000 in disputed contract claims.  The chapter 7 scenario assumes that the chapter 7 trustee will succeed in collecting only half of the disputed amount.

c) Cash balance in the main Estate account of approximately $2.9 million as of September 15, 2020, plus approximately $1.2 million of estimated cash currently in external accounts that is expected to be repatriated to the Debtors prior to Confirmation.

d) The Liquidation Analysis assumes that the D&O Claims would be handled by plaintiff's counsel for a contingency fee of 30% of any settlement or judgment amount.  All of the professional fees required to complete the Settlement process in the Chapter 11 Cases scenario are accounted for above in the line item immediately below marked (e).

e) Expenses to administer the Sexual Misconduct Claims (*e.g.*, proof of claim processing and telephone support services), as estimated by Epiq Bankruptcy Solutions, LLC, the proposed Sexual Misconduct Claims administrator.

f) Both the chapter 7 and Plan scenarios include estimated accrued and unpaid professional fees and other wind-down expenses paid or accrued through December 31, 2020.  The chapter 7 scenario excludes a $250,000 transaction fee that would otherwise be due to the Debtors financial advisor upon Confirmation of the Chapter 11 Cases.  The Plan scenario reflects a voluntary 5% reduction in fees incurred by the Estates' professionals (other than Moelis & Company LLC).

g) Represents remaining payments on two material Administrative Claims that have been settled for smaller amounts and partially satisfied by payments from the Debtors.

h) Represents the Debtors' current estimates based on recent claims work.

i) Assumes that the cost for a chapter 7 trustee and related professional fees and other expenses is equal to $2 million plus 3% of the estimated liquidation value.

j) Estimated judicial review expenses, assuming 10 elections at an expense of $100,000 each.

k) Assumed cost for the Liquidation Trust and related professional fee and other expenses.

l) Represents the Debtors' current estimate based on recent claims work. The Plan Proponents have assumed that the amount of General Unsecured Claims in a chapter 7 would approximately equal those asserted in the Chapter 11 Cases.

m) As set forth in the Global Notes above, per the Bankruptcy Court's order entered on September 9, 2020 [Docket No. 2966], the Bankruptcy Court established October 31, 2020 as the Tort Claims Bar Date, which is the deadline by which Holders of Sexual Misconduct

Claims were required to file proofs of claim in these Chapter 11 Cases. As of November 1, 2020, sixty-five (65) Tort Claims have been filed.  The Liquidation Analysis assumes that all Tort Claims that have been filed are Sexual Misconduct Claims with an average liquidated value of $2 million. Accordingly, the Liquidation Analysis assumes a Sexual Misconduct Claims pool of $130 million.

# **EXHIBIT C**

SEXUAL MISCONDUCT CLAIMS FUND PROCEDURES

**SEXUAL MISCONDUCT CLAIMS
RESOLUTION PROCEDURES IN THE CHAPTER 11 CASES
OF THE WEINSTEIN COMPANY HOLDINGS LLC AND ITS DEBTOR AFFILIATES**

**1.    PURPOSE**

The purpose of this protocol is to provide for the distribution of funds to holders of Allowed Sexual Misconduct Claims.  This protocol does not apply to other Tort Claims, which shall recover solely, if allowed, from the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement.

**2.    DEFINITIONS**

**2.1    Capitalized Terms**

A capitalized term used but not defined herein shall have the meaning ascribed to it in the Plan or the Bankruptcy Code and such definitions are incorporated herein by reference.

**2.2    Defined Terms**

(a)    "Claims Examiner" means Simone Lelchuck and Jed Melnick of Melnick ADR, LLP.

(b)    "Claimant" means a Holder of an Allowed Sexual Misconduct Claim.

**3.    RULES OF INTERPRETATION AND GENERAL GUIDELINES**

**3.1    Sole and Exclusive Method With Respect to the Debtors
and Former Representatives (other than Harvey Weinstein)**

The Plan and this protocol shall together be the sole and exclusive method by which a Claimant may seek monetary distribution on account of a Sexual Misconduct Claim against the Debtors and/or Former Representatives; provided, however, that after a Sexual Misconduct Claim is Allowed and liquidated in accordance with the procedures set forth herein, **a Claimant shall have the option to release Harvey Weinstein or to not release Harvey Weinstein and pursue an action against him (but not any Released Party) in a court of competent jurisdiction**.

Holders of Allowed Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall receive 25% of the Liquidated Value of their Allowed Sexual Misconduct Claims in consideration of the release of their Sexual Misconduct Claims against the Released Parties.

Holders of Allowed Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein shall receive the full Liquidated Value of their Sexual Misconduct Claims.

**3.2    Conflict with Plan.**

The terms of the confirmed Plan (as it may be amended) or the Confirmation Order shall prevail if there is any conflict between the terms of the Plan and the terms of this protocol.

### 3.3    Non-Compensatory Damages and Other Theories of Liability

In determining the distribution to any Claimant, punitive damages and damages that do not compensate the Claimant shall not be considered or allowed, even if these damages could have been considered or allowed under applicable non-bankruptcy law.  While punitive damages may be a tool for punishing behavior and deterring future similar behavior, taking potential punitive and similar damages into account in the context of a limit pool settlement would increase administrative costs and burdens and likely would benefit some Claimants to the detriment of other Claimants.

### 3.4    Withdrawal of Claims

A Claimant can irrevocably withdraw a Sexual Misconduct Claim at any time upon written notice to the Claims Administrator.  If a Claimant irrevocably withdraws a Sexual Misconduct Claim, the Claimant shall forever be barred, estopped, and enjoined from asserting such Sexual Misconduct Claim against each of the Debtors and the Released Parties and their respective property (or filing a subsequent proof of claim with respect thereto), and each of the Debtors, the Former Representatives, and their respective chapter 11 estates (as applicable), successors, and property shall be forever released from any and all indebtedness or liability with respect to or arising from such Sexual Misconduct Claim.

### 3.5    Res Judicata Effect

The Claims Examiner's determination with respect to a Sexual Misconduct Claim shall have no preclusive, res judicata, judicial estoppel, or similar effect outside of the Chapter 11 Cases as to any third party and, accordingly, the Claims Examiner's determination may not be used by or against any Claimant or Harvey Weinstein or any other third party in any other matter, case, or proceeding.

The Claims Examiner's determination and information or documents related thereto with respect to a Sexual Misconduct Claim (i) shall not be offered, introduced, admitted, referenced, discussed or otherwise disclosed to the judge, jury (any mediator(s) or arbitrator(s)) or any other finder of fact in any non-bankruptcy lawsuit or proceeding concerning any Non-Released Claim for any reason, except by a Released Party if necessary to prove entitlement to a credit against any amounts owed in connection with a judgment, award, decree or other order with respect to any such Non-Released Claim against any of the Released Parties, (ii) shall not have, and shall not be argued by a Holder of Non-Released Claims to have, preclusive, binding, res judicata, estoppel, or preemptive effect of any kind whatsoever with respect to the amount of any such Holder's Non-Released Claims, and (iii) shall not constitute an adjudication, judgment, trial, hearing on the merits, settlement, resolution of or otherwise establish any parties' liability or obligation for any Non-Released Claims.

### 3.6    Confidentiality and Privilege

All information that the Claims Examiner receives from any source about any Sexual Misconduct Claim, including all documents submitted in support of a Sexual Misconduct Claim (*e.g.*, medical records), shall be held in strict confidence and shall not be disclosed absent an Order of the Bankruptcy Court or the written consent of the Claimant (or such Claimant's counsel of record).

All information that the Claims Examiner receives from any Claimant (including from counsel to such Claimant) shall be subject to a mediation privilege and receipt of such information by the Claims Examiner shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

## 4.    SEXUAL MISCONDUCT CLAIMS EXAMINER

Simone Lelchuck and Jed Melnick of Melnick ADR, LLP have been appointed as the Claims Examiner under the terms of this protocol and an order of the Bankruptcy Court.  The Claims Examiner shall conduct a review of each of the Sexual Misconduct Claims and, according to the guidelines set forth in section 5 below, make determinations upon which individual monetary distributions will be made subject to the Plan.  The Claims Examiner's review as to each Claimant shall be final, subject only to: (1) reconsideration and judicial review as set forth in section 8 below; and (2) the option to not release Harvey Weinstein and pursue an action against him (but not any Released Party) in a court of competent jurisdiction as set forth in section 9 below.

## 5.    PROCEDURE FOR ALLOCATION
## AMONG ALLOWED SEXUAL MISCONDUCT CLAIMS

### 5.1    Proof of Sexual Misconduct Claim

As set forth in the Plan, upon the Effective Date of the Plan, the Debtors shall serve each person that filed a proof of claim asserting a Sexual Misconduct Claim with a long form proof of claim (the "Long Form Proof of Claim").  Holders of Sexual Misconduct Claims must submit the Long Form Proof of Claim to the Claims Examiner within 60 days following the Effective Date of the Plan.

The Claims Examiner shall consider all of the facts and evidence presented by the Claimant in the Claimant's filed Long Form Proof of Claim.

By a date to be established by the Claims Examiner and upon written request by a Claimant or such Claimant's counsel of record, the Claims Examiner may interview any Claimant; provided that any face to face interview shall be conducted by video conference.

### 5.2    Guidelines for Allocation for Allowed Sexual Misconduct Claims

#### (a)    Initial Evaluation

Each Sexual Misconduct Claim will be evaluated by the Claims Examiner.  Before making a final determination regarding a particular Sexual Misconduct Claim, the Claims Examiner shall consider the degree to which the Claimant has proven by a preponderance of the evidence that the sexual misconduct was perpetrated by Harvey Weinstein. The Claims Examiner will evaluate all evidence provided by the Claimant or otherwise available to the Claims Examiner that may enhance or diminish the overall reliability of any asserted Sexual Misconduct Claims.

The Long Form Proof of Claim shall require Claimants to disclose whether such Claimant previously entered into a settlement agreement or executed a release of liability with any of the Released Parties and/or Harvey Weinstein relating to the Sexual Misconduct Claim, the date of

the settlement or release, and to provide a copy of such agreement upon request of the Claims Examiner on a confidential basis. Claimants who previously entered a settlement agreement or release of liability with any Released Party and/or Harvey Weinstein relating to a Sexual Misconduct Claim may only recover for conduct that occurred after the date of the settlement or release of liability; provided, however, releases contained in ordinary course of business employment separation agreements shall not be a basis to disallow a Sexual Misconduct Claim.

(b)    <strong>Evaluation Factors</strong>

The Claims Examiner will review a Claimant's Long Form Proof of Claim and any accompanying evidence according to the guidelines below (the "Point Guidelines"). The Point Guidelines are illustrative of the various types and impacts of conduct, but are not meant to be a complete or conclusive description of all possible fact patterns for which the Claims Examiner may assign points. In evaluating a Claim, the Claims Examiner shall consider the totality of the circumstances of the Sexual Misconduct Claim. The Claims Examiner will also consider the likelihood that the Claimant would have been able to prove such Claimant's claims in court, including the application of relevant statutes of limitation and any other relevant considerations. The fact that a claim may be time-barred under the relevant statute of limitations shall not be used as a total bar to recovery on the Sexual Misconduct Claim.

The Claims Examiner will determine a Point Award in accordance with the Point Guidelines. **The total number of points for which a Claimant may qualify is 100 points.**

| NATURE OF PHYSICAL SEXUAL MISCONDUCT CLAIM<br>MAXIMUM 60 POINTS | | |
|---|---|---|
| **No.** | **Factor** | **Examples** |
| 1. | Type of alleged conduct | Unwanted penetration of any kind, including oral, anal, or vaginal.<br><br>Unwanted sexualized touching, such as being touched by Harvey Weinstein, being coerced or forced to touch Harvey Weinstein, or forced or coerced to masturbate in front of Harvey Weinstein.<br><br>Indecent exposure, such as being exposed to Harvey Weinstein's nudity, partial nudity, or to him masturbating, or being forced or coerced by Harvey Weinstein to remove clothing to expose breast(s), buttocks, or genitals. |
| 2. | Frequency and duration | Number of physical encounters. |
| 3. | Direct physical injury | Unwanted penetration of any kind, including oral, anal, or vaginal; unwanted sexualized touching, such as being touched by Harvey Weinstein, being coerced or forced to touch Harvey Weinstein, or forced or coerced to masturbate in front of Harvey Weinstein; bruises, scarring, internal or external injuries. |

| No. | Factor | Examples |
|---|---|---|
| 4. | Control of environment | Imprisonment whereby Claimant was physically prevented from leaving the environment, such as being locked in a room in an enclosed space without an easy form of exit (*e.g.*, an airplane or a hotel room); and/or the Claimant was transported to a location at Harvey Weinstein's direction or invitation and then prevented from leaving.  Other examples include being physically restrained by Harvey Weinstein or an attempted or actual sexual assault forced the Claimant to lock herself into a room. |
| **NATURE OF <u>NON-PHYSICAL</u> SEXUAL MISCONDUCT CLAIM**<br>**MAXIMUM 30 POINTS** | | |
| **No.** | **Factor** | **Examples** |
| 5. | Stalking | Repeated contact by or communication from Harvey Weinstein (*e.g.*, in-person, via text messages, email, or phone, or through intermediaries) after declining, avoiding, or expressing reluctance to communicate or meet with Harvey Weinstein.<br><br>Unplanned, unannounced, or otherwise unwelcome visits by Harvey Weinstein at Claimant's residence, lodging, or workplace.<br><br>Claimant was followed, investigated, or otherwise targeted by private investigators retained by or on behalf of Harvey Weinstein. |
| 6. | Type of non-physical sexual misconduct | Verbal sexual harassment may include being asked, explicitly or by implication, to engage in sexual acts or sexual conduct, being subjected to comments about a person's physical attractiveness, being called or exposed to gendered epithets, being subjected to insults based on sex stereotypes (*i.e.*, comments like women are only good for getting married and having children, derogatory comments about menstruation, etc.)<br><br>Employment or professional opportunity conditioned on performing gendered personal tasks for Harvey Weinstein outside of and in addition to the Claimant's profession, including those tasks that involved exposure to Harvey Weinstein's sexual encounters (such as obtaining or having to store or otherwise handle penile dysfunction medication for Harvey Weinstein or cleaning rooms following Harvey Weinstein's sexual encounters). |
| 7. | Frequency and duration | Number of occurrences, including whether Claimant was employed by the Debtors. |
| 8. | Employment retaliation | Unfavorable employment terms or denial of professional opportunity after the Claimant complained, whether in writing or orally, about Harvey Weinstein's sexual misconduct, sexual harassment, and/or sexual discrimination to Harvey Weinstein or others in the workplace, including human resources personnel. |

| IMPACT OF SEXUAL MISCONDUCT<br>MAXIMUM 10 POINTS | | |
|---|---|---|
| **No.** | **Factor** | **Examples** |
| 9. | Emotional distress | Mental health problems and other emotional trauma, whether or not diagnosed or treated, including: paranoia, depression, substance abuse, suicide attempt or suicidal ideation, self-harm, anxiety, flashbacks, post-traumatic stress disorder, damage to personal or familial relationships, and difficulty in obtaining or maintaining employment due to mental or emotional condition resulting from incident(s). |
| 10. | Economic harm | Economic harm including monetary loss attributable to retaliation, termination, or denial of professional opportunity by Harvey Weinstein for resisting or refusing to acquiesce to Harvey Weinstein's sexual conduct or demands or for complaining about such conduct or demands. |
| ADJUSTMENTS TO POINT AWARDS<br>MAXIMUM +/- 20 POINTS (UP TO A MAXIMUM OF 100 TOTAL POINTS) | | |
| **No.** | **Factor** | **Examples** |
| 11. | Age | Age of claimant at time of abuse. |
| 12. | Litigation | What was the outcome of prior litigation? What is the current status of pending litigation? |
| 13. | Corroborating evidence | Items such as documents, emails, text messages, videos, receipts, hotel folios, itineraries, travel records, event tickets, etc. |
| 14. | Limitation on Damages in Applicable Jurisdiction | Are there any limits on compensatory damages in the applicable jurisdiction? |
| DOWNWARD ADJUSTMENTS TO POINT AWARDS<br>MAXIMUM - 35 POINTS | | |
| **No.** | **Factor** | **Examples** |
| 15. | Limitations | What is or would be the applicable statute of limitation? Is the claim timely on its face under the applicable statute of limitations? Are there reasons why, notwithstanding a claim's apparent untimeliness the claim may not be time – barred, after all? Would the law applicable in the relevant jurisdiction lead to the conclusion that there is a reasonable expectation of the time bar being set aside? |

### 5.3    Joint or Several Liability Issues Not Applicable

The primary function of the Sexual Misconduct Claim evaluation is to facilitate the fair and equitable division of the proceeds of this settlement among the various Claimants.  Accordingly, there will be no consideration of joint or several liability issues vis-à-vis non-Debtor individuals or entities that may potentially be liable for the Sexual Misconduct Claim.

**6.**    **MINIMUM DISTRIBUTION**

Notwithstanding anything to the contrary herein or in the Plan, every holder of an Allowed Sexual Misconduct Claim shall receive a distribution of at least $7,500.  The Claims Examiner, however, shall have the discretion to apply downward adjustments to the minimum distribution amount based on the total number of Sexual Misconduct Claims.

**7.**    **MONETARY DISTRIBUTION**

Once the Claims Examiner determines each Claimant's Point Award, the Claims Administrator shall then calculate the value of each Point Award.  Each Claimant's Point Award value will be determined by dividing (x) the total amount of dollars in the Sexual Misconduct Claims Fund (approximately $17 million) by (y) the total number of points among all of the Point Awards, the result of which will be the value of one point (the "Point Value").  The Claims Administrator will then multiply the Point Value by each Claimant's Point Award to calculate the Liquidated Value of the Claimant's Sexual Misconduct Claims.  By way of example, if there are 100 claimants, with Point Awards totaling 7,500 points and a total settlement fund of $17 million, each point would be valued at $2,266.67 and a Claimant with 75 points would be allocated $170,000.  Claimants who receive a Point Award of zero points shall not be eligible to receive any monetary distribution, provided, however, such Claimants may seek reconsideration of their Point Award pursuant to the process set forth in Section 9 below.

At the conclusion of the claims determination process, as set forth in Section 8 below, the Claims Administrator shall make a monetary distribution to Holders of Allowed Sexual Misconduct Claims in accordance the written payment instructions provided to the Claims Administrator on the Long Form Proof of Claim.  Although the Claims Administrator is authorized to make interim distributions, the final monetary distribution will depend on (a) the number of Electing Judicial Claimants (defined below) and (b) the conclusion of all Final Judicial Determinations (defined below).

The Plan Proponents anticipate that an interim distribution will be made within approximately 7 months from the Effective Date of the Plan.

**8.**    **NOTICE OF SEXUAL MISCONDUCT CLAIMS DETERMINATION**

   **8.1**    **Claim Determination**

After the Claims Examiner has fully evaluated all Sexual Misconduct Claims and the Claims Administrator has calculated the Liquidated Value of each Claimant's Sexual Misconduct Claims, the Claims Administrator shall notify each Claimant in writing (the "Determination Notice") of their Point Award and the estimated Liquidated Value with respect to their Sexual Misconduct Claims (the "Claims Determination").

The Claims Administrator shall mail the Determination Notice to the Claimant or such Claimant's counsel of record, or in the case of unrepresented parties, to the last address based on the Claimant's filed proof of claim.  Upon mailing of a Claimant's Determination Notice where such Claimant is issued a Point Award of one or more points, such mailing shall constitute a withdrawal

of the Settlement Parties' objections to such Claimant's Sexual Misconduct Claims (if any) and such Claimant's Sexual Misconduct Claims shall be deemed Allowed Sexual Misconduct Claims.

 If a Claimant receives a Point Award of zero points and is therefore ineligible for monetary distribution, the Claims Determination will explain the reason(s) for such Point Award.  Upon mailing of a Claimant's Determination Notice where such Claimant is issued a Point Award of zero points, such mailing shall constitute an objection to the allowance of such Claimant's Sexual Misconduct Claims.  If such Claimant fails to seek reconsideration as set forth in Section 8.2 below, such Claimant's Sexual Misconduct Claims shall be deemed Disallowed Sexual Misconduct Claims.

### 8.2    Reconsideration

The Determination Notice shall be final and non-appealable unless the Claimant makes a timely request for the Point Award to be reconsidered by the Claims Examiner.  The Claimant may request reconsideration of the Point Award by delivering a written request for reconsideration to the Claims Examiner within 14 calendar days after the date of mailing of the Determination Notice. The Claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request upon a showing that such additional information was not previously available or was not previously provided to the Claims Examiner.  If a Claimant fails to request reconsideration within 14 calendar days after the date of mailing of the Determination Notice, the Claims Examiner's determination shall become final and non-appealable, provided, however, **a Claimant shall have the option to not release Harvey Weinstein and pursue an action against him (but not any Released Party) in a court of competent jurisdiction in accordance with section 9 below**.

If a Claimant makes a timely request for reconsideration, after reconsideration of the Claims Determination by the Claims Examiner, the Claims Administrator will issue a notice (a "Reconsideration Notice") of the outcome of its decision (the "Final Claims Determination"). If the Claimant accepts the Final Claims Determination, such Final Claims Determination shall be final and non-appealable; provided, however, **a Claimant shall have the option to not release Harvey Weinstein and pursue an action against him (but not any Released Party) in a court of competent jurisdiction in accordance with section 9 below**.

### 8.3    Judicial Review of Point Award

Claimants that reject the Final Claims Determination may appeal the Final Claims Determination to the District Court.[1]

Election of Judicial Review.  Within 14 days after a Claimant receives a Reconsideration Notice (the "Election Deadline"), such Claimant must (i) notify the Claims Administrator of the Claimant's intent to seek judicial review of Final Claims Determination ("Judicial Review") by submitting a written notice to the Claim Administrator (a "Judicial Review Election Notice") and (ii) file a copy of such Judicial Review Election Notice with the District Court.  Claimants who

---

[1]    Nothing in these procedures shall be deemed a waiver or modification of a Claimant's right to a trial by jury as to Harvey Weinstein.

fail to submit and file a Judicial Review Election Notice by the Election Deadline shall be deemed to accept the Final Claims Determination, and such Final Claims Determination shall become final, binding, non-appealable and not subject to review by any Court.

Claimants who submit and file a Judicial Review Election Notice by the Election Deadline ("Electing Judicial Claimants") shall have no right to receive any distribution from the Sexual Misconduct Claims Fund absent the issuance of an order or judgment of the District Court confirming or revising the Point Award for such Claimant's Sexual Misconduct Claims that are no longer subject to appeal and for which no appeal is pending (a "Final Judicial Determination").

Limited Scope of Judicial Review.  The Judicial Review shall be limited to the Final Claims Determination and the Point Award thereunder; provided, however, the District Court shall have plenary review of the Final Claims Determination and Point Award thereunder.  The maximum points that the District Court may award on account of a Sexual Misconduct Claim is 100 points.

Recovery Limited to Final Judicial Determination.  To the extent that a Claimant's Final Judicial Determination with respect to such Claimant's Sexual Misconduct Claims results in a Point Award that is more or less than the Point Award in the Final Claims Determination, the Claimant will receive payment from the Sexual Misconduct Claims Fund that will be based on the Point Award of the Final Judicial Determination.

Consolidation of Judicial Reviews.  Subject to notice and a hearing and at the discretion of the District Court, all judicial review proceedings elected pursuant to this Section 8.3 may be heard and determined in one or more consolidated proceedings to the extent practicable, in a manner acceptable to the District Court, and in accordance with applicable law.

Attorneys' Fees and Expenses.  Electing Judicial Claimants shall be required to pay their own attorneys' fees and expenses in connection with the Judicial Review.  The Plan Proponents have structured these Sexual Misconduct Claims Resolution Procedures in a manner that is intended to reduce administrative costs and attorneys' fees attendant to administering the Sexual Misconduct Claims Fund including, but not limited to, retaining the Claims Examiner and Claims Administrator in a pro bono capacity, which thereby maximizes the amount of funds available for distribution to Claimants.  The Judicial Review process is included for the benefit of all Claimants and to comport with applicable law.  Accordingly, all attorney's fees and expenses of the Claims Administrator and/or Claims Examiner in connection with the Judicial Review shall be paid from the Sexual Misconduct Claims Fund.  To the extent there are pending Judicial Reviews at the time of any interim distribution from the Sexual Misconduct Claims Fund, the Claims Administrator shall create a reserve for its expected attorney's fees and expenses related to such Judicial Reviews.

## 9.    ELECTION TO RELEASE HARVEY WEINSTEIN

Upon the later of (i) the Claims Determination; (ii) a Final Claims Determination; or (ii) a Final Judicial Determination, the Claims Administrator shall provide each Claimant with the option to release Harvey Weinstein or to not release Harvey Weinstein and pursue an action against him (but not any Released Party) in another court of competent jurisdiction (including the right to a jury trial) (the "Election Notice").  The Election Notice shall include the estimated minimum Liquidated Value of a Claimant's Allowed Sexual Misconduct Claims.

**Claimants who do not affirmatively elect to release Harvey Weinstein shall receive 25% of the Liquidated Value of their Allowed Sexual Misconduct Claims in consideration of the release of their Sexual Misconduct Claims against the Released Parties (except the Insurance Companies as it relates to such Claimant's Sexual Misconduct Claims against Harvey Weinstein).**

**Claimants who affirmatively elect to release Harvey Weinstein shall receive the full Liquidated Value of their Sexual Misconduct Claims in consideration of the release of their Sexual Misconduct Claims against the Released Parties and Harvey Weinstein.**

Claimants must return the Election Notice to the Claims Administrator within 14 calendar days after the date of mailing of the Election Notice.  If a Claimant **does not affirmatively elect to release Harvey Weinstein** (a "<u>Non-Releasing Claimant</u>"), such Non-Releasing Claimant shall receive 25% of the Liquidated Value of its Allowed Sexual Misconduct Claims and pursue an action against Harvey Weinstein (but not any Released Party) in another court of competent jurisdiction.

For each Non-Releasing Claimant, the remaining 75% of the Liquidated Value of their Allowed Sexual Misconduct Claim shall be allocated to a reversionary fund for the benefit of the Insurance Companies.

## 10.    <u>ELECTION TO IMMEDIATELY PURSUE HARVEY WEINSTEIN</u>

Notwithstanding anything to the contrary contained herein, a Claimant may, upon a preliminary showing of a valid Sexual Misconduct Claim, elect on the Long Form Proof of Claim to receive the minimum distribution amount ($7,500), waive all further rights with respect to the Sexual Misconduct Claims Fund, and immediately pursue an action against Harvey Weinstein (but not any Released Party) in another court of competent jurisdiction.

# **EXHIBIT D**

COVERAGE DISPUTE LETTERS

[*SEALED*]

**<u>EXHIBIT E</u>**

CURRICULUM VITAES OF SEXUAL MISCONDUCT CLAIMS EXAMINERS



**Simone Lelchuk, Esq. has been a full-time mediator, arbitrator, and special master since 2014.**

She has been involved in successfully mediating and managing multi-party and multi-faceted cases, with billions of dollars in aggregate settlements. She has comprehensive experience in ADR process design and the allocation of settlement funds. The matters Simone works on span many areas of the law: insurance coverage (D&O, E&O, and Representations & Warranties), sexual harassment, sexual discrimination, Title IX, litigation funding, professional liability, financial and accounting cases, antitrust, bankruptcy, and securities and derivatives. She prides herself on her ability to ascertain and comprehend legal and factual issues quickly, and manage large, complex ADR processes efficiently and objectively.

In addition to working on her own matters, Simone also collaborates with Judge Daniel Weinstein (ret.) and Jed D. Melnick, Esq., as well as other esteemed neutrals throughout the country, on both mediations and the allocation of settlement funds.

Prior to becoming a neutral, Simone worked in private practice at a large New York City law firm (Kasowitz Benson Torres LLP), where she worked in both litigation and transactional groups. Before practicing law, Simone was a valuation consultant at KPMG LLP. Simone's experience at KPMG allowed her to grow adept at not only understanding complicated processes and detailed financial data, but also organizing such processes and data cohesively, conducting analysis to define key insights, and presenting findings in a comprehensible manner to ensure buy-in and alignment. She received her juris doctor from the Benjamin N. Cardozo School of Law in New York City and her Bachelor's Degree from Ohio University.

## REPRESENTATIVE SPECIAL/SETTLEMENT MASTER ROLES

- Co-Special Master in the James Square facility (assisted living facility) class action settlement
- Deputy Special Master in In re UCBH Holdings, Inc.
- Deputy Settlement Master in In re Auto Parts Antitrust Litigation

## REPRESENTATIVE MEDIATIONS

- Antitrust - *In re Auto Parts Antitrust Litigation*
- Assault / Harassment Cases - Class Action settlement of various Plaintiffs and the NYAG against Harvey Weinstein and other Defendants, and Weinstein's related companies, and other Defendants; Mass action of elder abuse claims by residents and residents' families brought against the parent company of an assisted living facility; the mediation and resolution of multiple issues related to Church abuse cases
- Bankruptcy / Trustee - *In re Fresh & Easy, LLC*
- Consumer Class Actions - *Kinder, Deborah, et al. vs. Meredith Corporation, et al.*
- Coverage Litigation - extensive experience with D&O, E&O, and Representation & Warranty policies

## REPRESENTATITVE ARBITRATIONS

- Various fee allocation arbitrations among derivative plaintiffs
- Plan of Allocation of a Settlement Fund between Section 10(b) and Section 11 plaintiffs

## PUBLICATIONS

- Co-Author with Jed D. Melnic, "Video Conferencing and Mediating Complex Disputes in the New Normal: Settlements Don't Need to Wait," *New York Law Journal*, March 2020.
- Co-Author with Jed D. Melnick, "Go Work Your Magic," *American Bar Association*, Fall 2017.
- How to Mediate Like a Pro, *TYL Magazine/American Bar Association*, August 2015.

## BACKGROUND & EDUCATION

- Active Member, State Bar of New York
- Kasowitz Benson Torres LLP, 2010-2014
- KPMG LLP (Economic Valuation Services Group), 2005-2007
- President of the Cardozo Dispute Resolution Society
- Editor, Cardozo Journal of Conflict Resolution
- Certificate in Dispute Resolution from Kukin Program for Conflict Resolution at Benjamin N. Cardozo School of Law
- Member of The Mediation Clinic at the Benjamin N. Cardozo School of Law
- J.D., Benjamin N. Cardozo School of Law, 2010

- Cryptocurrency Disputes - SIM card theft that led to the loss of certain cryptocurrency assets

- Entertainment & IP Disputes - a dispute between a professor and his textbook publisher related to alleged royalties owed and other IP-related issues.

- Litigation Funding Disputes - a dispute about the enforceability of a litigation funding agreement

- Mergers & Acquisitions - *JAC Holding Enterprises, Inc., et al. vs. Atrium Capital Partners, LLC*

- Securities Class Actions - *In re Urban Outfitters, Inc. Securities Litigation*

- Title IX Matters - various mediations with educational institutions regarding compliance with Title IX

- B.B.A., summa cum laude Ohio University, 2005

**Back to Team**

# Melnick ADR

COVID

Team

News and Publications

Contact





# Jed D. Melnick, Esq.

**Case Manager**

Doug Duzant
T: 212-607-2787
F: 212-228-0222
620 Eighth Avenue, 34th Floor, New York, NY 10018
dduzant@jamsadr.com

# Biography

*Jed is available to conduct virtual mediations, arbitrations and other ADR proceedings on Zoom and other online platforms.*

**Jed D. Melnick, Esq. serves as a Mediator and Special Master in complex business litigation pending throughout the United States and internationally. Jed is highly respected for his ability to successfully resolve disputes with patience, persistence, and creativity.** Since becoming a full-time mediator in 2005, Jed has resolved over one thousand disputes, with an aggregate value in the billions of dollars. Specifically, Jed has extraordinary skill in resolving multi-party complex disputes, especially when they involve highly sensitive issues and difficult parties. Among numerous recognitions, two recent honors include Jed's twice being awarded the distinction of being an ADR Champion by the *The National Law Journal* as well as being invited to speak about "Mediation Strategies for Judges" as the closing presenter at the annual Delaware Judiciary retreat.

Jed often utilizes a team approach to mediation, which allows him to maintain a practice with the highest level of responsiveness, performance, and results. As part of Jed's team approach, and when appropriate, Jed relies on respected neutral experts to complement him and assist the involved parties by providing efficient and effective feedback on intricate accounting, insurance, economic, appraisal and environmental issues.

Jed's detailed list of representative matters is included below, but several of his more high-profile matters include: much of the litigation related to the Adelphia and Lehman bankruptcies, British Petroleum Securities Litigation, and Auto Parts Antitrust Litigation (currently part of the Settlement Master's team). Jed successfully mediated creditor claims against Dewey & LeBoeuf LLP's former chairman in the firm's Chapter 11 filing. Jed was also appointed by Judge Lewis Kaplan of the United States District Court for the Southern District of New York to serve as a mediator for the Lehman ADR Derivative Contract Program. Additionally, Jed was responsible for the successful mediation of a pro bono case between the Disability Rights Advocates and the New York City Taxi and Limousine Commission, which led to a historic settlement raising the number of handicap accessible

taxi cabs from less than 5% of the fleet to 50% of the fleet by 2020. This settlement led the Judge overseeing the case to issue a statement proclaiming: "[T]his is one of the most significant acts of inclusion in this city since Jackie Robinson joined the Brooklyn Dodgers."

# Representative Matters

- **Antitrust Matters**
  - *In re Polyurethane Foam Antitrust Litigation*
  - *In re Processed Egg Products Antitrust Litigation*
  - *Auto Parts Antitrust Litigation*
  - *In re Lithium Ion Batteries Antitrust Litigation*
- **Bankruptcy / Trustee Matters (Chapter 7 and Chapter 11)**
  - *Adelphia Recovery Trust v. Bank of America, NA*
  - Hunter Wise Commodities LLC re Commodity Futures Trading Commission enforcement actions
  - *In re LB Litigation Trust (Lyondell)*
  - *In re Universal Health Care Group, Inc.*
  - *In re Fresh & Easy, LLC*
- **Chinese Securities Litigation**
  - *In re HQ Sustainable Maritime Indus., Inc. Securities and related Derivative Litigation*
  - *In re China Mobile Games & Entertainment Group, Ltd. Securities Litigation*
  - *China MediaExpress Holdings, Inc., by Karl P. Barth as Receiver vs. American Home Assurance Company*
- **Contract Disputes**
  - A dispute between a South American farming conglomerate and its investors involving complex issues related to international law and land use.
  - A dispute between a major defense contractor and a uranium mining company over contracts related to the price of uranium.
  - A dispute between one of the world's largest car manufacturers and the plant producing batteries for cutting edge hybrid SUV vehicles – involving a three-day mediation in Alabama in tandem with the Federal Judge overseeing the matter.
- **Consumer Class Actions**
  - *Sullivan v. Wenner Media LLC*
  - *Kinder, Deborah, et al. vs. Meredith Corporation, et al.*
  - *Friske v. Bonnier Corporation*
  - *Krivy, Sophia vs. Jean Madeline Education Center of Cosmetology, et al.*
  - *Mouzon v. Radiancy, Inc.*
- **Coverage Litigation**
  - Hundreds of mediations involving Fortune 500 companies and Wall Street banks and those organizations' respective carrier(s) related to D&O, E&O, Casualty and Fidelity policies.  Examples of these mediations include: *LB (Lyondell) Litigation Trust, Carlyle, Adelphia and MF Global*.
  - Disability policies (*In re UnumProvident Corp*)
  - Auto policies (involving an Arizona Damron Agreement)
  - Maritime policies
  - Representations & Warranty policies
- **Delaware Litigation**
  - *In re Cornerstone Therapeutics Inc. Stockholder Litigation*
  - *In re CNX Gas Corporation Shareholders Litigation*
  - *Makover, M.D., Michael E. vs. Gopinathan, M.D., Govindan* (co-mediated with Vice Chancellor Sam Glasscock III)
  - *In re TIBCO Software Inc. Stockholders Litigation*
- **Entertainment and Intellectual Property**
  - A dispute between a professor and his textbook publisher related to alleged royalties owed and other IP-related issues.
  - A highly sensitive mediation related to the personal matters of a media mogul.
  - A bankruptcy dispute involving the financing and regulatory interests of Digital Domain Media.
  - Fraud claims between a group of private equity promoters and a film financing venture.

- A legal malpractice matter involving an underlying copyright claim between a major music label and its counsel.

- **ERISA and Employment Litigation**
  - A confidential employment dispute between a nuclear scientist and a defense contractor.
  - *Fiduciary Counselors, Inc. v. Magnuson*
  - *In re Comcast Corporation Litigation*
- **False Claims Act and *Qui Tam*:**  Jed mediates cases involving FCA, qui tam, whistleblower, and related claims at issue, including complex insurance coverage matters related thereto.  These disputes involve: national advertising companies, military contracts, the national polling agency, and contracts involving government agencies including FEMA and the U.S. Mint and the State Department.
  - *United States of America, ex rel., et al. vs. Galena Biopharma, Inc., et. al.*
  - *Gallup, Inc. vs. Greenwich Insurance Company* (insurance coverage related thereto)
  - *Zurich American Insurance Co. vs. GSD&M Idea City LLC* (insurance coverage related thereto)
- **Government Matters**
  - *FDIC, as receiver for Orion Bank of Naples, Florida vs. U.S. Specialty Insurance Co., et al.*
  - *Federal Deposit Insurance Corporation as Receiver for United Western Bank vs. Berling, Charles J., et al.*
  - *In re Department of Labor Investigation (MagnaCare Holdings, Inc.)*
  - *In re First Farmers Financial*
- **Maritime:**  Jed has experience mediating both insurance coverage disputes involving maritime insurance policies and the underlying maritime dispute.
- **Mergers and Acquisitions**
  - Kinder Morgan Acquisition: *In re El Paso Corporation Shareholder Litigation*
  - The Dominion Transaction: *In re CNX Gas Corporation Shareholders Litigation*
  - *JAC Holding Enterprises, Inc., et al. vs. Atrium Capital Partners, LLC*
- **Pharmaceutical / Healthcare Related Matters**
  - *Chelsea Therapeutics International, Ltd. Securities Litigation*
  - *In re Spectrum Pharmaceuticals, Inc. Securities Litigation*
  - *In re Cornerstone Therapeutics Inc. Stockholder Litigation*
  - *In re Department of Labor Investigation (MagnaCare Holdings, Inc.)*
  - *In re Amicus Therapeutics, Inc. Securities Litigation*
- **Securities Class Actions**
  - *In re Wachovia Preferred Securities and Bond/Notes Litigation*
  - *In re Lehman Brothers Equity/Debt Securities Litigation*
  - *In re BP p.l.c. Securities Litigation*
  - *Alan B. Marcus v. J.C. Penney Company, Inc., et al.*
  - *In re NII Holdings, Inc. Securities Litigation*
  - *In re Tower Group International Ltd. Shareholder Litigation*
  - *Westchester Putnam Counties Heavy and Highway Laborers Local 60 Benefit Funds v. Brixmor Property Group, Inc. et al.*
  - *In re The Bancorp, Inc. Securities Litigation*
  - *Lake County and Vicinity vs. Navistar International Corporation, et al.*
  - *In re Urban Outfitters, Inc. Securities Litigation*
  - *Plumbers & Pipefitters National Pension Fund v. Orthofix International N.V., et al.*
  - *Mitchell Arciaga, et al. vs. Barrett Business Services, Inc., et al.*
  - *Special Situations Fund III QP, L.P., et al. vs. Marrone Bio Innovations, Inc., et al.*
- **Sexual Assault and Abuse Cases (class and mass actions related thereto)**
  - *Doe 30 Mother 30 v. Bradley* - a $123 million settlement in a class-action lawsuit filed on behalf of young children who were sexually abused by former Delaware pediatrician Earl Bradley.
  - Mass action of elder abuse claims by residents and residents' families brought against the parent company of an assisted living facility.
  - The mediation and resolution of multiple issues related to Church abuse cases.
- **Special / Settlement Master**
  - Special Master in the James Square facility (assisted living facility) class action settlement
  - Deputy Settlement Master in *In re Auto Parts Antitrust Litigation*
- **Tax Matters**
  - *Swiss Reinsurance Company Ltd. et al. v. General Electric Co. et al.* – involving issues related to international tax structures.
  - *ClassicStar* - a complex multiparty dispute involving alleged "mare lease" tax shelters and numerous defendants.

○ Deloitte & Touche's settlement with The Adelphia Recovery Trust for $167.5 million - among the largest settlements ever reached between a public accounting firm and its audit client.
○ A confidential fee mediation that involved complex coverage and tax issues for fees incurred by the partners of a large accounting firm as a result of a wide ranging government investigation into the handling of certain tax shelters.
○ A confidential mediation between one of the largest auditors and a university.  This settlement allowed the university to continue its operations (current as of 2017).

# Honors, Memberships, and Professional Activities

- **ADR Champion (2016)** - One in 48 professionals selected by *The National Law Journal* to their inaugural list of Champions, "in honor of their passion, perseverance, and success in alternative dispute resolution."
- **Jed D. Melnick Annual Symposium of the *Cardozo Journal of Conflict Resolution*** – The *Cardozo Journal of Conflict Resolution* named its annual symposium the "Jed D. Melnick Annual Symposium of the *Cardozo Journal of Conflict Resolution*"
- **Pennsylvania Super Lawyers "Rising Star" (2010-2012)** – Honored by *Law & Politics Magazine and Philadelphia Magazine*, Jed was the only recipient in the Alternative Dispute Resolution category in the state
- **Lawyer on the Fast Track (2010)** – Recognized among 30 Pennsylvania lawyers under the age of 40 by *The Legal Intelligencer and Pennsylvania Law Weekly*
- **Philadelphia Common Pleas Appellate Mediation Program** – Former Special Master/Judge Pro-Tem
- Extensive bench and jury trial experience in the Major Trials Unit at the Defenders Association of Philadelphia and civil litigation experience in both state and federal court.

### Presentations

Jed is frequently invited to speak on panels and give presentations related to the mediation of complex commercial litigation.  A selection of his speaking engagements are as follows:
- Closing Panelist, "Mediation Strategies for Judges" presented at the 2017 Delaware Judicial Retreat, November 2017 (Delaware)
- Keynote Speaker, CLE Ethics Presentation at Kaufman, Borgeest & Ryan LLP, June 2017 (New York)
- Presenter, PLUS Webinar: The Nuts and Bolts of Mediating Complex D&O Claims, May 23, 2017
- Presenter, CLE Presentation on Mediation (presented to a major insurance company), January 2017 (New York)
- Panelist, "Let Us Mediate to Resolve Our Dispute," May 2017 (St. Lucia)
- Panelist [co-presenter with Judge Layn Phillips (Ret.)], "Latham & Watkins: Mediation Advocacy Training Program," April 2017 (Los Angeles)
- Panelist, "Rubenstein-Walsh CLE Seminar," February 2017 (Delaware)
- Panelist at the PLAN Regional Meeting, "D&O Marketplace 'Mediation Strategies," June 2016 (New York)
- Panelist, "Current Issues in D&O Liability & Insurance 2016," May 2016 (New York)
- Speaker, PLI's Bridge-the-Gap II for Newly Admitted New York Attorneys 2015, "Negotiation-Best Practices," August 2015 (New York)
- Panelist, 2015 ACCEC Panel, "Successfully Resolving Cases: Mediation and London Arbitration Tips from the Experts," May 2015 (Chicago)
- Panelist, 2015 CLM Bermuda Chapter Educational Event, March 2015 (Bermuda)
- Panelist, 2015 PLUS D&O Symposium, "The Post-Halliburton World: Securities Class Action Update," February 2015 (New York)
- Panelist, Webinar hosted by Advisen – Insurance Intelligence, "Advisen Webinar: Quarterly D&O Claims Trends: Q3 2014," October 2014 (New York)
- Speaker, American Conference Institute, D&O Liability, Mediation and Settlement Negotiation of D&O Claims, "Attaining a Favorable Result for Your Client or Company,"  October 2013 (New York)
- Speaker, Wiley Rein Professional Liability Insurance Seminar, "Mediator's Perspective on The Role of Insurance in Mediation," October 2013 (New York)
- Speaker, "Mediating Complex Disputes with Increasingly Sophisticated Parties," September 2012 (Philadelphia)
- Speaker, "Mediating Complex Disputes with Increasingly Sophisticated Parties," CLM Annual National Conference, March 2012 (San Diego)
- Speaker, "The Role of Mediation and Insurance in Bet the Company Litigation," February 2012 (Benjamin

N. Cardozo School of Law, New York)
- Speaker, "Developments in Securities Class Actions and Derivative Litigation," January 2012 (Bermuda)

**Publications**

- Author, "Video Conferencing and Mediating Complex Disputes in the New Normal: Settlements Don't Need to Wait," New York Law Journal, March 2020
- Author, "Go Work Your Magic," American Bar Association, Fall 2017
- Author, "Lost Opportunities in Mediation," Westlaw Journal Securities Litigation & Regulation, Vol 19, Issue 4, June 2013
- Author, Editor and Moderator, "The Role of Mediation and Insurance in Bet the Company Litigation," Cardozo J. Conflict Resol., Vol 14.2, 2013
- Contributed to "A Time to Cut Costs," by Gregory A. Markel, Chairman of the Cadwalader Wickersham & Taft Litigation Department, article found on Lawdragon.com, January 2012
- Co-Author with John Wilkinson, Vivien Shelanski, and Robin Gise, "Mediation Starts from the First Phone Call: Practice Points and Helpful Hints for Lawyers Going to Mediation," Cardozo J. Conflict Resol., Vol 11, Number 2, 2010
- Author, Substantive Introduction to "The Mediation of Securities Class Action Suits, A Panel Discussion Hosted by the Benjamin N. Cardozo School of Law," Cardozo J. Conflict Resol., Vol. 9, Number 2, Spring 2008
- Co-Author with Judge Weinstein and Michael Young, "The Role of Damages Issues – Post-Dura – in the Mediation of Securities Class Actions," Mealey's Emerging Securities Litigation, Vol. 6, #3, September 2007

## Background and Education

- J.D., Benjamin N. Cardozo School of Law, 1999
- B.A., Grinnell College, 1994
- While in law school, Jed founded the *Cardozo Journal of Conflict Resolution* and was part of the team from the Center for Court Innovation that founded and built the Crown Heights Community Mediation Center in Brooklyn.  In part, the initiative aimed to address conflicts between the Orthodox Jewish community and the Caribbean and African-American communities after the Crown Heights riots.

Available nationwide ›

**Disclaimer**

This page is for general information purposes.  JAMS makes no representations or warranties regarding its accuracy or completeness.  Interested persons should conduct their own research regarding information on this website before deciding to use JAMS, including investigation and research of JAMS neutrals. See More