# EXHIBIT A

1 | Ronald D. Wilton, State Bar No. 101510
WILTON LAW & MEDIATION
2 | 16055 Ventura Blvd., Suite 811
Encino, California 91436-2610
3 | Tel:  (818) 906-3500
Fax: (818) 906-3516
4 |

5 | Attorneys for Plaintiffs, SARTRACO, INC.,
ALDAMISA ENTERTAINMENT, LLC;
6 | ALDAMISA INTERNATIONAL; LLC;
SERGEI BESPALOV AND MARINA BESPALOV
7 |

8 |
SUPERIOR COURT OF THE STATE OF CALIFORNIA
9 |
FOR THE COUNTY OF LOS ANGELES
10 |
UNLIMITED CIVIL
11 |

12 |

SARTRACO, INC., ALDAMISA )   **CASE NO. 19VECV00448**
13 | ENTERTAINMENT, LLC; ALDAMISA )   *[Case Assigned to Hon. Huey P. Cotton,*
INTERNATIONAL; LLC; )   *Department A]*
14 | SERGEI BESPALOV AND MARINA )
BESPALOV, )   **SECOND AMENDED COMPLAINT FOR**
15 | )   **DAMAGES**
    Plaintiffs, )
16 | )
)
17 | )
    vs. )
18 | )
)
19 | ROBERT WEINSTEIN AKA "BOB" )
WEINSTEIN; HARVEY WEINSTEIN; DAVID )
20 | GLASSER AND DOES 1 THROUGH 100, )
INCLUSIVE, )
21 | )
)
22 |     Defendants. )
)
23 | _____ )

24 |
/// 
25 |
/// 
26 |

27 |
-1-
28 | SECOND AMENDED COMPLAINT FOR DAMAGES

Electronically Received 09/18/2020 02:02 PM

COMES NOW Plaintiffs, SARTRACO, INC., ALDAMISA ENTERTAINMENT, LLC; ALDAMISA INTERNATIONAL; LLC; SERGEI BESPALOV and MARINA BESPALOV and for causes of action against Defendants, and each of them, allege as follows:

**PARTIES**

1.      Plaintiff, Sartraco, Inc. ("Sartraco") is a corporation formed and organized under the laws of the State of Delaware.  At all times alleged in this action, Sartraco maintained its principal place of business within the County of Los Angeles, State of California.  All of Sartraco's actions and involvement with Defendants described in this Complaint occurred within the County of Los Angeles, State of California.

2.      Plaintiff, Aldamisa Entertainment, LLC, ("Aldamisa Entertainment") is a limited liability company formed and organized under the laws of the State of California.  At all times alleged in this action, Aldamisa Entertainment maintained its principal place of business within the County of Los Angeles, State of California.  All of Aldamisa Entertainment's actions and involvement with Defendants described in this Complaint occurred within the County of Los Angeles, State of California.

3.      Plaintiff, Aldamisa International, LLC, ("Aldamisa International") is a limited liability company formed and organized under the laws of the State of California.  At all times alleged in this action, Aldamisa International maintained its principal place of business within the County of Los Angeles, State of California.  All of Aldamisa International's actions and involvement with Defendants described in this Complaint occurred within the County of Los Angeles, State of California.

///

4.        Plaintiffs, Sergei Bespalov and Marina Bespalov are individuals residing within the State of California and doing business within the County of Los Angeles in their capacities as officers of Plaintiffs Sartraco, Aldamisa Entertainment and Aldamisa International (together, the "Entity Plaintiffs"), and each of them.  The Entity Plaintiffs each sustained damages resulting from the Defendants' misconduct, as alleged herein.

5.        Non-party, The Weinstein Company ("TWC") is, and at all times alleged in this Complaint, was a multimedia production and distribution company focused on the marketing and promotion of major motion pictures and television properties in the theater and home entertainment markets.  Plaintiffs are informed and believe that during the time period described in this Complaint, TWC was releasing approximately 18 major motion pictures annually and through a joint venture agreement with non-party Miramax LLC, had the right to exploit the 700-film Miramax library in various media.  TWC was one of the largest independent motion picture distribution companies in the United States at that time.

6.        Defendant, Robert Weinstein aka "Bob" Weinstein and Does 1-10, Inclusive ("Robert Weinstein"), is an individual who Plaintiffs are informed and believe resides within the County of Los Angeles, State of California.  At the all times relevant to this litigation, he primarily worked or conducted business within Los Angeles County on behalf of himself and, in the context of this litigation, on behalf of TWC.   Robert Weinstein was a co-founder of TWC along with his brother, Defendant Harvey Weinstein, and served as Chairman of the Board of Directors of TWC.

7.        Defendant, Harvey Weinstein and Does 11-20, inclusive ("Harvey Weinstein"), is an individual who Plaintiffs are informed and believe resides within the State of New York.  At all times relevant to this litigation, he primarily worked or conducted business within Los Angeles County, State of California on behalf of himself and, in the context of this litigation, on behalf of TWC.

-3-

Weinstein was a co-founder with his brother, Defendant Robert Weinstein of TWC. At all times relevant to this litigation, he also was the Chief Executive Officer and served on the Board of Directors of TWC.

8.    Defendant, David Glasser and Does 21-30, Inclusive ("Glasser"), is an individual who Plaintiffs are informed and believe maintains a residence within the County of Los Angeles, State of California and regularly worked or conducted business within Los Angeles County on behalf of himself and, in the context of this litigation, on behalf of TWC.   Glasser, at all times alleged herein, was the Chief Operating Officer of TWC until the Board of Directors of TWC terminated his position in or about February 2018.

9.    Defendants and each of them, including Robert Weinstein, Harvey Weinstein and David Glasser as officers and directors of TWC, both individually and together with the other Defendants, wielded such power and influence over the discretionary decision-making at TWC that they effectively controlled and directed the actions of TWC as further alleged herein.  These defendants jointly and severally determined the direction of the company and, as it pertained to Plaintiffs herein, made the decisions and directed the actions upon which liability is predicated.

**GENERAL ALLEGATIONS**

10.    Plaintiffs are ignorant of the true names or capacities of the Defendants sued herein under the fictitious names of DOES 1 through 100, inclusive, and therefore sues said Defendants under such fictitious names.  On information and belief, Plaintiffs allege that Doe Defendants 1-100, inclusive, were and/or are agents, employees, managers, supervisors, business affiliates, subsidiaries, parent entities, businesses and/or owners of the other Defendants, all of whom have committed the wrongful acts complained of herein.  Plaintiffs will amend this complaint to allege the true names or

SECOND AMENDED COMPLAINT FOR DAMAGES

capacities of said Defendants once they have been ascertained.  Plaintiffs are informed and believe

and thereon allege that Defendants and each of the fictitiously named Defendants are responsible in

some manner for the occurrences herein alleged and that the damages as herein alleged were

proximately caused by their conduct.

11.    On information and belief, and at all times relevant, each Defendant performed the

acts herein alleged and/or failed to perform as herein alleged on behalf of each other Defendant, and

acted or failed to act as the agent, servant or employee of each other Defendant.  Each Defendant

directed, authorized and/or ratified each act or failure to act, as herein alleged, undertaken by its own

agents, servants and/or employees.

## FACTUAL ALLEGATIONS

12.    On or about March 28, 2005, Miramax released the motion picture, *Sin City*.  The

movie was a crime anthology film based upon the novel "Sin City" written by Frank Miller.  Frank

Miller, Robert Rodriguez and others received credit for directing, producing and writing *Sin City*, the

film.  *Sin City* featured an all-star ensemble cast including Jessica Alba, Mickey Rourke, Bruce Willis

and others.  The movie achieved critical and commercial success.  *Sin City's* domestic gross was

estimated to have exceeded $74 million with worldwide gross receipts in excess of $158 million.

13.    In or about 2012, Plaintiffs acquired the rights to a film sequel to *Sin City* based on

Frank Miller's second book in the "*Sin City*" series called "*Sin City: A Dame To Kill For*."  Plaintiffs,

and each of them, individually and through related companies they owned or controlled secured the

necessary financing and entered into various contractual relationships to produce the sequel

ultimately entitled *Sin City: A Dame To Kill For* ("*Sin City 2*" or the "Film").

SECOND AMENDED COMPLAINT FOR DAMAGES

14.     Production of *Sin City 2* began in 2012.  It was directed by Robert Rodriguez and Frank Miller and featured performances by Mickey Rourke, Jessica Alba, Josh Brolin, and Bruce Willis among others.  Plaintiff, Sartraco, acquired the domestic distribution rights to *Sin City 2* and actively explored retaining the services of several distribution companies with the expertise and financial support to profitably market and distribute the Film.  The Film's principal director, Robert Rodriguez, insisted Plaintiff utilize the services of TWC and Plaintiffs, left with no viable alternative, reluctantly agreed.

15.     The Entity Plaintiffs as well as Plaintiffs Sergei Bespalov and Marina Bespalov expected to profit from the Film's exploitation through subsequently negotiated and executed agreements for the distribution of *Sin City 2* domestically and internationally.  Plaintiffs further anticipated the success of *Sin City 2* would increase their reputations as successful motion picture producers and consequently result in increased revenue in the future.  Defendants Robert Weinstein, Harvey Weinstein, and Glasser were aware of these expectations and understood Plaintiffs' financial success would be predicated upon the commercial success of the Film.

16.     Plaintiffs, individually and through their financial representatives, contacted Robert Weinstein to commence negotiations regarding distribution.  These negotiations included Defendants, and each of them, as well as their representatives and culminated in the execution of a "Sin City 2" Domestic Distribution Agreement on or about April 26, 2012 between Sartraco and TWC for the marketing, promotion and distribution of the Film.  The Domestic Distribution Agreement was subsequently amended September 28, 2012.  (The Domestic Distribution Agreement as amended shall hereafter be referred to as the "DDA.")

///

///

-6-
SECOND AMENDED COMPLAINT FOR DAMAGES

17.     During the conversations between Plaintiffs and Defendants Harvey Weinstein, David Glasser and Robert Weinstein prior to the execution of the DDA, Defendants, and each of them, made a number of representations relevant to this action.  These included the following:

    a.  That TWC would provide *Sin City 2* with a favorable release date that would maximize the Film's potential exploitation revenue stream;

    b.  That TWC would not release any other films for distribution within a time period of four weeks prior to or after the release date for *Sin City* 2.  This would be done, according to Defendants, to minimize competition that would reduce the number of available theater screens available to show *Sin City 2.*

    c.  That TWC would release the Film theatrically to no less than 2500 screens;

    d.  That TWC would incur a minimum of $25 million in the marketing and advertising of *Sin City 2.*

    e.  That TWC would not commingle marketing funds budgeted for *Sin City 2* with any other film.

    f.  That TWC would regularly provide correct and accurate accountings of expenses TWC incurred promoting and marketing the Film as well as all income received from the exploitation of the Film.

    g.  That TWC would cooperate fully with Plaintiffs' reasonable inquiries and produce regularly maintained books and records to substantiate expenses and income TWC represented were accurate.

18.     Anticipating timely compliance with the stated production schedule which required delivery of the Film by November 1, 2013, TWC set an initial release date for later that month.

///

-7-

19.    Due to circumstances outside of Plaintiffs' control, the Film was not ready for timely delivery to TWC. Defendants thereafter set a new release date of August 22, 2014. The last week in August of each year is generally considered within the industry as the worst date for release of a motion picture, yet Defendants specifically selected this date to essentially bury the Film in favor of the contemporaneous release of a different movie, *The Giver.* This movie, if successful, would result in a substantial financial and reputational benefit to each Defendant derived in part from each Defendant's personal financial interest in *The Giver* and from the reputational benefit of being involved in a movie deemed to be a box office success.

20.    *The Giver* was a science fiction motion picture loosely based on a 1993 novel describing a futuristic dystopian society. It starred Jeff Bridges, Meryl Streep, and others. Publicly, TWC represented it co-produced the film and owned the rights to the film along with Walden Media, yet each Defendant held a substantial personal and financial interest in *The Giver's* marketing success. Defendants took the action described herein to make certain *The Giver* achieved a profitable distribution even though doing so directly harmed Plaintiffs' Film, *Sin City 2*; a Film in which Defendants had no personal or financial interest.

21.    In furtherance of Defendants' intention to favor distribution of *The* Giver over *Sin City 2,* Defendants collectively decided to set the release of *The Giver* on August 15, 2014, one week prior to *Sin City 2's* release date and then heavily promoted and marketed *The Giver* to *Sin City 2's* detriment. When *Sin City 2* was released, it received little industry recognition, and eventually grossed approximately $18.8 million domestically and in Canada. The Film was shown in limited circulation and was considered a commercial failure.

22.    Defendants, and each of them, to further their collective scheme to divert budgeted marketing funds from *Sin City* 2, made multiple representations to Plaintiffs that TWC had incurred

-8-

expenses in excess of $30 million for Promotion and Advertising.  Defendants further represented an additional $5 million over the contractual cap was needed.  Defendants made these representations to Plaintiffs orally and in writing as more specifically set forth in this paragraph.

    a. At the beginning of July 2014, Plaintiffs became concerned Defendants were not providing documentation of the actual distribution costs associated with the release of the Film.  By email dated July 8, 2014, Phillip Elway, on behalf of Plaintiff Aldamisa Entertainment, LLC, wrote to representatives of TWC reminding such representatives that all "Distribution Costs" under the DDA must be "auditable out of pocket costs" supported by "verifiable third party invoices.  Further, Plaintiffs had learned that TWC executives were instructed by Defendants Harvey Weinstein, Robert Weinstein and David Glasser not to cooperate with Plaintiff Sartraco, Inc. regarding marketing issues leading up to the Film's Release scheduled for August 22, 2014.

    b. Therefore, on or about July 9, 2014, Plaintiffs, Sergei Bespalov and Marina Bespalov spoke by phone directly with Defendant Harvey Weinstein regarding these issues including the lack of documentation of marketing costs from TWC as required under the DDA.  Defendant, Harvey Weinstein, stated to Plaintiffs, Sergei Bespalov and Marina Bespalov during this phone call that the entire amount budgeted under the DDA of $35 million would be spent promoting *Sin City 2* prior to the Release Date. He further stated the documentation to be provided to Plaintiffs would be "auditable" as required by the DDA.  Defendant, Harvey Weinstein also stated during this phone conversation, that Defendant Robert Weinstein would be the primary contact person in charge of marketing moving forward as he was more involved in "Dimension" films.

SECOND AMENDED COMPLAINT FOR DAMAGES

c. On or about July 24, 2014, Plaintiff, Marina Bespalov, spoke with Defendant, Robert Weinstein by phone regarding the upcoming release of the Film and the marketing and promotion budget.  During this phone conversation, Defendant, Robert Weinstein, stated to Plaintiff, Marina Bespalov, he would make sure TWC spent the entire budgeted amount of $35 million.  He also stated much of that sum had already been spent or committed to be spent.  Defendant Robert Weinstein further asked Plaintiff Marina Bespalov during this conversation to obtain approval of an additional $5 million for a hard media buy prior to the Release Date.  Marina Bespalov explained to Defendant Robert Weinstein that increasing distribution costs was a concern, that depletion of the budget prior to the Release Date would leave inadequate funds available for marketing following the release of the Film, and that any decision to increase the market cap would require the approval of investors.  In response, Defendant, Robert Weinstein, stated that he personally would authorize a marketing spend of whatever amount he deemed appropriate, but that approval of the increased marketing cap was necessary to move forward.

d. On or about July 28, 2014, Plaintiff Marina Bespalov and Defendant Robert Weinstein spoke again regarding the Film's release pending for August 22, 2014.  During this phone conversation, Defendant Robert Weinstein stated again that he would make certain TWC spent the entire $35 million under the DDA budget, but that sum would be "inadequate" to promote the Film.  Defendant Robert Weinstein stated the initial tracking data showed the Film to be doing well with certain targeted demographics. He demanded approval of the additional $5 million cap for the media buy describing the approval as "necessary" to reach maximum box office sales.  He also stated during

this conversation that the additional $5 million requested would bring the total pre-release marketing spend to close to $40 million.

e. On or about August 1, 2014, Defendant Robert Weinstein sent an email to Jere Hausfater, CEO of Aldamisa Entertainment, LLC, asking him to call to discuss the need to increase the marketing budget and the contract cap by an additional $5 million. This email stated "Please call me regarding the marketing on SIN CITY. I think we need to spend $5 million more than we have budgeted. But I may need your approval, per the contract. It's a little ambiguous."

f. Later in the day (August 1, 2014), Defendant Robert Weinstein and Jere Hausfater, on behalf of Aldamisa Entertainment, LLC, also spoke on the phone. Defendant Robert Weinstein stated to Jere Hausfater that the budgeted amount of $35 million set forth in the DDA was insufficient and that an additional $5 million was necessary to allow for a successful release of the Film. He also stated he had told Marina Bespalov the same thing, but had not received a positive reply from her yet. He asked Mr. Hausfater to obtain the cap increase approval from his principals including Plaintiffs Marina Bespalov and Sergei Bespalov. Mr. Hausfater sent Robert Weinstein an email on August 1, 2014 advising he would be discussing the request "with all relevant financiers." Finally, Defendant Robert Weinstein stated he knew Mr. Hausfater did not have the authority to make the decision and that the content of this conversation should be communicated to those principals or investors involved in Aldamisa International, LLC.

g. On or about August 4, 2014, Stephen Bruno, President of Marketing at TWC, at the direction of Defendants Robert Weinstein and David Glasser, wrote an email to Jere

-11-

Hausfater with copies to Defendants Robert Weinstein and David Glasser.  In that email, Mr. Bruno stated, "I'm writing you with regards to the marketing budget for SIN CITY.  Presently, we are spending approximately $30M all-in for print advertising, trailers and outdoor with the biggest portion going towards TV."  He further stated in the email "in order to effectively do this and compete with the other movies in the marketplace, we are requesting that we be allowed to spend up to $5M in additional TV advertising."

h.  On August 5, 2014, Stephen Bruno, acting at the direction of Defendants Robert Weinstein and David Glasser, spoke with Jere Hausfater, the CEO of Aldamisa Entertainment, LLC regarding the media buy.  He stated $30 million had already been spent and that he would be sending an email providing documentation of the marketing expenses so far.  He then sent an email later that day (August 5, 2014) to Mr. Hausfater with copies to Defendants David Glasser and Robert Weinstein.  Mr. Bruno's email purported to constitute what he described as the "approximate breakdowns of the $30M P&A spend committed so far and the proposed additional $5M in media."  The email then went on to summarize totals of the money allegedly spent in various categories, but did not include any third-party documentation, invoices or other proof the money was actually spent to market the Film.  Plaintiffs Sergei Bespalov and Marina Bespalov received copies of this communication at that time.

i.  On August 7, 2014, Defendant Robert Weinstein sent an email to Jere Hausfater identifying three TV spots he believed would "jump start this campaign."  Following receipt of this email, Plaintiffs Sergei Bespalov and Marina Bespalov, as well as Mr.

-12-

Hausfater, spoke by phone with Defendants David Glasser, Robert Weinstein and several other TWC representatives not named as parties in this litigation.  During this conversation, Defendant Robert Weinstein provided Plaintiffs with tracking information justifying the "need" as he stated, for the additional media buy.  Mr. Weinstein further stated the budgeted $35 million was not going to be "enough" as evidenced by the fact TWC had already spent $30 million and had not yet achieved what he felt to be the "maximum impact."  He also suggested money would be needed for the TV spots he identified in his earlier email.

j.  Defendant, David Glasser, in the same phone call, also stated the company had already spent $30 million and he further explained an additional $5 million cap increase was needed to make certain media buys he believed would optimize the Film's reach into the targeted demographics their research indicated were interested in the *Sin City* series and would likely view the Film on its release.  Both Defendants David Glasser and Robert Weinstein, orally stated during this conversation that Plaintiffs really had no viable alternative but to increase the marketing cap.   As of this time, Plaintiffs believed at least $30 million had been spent so far based on the representations made to them as set forth above and were therefore willing to authorize the additional $5 million in expenses.

k.  On August 8, 2014, Jerry Hausfater memorialized his understanding of the conversations in an email sent to Defendant Robert Weinstein with copies to Defendant David Glasser among others, stating that Plaintiff Aldamisa Entertainment had agreed "to the additional $5m in hard media" and that "distribution costs will not exceed $35m based on a spend to date of approximately $30m."

-13-

SECOND AMENDED COMPLAINT FOR DAMAGES

l.  On or about August 12, 2014, Irwin Reiter, an attorney writing at the direction of Defendants David Glasser and Robert Weinstein, questioned whether everyone was on the "same page" and stated "We are spending the incremental $5 million because we understand that you approved this.  But as discussed this means we need to raise the cap to $40 million from $35 million because we still need to capture the other Non P&A distribution costs."

m.  In response to Mr. Reiter, Plaintiff, Marina Bespalov, spoke by phone with Defendant Robert Weinstein on August 12, 2014 regarding the foregoing issues.  During this conversation, Defendant Robert Weinstein, stated he agreed with Mr. Reiter's statement and told Plaintiff, Marina Bespalov, that he and David Glasser have confirmed TWC's marketing and promotion spend was already $35 million to date.  He also stated that in reliance on their previous approval, he (Robert Weinstein) assumed the "cap" had been increased to allow for reimbursement of non-promotion and advertising costs from the anticipated distribution income.  Marina Bespalov, on behalf of Aldamisa International, LLC, agreed to increase the cap by an additional $5 million.

23.  Each Defendant was aware the foregoing representations were untrue when made as they collectively directed and managed the promotion and advertising expenses consistent with their intention to divert funds budgeted for *Sin City 2* marketing to *The Giver*.  Defendants' executive positions with TWC further provided them with access to and control of all records, documentation or other information necessary to mislead Plaintiffs into believing $35 to $40 million were actually spent.

SECOND AMENDED COMPLAINT FOR DAMAGES

24.     Plaintiffs believed the foregoing representations David Glasser, Robert Weinstein and Harvey Weinstein made to them to be true and accurate when made and had no reason to question the accuracy or reliability of the statements regarding the promotion and advertising costs used to promote the Film.

25.     On or about February 7, 2017 Plaintiffs learned from a published news article of a lawsuit filed by FilmNation accusing TWC of deliberately releasing its movie, *The Founder*, within seven days of another TWC distributed film, thus diluting the potential audience for the competing films and, perhaps more importantly, breaching the terms of the underlying distribution agreement.

26.     Plaintiffs reasonably believed at that time, the Film's release on August 22, 2014 as well as its close proximity to the release of *The Giver* caused the Film's poor showing at the box office.  Having learned TWC may have acted similarly with another movie and breached the contractual provisions of the distribution agreement, Plaintiffs initiated contractual arbitration against TWC on or about August 1, 2017 seeking a recovery against TWC based on contractual breach and negligence.  Defendants David Glasser, Robert Weinstein and Harvey Weinstein were not parties to the DDA.

27.     The arbitration was held before JAMS and the Final Award issued March 2, 2018.  Plaintiff, Sartraco, Inc. was the Claimant; TWC the Respondent.  Defendants David Glasser, Robert Weinstein and Harvey Weinstein were not parties to the arbitration.  TWC did not participate in the proceedings despite having received timely notice.  The issues before the arbitrator were based solely on the assertion TWC breached the DDA, was negligent for unilaterally selecting the release date of August 22, 2014 and resulting damages.  The Arbitrator issued a written Final Award following the evidentiary hearing containing both Findings of Fact and Conclusions of Law.

28.     The Findings of Fact stated:

SECOND AMENDED COMPLAINT FOR DAMAGES

a. "Sartraco, a film production company, entered into the Sin City 2 Domestic Distribution Agreement with TWC, a film distribution company, to produce and release Sin City: A Dame to Kill (the "Film")."

b. "Pursuant to the Agreement, Sartraco, among other things, was obligated to: (1) finance, produce, and deliver the Film ; (2) apply a gross budget of at least $50 million dollars; and (3) obtain all applicable licenses, consents, and releases pertaining to all works authorship, trademarks, names, and likeness used in connection with the Film. The Arbitrator finds, Sartraco performed all of its obligations under the Agreement."

c. "TWC, among other things, was obligated to: (1) release the Film theatrically in the territory on the release date on no less than 2500 screens; (2) advance 100% of the distribution costs of not less than $25 million dollars in prints in advertising; and (3) release the Film on a date subject to majority vote of TWC, Sartraco, and Robert Rodriguez (the director), but not within 4 weeks before or after any other TWC release without Approval of Sartraco and Rodriguez."

d. "The Film was a commercial failure."

e. "The August 22, 2014 theatrical release date was commercially unviable."

f. "The last two weeks of August are, based upon historical box office performance data, the least favorable weeks to release a film."

SECOND AMENDED COMPLAINT FOR DAMAGES

g.  "The Agreement required a majority vote among Sartraco, TWC and Robert Rodriguez prior to choosing and publishing the date of release for the Film."

h.  "In particular, the pertinent provision in the Agreement states: ''Release Date' means a date on which the Picture must be theatrically released in the Territory, which date shall be subject to majority vote of TWC, Sartraco, and Robert Rodriguez, but which date shall not occur within four weeks before or after any other TWC release without Approval of TWC.'"

i.  "The documentary evidence and testimony given in this matter demonstrate that TWC unilaterally selected the August 22, 2014 theatrical release date and failed to obtain the consent of either Sartraco or Robert Rodriguez regarding the release date of the film."

j.  "Both Sartraco and Robert Rodriguez learned of TWC's decision to release the Film on August 22, 2014 through trade publications. These announcements came approximately one year before the announced release date."

k.  "After learning of the August 22, 2014 release date, both Sartraco and Robert Rodriguez contacted TWC to voice their displeasure and concern. Neither Sartraco nor Robert Rodriguez succeeded in convincing TWC to change the release date. Instead, TWC representatives acknowledged that Sartraco and Robert Rodriguez disagreed with the release date but still refused to change the

-17-

release date."

l.  "The Agreement further contained a provision that prohibited TWC from releasing another TWC film within 4 weeks of the Film. In particular, the Agreement provided that the Film's release date 'shall not occur within four weeks before or after any other TWC release without Approval of TWC.'"

m.  "The testimony of [redacted] and [redacted] support a finding that this clause contained a scriveners' error and, in fact, should have required the approval of Sartraco, rather than TWC. The Arbitrator finds it was in fact a scrivener's error. The testimony concerning industry custom and practice supports the finding that the Agreement prohibited TWC releasing another one of its films within four weeks of the Film."

n.  "TWC released two of its own films within four weeks of the Film. Specifically, TWC released "The Giver" on August I 5, 2014 and "The Disappearance of Eleanor Rigby" on September 12, 2014."

29.  The Final Award contained the following Conclusions of Law:

a.  "Based upon the facts set forth above, the Arbitrator concludes that the Claimant met its burden in proving that TWC breached the Agreement. Claimant bears the burden of proof by a preponderance of the evidence under California law. The elements of a breach of contract are (1) the existence of a written or verbal agreement, (2)

-18-

performance by the Plaintiff, (3) defendant's breach, and (4) damages to the Plaintiff as a result of the breach."

b. "The facts established by the documentary evidence and testimony in this matter support the conclusion that a written contract existed between the Parties, i.e. the "Sin City 2" Domestic Distribution Dated as Of April 26, 2012. Claimant, Sartraco, performed its obligations under the contract, as described more fully above, and intended to participate in the vote to determine the release date of the Film. TWC breached the contract by (a) releasing the Film on a date that was not agreed upon by a majority of the parties referenced in the Agreement and (b) releasing other TWC films within 4 weeks of the Film. Sartraco suffered significant financial losses as a result of TWC's breach of contract, as discussed more fully below."

c. "The Arbitrator further finds that the evidence in this matter further establishes that TWC acted negligently. As to the claim of negligence, Claimant also bears the burden of proof by a preponderance of the evidence under California law. The elements of negligence are (1) duty, (2) breach, (3) causation and (4) damages. In the instant case, TWC is guilty of negligence against Sartraco."

30.    That arbitration resulted in an award of approximately $17.4 million against TWC.

31.    In or about January 2018, upon further investigation in the context of preparing for the arbitration hearing, Plaintiffs learned that TWC, under the direction of Defendants David Glasser, Robert Weinstein and Harvey Weinstein, may not have spent anywhere close to the $35 million

-19-

promoting the Film as Defendants represented.  Rather, Plaintiffs learned of the likelihood

Defendants, David Glasser, Robert Weinstein and Harvey Weinstein agreed to and directed the

commingling of marketing funds earmarked for *Sin City 2* with funds allocated to promote *The Giver*

so that that the actual amount spent to promote *Sin City 2* was significantly less than was represented.

Plaintiffs further learned the actions of said Defendants to redirect the promotion and advertising

funds away from the Film substantially contributed to the commercial demise of *Sin City 2*.  Finally,

Plaintiffs understood Defendants had not provided the requisite "auditable" documentation of the

purported spending as part of a deliberate scheme or plan to prevent Plaintiffs from discovering the

truth.

32.     The success of subsequent international distribution of a motion picture initially

marketed within the United States is directly related to the value of the domestic distribution; the

more successful the film is domestically, the more successful it will be internationally.   Similarly, the

opposite also is true.  A movie that is a commercial failure within the United States is highly unlikely

to achieve commercial success internationally.  Plaintiffs are informed and believe that Defendants,

as experienced executives and experts in this field were aware of this correlation at the time the

misrepresentations were made.

33.     It is also an acknowledged correlation within the motion picture industry that the

future success or failure of involved individuals is highly dependent upon the success or lack thereof

of their previous film involvement.  This reputational relationship affects not only actors and

directors, but also producers.  A producer tied to a commercially unsuccessful film will find it

difficult to obtain future projects or favorable financing for such projects.  Plaintiffs are informed and

believe that Defendants, as experienced executives and experts in this field were also aware of this

correlation at the time the misrepresentations were made.

-20-
SECOND AMENDED COMPLAINT FOR DAMAGES

34.     Plaintiff Aldamisa Entertainment, a co-producer of *Sin City 2,* had a reputation as one of the most successful independent movie production companies in the United States prior to the release of *Sin City* 2.  It had achieved commercial success and positive industry recognition for its production of the movie, *Chef,* as well several other films.   Plaintiff Aldamisa Entertainment and its principals, Sergei Bespalov and Marina Bespalov, were working on future projects and anticipated significant financial success from the release of *Sin City 2* until Defendants' actions, as alleged herein, made that impossible.

35.     Defendants knew their conduct, as alleged herein, would significantly harm not only Sartraco, but also the Entity Plaintiffs and Sergei Bespalov and Marina Bespalov who all relied upon the success of *Sin City 2's* domestic distribution and were thus financially damaged by its failure. Such damages and the amount of such damages were reasonably foreseeable to Defendants who knew these companies and persons were involved in movie production and the international distribution of the Film.  Plaintiffs' damages resulting from Defendants' misconduct include past and future lost profits and income, all in an amount to be proven at time of trial.

**FIRST CAUSE OF ACTION FOR**

**FRAUD BASED ON INTENTIONAL MISREPRESENTATION**

**[By Plaintiffs Against all Defendants]**

36.     Plaintiffs incorporate the allegations contained in paragraphs 1-35 as though fully set forth herein.

37.     Defendants made the foregoing representations to Plaintiffs knowing them to be untrue at the time made and did so with the intention of inducing Plaintiffs to take the actions as described above.  Defendants further deliberately concealed their misconduct by providing either

-21-

false or inadequate documentation, as previously described, or by simply refusing to provide any documentation of purported marketing expenses, all to prevent Plaintiffs from discovering the truth.

38.    Plaintiffs justifiably relied upon Defendants' representations regarding the characterization of funds used to market and promote the Film as such accounting information rested particularly within Defendants' knowledge and within their sole control.  Plaintiffs did not have reasonable access to information that would verify Defendants' representations or any other reasonable means of ascertaining the truth of Defendants' representations.

39.    Plaintiffs were aware of the unfavorable release date of August 22, 2014 and reasonably believed the unfavorable release date was primarily responsible for the Film's unsuccessful showing.  Plaintiffs were unaware of Defendants' underlying scheme to defraud Plaintiffs through the misdirection of marketing funds and subsequent cover-up until January 2018, as alleged.

40.    Plaintiffs believed Defendants' representations to be true when made because Defendants deliberately concealed their misconduct including the commingling of funds, and because Defendants collectively acted in concert to convince Plaintiffs their representations regarding *Sin City 2* promotion and advertising costs were true when, in fact, they were not.  Defendants accomplished this by making false and misleading statements to Plaintiffs to the effect TWC was spending or had spent over $35 million to market and promote *Sin City 2*, by issuing documentation including accounting statements containing knowingly false expense figures, and by failing to provide third-part generated invoicing regarding the marketing costs, all to further hide and conceal the truth.

41.    In reliance upon the truth of the Defendants' misrepresentations, Plaintiffs authorized the additional $5 million cap increase.  This resulted in monetary damages to Plaintiffs of approximately $5 million as promotion and advertising expenses were reimbursable to TWC from the

-22-

Film's exploitation income prior to Plaintiffs receiving income.  By relying upon the representations to the effect TWC was spending an additional $5 million to market the Film and agreeing to increase the cap, Plaintiffs effectively authorized the repayment of $5 million from the distribution income, money that otherwise would have been paid to Plaintiffs.

42.    In further reliance upon the truth of the Defendants' misrepresentations, Plaintiffs did not take action to protect their interests.  Such action could have included termination of the DDA, retention of another company to handle domestic distribution of the Film, obtaining additional marketing financing, bringing a court action for injunctive relief and/or postponing the Release Date until these issues were resolved.  Plaintiffs did not take any of the foregoing actions relying instead on the accuracy of the representations made to them and believing the representations made by Defendants Robert Weinstein, Harvey Weinstein and David Glasser regarding the cost of the promotion and advertising campaign were truthful and accurate.

43.    As a further direct and proximate result of Defendants' misconduct, as alleged, Plaintiffs have suffered general and compensatory damages in an amount to be proven at trial, including lost profits and reputational damage.

///

///

///

///

///

///

///

///

SECOND AMENDED COMPLAINT FOR DAMAGES

1    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

2  follows:

3    1.    For general and compensatory damages including past and future lost profits

4          and reputational damage, according to proof;

5    2.    For interest on such damages at the legal rate;

6    3.    For costs of suit incurred herein; and

7
    4.    For such other and further relief as this Court may deem just and proper.
8

9  DATED: September 18, 2020                    WILTON LAW & MEDIATION

10

11
                                           By:
12                                              RONALD D. WILTON
                                                Attorneys for Plaintiffs,
13                                              SARTRACO, INC., ALDAMISA
                                                ENTERTAINMENT, LLC; ALDAMISA
14                                              INTERNATIONAL; LLC; SERGEI
                                                BESPALOV AND MARINA
15                                              BESPALOV

16

17

18

19

20

21

22

23

24

25

26

27
                                      -24-
28                                    SECOND AMENDED COMPLAINT FOR DAMAGES

**PROOF OF SERVICE**

I am employed in the aforesaid county, State of California; I am over the age of eighteen years and not a party to the within action.  My business address is 16055 Ventura Blvd., Suite 811, Encino, CA 91436-2610.

On the date entered below, I served the foregoing document described **SECOND AMENDED COMPLAINT FOR DAMAGES** on the interested parties in this action at the following addresses and in the manner set forth below

Jeffrey F. Gersh
STUBBS, ALDERTON & MARKILES, LLP
15260 Ventura Boulevard, 20th Floor
Sherman Oaks, CA  91403
Email: jgersh@stubbsalderton.com
Tel: (818) 444-9222 – Fax: (818) 444-9222
*Attorneys for Defendant, David Glasser*

Robert S. Chapman
Gregory P. Barchie
SAUER & WAGNER LLP
1801 Century Park East, Suite 1150
Los Angeles, CA 90067
Emails: rchapman@swattys.com and
gbarchie@swattys.com
Tel:  (310) 712-8111 - Fax: (310) 712-8108
*Attorneys for Defendant, Robert Weinstein*

Jessica R. Caterina
Jeffrey M. Eilender
SCHLAM STONE & DOLAN LLP
26 Broadway
New York, NY 10004
Emails: jcaterina@sclamstone.com and
jeilender@sclamstone.com
Tel: (212) 344-5400 – Fax: (212) 344-7677
*Attorneys for Defendant, David Glasser*

[X]    **ELECTRONIC MAIL**:  By transmitting via electronic mail a true copy of the above listed document(s) to the email address(es) set forth above on this date.

[X]    I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.

Executed on September 18, 2020 at Encino, CA.

Dina J. Cabrera

SECOND AMENDED COMPLAINT FOR DAMAGES