## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*,[1] | Case No. 18-10601 (MFW) |
| Debtors. | **Hearing Date: 1/14/202 at 10:00 a.m. (ET)** <br> **Obj. Deadline: 12/18/2020 at 5:00 p.m. (ET)** <br><br> **Re:  D.I. 3096** |

### NON-SETTLING SEXUAL MISCONDUCT CLAIMANTS' OBJECTION
### TO FOURTH AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION

Wedil David, Dominque Huett, Aimee McBain and Alexandra Canosa (collectively, the "Non-Settling Sexual Misconduct Claimants"), by and through their undersigned counsel, hereby submit this Objection to the *Fourth Amended Joint Chapter 11 Plan of Liquidation* [D.I. 3096] (the "Plan"),[2]  and respectfully state as follows:

### Preliminary Statement

1.       The Debtors' proposed liquidating Plan seeks to extend the most robust protections of this Court to non-debtor entities.  The Plan purports to prevent third party claimants such as rape and sexual assault victims from continuing litigation against, *inter alios*, ultra-affluent former board members and certain insurance companies.  The Plan seeks to stop and silence women forever from pursuing their path to justice and deprives them of their Constitutional right to a jury

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are 3837. The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

[2] Unless defined herein, capitalized terms shall have the meanings ascribed to them in the *Fourth Amended Disclosure Statement in Support of the Fourth Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and Official Committee of Unsecured Creditors* [D.I. 3098] ("Disclosure Statement" or "DS") and/or Plan.

trial in pending direct actions against third parties  and the therapeutic effect of telling their story to a jury and, in doing so, surviving Harvey Weinstein.  *None* of this extraordinary relief is necessary to disburse the Debtors' remaining cash or prosecute the D & O Claims. The Plan's extraordinary relief essentially benefits insurance companies and potential tortfeasors and comes in two forms of relief:  (a) broad *involuntary* Third Party Releases and (b) a Channeling Injunction. Both types of relief essentially are *de facto* discharges for non-debtor entities.  The Debtors are not entitled to a discharge.  The Court should not permit the insurance companies to use a Plan of liquidation for defunct Debtors to buy, for a fraction of available insurance proceeds, *de facto* discharges for themselves and a wide array of third parties.

2.      The Plan seeks to achieve its goal by judicial *fiat*; holders of Sexual Misconduct Claims are forced to forever release and waive all claims against insurance companies and potential tortfeasors.  No manner of affirmative consent is sought except for the incarcerated and most likely judgment proof Harvey Weinstein.  The third party release is non-consensual and therefore equally impermissible and inappropriate in these unremarkable cases.

3.      The Non-Settling Sexual Misconduct Claimants assert direct claims against third parties.  These causes of action are not property of the bankruptcy estate so the Debtors cannot unilaterally compromise them.   The Plan instead seeks to *force* the Non-Settling Sexual Misconduct Claimants to release and waive their claims against third parties.  Release and waiver are state law legal concepts that sound in contract and require the knowing, voluntary relinquishment of rights.   But the Plan does not ask for consent; the Non-Settling Sexual Misconduct Claimants are given no opportunity to opt-in or out of the third party releases.  Causes of action resulting from rape and sexual assault may only be released *by each individual victim by voluntary agreement*.

4.      Holders of Sexual Misconduct Claims, however, have one "choice" with respect to third party releases.  They can choose to release Harvey Weinstein from his alleged atrocious conduct by checking a box on a ballot.  But the decision to check the box or not check the box comes with consequences.  The choice is a *deathtrap*[3] provision and it is re-victimization at its worst.  It is particularly disturbing both on emotional and financial levels.  If the holder of a Sexual Misconduct Claim refuses to release Harvey Weinstein, she must forego 75% of her economic recovery under the Plan.  To preserve her right to pursue Harvey Weinstein, a rape victim must agree to release her alleged rapist.

5.      The Plan also forces a broad channeling injunction upon the holders of Sexual Misconduct Claims.  Their claims are channeled for collection to a pathetically meager Sexual Misconduct Claims Fund.  There is no opt-out mechanism except, as noted, to pursue claims against Harvey Weinstein under the deathtrap provision.  Instead of being able to tell their story to a jury, and in doing so proudly survive Harvey Weinstein, they are bound to the Sexual Misconduct Claims Resolution Procedures.  There, their stories of alleged conduct will be "scored" and given a Point Award.  The Point Award system pits women against women competing for a limited recovery from the pathetically meager Sexual Misconduct Claims Fund.

6.      Although the Debtors are not reorganizing, and therefore not entitled to a discharge, they ask the Court to confer that substantial debtor protection—in the form of third party releases

---

[3] In the context of a chapter 11 plan, a deathtrap provision is a "coercive provision that seeks to encourage claimants to vote in favor of a plan with promises--in return for a favorable vote--of treasure and/or favorable treatment. Should the claimants vote against the plan, the claimants will receive less or no treasure and/or is otherwise penalized. Simply, a death-trap provision provides a choice for a claimant when voting between a carrot and a stick."  *See* Douglas E. Deutsch & Eric Daucher, *Chapter 11 Plan Confirmation Issues: Settlements, Releases, Gifting and Death Traps*, Am. Bankr. Inst. J., October 2010, at 92.

and waivers—to a vast array of non-debtor third parties.[4]  The Plan seeks to convey upon third

parties the most robust equitable powers of this Court that the Debtors do not qualify for and, even

if they did, should only be invoked in extraordinary circumstances not present here.  These Debtors

are not a going concern struggling with asbestos/mass tort liability.  The Debtors are not operating

and have not been for years.  They have no employees and no going concern value to protect.

Judge Hellerstein in *Geiss v. Weinstein Co. Holdings LLC*, No. 17 CV. 9554 (AKH), 2020 WL

4266925, at *4 (S.D.N.Y. July 24, 2020) ("*Geiss*") previously denied an attempt to certify a class

of Sexual Misconduct Claimants.[5]  The Debtors solicited approximately 59,000 tort claimants,

including the broadest possible range of Sexual Misconduct Claims.[6]  *See* Tort Claims Bar Date

Motion [D.I. 2859] at ¶ 24.  The Debtors received only fifty-five (55) Sexual Misconduct Claims.

*See* DS, Art. III, at 4.  No official committee of tort claimants was formed.

       7.      The Debtors and their estates require none of the extraordinary protections set forth

in the Plan.  They simply have to disperse remaining cash that may or may not cover expenses of

administration and pursue D & O claims; which could be accomplished in chapter 7.  The insurance

companies are funding this Plan with a fraction of available insurance proceeds.  The funding by

the insurance companies is not about the Debtors' reorganization or the adjustment of the debtor-

---

[4] In fact, the Debtors seek to convey even greater protection than a discharge which is limited to pre-petition debt. The proposed Channeling Injunction purports to apply to **future** claims.  Plan at § 5.8.1 ("[P]ursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons and Entities that (a) have held or asserted, or that hold or assert, or that ***may hold or assert in the future***, any Sexual Misconduct Claims against the Released Parties, . . . each shall be permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Released Party or Harvey Weinstein with respect to any Sexual Misconduct Claims . . . .") (***emphasis*** added).

[5] According to Judge Hellerstein's Opinion in the *Geiss* litigation, proposed Class Action Counsel represented three (3) victims with active claims.

[6] The term Sexual Misconduct Claim is broadly defined to include from rape to inappropriate conduct.  Plan, Ex. 1, §§ 1.110 and 1.116.

creditor relationship.  Approximately one-half of the meager amount funded by the insurance companies is devoted to entities that are not even potential insurance beneficiaries, and may include satisfying professional fees.  The gambit is to purchase *de facto* third party discharges against any claim that now, or even in the future,[7] may be asserted against the Released Parties by a holder of a Sexual Misconduct Claim.  The Debtors seek the broadest section 524-style relief for these third parties while falling far short of qualifying for that relief.  The Debtors are not even entitled to a discharge, they certainly are not entitled to a discharge injunction or a supplemental discharge injunction.

8.      In seeking the Plan's robust relief, the Debtors rely on "***Section 105(a) of the Bankruptcy Code and other sections of the Bankruptcy Code*** . . . ."  Plan at p. 3.  The Court's authority under section 105, however, is not without limits, and cannot be relied upon to create substantive rights.  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004), *as amended* (Feb. 23, 2005) (internal citation omitted) ("*Combustion Engineering*").  Silencing women who have been, *inter alia*, raped and sexually assaulted by an incarcerated rapist is not "necessary or appropriate to carry out the provisions of [chapter 11] . . . ."  11 U.S.C. § 105(a).

## Relevant Background

### *Wedil David*

9.      Wedil David, an actress, was raped by Harvey Weinstein in California in 2016, and is the plaintiff in *David v. The Weinstein Company LLC et al*, No., 18 Civ. 5414, pending in the United States District Court for the Southern District of New York.  Ms. David has asserted claims of assault, battery, sexual battery under Cal. Civ. Code § 1708.5, gender violence under Cal. Civ. Code § 52.4, sex trafficking 18 U.S.C. § 1591, negligence and negligent supervision against

---

[7] Plan at § 5.8.1.

Harvey Weinstein, The Weinstein Company LLC and The Weinstein Company Holdings LLC.

Ms. David previously had asserted claims of negligence and negligent supervision against the

Debtors former directors and officers: Robert Weinstein, Lance Maerov, Richard Koenigsberg,

Tarak Ben Ammar, Dirk Ziff, Tim Sarnoff, Paul Tudor Jones, Jeff Sackman, and James Dolan.

The district court dismissed Ms. David's claims against the Former Representatives by decisions

dated April 24, 2019 and December 19, 2019. *See David v. Weinstein Co. LLC*, No. 18-CV-5414

(RA), 2019 WL 1864073, at *1 (S.D.N.Y. Apr. 24, 2019); *David v. Weinstein Co. LLC*, 431 F.

Supp. 3d 290 (S.D.N.Y. 2019).  Ms. David has the right to appeal the dismissal of those claims,

and intends to do so, until there is a final decision in her case within the meaning of 28 U.S.C. §

1291.  Her case is currently in discovery, which she has been aggressively pursuing.

### Dominique Huett

10.     Dominique Huett, an actress and model, was sexually assaulted by Harvey

Weinstein in California in 2010.  Ms. Huett is the plaintiff in *Huett v. The Weinstein Company et

al.*, No. 2:18-cv-6012, pending in the United States District Court for the Central District of

California.  Ms. Huett has asserted claims for negligence and sex trafficking 18 U.S.C. § 1591

against Harvey Weinstein and The Weinstein Company LLC.  The district court denied Harvey

Weinstein's motion to dismiss Ms. Huett's claims.  *See Huett v. Weinstein Co. LLC*, No. 2:18 CV

06012, 2018 WL 6314159, at (C.D. Cal. Nov. 5, 2018).  Ms. Huett's case has been stayed by the

district court pending the disposition of criminal proceedings against Harvey Weinstein.  *See Huett

v. Weinstein Co. LLC*, 2:18 CV 06012, 2019 WL 2902494 (C.D. Cal. Feb. 28, 2019).

### Aimee McBain

11.     Aimee McBain, an employee of the Weinstein company in 2017, filed a summons

with notice, a New York State Court procedure in which a plaintiff can file a notice to satisfy a

statute of limitations without filing a full complaint.  McBain has claims for a hostile work environment under the New York State Human Rights Law and the New York City Human Rights (not rape/sexual assault) against the Debtors.  She also has human rights law claims against certain directors and officers of the Debtors who may be liable on an aiding and abetting theory. Ms. McBain's claims are not derivative of claims against the Debtors.  The aiding and abetting theory was approved by one trial court in New York state court against Robert Weinstien in the Rahal case.

### Alexandra Canosa

12.    Ms. Canosa, an actress, was raped and sexually assaulted by Harvey Weinstein on multiple occasions.  Ms. Canosa is the plaintiff in *Canosa v. Weinstein et al.*, No. 1:18-cv-4115, pending in the United States District Court for the Southern District of New York.  Ms. Canosa has asserted the following claims against Harvey Weinstein which have survived defendant's motion to dismiss (by order of the Honorable Paul A. Engelmayer, U.S.D.J. on January 28, 2019): Battery, assault, intentional infliction of emotional distress, sexual assault, false imprisonment, New York State Human Rights Law, New York City Human Rights Law, Trafficking Victims Protection Act, and California law claims.  Ms. Canosa also asserted claims against various Former Representatives for negligent supervision, hiring and retention, aiding and abetting, New York State Human Rights Law, New York City Human Rights Law, quid pro quo harassment, hostile work environment, ratification, sex discrimination - disparate impact and hostile work environment based on sex.  The district court dismissed all of Ms. Canosa's claims against the Former Representatives by decision dated January 28, 2019, which cannot currently be appealed due to the finality rule, as Ms. Canosa's case is still ongoing by virtue of her other claims against other defendants. Her case is currently in discovery against Harvey Weinstein, The Weinstein

Company, LLC and the Weinstein Company Holdings, LLC, which she has been aggressively pursuing.

***The Debtors are Defunct, Have No Employees and No Business Operations***

13.     On March 19, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.

14.     On May 9, 2018, the Court entered an order approving the sale of substantially all of the Debtors' assets to Spyglass Media Group, LLC (f/k/a Lantern Entertainment LLC).  The sale closed over two years ago, on July 13, 2018. Since at least the sale closing, the Debtors have had no employees, no business operations and do not operate as a going concern.

***The Debtors Acknowledged Over Two Years Ago that Conversion to Chapter 7 is in the Best Interests of their Estates***

15.     Having completed the sale of substantially all of their assets and recognizing they no longer need the types of relief that Chapter 11 provides,  on May 14, 2019, the Debtors appropriately filed their *Motion for an Order (I) Converting Their Chapter 11 Cases  to Cases under Chapter 7 of the Bankruptcy Code and (II) Granting Related Relief* [D.I. 2357].

16.     On September 9, 2020, the Bankruptcy Court entered the Order (I) Establishing Deadlines for Filing Proofs of Claim Solely with respect to Tort Claims, (II) Approving Form and Manner of Notice Thereof, and (III) Granting Related Relief [DI 2966], which set October 31, 2020 as the deadline for filing a proof of claim for Tort Claims ("Tort Claims Bar Date").  To solicit holders of Sexual Misconduct Claims to file proofs of claim, notice of the Tort Claims Bar Date was given by (i) email and/or first class mail to approximately 59,000 potential claimants and (ii) publication in multiple newspapers including *The Hollywood Reporter*, *Variety* and *The New York Post,* and on various internet websites including, among others, for The New York Post (nypost.com), Page 6 (page6.com), The Sun (thesun.co.uk), The Toronto Star (thestar.com).

Sexual Misconduct Claims range from rape to inappropriate conduct.  In response to this broad

solicitation, only fifty-five (55) Sexual Misconduct Claims were filed.

***The Insurance Companies are Funding the Plan that Contains Broad Protections that Benefit Primarily the Insurance Companies and Potential Tortfeasors***

17.    On November 17, 2020, the Court entered an *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Approving Solicitation Procedures, (C) Setting Confirmation Hearing Date and Related Deadlines, (D) Estimating Certain Claims, and (E) Granting Related Relief* [D.I. 3101].  The DS describes a Plan funded by the insurance companies with, upon information and belief, only a fraction of available insurance proceeds.  The insurance proceeds funded pay claims that are not otherwise insured; *e.g.*, trade creditors and potentially estate-retained professionals.[8]  On November 17, 2020, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and Official Committee of Unsecured Creditors* [D.I. 3096] (as amended, the "<u>Plan</u>").  The Plan seeks approval of certain objectionable provisions including, among others:  (a) Bankruptcy Injunctions, a Channeling Injunction set forth in section 5.8 of the Plan, and a Plan Injunction, set forth in section 7.3 of the Plan, (b) Third Party Releases, (c) Exculpation and (d) Substantive Consolidation.

***The Channeling Injunction***

18.    The Debtors contend that "***Section 105(a) of the Bankruptcy Code and <u>other</u>*** <u>***sections of the Bankruptcy Code***</u> ***authorize the Bankruptcy Court to enter a "channeling injunction" pursuant to which the Sexual Misconduct Claims are forever channeled to the Sexual Misconduct Claims Fund . . . .  Following the issuance of the Channeling Injunction …  any and all Holders of Sexual Misconduct Claims shall be <u>permanently enjoined</u> from seeking***

---

[8] Pursuant to the Plan, $8,407,305.00 of the Settlement Amount will be distributed to the Liquidation Trust.  Plan at § 5.2.  General Unsecured Claims and Allowed Administrative Expense Claims, including professional fees, will be paid out of the Liquidation Trust. §§ 5.6 and 3.7.1.

*satisfaction of their Sexual Misconduct Claims against the Debtors or any other Released Party*

*or the property of any such Released Party.*"  Plan at p. 3 (***emphasis*** added).

19.    The Channeling Injunction is binding even if the holder of the Sexual Misconduct

Claim did not vote to accept the Plan or assent to be bound by the Channeling Injunction[9] and

applies to future claims.[10]

***Third Party Releases***

20.    The Plan seeks the following Third Party Releases that affect holders of Sexual

Misconduct Claims:

> ### 7.2.2. *Releases by … Holders of Claims ….*
>
> "… (ii) each present and former Holder of a Claim[11] …, will be **deemed** to unconditionally, completely, and forever **release, waive, and disclaim** the Released Parties of and from any and all Claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including **any direct** or

---

[9] Section 5.8 of the Plan, titled, **Channeling Injunction**, provides in relevant part:

- all Sexual Misconduct Claims against the Released Parties will be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order, except that Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall be excused from the Channeling Injunction solely for the purpose of pursuing an action against Harvey Weinstein (but not any Released Party) in another court of competent jurisdiction;

- upon the funding of the Sexual Misconduct Claims Fund by the Insurance Companies on behalf of the Released Parties … the Released Parties shall have no obligation to pay any liability of any nature or description arising out of, relating to, or in connection with the Sexual Misconduct Claims;

- **the Channeling Injunction shall be binding upon, and enforceable by its terms against, all Holders of Sexual Misconduct Claims, irrespective of whether any such Holder (i) has voted to accept the Plan or (ii) has agreed to be bound by the Channeling Injunction, in both cases, only where the Class consisting of the Holders of Sexual Misconduct Claims (Class 4) has voted to approve the Plan in accordance with section 1126(c) of the Bankruptcy Code.**

Plan at § 5.8 (**emphasis** added)**.**

[10] Section 5.8.1. of the Plan sets forth the ***Channeling Injunction Terms***, and applies to "[A]ll Persons and Entities that (a) have held or asserted, or that hold or assert, **or that may hold or assert in the future**, any Sexual Misconduct Claims against the Released Parties, or any of them . . . ." Plan at § 5.8.1 (**emphasis** added).

[11] The Plan's definition of "Claim" includes "future claims[.]"  Plan, Ex. 1, § 1.22.  This expands the definition of "Claim" in section 101(5) of the Bankruptcy Code and parallels section 524-relief.

derivative claims asserted or assertable by or on behalf of … any Holder of a Claim … , any Claims or causes of action asserted by … any Holder of a Claim … that … any Holder of a Claim or Interest would have been legally entitled to assert in their own right, whether individually or collectively, whether known or unknown, matured or unmatured, accrued or not accrued, foreseen or unforeseen, **existing or hereinafter arising**, in law or equity, based on any matter, cause, thing, conduct, or omission occurring prior to the Effective Date and in any way related to the Debtors, their businesses, operations, activities, or these Chapter 11 Cases …." (**emphasis** added).

21.    The third party releases are mandatory.  *See* Plan at 3.13.1 ("all Sexual Misconduct Claims shall be released as against the Released Parties …").[12]

### *The Discharge Style Injunction*

22.    The Plan also provides the following discharge-style Injunction:

> **7.3. Plan Injunction.** Except as otherwise provided in the Plan and/or the Plan Documents (including, specifically, the Plan Support Agreement), on and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims or Interests whether or not such Persons or Entities have voted to accept or reject the Plan (except, solely as it relates to parties other than the Debtors, Holders of Opt-Out GUCs), and other parties in interest, along with their respective present or former employers, agents, officers, directors, or principals, shall be and are permanently enjoined from and

---

[12] The Plan defines **Released Party(ies)** to mean: (i) the Debtors, the Estates, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, the Former Representatives and the Insurance Companies; (ii) professionals of firms specified in Schedule 1 to the Plan; and (iii) each such persons' or entities' current and former officers, directors and board representatives, predecessors, successors, assigns, insiders, subsidiaries, Affiliates, principals, equity holders, members, trustees, partners, managers, employees, agents, members of any boards or similar bodies of such persons, advisory board members, financial advisors, attorneys, insurers, reinsurers, accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, and nominees, in each case, in their capacity as such, or any other person who rendered services for, or provided goods to, any of the Debtors, with respect to liability for the actions or inactions of the Former Representatives, the Debtors, the Estate, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, or the Insurance Companies; provided, however, those persons or entities who fall within subparagraph (iii) (other than persons or entities specified in subparagraphs (i) and (ii)) are not released with respect to their own actions related to Sexual Misconduct Claims, regardless of their relationship with the Former Representatives, the Debtors, the Estates, Non-Debtor Affiliates, Non-Debtor Additional Affiliates, or the Insurance Companies, to the extent such action constitutes aiding, abetting or conspiracy to prevent the disclosure of or to cover up any Sexual Misconduct Claim (each a "Non-Released Party"). Plan at 1.94.

restrained against taking any of the following actions on account of any such Claims or Interests:

### *The Deathtrap Provision*

23. The Plan forces women to make a difficult financial and emotional

choice:

> Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall receive 25% of the Liquidated Value of their Sexual Misconduct Claims in consideration of the release of their potential Sexual Misconduct Claims against the Released Parties, and Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein shall receive the full Liquidated Value of their Sexual Misconduct Claims.

Plan at § 3.13.1.

24. The Plan also provides the following Exculpation and Releases:

> **14.5. Exculpation and Release.** The Exculpated Parties shall not have or incur, and are hereby released from, any claim, obligation, cause of action, and/or liability, in each case that arise from facts or circumstances that took place in whole or in part between the Petition Date and the Effective Date, to any Holder of a Claim, Interest, or any other Entity or any of their respective successors, assigns or Representatives for any act or omission with respect to or arising out of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence, fraud or willful misconduct or any obligations that they have under or in connection with the Plan, the Plan Documents, or any transactions contemplated thereby, and in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Plan at § 14.5.

### *The Plan Does Not Permit Holders of Sexual Misconduct Claims to Opt Out of the Channeling Injunction or Third Party Releases*

25. The Plan provides no mechanism for holders of Sexual Misconduct Claims to opt

out of the third party releases or channeling injunction:

**3.1    Sole and Exclusive Method With Respect to the Debtors and Former Representatives (other than Harvey Weinstein)**
The Plan and this protocol shall together be the sole and exclusive method by which a Claimant may seek monetary distribution on account of a Sexual Misconduct Claim against the Debtors and/or Former Representatives . . . a Claimant shall have the option to release Harvey Weinstein or to not release Harvey Weinstein and pursue an action against him (***but not any Released Party***) in a court of competent jurisdiction."

Plan, Ex. 4, Sexual Misconduct Claim Fund Procedures, § 3.1 (***emphasis*** add).

**5.8. Channeling Injunction.** From and after the Effective Date: (i) all Sexual Misconduct Claims against the Released Parties will be subject to the Channeling Injunction . . . except that Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall be excused from the Channeling Injunction solely for the purpose of pursuing an action against Harvey Weinstein (***but not any Released Party***) in another court of competent jurisdiction . . . .

Plan at § 5.8 (***emphasis*** add).

***The Plan's Governing Law Clause***

26.    The Plan is governed by the laws of the State of Delaware:

**14.6. Governing Law.** Unless a rule of law or procedure is governed by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and the Plan Documents, except as otherwise expressly provided in the Plan Documents.

Plan at § 14.6.

## Objection

27.    Section 1129(a) of the Bankruptcy Code provides that a plan may be confirmed if all of the requirements set forth therein are satisfied.  11 U.S.C. § 1129(a).  The Debtors bear the burden of proof by a preponderance of the evidence that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  *See In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012).

In *In re Genesis Health Ventures, Inc.,* 266 B.R. 591 (Bankr. D. Del. 2001), this Court also noted "[t]he Code imposes an independent duty upon the court to determine whether a plan satisfies each element of §1129, regardless of the absence of valid objections to confirmation." Here, the Debtors fail to meet these standards and confirmation should be denied.

**The Plan Impermissibly Provides for Non-Consensual Third Party Releases.**

28.     "Discharge is an involuntary release of a creditor's debt **by operation of law**." *In re Arrowmill Dev. Corp.,* 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (**emphasis** added) ("*Arrowmill*"). Bankruptcy discharge operates as a matter of law; *i.e.,* it is an order of the court, not a voluntary contractual agreement. Discharge binds only creditors as to their claims against the debtor, it does not affect the liability of a third party. *See In re Continental Airlines*, 203 F.3d 203, 211-218 (3d Cir. 2000) ("*Continental*") (Bankruptcy Code contemplates that a discharge only affects the debts of those submitting to its burdens). This is consistent with the plain language of the Bankruptcy Code. *See* 11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."). The Third Circuit explains:

> "[A] bankruptcy discharge arises by operation of federal bankruptcy law, not by contractual consent of the creditors and . . . a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confine of the bankruptcy proceedings . . . While the Bankruptcy Code expressly alters the contractual obligations of the bankrupt, it does not contemplate the same effect on the obligations and liabilities of third parties.

*First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993). Here, the Debtors are liquidating and not entitled to a discharge. *See* 11 U.S.C. § 1141(d)(3).

29.     In contrast to a bankruptcy discharge, waiver and release operate as a contractual matter. They require a knowing, intentional and voluntary relinquishment of rights for

consideration.  Waiver and release of a creditor's direct claims against a third party, therefore, cannot be imposed as a matter of law in the same manner as discharge; they require creditor consent.[13]  The court in *Arrowmill* explained the legal distinction as follows:

> "When a release of liability of a nondebtor is a consensual provision, however, agreed to by the effected creditor, it is no different from any other settlement or contract and does not implicate 11 U.S.C. § 524(e) . . .  Where the creditor consents to the release, and presumably receives consideration in exchange for that agreement, it has not been forced by virtue of the discharge provisions of the code, to accept less than the full value of its claim."

*Arrowmill*, 211 B.R. at 506.

30.    The Third Circuit has noted that "[w]aiver is a vague term used for a great variety of purposes . . .  In any normal sense, however, it connotes some kind of voluntary knowing relinquishment of a right . . .  These criteria of 'knowing' and 'willing' have been usefully applied to evaluate the validity of releases in other important contexts . . . ."  *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 521 (3d Cir. 1988) (internal citation omitted).  The Plan provides that the laws of the State of Delaware govern.  Plan at § 14.6.  Under Delaware law, waiver and release must be knowing and voluntary .  *See, e.g., Stratton v. Am. Indep. Ins. Co.*, No. CIVA 08C12012JRSCCLD, 2011 WL 2083933, at *6 (Del. Super. Ct. May 11, 2011) (the Court was prompted to "look carefully at the circumstances surrounding Stratton's purported settlement with AIIC to determine if the settlement was, in fact, knowing and voluntary.").  This Court has previously noted that it does not have the power to grant a third party release of a non-debtor as a matter of law.  *See In re Washington Mut., Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) ("*Washington Mutual*"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004).

---

[13] A debtor may compromise derivative claims because they are property of the estate.  *See In re Wilton Armetale, Inc.*, 968 F.3d 273, 283–84 (3d Cir. 2020) ("[T]he Bankruptcy Code makes a creditor's derivative causes of action property of the estate.")

**The Plan does not provide for the contractual consent of the holders of the Sexual Misconduct Claims to the Third Party Releases.**

31.     Third party releases of non-debtors may only be accomplished with the *affirmative agreement* of the third party affected.  The *Arrowmill* court explained:

> [A]s settlements arise by agreement of the parties and not by operation of law, they do not run afoul of section 524(e).  As stated by the Third Circuit, 'a bankruptcy discharge arises by operation of federal bankruptcy law, not by contractual consent of the creditors . . . .  While the Bankruptcy Code expressly alters the contractual obligations of the bankrupt, it does not contemplate the same effect on the obligations and liabilities of third parties.'"  *First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993).  In the case of voluntary releases, the nondebtor is released from a debt, not [by operation of law] but because the creditor agrees to do so.  Thus the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed.

*Arrowmill*, 211 B. R. at 507.  Many cases involve disputes whether the mechanism of expressing consent is sufficient.  *See, e.g., In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) ("[I]t cannot be said with certainty that those failing to return a ballot or Opt-Out Form did so intentionally to give the third-party release, and that is what the Court must find under the law to approve a third-party release absent the satisfaction of the *Continental* standard."); *Washington Mutual*, 442 B.R at 355 (Failing to return a ballot is not a sufficient manifestation of consent to a third party release"); *In re Coram Healthcare Corp*., 315 B.R. at 335 (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *In re Zenith Elecs. Corp*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (releases of third-party claims "cannot be accomplished without the affirmative agreement of the creditor affected."); *accord In re Exide Techs*., 303 B.R. 48, 75 (Bankr. D. Del. 2003) ("*Exide*") (absent consideration and creditor consent, third-party releases and injunctions are not permissible).

Manifestation of consent issues are not present here because, as noted, the proposed Third Party

Releases do not seek *any* form of consent from Holders of Sexual Misconduct Claims except as to

Harvey Weinstein.

32.    The proposed Plan, instead, *mandates* that holders of Sexual Misconduct Claims

release the Released Parties.  There is no mechanism for holders of Sexual Misconduct Claims to

opt out of the third party releases (except as to Harvey Weinstein).  *See* Plan, Ex.4, § 3.1 ("The

Plan and this protocol shall together be the sole and exclusive method by which a Claimant may

seek monetary distribution on account of a Sexual Misconduct Claim against the Debtors and/or

Former Representatives . . . a Claimant shall have the option to release Harvey Weinstein or to not

release Harvey Weinstein and pursue an action against him (***but not any Released Party***) in a court

of competent jurisdiction.") (***emphasis*** add); Plan at § 5.8 ("[A]ll Sexual Misconduct Claims

against the Released Parties will be subject to the Channeling Injunction . . . except that Holders

of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall be

excused from the Channeling Injunction solely for the purpose of pursuing an action against

Harvey Weinstein (***but not any Released Party***) in another court of competent jurisdiction")

(***emphasis*** add).

33.    The Third Circuit has noted that non-consensual third party releases "are the

exception, not the rule". *Washington Mutual*, 442 B.R. at 351 (*quoting Continental*, 203 F.3d at

212 ("non-consensual releases by a non-debtor of other non-debtor third parties are to be granted

only in 'extraordinary cases.'")*; see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141

(2d Cir. 2005) (holding that third party releases may be granted if important to the chapter 11 plan,

but "it is clear that such a release is proper only in rare cases."); *Class Five Nev. Claimants v. Dow*

*Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657–58 (6th Cir. 2002) (concluding that "such an injunction is a dramatic measure to be used cautiously").

34.     These cases are by no stretch extraordinary.   The Debtors are (and have been) defunct and are simply liquidating.  They previously determined their cases were best administered in chapter 7.  *See* [D.I.  2357].  The Plan is a vehicle by insurance companies are buying *de facto* discharges for themselves and others for a fraction of available insurance proceeds.  This precedent will only lead to abuse and mischief; *e.g.,* a bankrupt company with no operations files chapter 11 and no tort committee is appointed because there is no available cash.  The insurance companies and potential tortfeasors then campaign for generous relief for the least cost without ever putting themselves before the Court. This does not serve a legitimate bankruptcy policy.

35.     Holders of Sexual Misconduct Claims may have claims and causes of action against the Released Parties that they wish to pursue.  Due process concerns arise when third party releases and waivers in a bankruptcy plan are effective unilaterally and without consent, as is the case here. These claims and causes of action constitute property rights and unilaterally depriving a creditor of its property rights against a third party violates Due Process as set forth in the Fifth and Fourteenth Amendments to the Constitution.  Due process is an *individual* right.  *See In re Aegean Marine Petroleum Network, Inc*., 599 B.R. 717, 725 (Bankr. S.D.N.Y. 2019) ("we should not lose sight of the fact that when we impose involuntary releases we do not provide claimants with other procedural and substantive rights that they ordinarily would have."); *In re Digital Impact, Inc*., 223 B.R. 1, 13 n.6 (Bankr. N.D. Okla. 1998) (noting that a third-party release has "the effect of a judgment—a judgment against the claimant and in favor of the non-debtor, accomplished without due process").

36.     The Bankruptcy Code can force the adjustment of the debtor-creditor relationship because the debtor is before the court, charged to act as a fiduciary and in the best interests of its creditor constituencies.  A debtor must make available for distribution all of its available assets. However, a debtor cannot unilaterally alter a non-debtor's potential liability on a creditor's debt *by operation of law*. *See* §§ 524(e) and 1141(a).  To do so, each creditor whose direct rights against third parties are affected *must* consent.  The insurance companies should not be permitted to use a defunct company to adjust the insurance company-tort claimant relationship absent creditor consent, not requested or given here.

37.     The Plan seeks relief not provided in the Bankruptcy Code and, in fact, that is expressly prohibited by the Bankruptcy Code; *i.e.,* a *de facto* discharge for third parties for a debtor that does not qualify for a discharge or section 524 relief.  *See First Fidelity Bank v. McAteer,* 985 F.2d at 118 (the Third Circuit held that the confirmation of debtor's chapter 13 plan, and a creditor's receipt of payment under the plan, did not operate to erase or alter that creditor's right to collect from a third party, nondebtor insurance company.).

38.     Some courts have carved a limited exception to the prohibition in section 524(e) against non-debtor releases but such exception is narrowly tailored and applicable only in extraordinary circumstances not present here; *e.g.,* asbestos/mass tort liability.  The Third Circuit in *Continental* surveyed circuit court rulings considering the validity of non-debtor releases and permanent injunctions against third parties.  203 F.3d at 212-218.  The Court found that, while some circuits have held non-debtor releases and permanent injunctions impermissible under § 524(e), "[o]ther circuits have adopted a more flexible approach, albeit in the context of **extraordinary cases**."  *Id*. at 212 (**emphasis** added).  The cases adopting the more flexible approach were limited to asbestos/mass tort cases that upheld permanent injunctions in the context

of "global settlement of massive liabilities against the debtors and co-liable parties," where co-liable non-debtor parties had made substantial contributions to compensation for claimants in exchange for a release of their claims, and where such global settlement of massive tort claims was essential to the debtors' effective reorganization.  *Id*. at 213.  Ultimately, *Continental* did "not establish [a] rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible."  *Id.*  It did hold, however, that the non-consensual release of a non-debtor party and permanent injunctions in *Continental*'s plan did "not pass muster under even the most flexible tests for the validity of non-debtor releases."  *Id.* at 214.

39.     *Continental* laid out the hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual finding to support these conclusions. *Id; see also Exide*, 303 B.R. at 72 ("non-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in extraordinary cases.") (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. at 608).  In *Genesis Health Ventures*, the Court expanded that "necessity" under *Continental* requires a showing:  (a) that the success of the debtor's reorganization bears a relationship to the release of the non-consensual non-debtor parties and (b) that the non-debtor parties being released from liability have provided "a critical financial contribution to the debtors' plan" in exchange for the receipt of the release."  *Genesis Health Ventures* 266 B.R. at 607.  A financial contribution is considered "critical" if without the contribution, the debtor's plan would be infeasible.  *Id*.  Fairness of a release is determined by examining "whether non-consenting creditors were given reasonable consideration in exchange for the release."  *Id*. at 608.

40.     The Plan does not satisfy the hallmarks for third party releases enunciated by *Continental*:

    **Fairness**.  There is nothing fair about a Plan that requires a rape victim to release her rapist in order to receive a full reward from the Sexual Misconduct Fund.  There is nothing fair

in re-victimizing her financially by reducing her award by 75% if she does not agree to release her rapist.  And even if she receives 100% of her Point Award, that amount is far less than a jury might award.[14]

There is nothing fair about a plan that treats rape and sexual assault victims as nominal creditors.  There is nothing fair about depriving rape and sexual assault victims the substantial voice they should have in voting for the Plan under section 1126(c) by reducing the economic value of their vote to $1, effectively disenfranchising them.  This is entirely unnecessary in a case with only 55 holders of Sexual Misconduct Claims.

There is nothing fair in finding that the Holders of Sexual Misconduct Claims "release" and "waive" their claims against the Released Parties when, in fact, such holders do not agree to their claims being released and waived.

There is nothing fair in deeming the Non-Settling Sexual Misconduct Claimants' causes of action against Former Representatives released and waived in violation of Due Process or denying them their Constitutional right to a jury trial.

- **Necessity to Reorganization**.  The third party releases are not necessary to the Debtors' reorganization because the Debtors are not operating and have no employees.  These cases could be readily administered in chapter 7.  They remain in chapter 11, and the Plan is funded and proposed, for the primary purpose of allowing the insurance companies to purchase a *de facto* discharge for the Released Parties.  In the context of third party releases and extraordinary relief, "reorganization" means true, ongoing reorganization as a viable business.  The Plan is a liquidating plan.  *Washington Mutual*, 442 B.R.at 352 (citing with approval to *In re Nickels Midway Pier, LLC*, 2010 Bankr. LEXIS 1642, *13 (Bankr. D.N.J. May 21, 2010) (court held that third party releases were impermissible where no consideration was going to the releasing parties who had objected and were not necessary to the debtor's reorganization because it was liquidating).

- **Specific Factual Findings**.  There is no specific factual record that shows that the release in favor of the Released Parties is either fair or necessary to the Debtors' liquidation.  In the absence of such specific factual findings, the Third Party Releases must be struck from the Plan.

---

[14] Not surprisingly, awards in rape cases and serious sexual abuse cases outside bankruptcy are substantial.  *See, e.g., Gloria G v. Mount Vernon*, Westchester Cty. Index No. 70026/2012 ($28 million verdict obtained by this firm for fourteen year-old raped and assaulted one time); *see also Thompson v. Steuben Realty Corp.*, 820 N.Y.S.2d 285 (2nd Dept. 2006) ($4.5 million [$5.7 million  in today's dollars] for an adult tenant against property owner resulting from a single sexual assault);  *Bernstein v. 655 Realty Co., Goodman Mgmt. Co.*, 1985 WL 351193 (N.Y. Sup.) ($4 million award in 1985 for one-time rape of a woman by an intruder inside of her apartment); *McCormack v.  Cambria Home Remodeling Corporation*, 1985 WL 352653 (N.Y. Sup.) ($4 million award for a  30-year-old female who endured emotional distress after she was raped by an intruder in her  home); *Plaintiff Restaurant  Bartender and Alleged Sexual Abuse Victim v. Defendant Owner of Restaurant*, 2015 NY Jury Verdicts Review LEXIS 151 ($2.5 million verdict in 2015 resulting from a female employee being sexually assaulted twice by her supervisor, including once in the back office of the restaurant where  they both worked when he cornered her, turned her around and masturbated while he fondled her  breasts until he orgasmed); *Splawn v. Lextaj Corp.*, 197 A.D.2d 479 (1st Dept. 1993) ($2 million verdict in 1993 resulting from a one-time sexual assault of a female tenant by an intruder in her  hotel room).

41.     The Debtors also have not satisfied the conditions set forth *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994), and are left to their burden.

**The Debtors are Not Entitled to Section 524-style Relief.**

42.     The discharge of a debtor does not affect the liability of a third party. *See* 11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.").  Here, the Debtors do not qualify for a discharge, *see* 11 U.S.C. § 1141(d)(3)(a corporate debtor is not entitled to a discharge if "the plan provides for the liquidation of all or substantially all of the property of the estate" and "the debtor does not engage in business after consummation of the plan[,]" neither are they entitled to a discharge injunction under section 524(a) nor a supplemental injunction under section 524(g).[15] *See* 11 U.S.C. § 524(g)(1)(A)(court may enter "an injunction in accordance with this subsection *to supplement the injunctive effect of a discharge under this section*.") (*emphasis* added); *see also Am. Capital Equip.*, LLC, 688 F.3d 145, 151 (3d Cir. 2012) (noting bankruptcy court's conclusion that the debtor in that case "did not have a going concern, and … that without a going concern, it could not approve a trust pursuant to 524(g)").

43.     Even though the Debtor is not entitled to a discharge, and the Bankruptcy Code prohibits the discharge of third parties, the Debtors seek to confer upon the Released Parties a *de facto* discharge in the form of Third Party Releases and a Channeling Injunction.  The Plan seeks to enjoin holders of Sexual Misconduct Claims from pursuing non-debtor third parties such as insurance companies, to the full extent of coverage, and Former Representatives to extent of their

---

[15] Section 524(g) is structured and worded to supplement the injunctive effect of a discharge under §1141. *See* 11 U.S.C. § 524(g) ("court . . . may issue . . . an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section"). Since it is dependent on the §1141 discharge, the section 524(g) injunction cannot exist without it. Accordingly, the Plan's section 524(g)-style injunction is impermissible.

non-exempt assets. The Plan seeks to impose a channeling injunction directing those claims (and future claims) to a pathetically meager Sexual Misconduct Claim Fund that will not come close to paying such claims in full. The insurance companies are not devoting anywhere near the full amount of insurance proceeds to the Sexual Misconduct Claims Fund and there is no "evergreen" feature to the funding.

44.     The requested channeling injunction sought by the Plan is not an appropriate use of the Court's equitable powers in these cases. The only *express* channeling injunction is found in section 524(g) of the Bankruptcy Code and the Debtors do not come close to qualifying for section 524(g) relief. *See* 11 U.S.C. § 524(g)(2)(B)(i)(I) ("the injunction is to be implemented in connection with a trust that . . . is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, *asbestos or asbestos-containing products*") (*emphasis* added); *see also In re W.R. Grace & Co.*, 900 F.3d at 130.[16]

_____

[16] To invoke § 524(g), a debtor must meet (and the Debtors here, clearly do not meet) other express requirements including, but not limited to:

- the trust must assume the liabilities of a debtor "which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products," *see* § 524(g)(2)(B)(i)(I);

- the trust is to own or be entitled to own a majority of the voting shares of the debtor or its parent corporation, *see* § 524(g)(2)(B)(i)(III);

- the trust must use its assets or income to pay claims and demands, *see* § 524(g)(2)(B)(i)(IV);

- "the debtor is likely to be subject to substantial future demands for payment" arising from exposure to the debtor's asbestos, *see* § 524(g)(2)(B)(ii)(I);

- "the actual amounts, numbers, and timing of such future demands cannot be determined," *see* § 524(g)(2)(B)(ii)(II); and

- "pursuit of such demands" outside of bankruptcy would threaten the ability to "deal equitably with claims and future demands," *see* § 524(g)(2)(B)(ii)(I).

45.     The Third Circuit in *Combustion Engineering* indicated that section 524(g) relief is appropriate only for a business reorganizing as a going concern.  In *dicta*, the Third Circuit noted "[t]he implication of [524(g)(2)(B)(i)(II)] is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an "evergreen" funding source for future asbestos claimants."  *Combustion Engineering*, 391 F.3d at 248; *see also In re Flintkote Co.*, 486 B.R. 99, 130 (Bankr. D. Del. 2012) ("The Court of Appeals in *Combustion Engineering* stated, in dicta, that the implication of [§ 524(g)(2)(B)(i)(II)] is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an 'evergreen' funding source for future asbestos claimants."), *aff'd*, 526 B.R. 515 (D. Del. 2014); *In re Quigley Co.*, 437 B.R. 102, 141 (Bankr. S.D.N.Y. 2010) (§ 524(g)(2)(B)(i)(II) "implies an ability to make payments into the future—an 'evergreen' source of funding—and this is what the Third Circuit in *Combustion Engineering* undoubtedly meant when it referred to an 'ongoing business' requirement.").

46.     The Third Circuit in *Combustion Engineering* discussed the going concern requirement as follows: "Section 524(g)(2)(B)(i)(II) provides that the asbestos personal injury trust must be 'funded in whole or in part by the securities of 1 or more debtor involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends.'" *Combustion Engineering*, 391 F.3d at 248 (quoting 11 U.S.C. § 524(g)(2)(B)(i)(II)).  The implication of this requirement is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an "evergreen" funding source for future asbestos claimants.  *Id*.  The legislative history of section 524(g) also reflects the going concern requirement.  *See* 140 Cong. Rec . S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Heflin) ("[W]hen an asbestos-producing company goes into bankruptcy and is faced with present and

future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims. The underlying company funds the trust with securities and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.").

**The Debtors are Not Entitled to Section 524-Style Relief Based on Section 105 and other Sections of the Bankruptcy Code**

47.     The Plan trips on the fact that it seeks section 524-style relief pursuant to "[s]ection 105(a) of the Bankruptcy Code *and other sections of the Bankruptcy Code* . . . [,]"   Plan at p. 3 (*emphasis* added). The Debtors are not entitled to a discharge and clearly are not entitled to a section 524(g) super-discharge. Notwithstanding the foregoing, the Debtors seek to confer exactly that type of extraordinary relief on a broad array of Released Parties. The equitable powers authorized by § 105(a) "are not 'without limitation, and courts have cautioned that this section does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'" *Combustion Engineering*, 391 F.3d at 236; *see also Law v. Siegel*, 571 U.S. 415, 421 (2014) ("It is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.' . . . Section 105(a) confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits.") (internal citation omitted); *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) (§ 105(a) "does not give the court the power to create substantive rights that would otherwise be unavailable under the Code"); *In re Barbieri*, 199 F.3d 616, 620–21 (2d Cir.1999) (warning the "equitable powers emanating from § 105(a) . . . are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules") (citations omitted); *Opt-Out Lenders v. Millennium*

*Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 242 F. Supp. 3d 322, (D. Del. March 20, 2017) (stating that Section 105(a) cannot be used to craft new remedies that contravene existing statutory provisions, or create substantive rights that are otherwise unavailable under applicable law); *In re KI-1, Inc.*, No. 02-10536 WS, 2006 WL 2801873, at *8 (Bankr. D. Del. Sept. 28, 2006) ("Notwithstanding that 105(a) of the Code is the basis for a broad exercise of power in the administration of a bankruptcy case, the Court has no authority to alter property rights or other rights or duties under applicable non-bankruptcy law, nor create substantive rights that are otherwise unavailable under applicable law, except where such alteration is authorized by the Bankruptcy Code.").

48.     Simply put, the Bankruptcy Code does not sanction the extraordinary relief sought by the Debtors in the context of these cases.  Section 105 cannot be utilized when section 524 relief is not available; it is not an end around section 524.  Section 105 may be relied on solely to implement another section of the Bankruptcy Code.  Here, section 105 is being used to lower the bar for section 524-style relief because the Debtors do not qualify for such relief.  That sets a precedent for a construct where the Debtors can sell *de facto* discharges.

**The Court Lacks Jurisdiction to Force the Third Party Releases upon the Holders of Direct Claims against Non-Debtors**

49.     The Court lacks the power and jurisdiction to grant the Third Party Releases and Channeling Injunction set forth in the Plan. *See In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017).  Section 105 does not provide an independent source of federal subject matter jurisdiction. *Combustion Engineering*, 391 F.3d at 225; *see also In re Johns–Manville Corp.*, 801 F.2d 60, 63 (2d Cir.1986) ("Section 105(a) does not, however, broaden the bankruptcy court's jurisdiction, which must be established separately[.]").  "Related to" jurisdiction must therefore exist independently of any plan provision purporting to involve or enjoin claims against non-

debtors. *In re Zale Corp.*, 62 F.3d 746, 756 (5th Cir. 1995).  The definition of Released Parties is so broad the Court cannot find that a third party direct claim against *each* Released Party will have a conceivable impact on the Debtors' estates.  The Debtors are left to their burden.

**The Plan's Exculpation Provision is Impermissibly Broad**

50.     This Court in *Washington Mutual* stated that an "exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committee and their members, and the Debtors' directors and officers."  442 B.R. at 350-351.  The *Tribune* court was in accord, noting that any exculpation clause "must exclude non-fiduciaries." *Id*. at 189.

51.     Here, the definition of Exculpated Parties includes Representatives which, in turn, is defined to include:  "the present and former directors, officers, members, managers, employees, trustees, accountants (including independent certified public accountants), advisors, attorneys, consultants, experts or other agents of that Entity, or any other professionals of that Entity, in each case in their capacity as such."  Plan at 1.102.  It is respectfully submitted that the term Representative brings within the scope of Exculpated Parties many non-fiduciaries, and many persons who are former fiduciaries who did not serve during the administration of the cases.

**The Plan is Not Proposed in Good Faith**

52.     The insurance companies involved in these cases are very adept at cost-benefit and risk exposure analyses.  However, they are not charged to act as fiduciaries to the Debtors' estates and are not motivated to fund a Plan that is in the estate's best interests.  Instead, they are following their own economic interests, and the interests of insurance companies and tort victims are inimical.

53.    The Plan funded by the insurance companies is a contrivance to obtain *de facto*

discharges for the Released Parties in a case where such relief is inappropriate.  The Debtors are

most likely on the brink of administrative insolvency.  The insurance companies are using the Plan

as a vehicle to resolve the insurance company-insurance claimant relationship, not the Debtor-

creditor relationship.  A similar construct troubled the Third Circuit in *Combustion Engineering*:

"[t]he Plan has been presented as a prepackaged Chapter 11 reorganization plan, but it more closely

resembles, in form and in substance, a liquidation of the debtor with a post confirmation trust

funded in part by nondebtors." *Combustion Engineer*, 391 F.3d at 201.  Furthermore, the Third

Circuit questioned that "[i]t is debatable whether Combustion Engineering could satisfy §

524(g)(2)(B)(i)(II)." *Id*. at 248.

54.    In deciding whether the proposed Plan satisfies section 1129(a)(3)'s "good faith"

requirement, the court must consider the *Order (A) Approving the Adequacy of the Disclosure*

*Statement, (B) Approving Solicitation Procedures, (C) Setting Confirmation Hearing Date and*

*Related Deadlines, (D) Estimating Certain Claims, and (E) Granting Related Relief* [D.I. 3101]

and the resulting impact on the voting process.  *See, e.g., Quigley*, 37 B.R. at 125 (Section

1129(a)(3) "must be viewed in light of the totality of the circumstances surrounding the

establishment of a chapter 11 plan.") (internal citation omitted).  The Debtors gutted the two-thirds

dollar amount requirement of section 1126(c) effectively disenfranchising the Debtors' largest

creditors.  With only 55 holders of Sexual Misconduct Claims, there is no reason the voices of

rape and sexual assault victims are not heard in alignment with the magnitude of their claims.

**The Plan Substantially Penalizes Holders of Sexual Misconduct Claims for Not Releasing**
**Rapist Harvey Weinstein**

55.    There is an interplay of sections of the Bankruptcy Code that are designed to ensure

the Plan's fairness, and that interplay reinforces the dictate that "[e]quality of distribution among

creditors is a central policy of the Bankruptcy Code." *Combustion*, 391 F.3d at 239 (quoting *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)).  Section 1129(a)(1) of the Bankruptcy Code requires the Plan to comply with all applicable provisions of the Bankruptcy Code, including section 1123(a)(4).  Section 1123(a)(4) of the Bankruptcy Code provides, in relevant part, that "a plan shall—… provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such claim or interest."  11 U.S.C. § 1123(a)(4).  "[E]quality of distribution among creditors is a central policy of the Bankruptcy Code." *Combustion Engineering*, 391 F.3d at 239.  "[C]ourts have interpreted the 'same treatment' requirement to mean that all claimants in a class must have the 'same opportunity' for recovery."  *In re WR Grace & Co.*, 729 F.3d at 327.

56.    Here, the Debtors force rape victims to release their rapist in order to achieve the same opportunity for economic recovery as other Class 4 members.  This demand is outrageous financially and emotionally, does not serve a legitimate goal of the Debtors and does not further any policy of the bankruptcy code.

**The Plan Impermissibly Grants Substantive Consolidation**

57.    The equitable doctrine of substantive consolidation, if ordered, results in the treatment of a debtor and one or more of its affiliates as a single entity.  In that event, inter-entity claims of the debtor and its affiliates are eliminated, the assets of the debtor and its affiliates will be treated as common assets, and the claims of creditors against the debtor and its consolidated affiliates will be treated as claims against their common assets.  *See In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) ("*Owens Corning*"), *as amended by,* 2005 US App. LEXIS 18043 (3d. Cir. Aug. 23, 2005), *cert. denied*, 547 U.S. 1123, 126 S. Ct. 1910 (2006).  The Third Circuit reversed the Delaware District Court's decision that permitted consolidation of Owens Corning of

Delaware with certain wholly owned subsidiaries, some of which had also filed for protection under the Bankruptcy Code.  In reversing the lower court's decision, the Third Circuit Court, like other courts before it, emphasized that substantive consolidation is an extreme remedy that should be used only in "compelling circumstances calling equity (and even then only possibly substantive consolidation) into play."  *Owens Corning*, 419 F.3d at 211.  The court formulated a standard in making a determination whether to consolidate or not, and emphasized five principles to be advanced:

(1)  Limiting the cross-creep of liability by respecting entity separateness is a "fundamental ground rule."  As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.

(2)  The harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness.  Harms caused by creditors typically are remedied by provisions found in the Bankruptcy Code (*e.g.*, fraudulent transfer, §§ 548 and 544(b)(1), and equitable subordination, § 510(c)).

(3)  Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

(4)  Because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

(5)  While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

*Id.* at 211 (internal citations omitted).  Applying these five principles to formulate its own standard, the Third Circuit set forth the following two rationales for substantive consolidation (the "**Third Circuit Test**"):

> [W]hat must be proven (absent consent) concerning the entities for whom a substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id.*  The Non-Settling Sexual Misconduct Claimants leave the Debtors to their burden.

**Objection to the Proposed Mediator**

58.     The Plan defines Sexual Misconduct Claims Examiner to mean Simone Lelchuk and Jed Melnick of Melnick ADR, LLP.  Plan, Ex. 1, § 1.112.  The proposed Sexual Misconduct Claims Examiners unsuccessfully mediated claims in the *Geiss* case, as well as the claims of each of the Non-Settling Sexual Misconduct Claimants.  The proposed Sexual Misconduct Claims Examiners personally endorsed in a sworn declaration a settlement that was labeled "offensive" by a federal court judge because it provided more money for defendants' lawyers than for sexual abuse victims.[17]  Moreover, the proposed Sexual Misconduct Claims Examiners—Jed Melnick and Simone Lelchuk—accepted this appointment even though some parties to the mediation, including the Non-Settling Sexual Misconduct Claimants, have not consented to them having a role as Claims Examiners in these cases.  In doing so, Mr. Melnick and Ms. Lelchuk have violated basic ethical standards governing mediators, which provide that a mediator "shall not undertake

---

[17] *See Geiss v. The Weinstein Company Holdings*, 17 Civ. 09554 (S.D.N.Y) (Dkt. No. 333-6).

an additional dispute resolution role in the same matter *without the consent of the parties*." ABA

Model Standards of Conduct for Mediators, Standard (VI)(A)(8).[18]

      **WHEREFORE,** the Non-Settling Sexual Misconduct Claimants respectfully request the

Court deny confirmation of the Plan and for such other and further relief as is just and proper.


Dated:  December 18, 2020
Wilmington, Delaware

      Respectfully submitted,

      **THE ROSNER LAW GROUP LLC**

      */s/ Frederick B. Rosner*
      Frederick B. Rosner (DE # 3995)
      Zhao (Ruby) Liu (DE# 6436)
      824 N. Market Street, Suite 810
      Wilmington, Delaware 19801
      Tel.: (302) 777-1111
      Email: rosner@teamrosner.com
      liu@teamrosner.com

      -    and   -

      **WIGDOR LLP**
      Douglas H. Wigdor, Esquire.
      Bryan L. Arbeit, Esquire
      85 Fifth Ave, Fl. 5
      New York, NY 10003
      Phone: (212) 257-6800
      Email: dwigdor@wigdorlaw.com
      barbeit@wigdorlaw.com

      -    and   -

      **THE LAW OFFICE OF KEVIN MINTZER, P.C.**
      Kevin Mintzer, Esquire
      1350 Broadway, Suite 2220
      New York, New York 10018
      Phone: (646) 843-8180
      Email: km@mintzerfirm.com

---

[18] These standards can be found at: www.americanbar.org/content/dam/aba/administrative/dispute_resolution/Dispute resolution/model_standards_conduct_april2007.pdf

- and -

**RHEINGOLD GIUFFRA RUFFO & PLOTKIN LLP**
Thomas P. Giuffra, Esquire
551 5th Avenue, 29th Floor
New York, NY 10176
Phone: (212) 684-1880
Email: tgiuffra@rheingoldlaw.com

*Counsel for the Non-Settling Sexual Misconduct Claimants*