**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| THE WEINSTEIN COMPANY HOLDINGS LLC., *et al.*, [1] | Case No. 18-10601 (MFW) |
|  | Jointly Administered |
| Debtors. |  |

**DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS' JOINT (I) MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE WEINSTEIN COMPANY HOLDINGS, LLC ET AL. AND (II) OMNIBUS REPLY TO CONFIRMATION OBJECTIONS**

---

[1]  The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are 3837.  The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

RELIEF REQUESTED ........................................................................................ 1

PRELIMINARY STATEMENT ........................................................................... 2

BACKGROUND ................................................................................................. 5

I.      General Background .............................................................................. 5

II.     The Sale ................................................................................................ 6

III.    The Global Settlement and Early Plan Process.................................... 7

IV.     Plan Support Agreement ..................................................................... 10

V.      Finalizing the Plan and Approval of Disclosure Statement ............... 10

VI.     The Solicitation Process and Voting Results ..................................... 12

VII.    Plan Overview .................................................................................... 13

OBJECTIONS TO PLAN .................................................................................. 14

ARGUMENT ..................................................................................................... 15

I.      The David Objection Fails To Provide A Sufficient Basis To Deny Confirmation
        of The Plan............................................................................................ 15

        A.      The Third-Party Releases Are Permissible Under Section 1123 And Third
                Circuit Law. ............................................................................... 16

                1.      The Consensual Third-Party Releases Are Permissible And
                        Supported By Third Circuit Precedent...................................... 17

                2.      The Non-consensual Third-Party Releases Are Permissible And
                        Supported By Third Circuit Precedent...................................... 19

                        a)      The Non-consensual Third-Party Releases Are Necessary. ..........20

                        b)      The Non-consensual Third-Party Releases Are Fair. ...................24

                        c)      These Chapter 11 Cases Contain Exceptional Facts That
                                Justify Granting The Non-Consensual Third-Party
                                Releases...........................................................................29

        B.      The Channeling Injunction Is Appropriate. ......................................... 33

i

C.      Substantive Consolidation Of The Debtors' Estates Is Appropriate. ................... 34

D.      The Plan Was Proposed In Good Faith (§ 1129(a)(3)). .......................................... 36

II.     The Plan Satisfies The Remaining Applicable Requirements Of Section 1129. .............. 38

A.      The Plan Satisfies the Classification Requirements Of Bankruptcy Code
        Section 1122 ................................................................................................................ 39

B.      The Plan Satisfies The Mandatory Requirements Of Bankruptcy Code
        Section 1123(a). .......................................................................................................... 40

C.      The Plan Satisfies The Discretionary Provisions of Bankruptcy Code
        Section 1123(b) And Bankruptcy Rule 9019. ......................................................... 42

        1.      The Global Settlement Contained In The Plan Satisfies Section
                1123 And Bankruptcy Rule 9019. ............................................................. 43

        2.      The Debtors' Releases Comply With The Discretionary Provisions
                Of Bankruptcy Code Section 1123(b) ....................................................... 45

D.      The Debtors Complied With The Applicable Provisions Of The
        Bankruptcy Code (§ 1129(a)(2)) ............................................................................. 49

E.      The Plan Provides That The Payment Of Professional Fees And Expenses
        Are Subject To Court Approval (§ 1129(a)(4)). ..................................................... 50

F.      The Plan Does Not Require Governmental Regulatory Approval of A Rate
        Change (§ 1129(a)(6)) ............................................................................................... 51

G.      The Plan Is In The Best Interests Of All the Debtors' Creditors
        (§ 1129(a)(7)). ............................................................................................................ 51

H.      The Requirements Of Section 1129(a)(8) Are Satisfied. ...................................... 53

I.      The Plan Provides For Payment In Full Of All Allowed Priority Claims
        (§ 1129(a)(9)). ............................................................................................................ 53

J.      At Least One Class Of Impaired, Non-Insider Claims Accepted The Plan
        (§ 1129(a)(10)). .......................................................................................................... 54

K.      The Plan Is Feasible (§ 1129(a)(11)). ..................................................................... 54

L.      All Statutory Fees Have Been Or Will Be Paid (§ 1129(a)(12)). ......................... 55

M.      The Plan Satisfies The "Cram Down" Requirements Of Section 1129(b)
        Of The Bankruptcy Code. ......................................................................................... 55

N.      The Plan Complies With Bankruptcy Code Section 1129(d). .............................. 57

III.    Good Cause Exists To Waive The Stay Of The Confirmation Order.............................. 57

CONCLUSION................................................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).................................................................................................................51

*Bayard, P.A. v. Harvey Weinstein* (C.A. No.19C-12-118 (WCC) (Del. Sup. Ct Dec. 11, 2019)....................................................................................................30

*Canosa v. Weinstein*, No. 18-cv-4115-PAE (S.D.N.Y. May 8, 2018)............................................4

*David v. The Weinstein Co. LLC*, No. 18-cv-05414-RA-KNF (S.D.N.Y. Dec. 19, 2019) ...................................................................................................................4

*Geiss v. The Weinstein Co. Holdings, LLC*, No. 17-cv-9554 (AKH), 2020 WL 4266925 (S.D.N.Y. July 24, 2020) ...............................................................4, 6, 9, 25

*Geiss v. The Weinstein Co. Holdings, LLC*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019).....................23

*Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000) ......................................................................................................19, 20, 24

*Gillman v. Continental Airlines, Inc.*, 254 B.R. 93 (D. Del. 1998) ................................................29

*In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653, 2014 Bankr. LEXIS 863 (Bankr. D. N.J. Mar. 5, 2014)...............................................21, 24, 26

*In re Adelphia Commc'ns. Corp.*, 361 B.R. 337, 366 (S.D.N.Y. 2007). ......................................52

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) .............................45, 51

*In re Aegean Marine Petroleum*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019).....................................28

*In re Affiliated Foods, Inc.*, 249 B.R. 770 (Bankr. W.D. Mo. 2000)..............................................52

*In re Armstrong World Indus., Inc.*, 348 B.R. 111 (D. Del. 2006) ..........................................15, 40

*In re Blitz U.S.A.*, No. 11-13603 (PJW), 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ............................................................................................................23, 33, 34

*In re Capmark Fin. Grp., Inc.*, 438 B.R. 471 (Bankr. D. Del. 2010) ...........................................43

*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996)........................................32

*In re Caribbean Petroleum Corp.*, 512 B.R. 774 (Bankr. D. Del. 2014) .....................................46

*In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) .....................................42, 43

*In re Digital Impact, Inc.*, 224 B.R. 1 (Bankr. N.D. Okla. 1998) ............................................28, 29

*In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714 (Bankr. S.D.N.Y. 1992) .....................56

*In re Drexel Burnham Lambert Grp. Inc.*, 995 F.2d 1138 (2d Cir. 1993) ....................................29

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001)............................24, 26

*In re Glob. Indus. Tech., Inc.*, 645 F.3d 201 (3d Cir. 2011) .............................................19, 33, 34

*In re Glob. Indus. Techs., Inc.,* No. 02-21626-JKF, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013)..................................................................................................45

*In re Indianapolis Downs, LLC.*, 486 B.R. 286 (Bankr. D. Del. 2013) ............................17, 18, 46

*In re Jennifer Convertibles, Inc.*, 447 B.R. 713 (Bankr. S.D.N.Y. 2011)....................................35

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) ..............................................56

*In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D.N.Y 2009)................................................50

*In re Kaiser Alum. Corp.*, 343 B.R. 88 (D. Del. 2006)..................................................................34

*In re Louise's, Inc.*, 211 B.R. 798 (D. Del. 1997)........................................................................43

*In re Machne Menachem, Inc.*, 233 F. App'x 119 (3d Cir. 2007) .................................................15

*In re Marvel Entm't Grp., Inc.*, 222 B.R. 243 (D. Del. 1998) ......................................................43

*In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)..............................46

*In re Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr. D.N.J. 2000) .......................................................................................................................56

*In re Melinta Therapeutics, Inc., et al.*, No. 19-12748 (LSS) (Bankr. D. Del. Apr. 11, 2020) ...................................................................................................................16

*In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 283-84 (Bankr. D. Del. 2017) ...........................................................................................................................29

*In re Millennium Lab Holdings II, LLC*, 591 B.R. 559 (D. Del. 2018) ..................................19, 29

*In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019)................................. passim

*In re Motors Liquidation Co.*, 447 B.R. 198 (Bankr. S.D.N.Y. 2011) .........................................16

*In re N. Am. Refractories Co.*, No. 02-20198 (JKF), 2007 WL 7645287 (Bankr. W.D. Pa. Nov. 2007)..............................................................................................33, 34

*In re New Century TRS Holdings, Inc.*, 390 B.R. 140 (Bankr. D. Del. 2008) ..............................35

*In re New Century TRS Holdings, Inc.*, 407 B.R. 576 (D. Del. 2009) ...........................................35

*In re Nickels Midway Pier, LLC*, No. 03-49462 (GMB), 2010 WL 2034542
 (Bankr. D.N.J. May 21, 2010) ......................................................................................23

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) ...................................................................35

*In re PWS Holding Co.*, 228 F.3d 224 (3d Cir. 2000) .......................................................16, 37, 49

*In re Quorum Health Corp., et al.*, No. 20-10766 (Bankr. D. Del. June 30, 2020) .....................15

*In re Resorts Int'l, Inc.*, 145 B.R. 412 (Bankr. D.N.J. 1990) .......................................................50

*In re Sabine Oil & Gas Corp.*, 555 B.R. 180 (Bankr. S.D.N.Y. 2016) .................................55, 56

*In re Signal Int'l, Inc.*, No. 15-11498 (Bankr. D. Del. Nov. 24, 2015) ........................................34

*In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011) ....................................................17, 18, 19

*In re Tribune Co.*, 476 B.R. 843 (Bankr. D. Del. 2012) ...............................................................40

*In re U.S. Fidelis*, 481 B.R. 503 (Bankr. E.D. Mo. 2012) .....................................................19, 20

*In re United Steel Enters., Inc.*, No. 03-50284 (NLW), 2009 WL 1025398 (Bankr.
 D. N.J. Jan. 15, 2009) ..............................................................................................23, 33

*In re W.R. Grace & Co.*, 446 B.R. 96 (Bankr. D. Del. 2011) .................................................25, 52

*In re W.R. Grace & Co.*, 475 B.R. 34 (Bankr. D. Del. 2012) .......................................................52

*In re Wash. Mut., Inc.*, No. 08-12229, 2012 WL 1563880 (Bankr. D. Del. Feb. 24,
 2012) ........................................................................................................................45

*In re Wash. Mut. Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ................................................. passim

*In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) .................................46, 48, 55

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154 (3d
 Cir. 1993) ...........................................................................................................39, 55

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating*, LLC (*In re
 Charter Commc'ns*), 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...................................45

*King v. Baldino*, 409 F. App'x 535 (3d Cir. 2010) .......................................................................32

*Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996) ..................................................43, 44

*People of the State of New York v. The Weinstein Co. LLC*, No. 450293-2018E (N.Y. Sup. Ct., Feb. 11, 2018) ................................................................6

*Rehal v. Weinstein*, No. 151738-2018E (N.Y. Sup. Ct. Feb. 27, 2018).........................................25

*Rojas v. Ellison*, No. 2018-0755-AGB, 2019 Del. Ch. LEXIS 281 (Del. Ch. July 29, 2019) ................................................................32

*Stone & Webster*, 286 B.R. 532 (Bankr. D. Del. 2002) ................................................................35

*U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114 (Bankr. D. Del. 2010) ................................................................17, 46

*United Artists Theatre Co. v. Walton*, 315 F.3d 217 (3d Cir. 2000).............................................24

*Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639 (3d Cir. 2006) ......................44

**Statutes & Rules**

11 U.S.C. § 105(a) ................................................................19, 33, 34

11 U.S.C. § 507(a)(2)................................................................40, 55

11 U.S.C. § 510(b) ................................................................56

11 U.S.C. § 1107(a) ................................................................5

11 U.S.C. § 1108................................................................5

11 U.S.C. § 1122................................................................38, 39

11 U.S.C. § 1122(a)................................................................39, 40

11 U.S.C. § 1123................................................................16, 38, 43

11 U.S.C. § 1123(a) ................................................................40

11 U.S.C. § 1123(a)(1)................................................................40

11 U.S.C. § 1123(a)(2)................................................................40

11 U.S.C. § 1123(a)(3)................................................................41

11 U.S.C. § 1123(a)(4)................................................................41

11 U.S.C. § 1123(a)(5)................................................................41, 42

11 U.S.C. § 1123(a)(5)(C) ................................................................35

11 U.S.C. § 1123(a)(6)............................................................................................42

11 U.S.C. § 1123(a)(7)............................................................................................42

11 U.S.C. § 1123(b)....................................................................................16, 42, 43

11 U.S.C. § 1123(b)(1)–(4), (6).........................................................................16, 42

11 U.S.C. § 1123(b)(3)(A).......................................................................................45

11 U.S.C. § 1123(b)(6) ......................................................................................34, 36

11 U.S.C. § 1125.....................................................................................................49

11 U.S.C. § 1126.....................................................................................................49

11 U.S.C. § 1126(a).................................................................................................49

11 U.S.C. § 1126(c).................................................................................................49

11 U.S.C. § 1126(d).................................................................................................49

11 U.S.C. § 1126(f).................................................................................................50

11 U.S.C. § 1126(g).................................................................................................50

11 U.S.C. § 1129...................................................................................................1, 15

11 U.S.C. § 1129(a).................................................................................................55

11 U.S.C. § 1129(a)(1)............................................................................................38

11 U.S.C. § 1129(a)(2)......................................................................................49, 50

11 U.S.C. § 1129(a)(3)......................................................................................36, 37

11 U.S.C. § 1129(a)(4)......................................................................................50, 51

11 U.S.C. § 1129(a)(6)............................................................................................51

11 U.S.C. § 1129(a)(7)......................................................................................51, 53

11 U.S.C. § 1129(a)(8)......................................................................................53, 55

11 U.S.C. § 1129(a)(9)......................................................................................53, 54

11 U.S.C. § 1129(a)(10)..........................................................................................54

11 U.S.C. § 1129(a)(11)....................................................................................54, 55

11 U.S.C. § 1129(a)(12) ................................................................................................55

11 U.S.C. § 1129(b) ..........................................................................................53, 55, 57

11 U.S.C. § 1129(b)(2)(B) ............................................................................................55

11 U.S.C. § 1129(d) ......................................................................................................57

Del. Bankr. L. R. 1015-1 ................................................................................................5

Fed. R. Bankr. P. 1015(b) ...............................................................................................5

Fed. R. Bankr. P. 3020 ..................................................................................................57

Fed. R. Bankr. P. 3020(e) ..............................................................................................57

Fed. R. Bankr. P. 6004 ..................................................................................................57

Fed. R. Bankr. P. 6004(h) ..............................................................................................57

Fed. R. Bankr. P. 6006 ..................................................................................................57

Fed. R. Bankr. P. 6006(d) ..............................................................................................57

Fed. R. Bankr. P. 9019 ..................................................................................................43

**Other Authorities**

H.R. Rep. No. 95-595, at 412 (1977) ............................................................................49

Jan Ransom, *Harvey Weinstein's Stunning Downfall: 23 Years in Prison,* N.Y.
    Times (Mar. 11, 2020) ...........................................................................................13

U.S. Const. amend. V ....................................................................................................28

U.S. Const. amend. XIV ...............................................................................................28

**RELIEF REQUESTED**

The Weinstein Company Holdings LLC and its above-captioned affiliates, as debtors and debtors in possession (collectively, the "Debtors" or "TWC") and the Official Committee of Unsecured Creditors (the "Committee") (together, the "Plan Proponents"), hereby submit this memorandum of law (the "Confirmation Brief") in support of entry of an order, filed in connection herewith, (a) granting confirmation of the *Fifth Amended Joint Chapter 11 Plan of Liquidation* [D.I. 3182] (as it may be modified or supplemented in accordance with the terms thereof, the "Plan")[2] pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code") and (b) overruling objections to confirmation.  In support of the relief requested, the Debtors rely on the (i) *Declaration of Ivona Smith in Support of Confirmation of the Fifth Amended Joint Chapter 11 Plan of Liquidation of The Weinstein Company Holdings, LLC et al.* (the "TWC Declaration"); (ii) *Declaration of Kyle Herman in Support of Confirmation of the Fifth Amended Joint Chapter 11 Plan of Liquidation of The Weinstein Company Holdings, LLC et al.* (the "Herman Declaration"); (iii) *Declaration of Robert Peck in Support of Fifth Amended Chapter 11 Plan of Liquidation* (the "Peck Declaration"); (iv) *Declaration of David P. Schack in Support of Confirmation of the Fifth Amended Joint Chapter 11 Plan of The Weinstein Company Holdings, LLC et al.* (the "Schack Declaration"); (v) *Declaration of Paul H. Zumbro in Support of Confirmation of the Fifth Amended Joint Chapter 11 Plan of The Weinstein Company Holdings, LLC et al.* (the "Zumbro Declaration"); (vi) *Declaration of Stephenie Kjontvedt of Epiq Bankruptcy Solutions, LLC. Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Liquidation* (the "Voting Declaration") [D.I. 3160]; and *Report of the Official Committee of Unsecured Creditors Concerning Sexual Misconduct*

---

[2]  Capitalized terms not otherwise defined herein have the respective meanings ascribed to them in the Plan.

*Claims Ballots and Declaration of Debra L. Grassgreen In Support Thereof* (the "Committee Voting Report") [D.I. 3159].

## PRELIMINARY STATEMENT

1.      Almost three years have passed since the initial allegations against Harvey Weinstein became public and these chapter 11 cases were filed.  The settlement embodied in the Plan (the "Settlement") is the result of complex and hard-fought compromises and provides the greatest potential recovery for all creditors, especially Holders of Sexual Misconduct Claims. The Sexual Misconduct Claims Fund established by the Plan achieves the two principal goals that have been the unwavering objectives of the Plan Proponents throughout the plan process: (i) providing a meaningful financial recovery to Holders of Sexual Misconduct Claims; and (ii) fairly and equitably dividing the proceeds of the Settlement among the Debtors' creditors through a process that protects the privacy of Holders of Sexual Misconduct Claims.  No similar monetary outcome would be available to Holders of Sexual Misconduct Claims absent the Settlement given the complicated insurance coverage issues and litigation risks that would be involved in prosecuting the Sexual Misconduct Claims.  Moreover, without the Settlement, the Debtors would have had to convert these cases from chapter 11 to a chapter 7 liquidation, which the Plan Proponents firmly believe would have resulted in protracted and expensive litigation by multiple parties, significantly lower distributions to the Debtors' creditors ***and a real risk of no economic recovery whatsoever to the survivors of Harvey Weinstein's misconduct***.

2.      The Plan Proponents' firm belief that the Settlement embodied in the Plan is the best outcome in these cases is shared by all the voting classes, including, most importantly, the Holders of Sexual Misconduct Claims.  The Plan Proponents committed to pursuing confirmation of the Plan only if the class of Holders of Sexual Misconduct Claims voted to accept the Plan.  Holders of Sexual Misconduct Claims voted to accept the Plan by **82.98%** in amount

and number. (*See* Voting Decl. Ex. A.)  On the heels of this overwhelming support, the Plan Proponents are pleased to have reached this juncture in these cases and to be seeking confirmation of a plan that is supported by the overwhelming majority of the Debtors' creditors.[3]

3.      The sole remaining objectors to the Plan are Wedil David, Dominique Huett, Aimee McBain and Alexandra Canosa (the "David Claimants")—the same parties who have sought to derail confirmation of this Plan since the Plan Proponents filed the first version of the Plan. (*See Non-Settling Sexual Misconduct Claimants' Objection to Fourth Amended Joint Chapter 11 Plan of Liquidation* [D.I. 3145] (the "David Objection")).  The David Claimants argue that the Plan is unfair and should not be confirmed because of, *inter alia*, the non-consensual third-party releases contained in the Plan and the proposed amount of compensation available to Holders of Sexual Misconduct Claims.  However, as discussed below, non-consensual third-party releases are permitted in the Third Circuit, the standards of which have been met in these Chapter 11 Cases, and the amount of compensation available to Holders of Sexual Misconduct Claims is in excess of $17 million and represents substantial consideration in exchange for the non-consensual third-party releases.

4.      The Court should not permit the David Claimants, who are a small minority of the Holders of Sexual Misconduct Claims, to derail the Plan and override the will of the vast majority of the Holders of Sexual Misconduct Claims who voted in favor of the Plan and wish the receive the benefits of the Plan and the Settlement.  The Plan establishes an approximately $17 million fund for Holders of Sexual Misconduct Claims.  Recoveries for each Holder of Sexual Misconduct Claims likely will average in the mid-six-figures and Holders of Sexual Misconduct Claims who

---

[3]  In addition to the 82.98% acceptance by Holders of Sexual Misconduct Claims, Holders of General Unsecured Claims (Class 6) voted to accept the Plan by 96.39% in amount and 96.43% in number.(*See* Voting Decl. Ex. A.)

were subjected to the most egregious conduct may receive seven-figure recoveries, depending on the average severity of the Claims and the Sexual Misconduct Claims Examiner's assessment of the Claims pursuant to the Sexual Misconduct Claims Fund Procedures.[4]  And, the Plan eliminates the risks and costs of litigation and permits an orderly and private resolution of Sexual Misconduct Claims.  While the Plan Proponents wish the Sexual Misconduct Claims Fund was larger, the amount of the fund is the largest the Plan Proponents could achieve under the circumstances and provides Holders of Sexual Misconduct Claims with a greater recovery than any potential recovery they would obtain in a chapter 7 liquidation scenario.

5.     Despite the hyperbolic rhetoric in the David Objection, the reality is that the Sexual Misconduct Claims carry significant litigation and collection risk absent a global settlement like the one incorporated in the Plan.  Given the nature of the Sexual Misconduct Claims, such as alleged rape and other intentional torts, it is highly unlikely such Claims would be covered by the Insurance Policies.  Indeed, the Insurance Companies have taken the position that Sexual Misconduct Claims are not covered by the applicable Insurance Policies.  (*See* Shack Decl. Exs. 10-16).  Similarly, the courts that have addressed Sexual Misconduct Claims brought against the Former Representatives have largely dismissed the Claims.[5]  The David Claimants' characterization of the Former Representatives as "ultra-affluent"[6] does not mean they are *legally liable* for Harvey Weinstein's despicable behavior.

---

[4]  As of January 7, 2021, the Plan Proponents believe there are 52 facially valid Sexual Misconduct Claims (*See* Committee Voting Report ¶ 20.). Actual distributions to Holders of Sexual Misconduct Claims will depend on the outcome of the Claims review and determination process set forth in the Sexual Misconduct Claims Fund Procedures.

[5]  *See Geiss v. The Weinstein Co. Holdings, LLC*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019); Order, *Canosa v. Weinstein*, No. 18-cv-4115-PAE (S.D.N.Y. Jan. 28, 2019), ECF No. 152 [hereinafter, the "Canosa Order"]; Order, *David v. The Weinstein Co. LLC*, No. 18-cv-05414-RA-KNF (S.D.N.Y. Dec. 19, 2019), ECF No. 198 [hereinafter, the "David Order"].

[6]  *See* David Obj. ¶ 1.

6.     The reality is that the Plan Proponents—through hard work and tough negotiations—have persuaded two groups, whose liability for Harvey Weinstein's behavior is far from certain, to contribute tens of millions of dollars to a comprehensive global settlement. The Insurance Companies and the Former Representatives have provided valuable consideration for the third-party releases in the Plan, without which contributions there would be no Plan and the Plan Proponents believe no recovery for the Debtors' creditors.   And contrary to the unsubstantiated assertions in the David Objection, the third-party releases contained in the Plan clearly satisfy the applicable legal standard in the Third Circuit given the circumstances of these Chapter 11 Cases.[7]

7.     Accordingly, as discussed further below, the Debtors respectfully submit that the Court should overrule the sole objection and confirm the Plan.

## BACKGROUND

### I.     General Background

8.     On March 19, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108.  On March 28, 2018, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee.  As of the date of this Confirmation Brief, no trustee or examiner has been appointed in these Chapter 11 Cases.  The Chapter 11 Cases have been jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 1015-1.

---

[7] *See In re Millennium Lab Holdings II, LLC,* 945 F.3D 126 (3D Cir. 2019).  Surprisingly, the David Claimants fail to even mention the Third Circuit *Millennium* case in their objection.

9.      The Debtors filed their voluntary petitions for relief because, among other things, multiple lawsuits were filed in federal courts, state courts and foreign tribunals alleging, *inter alia*, that Harvey Weinstein engaged in sexual and other harassment and abuse, and that certain companies (including the Debtors) and their respective current and former officers, directors, and board representatives failed to stop such harassments and abuse, in violation of federal, foreign and state law.  (*See Declaration of Robert Del Genio in Support of First Day Relief* § III [D.I. 7] (the "First Day Declaration").)  Such lawsuits include, but are not limited to:  (i) *Geiss, et al. v. The Weinstein Company Holdings LLC, et al.*, No.: 17-CV-09554 (S.D.N.Y., Dec. 6, 2017), (ii) *Canosa v. Weinstein et. al.*, Case No. 18-cv-4115 (S.D.N.Y., May 8, 2018); (iii) *Wedil David v. The Weinstein Company LLC et. al.*, Case No. 18-cv-05414 (S.D.N.Y., June 15, 2018); and (iv) *People of the State of New York v. The Weinstein Company LLC, et al.,* No. 450293-2018E (N.Y. Sup. Ct., Feb. 11, 2018) (collectively, the "Tort Actions").

10.      Additional information on the Debtors' business and capital structure, as well as a description of the events precipitating the filing of these cases, is set forth in the First Day Declaration.

**II.      The Sale**

11.      On March 20, 2018, the Debtors filed a motion [D.I. 8] (the "Sale Motion") seeking approval to sell substantially all their assets to Spyglass Media Group, LLC (f/k/a Lantern Entertainment LLC) ("Spyglass") or the party making the "highest or otherwise best" offer.

12.      On May 8, 2018, the Court approved the Sale Motion, and on May 9, 2018, the Court entered the *Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [D.I. 846] (the "Sale Order")

Case 18-10601-MFW    Doc 3184    Filed 01/20/21    Page 17 of 69

approving the sale of substantially all the Debtors' assets (the "<u>Sale</u>") to Spyglass and authorizing the Debtors to consummate the transactions contemplated under the APA (as defined in the Sale Order). The Debtors later amended the APA to reduce the Cash Purchase Price (as defined in the APA), which the Court approved on July 11, 2018. [*See* D.I. 1220]. Substantially all of the proceeds of the Sale were used to satisfy the Debtors' secured debt obligations and other secured Claims against the Debtors.

13. In addition, consistent with the negotiations related to the APA amendment, on July 13, 2018, all directors other than Ivona Smith (a board member that was previously added at the request of the Committee in April 2018) resigned from the board, and on August 7, 2018, two new, Committee-selected directors—Alan D. Halperin and Alan M. Jacobs—were appointed to the board.

**III.    The Global Settlement and Early Plan Process**

14. Beginning shortly after the Petition Date, efforts were undertaken to pursue a global, mediated resolution of all the potential claims against the Debtors' former directors and officers related to Harvey Weinstein's misconduct (collectively, the "<u>D&O Claims</u>") together with claims against, as well as disputes with, insurance carriers who issued directors and officers and general liability insurance policies to the Debtors that could potentially provide coverage for the D&O Claims. As has been publicly reported, throughout these Chapter 11 Cases, confidential mediation proceedings (the "<u>Mediation</u>") took place in lengthy in-person group mediation sessions held on no fewer than five dates and extensive discussions and negotiations by telephone.

15. In February 2019, certain Holders of Sexual Misconduct Claims advised the Plan Proponents that they had terminated their participation in the Mediation. Thereafter, the Debtors evaluated their liquidity position, the prospects for reaching a global, mediated settlement, and the possibility of consensually confirming a chapter 11 plan. After significant deliberation among the

Debtors and their professionals, the Debtors determined at that time that a global settlement was not likely to be achieved and, accordingly, that converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code was in the best interests of the Debtors and their estates.

16.     On May 14, 2019, the Debtors filed a motion seeking to, among other things, convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code [D.I. 2357] (the "Pre-Settlement Conversion Motion").  The Debtors filed the Pre-Settlement Conversion Motion to preserve the Debtors' remaining funds and permit a chapter 7 trustee to pursue, among other things, the D&O Claims.

17.     After the Debtors filed the Pre-Settlement Conversion Motion, in an effort to obtain higher recoveries than would be likely in a conversion, the Plan Proponents, along with the other Settlement Parties, the New York State Office of the Attorney General, and Proposed Class Plaintiffs' Counsel, engaged in renewed settlement discussions. Over the course of the next year, the parties continued such discussions and, on June 29, 2020, the Settlement Parties reached a comprehensive settlement of all the claims related to Harvey Weinstein's sexual misconduct (the "Initial Settlement").  On June 30, 2020, the Plan Proponents filed their initial *Joint Plan of Liquidation* (the "Initial Plan") [D.I. 2856] and *Disclosure Statement In Support of The [Initial Plan]* [D.I. 2858].  The Initial Settlement embodied in the Initial Plan comprised a trio of settlement agreements: (1) the Global Settlement, (2) the Class Action Settlement Agreement and (3) the Individual Plaintiffs' Settlement Agreement (each as defined in the Initial Plan), each of which was integral to the Initial Plan.

18.     As the Initial Settlement contemplated the use of class action litigation mechanisms to resolve certain Sexual Misconduct Claims, including those arising prior to the formation of TWC,  the Debtors initially sought approval of the Class Action Settlement before the United

States District Court for the Southern District of New York (the "District Court").  On July 14, 2020, the District Court denied preliminary approval of the Class Action Settlement Agreement. *See Geiss v. The Weinstein Co., LLC*, No. 17-cv-9554 (AKH), 2020 WL 4266925 (S.D.N.Y. July 24, 2020).  Without the Class Action Settlement Agreement, the Initial Settlement and Initial Plan could not move forward.

19.    Notwithstanding the District Court's ruling, the Plan Proponents continued to believe that confirmation of a chapter 11 plan incorporating a global settlement would provide the best recoveries for creditors in these Chapter 11 Cases. Immediately after the District Court's ruling, the Plan Proponents pivoted to a modified settlement framework in an attempt to maximize recoveries for Holders of Sexual Misconduct Claims under a revised plan. Following approximately two months of intense negotiations among the Settlement Parties, the parties reached agreement on the revised framework.  These revisions were reflected in the *First Amended Joint Plan of Liquidation* (the "First Amended Plan") [D.I. 2952], which the Plan Proponents filed on September 1, 2020.

20.    The First Amended Plan (and current Plan) differ from the Initial Plan in several material respects, including, but not limited to: (1) resolution of only Tort Claims that arose after the creation of TWC; (2) Holders of Sexual Misconduct Claims have the option to release Harvey Weinstein or to decline to release Harvey Weinstein and bring or continue to prosecute any causes of action against Harvey Weinstein related such Holder's Sexual Misconduct Claims in any court of competent jurisdiction, and (3) Harvey Weinstein is not being reimbursed for any of his defense costs.  These modifications were made to address concerns with the Initial Settlement and the Initial Plan raised by the District Court and certain Holders of Sexual Misconduct Claims.

21.     After filing the First Amended Plan and in response to objections from parties in interest and rulings from this Court and others, the Settlement Parties revised the Initial Plan to ensure that the plan put forward for solicitation purposes was consistent with the settlement terms and most importantly, stood the best chance for confirmation.  On October 1, 2020, the Plan Proponents filed the *Second Amended Joint Chapter 11 Plan of Liquidation*, (the "<u>Second Amended Plan</u>") [D.I. 2994], the *Second Amended Disclosure Statement In Support of The [Second Amended Plan]*, (the "<u>Second Amended Disclosure Statement</u>") [D.I. 2995], and a motion to approve, *inter alia*, the adequacy of the Second Amended Disclosure Statement (the "<u>Disclosure Statement Motion</u>") [D.I. 3031].

## IV.    Plan Support Agreement

22.     To effectuate the Settlement set forth in the Second Amended Plan (and as further applicable to the Plan), the Settlement Parties entered into the Plan Support Agreement on October 19, 2020.   The Plan Support Agreement commits the Settlement Parties to provide the approximately $35 million in funding for the Plan and to support the Plan Proponents in seeking confirmation of the Plan.  (Plan Support Agreement §§ 1, 5.)  The Plan Support Agreement is expressly conditioned upon entry of a confirmation order approving the releases contained in the Plan.  (*Id.* § 17.A.)  Absent a confirmed chapter 11 plan containing these releases, any Settlement Party may withdraw from the Plan Support Agreement.  (*Id.*)

## V.    Finalizing the Plan and Approval of Disclosure Statement

23.     On November 4, 2020, the Plan Proponents filed the *Third Amended Joint Chapter 11 Plan of Liquidation* (the "<u>Third Amended Plan</u>") [D.I. 3067] and the *Third Amended Disclosure Statement In Support of The [Third Amended Plan]* (the "<u>Third Amended Disclosure Statement</u>") [D.I. 3076].

24.     As relevant here, the U.S. Trustee objected to the Disclosure Statement Motion on the grounds that the Debtors needed to provide creditors with the right to opt out of the third-party releases contained in the Third Amended Plan (the "Third-Party Releases").  (*See* U.S. Trustee's Obj. to The Disclosure Statement Mot., ¶ 17 [D.I. 3062].)  On November 5, 2020, the Court held a hearing on the Disclosure Statement Motion, and the Court granted the U.S. Trustee's Objection in part, ruling that the Debtors needed to provide Holders of non-Tort Claims with the right to opt out of the Third-Party Releases.  (Nov. 5 Hr'g Tr. 39:10-41:9.)

25.     Following discussions with other parties in interest, the Plan Proponents revised the Plan in accordance with the Court's ruling and on November 17, 2020, filed the *Fourth Amended Joint Chapter 11 Plan of Liquidation* (the "Fourth Amended Plan") [D.I. 3096] and the *Fourth Amended Disclosure Statement In Support of The [Fourth Amended Plan]* (the "Fourth Amended Disclosure Statement") [D.I. 3097].  The Fourth Amended Plan provided Holders of Claims in Class 6 with the right to opt out of the releases on their ballots.  (Plan § 3.15.2, Ex. 1 § 1.8.) Consistent with the Court's ruling, the Fourth Amended Plan did not otherwise modify the releases, as any broader modifications to the releases would have fundamentally altered the agreed upon Settlement and put the Plan at jeopardy.  (Nov. 5, 2020 Hr'g Tr. 39:10-41:9).  The Court entered the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Approving Solicitation Procedures, (C) Setting Confirmation Hearing Date and Related Deadlines, (D) Estimating Certain Claims, and (E) Granting Related Relief)* [D.I. 3101] (the "Disclosure Statement Order") on the same day.

26.     On January 20, 2021 the Plan Proponents filed the Plan.  The Plan Proponents have revised the Plan since the filing of the Fourth Amended Plan to address the informal and formal

objections to confirmation, but the changes are immaterial and the Settlement and the Sexual Misconduct Claims Fund Procedures remain the same.

## VI.     The Solicitation Process and Voting Results

27.     Among other things, the Disclosure Statement Order: (a) approved the Disclosure Statement as containing "adequate information" to enable a hypothetical, reasonable creditor to make an informed judgment as to whether to accept or reject the Plan; (b) authorized the Debtors to use the Disclosure Statement in connection with the solicitation of votes to accept or reject the Plan, and (iii) established the deadline for voting on the Plan as December 18, 2020 (the "Voting Deadline").

28.     On November 18, 2020, the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC ("Epiq"), sent solicitation packages approved by the Disclosure Statement Order (the "Solicitation Packages") to the holders of Claims in Classes entitled to vote to accept or reject the Plan (the "Voting Classes").  The instructions on the customized Ballots directed the holders of such Claims to complete and submit their respective Ballots such that they were actually received by Epiq by December 18, 2020 at 5:00 p.m. (Eastern Time).

29.     Following the Voting Deadline, the Debtors conducted an audit of all Ballots received and completed a final tabulation of votes.  These audited voting results are reflected below and in the voting report filed with the Court on January 7, 2011 (the "Voting Report") [D.I. 3160].

| Class | Number Voted to Accept | Number Voted to Reject | Amount Voted to Accept | Amount Voted to Reject |
|---|---|---|---|---|
| Class 4 (Sexual Misconduct Claims) | 39 **(82.98%)** | 8 (17.02%) | $39[8] **(82.98%)** | $8 (17.02% ) |
| Class 5 (Other Tort Claims) | No votes were submitted in this Class. | | | |
| Class 6 (General Unsecured Claims) | 81 **(96.43%)** | 3 (3.57%) | $70,821,652.43 **(96.39%)** | $2,649,311.32 (3.61%) |

## VII.  Plan Overview

30.  The Plan (i) provides for the resolution of all Claims and Interests against the Debtors, including the Sexual Misconduct Claims; (ii) the establishment of the approximately $17 million Sexual Misconduct Claims Fund; and (iii) liquidation of the Estates.

31.  Specifically, the Plan provides that:

- Holders of Sexual Misconduct Claims[9] (Class 4) will be permanently "channeled" to the Sexual Misconduct Claims Fund where their claims will be liquidated by the Sexual Misconduct Claims Reviewer pursuant to the Sexual Misconduct Claims Procedures.  The effect of "channeling" the Sexual Misconduct Claims to the Sexual Misconduct Claims Fund is that all Sexual Misconduct Claims against the Released Parties[10] can only be pursued through and paid from the Sexual Misconduct Claims Fund, and in exchange for the compensation (if any) provided

---

[8]  Pursuant to the Disclosure Statement Order, Sexual Misconduct Claims were valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution.  (*See* Disclosure Statement Order ¶ 16(f).)

[9]  While the definition of Sexual Misconduct Claims in the Plan is broad in its wording (through the embedded definition of Tort Claims contained therein), it is narrow in scope in the sense that it is limited solely to Tort Claims that arise out of, connect to or relate in any way "to any actual or alleged sexual conduct of Harvey Weinstein" that arise from facts or circumstances that took place in whole or in part on or after June 30, 2005.  (*See* Plan Ex. A § 1.107.)  Harvey Weinstein has been convicted of rape and certain related charges in New York and is currently incarcerated and serving a 23-year sentence at the Wende Correctional Facility in Erie County, New York.  *See* Jan Ransom, *Harvey Weinstein's Stunning Downfall: 23 Years in Prison,* N.Y. Times (Mar. 11, 2020), https://www.nytimes.com/2020/03/11/nyregion/harvey-weinstein-sentencing.html.

[10]  As specified in the Plan, the Insurance Companies are Released Parties with respect to Sexual Misconduct Claims against Harvey Weinstein only to the extent that Holders of Sexual Misconduct Claims affirmatively elect to release Harvey Weinstein.  In the event a Holder of a Sexual Misconduct Claim does not affirmatively elect to release Harvey Weinstein, Harvey Weinstein shall not be required to release the Insurance Companies from any Claims in any way arising out of, related to or connected to such Holder's Sexual Misconduct Claims and either Harvey Weinstein (or a Holder of Sexual Misconduct Claims who obtains a judgment against Harvey Weinstein) may seek to recover from the Insurance Companies with respect to any such judgments.  (*See* Plan § 7; Plan Support Agreement § 2.C.ii.)

through the Sexual Misconduct Claims Fund, Holders of Sexual Misconduct Claims must release such Released Parties and will be permanently enjoined from pursuing any action against such Released Parties as it relates to such Holder's Sexual Misconduct Claims. (Plan §§ 3.13, 5.8, 7.2, Ex. 4.)

- At the conclusion of the Sexual Misconduct Claims determination process, Holders of Sexual Misconduct Claims will be informed of the determined monetary amount of their Sexual Misconduct Claims and then will have the option to release Harvey Weinstein or not release Harvey Weinstein and pursue an action against him (but not any Released Party). Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein shall receive 25% of the determined monetary amount of their Sexual Misconduct Claims in exchange for the release of their potential Sexual Misconduct Claims against the Released Parties, and Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein shall receive the full determined monetary amount of their Sexual Misconduct Claims. (Plan Ex. 4.)

- Holders of Other Tort Claims (Class 5) will be compensated from the Liquidation Trust. In exchange for the compensation (if any) provided through the Liquidation Trust, Holders of Other Tort Claims must release the Released Parties and will be permanently enjoined from pursuing any action against the Released Parties as it relates to such Holder's Other Tort Claims. (Plan §§ 3.14, 7.2.)

- Holders of General Unsecured Claims (Class 6) will be compensated from the Liquidation Trust. In exchange for the compensation (if any) provided through the Liquidation Trust, Holders of General Unsecured Claims will have the option to opt-out of the Third-Party Releases. (Plan §§ 3.15, 7.2.)

32.    The Plan leaves Classes 1 (Other Priority Claims), 2 (Secured Tax Claims), and 3 (Secured Claims) unimpaired. (Plan §§ 3.10, 3.11, 3.12.) Classes 7 (Intercompany Claims) and 8 (Interests) are impaired and will receive no distributions under the Plan. (Plan §§ 3.16, 3.17.)

## OBJECTIONS TO PLAN

33.    The Debtors received three formal objections to the Plan (collectively, the "Objections"): (i) the David Objection; (ii) *Objection of Sartraco, Inc. to Debtors' Proposed Plan of Reorganization* [D.I. 3144] (the "Sartraco Objection"); and (iii) *United States Objection to the Fourth Amended Joint Chapter 11 Plan of Liquidation* [D.I. 3143] (the "IRS Objection"). The Sartraco Objection and the IRS Objection have been resolved

consensually, and the Plan and the proposed confirmation order contain language incorporating these resolutions.  The only outstanding objection is the David Objection.

<u>**ARGUMENT**</u>

34.     Section 1129 of the Bankruptcy Code provides the requirements a debtor must meet for a court to confirm a debtor's proposed plan.  Debtors bear the burden of proving they have satisfied the requirements of section 1129 by a preponderance of the evidence.  *See In re Machne Menachem, Inc.,* 233 F. App'x 119, 120 (3d Cir. 2007); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ("[T]he debtors' standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence.").

35.     Here, the David Claimants—the lone remaining objectors—argue that the Debtors cannot satisfy section 1129 with respect to certain provisions of the Plan.  Below, the Plan Proponents first discuss the provisions of the Plan attacked by the David Claimants' and establish that the law and the preponderance of the evidence show that the Plan satisfies the requirements of those provisions.  The Plan Proponents then discuss the remaining requirements of section 1129 and establish why the law and preponderance of the evidence support confirmation of the Plan as a whole.

**I.      The David Objection Fails To Provide A Sufficient Basis To Deny Confirmation of The Plan.**

36.     The David Claimants raise four primary arguments against confirmation of the Plan:   (1) the Third-Party Releases are impermissible; (2) the Channeling Injunction is inappropriate; (3) the Plan Proponents did not propose the Plan in good faith; and (4) the Debtors

are not entitled to substantive consolidation.[11]    (David Obj. ¶ ¶ 13-31.)   The Plan Proponents address each issue in turn.

### A.    The Third-Party Releases Are Permissible Under Section 1123 And Third Circuit Law.

37.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.   Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of" the Bankruptcy Code.  11 U.S.C. § 1123(b)(1)–(4), (6).  Third-party release provisions included in plans are not inconsistent with the Bankruptcy Code and have been approved by courts in the Third Circuit.  *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019);  *In re Wash. Mut. Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011); *see also In re Motors Liquidation Co.*, 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("[A] plan may 'include any other appropriate provision not inconsistent with the applicable provisions of this title' [and] third-party releases aren't 'inconsistent with the applicable provisions of this title . . . .'").

38.    Third-party releases may be consensual or non-consensual, and courts apply different standards of review depending on the nature of the third-party releases.  As discussed further below, the Plan contains consensual and non-consensual third-party releases, which this Court should approve under Third Circuit precedent.

---

11  The David Claimants also object on the grounds that the exculpation provision of the Plan is overbroad.  (*See* David Obj. ¶¶ 50-51; Plan § 14.5; Plan Ex. 1, §§ 1.44, 1.102.)  The Plan Proponents previously revised the Plan's exculpation provision in response to comments by the U.S. Trustee.  (*Compare* Second Amended Plan Ex. A § 1.44, *with* Third Amended Plan Ex. A § 1.44.)  The Plan's current exculpation provision is consistent with prior exculpation provisions contained in previously confirmed plans.  *See In re PWS Holding Co.*, 228 F.3d 224, 246 (3d Cir. 2000); Findings of Fact, Conclusions of Law and Order Approving the Debtors' Disclosure Statement For, and Confirming, the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization, Ex. 1 § 1.A.64, *In re Quorum Health Corp., et al.,* No. 20-10766 (Bankr. D. Del. June 30, 2020) (KBO), [D.I. 556]; Findings of Fact, Conclusions of Law, and Order Confirming Modified Amended Joint Chapter 11 Plan of Reorganization of Melinta Therapeutics, Inc. and its Debtor Affiliates, Ex. A § 1.54, *In re Melinta Therapeutics, Inc., et al.,* No. 19-12748 (Bankr. D. Del. Apr. 11, 2020) (LSS), [D.I. 520].

1.    **The Consensual Third-Party Releases Are Permissible And Supported By Third Circuit Precedent.**

39.    Courts in the Third Circuit routinely approve consensual third-party releases contained in plans. *See In re Indianapolis Downs, LLC.*, 486 B.R. 286, 305-306 (Bankr. D. Del. 2013); *In re Wash. Mut. Inc.*, 442 B.R. at 355; *U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del. 2010). Third-party releases are consensual when a creditor affected by the release contractually agrees to the release or votes in favor of a plan. *See In re Wash. Mut. Inc.*, 442 B.R. at 352 (finding that creditors may consent to third-party releases "by contract or the mechanism of voting in favor of the plan"); *In re Spansion, Inc.*, 426 B.R. at 144 (finding that a third-party release "binds . . . creditors voting in favor of the plan"). Third-party releases also are deemed to be consensual with respect to unimpaired creditors who are deemed to accept a plan and do not object to confirmation. *See In re Spansion, Inc.*, 426 B.R. at 144. But third-party releases are not consensual with respect to impaired creditors who are entitled to vote on a plan and fail to return a ballot when other members of the creditor class have cast votes. *See In re Wash. Mut. Inc.*, 442 B.R. at 355; *see also In re Tribune Co.*, 464 B.R. 126, 183-84 (Bankr. D. Del. 2011).

40.    Here, the Plan provides that Holders of Claims in Classes 1, 2 and 3 are unimpaired and deemed to accept the Plan (*see* Plan § 3.4), and no Holders of Claims in Classes 1, 2 and 3 objected to confirmation. The Court therefore should approve the Third-Party Releases as they pertain to Classes 1, 2 and 3. *See In re Spansion, Inc.*, 426 B.R. at 144.

41.    With respect to Holders of Claims in Classes 4, 5 and 6, approximately 82% of Class 4 voted in favor of the Plan, no Holders of Claims in Class 5 voted and approximately 96% of Class 6 voted in favor of the Plan. The David Claimants, each of whom only are Holders of Class 4 Claims (Sexual Misconduct Claims), argue that the "Third Party Releases do not seek any

form of consent from Holders of Sexual Misconduct Claims" as to the Released Parties.[12]
(*See* David Obj. ¶¶ 31-32.)  The David Claimants, however, do not cite any case law supporting
the proposition that voting in favor of the Plan is insufficient to establish consent to the Third-Party
Releases as they pertain to the Released Parties.  (*See id.*)  The Court should approve the
Third-Party Releases as they pertain to Holders of Claims in Classes 4 and 6 who voted in favor
of the Plan because such Holders have consented to the Third-Party Releases.  *See In re
Indianapolis Downs, LLC.*, 486 B.R. at 305-306; *In re Wash. Mut. Inc.*, 442 B.R. at 355.  The
Court also should approve  the Third-Party Releases as they pertain to Holders of Claims in Class
5; the Plan provides that if no member of an impaired class votes, such class is deemed to accept
the Plan (*see* Plan § 9.2); the Plan was distributed to all Holders of Claims (*see* Voting Decl. ¶ 7);
and no one in Class 5 voted (*see id.* Ex. A); therefore, Class 5 has consented to the Plan, including
the Third-Party Releases.  *See In re Tribune Co.*, 464 B.R. at 183-84.

42.    The Plan provides that Holders of Claims in Class 6 who failed to return a ballot or
who opted out of the Third-Party Releases are not subject to the Third-Party Releases.  (*See* Plan
§§ 5.2, 7.2.2, 7.3.)  In addition, Class 7 concerns Intercompany Claims, which are Claims by a
Debtor against another Debtor and therefore have no relation to the Third-Party Releases.
(*See* Plan § 3.16, Ex. 1 § 1.58.)

43.    As a result, the Third-Party Releases are consensual with respect to all Holders of
Claims except Holders of Claims in Class 4 (the "Non-Consenting Holders of Sexual Misconduct
Claims") who voted against the Plan or failed to return a ballot.  For the reasons discussed below,
the Court should approve these non-consensual Third-Party Releases.

---

[12]  The definition of Released Parties in the Plan does not include Harvey Weinstein.  *See* Plan at 2-3.  The Plan
provides that Harvey Weinstein is only released from Sexual Misconduct Claims if a Holder of Sexual Misconduct
affirmatively elects to release Harvey Weinstein at the conclusion of the claims review process set forth with respect
to Sexual Misconduct Claims.  *See* Plan §§ 3.13, 7.2.2, 7.2.3.

2.      **The Non-consensual Third-Party Releases Are Permissible And Supported By Third Circuit Precedent.**

44.      Third-party releases are non-consensual when an impaired creditor votes against the plan or fails to return a ballot when other members of the creditor class have cast votes. *See In re Wash. Mut. Inc.*, 442 B.R. at 355; *see also In re Tribune Co.*, 464 B.R. at 183-84. Non-consensual third-party releases are not impermissible *per se* and may be approved when a debtor puts forth specific factual evidence establishing that the releases are fair and necessary. *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 139 ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions." (quoting *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000))).   In addition to having to be fair and necessary, non-consensual third-party releases only are appropriate when cases present "exceptional facts". *Id.* at 129.  In the Third Circuit, section 105(a) of the Bankruptcy Code provides courts with the power to order non-consensual third-party releases when the fairness and necessity standards are met and when exceptional facts exist. *See In re Glob. Indus. Tech., Inc.*, 645 F.3d 201, 205 (3d Cir. 2011); *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 584 (D. Del 2018), *aff'd*, 945 F.3d 126.[13]

---

[13]  The court's holdings in *Global Industries* and *Millennium* flatly contradict the David Claimant's arguments that section 105 does not provide the Court with authority to issue non-consensual third-party releases and that such releases are per se impermissible under section 524(e).  (David Obj. ¶¶ 28, 36, 42, 47-48.)  Throughout their objection, the David Claimants consistently attempt to conflate releases and injunctions, which are both permissible under section 105, with discharges, which are permissible under sections 524 and 1141.  (*See id.*)  As explained by the court in *In re U.S. Fidelis*:

> By confirming a plan that includes a release of a non-debtor, the bankruptcy court is not entering a bankruptcy discharge for that non-debtor; it is entering a release for that non-debtor.  While there is similarity in effect between a bankruptcy discharge and a release of a non-debtor . . . , they are not interchangeable concepts.  They are based on different law, embody different scopes, serve different purposes, and are imposed upon under different circumstances.

481 B.R. 503, 516 (Bankr. E.D. Mo. 2012) (citation omitted).  The Debtors have conceded they are not entitled to a discharge.  (Disclosure Statement § X.E.3.)  The David Claimants' discharge arguments are a red herring.

45.    The Non-Consenting Holders of Sexual Misconduct Claims consist of eight Holders of Sexual Misconduct Claims who voted against the Plan (all of whom are represented by the David Claimants' counsel) and four Holders of Sexual Misconduct Claims who did not return a ballot.    As discussed further below, the non-consensual Third-Party Releases are fair and necessary, and the Court should not allow the dissenting views of a small number of Holders of Sexual Misconduct Claims to thwart the Plan, which is supported by the overwhelming majority of Holders of Sexual Misconduct Claims and General Unsecured Claims.

a)    <strong>The Non-consensual Third-Party Releases Are Necessary.</strong>

46.    Third-party releases are necessary where the releases are "critical to the success of the [p]lan". *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137.    Non-consensual third-party releases are critical to the success of the Plan where the feasibility of the plan hinges on non-debtor released parties making contributions to the plan in exchange for the releases. *Id.*; *see also In re Continental*, 203 F.3d at 215.    The facts and history of these Chapter 11 Cases establish that the non-consensual Third-Party Releases are critical to the success of the Plan.

47.    The Plan depends on (i) the Insurance Companies contributing over $35 million and (ii) the Former Representatives forgoing a significant portion of their coverage rights under the applicable Insurance Policies.    Without these substantial contributions by the Former Representatives and the Insurance Companies, the Debtors would not be able to confirm the Plan— or any other plan—let alone fund the $17 million Sexual Misconduct Claims Fund.    Specifically, the Plan is being funded by the proceeds of various Commercial General Liability ("CGL") insurance policies, CGL Excess and Umbrella insurance policies, joint Director and Officer ("D&O") and Employment Practices Liability ("EPL") insurance policies, and D&O and EPL

excess insurance policies that could potentially provide coverage for Claims against the Debtors, the Former Representatives and  Harvey Weinstein (collectively, the "Insurance Policies"). (*See* Schack Decl., ¶ 11, Exs. 10-16.)  The joint D&O and EPL Insurance Policies contain priority of payment provisions, which entitle the Former Representatives and Harvey Weinstein to coverage payments before any coverage payments may be made to the Debtors.  (*See, e.g.,* Schack Decl. Ex. 10 at 23.)  Under the Plan and the Plan Support Agreement, the Former Representatives agreed to forego a significant amount of coverage for defense costs in respect of which they are entitled to "first dollar" coverage under the Insurance Policies.  (*Id.*; Plan § 5.7; Plan Support Agreement § 5.)

48.     The Former Representatives also have agreed, subject to the limitations set forth in the Plan and the Plan Support Agreement, to release any Claims they have against the Insurance Companies, including Claims related to any Tort Actions.  (*See* Plan §§ 7.2.4-5; Plan Support Agreement § 2); *see also In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 Bankr. LEXIS 863, at *55 (Bankr. D. N.J. Mar. 5, 2014) (finding that the non-debtors' waiver of claims against the non-debtors' providing the plan funding constituted contribution in exchange for the non-consensual third-party releases).[14]  But the Former Representatives agreed to release the Insurance Companies only to the extent creditors' Claims against the Former Representatives are released.  (Plan Support Agreement § 2.)

49.     The Former Representatives' release of the Insurance Companies incentivized the Insurance Companies to provide the funds specified in the Plan.  These funds would have been unavailable to the Debtors if the Former Representatives did not agree to forego a significant

---

[14] For reasons similar to those discussed above with respect to the Former Representatives, the Non-Debtor Affiliates and the Non-Debtor Additional Affiliates also are making substantial and critical contributions to the Plan by foregoing their rights under certain of the Insurance Policies and waiving their Claims against the Released Parties. (*See* Plan § 7.2.4-5; Plan Support Agreement § 2; TWC Decl. ¶ 13.)

portion of their coverage rights under the applicable Insurance Policies. Specifically, the Insurance Companies are contributing over $35 million; approximately $17 million of the $35 million is for the Sexual Misconduct Claims Fund and approximately $8 million is for the Liquidation Trust, which will be used to satisfy all other Claims. (Plan §§ 5.2, 5.6; Plan Support Agreement § 1.) In exchange, the Insurance Companies are Released Parties who receive the benefit of the Third-Party Releases. (Plan § 7.2.2; Plan Support Agreement § 17.A.) Notably, the Insurance Companies are providing these funds despite their assertions that Tort Claims are not covered under the Insurance Policies and the Plan Proponents believe that the Insurance Companies will not pay any funds to cover Tort Claims absent the Settlement embodied in the Plan. (*See* Schack Decl., Exs. 1-8; Ex. 10 at 128 (coverage is barred for "claims alleging, arising out of, or in any way involving directly or indirectly battery, sexual abuse or sexual assault"); Ex. 14 at 35 ("[P]olicy does not apply to any . . . [l]iability arising . . . out of . . . [s]exual abuse, sexual assault, sexual molestation, sexual harassment or sexual misconduct".).)

50.     The contribution by the Insurance Companies is made possible only because of the contributions by the Former Representatives and Harvey Weinstein, and the proceeds of the Insurance Policies are funding the Plan. The Insurance Companies and the Former Representatives are therefore making critical contributions to the Plan in consideration of the Third-Party Releases. *See In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137.

51.     In addition, the feasibility of the Plan hinges on the contributions of the non-debtor Released Parties. As of November 30, 2020, the Debtors have approximately $3.5 million in cash on hand. (*See Debtors' November Monthly Operating Report* [D.I. 3125].) As noted above, the Plan provides an approximately $17 million Sexual Misconduct Claims Fund for the benefit of Holders of Sexual Misconduct Claims and approximately $8 million Liquidation Trust for the

benefit of all other Holders of Claims, including Holders of Tort Claims.  (Plan §§ 5.2, 5.6; Plan Support Agreement § 1.)  The Debtors cannot fund the Plan only with its cash on hand.  The Plan is only feasible due to the contributions of the non-debtor Released Parties.

52.    Without the non-consensual Third-Party Releases, the non-debtor Released Parties can (and would) withdraw from the Plan Support Agreement and eviscerate the Plan funding. (Plan Support Agreement § 17.A.)  Absent the contributions to the Plan by the non-debtor Released Parties, the Plan would not feasible, the Settlement would fall apart and the Debtors would be forced to convert the cases to chapter 7 liquidation cases.  Thus, the non-consensual Third-Party Releases are critical to success of the Plan.  *See In re Millennium Lab Holdings, LLC*, 945 F.3d at 137 (approving the non-consensual third-party releases because "without the releases and the enforcement of such releases through the [p]lan's injunction provisions, the [r]eleased [p]arties would not be willing to make their contributions under the [p]lan . . . [leading to] the result that liquidation . . . would [] be[] [the Debtor]'s sole option" (original alterations omitted)).

53.    The David Claimants put forth no evidence refuting the necessity of the non-consensual Third-Party Releases.  Instead, the David Claimants' only argument against the necessity of the non-consensual Third-Party Releases is that the Plan is a chapter 11 liquidating plan.  (David Obj. ¶ 40.)  Cases in this Circuit, however, have approved plans of liquidation containing non-consensual third-party releases where such releases were necessary and fair.  *See In re Blitz U.S.A.*, No. 11-13603 (PJW), 2014 WL 2582976 at *13-23 (Bankr. D. Del. Jan. 30, 2014); *In re United Steel Enters., Inc.*, No. 03-50284 (NLW), 2009 WL 1025398 at *3 (Bankr. D. N.J. Jan. 15, 2009).  The David Claimants cite *In re Nickels Midway Pier, LLC*, No. 03-49462 (GMB), 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010) in support of their argument.  The Court in *Nickels* did not find that third-party releases contained in chapter 11 liquidating plans are

impermissible *per se*, only that the proposed plan's "third party release language is impermissible as it is not necessary to the [liquidation] and has not been given in exchange for fair consideration . . . ." *Id.* The Court should overrule the David Objection as to the necessity of the Third-Party Releases.

<b>b)    The Non-consensual Third-Party Releases Are Fair.</b>

54.    A non-consensual third party release is considered fair if reasonable consideration is given in exchange for the release. *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2000) (citing *In re Continental*, 203 F.3d at 214-15); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001). The consideration provided is reasonable if under the proposed plan, recovery of the non-consenting creditors is greater than under a chapter 7 liquidation scenario. *See In re Genesis Health Ventures, Inc.*, 266 B.R. at 610; *see also In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 Bankr. LEXIS 863 at *55 (finding that non-consenting creditors are "receiving reasonable consideration in exchange for [a third-party] release, [when] they are receiving more than they would in liquidation").

55.    Here, fair consideration is being provided for the non-consensual Third-Party Releases. In exchange for releasing the Released Parties, the Non-Consenting Holders of Sexual Misconduct Claims will receive distributions from the Sexual Misconduct Claims Fund or the Liquidation Trust that exceed what would be available in a hypothetical chapter 7 liquidation. (*See* Second Amended Disclosure Statement Ex. B.)

56.    Without the settlement proceeds, the Debtors' primary assets consist of the Debtors' cash and the D&O Claims. As noted above, the Debtors do not have sufficient cash on hand to fund the Plan, and while the Debtors could in theory prosecute the potential D&O Claims, the litigation will be costly and the outcome of such litigation is unknown. Notably, in three lawsuits in which courts have issued rulings related to Sexual Misconduct Claims against the

24

Former Representatives, the courts dismissed *all* the Sexual Misconduct Claims against the applicable Former Representatives.[15]  These decisions clearly and adversely impact the potential value of the D&O Claims.

57.     The Plan, however, establishes an approximately $17 million fund—the Sexual Misconduct Claims Fund—from which Holders of Sexual Misconduct Claims (Class 4) may seek compensation and an approximately $8 million fund—the Liquidation Trust—to satisfy allowed claims of Holders of Other Tort Claims (Class 5).  (Plan §§ 3.13, 3.14, 5.4.)  In the event the Plan is not confirmed and these Chapter 11 Cases are converted to chapter 7 cases, the Plan Proponents believe that the Insurance Companies will contend that they have no responsibility to cover any costs and judgments related to Tort Claims (*see* Schack Decl., Exs. 1-8), and the Debtors' assets would be aggregated into a common distribution fund from which all general unsecured claims would receive pro rata recoveries from the distributable value (if any) of the Debtors' assets, *see In re W.R. Grace & Co.*, 446 B.R. 96, 127 (Bankr. D. Del. 2011) (explaining that if the debtors cases were converted, "as in any Chapter 7, their [tort] claims would be put into a pool of general unsecured creditors to await payment until all the claims in the class were liquidated, all the assets reduced to cash, distribution made, and insurance claims resolved").  The Plan Proponents' Liquidation Analysis reflects that in a chapter 7 liquidation scenario, potential recoveries for Holders of Tort Claims, especially Holders of Sexual Misconduct Claims, likely would be significantly less than their potential recoveries under the Plan.  (*See Second Amended Disclosure*

---

[15]  *See Geiss*, 383 F. Supp. 3d 156; Canosa Order; David Order.

While one court has denied a motion to dismiss filed by Robert Weinstein, the Plan Proponents believe the decision is an outlier as the plaintiff was previously formally employed by TWC and alleged Robert Weinstein was liable for Harvey Weinstein's conduct because he was her employer under New York State Human Rights Law due to his co-ownership of TWC.  *See* Order, *Rehal v. Weinstein*, No. 151738-2018E (N.Y. Sup. Ct. Feb. 27, 2018); *cf.* Canosa Order at 36-37 (finding that under New York State Human Rights Law, Robert Weinstein and other Former Representatives "are [] not liable under an employer theory.")

*Statement*, Ex. B.)  The magnitude of the recoveries available under the Plan compared against a chapter 7 liquidation involving substantial litigation costs, delayed payments to creditors and a risk of no recovery of insurance proceeds establishes that the Plan provides reasonable consideration to the non-consenting Holders of Tort Claims.  *See In re Genesis Health Ventures, Inc.*, 266 B.R. at 610; *see also In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 Bankr. LEXIS 863 at *55.

58.     Three additional provisions of the Plan also support finding that the non-consensual Third-Party Releases are fair, particularly with respect to the Non-Consenting Holders of Sexual Misconduct Claims:  (1) Holders of Sexual Misconduct Claims may choose to decline to release Harvey Weinstein—the central bad actor who caused *all* the alleged harms—pursue an action against Harvey Weinstein in the tort system and seek a recovery from the Insurance Companies for any judgments in their favor, (*see* Plan § 3.13); (2) notwithstanding the decisions by several courts dismissing nearly all the Sexual Misconduct Claims against the Former Representatives,[16] the Former Representatives have waived, subject to the terms and limitations set forth in the Plan and the Plan Support Agreement, their rights to seek coverage under the Insurance Policies for any defense costs incurred after April 25, 2019 in exchange for, *inter alia*, the Third-Party Releases, which waiver allowed the Plan Proponents to allocate a significant portion of the Settlement Amount to the Sexual Misconduct Claims Fund; and (3) Holders of Sexual Misconduct Claims who vote against the Plan, such as the David Claimants, have the same rights to recover from the Sexual Misconduct Claims Fund as those Holders of Sexual Misconduct Claims who voted in favor of the Plan.  (Plan §§ 5.2, 5.7; Plan Support Agreement §§ 2.B, 5.B.)  The Plan and Plan Support Agreement reflect that the Plan put forth by the Plan Proponents is the fairest deal for

---

[16] *See supra* Note 5.

Holders of Sexual Misconduct Claims that could be achieved under the circumstances, and certainly a significantly better outcome than a chapter 7 liquidation.

59.     The David Claimants' arguments are unsupported by any evidence, lack case law support and/or are contrary to precedent in the Third Circuit.

60.     *First*, the David Claimants argue that the non-consensual Third-Party Releases are unfair because Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein will receive the full Liquidated Value of their Sexual Misconduct Claims and Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein will receive 25% of the Liquidated Value of their Sexual Misconduct Claims.

61.     Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein shall receive the full Liquidated Value of their Sexual Misconduct Claims in consideration of the release of their Sexual Misconduct Claims against the Released Parties and Harvey Weinstein.  Holders of Sexual Misconduct Claims who do not affirmatively elect to release Harvey Weinstein will receive 25% of the Liquidated Value of their Sexual Misconduct Claims in consideration of the release of their Sexual Misconduct Claims against the Released Parties and may bring or continue to prosecute any causes of action against Harvey Weinstein related to such Holder's Sexual Misconduct Claims.  Among other things, the various court rulings dismissing certain Sexual Misconduct Claims against the Debtors, dismissing nearly all the Sexual Misconduct Claims against the Former Representatives and denying motions to dismiss certain Sexual Misconduct Claims against Harvey Weinstein,[17] support the proposition that the Sexual Misconduct Claims against Harvey Weinstein would constitute the bulk of any judgments awarded to Holders of Sexual Misconduct Claims.  Under the Plan, the non-consenting Holders of Sexual

---

[17] *See supra* Note 5.

Misconduct Claims are given the choice to seek recovery completely confidentially and without protracted litigation or to litigate against Harvey Weinstein in a public forum without any restrictions on their rights to attempt to obtain recovery under the Insurance Policies in the event such litigation is successful. (*See* Plan § 3.13). The Plan strikes a balance by allowing Holders of Sexual Misconduct Claims to choose whether to release Sexual Misconduct Claims against Harvey Weinstein but also includes the non-consensual Third Party Releases, which as discussed above, are necessary to ensuring Holders of Sexual Misconduct Claims obtain a larger recovery than the likely recovery in a chapter 7 liquidation or outside the bankruptcy system. The David Claimants want all the value put forth in the Plan (and more) and none of the restrictions. It contravenes fairness and equity to allow the David Claimants to attempt to obtain "the benefits of the settlement" and "still have the right to sue" the Released Parties. *See In re Millennium Lab Holdings, LLC*, 945 F.3d at 144.

62.     *Second,* the David Claimants argue that the non-consensual Third-Party Releases are unfair because they violate the David Claimants' due process rights under Fifth and Fourteenth Amendments of the United States Constitution. (David Obj. ¶¶ 35, 40.) The David Claimants cite *In re Aegean Marine Petroleum*, 599 B.R. 717, 725 (Bankr. S.D.N.Y. 2019), and *In re Digital Impact, Inc.*, 223 B.R. 1, 13 n.6 (Bankr. N.D. Okla. 1998), in support of their due process argument (David Obj. ¶ 35), but neither case supports their objection. The court in *Aegean Marine Petroleum* explicitly stated that the due process concerns quoted by the David Claimants were discussed only "to illustrate just how extraordinary . . . it is for [courts] to impose involuntary releases and why . . . [courts] should do so only in those extraordinary cases where a particular release is essential and integral to the reorganization itself." 599 B.R. at 726. The court denied the non-consensual third-party releases at issue because it found that they were not "necessary or

important." *Id.* at 729-30. The court did not issue any findings that the non-consensual third-party releases violated the non-consenting creditors' due process rights. And, the *Digital Impact* finding that "[a] release, or permanent injunction, contained in a confirmed plan [] has the effect of a judgment—a judgment against the claimant and in favor of the non-debtor, accomplished without due process", 223 B.R. at 13 n.6, has been expressly rejected in this circuit, *see In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 283-84 (Bankr. D. Del. 2017), *aff'd* 591 B.R. 559 (D. Del. 2018).[18]

**c)**      **These Chapter 11 Cases Contain Exceptional Facts That Justify Granting The Non-Consensual Third-Party Releases.**

63. The Third Circuit has held that non-consensual third-party releases are appropriate when cases present "exceptional facts". *In re Millennium Lab Holdings II, LLC*., 945 F.3d at 129. While courts have not established a bright line standard for what constitutes exceptional facts, under any standard, the facts and circumstances of these Chapter 11 Cases are exceptional.

64. The Debtors filed for bankruptcy protection because of the multiple lawsuits filed in federal courts, state courts and foreign tribunals, alleging, *inter alia*, that Harvey Weinstein engaged in sexual and other harassment and abuse, and that certain companies (including the Debtors) and their respective current and former officers, directors, and board representatives failed to stop such harassments and abuse, in violation of federal, foreign and state law. (*See* First Day Declaration § III). As of the Petition Date, more than 80 women had stepped forward to accuse Harvey Weinstein of sexual harassment, assault or rape. (*Id.* ¶ 33.) There have been

---

[18] To the extent the David Claimants are arguing that they have been deprived of their right to procedural due process, such an argument lacks any merit whatsoever as the David Claimants clearly have been provided with notice of the Third-Party Releases, an opportunity to object to the Third-Party Releases and the right to be heard in connection with confirmation of the Plan. *See In re Drexel Burnham Lambert Grp. Inc.*, 995 F.2d 1138, 1144-45 (2d Cir. 1993); *Gillman v. Continental Airlines, Inc.*, 254 B.R. 93, 99 (D. Del. 1998), *overruled on other grounds* 203 F.3d 203 (3d Cir. 2000).

numerous news reports, articles, opinion pieces, blogposts and even a television special concerning

their accusations. (*Id.*) Allegations have been reported worldwide, prompting police departments

in both the United States and the United Kingdom to open investigations and sparking the

international #metoo and Time's Up campaigns. (*Id.*)

65.     As of the Tort Claims Bar Date, 65 Tort Claims were filed in these Chapter 11

Cases, 52 of which are facially valid Sexual Misconduct Claims that relate to the alleged egregious

conduct of Harvey Weinstein. (*See* Committee Voting Report ¶ 20.) While this case may not be

a "mass tort" case in the traditional sense, the conduct at issue that led to the Debtors' bankruptcy

filing was all perpetrated by a single individual—a fact that is exceptional in and of itself.

66.     Despite the fact that Harvey Weinstein's conduct led to the filing of these Chapter

11 Cases and the filing of various lawsuits by persons who are Holders of Tort Claims in these

Chapter 11 Cases, the best opportunity Holders of Tort Claims have for a meaningful recovery is

not from Harvey Weinstein, but from contributions by parties who likely have no legally

cognizable liability with respect to Harvey Weinstein's conduct.

67.     Holders of Tort Claims related to Harvey Weinstein's conduct may be able to obtain

a judgment against him.  *See, e.g.*, Order, *Alexandra Canosa v. Harvey Weinstein, et al.*,

No. 18-cv-4115-PAE (S.D.N.Y. Jan. 28, 2019), ECF No. 152 (denying Harvey Weinstein's

motion to dismiss certain sexual harassment claims).  But Harvey Weinstein appears to be

effectively judgment proof.[19]  Holders of Tort Claims against Harvey Weinstein thus would have

---

[19]  While definitive information regarding Harvey Weinstein's finances is not publicly available, Harvey Weinstein has failed to pay significant legal fees to certain of his former attorneys.  (*See Motion of Bayard P.A. For Leave To Withdraw As Counsel To Harvey Weinstein* [D.I. 2192]; *Order Granting Bayard P.A. Leave To Withdraw As Counsel To Harvey Weinstein* [D.I. 2285]; Complaint, *Bayard, P.A. v. Harvey Weinstein* (C.A. No. N19C-12-118 (WCC) (Del. Sup. Ct. Dec. 11, 2019) (alleging that Harvey Weinstein owes Bayard P.A. $423,316.04 in unpaid legal fees and expenses).  It is therefore possible that other claimants with valid judgments against Harvey Weinstein will similarly experience difficulty obtaining payment from Harvey Weinstein on account of those judgments.

to rely on their judgment against Harvey Weinstein being covered by the Insurance Policies under which he is a named insured.  The Insurance Policies, however, do not provide coverage for Tort Claims against Harvey Weinstein.  (*See, e.g.,* Schack Decl. Ex. 10 at 128 (coverage is barred for "claims alleging, arising out of, or in any way involving directly or indirectly battery, sexual abuse or sexual assault"); Ex. 14 at 35 ("[P]olicy does not apply to any . . . [l]iability arising . . . out of . . . [s]exual abuse, sexual assault, sexual molestation, sexual harassment or sexual misconduct".))  Indeed, when the Debtors tendered coverage demands to the Insurance Companies related to certain Tort Actions, the Insurance Companies took the position that coverage for the Tort Actions was excluded under the applicable Insurance Policies.  (*See, e.g., id.* Ex. 1 at 4.)  It is unlikely that a Holder of a Tort Claim will have any judgment against Harvey Weinstein covered by the Insurance Policies.

68.     To attempt to obtain a meaningful recovery, Holders of Tort Claims could seek to recover from the Former Representatives on the basis that the Former Representatives are legally responsible for the harms such Holders suffered at the hands of Harvey Weinstein.  The Plan Proponents believe that obtaining a judgment against the Former Representatives is highly unlikely to be successful.  In fact, in every case in which Holders of Tort Claims have filed actions against the Former Representatives related to Harvey Weinstein's misconduct and the Former Representatives have moved to dismiss such Claims, the courts have dismissed every single Claim against every single Former Representatives except one court who denied Robert Weinstein's motion to dismiss.[20]  The fact that these Claims failed to survive motions to dismiss illustrates the relative weakness of the Sexual Misconduct Claims against the Former Representatives. And while Holders of Tort Claims could try to persuade a court that the Former Representatives

---

[20]  *See supra* Note 5.

are liable on a theory of failure of oversight under *Caremark*, such cases are exceedingly challenging to win. *See Rojas v. Ellison*, No. 2018-0755-AGB, 2019 Del. Ch. LEXIS 281, at *20 (Del. Ch. July 29, 2019) ("Chancellor Allen famously remarked in *Caremark* that to prove liability for failing to monitor corporate affairs is '**possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment**.'" (emphasis added) (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)); *see also King v. Baldino*, 409 F. App'x 535, 537 (3d Cir. 2010) (noting that the hurdle to establishing director liability on a theory of alleged failure to properly oversee a corporation is "particularly high").

69.     The Plan offers Holders of Sexual Misconduct Claims significant funds that they would likely not be able to collect through litigation, and the Plan provides these funds without the Holders of Sexual Misconduct Claims ever having to discuss such harms in a public forum.

70.     The Plan Proponents understand that for the David Claimants, a chance to have their "day in court" against Harvey Weinstein may be more important than any financial recovery. The Plan specifically gives Holders of Sexual Misconduct Claims who wish to litigate against Harvey Weinstein the ability to do so.  Thus, the Plan Proponents believe that the Plan strikes a balance that is both equitable and appropriate, and that the will of the 82% of Holders of Sexual Misconduct Claims who voted to approve the Plan should be respected.

71.     The approximately $17 million fund for the benefit of Holders of Sexual Misconduct Claims is the result of the Plan Proponents' success in convincing the Insurance Companies and Former Representatives—parties who would otherwise not be responsible for compensating Holders of Sexual Misconduct Claims for the harms caused by Harvey Weinstein— to provide the substantial contributions that make the Plan feasible.  The facts and circumstances of these cases clearly are exceptional.

\* \* \*

72.     In sum, the Plan Proponents have put forth evidence and arguments that the non-consensual Third-Party Releases are necessary and fair, and the David Claimants' objections fail to provide the Court with sufficient evidence and arguments to the contrary.  Accordingly, the Court should approve the non-consensual Third-Party Releases contained in the Plan.

### B.     The Channeling Injunction Is Appropriate.

73.     Channeling injunctions are evaluated in the Third Circuit under the same *Continental* standard that is applied to releases.  *See In re Glob. Indus. Techs., Inc.*, 645 F.3d at 206 (finding that channeling injunction for tort claims relating to silica products was both fair and necessary to debtors' reorganization under section 105(a) of the Bankruptcy Code).  Courts in the Third Circuit have approved channeling injunctions in cases involving a plan of liquidation.  *See In re Blitz U.S.A.*, 2014 WL 2582976 at \*13-23; *In re United Steel Enters., Inc.*, 2009 WL 1025398 at \*3.[21]

74.     The Channeling Injunction set forth in Section 5.8 of the Plan implements the Third-Party Releases discussed above by permanently enjoining all Holders of Sexual Misconduct Claims from pursuing any Claims released pursuant to the Plan or the proposed confirmation order. (*See* Plan § 5.8.)  The Channeling Injunction is a key Plan provision because it enforces the Third-Party Releases that are essential to the Plan for the reasons described above.  *See In re Blitz U.S.A.*, 2014 WL 2582976 at \*13-23 (approving a channeling injunction under the same factual record and legal rationale as for approval of releases); *In re N. Am. Refractories Co.*, No. 02-20198

---

[21]  The Plan Proponents are not aware of any cases where a channeling injunction was not approved solely on the basis that the plan at issue was a plan of liquidation rather than a plan of reorganization.

(JKF), 2007 WL 7645287, at *7 (Bankr. W.D. Pa. Nov. 2007) (finding that the *Continental* standard applies when reviewing channeling injunctions).

75.    The David Claimants object to the Channeling Injunction on two grounds. *First*, they argue that the Court may not issue a channeling injunction under section 105 of the Bankruptcy Code.  (*See* David Obj. ¶ 49.)  This is directly refuted by case law; courts do have the authority to issue channeling injunctions pursuant to section 105.  *See In re Glob. Indus. Techs., Inc.*, 645 F.3d at 206; *In re N. Am. Refractories Co.*, 2007 WL 7645287, at *6.  *Second*, the David Claimants claim that channeling injunctions are only permissible in cases involving mass torts or asbestos cases.  (*See* David Obj. ¶ 44.)  This is also incorrect.  "Numerous courts have concluded that . . . the entry of a channeling injunction under § 105(a) and § 1123(b)(6) of the Bankruptcy Code are appropriate to resolve non-asbestos-related liabilities under certain circumstances".  *See In re N. Am. Refractories Co.*, 2007 WL 7645287, at *6 (citing, *inter alia*, *In re Kaiser Alum. Corp.*, 343 B.R. 88 (D. Del. 2006)); *see also In re Blitz U.S.A.*, 2014 WL 2582976 at *13-23 (involving approximately thirty-five tort claims related to portable fuel containment and storage products); Findings of Fact, Conclusions of Law and Order Confirming Debtors' First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, *In re Signal Int'l, Inc.*, No. 15-11498 (Bankr. D. Del. Nov. 24, 2015) (involving approximately 13 labor-trafficking tort litigations against an oil-rig repairer).

76.    Thus, to the extent the Court approves the Third-Party Releases, which the Plan Proponents believe it should for the reasons discussed above, the Plan Proponents respectfully submit that the Channeling Injunction is also appropriate and should be approved.

### C.    Substantive Consolidation Of The Debtors' Estates Is Appropriate.

77.    It is well established that bankruptcy courts may use their equitable powers under section 105 of the Bankruptcy Code to consolidate cases involving related debtors.  *See, e.g., In re*

*New Century TRS Holdings, Inc.*, 390 B.R. 140, 159 (Bankr. D. Del. 2008) ("Substantive consolidation is a construct of federal common law that emanates from equity." (citing *In re Owens Corning,* 419 F.3d 195, 205 (3d Cir. 2005))).  Moreover, section 1123(a)(5)(C) of the Bankruptcy Code expressly contemplates plans that provide for a merger or consolidation of a debtor with one or more persons as a means for implementation of a chapter 11 plan. *See* 11 U.S.C. § 1123(a)(5)(C); *Stone & Webster*, 286 B.R. 532, 542 (Bankr. D. Del. 2002) ("[S]ubstantive consolidation such as that proposed by the Plan is, by reason of § 1123(a)(5)(C), clearly an allowable provision in a [c]hapter 11 plan.").

78.    In the Third Circuit, substantive consolidation is appropriate where creditors consent.  *See, e.g., In re Owens Corning*, 419 F.3d 195 at 211; *In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 591 (D. Del. 2009).  Critically, other than the David Claimants, no creditor or party-in-interest has objected to the substantive consolidation provided under the Plan.

79.    The David Objection does not provide any arguments or evidence as to why substantive consolidation is inappropriate here.  (*See* David Obj. ¶ 57).  The David Claimants simply "leave the Debtors to their burden."  (*Id.*)  The Debtors have met their burden here.

80.    In the absence of creditor consent, a bankruptcy court may grant substantive consolidation where a debtor proves that (i) prepetition the debtors disregarded "separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their [debtors] assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  *In re Owens Corning*, 419 F.3d at 211–12.  Ultimately, substantive consolidation is warranted if it leaves creditors better off.  *See id.* at 211, n.20; *see also In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 723–24 (Bankr. S.D.N.Y. 2011).

81.     The substantive consolidation contemplated by the Plan should be approved given the circumstances of these cases.  While the Debtors did employ separate special purpose vehicle entities for purposes of financing and developing films and other projects, at the "corporate level" things were not so clear and it was often difficult for creditors and other third parties to distinguish whether they were dealing with a particular TWC legal entity (and if so which one) or Harvey Weinstein personally.  (See Peck Decl. ¶ 5.)  Given the nature of Harvey Weinstein's overarching role at TWC, it would be impossible to discern if a particular Sexual Misconduct Claim related to the television entity, one or more film entities or the parent company.  (*Id.*)  Particularly following the closing of the Sale to Spyglass and the corresponding effective cessation of business operations, the assets and liabilities of the Debtors have been and are, for all intents and purposes, already merged.  The proposed substantive consolidation under the Plan will facilitate efficient distributions to creditors from the Liquidation Trust and the Sexual Misconduct Claims Fund.  Conversely, keeping the legal status of the individual Debtors separate will require a herculean attempt to review the Debtors' books and properly apportion the assets and liabilities of each Debtor.  If this were even possible, it would be extremely costly.  (*Id.* ¶ 7.)  This would deplete creditor recoveries without providing creditors with any meaningful benefits.  Creditors will therefore be better served by substantive consolidation than by preserving the corporate separateness of the Debtors' entities.

82.     Substantive consolidation of the Debtors' Estates should therefore be approved as consistent with section 1123(b)(6) of the Bankruptcy Code.

**D.     The Plan Was Proposed In Good Faith (§ 1129(a)(3)).**

83.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  "'[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether

such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re PWS*, 228 F.3d at 242 (citation omitted).

84.     The Plan was proposed in good faith, with the legitimate and honest purpose of liquidating the Debtors' estates while maximizing recoveries for the Debtors' creditors, especially Holders of Sexual Misconduct Claims.  The Plan will enable the Debtors to liquidate the estates while providing the best possible financial outcomes for creditors.  The Plan is the product of extensive arm's-length negotiations among the Debtors and the other Settlement Parties, (*see* TWC Decl. ¶¶ 4-5), the substance of which the Debtors have consistently communicated to the Court and to the public.  The Debtors only proceeded to seek confirmation of the Plan following the overwhelming supportive vote accepting the Plan by the most important stakeholders in these cases—the Holders of Sexual Misconduct Claims.  Finally, as set forth herein, the Plan complies with bankruptcy and applicable non-bankruptcy laws.  For these reasons, the Plan was proposed in good faith, and section 1129(a)(3) of the Bankruptcy Code is satisfied.

85.     The David Claimants make two arguments that the Plan was not proposed in good faith.  *First*, they again offer their theory that the Plan is unconfirmable because it is funded by proceeds of the Insurance Policies.  (*See* David Objection ¶ 52.)  The David Claimants raised the same argument when they unsuccessfully sought to convert these Chapter 11 Cases to chapter 7 cases.[22]  The Court has previously rejected this argument and the David Claimants provide no basis for the Court to reconsider its prior decision.  (*See Order Denying [David Claimants' Conversion Motion]* [D.I. 3046].)

---

[22]  *See Motion by [David Claimants] to Convert Debtors' Chapter 11 Cases to Chapter 7* (the "David Claimants' Conversion Motion") ¶¶ 24-27 [D.I. 2884]; *see also Response by [David Claimants] to [Plan Proponents'] Motion to Continue Hearing on [David Claimants' Conversion Motion]* ¶¶ 1-5 [D.I. 2892].

86.     *Second*, the David Claimants argue that the Plan was not proposed in good faith because each Sexual Misconduct Claim was estimated at one dollar solely for voting purposes. (David Obj. ¶ 40.)  Again, the David Claimants raised the same argument when they objected to the Disclosure Statement Motion and the Court overruled the objection.  (*See David Objection to [the Disclosure Statement Motion]* ¶¶ 2-3 [D.I. 3061]; Nov. 5 Hr'g Tr. 36:10-37:3.)  The David Claimants again provide no explanation for why the Court should revisit its prior ruling nor do they cite any case law supporting that estimation of claims at one dollar solely for voting purposes is relevant to the assessment of the whether the Plan was proposed in good faith.

87.     The Debtors have demonstrated that the Plan has been proposed in good faith. And, the David Claimants have failed to present any new or valid arguments to the contrary. Accordingly, the Court should find that the Plan was proposed in good faith.[23]

## II.     The Plan Satisfies The Remaining Applicable Requirements Of Section 1129.

88.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]," such as sections 1122 and 1123 of the Bankruptcy Code that govern, respectively, the classification of claims and the contents of a plan of reorganization.  In addition to the requirements already discussed, the Plan complies with the remaining requirements of sections 1122, 1123 (and thus 1129(a)(1)) of the Bankruptcy Code for the reasons set forth below.

---

[23]  The David Claimants also object to the appointment of the proposed Sexual Misconduct Claims Examiner. The David Claimants made the same argument in their objection to the Disclosure Statement, *see* D.I. 3061, ¶ 10, and the Plan Proponents addressed this argument in the Disclosure Statement, *see* Disclosure Statement §§ I.X.B, D, Ex. E. The David Claimants provide no rationale as to how the appointment of the proposed Sexual Misconduct Claims Examiner provides a basis for the Court to deny confirmation of the Plan.

A.      **The Plan Satisfies the Classification Requirements Of Bankruptcy Code Section 1122.**

89.     Section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows: Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  Plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,* 987 F.2d 154, 158-59 (3d Cir. 1993) (noting that a classification scheme is permissible if a legal difference exists between the classes).  The Plan's classification of Claims and Interests satisfies section 1122 of the Bankruptcy Code.

90.     The Plan's classification scheme provides for the separate classification of Claims and Interests based on the circumstances giving rise to the various Claims and Interests and their legal nature and priority.  The Plan places classified Claims and Interests into eight separate Classes as follows:

      a.            <u>Class 1</u>:  Other Priority Claims

      b.            <u>Class 2</u>:  Secured Tax Claims

      c.            <u>Class 3</u>:  Secured Claims

      d.            <u>Class 4</u>:  Sexual Misconduct Claims

      e.            <u>Class 5</u>:  Other Tort Claims

      f.            <u>Class 6</u>:  General Unsecured Claims

      g.            <u>Class 7</u>:  Intercompany Claims

      h.            <u>Class 8</u>:  Interests

91.     The Plan separately classifies Claims (rights to payment) and Interests (representing ownership in the business).  (*See* Plan § 3.)  In addition, Claims and Interests assigned to each Class are substantially similar to the other Claims and Interests in such Class, with the Claims and Interests in each Class differing from the Claims and Interests in each other

Class based on the relevant criteria.  (*See* Plan § 3.3.)  Specifically, the Plan bifurcates general unsecured claims based on whether they relate to Tort Claims.  (*See* Plan §§ 3.13, 3.14, 3.15.) The division of general unsecured claims is appropriate because the fundamental purpose of the Plan is to compensate Holders of Sexual Misconduct Claims, whose claims are sufficiently distinct from other general unsecured claims to "merit a separate voice" for purposes of Plan confirmation. *See In re Armstrong World Indus.*, 348 B.R. at 147 (holding that it was reasonable to separately classify personal injury claims and general unsecured claims despite their equal priority status); *In re Tribune Co.*, B.R. 843, 857 (Bankr. D. Del. 2012) (finding separate classification of claims was reasonable where distinguishable creditor interests warranted a "separate voice in [the] bankruptcy case").

92.     Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code.

**B.      The Plan Satisfies The Mandatory Requirements Of Bankruptcy Code Section 1123(a).**

93.     Section 1123(a) of the Bankruptcy Code sets forth seven requirements that every chapter 11 plan must satisfy.  The Plan satisfies each of these requirements.

94.     *First*, section 1123(a)(1) of the Bankruptcy Code requires a plan to "designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests[.]"  The Plan properly designates Classes of Claims and Interests, thus satisfying the requirement of section 1123(a)(1).

95.     *Second*, section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan[.]"  The Plan meets this requirement by identifying each Class that is Unimpaired in Section 3 of the Plan: these are Classes 1, 2, and 3.

96.    *Third*, section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan[.]"  The Plan meets this requirement by setting forth in Section 3 of the Plan the treatment of each Impaired Class: Classes 4, 5, 6, 7 and 8.

97.    *Fourth*, section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest[.]"  The Plan meets this requirement because holders of Allowed Claims and Interests in each Class receive the same treatment as other holders of Allowed Claims and Interests in such Class, unless the Holder of a Claim or Interest agrees to less favorable treatment on account of its Claim or Interest (as applicable).[24] (*See* Plan § 3.)

98.    *Fifth*, section 1123(a)(5) of Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.  "Adequate means" includes but are not limited to, "transfer of all or any part of the property of the estate to one or more entities", "sale of all or any part of the property of the estate," and "issuance of securities of the debtor . . . in exchange for claims or interests, or for any other appropriate purpose."  11 U.S.C. § 1123(a)(5).  The Plan satisfies this requirement because Section 12, as well as other provisions of the Plan, provide adequate means for the Plan's implementation.  Among other things, the Plan:

- Provides, by means of the Settlement, for the sources of distributions under the Plan (*See* Plan §§ 5.2, 5.3);
- establishes the Liquidation Trust and Sexual Misconduct Claims Fund (*See* Plan §§ 5.4, 5.6);

---

[24]  The David Claimants argue that it is unfair discrimination for Holders of Sexual Misconduct Claims who affirmatively elect not to release Harvey Weinstein to receive less compensation than Holders of Sexual Misconduct Claims who affirmatively elect to release Harvey Weinstein.  (*See* David Obj. ¶¶ 55-56.)  All Holders of Sexual Misconduct Claims have the same rights and are afforded the same treatment under the Plan.

- provides for the substantive consolidation of the Debtors (*See* Plan § 12.1);
- authorizes the Debtors and the Liquidation Trust to take all actions necessary or appropriate to effectuate the Plan (*See* Plan § 12.5);

99.    *Sixth*, section 1123(a)(6) of Bankruptcy Code requires that the Plan prohibit non-voting equity securities and provide for the appropriate distribution of voting power among classes of securities.  As the Plan provides that all Interests in the Debtors shall be canceled and no new shares will be issued pursuant to the Plan, this section of the Bankruptcy Code is inapposite here.  *See* Plan § 3.17.

100.    *Seventh*, section 1123(a)(7) of Bankruptcy Code requires that the Plan contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner and selection of the company's officers, directors or trustees, or any successor thereto.  The Plan meets this requirement by its appointment of Dean A. Ziehl of Pachulski Stang Ziehl & Jones LLP as the Liquidation Trustee and for Simone Lelchuk and Jed Melnick of Melnick ADR, LLP as the Sexual Misconduct Claims Examiners.  (*See* Plan §§ 6.4, Ex. 4.)

101.    Accordingly, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

**C.    The Plan Satisfies The Discretionary Provisions of Bankruptcy Code Section 1123(b) And Bankruptcy Rule 9019.**

102.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, Bankruptcy Code section 1123(b) provides that a plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or the estates".  11 U.S.C. § 1123(b)(1)–(4), (6).

1.    **The Global Settlement Contained In The Plan Satisfies Section 1123 And Bankruptcy Rule 9019.**

103.    Pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, as part of the restructuring process, courts may approve a compromise or settlement.  *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004).  "The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019."  *Id.*

104.    To be approved, a settlement need only be "fair and equitable."  *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010); *see also In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (*quoting In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).  In determining whether a settlement is fair and equitable, courts should evaluate the settlement "as a whole".  *In re Wash. Mut., Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011) ("[E]ach part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable . . . there are benefits to be recognized by a global settlement of all litigation . . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately.").

105.    In making this determination, the court "should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness."  *In re Capmark Fin. Grp., Inc.*, 438 B.R. at 515.  The Third Circuit has established a four-factor test for determining whether a settlement falls above the lowest point in the range of reasonableness: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996).

106.    Courts should defer to the debtor's business judgment "so long as there is a legitimate business justification for [its] action", *In re Coram Healthcare*, 315 B.R. at 330 (citing *Martin*, 91 F.3d at 395), and should exercise their discretion "in light of the general public policy favoring settlements," *In re Capmark*, 438 B.R. at 515 (citation omitted); *see also Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (noting that "[s]ettlements are favored").

107.    The Plan's global settlement of the D&O Claims and wide-ranging actual and potential litigations, which settlement has been overwhelmingly approved by creditors, easily satisfies the *Martin* standard and is a valid exercise of the Debtors' business judgment.

108.    *First*, as discussed at length above, the outcomes of the Claims resolved by the Settlement are highly uncertain absent the Settlement.  (*See supra* Part I.A.2.)

109.    *Second,* the Insurance Companies are unlikely to pay any judgments in the event that any litigation of the D&O Claims is actually successful.  (*See* Schack Decl. Exs. 1-8.) The Insurance Companies likely will contend that they have no responsibility to cover any costs and judgments related to Sexual Misconduct Claims.  (*Id.*)  By contrast, the Settlement secures funds for guaranteed distribution to the Debtors' creditors.

110.    *Third*, prosecution of the D&O Claims would require significant resources. The Debtors' resources are meager and would likely be insufficient to support the duration and complexity of the issues involved in litigating the D&O Claims.  (*See Debtors' November Monthly Operating Report*.)  While litigation funding may potentially address the expense component of the third *Martin* factor, whether such funding would be available and on what terms in these circumstances is highly uncertain.  And even if financing were available on acceptable terms, that

would not address the other two components of the third *Martin* factor — inconvenience and delay. The Settlement embodied in the Plan thus satisfies the third *Martin* factor.

111.   *Fourth,* the Settlement was negotiated with the interests of Holders of Sexual Misconduct Claims at the forefront and offers the best outcomes for all creditors compared to a chapter 7 liquidation.   As discussed above, potential recoveries for creditors in a chapter 7 liquidation would be significantly less than potential recoveries under the Plan.   (*See* Herman Decl. ¶ 15; Fourth Amended Disclosure Statement, Ex. B.)   The Settlement also avoids substantial litigation costs, delayed payments to creditors and the risk of no recovery of any of the insurance proceeds.   *See In re Wash. Mut., Inc*., No. 08-12229 (MFW), 2012 WL 1563880, at *22 (Bankr. D. Del. Feb. 24, 2012); *see also In re Glob. Indus. Techs., Inc.,* No. BR 02-21626-JKF, 2013 WL 587366, at *11 (Bankr. W.D. Pa. Feb. 13, 2013) ("The Settlements are fair and equitable and a proper exercise of the Debtors' business judgment because they enable the Debtors to consummate the [plan] . . . while at the same time avoiding complex, expensive and protracted litigation with uncertain outcomes").

112.   Accordingly, the Settlement satisfies the *Martin* factors and should be approved.

### 2.   The Debtors' Releases Comply With The Discretionary Provisions Of Bankruptcy Code Section 1123(b).

113.   A debtor's authority under section 1123(b)(3)(A) to settle or adjust "any claim or interest belonging to the debtor or to the estate" necessarily includes the debtor's right to settle or release claims against third parties belonging to the estate.   11 U.S.C. § 1123(b)(3)(A); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("Debtors are authorized to settle or release their claims in a chapter 11 plan."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007).

114.    Debtor releases are generally approved by courts in the Third Circuit "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion*, 426 B.R. at 143; *accord In re Wash. Mut.*, 442 B.R. at 327. Whether a release by the debtor is fair, reasonable, in the best interests of the estate and a valid exercise of the debtor's business judgment is evaluated by considering the non-exclusive and disjunctive "*Zenith*" factors:

> (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the Plan for payment of all or substantially all the claims of the class or classes affected by the injunction.

*In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)); *see also In re Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."). Courts have approved releases where only one or two of these factors are present. *See, e.g., In re Caribbean Petroleum Corp.*, 512 B.R. 774, 778 (Bankr. D. Del. 2014); *In re Spansion*, 426 B.R. at 143.

115.    Section 7.2.1 of the Plan provides for the release by the Debtors (the "Debtors' Releases") of certain Claims that the Debtors may have against the Released Parties. (*See* Plan § 7.2.1). All of the *Zenith* factors support the Debtors' Releases and notably, no party has objected to the Debtors' Releases. In the exercise of their sound business judgment, the Debtors have determined that the Debtors' Releases are fair, reasonable, and in the best

interests of their estates, based on the significant contributions, concessions, and compromises made by the Released Parties in the process of formulating and supporting the Plan.

116.    As to the first factor, there is an identity of interest between the Debtors and the non-debtor Released Parties.  An identity of interest exists, *inter alia*, where the debtor maintains indemnification obligations to a released party.  *See In re Indianapolis Downs LLC.*, 486 B.R. at 303; *In re Wash. Mut.*, 442 B.R. at 347.  The Non-Debtor Affiliates and Non-Debtor Additional Affiliates are, or were once affiliated with, the Debtors and are, or in certain instances may be, covered by the Insurance Policies.  (*See* TWC Decl. ¶¶ 13-14; Schack Decl. Ex. 13 at 23.)  Thus, suits against the Non-Debtor Affiliates and/or Non-Debtor Additional Affiliates may involve in the Debtors, and any recoveries against the Non-Debtor Affiliates and/or Non-Debtor Additional Affiliates may be covered by the Insurance Policies.  To the extent any such claims are eligible for coverage under the Insurance Policies, such recoveries may deplete the coverage available to the Debtors thereunder.  Accordingly, the Non-Debtor Affiliates and Non-Debtor Additional Affiliates share an identity of interest with the Debtors.

117.    The Former Representatives are covered by the Insurance Policies and the Debtors have certain indemnification obligations in favor of the Former Representatives under certain organizational documents.  (*See* TWC Decl. ¶¶ 13-14.)   Thus, suits against the Former Representatives may involve the Debtors and any recoveries against the Former Representatives will deplete the Debtors' coverage under the Insurance Policies, may give rise to certain indemnification obligations, and otherwise deplete limited estate resources.  Accordingly, the Former Representatives share an identity of interest with the Debtors.[25]

---

[25] Each of the Settlement Parties also have an identity of interest with the Plan Proponents because they are signatories to the Plan Support Agreement and committed to assisting with confirmation and consummation of the Plan.  *See* Plan Support Agreement § 5; *See In re Zenith*, 241 B.R. at 110 (finding an identity of interest with debtor where certain

118.    The second and third factors *Zenith* factors are satisfied for the same reasons presented with respect to the necessity of the Plan's Third-Party Releases.  (*See supra* Part I.A.2.)  In short, the Released Parties, specifically the Former Representatives and the Insurance Companies, have made substantial contributions to the Plan, and such contributions were conditioned on receiving certain releases in exchange, including the Debtors' Releases.  (*See* Plan §§ 5.2, 5.6; Plan Support Agreement §§ 1, 17.A.)

119.    As to the fourth factor, 82.98% of Holders of Sexual Misconduct Claims—the creditors most affected by a release of the Debtors' Claims against the Released Parties—voted to accept the Plan with full disclosure of and information regarding its release, exculpation and injunction provisions.  (*See* Voting Decl. Ex. A.)  The voting results are compelling evidence that the Debtors' Releases constitute a valid exercise of the Debtors' business judgment.

120.    The fifth *Zenith* factor is satisfied when a plan provides for a distribution to creditors affected by releases that is greater than the distribution such creditors would receive under a chapter 7 liquidation.  *See In re Zenith*, 241 B.R. at 111.  Here, the Plan satisfies this factor by virtue of meaningful recoveries for Holders of Sexual Misconduct Claims—again, the creditors most affected by the Debtors' Releases—and by providing for greater recoveries for other creditors, whose regrettably small recoveries under the Plan are still larger than would be available absent the Settlement and the Plan.  (*See* Herman Decl. ¶ 15; Fourth Amended Disclosure Statement, Ex. B.)  While the value of the Sexual Misconduct Claims is still unknown given that they have not been liquidated yet and it is therefore difficult to know whether the recoveries Holders of Sexual Misconduct Claims constitute "all or substantially all" of those Claims, the Plan

---

released parties who "were instrumental in formulating the [p]lan" shared an identity of interest with debtor "in seeing that the [p]lan succeed . . .").

does provide Holders of Sexual Misconduct Claims with certain and substantial recovery compared to recoveries under a chapter 7 liquidation. (*See supra* Part I.A.2(c).)

121.    Accordingly, the Debtors' Releases are a proper exercise of the Debtors' business judgment, are in the best interest of the Debtors and their estates and should be approved.

### D.    The Debtors Complied With The Applicable Provisions Of The Bankruptcy Code (§ 1129(a)(2)).

122.    Section 1129(a)(2) of the Bankruptcy Code requires that the "proponent of the plan compl[y] with the applicable provisions of the [Bankruptcy Code]." The legislative history of section 1129(a)(2) explains that this provision refers to the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re PWS*, 228 F.3d at 248.

123.    As discussed in Part I, above, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.

124.    Section 1126 of the Bankruptcy Code sets forth the requirements for acceptance of a plan of reorganization. Specifically, only holders of allowed Claims and allowed Interests in impaired classes that will receive or retain property under the plan on account of such claims or interests may vote to accept or reject such plan. 11 U.S.C. § 1126(a), (f). Sections 1126(c) and 1126(d) of the Bankruptcy Code specify that a class of claims or interests has accepted a plan if they are unimpaired or if impaired, the class has voted to accept the plan by two-thirds in amount and more than one-half in number.

125.    The Plan satisfies the requirements of section 1126. As set forth in Part I, above, the Debtors solicited acceptances or rejections of the Plan only from the holders of Claims in

Impaired Classes entitled to vote (Class 4, 5, and 6).  (*See* Voting Decl. ¶ 7.)  The Debtors did not

solicit votes from holders of Claims and Interests in Class 1, 2, 3, 7 or 8 because the holders of

Claims and Interests in these Classes either (i) are Unimpaired and, pursuant to section 1126(f) of

the Bankruptcy Code, are conclusively presumed to have accepted the Plan, or (ii) will receive no

distribution under the Plan, and are deemed to have rejected the Plan pursuant to section 1126(g)

of the Bankruptcy Code.  (*Id.*)

126.    Further, as described above and in the Voting Report, all Voting Classes voted to

accept the Plan in sufficient numbers and amounts as required by the Bankruptcy Code.  (*See id.*

Ex. A.)  Thus, the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

**E.     The Plan Provides That The Payment Of Professional Fees And Expenses Are Subject To Court Approval (§ 1129(a)(4)).**

127.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses

paid by the plan proponent, by the debtor, or by a person receiving distributions of property under

the plan, be subject to approval by the court as reasonable.  11 U.S.C. § 1129(a)(4).  Courts have

construed this section to require that all payments of professional fees which are made from estate

assets be subject to review and approval by the court.  *See In re Resorts Int'l, Inc*., 145 B.R. 412,

475-76 (Bankr. D.N.J. 1990); *In re Journal Register Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y

2009).

128.    Here, all payments made or to be made by the Debtors on account of Professional

Fee Claims are subject to Bankruptcy Court approval.  Pursuant to Section 3.8 of the Plan,

Bankruptcy Professionals asserting Professional Fee Claims must file with the Bankruptcy Court

an application for final allowance of such Professional Fee Claim.  Furthermore, all monthly and

interim compensation of Professionals by the Debtors prior to final allowance of such Professional

Fee Claims have been or will be approved by the Court and paid in accordance with the procedures

established by the *Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [Docket No. 247]. Thus, the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

**F.      The Plan Does Not Require Governmental Regulatory Approval of A Rate Change (§ 1129(a)(6)).**

129.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. This section is inapplicable to the Plan as the Debtors are not subject to such rate regulation.

**G.      The Plan Is In The Best Interests Of All the Debtors' Creditors (§ 1129(a)(7)).**

130.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)      each holder of a claim or interest of such class—
>
>> (i)      has accepted the plan; or
>>
>> (ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

131.    The best interests test applies to individual dissenting holders of impaired claims and interests and is generally satisfied through a comparison of the estimated recoveries by claimants in a hypothetical chapter 7 liquidation of that debtor's estate as of the effective date of the plan with the projected recoveries under that plan. *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the

plan.").  Under the best interests test, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7."  *In re Adelphia Commc'ns Corp.*, 368 B.R. at 252.

132.    A plan proponent satisfies its evidentiary burden with respect to the best interests test by providing "a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions."  *In re Adelphia Commc'ns. Corp.*, 361 B.R. 337, 366 (S.D.N.Y. 2007). The court must evaluate such liquidation analysis, keeping in mind the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7."  *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (citation omitted); *In re W.R. Grace & Co.*, 475 B.R. 34, 142 (Bankr. D. Del. 2012) ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record.  It is not necessary to itemize or specifically determine precise values during this estimation procedure.  Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation").

133.    The Debtors' liquidation analysis is attached to the Fourth Amended Disclosure Statement as Exhibit B (the "Liquidation Analysis").  The Liquidation Analysis is based on the models produced by the Committee's financial advisor, Berkeley Research Group, LLC, and, as demonstrated in the Herman Declaration, is not the product of "mere assumptions or assertions." *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 366.  The Liquidation Analysis shows that, in a chapter 7 case, creditors[26] would receive much smaller recoveries compared to the Plan.

---

[26] The Liquidation Analysis treats all unsecured creditors (Holders of General Unsecured Claims and Holders of Tort Claims) as members of a single class in a chapter 7 liquidation, which is the most likely scenario.  *See In re W.R. Grace & Co.*, 446 B.R. at 127 (explaining that if the debtors cases were converted, "as in any Chapter 7, the [tort]

(*See* Herman Decl. ¶ 15; *Fourth Amended Disclosure Statement* Ex. B.)  Even in the "high" scenario, which contemplates maximum recoveries in a chapter 7, creditors would recover of approximately 2.35%.  (*Id.*)  By contrast, the Plan projects recoveries of 14.38% for Holders of Sexual Misconduct Claims (Class 4) and 1.46% for Holders of General Unsecured Claims (Class 6) and Other Tort Claims (Class 5).  (*Id.*)  Thus, the Plan is in the best interest of creditors and satisfies section 1129(a)(7) of the Bankruptcy Code.

**H.      The Requirements Of Section 1129(a)(8) Are Satisfied.**

134.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims and interests must either accept a plan or be unimpaired thereunder.  Classes 4 and 6 voted to accept the Plan.[27] (*See* Voting Decl. Ex. A.)

135.    Even though Classes 7 and 8 are deemed to reject the Plan and, accordingly, the requirements of section 1129(a)(8) have not been met, the Court may "cram down" the Plan over the deemed rejection by such Classes, subject to further protections specified in section 1129(b) of the Bankruptcy Code, which are satisfied here.  (*See infra* Part II.M.)

**I.      The Plan Provides For Payment In Full Of All Allowed Priority Claims (§ 1129(a)(9)).**

136.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the plan's effective date, while the holders of certain other priority claims may receive specified deferred cash payments.  The Plan satisfies these requirements.

137.    *First*, the Plan provides that each holder of an Allowed Other Priority Claim will receive Cash from the Liquidation Trust in an amount equal to the Allowed amount of such Claim,

---

claims would be put into a pool of general unsecured creditors to await payment until all the claims in the class were liquidated, all the assets reduced to cash, distributions made, and insurance claims resolved").

[27] No member of Class 5 voted to approve or reject the Plan.

on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between the applicable Debtor or the Liquidation Trustee and the Holder of the Allowed Other Priority Claim against the applicable Debtor.  (*See* Plan § 3.10.)

138.    *Second,* the Plan also provides that each holder of an Allowed Priority Tax Claim entitled to priority under section 1129(a)(9)(A) will receive Cash from the Liquidation Trust equal to the Allowed amount of such Claim on, or as soon thereafter as is reasonably practicable, the date that is 90 calendar days after the Effective Date.  (*See* Plan § 3.9.)

139.    Thus, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.    At Least One Class Of Impaired, Non-Insider Claims Accepted The Plan (§ 1129(a)(10)).**

140.    Section 1129(a)(10) of the Bankruptcy Code provides that at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider."

141.    All Voting Classes in which a claimant cast a vote—Classes 4 and 6—have voted to accept the Plan.  (*See* Voting Decl. Ex. A.)  The Plan thus satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.    The Plan Is Feasible (§ 1129(a)(11)).**

142.    Section 1129(a)(11) of the Bankruptcy Code requires the court find that a plan is feasible.  Specifically, the court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11).

143.    As the Plan is a plan of liquidation, and such liquidation was proposed in the Plan, the requirements of section 1129(a)(11) are satisfied.

**L.      All Statutory Fees Have Been Or Will Be Paid (§ 1129(a)(12)).**

144.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."   Further, section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

145.    Sections 3.7 and 3.8 of the Plan provide that all such fees and charges, to the extent not previously paid, will be paid for each quarter until these cases are closed, dismissed or converted to cases under chapter 7 of the Bankruptcy Code.  (*See* Plan §§ 3.7, 3.8.)  Section 11.2 of the Plan further makes payment of such fees and charges a condition to the occurrence of the Effective Date.  (*See* Plan §§ 11.2.)  Thus, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

**M.      The Plan Satisfies The "Cram Down" Requirements Of Section 1129(b) Of The Bankruptcy Code.**

146.    As stated above, Classes 7 and 8 have been deemed to reject the Plan (together, the "Rejecting Classes").  The Court may "cram down" the Plan over the rejection by the Rejecting Classes, subject to compliance with the requirements of section 1129(b) of the Bankruptcy Code. Section 1129(b)(1) provides that, if all applicable requirements of Bankruptcy Code section 1129(a) are met other than section 1129(a)(8), a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.  *John Hancock Mut. Life Ins. Co.*, 987 F.2d at 157 n.5; *In re Zenith*, 241 B.R. at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of

reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'" (citation omitted)).  The Plan does not discriminate unfairly and it is fair and equitable with respect to the Rejecting Classes.

147.    A plan discriminates unfairly if similar classes are treated differently without a reasonable basis for the disparate treatment.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. at 310-11 ("Courts generally will approve placement of similar claims in different classes provided there is a 'rational' or 'reasonable' basis for doing so.").  Accordingly, as between classes of claims, there is no unfair discrimination if (a) the classes each contain of dissimilar claims or interests, or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.  *See*, *e.g., In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992) (separate classification and treatment was rational where members of each class "possess[ed] different legal rights").

148.    Simply stated, the Plan does not discriminate unfairly against any of the Rejecting Classes, as the two rejecting classes are dissimilar from the other classes of Claims—Class 7 is comprised of Intercompany Claims and Class 8 is comprised of Interests (Class 8).  No other class of Claims contains similar Claims and therefore, their separate classification is appropriate.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. at 310–11.  The treatment afforded to the Rejecting Classes under the Plan is also permissible under the Bankruptcy Code.  *See In re Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 232 (Bankr. D.N.J. 2000) (claims subordinated under Bankruptcy Code section 510(b) permit holders of such claims to receive different treatment than claims that are not subordinated).  Accordingly, the Plan does not discriminate unfairly with respect to any of the Rejecting Classes.

149.    For a plan to be "fair and equitable", (i) each creditor in a non-consenting class must receive or retain value equal to the allowed amount of such creditor's claim, or (ii) no creditor in a class junior to the non-consenting class may receive or retain any value under the plan. 11 U.S.C. §§ 1129(b)(2)(B), (C).  No creditor junior to Class 7 will receive or retain any property under the Plan and no creditor junior to Class 8 will receive or retain any property under the Plan. (*See* Plan § 3.)  Accordingly, the Plan is fair and equitable with respect to the Rejecting Classes.

150.    For these reasons, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

**N.      The Plan Complies With Bankruptcy Code Section 1129(d).**

151.    The Plan's purpose is not to avoid taxes or the application of section 5 of the Securities Act.  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.[28]  Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1129(d).

**III.    Good Cause Exists To Waive The Stay Of The Confirmation Order.**

152.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays of orders authorizing the sale of property and assignments of executory contracts or unexpired leases, respectively.  These rules also permit modification of the stay upon court order.

153.    Good cause exists for waiving any stay of the proposed confirmation order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed confirmation order may become effective immediately upon its entry.  As noted above, these Chapter 11 Cases have been

---

[28]  The IRS filed an objection to confirmation of the Plan, but the Plan Proponents have resolved the IRS Objection.

conducted in good faith and with a high degree of transparency and public dissemination of information.  The sooner the proposed confirmation order becomes effective, the sooner the review of the Sexual Misconduct Claims may commence, and the resulting distributions to Holders of Sexual Misconduct Claims.  Holders of Sexual Misconduct Claims have waited long enough to see these cases closed and receive compensation on account of the harm they have endured. The Plan should therefore take effect as quickly as possible to facilitate the evaluation and liquidation of Sexual Misconduct Claims.

154.    Thus, the Debtors request a waiver of the stay imposed by the Bankruptcy Rules so that the proposed confirmation order may become effective immediately upon its entry.

## **CONCLUSION**

155.    For all the reasons set forth herein and in the TWC Declaration, the Herman Declaration, the Peck Declaration, the Schack Declaration, the Zumbro Declaration, the Voting Declaration and the Committee Voting Report, and for additional reasons adduced at the Hearing, the Debtors respectfully request that the Court (i) overrule all remaining objections to the confirmation of the Plan to the extent not resolved prior to or at the Confirmation Hearing, (ii) confirm the Plan by entering the proposed confirmation order, (iii) waive the stay of the proposed confirmation order, and (vii) grant such other and further relief as is just and proper.

[*remainder of page intentionally left blank*]

Dated:    January 20, 2021
          Wilmington, Delaware

*/s/ Paul N. Heath*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
David T. Queroli (No. 6318)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

**CRAVATH, SWAINE & MOORE LLP**
Paul H. Zumbro (admitted *pro hac vice*)
Lauren A. Moskowitz (admitted *pro hac vice*)
Salah M. Hawkins (admitted *pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for the Debtors and Debtors in Possession*

*/s/ Colin R. Robinson*
**PACHULSKI STANG ZIEHL & JONES LLP**
James I. Stang (CA Bar No. 94435)
Robert J. Feinstein (NY Bar No. 1767805)
Debra I. Grassgreen (CA Bar No. 169978)
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100

*Counsel for the Official Committee of Unsecured Creditors*