# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              . Chapter 11
                              .
IN RE:                        .
                              . Case No. 18-10601(MFW)
THE WEINSTEIN COMPANY         .
HOLDINGS, et al,              .
                              .
                              .
                              . 824 Market Street
                  Debtors.    . Wilmington, Delaware 19801
                              .
. . . . . . . . . . . . . . . . Monday, January 25, 2021
```

TRANSCRIPT OF TELEPHONIC HEARING RE:
FIFTH AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:

For the Debtors:            Paul N. Heath, Esq.
                            Brett M. Haywood, Esq.
                            David T. Queroli, Esq.
                            RICHARDS LAYTON & FINGER, P.A.

                            Paul H. Zumbro, Esq.
                            Lauren A. Moskowitz, Esq.
                            CRAVATH, SWAINE & MOORE, LLP

                            David Schack, Esq.
                            BARNES & THORBURG, LLP

For the U.S. Trustee:       Hannah McCollum, Esq.
                            Jane M. Leamy, Esq.
                            OFFICE OF THE U.S. TRUSTEE


(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by CourtCall/B. McCarthy, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:  (Continued)

For the Official Committee
of Unsecured Creditors:        Jason Rosell, Esq.
                               Robert Feinstein, Esq.
                               Colin R. Robinson, Esq.
                               Debra Grassgreen, Esq.
                               PACHULSKI, STANG, ZIEHL
                                & JONES, LLP

For Kelly Sipherd:             Lauren Mills Taylor, Esq.
                               Alex Smith, Esq.
                               David Postel, Esq.
                               HENEIN HUTCHINSON, LLP

For the Chubb Insurer
Group:                         Tony Draper, Esq.
                               WALKER WILCOX MATOUSEK, LLP

For Lance Maerov and
Jeff Sackman:                  Israel David, Esq.
                               Anne Aufhauser, Esq.
                               FRIED, FRANK, HARRIS, SHRIVER
                                & JACOBSON

For the State of New York:     Sandra Pullman, Esq.
                               Enid Stuart, Esq.
                               Louis Testa, Esq.
                               Winnie Vien, Esq.
                               Rachel Sang, Esq.
                               Eugenie Dubin, Esq.
                               STATE OF NEW YORK - OFFICE OF THE
                                ATTORNEY GENERAL

For Spy Glass Media Group,
LLC:                           Matthew Sarna, Esq.
                               DLA PIPER (US), LLP

For Marc Lasry:                Mark Silverschotz, Esq.

                               Marshall Gilinsky, Esq.
                               ANDERSON KILL, PC

For the Non-Settling Sexual
Misconduct Claimants:          Zhao Liu, Esq.
                               THE ROSNER LAW GROUP, LLC

(Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

For Rowena Chiu, et al:      Douglas Wigdor, Esq.
                            WIGDOR, LLP

For Black Bear Pictures:    Michael Yurkewicz, Esq.
                            KLEHR HARRISON HARVEY
                             BRANZBURG, LLP

                            Andrew Tenzer, Esq.
                            PAUL HASTINGS, LLP

For Allianz Insurance
Company:                    Mark Ledwin, Esq.
                            WILSON ELSER, LLP

For Lindsay Orr:            Matthew Geragos, Esq.

For James Dolan:            John Rosenberg, Esq.
                            ROSENBERG, GIGER & PERALA, PC

For 99 Hudson Street
Associates, LLC:            Michael Tucker, Esq.
                            ULMER & BERNE, LLP

For Jane Does III-VIII:     Jesse Mautner, Esq.
                            MERSON LAW, PLLC

For HSBC Bank USA:          Kent Kolbig, Esq.
                            MOSES & SINGER, LLP

For Seyfarth Shaw, LLP:     William Chipman, Esq.
                            CHIPMAN, BROWN, CICERO
                             & COLE, LLP

For Jane Doe:               Genie Harrison, Esq.
                            GENIE HARRISON LAW FIRM

For Paul Tudor Jones:       James Masella, Esq.
                            Daniel Lowenthal, Esq.
                            PATTERSON, BELKNAP, WEBB
                             & TYLER, LLP

For Portfolio Funding
Company, LLC:               Christopher M. Samis, Esq.
                            POTTER, ANDERSON & CORROON, LLP

                            Edward McNeilly, Esq.
                            HOGAN LOVELLS US, LLP

(Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

```
The Directors Guild of
America, Inc., et al:        Susan E. Kaufman, Esq.
                            LAW OFFICE OF SUSAN E.
                             KAUFMAN, LLC

For David Objectors:        Kevin Mintzer, Esq.
                            LAW OFFICE OF KEVIN MINTZER, PC

For Viacom International,
Inc.:                       Alex Talesnick, Esq.
                            LUSKIN, STERN & EISLER, LLP

For Louisette Geiss,
et al:                      Lynn Ellenberger, Esq.
                            FEGAN SCOTT, LLC

For Cedirot, Armenta
Law Firm:                   Elizabeth Fegan, Esq.
                            FEGAN SCOTT, LLC

For Louisette Geiss:        Whitney Siehl, Esq.

For SAG-AFTRA, DGA, WGA:    David Ahdoot, Esq.
                            Joseph Kohanski, Esq.
                            BUSH GOTTLIEB

For Sartraco, Inc.:         Mark Pfeiffer, Esq.
                            Geoffrey Grivner, Esq.
                            BUCHANAN, INGERSOLL & ROONEY, PC

For Robert Weinstein:       Adam Harris, Esq.
                            SCHULTE, ROTH & ZABEL, LLP

Also Appearing:             Ivona Smith
                            Lauren Moskowitz
                            Alan Halperin
                            Robert Peck
                            Paul Zumbro
                            Alan Jacobs
                            Jed Zobitz
                            Tammuz Huberman
                            THE WEINSTEIN COMPANY

                            Michael Farag, Esq.
                            Michael Neumeister, Esq.
                            GIBSON, DUNN & CRUTCHER, LLP
```

(Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:                Robert Fitzgerald, Esq.
                               James Mazza, Esq.
                               SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM, LLP

                               Edward Fox, Esq.
                               SEYFARTH SHAW, LLP

                               Louisette Geiss, Chairwoman
                               TWC UCC

                               Jane Sullivan
                               EPIQ CORPORATE RESTRUCTURING, LLC

                               Mary Kane, *Pro Se*

                               Ihab Mikati, *Pro Se*

                               Melissa Thompson, *Pro Se*

                               Samir Amidi, *Pro Se*

                               Lauren O'Connor, *Pro Se*

                               Michelle Franklin, *Pro Se*

                               Melissa Jacoby, *Pro Se*

                               Sarah Thomas, *Pro Se*

                               Ashley Cullins
                               THE HOLLYWOOD REPORTER

                               Maria Chutchian
                               REUTERS

                               Alex Brozman
                               REORG, INC.

                               Jill Goldsmith
                               DEADLNE HOLLYWOOD

                               Gene Maddaus
                               VARIETY

                               Taylor Harrison
                               DEBTWIRE

     (Appearances Continued)

APPEARANCES VIA ZOOM:   (Continued)

Also Appearing:                Jeffrey Montgomery
                               LAW360

                               Kyle Herman
                               "BRG"

                               Hannah Meropol, Law Extern
                               Hannah Grace, Law Extern
                               STATE OF NEW YORK - OFFICE OF THE
                                ATTORNEY GENERAL

INDEX

|                                        | Page |
| -------------------------------------- | ---- |
| OPENING STATEMENT BY MR. ZUMBRO         | 11   |
| OPENING STATEMENT BY MS. GRASSGREEN      | 22   |
| OPENING STATEMENT BY MS. HARRISON        | 32   |
| OPENING STATEMENT BY MS. PULLMAN         | 34   |

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
| ------- | ------ | ----- | -------- | ------- |
| FOR THE DEBTORS | | | | |
| IVONA SMITH | * | 40 | 79 | -- |
| ROBERT PECK | * | 82 | -- | -- |
| JANE SULLIVAN | * | 91 | -- | -- |

*Via Declaration

| EXHIBIT | PAGE |
| ------- | ---- |
| Smith Declaration | 40 |
| Herman Declaration | 80 |
| Liquidation Analysis | 80 |
| Kjontvedt Declaration | 90 |
| Sullivan Declaration | 90 |
| UCC Committee Report | 93 |
| Schack Declaration | 93 |
| Zumbro Declaration | 93 |
| Court's Ruling | 112 |

1          (Proceedings commence at 3:00 p.m.)

2               THE COURT:  Okay.  Good afternoon.  This is Judge

3     Walrath, and we're here in the TWC case.  I see the parties

4     are joined.

5               So I'll turn this over to counsel for the debtor to

6     proceed.

7          (No verbal response)

8               THE COURT:  Mr. Zumbro, you have to unmute yourself

9     on the Zoom, yeah.

10              MR. ZUMBRO:  Okay.  That's good?  Can you hear me

11    now, Your Honor?

12              THE COURT:  I can.

13              MR. ZUMBRO:  Okay.  Thank you, Your Honor.

14              We're very pleased to be here for the confirmation

15    hearing on The Weinstein Company matter.

16              Before getting into my opening remarks, I thought I

17    would start by providing the Court a brief overview of how

18    the debtors propose to conduct today's hearing, to make sure

19    our approach is acceptable to the Court.

20              THE COURT:  Okay.

21              MR. ZUMBRO:  As the Court knows, the Official

22    Committee of Unsecured Creditors is a co-proponent with the

23    debtors of the plan.  And following my opening remarks, we

24    propose that Ms. Grassgreen be permitted to make some remarks

25    on behalf of the committee.

1          Following that, Ms. Harrison, on behalf of Sandeep

2     Rehal, one of the holders of sexual misconduct claims who

3     sits on the committee would like to make very brief marks in

4     support -- remarks in support of the plan.

5          Then Ms. Pullman, on behalf of the New York Office

6     of the Attorney General, will speak briefly in support of the

7     plan.

8          Finally, the David Claimants, who are the sole

9     objector to the plan, may make opening remarks.

10          As the Court will have seen from our filing, the

11     plan proponents have submitted significant evidence in

12     support of the plan.  Following opening remarks, we intend to

13     move those declarations and other documents into the

14     evidentiary record of the hearing.

15          The David Claimants have indicated that they wish

16     to cross-examine the plan proponents' witnesses, so we would

17     make the witnesses available for cross-examination at that

18     point.

19          And after cross-examination and any redirect has

20     concluded, counsel to the David Claimants may make their

21     arguments in opposition to the plan, followed by the debtors'

22     rebuttal, brief closing remarks.

23          And then the remainder of the two hours we have

24     would be reserved for questions from the Court and other

25     concluding (indiscernible)

1          Your Honor, there's been some dispute regarding

2     time allocation amongst the parties, mainly as to whether

3     there's sufficient time to complete the hearing today.  If we

4     are unable to complete the hearing today, we, the plan

5     proponents, are amenable to adjourning the hearing and

6     concluding it on another day.  Although we hope very much to

7     be in a position to have Your Honor confirm the plan today.

8          Does that proposed order of presentation work for

9     the Court?

10          THE COURT:  It does, if the opening remarks are

11    brief.

12          MR. ZUMBRO:  They are.  It will be roughly -- well,

13    we'll see.  They're not super-brief, and we'll do our best,

14    Your Honor.  Thank you, Your Honor.

15          Your Honor, it's been a long and winding path to

16    get to where we are today in this complex and unusual case.

17    And frankly, I'm pleasantly surprised that we are able to

18    stand before you today, asking the Court to confirm a largely

19    consensual plan.  That fact itself is rather remarkable,

20    given where these cases started almost three years ago.

21          I won't spend a lot of time on background, which

22    the Court is very familiar with at this point, but a couple

23    of things to note:

24          This is an exceptional case with exceptional facts.

25    I'm not aware of any comparable case where the actions of a

1  single person, a single man, brought down an entire company.

2  The mess that Harvey Weinstein left behind has been

3  exceedingly difficult to attempt to clean up.  He left

4  behind, not only financial destruction, but also emotional

5  distress and physical trauma.

6          While a bankruptcy court is a court of equity,

7  there are limits to what even a bankruptcy court can do in

8  exceptional circumstances like the ones presented by these

9  cases.  But today we have the opportunity to successfully

10  resolve these cases.

11          Confirming the plan would not only give effect to

12  the will of the overwhelming majority of creditors in these

13  cases -- approximately 83 percent of the holders of sexual

14  misconduct claims, and over 96 percent in amount and number

15  of general unsecured claims voted to approve the plan -- but

16  would also complete the process of maximizing recoveries for

17  creditors of these estates.

18          That process began with a Section 363 sale, with

19  which these cases began.  While that process wasn't easy, we

20  were able to bring in almost $300 million, which allowed the

21  debtors to satisfy all secured claims.  There wasn't much

22  left after the secured claims were satisfied.  But through

23  the hard and persistent work of the debtors and the

24  creditors' committee, we have been able to bring in another

25  35 million, which will fund the seventeen-million-dollar

1    sexual misconduct claim pool and allow some recovery for the

2    other general unsecured creditors.

3          Your Honor, absent the global settlement

4    incorporated in the plan, the debtors and the committee

5    firmly believe that the almost certain result would be no

6    economic recovery whatsoever for the survivors of Harvey

7    Weinstein's (indiscernible)

8          For reasons I'll discuss in more detail below, the

9    objectors' pot of gold theory of this case, either *vis-a-vis*

10   the insurance companies or the (indiscernible) former

11   directors and officers simply does not comport with reality.

12         The sole objection to the plan is brought on behalf

13   of four women:  Ms. David, Ms. Huett, Ms. Mcbain, and Ms.

14   Canosa.  Of those four, only Ms. David and Miss Canosa have

15   brought claims against the former directors and officers,

16   seeking to hold them liable for Harvey Weinstein's

17   misconduct.

18         The reality is that two separate Federal District

19   Courts have (indiscernible) at the motion to dismiss stage,

20   dismissed all claims against each and every former directors

21   and officers other than Harvey Weinstein.  Your Honor, those

22   decisions show that there is no (indiscernible) claims to

23   believe they can get large recoveries by suing the debtors'

24   former directors and officers.  Those direct tort claims have

25   failed.  And to the extent anyone attempts to bring a

1    Caremark-type claim, these are exceedingly challenging to

2    prevail upon under Delaware law.

3            As we noted in our confirmation brief Chancellor

4    Allen famously remarked in Caremark that to prove liability

5    for failing to monitor corporate affairs, quote:

6            "-- possibly the most difficult theory in

7    corporation law upon which a plaintiff might hope to win a

8    judgment."

9            That's at 698 A.2d 959, Page 967.

10           Similarly, the notion that a corporate insurance

11   policy is going to cover acts (indiscernible) or sexual

12   assault (indiscernible) the evidence we will submit -- the

13   policies themselves and the related coverage denial letters -

14   - shows that criminal acts and intentional torts are excluded

15   from coverage under the company's insurance policies.

16           The insurance companies (indiscernible) objection

17   (indiscernible) assure the Court are in no way pulling the

18   puppet strings of the debtors or the committee, are

19   contributing to the settlement (indiscernible) and avoid the

20   cost of litigation.  But the reality is that insurance

21   coverage is likely not available to cover any of the sexual

22   misconduct claims.

23           The plan, on the other hand, provides meaningful

24   financial recoveries for the survivors of Harvey Weinstein's

25   sexual misconduct.  Individual recoveries will likely average

in the mid-six-figure range, and may well be as high as seven

figures.  The plan will limit all risk costs of litigation

and permit an orderly, timely, and private resolution of

sexual misconduct claims.  Compared to the alternative messy,

uncertain, public, painful litigation that will take years

and will likely and unfavorably for the survivors

(indiscernible) approved plan represents a tremendous outcome

for these cases.

Turning back to the sole objection to the plan,

Your Honor, it would be neither fair, nor equitable to allow

a small minority of holdout claimants to derail the plan and

override the will of the overwhelming majority who voted in

favor of the plan (indiscernible) wish to receive the benefit

of the global settlement.  The (indiscernible) certain

recovery that's supported by the vast majority of claim

holders, while preserving claims that a small minority wishes

to pursue and that are very unlikely to result in any

monetary recovery.

Your Honor, the difficulty here is that preserving

the likely worthless claims for the benefit of

(indiscernible) necessarily means destroying recovery for the

37 women who voted in favor of the plan (indiscernible) as I

will discuss further below, unlike (indiscernible) third-

party releases are nice to have.  Here, they are a must have

for the sexual misconduct claims or there is no plan.

1          That said, the plan has been carefully designed to

2     balance the equities.  Under the plan, any survivor of Harvey

3     Weinstein who values having the ability to pursue claims

4     against him more than an immediate financial recovery has the

5     absolute right to do.  That is because all releases of Harvey

6     Weinstein under the plan are 100 percent optional, voluntary,

7     and consensual.  Under the carefully constructed architecture

8     of the plan, no woman is required to provide a release to

9     Harvey Weinstein unless she affirmatively elects to do so.

10          And to make that choice as informed, knowing, and

11    voluntary as possible, the plan contains an extraordinary

12    provision.  The decision to release Harvey Weinstein or to

13    not release Harvey Weinstein does not have to be made until

14    after the claims examiner has determined the liquidated value

15    of each holder's sexual misconduct claim.

16          Yes, a woman who chooses to preserve her ability to

17    have her day in court against Harvey Weinstein receives a

18    significantly reduced recovery under the claims procedures.

19    But given that, one, Harvey Weinstein is the central bad

20    actor who directly caused all of the alleged harms and he's

21    the person against whom claims are legally (indiscernible);

22    and two, women who do not choose to release Harvey Weinstein

23    maintain the right to see insurance coverage for any judgment

24    they may obtain (indiscernible) that result is neither

25    surprising, nor unfair.

1          Your Honor, we should not let this opportunity for

2     favorable closure of this really ugly story to slip away,

3     particularly because there is no reason to.  As a legal

4     matter, the plan we are presenting to the Court today can and

5     should be approved by the Court.

6          Your Honor, the main objection to the plan, really,

7     the only legally colorable objection is to the third-party

8     releases and injunction.  Given the voting results in the

9     sexual misconduct claims class, these releases are largely

10    consensually.  But it is true that we are asking the Court

11    today to approve non-consensual third-party releases and

12    injunctions for the small minority of holders in Class 4 that

13    have not voted in favor of the plan.

14         The Third Circuit in Millennium, 945 F.3d 126 -- a

15    recent 2019 case -- very clearly answers a specific question

16    of whether a Bankruptcy Court, without running afoul of

17    Article III of the United States Constitution, can confirm a

18    Chapter 11 plan containing non-consensual third-party

19    releases and injunctions.  And the answer to that question is

20    yes.  On the specific exceptional fact of that case, the

21    third party -- excuse me -- the Third Circuit held that the

22    Bankruptcy Court was permitted to confirm a plan because the

23    releases and injunctions were integral to the plan.  In

24    Millennium, the plan proponents insisted on comprehensive

25    relief with an injunction as a condition of funding the plan,

absent which the result would have been a value-destructive

Chapter 7 liquidation.

Going all the way back to Master Mortgage, and I'll

quote:

"Just as the settlement is the linchpin of the

plan, the injunction is the cornerstone of the settlement."

That's Master Mortgage, 168 B.R. 930, at 938.

Those are precisely the circumstances here.  As I

stated at the disclosure statement hearing, the third-party

releases and injunctions for the sexual misconduct claims are

the *sine qua non* of this plan.  And we submit that, under

Millennium, there is no question that the Court has

authority, this Court has the authority to approve them.  In

limited and exceptional circumstances, such as those

presented by this case, where, absent them, the plan would

fail, non-consensual third-party releases and injunctions are

permissible under Third Circuit law.

Your Honor, the objectors are just plan wrong that

Bankruptcy Courts can only approve non-consensual third-party

releases in asbestos cases under Section 524(g).  Limiting

non-consensual third-party releases to asbestos cases is

simply not the law in the Third Circuit.  Millennium itself

did not involve asbestos claims, and we do not contend that

asbestos-containing products are at issue in this case.

Under Third Circuit law, this Court can approve the plan

18

1    release and injunction provisions under the specific

2    exceptional facts of these cases.

3         Now that we've established that the Court can

4    approve the plan, the question is:  Should the Court approve

5    the plan.  Continental and Millennium provide the answer to

6    that question, which is a resounding yes.  Continental, 203

7    F.3d 203, at Page 214, established that the hallmarks of

8    permissible non-consensual releases are fairness, necessity

9    to the reorganization, and specific factual findings that

10   support these conclusions.

11        Like with the asbestos point, the objectors attempt

12   to make a lot of hay about how the plan is a Chapter 11

13   liquidation plan, rather than a plan of reorganization.  But

14   that argument is unavailing.  What matters is whether the

15   releases are fair and necessary.

16        Courts in this Circuit have approved plans of

17   liquidation containing non-consensual third-party releases,

18   where such releases are fair and necessary.  In our

19   confirmation brief, we cite to In Re (indiscernible) which is

20   WL -- Westlaw -- 2582976 and In Re United Steel Enterprises,

21   Westlaw 1025398, which is a Bankruptcy District of New Jersey

22   case.  The objectors have not provided the Court with a

23   single case where a court has denied non-consensual third-

24   party releases simply because they were contained in a plan

25   of liquidation.

1          And as to fairness, the releases in the plan are

2     fair.  The corporate directors and officers are waiving their

3     (indiscernible) claims against the insurance companies and

4     contributing well in excess of $10 million.  And the

5     insurance companies are providing tens of millions of dollars

6     to fund the plan.  In other words, each of the settling

7     parties who is receiving a release has made a substantial

8     contribution to the plan.

9          Under the liquidation analysis attached to the

10     disclosure statement that we will be submitting into evidence

11     today, recoveries under the plan will be significantly

12     greater than they would be in a Chapter 7 liquidation, which

13     is what would occur if the plan were not confirmed today.  In

14     other words, the consideration provided in exchange for the

15     releases is fair.

16          The Genesis case we cite in our confirmation brief,

17     266 B.R. 591, at 608, supports the proposition that

18     contributions (indiscernible) here, holders of the sexual

19     misconduct claims, to receive more than what they are to

20     receive in a Chapter 7 liquidation constitutes fair

21     consideration under a Continental analysis.

22          And importantly, the class impacted by the releases

23     has overwhelmingly voted to accept the plan, eighty-three

24     percent in favor.  Thirty-seven women who hold sexual

25     misconduct claims have voted in favor of this plan, and only

1    four woman -- all represented by the objectors' counsel --

2    have objected to this plan.  While creditor support is not,

3    by itself, dispositive, it is a very important factor in the

4    analysis by courts, both in this Circuit and others.  Indeed,

5    some courts consider it to be the single most important

6    factor.

7                Your Honor herself stated, at the hearing on the

8    objectors' motion to convert these cases, quote:

9                "It is up to the creditors to decide whether or not

10   a plan is in their best interests."

11               The creditors have now spoken through a record of

12   this class vote, Your Honor.  And we urge the Court to

13   respect their decision.

14               The releases in the plan are also necessary.  Like

15   in Millennium, the releases are essential to the plan.

16   Without the releases and injunctions, there would be no plan,

17   and there would be little likelihood of any financial

18   recovery for the holders of sexual misconduct claims and

19   general unsecured creditors.

20               Your Honor, the evidence we have submitted and will

21   be moving into the record -- the Ivona Smith declaration, the

22   plan support agreement, the voting declaration, and the

23   letters from the insurance companies (indiscernible) sexual

24   misconduct claims are not covered by the insurance policies,

25   among others -- will provide the Court with a clear basis for

1    the specific factual findings necessary to support

2    (indiscernible) thus, Your Honor, we submit that, based on

3    all of the facts and circumstances present here, this case is

4    here is the exceptional case that satisfies the Millennium

5    and Contintenal standards.

6        Your Honor, our confirmation brief walks through in

7    detail how the plan proponents have carried their burden

8    (indiscernible) specific Section 1129 confirmation

9    requirements, so I will rest on our papers for those points,

10    unless the Court has any questions or points that you would

11    like me to specifically address.

12        THE COURT:  No, thank you.

13        MR. ZUMBRO:  Thank you, Your Honor.

14        If not, at this point, I will turn the virtual

15    podium over to Ms. Grassgreen on behalf of the committee, and

16    I will reserve time for rebuttal, after the objectors have

17    made their presentation.  Thank you --

18        THE COURT:  Thank you.

19        MR. ZUMBRO:  -- very much, Your Honor.

20        THE COURT:  Thank you.

21        Ms. Grassgreen, you're still on mute, as well.

22        MS. GRASSGREEN:  Sorry, Your Honor.  Can you hear

23    me okay?

24        THE COURT:  I can hear you now.

25        MS. GRASSGREEN:  Sorry.  Okay.

22

1          Good afternoon, Your Honor.  Debra Grassgreen of

2     Pachulski, Stang, Ziehl & Jones on behalf of the Official

3     Committee of Unsecured Creditors.

4          I'm going to limit my comments to the release and

5     injunction issues because, in my mind, that's really the

6     central issue here.  And I don't want to repeat the arguments

7     that Mr. Zumbro just made.  Suffice it to say that the

8     committee joins in those arguments.

9          But before I go through the releases, I'd like to

10    give you a very high-level summary of the voting integrity

11    report, which I filed and certified and which will be moved

12    into evidence.  Is that an okay way to proceed?

13         THE COURT:  That's fine.  I did get it, and thank

14    you for doing that.

15         MS. GRASSGREEN:  You're welcome.

16         Your Honor, as to the voting report, you'll recall

17    at the disclosure statement stage that one of the concerns

18    that was identified by the objectors was that voting would be

19    skewed somehow by invalid claims.  And in order to address

20    that objection in a way that did not invade the privacy of

21    survivors -- which was really important -- I agreed to

22    conduct a detailed review of the claims and to reach out and

23    verify the claims were within the Weinstein era; i.e, not

24    before The Weinstein Company existed -- and there were plenty

25    claims also in the Miramax era.  And I also agreed to verify

1    that none of the voting claims were facially invalid because

2    they didn't even allege a sexual misconduct claim.  The point

3    of the exercise was not to adjudicate any allegations or to

4    get into the allegations in depth, but just to confirm that

5    each of the parties asserted facts that, if proven, would

6    constitute a sexual misconduct claim under the plan.

7         As laid out in the report, we were very methodical

8    in our review.  We did identify three claims that actually

9    voted, and a few others that didn't vote, that were not a

10   sexual misconduct claim because they were Miramax era claims.

11   Two of the Miramax era claimants that voted subsequently

12   withdrew their claims.  And the third one, as the report sets

13   forth, did vote, but taking that vote away wouldn't change

14   the outcome because it was a yes vote for the plan.

15        But what I really wanted to note, that, in

16   undertaking this review, I had the opportunity to speak to

17   some of the individual survivors on a really personal level,

18   and it was humbling, it was really humbling, Your Honor.  And

19   the suffering here is very real.  I was already convinced of

20   the need that these women needed closure.  But after making

21   those calls, I'm even more convinced than I was, you know,

22   coming into this.

23        So I don't know if you have any questions about the

24   voting report.  I don't want to get into too much depth.

25   Obviously, it's confidential.  I do have with me all of the

1    detail and the background and the notes because we did

2    summarize it in the notes, if you have any questions about

3    it.  But if you don't, I'll just move on to the release

4    issue.

5                THE COURT:  No, I had no questions, and I think it

6    was comprehensive.  Thank you.

7                MS. GRASSGREEN:  Thank you.

8                So, as Mr. Zumbro noted, Your Honor, the central

9    question you need to decide is whether the unique

10   circumstances of this case justify the third-party releases

11   and support approval of a global settlement.  There are other

12   arguments that have been made by the objectors, but I think

13   it all really boils down to the third-party releases.

14               And on its face, it seems like a really hard call,

15   a close call, a call that requires you -- and I'm glad it's

16   you and not me -- to balance the needs and desires of the

17   nearly 40 survivors who suffered unthinkable harms, but voted

18   for the plan, with the wishes of the 4 survivors who suffered

19   equally horrific harms and objected to the plan.  But it

20   wasn't a close call for the committee, Your Honor.  And we

21   actually don't think it should be a close call for you, and

22   I'd like to explain why.

23               First, I want to be a hundred percent clear.  I

24   have a tremendous amount of sympathy with the women that are

25   objecting.  No one here is minimizing what they've gone

1  through.  Having their day in court is important for them,

2  and we understand and respect that.  But this plan gives them

3  that day in court against the real bad guy.  And it gives

4  them the ability to pursue insurance proceeds on account

5  (indiscernible)

6        But we also have to consider the rest of the women,

7  the ones who just want to move on with their lives.  And the

8  last thing they want is to have to go through years of public

9  litigation and risk getting nothing at the end.  They want to

10  stop the suffering, they want closure.  The women who chose

11  certainty and privacy voted overwhelmingly to support this

12  plan, and we have to equally understand and respect their

13  choice, as much as the four objectors that are here today.

14        And I heard the voices of these women, I've spoken

15  to many of these survivors, and it really hit home for me

16  when, simply getting an email from me to set up a call to

17  discuss their claims for the voting report triggered anxiety

18  and distress.  We wrote the emails, Your Honor, in the most

19  general way possible, professional way possible.  But just

20  getting that email, I had more than one woman reach back out

21  to me and say you have no idea how upsetting it was to even

22  read your email and see the name "The Weinstein Company" on a

23  piece of paper.  That is how triggering it is for these

24  women.  These women need closure.  And you have heard that

25  from them, too, not in the same way I did, on a phone call,

1    but with their votes.

2            So, with that backdrop, I just want to go through

3    the points, some of which you've heard from Mr. Zumbro, that

4    -- of why the third-party release -- releases here -- which

5    are narrow third-party releases -- can and should be approved

6    because they're necessary and fair.

7            And I'd also like to share with you why the

8    committee, who -- I want to remind everybody the committee

9    includes sexual misconduct claim holders and trade vendors.

10   This was a mixed committee.  And they're fiduciaries to all

11   of the creditors.  The committee didn't see it as a close

12   call, at all.  And in fact, the trade creditors on the

13   committee, not only supported the plan, but they put their

14   money where their mouth is.  The trade creditors

15   overwhelmingly voted -- 96 percent of those that voted -- for

16   the plan.  And you're not seeing any trade creditors

17   objecting.

18           And not only are the trade cred -- are the insurers

19   and the former representative contributing to the settlement,

20   Your Honor, but the other general unsecured creditors are

21   providing consideration because they're allowing for a fixed

22   pot that's untouchable by administrative expenses, a fixed

23   amount to go to the sexual misconduct claims, while the trade

24   creditors' recovery is not the same pro rata amount.  And you

25   can see that all in the liquidation analysis and the recovery

1    analysis.

2          But at the end of the day, you've got to be

3    satisfied that we meed the standards that the third-party

4    releases are necessary, fair, and that we have the facts here

5    to justify their approval.  We think you can make that

6    finding, and here's why.  I'll just try to go through it as

7    quickly as possible.

8          The first factor is necessary.  The objectors argue

9    that "necessary" means necessary to a business

10   reorganization, in the traditional sense; and that, because

11   we don't have an operating business here, we can never meet

12   necessary.  And I disagree with that, Your Honor.  And if you

13   read Millennium, in particular, they talk about necessary to

14   the reorganization of the, quote, "debtor/creditor

15   relationship."

16         Here, the objectors are right, there's no operating

17   business.  But what is our business?  Our business is

18   managing litigation.  And the releases are necessary to

19   resolving that litigation.  So I think that we meet the

20   necessary step because the -- as Your Honor heard from Mr.

21   Zumbro, there isn't a settlement without these releases.

22         In fact, I think it's actually pretty remarkable

23   that we have a settlement where these insurers are not

24   getting complete world peace, Your Honor.  They're getting

25   partial peace.  Any survivor that doesn't want to release

1    Harvey Weinstein gets to pursue him and the insurance that

2    stands behind his claims.  But the insurers were clear in the

3    plan support agreement, they're not going to do this without

4    any peace.  And without the insurers' contribution, there's

5    just no settlement.  So we certainly can meet the standard on

6    necessary.

7            The next consideration is fair.  This factor, in my

8    mind, is why approval of the plan is not a close call, and

9    why the plan received the overwhelming creditor support that

10   it did because fair is where that balancing I talked about in

11   the beginning comes in.  We can't just look at these third-

12   party releases in a vacuum.  What's fair, if we have

13   unlimited insurance proceeds and no viable defenses, is

14   completely different from what's fair in the context we have

15   here, with limited insurance, subject to complete defenses,

16   and claims that the former -- of the former representative,

17   which have not withstood scrutiny in the courts where they've

18   been considered.

19           The committee believes the settlement is fair, that

20   it (indiscernible) the women who want closure to have their

21   day in court against the wrongdoer, Harvey Weinstein, and it

22   allows them to seek to collect from applicable insurance

23   coverage, if they think they can overcome the defenses,

24   which, as you heard from Mr. Zumbro, we don't.  But at the

25   same time, the rest of the survivors, the ones who got that

1   email from me and it just brought about an incredible amount

2   of emotion, the ones that didn't even want to get on the

3   phone with me to answer the most basic questions, it gives

4   them certainty, it gives them closure, it gives them a

5   monetary recovery, and it respects their privacy.  It lets

6   them start to heal.

7           And as I mentioned, this really hit home when I

8   made those calls to verify the voting.  Like you, I read

9   everything in the newspaper, I heard about it from the

10  lawyers.  But honestly, Your Honor, there is just nothing,

11  nothing like hearing it directly from one of these women.

12          So the settlement is also fair because the former

13  representative claims that are being released, these claims

14  are highly questionable value.  You heard Mr. Zumbro explain

15  to you that only one has survived a motion to dismiss.  Well,

16  tellingly, the single survivor whose claims against a former

17  representative was not dismissed at the motion to dismiss

18  claim -- and by the way, it only survived as to one former

19  director, Robert Weinstein; it was dismissed as to the rest

20  of the former reps -- that's a committee member.  It's a

21  committee member that, even though she has that claim that

22  survived, nonetheless supports the plan.

23          So now let's consider the alternative because we

24  can't consider whether this is fair without the alternative.

25  The alternative is not enough money to fund administrative

1    expenses.  The case is converted to Chapter 7, where the

2    thirty-million-dollar D&O tower would likely not be available

3    because it will be exhausted by defense costs, if it hasn't

4    already.  And in a Chapter 7, because the sexual misconduct

5    claims share *pari passu* with the trade creditors, the trustee

6    would have to recover without insurance -- I calculated,

7    based on the liquidation analysis, Your Honor -- $60 million

8    on the former representative claims, just to get the same

9    recovery that's proposed here, and multiples to do any

10   better.

11        So I would suggest, Your Honor, that forcing the

12   women who want closure to take the risk of years of

13   litigation and uncertain recovery isn't fair, and it's

14   certainly not fair compared to the plan that we have on the

15   table to let the ones who want closure get it and the ones

16   that want to pursue Harvey Weinstein continue the litigation.

17        The final factor, Your Honor, obviously, is

18   exceptional facts.  And this is a place where the objectors

19   and the debtors agree that we need to show exceptional facts.

20   We disagree about whether those facts are present here.  But

21   the Millennium case is pretty telling here, and it makes it

22   clear that these decisions have to be made on the facts of

23   the case, and they shouldn't establish precedent.  And here,

24   as in Millennium, we believe that the decision will be

25   limited to the facts of this case.

1          The whole (indiscernible) the whole context in

2    which this -- these claims arise is unique.  I truly hope we

3    never see another case where a single individual like Harvey

4    Weinstein has the power, the power to victimize so many women

5    and singlehandedly destroy a valuable business.  Because of

6    the bravery of the victims here, the survivors here and the

7    Me Too movement that they sparked, hopefully that will never

8    happen again.

9          The other unique fact is what I talked about

10   before, the partial peace.  This isn't full world peace for

11   these insurers.  The insurers are taking risk here.

12          And the third is that, with the wasting D&O policy,

13   the asserted coverage (indiscernible) and the existence of

14   the other trade debt, notwithstanding all of that, most of

15   this money is getting directed to the most deserving

16   claimants, the abuse survivors.  The overwhelming trade

17   support for that fixed fund, which meant that the trade

18   creditors took a lot of risk in this, shows that the trade

19   viewed this plan as doing right by survivors, and as that

20   being important.

21          So, taken together, Your Honor, all of these

22   circumstances demonstrate that the plan proponents have met

23   their burden of establishing the propriety of the third-party

24   releases on the very specific facts of this case; and,

25   accordingly, the committee urges you to approve the third-

1    party releases and otherwise confirm the plan.

2            I don't have anything further, unless you have any

3    questions for me.

4            THE COURT:  I have no questions.  Thank you.

5            MS. GRASSGREEN:  You're welcome.

6            THE COURT:  And who do we have speaking for your

7    committee member.

8        (Participants speak simultaneously)

9            THE COURT:  Who is it?

10           MS. HARRISON:  That's me.  That's me, Your Honor,

11   Genie Harrison from Los Angeles.  Are you able to hear me?

12           THE COURT:  I can hear you.  Are you on -- is your

13   video on?

14           MS. HARRISON:  It is, yes.  Are you able to see me?

15           THE COURT:  No.  Ah, there you are.

16           MS. HARRISON:  (Indiscernible)

17           THE COURT: All right.  Okay.

18           MS. HARRISON:  Wonderful.  Thank you so much.

19   Again, this is Genie Harrison from Los Angeles.  And thank

20   you for allowing me to make some very brief statements.  I

21   represent Sandeep Rehal, who has been on the unsecured

22   creditors' committee from the inception of the committee, and

23   I have been her attorney, along with my co-counsel Laura

24   Schnell from New York.

25           During this entire time, we have been directly and

1    extensively involved in the proceedings and all of the

2    settlement discussions.  My client Sandeep Rehal has paid

3    very close attention to all of the proceedings and settlement

4    discussions.  She's smart, she's thoughtful, and she takes

5    her fiduciary duty very seriously.  She has no doubt that

6    this plan is in the best interest of the victim.  She

7    believes the amounts that are going to be paid out under this

8    plan will, in fact, be fair.  And she understands this,

9    especially through -- in light of the very substantial

10   coverage disputes that exist.

11         My co-counsel and I personally attending the

12   mediations and settlement discussions, and we have no doubt,

13   in our fiduciary capacity, about this plan being in the best

14   interests of the victim.

15         Your Honor, I also represent four other women who

16   were raped and sexually abused by Harvey Weinstein.  I have a

17   total of five clients as against the four who are objecting.

18   And I will tell you that the ability not to release Harvey

19   Weinstein was material, especially to one of my clients.

20   However, none of my clients are -- had any problem with the

21   other releases, the third-party releases.  So I do think that

22   this plan is directed at the main concerns of my client and

23   addresses -- my clients and addresses those.  All of my

24   clients see very clearly, without a doubt, that this plan is

25   in the best interests of themselves and the victims.  They

1    have asked me hours and hours and hours of questions, which I

2    have answered at every turn.

3         Your Honor, from my clients' perspective and from

4    our perspective on the unsecured creditors' committee, this

5    is not a close call to us.  My clients view this as a no

6    brainer, in terms of going forward and approving the plan, so

7    that they can have closure.  And that is from a client's

8    perspective, obviously not a legal analysis.  But I thought

9    it was important for Your Honor to hear from our perspective.

10   And I appreciate the Court's time in that regard.  Thank you.

11        THE COURT:  Thank you.

12        I understand Ms. Pullman --

13        MR. ZUMBRO:  Yes, Your Honor.

14        THE COURT:  -- wishes to be heard?

15        MR. ZUMBRO:  I believe Ms. Pullman from the New

16   York Attorney General's Office.

17        THE COURT:  Thank you.

18        MS. PULLMAN:  Thank you, Your Honor.

19        Ever since the New York Attorney General's Office

20   filed suit in 2018 against Harvey Weinstein, Bob Weinstein,

21   and The Weinstein Company, for sexual harassment of TWC

22   employees, we've worked for the last three years toward one

23   goal:  Obtaining the greatest possible recovery under

24   difficult circumstances for the greatest number of victims.

25        These difficult circumstances have been alluded to

1  by every attorney who's spoken before me.  Obviously, it's a

2  bankruptcy, TWC, the lack of assets of Harvey Weinstein, who

3  is incarcerated; a series of court orders rejecting claims

4  against the board members; coverage exclusions in insurance

5  policies for sexual assault; and the priority of payment

6  under te D&O policy to legal fees, which now eclipse the

7  policy itself.

8         Now, despite these challenging circumstances, it's

9  now clear that the proposed plan will provide significant

10  recovery to victims.  Awards will average hundreds of

11  thousands of dollars per person.  The Attorney General's

12  Office, accordingly, believes that this plan is the greatest

13  possible recovery for the greatest number of victims.

14         More importantly, the Attorney General's Office has

15  supported the rights of the victims to say for themselves

16  what they want.  The victims have now spoken.  Well over 80

17  percent of them have voted in favor of the plan.  Our office,

18  therefore, respectfully asks this Court to respect their

19  issues and confirm this plan.

20         I would also like to just -- to discuss very

21  briefly the statements of the attorney for the objectors, who

22  have attacked this plan and the AG's Office in ways that are

23  misleading and contradictory.  As this Court knows, the

24  attorneys for the objectors have supported, from day one, to

25  tell us all what rape victims want.  And yet, at our last

1    hearing, they opposed the rights of victims to vote on this

2    plan and say for themselves what they want.

3         The attorneys for the objectors have also

4    repeatedly sought to pursue their cases against Harvey

5    Weinstein in court, saying that they alone could get an

6    enforceable judgment against him and/or the insurance

7    companies.  Now, afforded that option, they say that doing so

8    would be futile because, as the (indiscernible) have said all

9    along, Harvey Weinstein has few, if any, assets remaining,

10   and the insurance policies are unlikely to provide him with

11   any coverage for committing sexual assault.

12        Next, the attorneys for the objectors have said

13   that all they want is their day in court, so that their

14   clients can tell their story.  Now, afforded that option

15   under the plan, they say that having their day in court with

16   little likelihood of financial recovery is a waste of their

17   time.

18        Finally, and perhaps most oddly, the attorneys for

19   the objectors have come up with a pithy, but nonsensical

20   description of the option they have been afforded at their

21   insistence to forego a damages payment in exchange for the

22   right to sue Harvey Weinstein in court.  Their brief says,

23   and I quote:

24        "To preserve her right to sue Harvey Weinstein, a

25   rape victim must agree to release her alleged grievance."

1          That may sound inflammatory, but that's only

2     because it's a complete misstatement of how the plan actually

3     works.  The objectors are clearly not releasing Harvey

4     Weinstein if they wish to preserve their right to sue.  As

5     their attorneys certainly know, the victims have an option to

6     either sign a release of their claim in exchange for a

7     payment of damages, or they can forego that portion of the

8     settlement allocated to Harvey Weinstein, and refuse to

9     release Mr. Weinstein, and thereby preserve their claims.

10          This attempted obfuscation of the facts and the

11     ever-changing positions by the attorney for the objectors

12     should not be allowed to overturn the will of the victims,

13     the vast majority of whom have voted in favor of the plan.

14     This plan reflects the victim's choice.  The Attorney

15     General's Office, therefore, respectfully asks this Court to

16     let their choice prevail and to confirm the plan.  Thank you

17     very much.

18          THE COURT:  Thank you.

19          And I'll hear from the opponents.  Ms. Liu?  No --

20     there you go.

21          MS. LIU:  Good afternoon, Your Honor.  Ruby Liu

22     from the Rosner Law Group on behalf of the non-settling

23     sexual misconduct claimants.  I'm joined by my co-counsel Mr.

24     Kevin Mintzer from the Law Office of Kevin Mintzer, PC.  And

25     thank you, Your Honor, for granting the order admitting Mr.

1    Mintzer *pro hac vice.*

2           To -- I'm very mindful of the Court's time today.

3    To save time, we are not going to have any opening remarks

4    and just go straight into evidence and reserve time for our

5    argument at the end.

6           THE COURT:  All right.  Thank you.

7           Then I'll turn it back over to Mr. Zumbro.  Are you

8    presenting the case (indiscernible)

9           MR. ZUMBRO:  Yes, Your Honor.  I'll turn it over

10   (indiscernible) my colleague, my partner Lauren Moskowitz

11   will be moving the submission of the evidence.

12          MS. MOSKOWITZ:  Good afternoon, Your Honor.  Can

13   you see me and hear me okay?

14          THE COURT:  I can, thank you.

15          MS. MOSKOWITZ:  Thank you, Your Honor.

16          At this time, I would like to move into evidence a

17   number of declarations and exhibits that were submitted in

18   support of our confirmation motion.

19          THE COURT:  Okay.

20          MS. MOSKOWITZ:  First, we have the declaration of

21   Ivona Smith, which is Docket Number 3185.  That does not have

22   any attachments.  But we'd like to move that into evidence

23   and we've made her -- Ms. Smith available for cross-

24   examination.

25          THE COURT:  All right.  Do the objecting parties

1    wish to cross-examine Ms. Smith?

2              MS. LIU:  Yes.

3              THE COURT:  All right.  Is she on the Zoom?

4         (Participants speak simultaneously)

5              THE WITNESS:  I am here.  I am here.

6              THE COURT:  All right.  Let me find you then.

7              MS. MOSKOWITZ:  And Your Honor --

8              UNIDENTIFIED:  (Indiscernible)

9              MS. MOSKOWITZ:  -- would you like to treat her

10    declaration as her direct testimony, admitted into evidence,

11    and then tender her for cross?

12              THE COURT:  Yes.

13              MS. MOSKOWITZ:  Thank you.  I so move her

14    declaration into evidence as her direct testimony.

15              THE COURT:  All right.  Well, let me have Ms. Smith

16    given the oath by our clerk.

17              THE CLERK:  Ms. Smith, could you please raise your

18    right hand.

19    IVONA SMITH, WITNESS FOR THE DEBTORS, AFFIRMED

20              THE CLERK:  Please state your full name and spell

21    your last name for the record.

22              THE WITNESS:  My full name is Ivona Smith, that's

23    S-m-I-t-h.

24              THE CLERK:  Thank you.

25              THE COURT:  Thank you.

Smith - Cross                    40

1          And can you confirm for the record that your

2     declaration is what you would have testified to, had you been

3     called on direct and asked those questions?

4               THE WITNESS:  Yes, I confirm that.

5               THE COURT:  All right.  You're tendered for cross

6     then.

7          (Smith Declaration received in evidence)

8               MR. MINTZER:  Your Honor, this Kevin Mintzer for

9     the David Plaintiffs.  May I proceed?

10              THE COURT:  You may.

11                          CROSS-EXAMINATION

12    BY MR. MINTZER:

13    Q    Ms. Smith, I'm going to be asking you questions on

14    behalf of the David Claimants.  I would ask you to answer my

15    questions with a yes or no whenever possible.  And since

16    we're doing this over Zoom instead of in court, I would ask

17    if you could please say on the record at any point if you're

18    consulting a document or if you are looking at any kind of

19    electronic communication on your phone or on your computer.

20    Is that acceptable?

21    A    That is acceptable.

22    Q    Okay.  And also, as you've already started to do, please

23    let me finish my questions entirely, and I'm going to do my

24    best to let you finish all of your answers.  Is that clear?

25    A    Yes.

1    Q    Okay.  And the declaration that was just admitted into

2    evidence for purposes of this confirmation hearing was an

3    eleven-page declaration that you signed, correct?

4    A    Correct.

5    Q    And that declaration contained information that was

6    based on either your review of documents, information

7    provided to you by the debtors' advisors, or your opinion

8    based on experience and knowledge and information concerning

9    the debtors' cases, correct?

10   A    Correct.

11   Q    Okay.  And you are currently a Board Member of The

12   Weinstein Company.  Is that right?

13   A    That is correct.

14   Q    You were hired to serve as a board member in April of

15   2018.

16   A    Yes.

17   Q    And you were hired as a board member by Robert

18   Weinstein, among others.  Is that right?

19   A    Correct.

20   Q    When you were hired by Robert Weinstein, he publicly

21   commented that he was delighted to welcome you to the Board

22   of The Weinstein Company.  Do you recall that?

23   A    Initially, he was not so delighted.  I was actually

24   hired by Robert Weinstein; however, it was at the request of

25   the creditors' committee.

Smith - Cross                           42

1    Q    Okay.  But do you remember him making a public statement

2    and issuing a press release saying that he was delighted to

3    have you to the board?  Yes or no.

4    A    I -- I don't recall the -- I don't recall the specifics

5    of how he felt.

6    Q    And under the plan that's been proposed that's under

7    discussion today, as a Board Member of the Weinstein Company,

8    you are a released party.  Is that right?

9    A    Correct.

10   Q    And under the plan, as a board member, you are receiving

11   an exculpation.  Is that right?

12   A    That is correct.

13   Q    The proposed plan before the Court is a plan of

14   liquidation.  True?

15   A    It's a Chapter 11 plan of liquidation, yes.

16   Q    And it's a plan of liquidation because the debtors are

17   not currently operating and has no plans to operate in the

18   future.

19   A    That is correct.

20   Q    And the plan is not filed to save anyone's job, right?

21   A    That is correct.

22   Q    The debtors have no current employees.

23   A    Correct.

24   Q    And the debtors are not generating any revenue from

25   business operations.

1    A    That is correct.

2    Q    Okay.  Now you have many years of experience serving as

3    an independent director for companies that are reorganizing.

4    Is that right?

5    A    I would not call it "many years of experience," no.

6    It's less than one year of experience.

7    Q    You -- have you served as an independent director for

8    any other company that has been in the reorganization

9    process?

10   A    Not before 2020.  Before 2020, it was just The Weinstein

11   Company.

12   Q    Are you a reorganization professional; would you

13   describe yourself in that way?

14   A    Yes.

15   Q    Okay.  And you work for a company called Drivetrain?

16   A    Correct.

17   Q    And what does Drivetrain do?

18   A    Drivetrain primarily works on post-bankruptcy trusts,

19   and I've been with them for four years.

20   Q    Okay.  Now would you agree that sexual assault victims

21   differ from most other general unsecured creditors, in terms

22   of the type of emotional harm that they have experienced?

23   A    Yes.

24   Q    And as a Board Member for The Weinstein Company, as an

25   estate fiduciary, have you educated yourself about what it

1    means to be "trauma-informed"?

2    A    I -- I -- no, I don't know what "trauma-informed"

3    technically means, if that's a technical description of

4    anything.

5    Q    Okay.  So you're not familiar with that phrase?

6    A    No, not as -- not as an official phrase.  No.

7    Q    Okay.  Would you agree that sexual assault, by its very

8    nature, involves unwanted sexual touching?

9    A    I would agree.

10   Q    And few experiences deprive an individual of control

11   more than sexual assault.  Is that true?

12   A    Few experiences -- can you repeat that?

13   Q    Few experiences of -- a human being can have deprive a

14   person of control more than being sexually assaulted.  Is

15   that a fair statement?

16   A    Yes, that would be fair (indiscernible)

17   Q    And the --

18   A    Yes.

19   Q    -- plan in this case, if confirmed, will force some

20   victims of sexual assault to release legal claims against

21   their will.  Is that right?

22   A    Some.  It will force to release, yes, some legal -- yes,

23   yes.  Some.

24   Q    And in your declaration, on -- in Paragraph 11, when you

25   refer to "non-consensual third-party releases," what that

1    means, in plain English, is forcing sexual assault victims to

2    release claims against people they want to try to hold

3    responsible for what happened to them at The Weinstein

4    Company.  Isn't that true?

5    A    I'm sorry.  I'm going to just turn to my -- I am -- I am

6    referring to my declaration --

7    Q    Thank you.

8    A    -- that is in front of me.

9    Q    Thank you.

10   A    So can you repeat that question again --

11   Q    Yes.

12   A    -- now that I'm looking at that section?

13   Q    Sure.  When you refer to "non-consensual third-party

14   releases," what that really means is requiring, forcing a

15   sexual assault victim to release claims against people that

16   they want to hold responsible and to accept a settlement that

17   they don't necessarily want.  Isn't that true?

18   A    The sexual assault victims in this case are part of a

19   class, so they have a -- the class, as a whole, has a voice.

20   Q    You understand that there are certain objectors to the -

21   -

22   A    Yes.

23   Q    -- to the proposed settlement, correct?

24   A    Correct.

25   Q    And I believe that a number -- this was repeated earlier

1    today -- that there were only four people who have filed

2    objections.  But in fact, there were eight people, eight

3    survivors that voted against the plan, correct?

4    A    Correct.

5    Q    Okay.  And those individuals, by providing non-

6    consensual third-party releases, will have to give up certain

7    claims that they have that they don't want to give up, right?

8    A    Yes --

9    Q    If the --

10   A    -- it's (indiscernible)

11   Q    -- plan is confirmed.

12   A    True, except that the releases aren't being given up in

13   a bubble, right?  You're getting consideration for those

14   releases --

15   Q    But --

16   A    -- (indiscernible)

17   Q    Let's -- we'll get --

18   A    Yes.

19   Q    We'll come back to --

20   A    Yes.

21   Q    -- to what they're getting for it.

22        But my question right now is:  Do you acknowledge that

23   the non-consensual third-party releases will require certain

24   individual survivors of Harvey Weinstein to have to forego

25   claims that they want to pursue in court against third

1    parties?

2    A    Yes, that is part of the settlement.

3    Q    Okay.

4    A    Yes.

5    Q    And now did the board consider what impact the plan

6    would have on a sexual assault victim by requiring that she

7    accept something that's against her will?

8    A    Of course we did.

9    Q    Okay.  And nevertheless, you decided to go ahead with

10   the plan.

11   A    The victims were involved in the negotiation of this

12   plan the entire time.

13   Q    But you understood that there were some victims who did

14   not want to take this settlement, correct?

15   A    Correct.  But then there would be no plan.  Correct.

16   Then there would be no settlement.  The plan -- yes.

17   Q    Now we heard earlier that the debtors have pointed to

18   the fact that the plan allows for sexual assault survivors

19   who object to the plan to continue to sue Harvey Weinstein,

20   correct?

21   A    Correct.

22   Q    All right.  But if the plan is confirmed, those

23   survivors may sue Harvey Weinstein only and no one else.

24   A    That is correct.

25   Q    And they may only sue Harvey Weinstein if they agree to

Smith - Cross

1    accept a 75 percent reduction in the award that they receive

2    from the victims fund.

3    A    They can only sue Harvey Weinstein, yes, and that would,

4    yes, entail them giving up 75 percent of their payout.  Yes.

5    Q    And did the board approve that?

6    A    Yes.  The board proposed the plan, the debtor proposed

7    the plan, so yes.

8    Q    But did the board approve that mechanism, whereby, in

9    order for a victim to have -- to be able to pursue a claim

10   against Harvey Weinstein, she would have to forego 75 percent

11   of the award that she would receive in the settlement

12   process, right?

13   A    Well, yes, because, theoretically then, she would be

14   pursuing Harvey Weinstein and the insurance companies.  So

15   the insurance company will not submit the proceeds to the

16   fund if they need to now defend Harvey Weinstein.  So it's --

17   it's sort of a -- it's a complete --

18   Q    But the fact --

19   A    -- package (indiscernible)

20   Q    But Ms. Smith, the fact is, is that, in order to be able

21   to sue Harvey Weinstein, the victim has to forego 75 percent

22   of the award that she would be otherwise entitled to under

23   the settlement process.  True?

24   A    Correct.

25   Q    And would you agree that that's a strong incentive for

1    victims to not continue to sue Harvey Weinstein?

2    A    I don't have -- I don't know.  I don't know if that's a

3    strong incentive.  I think, if -- if -- I don't know.

4    Q    Well, you certainly have to acknowledge that it's an

5    incentive, correct?

6    A    Yes.

7    Q    Okay.  So Harvey Weinstein gets a benefit from this plan

8    because victims who would otherwise be inclined to pursue

9    claims against him have an economic motivation to grant him a

10   full release of claims.  Isn't that a fact?

11   A    Can you repeat that again?

12   Q    Sure.

13   A    (Indiscernible)

14   Q    Happy to.  So Harvey Weinstein gets a great economic

15   benefit from this plan because victims who would otherwise

16   sue him have a powerful economic incentive to grant him a

17   full release of claims.

18   A    I don't -- I don't -- I don't know if he gets an

19   economic benefit from this.  It's -- I'm not viewing it from

20   Harvey Weinstein's, you know, view, right?  This is -- this

21   is giving women an option.  And so, either they can choose to

22   go after Harvey Weinstein, if they want to, to have their day

23   in court, or they can choose to take the settlement from the

24   fund.  It's an option at the choice of the women.

25   Q    But you understand that Harvey Weinstein faces a number

1   of different liabilities and lawsuits from his victims,

2   correct?

3   A    Correct.

4   Q    All right.  And you would agree, as you just said, that

5   requiring the victim to forego 75 percent of the settlement

6   award that they might otherwise get is an incentive for that

7   victim to release Harvey Weinstein instead of pursuing the

8   claim against Mr. Weinstein, right?

9   A    In some cases, it may be.

10  Q    Right.

11       So he -- if -- so he has the benefit of that incentive.

12  Isn't that a fact under this plan, if it's confirmed?

13  A    In some cases, he may have the benefit.

14  Q    Okay.  And what is Harvey Weinstein contributing to this

15  plan to get that benefit?

16  A    Harvey Weinstein isn't contributing anything to this

17  plan, right?  But the insurance company is contributing to

18  the plan.

19  Q    Okay.  In your declaration --

20  A    The -- the money --

21  Q    -- at Page --

22  A    I'm sorry.  Can I just add?  The money that the women

23  are giving up is not going into Harvey Weinstein's pockets,

24  right?  The 75 percent is going back to the insurance

25  company.  So Harvey isn't economically benefitting in that

1    way.  The money is just going back to the insurance company -

2    -

3    Q    Well, Harvey --

4    A    He has a right to defend -- he's going to be defended,

5    and there might be a judgment against Harvey Weinstein, which

6    would then probably be -- be paid out, out of the insurance

7    proceeds.

8    Q    Harvey Weinstein will have fewer women suing him,

9    correct?  Because many of them are going to be incentivized

10   to take a full settlement, rather than take the 75 percent

11   discount.  True?

12   A    They're going to want, yes, the full settlement because

13   they will want to move on.  And they probably consider the

14   settlement enough.

15   Q    Right.  And so we just said that that's a benefit for

16   Harvey Weinstein.  I believe you just acknowledged that,

17   correct?

18   A    They will be (indiscernible) suing him --

19   Q    And if --

20   A    -- (indiscernible) there is a settlement, yeah.

21   Q    And it's also a fact that Mr. Weinstein is not

22   contributing anything to get that benefit from this plan.

23   A    He has an indirect benefit, so, no, he's not -- he's not

24   contributing anything.

25   Q    Okay.  Now, in your declaration, at Paragraph 4, you

1  describe being involved in a lengthy mediation process that

2  led to the plan that is being presented for the Court today.

3  Do you recall that?

4  A    I do recall that.

5  Q    And you said in your direct -- declaration at Page 5 --

6  A    Uh-huh.

7  Q         "Absent the injunctions and plan releases set forth

8  in the plan, I do not believe that the settlement parties

9  would have reached agreement on the terms of the plan support

10  agreement and settlement."

11       Is that a true statement?

12  A    That's correct.

13  Q    Now the basis for the belief that you described in that

14  sentence is that the insurance companies and the former

15  representatives have taken that position in negotiations,

16  correct?

17  A    Yes.

18  Q    But isn't it true that people often say things in

19  negotiations that they later reconsider?

20  A    I don't know if it's often true.

21  Q    Well, how about an example that we had in this case?  At

22  an earlier stage in this proceeding, on behalf of the

23  debtors, you supported the proposed class action settlement

24  that was presented before United States District Judge

25  Hellerstein.  Is that right?

1    A    Yes.

2    Q    And as part of that settlement, the settling parties,

3    including the debtor --

4    A    I'm sorry.  Wait.  I've got to go back.  I don't know if

5    the debtors specifically supported that -- that document.

6    Q    Are you saying that this -- do you recall --

7    A    I believe we did.  I don't recall, I don't recall, I

8    don't recall.  I mean, we were okay with the class settlement

9    (indiscernible)

10   Q    Do you recall that the settlement was part of the first

11   plan of liquidation that was presented to this Court?

12   A    Yes.  Yes, I do.

13   Q    Okay.  And does that --

14   A    Right.

15   Q    -- refresh your --

16   A    Right.

17   Q    -- recollection that --

18   A    Yes, it does.

19   Q    -- (indiscernible)

20   A    Thank you very much.  Yes.

21   Q    Yeah.  Now, as part of that settlement, the settling

22   parties had agreed to enjoin victims who didn't want to

23   participate.  It was a non-opt-out settlement.  Do you recall

24   that?

25   A    Yes.

1    Q    And Judge Hellerstein said that he could not subscribe

2    to that.  You remember that, right?

3    A    That's correct, yes.

4    Q    Okay.  And that same proposed would have provided over

5    $12 million to the former representatives of The Weinstein

6    Company for reimbursement of their attorneys' fees and costs.

7    Do you remember that?

8    A    I don't -- I don't quite remember the exact number, but

9    that sounds around --

10   Q    I --

11   A    -- (indiscernible) remember.

12   Q    12.2.  Does that sound about right?

13   A    (Indiscernible) specific, but fine.  Yes.

14   Q    And that was actually part of the first plan of

15   reorganization that was filed in this Court.  Do you recall

16   that?

17   A    Uh-huh.

18   Q    Okay.

19   A    Yes.

20   Q    But Judge Hellerstein rejected that proposal.  Yes?

21   A    I -- I know Judge Hellerstein rejected, yeah, the --

22   yeah, I guess everything that was proposed because of the

23   class situation, but I don't remember the specific

24   (indiscernible) why he rejected --

25   Q    Now, at --

1   A    -- (indiscernible)

2   Q    At the time that the settlement was proposed, the

3   debtors believed, the board believed that the former

4   representatives would not accept the settlement that provided

5   for less than $12 million in reimbursement.  Isn't that true?

6   A    Say that again.

7   Q    At the time that settlement was proposed, the debtors

8   believed, you believed that the former representatives

9   wouldn't take less than $12 million in reimbursement for

10  their fees.  True?

11  A    I don't -- I don't really specifically recall whether or

12  not we believed that they would take less.

13  Q    Well, did you not -- when you were presenting a

14  settlement to Judge Hellerstein and --

15  A    I don't have that settlement in front of me.  I don't

16  remember the details from that settlement.

17  Q    Well, you presumably thought, on behalf of the board,

18  that you were getting the best deal possible, when you were

19  asking a Federal Judge to adopt that as part of a class

20  action settlement in a plan of liquidation.  Fair?

21  A    (No verbal response)

22  Q    Did you think that there was a better deal to be had

23  that -- when you were proposing that?

24  A    Probably not at the time.

25  Q    Right.  So you believed that that was the best deal that

1    -- to be negotiated.  But that turned out not to be true,

2    right?

3    A    The deal changed.

4    Q    The deal changed.  And the former -- after Judge

5    Hellerstein rejected the plan, that proposed settlement, the

6    former representatives agreed to accept $9.7 million in

7    reimbursement for defense costs, and that's part of the plan

8    that we have before the Court today, right?

9    A    That's correct.

10   Q    So it turned out that the former representatives were

11   willing to take about a quarter less, in order to get the

12   various benefits provided by the plan, including being

13   released from all potential liability from sexual assault

14   victims of Harvey Weinstein, right?

15   A    They're taking -- they're taking less, meaning they're

16   taking less --

17   Q    They took less in reimbursement for their fees and

18   costs.  It went from 12.2 to 9.7.

19   A    Yeah, it's true.

20   Q    And -- yeah.

21   A    (Indiscernible)

22   Q    And if this Court declined to confirm the plan as

23   presently proposed, would you agree that it's also possible

24   that the former representatives would accept a still lower

25   amount of reimbursement to obtain those releases?

1   A    No, I don't think that at all.

2   Q    It's not possible, even though it happened once before?

3   A    I think -- I think they're taking only nine, but they're

4   -- they're actually able to take a lot more than that, so

5   they're giving up a lot.  And for all we know, it's -- they

6   might go after the entire amount of legal expenses that they

7   have the right to be reimbursed for.

8   Q    And it's also possible, as they did in the past, that

9   they might accept a lower amount of reimbursement or no

10  reimbursement at all, to accept the -- to accept the benefits

11  that this plan provides, in terms of third-party releases.

12  Isn't that true?

13  A    It could be less; it could be more, it could be a lot

14  more.

15  Q    Okay.  Now let's --

16  A    I don't know.  I don't know.

17  Q    Let's go back to the mediation.  Jed Melnick was the

18  lead mediator for the mediation process that you described in

19  your declaration.  Is that right?

20  A    Correct.

21  Q    And Mr. Melnick strongly supported the settlement that

22  was presented to Judge Hellerstein?  Do you remember that?

23  He submitted a whole declaration about it.  Do you recall?

24  A    I think -- I don't recall the actual declaration that he

25  submitted.

Smith - Cross

1    Q    But you recall --

2    A    But yes --

3    Q    -- that he supported --

4    A    -- he supported it.

5    Q    -- the settlement.  You recall that he was supportive of

6    the settlement?

7    A    Yes, he was probably supportive of the settlement since

8    he submitted it.

9    Q    And mister --

10   A    (Indiscernible)

11   Q    Mr. Melnick was privy, being a mediator, to numerous

12   private settlement communications between the parties over

13   the course of that long process that you described in your

14   declaration.

15   A    I don't -- I don't recall his declaration.  I -- I don't

16   know what he wrote or what he said specifically --

17   Q    I'm not asking --

18   A    -- I'm sorry.

19   Q    I'm not asking about his declaration; I'm asking about

20   yours.

21        So, when you referred to that long, lengthy mediation

22   process that took place over a couple of years, it's true

23   that Mr. Melnick, as a mediator, was a person who was

24   receiving all kinds of confidential mediation communications

25   in that process, right?

1    A     I would think he would be, yes.

2    Q     And is it fair to say that, as a mediator, Mr. Melnick

3    might have formed certain opinions about the parties and

4    their counsel during that process?

5    A     I -- I don't know.  I mean, as a human being, probably,

6    but I have no idea what sort of opinions he formed.

7    Q     Right.

8          And yet, despite being involved in these confidential

9    settlement communications for years, Mr. Melnick and his

10   partner had been named the claims examiner under the plan,

11   and will be given the power to make awards under the plan.

12   Isn't that true?

13   A     Yes, correct.

14   Q     And --

15   A     From what I understand, it's a -- it's a pro bono

16   position.

17   Q     Well, notwithstanding that it's pro bono, are you aware

18   that the Model Ethical Rules for Mediators, published by the

19   American Bar Association, provide that a mediator should not

20   later accept another dispute-resolution role in the same

21   manner, without the consent of all the parties involved?

22         MS. MOSKOWITZ:  Objection, Your Honor.  This is

23   legal argument (indiscernible) the witness' declaration.

24         THE COURT:  Sustained.

25   BY MR. MINTZER:

1    Q    Are you aware that my clients have not consented and

2    strongly object to Mr. Melnick serving as a claims examiner

3    in this -- in the plan, should it be approved?

4    A    No, I'm not aware that they are specifically objecting

5    to Mr. Melnick being hired for this job --

6    A    All right.  Let's --

7    A    -- I'm not aware.

8    Q    Let's talk about a few of the former representatives who

9    support confirmation of this plan, starting with Mr. Robert

10   Weinstein --

11   A    Uh-huh.

12   Q    -- who you know is Harvey Weinstein's brother, right?

13   A    Uh-huh.

14   Q    Yes?

15   A    Yes.  Yes.  I'm sorry.  Yes.

16   Q    Okay.

17   A    Yes.

18   Q    I'm sorry.  You have to answer --

19   A    I'm nodding.  No, I'm sorry.

20   Q    That's okay.

21        And Robert Weinstein founded The Weinstein Company with

22   Harvey Weinstein in 2005?

23   A    I -- I believe so.  I don't recall the date he founded

24   the company.

25   Q    And they were both CEOs, co-CEOs of The Weinstein

1    Company from 2005 to roughly 2017?

2    A    I believe so.  I don't know.

3    Q    And you -- before that, do you know that they were co-

4    heads of Miramax, which was owned --

5    A    Yes.

6    Q    -- by Disney?

7    A    Yes.

8    Q    And are you aware that Mr. Robert Weinstein has been

9    accused in various lawsuits of negligently supervising Harvey

10   Weinstein at The Weinstein Company?

11   A    Not specifically.

12   Q    Tell me, generally, your understanding.

13   A    Yes, I -- I know that that is an argument that can be

14   applied to the -- some of the --

15   Q    Well --

16   A    -- Ds and Os, yes.

17   Q    Well, you're aware that Mr. Robert Weinstein has been

18   sued in some respects for negligence in the performance of

19   his duties at The Weinstein Company in relation to his

20   brother's conduct; you know that, right?

21   A    Yes.

22   Q    Okay.  And you're aware that Robert Weinstein has been

23   accused of aiding and abetting Harvey Weinstein's

24   discriminatory behavior against women who work at The

25   Weinstein Company, right?

1   A    No, I'm not aware of -- of the specifics of that

2   lawsuit.

3   Q    Okay.  And you do know that Robert Weinstein is alleged

4   to have knowledge that Harvey Weinstein sexually assaulted or

5   sexually harassed women while working at The Weinstein

6   Company, right?

7   A    Can you -- wait.  Can you just repeat that again?

8   Q    Yeah.  You know --

9   A    Thank you.

10  Q    You're aware that Robert Weinstein is alleged, in

11  various lawsuits, to have knowledge that Harvey Weinstein

12  sexually assaulted and sexually harassed women working at The

13  Weinstein Company.

14  A    Yes.

15  Q    You know that that --

16  A    Right.

17  Q    -- (indiscernible) --

18  A    Yes.

19  Q    -- have been made --

20  A    Correct.

21  Q    -- about that.

22  A    Yes.

23  Q    And you also are aware that Mr. Weinstein is alleged,

24  despite having that knowledge of Mr. Harvey Weinstein's

25  behavior, to have approved a new contract for Harvey

1    Weinstein in 2015, right?

2    A    I don't -- I don't -- I don't know the specifics of

3    contracts from 2015.

4    Q    Well, you -- are you not aware that Harvey Weinstein

5    received a new contract that was approved by the Board of The

6    Weinstein Company in 2015?

7    A    I don't recall the date of any contracts he received.

8    Q    Well, do you recall that he received a new contract not

9    long in the years prior to the --

10   A    What kind of --

11   Q    -- (indiscernible) him?

12   A    I'm sorry.  Can you clarify what kind of contract you're

13   talking about?

14   Q    Employment contract at --

15   A    Employment contract.  I know, yeah, he re -- I'm sure he

16   received an employment contract.  I'm not sure of the

17   specifics of that employment contract.  It was before I

18   became a board member --

19   Q    Understood.

20   A    -- (indiscernible)

21   Q    I wasn't asking for the specifics of the contract.  My

22   question was you're aware that --

23   A    Or the date.

24   Q    Well, that --

25   A    I -- I am aware.  I -- I'm not --

1          MS. MOSKOWITZ:  Your Honor --

2     A    -- aware of all of the contracts, I don't know any

3     specifics --

4          THE COURT:  It --

5     A    -- about the contracts.

6          THE COURT:  Let me interrupt.  You're not going to

7     get that if she does not know.  So can you move on?

8          MR. MINTZER:  Yes, Your Honor.

9     BY MR. MINTZER:

10    Q    Now some of the claims, as we've heard earlier today,

11    against Robert Weinstein have been dismissed by trial courts,

12    correct?

13    A    Correct.

14    Q    But none of those claims, none of those decisions have

15    ever -- have been reviewed by an appellate court.  True?

16    A    I don't know.

17    Q    Well -- and if this plan is confirmed, there won't be

18    any opportunity for an appellate court to ever review any of

19    the decisions adverse to the survivors of Harvey Weinstein

20    about Robert Weinstein.  Is that right?

21    A    I -- it seems like a very unknown path to take.

22    Q    Well, the point is, is that the survivors who object to

23    this plan will not have the opportunity to pursue further

24    prosecuting their cases, including appeals, as against Robert

25    Weinstein.  Isn't that true?

1   A    Your survivors won't, if they -- right.  Correct.  But

2   most survivors are -- are -- are achieving relief, right?

3   Q    I --

4   A    For the consideration, so --

5   Q    Well --

6   A    But your survivors won't be --

7   Q    Understood.

8   A    -- (indiscernible) --

9   Q    But the --

10  A    -- Robert Weinstein.

11  Q    But the plan provides that no one will be able to pursue

12  any claims against Robert Weinstein related to Harvey

13  Weinstein's sexual misconduct, right?  They'll be enjoined.

14  A    Correct.  Correct.  But the releases are not -- again,

15  you're right.  But there's something being gained from giving

16  these releases.  We're not just letting, you know, Robert

17  Weinstein go, right?  I mean, we're giving him a release, and

18  he's giving the insurance company a release; and, therefore,

19  there is a plan with a set amount of consideration in it.

20  You know, going after Robert Weinstein or letting the women

21  going after Weinstein, I understand.  But it's an unknown

22  outcome.

23  Q    Well, but --

24  A    And it is --

25  Q    I'm sorry.

1    A    No, I'm sorry.  It's an unknown -- unknown outcome.  So

2    it's the choice of going down the -- going after certain Ds

3    and Os with an unknown outcome and -- or -- or choosing this

4    plan, with a known settlement, a settlement package.  And

5    yes, it involves these releases.

6    Q    But the point is, is that the survivors who want to go

7    forward against Robert Weinstein won't have that option,

8    right?

9    A    The survivors are a part of a class, and there are more

10   than just the 8 that you represent; there are 39 other

11   survivors that are choosing what is in the plan.  So 83

12   percent have voted for what we're proposing in the plan.

13   They were a part of that negotiation, too.  We included them

14   all in the negotiation, as -- as Ms. Harrison said earlier.

15   And they were all -- all an integral part of this negotiation

16   that came up with what is now being proposed in the plan.

17   Q    Ms. Smith, if you could just focus just on my question.

18   As to the women who want to proceed against Robert Weinstein,

19   if this plan is confirmed, they will not have that option.

20   True?

21   A    They will not, true.

22   Q    And that would include my clients, Wedil David and

23   Alexandra Canosa, who have asserted claims against Robert

24   Weinstein that were dismissed, but are still subject to

25   appeal, right?

1    A    Correct.

2    Q    And my client Aimee Mcbain, who has asserted claims

3    against Robert Weinstein under the New York City Human Rights

4    Law and the New York State Human Rights Law, will not have

5    the opportunity to pursue those claims, if this plan is

6    confirmed, right?

7    A    Correct.

8    Q    And I think we were -- we heard something about it

9    earlier in the hearing.  But it's a fact that a trial court

10   in New York County denied Robert Weinstein's motion to

11   dismiss in a case involving violations -- alleged violations

12   of New York City's human rights law, right?  You're aware of

13   that.

14   A    I'm not aware of the specifics of that.

15   Q    Well, you're aware that there was a motion to dismiss

16   made by Robert Weinstein in Ms. Rehal's case that we heard

17   about earlier today --

18   A    Yes.

19   Q    -- that was denied.

20   A    Yes.

21   Q    Okay.  And it's true that the New York State Attorney

22   General's Office, that we also heard from earlier -- okay --

23   that they've asserted claims in their case against Robert

24   Weinstein under the New York State and New York City Human

25   Rights Law, on behalf of a group of Weinstein Company

1   employees.  Is that right?

2   A    I'm sorry.  I -- I don't have a list of what has been

3   asserted against Mr. Weinstein.

4   Q    Okay.  You're aware, generally, that the New York State

5   Attorney General has a case against Robert Weinstein, though,

6   right?

7   A    No, I am not aware.  I don't recall --

8   Q    Well --

9   A    -- (indiscernible)

10  Q    Understood.

11  A    I --

12  Q    But --

13  A    I --

14  Q    So -- but Ms. Smith, would you agree that, if the plan

15  is not confirmed, Robert Weinstein faces very significant

16  potential liabilities in connection with Harvey Weinstein's

17  sexual misconduct at The Weinstein Company.

18          MS. MOSKOWITZ:  Objection.  Calls for --

19  A    Yeah --

20          MS. MOSKOWITZ:  -- legal --

21          THE COURT:  Sustained.  Sustained.

22  BY MR. MINTZER:

23  Q    And Robert Weinstein is not contributing any of his own

24  funds to this plan, right?

25  A    Oh, indirectly, he -- he is, if you consider if you

1    consider the fact that he can be reimbursed for his defense

2    costs, so he's contributing part of that --

3    Q    Well, let's talk about that.

4    A    -- (indiscernible)

5    Q    So that's then -- that goes back the 9.7 million in

6    attorneys' fees that --

7    A    Uh-huh.

8    Q    -- the former directors -- the former representatives

9    are receiving, right?

10   A    Correct.

11   Q    And I -- if I understand you, you're saying that he

12   could be entitled to more than that; so, by giving something

13   up, he is contributing to the plan, right?

14   A    He is entitled to more than that.

15   Q    Okay.  What --

16   A    He -- the whole group is entitled to more than that, not

17   just he, right?

18   Q    Right.  I --

19   A    Yeah.

20   Q    I'd like to --

21   A    (Indiscernible)

22   Q    -- focus on Robert Weinstein at the moment.  What is it

23   that Mr. Weinstein would be entitled to, in terms of

24   reimbursement for his attorneys' fees?

25   A    I don't have the breakdown as to what his specific fees

1    are.

2    Q    Okay.  And he -- you don't know what the supposed --

3    I'll call it "discount" that he's giving, that is supposed to

4    be his contribution to the plan, you don't know what the

5    number is.

6    A    Specific?  No.

7    Q    No.

8    A    The group as a -- no, not specifically to Robert

9    Weinstein.

10   Q    Well, how is it that that money is divided, the

11   attorneys' fees money, under the plan?  How is that going to

12   be distributed to the former director group?  Is it in equal

13   shares or something else?

14   A    I don't know how it's going to be distributed to that

15   group.  I know they have submitted invoices through April of

16   2019.  I don't even know if they submitted invoices.  I know

17   there's a number as of April 2019 that indicates that they

18   have incurred legal expenses for their own defense of about

19   $20 million, a little more than $20 million, and they are

20   taking $9.7 million from this settlement to pay for those

21   defenses, right.  I don't know how that's going to be broken

22   down or I don't know any of the details behind that number.

23   Q    So, you can't say specifically what Robert Weinstein is

24   contributing to this settlement.  All you can do is refer to

25   the group of former directors; is that right?

1    A    That is correct.

2    Q    Now, his invoices that you refer to, have you ever seen

3    any of the invoices from the attorneys for the former

4    representatives that they're claiming that they incurred

5    $20 million or thereabouts in fees?

6    A    Nobody has ever shown me an actual invoice.

7    Q    And do you know how they were -- if they've been

8    reviewed, at all, for reasonableness?

9    A    I am not aware if they've been reviewed for

10   reasonableness.

11   Q    Okay.  So, for all you know, those invoices could be

12   completely inflated?

13            MS. MOSKOWITZ:  Objection, Your Honor.

14            THE COURT:  Sustained.

15   BY MR. MINTZER:

16   Q    Do you know what the attorneys for the former

17   representatives to accumulate that much in fees?

18            MS. MOSKOWITZ:  Objection, Your Honor; again, this

19   is outside the scope.

20            THE COURT:  Sustained.  She hasn't seen the

21   invoices, so I don't know what she can say in answer to your

22   question either, so ...

23   BY MR. MINTZER:

24   Q    Now, as I understand it, the debtors' position is that

25   the former representatives are taking a 50 percent discount

1   in what their actual attorneys' fees are and that's part of

2   their contribution to the plan; is that right?

3   A    As of April 2019.  They're taking more of a discount

4   because they've been, you know, involved in these discussions

5   through sometime in 2020.

6   Q    Okay.  And that means that there are legal bills that

7   they're going to have that they're not going to be reimbursed

8   by the debtor or by the insurance company that, presumably,

9   they have to pay themselves; is that right?

10  A    Correct.

11  Q    All right.  Do you know whether any of the former

12  representatives are actually going to be required to pay

13  those bills to their lawyers?

14  A    I have not investigated the invoices behind the legal

15  directors and their legal defenses.

16  Q    Well, do you know if those law firms are going to write-

17  off the fees or are the directors actually going to be

18  required to pay those bills?

19        MS. MOSKOWITZ:  Objection.

20        THE COURT:  Sustained.

21        MR. MINTZER:  Your Honor, this goes to the

22  substantial contribution.

23        THE COURT:  Yeah, but I don't think you're going to

24  get any facts from this witness in response to that.  She's

25  already said she hasn't seen the invoices and doesn't know

1   anything about their arrangement with their attorneys, so I'm

2   going to sustain.

3   BY MR. MINTZER:

4   Q    Now, it's also true that if I ask -- I don't want to

5   belabor for all the former representatives, but it's also

6   true that you don't know any of the arrangements that any of

7   the former representatives had with their attorneys in terms

8   of what they're going to have to pay and what they don't; is

9   that right?

10  A    That is correct.

11  Q    All right.  And is it your understanding that these

12  individuals would not approve this plan unless they received

13  that discount in attorneys' fees reimbursement that we've

14  been talking about?

15          MS. MOSKOWITZ:  Objection; form and confusing.

16          THE COURT:  Sustained.

17  BY MR. MINTZER:

18  Q    Is it your understanding that the former directors would

19  not approve the plan unless they received reimbursement for

20  their attorneys' fees in some form?

21  A    I mean (indiscernible) not really part of the approval

22  of the plan.

23  Q    Well, they had to approve the third-party releases,

24  correct?

25  A    You're talking about the settlement, would they have

1    approved the settlement?

2    Q    Yes.

3    A    Without what?  Without some form of payment?

4    Q    Right.

5    A    You know, I mean, we didn't just give them -- I mean,

6    this is what came out of those negotiations with us.

7         So, would they have approved the plan without that

8    payment?

9         No, they would not have approved the plan without that

10   payment.  It was necessary to -- I mean, if you look at it as

11   a payment, yes.  But we look at it as a constitution right?

12   Q    Now, the former representatives aren't the only people

13   who are released parties from the plan; is that right?

14   A    Correct.

15   Q    So, Exhibit 1 of the plan at Section 199 states that

16   professionals and the firms listed in Schedule 1 of the plan

17   also receive leases.

18   A    No, I don't have the plan in front of me, sorry.

19   Q    So, does that sound familiar to you that, there are --

20   A    The professionals are released?  Yes.

21   Q    Right.  And if you looked at the -- I understand that

22   you don't have it in front of you -- but I'll represent that,

23   for example, among the professionals listed in that schedule

24   are Harvey Weinstein's lawyers at Lewis Brisbois and they're

25   among the people getting the release.

1    Do you recall seeing that?

2    A    I don't recall seeing it.  You know, at some point I did

3    look at the list.  I don't recall the specific law firms that

4    are being released.

5    Q    Isn't it true that Lewis Brisbois has not made any

6    financial contribution to this plan?

7             MS. MOSKOWITZ:  Objection, Your Honor.

8             THE COURT:  Sustained.

9    BY MR. MINTZER:

10   Q    Well, what is the contribution, if any, that Lewis

11   Brisbois has made to warrant the release from the debtors'

12   perspective?

13            MS. MOSKOWITZ:  Objection.

14            THE COURT:  What is your objection?

15            MS. MOSKOWITZ:  Your Honor, this is -- what the

16   professionals are, that are getting released is not what Ms.

17   Smith is testifying to.  She's testifying to the third-party,

18   nonconsensual releases of the former representatives and the

19   insurance companies, and going into the professionals being a

20   stretch for their declaration.

21            THE COURT:  All right.  I'll sustain.

22            MR. MINTZER:  Your Honor, I believe that Ms. Smith,

23   part of her declaration was explaining the scope of all the

24   releases and the contributions made for the releases by all

25   of the released parties that that would include these law

1    firms.

2         I would ask the Court to allow us to find out what

3    these law firms are contributing to this plan.

4         THE COURT:  Well, if she knows.

5         Can you answer, Ms. Smith?

6         THE WITNESS:  I don't know with that specific law

7    firm, what part of, you know, what part he's played until the

8    plan.  I don't recall.

9    BY MR. MINTZER:

10   Q    Okay.  And in general, do you know what any of the law

11   firms to the former representatives are contributing to the

12   plan to warrant their getting the releases?

13   A    Other than representing their clients, that's all I

14   know.  They're representing their client.

15   Q    Now, we've heard statement today and I believe you refer

16   in your declaration to the fact that there was an

17   overwhelming vote in favor of the plan before the Court,

18   correct?

19   A    Correct.

20   Q    But in that vote, each victim had one vote valued at one

21   dollar, right?

22   A    For the Class 4 victims, yes.

23   Q    As to the Class 4 victims.

24        And that was true, the value of the vote was the same

25   for a victim who was raped, as opposed to a victim who

1    suffered verbal sexual harassment; is that right?

2    A    It was the same for everyone in that class.

3    Q    Right.  And they were all valued equally?

4    A    It was one vote per victim.

5    Q    Do you believe that women suffer equivalent harm from

6    being verbally, sexually harassed than being raped?

7              MS. MOSKOWITZ:  Objection, Your Honor.

8              UNIDENTIFIED:  Objection.

9              THE COURT:  Sustained.

10   BY MR. MINTZER:

11   Q    The debtor has contended, and I believe you say in your

12   declaration, that the insurance companies have made a

13   substantial contribution to the plan by funding the

14   settlement, right?

15   A    Repeat that.  I didn't hear it.

16   Q    The debtor is contending in this proceeding that the

17   insurance companies that are receiving releases have made a

18   substantial contribution to the plan by funding the

19   settlement pool?

20   A    Correct.

21   Q    Now, do you know what the total possible exposure is

22   that those insurers have under the policies that they

23   underwrote to The Weinstein Company?

24   A    No, I don't know off the top of my head what that exact

25   number is.

1    Q    To your knowledge, did The Weinstein Company ever do a

2    written analysis of what the potential exposure that the

3    insurance companies had under those policies were and the

4    potential defenses?

5    A    Are you speaking about all policies?

6    Q    Yeah, the policies that --

7    A    We -- I don't remember what -- when or what number we

8    came up with as the potential exposure that we had.

9    Q    My only question at this point was whether or not you

10   ever recall seeing a written analysis of that from in the

11   company?

12   A    I don't recall.

13   Q    Did the plan provide that insurance companies will make

14   any additional future contributions to the sexual misconduct

15   claim fund, beyond the 17 million that's in the fund?

16   A    No.

17   Q    And does the plan provide that the debtors would provide

18   any additional funding to that sexual misconduct claim fund?

19   A    No.

20   Q    But if people come -- if any future victims come

21   forward, they'll still be bound by this plan and be unable to

22   bring claims against either of the debtors or their insurers;

23   is that right?

24   A    Correct.  They will be channeled into, you know, to

25   access the victims fund that has been set up for the victims.

1    Q    But if the fund is exhausted, will victims have any

2    other recourse under this plan?

3    A    No.

4              MR. MINTZER:  I don't know any other questions at

5    this time, Your Honor, thank you.

6              THE COURT:  Thank you.  Any redirect?

7              MS. MOSKOWITZ:  Your Honor, very briefly.

8                         REDIRECT EXAMINATION

9    BY MS. MOSKOWITZ:

10   Q    Just one question, Ms. Smith.

11        Do you recall being asked on cross about what

12   contribution, if any, Mr. Harvey Weinstein was making --

13   A    Yeah.

14   Q    -- in connection to the plan?

15   A    Yes.

16   Q    I don't know you don't have the plan in front of you.

17        Do you recall whether Mr. Weinstein is receiving any

18   amount of money to cover his defense costs in connection with

19   the plan?

20   A    I don't recall his receiving any amount of money.

21   Q    And is he giving up his entitlement to defense costs by

22   not receiving any money in connection with the plan?

23   A    Is he giving up his entitlement to the defense costs?

24   Q    Correct.

25   A    I believe that's -- I, actually, don't know.

1    I'm sorry, Lauren.

2    Q    No problem.  That's in the plan and we can point to that

3    separately.

4              MS. MOSKOWITZ:  Nothing further, Your Honor.

5              THE COURT:  All right.  Thank you.

6              The witness may be excused then?

7              THE WITNESS:  Thank you.

8         (Witness excused)

9              MS. MOSKOWITZ:  Pardon me, Your Honor.

10             THE COURT:  Go ahead.

11             MS. MOSKOWITZ:  Thank you.

12             I think next up we have the declaration of Kyle

13   Herman, which also did not contain any exhibits, and that is

14   Docket Number 3186.  But there is one exhibit that was filed

15   in connection with the disclosure statement that is referred

16   to and we'd like to move both, the declaration and the

17   exhibit, which is the liquidation analysis at 3098 into

18   evidence.

19        THE COURT:  All right.  Subject to cross-examination.

20        (Herman Declaration received in evidence)

21        (Liquidation Analysis received in evidence)

22             THE COURT:  Do any of the parties wish to cross-

23   examine Mr. Herman -- is Mr. Herman present?

24             MS. MOSKOWITZ:  He is, Your Honor.

25             MR. HERMAN:  I am.

1      MS. MOSKOWITZ:  He's on the screen, yes.

2           THE COURT:  I can hear you.  Let's see if I can

3      find you.

4           MS. LIU:  Your Honor, before you find him, I just

5      wanted to say we have no objection to the admission of his

6      declaration and I do not intend to cross-examine the witness.

7           THE COURT:  Okay.  I found him, but it's

8      unnecessary, so I'll accept the declaration.

9           MS. MOSKOWITZ:  And, Your Honor, if we could also

10     just confirm that the liquidation analysis, itself, at Docket

11     Number 3098 is also admitted?

12          THE COURT:  It is, also.

13          MS. MOSKOWITZ:  Thank you, Your Honor.

14          Next up we have the declaration of Robert Peck,

15     which is Docket Number 3187, which we'd like to move into

16     evidence, subject to cross.

17          THE COURT:  All right.  Subject to cross, do any of

18     the objectors wish to cross Mr. Peck?

19          MS. LIU:  Yes, Your Honor.  I have some questions

20     for Mr. Peck.

21          THE COURT:  All right.  Let's find him.  There we

22     are.

23          Okay.  Mr. Peck, before we get started, I'm going

24     to ask the clerk to give you the oath.

25          THE CLERK:  Mr. Peck, please raise your right hand.

1       (Oath administered)

2              ROBERT PECK, DEBTORS' WITNESS, AFFIRMED

3              THE WITNESS:  I do.

4              THE CLERK:  Please state your full name and spell

5       your last name for the record.

6              THE WITNESS:  Robert Peck, P-e-c-k.

7              THE CLERK:  Thank you.

8              THE COURT:  Mr. Peck, again, for the record, is

9       your declaration a true statement of what you would have

10      testified to, has you been called on direct?

11             THE WITNESS:  Yes.

12             THE COURT:  All right.  I'm going to proffer you

13      for cross-examination, then.

14                       CROSS-EXAMINATION

15      BY MS. LIU:

16      Q    Good afternoon, Mr. Peck.  For the record, again, my

17      name is Ruby Liu, on behalf of the non-settling, sexual

18      misconduct claimants.  I have some questions for you today

19      regarding your declaration.

20           Now, we agree that following the sale of the debtors'

21      assets to Spyglass, that all of the debtors' secured debt was

22      paid in full?

23      A    Yes.

24      Q    You stated in paragraph 5 of your declaration that the

25      debtors' employed separate special purpose vehicles for

1    purposes of financing and developing film and other products.

2    Do you recall that?

3    A    Yes.

4    Q    Are any of those entities a debtor in these cases?

5    A    Yes, I believe they probably are.

6    Q    Is the substantive consolidation sought with respect to

7    these entities?

8    A    Yes.  We consolidated all up into The Weinstein Company

9    Holdings.

10   Q    Okay.  Can you describe to the Court why substantive

11   consolidation is necessary or appropriate for this -- for

12   these special vehicle entities if it has no president?

13   A    Just that they're still outstanding entities.  There's

14   no activity in them, but they would still roll up, but

15   there's no assets or liabilities in those companies at this

16   point.

17   Q    I know you don't have the document in front of you, but

18   I'm looking at Docket Number 300, and I'm going to represent

19   to the Court that's the schedules filed for debtor Avenging

20   Eagle SPV, LLC, Case Number 18-10602.

21       And would it surprise you on page 21 of 24, that's the

22   Schedule F for this particular debtor, that the creditors do

23   not list any -- I mean, the debtor did not list any creditors

24   for this particular entity?

25   A    Would it surprise me?

1    Q    Yes.

2    A    No.

3    Q    Would it also surprise you -- okay, let me

4    (indiscernible).

5         Did each debtor full time its own schedules of assets

6    and liabilities in these cases?

7    A    Yes.

8    Q    Was each debtor able to identify its own creditors of

9    (indiscernible)?

10   A    Probably not.

11   Q    You're saying that on these schedules and statements

12   filed by the debtor, it did not list its own creditors?

13   A    They would all -- have all been listed under one entity

14   and not necessarily like the underlying SPVs.

15   Q    Okay.  Did the debtors establish a bar date in these

16   cases, to your knowledge?

17   A    Repeat that, please.

18   Q    Did the debtors establish a bar date order in these

19   cases?

20   A    I don't know.

21   Q    Were the creditors of these debtors required to file a

22   proof of claim against the debtors whom they have claims for?

23   A    I believe so, yes.

24   Q    If I represent to you that the proof-of-claim form that

25   was used for all of these debtors' cases, require that a

1    creditor to identify the specific debtor entity against whom

2    they have claims, would that surprise you?

3    A    No.

4    Q    You state in paragraph 6 of your declaration that given

5    the nature of Harvey Weinstein's overarching role at TWC, it

6    would be impossible to discern the TWC entity that is

7    implicated in a particular sexual misconduct claim.

8        So, to your knowledge, for those who have filed lawsuits

9    against the debtors, did the victims name the specific debtor

10    entities in your complaint?

11    A    I don't know.

12    Q    Would you believe that they did not?

13    A    I could believe that.

14    Q    Did the debtors also establish a bar date for tort

15    claimants?

16    A    I don't know.

17    Q    So, you didn't know that the Court previously granted

18    bar date order that requires all tort claimants, including

19    sexual misconduct claimants like my client, to file a proof

20    of claim with the Court?

21    A    I knew that they had to file claims.  I didn't know -- I

22    don't know what the date is.

23    Q    Okay.  Have you ever seen the proof-of-claim form used

24    for the tort claimants?

25    A    Yes, I think I have.

Smith - Cross

86

1    Q    And do you recall if it asks the claimant to identify

2    which specific debtor they have a claim against?

3    A    Yes, I believe it lists all of the debtors, yes.

4    Q    Well, unfortunately, I do not have the proof-of-claim

5    form no front of me, but I can represent to you that actually

6    it did not ask the claimant to identify the specific debtor

7    it has a claim against for at least the tort claimants?

8              MS. MOSKOWITZ:  Is there a question, Your Honor?

9              THE COURT:  Yeah, is there a question?

10   BY MS. LIU:

11   Q    Yeah, the question is, couldn't we agree that had the

12   debtors had done so, they would be able to determine which

13   debtor entity it implicated in each specific sexual

14   misconduct claim?

15   A    No, I don't think so.

16   Q    So, you don't think that a claimant, themself, would

17   know which entity they would have a claim against?

18   A    No.

19   Q    You stated in paragraph 7 after your declaration that

20   the debtors were party to tens of thousands of agreements

21   during your operating history.

22         In connection with preparing the schedules, was each

23   debtor able to list executory contracts that it is a party

24   to?

25   A    Yes, I believe so.

Smith - Cross

1  Q    You also state in paragraph 7 that the debtors no longer

2  have any employees and the debtor has left sufficient

3  personnel to adequately review the defendants' assets and

4  liabilities.

5       Is it your contention that substantive consolidation is

6  appropriate in cases where the debtors left resources?

7  A    It's my -- I believe in this case it is.  I don't know

8  about in all cases, but for this case, yes.

9  Q    You state in paragraph 8 that the personal assets are

10  the debtors' cash on hand as of the moment, correct?

11  A    Yes, and the proceeds from the settlement, the insurance

12  proceeds.

13  Q    Was that to say if the plan is actually being approved?

14  A    Yes.

15  Q    How much of the debtors' cash is available for a

16  distribution, to your knowledge?  To be clear, not including

17  any insurance proceeds.

18  A    Well, I can tell you that currently, cash, liquid cash

19  on hand at our HSBC bank account, the estate's HSBC bank

20  account is a little over $3 million.

21  Q    Okay.  What is the aggregate amount of expense

22  administration in these cases, including any unpaid

23  professional fees?

24  A    I don't have that number with me.

25  Q    Ballpark?

1    A    It's probably north of the $3.3 million in the bank.

2    Q    Okay.  So, is it the insurance proceeds that cause the

3    confusion, which requires the substantive consolidation of

4    these debtors?

5              MS. MOSKOWITZ:  Objection.

6              THE COURT:  Sustained.

7    BY MS. LIU:

8    Q    You state in paragraph 11 that the substantive

9    consolidation will not prejudice creditors.

10             Can we agree that insurance proceeds are being used to

11   fund distributions to general unsecured claims?

12   A    I believe so.

13   Q    And many of these general unsecured claims are going to

14   the trade creditors?

15   A    Yes.

16   Q    Can you describe to the Court how these ordinary trade

17   creditors have legal right to insurance proceeds?

18             MS. MOSKOWITZ:  Objection.

19             THE COURT:  Sustained.

20   BY MS. LIU:

21   Q    Can we agree that a holder of a second (indiscernible)

22   claim may have an insurable claim?

23             MS. MOSKOWITZ:  Objection.

24             THE COURT:  Sustained.

25   BY MS. LIU:

Smith - Cross

89

1    Q    Can we agree that the diversion of $8.1 million of

2    insurance proceeds to the general unsecured creditors are

3    being diverted away from holders of sexual misconduct

4    claimants?

5              MS. MOSKOWITZ:  Objection.

6              THE COURT:  Sustained.

7              MS. LIU:  Okay.  I have no further questions, but I

8    would like to ask the Court to take judicial notice of docket

9    numbers:  Docket Number 299 through 357, which is the

10   Schedules F of the schedules and statements filed by each

11   debtor in these cases, and also Docket Number 1890-1, which

12   is the proof-of-claim form that was initially approved by the

13   Court, and Docket Number 2966-1, which is the proof-of-claim

14   form for the tort claimants.

15             THE COURT:  Any objection?

16             MS. MOSKOWITZ:  To Your Honor taking judicial

17   notice of the proofs of claim?

18             THE COURT:  The forms and the schedules.

19             MS. MOSKOWITZ:  No.  No, Your Honor.

20             THE COURT:  All right.  I will.

21             MS. MOSKOWITZ:  Your Honor, no redirect for Mr.

22   Peck.

23             THE COURT:  All right.

24             MS. MOSKOWITZ:  Thank you.

25             THE COURT:  You may be excused, Mr. Peck.

1          THE WITNESS:  Thank you.

2      (Witness excused)

3          MS. MOSKOWITZ:  Your Honor, next, we have two

4  declarations that are taken together.  There was the

5  declaration Stephenie Kjontvedt, which I'm sorry, I cannot

6  pronounce, but it's K-j-o-n-t-v-e-d-t, which was Docket 3160

7  and there's a related declaration of Jane Sullivan at Docket

8  3191 in lieu of Ms. Kjontvedt could not appear today, so

9  Ms. Sullivan will both, correct my pronunciation and be

10  appearing to testify, subject to cross, if any cross is

11  necessary.

12          But we would ask that those declarations be

13  admitted into evidence.

14          THE COURT:  Okay.  Subject to cross-examination,

15  they will be.

16      (Kjontvedt Declaration received in evidence)

17      (Sullivan Declaration received in evidence)

18          THE COURT:  Do the objecting parties wish to cross-

19  examine Ms. Sullivan?

20          MS. LIU:  Yes, Your Honor.  I have just a few short

21  questions.

22          THE COURT:  Okay.  Let's see if I can find Ms.

23  Sullivan.  There she is.

24          Good afternoon.  All right.  Ms. Sullivan, before

25  we begin, I'm going to have the clerk swear you in.

1          THE CLERK:  Ms. Sullivan, please raise your right

2     hand.

3          (Oath administered)

4               JANE SULLIVAN, DEBTORS' WITNESS, AFFIRMED

5          THE WITNESS:  I do.

6          THE CLERK:  Please state your full name and spell

7     your last name for the record.

8          THE WITNESS:  Jane Sullivan, S-u-l-l-i-v-a-n.

9          THE CLERK:  Thank you.

10         THE COURT:  Okay.  Ms. Sullivan, is your

11    declaration, 3191, I believe, would that be your testimony if

12    you were called on direct?

13         THE WITNESS:  My declaration is my testimony if

14    called on direct, yes.

15         THE COURT:  Okay.  Thank you.

16         Then I'll turn you over for cross-examination.

17         MS. MOSKOWITZ:  Your Honor, just to interrupt

18    briefly -- this is Lauren Moskowitz.  Paul Heath is going to

19    be defending Ms. Sullivan.  So, if you hear objections, it

20    may be coming from him instead of me on this one.

21         THE COURT:  All right.  I've got him up as well.

22         Go ahead, Ms. Liu.

23                     CROSS-EXAMINATION

24    BY MS. LIU:

25    Q    Good afternoon, Ms. Sullivan.  I just have a few brief

1    questions for you.

2         How many solicitation packages did you mail out to

3    creditors intending to vote on a plan?

4    A    So, I don't have that exact number handy.  We filed an

5    affidavit of service in connection with the solicitations,

6    but I don't have the exact number.

7    Q    Did any of those packages come back in the mail as non-

8    deliverable for any reason?

9    A    I don't have that information.

10             MS. LIU:  All right.  That's all I have.  Thank

11   you.

12             THE COURT:  All right.  Thank you.

13             You may be excused.

14         (Witness excused)

15             MS. MOSKOWITZ:  Thank you, Your Honor.

16             So, I believe the next item on my list is the

17   report of the committee, the UCC, that Ms. Grassgreen

18   mentioned earlier.  I would like to move that into evidence.

19   That's Docket 3159.

20             THE COURT:  All right.  That will be admitted,

21   subject to cross-examination.

22             Did the objectors wish to cross-examine

23   Ms. Grassgreen?

24             MS. LIU:  No, Your Honor.

25             THE COURT:  Then it is admitted.

1        (UCC Committee Report received in evidence)

2               MS. MOSKOWITZ:  Thank you, Your Honor.

3               Next up we have the declaration of David Schack,

4    which is Docket Number 3193.  The debtors would move into

5    evidence, subject to cross-examination.

6               Mr. Schack is on screen and available.

7               THE COURT:  Do the objecting parties wish to cross-

8    examine Mr. Schack?

9               MS. LIU:  No, Your Honor.

10              THE COURT:  All right.  Then his declaration will

11   be admitted, without objection.

12       (Schack Declaration received in evidence)

13              MS. MOSKOWITZ:  And finally, unless someone

14   virtually pings me, I believe the last item for evidence

15   purposes is the declaration of Paul Zumbro, which is simply

16   an attorney declaration attaching two exhibits.  So, we'd

17   like to move that declaration, Docket 3189, into evidence.

18              THE COURT:  Any objection?

19              MS. LIU:  No, Your Honor.

20              THE COURT:  All right.  It's admitted.

21       (Zumbro Declaration received in evidence)

22              MS. MOSKOWITZ:  Thank you, Your Honor.

23              No virtual pings have come in, so I believe that

24   concludes our presentation of the evidence.  Thank you very

25   much.

1            THE COURT:  Thank you.

2            Did the objectors have any evidence to present?

3            MS. LIU:  No, Your Honor, we do not.

4            THE COURT:  All right.  Then I will hear arguments.

5       I think it was suggested that the objectors go first.

6            MS. LIU:  That's fine with us.

7            Your Honor, my clients, as you know, object to the

8       plan and among many other things, primarily, they object to

9       the nonconsensual, third-party releases and the channeling

10      injunction.

11           And releases, as you know, are voluntarily given

12      and for consideration.  Here, the debtors and the committee

13      want the Court to deem my client to have released certain

14      responsible parties because it wants to, and which to hold

15      accountable, such as the former representatives, and limit

16      our recovery to a certain, what we, at least in our view,

17      believe are sexual misconduct claims filed.

18           To put it in context, and as you have also heard on

19      the record, I talked about Mr. Robert Weinstein, one of the

20      former representatives.  Mr. Robert Weinstein ran The

21      Weinstein Company with his brother, Harvey Weinstein, from

22      2005 until 2017.  Before that, they were co-executives of

23      Miramax for over a decade.

24           Robert Weinstein is alleged in numerous lawsuits to

25      of helping his brother conceal sexual assault and sexual

1    harassment claims and misconduct, enabling Harvey Weinstein's

2    conduct, even as late as 2016, by rewarding him with an

3    employment contract.  Some of these claims, either negligence

4    or sex trafficking against Robert Weinstein, have been

5    dismissed, however, none of them have been reviewed on

6    appeal.

7            Importantly, as Your Honor has heard, as one of

8    Robert Weinstein's motion to dismiss a sexual harassment

9    claim in a New York State Court under the New York human

10   rights law, was denied in a (indiscernible) case.  So does

11   our client that has, our client, Ms. Amy Mustang (phonetic)

12   has similar claims against Robert Weinstein.

13           Without question, Robert Weinstein has that

14   potential liabilities to at least some of Harvey Weinstein's

15   victims.  Yes, Robert Weinstein is paying nothing, or at

16   least no real dollars out of his own pocket, for these

17   nonconsensual releases, and is getting paid, on the other

18   hand for his attorney's fees under a proposed plan.

19           In the context of his potential liabilities,

20   whatever the count he's getting on his attorney's fees cannot

21   be considered a substantial contribution to the plan that is

22   necessary to the debtors' reorganization.  There's nothing

23   exceptional about these cases.  The debtors are liquidating.

24   There's no equity.  There's no enterprise value to be

25   preserved.

Smith - Cross

96

1      Nonconsensual third-party releases and the

2    channeling injunction should not be allowed in these cases.

3    And I want to start with the debtors' proposition that under

4    Section 1123(b), a plan may include any other applicable

5    provisions, not inconsistent with (indiscernible).

6          The debtors seek that this Court approves some

7    expansive nonconsensual third-party releases and a channeling

8    injunction to certain release parties that are tantamount to

9    a discharge.  And discharge in Chapter 11, as set forth in

10   1141(b) and 1141(b)(3), expressly provides that companies

11   that are liquidating are not entitled to a discharge, simply

12   because they're liquidating and not reorganizing.

13         The debtors (indiscernible) of the Code is, you

14   need to be a debtor before this Court to get a discharge and

15   not a third party.  That rule is set forth in 524(g).  The

16   Code expressly precludes the Bankruptcy Court from

17   discharging liabilities of third parties.

18         Discharge is usually available to persons and

19   entities that are putting themselves before the Court.  What

20   we're saying is if the debtors, themselves, as they have

21   admitted in their papers, that they're not even entitled to a

22   discharge, so why should the Court extend its equitable

23   powers to any third parties who are not even in bankruptcy,

24   be giving this broad, sweeping third-party releases and

25   channeling injunction that has the functional equivalent of a

1    discharge?

2            These are extraordinary relief typically only made

3    available in seldom companies facing mass-tort liabilities

4    and in those cases, generally, the debtors are funding

5    substantial dividends over a long period of time and

6    insurance companies have to surrender full value of the

7    insurance policies.  These are not those cases.  These are

8    straight liquidation.

9            The Third Circuit in <u>Combustion Engineering</u>, in

10   *dicta*, have ruled that extraordinary relief is only available

11   in true reorganization cases and not liquidation, and for

12   that reason, we're saying it's inconsistent with the Code.

13           Turning to the third-party releases and being one

14   of the factors that we disagree from the debtors

15   (indiscernible) perfected is whether it is necessary to

16   reorganization.  Generally, the cases that were granted

17   third-party, nonconsensual releases, again, are those debtors

18   who are truly reorganizing.  That absent the third-party

19   releases, the company would not be able to continue as a

20   going-concern.  They would not be able to save jobs, to

21   continue to employ people, and would not be able to purchase

22   goods and services.

23           But, again, that's not the case.  As you have heard

24   from Ms. Smith's testimony, the debtors currently are not

25   operating and have no plan to operate in the future and

Smith - Cross                    98

1    they're not generating any income or revenue from the

2    business operations, that they have no employees, that the

3    plan is not filed here to save any jobs at all.

4            What the debtors are arguing is the releases are

5    necessary to the success of this so-called liquidation plan

6    because insurance companies will not pay unless they get the

7    third-party releases.  Well, if the only conclusion they can

8    draw from it is a condition precedent for insurance companies

9    to put the money in, nonconsensual third-party releases are

10   the exception, not the rule.

11           When a third party requires that releases be

12   necessary to a reorganization, it must have meant something

13   more than any condition precedent to put the money in a

14   liquidating company.  If that's the what the third party

15   meant to have a necessity to reorganization then

16   nonconsensual third-party releases will be considered

17   necessary in every liquidation case where the released

18   parties conditions their contributions to the plan upon a

19   grant of third-party releases.

20           This is going to lower the standard, what is

21   appropriate to allow nonconsensual third-party releases and

22   this would also, if the Court is going to adopt what the

23   debtors' and the committee is proposing today, this also sets

24   that precedent for future cases and to (indiscernible) a

25   well-insured debtor in cases (indiscernible) for liability in

1   the future and that debtor is filing a liquidation Chapter

2   11.

3           And the insurance company agrees to fund the plan

4   of liquidation by paying the creditors two cents more over

5   the liquidation value than what they would have been able to

6   receive in a hypothetical Chapter 7 and how the debtor, hey,

7   go get me the third-party releases, otherwise, I'm not going

8   to put a dollar in.

9           And all the debtor has to come back to do is ask

10  the Court, this is necessary to reorganization because

11  (indiscernible) the insurance company is not going to give us

12  the money and the creditors will receive less and not more

13  than what it could be in a Chapter 7 liquidation.  That

14  (indiscernible) the standard when the Third Circuit requires

15  debtor releases be necessary to reorganization, quote,

16  unquote.

17          And I just want to point out the debtors -- the

18  majority of the cases that debtors have cited to, and also

19  those cases that have gone up to the Third Circuit, involve

20  plans of reorganization.  The only two cases that involve

21  plans of liquidation referred to by -- as cited by the

22  debtors in their papers is the (indiscernible) case and the

23  United Steel case and both of those cases are distinguishable

24  here.  One, the (indiscernible) case, the debtors decided to

25  do a confirmation order.  There was one objection held by the

1   United States Trustee's Office that was later withdrawn.

2           So, as Your Honor has previously ruled, cases

3   without opinion have no precedential, as we don't really know

4   if the issues have been opposed or litigated or decided by

5   the Court, and in this case, in particular, there was -- the

6   only objection was withdrawn.  So, the judge had decided

7   that.

8           And also, more importantly, that case does not

9   involve sexual assault claims, like what we have here.  Also,

10  what is different in that case is released parties are

11  putting in large quantifiable dollars, in exchange for their

12  releases; for example, the insurance companies are putting in

13  $138 million and Walmart itself was putting in $28 million,

14  in exchange for the releases it's getting.

15          But here, the insurance company is putting a lot

16  less amount, which is $38 million, where in comparison, the

17  former representatives are not really putting in real

18  dollars; they're just giving a portion of their insurance

19  litigation costs and the (indiscernible) they're entitled to.

20  And putting that aside, it seemed as if the debtors did not

21  put forth any evidence, what contribution, if any, was made

22  by any of the other released parties that was set forth in

23  Section 1.99 of the definition.

24          Some examples of those parties are nondebtor

25  affiliates, professionals, managers, employees.  I'm not

1    going to give Your Honor a full definition, but it's unclear

2    to me at this moment, or anyone, whether any of those parties

3    made any contribution to this plan.

4              So, in our view -- oh, sorry, my apologies.

5              And the other case that was cited by the debtor

6    that also referenced a plan of liquidation is United Steel;

7    again, in that case, the plan was uncontested.  In our view,

8    substantive third-party releases are only appropriate in true

9    reorganization cases and not liquidation cases like this.

10             And talking about the second factor, the fairness

11   factor, in our view, the consideration provided here is not

12   fair, with respect to my client.

13             But throughout the case, the debtors, the

14   committee, the AG's Office are painting my clients as if they

15   were the bad guys that were trying to blow up this whole deal

16   for everybody else.  And I just want to say, again, that is

17   really not the case.  Again, we support the rights of those

18   survivors who want to have closure, who want to settle their

19   claims for whatever reasons they have and that's their right.

20   That's their choice.  I agree, and we respect that.

21             But the real question here and the correct

22   (indiscernible) to be made is whether their right to settle

23   should come at the expense of my client's right not to

24   settle.  In our view, the consideration is not fair in many

25   ways.  I know some of the other claimants that have agreed to

1    the settlement may have been rape or sexual assault victims

2    and, again, we obviously do not know the degree of harm

3    suffered by all of the other claimants, but what I do know is

4    my clients here are also most aggrieved victims by Harvey

5    Weinstein; they either have rape or sexual assault claims.

6           And we can all agree that a rape and sexual assault

7    victim has a monetary claim that is greater than women who

8    are merely touched or experienced verbal assault.  The

9    insurance companies are putting in $17 million to settle the

10   55 victims' claims who have suffered a different degree of

11   harm.

12          It is respectfully submitted that the sexual --

13   that the rape and sexual assault victims alone, if were

14   brought to the jury and if successful, that could easily

15   consume the full $17 million fund.

16          And as heard, you know, different parties are

17   emphasizing there's a very low likelihood of success of my

18   client to prevail on their claim, but again, that is a risk

19   that my client is willing to take and that cannot be the

20   inquiry.  Whether their expense is high or low, it is not the

21   correct inquiry to be made.  It's whether they are giving up

22   that right voluntarily or not.

23          Here, the option of opportunity to pursue on an

24   appeal is taken away from my client and, again, we think the

25   consideration is unfair for many other reasons.  For example,

1    it is not fair in our view that my clients, who have rape and

2    sexual assault claims are given the same one-dollar valuation

3    for their vote, and it's not fair to them that their voice in

4    the case is silenced or diminished by those of other women

5    who have experienced lesser harm.  It's not fair for them or

6    anyone that in order to receive full recovery under the

7    sexual misconduct fund, they have to give up -- they have to

8    agree to release their sexual assaultant [sic] or rapist;

9    otherwise, they have to release 75 percent of the potential

10   recovery.

11           And most importantly, and I just want to emphasize

12   this again, that there's more than monetary consideration

13   that my clients are seeking.  They are seeking a finding bit

14   jury that holds all responsible parties accountable, and

15   that's not just Harvey Weinstein.  That includes the former

16   representatives, such as Robert Weinstein and the other board

17   members who allegedly looked the other way and helped to

18   conceal Harvey Weinstein's misconduct.

19           What the committee and the debtors are proposing

20   right now is (indiscernible) sufficient because my clients

21   can now go after Harvey Weinstein, but in our view that's not

22   sufficient.  What is sufficient is they can go after every

23   person that should have been held accountable.

24           So, again, I just want to emphasize that from the

25   Third Circuit case law, for example, in Continental, the

1    Third Circuit repeatedly warns against the exercise of

2    unfettered discretion to discharge nondebtors from liability

3    and explained that, you know, a permanent injunction,

4    limiting the liability of nondebtor parties is a rare thing

5    and it should not be considered absent of showing exceptional

6    circumstances.  And, again, this case is not exception,

7    because it is a liquidating case.

8              And just quickly on the point of the substantive

9    consolidation, the substantive consolidation is only

10   appropriate if prepetition, the debtors have disregarded

11   separateness so significantly that creditors rely on the

12   breakdown of entity orders and treat them as one legal entity

13   or post-petition, the debtors' assets and liabilities are so

14   scrambled that severing them is prohibiting or hurting all

15   creditors.  And the burden is on the debtor to prove that.

16             And we represent that the debtors have not met the

17   burden.  First of all, the debtors did not put on any

18   evidence that prepetition, the debtors significantly

19   disregarded separateness of different debtors.  The creation

20   of many special vehicle entities by the debtors, itself, is

21   evidence showing that the debtors are trying to maintain

22   separateness among these specific entities.

23             Of those proof-of-claim forms used by the debtors,

24   require the creditors to self-identify the debtor against

25   whom they have claims.

1         (Indiscernible) the debtor has not put forth any

2     evidence showing that the creditors had trouble identifying

3     the correct creditor -- I can't speak today -- against which

4     they had claims or that the creditors treated any or all of

5     the debtors as one single entity.  (Indiscernible) the

6     debtors also failed to show that post-petition, the debtors'

7     assets and liabilities are so scrambled that separating them

8     is prohibiting.

9         Each of the debtors have filed its own schedules

10    and statements of affairs and from the schedules that the

11    debtors have filed, it appears that they were able to

12    identify their own creditors and contract counterparties.

13        And with that, that will conclude my argument and

14    we respectfully request the Court to deny the plan,

15    especially the third-party releases and channeling injunction

16    that's embodied in the plan.

17        THE COURT:  All right.  Thank you.

18        The does the debtor wish to respond?

19        MR. ZUMBRO:  Yes, Your Honor.  Thank you.

20        Can you hear me?  Are we on?

21        THE COURT:  I can.

22        MR. ZUMBRO:  Thank you, Your Honor.

23        So, a few things in rebuttal to Ms. Liu's

24    presentation.  First of all, I want to make clear, we don't

25    think of them as bad guys and we are certainly not -- that's

1   not our intention.

2           The harsh reality, Your Honor, is what I pointed

3   out in my opening remarks, which is that there's a difficult

4   choice that the Court needs to make, which is to say

5   preserving the claims that we believe are likely worthless

6   claims would be the only way we could -- would destroy the

7   ability to recover for the women who have overwhelmingly

8   voted in favor of this plan.

9           We think -- I disagree with Ms. Liu.  I think the

10  notion that this is an exceptional -- is not an exceptional

11  case, I think is a bit crazy.  I think it's a (indiscernible)

12  if I remember from law school, but this case is very

13  exceptional.  It's not like anything any of us have ever seen

14  and hopefully it's not something we will ever see again.

15          It's a very exceptional case.  We aren't not asking

16  Your Honor to sort of give a blanket blessing for third-party

17  releases; we're asking Your Honor to approve the third-party

18  releases in the specifics that we find ourselves here today.

19          Ms. Liu referred, again, to 524(g), the

20  (indiscernible) in this case.  I think she may have meant

21  524(e) in (indiscernible).  Having spent some time in

22  California on the PG&E case, if we were there, 524(e) might

23  be something we have to worry about.

24          We are not in the Ninth Circuit.  We are in the

25  Third Circuit and Millennium controls.  And as I articulated

1   earlier, I think we clearly meet the Millennium standards for

2   approval.

3          Your Honor, Ms. Liu's argument in some way, proves

4   too much.  She emphasizes that her clients are likely or

5   alleged to be rape victims.  I don't know whether that's true

6   or not, but I do know if it were true, there's no way, either

7   under the determination of a insurance policy or likelihood

8   of a matter of public policy, that an insurance policy would

9   cover rape.  That's just not the way insurance policies work.

10         So, unfortunately, she proves too much by

11  emphasizing that point.  We have obtained a settlement which

12  has third parties contributing, the insurance companies and

13  four directors, in respect of claims that they are likely not

14  legally liable.

15         And the (indiscernible) point, I think is a bit of

16  a red herring, particularly following the sale.  It probably

17  -- we should look at it from a (indiscernible) period.

18  There's no dispute that there was nothing left once the

19  secured creditors were satisfied.  There weren't -- as Your

20  Honor may recall there was litigation.  There were lots of

21  silos of different secured creditors who had different rights

22  that were (indiscernible) in an earlier part of this case,

23  following the sale.  That was not the case.

24         Post-sale, which is the relevant period, it would

25  be impossible.  As Mr. Peck testified, and I don't think the

1    testimony was controverted, the key point is it would be

2    impossible to know which particular legal entity was

3    implicated in the sexual misconduct claims (indiscernible)

4    interviewed for Project Runway or if she came to talk about

5    (indiscernible) it's impossible to know when the misbehavior

6    occurred.

7           Your Honor, just to clarify one point from Ms.

8    Smith's testimony, Section 5.7 of the plan -- Ms. Smith

9    didn't have it in front of her -- but the point of Harvey

10   Weinstein's contribution, in respect to his release, Mr.

11   Weinstein is a named -- Mr. Harvey Weinstein is a named

12   insured under the insurance policies.  Section 5.7 of the

13   plan provides specifically that the defense costs are not,

14   the reimbursements (indiscernible) is not a benefit to Mr.

15   Weinstein.  He's entitled to -- effectively, he has raised

16   those rights as his form of substantial contribution to the

17   plan.

18          Finally, two final points.  Ms. Liu talked about

19   the (indiscernible) case, which is one case, it was an

20   employment-based case where Mr. Robert Weinstein, a plan

21   against him survived a motion to dismiss.  Your Honor, I

22   think it's very important (indiscernible) spoke eloquently

23   earlier about her clients.  The plaintiff under that specific

24   case supports the plan.

25          Finally, Your Honor, I would argue that the

1    rambling road, that Mr. Mintzer took us down in his

2    cross-examination of Ms. Smith showed us just how important

3    it is to confirm this plan today.  Continuing to discuss

4    Robert Weinstein's relationship with his brother or Harvey

5    Weinstein's 2015 employment agreement is not in the interests

6    of Harvey Weinstein's victims.

7            It's 2021.  Closure, as Ms. Grassgreen eloquently

8    discussed in her remarks, is a fair and private process that

9    provides for a guaranteed recovery of a fair amount

10   (indiscernible) Harvey Weinstein's victims interest as of

11   this by an 83 percent approval of this plan.

12           Your Honor, to answer the question that I posed

13   earlier, this Court can approve this plan and under the

14   applicable legal authority, set aside by the Third Circuit,

15   this Court should approve this plan, and we'd respectfully

16   ask Your Honor to do so today.  Thank you, Your Honor.

17           THE COURT:  Thank you.

18           Anybody else?

19           MS. GRASSGREEN:  Your Honor, may I be heard?  Ms.

20   Grassgreen.

21           THE COURT:  You may.

22           MS. GRASSGREEN:  Your Honor, I just rise at my

23   virtual podium, I just want to address one point that was

24   made in the closing by the objectors where they talk -- they

25   tried to make the case that somehow money is being diverted

1    from the victims, the sexual misconduct victims, the

2    survivors, to the trade creditors.  And what you heard me say

3    in my remarks is it's the opposite, exactly the opposite.

4            And the reason is, Your Honor, that the estate has

5    claims against the former representatives and the estate

6    claims against the former representatives are being settled

7    here.  They include breach of the duty of loyalty, breach of

8    the implied covenant of good faith and fair dealing,

9    interference with contract, we can go on and on.  Those

10   claims and the estate's claims, any settlement on account of

11   those belong equally to the trade creditors and the holders

12   of the sexual misconduct claims.

13           But what's happening here and why I said this is a

14   gift by the trade creditors, and it absolutely is, is that

15   the insurance companies are paying money and it's a fixed

16   fund and it's untouchable, for the survivors of the sexual

17   misconduct, and there's another fund that's going to the

18   trades.  And it's not *pro rata*.  The trade creditors are

19   getting much less and they're doing that because they

20   acknowledge how important this is.  They wanted to make the

21   plan work and, again, they voted 96 percent in favor of the

22   plan.

23           I just think that's a really important distinction

24   that we need to not lose sight of and, again, because the

25   alternative is a Chapter 7 where everybody is going to have

1  to share in any recovery of the estate claims, which you

2  would expect that a Chapter 7 Trustee would bring, you know,

3  if they could even fund such an event.

4          I absolutely want to state the same thing you heard

5  from Mr. Zumbro.  No one is trying to victimize these

6  objectors.  Absolutely not the committee.  We sympathize with

7  them.  It's heartbreaking what they went through, but at the

8  end of the day, they have their day in court against the

9  wrongdoer.  The releases are narrow; they're only against the

10  former reps and none of those claims have been sustained and

11  they said themselves their claims against the former reps

12  have been dismissed; it's just their appellate rights that

13  are being impacted.

14          So, Your Honor, I'm not going to repeat everything

15  I said.  You heard it from me.  You heard it from my heart

16  and you've known me for a long time.  This is fair.  This

17  should be approved.  This is the best we're going to do.

18  Everyone has worked really, really hard to get here.

19          And I'm sorry that this is not perfect for all of

20  the objectors, but it's never going to be perfect.  The few

21  Chapter 11 cases where everybody gets everything they want,

22  it's just a circumstance and where Mr. Zumbro started, this

23  is a horrible, awful circumstance, but the fact that we're

24  here and we're giving these women a choice is fabulous under

25  these circumstances and we ask you to please approve it.

1    Thank you.

2              THE COURT:  All right.  Does anybody else wish to

3    be heard?

4              MR. PFEIFFER:  Yes, Your Honor.  Mark Pfeiffer --

5              THE COURT:  Yes.

6              MR. PFEIFFER:  -- from Buchanan Ingersoll & Rooney,

7    for Sartraco.

8              THE COURT:  All right.  Thank you.

9              MR. PFEIFFER:  One housekeeping matter.

10             My client filed objection to the plan, which has

11    been addressed by a slight tweak to the carve-out to the

12    release.  So, my objection is really moot at this point.

13             THE COURT:  Okay.  Thank you for speaking up.

14             All right.  Anybody else wish to be heard?

15        (No verbal response)

16             THE COURT:  I hear none.

17             All right.  Well, let me make my ruling here.

18    First, I agree with the debtor that in the Third Circuit, the

19    Third Circuit tells us that Bankruptcy Courts can approve

20    nonconsensual releases where they are integral to

21    confirmation of a plan and, specifically, in the Millennium

22    case, the Court held that there are standards that have to be

23    met.  There must be fair consideration given for the release.

24    It must be fair.  And it must be necessary to confirmation.

25    The Courts also look at a fourth factor; that is, whether

1    there's overwhelming support for the plan by the affected

2    creditors.

3          So, let me take care of those factors in order.

4    First, in this case, I think there is fair consideration

5    given for the releases.  The former directors and officers

6    are waiving defense claims they have, which under the

7    insurance policies, they would have been entitled to have

8    paid before any other claims are paid out of the insurance

9    proceeds.

10          With respect to Mr. Harvey Weinstein, he is waiving

11    all of his defense-cost claims.  The other directors and

12    officers, as a group, are waiving 50 percent of their defense

13    claims through April 2019, and so that 50 percent is probably

14    larger at this time.

15          The insurance companies are contributing $35

16    million to fund the plan of reorganization.  I think it's

17    clear that under this plan, creditors are getting more than

18    if there were a Chapter 7 liquidation, which is the only

19    other alternative.

20          The only nonconsensual release is the release of

21    the former directors and officers, other than Harvey

22    Weinstein, because the creditors have the right to not agree

23    -- the tort claimants have a right to not agree to any

24    release of Harvey Weinstein.

25          The objectors say that this nonconsensual release

is not fair.  Well, first, let me talk about -- they say that

the releases are not necessary because there is not a plan of

reorganization or a reorganization of the debtor that is

proceeding.  And I would object to that.  There are cases of

liquidating debtors that have included third-party releases

and even nonconsensual third-party releases and the debtor

has cited those cases.  So, I'd reject that.

So, back to a fair consideration for the releases.

The objectors argue that it is not fair for them to get a

full recovery from the fund, only if they agree to release

Harvey; however, that is their choice.  They were given a

choice as to whether or not after their claim is determined

in the plan process to make a decision as to whether or not

they believe they would recover more if they do not release

Mr. Harvey Weinstein than if they do agree to the release.

They characterize, also, the choice as being not

fair of them to have to release the other directors for only

a 25 percent recovery; however, I think that's fair under the

circumstances of this case, fair consideration because,

number one, the insurance carriers have said that they will

not agree to give anything if they do not at least get a

release of all the other directors and officers.  They have

agreed that that is not necessary as to Mr. Weinstein.

Secondly, though, the fact is that in every case,

except one, claims filed by sexual abuse victims against the

1    other directors and officers have been dismissed by the

2    Court.  And while they have not received it through appeal, I

3    think it is significant or at least evidence to this Court

4    that the fact that the trial courts have dismissed those

5    claims has some suggestion as to whether or not those claims

6    would be bound or what the value of those claims would be.

7              With respect to, again, the necessity of the

8    releases to confirmation, which I think is the proper test

9    not to reorganization, it is clear that without the

10   contributions by the insurance company and the directors and

11   officers who are being released, there could be no

12   confirmation.  The debtor has $3 million, which is not

13   sufficient to pay administrative claims, let alone any

14   recovery for other creditors.  So, without the settlement, no

15   plan is possible.

16             I don't accept the suggestion in cross-examination

17   that if everybody went back to the drawing board, that there

18   would be additional recovery or substantial additional

19   recovery.  I accept that the parties have negotiated in good

20   faith and this is what is available and is what I'm being

21   asked to determine whether it is necessary to confirm a plan

22   here.

23             The debtor has already filed a motion to convert

24   and has expressed its intention to convert if the plan is not

25   confirmed.  I think it is clear based on the liquidation

1    analysis, again, that conversion would not result in a

2    greater recovery for any of the general unsecured creditors.

3    Is it not clear whether a trustee would pursue the

4    complicated, extensive litigation that is necessary, first,

5    against the insurance companies for coverage of the various

6    tort claims and, secondly, underlying lawsuits that the tort

7    victims have filed.

8             It is also, I think, I've said, significant to the

9    Court that there has been overwhelming support for this plan

10   by not only general unsecured creditors, generally, but by,

11   specifically, the class of tort creditors.  Over 83 percent

12   -- almost 83 percent have voted in favor of it and only 4

13   have opposed it.

14            And I will not get into an analysis of whether one

15   victim's claim has under validity or more value than

16   another's.  I think that's going down a rabbit hole.  It is

17   not for this Court to determine that.

18            Every victim of Harvey Weinstein was victimized and

19   deserves to have its say into the plan confirmation.  And if

20   they choose not to release Mr. Weinstein, they have the right

21   to go and have a jury trial or resolution and closure for

22   them as a result of his abuse.  But 83 percent of the victims

23   have expressed very loudly that they want closure through

24   acceptance of this plan, that they do not seek to have to go

25   through any further litigation in order to receive some

1    recovery, some possible recompense for what was done to them;

2    although, it is clear that money alone will never give them

3    that.  But I can only deal with the financial aspect of this,

4    and the Bankruptcy Code provides that creditors should

5    decide, as a class, how they want their claims to be treated.

6    And in this case, both the trade creditors and the tort

7    creditors, have come to a resolution with some recovery for

8    the victims of Mr. Weinstein's terrible conduct.

9         Let me address some of the other objections.  The

10   objectors say that 524 specifically precludes the grant of

11   any third-party releases or channeling injunctions, but the

12   Third Circuit has already spoken to that.  In Millennium and

13   in other cases, the Court has allowed under exceptional

14   circumstances, a third-party release, even when it is not

15   consensual.

16        And I think that the case that is before me is one

17   of the most exceptional cases.  It cries out for the granting

18   of third-party releases; albeit, nonconsensual third-party

19   releases, as to the other directors and officers.  Because

20   without that, I find that the victims of Mr. Weinstein's

21   actions would get minimal, if any, recovery.

22        With respect to substantive consolidation, that is

23   a harder standard for a debtor to meet.  The debtor does have

24   to show that the creditors have disregarded the separateness

25   of the debtors and that it would be impossible to determine

1    who has claims against which entity.  And while with respect

2    to the trade creditors, it might have been easier.  I think

3    that even as to them, the way that the Weinsteins ran their

4    company, would make it very difficult, if not impossible, to

5    determine against which entity a creditor would have a claim.

6         The TWC Company oversaw everything.  It did a lot

7    of matters.  It did a lot of administrative and other

8    activities that even the special purpose vehicles did not

9    reimburse.  Mr. Weinstein, himself, was provided numerous

10   services with respect to marketing and distribution.  It

11   inured to the benefit of every SPV, every forum that The

12   Weinstein Company participated in.

13        But with respect to the victims themselves, it

14   would be -- I am not going to put the victims in the position

15   of having to prove that if they came in for an interview for

16   a role or having them try to figure out what legal entity

17   that role dealt with, and especially since there has been

18   evidence that Mr. Weinstein's abuse of the victims did not

19   happen once, that many of the victims were abused over

20   several years, and I think that with respect to that, it

21   would be impossible to determine if it was with respect to a

22   specific project or a specific special purpose vehicle owned

23   or whether it was with respect to The Weinstein Company,

24   itself.

25        And I think that especially in this case, the

1    victims do not need to be put to that burden.  They have

2    suffered enough.  So I think that substantive consolidation,

3    where the insurance companies are contributing funds under

4    policies that covered more than one debtor, in order to

5    result in a recovery to the general unsecured creditors and

6    more importantly, the abuse victims, is appropriate in this

7    circumstance.  I think it's very appropriate because it will

8    assure that those victims are able to receive some recovery

9    now without waiving many, many more years to determine or

10   resolve their litigation claims, recovery claims against the

11   insurance companies, and then a determination as to which

12   debtor posed that claim.  So, for that reason, I will

13   overrule the objections and I will confirm this plan.

14          The debtor has submitted a revised plan -- excuse

15   me -- a revised form of order that had the one resolution, I

16   think.

17          MR. ZUMBRO:  We have Your Honor.  I think I was

18   being informed that there was one or two tweaks that were

19   made during the course of this hearing, but I think we'll be

20   in a position to upload a revised form of confirmation order

21   shortly today.

22          THE COURT:  All right.  And you'll do that under

23   certification of counsel.  Just let my chambers know.  That's

24   fine.

25          MR. ZUMBRO:  We will, Your Honor.

1          In closing, I do want to thank Your Honor, not only

2     for your ruling today, but I really want to offer on behalf

3     of the debtors and the committee, a heartfelt thanks to the

4     Court for your fair and impartial supervision in these cases

5     from the very first hearing back in March of 2018.  These

6     have been difficult cases and we really do appreciate the

7     guidance and the supervision the Court has provided for us,

8     so thank you.

9          THE COURT:  Well, I appreciate the efforts of the

10    debtor and all of the parties that participated in years of

11    negotiations to get us to this point.

12         All right.  That being all that's before the Court,

13    we will stand adjourned.

14         COUNSEL:  Thank you, Your Honor.

15     (Proceedings concluded at 5:37 p.m.)

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2              I certify that the foregoing is a correct

3       transcript from the electronic sound recording of the

4       proceedings in the above-entitled matter to the best of my

5       knowledge and ability.

6

7

8

9       /s/ William J. Garling                    January 25, 2021

10      William J. Garling, CET**D-543

11      Certified Court Transcriptionist

12      For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25