**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re: | Chapter 11 |
|---|---|
| THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*[1] | Case No. 18-10601 (MFW) |
| | (Jointly Administered) |

**APPLICATION OF LOUISETTE GEISS, CO-CHAIR OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES RENDERED AS A SUBSTANTIAL CONTRIBUTION IN THESE CASES UNDER 11 U.S.C. § 503(b)(3)(D)**

Louisette Geiss ("Ms. Geiss"), Co-Chair of the Official Committee of Unsecured Creditors, hereby files this application (the "Application") pursuant to Sections 503(b)(3)(D) and 503(b)(4) of Title 11 of the United States Code (the "Bankruptcy Code") seeking payment of professional fees and expenses incurred by Ms. Geiss and other victims represented by Ms. Geiss' Counsel based on the substantial contributions made for the benefit of the Debtors' estates in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), and in support thereof, Ms. Geiss respectfully states as follows:

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are 3837. The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

**PRELIMINARY STATEMENT**

1. The Chapter 11 Cases were precipitated by numerous women bravely stepping forward to accuse Harvey Weinstein, the co-founder and (now former) co-Chairman of the Debtors[2] of sexual assault and rape. Absent a consensual resolution among the parties, it was unlikely that the Debtors would be able to confirm a plan in Chapter 11 and the victims would receive a minimal distribution, if any, on account of their claims. Ultimately, almost three years after the Petition Date, the Court confirmed the Debtor's Fifth Amended Chapter 11 Plan of Liquidation [D.I. 3195] ("Fifth Amended Plan" or "Plan"). The formulation and confirmation of the Plan, including the creation of the Sexual Misconduct Claims Fund (the "Fund") for Holders of Sexual Misconduct Claims was the direct and proximate result of a settlement among Ms. Geiss, as a representative of other victims, the Debtors, the Debtors' former insiders, the Official Committee of Unsecured Creditors (the "Committee" or "UCC"), the Office of the New York Attorney General ("NYOAG"), and certain insurers (the "Insurance Companies"), all achieved through approximately two years of mediation and negotiation in which Ms. Geiss and her counsel, Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Brown Rudnick LLP ("Brown Rudnick," and together with Hagens Berman, "Geiss Counsel"), took a leadership role.[3]

2. Ms. Geiss and her counsel provided a substantial contribution to the bankruptcy estate in the over two years of intensive negotiation necessary for the settlement and Fund embodied in the Plan. As explained below, once efforts began in May 2018 to explore, in mediation, a global settlement of all civil claims against the former directors and officers of

[2] Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.

[3] Geiss Counsel also represented other tort creditors and victims in connection with the Chapter 11 Cases and other matters involving Harvey Weinstein and the Debtors, but Ms. Geiss was named to co-chair the Committee.

Debtors, Ms. Geiss and her counsel led all efforts during the critical period when such efforts were made to structure a proposed global settlement. Geiss Counsel interacted at times virtually daily during an intensive but critical period from June 2018 through June 2019, as well as several periods thereafter, and was instrumental in organizing and acting, at critical times, on behalf of various creditor constituencies in close consultation with the NYOAG to bring as much global consensus as possible to the negotiating table. Further, in a settlement predicated on funding by Insurance Companies, Ms. Geiss and her counsel played a decisive role in facilitating the participation of such carriers as part of a global deal. During this critical period of settlement negotiations, Ms. Geiss and her counsel effectively led and facilitated negotiations for various plaintiff constituencies to try to achieve (while always seeking their consent) the best possible global economic deal on behalf of both those tort victims whose counsel agreed to participate in the global settlement efforts, the Committee, the NYOAG, and even the Debtors. The global settlement reflected in the Plan approved by the Court would not have occurred but for the tenacious efforts of Ms. Geiss and her counsel, in particular, during an approximately one-year period when they took the lead in virtually all global negotiations. While Ms. Geiss and her counsel are constrained by virtue of the confidentiality restrictions of the mediation from detailing the full extent of the work conducted to facilitate the global settlement reached, it cannot be disputed that during a critical period of settlement negotiations, including prior to, during, and after a series of all-day all-hands mediation sessions, Geiss Counsel served as a primary point of contact on behalf of the tort victims who ultimately have approved the Plan and on behalf of other interested parties, including the UCC, the NYOAG and even the Debtors, with the mediator, the former officers and directors and the Insurance Companies. Beyond this critical period, Ms. Geiss and her counsel

continued to actively participate in numerous conversations with the mediator and interested parties, negotiations, and drafting sessions to finalize the global settlement.

3. While the total of incurred actual and necessary unpaid charges of Geiss Counsel is in excess of $1.7 million in attorneys' fees on mediation and Plan-related work alone that was essential to the Plan, and approximately $173,392.92 in mediation related expenses (including payment of more than $89,000 in mediation administrative JAMS expenses by Hagens Berman), Ms. Geiss requests payment of **$1,173,392.92** from the bankruptcy estate as an administrative expense, representing a significant reduction in actual post-petition fees and expenses incurred.[4] A redacted copy of the time entries is attached hereto as **Exhibit A** and **Exhibit B**.[5] It is proposed that Hagens Berman and Brown Rudnick, each receive $500,000 payment for their respective legal fees, and that the expense reimbursement be allocated $147,877.33 to Hagens Berman and $25,515.59 to Brown Rudnick. Geiss Counsel do not seek to have their substantial contribution application invade or impact in any respect the Sexual Misconduct Claims Fund, as defined in the Plan, and believe that there are sufficient administrative funds available to satisfy this substantial contribution claim.

## FACTUAL AND PROCEDURAL HISTORY

4. On December 6, 2017, on behalf of Louisette Geiss, Katherine Kendall, Zoe Brock, Sarah Ann Thomas (a/k/a Sarah Ann Masse), Melissa Sagemiller, and Nannette Klatt ("Original

[4] Total unpaid fees incurred by both firms, including both mediation related and non-mediation related attorney time, are materially in excess of the fees incurred in connection with mediation-related efforts. In view of the limited funds remaining for administrative expenses, Ms. Geiss has requested a lower figure than the actual mediation related fees that were incurred.

[5] Substantially contemporaneously herewith, the Movant is filing a motion to seal the Exhibits containing the time entries of Ms. Geiss' Counsel. As more fully set forth in the motion to seal, an unredacted copy is being provided to counsel for the Debtors, the Creditors Committee, and the Office of the United States Trustee.

*Geiss* Plaintiffs"), Hagens Berman filed the original Class Action Complaint, *Geiss et al. v. The Weinstein Company Holdings, LLC et al.*, No. 1:17-cv-09554-AKH (S.D.N.Y.) (the "District Court Action"). The Original *Geiss* Plaintiffs alleged Harvey Weinstein isolated Plaintiffs and Class Members (collectively and together with any other Holders of Sexual Misconduct Claims under the Plan, the "Victims") in an attempt to engage in unwanted sexual conduct that took many forms: flashing, groping, fondling, harassing, battering, false imprisonment, sexual assault, attempted rape and/or completed rape. Plaintiffs sought recovery for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), civil battery, assault, and intentional and negligent infliction of emotional distress against the Debtors, Non-Debtor Entities, and Director Defendants, including Harvey Weinstein. Plaintiffs also sought recovery from the Debtors, Non-Debtor Entities and Director Defendants for the negligent supervision or retention of Harvey Weinstein.

5. On March 19, 2018 ("Petition Date"), The Weinstein Company Holdings LLC and its affiliates ("Debtors") filed the Chapter 11 Cases, pursuant to voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 18-10601.

6. Ms. Geiss was appointed to serve as Co-Chair of the UCC in the Chapter 11 Cases. Based on her appointment, Geiss Counsel attended regular telephonic and in-person meetings of, and negotiations with, the UCC, together with Ms. Geiss and attorneys from Hagens Berman and Fegan Scott.[6] Hagens Berman retained Brown Rudnick to act as bankruptcy counsel on behalf of Ms. Geiss and other tort victims.

[6] Elizabeth Fegan, attorney for Ms. Geiss, was a partner of Hagens Berman during much of this time but is now a partner at Fegan Scott LLC ("Fegan Scott").

7. On May 9, 2018, this Court approved the sale of substantially all of the assets of the Debtors to Lantern Entertainment. The sale closed on July 13, 2018. [D.I. 846].

8. On May 25, 2018, Harvey Weinstein was arrested in New York and arraigned by the New York District Attorney ("NYDA") on charges of criminal sexual act in the first degree (Penal Law §130.50(1)), rape in the first degree (Penal Law §130.35(1)), and rape in the third degree (Penal Law §130.25(1)). A grand jury formally indicted Weinstein on those charges on May 30, 2018, in the matter *The People of the State of New York v. Harvey Weinstein*, Docket No. 2018NY023971. On June 5, 2018, Weinstein pleaded not guilty.[7]

9. On June 1, 2018, on behalf of additional women including unsecured creditor Melissa Thompson, Hagens Berman filed the second Class Action Complaint in *Dulany et al. v. Miramax Film NY, LLC et al.*, No. 1:18-cv-4857-AKH (S.D.N.Y.), based on similar allegations and causes of action. Joint Declaration of Elizabeth A. Fegan and Steve W. Berman in Support of the Application, filed herewith ("Fegan/Berman Declaration") at ¶ 22.

10. Starting with a mediation session on June 22, 2018, Geiss Counsel became the primary point of contact for and took the lead in mediation seeking to resolve the claims of the Victims in the Chapter 11 Cases. Fegan/Berman Declaration at ¶ 44; Declaration of Sigmund S. Wissner-Gross in Support of the Application, filed herewith ("Wissner-Gross Declaration") at ¶ 8.

11. On July 2, 2018, the NYDA filed a superseding indictment charging Harvey Weinstein with the crimes of predatory sexual assault (Penal Law §130.15(2)), criminal sexual act in the first degree (Penal Law §130.5(1)), rape in the first degree (Penal Law §130.35(1)), and rape in the third degree (Penal Law §130.25(1)). Fegan/Berman Declaration at ¶ 23.

[7] Harvey Weinstein was ultimately tried, convicted, and sentenced in New York state court, where he is currently incarcerated. He has also been charged in California. *See The People of the State of California v. Harvey Weinstein*, No. BA483663 (Cal. Sup. Ct.).

12. On September 12, 2018, the District Court for the Southern District of New York held oral argument on the motions to dismiss the *Geiss* Complaint. The court granted the motions to dismiss without prejudice and with leave to amend. *Id.* at ¶ 24.

13. On October 31, 2018, on behalf of the Original *Geiss* Plaintiffs and *Dulany* Plaintiffs, Hagens Berman filed the First Amended Class Action Complaint in the *Geiss* litigation. In addition to amending the factual allegations, Plaintiffs also added defendants, including but not limited to former employees of the Debtors. *Id.* at ¶ 25.

14. From June 22, 2018 onward, Ms. Geiss and her counsel coordinated their efforts with other crucial stakeholders in the Chapter 11 Cases in a leadership role. It was understood by all parties that it was Geiss Counsel who would take the lead interacting with the mediator, and working on behalf of a variety of parties with actual or potential claims against Harvey Weinstein and against the former Weinstein officers and directors to advance a possible global settlement. First, Geiss Counsel coordinated closely with the NYOAG, which had commenced its own separate civil proceeding in New York Supreme Court relating to Weinstein's conduct, and was continuing its investigation into the matter. Geiss Counsel further undertook, in a lead capacity, to interact with counsel to other tort victims who had commenced separate lawsuits in California, New York, Canada, and the United Kingdom in an effort to secure a more global settlement. Geiss Counsel also engaged with the UCC, which included both tort victims and trade creditors among its members, to make sure that the steps they were taking during the critical global negotiations were in accord with the objectives of the whole Committee. Geiss Counsel also negotiated with counsel to various of the former directors and with representatives of the Insurance Companies in order to secure a fully funded global resolution. For example, on or about October 11, 2018, Elizabeth A. Fegan made a several-hour mediation-related presentation at Brown Rudnick's

offices to counsel for the directors and various Insurance Companies. Finally, while the Debtors' counsel maintained their independence during the mediation process, Geiss Counsel coordinated their efforts with Debtors' counsel, keeping Debtors' counsel in the loop with respect to Geiss Counsel's efforts as lead to secure a global settlement. Ms. Geiss, through her counsel, also interacted with counsel to various of the former directors and with representatives of the Insurance Companies in order to secure a global resolution. In short, during this critical period, Ms. Geiss and her counsel, working closely with the mediator, served as the primary point of contact for various parties pursuing or reserving the right to pursue claims against Harvey Weinstein and the former officers and directors, and effectively led the mediation efforts on their behalf. *See generally* Fegan/Berman Declaration; Wissner-Gross Declaration.

15. Most crucially, Geiss Counsel hosted four full days of in-person mediation sessions on November 6-7, 2018 and December 11-12, 2018 at the New York offices of Brown Rudnick. As many as approximately 70 professionals representing the interests of different parties attended these sessions. Geiss Counsel thereafter sought—and, despite certain adverse District Court rulings, ultimately obtained—a settlement that would provide global peace to Victims and several other tort victims who had filed their own direct actions, the NYOAG, Debtors, Debtor's former officers and directors, the UCC, and Insurance Companies. Additional all-hands in-person sessions occurred on April 25, 2019 and May 29, 2019. These efforts materialized in the Fund, which provides $17,064,525.30 for the Victims through the Plan. This was a substantial contribution to the bankruptcy estate. *See* Wissner-Gross Declaration at ¶¶ 8-16; Fegan/Berman Declaration at ¶¶ 34-42.

16. The efforts of Ms. Geiss and her counsel during these all-hands in-person and other mediation sessions and extensive mediation-related efforts benefitted all parties, produced a direct

benefit to the bankruptcy estate, and were not duplicative of services rendered by attorneys for the UCC or the Debtors. As counsel for the leading party, Geiss Counsel updated counsel for the UCC and the Debtors as to its efforts, for example, before, during, and after the November and December 2018 mediation sessions. While counsel for the UCC and Debtors monitored the mediation sessions, it was Geiss Counsel who took the lead and updated both UCC counsel and Debtors' counsel as to progress that was being made. *See id.* at ¶¶ 6-8; 12.

17. Consistent with the foregoing, on November 6, 2018, Debtors moved to give the UCC authority to prosecute and settle actions on its behalf with respect to director-and-officer claims (the "Affected Claims"). *See Joint Motion Of Debtors And Official Committee Of Unsecured Creditors To Approve Stipulation Granting Leave, Standing, And Authority To The Official Committee Of Unsecured Creditors To Investigate, Prosecute, And Settle Certain Claims And Causes Of Action* [D.I. 1668]. At that time, Debtors argued that such a delegation was "in the best interest of the Debtors' estates and beneficial to the fair and efficient resolution of these chapter 11 cases because, among other things, it will avoid the unnecessary duplication of efforts." *Id.* at ¶ 17.

18. All parties understood at the time that Geiss Counsel would be acting on behalf of the UCC in taking the lead in the mediation process. Indeed, the Debtors also noted in their application that the UCC included "tort claimants on the Committee [who] have retained sophisticated legal advisors and have spent significant time evaluating and discussing outbound estate claims and the best ways to maximize value in connection with those claims, and have discussed those evaluations at confidential Committee meetings and with Committee professionals over the course of several months." The Debtors went on to tell this Court that the UCC and its members "had the benefit of those extensive discussions and evaluations, while the [Debtors']

New Board necessarily has not, in keeping with the parties' prior agreement regarding the division of responsibilities between the Debtors and the Committee." *Id*. at ¶ 20.

19. Similarly, Geiss Counsel kept the UCC's counsel posted of Geiss Counsel's efforts, as they pursued a global settlement with the former directors and officers and the Insurance Companies at the all-day all-hands mediations in November and December 2018. *See* Wissner-Gross Declaration at ¶ 8; Fegan/Berman Declaration at ¶ 39.

20. On April 18, 2019, the District Court for the Southern District of New York granted in part and denied in part Harvey Weinstein's motion to dismiss and granted the remaining Defendants' motions to dismiss. Fegan/Berman Declaration at ¶ 30.

21. Geiss Counsel participated in multiple additional negotiation sessions with the UCC, Debtors, and Debtor's former officers and directors, both in person and via telephone, and was directly involved in numerous other efforts to advance a global settlement. Additional all-hands mediation sessions were held on or about April 25, 2019, and May 29, 2019. Additional mediations with certain parties took place on or about August 16, 2018 (defense counsel only) and October 24, 2018 (insurance counsel only). As noted, Hagens Berman also incurred considerable administrative mediation expenses by sharing with the Debtors one-half of all JAMS mediation expenses.

22. This intensive period of negotiation eventually led to an agreement in principle and a term sheet outlining the contours of a settlement. The parties signed the settlement term sheet in late 2019. *See* Wissner-Gross Declaration at ¶ 14; Fegan/Berman Declaration at ¶ 46. The material terms of this term sheet became the basis of the Sexual Misconduct Claims Fund embodied in the Plan.

23. With the term sheet in place, the parties continued the painstaking work of negotiating the terms of a settlement agreement and plan. *See* Wissner-Gross Declaration at ¶ 15; Fegan/Berman Declaration at ¶ 47.

24. Further negotiation sessions occurred among the parties, including in person and Zoom drafting sessions, continuing negotiation and coordination of the terms of the settlement agreement and Plan, including but not limited to sessions or phone conferences on the following dates: March 2, 2020, March 12, 2020, March 19, 2020, March 26, 2020, April 16, 2020, May 15, 2020, June 10, 2020, June 24, 2020, July 21, 2020, and August 28, 2020. *See* Fegan/Berman Declaration at ¶ 47.

25. On June 30, 2020, the Debtors filed the Chapter 11 Plan of Liquidation with this court and counsel filed the Motion for Preliminary Approval of the Class Action Settlement [Docket No. 333] (the "<u>District Court Proposed Settlement</u>") in the District Court Matter before Judge Hellerstein.

26. On July 14, 2020, Judge Hellerstein entertained oral argument and declined to approve the Class Action Settlement. [Dist. Ct. Dkt. No. 357].

27. Geiss Counsel, the Debtors, Harvey Weinstein, Robert Weinstein, other former members of the board of representatives of and/or directors and officers of the Debtors, the NYOAG, and numerous insurance companies conducted additional negotiations and revisions to submit the Fifth Amended Plan filed on September 1, 2020. *See* Fegan/Berman Declaration at ¶ 47.

28. After further discussions, revisions, negotiations, and amendments, the Fifth Amended Plan was submitted to this Court on January 20, 2021. At Section 5, the Plan includes a proposed compromise and settlement under section 1123(b)(3) of the Bankruptcy Code and

Bankruptcy Rule 9019. This settlement includes a payment of $35,214,882.30 by the Insurance Companies on behalf of the Debtors, certain former officers and directors of the Debtors, and Harvey Weinstein, to the extent Victims affirmatively elect to release Harvey Weinstein (collectively, the "Released Parties"). That amount is allocated as follows: (i) $17,064,525.30 to the Sexual Misconduct Claims Fund, out of which Victims are paid, (ii) $8,407,305.00 to the Liquidation Trust Settlement Payment to cover administrative expenses, and (iii) $9,743,052.00 to the Former Representatives Defense Costs, which does not include any reimbursement for defense costs incurred by Harvey Weinstein. As a part of this settlement, the Insurance Companies withdraw their claims against the Debtors, and all claims against the Released Parties are channeled to the Fund with the exception of certain opt-out general unsecured creditors.

29. On January 26, 2021, this Court entered the Order Confirming Plan Proponents' Fifth Amended Joint Chapter 11 Plan of Liquidation. [D.I. 3203]. The Plan went effective on February 18, 2021 (the "Effective Date"). [D.I. 3258].

**JURISDICTION AND VENUE**

30. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**BASIS FOR RELIEF**

A. Bankruptcy Code Section 503(b) Authorizes the Requested Payments.

31. Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code authorize the bankruptcy court to award compensation to creditors for their legal and other expenses incurred in making a "substantial contribution" in a case. Section 503(b) of the Bankruptcy Code provides in pertinent part:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> . . . .
>
> (3) the actual, necessary expenses. . . incurred by—
>
> (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, **in making a substantial contribution in a case under chapter 9 or 11 of this title**;
>
> . . . .
>
> (4) reasonable compensation for **professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3)** of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;
>
> . . . .

11 U.S.C. § 503(b) (emphasis added).

32. "The inquiry concerning the existence of a substantial contribution is one of fact" for a bankruptcy court to decide. *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 946 (3d Cir. 1994). Accordingly, bankruptcy courts have wide discretion to determine the amount of expense to award. *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988). As a question of fact, the applicant has the burden of showing by a preponderance of the evidence that a substantial contribution was made. *In re Summit Metals, Inc.*, 379 B.R. 40, 50 (Bankr. D. Del. 2007), *aff'd*, 406 F. App'x 634 (3d Cir. 2011).

33. To determine whether there has been a substantial contribution under section 503(b)(3)(D), "the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." *Lebron*, 27 F.3d at 944 (quoting *Lister*, 846 F.2d at 57); *accord In re Worldwide Direct, Inc.*, 334 B.R. 112, 121 (Bankr. D. Del. 2005) (Walrath, J.). "[S]ervices which substantially contribute to a case are those which foster

and enhance . . . the progress or reorganization." *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986); *accord Lebron* 27 F.3d at 944; *Worldwide Direct* 334 B.R. at 123.

34. Creditors are generally presumed to act in their self-interest, and to be sure, an allowance of substantial contribution under section 503(b)(3)(D) is not a low standard. But a high standard should not mean that it is an impossible standard. As this Court has said, "[i]n determining whether a creditor has met [its] burden, courts consider the following factors: 1) whether the services were rendered solely to benefit the client or to benefit all parties in the case; 2) whether the services provided direct, significant and demonstrable benefit to the estate; and, 3) whether the services were duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys." *Worldwide Direct*, 334 B.R. at 122. All three elements are more than easily satisfied here. In any event, moving creditors are not required to have acted in a purely altruistic manner, and there are instances in which creditors take a more significant role and in which the estate properly should pay for them to do so. *See In re DeVal Corp.*, 601 B.R. 725, 736 (E.D. Pa. 2019) ("[N]othing in the Bankruptcy Code requires a self-deprecating, altruistic intent as a prerequisite to recovery of fees and expenses under section 503) (quoting *In re DP Partners Ltd. P'ship*, 106 F.3d 667, 673 (5th Cir. 1997)); *accord In re Grasso*, 519 B.R. 137, 140 (Bankr. E.D. Pa. 2014). Ms. Geiss is an example of a creditor who not only meets, but significantly exceeds, the standards required by section 503(b)(3)(D).

35. Ms. Geiss is not barred from seeking recovery for a substantial contribution simply because she sits on the Committee. 4 COLLIER ON BANKRUPTCY P 503.11 (16th 2021) ("an individual committee member that makes a 'substantial contribution' under section 503(b)(3)(D) as a creditor or equity security holder, independent of the work of the committee, is eligible to seek administrative expense status for professional fees under section 503(b)(4).").

Where, as here, a committee member performs independent work to benefit the estate above and beyond their service on the committee, that work is eligible for a substantial contribution claim. *See In re Lehman Bros. Holdings, Inc.*, 508 B.R. 283, 295–96 (S.D.N.Y. 2014) (rejecting U.S. Trustee's objection to committee member's substantial contribution, nothing that "[a]lthough official committee membership alone cannot be a sufficient condition for reimbursement of professional fee expenses, it is not a disqualification."); *accord In re Grasso*, 519 B.R. 137, 140 (Bankr. E.D. Pa. 2014).

B. Ms. Geiss and Her Counsel Led, During Critical Periods, a Settlement Process that Resulted in Global Peace Among Key Parties and Cleared the Path Toward the Negotiation and Confirmation of the Plan.

36. Ms. Geiss and her counsel took the lead in driving a lengthy negotiation and mediation process among all parties, at a minimum, from mid-2018 through mid-2019 and remained actively involved in global mediation efforts thereafter. The period between mid-June 2018 and mid-2019 was a most critical period of negotiations, during which the basic structuring of the global settlement—that it would be funded by the carriers, involve general releases, and include a fund for tort victims—was developed under the leadership of Ms. Geiss and her counsel. Had Ms. Geiss and her counsel not taken the lead during this critical period, and engaged in such substantial efforts, there would never have been a global settlement reached, nor a Sexual Misconduct Claims Fund for Victims created. These negotiations resulted in a form of a proposed settlement embodied in the Rule 9019 settlement term sheet that provided "global peace" and resolved key outstanding issues among the Victims, the NYOAG, the Debtors, the Debtors' former officers and directors, the UCC, and Insurance Companies. This set the stage for the ultimate confirmation of the Plan and its Plan Support Agreement, which contain the Sexual Misconduct Claims Fund that tracks in its structure the settlements negotiated by Ms. Geiss and her counsel.

37. In allowing creditors to recover fees and expenses for substantial contributions, subsection 503(b)(3)(D) strikes a balance between the "two conflicting objectives of encouraging participation in the reorganization process and preserving the value of the estate for creditors." *In re Essential Therapeutics, Inc.*, 308 B.R. 170, 174 (Bankr. D. Del. 2004) (Walrath, J.); *accord Lebron*, 27 F.3d at 944 ("Subsection 503(b)(3)(D) represents an accommodation between the twin objectives of encouraging meaningful creditor participation in the reorganization process, and keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors.").

38. Where, as here, a creditor "ensur[es] that key parties to a reorganization are content with their treatment during a sale or under a plan," the creditor's involvement "may obviate further litigation and, perhaps, avoid a denial of plan confirmation" and thereby make a substantial contribution. *In re M&G USA Corp.*, 599 B.R. 256, 263 (Bankr. D. Del. 2019) (quoting *In re 1250 Oceanside Partners*, 519 B.R. 802, 808 (Bankr. D. Haw. 2014)). This brings the two objectives of 503(b)(3)(D) into harmony: Geiss Counsel's leadership in mediation resolved conflict and thereby reduced other administrative expenses.

39. Reducing further litigation fees was especially crucial in the context of the Chapter 11 Cases. The Sexual Misconduct Claims Fund contains approximately $17 million for Victims. But already, counsel for the Debtors and UCC have incurred approximately ***$21.8 million*** in fees as of December 31, 2020.[8] Absent the mediations led by Ms. Geiss and her counsel, and especially in light of the S.D.N.Y.'s July 14, 2020 ruling foreclosing class litigation [Dist. Ct. Dkt. No. 357],

[8] Approximately $12.2 million for Cravath, Swaine & Moore LLP ("Cravath") on behalf of the Debtors [D.I. 3209], $4.6 million for Richards, Layton & Finger, P.A. ("Richards Layton") on behalf of the Debtors [D.I. 3248], and $5 million for Pachulski Stang Ziehl & Jones LLP ("Pachulski") on behalf of the UCC [D.I. 3256].

full litigation costs in multiple one-off cases by victims in the United States, Canada, and the United Kingdom would have eaten into the remaining assets of the estate and seriously imperiled any recovery for the Victims and other creditors. Conversion of the Chapter 11 Cases was a live possibility throughout, and conflict among the parties may easily have led there. Avoiding this conflict is a substantial contribution. *See, e.g.*, *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 250, 257 (Bankr. M.D. Fla. 2006) (substantial contribution for negotiating compromise that resolved dispute which, if it proceeded to litigation, might "wipe out" estate).

40. To be sure, Ms. Geiss' efforts were neither self-interested nor duplicative of the Debtors' efforts. Had Ms. Geiss not acted, the settlement resulting in the global change to the Sexual Misconduct Claims Fund would not have occurred. Ms. Geiss' leadership throughout the mediation process was the quintessential case of a creditor stepping into the shoes of a debtor and driving an outcome that the debtors' professionals might have but did not work toward. *See In re Essential Therapeutics, Inc.*, 308 B.R. 170, 176 (Bankr. D. Del. 2004) (Walrath, J.) (administrative expense claim for professional services where "[d]ebtors' professionals may have been able to provide these services" but "they did not.").

41. In particular here, Debtors consented to Ms. Geiss leading the mediation efforts during critical periods, and Ms. Geiss received the proxy of, *inter alia*, the proposed class plaintiffs and the UCC to act on their behalf in the mediation during critical periods. *See* Wissner-Gross Declaration at ¶¶ 12, 17; Fegan/Berman Declaration at ¶ 44. It was Ms. Geiss who shared one-half of the JAMS mediation fees necessary to drive the parties to settlement. Fegan/Berman Declaration at ¶ 34. This corroborates Ms. Geiss' genuine concern for protecting the value of the estate as a whole rather than acting in narrow self-protection. *See In re Deval Corp.*, 592 B.R. 587, 600 (Bankr. E.D. Pa. 2018), *aff'd sub nom. In re DeVal Corp.*, 601 B.R. 725 (E.D. Pa. 2019)

("[m]ost significantly of all," covering CRO fees showed that creditors' role "transcend[ed] self-promotion").

42. In fact, Ms. Geiss' efforts continued well beyond the critical one year mediation period from June 2018-Juen 2019, including numerous negotiation sessions among the Parties after June 2019 to negotiate and finalize the Global Settlement Agreement resulting in the Plan confirmed by this Court. *See* Fegan/Berman Declaration at ¶¶ 42, 47.

C. The Work of Ms. Geiss and Her Counsel in Leading Negotiations Made a Substantial Contribution Despite a Delay in Confirmation.

43. It is well settled that a creditor's work leading a mediation or negotiation toward a settlement can qualify a creditor for a substantial contribution claim. *See, e.g., In re PG&E Corp.*, No. BR 19-30088-DM, 2021 WL 666333, at *2 (Bankr. N.D. Cal. Feb. 17, 2021) (substantial contribution where, through participation in a mediation, a plaintiff-creditor and its counsel resolved disputes and materially enhanced the position and potential recovery of thousands of other parties); *In re M&G USA Corp.*, 599 B.R. 256, 263 (Bankr. D. Del. 2019) ("creditor activities which result in meaningful settlements and a consensual process may constitute a substantial contribution to reorganization," in particular where creditor "facilitated and encouraged the negotiations that led to a settlement."); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 257 (Bankr. M.D. Fla. 2006) (substantial contribution where creditor committee members dedicated substantial time, effort, and funds to analyzing a key issue and negotiating a compromise); *see generally In re FF Holdings Corp.*, 343 B.R. 84, 87 (D. Del. 2006) (substantial contribution where one creditor convinced another to withdraw objection, leading to consensual plan confirmation).

44. Even where a later adverse contingency prevents a bargained-for resolution from being consummated, an administrative expense under section 503 is appropriate where a party's labor "provid[ed] valuable information, and accept[ed] certain risks, that paved the way for" the

ultimate reorganization. *In re Energy Future Holdings Corp.*, --- F.3d ---, 2021 WL 957301, at *15 (3d Cir. Mar. 15, 2021); *see also In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) (administrative expenses allowed for bidder who was ultimately unsuccessful) (Walrath, J.).

45. In *Energy Future Holdings*, a transaction approved by the bankruptcy court fell through due to a state regulatory denial. *Id*. at 3. The would-be buyer sought an administrative expense allowance for its work on the transaction under section 503(b)(1)(A).[9] *Id*. at 4. Following this Court's reasoning in *Women First Healthcare*, the Third Circuit held that it was appropriate to view administrative expense applications on behalf of ultimately unsuccessful efforts "through the rearview mirror" to see whether they "turned out" to be beneficial. *Id*. at *12.

46. So too here: the global mediation did not lead immediately to a confirmed plan, but Ms. Geiss and her counsel played a decisive role in leading and shaping the global mediation efforts, that were predicated on a structure whereby funding was provided by the Insurance Companies, releases were to be given to the Debtors, as many tort victims as possible would participate in the global deal, and the NYOAG would participate as well. *See* District Court Proposed Settlement at 14; Plan at Section V, pp. 16-17. That laid critical groundwork for the ultimate Sexual Misconduct Claims Fund and Plan. That the ultimate economics that were incorporated in the final Plan that was approved may have been different than initially proposed to the Court does not impact this application.

---

[9] *EFH* and *Women First* deal primarily with subsection 503(b)(1)(A) rather than subsection 503(b)(3)(D), but both speak in general terms of the standard for an "administrative expense." The reasoning should apply—and has been applied—in the substantial contribution context. *See, e.g., In re Deval Corp.*, 592 B.R. 587, 602 (Bankr. E.D. Pa. 2018), *aff'd* 601 B.R. 725 (E.D. Pa. 2019) (citing a general administrative expense point from *Women First* in the substantial contribution context).

47. The chief difference with *Energy Future Holdings* and *Women First* is that here, the mediation efforts *succeeded* in establishing the settlement that became the Sexual Misconduct Claims Fund, just later and under somewhat altered terms. *Compare* District Court Proposed Settlement at pp. 14-19 (proposing a $18,875,000 Class Action Settlement Fund) *with* Plan at Section V (creating a $17,064,525.30 Victims Fund with similar structure). The mediations here yielded more than just the information and hypothetical risk-bearing discussed in *Women First*—the Sexual Misconduct Claims Fund occurred as a direct result of the mediation process that Ms. Geiss led for over one year, as the time entries, District Court Proposed Settlement, Plan, and Declaration show. *See* Wissner-Gross Declaration at ¶ 17; Fegan/Berman Declaration at ¶ 35-42, 47; *see also Joint Declaration of Elizabeth A. Fegan and Steve W. Berman in Support of Motion For Preliminary Approval Of Class Settlement* [District Court Matter Docket No. 333-2] at ¶¶ 27-34 (discussing course of mediation and stating settlement emerged from "dozens of negotiation sessions"). The delays caused by the District Court rulings did not displace the basic structure and economic terms of that settlement: under both settlements, a $17-18 million fund is created for Victims, the Debtors' directors and officers were released, their Insurance Companies provided funding, and the NYOAG and the vast majority of tort victims signed on to the settlement.

48. With mediation substantially advanced and the basics of a global deal in place by early 2019, the parties were able to weather certain adverse judicial rulings that were issued in April 2019 and July 2020, and consummate the Plan, which embodies the Sexual Misconduct Claims Fund structure reached during the mediation process. Looking through the rearview mirror at the history of the case, Geiss' expenses at the mediation were actual and necessary to achieving their benefit for the Plan. Indeed, Hagens Berman advanced over $89,000 of administrative mediation expenses, sharing with the debtors one-half of all JAMS mediation expenses.

49. For all the foregoing reasons, this Application should be granted.

D. Fees and Expenses for which Reimbursement is Requested.

50. The total professional fees and expenses incurred in connection with settlement efforts is $1,921.536.35. A breakdown of these fees and expenses incurred by firm and sought is set forth in the following table:

| **Firm** | **Fees** | **Expenses** | **Total** |
|---|---|---|---|
| Brown Rudnick LLP | $945,483.43 | $25,515.59 | $970,999.02 |
| Hagens Berman LLP | $802,660.00 | $147,877.33 | $950,537.33 |
| Total fees & expenses sought | $1,000,000 | $173,392.92 | **$1,173,392.92** |

51. Attached as **Exhibit A** to this Application are the detailed time entries and cost records reflecting the specific services provided by and actual and necessary expenses incurred by Brown Rudnick in these Chapter 11 Cases.

52. Attached as **Exhibit B** to this Application are the detailed time entries and cost records reflecting the specific services provided by and actual and necessary expenses incurred by Hagens Berman in these Chapter 11 Cases.

53. Brown Rudnick and Hagens Berman are prepared to answer any questions the Court may have with respect to the services described in the Exhibits and the underlying basis for this Application.

54. Ms. Geiss respectfully submits that these fees are reasonable in both absolute terms and in relation to the other professional fees sought in this case. For example, as discussed above, the counsel for the Debtors and UCC incurred $21.8 million in fees up to December 31, 2020. Under the Plan, the Former Representatives Defense Costs total $9,743,052.00. Representatives of the Allianz and Chubb Insurance Companies reserve $500,000 under the Liquidation Trust

Agreement. *See* Plan at § 5.6. In sum, the total fees and expenses sought in this Application are less than 7% of the total for the Debtors' counsel, and less than 13% of the total for the Former Representatives Defense Costs, and less than 24% of the total for the UCC's counsel.

## NOTICE

55. Notice of this Application has been given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) Debtors' counsel; and (ii) all other parties that have requested notice in these cases.

## CONCLUSION

WHEREFORE, Ms. Geiss respectfully requests that this Court: (i) approve the Application; (ii) enter an order, substantially in the form attached hereto, authorizing and directing the Disbursing Agent to pay Brown Rudnick $525,515.59 for professional fees and expenses and to pay Hagens Berman $647,877.33 for professional fees and expenses based upon their substantial contribution to these Chapter 11 Cases; and (iii) grant such other and further relief as is just and proper.

Dated: April 5, 2021

Respectfully submitted,

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
jwaxman@morrisjames.com

HAGENS BERMAN SOBOL SHAPIRO LLP

Steve W. Berman
Shelby Smith
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
steve@hbsslaw.com
shelby@hbsslaw.com

Whitney K. Siehl
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Tel: (708) 628-4949
whitneys@hbsslaw.com

BROWN RUDNICK LLP

Sigmund S. Wissner-Gross (*Pro Hac Vice*)
Seven Times Square
New York, NY 10036
Tel: 212-209-4930
SWissner-Gross@brownrudnick.com

*Attorneys for Louisette Geiss, Co-Chair of the Official Committee of Unsecured Creditors*