**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*[1] | Chapter 11<br><br>Case No. 18-10601 (MFW)<br><br>(Jointly Administered) |

**DECLARATION OF SIGMUND S. WISSNER-GROSS IN SUPPORT OF THE APPLICATION OF LOUISETTE GEISS, CO-CHAIR OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES RENDERED AS A SUBSTANTIAL CONTRIBUTION IN THESE CASES UNDER 11 U.S.C. § 503(b)(3)(D)**

I, Sigmund S. Wissner-Gross, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am a member of the firm of Brown Rudnick LLP ("Brown Rudnick"), which maintains offices for the practice of law at, among other locations, Seven Times Square, New York, New York 10036.

2. I submit this declaration in support of the *Application of Louisette Geiss, Co-Chair of The Official Committee of Unsecured Creditors, for Compensation for Services Rendered and Reimbursement of Expenses Rendered as a Substantial Contribution in These Cases under 11 U.S.C. § 503(B)(3)(D)* (the "Application"), filed contemporaneously herewith by Brown Rudnick

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are 3837. The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

1

and Hagens Berman Sobol Shapiro LLP ("Hagens Berman," and collectively with Brown Rudnick, "Geiss Counsel") in the Chapter 11 Cases.[2]

3. Unless otherwise specified, the statements in this Declaration are based on my personal knowledge. If called to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of Brown Rudnick.

4. I understand that, in order to be allowable administrative expenses for a substantial contribution, a party's expenses must be "actual" and "necessary" expenses incurred by a creditor "in making a substantial contribution in a case under chapter 9 or 11 of this title." 11 U.S.C. § 503(b)(3)(D). I understand that the test for determining whether a creditor has made a substantial contribution looks to whether the creditor's efforts "resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." *Lebron v. Mecham Financial Inc.*, 27 F.3d 937 (3d Cir. 1994).

5. I believe that the efforts of Ms. Geiss and her counsel in the Chapter 11 Cases have resulted in actual, tangible, and demonstrable benefit to the estate, the Victims who will benefit from the Fund, and other creditors. Consequently, I believe that Ms. Geiss's Application for fees and expenses of $1,173,392.92 as an administrative expense should be allowed, of which $525,515.59 should be allocated to Brown Rudnick for its fees and expenses, with the balance to go to Hagens Berman. Brown Rudnick has attached as **Exhibit A** to the Application a copy of the time entries and expenses incurred by Brown Rudnick that pertained to the mediation, for which we seek recovery. Although Brown Rudnick's total expenditure on the Chapter 11 Cases amounts to nearly $1,400,000, we have not included the balance of Brown Rudnick's time entries and expenses that are not related to the mediation efforts, nor are we seeking recovery for the value of

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Application, or if not in the Application, then in the Plan.

2

those non-mediation-related time or expenses. Instead, to be clear, Ms. Geiss seeks only $525,515.59, 37% of Brown Rudnick's actual time entries on the Chapter 11 Cases.

6. Ms. Geiss's substantial contributions to the estate and its creditors include, but are not limited to, the following:

   a. Through Geiss Counsel's extensive negotiation and mediation work with various of the tort claimants, the New York Office of the Attorney General ("NYOAG"), Debtors, Debtors' former officers and directors, the UCC, and Insurance Companies, particularly during the critical period from June 2018 to June 2019 (and thereafter), the Debtors have achieved their goal of confirming and consummating a chapter 11 plan with the consent of major stakeholders pursuant to a global settlement (the "Global Settlement") embodied in the Plan. *See* Plan at Section 5. That Global Settlement is the cornerstone of the Plan.

   b. The Global Settlement achieved through Ms. Geiss's mediation efforts avoids what would otherwise likely have been time-consuming and costly litigation that threatened to derail the Debtors' Chapter 11 Cases.

   c. But for the efforts of Ms. Geiss and her counsel, which facilitated the basic structure of the Global Settlement, there would not have been a settlement reached in the end. All of the critical pieces of the ultimate settlement that this Bankruptcy Court approved were developed during the period that Geiss Counsel was tasked on behalf of all the interested parties to try to deliver a global settlement.

   d. By achieving maximum global peace among the key stakeholders at and in connection with the mediation process, Geiss Counsel played a critical role that

3

led to a global resolution that facilitated the Insurance Companies funding the Global Settlement.

7. From the inception of the Chapter 11 Cases, Geiss Counsel vigorously sought a global resolution that would minimize expenses and vindicate the legitimate interests of all parties. Geiss Counsel led substantial settlement negotiations among key stakeholders, including defendants, the NYOAG, Debtors, the UCC, and Insurance Companies, including several all-day in-person mediation sessions overseen by mediator Jed Melnick of JAMS ADR.

8. During the mediation process, beginning in June 2018, I personally was in constant contact with the mediator, both before, during, and after various in-person mediation sessions. Several critical all-hands in-person mediation sessions were conducted at Brown Rudnick's New York offices on November 6-7, 2018 and December 11-12, 2018, at which all parties were represented in person or by phone, and the efforts to secure a global deal required my constant efforts before, after, and between those dates. In particular, during the period from June 2018 through the end of January 2019, I was tasked to serve as the lead in the mediation process in efforts to try to secure a global settlement, and was at times in daily contact, and always in regular contact, with the mediator, and other interested parties to try to achieve a global settlement that advanced the interests of the tort claimants, and benefited the Debtors, the UCC, and other interested parties such as the NYOAG.

9. In addition, Geiss Counsel from Brown Rudnick and/or Hagens Berman attended various other mediation sessions, before and after the November/December 2018 all-hands global mediation sessions. Yet other mediation sessions overseen by the mediator which did not include the plaintiffs include May 14, 2018 (initial session, limited participants), May 25, 2018

(Defendants, UCC, and Insurance Companies), August 16, 2018 (Defendants only), and October 24, 2018 (Insurance Companies only).

10. Further, after a June 22, 2018 in-person mediation session that was held at Debtors' counsel's offices, Elizabeth Fegan (then of Hagens Berman LLP), undertook to secure the involvement of as many other tort victims who had filed their own separate lawsuits as possible. Those lawsuits were pending in California, New York state and federal district courts, Canada, and the United Kingdom.

11. This complex and difficult effort to secure the Global Settlement that was endorsed by the vast majority of individual tort victims and by the NYOAG's office only occurred as a result of Geiss Counsel's joint efforts, working on a coordinated basis to secure the maximum coordinated support for a global settlement, since the Insurance Companies, who were expected to be the primary source of funding of any global settlement, wanted "maximum global peace" among the parties before committing to fund the settlement.

12. Debtors consented to Geiss Counsel leading the mediation efforts during a critical period in the mediation process. Geiss Counsel likewise received the proxy of the UCC, class plaintiffs, and certain other tort victims to act on their behalf during critical periods in the mediation process.

13. These negotiations were hard fought and conducted at arms' length by experienced counsel. This intensive period of negotiations eventually led to an agreement in principle and a term sheet outlining the contours of a settlement.

14. The parties signed a settlement term sheet in late 2019 reflecting the results of these negotiations.

15. With the term sheet in place, the key stakeholders continued the painstaking work of negotiating the terms of a settlement agreement. Many further negotiation sessions occurred among the Parties, including in person and Zoom drafting sessions—continuing negotiation and coordination of the terms of a proposed Class Settlement Agreement, Global Settlement Agreement, and Joint Plan of Liquidation.

16. The Global Settlement embodied in the Plan confirmed by this Court and consummated by the Debtors reflects in its structure and major material terms the resolution reached through the mediation process that Geiss Counsel led. In particular, it follows a structure under which funding was provided by the Insurance Companies, releases are provided by the Debtors, as many tort victims as possible participate in the Global Settlement and recover from the Fund, and the NYOAG participates as well.

17. During critical periods in the negotiation process, Geiss Counsel stepped into a leadership role and assumed responsibility for trying to facilitate a reconciliation of the interests of the major stakeholders, which would benefit the Victims, the UCC, and the Debtors. Had Ms. Geiss failed to bring any one of those parties into the settlement process under the structure discussed above, the Victims' recovery would have been imperiled and the outcome of these Chapter 11 Cases would not have been the same.

18. Looking back over the history of the Chapter 11 Cases, the work of Geiss Counsel in leading the mediations and driving them toward a settlement term sheet laid the groundwork for the Global Settlement. Without that work, I do not believe the Global Settlement would have emerged.

19. For the foregoing reasons, and as more fully set forth in the Application, I believe the relief requested in the Application should be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 5, 2021
      New York, NY

By: _____
Sigmund S. Wissner-Gross, Esq.
Brown Rudnick LLP