**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TWC Liquidation Trust, LLC, | Case No. 18-10601 (MFW) |
| Debtor.[1] | **Hearing Date: July 6, 2021 at 2:00 p.m. (ET)**<br>**Objection Deadline: June 29, 2021 at 4:00 p.m. (ET)** |

**MOTION OF ROBERT WEINSTEIN FOR ENTRY OF AN ORDER
ENFORCING THE SALE ORDER AND GRANTING RELATED RELIEF**

Robert Weinstein ("Mr. Weinstein"), pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), by and through the undersigned counsel, respectfully moves this Court (this "Motion") for entry of an order requiring Lantern Entertainment LLC (n/k/a Spyglass Entertainment, LLC; "Lantern") to comply with its obligations to pay Mr. Weinstein his participation interest in the motion picture *Scream 4* as set forth in the *Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [D.I. 846] (the "Sale Order") approving the Asset Purchase Agreement (as amended, the "APA"), pursuant to which Lantern acquired substantially all of the assets of The Weinstein Company, LLC and the other Debtors (collectively, "TWC").

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). A complete list of the Debtors in these cases (collectively, the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, can be found on the claim's agent website: http://dm.epiq11.com/#/case/TWC.

## PRELIMINARY STATEMENT[2]

This dispute arises out of Lantern's attempt to disregard both the straightforward language of the APA—approved by this Court—as well as its own written admissions to deprive Mr. Weinstein of his participation interest in the profits generated by the motion picture entitled *Scream 4* (the "Participation Interest").

Mr. Weinstein was granted his Participation Interest in *Scream 4*, along with a number of other films, pursuant to the terms of his 2010 employment contract with TWC.[3]  Pursuant to the terms of that 2010 agreement, Mr. Weinstein's Participation Interests in *Scream 4* and the other movies vested immediately and survived the expiration of that employment agreement in 2015. This meant that TWC no longer owned 100 percent of its original interests in those films and obviously that the estate could not sell what TWC no longer owned.  After TWC filed for bankruptcy in this Court, Lantern negotiated with the estate to purchase certain of TWC's assets, and ultimately entered into the APA.  The APA, approved by this Court, provided that Lantern was acquiring TWC's interest in *Scream 4* subject to Mr. Weinstein's Participation Interest.[4] Lantern has acknowledged this.  After executing the APA and just days prior to the closing of the transaction, Lantern, in response to a written demand by Mr. Weinstein, issued a participation statement which stated that Mr. Weinstein was entitled to share in certain profits generated from *Scream 4* once the film reached "CBE" [Cash Break Even].

---

[2] Terms utilized but not defined in this Preliminary Statement shall have the meanings ascribed to them in the body of this Motion.

[3] Mr. Weinstein's 2010 employment agreement expired long ago, replaced by an agreement he entered with TWC in 2015.  As a result, the 2010 employment agreement was not an executory contract subject to assumption or rejection at the time the Debtors commenced these chapter 11 cases.

[4] In this regard, Mr. Weinstein's Participation Interests are no different than those granted by TWC to others prior to the commencement of these cases.

{1202.001-W0065089.}

Despite the express language of the APA, which had been heavily negotiated, and Lantern's prior written admission, Lantern inexplicably changed its position. When Mr. Weinstein subsequently demanded payment of his share of the *Scream 4* profits, Lantern refused. It argued that because Mr. Weinstein's *Scream 4* Participation Interest was awarded pursuant to the terms of his long-expired 2010 employment contract, and because Lantern did not assume any of Mr. Weinstein's employment agreements, it had no obligation to honor Mr. Weinstein's Participation Interests. Lantern's position is completely wrong.

The very document and court order pursuant to which Lantern purchased the rights to *Scream 4* specifically recites that Robert Weinstein is entitled to Participation Interests from *Scream 4*. The exact language of Section 3.10(a) of the Disclosure Schedule is that Mr. Weinstein is "currently entitled to Participations" from *Scream 4*. Lantern's interpretation is that it somehow simultaneously purchased *Scream 4* and rejected Mr. Weinstein's "current" entitlement to Participations. That interpretation makes no sense and is not sustainable as a matter of law. Lantern's position would require this Court to interpret the APA in such a way as to ignore the Disclosure Schedule completely. Moreover, it would require the Court to ignore (i) the negotiations between Lantern and the Debtors that culminated with the execution of the APA, and (ii) unequivocal admissions made by Lantern after the APA's approval but prior to the occurrence of this dispute. This straightforward issue of contract interpretation can be resolved easily by reference only to the APA's terms. However, to the extent that the Court finds that those provisions are somehow ambiguous (they are not), the relevant extrinsic evidence is that the mutual intent of the parties in entering into the APA was for Lantern to honor Mr. Weinstein's entitlement to a share of the profits generated by *Scream 4* and the other films in which he had been granted Participation Interests.

Accordingly, for these reasons and the additional reasons set forth below, this Court should enforce the Sale Order, and require Lantern to (i) honor Mr. Weinstein's Participation Interest in *Scream 4,* and (ii) pay to Mr. Weinstein all amounts due and that may become due in accordance with the terms of his Participation Interests and required under the APA.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[5]

2.      Pursuant to the Sale Order, the Court retained "jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA [….] and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction[.]" Sale Order, ¶¶ 51, 66.

3.      The statutory predicate for the relief requested herein is section 105(a) of the Bankruptcy Code.

---

[5] Pursuant to Local Rule 9013-1(f), Mr. Weinstein hereby confirms his consent to entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

{1202.001-W0065089.}

## FACTUAL BACKGROUND

### A.    Mr. Weinstein's Employment Contract and Participation Interests

4.    Mr. Weinstein entered into an employment agreement with The Weinstein Company Holdings LLC (the "Employment Agreement") on July 29, 2010.[6]  Pursuant to the Employment Agreement, Mr. Weinstein received certain profit participations in recognition of his services as producer of certain feature-length motion pictures.   Employment Agreement, Section 4(b).  Specifically, Mr. Weinstein was granted a participation representing 1.875 percent of the total of the Adjusted Defined Receipts, as that term is defined in the Employment Agreement, generated by each of the films for which he received such participation interests, including *Scream 4*. *Id.*

5.    The Employment Agreement expired by its own terms on December 31, 2015.  The Participation Interests, however, have no expiration.  Although Mr. Weinstein earned his profit Participation Interest in *Scream 4* and other films in consideration of producing services he rendered pursuant to the Employment Agreement, TWC's grant of the Participation Interests created a separately enforceable right that immediately vested in Mr. Weinstein's favor.  The Employment Agreement expressly provides that the Participation Interests survive termination of the Employment Agreement subject to certain conditions that are not applicable here.  *Id.*, p. 4, Section 21.

6.    On May 9, 2018, the Court entered the Sale Order approving the APA, which was amended pursuant to the *Order Approving Amendment to Asset Purchase Agreement Entered Into by and Between the Debtors and Lantern Entertainment LLC* [D.I. 1220] (the "Amendment Sale

---

[6] The Employment Agreement is attached hereto as **Exhibit 1**.

{1202.001-W0065089.}

Order"), between Lantern and the Debtors.[7]  Under the APA, Lantern acquired from TWC its rights

and interests in each film identified in Annex 1 to the agreement as a "Covered Title," which

includes *Scream 4*.  *See* APA, Annex 1, Top Title, item 47.

7.      Pursuant to Section 2.3 of the APA (and consistent with Section 2.4(j) of the APA),

Lantern assumed all liabilities for "Participations"[8] for any period after the Closing Date for each

Covered Title, including *Scream 4*.  Pursuant to Section 2.3 of the APA, Lantern agreed to assume

all liabilities for such Participations that became due after closing.  Mr. Weinstein's Participation

Interests fit squarely into the definition of Participations under the APA.  Further, Section 3.10(a)

of the Disclosure Schedule to the APA—titled "Rights and Entitlement"—specifically includes

Mr. Weinstein's Participation Interest at issue here, providing that he is "currently entitled" to a

share of the profits on certain films, again including *Scream 4*.

8.      As set forth above, the Employment Agreement expired prior to the entry of the

APA, and thus, was not an executory contract that could be assumed and assigned or rejected by

the Debtors.  The fact that Schedule 2.2(h) of the Disclosure Schedule expressly provides that

Lantern was not assuming TWC's employment agreements in connection with its purchase of the

company's assets has no bearing on whether Mr. Weinstein's post-closing Participation Interests

must be paid by Lantern.

---

[7] The APA is attached hereto as **Exhibit 2**.

[8] The APA defines "Participations" as "with respect to any Covered Title, any contractually required amounts (excluding Guild Residuals) payable to or on behalf of any third party involved in the development and/or production of such Covered Title, including all third parties who rendered services or granted rights in connection with such Covered Title, which are (a) a contingent amount determined in whole or in part based on the financial performance or other performance of such Covered Title, including amounts contingent upon or determined by box office receipts, gross receipts, or a percentage of such gross receipts or net receipts however defined, denominated or calculated, or are otherwise determined, and are payable in a fixed or allocable amount or as a percentage of such receipts, and/or (b) payable in a fixed amount upon the occurrence of contingent events commencing after the Exploitation of such Covered Title such as receipt of an award or sale of specified number of video devices or the attainment of specific level of receipts or contingent proceeds from, or other financial performance of Exploitation of such Covered Title. APA, Exhibit A-9.

{1202.001-W0065089.}

9.      This Court need not go beyond the four-corners of the APA and Employment

Agreement to reach this conclusion.  If the Court deems it necessary to do so, however, the parties'

negotiations surrounding the APA further support this argument.  Lantern's counsel aggressively

negotiated whether Affiliates of TWC—including Mr. Weinstein—would retain their Participation

Interests following the closing of the transaction.  *See Declaration of Andrew Wark* ("Wark

Declaration"), attached hereto as **Exhibit 3**.   Those negotiations demonstrate that Lantern

understood that, even though it would not assume TWC's employment agreements, the continued

viability of Participation Interests held by Mr. Weinstein and other TWC Affiliates was a separate

and unrelated issue.  *Id.*

10.      For example, on March 7, 2018, Lantern's counsel wrote to Debtors' counsel

proposing the addition of the following language to Section 3.10(a): "After the Closing, neither

the Seller Parties nor any of their Affiliates shall have any ownership interest in any of the Title

Rights or the Covered Titles, whether at law or in equity." *Id.*, ¶ 3.  Debtors' counsel rejected that

additional language.  Rather, on March 13, 2018, Debtors' counsel sent a revised draft of the APA

to Lantern's counsel with a cover email that stated: "Section 3.10(a) of the Disclosure Schedules

to include Participation rights owed to affiliates." *Id.*, ¶ 8.  On the following day, March 14, 2018,

Lantern's counsel conceded the point, sending another draft of the APA providing that "Section

3.10(a) of the Disclosure Schedules shall include Participation rights owed to Affiliates of the

Seller Parties or any other interest of any Affiliates in Covered Titles or any Title Rights." *Id.*, ¶

9.   And that same day, Debtors' counsel provided Lantern's counsel with a draft Disclosure

Schedule providing that Mr. Weinstein is "currently entitled to Participations on the following

films arising out of those 2010 employment agreements: … **Scream 4**." *Id.*, ¶ 10.

11.     That language is included in the final Disclosure Schedule delivered to Lantern.[9] Had the APA's exclusion of TWC Employment Agreements somehow served to have terminated Mr. Weinstein's Participation Interests, the negotiations set forth above would have been pointless. The heavily negotiated language of Section 2.3 of the APA and Section 3.10(a) of the Disclosure Schedule to the APA establish that the parties agreed that Mr. Weinstein (and the other Affiliates) would retain his Participation Interests in the Covered Titles, including *Scream 4*, and that Lantern would honor those continuing obligations.

**B.      Mr. Weinstein's Request for Payment of His Participation Interest**

12.     Mr. Weinstein served as a producer of *Scream 4*, which was released in 2011. Thus far, the film has generated in excess of $100 million in receipts and continues to generate revenue.

13.     On August 20, 2018, nearly three months *after* the parties entered into the APA and the Court entered the Sale Order, counsel for Mr. Weinstein wrote a letter to Lantern demanding confirmation that Mr. Weinstein was entitled to his participation in *Scream 4* and setting out several reasons, including the language of the APA, for that entitlement. *See* Letter from Richard B. Kendall to Chris Halpin (Aug. 20, 2018), attached hereto as **Exhibit 5**. Over a month later, on September 26, 2018, counsel for Mr. Weinstein again wrote to Lantern, this time to Kristen Esposito, who worked at Lantern in the accounting division. Counsel for Mr. Weinstein demanded a current participation statement, to which Mr. Weinstein was entitled as a profit participant. *See* Letter from Richard B. Kendall to Kristen Esposito (Sep. 26, 2018), attached hereto as **Exhibit 6**. In response to that letter, Lantern, through Ms. Esposito, sent a participation statement for *Scream 4* to counsel for Mr. Weinstein.[10] That statement recited, based on receipts through July 13, 2018

---

[9] The final version of the Disclosure Schedule is attached hereto as **Exhibit 4**.

[10] The participation statement is attached hereto as **Exhibit 7**.

{1202.001-W0065089.}

– four days prior to the closing of the APA transaction – that *Scream 4* was $542,223 below cash break even ("CBE").  The participation statement further stated that when CBE was reached, Mr. Weinstein and the other profit participant in *Scream 4* would collectively receive $2,302,722 in post-closing profits from the film.  *See* Ex. 7.  Specifically, the participation statement provided that: "This amount is due once statement reaches CBE." *Id.*  Based on his experience in the motion picture business, Mr. Weinstein believes that *Scream 4* has passed the CBE threshold.

14.    Beginning in late May 2018, Mr. Weinstein's counsel in this matter again raised the issue of payment of the Participation Interests for *Scream 4*.  *See* E-mail from Adam Harris to Meredith Lahaie (May 25, 2018), attached hereto as **Exhibit 8**.  Throughout the summer of 2018, Mr. Weinstein's counsel continued to press Lantern's counsel for Lantern's agreement that it was obligated to satisfy the *Scream 4* Participation Interests.  *See* E-mail from Adam Harris to Meredith Lahaie (Jul. 25, 2018), attached hereto as **Exhibit 9**.  Ultimately, a formal demand for *Scream 4* Participation Interests was made on January 14, 2019.  Letter from Adam Harris to Chris Halpin (Jan. 14, 2019), attached hereto as **Exhibit 10**.  Lantern has refused to satisfy the Participation Interests.  Counsel for Lantern argued that because the Employment Agreement was not an assumed contract per Schedule 2.2 to the APA, and that Section 2.4(f) of the APA excludes liabilities arising under any contract that Lantern did not assume, Lantern is not obligated to honor Mr. Weinstein's Participation Interests.  Letter from Rachael Albanese to Adam Harris (Jan. 23, 2019), attached hereto as **Exhibit 11**.  That argument, however, is directly contradicted by Section 3.10(a) of the Disclosure Schedule, which expressly provides that Mr. Weinstein has a "current" participation right in *Scream 4* and is directly contrary to Lantern's prior admission in the participation statement.

**ARGUMENT**

I.    **THE EXPRESS TERMS OF THE APA REQUIRE LANTERN TO HONOR MR. WEINSTEIN'S PARTICIPATION INTEREST IN *SCREAM 4*.**

15.    It is well settled that a "Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders." *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009).  As set forth in the Sale Order and APA, Lantern assumed and is responsible for all obligations arising from its post-closing operations of the purchased assets.  With respect to Mr. Weinstein's post-closing Participation Interests, Lantern seeks to avoid its express obligations under the APA.  Accordingly, Mr. Weinstein requests that the Court enter an order enforcing the Sale Order and Lantern's obligations under the APA.

16.    To resolve this Motion, the Court need not look beyond the four corners of the APA (and the Sale Order approving it), which requires in Section 2.3 of the APA and Section 3.10(a) of the agreement's Disclosure Schedule that Lantern honor Mr. Weinstein's Participation Interests in *Scream 4* occurring post-closing.  The Participation Interests expressly survived the expiration of the Employment Agreement and fit squarely within the definition of "Participations" under the APA.  While Mr. Weinstein's interpretation of the APA gives effect to each and every portion of the agreement, acceptance of Lantern's interpretation would require the Court to interpret the APA in a manner that ignores heavily negotiated provisions.  As a matter of law, Lantern's position must be rejected.

17.    Under bedrock principles of contract interpretation, when a court construes a contract, it must do so in a way that harmonizes all of the agreement's provisions.  The Delaware Supreme Court has explained "[i]n giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract.  That is true in all commercial contexts, but especially so when the contract at issue involves a definitive acquisition agreement

{1202.001-W0065089.}

addressing the sale of an entire business." *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913-14 (Del. 2017); *see also Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (under New York law, when interpreting a contract, the court should consider the contract's provisions in the context of the entire agreement and in light of the contractual obligations as a whole).

18.     Consistent with that well-settled rule, courts must also give effect to every part of a contract, with each provision helping to interpret the other provisions. *See, e.g.*, *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."); *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole, and if possible it will be so interpreted as to give effect to its general purpose."); *see also* California Civil Code § 1641. Moreover, courts must interpret contracts in a manner that makes them reasonable, as long as that can be done without violating the intent of the parties. *See, e.g.*, *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057 (Del. 2010) ("[A] court will not adopt [an] interpretation that leads to unreasonable results, but instead will adopt [a] construction that is reasonable and that harmonizes the affected contract provisions."); *Cromwell Towers Redevelopment Co. v. City of Yonkers*, 41 N.Y.2d 1, 6 (1976) (when analyzing contracts, courts must consider the parties' intent in contracting and give a "fair and reasonable interpretation" consistent with that intent); *see also* Cal. Civil Code § 1643. Finally, a contract should be analyzed by reference to the circumstances under which it was made and the matter to which it relates. *See, e.g.*, *Town of Cheswold v. Central Delaware Business Park*, 188 A.3d 810 (Del. 2018) ("[C]ontracts should be read in full and situated in the commercial context between the parties.");

{1202.001-W0065089.}

*Matter of Riconda*, 90 N.Y.2d 733, 737 (1997) (courts should "consider the entirety of [an] agreement in the context of the parties' relationship and circumstances"); *see also* Cal. Civil Code § 1647.

19.     Here, the application of each of these bedrock principles of contract interpretation leads to only one conclusion:  Under the APA, Lantern is obligated to honor Mr. Weinstein's post-closing Participation Interests in the profits generated by *Scream 4*.

20.     Section 3.10(a) of the APA's Disclosure Schedule provides that if Mr. Weinstein produced certain motion pictures—one of which is *Scream 4*—he would be entitled to a contingent payment calculated based on a percentage of Adjusted Defined Receipts.  Because Mr. Weinstein rendered those producing services, the Disclosure Schedule provides that he is "currently entitled to Participations" with respect to a number of films, including *Scream 4*.  *See* **Exhibit G** to the Wark Declaration, Disclosure Schedule, § 3.10(a).

21.     Nevertheless, Lantern claims that because, under Section 2.2 of the APA and Schedule 2.2(h), it did not assume the 2010 Employment Agreement (which was an Excluded Asset) the Participation Interest was also not assumed and therefore it has no obligation to honor Mr. Weinstein's pre-existing Participation Interest in *Scream 4*.  But that contention contradicts the express terms of the Disclosure Schedules that specifically recite that Mr. Weinstein *is* entitled to the Participation Interest.  Indeed, Lantern's position renders Section 3.10(a) of the Disclosure Schedule impermissibly superfluous.  *See, e.g.*, *Kuhn Const., Inc.*, 990 A.2d at 396-97; *Westmoreland Coal Co.*, 100 N.Y.2d at 358.  The parties negotiated and drafted the terms of the Disclosure Schedule with full knowledge that Lantern would not be assuming any of TWC's employment agreements—all of the language appears in the same document.  Lantern's new-found position that it is not obligated to honor Mr. Weinstein's Participation Interest because it did not

assume his 2010 Employment Agreement—which, in any event, had expired years earlier and as a matter of law could not be assumed—simply cannot be squared with the language in the APA and Disclosure Schedule expressly providing otherwise.[11]

22.      By contrast, Mr. Weinstein's interpretation of the APA gives effect to all of the agreement's provisions and complies with all of the well-settled principles of contract interpretation set forth above.  Specifically, under Section 2.3 of the APA, Lantern acquired certain assets from the Debtors' estates, and assumed certain liabilities.  One such asset was the Covered Title *Scream 4* and all rights attendant thereto.  But along with those rights, Lantern also took on the associated post-closing liabilities, which—with respect to *Scream 4*—necessarily included Mr. Weinstein's Participation Interests.  Simply put, *any* other interpretation would create a situation in which certain provisions of the APA directly contradict and supersede other provisions of that same contract.  Such a result is not permitted under well-accepted principles of contract interpretation.

23.      Section 2.4(j) of the APA further bears out this interpretation by limiting Lantern's obligations in respect of Participations to post-closing obligations.  All Participation Interests sought by Mr. Weinstein are for post-closing obligations.

24.      The Sale Order provides that "nothing in this Order or the APA shall be deemed to otherwise alter, modify, extend or enhance the Debtors' rights, title or interest to or under any Purchased Asset. . ."  Sale Order, ¶ LL.  Thus, Lantern purchased TWC's interests in the Covered Titles, including *Scream 4*, subject to all obligations owed on and after closing to Mr. Weinstein's Participation Interests.  As this Court has made clear in previous, unrelated disputes, Lantern "is

---

[11]   Mr. Weinstein's 2010 Employment Agreement, which expired on December 31, 2015, was not an executory contract at the time these cases were commenced and, accordingly, could not have been assumed by Lantern.

{1202.001-W0065089.}

bound by, and shall comply with all post-closing obligations arising [from the purchased assets], including, but not limited to its payment obligations." *Order (I) Granting Lantern Entertainment LLCs Motion for Summary Judgment; (II) Denying Motion to Strike of Contract Counterparties; (III) Denying in Part, and Granting in Part, Joint Motion of SLP Contract Counterparties to Clarify Sale Order; and (IV) Denying in Part, and Granting in Part, Contract Counterparties Motion for Order Confirming that Counterparties Agreements Have Been Designated by Lantern for Assumption and Assignment, Including Joinder of Committee* [D.I. 2013] at ¶ 1, *aff'd*, Civ. Nos. 19-242-MN, 19-243-MN (D. Del. Mar. 20, 2020) (stating that Lantern is "required to comply with all post-closing obligations under the Talent Party Agreements as part of the purchase under section 363 of the Bankruptcy Code.") .

## II.    THE EXTRINSIC EVIDENCE SUPPORTS MR. WEINSTEIN'S INTERPRETATION OF THE APA.

25.    Even if the language of the APA did not provide that Lantern assumed the obligation to honor Mr. Weinstein's Participation Interest in *Scream 4* when it acquired this Covered Title (which it does), the extrinsic evidence demonstrates what the parties intended when they negotiated and entered into that agreement.

26.    Courts may consider extrinsic evidence to interpret a contract if that contract is reasonably susceptible to different interpretations. *See, e.g.*, *GMG Capital Invs., Ltd. Liab. Co. v. Athenian Venture Partners I, Ltd. P'ship*, 36 A.3d 776, 783 (Del. 2012) (holding that extrinsic evidence is only admissible to determine the meaning of a contract if the contract is ambiguous). Here, although the relevant provisions of the APA are not ambiguous, Lantern has—in an attempt to evade its contractual obligations—offered an interpretation of those terms that finds no support in the express language.  However, the mere fact that the parties have different interpretations of the APA and its Disclosure Schedule does not render them ambiguous. *Id.* at 780. "The test for

ambiguity is whether 'the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.' Thus, '[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.'" *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 760 (Del. 2018) (internal citations omitted).

27.     To the extent the Court does determine that the relevant provisions of the APA are ambiguous, *all* of the relevant extrinsic evidence supports Mr. Weinstein's plain language interpretation of that agreement.  First, the history of the parties' negotiations regarding the relevant provisions definitively demonstrates the shared understanding of the Debtors and Lantern that, although Lantern was acquiring all of the Debtors' rights with respect to *Scream 4* (including rights to revenues generated by *Scream 4*), it did so only subject to Mr. Weinstein's pre-existing participation right.  Because TWC previously had granted that interest to Mr. Weinstein, TWC could not also transfer that interest to Lantern.

28.     As set forth in detail above, as the parties were negotiating the terms of the APA and its Disclosure Schedules, Lantern's counsel requested that the Debtors include language in the agreement expressly terminating Participation Interests—like Mr. Weinstein's in connection with *Scream 4*—held by Affiliates of TWC following the closing date of the APA.  *See* Ex. 3.  But that language was not included in the final draft of the APA, which expressly provided for precisely the opposite.  *See* Ex. 2 at Section 3.10.  If Lantern actually believed that by not assuming Mr. Weinstein's 2010 Employment Agreement, it had no obligation to honor his Participation Interests, it would never have proposed such language terminating those interests in the Disclosure Schedule. In sum, Lantern's words and conduct during the negotiations of the APA are completely contrary to the position it now takes.

29.     Second, even if the extrinsic evidence arising out of the parties' negotiations was not dispositive of their mutual intent (and it is), Lantern's conduct after the execution of the APA but prior to the development of this dispute definitively establishes that Lantern—like the Debtors—intended for that agreement to require Lantern to honor Mr. Weinstein's Participation Interest in *Scream 4*.  As set forth above, several months after Lantern entered into the APA, and after a demand by Mr. Weinstein's counsel setting forth Mr. Weinstein's entitlement to the participation, Lantern provided Mr. Weinstein with a participation statement for *Scream 4* that expressly provided that Lantern would owe him his share of over $2.3 million once the film's post-closing revenues reached cash break even.  *See* Ex. 7.

30.     Only after Mr. Weinstein suspected that the film had reached (or was about to reach) cash break even and demanded payment from Lantern did Lantern manufacture its current position.  But it is well-settled that Lantern's acknowledgement of its obligations to Mr. Weinstein—made after the APA was executed and approved but prior to the existence of this dispute—is "the most reliable evidence of the parties' intentions." *Kennecott Corp. v. Union Oil Co. of California*, 196 Cal. App. 3d 1179, 1189 (1987); *see also Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 340 (Del. 1939) (noting the common-law rule that contract interpretation based on the parties' acts prior to any controversy arising is entitled to "great weight"); *Town of Pelham v. City of Mount Vernon*, 304 N.Y. 15, 22 (1965) ("There is no surer way to find out what parties meant, than to see what they have done.").  Lantern's new-found and self-serving interpretation of the APA is completely inconsistent with its prior conduct and admissions, and it should be rejected.

31.     The extrinsic evidence resolves any purported ambiguity consistent with the most

reasonable reading of the APA:  Mr. Weinstein is entitled to have his Participations in *Scream 4*

honored, and all amounts due in respect thereof arising after the closing date paid.

## CONCLUSION

For each of the foregoing reasons, this Court should enforce the Sale Order and

direct Lantern to (i) honor Mr. Weinstein's Participation Interests in *Scream 4* or any other Covered

Title*,* (ii) pay Mr. Weinstein any and all amounts currently due in respect of his Participation

Interests in *Scream 4* or any other Covered Title, and (iii) continue paying Mr. Weinstein his

Participation Interests under any Covered Title as and when required in accordance with the terms

of the Participation Interests.

Dated: June 16, 2021                                   **LANDIS RATH & COBB LLP**
Wilmington, Delaware

                                        */s/ Kerri K. Mumford*
                                        Adam G. Landis (No. 3407)
                                        Kerri K. Mumford (No. 4186)
                                        Matthew R. Pierce (No. 5946)
                                        919 North Market Street, Suite 1800
                                        Wilmington, Delaware 19801
                                        Telephone:  302.467.4400
                                        Facsimile:  302.467.4450
                                        E-mail:landis@lrclaw.com
                                              mumford@lrclaw.com
                                              pierce@lrclaw.com

                                        -and-

                                        **SAUER & WAGNER LLP**
                                        Robert S. Chapman
                                        1801 Century Park E
                                        Los Angeles, California 90067
                                        Telephone:  310.712.8100
                                        Email: rchapman@swattys.com

                                        *Counsel to Robert Weinstein*