**<u>EXHIBIT B</u>**
**Proof of Claim**

**United States Bankruptcy Court for Delaware**
**The Weinstein Company Holdings LLC, Claims Processing Center**
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 4419
Beaverton, OR 97076-4419

To submit your form online please go to https://epiqworkflow.com/cases/TWC

Name of Debtor: Weinstein Global Film Corp.
Case Number: 18-10621

For Court Use Only

Filed: USBC - District of Delaware
The Weinstein Company Holdings LLC, et al., (GEN)
18-10601 (MFW)

**TWC**

0000080074

**RECEIVED**

**FEB 15 2019**

**LEGAL SERVICES**

### Fill in this information to identify the case (Select only one Debtor per claim form):

| | | |
|---|---|---|
| ☐ The Weinstein Company Holdings LLC (18-10601) | ☐ The Weinstein Company LLC (18-10620) | ☐ HRK Films, LLC (18-10639) |
| ☐ Avenging Eagle SPV, LLC (18-10602) | ☒ Weinstein Global Film Corp. (18-10621) | ☐ WTV Yellowstone SPV, LLC (18-10640) |
| ☐ TWC Waco SPV, LLC (18-10603) | ☐ Tulip Fever LLC (18-10622) | ☐ TWC Polaroid SPV, LLC (18-10641) |
| ☐ Small Screen Productions LLC (18-10604) | ☐ Current War SPV, LLC (18-10623) | ☐ InDirections LLC (18-10642) |
| ☐ Small Screen Trades LLC (18-10605) | ☐ Weinstein Productions LLC (18-10624) | ☐ TWC Production-Acquisition Borrower 2016, LLC (18-10643) |
| ☐ Twenty O Five Holdings, LLC (18-10606) | ☐ TWC Borrower 2016, LLC (18-10625) | ☐ InteliPartners LLC (18-10644) |
| ☐ Branded Partners LLC (18-10607) | ☐ Weinstein Television LLC (18-10626) | ☐ ISED, LLC (18-10645) |
| ☐ W Acquisition Company LLC (18-10608) | ☐ DRT Films, LLC (18-10627) | ☐ TWC Production, LLC (18-10646) |
| ☐ Spy Kids TV Borrower, LLC (18-10609) | ☐ TWC Domestic LLC (18-10628) | ☐ MarcoTwo, LLC (18-10647) |
| ☐ Check Hook LLC (18-10610) | ☐ WTV Guantanamo SPV, LLC (18-10629) | ☐ TWC Replenish Borrower, LLC (18-10648) |
| ☐ WC Film Completions, LLC (18-10611) | ☐ TWC Fearless Borrower, LLC (18-10630) | ☐ TWC Short Films, LLC (18-10649) |
| ☐ Team Players LLC (18-10612) | ☐ DRT Rights Management LLC (18-10631) | ☐ One Chance LLC (18-10650) |
| ☐ Weinstein Books, LLC (18-10613) | ☐ WTV JCP Borrower 2017, LLC (18-10632) | ☐ TWC Untouchable SPV, LLC (18-10651) |
| ☐ The Actors Group LLC (18-10614) | ☐ TWC Library Songs (BMI), LLC (18-10633) | ☐ PA Entity 2017, LLC (18-10652) |
| ☐ CTHD 2 LLC (18-10615) | ☐ FFPAD, LLC (18-10634) | ☐ Paddington 2, LLC (18-10653) |
| ☐ Weinstein Development LLC (18-10616) | ☐ WTV Kalief Browder Borrower, LLC (18-10635) | ☐ PS Post LLC (18-10654) |
| ☐ The Giver SPV, LLC (18-10617) | ☐ TWC Loop LLC (18-10636) | ☐ Scream 2 TC Borrower, LLC (18-10655) |
| ☐ Weinstein Global Funding Corp. (18-10618) | ☐ WTV Scream 3 SPV, LLC (18-10637) | |
| ☐ Cues TWC (ASCAP), LLC (18-10619) | ☐ TWC Mist, LLC (18-10638) | |

## Proof of Claim (Official Form 410)

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of claims arising under section 503(b)(9) of the Bankruptcy Code, do not use this form to make a request for payment of an administrative expense. Such a request should be made by filing the separate administrative claim request form approved by the bankruptcy court. Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim): Redrover Co. Ltd., by its agent Fintage Collection Account Management B.V.

Other names the creditor used with the debtor: _____

- General POC Page 1 of 3 -

**2.   Has this claim been acquired from someone else?**   ☒ No   ☐ Yes.   From whom? _____

| | | |
|---|---|---|
| **3.   Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | | **4.  Does this claim amend one already filed?** |

| **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) | ☒ No |
|---|---|---|
| Adam Hiller, Esquire<br>Hiller Law, LLC | Redrover Co. Ltd. | ☐ Yes.   Claim number on court claims register (if known) _____ |
| Name<br>1500 N French St. | Name   12F/13F, 20 Pangyoyeok-ro 146beon-gil,<br>        Bundang-gu | Filed on _____<br>                MM  / DD  / YYYY |
| Number    Street<br>Wilmington DE 19801 | Number    Street<br>Seongnam-city Gyeonggi-do, 13529 | **5. Do you know if anyone else has filed a proof of claim for this claim?** |
| City           State       ZIP Code | City           State       ZIP Code | ☒ No |
| Country (if International): _____<br>            302.442.7677 | Country (if International):   Korea | ☐ Yes.  Who made the earlier filing? |
| Contact phone: _____ | Contact phone:  +82-31-5171-3800 | |
| Contact email:   ahiller@adamhillerlaw.com | Contact email:   stiehlf@redrover.co.kr | _____ |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| **6. Do you have any number you use to identify the debtor?** | **7. How much is the claim?** | **8. What is the basis of the claim?** |
|---|---|---|
| ☒ No<br><br>☐ Yes.<br>Last 4 digits of the debtor's account or any number you use to identify the debtor:<br><br>__ __ __ __ | $  524,336.86 _____.<br><br>**Does this amount include interest or other charges?**<br><br>☒ No<br><br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). | Examples:  Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.  Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).  Limit disclosing information that is entitled to privacy, such as health care information.<br><br>See attached. |

| **9. Is all or part of the claim secured?** | **10. Is this claim based on a lease?** | **11. Is this claim subject to a right of setoff?** |
|---|---|---|
| ☐ No<br><br>☒ Yes.   The claim is secured by a lien on property.<br>**Nature of property:** | ☒ No<br><br>☐ Yes. Amount necessary to cure any default as of the date of petition. | ☒ No<br><br>☐ Yes. Identify the property:<br>(unknown, rights reserved) |
| ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim*. | $ _____ | |

**9.** (continued)

☐ Motor vehicle

☒ Other. Describe: _____See attached_____

Basis for perfection: _____

_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                    $_____

Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured: $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any
default as of the date of the petition:  $_____

Annual Interest Rate (when case was filed) _____%
                              ☐ Fixed  ☐ Variable

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☒ No

☐ Yes. *Check one:*

A claim may be partly priority and partly nonpriority.  For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

☐ Other.  Specify subsection of 11 U.S.C. § 507 (a)(__) that applies.

*  Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☒ No

☐ Yes.  Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9): $_____

| Part 3: | Sign Below |
|---|---|

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br>☒ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  02/13/2019  _____<br>　　　　　　　　　　MM / DD / YYYY　　Signature |

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Sun ook | | Kim |
| | First name | Middle name | Last name |
| Title | CEO | | |
| Company | Redrover Co., Ltd. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 12F/13F 20 Pangyoyeok-ro 146beon-gil Bundang-gu | | |
| | Number　　　　　Street | | |
| | Seongnam | Gyeonggi-do, Korea | 13529 |
| | City | State | ZIP Code |
| Contact Phone | +82-31-5171-3800 | Email | sunook_kim@redrover.co.kr |



Adam Hiller, Esquire
Direct Dial (302) 442-7677
ahiller@adamhillerlaw.com

February 14, 2019

**VIA OVERNIGHT DELIVERY**
The Weinstein Company Holdings, LLC
Claims Processing Center, c/o
Epiq Bankruptcy Solutions, LLC
10300 SW Allen Boulevard
Beaverton, Oregon 97005

Re:     In re The Weinstein Company Holdings LLC, et al.,
        Case Nos. 18-10601-MFW (Chap. 11), et seq.

Dear Sir or Madam:

    Enclosed please find the original and one copy of a Proof of Claim to be filed on behalf of Redrover Co. Ltd. Please file the original on the claims register and date-stamp and return the copy in the enclosed self-addressed, stamped envelope. Thank you for your assistance in this matter.

Sincerely,

Adam Hiller

Enclosures

# Continuation Statement

*In re The Weinstein Company Holdings LLC, et al., Case Nos. 18-10601-MFW (Chap. 11), et seq. (jointly administered)*

1.  Redrover Co. Ltd. ("Claimant"), on behalf of itself and its collection account manager Fintage Collection Account Management B.V. ("Fintage"), files this Proof of Claim evidencing Claimant and Fintage's claims against debtor Weinstein Global Film Corp. (the "Debtor") in the above-referenced jointly administered Chapter 11 cases filed on March 19, 2018 (the "Petition Date"). Claimant's claims against the Debtor and its estate (collectively, the "Claims") arise from, among other things, amounts due on account of (and to the extent applicable, breach of) that Collection Account Management Agreement (the "Fintage Collection Management Agreement," a copy of which is attached hereto as **Exhibit A**) executed by and among the Debtor, Redrover, and Fintage. Claimant's claims may also arise on account of unjust enrichment, restitution, estoppel, conversion, breach of trust, breach of fiduciary duty, breach of contract (in relation to distribution agreements between Claimant and various third parties each a "Distribution Agreement," and collectively, the "Distribution Agreements"), tortious interference with contract (in relation to the Fintage Collection Management Agreement and/or one or more Distribution Agreements), and other causes of action.

2.  Pursuant to the Fintage Collection Management Agreement, royalties and other amounts payable under the Distribution Agreements were supposed to be made to Fintage, which was then supposed to disburse them to Redrover, the Debtor, and other applicable parties. Monies paid to and/or received by the Debtor on account of distribution agreements between Claimant and various third parties are held in trust by the Debtor for the benefit of Claimant. The Debtor has confirmed to Claimant that as of the Petition Date, the Debtor received funds in the amount of at least US$524,336.86 (as converted) under various Distribution Agreements, a calculation of which is attached hereto as **Exhibit B**. To the best of Claimant's knowledge, the Debtor has not returned any of the funds it wrongfully received under the Distribution Agreements (the "Trust Funds"), including but not limited to the funds reflected on Exhibit B.

3.  Claimant asserts that the Debtor's continuing possession of the Trust Funds is merely possessory and that equitable ownership of the Trust Funds belongs to Claimant. The filing of this claim does not constitute a waiver of Claimant's assertions that (i) the Trust Funds are held in trust by the Debtor for the benefit of Claimant, and/or (ii) the Debtor is holding the Trust Funds as a mere conduit for transmission of same to Fintage and/or Claimant.

4.      Claimant has received a power of attorney from Fintage, authorizing Claimant to act as its attorney in fact in relation to this Proof of Claim. Fintage serves as collection account manager, acting as the representative of Claimant and Debtor for the films "The Nut Job" and "Nut Job 2," to, on their behalf, receive all revenues derived from the exploitation of these two films, and to administer, allocate and pay the same on behalf of the Claimant and Debtor, pursuant to the terms of collection account management agreements for these two films (including but not limited to the Fintage Collection Management Agreement as defined above).

5.      Claimant reserves the right to amend this proof of claim to narrow or expand the claims asserted, including but not limited to (i) specifying different debtor(s) against which all or any portion of the Claims are asserted, (ii) increasing, including but not limited to adding interest, penalties, attorneys' fees, and charges, in connection with any of the Claims asserted herein or the contracts underlying such Claims, (iii) adding any additional claims that may arise after the Petition Date, including but not limited to pursuant to 11 U.S.C. § 502(h), (iv) modifying the priority asserted in connection with any of the Claims, including but not limited to administrative expense priority in accordance with 11 U.S.C. § 503, and/or (v) asserting any lien or security interest on property of the Debtor purporting to secure any Claims.

6.      Supporting documents for this claim may be voluminous and therefore only a summary of the Claims may be attached.

7.      The filing of this proof of claim is not intended to waive any rights under applicable non-bankruptcy law, including but not limited to consenting to the jurisdiction of this Court or of any court administering this insolvency proceeding. Claimant does not consent to the personal jurisdiction of this court or service of process in connection with any proceeding other than the assertion and defense of the within claims. To the extent otherwise available under applicable non-bankruptcy law and/or any agreements between the parties, Claimant does not waive, and hereby expressly reserves, (i) any and all rights to demand a jury trial in accordance with applicable law in connection with each of the Claims, and (ii) any and all rights to demand a resolution of the Claims or any other claims between Claimant and the Debtor's bankruptcy estate by arbitration or other means of alternative dispute resolution.

# EXHIBIT A

## COLLECTION ACCOUNT MANAGEMENT AGREEMENT

### "THE NUT JOB"

This Agreement ("Agreement") is made on November 27, 2013 ("Effective Date") BETWEEN:

1. **Fintage Collection Account Management B.V.**, Stationsweg 32, 2312 AV Leiden, The Netherlands ("**CAM**")

2. **Redrover Co. Ltd.**, 3F, Bundang M Tower, 188 Gumi-dong Bundang-gu, Seongnam-city Gyeonggi-do, KOREA 463-870 ("**Licensor**")

3. **Weinstein Global Film Corp.**, 9100 Wilshire Blvd. Suite 700W, Los Angeles, California 90212, USA ("**Sales Agent**")

Severally and collectively the "Party" or "Parties"

WHEREAS:

The Parties have agreed that the CAM acting as their representative shall on their behalf receive all revenues derived from the exploitation of the Project in the Territory and administrate, allocate and pay the same on behalf of the Parties upon the terms and conditions hereinafter appearing.

In this Agreement the singular includes the plural and vice versa and the neuter shall include the masculine or feminine gender and persons shall include firms and corporations.

NOW IT IS AGREED as follows:

## 1.    DEFINITIONS

In this Agreement the following definitions shall apply:

| | |
|---|---|
| "Accounting Currency" | US Dollar. |
| "Accounting Period" | One of the individual periods as described in clause 3.1, which is the subject of a Statement produced by the CAM. |
| "Basic Agreement" | The applicable SAG collective bargaining agreement and any and all applicable present and future amendments thereto and replacements therefore and extensions thereof. |
| "Beneficiaries" | All persons, firms, companies, etc. who have the right to receive an Entitlement (except for CAM Fee and/or CAM Expenses). |
| "Business Day" | Any day except Saturday, Sunday and any day, which is a public holiday in the place in which any of the Parties has its main place of business. |
| "CA Bank" | OneWest Bank, 2450 Broadway Avenue, Suite 500, Santa Monica, California, 90404 USA, being the bank at which the Collection Account is opened, held and maintained. |
| "CAM Expenses" | All of the actual, out-of-pocket bank charges incurred by the CAM in relation to its duties and obligations hereunder, and, to the extent provided for in this Agreement, all of the CAM's actual, verifiable, customary, reasonable, out-of-pocket outside audit and legal fees and expenses, costs, related costs, including but not limited to those expenses incurred by the CAM on behalf of one or more of the Parties or Beneficiaries provided that such fees and expenses, costs and related costs shall not exceed USD$2,500 (two and a half thousand US Dollars) in aggregate per annum (but excluding any CAM Expenses pursuant to clause 5.11) without the written consent of Licensor. The CAM has the discretionary right to retain monies in the Collection Account in order to create a reasonable reserve for the Term of this Agreement to defray the CAM Expenses if there is a reasonable likelihood of the CAM incurring CAM Expenses as set out in clause 5.11, not to exceed USD25,000. |
| "CAM Fee" | Remuneration for the CAM, exclusive of CAM Expenses, for its services rendered pursuant to this Agreement, consisting of a commission of 1% of all Collected Gross Receipts up to USD1,750,000, 0.75% of the next USD1,750,000 of Collected Gross Receipts, 0.5% of the next USD1,750,000 of Collected Gross Receipts and 0.4% of the Collected Gross Receipts thereafter or, alternatively, a minimum commission of USD425 per Statement, whichever is the highest. |

| "Collected Gross Receipts" | Gross Receipts received in or credited to the Collection Account, including Deemed Collected Gross Receipts. |
| "Collection Account" | Bank account at CA Bank, designated to receive those Gross Receipts, which, in accordance herewith, are payable into this account, as described in clause 2.2. |
| "Collection Account Interest" | Interest accrued on the Collection Account at CA Bank. |
| "Deemed Collected Gross Receipts" | Amounts received by a Party other than the CAM, which, had they been credited to the Collection Account, would have been Collected Gross Receipts. |
| "Distribution Agreements" | Each and every agreement in connection with the Project for the exploitation, distribution, sale, leasing, license, exhibition, transmission, or any other form of exploitation, or any associated rights of the Project in any part of the Territory through any existing or future product, service or platform, excluding interactive rights, digital rights, gaming rights, merchandising rights, music publishing rights, and soundtrack album rights. |
| "Distributors" | Those individuals, firms, companies or other legal entities, which enter or have entered into Distribution Agreements. |
| "Effective Date" | As described in the heading of this Agreement. |
| "Entitlement" | Such part or parts of the Collected Gross Receipts, payable to a Beneficiary and/or the CAM under the terms and conditions of this Agreement. |
| "Excluded Territory" | The United States, Israel, Korea, Russia and "C.I.S." (i.e., Russia and Abkhazia, Armenia, Azerbaijan, Belorussia, Estonia, Georgia, Latvia, Lithuania, Kazakhstan, Kyrgyzstan, Moldova, Tajikistan, Turkmenistan, South Ossetia, Ukraine and Uzbekistan) and their respective territories and possessions. |
| "Excluded Territory Gross Receipts" | All proceeds derived from distribution agreements in the Excluded Territory. |
| "Gross Receipts" | All proceeds (exclusive of VAT or similar taxes or duties) derived from Distribution Agreements in the Territory. |
| "Notice" | As described in clause 8. |
| "Payment Notification" | Notification by CAM, informing the Parties about Collected Gross Receipts as and when Gross Receipts are received in the Collection Account. |
| "Payroll House" | Entertainment Partners or such other payroll service company engaged by Licensor to provide administrative |

|  |  |
|---|---|
|  | services in connection with the Collection Account pursuant to this Agreement, as timely notified to CAM. |
| "Project" | The film entitled "Nut Job". |
| "Residuals" | All additional compensation, pension & welfare plans, re-use fees and similar mandatory payments, if any, in connection with the distribution and exploitation of the Project that is or may become due under any applicable guild bargaining agreement when the Project is exhibited, distributed or otherwise exploited, including but not limited to additional compensation payable on advances and/or minimum guarantees or similar lump sum payments provided by Distributors. |
| "SAG-AFTRA" | Screen Actors Guild-American Federation of Television and Radio Artists, 5757 Wilshire Boulevard, 7th Floor, Los Angeles, California 90036, USA. |
| "Sales Agency Agreement" | The deal memorandum dated as of May 3, 2013 pursuant to which, among other things, the Sales Agent has the right to enter into, as agent of the Licensor, Distribution Agreements in the Territory, and has the non-exclusive right to negotiate the license of any right in the Project in any language in the Bahamas, Bermuda and the Caribbean Basin. |
| "Sales Agent Commission" | The commission payable to Sales Agent in connection with the Project pursuant to and in accordance with the Sales Agency Agreement equal to 5% of all Territory Receipts. |
| "Sales Agent Expenses" | The amount payable to Sales Agent for its sales expenses and other actual costs and expenses in connection with the Project including a one-time flat, non-accountable payment in the amount of USD150,000 (the "Expense Allocation") as well as Sales Agent's cost to create or deliver any delivery items, talent travel costs and any audit, enforcement and/or collection costs ("Additional Expenses") all of which Additional Expenses in excess of the Expense Allocation shall be subject to Licensor's prior written approval and then recoupable hereunder. |
| "Statement" | A written (electronic) accounting statement in the Accounting Currency in respect of an Accounting Period, specifying: |
|  | - the amounts of and the sources from which the (Collected) Gross Receipts and Deemed Collected Gross Receipts have derived; <br> - the Collection Account Interest; <br> - the allocation of Collected Gross Receipts to the Beneficiaries (and CAM) of the Entitlements. |
| "Term" | The period of time for which this Agreement is in force and effect and limited to 7 years after the Effective Date, unless |

this Agreement is extended in writing by a majority of the Parties.

"Termination"          As described in clause 7.

"Territory"            The universe excluding the Excluded Territory.

## 2.    THE CAM, COLLECTION ACCOUNT AND ASSIGNMENT

### 2.1    Appointment of the CAM

**2.1.1** The Parties, excluding the CAM, hereby jointly appoint the CAM during the Term as their sole and exclusive representative, to open the Collection Account in which it is to receive or pay no monies other than Gross Receipts and Collection Account Interest, to administer the Collection Account, to calculate the Entitlement(s), to provide Statements to the Parties and to carry out the payment of Entitlement(s) to each of the Beneficiaries in accordance with the terms and conditions hereof. If the CAM receives monies in the Collection Account other than Gross Receipts or Collection Account Interest, it shall forthwith have such monies transferred out of the Collection Account. If the CAM receives Gross Receipts elsewhere than in the Collection Account it shall immediately transfer such receipts into the Collection Account, subject to the usual bank transfer costs. The CAM hereby agrees to this appointment, in accordance with, and subject to the terms and conditions hereunder.

**2.1.2** Other than as provided for in this Agreement, the Parties other than the CAM, shall not, during the Term hereof, authorize or permit any third party to carry out any or all of the services rendered by the CAM for the Project hereunder.

**2.1.3** Notwithstanding anything in this Agreement to the contrary and for the avoidance of doubt, the CAM acknowledges and agrees that it has no legal title to the Collected Gross Receipts, the Collection Account Interest, and any other monies at any time in or credited to the Collection Account, all of which are actually the property of the Parties hereto (excluding the CAM). The CAM shall only acquire title to monies paid to it in respect of the CAM Fee or CAM Expenses upon actual payment to it, by withdrawal from and transfer out of the Collection Account, of such monies in accordance with Exhibit A hereto.

**2.1.4** Notwithstanding anything to the contrary in this Agreement, it is agreed that the CAM does not have and shall not take on any fiduciary obligations whatsoever hereunder.

### 2.2    All Gross Receipts in Collection Account

The Sales Agent and, to the extent applicable, all the Parties hereto having ownership of and/or control over the Distribution Agreements and/or the applicable rights and/or the Gross Receipts, shall undertake to issue or insert into the Distribution Agreements irrevocable instructions to the Distributors, substantially in the form of Exhibit B hereto, to pay the Gross Receipts into the following Collection Account and otherwise such Parties shall ensure that the Distributors shall pay the Gross Receipts into the Collection Account, subject only to clause 2.7.2 below.

Account Name:              Fintage Collection Account Management, The Nut Job

| Account Number: | 1312010834 |
|---|---|
| Bank: | OneWest Bank<br>Pasadena, CA, USA |
| SWIFT: | OWBKUS6L |
| ABA: | 322270288 |

**2.3    Interest bearing Collection Account**

The Collection Account shall be a separate segregated account and the CAM shall use all reasonable endeavours to procure that monies standing to the credit of the Collection Account earn Collection Account Interest at the most favourable rate available at the CA Bank for similar accounts and for similar amounts. The CAM shall not use funds in, pay funds to, withdraw any funds from or set off against funds in the Collection Account except as expressly set out in this Agreement.

**2.4    Property in Collected Gross Receipts**

The CAM agrees to hold in trust (provided that CAM's obligations hereunder shall not exceed those explicitly described herein), until their distribution, all Collected Gross Receipts deposited into the Collection Account, the Collection Account Interest, the rights vis-à-vis the Collection Account and all rights towards the CA Bank as representative for the Parties (excluding the CAM) for the benefit of the Beneficiaries, who shall be the owners or the deemed owners thereof to the extent of their Entitlement(s).

**2.5    No lien over and no assignment of Collected Gross Receipts**

**2.5.1** The Parties shall not create any lien, attachment, pledge, charge or any similar legal instrument over the Collection Account, the Collected Gross Receipts, the Collection Account Interest, or any other monies standing to the credit of, or rights to, the Collection Account, except for the security interests pursuant to clause 2.5.2 below.

**2.5.2** The Parties agree that the Licensor is hereby granted a security interest over the Collection Account and sums standing to its credit from time to time solely to the extent of its Entitlement thereto and solely to secure its right to receive its Entitlement pursuant to the terms hereof.

**2.6    Collected Gross Receipts and Entitlements in other currencies**

**2.6.1** Collected Gross Receipts in a currency other than the Accounting Currency will forthwith be automatically converted by CA Bank into the Accounting Currency, at the exchange rate prevailing at the time of such conversion.

**2.6.2** Entitlements will be paid out in the Accounting Currency, unless otherwise specified in this Agreement or if the CAM is timely notified otherwise by a relevant Party. In case the CAM is instructed to pay out the Entitlement in another currency than the Accounting Currency, the Entitlement will be converted into the requested currency, at the exchange rate prevailing at the time of such conversion, to the extent the Entitlement is not

available in the Collection Account in such currency and the Collection Account shall be debited with the counter-values in the Accounting Currency.

**2.6.3** Entitlements which are being paid in full or in part in a currency which is not the Accounting Currency, shall be reported in Statements as being the sum of amounts (in the Accounting Currency) actually debited from the Collection Account.

**2.7   All Deemed Collected Gross Receipts into the Collection Account**

**2.7.1** Notwithstanding the Parties' obligation (other than the CAM) under clause 2.2 above, it is acknowledged that if Deemed Collected Gross Receipts are received by any of the Parties (other than the CAM), including those Deemed Collected Gross Receipts received prior to the Effective Date, such Party shall forthwith:

> -    inform the CAM that Deemed Collected Gross Receipts are or have been received and simultaneously
> -    transfer such Deemed Collected Gross Receipts into the Collection Account without any deduction whatsoever (other than Sales Agent as per this clause 2.7  or as otherwise agreed), except for bank transfer costs.
> -    In the event Sales Agent receives any Gross Receipts directly from Distributors, Sales Agent shall remit such monies to the Collection Account after first deducting Sales Agent's Sales Agent Commission in accordance with the Sales Agency Agreement, provided however, that for the purposes of this Agreement, the full amount of such Gross Receipts, including such amounts used for payment of the Sales Agent Commission, shall be Deemed Collected Gross Receipts hereunder.

Pending transfer of such Deemed Collected Gross Receipts into the Collection Account, such Parties shall hold such Deemed Collected Gross Receipts in trust (provided that CAM's obligations hereunder shall not exceed those explicitly described herein) for the benefit of the other Parties and to be applied solely in accordance with the terms of this Agreement.

In the event any Party other than Licensor receives any Excluded Territory Gross Receipts, including the CAM, such Party shall immediately transfer such Excluded Territory Gross Receipts to the Licensor without any deduction whatsoever.

**2.7.2** The Parties (other than the CAM) may jointly and unanimously notify the CAM in writing, that Deemed Collected Gross Receipts may be retained by any one or more of the Parties hereto and that such Parties shall hold such Deemed Collected Gross Receipts in trust to be allocated by the CAM in accordance with the terms of this Agreement and that such Parties shall subsequently immediately pay out such Deemed Collected Gross Receipts to such Beneficiaries as designated by the CAM and solely in accordance to CAM's instruction.

**2.7.3** In the event proceeds are received into the Collection Account from distribution agreements related to the Project outside of the Territory, such proceeds shall be immediately disbursed by CAM to Licensor without deduction of any kind.

**3.    STATEMENTS, DISBURSEMENTS, ACCOUNTING AND AUDITING**

**3.1   Statements and disbursements by the CAM**

**3.1.1** As soon as the CAM has received written notice from the CA Bank of the first Collected Gross Receipts being received, or from any of the Parties (except the CAM) of the first Deemed Collected Gross Receipts being (deemed) received in the Collection Account, the CAM shall provide the Parties with a Statement on a monthly basis, within 20 Business Days of the end of each Accounting Period to which it relates, up to 18 months after the issuance of the first Statement, provided that at least USD5,000 of Collected Gross Receipts are available for disbursement, otherwise the CAM shall provide the Parties with a Statement on a quarterly basis, within 20 Business Days of the end of each Accounting Period to which it relates, provided that for the Accounting Period ending on December 31st, CAM shall provide the Parties with a Statement within 30 Business Days of the end of the Accounting Period.

**3.1.2** Then, until the Termination of this Agreement or expiry of the Term, the CAM shall provide the Parties with a Statement on a quarterly basis, within 20 Business Days of the end of each Accounting Period to which it relates, provided that at least USD5,000 of Collected Gross Receipts are available for disbursement, otherwise the CAM shall provide the Parties with a Statement on a semi-annual basis, within 20 Business Days of the end of each Accounting Period to which it relates, provided that for the Accounting Period ending on December 31st, CAM shall provide the Parties with a Statement within 30 Business Days of the end of the Accounting Period.

**3.1.3** The Parties may request CAM to produce an interim Statement, but no more often than once per calendar month, whereby the CAM Fee shall be increased by the higher of (i) 0.25% of the Collected Gross Receipts during that Accounting Period with a maximum increase of USD625 or (ii) USD325 (if the minimum fee per Statement is applicable), whereby such increase shall be borne by the requesting Party(ies).

**3.1.4** Notwithstanding the foregoing, the CAM shall issue the first Statement no earlier than in the month following receipt by the CAM of a fully executed copy of this Agreement, which, subject to clause 9.2 hereof, is binding and in full force and effect.

**3.1.5** The CAM shall pay out Entitlement(s) from the Collection Account to the Beneficiaries hereto within 5 (five) Business Days after the issuance of a Statement; provided that CAM shall retain Gross Receipts that have been received from Distributor(s) in the Collection Account until CAM has been notified by Licensor and/or Sales Agent that the Project has been delivered to and accepted by the Sales Agent in accordance with the Sales Agency Agreement. The content as well as the form of the first Statement is subject to the approval by Sales Agent and Licensor of a draft of the first Statement, which approval shall be deemed given unless the CAM has received a written notification to the contrary, which must be sufficiently detailed to clarify the reason for the objection (and which notification is to be sent as described in clause 8 (i) hereof) from Sales Agent and/or Licensor within 10 Business Days after issuance of such draft Statement. Notwithstanding the foregoing, the Parties shall pre-approve the first Statement to the CAMA prior to execution hereof, attached hereto and incorporated herein, as Exhibit F.

**3.1.6** In the event Sales Agent or Licensor disapproves the content and/or the form of the first Statement, the CAM shall as soon as reasonably possible re-issue the first draft Statement to all Parties. Then, as of the moment the first draft Statement has been re-issued by the CAM, the approval by Sales Agent and

Licensor of the draft first Statement shall be deemed given unless the CAM has received a written notification to the contrary from Sales Agent or Licensor within 5 Business Days thereafter.

**3.1.7** An Entitlement standing to the credit of the Collection Account shall be retained therein, until, subject to 3.1.1 and 3.1.2 above, such Entitlement totals at least USD750, but in any event it shall be disbursed once per calendar year.

**3.2    Payment Notification and Fintage Live Reporting**

As soon as the CAM has received written notice from the CA Bank of any Collected Gross Receipts or a notification under Clause 2.7.1 hereof, the CAM shall send a Payment Notification to all Parties. All Parties will be given the opportunity to have access to Fintage Live Reporting for this Project, which includes Internet access to all the financial information that CAM has available (and will keep up to date) on all Distribution Agreements in connection with the Project, as well as the Statements issued under this clause 3.

**3.3    The CAM shall keep books of account**

The CAM shall keep complete and accurate books of account in the Accounting Currency and records relating to all monies received in the Collection Account until three (3) years after the Termination of this Agreement or after expiry of the Term.

**3.4    The CAM may be audited**

**3.4.1** Each of the Parties has the right to audit the CAM's books relating to the receipt, allocation and distribution of the Collected Gross Receipts of the Project at its own expense, but no more than once every twelve months during the Term.

**3.4.2** If after conducting any such audit it is determined that there has been an error in excess of five percent (5%) of an Entitlement for any such audit period, then (provided the excess is greater than USD5,000) the CAM shall reimburse the auditing Party for the direct costs and expenses of such audit from the CAM's own funds (which shall not be recoupable as CAM Expenses), which will otherwise be borne by the auditing Party, and the CAM shall reimburse each Party its shortfall regarding the Entitlement out of the Collected Gross Receipts.

**3.4.3** This right of audit continues for three years after the issuance of the applicable Statement. The limitation of liability of the CAM in clause 5.8 shall not apply in case an audit under this clause 3.4 shall disclose defaults in payments made by the CAM pursuant to this Agreement, which could not have been ascertained from the Statements, disbursements or other information reasonably available to a Party.

**4.    ALLOCATION OF COLLECTED GROSS RECEIPTS**

The Collected Gross Receipts and the Collection Account Interest shall be allocated and paid out by the CAM in accordance with Exhibit A.  The Parties acknowledge that each Beneficiary may amend its bank account details specified in Exhibit C for the payment of its Entitlement by giving notice to the CAM in accordance with clause 5.2.2 below and will not require the approval of any other Party to do so.

## 5.    GENERAL TERMS

### 5.1    All relevant information to the CAM

The Parties (other than the CAM) shall provide the CAM in timely fashion with all relevant information to enable it to meet its allocation, accounting- and payment obligations pursuant to this Agreement.

The information shall include, but is not limited to, detailed sales estimates and sales reports, copies of all deal memos and Distribution Agreements, if executed separately to the Distribution Agreements copies of all the irrevocable instructions to and/or signed by Distributors, further copies of the names, addresses, telephone and fax numbers and bank details of all Beneficiaries (if not specified in Exhibit C hereto), detailed information about agreed expenses, approvals for payment of agreed expenses, etc., instructions for payment of residuals, accountings from Distributors and all further information that the CAM may reasonably require to meet its allocation, accounting and payment obligations hereunder. The CAM may at any time check any source of information, to verify if the relevant Distributors or the Parties hereto meet their obligations hereunder and it may elect to formally notify such party and advise one or more of the Parties, if it is in reasonable doubt.

### 5.2    Information or approval to be provided to the CAM

**5.2.1** If the CAM is to take into account information to be supplied to it by one or more of the Parties, such information shall be provided to the CAM as described in clause 8 (i) within five (5) Business Days after the end of the relevant Accounting Period, and CAM shall upon request provide the Parties with copies of such information.

**5.2.2** If the CAM receives conflicting information, conflicting demands or conflicting instructions, the CAM shall request that the Parties that provided or should have provided the information or demands without conflict, provide accurate and consistent information or demands within 5 Business Days and the CAM shall consequently postpone the issuance of the relating Statement and the consequent payment by 5 Business Days. If the relevant Parties do not provide such information or demands and / or fail to resolve the conflict within aforementioned period, the CAM may elect either that the information was not provided, or issue a Statement stating that the disputed amounts are retained in the Collection Account until the conflict is resolved and / or suspend the issuance of Statements and consequent payments and proceed in accordance with clause 6.2, provided that CAM shall endeavour to disburse the portion of held funds in respect of which information has been provided and calculations can be made. The CAM shall immediately notify the Parties upon the occurrence of such event. In absence of material breach, gross negligence or wilful misconduct, the CAM has no liability in respect of any decision taken and/or executed with respect to this clause 5.2.

**5.2.3** If the CAM may or is to receive a joint notification from the Parties hereto and one or more of such Parties has gone into administration, receivership, liquidation or any applicable or equivalent process in such Party's particular jurisdiction ("Bankrupt Party"), the notification may be done by the other Party who is to notify CAM (but not the Bankrupt Party), to the extent this is permitted by the applicable law of the Bankrupt Party, otherwise, if a Party must be represented by

a liquidator, administrator, receiver or other external administrator appointed to that Party's assets or business (jointly "Administrator"), the Administrator is entitled to represent the Bankrupt Party and give joint instructions and reply on behalf of the Bankrupt Party. However, if such Administrator does not reply on behalf of the Bankrupt Party within 10 Business Days after a written request for a notification (such time being specified in the notice to the Administrator) then the Administrator's failure to respond within the requisite time period will mean "deemed acceptance" and the other Parties can proceed without the Administrator's involvement in relation to that specific issue only.

**5.2.4** Any third party Beneficiary hereunder is not to receive any Statements, Payment Notifications or other Notices unless CAM has received a written request to the contrary of one of the Parties and provided that such a request is accompanied with the contact and (email) address details of the applicable third party Beneficiary.

**5.2.5** In order for CAM to be able to comply with its disbursement obligations hereunder, the Parties agree to timely provide CAM in writing with any outstanding or updated bank details, as the case may be, of such Party or Parties, to the extent not provided to CAM prior to execution of this Agreement, in the form of Exhibit E hereto. The Licensor agrees to use good faith efforts to provide CAM with any outstanding bank account details of any third party Beneficiary that is entitled to receive Entitlements under this Agreement, to the extent not provided to CAM prior to execution of this Agreement, in the form of Exhibit E hereto.

**5.2.6** Subject to clauses 5.2.1 to 5.2.5 above, the CAM shall notify each of the other Parties promptly of any notice of any claim received by the CAM from any third party that such third party is entitled to receive all or any portion of the Collected Gross Receipts, Deemed Collected Gross Receipts or Collection Account Interest.

**5.3    Reasonable doubt**

In the event that the CAM is in reasonable doubt about the allocation, accounting or payment of Entitlement(s), it may retain such Entitlements ("Doubtful Entitlements") in the Collection Account and it shall not be obliged to make any further payments as regards the amount(s) of the Doubtful Entitlements to the Beneficiaries, until such situation of uncertainty has been resolved. The CAM shall immediately notify the Parties upon the occurrence of such event. In absence of material breach, gross negligence or wilful misconduct, the CAM has no liability in respect of any decision taken and executed.

**5.4    No disbursement if unlawful, force majeure**

**5.4.1** This Agreement and all receipts, allocations and payments of Collected Gross Receipts hereunder by the CAM shall be subject to the requirements of all applicable present and future laws, regulations or directives including any and all withholding taxes or other taxes or duties, levies, fees or charges imposed by any international, national, multi-national, federal, state, local or other governmental or quasi-governmental authority ("Amounts Due"). The provisions of this Agreement shall be curtailed and limited to the extent necessary to comply with such requirements such that the CAM has no obligation to make any payment of Amounts Due to a Beneficiary if such payment by the CAM to such Beneficiary would be unlawful in a jurisdiction to which the CAM is subject to under this Agreement or under applicable law provided that (i) CAM provides prior written

notice to such Beneficiary that it intends to withhold any Amounts Due, (ii) the CAM segregates the Amounts Due and agrees not to pay such monies to any other party, including any Party or Beneficiary under this Agreement or otherwise, unless CAM is required to do so in order to comply with laws, regulations or directives ("Adverse Order"); provided, however, in no event may CAM pay such Amount Due pursuant to an Adverse Order unless (a) the CAM has promptly notified such Beneficiary of the Adverse Order, (b) the CAM provides to the applicable Beneficiary a legal opinion from a reputable law firm opining that payment of the Amounts Due pursuant to the Adverse Order is absolute and necessary under applicable laws, regulations or directives, (c) the Beneficiary has had an opportunity to either (x) interplead the Amount Due pursuant to the Adverse Order for final determination by a court of competent jurisdiction in the State of California or other applicable law of the proper disposition of such funds, (y) seek a court order to restrain CAM from paying such Amounts Due, or (z) agree to payment of the Amounts Due pursuant to the Adverse Order.

The Parties agree that CAM has the right to create a reasonable reserve for Amounts Due from Collected Gross Receipts or Entitlements payable to a Beneficiary subject to prior consultation with the applicable Beneficiary with respect to such reserve amount and provided such reserved amounts are only paid pursuant to the provisions of this Section 5.4.1. Such reserve shall subsequently be liquidated on the basis of good faith negotiations between the affected Beneficiaries and CAM but in no event shall be later than sixty (60) days after the establishment of such reserve. In absence of breach, negligence or wilful misconduct, the CAM has no liability in respect of any decision taken and executed.

**5.4.2** If it becomes illegal or reasonably impractical, problematic or impossible for reasons outside the CAM's control to carry out any of the provisions hereof ("Force Majeure"), CAM shall incur no liability as a consequence thereof, for as long as this situation continues and during such period it shall have no responsibility for the validity, effectiveness or enforceability hereof, provided that CAM shall as soon as reasonably possible notify the other Parties hereto about the existence of such situation.

**5.4.3** If a Force Majeure continues in excess of 6 (six) months, the Parties or the CAM may terminate this Agreement in accordance with clause 7 hereof.

**5.5**   **Prompt payment and accountings from Distributors**

The Sales Agent undertakes to use reasonable efforts throughout the term of the Distribution Agreements to procure prompt payments from Distributors in the Territory into the Collection Account as well as prompt and accurate distribution statements (via the Sales Agent) to the CAM.

**5.6**   **The CAM may rely on information**

The CAM shall be entitled to rely on information, reasonably believed by it to be correct, provided to it by any of the Parties, Beneficiaries or third parties and on any communication, document or correspondence reasonably believed by the CAM to be genuine and to have been made available, sent or signed by the person by whom it purports to have been made available, sent or signed and the CAM shall not be obliged to inquire further as to the accuracy or authenticity of said communication, information or document. In the absence of material breach,

gross negligence or wilful misconduct the CAM shall not be liable to any Party or Beneficiary for any consequence of such reliance.

## 5.7   The CAM shall on request furnish information

The CAM shall on request furnish to a Party copies of all statements, accountings and Distribution Agreements received by it from Sales Agent, Distributors or other Parties, and answer to questions reasonably raised by any Party in connection with this Agreement.

## 5.8   Liability of the CAM

No liability shall attach to the CAM on account of its payment of any monies received by it under this Agreement, provided that such monies are applied in accordance with this Agreement. If however the CAM makes an erroneous payment ("Erroneous Payment") in relation to an Accounting Period ("Applicable Period"), it will make good any direct loss plus interest (excluding consequential damages and lost profits) suffered by any of the Parties as a result of the Erroneous Payment, provided that the claim relating to the Erroneous Payment has been made within a term, commencing upon execution of the Erroneous Payment, equal to the Applicable Period less 10 Business Days, with a maximum of three (3) months, whichever is the shortest. With regard to any other obligations on the part of the CAM under this Agreement, no liability shall attach to the CAM in the absence of material breach, gross negligence or wilful misconduct on its part.

## 5.9   Repayment of overpayment

Each Party agrees that in case it has received more than its Entitlement(s), it shall upon becoming aware thereof or upon request by the CAM, which request may also be addressed to any Beneficiary, not being a Party, immediately pay or repay such amount into the Collection Account for correct distribution by the CAM in accordance with this Agreement. The CAM's next Statement will, to the extent applicable, be an adjusted Statement showing the correct Entitlement(s). The CAM shall make no further payments to the relevant Party(ies) or Beneficiaries, as applicable, until such amount has been repaid in full, and it may formally notify such Party(ies) or Beneficiary, as applicable, upon the occurrence such situation.

## 5.10   No risk of own funds and maintenance of operations

Subject to clauses 3.4, 5.8 and 6 hereof, none of the provisions hereof shall be construed so as to require the CAM to expend or risk any of its own funds or otherwise incur any financial liability, personal liability of its employees, shareholders, directors, etc. in the performance of its obligations hereunder and the CAM shall be under no obligation to make any payment to any Beneficiary except out of the Collected Gross Receipts and the Collection Account Interest standing to the credit of the Collection Account. The CAM shall sufficiently maintain its operation to carry out its obligations hereunder.

## 5.11   Indemnification of the CAM

**5.11.1** If the CAM incurs any third-party liability, loss, damage, costs or expense, including actual, direct, out-of-pocket, verifiable and reasonable outside (legal) counsel's fees, reasonable (legal) counsel's costs or court or arbitration costs,

either through a claim or action arising out of, or in connection with its acceptance or its performance under this Agreement (including third party claims) or otherwise, the Parties hereto shall indemnify the CAM and agree to hold the CAM safe, harmless, defended and indemnified against any such liabilities, losses, damages, costs or expenses, all of these being deemed CAM Expenses for the purposes hereof.    For the avoidance of doubt, the CAM shall not withhold payment due to one Party because another Party has failed to make a payment to CAM under this clause.

Notwithstanding the foregoing, the obligation of the Parties under this Clause 5 shall only apply to the extent that loss, claim or damage is not directly or indirectly due to the material breach, gross negligence or wilful misconduct on the part of the CAM.

If any Party incurs any third party liability, loss, damage, costs or expense, including reasonable outside (legal) counsel's fees, reasonable outside (legal) counsel's costs or court or arbitration costs, either through a claim or action arising out of, or in connection with, a material breach by the CAM of its representations, warranties, covenants or agreements under this Agreement or the CAM's gross negligence or wilful misconduct in connection with this Agreement, the CAM hereby indemnifies such Party and agrees to hold such Party safe, harmless, defended and indemnified against any such liabilities, losses, damages, costs or expenses.

**5.11.2** If at any time the CAM shall in good faith determine that the monies standing to the credit of the Collection Account are not sufficient to discharge the CAM Expenses which have been incurred by the CAM, the Parties hereto shall, upon first written request of the CAM, forthwith pay, in proportion to their respective Entitlements on the basis of the total amount of Collected Gross Receipts at the time of such demand, the amount of such shortfall into the Collection Account. The Parties who paid such portion shall recoup the same pro rata and pari passu in first position from any Collected Gross Receipts, after payment of the CAM Expenses.

**5.11.3** The benefit of clause 5.11.1 shall extend to the officers, directors, employees, agents, advisers, representatives and affiliates of the CAM.

**5.11.4** The CAM shall have the discretionary right to require a specific indemnification from the Parties hereto before taking any legal or other action hereunder which might in its reasonable judgment involve any expense to or liability of the CAM, except when conducting its normal activities with respect to the Collection Account. No legal or other action in relation to this Project shall be executed by CAM without the prior written approval from the Licensor and Sales Agent provided that the CAM shall not need such pre-approval to legally or otherwise defend and/or protect its own position or interests in relation to the Project. Any of the Parties shall have the right to refuse to give the CAM such indemnification, in which event the CAM shall have no delegation to take such legal or other action hereunder.

**5.11.5** Notwithstanding the foregoing, indemnification of the CAM hereunder shall only be due by the Parties in the absence of material breach, gross negligence or wilful misconduct on the part of the CAM.

## 5.12   The CAM has no other duties

The CAM shall have no duties or obligations pursuant to this Agreement other than those specified in this Agreement.

## 5.13   Authority to the CAM

**5.13.1** Each Party authorizes the CAM to perform the CAM's services as set out in this Agreement and to take such action on its behalf and to exercise such powers as are specifically delegated to it by the provisions of this Agreement, including those that may reasonably increase the likelihood of the Beneficiaries receiving their pre-agreed (potential) Entitlements, together with all the powers reasonably incidental thereto.

**5.13.2** No Party shall interfere with, frustrate or take any action contrary to the terms of this Agreement.

## 5.14   Power to represent

Each Party hereby represents and warrants that each individual signing this Agreement has the power to sign on behalf of the Party he or she is representing.

## 5.15   Intentionally deleted

## 5.16   Termination of the Sales Agency Agreement

**5.16.1** Upon receipt by the CAM of notification by Licensor and/or Sales Agent that the Sales Agency Agreement has been terminated or that its term has expired, which notification shall be accompanied with a copy of the relevant contractual termination settlement arrangements, if any (including arrangements regarding current and future Sales Agent Commission and Sales Agent Expenses and any other fees payable pursuant to the Sales Agency Agreement) whereupon, subject to clause 5.16.2 below, the CAM shall take all steps to sufficiently verify the termination of the Sales Agency Agreement, provided that in the event the Sales Agency Agreement has been terminated following the going into administration, receivership or liquidation of the Sales Agent (together referred to as the "Sales Agent Insolvency Event"), or any applicable or equivalent process in Sales Agent's particular jurisdiction, Licensor may instruct CAM (but subject always to clause 5.2.3 above) of the settlement arrangements, if any (including arrangements regarding current and future Sales Agent Commission and Sales Agent Expenses and any other fees payable pursuant to the Sales Agency Agreement) whereupon the CAM shall take all steps to sufficiently verify the Sales Agent Insolvency Event (by obtaining unequivocal evidence of such Sales Agent Insolvency Event) and that the Sales Agency Agreement has been terminated in relation thereto, and the CAM shall perform such arrangements, if any and, subject to the terms and conditions of this Agreement, shall cease to make payments to the Sales Agent. The settlement arrangements, if any, shall be notified to the CAM as soon as agreed in writing and signed by all relevant Parties, including the Sales Agent, or the Administrator (subject always to clause 5.2.3 above).

**5.16.2** Upon notification by the Licensor and/or the Sales Agent to the CAM that the Sales Agency Agreement has been terminated or that its term has expired, this Agreement shall be terminated as against the Sales Agent ("Sales Agent Termination"), subject to the contractual settlement arrangements, if any, notified to the CAM pursuant to clause 5.16.1., provided that the Sales Agent shall have the opportunity to disagree with the Sales Agent Termination by (1) so

notifying all the Parties in writing within 10 Business Days of the notification triggering the Sales Agent Termination and (2) requesting that the disagreement be arbitrated pursuant to clause 6 hereof, failing which the Sales Agent Termination shall automatically become final.

**5.16.3** Subject to compliance with the provisions of clauses 5.16.1 and 5.16.2, the Licensor shall have the right to designate to a new sales agent ("New Sales Agent") by giving notice to all the Parties of the identity of the New Sales Agent and of the detailed terms under which the New Sales Agent is appointed. Provided that:

a.    the Sales Agent Termination pursuant to clause 5.16.2 has become final, and

b.    the New Sales Agent has duly accepted all rights and obligations of the Sales Agent under this Agreement.

## 5.17   Invalid Clause(s)

The validity of remaining clauses of this Agreement shall not be affected, should one or more of the clauses hereof be invalid, impracticable or unenforceable. The Parties shall, to the extent reasonably required, replace the inapplicable clauses by a clause or clauses, which come(s) as close as (legally) possible to the economic purpose pursued by the Parties through the original clause(s). The same shall apply to any gaps in the provisions or structure of this Agreement.

## 5.18   No waiver

Except as otherwise described hereunder, no failure or delay by any Party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise by it of any right, power or privilege, exclude any further exercise thereof.

## 5.19   Cumulative rights and remedies

The rights and remedies herein provided are cumulative and not exclusive of any rights and remedies provided by law.

## 5.20   Written amendments

No provision of this Agreement may be amended, modified, waived, discharged or cancelled other than by the express written consent of the Parties affected by it, nor may any breach of any provision of this Agreement be waived or discharged except with the express written consent of the Parties affected by it.

## 5.21   Clause headings not relevant

The clause headings in this Agreement are provided for convenience only and shall not affect the construction, the interpretation or the effect of this Agreement.

## 5.22   No partnership, joint venture, no other obligations CAM

Nothing herein shall constitute a partnership between, or joint venture by, the Parties or any two or more of them. The CAM shall not have any obligations or

responsibilities to the Beneficiaries or otherwise, except as expressly set out in this Agreement.

**5.23    This Agreement is principal Agreement and Warranty Entitlements**

In relation to (administering) the receipt, allocation and disbursement of Gross Receipts, (Deemed) Collected Gross Receipts and Collection Account Interest from the Project, each Party hereby agrees that this Agreement sets out the entire Agreement and understanding between the Parties hereto and that this Agreement shall supersede and prevail over all and any previous agreement(s), arrangement(s) and, or, understanding(s) between them and warrants that the Entitlements as described herein or in the Exhibits hereto are correct, provided that if this Agreement is terminated for any reason the material business terms of this Agreement including without limitation the allocation of Collected Gross Receipts set forth in Exhibit A,  shall, subject to amendments and termination of such agreements, remain in full force and effect.

**5.24    Intentionally Deleted**

**5.25    DVD and poster for the CAM**

The Licensor shall provide the CAM with one DVD and one poster of the Project as soon as these become available, provided the Licensor's failure to provide such DVD or poster shall not constitute a breach of this Agreement and shall not entitle CAM to bring any action against the Film or any of the Parties and CAM expressly waives any right it may have to bring such an action.

**5.26    Third Party Rights**

A person or (legal) entity that is not a Party to this Agreement has no right to enforce any term of this Agreement.

**5.27    Assignment**

Nothing contained herein shall limit or prevent a Party from assigning its Entitlements hereunder, provided that each Party's right of assignment shall remain subject to restrictions and obligations regarding assignments set forth in the other agreements entered into by such Party in connection with the Project. CAM may assume that there are no restrictions and obligations regarding assignments set forth in any other agreements entered into by any Party in connection with the Project.

**6.      ARBITRATION**

**6.1**    The Parties agree that disputes or disagreements on the performance or interpretation of this Agreement or of any provision hereof shall, subject to providing the other Party or Parties with written notice of the alleged breach or dispute and granting a cure period of no less than 15 Business Days, be irrevocably solved by way of binding final and exclusive arbitration without appeal in Los Angeles, California and shall be governed by the laws of the State of California (without regards to principles of conflicts laws)  under the rules then in force of International Arbitration of the Independent Film & Television Alliance, formerly known as the American Film Marketing Association, subject as herein provided.

**6.2**  Any Party shall have the right to notify all the other Parties and Beneficiaries in writing of a disagreement by written notice ("Arbitration Notice") which shall (1) state the subject of the disagreement and (2) the identity of the Parties whose interest hereunder is the subject of such disagreement and who are requested to be represented in the arbitration (together with the Party making notice; the "Arbitration Parties"). Any Party that is not named as an Arbitration Party will automatically become an Arbitration Party upon notification in writing to such Party within 10 Business Days of the Arbitration Notice.

**6.3**  The Arbitration Parties shall within 10 Business Days after the Arbitration Notice mutually appoint, at their own expense, one arbitrator (such arbitrator being an expert on the motion picture industry and the legal aspects thereof). If any of the Arbitration Parties fails to agree on the appointment of an arbitrator within the above mentioned 10 Business Days period, it shall be entitled to request from the President of the Chartered Institute of Arbitrators the appointment of a sole arbitrator (the "Arbitrator") within 10 Business Days of such application.

**6.4**  The Parties shall provide the Arbitrator with all the relevant information, documentation, etc. as requested by the Arbitrators within one week of such request and the arbitration shall commence at a location in Los Angeles, California within 10 Business Days thereafter. Such arbitration shall continue on each consecutive Business Day there from until fully concluded, and in any event the arbitrator shall be instructed to reach a binding decision within 60 Business Days after commencement of the arbitration.

**6.5**  Immediately after the Arbitrator pursuant to this clause has reached a decision, the Parties shall forthwith execute the decision and if so required transfer any monies payable by them into the Collection Account. The CAM shall subsequently disburse Collected Gross Receipts in accordance with the Arbitrator's award.

**6.6**  The CAM shall only be involved as an Arbitration Party if the dispute being the subject of the arbitration relates to the CAM's performance of its duties under this Agreement. Upon receipt of an Arbitration Notice, the CAM may cease to pay any of the disputed Entitlements until either (1) the Arbitrator has notified the CAM in writing of its award, or (2) the Arbitration Parties have each provided the CAM with a copy of the Arbitrator's award or a joint notification that the arbitration was abandoned. The reasonable, actual and bona fide costs, charges and expenses incurred by the CAM in relation to the proceeding of the arbitration and the implementation of the Arbitrator's award (inclusive of the time spent by the CAM at a reasonable hourly rate) shall be deemed CAM Expenses, except that if the CAM is an Arbitration Party, payment of such costs shall be subject to any award of costs made by the Arbitrator.

**6.7**  The prevailing Parties in any dispute shall be entitled to receive their actual, verifiable, reasonable out-of-pocket third party costs, charges and expenses incurred in relation to the proceeding of the arbitration, and the Arbitrator shall include such entitlement in the arbitration award.

## 7.  TERMINATION

**7.1**  The CAM may at any time terminate this Agreement subject to a 30 Business Days prior written notice to all Parties.

(i)    during 36 months after the issuance of the first Statement, the CAM can only terminate this Agreement if the CAM cannot reasonably be expected to continue to provide its services hereunder;

(ii)    the CAM's notice shall specify the arrangements proposed to be made by the CAM to pay the Entitlements which prior to such termination would have been payable to the Beneficiaries under the provisions of this Agreement and the CAM shall give good faith consideration to any representations made to it concerning such proposed arrangements as any Party may provide to the CAM within 15 Business Days thereafter; and

(iii)    this Agreement shall not terminate until such time as the Collected Gross Receipts standing to the credit of the Collection Account at the date of Termination have been fully disbursed in accordance with this Agreement or otherwise paid to the replacement collection account manager.

**7.2**    The Parties acting jointly shall have the right to terminate this Agreement at any time upon a 30 Business Days prior written notice to all Parties, subject to a term of 24 months after the issuance of the first Statement. Notwithstanding the foregoing, if the CAM commits a material breach of the terms of this Agreement which is not remedied within 20 Business Days of written notice given to the CAM by a majority of the Parties, the 24 months term shall not apply.

**7.3**    In the event of Termination pursuant to clauses 7.1 or 7.2 above, the Parties shall instruct the CAM in writing within 10 Business Days from the date of Termination, to transfer the relevant administration relating to this Agreement to a properly specified successor collection account manager and to close the Collection Account no later than one month after the date of Termination and transfer the balance in the Collection Account to the account designated in writing by the successor collection account manager (Licensor and Sales Agent, in their good faith discretion, may select such successor collection account manager). If such instruction has not been received within aforementioned period, the CAM may close the Collection Account without further notice.

**7.4**    As of the date of Termination pursuant to clause 7.1, the CAM shall no longer perform its obligations hereunder and shall be automatically released and discharged there from in full for all future obligations, without prejudice to any rights and obligations of the Parties in respect of the period prior to the date of Termination, including without limitation of the foregoing, the CAM's right to be paid the CAM Fee and its CAM Expenses up to and including the date of Termination, or the Parties rights against any of the other Parties or the CAM, for any actions prior to the date of such Termination.  Any monies related to the Project, received by the CAM after the date of Termination and not payable to the CAM, shall upon receipt by the CAM be transferred to the properly specified successor collection account manager.

**7.5**    It is expressly agreed that any Party who shall have no further obligation under this Agreement and who is not entitled to receive any (further) Entitlement hereunder, shall no longer receive Statements from the CAM or have the right to agree (or disagree as the case may be) on amendments hereto or terminate this Agreement as described in this clause 7., and such Party's consent shall thereafter no longer be required where its consent is required hereunder.

**8.     NOTICES, STATEMENTS AND PAYMENT NOTIFICATIONS**

(i)     Any notice ("Notice") given under this Agreement other than Statements and Payment Notifications,  shall be in writing and shall be sent by facsimile transmission, by registered letter or by electronic mail, to the (email) address (or fax number) of the Party as set out in Exhibit C or alternatively such other address as notified by such Party to the other Parties, or, with respect to a Beneficiary who is not a Party to this Agreement, such other address as notified to the CAM or the Parties by such Beneficiary. A Notice shall be deemed to have been given (a) if posted, when delivered or left at the above mentioned addresses, on the date at which they would be received in the normal course of posting, (b) if sent by facsimile, when the proper answer back code has been received by the sender upon completion of a successful transmission and (c) if sent by electronic mail, when a "Delivery Receipt" has been received by the sender; and

(ii)    Statements and Payment Notifications shall be sent by the CAM by electronic mail and shall be deemed to have been given when no notification has been received to the contrary.

**9.     EXECUTING PARTIES AND COUNTERPARTS**

**9.1**    Subject to clause 9.2, in no circumstances will any prospective Party shown as a Party to this Agreement have, or be recognized as having, any rights and obligations under this Agreement unless such Party has executed this Agreement.

**9.2**    This Agreement shall be binding and in full force and effect as of the day and the year first above written, subject to all Parties duly having executed this Agreement.

**9.3**    This Agreement may be executed in two or more counterparts each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Facsimile signatures and electronic signatures shall have the same force and effect as original signatures.

**10.    LAW**

This Agreement shall be governed and construed in accordance with the substantive laws of the State of California (without regard to principles of conflicts of law) and the Parties, subject to Clause 6, submit to the exclusive jurisdiction of the State and Federal Courts located in the City of Los Angeles (County of Los Angeles), except that for the purpose of enforcing any arbitration award or judgment obtained hereunder, this provision does not prohibit the Parties from enforcing such arbitration award or judgment at the courts and under the applicable laws and regulations of the country, state or province where the relevant assets are located.

CAM Agreement "The Nut Job"
Date 130724

**Fintage Collection Account Management B.V.**

Per: ....................................................
    Authorized Signatory

**RedRover Co. Ltd.**

Per: ....................................................
    Authorized Signatory     Hoe Jin  Ha

    03 . Dec . 2013            CEO

**Weinstein Global Film Corp.**


Per: ....................................................
    Authorized Signatory

© 2013 - Fintage Collection Account Management B.V.
LA2310563.12_220997-10001

21

CAM Agreement "The Nut Job"
Date 130724

**Fintage Collection Account Management B.V.**

Per: ....................................................
Authorized Signatory

**Redrover Co. Ltd.**

Per: ....................................................
Authorized Signatory

**Weinstein Global Film Corp.**

Per: ....................................................
Authorized Signatory

**EXHIBIT A.**

**Allocation and Distribution of Collected Gross Receipts**

The Collected Gross Receipts and Collection Account Interest shall be allocated and paid by CAM in the following manner and order (to the extent said amounts have not already been (partly) paid or repaid, in which case the relevant Party shall as soon as reasonably possible notify this to CAM):

1.0  First, on a pro rata pari passu basis, to CAM in payment of the CAM Fee and the CAM Expenses (provided that the CAM Fee and any CAM Expenses shall not be borne by Sales Agent and shall solely be paid out of monies otherwise payable to Licensor prior to any amounts being paid to Licensor) and to the Sales Agent in payment of the Sales Agent Commission; thereafter

2.0  Second, to the Sales Agent in payment of the Sales Agent Expenses; thereafter

3.0  Third, in order to create a residuals reserve to pay all usual Residuals, CAM shall retain 6.2% of the Collected Gross Receipts, retroactively and prospectively, in the Collection Account. Licensor shall appoint a Payroll House to calculate the exact amount of Residuals due on the basis of the usual information to be provided to the Payroll House by CAM and shall have CAM copied on the resulting invoices to Licensor, whereby CAM may rely on the accuracy of such notifications. Any excess reserve shall be liquidated in accordance with the remainder of this recoupment schedule as per the subsequent Statement of CAM; thereafter

4.0  Fourth, the remainder to Licensor.

## EXHIBIT B.

### Irrevocable Instructions to Notice of Acknowledgement by Distributor

Distributor is hereby irrevocably instructed by Sales Agent (which instruction can only to be changed or revoked by an original written and duly signed document by Fintage Collection Account Management B.V., tel. +31 71 565 9999, e-mail balazs.boltresz@fintagehouse.com and magdolna.nyeso@fintagehouse.com ), to pay all proceeds on "The Nut Job" due and payable to Sales Agent under the Distribution Agreement dated [../../....] directly and without diversion or deduction, into the following Collection Account:

| | |
|---|---|
| Account Name: | Fintage Collection Account Management, The Nut Job |
| Account Number: | 1312010834 |
| Bank: | OneWest Bank<br>Pasadena, CA, USA |
| SWIFT: | OWBKUS6L |
| ABA: | 322270288 |

Sales Agent and Distributor agree that they shall not alter the payment authority and direction contained herein without the prior written consent of Fintage Collection Account Management B.V. and Distributor and Sales Agent agree that in the absence of Sales Agent providing a copy of such consent to Distributor, Distributor shall continue to make payments solely into the Collection Account as provided for herein.

The Distributor agrees that it will not invoke any rights of set-off, cross-collateralisation, counter-claim or defence or any other rights, or make any withholding or deduction save as required by law, or as a result of customary bank transfer charges or deduction of applicable withholding tax (unless recovered) so as to extinguish or reduce any payments due to be made by the Distributor under the Distribution Agreement.

Very truly yours,

[Sales Agent]

## EXHIBIT C.

[To be filled out for each Party and each Beneficiary ]

**Parties within the EU must provide CAM with their Value Added Tax number, in order to enable CAM to pay out their Entitlements without deduction of VAT. Dutch Parties shall at all times be subject to deduction of VAT.**

Company name: **Redrover Co. Ltd.** ("**Licensor**")

**Contact person** to whose attention Statements and Payment Notifications and any other Notices need to be addressed:

REDROVER CO., LTD
3F, Bundang M Tower,
188 Gumi-dong Bundang-gu,
Seongnam-city Gyeonggi-do,
KOREA 463-870

Contact : Suwon Ahn
Phone : +82-70-7605-3233
Fax : +82-31-601-7901

With a copy to Loeb & Loeb LLP
10100 Santa Monica Blvd., Ste 2200
Los Angeles, California 90067
Attention: Susan Zuckerman Williams, Esq.
Fax:  310-282-2200

**Bank account details**

Bank Name:  Woori Bank Suwonyeok Branch
SWIFT:        HVBKKRSE
Recipient:    Redrover Co., Ltd.
Account No.: 1081-800-344895 (USD)
Address:      30 Maesanno 2Ga, Paldal-gu Suwon-si,
                    Gyeonggi-do, 442-847 Korea


Company name: **Weinstein Global Film Corp.** ("**Sales Agent**")

**Contact person** to whose attention Statements and Payment Notifications and any other Notices need to be addressed:

Contact Name:     Ennis Hensley
Telephone:         424-204-4720
Facsimile:          (917) 368-7044
E-mail:              Ennis.Hensley@weinsteinco.com

**Bank account details**

Weinstein Global Film Corp.
 c/o The Weinstein Company, LLC

Global Payments and Cash Management
HSBC Bank USA, NA90 Christiana Road
New Castle, Delaware 19720 USA
Acct: 000147133
ABA#: 021001088

### Third Party Beneficiary (ies)

The following parties are not to receive Statements, Payment Notifications, unless CAM is otherwise instructed by any of the Parties hereto.

**Company name: Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA")**

**Contact person** to whose attention Statements and Payment Notifications need to be addressed (if applicable): **Rashan Hall, Bonnie Chavez and Lucia Kovacs**

Address:      5757 Wilshire Boulevard, 7th Fl.
              Los Angeles
              California 90036
              USA
Telephone:    +1 323 549-6531
Fax:          +1 323 549-6801
E-mail:       CAMAcompliance@sagaftra.org  and bonnie.chavez@sagaftra.org

**EXHIBIT D.**

**Information on Project; Title, main cast, director, budget, etc.**

Please Provide

Title:        "The Nut Job"
Main Cast:    [...]
Director:     [...]
Budget:       [..]
ISAN:         [..]

## EXHIBIT E

[LETTERHEAD OF THE COMPANY]

Fintage Collection Account Management B.V
Attn: [                    ]
Stationsweg 32
2312 AV Leiden
The Netherlands

Fax no. [                    ]

Date [                    ]

Ref: "The Nut Job"/Confirmation of bank account details

Dear Sirs,

We hereby confirm that the following bank account details apply to the entitlements payable to [Company name] regarding "The Nut Job":

Account name:
Account number (IBAN):
ABA no./sort code/ or Swift/ BIC code:
Bank:
Address of bank:
Tel:
Reference:

Best regards,

_____
Authorized signature

**EXHIBIT F**

**First Statement**

# EXHIBIT B

Exhibit B

| Payments made to TWC by Distributors | | | | |
|---|---|---|---|---|
| Contract | Territory | Date | Amount | Total* |
| TSI Distribution Agreement (Sept. 30, 2013) | Airlines | 2014.06.23 | $ 90,000.00 | |
| | | 2014.09.03 | $ 185,353.70 | |
| | | 2014.10.20 | $ 28,359.94 | |
| | | 2015.01.20 | $ 46,395.10 | |
| | | 2015.03.06 | $ 9,900.00 | |
| | | 2015.03.30 | $ 6,319.75 | |
| | | 2015.04.22 | $ 9,369.00 | |
| | | 2015.05.29 | $ 7,020.00 | |
| | | 2015.10.28 | $ 3,345.00 | |
| | | 2015.03.12 | $ 495.00 | |
| | | 2016.06.30 | $ 1,800.00 | |
| | | 2017.06.15 | $ 2,400.00 | $ 390,757.49 |
| Elite Ascot Distribution License Agreement (May 12, 2014) | Switzerland | 2016.10.28 | $ 4,292.85 | |
| | | 2016.11.15 | $ 11,230.86 | |
| | | 2017.04.07 | $ 11,010.54 | |
| | | 2017.06.12 | $ 2,426.00 | |
| | | 2017.08.30 | $ 490.39 | $29,450.64 |
| Ster Kinekor Distribution License Agreement (May 30, 2013) | South Africa | 2014.09.02 | $ 3,466.16 | |
| | | 2015.03.02 | $ 7,607.83 | |
| | | 2015.04.01 | $ 87,743.55 | $ 98,817.54 |
| Italia Distribution License Agreement (May 31, 2013) | Middle East | 2015.08.17 | $ 5,311.19 | $ 5,311.19 |

| Total Unreceived in Fintage Collection Account | $ 524,336.86 |
|---|---|

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>THE WEINSTEIN COMPANY HOLDINGS LLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case Nos. 18-10601 (MFW), *et seq.*<br>(Jointly Administered) |

## SPECIAL POWER OF ATTORNEY

To:     Redrover Co. Ltd. ("Attorney In Fact"), of 12F/13F, 20 Pangyoyeok-ro 146beon-gil, Bundang-gu Seongnam City, Gyeonggi-do 13529, Korea

      The undersigned claimant hereby authorizes you as attorney in fact for the undersigned, and with full power of substitution, to file, prosecute, defend, negotiate, and resolve a proof of claim in relation to the films "The Nut Job" and "Nut Job 2, in the above-captioned cases on behalf of the undersigned substantially in the form attached, if any (a "Proof of Claim"); and to file, prosecute, defend, negotiate, and resolve a Motion For Entry Of An Order Compelling Rejection Of Executory Contracts and Requiring Turnover of Funds in Trust in the above-captioned cases on behalf of the undersigned substantially in the form attached, if any (a "Motion"); and to take such steps as Attorney in Fact deems necessary or appropriate to pursue and defend the relief set forth in the Proof of Claim and/or the Motion in Attorney in Fact's discretion.

Dated: February 12, 2019

Fintage Collection Account Management B.V.

signed: _____

by (print name): _____ Lars Plukker / Vaucia Palhad _____

as (print name): _____ Executive Vice President / _____
_____ Authorized Signatory. _____

Address: _____ Schipholweg 71, 2316 ZL, Leiden, _____
_____ The Netherlands _____

Acknowledged before me on _____, by _____
who says that he or she is _____ of the corporation named above and is authorized to execute this power of attorney in its behalf.

_____
Notary (sign and stamp)




The identity of:

1. Mr Lars Ruben Plukker, holder of passport number NTC414597, issued in Lansingerland on the twelfth of November two thousand fourteen;
2. Ms Vaucia Miriam Pahlad, holder of passport number NTPKFR5R1, issued in 's-Gravenhage on the fifteenth of May two thousand eighteen;

has been determined by me, Roeland Hugo Breedveld LL.M., civil-law notary in Leiden, based on the aforementioned identification document.

Abovementioned persons have placed their signature on the foregoing document.

The significance of this legalization is strictly limited to determining the identity of mentioned persons and the placing of their signature.
Consequently, I am not giving an opinion on their authority or capacity, neither on the content, the possible legal consequences nor on any other aspect of the document signed by them.

Signed in Leiden (the Netherlands) on the twelfth of February two thousand nineteen.



ORIGIN ID:ZWIA    (302) 442-7677
ADAM HILLER
HILLER LAW, LLC
1500 NORTH FRENCH STREET
2ND FLOOR
WILMINGTON, DE 19801
UNITED STATES US

SHIP DATE: 14FEB19
ACTWGT: 1.00 LB
CAD: 102990755/INET4100

BILL SENDER

TO  **WEINSTEIN CO CLAIMS PROCESSING CTR**
**EPIQ BANKRUPTCY SOLUTIONS, LLC**
**10300 SW ALLEN BLVD**

**BEAVERTON OR 97005**
(302) 442-7676          REF: RED-TWC
INV:
PO:                        DEPT:



FedEx
Express

FRI - 15 FEB 10:30A
PRIORITY OVERNIGHT

TRK#
0201  **7744 7712 5260**

**XH BNOA**          **97005**
OR-US  **PDX**



RECEIVED

FEB 1 5 2019

LEGAL SERVICES

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.